**Commonwealth of Massachusetts**
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

# SUCV2004-03088
## Vantage Finanial Services Incv v Nonprofit Service Group et al

| | | | | | |
|---|---|---|---|---|---|
| File Date | 07/13/2004 | Status | Disposed: transfered to other court (dtrans) | | |
| Status Date | 08/02/2004 | Session | BLS2 - CtRm 20 | | |
| Origin | 1 | Case Type | BE1 - Fraud, business torts, etc | | |
| Lead Case | | Track | B | | |

| Service | | Answer | | | |
|---|---|---|---|---|---|
| Rule 15 | | Discovery | | Rule12/19/20 | |
| Final PTC | | Disposition | | Rule 56 | |
| | | | | Jury Trial | No |

### PARTIES

**Plaintiff**
Vantage Finanial Services Incv
Active 07/13/2004

**Private Counsel 252720**
Laurence M Johnson
Davis Malm & D'Agostine
1 Boston Place
Boston, MA 02108
Phone: 617-367-2500
Fax: 617-523-6215
Active 07/13/2004 Notify

**Defendant**
Nonprofit Service Group
Service pending 07/13/2004

**Private Counsel 549096**
Richard L Nahigian
Peabody & Arnold
50 Rowes Wharf
Boston, MA 02110
Phone: 617-951-2100
Fax: 617-951-2125
Active 08/02/2004 Notify

**Private Counsel 641720**
Matthew J Griffin
Peabody & Arnold
30 Rowes Wharf
Boston, MA 02110
Phone: 617-951-2100
Fax: 617-951-2125
Active 08/02/2004 Notify

**Defendant**
George E  Miller
Service pending 07/13/2004

**Private Counsel 549096**
Richard L Nahigian
Peabody & Arnold
50 Rowes Wharf
Boston, MA 02110
Phone: 617-951-2100
Fax: 617-951-2125
Active 08/02/2004 Notify

case01 239939 y y y y y y

MAS-20030912
guen

**Commonwealth of Massachusetts**
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

08/02/2004
11:13 AM

## SUCV2004-03088
## Vantage Finanial Services Incv v Nonprofit Service Group et al

| | |
|---|---|
| | Private Counsel 641720<br>Matthew J Griffin<br>Peabody & Arnold<br>30 Rowes Wharf<br>Boston, MA 02110<br>Phone: 617-951-2100<br>Fax: 617-951-2125<br>Active 08/02/2004 Notify |

### ENTRIES

| Date | Paper | Text |
|------|-------|------|
| 07/13/2004 | 1.0 | Complaint (Business) |
| 07/13/2004 | | Origin 1, Type BE1, Track B. |
| 07/13/2004 | 2.0 | Civil action cover sheet filed |
| 07/14/2004 | 3.0 | ORDER: Short order of notice filed & allowed (vanGestel,J) |
| 07/14/2004 | | Notice ORDER issued, hereon returnable at the BLS session  Ctrm 6, 15th Flr on Wednesday, August 4,2004 at 2:00pm  to show cause why Prayer #1 should not be granted (vanGestel,J) Summons & order of notice issued  See P#1 |
| 07/21/2004 | 4.0 | Notice of Acceptance Into Business Litigation Session: (Allan vanGestel, Justice) Dated 7/13/04  Notice sent 7/14/04 |
| 07/31/2004 | | Certified copy of petition for removal to U. S. Dist. Court of Defts. Nonprofit Service Group and George E. Miller U. S. Dist.#(04-11686WGY). |
| 08/02/2004 | | Case REMOVED this date to US District Court of Massachusetts |

### EVENTS

| Date | Session | Event | Result |
|------|---------|-------|--------|
| 08/04/2004 | CtRm 6 | Motion/Hearing: prel inj | Event canceled not re-scheduled |

. HEREBY ATTEST AND CERTIFY ON

AUGUST 3, 2004 THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

ASSISTANT CLERK.

**1**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT

04 - 3088 B.L.S.

VANTAGE FINANCIAL SERVICES, INC.
        Plaintiff,

v.

NONPROFIT SERVICE GROUP AND
GEORGE E. MILLER,
                Defendants.

**COMPLAINT**

### 1. The Parties

1.      Plaintiff, Vantage Financial Services, Inc. (hereinafter "Vantage") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal and usual place of business located in Boston, Suffolk County, Commonwealth of Massachusetts.

2.      Defendant Nonprofit Service Group ("NSG") is a professional services organization, at least two of the principals of which practice law and offer legal services among the services that NSG provides to its clients. NSG's principal place of business is located in Arlington in the Commonwealth of Virginia.

3.      George E. Miller ("Miller") is an attorney who now or formerly was a member of the bar of the State of Missouri. Miller is a principal of NSG and has his principal place of business at NSG's offices in Arlington, Commonwealth of Virginia. Miller holds himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" including fundraising program compliance with postal regulations.

### 2. Jurisdiction and Venue

4.      With respect to the claims asserted in this action, both NSG and Miller:

(i)    transacted business within the Commonwealth of Massachusetts ("Massachusetts"),

(ii)    contracted with Vantage to supply services to Vantage within Massachusetts, and

(iii)    caused tortuous injury to Vantage in Massachusetts, by acts and/or omissions outside of Massachusetts. Both NSG and Miller regularly do or solicit business and/or engage in a persistent course of conduct and/or derive substantial revenue from services used, consumed or rendered within Massachusetts.

5.    Accordingly, pursuant to the provisions of G.L. ch. 223A, §3, the Courts of Massachusetts are vested with *in personam* jurisdiction over both NSG and Miller.

6.    Because Vantage's usual place of business is located in Suffolk County, venue is proper in this Court pursuant to G.L. ch. 223, §1.

### 3. The Facts

7.    Vantage engages in the business of assisting non-profit organizations (hereinafter "NPOs") in fundraising and membership solicitation and in providing solicitation preparation, printing, collating, addressing, envelope filling and mailing services to NPOs in connection therewith. Over a period of many years prior to 1999, Vantage had built a reputation as a provider of quality fundraising services to NPOs, provided such services to a large number of NPOs, both large and small, and had developed a successful and profitable business providing such services.

8.    During and prior to 1999, Vantage and two members of its senior management were defendants in a civil action in the United States District Court for the District of Massachusetts (hereinafter the "Action"), originally commenced by a disaffected former employee, pursuant to the provisions of the Federal False Claims Act, in which recovery was

sought for alleged postal deficiencies, penalties and exemplary damages claimed to be due as a result of fundraising mailings made by Vantage for various of its NPO customers at not-for-profit postal rates. It was further alleged in the Action that such mailings were not eligible for mailing at not-for-profit postal rates because Vantage's contracts with such NPO customers either limited the NPO customer's liability to pay Vantage for its services and out-of-pocket costs or restricted the means by which Vantage could obtain payment for same in the event of a shortfall in the funds raised by the solicitation mailings and that, as a result, the mailing of such solicitations at not-for-profit postage rates was proscribed by the United States Postal Service's Cooperative Mail Rule (hereinafter the "CMR").

