UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Vantage Financial Services, Inc.<br>Plaintiff<br><br>v.<br><br>Nonprofit Service Group and George E. Miller<br>Defendants | CIVIL ACTION NO. 04-11686-WGY |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND FOR TRANSFER OF VENUE TO EASTERN DISTRICT OF VIRGINIA UNDER 28 U.S.C. §1406(a)

## INTRODUCTION

Plaintiff Vantage Financial Services, Inc. ("Vantage") seeks to recover damages it allegedly suffered as a result of services provided outside of Massachusetts over an approximately two month period in 1999 by defendants Nonprofit Service Group, Inc. ("Nonprofit") and its principal, George E. Miller ("Miller"), an attorney. The complaint alleges breach of contract, negligence, misrepresentation, and violation of M.G.L. c. 93A. The services provided by the defendants involved a fund raising contract between Vantage, in its capacity as a provider of direct-mail fundraising services, and Shriners Hospital for Children (the "Shriners"), a well-known charitable institution headquartered in Florida. Vantage contacted and engaged Nonprofit to help draft an agreement from Nonprofit's location in Washington, D.C. that complied with the United States Postal Service's Cooperative Mail Rule. As then in effect, the Cooperative Mail Rule required nonprofit mail permit holders that employed a for-profit professional fund raiser to remain at risk for the cost of charitable solicitation mailings at the nonprofit postal rate. With Nonprofit's and Miller's help, Vantage entered into a highly lucrative

arrangement with the Shriners in Florida. The arrangement came to the attention of the United

States Attorney, however, who was already prosecuting a qui tam action against Vantage and

others as a result of illegal side-agreements Vantage had previously entered into with its

customers that violated the Cooperative Mail Rule.[1]  The United States Attorney amended its

complaint by adding claims relating to the Shriners contract.  Although Vantage moved for

summary judgment, the motion was denied in part largely due to Vantage's failure to support its

position with expert testimony.  As a result, Vantage settled with Government and now seeks in

this case to transfer the cost of the settlement to Nonprofit and Miller.  Because the court lacks

personal jurisdiction over Miller and Nonprofit, they now move to dismiss the complaint under

Fed.R.Civ.P. 12(b)(2).  Nonprofit and Miller also request that this case be transferred to the

United States District Court for the Eastern District of Virginia pursuant to 28 U.SC. §1406(a).

## STATEMENT OF FACTS

Miller resides at 1130 Marion Avenue, McLean, Virginia and is Nonprofit's President.

(Affidavit of George E. Miller, hereinafter "Miller Aff.", ¶1).  Nonprofit is a Virginia

corporation with a principal place of business at 1601 North Kent Street, Arlington, Virginia.

(Miller Aff., ¶3).  Nonprofit is not registered to do business in Massachusetts.  Neither Miller nor

Nonprofit regularly conducts business in Massachusetts, and they do not maintain an office in

Massachusetts or have Massachusetts employees or agents representing them for the purposes of

soliciting business, selling merchandise or providing services in Massachusetts. (Miller Aff.,

¶¶5-6, 9).  Miller and Nonprofit do not own real property in Massachusetts, and neither of them

holds any other assets or maintains any bank or financial accounts in Massachusetts. (Miller Aff.,

¶¶7-8).

---

[1] Nonprofit had nothing to do with those side agreements and submits, as Vantage argued in the qui tam action, that

Vantage is a Massachusetts corporation that provides national direct marketing and fundraising services to organizations throughout the United States. Vantage's affiliated companies also provide group travel and insurance services throughout the United States and abroad. In April 1999, Vantage and two members of its senior management were defendants in a qui tam action (the "qui tam action") in this court under the Federal False Claims Act and the Federal Debt Collections Procedures Act.[2] (Complaint, ¶8). In that action, the United States Attorney sought recovery of postal revenue deficiencies due and damages as a result of Vantage's violation of the Cooperative Mail Rule. (Complaint, ¶8).

In April 1999, Vantage reached out to Nonprofit and engaged it to assist Vantage in negotiating a contract in the State of Florida with the Shriners that would comply with the Cooperative Mail Rule . (Miller Aff., ¶10). Neither Nonprofit nor Miller solicited this or other business from Vantage. (Miller Aff., ¶11). All services provided by Nonprofit and Miller in connection with the negotiation of the contract were provided outside of the Commonwealth of Massachusetts. (Miller Aff., ¶12). Miller worked on contract formation primarily from Nonprofit's office which was located, at the time, in Washington D.C. (Miller Aff., ¶12). Miller's and Nonprofit's only contacts with Massachusetts during the period of contract formation were limited to telephone calls and correspondence to Vantage. (Miller Aff., ¶12). From its location in Florida, the Shriners, including its managing attorney, Jay Fleisher, participated in a substantial number of those contacts as a party to such telephone calls or by sending or receiving contract-related correspondence. (Miller Aff., ¶12). During the contract formation period, Miller met with Vantage representatives in Washington D.C., and he was

---

the contract with the Shriners fully complied with the Cooperative Mail Rule.

[2] The Qui tam action was captioned U.S. ex. Rel. Laurence Saklad v. Henry Lewis, et al., C.A. No. 97-10052-MLW.

aware that Vantage also had an office in Washington D.C. at the time. (Miller Aff., ¶13). Both Miller and Vantage were also physically present in Florida to meet with the Shriners to discuss the contract. (Miller Aff., ¶13). Vantage, through its representative, Larry Lyons, was at times also physically present in Florida during the period of contract formation, and Miller made a number telephone calls to him in Florida for contract formation purposes. (Miller Aff., ¶12). Miller was never in Massachusetts for the purpose of contract formation and did not travel to Massachusetts to meet with Vantage in connection with the contract until two years after Vantage and the Shriners entered into the contract. (Miller Aff. ¶13).

After learning of the contract, the Government amended its complaint in the qui tam action, claiming that mailings made by Vantage on behalf of Shriners also violated federal law. (Complaint, ¶19). Vantage filed for summary judgment on the claims arising out of the Shriner's mailings. (Complaint, ¶23). The Court granted Vantage's motion for summary judgment on the Government's False Claims Act claim for exemplary damages, but denied summary judgment on the Government's postage revenue deficiency claim. (See March 5, 2004 Memorandum and Order (Wolf, J.) attached hereto as Exhibit A.) Rather than proceeding to a trial that could have established the legality of the Shriners contract, Vantage settled the case, including the claims arising from the Shriners arrangement. (Complaint, ¶25).

At the time that Vantage reached out to Nonprofit and asked it to assist with the contract, it was Miller's understanding that Nonprofit was being asked help negotiate an agreement in Florida with a Florida-based charitable institution. (Miller Aff., ¶14). In fact, by its terms, the contract was entered into in the State of Florida on June 17, 1999 and was to be governed by Florida law. (Miller Aff., ¶14). Neither Nonprofit nor Miller ever had any reason to anticipate or foresee that they would be summoned into court in Massachusetts to defend any litigation that

might arise as a result of the contract formation services that they provided in Washington, D.C. and Florida. (Miller Aff., ¶14).

