UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VANTAGE FINANCIAL SERVICES, INC.
Plaintiff,

v.

NONPROFIT SERVICE GROUP AND
GEORGE E. MILLER,
Defendants.

**C.A. No. 04-11686-WGY**

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND TRANSFER VENUE AND TO CONTINUE HEARING

### INTRODUCTION

The plaintiff, Vantage Financial Services, Inc. ("Vantage"), hereby opposes the Motion to Dismiss and for Transfer of Venue to Eastern District of Virginia ("Defendants' Motion") filed by the defendants, Nonprofit Service Group ("NSG") and George E. Miller ("Miller") (collectively "Defendants"). This Court has ample basis for the exercise of personal jurisdiction over Defendants. Defendants have failed to demonstrate any circumstances justifying transfer of this case to Virginia.

Vantage engages in the business of assisting non-profit organizations in fundraising and membership solicitation and has utilized the services of Defendants since 1994. This particular case arises from Defendants' negligent provision of professional services to prepare a contract between Vantage and its customer, Shriners Hospital for Children, ("Shriners Contract") that would allow Vantage to perform fundraising services upon terms satisfactory to Shriners, but that would also not violate the United States Postal Service's Cooperative Mail Rule (hereinafter the "CMR"), compromise the ability of Shriners to mail its fundraising materials at not-for-profit rates or expose Vantage to additional claims or potential liability. (Complaint, ¶ 13.) Defendant's Motion must be denied because the facts establish that this Court may exercise personal jurisdiction over

Defendants.  Defendants here had significant contacts with Massachusetts both with respect related directly to the very claims alleged by Vantage in this suit and in the course of numerous engagements over a ten (10) year period since 1994.

BACKGROUND FACTS

Vantage engages in the business of assisting non-profit organizations (hereinafter "NPOs") in fundraising and membership solicitation.  (Id., ¶ 7.)  During and prior to 1999, Vantage and two members of its senior management were defendants in a civil suit by the United States, pursuant to the provisions of the Federal False Claims Act, in which recovery was sought for alleged postal deficiencies, penalties and exemplary damages claimed to be due as a result of fundraising mailings made by Vantage for various of its NPO customers at not-for-profit postal rates (the "Action.")  (Id., ¶ 8.).  It was claimed that such mailings were not eligible for mailing at not-for-profit postal rates because Vantage's contracts with such NPO customers either exonerated the NPO customers from liability to pay Vantage for its services and out-of-pocket costs or affected the same results by restricting the means by which Vantage could obtain payment for same in the event of a shortfall in the funds raised by the solicitation mailings.  Plaintiff alleged that, as a result, the mailing of such solicitations at not-for-profit postage rates was proscribed by the CMR.  (Id., ¶ 8.)

While the Action was pending, Vantage consulted Defendants and sought their assistance, professional services and legal counsel with respect to a substantial fundraising services contract that Vantage was then negotiating with Shriners, a large nonprofit corporation.  (Id., ¶ 10.)  It was anticipated by Vantage that any fundraising services contract with Shriners would involve repeated and substantial mailings on behalf of Shriners requiring the payment of several million dollars in postage even at not-for-profit postal rates.  (Id.)  While Shriners wanted to be able to mail its fundraising mailings at not-for-profit postal rates, Shriners had nonetheless demanded, during the course of the negotiations, that any fundraising services contract with Vantage include terms that protected it from liability to pay Vantage for its fundraising services and out-of-pocket expenses

from Shriners' cash assets in the event that the fundraising programs failed to raise sufficient amounts to pay out of the fundraising proceeds. (Id., ¶ 11.)

In light of the claims pursued by the United States in the Action, Vantage employed Defendants to prepare a contract that would satisfy the desire of Shriners for protection against having to pay for Vantage's fundraising services out of Shriners' own cash assets, while at the same time complying with the CMR, permitting Shriners to mail its fundraising materials at not-for-profit rates and protecting Vantage from additional or potential liability or claims such as then being asserted against it in the Action. (Id., ¶¶ 12-13.)

Vantage expressly informed Defendants of the pendancy of the Action and of the claims being asserted and positions being taken by the United States therein. (Id., ¶ 14.) Vantage emphasized to Defendants that it wanted to be sure that any terms in the contract with Shriners limiting the liability of Shriners or restricting the manner or means by which Vantage would have a right to enforce payment for its services and expenses incurred on behalf of Shriners must be consistent with the requirements of the CMR and must effectively protect Vantage from any further claims of the kind being asserted in the Action, based upon mailings made by Vantage on behalf of Shriners. (Id., ¶ 14.) Vantage also requested that Defendant advise it if they concluded that it was not possible to prepare contract provisions that would both satisfy Shriners and protect Vantage from potential liability for violation of the CMR or additional claims against it in the Action. (Id., ¶ 14.)

