COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                   SUPERIOR COURT DEPARTMENT
                                               CIVIL ACTION NO. 04-3088-BLS

| | |
|---|---|
| VANTAGE FINANCIAL SERVICES, INC.<br>Plaintiff,<br><br>v.<br><br>NONPROFIT SERVICE GROUP AND<br>GEORGE E. MILLER,<br>Defendants. | **AFFIDAVIT OF HARRY S. MELIKIAN** |

I, Harry S. Melikian, being duly sworn, do hereby on oath state as follows:

1. As President of the plaintiff, Vantage Financial Services, Inc. ("Vantage"), I have personal knowledge of the matters set forth in this affidavit and in the Complaint (the "Complaint") filed in this action. I am over twenty-one years of age and understand the obligations and consequences of an oath.

2. This affidavit is offered in opposition to the Motion to Dismiss and Transfer Venue filed by the defendants, Nonprofit Services Group and George E. Miller ("Defendants"), in this matter.

3. Vantage is in the business of assisting non-profit organizations (hereinafter "NPOs") in registration, fundraising and membership solicitation and in providing solicitation preparation, printing, collating, addressing, caging and mailing services to NPOs in connection therewith.

4. This matter arises from the legal malpractice committed by Defendants in connection with their engagement to prepare a contract in the Spring of 1999 between Vantage and one of its largest customers, Shriners Hospital for Children ("Shriners"), and provide expert advice in connection therewith, that would permit direct premium solicitation mailings by

Vantage on behalf of Shriners to be made at not-for-profit rates without violation of the Postal Service's "Cooperative Mail Rule" ("CMR").

5.      Prior to this date, Vantage generally prepared contracts with its NPO customers on an in-house basis and sought legal advice when necessary. Vantage sought professional expert assistance for the Shriners Contract because, during and prior to 1999 and thereafter, Vantage and two members of its senior management were involved in a civil action brought by the United States Postal Service in the United States District Court for the District of Massachusetts (hereinafter the "Action"), in which recovery was sought by USPS as a result of several previous fundraising mailings made by Vantage for various of its NPO customers at not-for-profit postal rates. It was further alleged in the Action that such mailings were not eligible for mailing at not-for-profit postal rates because Vantage's contracts with such NPO customers either limited the NPO customer's liability to pay Vantage for its services and out-of-pocket costs or restricted the means by which Vantage could obtain payment for same in the event of a shortfall in the funds raised by the solicitation mailings and that, as a result, the mailing of such solicitations at not-for-profit postage rates was proscribed by the CMR.

6.      Vantage initially discussed this engagement with Defendants because Vantage had an on-going relationship with Defendants, under which Defendants had been performing services to support Vantage's NPO customers since as early as 1994. This pre-1999 work included preparing registration materials for various NPO's to operate in Massachusetts and other states. In preparing these pre-1999 registration materials, Defendants communicated with Vantage at its Massachusetts office by letter, telephone, facsimile and email on a regular basis. In addition, Defendants invoiced Vantage in Massachusetts on nearly a monthly basis, (and in some instances more than once per month), and payment was made by Vantage in each instance from their Massachusetts offices.

7. Since the inception of Vantage and Defendants' relationship in 1994 through present, Defendants have sent over 192 invoices to Vantage in a total amount of $519,729.16 for services provided. All of those invoices were sent to Vantage in Massachusetts and all of the invoices were paid by Vantage from its offices in Massachusetts.

8. While the Action was pending, Vantage consulted Defendants with respect to the proposed Shriner's Contract. Vantage had actively solicited the Shriners for a number of years, which culminated in serious negotiations beginning in the Fall of 1998. Vantage informed Defendants that it was extremely concerned that entering into a contract with Shriners would simply add to its potential liability in the Action. Vantage informed Defendants that it sought their counsel and advice in preparing terms with respect to Shriners' contractual obligations that would be suitable to satisfy the contract requirements of Shriners and, at the same time, protect Vantage from further liability with respect to any claim (such as those being asserted in the Action) that the contractual terms with Shriners rendered any premium solicitation mailings for Shriners not eligible for not-for-profit postal rates pursuant to the CMR.

9. Communications related to this potential engagement of Defendants, which initially were limited to telephone communications, were numerous and began in either late 1998 or early 1999. The vast majority of these communications either involved telephone calls by Vantage from Massachusetts or by Defendants to Massachusetts. The content of these early communications focused on providing Defendants with detailed background information regarding the Action and Defendants' experience in the area of drafting fundraising contracts involving nonprofits, such as Shriners, which would satisfy existing law and regulations. It is clear that Defendants had full knowledge of the Action prior to commencing work on the Shriners Contract.

10. During these numerous communications, Defendants held themselves out to Vantage as specialists and experts in "nonprofit organizations," "for-profit fund raisers," "postal

rates and regulation," "contracts" and "evaluation of direct mail or telemarketing fundraising programs." Defendants represented that they had drafted contracts for other customers that did not violate the CMR.  These representations were also made on Defendants' Website, which Defendants recommended Vantage visit.  Vantage has since independently determined that these representations were false and that Defendants have no such expertise.

