UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Vantage Financial Services, Inc.<br>Plaintiff<br><br>v.<br><br>Nonprofit Service Group and George E. Miller<br>Defendants | CIVIL ACTION NO. 04-11686-WGY |

**REPLY AFFIDAVIT OF GEORGE E. MILLER**

I, George E. Miller, upon oath, do hereby depose and say the following based upon my personal knowledge:

1.      I reside at 1130 Marion Avenue, McLean, Virginia.

2.      I am an attorney licensed to practice law by the State of Missouri and am the

President of Nonprofit Service Group, Inc..

3.      I submit this affidavit in order to supplement my earlier affidavit and to reply to

Plaintiff's opposition to Defendants' motion to dismiss and for transfer of venue and to address

issues that were raised in that opposition but which were not addressed fully in my earlier

affidavit that was filed contemporaneously with Defendants' motion.

4.      I have worked in the nonprofit field since 1982 representing the interests of

nonprofit organizations and their service providers in the area of postal regulation and

compliance with state solicitation laws.  I served from 1982 to 1988 as the Executive Director of

the Nonprofit Mailers Federation ("NMF"). A membership organization of some two hundred nonprofits, NMF advocated to preserve and stabilize nonprofit postal rates and for fair treatment of nonprofit mailers through postal regulations. In 1988 I joined with two other lawyers to form a firm based in Washington, DC called Noto, Oswald, and Miller ("NOM"). The two principal lines of practice were immigration law and nonprofit postal and state regulation. NOM never had an office in Massachusetts; it never had a bank account or property there, nor did any of its principals ever travel there as representatives of NOM. When NOM disbanded in 1994, I took the nonprofit line of business and opened a small firm, Nonprofit Service Group ("NSG"), that provided consulting services in the areas of fund raising, state regulation of charitable solicitation, postal regulations and drafting fund raising contracts, primarily for nonprofit organizations. I continue to work in these areas primarily for nonprofit organizations. Currently, I also serve as special counsel to the Direct Marketing Association Nonprofit Federation advising on postal and legislative issues. See Exhibit A for further detail concerning my qualifications.

5.    Mr. Melikian and I spoke on or about November 13, 1993, when Mr. Melikian called me at my office in Washington, DC to discuss Vantage Financial Service's ("VFS") compliance with state registration laws, particularly the Commonwealth of Virginia which had issued a "cease and desist" order barring VFS from continuing to mail solicitations on behalf of its nonprofit clients into Virginia until VFS registered.

6.    In December, 1993 and January, 1994, Noto, Oswald, Miller and VFS respectively entered into a work agreement that was executed by me for NOM and Mr. Melikian for VFS. The scope of service was to assist VFS to respond to inquiries from state regulatory officials concerning VFS' direct mail fund raising programs for nonprofit organizations. At the time and for six (6) years thereafter, VFS maintained an office in Washington, DC.

7.      About forty (40) states and counties regulate charitable solicitation through annual

registration with either the Attorney General or Secretary of State of the contract between the

soliciting nonprofit and its professional fund raiser.  The nonprofit is also required to file its

annual audited financial statements and federal tax return (IRS Form 990).  Both the nonprofit

organization and its fund raising consultant are required to comply before they commence any

fund raising.

8.      Initially NOM assigned VFS registration work to Grant A. Wills, a certified

public accountant and independent contractor, who specialized in nonprofit accounting and

compliance matters.  For the first three years of the engagement, from November, 1993 through

November, 1996, Mr. Melikian requested NOM services on an ad hoc basis.

9.      By 1998, Mr. Melikian had directed NSG to prepare state registration filings for

five (5) of its nonprofit clients, and this work commenced in late 1997 and early 1998.  NSG

retained another independent contractor, Jeff W. Galgainitis, CPA, to assist.

