UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Vantage Financial Services, Inc.<br>    Plaintiff<br>v.<br><br>Nonprofit Service Group, Inc. and George E. Miller<br>    Defendants | CIVIL ACTION NO. 04-11686WGY |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL DISCOVERY AND FOR EXTENSION OF TIME TO COMPLETE DISCOVERY**

**I. INTRODUCTION**

  This is a multimillion dollar legal malpractice claim against an attorney and a corporation specializing in serving the nonprofit industry. Plaintiff Vantage Financial Services, Inc. ("Vantage") claims that it suffered approximately $2,250,000.00 of damages as a result of legal advice allegedly provided by defendants Nonprofit Service Group, Inc. and George E. Miller ("defendants") during the negotiation of a direct mail fundraising services contract with the Shriners Hospitals for Children ("the Shriners"). Vantage alleges that this sum was paid to the United States Government as part of a $4,500,000.00 settlement with the United States to resolve an underlying *qui tam* action brought against Vantage, two of its principals and its related companies pursuant to the False Claims Act, 31 U.S.C. §3729(a) et seq.

  In the *qui tam* action, the government alleged that Vantage and three other corporate entities[1] entered into numerous direct mail fundraising contracts with nonprofit organizations that violated federal postal regulations. The government's complaint sought single damages on account of its postal revenue deficiency claims as well as exemplary and statutory damages for

---

[1] Vantage Travel Services, Inc.; The Vantage Group, Inc.; and Vantage Direct Marketing Services.

False Claims Act violations. Vantage's contract with the Shriners was just one of many contracts eventually included in the underlying action.[2] Without adequate explanation, Vantage now alleges that approximately fifty percent of the total settlement of the underlying action was somehow attributable to the Shriners claim.

The early stages of this case were occupied by briefing and argument on a motion to dismiss under Fed. R. Civ. P. 12(b)(2) that the court ultimately denied. Promptly thereafter, defendants turned their attention to merits discovery and served two sets of document requests, interrogatories and notices of the depositions of two Vantage principals and a Rule 30(b)(6) corporate designee. Despite defendants' best efforts to obtain meaningful responses and deposition testimony, Vantage has engaged in a three month game of delay, excuses and avoidance. To date, Vantage has failed to provide any discovery in response to these requests. First and foremost, Vantage has yet to respond to interrogatories that were served over three months ago without any legitimate explanation for its delay. Vantage also took three months to draft a woefully inadequate response to defendants' first document request which, together with its response to defendant's second request for production, consists primarily of blanket objections to many of defendants' most basic requests. Vantage has yet to even provide defendants with the documents that it did agree to produce. In addition to ignoring and avoiding the defendants' written discovery requests, Vantage has engaged in dilatory tactics to avoid two properly noticed depositions of its corporate officers as well as the deposition of a Rule 30(b)(6) designee.

Contrary to its stated intention to engage in swift and open discovery, as expressed during the negotiation of a joint case management proposal, Vantage has failed to reveal even basic

---

[2] The *qui tam* action involved Vantage contracts with 80 nonprofit organizations.

information about its claims despite numerous inquiries by defendants. Its cavalier attitude towards its discovery obligations has put defendants in a precarious position considering that the agreed-to discovery deadline is fast approaching. Defendants request that Vantage be ordered to respond to and comply with all outstanding interrogatories and document requests and to produce all requested documents. Defendants ask that they be awarded costs and attorneys' fees related to this motion and that the discovery and other scheduling order deadlines be extended ninety days.

## II. FACTUAL BACKGROUND

Vantage is engaged in the business of direct mail fundraising programs on behalf of nonprofit entities. Under a typical arrangement, Vantage contracts to issue direct mail solicitations to the public seeking contributions for its nonprofit clients. Vantage's direct mail solicitations are accompanied by premium items (personalized address labels, notecards, and the like) as an inducement to encourage donations. For its work, Vantage is typically reimbursed for its out-of-pocket costs and also receives a markup for any mail pieces, including the premium enclosures, that it produces and sends on behalf of the nonprofit.

