**EXHIBIT "A"**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. LAURENCE SAKLAD, <br><br> Plaintiff, <br><br> v. <br><br> HENRY R. LEWIS, VANTAGE TRAVEL SERVICE, INC., and HARRY MELIKIAN, <br><br> Defendants. <br><br> v. <br><br> AMERICAN TRAPSHOOTING HALL OF FAME ET AL., <br><br> Third-Party Defendants. | C.A. NO. 97-10052-MLW |

### AMENDED MEMORANDUM IN SUPPORT OF MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENT

### STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1, the plaintiff, the United States, submits this statement of the material facts as to which there is no genuine issue to be tried.

1. During the period January 29, 1992 to November 19, 2001 (the "Mailing Period"), Vantage operated direct mail fundraising programs for the nonprofit organizations (hereinafter the "Nonprofit Organizations") identified in Exhibit A to the Declaration of Special Agent Beth Ann Irvine ("Irvine Decl.") ¶ 15.[1]  The mailings listed in Exhibit A to the Irvine Declaration (the

---

[1] Certain declarations are contained in Appendix Volume ("App. V") 1A. Deposition transcript pages are contained in App.V1B. Appendix volumes 2-15 contain documents specific to each of

"Subject Mailings") were mailed at the standard nonprofit mail rate, formerly known as the special bulk third-class rate (the "Nonprofit Rate"). Irvine Decl. ¶ 15, Ex. A.

## THE DEFENDANTS AND EMPLOYEES

2.      Vantage Financial Services is a wholly-owned subsidiary of Vantage Travel Service, Inc. Deposition of Harry Melikian ("Melikian Dep.") at 10-11. Henry Lewis ("Lewis") and Harry Melikian ("Melikian") are the officers of Vantage Financial Services, Vantage Travel Service and The Vantage Group. Id.

3.      Vantage Financial Services operates Vantage's fundraising business and Vantage Travel Services operates Vantage's travel business. Id. During the Mailing Period, Vantage's fundraising business has operated under, or been referred to as, Vantage Direct Marketing Service, Vantage Group Services, and Vantage Studios. See Deposition of Henry Lewis ("Lewis Dep.") at 28-30; Deposition of Mary Lou Newman ("Newman Dep.") at 7-10; Deposition of Jay Gelb ("Gelb Dep.") at 13-14; Deposition of Dallas Graves ("Graves Dep.") at 8-10.

4.      Throughout the Mailing Period, Lewis has been the Chief Executive Officer and/or President of Vantage Travel Service, Vantage Financial Services, and The Vantage Group, and Melikian has been the Executive Vice President and Treasurer of Vantage Travel Service, Vantage Financial Services, and The Vantage Group (collectively, "Vantage"). Melikian Dep. at 11-15; Lewis Dep. at 6-7, 31.

---

the 80 Nonprofit Organizations who contracted with Vantage. These documents are largely repetitive (i.e., the programs operated materially the same for each group) and are attached mostly for purposes of the record. In addition, representatives from 27 of the Nonprofit Organizations have provided sworn declarations attesting to how Vantage promoted its programs and how those programs operated. These declarations are attached at the tab labeled "Declaration" for each of the Nonprofit Profits Organizations. See App. V2-15.

5.      Jay Gelb ("Gelb") is the Executive Vice President of Sales for Vantage. Gelb Dep. at 6-9. Larry Lyon ("Lyon") is the Senior Vice President of Sales and Marketing for Vantage. Deposition of Larry Lyon ("Lyon Dep.") at 6-7.

6.      Richard Jarvis ("Jarvis") was President of Vantage Studios, the fundraising branch of Vantage, from, at least, 1990 through 1992, and reported directly to Lewis. Lewis Dep. 28-31, 99. Mary Lou Newman ("Newman") is the Vice President of Printing & Purchasing for Vantage Direct Marketing Services. Newman Dep. at 7-11. Dallas Graves was President of Vantage's fundraising group from July 1995 through January 1997. Graves Dep. at 8-10.

## THE 1990 INVESTIGATION

7.      In 1990, United States Postal Inspector Helen Seweryn began investigating an inquiry from the Union Saint Jean Baptiste ("Jean Baptiste"), a nonprofit organization, concerning a proposed direct mail fundraising contract between Jean Baptiste and Vantage Studios. Declaration of Helen Seweryn ("Seweryn Decl.") ¶¶ 1-2, Ex. A.

