**EXHIBIT "A-1"**

43.    Substantive changes to the standard program agreements and standard side letters generally had to be reviewed by Melikian.  Graves Dep. at 122-23.  See also Melikian Southern Tennis Dep. at 28.

## DEFENDANTS' KNOWLEDGE OF POSTAL REGULATIONS GOVERNING USE OF THE NONPROFIT RATE[4]

44.    As a result of the 1990 Investigation, Vantage changed the language of its standard program contracts so that it could send mail at the Nonprofit Rate, and began, at times, to use the side letters.  Lyon Dep. at 153-55.

45.    Prior to the 1990 Investigation, the language of the side letters was included in the program agreements.  Melikian Southern Tennis Dep. at 171.  Melikian considered the side letters an "amendment" or an "enhancement" of the program agreement.  Id. at 49.  Melikian knew that the Nonprofit Organizations wanted the side letters because they did want to have any financial liability in the event of a shortfall.  Id. at 42-44.

46.    Of the 80 Nonprofit Organizations, 66 had at least one side letter.  Irvine Decl. ¶ 17.  See also App.V2-15 (typically Ex. B).  In addition to containing the shortfall provision, many side letters also stated that Vantage was providing the nonprofit with a cash advance or guarantee in connection with the program.  Irvine Decl. ¶ 17(a).

47.    The side letters released the Nonprofit Organizations from having any risk of incurring financial liability in the event a fundraising program was unsuccessful (i.e., if donations did not cover Vantage's costs, expenses, and profit markup).  See Lewis Dep. at 59, 66, 92, 122-23; Gelb Dep. at 80; Lyon Dep. at 29-34, 156; Declaration of Kim Segers ("Segers Decl.") ¶ 11

---

[4]  This section details the defendants' knowledge of the Postal Service's prohibition on cooperative mailings in addition to that demonstrated in the section entitled "The 1990 Investigation."

13

("the side letters took away any risk of [the nonprofit] incurring any financial liability"). See also G.App. Vs. 2-15 (Declarations from Nonprofit Organizations stating that the programs were promoted by Vantage as "risk free" for the nonprofit).[5]

48.    Under the side letters, the Nonprofit Organizations had the option of either paying the shortfall or having Vantage do additional mailings to try to recover the shortfall. Lyon Dep. at 29-34, 127-29; Gelb Dep. at 127. The side letters protected the Nonprofit Organizations from any risk of having to make out-of-pocket payments (as opposed to payments from program donations). Lewis Dep. at 121.

49.    In June 1995, Melikian told the Iowa Farm Bureau's attorney, James McCarthy, that, if the language of the side letter was placed in the contract, instead of § 6(c), the mailings would not qualify for the Nonprofit Rate. See Declaration of James McCarthy ¶ 9, Ex. E, App. V8 (Iowa Farm Bureau). Melikian also told McCarthy that, under postal regulations, the contract must show that the nonprofit bears the risk if the program is unsuccessful. Id. ¶ 10, Ex. E.

50.    A facsimile memorandum from Melikian to McCarthy, dated June 17, 1995, states: "Attached please find relevant sections of the Domestic Mail Manual dealing with use of non-profit (Special Bulk Mail) postage rates." Id. ¶ 12, Ex. G. The attached documents include

---

[5]  For example, Lewis testified:

| | | |
|---|---|---|
| Q: | What did you know about the side letters? | |
| A: | Just that it was a release. | |
| Q: | A release for the non-profit? | |
| A: | No. A release from liability. | |
| Q: | For the non-profit? | |
| A: | Yes. | |

Lewis Dep. at 92.

DMM § 625.52, entitled "Cooperative Mailings."

51.    On July 11, 1995, McCarthy sent Melikian a revised version of a proposed

contract that Melikian had sent McCarthy.  Id. ¶ 13, Ex. H.  Paragraph 9(b) of McCarthy's

revised contract provides:  "In the event that proceeds from the Program are insufficient to cover

all Program costs (including postage and bank charges) Vantage shall continue the fund-raising

program until such shortfall is eliminated or IFBF Foundation will have the option to pay

Vantage the remaining Program costs."  Id. ¶ 14, Ex. H.

