**EXHIBIT "A-3"**

C.      **The Defendants are Liable for the Postage Deficiency**

1.      **Count IV: Federal Debt Collection Procedure Act**

The Federal Debt Collection Procedure Act, 28 U.S.C. § 3001 *et seq.* (hereinafter,

"FDCPA"), provides a procedure for the United States "to recover a judgment on a debt." 28

U.S.C. § 3001.[17]  The term "debt" is defined as "an amount that is owing to the United States" on

account of, *inter alia*, a fee, service, restitution, damages, "or other source of indebtedness to the

United States." 28 U.S.C. § 3002(3).  Unpaid postage supports a claim under the FDCPA.

Raymond & Whitcomb, 53 F.Supp.2d at 443.

Any reasonable fact finder would conclude that Vantage paid a lower postage rate than it

should have with respect to the Subject Mailings.  See Irvine Decl., Exs. A & B.  See also, supra,

Statement Undisputed Facts.  Cf. Raymond & Whitcomb, 53 F.Supp.2d at 443 (holding that

R&W has failed to raise an issue of material fact as to the debt, and, therefore, that the

government is entitled to summary judgment as a matter of law) (citation omitted).

It is of no import that the mailings were submitted by mailhouses because Vantage's

"cooperative stake in the venture establishes that the disputed mailings were submitted on behalf

of" Vantage.  Raymond & Whitcomb, 53 F.Supp.2d at 443.  "The cooperative mailing rule

prohibits any nonprofit rate mailings '*in behalf of or produced* for an organization not authorized

to mail at the [Nonprofit Rate].'"  Id. (quoting Owen v. Mulligan, 640 F.2d 1130, 1133-34 (9th

Cir.1981) (emphasis in original).  It is also plain that the mailhouses acted solely as agents for

---

[17] See Nat'l Labor Relations Bd. v. E.D.P. Med. Comp. Sys., 6 F.3d 951, 954 (2d Cir.1993) ("The purpose of the Act was 'to create a comprehensive statutory framework for the collection of debts owed to the United States government,' in order to 'improve the efficiency and speed in collecting those debts.") (quoting H.R.Rep. No. 736, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6630, 6631)).

Vantage. See, e.g., Johnson Decl. ¶¶ 2-6; Statement Undisputed Facts ¶¶ 35, 40-42.

### 2.    Count III: Unjust Enrichment

The Postal Service was not properly paid for the service of delivering the disputed

mailings. Based on principles of quantum meruit, the United States claims "the value of services

rendered, which is appropriate when there was no properly agreed-upon payment amount for

agreed-upon provision of goods or services." Raymond & Whitcomb, 53 F.Supp.2d at 444

(citations omitted). As in Raymond & Whitcomb, "the Postal Service's provision of mailing

services for [Vantage], without proper payment, satisfies all quantum meruit elements." Id.

## II.    THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT ON ITS FALSE CLAIMS ACT (COUNT I) AND FRAUD CLAIMS (COUNT II)

Between January 1992 and November 2001, Vantage, Lewis, and Melikian, submitted, or

caused to be submitted, at least 762 mailing statements to the Postal Service. In each mailing

statement, Vantage, Lewis, and Melikian, (i) certified that the mailing was not a "cooperative

mailing" under Postal Service regulations and (ii) failed to disclose Vantage's participation in the

mailing. Vantage, Lewis, and Melikian, knew or should have known that these mailing

statements were false, but nevertheless directed the mailhouses to submit them to the Postal

Service in order to obtain the benefits of the reduced, Nonprofit Rate. This conduct violated the

False Claims Act, and constituted common law fraud, and the government is therefore entitled to

summary judgment on Counts I & II of its complaint.

### A.    The False Claims Act Applies to Defendants' Conduct

The False Claims Act imposes liability on anyone who "knowingly presents" a "false or

fraudulent claim" to the government. 31 U.S.C. § 3729(a). In 1986, the statute was amended to

apply to one who knowingly uses "a false record or statement" in order to "conceal, avoid, or

36

decrease an obligation to pay . . . money . . . to the Government." 31 U.S.C. § 3729(a)(7) (the reverse false claims provision). The First Circuit has noted that the amended False Claims Act "clearly embraces" underpayment of postage due to misrepresentations to the Postal Service to obtain the benefits of the reduced, Nonprofit Rate. United States v. American Heart Research Found., 996 F.2d 7, 8-9 (1st Cir.1993). See also United States ex rel. Franklin v. Parke-Davis, 147 F.Supp.2d 39, 51 (D. Mass. 2001) ("the False Claims Act can be used to create liability where failure to abide by a regulation amounts to material misrepresentations made to obtain a government benefit").[18]

