**EXHIBIT "C"**

## DECLARATION OF ALAN E. DOUILLETTE

My name is Alan E. Douillette. I am a United States Postal Inspector in Boston, Massachusetts. I have been a Postal Inspector since 1983. I make this declaration on personal knowledge.

1. In October 2000, I was assigned by the United States Postal Inspection Service to assist the United States Attorney's Office for the District of Massachusetts with regard to a case involving allegations that Vantage Travel Service Inc. ("Vantage") had violated the United States Postal Service's prohibition on cooperative mailings.

2. Since May 2001, I have served as the principal investigator in the above matter. In this capacity, I conducted my investigation at the direction of, and reported my findings to, the Assistant U.S. Attorney handling the case.

3. I have reviewed the Vantage Program Contract Summary (the "Vantage PCS") attached to a letter from Vantage's counsel to counsel for the government, dated January 10, 2002. True and accurate copies of the January transmittal letter and the Vantage PCS are attached hereto as Tab A.

4. The pertinent columns included in the Vantage PCS are titled as follows: Non-Profit; Program Number; Payments to Vantage; Program Receipts; and Agreed Contract Charges. The Vantage PCS lists the names of the 80 nonprofit organizations included in the government's summary of single damages (the "Single Damages Summary"). Of the approximately 295 programs or combinations of programs listed on the Vantage PCS, approximately 290 programs or combinations of programs are listed on the Single Damages Summary. See Declaration of Beth Ann Irvine ("Irvine Decl.") ¶ 9, Ex. A.

5. Based on the Vantage PCS, the nonprofit organization did not pay Vantage in full for the Agreed Contract Charges in 74 (or 25%) of the identified 290 programs or combination of programs which are included in single damages. I calculated that 74 programs, for 45 nonprofit groups, made payments to Vantage totaling $14,050,705 when the Agreed Contract Charges totaled $19,168,764. Consequently, Vantage did not collect $5,117,484 or 27% of its Agreed Contract Charges in connection with these programs. The underpayment of the Agreed Contract Charges occurred in at least one program for 45 (or 56%) of the 80 nonprofit organizations mentioned above.

6. Based on the Vantage PCS, I calculated that, with respect to all of the 295 programs or combination of programs, Vantage's total Agreed Contract Charges equaled $45,907,924, that total Payments to Vantage equaled $40,848,772, and that total Program Receipts equaled $53,178,481. Thus, 76% percent of all Program Receipts were paid to Vantage.

7. I have also reviewed the Vantage Contract Summary Combined (the "Vantage CSC"), which was forwarded with the January 10, 2002, letter from Vantage's counsel. A true and accurate copy of the Vantage CSC is attached hereto as Tab B.

8. The Vantage CSC provides financial data on a line by line basis for all of the pertinent nonprofit programs except Shriners Hospital. The financial results for each of the 79 fundraising programs listed for the Shriners Hospital during the period 1999 through 2001 are reported as combined totals. Payments to Vantage totaled $20,616,253, Program Receipts totaled $23,834,491 and Agreed Contract Charges totaled $24,625,179. I calculated that, even if 100% of the $23,834,491 in program receipts had been paid to Vantage, the donations from the 79 programs would still be $790,687 short of the amount needed to pay Vantage it's Agreed Contract Price of $24,625,179.

9. I have reviewed the available business records, correspondence and other documents detailing the fundraising relationship between Vantage and the Fleet Reserve Association (FRA). During the period from 1992 through early 2000, Vantage and the FRA conducted at least 25 fundraising programs under multiple written agreements.

10. My review of the records, correspondence, and other documents related to single damages indicates that Vantage paid the up front costs and expenses of the FRA programs, that the donations received from programs were commingled into one escrow account in the name of the FRA until sometime during the first few months of 2000, and that Vantage, in the event of a shortfall, transferred the proceeds from one existing program to recover a shortfall in another program, ran an additional program, or sent additional mailings to recover the shortfall. The FRA did not have to pay any shortfalls from its general funds, as opposed to from the escrow account set up for program receipts.

11. Proceeds from each of the fundraising programs listed on the Single Damages Summary were deposited into one consolidated bank account #7608-702-2 (the "7608 Account") in the name of the FRA. The 7608 Account was set up by Vantage for the FRA. Vantage invoiced the FRA for payment of individual program costs and expenses only after sufficient donations were received and deposited to the 7608 Account to pay the invoice. Invoices were paid by checks drawn from the 7608 Account. Donations from multiple programs were commingled in the 7608 Account, thereby increasing the

2

likelihood of donated funds being available for payment of Vantage's invoices.

12. Section E on two of the Response Analysis Reports ("RARs") prepared by Vantage for the FRA to track donations to the programs contain the following language: "Continue program until shortfall is eliminated" or "Vantage has the right to continue program till shortfall is eliminated". True and accurate copies of these RARs are attached as Tab C (DOJ 19156, DOJ 21423).

13. On occasion, some of the program RARs listed the balance due Vantage from the FRA, and detailed the reduction of the balance due Vantage because of the crediting of various amounts from or to other fundraising programs. Some of these fund transfers were from donations received in programs initiated under entirely different written contracts. These transfers effectively adjusted the balance due to Vantage and eliminated the need to invoice the FRA for the respective amount of the transfer.

14. On at least one occasion, Vantage conducted a fundraising program, waived the product sell price, and then credited the proceeds to another program, thereby preventing the FRA from reporting more than a $65,000 shortfall. Details related to the program are provided in an authorization request, dated January 22, 1999, from Thomas L. Leisher, FRA National President to the FRA National Board of Directors. A true and accurate copy of the January 22, 1999 authorization request is attached as Tab D.

16. In February 1998, Larry Lyon, Vantage's Senior Vice President of Sales and Marketing, attended an FRA meeting and stated as follows: "[W]ithout any cost, of course, or guarantees on the part of the Fleet Reserve Association, as of yesterday, February 6, we (Vantage) have generated 2,457,329.28 of net profit to the Fleet Reserve Association over the last seven years." True and accurate copies of the pertinent pages of this transcript are attached as Tab E (DOJ 21310).

3

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Alan E. Douillette*
Alan E. Douillette
United States Postal Inspector

Dated: 4/24/02