9.  At all material times, Vantage had denied the allegations and was vigorously defending itself in the Action. Prior to 1999, the United States had intervened in the Action and was prosecuting it.

10.  While the Action was pending, Vantage consulted NSG and Miller and sought their assistance, professional services and legal counsel with respect to a substantial fundraising services contract that Vantage was then negotiating with Shriners Hospitals for Children ("Shriners") a large nonprofit corporation. It was anticipated by Vantage that any fundraising services contract with Shriners would involve repeated and substantial mailings on behalf of Shriners requiring the payment of several million dollars in postage even at not-for-profit postal rates.

11.  While Shriners wanted to be able to mail its fundraising mailings at not-for-profit postal rates, Shriners had nonetheless demanded, during the course of the negotiations, that any fundraising services contract with Vantage include terms that limited its liability to pay Vantage for its fundraising services and out-of-pocket expenses from Shriners' cash assets in the event that the fundraising programs failed to raise sufficient amounts to pay out of the fundraising proceeds.

-3-

12.     In light of the claims pursued by the United States in the Action, Vantage was extremely concerned lest, in entering into a fundraising services contract with Shriners, it add to its potential liability in the Action.

13.     To protect itself against the risk of such increased liability, Vantage employed NSG and Miller, and they accepted professional employment (hereinafter the "Engagement") to prepare a contract that would satisfy the desire of Shriners for protection against having to pay for Vantage's fundraising services out of Shriners' own cash assets, while at the same time containing provisions that would not violate the CMR, compromise the ability of Shriners to mail its fundraising materials at not-for-profit rates or expose Vantage to additional claims or potential liability such as that then being asserted against it in the Action. As a result of such employment, an attorney-client relationship came into existence between Miller and NSG, and each of them, as attorneys, and Vantage as their client.

14.     Both Miller and NSG were already well aware, through their activities with respect to the non-profit fundraising industry, of the Action. However, in connection with its employment of NSG and Miller, Vantage again expressly informed them of the pendancy of the Action and of the claims being asserted and positions being taken by the United States therein. Vantage emphasized to both NSG and Miller that it wanted to be sure that any terms in the contract with Shriners limiting the liability of Shriners or restricting the manner or means by which Vantage would have a right to enforce payment for its services and expenses incurred on behalf of Shriners must be consistent with the requirements of the CMR and must effectively protect Vantage from any further claims of the kind being asserted in the Action, based upon mailings made by Vantage on behalf of Shriners. Vantage also requested that NSG and Miller advise it if they concluded that it was not possible to prepare contract provisions that would both satisfy Shriners and protect Vantage from potential liability for violation of the CMR or additional claims against it in the Action and NSG and Miller agreed to do so.

-4-

15.     Pursuant to the Engagement, NSG and Miller prepared a fundraising services agreement between Vantage and Shriners (the "Contract"). A true and complete copy of the Contract is attached hereto as Exhibit "A."

16.     The Contract prepared by NSG and Miller provided, in relevant part, that Shriners would have the option of paying Vantage's then unpaid charges at the time of any termination of the Contract by Shriners either (1) directly in cash or (2) by permitting Vantage to rent or use for the benefit of Vantage's other customers Shriners' donor list file and to use the amounts paid by such other customers for the use of the Shriners donor list file to satisfy any outstanding amounts owed by Shriners to Vantage. The relevant provisions of the Contract appear at Paragraph 13.1(A) and (B) thereof.

17.     NSG and Miller advised Vantage that the above-described provisions would be effective to avoid any violation of the CMR and protect Vantage from possible claims with respect to mailings at not-for-profit postal rates made pursuant to the Contract and from any exposure to additional liability on claims such as those being asserted in the Action. Miller and NSG expressly assured Vantage that the form of contract drafted by Miller had been used repeatedly by fundraisers for non-profits with the knowledge and without question, objection or challenge by the Postal Service and that the use of that form of contract and the making of fundraising mailings and not-for-profit postage rates pursuant thereto complied with the CMR and was safe, lawful and appropriate.

18.     In reliance upon NSG's and Miller's advice, Vantage entered into the Contract with  Shriners and thereafter proceeded to render substantial services and make extremely voluminous mailings on behalf of Shriners pursuant thereto, at not-for-profit postal rates.

19.     When the United States learned, through discovery, of the Contract and the mailings on behalf of Shriners made pursuant thereto, it promptly amended its Complaint in the Action to add claims with respect to all mailings made by Vantage on behalf of Shriners pursuant

-5-

to the Contract (the "Shriners Mailings"). The effect of such amendment was to increase the amount of the United States' claims by approximately $3,000,000 in compensatory damages and for an additional $6,000,000 in exemplary or punitive damages, thus approximately doubling the amount of the claims asserted against Vantage in the Action.

20.     In preparing the Contract and advising Vantage that it was effective to prevent the exposure of Vantage to CMR liability, NSG and Miller failed to exercise reasonable professional skill and care and in particular, failed to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" would have exercised in the circumstances.

21.     Vantage relied upon NSG and Miller to exercise reasonable professional skill and care with respect to the professional services that they rendered to it.

22.     Vantage moved for summary judgment in its favor in the Action and, as a part of that Motion, specifically sought summary judgment in its favor with respect to the Shriners mailings. The United States moved for partial summary judgment in its favor on liability with respect to all of its claims, including those based upon the Shriners mailings.

23.     After extensive briefing and argument, the United States District Judge denied Vantage's motion for summary judgment and, granted the motion for summary judgment of the United States with respect to its claims based upon mailings made on behalf of certain of Vantage's customers other than Shriners and, with respect to the United States' claims based on the Shriners mailings, while it did not grant summary judgment to the United States, intimated that the Shriners mailings might well have violated the CMR because of the limitation of Vantage's right to collect payment for its billed and unpaid services and out-of-pocket expenses to the proceeds of rental of the Shriners donor list file to other customers might be found to provide inadequate assurance that Vantage would be paid in full for such services and expenses

-6-

and thus might violate the CMR. In recognition of the fact that Vantage had consulted
supposedly expert counsel in entering into the Contract and had expressly relied upon the advice
of NSG and Miller, the Court granted summary judgment in Vantage's favor with respect to the
United States' False Claims Act claims for exemplary damages, but reserved the United States'
revenue recovery (single damages) claims for trial, concluding that such claims were not barred
if the Shriners mailings in fact violated the CMR and NSG's and Miller's advice to the contrary
had been erroneous.

24.    At that point, Vantage was faced with the choice between settling all the
remaining claims of the United States or going to trial on all such claims, involving exposure to a
judgment of more than twelve million ($12,000,000) dollars before assessment of interest. The
remaining claims of the United States involved claims of approximately three million
($3,000,000) dollars based upon mailings made on behalf of other Vantage customers, three
million ($3,000,000) dollars based upon the Shriners mailings and a possible additional six
million ($6,000,000) dollars in exemplary damages. Of this, the claims for exemplary damages
were subject to certain additional defenses not available with respect to the revenue recovery
claims of the United States and thus Vantage's principal exposure was with respect to the
$6,000,000 of revenue recovery claims. Nonetheless, because a judgment of such magnitude
could have been fatally injurious to Vantage, it determined that it was necessary to settle the
case, if possible.