While Nonprofit and Miller have had other business dealings with Vantage, none of them involved any continuous, systematic or substantive presence in Massachusetts on either Nonprofit's or Miller's part. (Miller Aff., ¶15). Nonprofit has provided registration services in various states throughout the country in connection with Vantage's direct mail fundraising activities, but those services have been performed since 1999 by an attorney located in Harrisburg, Pennsylvania whom Nonprofit engaged to provide such services. (Miller Aff., ¶15). Both now and during the formation of the contract, it has been Miller's practice to work primarily, and almost exclusively, out of Nonprofit's office, which at the time of the contract was located in Washington, DC. (Miller Aff., ¶15). Miller did not deviate from this practice in his dealings with Vantage. (Miller Aff., ¶15). Vantage, on the other hand, is actively engaged in providing direct mail fundraising and group travel services throughout the United States and abroad. (Miller Aff., ¶15).

Vantage brought suit for alleged legal malpractice against Nonprofit and Miller in the Massachusetts Superior Court (Suffolk County). Nonprofit and Miller removed the case to this Court based on the parties' diversity of citizenship. It is Miller's and Nonprofit's understanding that that this lawsuit arises out of contract formation services that he and Nonprofit provided primarily in Washington D.C., as well as in Florida, during the period leading up to, but not after, the execution of the contract. (Miller Aff., ¶10).

**ARGUMENT**

**I.   THIS ACTION SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER THE DEFENDANT.**

The Court may exercise authority over a defendant by virtue of either specific or general jurisdiction.

> Specific jurisdiction exists <u>when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities</u>.

<u>Mass. Sch. of Law v. Am. Bar Ass'n</u>, 142 F.3d 26, 34 (1st Cir. 1998) (emphasis added).

> General jurisdiction "exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless <u>engaged in continuous and systematic activity, unrelated to the suit, in the forum state</u>." *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992). . . .

<u>Mass. Shc. of Law</u>, 142 F.3d at 34 (emphasis added).  For purposes of general jurisdiction, the defendant's contacts with the forum are measured at the time the complaint is filed.  <u>Noonan v. Winston Co.</u>, 135 F.3d 85, 94-95 (1st Cir. 1998).

In either case, the exercise of jurisdiction must be authorized by the Massachusetts Long-Arm Statute M.G.L. c. 223A §3 and comport with the Due Process Clause of the United States Constitution.  <u>Tatro v. Manor Care, Inc.</u>, 416 Mass. 763, 767 (1994); <u>see also</u> <u>Mass. Sch. of Law</u>, 142 F.3d at 34-35.  The plaintiff bears the burden of establishing sufficient facts upon which the court may properly exercise jurisdiction over a non-resident defendant.  As demonstrated below, there is no basis for this Court to assert specific or general jurisdiction over Nonprofit or Miller.

A.      **Nonprofit May Not Be Brought Before This Court On A Specific Jurisdiction Theory.**

Vantage cannot satisfy either the statutory or constitutional standards for the exercise of specific jurisdiction over Nonprofit or Miller.  Specific jurisdiction exists only when the Massachusetts Long-arm Statute confers jurisdiction and where the exercise of jurisdiction under the Long Arm Statute is consistent with the requirements of the United States Constitution.

1.      **The Massachusetts Long-Arm Statute Does Not Confer Personal Jurisdiction Over Nonprofit or Miller.**

In its complaint, Vantage contends that sub-sections (a), (b) and (d) of Chapter 223A confer personal jurisdiction over Nonprofit and Miller.[3]  (Complaint, ¶4).  Chapter 223A functions as an assertion of personal jurisdiction to the limits allowed by the Constitution.  Tatro v. Manor Care, Inc., 416 Mass. at 771.  While the legislature did not intend to foreclose jurisdiction where the literal requirements of the long-arm statute are satisfied, Id., they have not been satisfied here.

(a)     **Nonprofit and Miller Have Not "Transact[ed] Any Business" In Massachusetts.**

M.G.L. c. 223A, §3(a) authorizes the exercise of personal jurisdiction where the alleged cause of action arises from the non-resident defendant's transaction of business in Massachusetts.  Tatro, 416 Mass. at 767.  This test requires a finding of deliberate, as opposed to fortuitous, contacts with the forum.  See United Elec. Radio, 960 F.2d at 1087 (relevant inquiry is whether "defendant attempted to participate in the [C]ommonwealth's economic life").  Here, Miller and Nonprofit did not transact business in Massachusetts.  Their activities had almost no

---

[3] The Massachusetts Long-Arm Statute provides, in relevant part: A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this Commonwealth; (b) contracting to supply services or things in this Commonwealth;. . . [and] (d) causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth. . . G.L. c. 223A, §3.

connection to this forum beyond the fact that their client was a Massachusetts corporation. Miller worked from Nonprofit's Washington, D.C. office to negotiate the contract with the Shriners, which was located in Florida. To the extent that any travel was involved, Miller visited Florida, not Massachusetts, for contract formation purposes. In fact, Miller spoke to and corresponded with Vantage's representative, Larry Lyons, about the Shriners contract while Lyons was in Florida.

The "transacting business" test is not implicated where the non-resident defendant's activities on which the lawsuit is based are not deliberate and do not demonstrate an effort to participate in commerce in Massachusetts. See "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 446 (1972) (where defendant mailed purchase order and check to Massachusetts plaintiff and received letter and invoice from Massachusetts, defendant did not purposefully avail itself of privilege of conducting activities within forum State); Droukas v. Divers Training Acad., Inc., 375 Mass. 149, 154 (1978) (where defendant placed advertisement in publication distributed in Massachusetts, received telephone call from Massachusetts plaintiff regarding purchase of goods, sent correspondence to Massachusetts confirming sale, and shipped goods to plaintiff, court found isolated transaction did not give rise to personal jurisdiction).

Courts interpreting the "transacting any business" language have recognized that this provision requires more than incidental contacts with the forum state. In Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111 (1st Cir. 1997), the First Circuit declined to exercise jurisdiction over a California corporation that had entered into a contract with a Massachusetts resident (who agreed to act as a purchasing agent for the corporation); forwarded purchase orders to plaintiff in Massachusetts; communicated with plaintiff; and sent an employee to a Massachusetts trade show. Id. at 112-14. The court stated that "[o]ften the 'transacting business' test is importantly informed by ascertaining whether the non-resident party initiated or

8

solicited the business transaction in Massachusetts." Id. at 113.  Observing that the plaintiff sought out the purchasing agent job with the California corporation, that the corporation did not advertise or solicit employees in Massachusetts, and that the contract did not call for services to be performed in Massachusetts, the Lyle court concluded that the defendant's contacts with the forum state were too incidental to support the exercise of personal jurisdiction for plaintiff's breach of contract claim.  Id.

In Telco Communications, Inc. v. New Jersey State Firemen's Mut. Benevolent Ass'n, 41 Mass. App. Ct. 225 (1996), the court held that determining whether a contract constitutes transacting business under the long-arm statute calls for "an evaluation of the relations between the parties, their respective activities under the contract, and the linkages, if any, between the defendant's participation in the transaction and the Commonwealth[.]" Id. at 228-29.  Other than communicating with the plaintiff, the defendant had no contact with Massachusetts.  The court held that entering into a contract with a company that has a place of business in Massachusetts is "hardly enough" to satisfy the long-arm statute.  Id. at 231.