Pursuant to their employment, Defendants prepared a fundraising services agreement between Vantage and Shriners (the "Contract"). (Id., ¶ 15 and the Contract attached thereto as Exhibit A.) The Contract prepared by Defendants provided, in relevant part, that Shriners would have the option of paying Vantage's then unpaid charges at the time of any termination of the Contract by Shriners either (1) directly in cash or (2) by permitting Vantage to rent to or use for the benefit of Vantage's other customers Shriners' donor list file and to use the amounts paid by such

other customers for the use of the Shriners donor list file to satisfy any outstanding amounts owed by Shriners to Vantage. (Id., ¶ 16.)

Defendants advised Vantage that the above-described provisions would be effective to avoid any violation of the CMR and protect Vantage from possible claims with respect to mailings at not-for-profit postal rates made pursuant to the Contract and from any exposure to additional liability on claims such as those being asserted in the Action. (Id., ¶ 17.) In reliance upon Defendants' advice, Vantage entered into the Contract with Shriners and thereafter proceeded to render substantial services and make extremely voluminous mailings on behalf of Shriners at not-for-profit postal rates. (Id., ¶ 18.)

When the United States learned, through discovery, of the Contract and the mailings on behalf of Shriners made pursuant thereto, it promptly amended its Complaint in the Action to add claims with respect to all mailings made by Vantage on behalf of Shriners pursuant to the Contract (the "Shriners Mailings"). The effect of such amendment was to increase the amount of the United States' claims by approximately $3,000,000 in compensatory damages and for an additional $6,000,000 in exemplary or punitive damages, thus approximately doubling the amount of the claims asserted against Vantage in the Action. (Id., ¶ 19.)

The United States and Vantage each moved for partial summary judgment on liability with respect to all of its claims in the Action, including those based upon the Shriners mailings. (Id., ¶ 22.) The Motion of the United States was granted with respect to its claims based upon mailings made on behalf of certain of Vantage's customers other than Shriners. Vantage's Motion was denied in substantially all respects although partial summary judgment was granted with respect to some of the claims being asserted against the individual defendants. (Id., ¶ 23.) With respect to the United States' claims based on the Shriners contract, while it did not grant summary judgment to the United States, the Court intimated that the Shriners mailings might well have violated the CMR because of the limitation of Vantage's right to collect payment for its billed and unpaid services and

-4-

out-of-pocket expenses to revenues raised from commercial exploitation of the Shriners' Donor's List. (Id., ¶ 23.)  In recognition of the fact that Vantage had consulted supposedly expert counsel in entering into the Contract and had expressly relied upon the advice of Defendants, the Court granted summary judgment in Vantage's favor with respect to the United States' False Claims Act claims for exemplary damages, but reserved the United States' revenue recovery (single damages) claims for trial, concluding that such claims were not barred if the Shriners mailings in fact violated the CMR and Defendants' advice to the contrary had been erroneous. (Id., ¶ 23.)

At that point, Vantage was faced with the choice between settling all the remaining claims of the United States or going to trial on all such claims, involving exposure to a judgment of more than twelve million ($12,000,000) dollars before assessment of interest.  After protracted and vigorous negotiations with the United States, Vantage entered into an agreement to settle the United States' claims (the "Settlement Agreement") for four million five hundred thousand ($4,500,000) dollars. (Id., ¶ 25.)  Approximately one half of this amount, or almost two million two hundred fifty thousand ($2,250,000) dollars, was agreed to by Vantage in order to resolve its potential liability with respect to the Shriners mailings. (Id., ¶ 25.)

<u>JURISDICTIONAL FACTS</u>

Vantage initially discussed engaging with Defendants because Vantage had an on-going relationship with Defendants, under which Defendants had been performing services to support Vantage's NPO customers since as early as 1994.  (Affidavit of Harry S. Melikian, hereinafter "Melikian Aff.," ¶ 6.)  This pre-1999 work included preparing registration materials for various NPO's to operate in Massachusetts and other states.  In preparing these pre-1999 registration materials, Defendants communicated with Vantage at its Massachusetts office by letter, telephone, facsimile and email on a regular basis and invoiced Vantage in Massachusetts on nearly a monthly basis. (Id., ¶ 6.)

Since the inception of Vantage and Defendants' relationship in 1994 through present, Defendants have sent over 192 invoices to Vantage in a total amount of $519,729.16 for services provided. All of those invoices were sent to Vantage in Massachusetts and all of the invoices were paid by Vantage from its offices in Massachusetts. (Id., ¶ 7.) While the Action was pending, Vantage consulted Defendants with respect to the proposed Shriner's Contract. (Id., ¶ 7.) Vantage informed Defendants that it was extremely concerned about entering into a contract with Shriners would simply add to its potential liability in the Action. Vantage informed Defendants that it sought their counsel and advice in preparing terms with respect to Shriners' payment obligations that would be suitable to satisfy the customer's demands and, at the same time, protect it from potential liability with respect to any claim (such as those being asserted in the Action) that the contractual terms with Shriners rendered any funds solicitation mailings for Shriners not eligible for not-for-profit postal rates pursuant to the CMR. (Id., ¶ 7.)