11.     While Defendants allege that Defendants did not negotiate the terms of either their engagement or the Shriner's Contract with Vantage in Massachusetts, that is simply not true.  Vantage and Defendants discussed these matters over the telephone while Vantage was in Massachusetts in early 1999.  It should also be noted that contrary to Defendants assertions, on February 24, 1999, as part of Defendants and Vantage's ongoing relationship, Defendants traveled to Massachusetts to prepare and conduct a private workshop for Vantage on state registration requirements for NPO's.  (A true and accurate copy of an Invoice from Defendants to Vantage, dated February 26, 1999 is attached hereto as Exhibit A.)

12.     Based on Defendants' representations regarding their expertise, Vantage decided to engage Defendants to prepare the Shriners Cnotract.  The Shriners engagement contemplated an ongoing multiyear relationship with Defendants that would encompass both preparing the Shriners Contract, drafting future contracts for other of Vantage's NPO customers and performing lobbying activities related to State and Federal regulations.

13.     Invoices submitted by Defendants to Vantage show that Defendants were working on the Shriners Contract and communicating regularly with Vantage in Massachusetts in 1999.  For example, an invoice from April 1999 shows that Vantage and Defendants telephoned each other at least thirteen times to discuss the Shriners Contract and various parties' comments regarding the contract.  A significant portion of these telephone calls were initiated by Defendants.  In addition, the parties communicated regularly by email and Defendants forwarded

at least one memorandum and a fax to Vantage in Massachusetts related to the Shriners matter in April.

14.     In May 1999, Defendants were heavily engaged in negotiating and preparing the Shriners Contract and communications between Vantage and Defendants were again numerous. Invoices submitted by Defendants to Vantage in Massachusetts show at least twenty-one separate telephone communications, the majority of which were initiated by Defendants. Defendant always consulted Vantage in connection with negotiations. As in April, Defendants drafted and forwarded at least one memorandum to Vantage in Massachusetts as an update on the Shriners matter and again communicated with Vantage regularly by email.

15.     Defendants' invoices show that Vantage and Defendants continued communicating at this frequency with regard to the Shriners Contract until it was ultimately executed in June 1999. Even after the Shriners Contract was executed, Defendants continued to work for Vantage on the Shriners matter and continued to communicate regularly. As but one example of many, on October 2, 2000, Miller wrote to Shriners on behalf of Vantage, carbon-copying Vantage in Massachusetts, to inform them that Vantage would defend any challenge to mailings under the Shriners Contract. (A copy of the October 2000 Letter is attached hereto as Exhibit B.) This letter is particularly significant because it establishes that Defendants continued their wrongful conduct against Vantage when they stated, without any basis, that the Shriners Contract complied with state and federal regulations. Carolyn A. Emigh ("Emigh"), another representative of NSG, again continued Defendants' wrongful conduct when she suggested in an email, dated May 2, 2000, that Vantage forward her credentials to Shriners to show that Defendants were "specialist in charitable fund raising in particular." (A copy of the May 2, 2000 email is attached hereto as Exhibit C.)

16. Furthermore, even as late as September 12, 2002, Defendants were working with Vantage and communicating with Vantage regularly regarding amendments to the Vantage Contract.

17. Vantage has conducted a preliminary search for emails representing communications between Defendants and Vantage. Due to time constraints, this search is by no means exhaustive. Nevertheless the search has turned up twenty-two emails from either Miller or Emigh, in which Defendants were either discussing various recommended changes to the Shriners Contract or attaching suggested amendments. What comes across clearly from these emails is that negotiations related to the Shriners Contract were not limited to communications between Defendants' offices in Washington and Virginia and Shriners' office in Florida. The emails show that all significant decisions were made by Vantage from its Massachusetts office, that Defendants made no independent determinations regarding changes to contract terms without first communicating those suggested changes to Vantage for approval at its Massachusetts office, and that Defendants repeatedly contacted Vantage in Massachusetts in connection with their engagement.

18. Finally, related to Shriners and Vantage's other NPO customers, Defendants represented Vantage by participating in lobbying efforts together with other Washington counsel to have certain changes implemented in the laws governing nonprofit mailings. The numerous invoices submitted to Vantage in Massachusetts establish that Defendants regularly communicated by mail, email and telephone with Vantage in Massachusetts regarding the progress of those lobbying efforts.

19. In addition to work related to Shriners, Defendants continued to work on numerous other matters for Vantage and other of Vantage's customers. Primarily this work related to registration and incorporation of various NPO's in a large number of states. These customers included American Helenic Educational Philanthropy Association, Imperial Shrine,

-6-

Wildlife Land Trust, USA Hockey, Fleet Reserve Association, Air Force Enlisted Widows, National Antivivisection Society, Drag Racing Women, Order Of Sons of Italy, TX Knights of Columbus, Order of the Eastern Star, Sons of Italy Foundation, Benevolent & Protective Order of Elks of the USA.

20. This registration work included registering Vantage's NPO customers in many, if not every state, including Massachusetts. In connection with this work, Defendants communicated with Vantage at its Massachusetts offices on untold number of occasions. A review of Defendants' invoices alone show Defendants communicated with Vantage in Massachusetts on literally hundreds of occasions since their relationship began.