10.     Because of the expense and stress that VFS incurred when one of its nonprofit

clients failed to register to solicit, Mr. Melikian represented to me that he had worked an

arrangement with certain VFS nonprofit clients so that NSG would prepare their state

registration filings and send the invoice to the nonprofit client in care of VFS.   The nonprofit

client would instruct the escrow agent of its bank account in Boston, MA--the account that held

donations received in response to solicitations that the nonprofit hired VFS to create and mail--to

cut a check from the escrow account to reimburse VFS.  As a result, I never thought that VFS

paid those invoices even though the "in care of" invoices were paid on a VFS corporate check.

My understanding is that VFS was reimbursed from the nonprofit's escrow bank account.

During the period November, 1993 through March, 1999, NSG billed about $15,000 to five (5)

3

nonprofits in care of VFS to prepare their respective state registration filings. During the same period, NOM, later NSG, billed VFS directly for about $41,000.

11.    Contrary to Mr. Melikian's claim in Paragraph 6 of his affidavit in this case, in the five years and five months from November, 1993 to April 13, 1999, NOM, later NSG, sent 15 invoices to VFS for work performed for VFS' own account. That works out to be less than one invoice per month, not "on nearly a monthly basis, (and in some instances more than once per month) . . . ." During the same period, NSG never sent two invoices in the same month for work it performed for VFS for its own account. With respect to the five (5) VFS nonprofit clients for whom NSG prepared state registration filings and sent their respective invoices in care of VFS, the distribution of invoices during that period was as follows: VFS Client #1: two (2) invoices in 1998; none thereafter (it preferred NSG to bill it directly); Client #2: one (1) invoice in 1998 and none thereafter; Client #3: one (1) invoice in 1998; Client #4: one (1) invoice in 1998 and two (2) invoices in 1999; Client #5: one (1) invoice in 1998 and one (1) invoice in 1999. While Mr. Melikian's affidavit reads as though Defendants communicated with VFS on a regular basis either by phone, fax, e-mail, or letter, I have reviewed my timesheets, and they seem to suggest something quite different. During the period from 1993 to April, 1999, I recorded that Mr. Melikian and I spoke only twenty-six (26) times.

12.    During this same period, from November, 1993 to April, 1999, the only travel on behalf of VFS was done by Messrs. Wills and Galginaitis. Mr. Melikian had requested that NSG conduct a training workshop at the VFS corporate office in Boston in April, 1998 and again the following year in February, 1999 in order to familiarize the changing mix of VFS account representatives with state registration compliance and the penalties that states impose on nonprofits and their fund raising consultants when they solicit without registering in advance.

4

NSG gave that assignment to its independent contractors who handled preparation of state registration filings. As a university professor, Mr. Wills made an excellent trainer. I did not participate in those workshops.

13.    On or about March, 1999, Larry Lyon, Senior Vice President for Sales and Marketing for VFS, called and asked me to meet him in Washington, DC.   During this meeting, Mr. Lyon discussed a possible fund raising agreement between VFS and Shriners Hospital for Children ("SHC").  Under the Postal Service's cooperative mail rule, the nonprofit must ultimately bear the risk in order to mail the direct mail pieces at the lower nonprofit mail rate. As long as SHC assumed responsibility for the risk, an agreement could be drafted that would meet the Postal Service requirements, even if the program failed to raise sufficient revenue to cover its costs.

14.    On April 14, 1999, Larry Lyon called to solicit my assistance to prepare a contract to cover work that VFS was going to do for the SHC.  Mr. Lyon outlined the essential terms of the agreement, and he asked me if I could draft an agreement that would meet the Postal Service's cooperative mail rule.  Mr. Lyon was very anxious to get an agreement drafted and the mail program started.  Other than this call and my earlier meeting with Mr. Lyon in Washington, DC, I had no prior discussions with anyone, including Mr. Melikian, at VFS regarding possible work on a contract for the SHC.