Under United States Postal Service ("USPS") regulations, nonprofit entities are entitled to use a special, reduced postage rate for their mailings. In the past, the USPS limited the circumstances under which a nonprofit could engage a for-profit entity, such as Vantage, to mail on the nonprofit's behalf at the reduced nonprofit postage rates. What is referred to as the "cooperative mail rule" required, among other things, that in order to mail at the reduced rate, a nonprofit had to assume all financial risk for the cost of mailings under a fundraising contract administered by a for-profit entity. If it was determined that a for-profit fundraiser, such as Vantage, assumed the risk of not being paid for its work in the event that, for example, charitable donations were insufficient to cover the fundraiser's fees and costs, such a contract would have

3

violated the cooperative mail rule.

In 1997, the United States began pursuing a *qui tam* action[3] initiated by a former employee of one of the Vantage entities. The *qui tam* action alleged that Vantage Travel Services, Inc. had entered into numerous contracts with nonprofits that violated the cooperative mail rule. These practices dated back to the early 1990's and typically involved secret side-letter schemes in which Vantage Travel Services, Inc. would assure its nonprofit clients, by letter, that the nonprofits were not at risk for program shortfalls despite the explicit terms to the contrary in the fundraising contracts. Essentially, it was alleged that Vantage Travel Services, Inc. adopted a business practice of entering into bogus contracts which, on their face, complied with the cooperative mail rule, but which actually violated the rule as a result of the illegal, secret side-letters. The *qui tam* action put an end to the viability of that scheme.[4]

In 1999, Vantage asked defendants to assist it in the negotiation of a lucrative fundraising contract with the Shriners. As a prerequisite to doing business with the Shriners, the Shriners insisted that its liability to pay for fundraising services be limited to proceeds generated by Vantage's direct mail solicitations. Because Vantage and the Shriners wanted to mail at the reduced nonprofit postage rate, Vantage sought defendants' input as to how it could do so without violating the cooperative mail rule and without resorting to the tactics that had previously resulted in the massive False Claims Act case against Vantage Travel Services, Inc. The Shriners contract was executed on June 17, 1999. With Vantage Travel Services, Inc. already under scrutiny by the United States Attorney for its prior mailing practices, the government decided to make the Shriners contract a part of its claims in the *qui tam* action. In

---

[3] United States ex rel. Lawrence Saklad v. Henry Lewis, et al, Civil Action No. 97-CV-10052MLW.
[4] For a more detailed discussion of the factual background of the *qui tam* action see Amended Memorandum in Support of Motion of the United States for Summary Judgment attached hereto as Exhibit "A".

4

response, Vantage's attorneys persuasively argued that the Shriners contract complied with the cooperative mail rule in all respects. While the court granted summary judgment on some of the government's other claims, it denied the government's motion for summary judgment as to the Shriners claims, holding that Vantage was entitled to summary judgment on the False Claims Act allegations, and that a trial was necessary as to the single damages claim related to the Shriners mailings.

Vantage alleges that it nevertheless settled the claims relating to the Shriners contract as part of a global settlement of the *qui tam* action. It claims that fifty percent of the total $4,500.000.00 settlement was allocated to the settlement of the postal revenue deficiency claim associated with the Shriners mailings simply because approximately fifty percent of the government single damages claim for postage due was related to the Shriners mailings. Vantage contends that defendants are liable for fifty percent of the settlement even though, among other things, (1) there is no evidence that Vantage and the government ever agreed to, or even discussed, an allocation of the settlement funds to the various contracts at issue in the *qui tam* action; (2) numerous remaining non-Shriners claims still involved far greater exposure based on potential False Claims Act liability for exemplary and statutory damages; and (3) the Shriners contract explicitly stated that the Shriners were responsible for the payment of any postage incurred under the contract. ("Agreement to Provide Fund Raising Consulting and Management Services", attached hereto as <u>Exhibit</u> "B", at ¶2). Despite this contract provision, Vantage subsequently agreed to indemnify the Shriners from any liability arising from the *qui tam* action. This agreement was provided to the Shriners in spite of the fact that Vantage entities brought third-party claims against a number of their other charitable clients whose fundraising contracts with Vantage entities were implicated in the *qui tam* action.