8.      Inspector Seweryn sent Jarvis, President, Vantage Studios, a letter, dated August 27, 1990, which she "cc" copied to Vantage's attorney, Walter Wekstein, stating that the Postal Inspection Service is investigating the possible misuse of the Nonprofit Rate by Vantage through the use of "[c]ooperative mailings." Id. ¶¶ 6, 10 Ex. B.

9.      Inspector Seweryn spoke by telephone with Jarvis and told him that she believed Vantage was engaged in illegal cooperative mailings. Id. ¶ 7. Inspector Seweryn told Jarvis that the proposed direct mail program violated the Postal Service's Cooperative Mail Rule because it demonstrated a joint venture arrangement, rather than a principal agent relationship, because Vantage had a direct, financial interest in the success or failure of the mailing, and therefore

shared in the costs, risks, and benefits of the proposed mailings. Id. ¶ 8.

10. Inspector Seweryn told Jarvis that the problem with the contract was that Vantage paid up front all costs and expenses of the program; there was no term requiring payment by the nonprofit; and, instead, under paragraph 6 of the contract, Vantage agreed to receive payment solely from "gross collections" associated with a "program"; and, in the event of a shortfall, Vantage secured the right to solicit further contributors until the shortfall was eliminated. Id. ¶ 7, Ex. A. Vantage's promotional material describe its fundraising program as "risk-free". Id., Ex. A (DOJ 11139) (emphasis in original).

11. Inspector Seweryn told Jarvis that Vantage could operate mailings for nonprofit groups using the Nonprofit Rate only if Vantage acted solely as an agent for the nonprofit group and did not share in the costs, risks, or benefits of the mailing. Id. ¶ 8.

12. A letter from Jarvis to Inspector Seweryn, dated September 12, 1990, and "cc" copied to Harry S. Melikian, Executive Vice President, Vantage Financial Services, Inc., states that Vantage Studios provided direct mail services to one nonprofit and that "Vantage Studios is acting as an agent for the group and earns a fee for its services." Id. ¶ 11, Ex. C.

13. In Fall 1990, Inspector Seweryn inherited an ongoing investigation regarding allegations that Vantage Travel Service, Inc., was violating the Cooperative Mail Rule. Id. ¶ 12. Inspector Seweryn sent a letter, dated October 25, 1990, to Henry Lewis, President, Vantage Travel Services, Inc., and "cc" copied to attorney Wekstein, referring to the Postal Service's "investigation into the misuse of special bulk rate mailing privileges to make cooperative mailings between nonprofit organizations and your company." Id. ¶ 12, Ex. D.

14. Inspector Seweryn sent a letter, dated November 16, 1990, to Lewis, President, Vantage Financial Services, and "cc" copied to Davis and attorney Wekstein (the "November 1990 Letter"), stating:

> The Postal Inspection Service is currently investigating the unauthorized use of the special bulk rate mailing privileges by numerous nonprofit organizations and Vantage Travel Service, Inc. Review of the contractual information shows that mailings made in conjunction with your organization's programs and nonprofit groups were cooperative in nature.

Id. ¶ 15, Ex. F.

15. The November 1990 Letter further states:

> Postal personnel . . . are being advised to refuse special bulk rate mailings made by nonprofit groups and Vantage Financial Services, Inc., Vantage Travel Service Inc., Vantage Studios, or any other subsidiary of Vantage Financial Services, Inc. until a review of the mail matter and business arrangements can be performed by the Inspection Service.

Id., Ex. F.

16. The November 1990 Letter requests that Vantage forward a sample of any mailing it intends to mail before using a nonprofit group's special bulk rate permit, and concludes:

> [A] system of monitoring all mailings made by Vantage Financial Services, Inc. using nonprofit organizations special third class mailing permits needs to be established. Attempts to deposit mailings by Vantage Financial Services, Inc. or attempts by nonprofit groups to deposit mailings in conjunction with Vantage Financial Services, Inc. or any of it's subsidiaries at the special bulk rate without allowing the Postal Inspection Service an initial examination will be considered as an act to purposely circumvent the Postal Inspection Service's Investigation.

Id., Ex. F.