52.    By letter dated July 11, 1995, Melikian responded to McCarthy, stating:

> With respect to paragraph 9(b), if this paragraph is kept in the agreement, we will
> be unable to mail at non profit bulk rates on your behalf.  This will result in an
> additional $45,000 in postage being paid by your client to mail the three (3)
> phases of this program.

> With respect to paragraph 2, this clause will also cause the agreement to be
> ineligible to use non profit postal rates, inasmuch as the post office will note that
> there is no liability to the group.  This is evidenced by the fact that there are
> progress billings based upon the amount contributed by members of your client's
> organization, and that your client does not have absolute liability.

Id. ¶¶ 14-15.

53.    In 1990, Melikian knew that the United States Postal Inspection Service

conducted an investigation of Vantage Studios, and that the investigation involved the

Cooperative Mail Rule and whether certain mailings made by Vantage on behalf of certain

nonprofit organizations qualified for the Nonprofit Rate.  Melikian Dep. at 145-46, 153-54.

54.    Lyon became aware of the Cooperative Mail Rule in 1980 or 1981.  Lyon Dep. at

6.  Since that time, Lyon has understood that, under the Cooperative Mail Rule, if a for-profit

company provides a nonprofit group with a financial guarantee of up front money in connection

with a fundraising mailing, then the mail has to be sent at the regular bulk rate.  Id. at 13-16.

15

55.    After the 1990 Investigation, and throughout the Mailing Period, Lyon was aware

that a mailing involving Vantage and a nonprofit group could not be sent at the Nonprofit Rate if

the nonprofit group had no risk of incurring financial liability. Id. at 13-18, 156. Lyon

understood that the side letters eliminated financial liability on the part of the nonprofit

organization. Id. at 156.

56.    In 1992, Lyon understood that, under the Cooperative Mail Rule, if the language

of his March 1992 side letter between Vantage and the Humane Society was included in the

contract, instead of paragraph 6 of the contract, then the mail would be ineligible for the

Nonprofit Rate. Lyon Dep. at 18-26. The March 1992 side letter states: "This letter supercedes

the payment method described in paragraph six (6) of this Agreement and will serve to affirm our

mutual understanding of the financial arrangements associated with the above stated fund-raising

program". Id. at 21-23; App. V7, Ex. B.[6]

57.    Throughout the Mailing Period, Lewis was aware that there were postal

regulations governing eligibility to send mail at the Nonprofit Rate. Lewis Dep. at 49, 54. Prior

to being notified in 1997 of the investigation that led to this litigation, Lewis did nothing to

determine how those regulations might apply to Vantage's fundraising business. Id. at 54. As of

October 2001, Lewis had made no effort to determine what the Cooperative Mail Rule is. Id. at

55-56.

---

[6] Lyon provided the Humane Society with a side letter, dated March 4, 1992, stating that Vantage
will not invoice the Humane Society in the event of a shortfall, and that, instead, Vantage would
have the right to conduct additional mailings to recover the shortfall. Id. at 20-23; G.App. V7,
Ex. B (Humane Society). The Program Agreement between Vantage and The Humane Society,
also dated March 4, 1992, states, in paragraph 6, that, in the event of a shortfall, Vantage will bill
the Humane Society for the shortfall, which will be due and payable within 30 days. Lyon Dep.
20-23; G.App. V7, Ex. A.

16

60.     During her training at Vantage in 1992, Kim Segers was advised by Susan Jones of Vantage that the language of the side letters "could not go into the contracts themselves because of United States postal regulations." Segers Decl. ¶ 13.