**B.      The Defendants Caused the False Mailing Statements to be Presented to the Postal Service**

The mailing statements were false. In each mailing statement, the defendants certified, inter alia, that the mailing does not violate DMM 625 (or the more recent versions of the cooperative mailing regulation) and is not a cooperative mailing with other persons or organizations that are not authorized to mail at the Nonprofit Rate. See Irvine Decl. ¶ 16; Johnson Decl. ¶ 6.[19] As demonstrated above, this statement was false. The Subject Mailings were "cooperative mailings", in violation of DMM § 625.521 and its progeny, because they were the product of a joint venture between Vantage and each of the Nonprofit Organizations in which Vantage shared in the costs, risks, and/or benefits of the mailings.

---

[18] The purpose of the False Claims Act is to make the government whole through restitution and to deter fraud against the government. United States v. O'Connell, 890 F.2d 563, 568 (1st Cir. 1989).

[19] The mailing statements for Vantage and each of the Nonprofit Organizations are attached as the last exhibit (usually Exhibit E) in each of the government appendix sections for the Nonprofit Organizations. See G.App. V2-15.

The defendants caused the mailing statements to be submitted to the Postal Service. The False Claims Act imposes liability on those who make a false statement or cause a false statement to be made. 31 U.S.C. § 3729(a)(7). The False Claims Act does not require any direct contact between the defendant and the government; the government need only show that the defendant knowingly assisted in causing the submission of a false claim or statement. United States v. Rivera, 55 F.3d 703, 707 (1st Cir.1995) (citing United States v. Borenstein, 423 U.S. 303, 309 (1976) (false claim may be presented through an innocent third party)). See also United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943) (provisions of the FCA "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government"). Thus, the fact that the mailing statements were submitted by the mailhouses does not affect the defendants' liability.

**C.    The Defendants Knew or should have Known that the Mailing Statements were the Subject Mailings were not Entitled to the Nonprofit Rate**

The terms "knowing" and "knowingly" in the False Claims Act mean, with respect to information, that a person: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud in required. 31 U.S.C. § 3729(b). See also United States v. Data Translation, Inc., 984 F.2d 1256, 1266 (1st Cir. 1992).

In light of the 1990 Investigation, and Vantage's transparently deliberate attempt to conceal the side letters from the Postal Inspection Service, no reasonable factfinder could conclude that the defendants did not have actual knowledge that the Postal Service viewed the Subject Mailings as ineligible for the Nonprofit Rate. The very existence of the side letters

38

demonstrates that knowledge.

The undisputed facts demonstrating the defendants' collective knowledge of the Postal Service's prohibition on cooperative mailings, generally, and, specifically, the prohibition on Nonprofit Rate mailings where a for-profit company shares in the costs, risks, or benefits of the mailing, are detailed, supra, at paragraphs 7-33 and 44-62 of the government's Statement of Undisputed Facts. For convenience, some of the more blatant facts are repeated below.

Inspector Seweryn told Jarvis, the President of Vantage's fundraising division, that its fundraising contracts violated the Postal Service's prohibition on cooperative mailings because Vantage shared in the costs, risks, and benefits of the mailings, and therefore the arrangement was a joint venture not a principal agent relationship. Seweryn Decl. ¶¶ 6-8, 9, Ex. B. Jarvis acknowledged receipt of this information, in a letter "cc" copied to Melikian, by stating that Vantage acted solely as an "agent" for its nonprofit clients and received a set fee for its services. Id. ¶ 11, Ex. C. The Postmaster Ranft Letter to Jarvis was "cc" copied to Melikian and includes a paragraph quoting DMM § 625.5's prohibition on cooperative mailings, and states it is enclosing a report outlining approximately $40,000 in revenue deficiencies as the "result of analysis of unauthorized cooperative mailings between your Firm(s) and 6 non-profit organizations." Id. ¶ 26, Ex. M. Postal Service Controller Fetterman's March 13, 1991, letter to Melikian states that it is responding to Melikian's letter protesting the imposition of revenue deficiencies against Vantage's clients. Id. ¶¶ 29, Ex. N. Jarvis sent the Postal Service a check for approximately $22,000 to pay the Postage deficiency for one of Vantage's clients. Id. ¶ 31, Ex. O. See also Declaration of Marion Crum ¶ 4, App. V4 (Cryptic Masons).