25.    After protracted and vigorous negotiations with the United States, Vantage
entered into an agreement to settle the United States' claims (the "Settlement Agreement") for
four million five hundred thousand ($4,500,000) dollars. Approximately one half of this amount,
or almost two million two hundred fifty thousand ($2,250,000) dollars, was agreed to by Vantage
in order to resolve its potential liability with respect to the Shriners mailings.

-7-

#### 4. Count I – Breach of Contract - Legal Malpractice

26.    Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 25, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

27.    NSG and Miller, and each of them, substantially and materially breached their contract of professional employment with Vantage by failing to exercise reasonable professional skill and care and, in particular, failing to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" would have exercised in the circumstances.

28.    As a result of the aforesaid breaches of contract, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

#### 5. Count II  Negligence – Legal Malpractice

29.    Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 28, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

30.    Pursuant to their attorney-client relationship with Vantage, NSG and Miller, and each of them, owed Vantage a duty to exercise reasonable professional skill and care and, in particular, to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" would have exercised in the circumstances.

-8-

31.     NSG and Miller, and each of them, were negligent in failing to exercise such skill and care.

32.     As a result of the aforesaid negligence of NSG and Miller, and each of them, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

### 6. Count III   Fraudulent Misrepresentation

33.     Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 32, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

34.     In connection with obtaining the Engagement, NSG and Miller, and each of them, represented that they were skilled and experienced in advising non-profits and their professional fundraisers in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" and that they had the experience and ability to prepare a contract that would satisfy Shriners' requirement for limitations on its liability to pay for Vantage's fundraising services out of Shriners' own cash assets while at the same time, complying with the requirements of the CMR and shielding Vantage from exposure to additional liability in the Action.  NSG and Miller further represented that the draft contract that Miller prepared for use with Shriners effectively met these objectives.

35.     The aforesaid representations, and each of them, concerned matters of fact.

36.     The aforesaid representations, and each of them, were false and both NSG and Miller knew that they were false.

37.     The aforesaid representations, and each of them, were made by NSG and Miller with the intention that Vantage rely upon them in entering into the Engagement.

38.    Vantage believed and reasonably relied upon the aforesaid representations, and each of them.

39.    As a result of the aforesaid false and fraudulent misrepresentations, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

### 7. Count IV   Negligent Misrepresentation

40.    Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 39, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

41.    NSG and Miller, and each of them, was under a duty to refrain from inducing Vantage to enter into the Engagement by means of representations that they knew, or should have known, were false.

42.    NSG and Miller, and each of them, knew of ought to have known that the aforesaid representations were false.

43.    As a result of the aforesaid negligent misrepresentations, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

### 8. Count V   Unfair and Deceptive Acts and Practices – Violation of G.L. ch. 93A

44.    Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 43, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

45.    Vantage, NSG and Miller, and each of them, are all persons engaged in the conduct of trade or commerce within the meaning of G.L. ch 93A, §§ 1 and 2 as amended, and

the rules and regulations of the Attorney General of the Commonwealth of Massachusetts promulgated pursuant thereto.

46.     None of the wrongful acts, or the transactions to which they relate, that are the subject of this claim, constitute acts or transactions which are exempt from the provisions and prohibitions of G.L.ch. 93A pursuant to the provisions of §3 thereof.

47.     The acts and transactions constituting the unfair and deceptive acts and practices as hereinbefore set forth occurred primarily and substantially within the Commonwealth of Massachusetts, within the meaning of G.L. ch. 93A, §11.

48.     At all times material hereto, NSG and Miller, and each of them, were well aware that their course of conduct was likely to have the effect of inducing Vantage to enter into the Engagement and to proceed with the Contract and the Shriners mailings, and thereby to expose Vantage to substantial additional liability and related expense in the Action. Notwithstanding such awareness, NSG and Miller, and each of them, nonetheless deliberately embarked upon and pursued their wrongful course of conduct and committed the wrongful acts hereinbefore set forth, and each of the aforesaid acts, to promote and advance their own interests. The use and employment of the aforesaid unfair and deceptive acts and practices constituted knowing and willful violations by NSG and Miller, and each of them, of G.L. ch. 93A §2, within the meaning of §11.

49.     As a result of the aforesaid unfair and deceptive acts and practices, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial, all before doubling or trebling as authorized by §11.

50.     In addition, Vantage is entitled to recovery of its reasonable attorneys fees and costs, as required by §11.

WHEREFORE, Vantage prays:

1.    That this Court, after notice and a hearing, enter a preliminary injunction enjoining the defendants NSG and Miller, and each of them, from conveying, transferring, encumbering, hypothecating or otherwise disposing of their assets, except in the ordinary course of business, pending further order of this Court,

2.    That this Court, after a trial on the merits or upon such other basis as is appropriate for adjudication thereof, determine and adjudicate the amount of damages sustained by Vantage as a result of the wrongful conduct hereinbefore set forth in Counts I through IV, inclusive and award Judgment against defendants NSG and Miller, and each of them, in such amount, together with interest and their costs in maintaining this proceeding,

3.    That this Court, after a trial on the merits or upon such other basis as is appropriate for the adjudication thereof, determine and adjudicate, with respect to Count V, that the aforesaid unfair and deceptive acts and practices committed by NSG and Miller, and each of them, constituted knowing and willful violations of the provisions of G.L. ch. 93A, §2 and enter judgment in favor of Vantage for three times but not less than twice the amount of such damages sustained by it as a result of such violations, together with its costs, including but not limited to its reasonable attorneys' fees in connection with this proceeding,

4.    For such other and further relief as this Court shall deem appropriate.

*[handwritten: 7-14-04  Short order of notice to issue returnable Aug. 4, 04 @ 2:00 pm Room 6 - 15th floor re: prayer one (on Distel J) Attest ... July - ... Asst Clerk]*

**VANTAGE FINANCIAL SERVICES, INC.**
By its Attorney,

*[signature: Laurence Johnson]*    njB
Laurence M. Johnson (BBO #252720)
Davis, Malm & D'Agostine
One Boston Place
Boston, MA 02108
(617) 367-2500
ljohnson@davismalm.com

Dated: July 12, 2004

*[handwritten: Summons + order of notice issued]*

J:\Johnson\VANTAGE\Malpractice Claim 8642-4\complaint.doc

-12-

. HEREBY ATTEST AND CERTIFY ON
AUGUST 3, 2004 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY
ASSISTANT CLERK.

EX A

## Agreement To Provide Fund Raising
## Consulting and Management Services

This Agreement To Provide Fund Raising, Consulting and Management Services ("Agreement") is made and as of this _____ day of _____, 1999 between Shriners Hospitals For Children, a nonprofit corporation with its principal office located at 2900 Rocky Point Drive, Tampa, FL 33607 ("Shriners"), and Vantage Financial Services, Inc., a Massachusetts corporation with its principal office located at 1244 Boylston Street, Chestnut Hill, MA 02467 ("Vantage").