As in the Droukas, Lyle Richardson, and Telco cases, Nonprofit and Miller's contact with Massachusetts was limited to being hired by Vantage and to communicating with Vantage about the negotiation of a contract with one of its prospective customers in Florida.  All substantive work in negotiating and drafting the contract was performed over a two month period primarily in Washington, D.C. and to some extent in Florida.  Nonprofit and Miller did nothing to solicit the Shriners engagement, and nothing about the negotiation process or the contract can be read as a deliberate attempt by Nonprofit or Miller to participate in the economic life of the Commonwealth.  While Nonprofit expected to be paid by Vantage for the work done in Washington, D.C. and Florida, this expectation was merely an incidental and ancillary contact that does not amount to the transaction of business under §3(a) the Long Arm Statute.

9

**(b)    Neither Nonprofit Nor Miller Contracted To Provide Services or Things In The Commonwealth.**

Personal jurisdiction over Nonprofit or Miller is not authorized by subsection (b) of the Massachusetts long-arm statute. This lawsuit does not involve the "contracting to supply services or things in this Commonwealth" within the meaning of M.G.L. c. 223A, §3(b). The fact that Nonprofit and Miller were retained by a Massachusetts corporation does not, in itself, confer personal jurisdiction over them under §3(b). See Droukas, 375 Mass. at 157-59 (non-resident corporation's contract to sell marine engines to Massachusetts resident did not satisfy §3(b), even though non-resident agreed to ship engines to Massachusetts); Davis v. P.M. Video, Inc., 532 F. Supp. 1012 (D.Mass 1982) (no jurisdiction pursuant to §3(b) based on contract of employment entered into in Massachusetts where negligent acts were performed in another state). As discussed above, Nonprofit and Miller did not provide any substantive contract formation services in Massachusetts. All of the contract formation work was undertaken primarily in Washington, D.C. and Florida.

**(c)    The "Tortious Injury" Provision Of The Long-Arm Statue Does Not Confer Jurisdiction Over Nonprofit Or Miller.**

Vantage also fails to satisfy §3(d) of the Long Arm Statute because the alleged tortious injury to Vantage did not occur inside the Commonwealth. The tortious injury allegedly was Vantage's agreement to enter into an allegedly illegal contract in Florida based on allegedly bad advice emanating from Washington, D.C. and, to a lesser extent, Florida. The contract was negotiated and executed with Vantage's active participation in those fora. The fact that Vantage agreed to settle a qui tam action in Massachusetts to resolve claims related in part to the Shriners contract does not mean that jurisdiction is proper in this case under §3(d). See U.S. v. Swiss American Bank, Ltd., 191 F.3d 30, 38 (1st Cir 1999) on remand 116 F. Supp. 2d 217 (stating that for purposes of jurisdiction under §3(d) injury does not occur in Massachusetts merely because

the plaintiff feels the effects of a tortious injury there). In this case, the settlement with the Government in the qui tam action was merely an ancillary effect of the contract that was felt in Massachusetts. The alleged tortious injury was allegedly caused, if anywhere, in Washington, D.C., where Nonprofit worked to negotiate and draft the contract with the Shriners, and in Florida where the Shriners and Vantage entered into the contract.

Personal jurisdiction under §3(d) is lacking in any event because jurisdiction may only be predicated on §3(d) where the non-resident defendant regularly "does or solicits business or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth." M.G.L. c. 223A, §3(d). While Nonprofit has had other contacts with Vantage, some of which may have occurred in Massachusetts,[4] there is nothing to suggest the regular and persistent course of conduct that would be necessary to support jurisdiction under §3(d). For this additional reason, personal jurisdiction fails under §3(d). See generally Miller Aff..

### 2. The Exercise Of Specific Jurisdiction Over Nonprofit Or Miller Would Violate Due Process.

Even if the long arm statute were satisfied, the exercise of personal jurisdiction must "comport with the strictures of the Constitution." Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 144 (1st Cir. 1995). The First Circuit has adopted a tripartite test for testing whether jurisdiction is constitutional, which requires a plaintiff to demonstrate: (1) "relatedness;" (2) "purposeful availment (sometimes called 'minimum contacts');" and (3) "reasonableness." Mass. Sch. of Law, 142 F.3d at 35. As discussed below, none of these elements is met in this case.

---

[4] Most, if not all, of these contacts were for the purpose of assisting Vantage and its customers with state and local charitable solicitation registration requirements. Miller did not provide these services. Nonprofit engaged a lawyer in Harrisburg, Pennsylvania to perform them.

(a)   **There Is No Relatedness Between Nonprofit's Or Miller's Activities And The Forum State.**

In order for personal jurisdiction to satisfy the requirements of due process, a claim must "arise out of, or be related to, defendant's in-forum activities." Mass. Sch. of Law, 142 F.3d at 35 (citation omitted). The "relatedness" requirement is not satisfied just because a plaintiff's claim arose out of the general relationship between the plaintiff and defendant. Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995). Instead, the claim must "directly arise out of the specific contacts between the defendant and the forum state." Id. citing Fournier v. Best Western Treasure Island Resort, 962 F.2d 126, 127 (1st Cir.1992) (where plaintiff had made vacation arrangements in Massachusetts but was injured out-of-state, cause of action did not "arise from" the defendant resort operator's contacts with Massachusetts); Pickens v. Hess, 573 F.2d 380, 386 (6th Cir. 1978) (no personal jurisdiction over defendants under state long-arm statute which extends to limits of due process when "the cause of action between the parties did not arise from any acts of the defendants in [the forum state]"); Bryant v. Weintraub, Genshlea, Hardy, Erich & Brown, 844 F. Supp. 640, 642 (D.Or. 1994) (where Oregon resident sued California law firm for failure to obtain service in California, the injury arose directly from alleged malpractice in California and had no connection to the firm's other Oregon contacts), aff'd, 42 F.3d 1398 (9th Cir. 1994).

Although the complaint here contains a count for breach of contract, this is essentially a tort action, focusing allegations of negligence and misrepresentation. In approaching the relatedness inquiry in a tort action, courts "customarily look to whether the plaintiff has established 'cause in fact (i.e., the injury would not have occurred 'but for' the defendant's in-forum activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action.)." Mass. Sch. of Law, 142 F.3d at 35 (quoting United Elec. Radio & Mach. Workers, 960 F.2d 1080, 1089 (1st Cir. 1992) (emphasis added). Here, Vantage cannot show that its

alleged injury would not have occurred "but for" Nonprofit's and Miller's in-forum activities or that their in-state conduct was the legal cause of Vantage's claim. In the absence of the necessary causal relationship with the forum, the mere existence of an attorney-client or other relationship between the parties does not in itself satisfy the relatedness requirement. Personal jurisdiction in Massachusetts is lacking here because the activity that allegedly caused Vantage's claimed injury, the formation of the Shriners contract, occurred outside of the Commonwealth.

Under similar circumstances, the First Circuit found personal jurisdiction absent in Sawtelle, supra, which also involved legal malpractice claims against out-of-state counsel. The plaintiffs in Sawtelle, who were residents of New Hampshire, retained Virginia and Florida law firms to represent them in a wrongful death action in Florida resulting from the death of plaintiffs' son in a plane crash. Sawtelle, 70 F.3d at 1386-87. The decedent's plane was struck over the New Hampshire-Vermont border by an airplane from Florida. Id. Ultimately the Virginia and Florida law firms recommended, via telephone call and correspondence to New Hampshire, that the plaintiffs settle the wrongful death claim for $155,000.00. Id. The plaintiffs followed the attorneys' advice and entered into the settlement. The plaintiffs later discovered that the representative of another occupant of the plane had settled a similar claim for $500,000.00. Id. The plaintiffs brought suit against both law firms in the United States District Court for the District of New Hampshire alleging malpractice in the negotiation of the settlement. Id. The defendants challenged the personal jurisdiction of the New Hampshire District Court.