Communications related to this potential engagement of Defendants were numerous and began in either late 1998 or early 1999. (Id., ¶ 8.) The vast majority of these communications either involved telephone calls by Vantage from Massachusetts or by Defendants to Massachusetts. (Id., ¶ 8.) The content of these early communications focused on providing Defendants with detailed background information regarding the Action and Defendants' experience in the area of drafting fundraising contracts involving nonprofits, such as Shriners. (Id., ¶ 8.) During these numerous communications, Defendants held themselves out to Vantage as specialist and expert in "nonprofit organizations," "for-profit fund raisers," "postal rates and regulation," "contracts" and "evaluation of direct mail or telemarketing fundraising programs." These representations were also made on Defendants' Website, which Defendants recommended Vantage visit. (Id., ¶ 10.) Vantage has since independently determined that these representations were false and that Defendants have no such expertise. (Id., ¶ 10.)

While Defendants allege that Defendants did not negotiate the terms of either their engagement or the Shriner's Contract with Vantage in Massachusetts, that is simply not true. As an initial matter, Vantage and Defendants discussed these matters over the telephone while Vantage was in Massachusetts in early 1999. (Id., ¶ 11.)

Based on Defendants' representations regarding their expertise, Vantage decided to engage Defendants. The Shriners engagement contemplated an ongoing relationship with Defendants that would encompass both preparing the Shriners Contract, drafting future contracts for other of Vantage's NPO customers and performing lobbying activities related to State and Federal regulations. (Id., ¶ 12.) Invoices submitted by Defendants to Vantage show that Defendants were working on the Shriners Contract and communicating regularly with Vantage in Massachusetts in 1999. (Id., ¶ 13.) For example, an invoice from April 1999 shows that Vantage and Defendants telephoned each other at least thirteen times to discuss the Shriners Contract and various parties' comments regarding the contract. A significant portion of these telephone calls were initiated by Defendants. In addition, the parties communicated regularly by email and Defendants forwarded at least one memorandum and a fax to Vantage in Massachusetts related to the Shriners matter in April. (Id., ¶ 13.)

In May 1999, Defendants were heavily engaged in negotiating and preparing the Shriners Contract and communications between Vantage and Defendants were again numerous. (Id., ¶ 14.) Invoices submitted by Defendants to Vantage in Massachusetts show at least twenty-one separate telephone communications, the majority of which were initiated by Defendants. As in April, Defendants drafted and forwarded at least one memorandum to Vantage in Massachusetts as an update on the Shriners matter and again communicated with Vantage regularly by email. (Id., ¶ 14.)

Defendants' invoices show that Vantage and Defendants continued communicating at this frequency with regard to the Shriners Contract until it was ultimately executed. (Id., ¶ 15.) Even after the Shriners Contract was executed, Defendants continued to work for Vantage on the Shriners

matter and continued to communicate regularly. As but one example of many, on October 2, 2000,

Miller wrote to Shriners on behalf of Vantage, carbon-copying Vantage in Massachusetts, to inform

them that Vantage would defend any challenge to mailings under the Shriners Contract. (Id., ¶ 15

and the October 2, 2000 Letter, attached thereto as Exhibit B.) This letter is particularly significant

because it establishes that Defendants continued their wrongful conduct against Vantage when they

stated, without any basis, that the Shriners Contract complied with state and federal regulations.

Carolyn A. Emigh ("Emigh"), another representative of NSG, again continued Defendants'

wrongful conduct when she suggested in an email, dated May 2, 2000, that Vantage forward her

credentials to Shriners to show that Defendants were "specialist in charitable fund raising in

particular." (Id., ¶ 15 and May 2, 2000 Email, attached thereto as Exhibit C.)

Even as late as September 12, 2002, Defendants were working with Vantage and

communicating with Vantage regularly regarding amendments to the Vantage Contract. (Id., ¶ 16.)

Nevertheless the search has turned up twenty-two emails from either Miller or Emigh, in which

Defendants were either discussing various recommended changes to the Shriners Contract or

attaching suggested amendments. (Id., ¶ 17.) What comes across clearly from these emails is that

negotiations related to the Shriners Contract were not limited to communications between

Defendants' offices in Washington and Virginia and Shriners' office in Florida. The emails show

that all significant decisions were made by Vantage from its Massachusetts office, that Defendants

made no independent determinations regarding changes to contract terms without first

communicating those suggested changes to Vantage for approval at its Massachusetts office, and

that Defendants repeatedly contacted Vantage in Massachusetts in connection with their

engagement. (Id., ¶ 17.)