21. A review of the limited number of emails that Vantage has been able to retrieve to date shows that either Miller or Emigh communicated with Vantage at its Massachusetts office no less than forty-eight (48) times between 2000 and 2002. These emails relate to issues related to registration of numerous of Vantage's NPO customers, as well as contract negotiations with Vantage's NPO customers. Again, as with matters related to Shriners, Defendants communicated with Vantage in Massachusetts throughout those matters. As such, the emails referenced above include working drafts of numerous contracts and other documents forward to Vantage by Defendants.

22. Vantage is aware that Defendants traveled to Massachusetts on December 6, 2001 for a meeting with Vantage during which they discussed, among other things, outstanding issues related to Shriners.

Signed under the pains and penalties of perjury this the 7th day of October 2004.

Harry S. Melikian

# EXHIBIT A

## Nonprofit Service Group
Suite 400
1250 24th Street, N.W.
Washington, D.C. 20037

202/466-6620
Fax 202/223-2775

George E. Miller, Esq.
Carolyn A. Emigh, Esq.

Grant A. Wills, CP.
Jeffrey Galginaitis, CP.

February 26, 1999

I N V O I C E

*[handwritten: PETER Let's Discuss]*

*[stamp: FILE COPY]*

To:   Mr. Harry S. Melikian
      Executive Vice President
      Vantage Financial Services
      1244 Bolyston St., Suite 302
      Chestnut Hill, MA 02467

Project:  Prepare and conduct private workshop on state
          registration requirements

Dates Work Performed:  February 24 - 25, 1999

Invoice No.:  VFS 99-2

Invoice Amount:  $1,557.00

---

There is now due for work performed and expenses incurred on the projects described above the sum of one thousand five hundred fifty seven dollars ($1,557.00).

---

Summary of Invoice Amount
    Time charged:
    Workshop @ flat fee:   *[handwritten: outstanding balance]*   $1,000.00
    Expenses charged:                                                $557.00

Total Amount Due:                                                  $1,557.00
                                                                   ========

Note:  See attached time and expense recordation sheets for detailed itemization. All receipts available upon request.

**EXHIBIT B**

### *Nonprofit Service Group*
Suite 400
1250 24th Street, N.W.
Washington, DC 20037
Phone: 202/466-6620
Fax: 202/223-2775

George E. Miller, Esq.*†
Janice L. Anderson, Esq.*‡
Carolyn A. Emigh, J.D. ††

Grant A. Wills, CPA ††
Keith E. Negrin ††
Dusty A. Nichols ††

\* In District of Columbia, practice
limited to matters and proceedings
before federal courts and agencies

† Missouri Bar only
‡ Pennsylvania and
New Jersey Bars only
†† Not a member of the Bar

October 2, 2000

Mr. Jay Fleisher, Esq.
General Counsel
Shriners Hospitals for Children
2900 Rocky Point Drive
P.O. Box 31356
Tampa, Florida 33631-3356

RE: <u>Agreement By Vantage Financial Services, Inc. ("VFS")
Not To Implead Shriners Hospitals for Children ("SHC")</u>

Dear Mr. Fleisher:

My client, Vantage Financial Services, Inc. has instructed me to inform you that VFS will defend any challenge that a mailing prepared and entered into the U.S. Mail pursuant to the contract between VFS and SHC dated June, 1999, constitutes an unauthorized cooperative mailing. VFS will bear the entire burden, financial or otherwise, of its defense. Further, by this letter, VFS agrees that it will refrain from impleading SHC as a third party defendant in any such litigation.

VFS remains confident that the terms of the contract comply with all state and federal regulations that govern charitable solicitation and eligibility of SHC's packages to be mailed at the Nonprofit Standard A Mail rate. Please do not hesitate to contact me if you have any question concerning the content of this letter.

Sincerely,

*George E. Miller*

George E. Miller

Cc: Harry Melikian

# EXHIBIT C

Oct-07-2004  03:30pm  From-VANTAGE DELUXE WORLD TRAVEL           617-878-6142       T-054  P.011/035  F-812



"Carolyn A. Emigh"
<CEmigh@nonprofitserv.com>

05/02/2000 05:52 PM

To  MKaiser@vantagetravel.com
cc
bcc
Subject  Shriners DM Program

Matt:  I was hoping to receive some feedback from you or Larry.  If Larry
used what I had worked on yesterday, last night, and today, I got to
thinking that it might be good to include my bio.  That way whoever he
passes it on to at the Shriners would be able to assess my credentials as an
economist in general and a specialist in charitable fund raising in
particular.

I've been out of pocket this afternoon with another client.  Having
just returned to the office, I thought I'd go ahead and send the bio anyway.
If it's useful, then you'll have it.

I still hope to receive some feedback from you or Larry.  If we
could work on one of these calculations together, then I'd learn how Vantage
likes to present these critical issues, and the next time I could prepare it
in less time, and I might come closer to what Larry likes on the first try.

Talk to you soon,  --Carolyn


<<Bio_CAE.doc>>