15.    I agreed to prepare a draft contract that incorporated the terms that Mr. Lyon had outlined in our phone conversation.   The negotiations with counsel for SHC and Larry Lyon on behalf of VFS took approximately two months to complete.  There were numerous drafts, and one of the key issues was whether SHC would assume the risk for the mail program, even though the SHC wanted to mail the solicitation pieces at the nonprofit mail rate.  At no time during the

drafting of the SHC/VFS agreement did I travel to Massachusetts; however, I did travel to Florida. Apparently on several earlier occasions, unbeknownst to me until an affidavit by Ralph W. Semb surfaced several years later in conjunction with the False Claims Act case pending in federal court against VFS, Mr. Lyon had assured various SHC leaders that SHC would not be at risk beyond the funds raised by the program.

16.    Throughout the negotiations I reminded all parties that SHC must assume responsibility for the cost of the program in order to qualify the solicitations pieces for the lower nonprofit mail rate. To this end, I traveled to Tampa on May 13, 1999, where I met Larry Lyon and together we met with a group of SHC Board members and their counsel, Jay Fleisher. During this meeting, I continued to stress that postal regulations require that the nonprofit mailer assume the risk for the cost of the program, but I informed them that the costs could be paid from the revenue raised by the program.

17.    A 1992 ruling by postal headquarters in a cooperative mail case held that an arrangement between a fund raiser and a nonprofit mailer didn't violate the cooperative mail rule even though the fund raiser waited for months for some of the nonprofit's thirty-nine (39) departments and auxiliaries to pay the fund raiser's fees and costs in full. In those instances, it took multiple additional mailings to the donor file finally to generate sufficient funds in order to pay the fund raiser's fees and costs for the first shortfall and its costs and fees for all of the subsequent mailings. The Postal Service cited "[a]ffidavits submitted on behalf of [fund raiser] indicate that there was no intent or authorized promise to shift the contractual risk from the nonprofit organizations to [fund raiser]." Letter from Donald D. Dillman, Director, Office of Classification and Rates Administration, United States Postal Service, to Jim Finch, Swidler & Berlin (March 23, 1992). (A true and accurate copy of this document is attached hereto as

Exhibit B). The case covered all 121 of the fund raiser's nonprofit clients; of those NSG

represented 39 individual accounts in the cooperative mail case.

18.     In light of the prior decision by the Postal Service and other factors, I proposed

that the SHC pledge sufficient collateral to VFS to guarantee the payment of any shortfall.  The

Postal Service had accepted for some time the pledge of list rental income as collateral to

guarantee the payment of any shortfall.

19.     At no time prior to the negotiations between VFS and SHC did I go to

Massachusetts on behalf of VFS, nor at any time during the negotiations between VFS and the

SHC did I go to Massachusetts.  Contrary to Mr. Melikian's representations as set forth in

Paragraphs 9 and 10 of his affidavit, I did not communicate with Mr. Melikian or anyone else at

VFS to solicit business, nor did I make any representations about myself or NSG's abilities to

represent their interests.  VFS actively sought out my services and the services of NOM, later

NSG, on every occasion.

20.     Further, no one from VFS disclosed to me at the time of contract negotiations

that VFS did not intend to follow the terms of the contract with regard to the mail program

schedule set forth in the Pro Forma and incorporated into the contract.  The Pro Forma projected

that the fund raising program would break even after eighteen (18) months.  Therefore, the

collateral that SHC pledged as described in the contract would have been more than sufficient to

guarantee full payment of VFS invoices.  Later in 2001, Mr. Lyon disclosed to me that VFS had

unilaterally decided to mail ten (10) million solicitation pieces to non-donors ("prospects") in

2000.  That decision not only violated the terms of the contract because SHC had not given prior

written approval to VFS, but also the cost of those mailings assured that the Pro Forma's

7

projection--that the program would break even within eighteen (18) months--could not be accomplished.