Vantage's complaint in this action alleges that defendants are liable for the approximately

5

$2,250,000.00 in settlement funds that purportedly have been paid to resolve the postal revenue deficiency claims relating to the Shriners' contract.[5] Vantage has not disclosed how much money it actually made as a result of the Shriners contract. It does allege, however, that the provisions in the contract that allegedly violates the cooperative mail rule were a prerequisite to doing business with the Shriners. (Complaint, ¶11). A declaration submitted by the United States in the *qui tam* action indicates that from 1999 to 2001 Vantage's fundraising program for the Shriners generated over $23,000,000.00 in donations, only $3,000,000.00 of which was retained by the Shriners. (Declaration of Alan E. Douillette, attached hereto as Exhibit "C", at ¶8). Payments to Vantage totaled $20,616,253.00, a substantial portion of which likely represents pure profit well in excess of the $2,250,000.00 allegedly paid to settle the Shriners claim (Id.) – profit that Vantage would never have realized but for the contractual provisions they now claim violated the cooperative mail rule.

### III. PROCEDURAL BACKGROUND

Following a hearing on defendants' motion to dismiss on October 27, 2004, the court held an unscheduled and abbreviated initial scheduling conference and directed the parties to submit a joint case management proposal setting forth agreed-to deadlines, including a discovery deadline. Despite defense counsel's misgivings about an accelerated scheduling order, defendants consented to an April 30, 2005 discovery date based on assurances from Vantage's counsel that defendants would have "ample means to elicit the factual basis and legal theories underlying its opponent's (sic) contentions regarding both liability and damages during fact discovery...." (Email dated November 5, 2004 from Laurence Johnson to Richard L. Nahigian attached as Exhibit "A" to the Affidavit of Richard Nahigian ("Nahigian Aff.")) Despite

---

[5] Vantage also claims that it is entitled to recover fifty percent of all legal fees it expended beginning on the date that the Shriners contract was made part of the *qui tam* action.

6

counsel's assurances of informality, cooperation and early compliance, defendants have since met with a constant barrage of delay, excuses and discovery avoidance.

Defendants served interrogatories and a request for production of documents to Vantage on December 3, 2004. (Defendants First Set of Interrogatories to Plaintiff attached hereto as Exhibit "D"; Defendants First Request for Production of Documents attached hereto as Exhibit "E"). On that date, defendants also noticed the depositions of two of Vantage's principals, Harry Melikian and Lawrence Lyon, who, upon information and belief, were involved in the negotiation and/or administration of the Shriners contract and the underlying *qui tam* action. (Notice of Deposition of Harry Melikian attached hereto as Exhibit "F"; Notice of Deposition of Lawrence Lyon, attached hereto as Exhibit "G"). Those depositions were scheduled for January 20 and 21, 2005, well over a month from the date the notices were served.

Just days before defendants were set to go forward with the depositions of Mr. Melikian and Mr. Lyon, Vantage's counsel requested that the depositions be postponed and that he would propose alternative dates. (Nahigian Aff., ¶3). Defendants have yet to receive any additional dates for those depositions despite their requests. In a further attempt to obtain deposition testimony from Vantage, defendants served a notice of Rule 30(b)(6) deposition on Vantage on February 8, 2005, scheduling the deposition for February 17, 2005. (Id., ¶4). Defense counsel contacted counsel for Vantage on February 14, 2005 to discuss the Rule 30(b)(6) deposition. At that time and no earlier, counsel for the defendants was informed that Vantage's counsel was not available for a deposition on February 17th and that he was starting a bench trial on February 15, 2005. (Id.). Although counsel for Vantage indicated that he would contact defense counsel on February 16, 2005 to discuss scheduling the depositions and other discovery-related matters, no such call was received. (Id., ¶5). As a result, defense counsel contacted Vantage's counsel in the late afternoon on February 16, 2005. At that time, defense counsel was told that Vantage had not

7

yet designated a Rule 30(b)(6) witness and that Vantage's counsel would contact defense counsel early the following week to discuss the Rule 30(b)(6) deposition. (Id., ¶6). Counsel for Vantage also indicated that he was traveling out of state on February 17th for a personal commitment. During the call, Vantage's counsel indicated that Vantage would be responding to the outstanding written discovery requests in the near future. (Id.).