17. Inspector Seweryn obtained copies of Vantage's contracts and correspondence from some of Vantage's nonprofit clients. Id. ¶ 17. Inspector Seweryn reviewed the contract between Vantage Studios and the Society for Barber Shop Quartet Singing and determined that

the terms were the same as in the contract with Jean Baptiste. Id. In particular, Inspector Seweryn observed that there was no term requiring payment other than from gross collections of the program and paragraph 6(c) provided that, in the event of a shortfall, Vantage shall have the right to solicit further known contributors until such shortfall is eliminated. Id.

18.    By memorandum to bulk mail acceptance employees, dated December 4, 1990, Inspector Seweryn advised that the "Postal Inspection Service is conducting an investigation into cooperative mailings by Vantage Financial Services, Inc., Vantage Studios, Vantage Travel, and any other subsidiary of that organization," and that "mailings between Vantage Financial Services, Inc. and any of their subsidiaries in conjunction with any nonprofit organization will not be accepted at the special (nonprofit) bulk rates of postage." Id. ¶ 18, Ex. H.

19.    On January 2, 1991, Inspector Seweryn and Postal Inspector James Degnan met with Jarvis at Vantage and told Jarvis that, under the cooperative mailing rule, Vantage and its nonprofit clients were not allowed to use the nonprofit rate when Vantage paid up front all costs and expenses of the mailings, received payment from the proceeds of the mailings, and agreed to recover any shortfall by conducting additional mailings, because Vantage was sharing in the costs, risks, and benefits of the mailing program. Id. Seweryn, Degnan, and Jarvis discussed the possibility of the Postal Service and Vantage Studios entering a third-party agreement whereby the Postal Service would agree to suspend and terminate assessment proceedings against Vantage Studios' nonprofit clients, and Vantage Studios would agree to pay the postage deficiencies on behalf of its nonprofit clients. Id. ¶ 21.

20.    By memorandum dated January 10, 1991, Inspector Seweryn sent to Thomas Ranft, the Postmaster for the Boston area, an Investigative Memorandum that she prepared, and a

6

proposed third-party agreement between Vantage and the Postal Service. Id. ¶ 24, Ex. L.

21. A letter from Postmaster Ranft to Jarvis, dated January 18, 1991 (the "Postmaster Ranft Letter"), and "cc" copied to Harry Melikian, states that it is enclosing Inspector Seweryn's Postal Inspection Service report outlining revenue deficiencies in the amount of $40,621.75 as a result of "unauthorized cooperative mailings" between Vantage and six nonprofit organizations involving greeting card or calendar fundraising promotions. Id. ¶ 26, Ex. M. The Postmaster Ranft Letter cites Domestic Mail Manual § 625.5 on "Cooperative Mailings", and encloses a copy of the third-party agreement covering the deficiency. Id., Ex. M.

22. The third party agreement states that the postage deficiency represents "the difference between the special bulk third-class rate paid and the regular third-class rate then in effect, each claim being that the mailing in question was a cooperative mailing" between the nonprofit permit holders and Vantage Studios. Id., Ex. M (at DOJ 10997). Vantage never signed the third party agreement and the Postal Service resumed postage deficiency collection efforts from Vantage's six nonprofit clients. Id. ¶ 27.

23. A letter from Robert Fetterman, Controller of the Boston Division of the Postal Service, to Melikian, dated March 13, 1991, notes that it is responding to a letter from Melikian protesting the potential imposition of revenue deficiencies against Vantage's six nonprofit clients, notes that only permit holders can protest imposition of the deficiencies, and states that, since Vantage did not enter into the third party agreement, the Postal Service is proceeding against the nonprofit permit holders. Id. ¶¶ 28-29, Ex. N.

24. A letter from Jarvis to Fetterman, dated May 23, 1991, enclosed a check in the amount of $22,636.20 "for the Cryptic Masons Medical Research Foundation for the postal

deficiency." Id. ¶ 31, Ex. O. Cryptic Masons was one of the six nonprofit groups identified by Inspector Seweryn for a revenue deficiency as a result of cooperative mailings with Vantage Studios. Id. ¶ 31. The check is co-signed by Marion Crum of Cryptic Masons and Jarvis of Vantage Studios. Id., Ex. O. See also Declaration of Marion Crum, App. V4 (Cryptic Masons).

25.  In September 1991, Inspector Seweryn told Jarvis no Vantage mailings would be allowed at the Nonprofit Rate until the contracts were provided for review. Id. ¶ 32. Inspector Seweryn subsequently received a letter from Jarvis, dated September 13, 1991, enclosing executed contracts for product-induced fundraising programs with seven nonprofit groups (the "September 1991 Letter"). Id. ¶ 33, Ex. P.