61.     Gelb manages the salespeople within Vantage and is responsible for training. Gelb Dep. at 24-25, 31. Gelb has never received, and never provided Vantage salespeople with, any training on the rules and regulations that govern direct mail in the nonprofit industry. Id. at 34-35. Vantage's salesmen never received any training regarding postal regulations governing the use of the Nonprofit Rate. Chandler Dep. at 27-28; Gelb Dep. at 34-35, 60; Lyon Dep. at 35; Declaration of Laurence Saklad ("Saklad Dep.") at 13.

62.     From at least approximately 1997 to 1999, Vantage provided potential nonprofit fundraising clients with a promotional brochure stating that "Vantage understands the non-profit world . . . its organizational culture, legal parameters, postal regulations . . . ." Gelb Dep. at 39-47, Ex. 1 (DOJ 20606) (attached to Gelb Dep.). The promotional brochure also described Vantage's fundraising product as "Turnkey Programs: From Start to Finish." Id.

## THE FINANCIAL RESULTS OF THE SUBJECT MAILINGS

63.     Vantage provided the government with a spreadsheet entitled Vantage Program Contract Summary ("PCS"), which shows, for the Subject Mailings, the Program Receipts (i.e., donations), the Payments to Vantage, and Vantage's Agreed Contract Charges. Douillette Decl. ¶¶ 4-5, Ex. A.

64.     The Vantage PCS shows that, the Nonprofit Organizations did not pay Vantage in full for Vantage's Agreed Contract Charges in 74 (or 25%) of the programs included in the government's single damages. Id. ¶ 5. The Agreed Contract Charges for these programs totaled

17

$19,168,764 and Vantage received payments totaling $14,050,705. Id., Ex. A. Consequently, Vantage did not collect $5,117,484 (or 27%) of its Agreed Contract Charges in connection with these programs. Id.

65.     If any of the Nonprofit Profit Organizations had paid Vantage it would show up on the Vantage PCS or the Vantage Contract Summary Combined. Melikian Dep. 402.

66.     With respect to all of the programs for the Subject Mailings, Vantage's total Agreed Contract Charges equaled $45,907,924; total Payments to Vantage equaled $40,848,772; and total Program Receipts equaled $53,178,481. Id. ¶ 6. Therefore, 76% percent of all Program Receipts went to Vantage. Id. According to Melikian, Vantage typically had a profit markup on costs of anywhere from 50% to 70%, or more. Melikian Dep. at 255-57. See also Graves Dep. at 15, 124 (stating that Vantage typically used a 100% mark up on costs).

67.     Vantage also provided the government with a spreadsheet entitled Vantage Contract Program Summary Combined ("CSC"). Id. ¶ 8, Ex. B. The financial results for the ongoing fundraising programs listed on the Vantage CSC for the Shriners Hospital, during the period 1999 through approximately 2001, show that, as of approximately January 2001, Payments to Vantage equaled $20,616,253, Program Receipts equaled $23,834,49, and the Agreed Contract Charges equaled $24,625,179. Id., Ex. B.

68.     The Shriner's Hospital contract operated as follows: donations were used first to pay Vantage its costs, expenses, and profit markup; in the event of a shortfall, Shriners had the option of either paying the shortfall amount or having Vantage do additional donor mailings to try to recover the shortfall; and, so long as the Shriners did not terminate the agreement, the Shriner's could avoid ever having to make any payments from its operating funds by having

18

Vantage do additional mailings to try to recover any shortfall. Lyon Dep. at 121, 127-29; Declaration of Ralph W. Semb ("Semb Decl.") ¶ 10, App. V13 ¶ 10 (Shriner's Hospital).

69.    Prior to entering the contract with Shriners, Lyon provided the Shriners with a pro forma showing, on a monthly basis, the anticipated financial results of the four year donor acquisition program. Lyon Dep. at 131-33. The pro forma showed that, at the end of the first year of the program, Shriner's would owe Vantage $1,148,350. Id. See also App. V13, Ex. D (DOJ 21949) (Shriner's Hospital). Vantage, however, would only invoice the Shriner's based on the available donations in the escrow account. Lyon Dep. at 131-33.