Jarvis's September 1991 Letter to Inspector Seweryn, which was "cc" copied to Melikian, encloses executed contracts for fundraising programs with seven nonprofit organizations, and states: "These have been reviewed by our counsel to be concurrent with postal regulations regarding cooperative mailings. Please note paragraph 6(c)." Id., Ex. P. Paragraph 6(c), of course, is the critical paragraph that, in the prior contracts, such as that for Jean Baptiste, said Vantage had the right to continue mailing in the event of a shortfall. Id. ¶ 34, Ex. A (at DOJ 11103). On the contracts sent to Seweryn with the September 1991 Letter, paragraph 6(c) states that, in the event of a shortfall, the organization will be billed by Vantage, which will due and payable within 30 days. Id., Ex. P (at DOJ 10861). Vantage did not send Inspector Seweryn copies of any of the side letters that went along with the contracts forwarded in September 1991; the NYKC side letter, dated the same month as the corresponding contract, put back into place the shortfall provision from the prior Vantage contracts. Id. ¶ 40, Ex. S.

The correspondence between Melikian and the Iowa Farm Bureau's lawyer, James McCarthy, plainly shows Melikian's knowledge of the cooperative mailing regulations, and, specifically, his knowledge that the contract must show that the nonprofit organizations bears the risk of liability if the program is unsuccessful or the mail will be ineligible for the Nonprofit Rate. Declaration of James McCarthy ¶¶ 9-15, Ex. G (Melikian's June 17, 1995 memo enclosing copy of DMM cooperative mailing regulation); Ex. H (Melikian's July 11, 1995 letter to McCarthy) ("[T]his clause will also cause the agreement to be ineligible to use non profit postal rates, inasmuch as the post office will note that there is no liability to the group. This is evidenced by the fact that there are progress billings based upon the amount contributed by members of your client's organization, and that your client does not have absolute liability.").

40

Vantage knew that the side letters released the Nonprofit Organizations from having any risk of incurring financial liability in the event a fundraising program was unsuccessful (i.e., in the event of a shortfall). Lewis Dep. at 59, 66, 92, 122-23; Gelb Dep. at 80; Lyon Dep. at 29-34, 156; Segers Decl. ¶ 11.[20]

The testimony below of Larry Lyon, Vantage's Senior Vice President of Sales and Marketing, demonstrates that he knew, in 1992, that, if the language of the side letters was in the contracts, instead of paragraph 6, then the Subject Mailings were ineligible for the Nonprofit Rate. See United States v. Bank of New England, N.A., 821 F.2d 844, 856 (1st Cir.1987) ("knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation"); United States v. O'Connell, 890 F.2d 563, 569 (1st Cir. 1989). See also United States v. Penagaricano-Soler, 911 F.2d 833, 843 (1st Cir.1990).

> Q:    Was it your understanding in March of '92 that if Paragraph 6 of the program agreement was not in the program agreement and instead the language from the side letter was in the program agreement, was it your understanding in March of '92 that that mail could not go at the non-profit rate.
>
> A:    Yes.
>
> Q:    And why is that?
>
> A:    I think that was the law, to be honest, that you had to have this paragraph, that if there was a shortfall, that they had to pay it in 30 days.

---

[20]  For example, Lewis testified:

> Q:    The side letter took away the risk for the organization?
> A:    Yes.
> Q:    And ensured they would have no liability?
> A:    Yes.

Lewis Dep. at 66.

Lyon Dep. at 25-26.

> Q:    Did you ever have any discussions with any of your colleagues, Vantage, about why this was being done in a side letter and not in the contract itself?
>
> A:    I think the understanding was that the only way, as I said, that you could do this fundraising was if you mailed nonprofit, you had to have that liability, Section 6C, had to be in there to mail non-profit.
>
> Otherwise, if you took that out and put this in [the side letter language], you'd have to mail it bulk, and you would have to pay more money to mail to their people than if they had that paragraph in.

Id. at 24.

> Q:    The paragraph you just read [the Human Society side letter] states that it supersedes Paragraph 6 of the agreement.  Why didn't you just change the agreement?
>
> A:    I believe that if you changed the agreement, you have to mail that bulk.