### Recitals

A.  Vantage has expertise and experience to create, produce, and manage direct response fund raising campaigns for nonprofit organizations both to identify new donors and renew existing ones, in particular to develop creative strategy, select lists of likely prospects, and use premium-based fund raising techniques.

B.  Vantage has expertise and experience to create, prepare, and distribute informational and educational material customized to the specific purpose of a nonprofit organization.

C.  Shriners is a nonprofit corporation that desires to raise funds from the public through direct response campaigns for its charitable purposes.

D.  Shriners desires to raise funds to support the mission of Shriners to provide hospital and medical care for children, and otherwise engage in charitable activities such as research.

### Agreements

Now, Therefore, in consideration of the foregoing premises and the mutual covenants and agreements set forth below, the receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant and agree as follows:

Paragraph 1.  Definitions

1.1  "Acknowledgment" is the program to thank donors by sending a letter to them that verifies Shriners receipt of their contributions and may contain educational material as defined in subparagraph 1.12 below.

- 2 -

1.2 "Agreement" is defined in the introductory paragraph.

1.3 "Caging" is the procedure whereby envelopes containing contributions from the public are opened, recorded, keypunched, verified, and deposited in the appropriate bank account by a "lockbox" facility jointly selected and mutually agreed to by both parties. Shriners shall exercise exclusive ownership and control over any and all bank accounts that receive deposits from the lockbox facility.

1.4 "Campaign Approval Packet" is defined in Paragraph 6.

1.5 "Campaign Period" is defined as the time between the date on which a direct mail package is mailed and the last day of the fourth month following the date of that mailing. By way of illustration, the parties agree that if a direct mail package is distributed on June 10, the campaign period for that mailing shall commence on June 10 and end on October 31.

1.6 "Comment Mail" consists of correspondence or other written communications that recipients of Shriners direct mail packages send to Shriners. The caging facility shall open all comment mail, record, and forward it to the Shriners' Program Administrator. Shriners shall be solely responsible to review and respond to all comment mail received from recipients of its direct mail packages.

1.7 "Direct Mail Package" contains correspondence or other related printed material which includes a request for financial support or combines such a request for financial support with material that is educational or is designed to raise public awareness.

1.8 "Direct Mail Program" is defined in Paragraph 5.

1.9 "Donor Acquisition Mailing" - Vantage, for the benefit of Shriners, conducts Shriners' donor acquisition program when Vantage, for the benefit of Shriners, distributes direct mail packages that contain either a straight letter appeal or an appeal that uses a premium as part of the inducement, which Shriners has given prior written approval to mail, to persons who potentially have a need for or use of information in the direct mail package or are interested in supporting Shriners financially.

1.10 "Donor Renewal Mailing" - Vantage, for the benefit of

- 3 -

Shriners, conducts Shriners' donor renewal mailing when Vantage,
for the benefit of Shriners, distributes direct mail packages,
with Shriners' prior written approval, to all or a part of
Shriners' file of donors generated by this Agreement, in order
to provide them with educational material and/or request their
continued financial support.

1.11  "Educational Material" distributed in connection with
a direct mail package, as distinguished from a request for fi-
nancial support, shall be specific, help to accomplish the
Shriners mission, should help the recipient or society or should
assist Shriners to raise public awareness.  Educational Material
may be printed in a separate brochure or in components of a
Direct Mail Package in a manner determined by the Shriners'
Program Administrator on a case-by-case basis.

1.12  "Effective Date" is defined in paragraph 15.

1.13  "Follow-Up Mailings" are Direct Mail Packages dis-
tributed with the Shriners prior written approval to potential
or existing donors who have previously received, but have not
yet responded to, a Direct Mail Package from the Shriners in
order to encourage them to provide financial support or
participate in Shriners' programs.

1.14  "Gross Income" is defined for the purpose of this
Agreement as the total of contributions received as a direct and
proximate result of a Direct Mail Package, Direct Mail Program,
Donor Renewal Mailing, Follow-up Mailing, or any other Mailing
under this Agreement before deducting any fees or expenses
associated with that campaign.  Gross Incomes shall also include
any contributions from persons excluded from Mailing Lists by
Shriners pursuant to the last sentence to Section 1.16 herein.

1.15  "Know-How" means all factual knowledge and infor-
mation not capable of precise or separate description but which,
in accumulated form, after being acquired by trial and error or
other means of experimentation, gives an ability to the acquirer
to produce or market something which that person otherwise would
not have known how to produce or market with the same accuracy
or efficacy necessary to produce net income.

1.16  "Mailing Lists" used for the Shriners Direct Mail
Program contain names and addresses of persons who, by virtue of
previous patterns of charitable giving or other identifiable
demographic data or statistical studies, are likely to have a
need for or potential use of information in the Shriners' direct

- 4 -

mail packages. It is the intent of the parties that Mailing
Lists shall not include any past or present contributors to
Shriners or any individual who donates to Shriners through the
Combined Federal Campaign, or similar campaigns, or to any
Shriner members or to future donors who may make major donations
to Shriners independent of this Agreement. Shriners also has
the discretion to exclude from Mailing Lists names of
individuals who contribute $5,000 or more pursuant to the Direct
Mail Program.

1.17 "Net Income" is the amount that remains after the
costs of each billing statement approved by Shriners in writing
are subtracted from donations that Shriners receive in response
to the Donor Acquisition Mailing, Direct Mail Packages, Direct
Mail Program, Donor Renewal Mailing, Follow-up Mailings, or any
other Mailing under this Agreement related to that billing.

1.18 "Notice" is defined in Paragraph 12.

1.19 "Program Account" is defined in Paragraph 7.2.

1.20 "Program Administrator" - Shriners shall designate in
writing one (1) person to serve as the Program Administrator who
shall have primary responsibility to communicate with Vantage
regarding planning and execution of Shriners direct mail
campaigns during the term of this Agreement. The Program
Administrator shall have responsibility, on behalf of the
Shriners, to secure approval or disapprove all Campaign Approval
Packets. The Program Administrator will attempt to facilitate
communication between Vantage and the Shriners' staff to develop
Vantage's Direct Mail Packages, Direct Mail Program, Donor
Renewal Mailing, Follow-up Mailing, Donor Acquisition Mailings
or Direct Mail Packages or any other Mailing under this
Agreement for Shriners.

1.21 "Program Donors" are persons who respond to a Direct
Mail Package, Donor Renewal Mailing, Follow-up Mailing, Donor
Acquisition Mailings or Direct Mail Packages or any other
Mailing distributed pursuant to this Agreement.

1.22 "Shriners Suppression File" is the list of names of
Shriners' members and donors that the Shriners agrees to provide
to Vantage biannually (or more frequently if desired by
Shriners) and that Vantage agrees it will use prior to each
Donor Acquisition Mailing under this Agreement in order to
eliminate names on the Shriners Suppression File from the lists
of prospective donors that Vantage proposes to mail as part of

- 5 -

any mailing made pursuant to this Agreement.  The Shriners
Suppression File list of names includes:  All past and present
contributors to Shriners, or any individual who donates to
Shriners through the Combined Federal Campaign, or similar
campaigns, or any Shriner members or to future donors who may
make major donations to Shriners independent of this Agreement.
Also, Shriners has the discretion to exclude from subsequent
Donor Renewal Mailings any individuals who contribute $5,000 or
more pursuant to the Direct Mail Program.