In evaluating jurisdiction over the Virginia and Florida defendants, the First Circuit reviewed each of the constitutional requirements set forth above, including the relatedness requirement. The court stated that it would be "illogical" to conclude that telephone

13

communications and letters sent to New Hampshire by the law firms were in-forum, injury-causing activities sufficient to create personal jurisdiction. <u>Sawtelle</u>, 70 F.3d at 1390:

> A review of the all the allegedly negligent actions of the defendants preceding the injury indicates numerous non-forum decisions reached by the defendants in Virginia and Florida, but not in New Hampshire.  It was the defendants' investigation, in Florida and Virginia, which informed their judgment about the propriety of the proposed settlement.  In short, it was the aggregate of the defendants' allegedly negligent acts and omissions which caused the Florida injury, and the out-of-forum negligence was the effective cause.

<u>Id.</u>  The same is true here.  Any communications sent to Vantage in Massachusetts were ancillary to the alleged malpractice, which occurred, if anywhere, outside of Massachusetts (i.e. the contract formation).  The allegedly illegal contract entered into with the Shriners in Florida was the result of decisions, actions and advice by Nonprofit and Miller that originated and occurred outside of the Commonwealth.  As a result, Vantage cannot establish any substantive contacts by Nonprofit and Miller with the forum that are related to Vantage's malpractice claim.[5]  <u>See generally</u> Miller Aff..

### (b)    Nonprofit and Miller Did Not Purposefully Avail Themselves Of The Privilege Of Conducting Activities Within Massachusetts

To exercise specific jurisdiction over an out-of-state defendant, the court must find that the defendant has certain "minimum contacts" with the forum state such that the defendant could "reasonably anticipate being haled into court there."  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 474 (1985), <u>quoting</u> <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 295 (1980).  "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus, invoking the

---

[5] Nonprofit had limited contract-administration contacts with Vantage in Massachusetts related to the Shriners contract, but those contacts are unrelated to the alleged malpractice because they occurred subsequent to the execution of the contract.  Vantage's claims arise from the negotiation and drafting of the contract, not its administration.

benefits and protections of its laws." Burger King Corp., 471 U.S. at 475 (citation omitted).  In

Sawtelle, the First Circuit determined that the mere existence of an attorney-client relationship

does not rise to the level of purposeful availment absent sufficient contacts with the forum state.

Sawtelle, 70 F.3d  at 1391-1392 citing Austad Co. v. Pennie & Edmonds, 823 F.2d 223 (8th Cir.

1987) (finding numerous phone calls, mailings and a three-day visit to the forum state did not

satisfy the purposeful availment requirement in malpractice action against New York law firm).

     The issue is essentially one of voluntariness and foreseeability. Sawtelle, 70 F.3d at 1391-

1392.  Nonprofit's and Miller's conduct, however, did not evince any acknowledgement that

they might become subject to jurisdiction in Massachusetts by working on a contract in

Washington, D.C. and Florida.  Nor did they have any reason to foresee such a consequence

when they agreed to do the work.

     The only contract formation-related contacts that Nonprofit and Miller had with

Massachusetts were telephone calls and letters to Vantage about out-of-forum activities that they

were conducting for Vantage.  See generally Miller Aff..  This limited contact with Vantage in

Massachusetts does not rise to the level of purposeful availment of the benefits and protections

of Massachusetts law.  Nonprofit and Miller had other contacts with Vantage while it was in

Washington, D.C. and Florida for contract-formation purposes.  "The mere act of agreeing to

represent (and then representing) an out-of-state client, without more, does not suffice to

demonstrate voluntary purposeful availment of the benefits and protections of the laws of the

client's home state." Sawtelle, 70 F.3d at 1394.

     Like the defendants in Sawtelle, Nonprofit and Miller could not have reasonably foreseen

being haled into a Massachusetts court for representing Vantage in a transaction outside of the

Commonwealth.  This is particularly true given that Vantage traveled to Washington and Florida

to work on the contract.  At times Vantage even communicated from Florida with Miller while he was in his Washington office.

**(c)    Asserting Specific Jurisdiction Over Nonprofit and Miller Would Be Unreasonable.**

The exercise of personal jurisdiction must be reasonable.  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).  Reasonableness is determined by weighing what the First Circuit has called the five "gestalt factors."  Sawtelle, 70 F.3d at 1394 citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985).  The gestalt factors, however, do not come into play if the relatedness and purposeful availment elements have not been met.  Sawtelle, 70 F.3d at 1394 (citation omitted).  To the extent applicable, these factors are:  (i) the burden on the defendant in appearing; (ii) the interest of the forum state in adjudicating the dispute; (iii) the interest of the plaintiff in obtaining convenient and effective relief; (iv) the interest of the judicial system in obtaining the most effective resolution of the controversy; and (v) the interests common to all sovereigns in promoting substantive social policies.  Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 150 (1st Cir. 1995).

**i.    Defendants' Burden Of Appearance**

The burden of defending this lawsuit in Massachusetts would be a heavy one for Nonprofit and Miller.  Nonprofit is a small company that employs less than ten people and has gross revenues under $500,000.00. (Miller Aff., ¶ 4).  Its client base is primarily made up of charities and nonprofit organizations, and it frequently provides pro bono services to its clients in light of their limited financial resources.  (Miller Aff., ¶ 4).  Defending this case in Massachusetts would have a deleterious effect on Nonprofit's ability to conduct business and, likewise, would compromise the interests of the clients it serves.  Brookfield Machine, Inc. v. Calbrit Design, 929 F. Supp. 491, 500 (D.Mass. 1996) (concluding that burden of having six of eight employees of defendant firm travel to Massachusetts, causing defendant to "effectively

16

have to shut down" during that period tips balance in defendant's favor on first gestalt factor). Vantage, on the other hand, is a large corporation that conducts business nationally and internationally.[6] Vantage's customer base is made of organizations from a number of different states, including Virginia, where Miller resides and Nonprofit is now located.[7]  In the past, Vantage has had an office in the Washington, D.C. area, whereas Nonprofit has never maintained an office in Massachusetts. (Miller Aff., ¶¶5, 12).

### ii.    The Forum State's Adjudicatory Interest

Massachusetts has a limited interest in the adjudication of this case.  Vantage's malpractice claim is premised on activities that occurred outside of the Commonwealth.  A state has a far less compelling interest in a malpractice suit stemming from an injury that occurred in another state. Sawtelle, 70 F.3d at 1395.  The Sawtelle Court found that New Hampshire, where the plaintiffs resided and the decedent was killed in an airplane accident, did not have a more compelling interest in the case than Florida, the site of the alleged malpractice. Id.  Miller and Nonprofit practice and provide services in and from the Washington, D.C. area.  It is that location, not Massachusetts, that has the most compelling interest in regulating their conduct.

### iii.   The Plaintiffs' Interest In Obtaining Convenient Relief

Although the plaintiff's choice of forum is typically "accorded a degree of deference with respect to the issue of its own convenience," Massachusetts is not "unquestionably" a more

---

[6] Vantage is part of a number of affiliated corporations doing business throughout the United States and abroad. See www.vantagedirect.com; www.vantagetravel.com/whyUS/careers.asp ("...as a part of the Vantage Group, Inc., Vantage Deluxe World Travel is a $125 million, highly diversified travel/direct marketing company that has escorted more than 300,000 mature travelers around the world.  Our proven financial track record is demonstrated by our nearly $12 million in stockholder's equity...").