Finally, related to Shriners and Vantage's other NPO customers, Defendants represented

Vantage by participating in lobbying efforts to have certain changes implemented in the laws

governing nonprofit mailings. The numerous invoices submitted to Vantage in Massachusetts

establish that Defendants regularly communicated by mail, email and telephone with Vantage in Massachusetts regarding the progress of those lobbying efforts.  (Id., ¶ 18.)

In addition to work related to Shriners, Defendants continued to work on numerous other matters for Vantage and other of Vantage's customers.  Primarily this work related to registration and incorporation of various NPO's in a large number of states.  (Id., ¶ 19.)  These included as many as 15 of Vantage's NPO customers.  (Id., ¶ 19.)  This registration and incorporation work included registering and incorporating Vantage's NPO customers in many, if not every state, including Massachusetts.  (Id., ¶ 20.)  A review of Defendants' invoices alone show Defendants communicated with Vantage in Massachusetts on literally hundreds of occasions since their relationship began.  (Id., ¶ 20.)

A review of the limited number of emails that Vantage has been able to retrieve to date shows that either Miller or Emigh communicated with Vantage at its Massachusetts office no less than forty-eight (48) times between 2000 and 2002.  (Id., ¶ 21.)  These emails relate to issues related to registration and incorporation of numerous of Vantage's NPO customers, as well as contract negotiations with Vantage's NPO customers.  Again, as with matters related to Shriners, Defendants communicated with Vantage in Massachusetts throughout those matters.  (M Id., ¶ 21.)  As such, the emails referenced above include working drafts of numerous contracts and other documents forward to Vantage by Defendants.  (Id., ¶ 21.)

Vantage is also aware that Defendants traveled to Massachusetts.  On February 24, 1999, as part of Defendants and Vantage's ongoing relationship, Defendants traveled to Massachusetts to prepare and conduct a private workshop for Vantage on state registration requirements for NPO's.  (Id., ¶ 11 and the February 26, 1999 Invoice, attached thereto as Exhibit C.)  In addition, on December 6, 2001 for a meeting with Vantage during which they discussed, among other things, outstanding issues related to Shriners.  (Id., ¶ 22.)

As a final matter with respect to jurisdiction, the Court is in a position to discredit the affidavits submitted in support of Defendants present motion and to make inferences in favor of Vantage based on what is notably absent from those submissions. Defendants admitted to business dealings with Vantage, (Affidavit of George E. Miller, ¶ 11), but failed to inform the Court that those dealings occurred of a period of 10 years and resulted in billings in excess of $500,000.00 to Vantage in Massachusetts. Vantage has been able to counter Defendants statement with evidence from its own files. However, Vantage simply does not have access to information that addresses whether (1) Defendants have any other customers in Massachusetts; (2) Defendants visited Massachusetts to meet with those clients; (3) Defendants have sought any new relationships with Massachusetts business; and (4) Defendants received any revenue from any other sources in Massachusetts. If Defendants had no such customers or contacts one would have expected them to allege it prominently in their affidavits. The fact that they did not should lead the Court to conclude that such contacts do in fact exist, or, in the alternative, provide Vantage with an opportunity to conduct discovery on these and other jurisdictional matters.

<u>ARGUMENT</u>

I.    <u>FEDERAL COURT'S EXERCISE OF PERSONAL JURISDICTION</u>

The facts plainly demonstrate that Defendants are subject to this Court's jurisdiction. "'In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'" <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 51 (1st Cir. 2002) quoting <u>Sawtelle</u>, 70 F.3d at 1387. "A district court may exercise authority over a defendant by virtue of either general or specific [personal] jurisdiction." <u>Daynard</u>, 290 F.3d at 51 quoting <u>Mass. Sch. of Law</u>, 142 F.3d at 34. "General jurisdiction exists when the defendant has engaged in 'continuous and systematic activity' in the forum, even if the activity is unrelated to the suit." <u>Daynard</u>, 290 F.3d at 51 citing <u>United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.</u>, 960

F.2d 1080, 1088 (1st Cir.1992). "In the absence of general jurisdiction, a court's power depends

upon the existence of specific jurisdiction." Daynard, 290 F.3d at 51 quoting Mass. Sch. of Law,

142 F.3d at 34. "[Vantage] must show that the Massachusetts long-arm statute grants jurisdiction

and, if it does, that the exercise of jurisdiction under the statute is consistent with the constitution."

Daynard, 290 F.3d at 51 citing Foster-Miller, 46 F.3d at 144.