21.     Thereafter, instead of mailing less expensive solicitation packages or taking other steps to contain the growing shortfall, VFS continued to mail huge numbers of relatively expensive packages to prospects.  In direct mail, the profit of the fund raiser is directly proportionate to its mark up of each direct mail piece and the volume of pieces mailed.  Thus, VFS had a direct pecuniary interest to increase the number of packages mailed.  Another factor that contributed to the growing shortfall was that VFS did not insist that SHC make larger payments on unpaid VFS invoices despite the fact that the SHC was banking several millions of dollars in donations.

22.     Contrary to Mr. Melikian's representation in Paragraph 11 of his affidavit, I did not discuss the terms of my engagement to draft the SHC agreement with Mr. Melikian.  Mr. Lyon called me in Washington, DC, on April 14, 1999, I believe while he was on the road, and asked me to draft a contract for the SHC.  During the two months that it took for the negotiations to reach agreement on the final terms of that contract, I did communicate with Mr. Lyon and Mr. Melikian, and some of those communications did take place while they were in Massachusetts.

23.     In Paragraph 14 of his affidavit, Mr. Melikian claims that Defendants' invoices for May, 1999 "show at least twenty-one separate telephone communications, the majority of which were initiated by the Defendants."  A review of the telephone bill for the month of May, 1999 shows that I initiated sixteen (16) calls to Massachusetts and sixteen (16) calls to Florida. Comparing my timesheets for May, 1999 to the telephone bill for May, VFS initiated twenty calls to me.  The person at VFS who initiated most of the twenty calls was Larry Lyon.

24.     In Paragraph 15 of his affidavit, Mr. Melikian refers to a letter dated October 2, 2000 that I drafted at Mr. Melikian's request. I drafted this letter after SHC's counsel learned of the pending False Claims Act case. He wanted a guarantee that VFS would not implead the SHC and would defend the agreement without any cost or obligation to the SHC, if it became necessary. At that point, VFS did not want the SHC direct mail program to stop for any reason because of the revenue that VFS was generating for itself. The statements contained in that letter I believed to be true, and I still believe that they are true.

25.     Mr. Melikian is correct when he states in Paragraph 16 of his affidavit that I was working for VFS in September, 2002. Mr. Lyon called me in Washington, DC to ask me to draft an amendment to the SHC agreement that would modify the Pro Forma schedule contained in the contract. At this point, the revenue generated by the mailings for SHC was not sufficient to cover the costs of the direct mail program. Now, VFS wanted to eliminate from the mail schedule a mailing of 5,000,000 pieces to solicit prospects and replace it with five (5) one million piece mailings to persons who had already donated and, therefore, were more likely to donate again in an attempt to reduce the outstanding shortfall before the contract terminated. The five (5) donor mailings contemplated by VFS were still high cost mailings for SHC because of the per package price that the SHC had agreed to pay in the contract, and they were highly profitable for VFS.

26.     Contrary to Mr. Melikian's claim in Paragraph 17 of his affidavit, the negotiations over the terms of the SHC agreement took place primarily between Tampa and Washington, DC. Still I did communicate with Mr. Lyon and on occasion with Mr. Melikian when they were in Massachusetts regarding the status of the negotiations with the counsel for the SHC. A number of my contacts with Mr. Lyon were outside Massachusetts while he was traveling for VFS.

9

27.     At no time prior to the negotiations between VFS and the SHC did I go to Massachusetts on behalf of VFS, nor at any time during the negotiations did I go to Massachusetts. All negotiations were conducted by conference call, fax, and e-mail. The principals in the negotiations were Jay Fleisher for SHC and Larry Lyon and myself for VFS.

28.     While I was engaged to draft the SHC contract, there weren't any negotiations with Mr. Melikian as he suggests in Paragraph 12 of his affidavit regarding any ongoing multiyear relationship with VFS that would encompass a larger role for myself or NSG, such as drafting future contracts for other VFS nonprofit clients and performing lobbying activities related to state and federal regulations. With respect to lobbying activities, I did recommend that VFS retain Washington counsel, and I recommended a law firm, Williams and Jensen, which is known for its strong lobbying capabilities on Capitol Hill. VFS did retain Williams and Jensen to represent them on Capitol Hill. NSG did prepare some background briefing papers, propose documents to create legislative history and language, and accompany Williams and Jensen to meet with key congressional staff and with coalition partners because of our knowledge of both postal regulations, in particular the history and application of the cooperative mail rule, and of VFS' operations.