Following the February 16th call, defense counsel heard nothing further from Vantage until defense counsel called Vantage's counsel on February 24, 2003. At that time, defense counsel was advised that Vantage still had not designated a Rule 30(b)(6) witness, and that counsel had "mislaid" the defendants' written discovery requests. (Nahigian Aff., ¶7). During that call, defense counsel also raised the need to settle on dates for the already-noticed depositions, and counsel for Vantage responded that he would contact defense counsel early the next week to discuss the depositions. (Id.). On that same day, defense counsel wrote to Vantage's counsel that although defendants would prefer to avoid filing motions to compel, they would do so if it becomes necessary. (Letter dated February 24, 2005 from Richard L. Nahigian to Laurence Johnson attached as Exhibit "B" to the Nahigian Aff.). Vantage's counsel was reminded of the fact that discovery was scheduled to be completed on April 30, 2005 and, as a result, defendants could not afford to wait much longer before seeking the assistance of the court.

Counsel for defendants received a subsequent telephone call from Vantage's counsel on March 2, 2005 at which time defense counsel was informed that Vantage's counsel would be leaving that week for a vacation. (Nahigian Aff., ¶9). During that call, Vantage's counsel again promised that written discovery responses would be served early the following week. (Id.).

In yet another attempt to obtain deposition testimony relating to this case, defendants noticed the deposition of a former Vantage employee, Peter Demakis, for March 10, 2005. (Notice of Deposition of Peter Demakis attached hereto as Exhibit "H"). Counsel for Vantage

8

telephoned defense counsel and stated that the deposition could not go forward because lead plaintiff's counsel was unavailable and that other counsel was not available for the deposition that day. (Affidavit of Matthew J. Griffin ("Griffin Aff."), ¶3). Counsel for Vantage stated it would propose alternative dates for the Demakis deposition, but no dates have been offered. (Id.).

On March 7, 2005, defendants sent counsel for Vantage a request for a discovery conference pursuant to Local Rule 37.1(A) in hopes of prompting discussion about the numerous outstanding discovery requests and depositions. (Letter dated March 7, 2005 from Matthew J. Griffin to Laurence Johnson, attached as Exhibit "A" to the Griffin Aff.). That same day, Vantage finally served a response to defendants' document requests. (Plaintiff's Responses to Defendants' First Request for Production of Documents, attached hereto as Exhibit "I"; Plaintiff's Responses to Defendants' Second Request for Production of Documents, attached hereto as Exhibit "J").[6] Those responses were deficient in a number of respects, most particularly with respect to Vantage's blanket refusal to produce categories of documents relevant to numerous aspects of the case, including the financial results of the Shriners direct mail fundraising program, the *qui tam* action and Vantage's defense costs. As for the documents Vantage did agree to produce, none of those documents have been made available to defendants. To date, Vantage has not responded to the December 3, 2004 interrogatories at all. Despite defendants' hope that Vantage's discovery response would make good on its attorney's promise of cooperative discovery, it is apparent that Vantage has no interest in complying with its obligations under the Federal Rules of Civil Procedure. The most troubling result of this

---

[6] On February 1, 2005, defendants served Vantage with a second document request seeking the production of documents in support of Vantage's claim for attorneys fees incurred during the *qui tam* action. (Defendants' Second Request for Production of Documents attached hereto as Exhibit "K").

9

noncompliance is that defendants have been unable to obtain a coherent explanation of Vantage's damages claim.

On March 21, 2005, the parties participated in a Local Rule 37.1(A) meet and confer at the offices of Vantage's counsel beginning at 11:00 a.m. (Nahigian Aff., ¶10). Vantage was represented at the meeting by Laurence Johnson and Neil Bingham. Defendants were represented by Richard Nahigian and Matthew Griffin. Despite a near two-hour discussion, the parties were unable to resolve their fundamental differences with respect to many key areas of discovery. (Id.). As an initial matter, counsel for Vantage could not state with any certainty when Vantage would finally be serving answers to defendants' interrogatories. It was also made clear that Vantage would not agree to produce any financial documentation relating to the Shriners contract, any documents concerning the *qui tam* action (unless defendants agreed to limit their request to documents concerning the Shriners), and any documents that would provide actual support for its claim for attorney's fees. (Id.). Counsel for Vantage did agree to contact his client that day to determine when it would be producing those documents it did agree to turn over to defendants, and to determine availability for the previously noticed depositions. Counsel for Vantage indicated that he would call defense counsel by the end of the day, whether he received responses to these inquiries or not. No call was received that day. (Id., ¶11).