26.  The September 1991 Letter, which was "cc" copied to Melikian, states: "<u>These have been reviewed by our counsel to be concurrent with postal regulations regarding cooperative mailings. Please note paragraph 6(c).</u>" Id., Ex. P (emphasis added).

27.  Paragraph 6(c) of the contracts provided with the September 1991 Letter states: "In the event that gross collections associated with a PROGRAM are insufficient to cover the expenses and costs . . . then the ORGANIZATION will be billed by VANTAGE for the shortfall, which will be due and payable within 30 days of invoice." Id., Ex. P (e.g., at DOJ 10861).

28.  Paragraph 6(c) on Vantage's proposed contract with Jean Baptiste states: "In the event that gross collections associated with a PROGRAM are insufficient to cover the expenses and costs . . . then VANTAGE shall have the right to solicit further known contributors until such shortfall is eliminated." Id. ¶ 34, Ex. A (DOJ 11103).

29.  Paragraph 6 of Vantage contract with Jean Baptiste states that payments would be made from gross collections to a Program; Paragraph 6 of the contracts provided with the

8

September 1991 Letter states that payments will be made by the organization. Id.. ¶ 34; cf. Ex. P (at DOJ 10860) with Ex. A (at DOJ 11103).

30. Based on the revised contracts provided with the September 1991 Letter, Inspector Seweryn concluded that Vantage had changed its contracts to comply with the prohibition on cooperative mailings. Seweryn Decl. ¶ 35.

31. In or about 1997, Inspector Seweryn reviewed a letter, dated July 22, 1991, from Larry Lyon of Vantage Studios to the New York State Council Knights of Columbus (the "NYKC Side Letter"). Id. ¶ 39, Ex. S. One of the contracts Jarvis had provided Seweryn in September 1991 was between Vantage and the New York State Council Knights of Columbus ("NYKC"), and was dated July 1991. Id., Ex. P (at DOJ 10865).

32. The NYKC Side Letter states:

Confirming our conversation regarding the distribution of gross collections for the greeting card fund-raising program, Vantage Studios has agreed to the following:

From the proceeds of the card program:

A) Vantage will allow [NYKC] to keep the first $1.00 per box mailed (after postage costs for presend and box) as advanced profits for the program. Subsequent proceeds will be applied to the program cost. Once those costs are paid in full, then all future proceeds will go to the [NYKC].

B) In the event that the proceeds from the program are insufficient to cover the expenses, then Vantage Studios shall have the right to extend the program and mail to known contributors until such shortfall is eliminated.

Id., Ex. S. The NYKC further states: "This letter supercedes the payment methods described in paragraph 6 of the Agreement and will serve to affirm our mutual understanding of the financial arrangements associated with the greeting card fund-raising program." Id. ¶ 40, Ex. S.

9

33. If Inspector Seweryn had known of the existence of the NYKC Side Letter in September 1991, she would have informed Vantage that its agreements still violated the Cooperative Mail Rule and would have instructed the Post Offices not to allow any mail associated with Vantage to be sent at the nonprofit rate. Id. ¶ 41.

## VANTAGE'S BUSINESS ARRANGEMENT WITH THE NONPROFIT ORGANIZATIONS

34. Vantage contracts with primarily nonprofit organizations to perform "product induced" or "premium induced" direct mail fundraising on behalf of the organizations. Melikian Dep. at 15-16; Lewis Dep. at 41-45. In these type of fundraising programs, a nonprofit organizations members are sent small gifts from the nonprofit, such as a pack of calendars, along with a request for a donation to the nonprofit. Melikian Dep. at 15-16; Lewis Dep. at 41-45.

35. The nonprofit organizations provide Vantage with their mailing list and Vantage does all the work associated with the programs, including: devising and designing the mail pieces (subject to approval of the nonprofit group); contracting with vendors to do the printing, caging (i.e., collecting and holding donations in escrow); coordinating mailings; deciding when the mailings should be sent; and coordinating responses. Lewis Dep. at 41-45; Gelb Dep. at 140-41; Newman Dep. at 28, 36-38, 40-43; Melikian Dep. at 358-59, 377-78; Graves Dep. at 24.