## DAMAGES

70.    During the Mailing Period, Vantage mailed more than 78 million pieces of mail at the Nonprofit Rate in connection with fundraising programs for the Nonprofit Groups (i.e., The Subject Mailings). Irvine Decl. ¶ 15, Ex. A.

71.    Throughout the Mailing Period, the Nonprofit Rate has been, on average, approximately one-half the regular bulk third-class rate (the "standard rate"). Irvine Decl. ¶ 6. Based on a formula provided by Melikian, the difference between the postage paid to the Postal Service for the Subject Mailings and the postage that would have been due, had the mail been sent at the standard rate, is $6,081,556.25. Irvine Decl. ¶ 15, Ex. A.

72.    Throughout the Mailing Period, the number of Vantage Nonprofit Rate mailings documented by PS Forms 3602 ("Mailing Statements") totaled at least 762. Irvine Decl. ¶ 16.

## THE PROHIBITION ON COOPERATIVE MAILINGS

Since 1951, Congress has authorized reduced rates for postage for a limited number of types of nonprofit organizations. See 65 Stat. 672 (1951); former 39 U.S.C. § 4452 (1964)

(superseded). In 1975, the Postal Service issued Postal Service Manual ("PSM") § 134.57, a regulation containing restrictions on the use of the Nonprofit Rate, including the prohibition on "cooperative mailings." See 40 Fed. Reg. 37,209 (Aug. 26, 1975). See also National Retired Teachers Assoc. v. United States Postal Service, 593 F.2d 1360, 1361-62 & n.2 (D.C. Cir. 1979) (tracing the history of the cooperative mail regulation).

PSM § 134.57 "defines the conditions under which nonprofit organizations qualified for special third-class mailing privileges under § 300.221 of the Domestic Mail Classification Schedule (DMCS) may receive the lower [Nonprofit Rate] for matter mailed by them." National Retired Teachers Assoc., 593 F.2d at 1361.[7] The PSM was replaced by the Domestic Mail Manual (DMM) on July 6, 1975, and the language of PSM § 134.57 was placed in the DMM, substantively unchanged, under a different section number. Declaration of Jerome M. Lease ("Lease Decl.") ¶ 7. The DMM is adopted as a Postal Service regulation and incorporated by reference in the Code of Federal Regulations. See 39 C.F.R. §§ 111.1-111.5, 211.2(a)(2).[8] For purposes of this motion, the government refers to the section numbers from DMM Issue 42,

_____

[7] DMCS § 300.221 provides:

> The nonprofit bulk rate is available for bulk rate third-class mail mailed by qualified nonprofit organizations. A qualified nonprofit organization is a religious, educational, scientific, philanthropic, agricultural, labor, veteran's or fraternal organization or association that is not organized for profit and none of the net income of which inures to the benefit of any private stockholder or individual. Before being entitled to mail at the nonprofit bulk rate, the organization shall furnish proof of its qualifications to the Postal Service.

[8] The DMM, and its amendments, have been published in the federal register. See The Conservative Caucus, Inc. v. United States, 650 F.2d 1206, 1209 n.1 (1981).

20

March 15, 1992, the pertinent pages of which are attached as Exhibit A to the Lease Declaration.[9]

DMM § 625.521 provides, in a section entitled "Cooperative Mailings":

> Cooperative mailings may be made at the [Nonprofit Rate] only when each of the cooperating organizations is individually authorized to mail at the [Nonprofit Rate] at the post office where the mailing is deposited. Cooperative mailings involving the mailing of any matter on behalf of or produced for an organization not itself authorized to mail at the [Nonprofit Rate] at the post office where the mailing is deposited must be paid at the regular rate.