Id. at 23.[21]

Lyon became aware of the Cooperative Mail Rule in 1980 or 1981.  Lyon Dep. at 6. Since that time, Lyon has understood that, under the Cooperative Mail Rule, if a for-profit company provides a nonprofit organization with a financial guarantee of up front money in connection with a fundraising mailing, then the mail has to be sent at the regular bulk rate.  Id. at 13-16.  Lyon himself, and Vantage generally, provided many of the Nonprofit Organizations with financial guarantees or advances in connection with the Subject Mailings.  Lyon Dep. at 76-79; Lewis Dep. at 121-28.  See also Irvine Decl. ¶¶ 17-19 (detailing financial guarantees or advances).  For example, Lyon provided the Shriners with a $100,000 guarantee, Cryptic Masons with a $25,000 guarantee, and Wildlife Forever with a $20,000 advance.  Lyon Dep. at 76-79.

---

[21] The "program agreement" refers to the March 1992 contract between Vantage and the Humane Society and the "side letter" refers to the March 1992 side letter between Vantage and the Humane Society.  Id. at 18-24.

Inspector Seweryn's November 1990 Letter to Lewis states that she is investigating the unauthorized use of Nonprofit Rate mailing privileges by Vantage Travel Service, Inc., that review of the contracts shows that mailings were "cooperative" in nature, and that postal personnel are being advised to refuse Nonprofit Rate mailings made by any of the Vantage companies. Seweryn Decl. ¶ 15, Ex. F. Lewis testified that, throughout the Mailing Period, he was aware that there were postal regulations governing eligibility to send mail at the Nonprofit Rate, and that prior to being notified in 1997 of the investigation that led to this litigation, he did nothing to determine how those regulations might apply to Vantage's fundraising business. Lewis Dep. at 49, 54. In addition, the undisputed testimony is that none of Vantage's salespeople ever received any training on the rules and regulations that govern direct mail in the nonprofit industry. Gelb Dep. at 24-25, 31, 34-35, 60; Chandler Dep. at 27-28; Lyon Dep. at 35; Saklad Decl at 13.[22] See United States v. Krizek, 111 F.3d 934, 941-42 (D.C. Cir 1997) (reckless disregard standard satisfied where claimant has reason to believe claim is based on inaccurate information, but fails to make an investigation as to the veracity of the information conveyed to the government); Raymond & Whitcomb, 53 F.Supp.2d at 446 (United States "need not prove an intent to defraud, but only that the violations were committed knowingly, that is with willful blindness to the existence of a fact or reckless disregard for the truth").

---

[22] Gelb testified:

> I had virtually no training in this company, so that's why its very difficult. I had no training. I was thrown to the wolves.

Gelb Dep. at 60.

**D.    The Court Should Award Treble Damages on the Postage Deficiency and Penalties for Each False Mailing Statement**

If not for the false mailing statements, the defendants would not have been permitted to mail more than 78 million pieces of mail at the Nonprofit Rate.  Accordingly, the United States has sustained damages of $6,081,556.25 as a result of the defendants' violations of the False Claims Act.  See Irvine Decl. ¶¶ 15-16 , Ex. A.  Pursuant to 31 U.S.C. § 3729(a), the United States is entitled to judgment equal to three times this amount, or $18,244,668.75.

In addition, the United States is entitled to recover a civil penalty of not less than $5,000 and not more than $10,000 for each violation of the False Claims Act.  The defendants' submission of each false mailing statement constitutes a separate violation of the false claims act.  United States v. Borenstein, 423 U.S. 303, 311 (1976).  In light of the flagrant nature of the violations in this case, including the deliberate deception of the Postal Inspection Service by concealing the side letters at the conclusion of the 1990 Investigation, the government requests that the Court impose the maximum $10,000 penalty for each of the 762 false mailing statements (totaling $7,620,000).

## CONCLUSION

For the foregoing reasons, the Motion of the United States for Summary Judgment should

be granted with respect to Counts 1-4 of the government's Complaint.

Respectfully submitted,

MICHAEL J. SULLIVAN

United States Attorney

By:  _____
PETER K. LEVITT
Assistant U.S. Attorney
United States Courthouse
One Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3355

Dated: April 30, 2002

Certificate of Service
I hereby certify that a true copy of
the above document was served upon
(each party appearing pro se and) the
attorney of record for each. Other
party by mail/hand on _4/30/02_

_4/30/02_          _____
DATE             Assistant U.S. Attorney

45