    1.23   "Vendors" are individuals or businesses which provide
supplies or services under contract with Vantage necessary to
execute any mailing made pursuant to this Agreement.  These
vendors include, without limitation, suppliers of envelopes and
other paper products, suppliers of promotional materials,
printers, typesetters, artists, copywriters, letter shops, and
data processors.  Vantage will not use any Vendor in which
Vantage has a direct or indirect ownership interest of fifty
(50) percent or more.

Paragraph 2.  <u>Authority of Vantage; Limitations on Authority</u>

    During the term of this Agreement, Shriners retains Vantage
exclusively to plan and manage the Direct Mail Program, Donor
Acquisition Mailing, Direct Mail Packages, Direct Mail Program,
Donor Renewal Mailings, or Follow-up Mailings, or any other
Mailing under this Agreement and to create, prepare, and
distribute the Direct Mail Packages itemized in Schedule A,
which is attached hereto and made a part hereof by reference,
and any replacement or additional packages that Vantage may from
time to time propose to Shriners and which Shriners approves in
writing.  Vantage shall act solely as agent for Shriners pur-
suant to Shriners' written directive.  In no event shall Vantage
have authority to receive contributions on behalf of Shriners or
have access to such contributions.  All mailings made by Vantage
pursuant to this Agreement require Shriners' prior written
approval.  Shriners assumes complete and full responsibility for
payment of all postage incurred as a result of the operation of
this Agreement, and Vantage has no obligation whatsoever for
payment of postage.

Paragraph 3.  <u>Term of Agreement</u>

    3.1  This Agreement shall commence on the Effective Date
hereof and shall extend for a term of four (4) years unless
sooner terminated in accordance with paragraph 13 of this
Agreement.

- 6 -

3.2  For solicitations conducted in the State of New York, this Agreement shall be effective as of fifteen (15) days following the date on which the Agreement is filed with the Attorney General's Charities Bureau.  Notwithstanding the above, Shriners may, without giving any reason, cancel this contract without cost, penalty, or liability for a period of fifteen (15) days following the date of the filing hereof with the New York Charities Bureau, if Shriners notify Vantage by letter or other written notification indicating that it does not intend to be bound by this Agreement.  Said notice may be hand delivered or mailed to Vantage at 1244 Boylston Street, Chestnut Hill, Massachusetts 02467.  If notice is hand-delivered, the cancellation is effective as soon as it is deliver to Vantage.  If the notice is mailed, the cancellation is effective as soon as the notice is deposited, properly addressed with postage prepared, in a mailbox.  Shriners must also mail a duplicate copy of the notice of cancellation to the State of New York, Office of the Attorney General, Charities Bureau, The Capitol, Albany, NY 12224.

3.3  Vantage agrees to recognize the terms of any cooling off provision to the extent that any jurisdiction in which Shriners may conduct the Direct Mail Program requires fund raising counsel to offer a cooling off period, such as the State of New York.

Paragraph 4.  Educational Material in Direct Mail Packages

If Shriners would like Vantage to propose direct mail packages that are multipurpose, that is contain Educational Material that may be allocated to public education as defined by the American Institute of Certified Public Accountants, Shriners Program Administrator shall notify Vantage and indicate the approximate proportion of the content of the package that Shriners would like to be classified as public education.

Paragraph 5.  Direct Mail Program

5.1  Consultant Services - During the term of this Agreement, Shriners agrees to use the services that Vantage provides and which are herein referred to as the "Direct Mail Program."  Vantage agrees to provide the full range of services that Shriners requests and approves in writing in order to conduct the Direct Mail Program including but not limited to selection of mailing lists, preparation and distribution of the initial direct mail package, caging, data processing, and ac-

- 7 -

knowledgment of donations. These consultant services draw on
Vantage's particular Know-How in direct mail marketing and
premium fund raising techniques including but not limited to
name and address labels, note cards, holiday greeting cards,
lapel pins, and calendars.

5.2  Mail Schedule - Schedule A attached hereto sets forth
the preliminary mail schedule for the Shriners' Direct Mail
Program, including the proposed number of campaigns and for each
such campaign, whether it is a Donor Acquisition Mailing, Donor
Renewal Mailing, Donor Acknowledgment Mailing; Direct Mail
Package or Follow-up Mailing, whether a premium is proposed and,
if so, the type of premium to be offered and its cost; the
number of initial packages to be mailed; mail package design;
and the anticipated mail or drop date. Schedule A also sets
forth all costs, including but not limited to, the product
costs, postage, list costs, and results for each such campaign.
Costs other than postage cannot be unilaterally increased by
Vantage during this Agreement. Any cost increases must be
approved by Shriners in writing. The projected response rate
contained in Schedule A is a projection, and Vantage cannot
guarantee it.

5.3  Test Mailing - In order to identify a universe of pro-
spective Shriners' donors to receive Donor Acquisition Mailings
and to determine which lists Shriners will continue to mail to
under this Agreement, Vantage will recommend certain lists for
the Shriners to test. Vantage will arrange to have
approximately 5,000 names drawn randomly from each such list.
If the response from a list to the test package is 2.5 percent
(2.5%) or greater, that list will be part of the universe of
Shriner prospects. Vantage shall arrange for a test mailing of
a total of approximately 200,000 pieces on or about July 1,
1999, or at a later date if so directed in writing by Shriners,
which will conclude four months later as set forth in Schedule
A, and as approved by Shriners in writing. As soon as possible
following the test (but in any event within thirty (30) days
from conclusion of the test), Vantage shall advise Shriners how
many of the lists tested produced a response rate of 2.5 percent
(2.5%) or greater. Vantage shall make the determination as to
whether a list produced a response rate of 2.5 percent (2.5%) or
greater, but the Shriners may independently verify it. This
test mailing is to be made at the Nonprofit Standard A rate.
The cost of postage shall be paid from Gross Income. A complete
"Campaign Approval Packet" is not required for this test as the
Shriners have given approval, contemporaneously with the
execution of this Agreement, to the copy and graphics; however,

- 8 -

Vantage must obtain Shriners' written approval of the budget for the test mailing.  This budget shall include all items shown in the budget described in Section 6.1 of this Agreement.

Paragraph 6.   <u>Shriners Approval of Direct Mail Packages and Campaigns</u>

6.1  At least sixty (60) days prior to the anticipated date of the first mailing as set forth in Schedule A, Vantage shall submit the "Campaign Approval Packet" to Shriners Program Administrator which shall consist of:  copy and graphics for each component of the mail package for the upcoming campaign, the proposed number of packages to be mailed, the lists to be mailed, and a budget that details all costs, including, but not limited to, list costs, postage (including outgoing and return postage, if any is contemplated, product cost and any other costs or charges that will be on the billing statement of paragraph 7.3.1, and projected results so that Shriners will have a complete understanding of its financial obligation, the concept and contents of the direct mail package, and the anticipated number of new donors and total amount of donations. There will be no costs on the list other than those costs recited in Schedule A.  Vantage shall assign a unique job identification code to each campaign or job and shall provide a space for the Shriners Program Administrator to indicate approval or disapproval of the proposed campaign and direct mail package.