[7] The United States' claims against Vantage in the qui tam action involved Vantage's business relationships with entities located in numerous states including New York (Catholic Daughters of the Americas), Virginia (Fleet Reserve Association), Illinois (Moose International) and the Shriners (Florida). See Exhibit A, at 2); www.catholicdaughters.org; www.fra.org; www.mooseintl.org; www.shrinershq.org.

convenient forum for Vantage. <u>Sawtelle</u>, 70 F.3d at 1395 (citations omitted). Vantage regularly does business with customers around the country. It has had customers in Virginia, had an office in Washington, D.C. and also chose to retain Nonprofit, which was located in Washington, D.C. and now located in Virginia. Vantage, moreover, traveled to Washington, D.C. and Florida to seek Nonprofit's services. <u>See</u> <u>Gelineau v. New York University Hosp.</u>, 375 F. Supp. 661, 667 (D.N.J. 1974) (client who travels to seek services apparently not available at home ought not complain if he has to travel again once he claims services sought in foreign jurisdiction were rendered defectively). Based on this history, it would be difficult for Vantage to argue that another forum, particularly Virginia, would be inconvenient.

### iv.   The Administration Of Justice

This case follows closely on the heels of the qui tam action, which Vantage settled. Vantage chose to file this case in state court, rather than this court, indicating that it perceived no particular efficiency in the administration of justice by filing in the same jurisdiction in which the qui tam action was litigated. All other things being equal, "' the interest . . . in the effective administration of justice does not appear to cut in either direction' here." <u>Sawtelle</u>, 70 F.3d at 1395.

### v.   Public Policy

Exercising personal jurisdiction over the defendants here would portend a negative impact on the ability of individuals and companies to retain out-of-state counsel to represent them in activities outside of their home states. Under similar circumstances, attorneys and others may be hesitant to provide services to residents of other states when faced with the prospect of being haled into a court where they otherwise would not expect to be subject to jurisdiction. <u>See</u> <u>Gelineau v. New York University Hosp.</u>, 375 F. Supp. 661, 667-68 (D.N.J. 1974). Reasonable restrictions on the exercise of personal jurisdiction have a tangible economic and social benefit.

**B.**    **Neither Nonprofit Nor Miller May Be Brought Before This Court On A General Jurisdiction Theory.**

There is no basis for Vantage to assert that Nonprofit or Miller has engaged in continuous and systematic activity, unrelated to the suit in Massachusetts, which would permit this Court to exercise general jurisdiction over them. See Donatelli v. Nat'l Hockey League, 893 F.2d 459, 463 (1st Cir. 1990) ("[A]lthough minimum contacts suffice . . . for specific jurisdiction . . . the standard for general jurisdiction is considerably more stringent.") (citation omitted). The accompanying Affidavit of George E. Miller demonstrates that neither Nonprofit nor Miller has carried on any continuous business activities within the Commonwealth. Nonprofit is not registered to do business in Massachusetts and does not maintain an office or own real property there. (Miller Aff., ¶¶5-7). Moreover, Nonprofit does not have any employees or agents in Massachusetts for the purposes of soliciting business, selling merchandise or providing services in Massachusetts. (Miller Aff., ¶5). Likewise, Miller does not maintain an office or own real property in Massachusetts, nor has he continually conducted business in the Commonwealth. (Miller Aff., ¶¶5,7,9). Neither Miller nor Nonprofit maintains any significant, let alone persistent, presence in Massachusetts.

Many of the same considerations discussed above that counsel against the exercise of specific jurisdiction make it clear that general jurisdiction would be no more palatable than the exercise of specific jurisdiction would be. Asserting jurisdiction over Nonprofit and Miller under a general jurisdiction theory would violate the Due Process Clause of the United States Constitution.

**II.**    **The Court Should Transfer This Case To The Eastern District of Virginia.**

The Court should transfer this case to the Eastern District of Virginia under 28 U.S.C. §1406 because it does not have personal jurisdiction over Nonprofit and Miller. It is within this Court's power to make such a transfer even though it lacks personal jurisdiction. Roxco, Ltd. v.

Harris Specialty Chemicals, Inc. 133 F.Supp.2d 911, 918 (S.D. Miss. 2000) (District Court may transfer case to district where venue is proper even if it lacks personal jurisdiction over defendant); Telesis Mergers & Acquisitions, Inc. v. Atlis Federal Services, Inc. 918 F. Supp. 823, 829 (D.N.J. 1996) (same); Waterman S.S. Corp. v. Southern Machinery Co., 872 F. Supp. 332, 334-35 (E.D.La. 1994) rehearing denied 1995 WL 21654 (same).

Both jurisdiction and venue are proper in the Eastern District of Virginia. See L.H. Carbide Corp. v. Piece Maker Co., 852 F. Supp. 1425 (N.D.Ind. 1994) (transfer of case from Indiana, where personal jurisdiction was lacking, to Michigan, where defendant resided and conducted most of its business); Capital Bank Intern. Ltd v. Citigroup, Inc., 276 F. Supp. 2d 72 (D.D.C. 2003) (transfer to Delaware in the interest of justice where venue and personal jurisdiction would be satisfied); French Transit, Ltd. v. Modern Coupon Systems, Inc., 858 F.Supp. 22 (S.D.N.Y. 1994) (transfer to Arizona court appropriate where defendant and his employees, who were potential witnesses, resided there). Nonprofit's principal place of business is located in Virginia and it is incorporated there. (Miller Aff., ¶3). Miller lives and works in Virginia. (Miller Aff., ¶1,3). The requirements of Due Process would be satisfied if they were called upon to defend this case there.

## CONCLUSION

When ruling on personal jurisdiction, a court must assess the nature and quality of the defendants' contacts with the forum, not the mere number of such contacts. Here, the quality and nature of Miller's and Nonprofit's contacts with Massachusetts are inconsistent with the requirements of both the long-arm statute and Due Process. For this reason and the reasons set forth above, this Court lacks of personal jurisdiction and transfer the case to the Eastern District of Virginia pursuant to 28 U.S.C. §1406.

Respectfully submitted,


Nonprofit Service Group and
George E. Miller,
By their attorneys,

Richard L. Nahigian, Esq., BBO#: 549096
Matthew J. Griffin, Esq., BBO#641720
PEABODY & ARNOLD LLP
30 Rowes Wharf, 6th Floor
Boston, MA  02110-3342
(617) 951-2100

PABOS2:RNAHIGI:596718_1

21

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
ex rel. LAURENCE SAKLAD,        )
    Plaintiff,              )
                                )
    v.                      )        C.A. No. 97-10052-MLW
                                )
HENRY R. LEWIS, et al.          )
    Defendants.             )

MEMORANDUM AND ORDER

WOLF, D.J.                                        March 5, 2004

I.    INTRODUCTION

The United States of America has intervened in this False
Claims Act case on behalf of the United States Postal Service
("USPS" or the "Postal Service") in an attempt to recover what it
claims is over $6,000,000 in underpayment of postage by the
defendants Vantage Travel Services, Inc. ("VTS"), The Vantage
Group, Inc., Vantage Financial Services, Inc. and Vantage Direct
Marketing Services (collectively "Vantage" or "the Vantage
defendants"). Defendant Henry Lewis was Vantage's Chief Executive
Officer. Defendant Harry Melikian was Vantage's Executive Vice
President. The government alleges that the defendants, who do not
have valid permits to send mail at the nonprofit rate, improperly
underpaid postage by sending over 78,000,000 pieces of mail in
cooperative mailings with 80 nonprofit groups in violation of the
cooperative mail rule.