 Vantage alleges that jurisdiction exists under subsections (a), (b) and (d) of the

Massachusetts long-arm statute. See G.L. c. 223A, § 3.[1] The Court "may sidestep the statutory

inquiry and proceed directly to the constitutional analysis, however, because the Supreme Judicial

Court of Massachusetts has interpreted the state's long-arm statute 'as an assertion of jurisdiction

over the person to the limits allowed by the Constitution of the United States.'" Daynard, 290 F.3d

at 51 quoting Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441(1972).

(Remainder of citation omitted.) "'[D]ue process requires only that in order to subject a defendant

to a judgment in personam, if he be not present within the territory of the forum, he have certain

minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of

fair play and substantial justice.'" Daynard, 290 F.3d at 51 quoting Int'l Shoe, 326 U.S. at 316, 66

S.Ct. 154; see also Noonan v. Winston Co., 135 F.3d 85, 90 (1st Cir.1998).[2] As is set forth below,

Vantage has adduced evidence of specific facts that, when viewed in a light most favorable to

---

[1] In pertinent part, the Massachusetts Long-Arm Statute reads as follows: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth; (b) contracting to supply services or things in this commonwealth; . . . (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth. . . ."

[2] Because this Court has not held an evidentiary hearing in this matter, Vantage need only make a prima facie showing that the court has personal jurisdiction over Defendants. See Sawtelle v. Farrell, 70 F.3d 1381, 1386 n. 1 (1st Cir.1995) citing United Elec. Radio and Mach. Workers of Amer. v. 163 Pleasant St. Corp., 987 F.2d 39, 43 (1st Cir.1993). To make a prima facie showing of jurisdiction, Vantage must "adduce evidence of specific facts" that support its jurisdictional claim. Foster-Miller, 46 F.3d at 145; United Elec. Radio and Mach. Workers of Amer. v. 163 Pleasant St. Corp., 987 F.2d at 44. The facts offered by Vantage are taken as true and construed in the light most favorable to Vantage's claim. See Mass. Sch. of Law, 142 F.3d at 34; Foster-Miller, 46 F.3d at 145. The Court does not act as a fact-finder, but instead determines "whether the facts duly proffered, [when] fully credited, support the exercise of personal jurisdiction." Rodriguez, 115 F.3d at 84 citing Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir.1992). The Court should only consider facts offered by Defendants to the extent those facts are uncontradicted. See Mass. Sch. of Law, 142 F.3d at 34 quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir.1994).

Vantage, makes out a prima facie showing of both specific and general personal jurisdiction over

Defendants.

A.    This Court's Exercise Specific Jurisdiction Over Defendants Comports With The
      Strictures Of The Constitutions

The Court may exercise specific jurisdiction over Defendants because they had significant

contacts with Massachusetts related to the Shriners Contract. "For specific jurisdiction, this circuit

divides the constitutional analysis into three categories: relatedness, purposeful availment, and

reasonableness. . . ." Daynard, 290 F.3d at 61.

As is set forth below, Vantage has met its burden under each of these categories.

1.    Defendants' activities that give rise to this litigation are directly related to
      Massachusetts

Under the "relatedness" prong of the analysis, Vantage must show that the claim underlying

the litigation directly arose out of, or was related to, Defendants' activities in the forum-state."

Daynard, 290 F.3d at 61 citing Foster-Miller, 46 F.3d at 144. Vantage's claims under the Complaint

are related to Defendants activities in Massachusetts. Vantage has more than carried its burden of

showing relatedness.

Here, the litigation is related directly to Vantage's engagement to prepare the Shriners

Contract in 1999 and communications that resulted in the engagement. (Melikian Aff., ¶ 4.)

Vantage's claims arose after they sought the assistance, professional services and legal counsel of

Defendants in the Shriners matter. Vantage engaged Defendants because it had an ongoing

relationship with them, under which they had repeatedly provided Vantage with representation in

fundraising services matters at Vantage's Massachusetts offices since approximately 1994. (Id, ¶ 6.)

Prior to Vantage's engagement of Defendants on the Shriners matter, Vantage and Defendants had

numerous communications during which the parties discussed the details of the ongoing Action and

their desire to enter into a contract for providing fundraising services that would not violate the

CMR. (Melikian Aff., ¶¶ 6-13.) These communications were directly related to the litigation

because, during these communications, Defendants repeatedly assured Vantage that they had
expertise in the area of nonprofit fundraising compliance matter. (Melikian Aff., ¶¶ 10, 15 and
Exhibits A and B, attached thereto.) Furthermore, Defendants represented that they had prepared
similar contracts for other nonprofits that did not violate the CMR. (Melikian Aff., ¶ 10.) These
representations were false, because Defendants failed to warn Vantage that the contracts that it had
prepared for other nonprofits had never been questioned or tested by the USPS and that no
applicable authorities confirmed that such contracts complied with the CMR. See Daynard, 290
F.3d at 61 (relatedness established where law firm communications with plaintiff in Massachusetts
were in the form of a working relationship requiring interaction between plaintiff and law firm).