29.     On January 13, 2004, VFS notified NSG to stop all work for VFS. Subsequently, I inquired where to send VFS' files, and we did so. With respect to my inquiry as to how NSG should proceed relative to ongoing registration work that NSG routinely performed for certain of VFS' nonprofit clients, VFS expressly directed NSG to continue to perform the registration work and to continue to invoice each nonprofit client in care of VFS. Because we had not been served in this lawsuit at that point, I thought nothing more about it. We continue to prepare registration materials for several VFS clients today who we invoice through VFS at its request.

30.    NSG performed work for a nonprofit organization and a for-profit fund raising agency that both have their respective headquarters in Boston, MA. In 1991, a member of the Nonprofit Mailers Federation ("NMF"), Elderhostel, called me in Washington, DC to discuss a postal eligibility issue as well as a legislative matter. At the time, I was a consultant to NMF on postal regulations and legislative matters. I agreed to represent them in Washington; I worked for Elderhostel exclusively in Washington, DC; and I did not travel to Massachusetts to meet with Elderhostel on business. The Massachusetts fund raising consultant, LW Robbins, that NSG performed work for related to an issue in Pennsylvania. NSG counsel, Janice Anderson, who lives and works in the Harrisburg, PA area, handled the matter. Since that issue was settled, we have done no further work for LW Robbins, nor has anyone at NSG traveled to Massachusetts to meet or do business with LW Robbins. NSG has always relied on referrals as the means to obtain new business. We have done no advertising in Massachusetts for new business, and apart from VFS, neither I nor NSG has received any revenue from sources in Massachusetts other than the two mentioned above and one nonprofit state registration client. Of NSG's thirty-nine (39) state registration clients, one is domiciled in Massachusetts. No one at NSG has ever traveled to Massachusetts to visit or work with that nonprofit organization.

31.    Contrary to Plaintiff's assertion at page 6 of its opposition memorandum, NSG's website was not connected to the internet until the end of December, 1999, at the earliest. As a result, Defendants couldn't have recommended that the Plaintiff visit the website in order to obtain information on our qualifications. Also, there is no reference on our website, then or now, regarding the cooperative mail rule.

32.    In Paragraph 7 of Mr. Melikian's affidavit, he alleges that NOM, later NSG, over the course of ten (10 ) years (1994-2004) sent more than 192 invoices to VFS that total

11

$519,729. The actual total number of invoices that we sent to VFS for work that we did for VFS as a corporate entity was sixty-one (61) invoices. Beginning in 2001, it suited VFS bookkeeping to have NSG divide the work it performed and billed to VFS into two invoices, which were numbered "A" and "B."   If one counts A and B as separate invoices the total number of invoices that NSG sent to VFS was eighty-three (83). The total amount invoiced to VFS for work performed for the corporate entity was $353,695. As indicated above, pursuant to an understanding with VFS we did perform state registration work for some VFS nonprofit clients. We billed some of these clients directly, and some we billed in care of VFS. For this latter group of clients, VFS cut a check to NSG and then sought reimbursement from the nonprofit client's escrow bank account that contained the proceeds of the solicitation campaigns.

Signed under the pain and penalties of perjury this 21st day of October, 2004.

George E. Miller

**Exhibit A**

## QUALIFICATIONS OF GEORGE E. MILLER

I have worked for and with nonprofit organizations that rely on the U.S. Mails to raise funds and communicate with the public since 1981. My first assignment in this field came in 1982 when a group of nonprofit mailers retained me to address a fait accompli: Nonprofit mail rates had just jumped fifty (50) percent when Congress eliminated the bulk mail rate for otherwise qualified churches, charities, colleges and universities and other nonprofit mail permit holders.