Defense counsel subsequently spoke to Vantage's attorney on March 23, 2005. (Nahigian Aff., ¶12). As of the March 23rd conversation, Vantage still could not advise defendants of any date certain for the production of documents it had agreed to produce, nor did Vantage indicate when it would be responding to the outstanding interrogatories. (Id.). Defendants can wait no longer.

10

# IV. ARGUMENT

F.R.C.P. 26(b)(1) states, in part, that: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." "The scope of discovery is broad and encompasses any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." <u>Or. Precision Indus. v. Intern. Omni-Pac Corp.</u>, 160 F.R.D. 592, 594 (D. Or. 1995), <u>citing</u> <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978).

### A. Vantage should be ordered to produce various categories of documents that are unquestionably relevant and responsive.

Vantage is refusing to produce numerous categories of documents that are directly relevant to the claims and defenses in this action. The requests that Vantage is resisting can generally be grouped into four categories of documents. These categories encompass information that is central to this case:

### 1. Financial Records Relating to the Shriners Fundraising Program

Cryptically, Vantage responded to each of the following requests by stating that "this request is objected to in its entirety on the grounds asserted in the foregoing general objections:" There was no particularization as to what "general objection" applied to each, or any, of the requests.

**Request No. 2:**

All financial records and statements concerning the Contract including, but not limited to:

    a)    records and statements of funds generated by Contract mailings;

    b)    records and statements of funds received by the Plaintiff for performing under the Contract;

    c)    records and statements of the Plaintiff's out-of-pocket expenses incurred under the Contract;

  d)  records and statements of payments made by the Shriners to the Plaintiffs to reimburse the Plaintiffs for their out-of-pocket expenses;

  e)  records and statements of funds paid to the Shriners; and

  f)  records and statements of postage paid for mailings on behalf of the Shriners.

**Request No. 9:**

All registration statements filed by the Plaintiff in any jurisdiction concerning the amounts of money collected by Vantage under the Contract.

**Request No. 10:**

All registration statements filed by the Plaintiff in any jurisdiction concerning the net amount of proceeds received by the Shriners as a result of the Contract.

**Request No. 18:**

All contracts, memoranda, letters, or other documents concerning any payments, goods or services that the Plaintiff provided to the Shriners at any time, including, but not limited to, charitable contributions to the Shriners by the Plaintiff or any charitable foundation in any way affiliated with or related to the Plaintiff.

**Request No. 20:**

All mail schedules that the Plaintiff prepared for the Shriners.

**Request No. 21:**

All budgets the Plaintiff prepared and submitted to the Shriners concerning mailings made pursuant to the Contract.

**Request No. 22:**

All invoices concerning any goods or services, including but not limited to paper, printing, cover letters, couriers, envelopes, reply envelopes, lettershop, address mail labels, back-end data processing, and front-end premiums in connection with the mailings made pursuant to the Contract.

**Request No. 23:**

All checks the Plaintiffs used to pay the invoices requested in Request No. 22.

**Request No. 24:**

All checks used to pay postage for any mailings made pursuant to the Contract.

**Request No. 25:**

All documents concerning the amounts of contributions made in response to the Plaintiff's mailings.

**Request No. 26:**

All documents concerning the number of donors who made contributions in response to the Plaintiff's mailings.

**Request No. 31:**

All summaries created by the Plaintiff concerning the fundraising programs that were the subject of claims in the underlying litigation, including, but not limited to, summaries entitled "Vantage Program Contract Summaries" and "Vantage Contract Summary Combined".

**Request No. 32:**

All Response Analysis Reports that the Plaintiff created concerning the Contract.

**Request No. 35**

All documents concerning all bank accounts maintained by the Plaintiff, including, but not limited to, any related entities as specified in definition no. 4 above, for the period January 1, 1999 through the present.