36. With respect to the Subject Mailings, Vantage incurred and paid up front all of the costs and expenses associated with the fundraising programs. See Melikian Dep. at 34-35; 224-28, 246-49, 259-60, 364-67; Lewis Dep. at 41-45; Newman Dep. at 21-35; Gelb Dep. at 74-76, 121-24.[2]

---

[2] The costs and expenses paid up front by Vantage typically include all or some of the following elements: postage; printing; envelopes; the cost of the product; mailhouse charges; bank fees; mail permit fees; the National Change of Address ("NCOA") fee; mail sweeping fees; and mail

10

37. With respect to the Subject Mailings, the arrangement between Vantage and the Nonprofit Organizations was that donations to a fundraising program were distributed in the following order: first, to reimburse Vantage for its costs and expenses; second, to pay Vantage's profit markup; and, third, any remaining balance went to the nonprofit organization. In the event of a shortfall (i.e., where the donations received from a program are less than Vantage's costs, expenses, and profit markup), most of the Nonprofit Organizations had the option of either paying Vantage the shortfall amount or having Vantage attempt to recover any shortfall through either a set number of, or unlimited, additional mailings (depending on the particular arrangement). Melikian Dep. at 34-35, 140, 224-28, 246-49, 259-60, 364-67; Lewis Dep. 41-45; Newman Dep. 21-35; Gelb Dep. 72, 74-76, 80-82, 121-24; Lyon Dep. at 29-34, 127-29, 131-33; Deposition of Melikian in Vantage v. Southern Tennis ("Melikian Southern Tennis Dep.") at 22-23, 39-41. See also Irvine Decl. ¶¶ 17-19 (detailing arrangements of each of the Nonprofit Organizations); Douillette Decl. ¶¶ 9-16 (detailing arrangements of one of the Nonprofit Organizations).

38. In the alternative, some of the Nonprofit Organizations had agreements with Vantage that, in the event of a shortfall, either the nonprofit would have no further liability immediately, or Vantage would have the right to conduct a specific number of additional mailings, and then the nonprofit would have no further liability. See Irvine Decl. ¶¶ 17-19.

39. In addition, with respect to the Subject Mailings, Vantage sometimes provided a nonprofit group with an up front cash payment or advance, or guaranteed a nonprofit group that it would receive a certain amount of money. Lyon Dep. at 49, 64, 69-71, 76-79; Lewis Dep. 121-

---

opening charges. Melikian Dep. at 375, 384, 358; Gelb Dep. at 121-24, 75.

28. See also Irvine Decl. ¶¶ 17-19 (detailing the financial advance or guarantees provided to the Nonprofit Organizations).[3]

40. Vantage has never had a permit allowing it to mail at the Nonprofit Rate. Irvine Decl. at ¶ 16. Vantage negotiates contracts with various mailhouses to do the mailings, instructs the vendors to which mailhouse to send the prepared packages, and provides instructions to the mailhouses about how and when to do the mailings. Newman Dep. at 40-41. The mailhouses invoice Vantage, which pays the bills and adds the amount to the costs of the program owed by the non-profit. Id. at 42-43.

41. Over the last ten years, Vantage has hired and paid Century Mailing Company to mail millions of pieces of mail annually at the Nonprofit Rate. Declaration of Robert Johnson ("Johnson Decl.") ¶ 2. In the event a nonprofit group did not have a permit to mail at the nonprofit rate, Vantage provided Century with the money and required documents to obtain the permit, and Century applied for the permit on behalf of the nonprofit organization. Id. at 3.

42. The mailhouses signed a mailing statement for each of the Subject Mailings. See Irvine Decl. ¶ 16; Johnson Decl. ¶ 6. Each mailing statement for the Subject Mailings contains a certification that the mailing does not violate DMM § 625 (now DMM § E670.5.3) and is not a cooperative mailing. See Irvine Decl. at 16; Johnson Decl. at 6. Each mailing statement for the Subject Mailings identifies the Nonprofit Group but does not identify Vantage. Irvine Decl. at 16. The mailing statements were provided to the post office and then copies were returned to Vantage. Johnson Decl. at 6. See also Irvine Decl. at 16.

---

[3] For example, Lyon gave Cryptic Masons a $25,000 guarantee and a letter saying Cryptic Masons would have no liability in the event of a shortfall, gave the Shriners a $100,000 guarantee and a no liability letter, and gave Wildlife Forever a $20,000 advance. Lyon Dep. at 76-79.

12