DMM § 625.521 (emphasis added); Lease Decl. ¶ 10, Ex. A.[10]

Although the DMM does not define the term "cooperative mailing," in 1989 the Office of Classification and Rates Administration of the Postal Service issued Postal Service Customer Support Ruling PS-209 ("CSR 209"), entitled "Cooperative Mailings," to provide postal employees and customers with guidance regarding the prohibition on cooperative mailings. Lease Decl. ¶ 11. CSR 209 was widely distributed in March 1990, when it was printed in "CCC", a Postal Service publication available to those in the business of mailing nonprofit mail. Id. PS-209 was updated in 1996 to reflect changes in the DMM numbering system; the substance

---

[9] The substantive language of PSM § 134.57 has remained the same since its inception; the relevant DMM provisions have been renumbered by the Postal Service at various times since 1992. Lease Decl. ¶ 7. PSM § 134.57 is reproduced in its entirety in National Retired Teachers Assoc., 593 F.2d at 1362 n.3. Pertinent DMM provisions from the 1996 and 2000 DMM are attached as Exhibit B to the Lease Declaration. The changes over the years are non-material -- for example, the nomenclature for the nonprofit rate has changed from "special bulk third-class rates" to "Nonprofit Standard Mail rates". Lease Decl. 4, 7.

[10] Postal regulations also contain additional restrictions regarding use of the Nonprofit Rate. The regulations provide that (i) an organization authorized to mail at the Nonprofit Rate "may mail only its own matter at those rates," (ii) an organization "may not delegate or lend the use of its authorization to mail at the [Nonprofit Rate] to any other person or organization," and (iii) no person or organization "may mail, or cause to be mailed by contractual agreement or otherwise, any ineligible matter at the [Nonprofit Rate]." DMM § 625.525. See also National Retired Teachers Assoc., 593 F.2d at 1361-62.

of PS-209 has not changed since 1989. Id., Ex. C (1989 and 1996 versions).[11]

CSR 209 is the Postal Service's interpretation of the Postal Service regulation regarding cooperative mailings. Id. at 13. The ruling begins by noting that "[t]he term 'Cooperative Mailing' refers to mailings made at the [Nonprofit Rate] in which one or more parties 'cooperate' with the authorized permit holder." Id., Ex. C. The ruling then sets forth an exception to the DMM's prohibition on cooperative mailings between an authorized and an unauthorized party: "A cooperative mailing may be considered proper if the authorized organization uses a for-profit entity (or other unauthorized entity) as an agent." Id., Ex. C.

CSR 209 states that such mailings are permitted at the Nonprofit Rate only if they are the product of a legitimate principal agent relationship.

> The mailer must be able to show, however, that the relationship is a legitimate principal/agent relationship in order to use the special rates. Mailings may not be sent at the special rates if made in conjunction with or in support of a venture of an unauthorized entity or a joint venture between authorized and unauthorized entities even if it is claimed that the mail matter itself is 'owned' by the authorized entity.

Id., Ex. C.

In a section of the ruling entitled "Joint Business Venture," CSR 209 reiterates the prohibition on non-profit mailings pursuant to a joint venture.

> When a nonprofit and for-profit organization enter into a joint business venture, the joint business venture is not entitled to mail at the Nonprofit Standard Mail Rate. Typically both parties put something in (a list of names and use of special rate permit for the nonprofit party, and payment of printing and mailing costs by

---

[11] CSRs are published on the Postal Services website. See http://ribbs.usps.gov. The website states: "Customer Support Rulings were created to assist postal personnel and customers with interpreting, clarifying, and applying the meaning of the standards contained in the Domestic Mail Manual (DMM). The rulings are intended to be used in conjunction with the DMM standards." CSRs are also published in Postal Service publications, such as *Mailer's Companion* and its predecessor, *Classification Currents Communicator.*" Lease Decl. ¶ 12.

the for-profit organization) and both parties take something out (a share of the proceeds/profits).

Id., Ex. C.