6.2  Shriners Program Administrator shall review each Campaign Approval Packet and shall notify Vantage of Shriners' decision whether all or any part of the Campaign Approval Packet is satisfactory no later than fourteen (14) days after Shriners' Program Administrator receives the Campaign Approval Packet. Shriners has the sole authority to approve, such approval to be in writing, the specifications set forth in each Campaign Approval Packet, and Vantage shall commence production only in accordance with the express written approval of Shriners of the specifications so approved, and Vantage shall cause the Direct Mail Packages to be distributed as set forth in Schedule A as so approved by Shriners.

6.3  <u>Use and Ownership of Mail Lists</u>

6.3.1 Vantage agrees that it will not intentionally or through its negligence mail to any name contained in the Shriners Suppression File. To accomplish this objective, Vantage shall designate the names of each respondent to the Shriners'

- 9 -

Direct Mail Program as "Program Donors." Shriners shall be the sole owner of the list of Program Donors. Vantage shall not use the list of Program Donors for any purpose except to carry out its rights and obligations pursuant to this Agreement. Vantage shall update the list of Program Donors weekly and maintain it during the term of this Agreement. Every six (6) months, Vantage shall provide a magnetic tape record, in a format that is mutually agreed to in advance, to Shriners of the names of all Program Donors along with the amount of any donation received up to that time. No later than ninety (90) days after termination of this Agreement, Vantage shall provide the list of Program Donors to Shriners that includes all updates that have been caged up to the seventy-fifth (75th) day after termination. Upon transmittal of the complete updated list of Program Donors, Vantage shall have no rights whatsoever to such list, except those specified in Section 13 of this Agreement.

6.3.2 In order to assist Vantage to carry out its obligation set forth in Sections 1.22 and 6.3.1, Shriners will prepare a list of all members and donors to be called the Shriners Suppression File. Vantage agrees that it will use this file to suppress the names contained thereon from any list of prospective donors that Vantage proposes to use in the Shriners Direct Mail Program. The Shriners will update the suppression file biannually (or more often, at Shriners' discretion), and provide a magnetic tape to Vantage of the updated suppression file in a mutually agreed format.

6.3.3 Prior to termination of this Agreement, Shriners may not use the list of Program Donors for the purpose of making a mass mailing similar to those made by Vantage under this Agreement, unless Vantage has given to Shriners its prior written approval, which approval will not be unreasonably withheld.

6.3.4 Unless caused by erroneous entries in Shriners' Suppression File, if Vantage breaches Section 6.3.1 or 8.2 of this Agreement, it shall pay liquidated damages to Shriners of ten dollars ($10) per name for the wrongful use of the Shriners' member and donor list.

6.3.5 Vantage shall secure a surety bond of one million dollars ($1,000,000) in the event that it fails to perform under Section 6.3.4 or Section 8.2 of this Agreement.

Paragraph 7. <u>Receipt of Proceeds and Costs</u>

-10-

7.1  **Program Account, Control of Funds Deposited** - Vantage shall prepare all mail packages for Shriners under this Agreement so the mail packages include a clear statement that directs the recipient to send all donations to a designated post office box in the name of Shriners. Based on the number of responses, Vantage shall instruct the designated U.S. Post Office to sweep the designated postal box several times a week and forward the contents to the designated depository bank, Boston Financial Data Services, Inc., a subsidiary of State Street Bank of Boston ("Bank"), for deposit into a segregated account in the name of Shriners Hospitals for Children.

7.2  Boston Financial Data Services shall count, record by donor, and deposit all such proceeds in Shriners' segregated bank account at State Street Bank of Boston (hereinafter referred to as the "Program Account"). Shriners shall establish the Program Account so that it is dedicated solely to deposits that are generated pursuant to this Agreement. The Program Account shall be in Shriners' name, and Shriners alone shall own and control it. Any interest that accrues on funds deposited in the Program Account shall be the sole property of Shriners. Bank shall invoice Shriners directly for all fees and other costs associated with services that Bank renders to Shriners, or Bank may withdraw payment of such invoices from the Program Account, at Shriners' choice and at Shriners' discretion. Vantage shall prepare and submit a report to Shriners weekly that sets forth the amount of funds received and deposited pursuant to this Agreement or Shriners may receive such information directly from the Bank, at Shriners' choice and discretion.

7.3  **Submission and Payment of Billing Statements**

7.3.1  After a mailing is dropped, Vantage shall prepare and submit a billing statement, consistent with this Agreement, of the charges for that mailing to the Shriners Program Administrator along with a copy of the U.S. Postal Service ("USPS") Form 3602, or an equivalent form certified by the USPS, that shows the actual quantity of packages mailed and postage paid. Vantage shall use the unique job identification code it assigned to the mailing to which the billing statement relates so that Shriners can easily match each billing statement and the corresponding USPS Form 3602 to the correct Campaign Approval Packet of paragraph 6 herein in order to verify that invoiced charges are identical to those costs that Shriners approved and authorized Vantage to incur on behalf of the Shriners and to

-11-

verify that the billing statement is based on the number of
packages that Shriners approved and that Vantage actually
mailed. The charges contained in a billing statement shall not
be other than contained in Schedule A, and shall not exceed the
costs that Shriners approved in the Campaign Approval Packet,
nor include any additional costs.

7.3.2  Shriners agrees to retain all funds received in
response to the Direct Mail Program in the Program Account.
Upon receipt and verification of the billing statement, and upon
verification from the Bank of the amount of funds available in
the Program Account to pay the charges on the billing statement,
Shriners shall pay the charges on the billing statement from the
Program Account.

7.3.3  Upon Shriners' verification of the correctness of a
billing statement, the order of payment from the Program Account
is as follows: first - postage; second - list rentals; third -
product cost.

7.4    <u>Withdrawals from Program Account</u> - Unless terminated
pursuant to Section 13 of this Agreement, beginning on the
effective date of this Agreement, and through the first eighteen
(18) months of operation of the Shriners' Direct Mail Program,
Shriners will not withdraw funds from the Program Account until
it is current with all undisputed outstanding billing
statements, and the Program Account contains at least one-half
of the total budgeted expense for the upcoming mailing that has
been approved by Shriners in writing. Unless sooner terminated
pursuant to Section 13 of this Agreement, beginning on January
1, 2001, and at the conclusion of every three month period
thereafter, Shriners may withdraw an amount from the Program
Account equal to twenty percent (20%) of gross donations it
received in the same three-month period a year earlier. Unless
sooner terminated pursuant to Section 13 of this Agreement, at
any time after April 1, 2001, Shriners may withdraw more than
twenty percent (20%) if it is current with all outstanding
undisputed billing statements, and the Program Account contains
at least one-half of the total budgeted expense for the upcoming
mailing that has been approved by Shriners in writing.