The government asserts four causes of action: violation of the
False Claims Act ("FCA") (Count I); common law fraud (Count II);

**EXHIBIT A**

unjust enrichment (Count III); and an action to recover a debt under the Federal Debt Collection Procedure Act ("FDCPA") (Count IV).

The parties filed cross-motions for summary judgment with respect to the plaintiff's claims arising out of mailings associated with four charities: (a) Catholic Daughters of the Americas (the "Catholic Daughters"); (b) Fleet Reserve Association ("Fleet"); (c) Moose International (the "Moose"); and (d) Shriner's Hospital for Children ("Shriner's"). After a series of hearings that took place on August 30, 2002, May 5, 2003, and May 9, 2003 the court allowed the plaintiff's motion for summary judgment in part, and denied it in part. The court allowed, without objection, the defendants' motion for summary judgment on the False Claims Act and common law fraud claims with respect to mailings associated with Shriner's, allowed VTS' motion for summary judgment in all respects and denied the defendants' motions for summary judgment in all other respects.

This Memorandum and Order summarizes the reasons for those rulings and the transcripts of the various hearings contain a more complete record of the reasons for the court's decisions.

II.    THE COOPERATIVE MAIL RULE APPLIES TO FUND-RAISING MAILINGS
       THAT DO NOT INVOLVE PRODUCTS AND SERVICES

The parties disputed whether the cooperative mail rule is properly applied to fund-raising mailings that do not involve products and services. The cooperative mail rule is most

succinctly stated in the Domestic Mail Manual, sections 625.521 and 625.525, which are incorporated in the Postal Service's regulations. Those provisions state, in pertinent part, that an organization authorized to mail at the special nonprofit bulk rates "may mail only its own matter at those rates." An organization "may not delegate or lend the use of its authorization to mail at the [nonprofit rate] to any other person or organization."

Section 625.521 of the Domestic Mail Manual, which is captioned, "Cooperative Mailings," states in part:

> Cooperative mailings may be made at the [nonprofit rate] only when each of the cooperating organizations is individually authorized to mail at the [nonprofit rate] at the post office where the mailing is deposited. Cooperative mailings involving the mailing of any matter on behalf of or produced for an organization not itself authorized to mail at the [nonprofit rate] at the post office where the mailing is deposited must be paid at the regular rate.

The cooperative mail rule existed for many years prior to 1990. 39 U.S.C. §3626 was enacted in 1990. It provides, in pertinent part, that reduced nonprofit mailing rates are not available if the mailing offers products or services if "the mail matter involved is part of a cooperative mailing (as defined under regulations of the Postal Service) with any person or organization not authorized to mail at the [nonprofit rate]" 39 U.S.C. §3626(j)(1)(D)(ii).

The Vantage defendants are not authorized to mail at the nonprofit rate.

The defendants argue that the 1990 statute both defined and

3

limited the authority of the Postal Service to apply its cooperative mail rule to mailings such as those at issue in this case, which either did not offer any products or services or provided only low cost articles which are exempt under 39 U.S.C. §3626(m)(1)(B). The government disagrees and asserts that the statute is intended only to clarify and supplement the existing Postal Service regulations regarding the cooperative mail rule. The government is correct.

The court must analyze this issue using the standards initially described by the Supreme Court in <u>Chevron U.S.A., Inc. v. National Resource Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984), and applied by the Supreme Court in <u>Barnhart v. Walton</u>, 535 U.S. 212, 217-18 (2002). <u>Chevron</u> states that when a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. <u>Chevron</u>, 467 U.S. at 842.

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court [may] not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation

<u>Id.</u> at 842-43.

More recently, in <u>Barnhart</u>, the Supreme Court said:

> [T]he legal question before us is whether the Agency's interpretation of the statute is lawful. This Court has previously said that, if the statute speaks clearly "to the precise question at issue," we "must give effect to

4

the unambiguously expressed intent of Congress." <u>Chevron</u>,
467 U.S., at 842-843, 104 S.Ct. 2778. If, however, the
statute "is silent or ambiguous with respect to the
specific issue," we must sustain the Agency's
interpretation if it is "based on a permissible
construction" of the Act. <u>Id.</u>, at 843, 104 S.Ct. 2778.
Hence we must decide (1) whether the statute
unambiguously forbids the Agency's interpretation, and,
if not, (2) whether the interpretation, for other
reasons, exceeds the bounds of the permissible. <u>Ibid.</u>;
<u>see also</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 227,
121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

<u>Barnhart</u>, 535 U.S. at 217-18.

Here, the 1990 statute is silent on the issue of whether the

Postal Service may apply the cooperative mail rule to mailings that

do not offer products and services.  The 1990 statute states, in

effect, that the Postal Service must apply its cooperative mail

rule to mailings involving products and services.  The statutory

provision appears to have resolved a particular, then current,

dispute concerning mailings that involved products and services.

The statute could have expressly stated that the cooperative mail

rule could not be applied to mailings that do not involve products

or services.  It did not.

This silence indicates that the Postal Service has some

discretion regarding this issue.  In contrast to mailings involving

products and services, the statute left the Postal Service

discretion to decide whether to apply the cooperative mail rule to

mailings that did not offer products and services.  It was

permissible for the Postal Service to issue regulations that it

interprets as applying the cooperative mail rule to offers that do

not include products or services.

Barnhart is illuminating by analogy on this issue. First, in this case, the Postal Service's interpretation of the statute makes sense in terms of the statute's basic objectives. The statute's manifest aim is to limit the use of nonprofit rates to genuine nonprofit activities. That is, to subsidize and thus promote nonprofit organizations, but to limit that subsidy to serving those purposes. The statute addressed explicitly the main type of perceived abuse prevalent in 1990. It was, however, foreseeable that other schemes might be developed in the future or become more common. As indicated earlier, the statute could have expressly limited the cooperative mail rule to mailings involving products or services. It was permissible for the Postal Service to interpret the statute as leaving it the discretion to apply the cooperative mail rule to other schemes.

In 1991, soon after the statute was enacted, the Postal Service adopted cooperative mail rule regulations. After notice and an opportunity for public comment, the Postal Service adopted its present position in 1991. It informed Vantage, among others, that it asserted that the cooperative mail rule applied to mailings that did not include any products or services. The defendants claim that certain members of Congress are concerned about this application of the cooperative mail rule and may take action. However, while Congress has since 1991 repeatedly amended the eligibility requirements for the nonprofit rate that are included

6

in 39 U.S.C. §3626, it has not disturbed the Postal Service's interpretation of the 1990 statute or its application of the cooperative mail rule.

As the Supreme Court said in Barnhart, "[t]hese circumstances provide further evidence--if more is needed--that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." Id. at 220. As the statute is silent on the issue in question and the agency's construction is permissible, the court must defer to it. Id. at 218.