      Defendants communications with Vantage giving rise to this litigation did not end with the
decision to engage Defendants, as the engagement in fact contemplated an ongoing relationship
with respect to the Shriners Contract. After Defendants were engaged, Vantage and Defendants had
many additional communication as they negotiated the terms of the Shriners Contract, during which
Defendants reaffirmed their expertise in this area. (Melikian Aff., ¶ __.) In addition, after the
Shriners Contact was prepared and executed by the parties, Defendant wrote a letter to Shriners,
carbon copying Vantage, which was dated October 2, 2000. In that letter, Defendants wrote to
Shriners to inform Shriners that the terms of the Shriners Contract complied with all state and
federal regulations and that Vantage would defend any challenge to the Shriners Contract.
(Melikian Aff., ¶ 15, and Exhibits A and B, attached thereto.) These material omissions from the
parties later communications were purposeful misdirection that relate directly to the claims asserted
in the present case. Accord Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 213 (5th Cir. 1999) (a
lawyer who chose to represent a client in another forum was subject to the personal jurisdiction of
that forum where his communications steadfastly failed to disclose material information).

      2.    <u>Purposeful Availment</u>

Under the second prong, "[Defendant's] in-state contacts must represent a purposeful

availment of the privilege of conducting activities in the forum state, thereby invoking the benefits

and protections of that state's laws and making the defendant's involuntary presence before the

state's courts foreseeable." Daynard, 290 F.3d at 61 citing Foster-Miller, 46 F.3d at 144.  "The

cornerstones upon which the concept of purposeful availment rest[s] are voluntariness and

foreseeability." Daynard, 290 F.3d at 61 citing Sawtelle, 70 F.3d at 1391 (citing Ticketmaster, 26

F.3d at 207).

Defendants make much of their assertion that they were never present in Massachusetts

during their engagement negotiations or formation of the Shriners Contract.  Their lack of presence,

however, is not dispositive of the issue of personal jurisdiction.  See Hahn v. Vermont Law School,

698 F.2d 48, 50-52 (1st Cir. 1983) (where defendant made effort to reach and serve the market for

legal education in Massachusetts, jurisdiction was established despite defendant not physically

appearing in Massachusetts and regardless of whether contract had been concluded in

Massachusetts); Tatro v. Manor Care, Inc., 416 Mass. 763,  (1994) (defendant that obtained

business from Massachusetts businesses and maintained telephone and mail contact with them were

subject to a Massachusetts court's exercise of jurisdiction).[3]

What is clear is that Defendants communicated with Vantage in Massachusetts often while

they negotiated both the engagement and the Shriners Contract by letter, telephone and email.

These communications include the numerous emails, faxes, letters and invoices referenced above.

(Melikian Aff., ¶¶ 6-10.)  Moreover, Vantage's engagement of Defendants contemplated that they

would have a continuing relationship with respect to the Shriners Contract, which include both

negotiating the terms of the contract and performing lobbying activities on behalf of Vantage in

_____

[3] It should be noted that "[t]he transmission of facts or information into Massachusetts via telephone or mail would of
course constitute evidence of a jurisdictional contact directed into the forum state." Mass Sch. of Law, 142 F.3d at 36;
see also Burger King, 471 U.S. at 476 (stating that "it is an inescapable fact of modern commercial life that a substantial
amount of business is transacted solely by mail and wire communications across state lines" and that defendants may
not defeat jurisdiction merely by showing that they never physically entered the forum).

Washington related to effecting a change to the CMR.  Defendants communications with Vantage in

Massachusetts related to these matters continued to be numerous.  (Melikian Aff., ¶¶ 7, 15, 18-21.)

"The Supreme Court, speaking on the subject of specific personal jurisdiction in contract cases, has

'emphasized that parties who 'reach out beyond one state and create continuing relationships and

obligations with citizens of another state' are subject to regulation and sanctions in the other State

for the consequences of their activities.'" Burger King, 471 U.S. at 473 quoting Travelers Health

Ass'n v. Virginia, 339 U.S. 643, 647 (1950); see also Daynard, 290 F.3d at 61 (where business

relation contemplated ongoing interaction between plaintiff, in Massachusetts, and defendants,

outside of Massachusetts, the plaintiff's breach of contract claim was found to have arisen out of, or

related to, the defendants' Massachusetts activities).

       Defendants cite Automatic Sprinkler and Droukas for the proposition that specific

jurisdiction is not conferred in cases where contacts are limited to hiring an out-of-state business

and communicating with the business about contract negotiations.  These cases are distinguishable.