I set about to build a coalition of nonprofit mailers, and together we convinced Congress not only to re-instate the preferred mail rate for bulk mail--primarily direct mail solicitations--but also to roll back the nonprofit bulk rate by a penny a piece. It was the first postage roll back since the days of Calvin Coolidge. We had to overcome two presidential vetoes.

Prior to 1982, I had about fifteen years legislative experience in Washington, DC. I represented the member firms of the New York Stock Exchange during the period that Wall Street sought protection similar to the Federal Deposit Insurance Corporation (Congress finally established the Securities Investor Protection Corporation); commercial bulk mailers (when Congress still set postal rates legislatively); the Interstate Commerce Commission, Rail Public Counsel, and the U.S. Railway Association ("USRA")--the federal banker for Conrail, the successor to the Penn Central Railroad.

During my tenure with the USRA, I also worked extensively with state and local government agencies in New England.

In 1982, the coalition that secured the reinstatement of the nonprofit mail rate for bulk mail and a rate rollback incorporated as the Nonprofit Mailers Federation, and I served as Executive Director until 1988. During that period, we managed to preserve and stabilize nonprofit mail rates. Not only did I represent nonprofit mailers before Congress, but also I testified before the Postal Rate Commission, the federal agency that sets postal rates and rules on classification matters.

Beginning in the mid- to late-1980s, the U.S. Postal Service and its independent arm, the U.S. Postal Inspection Service began to enforce the Postal Service's cooperative mail rule with vigor. Initially they focused on nonprofits' use of the nonprofit mail rate to sell goods and services cooperatively with unauthorized parties, such as insurers, credit card issuers, cruise operators, and other vendors. They expanded the enforcement campaign to fund raising. This period of vigorous enforcement of the cooperative mail rule extended from the late 1980s to the early 1990s.

During this period, I represented a number of nonprofit mailers and for-profit fund raisers in administrative postal deficiency cases. A mailer may appeal from a postal deficiency ruling at three levels. In two of the cases that I worked on during that period, the permit holder sought judicial review of the final agency decision. In each case, the Court ultimately found for the permit holder.

In 1989, the American Society of Association Executives designated me as its expert on nonprofit mail rates.

The Nonprofit Mailers Federation retained me to represent their nonprofit members during congressional mark-up of what became the 1990 amendments to the federal postal statute to eliminate abuse legislatively. As part of those amendments, Congress authorized the Postal Service to collect revenue deficiencies directly from third parties that are not authorized to mail at the nonprofit mail rate.

During the same period that the Postal Service was using civil subpoena authority to scrutinize contracts between nonprofit mailers and third parties to discover unauthorized cooperative mailings, state officials and legislators tightened regulation of charitable solicitation. Jurisdictions that required registration of nonprofits and their professional fund raisers prior to soliciting the public began to computerize their filings. "Passive compliance"-- wait to register until the state sends a cease and desist order--became increasingly more expensive. Nonprofits and for-profit agencies that had been ignorant of or ignored state regulation of charitable solicitations began to comply. There were--and are--some hold outs, but NOM/NSG began receive more inquiries concerning state registration in the late 1980s.

During this period, I began to work more closely with the National Association of Attorneys General ("NAAG") and the National Association of State Charity Officials ("NASCO"), the organizations that represent state regulators. I participated in a multi-year effort with nonprofits, fund raisers, NAAG, and NASCO to draft a uniform state law to regulate charitable solicitation.

With the states focusing more sharply on compliance, I encouraged a small group of for-profit fund raising consultants to establish a trade association to set ethical business guidelines and to work with the state regulators. The group incorporated as the Association of Direct Response Fund Raising Counsel. The group has grown in number and stature. For many years, it has had a full-time staff attorney, and its comprehensive ethics code, "Rules of Business Ethics and Practice," has become the standard of behavior in the direct mail fund raising industry.