**Request No. 38**

All documents concerning mailing lists rented or exchanged for any of the mailings made under the contract.

**Request No. 39:**

Plaintiff's list rental and exchange registry.

Each of these requests for financial information concerning the Shriners contract is relevant because Vantage claims that, by entering into the Shriners contract, it lost $2,250,000.00. It is apparent from the *qui tam* action, however, that Vantage generated substantial profits by entering into the Shriners contract. These profits should have been well in excess of any settlement proceeds claimed to be attributable to the Shriners contract.[7] The Shriners contract and Vantage's resulting profits would never have materialized without the insisted upon language that allegedly violated the cooperative mail rule. If Vantage's profits exceed the amount it paid to litigate and settle the Shriners claims, Vantage has no claim for damages. In an effort to document and quantify Vantage's profits, defendants have requested basic underlying financial data.[8] In its document response, and at the meet and confer, Vantage

---

[7] See pp. 5-7, supra.

[8] The particular requests included in this category are also summarized in Exhibit "L." By means of Request No. 13, defendants also requested Vantage's federal tax returns from 1998 to 2002, which are also discoverable. Buntzman v. Springfield Redevelopment Authority, 146 F.R.D. 30, 32 (D.Mass.1993), citing Pogharian v. Croce, C.A. 81-1307-F (D.Mass.1985) ( "[w]here a party has put in issue the amount of [his] income, that party's tax returns or reasonable substitutes are discoverable").

13

has made it abundantly clear that it has no intention of providing this information, even though it is relevant and not subject to any privilege.

Based on materials produced in the *qui tam* action, it is apparent that Vantage did in fact profit from the Shriners contract regardless of its settlement with the government. According to the Douillette declaration, attached hereto as Exhibit "C", Vantage pocketed over $20 million dollars in gross proceeds under the Shriners contract. Defendants' document requests were targeted, in part, at obtaining any and all financial data necessary to calculate what portion of the gross proceeds were profit for Vantage. To defendants' knowledge, that information may not have been produced during the *qui tam* action so it is not available from any other source than Vantage.

Beyond its relevance to Vantage's alleged damages, the program financial data is also relevant to whether the Shriners contract was in violation of the cooperative mail rule. At the time the Shriners fundraising program was undertaken, the USPS considered numerous factors in determining whether a fundraising contract violated the cooperative mail rule. The determination did not depend solely on the contract provisions. The USPS looked at various indicia to determine whether a principal-agent relationship actually existed between the nonprofit and mailers such as Vantage. The *qui tam* action itself is an example of this process. The great majority of Vantage's fundraising contracts were valid on their face, but Vantage's other business practices are what ultimately lead it to be sued for False Claims Act violations. Here, the financial data associated with the Shriners contract are relevant not only to whether the contract did comply with the cooperative mail rule, but also to whether Vantage's business practices, possibly at variance from the contract, resulted in violations of the rule.

Finally, and maybe most importantly, profit was the single most important factor driving Vantage's desire to contract with the Shriners. The Shriners contract was a highly lucrative

opportunity that Vantage was willing to pursue at all costs. Vantage stood to make, and likely did make, enormous profits from the Shriners contract. This was likely the true determining factor behind its decision to enter into the contract, not anything that defendants did or did not say. The requested financial data is essential to defendants' ability to make this point.

Whether or not the payment of postal revenue deficiencies was an inevitable result of Vantage's decision to do business with the Shriners is likely to be a point that is contested by the parties. A disagreement on the merits of that point is not a valid ground for Vantage to refuse to produce financial data associated with the Shriners program. Defendants are entitled to open discovery of such information in order to support their defenses, however much Vantage disagrees with defendants' position.

### 2. Documents Concerning The *Qui Tam* Action and Other Vantage Contracts

Vantage responded to each of the following requests by stating that "this request is objected to in its entirety on the grounds asserted in the foregoing general objections:" Again, there was no particularization as to what "general objection" applied to each, or any, of the requests.

**Request No. 7:**

All contracts that were the subject of the claims in the underlying action.

**Request No. 11:**

All pleadings, motions, affidavits, discovery responses and other documents the Plaintiff filed or served in the underlying action.