"The purpose of CSR 209 is to ensure that, consistent with the Postal Service's statutory and regulatory mandate, only nonprofit organizations benefit financially from use of the significantly reduced Nonprofit Rate." Id. ¶ 16. In furtherance of this goal, CSR 209 stresses the prohibition on use of the Nonprofit Rate when the mailings are the product of a cooperative venture between a nonprofit entity and a for-profit company in which the for-profit company has a financial stake in the success or failure of the mailing. Id. The Postal Service has determined that, in such instances, the venture ceases to be a truly nonprofit endeavor and mailings supporting it are ineligible for the Nonprofit Rate. Id.

To determine if a mailing involving an authorized party and an unauthorized party is a prohibited cooperative mailing, CSR 209 states that "it is necessary to determine the relationship between all of the participating entities." Id., Ex. C. The ruling advises that "[t]his requires a review of all contracts executed by the parties, as well as other documents that may demonstrate the relationship between them." Id., Ex. C. The ruling also cautions that "[p]rovisions in these documents showing that the parties are not engaged in a joint venture or that the unauthorized party is the agent of the authorized nonprofit entity are relevant, but are not determinative evidence of the relationship between the parties, particularly if other evidence demonstrates a different relationship between the parties." Id., Ex.C.

CSR PS-209 sets forth the following factors that "may be considered" in determining whether a mailing is the product of a legitimate principal/agent relationship or a joint venture.

23

- The identity of the party that devised, designed, prepared, and paid for the mailpiece.

- The identity of the party which directly or indirectly paid the postage for the mailing.

- How the unauthorized parties are compensated.

- How the profits and revenues from the enterprise supported by the mailing are divided.

- What risks are entailed in the enterprise supported by the mailing, and whether the parties share the risk.

- How managerial decisions are made concerning the content of the mailings or the enterprise it supports, and who makes those decisions.

- The contribution each participant makes toward the enterprise supported by the mailing (e.g., money, service, managerial decision making, etc.).

- The intent and interests of the participants; and any other evidence that may be relevant to the standards discussed above.

In April 1990, the Postal Service published Postal Service Publication 417, entitled "Nonprofit Standard Mail Eligibility," to further explain eligibility restrictions on use of the Nonprofit Rate. Lease Decl. ¶ 20, Ex. D. Publication 417 contains a cover letter to "Postal Customer[s]" explaining that the Nonprofit Rate is a privilege based on congressional legislation and stating that the information contained in Publication 417 is based on DMM §§ 625 & 626.

Publication 417 states that, for each nonprofit mailing, the organization must sign a "mailing statement" which certifies that, among other things, the mailing does not violate DMM § 625.5 and "the mailing is not a cooperative mailing with other persons or organizations that are

24

not entitled to [the Nonprofit Rate]." Id. ¶ 21, Ex. D. In addition, Publication 417 states:

> If the mailing statement is signed by your agent, the agent's signature certifies that: (1) it is authorized to sign on your behalf; (2) the certifications on the mailing statement bind both you and your agent; and (3) both you and your agent will be liable for and agree to pay any postage deficiency assessed on the mailing.

Publication 417 was distributed throughout the nonprofit mailing community and was available at local post offices. Id.

In April 1990, the Postal Service published Postal Service Publication 417A, entitled "Nonprofit Standard Mail Eligibility," to further explain the prohibition on cooperative mailings. Id. ¶ 22, Ex. E. In a section entitled "What is a cooperative mailing?", Publication 417A states:

> A "cooperative mailing" is designed to serve the uses of or benefit a party other than the authorized nonprofit permit holder. Typically, in a cooperative mailing one or more parties "cooperate" with an authorized nonprofit organization to share the cost, risk, or benefits of the mailing. Cooperative mailings may be made at the [Nonprofit Rate] only when all of the cooperating parties are authorized to mail at the [Nonprofit Rate] at the post office where the mailing is entered.

Id., Ex. E.

Publication 417A lists many of the same factors as CSR PS-290 for determining whether an arrangement is a principal/agent relationship or a joint venture. Id. For example, Publication 417A states that some of the factors that are used to determine whether a mailing is eligible for the Nonprofit Rate include, among others, "[h]ow the profits and revenues are divided" and "[w]hat risks are entailed, and are they shared." Id. Publication 417A was distributed throughout the nonprofit mailing community and made available at local post offices. Id.