Paragraph 8.   <u>Trademarks, Trade Names, Service Marks</u>

8.1  Vantage agrees that it will use the name "Shriners
Hospitals for Children" or any of Shriners' trademarks, trade
names, or service marks ("Shriners Marks") only in connection
with the conduct and operation of Shriners' Direct Mail Program

-12-

provided for under this Agreement and only with the written
approval of Shriners for all such applications. Vantage
recognizes and acknowledges that the use of the Shriners Marks
shall not confer any proprietary rights on Vantage to the
Shriners Marks. Upon expiration or termination of this
Agreement, Vantage's right to use Shriners Marks shall
terminate, and Vantage shall cease all use of Shriners Marks,
except as permitted under Sections 13.1 and 13.2 of this
Agreement. Shriners shall accrue all goodwill relating to the
use of the Shriners Marks at any time.

   8.2  Vantage acknowledges that Shriners member and donor
lists are an asset of substantial value and shall maintain this
information in strictest confidence and shall use only the names
in accordance with this Agreement. The confidentiality
obligation imposed on Vantage pursuant to the preceding sentence
shall survive the term of this Agreement.

Paragraph 9.  Intellectual Property and Confidentiality

   9.1  Shriners recognizes that Vantage has expended Know-How
and other intellectual property of a proprietary nature that
Vantage has developed in order to fashion and present the Direct
Mail Program to Shriners as embodied in Schedule A. Shriners
recognize further that Vantage's intellectual property as rep-
resented by the Direct Mail Program and Schedule A has value to
Shriners, Vantage, and Vantage's competitors.

   9.2  Shriners shall use its best efforts to ensure the con-
fidentiality of Schedule A and all other Know-How, other Vantage
intellectual property of a proprietary nature, and any confi-
dential business information related thereto or that otherwise
relates to implementing this Agreement.

   9.3  Shriners shall use its best efforts to restrict access
to such information to personnel who have a need to know, in-
cluding by way of limitation: (a) members of its legal de-
partment; (b) Shriners' Program Administrator or other high
level employee, such as its Executive Secretary; (c) accounting
department; (d) Shriners' corporate officers, directors and
     trustees; and (d) officials of governments or judiciaries
who have a legal right to know.

     9.4  Notwithstanding the foregoing, confidential infor-
          mation shall not include any information that (a) is
          or becomes a part of the public domain by some means
          other that through an act or omission of Shriners or

-13-

Vantage; (b) Vantage discloses to a third party
without any restriction on such third party; (c) is in
the possession of Vantage or Shriners without actual
or constructive knowledge of an obligation of
confidentiality with respect thereto at or prior to
the time it is disclosed under this Agreement; or (d)
is developed by Shriners independently of this
Agreement.

Paragraph 10.   Compliance with State Law and Registration
                Requirements

     Shriners and Vantage agree that each party is responsible
to comply with its duties and registration obligations pursuant
to the laws and regulations of each state provided, however,
that Vantage shall in all events be responsible to register this
Agreement with the appropriate jurisdictions as required by law.
Each party shall bear its own registration and licensing costs
and fees, all penalties under state law for noncompliance, and
all expenses or fees incurred by that party as a result of any
administrative or legal action arising from noncompliance.  Both
parties agree that they will provide a complete list to the
other party of the jurisdictions where they have registered as
well as the registration number if they have received one.
Shriners has the option to direct Vantage not to mail anything
to a particular state, should Shriners determine it is not in
its best interests for Shriners to register to solicit for
charitable contributions in that state.  As of the execution of
this Agreement, Shriners has not registered to solicit for
charitable contributions in the states of: Alabama, Arkansas,
Louisiana, Maine, Michigan, and Nebraska.  If Shriners elects to
register in those states, it will advise Vantage.

Paragraph 11.   Indemnification

     Shriners and Vantage each agrees to indemnify, defend, and
hold harmless the other party to this Agreement and its
respective partners, directors, trustees, officers, agents, and
employees, from and against any loss, damage, liability, claims
or causes of action (including attorneys' fees and expenses of
litigation) in any way resulting from such party's intentional
or negligent acts or omissions or the intentional or negligent
acts or omissions of such party's partners, directors, trustees,
officers or employees, or members in connection with or in any
way related to the Direct Mail Program or any such party's
breach of its respective obligations under this Agreement.
Vantage and Shriners shall indemnify each other only up to the

-14-

limits of each other's respective comprehensive general liability insurance policy.

Paragraph 12.   Notice

12.1   Any Notice or other communication between Shriners and Vantage concerning or required under this Agreement shall be in writing and shall be sent by Certified U.S. Mail or overnight courier service to the address listed below or to such other address as either of the parties may hereafter specify by such Notice to the other:

        To:   Shriners Hospitals for Children
              2900 Rocky Point Drive
              Tampa, FL 33607
              Attn:  Director of Giving
              Copy to:  Executive Vice President of Shriners
                        Hospitals for Children

        To:   Vantage Direct Mail Services
              1244 Boylston Street
              Boston, MA 02467
              Attn:  Ms. Lynn S. Edmonds
                     Executive Vice President and General
                     Manager

12.2   Service - Determination of the date that Notice is received:  (a) certified mail is the date received; (b) first class mail is the date postmarked; and (c) overnight courier service is the date sent.

Paragraph 13.   Termination, Proprietary Material

13.1   Termination Without Cause by Shriners - At any time within the term of this Agreement, Shriners may terminate this Agreement unilaterally without cause by providing Vantage with sixty (60) days prior written notice in accordance with the notice requirements of Paragraph 12 above.  In that event, this Agreement shall automatically terminate on the sixtieth (60) day following the date of the written notice or at the end of the mailing campaign during which the written notice is given, whichever occurs first. Upon termination, Shriners shall have two options to satisfy Billing Statements prepared by Vantage which have been approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement:

-15-

A.    First, Shriners may pay such billing statements directly.    If such direct payments are made by Shriners, Vantage shall within thirty (30) days of complete payment, deliver to Shriners, at Vantage's cost, all materials prepared by Vantage on behalf of Shriners, including, but not limited to Mailing Lists.

B.    Second, at Shriners' option, Shriners may permit Vantage to rent or exchange Shriners' donor file and use the proceeds to satisfy any outstanding Billing Statements approved by Shriners in accordance with Section 7.3.1 of this Agreement. If Shriners elects this second method of payment, Vantage also has the right to continue to conduct Donor Renewal Mailings to those donor names acquired through the efforts of Vantage.    In this case the Donor Renewal Mailings must be approved by Shriners in the manner provided by Paragraph 6 of this Agreement, but Shriners' approval shall not be unreasonably withheld.    Shriners agrees to apply all Gross Income from these Donor Renewal Mailings to settle any Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement.    Vantage may continue to conduct Donor Renewal Mailings, or continue to rent or exchange Shriners' donor file, until the balance of Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement, which is outstanding upon the termination of this Agreement, is paid in full by Shriners.    Vantage shall mail to Program Donors for thirty-six (36) months until all outstanding billing statements are paid or until such mailings no longer produce net income at which time Shriners shall be responsible to pay the balance.    In no case shall Vantage continue to conduct Donor Renewal Mailings after thirty-six (36) months from the date of the Notice of Termination.