Applying the cooperative mail rule to the mailings at issue in this case does not violate the Constitution. Charitable solicitations are generally entitled to First Amendment protection. See Riley v. Nat'l Fed. of the Blind, Inc., 487 U.S 781, 788-89 (1988). However, the government may restrict the exercise of constitutional activities by reasonable time, place, and manner restrictions that are content neutral and are narrowly tailored to serve a significant interest and leave open equal alternative channels of communication. See United States v. Grace, 461 U.S. 171, 177 (1983).

There are different degrees of First Amendment protection that are afforded to different kinds of speech. In this case, the cooperative mail rule is aimed at determining whether a particular mailing is primarily or exclusively a charitable solicitation. Use of the nonprofit rate is a privilege, not a right. See Lewis Pub.

7

Co. v. Morgan, 229 U.S. 288, 304-05 (1913). In the application of
the cooperative mail rule, the Postal Service decides, subject to
judicial review, whether the charitable rate can properly be used.

The cooperative mail rule is content neutral on its face. The
evidence before the court does not indicate that it is being
applied in a way that discriminates based on the content of any
proposed mailing. The cooperative mail rule is narrowly tailored
to serve the significant government interest of promoting
charitable activity through a postal subsidy, and also limiting
that subsidy to true charitable solicitations and discouraging
fraud. Cf. Enterprise, Inc. v. United States, 833 F.2d 1216 (6th
Cir. 1987) (upholding constitutionality of paid-subscriber rule).
In addition, there are also ample other channels for communication,
including mailing at regular rates.

There is no evidence in this case that the Postal Service uses
the cooperative mail rule to discriminate against unpopular
charitable causes. The defendants' clients are diverse, and many
appear to be in the popular mainstream of American life, such as
the Knights of Columbus, the Iowa Farm Bureau, and the Masons. Nor
is the cooperative mail rule infirm due to overbreadth. Finally,
there is no issue of prior restraint in this case because the
Postal Service did not prevent the defendants from making any
mailings.

III.   GENERAL COOPERATIVE MAIL RULE PRINCIPLES

The Postal Service determines whether a mailing is cooperative

8

under the cooperative mail rule by evaluating whether the participating entities have a joint venture or a principal-agent relationship. In making this evaluation, the Postal Service "certainly looks to traditional agency principles." <u>United States v. Raymond & Whitcomb Co.</u>, 53 F. Supp. 2d 436, 441 (S.D.N.Y. 1999). For example, "[t]raditional indicia of an agency relationship include (1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; and (4) control by the principal." <u>Id.</u> (internal quotation marks omitted).

However, the most critical factor in the context of the cooperative mail rule is whether the parties share the cost, risk, or benefit of the mailings. <u>Id.</u> at 441-42. Such rate-disqualifying sharing may occur where the mailing: results from an authorized organization's delegation or lending of its nonprofit permit; is sent on behalf of or produced for an unauthorized organization; or benefits any other person or organization.

These, however, are not the sole criteria. The Postal Service also uses six additional factors, some of which distinguish the cooperative mailing inquiry from a pure agency law analysis, to evaluate not only the risk taken by each party, but also participation in the endeavor. <u>Id.</u> at 442. These factors are: (1) the identity of the party that devised, designed, prepared, and paid for the mail piece; (2) the identity of the party which directly or indirectly paid the postage for the mailing; (3) the way in which the profits and revenues from the mailing or

enterprise it supports are divided; (4) the risks entailed for the mailing or enterprise it supports and the identity of the party that bears these risks; (5) the identity of the party which makes managerial decisions concerning the contents of the mailings or the enterprise it supports and the way in which that party makes those decisions; and (6) the intent and interest of the participants in the mailing.  Id.; accord Postal Svc. Pub'n 417; Postal Svc. Cust. Supp. Ruling PS-209.

     The Postal Service's evaluation of these factors focuses less on the mailing piece itself than on the participating entities' relationship, as revealed by a review of all contracts and other relevant documents generated or executed by the parties. Generally, the Postal Service places the burden on the mailer to show that the relationship is a legitimate principal-agent relationship rather than a joint venture.

     In applying these factors, courts have found certain aspects of particular mailings sufficient to constitute an ineligible cooperative mailing.  In United States Postal Service v. University Publishing Corp., 835 F. Supp. 489, 491 (S.D. Ind. 1993), the court found an ineligible cooperative mailing because the revenues of the for-profit company were linked to the success of the mailings in generating contributions.  The court relied, in part, on the fact that the for-profit company received the first $15 of every contribution to defray production and mailing costs.  In Raymond & Whitcomb, the court found an ineligible cooperative mailing when

10

the for-profit company paid the postage and printing costs of the disputed mailing up front and the for-profit company helped shape much of the substance of the program. 53 F. Supp. 2d at 443. The court reached its conclusion in Raymond & Whitcomb even though the authorized nonprofit had ultimate control over the mailings and did the overwhelming share of the work. Id.

Although the mailings in these cases involved products or services, it is, for the reasons discussed earlier, permissible for the Postal Service to apply the cooperative mail rule to mailings that do not involve products or services.

Many of the agreements between Vantage and its nonprofit partners were evidenced by written contracts that were subsequently modified by "side letters". The written contracts were crafted so that the nonprofit retained full liability for the costs of a mailing program. Thus, if the USPS were to review the contract, it would presumably permit mailings at the nonprofit rate. However, the written contracts were modified by secret side letters that were not disclosed to the USPS. The provisions of the side letters were the key provisions establishing the terms by which the nonprofits would escape liability for the costs of the mailings and Vantage would share in the costs, risks, and benefit of the mailings.

Here, the undisputed contracts and the side letters for some of the mailings at issue show that the defendants shared in the costs, risks, and benefit of the subject mailings. Defendants took

11

a substantial risk by incurring and paying up front all of the costs associated with each fund-raising mailing, while pinning recovery of those outlays on anticipated donations.

This court identified three types of contractual arrangements that resulted in ineligible cooperative mailings. The first was the "no liability" arrangement. Under this arrangement, Vantage released the nonprofit from liability for the costs of the mailings. Under this arrangement the defendants must be said to have taken a risk and not received a benefit, incurring a financial cost. As the cooperative mail rule bars risk and cost sharing, this arrangement rendered defendants ineligible for the nonprofit rate.

The second was the "finite mailings" arrangement. Under this arrangement, Vantage would have the right to continue mailing to the nonprofits mailing list a finite number of times to recoup its costs and, because of the markup it applied to its costs, receive a benefit. The third arrangement was the "infinite mailings" arrangement. Under this arrangement, Vantage would have the right to continue mailing as many times as was necessary to cover its costs and profit from its markup.

Under the latter two arrangements, the defendants took a risk, and then, upon receiving no benefit and facing a financial loss, took an additional financial risk in order to cover its costs and, because of markup, receive a benefit. They took the additional financial risk by financing the additional mailings.

12

If the additional efforts were successful, the defendants had taken multiple risks and received a benefit without any actual cost. If the defendants' additional efforts were not successful, they had taken multiple risks and incurred a financial cost. In either case, some of the defendants shared the risk and either cost or benefit with the nonprofit organization, thus rendering themselves ineligible for the nonprofit rate under the cooperative mail rule. See Raymond & Whitcomb, 53 F. Supp. 2d at 441-42.

Under all three arrangements, the defendants have in some way linked their revenue to the success of the mailing in violation of the cooperative mail rule. See Univ. Pub., 835 F. Supp. at 491. Under all three arrangements, the defendants shaped much of the substance of the fund-raising program, contributing to the violation of the cooperative mail rule, see Raymond & Whitcomb, at 443, even if the nonprofits retained ultimate decision-making power for almost every one of the subject mailings. The defendants helped devise and design the mail pieces, including their size, type, layout, content; arranged and oversaw the printing, stuffing, mailing, mail opening, and caging services provided by subcontractors; and decided when the mailing should be sent.

For all of these reasons, a reasonable fact-finder would be compelled to conclude that mailings sent under agreements that fit one of the three criteria described were ineligible for the nonprofit rate.

13

IV.    APPLICATION OF COOPERATIVE MAIL RULE PRINCIPLES TO TEST
       CASES

The parties briefed cross-motions for summary judgment with
respect to mailings associated with four charities that were to
serve as test cases.    The charities were: (a) the Catholic
Daughters; (b) Fleet; (c) the Moose; and (d) Shriner's.

With regard to the individual defendants, Lewis and Melikian,
there are genuine issues of material fact that preclude summary
judgment for either the government or the defendants on the FCA,
fraud and FDCPA claims.  At issue is whether Lewis or Melikian knew
of the side letters that rendered the agreements between Vantage
and various charities joint ventures in violation of the
cooperative mail rule.   This issue requires a trial.   Lewis and
Melikian are, however, entitled to summary judgment on the unjust
enrichment claim, count III, as this claim attempts to enforce
contracts implied in law with the corporate entities. See Raymond
& Whitcomb, 53 F. Supp. 2d at 444 ("More precisely, the United
States' unjust enrichment claim is a qunatum meruit claim for the
value of services rendered, which is appropriate when there is no
properly agreed-upon payment amount for agreed-upon provision of
goods or services.").

With regard to Vantage Travel Services, the government has
failed to provide evidence sufficient to prove that this particular
defendant was involved with the mailings of the four nonprofits at
issue.   Therefore, Vantage Travel Services is entitled to summary

14

judgment on all of the claims against it.

With regard to the other Vantage defendants, the government is entitled to summary judgment on some of its claims.[1]  Neither the government nor the defendants are entitled to summary judgment on claims relating to Fleet, as there are genuine issues of material fact relating to the terms of the agreement between Vantage and Fleet.  Therefore, there must be a trial to determine whether the Fleet mailings violated the cooperative mail rule.

There is no genuine dispute that the mailings associated with the Catholic Daughters were sent pursuant to an infinite mailings agreement.  There is also no genuine dispute that the mailings associated with the Moose were sent pursuant to a finite mailings agreement.  Thus, all of these mailings violated the cooperative mail rule and the government is entitled to summary judgment on its unjust enrichment and FDCPA claims against Vantage with respect to these mailings.

Under the collective knowledge doctrine, as adopted by the First Circuit in United States v. Bank of New England, N.A., 821 F.2d 844, 856 (1st Cir. 1987), the government is entitled to summary judgment on its False Claims Act claims against Vantage as to Catholic Daughters and the Moose because, in view of the undisputed material facts, a reasonable fact-finder would be compelled to conclude that either there was a single Vantage

---

[1]The parties did not brief the issue of whether summary judgment is appropriate for the fraud claims.

15

employee who knew both (a) that there were side letters associated with these two charities and (b) that the side letters' terms precluded use of the nonprofit rates under the cooperative mail rule or that the Vantage enterprise was so grossly negligent in not putting the two pieces of information together that it had the requisite scienter under the False Claims Act.

With regard to Shriner's, Vantage had obtained a letter from outside counsel advising it that the mailings did not violate the cooperative mail rule.  The government acknowledged that there is no evidence to indicate that the individual and Vantage defendants did not rely in good faith on the opinion of outside counsel with respect to the propriety of the Shriner's mailings.  Therefore, all defendants are entitled to summary judgment on the fraud and FCA claims relating to Shriner's as, relying on the advice of counsel, they lacked the necessary scienter to establish liability under the FCA or for common law fraud.  See John T. Boese, Civil False Claims and Qui Tam Actions §2.04[D] (2d ed. 2003 Supp.) ("The 'expert advice' defense is available even with the lowered intent standard under the civil False Claims Act.  If a defendant has satisfied the criteria set forth in these cases [applying the defense in the context of criminal fraud]--full disclosure and good faith reliance--there is no way the false claim could be submitted 'knowingly.'").  Melikian and Lewis are entitled to summary judgment on the FDCPA claims relating to Shriner's as well, because in the absence of a valid fraud or FCA claim, Lewis and Melikian do not

16

owe a debt to the government in their individual capacities.

The court finds, however, that the Shriner's mailings may have violated the cooperative mail rule. Consequently, either the government is entitled to summary judgment on its unjust enrichment and FDCPA claims against the Vantage defendants or a trial is necessary on this issue. The Shriner's agreement provided that if Vantage was terminated without cause, Shriner's would be fully liable for the costs of the mailings. See §13.1. However, if the agreement were terminated for any other reasons, Vantage would not be able to recoup its costs directly from Shriner's. See §13.2. Rather, Vantage had two options. It could recoup its costs under an infinite mailings agreement that expired in three years, at which point Shriner's liability would be extinguished. Alternatively, Vantage could rent Shriner's mailing list to other companies for three years and use the proceeds to cover the costs and markup associated with the Shriner's mailings. Again, at the end of the three year period, Shriner's liability would be extinguished.

Although the defendants correctly argue that "payment in kind" as opposed to payment in cash does not violate the cooperative mail rule, an agreement that does not provide for full liability for the nonprofit organization does. By limiting Vantage's recourse to defined assets, Shriner's and Vantage created an arrangement in which Vantage shared the risk, costs and benefits of the fund-raising mailings because there was no guarantee that, if the

17

mailings were unsuccessful, Shriner's would cover the costs of the mailings advanced by Vantage.

The Vantage defendants argued that the Shriner's mailing list was so valuable that there was no real difference between the non-recourse arrangement in the Shriner's contract and a full-recourse contract.  There is, however, no evidence in the record supporting this claim.  The court did not resolve the questions of (1) whether a non-recourse agreement would be more properly characterized as a principal-agent agreement than a joint venture if the asset was sufficiently valuable; and (2) if so, whether the burden of proof on this issue would fall on the plaintiff or the defendant. Therefore, the court did not rule as to whether the government was entitled to summary judgment on its unjust enrichment and FDCPA claims with regard to Shriner's or if a trial was necessary to determine the value of the Shriner's mailing list.

V.     ORDER

Accordingly, it is hereby ORDERED that:

1.   Defendant Vantage Travel Services' motion for summary judgment is ALLOWED with respect to all claims arising out of mailings associated with Catholic Daughters, Fleet, the Moose and Shriner's.

2.   Defendants Harry Melikian and Henry Lewis' motion for summary judgment is ALLOWED with respect to count III and with respect to all claims arising out of mailings associated with Shriner's and DENIED in all other respects.

3.    The government's motion for summary judgment is ALLOWED with respect to counts I, III and IV against all Vantage defendants except Vantage Travel Services with respect to mailings associated with Catholic Daughters and the Moose and DENIED in all other respects.    The court is, however, taking under advisement the government's motion for summary judgment on Counts III and IV against the Vantage defendants for mailings associated with Shriner's.

4.    The Vantage defendants' motion for summary judgment is ALLOWED with respect to counts I and II for all mailings associated with Shriner's and DENIED in all other respects.

```
          /s/ Mark L. Wolf
UNITED STATES DISTRICT JUDGE
```

19