In Automatic Sprinkler, the defendant's only contact with the Commonwealth was its mailing of a

purchase order and a check in partial payment to the plaintiff and receipt of a letter and an invoice

mailed from Massachusetts.  In Droukas, the defendant's only contacts with Massachusetts were the

placement of an advertisement in a publication distributed in Massachusetts, the receipt in Florida

of a telephone call from the plaintiff in Massachusetts regarding a purchase of equipment, the

sending of correspondence to the plaintiff confirming the sale, and the shipment of the equipment to

Massachusetts.  As is clear from the number of communications discussed above, this Court's

justification for exercising specific jurisdiction in this case is much greater than those alleged by the

plaintiffs in Automatic Sprinkler and Droukas.

       The more analogous case is Good Hope Industries, Inc. v. Ryder Scott Company, 378 Mass.

1, 9 (1979).  There, the plaintiff, a Texas corporation with its principal place of business in

Massachusetts, sought out the defendant, a Texas corporation, to perform engineering and

geological services in Texas.  Although the plaintiff and defendant only met in person in Texas,

defendant was made aware that plaintiff operated out of Massachusetts.  The defendant prepared

approximately nine (9) appraisal reports and sent them to the plaintiff in Massachusetts.  The

plaintiff also initiated approximately fifty-two telephone calls to the plaintiff in Massachusetts, sent

seventeen invoices to Massachusetts for its services and the invoices were paid from a checking

account in Massachusetts.  Based on these limited contacts, the court found that the defendant

knowingly and purposefully engaged in transactions with the plaintiffs in Massachusetts.  Id. at 10-

11.  The Court found that it was insignificant that the defendant was never physically present in

Massachusetts, noting "[w]idespread use of the telephone and the mails make actual physical

presence unnecessary in many cases."  Id. at 11 quoting McGraw v. Matthaei, 340 F.Supp. 162, 164

(E.D. Mich. 1972).

        3.     Reasonableness

The exercise of this Court's jurisdiction over Defendants is reasonable.  Under the final

prong, the Court must determine whether the exercise of jurisdiction would be reasonable in light of

the Gestalt factors.  See Daynard, 290 F.3d at 62-63 citing Foster-Miller, 46 F.3d at 144; World-

Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).  The factors are "(1) the

defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the

plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in

obtaining the most effective resolution of the controversy, and (5) the common interests of all

sovereigns in promoting substantive social policies."

With respect to the first factor, our Courts recognize that when, as here, defendants routinely

represents clients outside their home state, it is not unusual for them to be required to appear.  See

Daynard, 290 F.3d at 63.  Similarly, there can be no doubt that the Court has an interest in

redressing injuries inflicted by an out-of-state actor such as Defendants.  See Daynard, 290 F.3d at

63; accord Trinity Industries, Inc. v. Myers & Assoc., Ltd., 41 F.3d 229, 232 (5th Cir. 1995)

("Assuming minimum contacts exist . . . a lawyer accused of violating his or her professional

obligations to a client is answerable no only where the alleged breach occurred but also where the

professional obligation attached."). Vantage's interest in obtaining convenient relief and the judicial

system's interest in obtaining the most effective resolution are the same. Massachusetts is also the

most convenient forum because it was the center of all communication related to Defendants

malpractice as between Vantage, Defendants and Shriners. A majority of the potential witnesses

are therefore located in Massachusetts.

B.   The Court Has General Jurisdiction Over Defendants Because They Have
     Maintained Continuous And Systematic Business Contacts In Massachusetts Since
     At Least 1999

The Court may properly exercise personal jurisdiction over Defendants because their

contacts with Massachusetts are sufficient to establish general jurisdiction. "In evaluating whether

the exercise of personal jurisdiction is warranted, courts concentrate on the 'quality and quantity of

contacts between the potential defendant and the forum.'" United States v. Swiss American Bank,

Ltd., 274 F.3d 610, 619 (1st Cir. 2001) quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc.,

196 F.3d 284, 288 (1st Cir.1999). The assertion of general jurisdiction comports with due process

when two criteria are met. "First, there must be 'continuous and systematic general business

contacts' between the foreign defendant and the forum." United States v. Swiss American Bank,

Ltd., 274 F.3d at 619 quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416

(1984). "Second, the plaintiff must show that the exercise of jurisdiction would be reasonable."

United States v. Swiss American Bank, Ltd., 274 F.3d at 619 citing Donatelli, 893 F.2d at 465.

Both criteria have been met here.

In the present case, Vantage has established that Defendants have had continuous and

systematic general business contacts with Massachusetts. As a starting point, Defendants contacts

with Vantage go back to 1994. During that period Vantage utilized the services of Defendant for

purposes of preparing registrations and contracts for Vantage's nonprofit customers.  extend back to

a date well before Defendants were engaged to provide professional services in connection with the

NSG Contract and the Shriners Contract. Prior to that date, Vantage had utilized the services of

NSG and Miller on numerous occasions dating back to early 2000. As is set forth in the Melikian

Affidavit, Defendants numerous contacts with Vantage and its NPO customers in Massachusetts are

in and of themselves significant enough to support this Court's exercise of general jurisdiction over

Defendants. (Melikian Aff., ¶¶ 6-22.)

II.    ALTERNATIVELY, SHOULD THE COURT DETERMINE THAT PLAINTIFF HAS
       NOT MET ITS BURDEN IN ESTABLISHING JURISDICTION OVER DEFENDANTS,
       VANTAGE IS ENTITLED TO CONDUCT JURISDICTIONAL DISCOVERY

       If the Court determines that Vantage has not provided sufficient evidence to establish

jurisdiction over Defendants, Vantage should be permitted an opportunity to marshal the necessary

proof through jurisdictional discovery. The First Circuit recognizes that "[a] timely and properly

supported request for jurisdictional discovery merits solicitous attention." See United States v.

Swiss American Bank, Ltd., 191 F.3d 30, 45-46 (1st Cir. 1999) citing Sunview Condo. Ass'n v.

Flexel Int'l, Ltd., 116 F.3d 962, 964 (1st Cir.1997).

       In addition to the numerous forum contacts that Defendants have had with Massachusetts

due to their relationship with Vantage and its customer base, Defendants have admitted to other

Massachusetts contacts with Vantage in their papers. Here, jurisdictional discovery is in order

because Vantage is not in a position to know what contacts Defendants have or have had with

Massachusetts other than its Vantage contacts, a point Defendants have, notably, failed to address in

their opposition affidavit. See Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962, 964 (1st

Cir.1997) (explaining that "a diligent plaintiff who sues an out-of-state corporation and who makes

out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum

of jurisdictional discovery if the corporation interposes a jurisdictional defense"); Surpitski v.

Hughes-Keenan Corp., 362 F.2d 254, 255-56 (1st Cir.1966) (per curiam) (It is an abuse of

discretion to disallow discovery before the court ruled on the motion to dismiss for want of personal

jurisdiction where the plaintiff had been diligent and was somewhat unfamiliar with his adversary's business practices).

Jurisdictional discovery is particularly appropriate in this matter where Defendants failed to address in their submission to this Court whether they (i) have any other customers in Massachusetts; (ii) visited Massachusetts to meet with those clients; (iii) have sought any new relationships with Massachusetts business; and (4) received any revenue from any other sources in Massachusetts. If Defendants had no such customers or contacts one would have expected them to allege it prominently in their affidavits. Fairness therefore dictates that no further action should be taken on Defendants Motion to Dismiss until Vantage has had a full opportunity to inquire into Defendants' other forum contacts.

III.    ALTERNATIVELY, SHOULD THE COURT DECIDE TO EXERCISE JURISDICTION IN THIS MATTER, THE CASE SHOULD NOT BE TRANSFERRED TO THE EASTERN DISTRICT OF VIRGINIA

In the event that the Court decides to exercise jurisdiction in this matter, the Eastern District of Virginia is not an appropriate venue for transfer. A defendant seeking transfer to a forum that it claims is more convenient has the burden of proving that transfer is warranted. Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 719 (1st Cir.1996). "Since there is a strong presumption in favor of a plaintiff's forum choice, the defendant must bear the burden of proving both the availability of an adequate alternative forum and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum." Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 719 (1st Cir. 1996) citing Mercier v. Sheraton Int'l, Inc., 935 F.2d 419, 423 (1st Cir.1991). The factors the Court should consider include "the convenience of parties and witnesses, . . . the availability of documents; the possibility of consolidation; and the order in which the district court obtained jurisdiction." Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir.2000).

Here, Defendants have set forth no facts that would establish that Virginia is a more convenient jurisdiction than Massachusetts. To the contrary, the majority of the witness in this

matter are principals or employees of Vantage and are located in Massachusetts.  Moreover, as is set forth above, the majority of the documents that are relevant to Vantage's claims are located in Massachusetts.  The fact that Defendants have their offices in Virginia is not sufficient to satisfy their burden of proving transfer is warranted nor does it overcome the strong presumption in favor of a plaintiff's forum.  A transfer to the District of Virginia should be denied.

CONCLUSION

For the foregoing reasons, Vantage respectfully request that the Court deny Defendants' Motion or, in the alternative, allow Vantage to conduct jurisdictional discovery.

**VANTAGE FINANCIAL SERVICES, INC.,**

By its Attorney,

Laurence M. Johnson (BBO #252720)
Neal J. Bingham (BBO #652029)
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA 02108
(617) 367-2500

Dated: October 8, 2004

I HEREBY CERTIFY THAT A COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH PARTY BY MAIL/HAND ON 10/8/04