In 1988, Special Olympics International retained me to evaluate its direct response fund raising program, both direct mail and telemarketing, including its fund raising contracts, expenses, and results, and to report directly to its founders and top executives, Eunice and Sargent Shriver. Thereafter, other nonprofit organizations requested that I perform a similar service for their direct response fund raising programs.

Several nonprofits also used my service to value their donor files and, in a couple cases, to assist them to develop a strategy and plan of action to take ownership or possession of their donor files from their respective fund raisers and exercise executive control of their fund raising programs.

Teamed up with in-house associates, independent contractors, and client and non-client nonprofit mailers and for-profit fund raisers, I gained considerable first- and secondhand knowledge about charitable fund raising, postal rates and regulation, fund raising contracts, and state regulation of charitable solicitation.

As a result, beginning in the mid-1980s and continuing throughout the decade of the 1990s, I received many invitations to present at  public seminars, at meetings of nonprofit associations, at the U.S. Postal Service's National Postal Forum, and the public session of the annual NAAG/NASCO conference.

I continue to serve as postal legislative counsel to the successor organization of the Nonprofit Mailers Federation, the Direct Marketing Association Nonprofit Federation.

**Exhibit B**



UNITED STATES POSTAL SERVICE
ROOM 8430
475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-5903

OFFICE OF CLASSIFICATION
AND RATES ADMINISTRATION

MC320:JMLease:rep

MAR 23 1992

Mr. Jim Finch
Swidler & Berlin
3000 K Street, N.W., Suite 300
Washington, DC  20007-3851

Dear Mr. Finch:

This decides your appeal dated September 10, 1991, on behalf of 121 nonprofit organizations (these are the organizations listed in Postal Inspection Service Exhibit 1 less one duplicate and the 39 Disabled American Veteran organizations and auxiliaries listed therein) regarding mailings made at the special bulk third-class rates pursuant to those organizations' contractual relationships with Brick Mill Studios, Inc., (BMS).

As summarized in your appeal, on March 22, 1991, the Postal Service notified the involved nonprofit organizations, including Departments and Auxiliaries of the American Legion, Veterans of Foreign Wars, State Grange, Grand Lodge, and others that it had concluded that mailings made under their special bulk third-class authorizations between October 6, 1987 and October 6, 1989, were cooperative mailings under section 625.5 of the Domestic Mail Manual (DMM) and were, therefore, improperly entered at the special bulk third-class rates.  On May 10, 1991, the Postal Service issued to each of the nonprofit organizations a deficiency demand for a sum equal to the difference between the postage which would have been due at the regular rates and the amounts actually paid on the mailings in question.  The total of these deficiencies covered by this appeal is $1,527,942.16.  Also at issue is an amount representing the difference between regular and special rates charged on mailings over approximately a two-month period beginning May 1, 1991. These mailings were required to be deposited at the higher regular bulk rate at the direction of the division Controller by letter dated April 22, 1991.  The appeal asserts that a refund of the difference beyond the special rate should be granted.

The applicable regulations in this case are section 133.2, and section 148.2, of the Domestic Mail Manual.  The deficiency appeal is under 148.2 and the classification decision requiring regular rate postage after May 1, 1991, is under 133.2.



OFFICIAL OLYMPIC SPONSOR

-2-

There is no dispute whether the nonprofit organizations are eligible to mail at the special bulk third-class rates. Each is an authorized nonprofit organization. One basis for the deficiency assessment is an Inspection Service investigative memorandum dated November 1, 1990, providing evidence that the mailings were cooperative mailings in violation of DMM 625.5, because of the nature of the business relationship between BMS and the nonprofit organizations. Ms. Elizabeth Smith, the Controller of the Manchester Division and postal official responsible for deciding whether the mailings of BMS and its clients were improper cooperative mailings, sought and received the advice of the General Manager of the New York Rates and Classification Center (RCC), who advised that the mailings were indeed cooperative. Thereafter, Ms. Smith issued her decisions, finding that the mailings in question were improper cooperative mailings.

Section 625.51, Domestic Mail Manual, states that an organization authorized to mail at the special bulk rates may mail only its own matter at those rates. An organization may not delegate or lend the use of its permit to mail at the special bulk rates to any other person or organization.

Section 625.521 (formerly 625.52), provides that cooperative mailings may be made at the special bulk rates only when each of the cooperating organizations is individually authorized to mail at the special bulk rates at the post office where the mailing is deposited. Cooperative mailings involving the mailing of any matter in behalf of or produced for an organization not itself authorized to mail at the special bulk rates at the post office where the mailing is deposited must be paid at the applicable regular rate.

The Postal Service examines a number of factors such as risk of loss, division of profits, and management control to determine whether a mailing involving another party was actually the nonprofit organization's own, or a cooperative mailing ineligible for the special rates. Other factors which may be examined are the existence, and terms, of any agreement, intent of the parties, contribution of each to the venture, and the presence of a community of interest in a common purpose.

Based on the Inspection Service's report and the opinion from the General Manager of the New York Rates and Classification Center, the Controller of the Manchester Division concluded that BMS shared, or bore in its entirety, the risk of loss and had substantial influence and management control over the program,

-3-

inconsistent with its asserted role as an agent in service to the nonprofit organizations; this resulted in the assessment of the deficiencies.

I have evaluated your appeal and the exhibits and supporting papers submitted to substantiate your position. According to your appeal each nonprofit organization "purchased from BMS a package of goods and services to enable the nonprofit organization to carry out its fund-raising programs." Contracts spell out the goods and services to be purchased and the fixed unit price to be paid by the nonprofit organizations. Indeed, it appears the contracts create a binding obligation on the part of the nonprofit organizations to pay for what was contracted.

The General Manager of the RCC opined, and Ms. Smith determined, that evidence adduced by the Inspection Service demonstrated a pattern and practice by BMS of not holding its nonprofit clients responsible for losses incurred in connection with unsuccessful promotions. Materials submitted with the Appeal cast doubt upon these findings. Affidavits submitted on behalf of BMS indicate that there was no intent or authorized promise to shift the contractual risk from the nonprofit organizations to BMS. The evidence further indicates that the nonprofit organizations were held responsible for any losses, except for a small number of instances where adjustments were made due to BMS's failure to comply with its obligations.

The question concerning the practice of funds or donations being mailed directly to BMS and not the nonprofit organizations for handling is answered by your appeal which shows that this "cashiering" service was an option for which BMS charged an additional flat rate fee for the number of pieces handled. You indicated that 27 percent of BMS customers chose to use this optional service. The remaining 73 percent had donations submitted directly to the nonprofit organizations for handling.

My review of the record of this matter shows that the written contracts used by BMS define an appropriate principal/agent relationship between BMS and its nonprofit organization clients. The evidence that the true relationship is not governed by the terms of the contract is unpersuasive or rebutted.

Thus, after giving full consideration to the evidence in this case, I cannot find that the arrangements between BMS and the various nonprofit organizations constituted anything other than a legitimate principal/agent, purchaser/supplier relationship. As such, the mailings that relied upon the services of BMS were

-4-

mailable at the special bulk third-class rates. Therefore, I
find that the mailings upon which the deficiencies assessed on
May 10, 1991, against the 121 nonprofit clients of BMS covered
by this Decision were not improper cooperative mailings, and
that the deficiency assessments are hereby rescinded. Moreover,
the additional postage collected from these nonprofit organi-
zations subsequent to May 1, 1991, should be refunded to the
nonprofit organizations. By copy of this letter I am advising
the local postal authorities of my decision.

Sincerely,

Donald D. Dillman
Director

CERTIFIED - RETURN RECEIPT REQUESTED

bcc: General Manager
Rates and Classification Center
New York, New York  10095-9599

Postmaster
Wilton, NH  03086-9998

Controller
Manchester Division
U.S. Postal Service
Manchester, NH  03103-9995

Mr. Dan MacDougall
Inspection Service