Documents concerning the claims and defenses in the underlying *qui tam* action as well as other relevant documents related to Vantage's business practices are highly relevant.[9] This

---

[9] Although it is hard to believe, Vantage has objected to producing any materials that were filed or served in the *qui tam* action. Vantage will only do so if defendants agree to limit their request to materials that directly relate to the Shriners claim.

15

case arises in its entirety from the settlement of the *qui tam* action and the business practices that lead to it. Vantage has withheld this information for no apparent reason other than obstruction. All such documents are directly relevant to the claims and defenses in this action and should be produced by Vantage.[10] The other claims in the *qui tam* action influenced both on the global settlement of the case and Vantage's decision to enter into the fundraising contract that it agreed to with the Shriners. Vantage's attempt to withhold this category of documents is unsupportable.

Documents relating to all claims and contracts in the *qui tam* action directly impact on the proper allocation of the settlement funds paid to the government. Vantage's supposed allocation of the settlement funds is based on a quantitative process of simply allocating the settlement in proportion to the amount of single damages claimed by the government with respect to each of the fundraising programs at issue. Because the Shriners single damages claim totaled 49 percent of the total amount of single damages claimed, Vantage decided to allocate half of the settlement funds to that worst case scenario. This approach is sophistical. Any reasonable allocation of the settlement funds would necessarily include a qualitative review of the strengths and weaknesses of each individual claim included in the *qui tam* action. For this reason, all documents relating to claims arising out of contracts other than the Shriners, as well as the contracts themselves, are necessary to evaluate defend against Vantage's damages claims. This is particularly true since there is no evidence of any "meeting of the minds" with the government as to the allocation of the settlement funds. Apparently, the allocation was based on nothing more than Vantage's agreement with itself.

Documents concerning all of the contracts at issue in the *qui tam* action, as well as additional Vantage fundraising contracts, are also relevant evidence of Vantage's contractual and

---

[10] The specific requests included in this category are also set forth in <u>Exhibit</u> "L" and include Requests Nos. 7, 11,

16

business practices. These practices are relevant because, among other things, Vantage's prior fundraising contracts and all documents relating to the *qui tam* action are likely to reflect Vantage's knowledge and sophistication concerning the cooperative mail rule and the other nuances of the direct mail fundraising business. Vantage was a sophisticated player in a high stakes business. The documents requested in this category are necessary to establish this fact and to establish the circumstances under which Vantage negotiated and agreed to the Shriners contract . Vantage's knowledge of the cooperative mail rule, as well as its alleged prior indiscretions certainly impacted on both its knowledge and state of mind in entering into the Shriners contract.

### 3. Meeting Minutes

Defendants sought minutes of Vantage company meetings to no avail as follows:

**Request No. 29:**

Any minutes of company meetings concerning the Plaintiff created from January 1, 1999 to the present.

**Response No. 29:**

This Request is objected to in its entirety on the grounds asserted in the foregoing General Objections.

The substance of any company discussions concerning the Shriners contract and the *qui tam* action, including Vantage's reasons for settling, go to the heart of this case. Regardless of what Vantage alleges to have been the reasons for the various decisions it made concerning the Shriners contract and the *qui tam* action, it now attempts to lay the consequences of those decisions at defendants' door. Defendants would agree to limit Request No. 29 to matters concerning the Shriners contract and the *qui tam* action, but defendants also believe that Vantage cannot be relied upon to make the necessary distinctions and redactions. All minutes concerning these matters should be produced.

---

29, 33 and 34.

### 4. Documentation of Legal Fees Attributable to the Shriners Claim

Vantage's response to defendants' second request for production of documents is similarly deficient and perplexing. This document request seeks the production of documents concerning the defense costs that Vantage claims it incurred as a result of the Shriners contract being added to the *qui tam* action. The requests and responses are as follows:

**Request No. 1:**

All bills for legal services received by the plaintiff concerning the underlying action, including, but not limited to, bills for legal services rendered by Laurence Johnson, Morris Goldings, Brian LeClair, Seth Perlman, Davis, Malm & D'Agostine and Perlman & Perlman.

**Response No. 1**

This Request is objected to in its entirety on the grounds asserted in the foregoing General Objections.

**Request No. 2:**

All documents concerning all defense costs referred to in Paragraph (C)(2) of Plaintiff's Initial Disclosures

**Response No. 2:**

Subject to , and as limited by, the foregoing General Objections, Plaintiff will produce documents responsive to this Request.

In its Rule 26 initial disclosures, Vantage claims that, subsequent to the addition of the Shriners claim in the *qui tam* action, fifty percent of its attorneys' fees were somehow attributed to that one claim. In order to discover the factual basis of this claim, defendants requested all legal bills concerning the underlying action. (See Exhibit "K"). In response, Vantage objected to producing bills for legal services. (See Exhibit "J" at Response No. 1.). Vantage has agreed to produce other information concerning the legal fees it paid in the underlying action, but no such documents have been produced to date. Apparently, Vantage will disclose what it paid to its attorneys, but it refuses to disclose what work was actually performed and detailed in the legal bills. Because the *qui tam* action involves far more than the Shriners claims, defendants are entitled to review the legal bills to determine for themselves the reasonableness of the fees and whether they had anything to do with the Shriners at all. Vantage cannot have it both ways. If it

18

intends to claim that a portion of its damages is comprised of legal fees paid for the defense of the *qui tam* action, defendants are entitled to discover what legal work was performed, whether it had anything to do with the Shriners claims and what legal fees and expenses are actually attributable to the Shriners claim.  As with the other component of its damages claim, Vantage applies its "fifty percent rule" in calculating its defense cost damages.  Simply stating that fifty percent of the legal fees were allocated to a single claim is not enough and is, again, sophistical on its face.[11]  Any records that support, or undermine, Vantage's claims for legal fees are relevant, and subject to production as long as Vantage claims damages on account of its defense costs incurred in the *qui tam* action.  Defendants are not obligated to accept Vantage's damages theory without an opportunity to challenge it on the basis of full disclosure.  Otherwise, it should be precluded from making claims for attorney's fees and expenses.

    **B.**    **Vantage should be ordered to respond immediately to defendants' outstanding interrogatories.**

Vantage's treatment of the defendants' first set of interrogatories constitutes an even bolder refusal to meet its discovery obligations.  In excess of thirty days has passed since defendants served interrogatories on Vantage.  Despite repeated promises to provide answers, defendants have received nothing in response to their interrogatories.  Vantage has not provided a legitimate excuse for this near four month delay, not that one could even exist.  Defendants need not say much more on this point.  Vantage's failure to respond speaks for itself.  The Court should order Vantage to respond to the interrogatories forthwith.

    **C.**    **The court should extend the discovery deadline for ninety days.**

Additional time for defendants to engage in discovery is clearly necessary due to

---

[11] In addition to the amounts of legal fees, the dates on which Vantage allegedly incurred the fees are also relevant evidence.  Vantage was not added to this action as a defendant until about four years after it was commenced.

19

Vantage's delay tactics as well as the complex nature of this case. It took years for the United States Attorney to complete discovery against Vantage in the *qui tam* action. As matters currently stand, defendants now have little more than a month to conduct substantive discovery, and Vantage has not even begun to produce those documents it agreed to produce. Given what has gone on before, there is no telling how much, or little, progress will be made in discovery once this motion is served. At this point, however, defendants have no choice but to seek the court's assistance. Under the circumstances, a ninety day extension of the discovery deadline, and all other scheduling order dates calculated from the date of Vantage's compliance with the outstanding discovery requests, is appropriate.

## V. CONCLUSION

For the reasons set forth above, defendants' motion to compel discovery should be allowed. The court should also extend the discovery deadline and all other scheduling order dates by ninety days, calculated from the date of Vantage's compliance with the outstanding discovery requests, and award defendants attorney's fees and costs associated with this motion as a sanction for Vantage's lack of discovery compliance.

>Respectfully submitted,
>Nonprofit Service Group, Inc. and George
>E. Miller,
>By their attorneys,
>
>/s/ Matthew J. Griffin
>Richard L. Nahigian BBO No. 549096
>Matthew J. Griffin BBO No. 641720
>Peabody & Arnold LLP
>30 Rowes Wharf
>Boston, MA 02110
>(617) 951-2100

609344_1