Since at least 1990, the Postal Service has held that a business arrangement between a nonprofit entity and a for-profit company to conduct direct mail fundraising violates the DMM's prohibition on cooperative mailings if the for-profit entity has a financial stake in the success or

failure of the program (i.e., if the for-profit shares in the costs, risks, or benefits of the program).

Lease Decl. ¶¶ 26-29.

In the early 1990s, the Postal Service brought two separate revenue deficiency actions

against a for-profit, direct mail fundraising company called Famous Artists Corporation. Id. ¶ 24.

See also United States v. Famous Artists Corp., 1996 WL 114932 (E.D.Pa.).[12]  Famous Artists

provided premium induced fundraising programs for non-profit organizations.  Famous Artists

paid all of the costs and expenses of the programs up front, and was paid from the proceeds of

the programs; if the collections associated with a program were insufficient to cover Famous

Artists' expenses, costs, and profit markup, then Famous Artists had the right to solicit further

known contributors until such shortfall was eliminated.  Id.  See also Famous Artists Corp., 1996

WL 114932 *1-2 (describing Famous Artists' fundraising programs and the basis for the

government's allegation that the arrangements were "cooperative").

The Postal Service concluded that this arrangement constituted a joint venture in

violation of the prohibition on cooperative mailings because Famous Artists shared in the costs,

risks, and benefits of the mailing programs.  Lease Decl. ¶ 24; Famous Artists Corp., 1996 WL

114932 *2 (government alleged relationships cooperative because (i) the non-profits had no risk

since they "would not be financially responsible except to the extent of money received as a

result of the fundraising program" and (ii) donations were deposited into a bank account held

---

[12]  Congress has authorized the Postal Service to assess a postage deficiency in the amount of the unpaid postage if it determines that mail not eligible for the Nonprofit Rate has been posted at that rate.  See 39 U.S.C. § 3626(k)(2) (1990).  See also 39 U.S.C. § 3626(k)(1) ("No person or organization shall mail, or cause to be mailed by contractual agreement or otherwise, [at the reduced rates], any matter to which those rates do not apply.").  If a postage deficiency is levied, the statute provides for adjudication of the deficiency in an administrative proceeding.  See id. § 3626(k)(2)-(3).

26

jointly by Famous Artists and the non-profit client).  The Postal Service and Famous Artists

ultimately reached a monetary settlement.  Id. ¶ 24.[13]

## ARGUMENT

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the evidentiary materials "show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  See Fed.R.Civ.P. 56(c).  If the moving party meets its initial burden, the

opposing party "may not rest upon mere allegations or denials of his pleading, but must set forth

*specific facts* showing that there is a genuine issue for trial." Feliciano v. Rhode Island, 160 F.3d

780, 784 (1st Cir. 1998) (emphasis added) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 256 (1986)); Smoot v. Mobil Oil Corp., 722 F.Supp. 849, 853 (D.Mass. 1989) (Wolf, J.) (to

defeat a proper motion for summary judgment, the nonmoving party "must produce substantial

evidence, going beyond the mere allegations [or denials of the pleadings] and supporting the

claimed dispute, which would require a judge or jury to resolve the conflicting versions of truth

at trial") (citing Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir.1975).  See also Matsushita Elec.

Indus. Co. v. Zenith radio, 475 U.S. 574, 586 (1986) (opponent must "do more than simply show

that there is some metaphysical doubt as to the material facts").

---

[13]  In October 1995, the Postal Service issued Publication 417, Special Bulk Third-Class
Eligibility, which combined and updated the 1990 Publications 417 and 417A, and again
distributed it in the manner described above. Id. ¶ 22, Ex. F (pertinent pages).    The publication
was again updated and reissued in 1996 under the title Publication 417, Nonprofit Standard Mail
Eligibility. Id.