13.2 _Termination for any Other Reason_ - In the event this Agreement is terminated for any other reason than that provided in Section 13.1 hereof, after sixty (60) days from termination Vantage shall have the right to rent or exchange Shriners' donor file and use the proceeds to satisfy any outstanding Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement.    In addition, Vantage has the right to continue to conduct Donor Renewal Mailings to those donor names acquired through the efforts of Vantage, which Donor Renewal Mailings must be approved by Shriners in the manner provided by Paragraph 6 of this Agreement.    Gross Income from these Donor Renewal Mailings will be used to settle any outstanding Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement.    Vantage may continue to conduct Donor

-16-

Renewal Mailings, or continue to rent or exchange Shriners'
donor file until thirty-six (36) months from termination of this
Agreement.  In no case shall Vantage continue to conduct Donor
Renewal Mailings for this paragraph after thirty-six (36) months
from the date of termination.  Upon the conclusion of said
thirty-six (36) month period, Vantage shall have no further
recourse against Shriners.

13.3 Proprietary Material - Proprietary material shall
include without limitation selection of mailing lists,
preparation and distribution of the initial direct mail package,
acknowledgement of donations, and specialized mail packages that
includes such premiums as name and address labels, note cards,
holiday greeting cards, lapel pins, and calendars.  In the event
that Shriners terminates this Agreement Shriners shall not use
any proprietary material that Vantage developed for Shriners,
for a period of five (5) years from the date of the termination.
Excluded therefrom shall be any material that is proprietary to
Shriners, which was utilized by Vantage to develop its material.

13.4 Bankruptcy - This Agreement shall terminate
immediately upon the filing by either party of any petition in
bankruptcy or for reorganization or debt consolidation under the
Federal Bankruptcy Laws or under any comparable law by or
against either party, or upon either party's making an
assignment of its assets for the benefit its creditors, or upon
the application of either party for the appointment of a
receivor or trustee of its assets.

Paragraph 14.    General

14.1 Headings - The headings set out in this Agreement are
for the convenience of reference only and shall not be deemed a
substantive part of this Agreement.

14.2 Counterparts - This Agreement may be executed in
counterparts, all of which taken together shall constitute on
Agreement

14.3 Benefit - This Agreement shall be binding upon and
inure to the benefit of the parties signing it, their
successors, and assigns. Neither party shall have the right to
assign its rights or liabilities under this Agreement, in whole
or in part, without prior written consent of the other party.

14.4 Recitals - The Recitals to this Agreement are hereby
incorporated as an integral part of this Agreement.

-17-

14.5  <u>Use of Terms</u> - Use of the terms "hereunder,"
"hereof," "herein," and similar terms refer to this Agreement.

14.6  <u>Waiver</u> - No failure on the part of either party to
notify the other party of any noncompliance hereunder and no
failure on the part of any party to exercise its rights created
by such noncompliance shall prejudice any remedy for any sub-
sequent non-compliance; any waiver by any party of any breach or
non-compliance with any term or condition of this Agreement
shall be limited to the particular instance and shall not
operate or be deemed to waive any future breaches or
noncompliance with any term or condition.

14.7  <u>Other Agreements</u> - This Agreement constitutes the
entire agreement between the parties and it supersedes all
negotiations, representations, warranties, commitments, offers,
contracts, and writings executed prior to the Effective Date,
except as otherwise provided in this Agreement.  Other than
those documents required to be signed during the term of this
Agreement's operation, there are no other exhibits, attachments,
recitals or documents that make up, supplement or otherwise
enhance or limit this Agreement other than those attached
hereto, and dated and signed by the parties.

14.8  <u>Severability</u> - The parties agree that each of the
foregoing covenants shall be construed as independent of any
other covenant in this Agreement.  If all or a portion of a
covenant herein contained is held to be unenforceable, the
parties agree to be bound by any lesser covenant subsumed within
the terms of such covenant, as if the resulting covenant were
separately stated in this Agreement.

14.9  <u>Survival</u> - All covenants and agreements within this
Agreement made by the parties within this Agreement, which take
effect after its termination, shall survive the termination of
this Agreement.

14.10  <u>Modifications</u> - All modifications to this Agreement
can only be made by a writing signed and dated by both parties.

14.11  <u>Governing Law</u> - This Agreement shall be deemed to
have been made in the State of Florida and shall be construed
according to the laws of that state.

14.12  <u>Mediation</u> - With respect to any dispute, contro-
versy, or claim that may arise out of or in connection with this
Agreement, Shriners and Vantage agree that they shall submit

-18-

such disagreement to non-binding mediation by a single mediator
in Florida, such mediator to be agreed to mutually by
the parties.  The parties shall divide the cost of the mediator
equally among them.

14.13  Relationship of Parties - This Agreement does not
constitute and shall not be construed to constitute a
partnership or joint venture between Shriners and Vantage.
Neither party shall have any right to obligate or bind the other
party in any manner whatsoever except as authorized in this
Agreement or as either party may specifically authorize the
other in writing.

Paragraph 15.  Effective Date

This Agreement shall not become effective until all ex-
hibits, attachments and recitals mentioned in this Agreement
have been appended to this Agreement and executed by the
parties.  Such exhibits, attachments and recitals must be con-
sistent with this Agreement, otherwise the Agreement does not
become effective.

In Witness Whereof, we have executed this Agreement on
behalf of Shriners and Vantage as of the Effective Date first
entered above.

Vantage Financial Services,
Inc.

By: _____
Evelyn M. Edmonds
Executive Vice President and
General Manager

By: _____
Lawrence C. Lyon
Senior Vice President Sales
and Marketing

STATE OF          )
massachusetts     ) ss.:
COUNTY OF         )

The foregoing instrument was acknowledged before me, the 22
undersigned Notary Public, in and for said State, on the
day of June , 19 99 , by Douglas C. Morgan ,
as _____ and _____ as
_____ of Vantage Financial Services, Inc., a

-19-

_____ corporation, for the purposes therein expressed
as the act and deed of said corporation. They are personally
known to me.  In witness whereof I hereunto set my hand and
official seal.

Notary Public _____

Notary's Name
Typed

My Commission Expires:

**Shriners Hospitals for
Children**

By: _____

John D. VerMaas
President

By: _____

Gene Bracewell
Treasurer

STATE OF FLORIDA     )
                     ) ss.:
COUNTY OF HILLSBOROUGH)

The foregoing instrument was acknowledged before me, the
undersigned Notary Public, in and for said State, on the 17th
day of __June__, 19__99__, by John D. VerMaas, as President and
Gene Bracewell as   Treasurer        of Shriners Hospitals for
Children, a Colorado corporation, for the purposes therein
expressed as the act and deed of said corporation. They are
personally known to me.  In witness whereof I hereunto set my
hand and official seal.

Notary Public Suzanne Walsh

Notary's Name
Typed

My Commission Expires:

