UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Vantage Financial Services, Inc.<br>　　　　Plaintiff<br><br>v.<br><br>Nonprofit Service Group Inc. and George E. Miller<br>　　　　Defendants | CIVIL ACTION NO. 04-11686WGY |

### DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Defendants George E. Miller and Nonprofit Service Group, Inc. set forth the following statement of material facts as to which there is no genuine issue to be tried.

### PARTIES

1.　Defendants George E. Miller ("Miller") and Nonprofit Service Group, Inc. ("Nonprofit") are an attorney and corporation that specialize in providing services to nonprofit organizations and their fundraisers. (Complaint at ¶¶ 2-3, attached hereto as Exhibit "A").

2.　Plaintiff Vantage Financial Services, Inc. ("Vantage") contracts with primarily nonprofit organizations to perform "product induced" or "premium induced" direct mail fundraising on behalf of the organizations. (3/15/02 Deposition of Harry Melikian, hereinafter "3/15/02 Melikian, Tr." Melikian, Tr. at 15-16, attached hereto as Exhibit "B"; Deposition of Henry Lewis, hereinafter "Lewis Tr." at 41-45, attached hereto as Exhibit "C"). In these type of fundraising programs, a nonprofit organization's members are sent small gifts from the nonprofit, such as a calendar, along with a request for a donation to the nonprofit. (3/15/02 Melikian Tr. at 15-16; Lewis Tr. at 41-45;.Complaint at ¶7).

3.      Vantage is or at relevant times was a wholly-owned subsidiary of Vantage Travel Service, Inc. (3/15/02 Melikian Tr. at 10-11). Henry Lewis ("Lewis") and Harry Melikian ("Melikian") have been officers of Vantage, Vantage Travel Service, Inc. and The Vantage Group, Inc. (Id.)

4.      Lewis has been the Chief Executive Officer and/or President of Vantage, Vantage Travel Services, Inc., and The Vantage Group, Inc., and Melikian has been the Executive Vice President and Treasurer of Vantage, Vantage Travel Services, Inc., and The Vantage Group, Inc. (3/15/02 Melikian Tr. at 11-15; Lewis Tr. at 6-7, 31).

5.      Vantage's fundraising business has operated under a variety of names, including Vantage Direct Marketing Services, Vantage Group Services, Inc. and Vantage Studios. (See Lewis Tr. at 28-30; Deposition of Mary Lou Newman, hereinafter "Newman Tr." at 7-10, attached as Exhibit "D"; Deposition of Jay Gelb, hereinafter "Gelb Tr." at 13-14, attached hereto as Exhibit "E"; Deposition of Dallas Graves, hereinafter "Graves Tr." at 8-10, attached hereto as Exhibit "F".).

6.      From at least approximately 1997 to 1999, Vantage provided potential nonprofit fundraising clients with a promotional brochure stating that "Vantage understands the non-profit world . . . its organizational culture, legal parameters, postal regulations . . . ." (Gelb Tr. at 39-47, Ex. 1 (DOJ 20606) to Gelb Tr., attached hereto as Exhibit "G").

7.      Vantage typically has incurred and paid up front all of the costs and expenses associated with the fundraising services it has provided. (See 3/15/02 Melikian Tr. at 34-35; 224-28, 246-49, 259-60, 364-67; Lewis Tr. at 41-45; Newman Tr. at 21-35; Gelb Tr. at 74-76,

2

121-24).[1]

## THE COOPERATIVE MAIL RULE

8.  Under United States Postal Service ("USPS") regulations, nonprofit entities are entitled to use special, reduced postage rates for their mailings.  In the past, the USPS limited the circumstances under which a nonprofit could engage a for-profit entity, such as Vantage, to mail on the nonprofit's behalf at the reduced nonprofit postage rates.  What is referred to as the "cooperative mail rule" required, among other things, that in order to mail at the reduced rate, a nonprofit had to assume all financial risk for the cost of mailings under a fundraising contract administered by a for-profit entity.  If it was determined that a for-profit fundraiser, such as Vantage, assumed the risk of not being paid for its work in the event that, for example, charitable donations were insufficient to cover the fundraiser's fees and costs, such a contract may violate the cooperative mail rule.  See Domestic Mail Manual §625.521; Postal Service Customer Support Ruling PS-209; Postal Service Publication 417 & 417A,  "Nonprofit Standard Mail Eligibility."

## THE *QUI TAM* ACTION

9.  On January 17, 1997, Lawrence Saklad ("the Relator") filed a complaint under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq,* against Vantage and Lewis.  The Relator alleged that Vantage and Lewis had submitted false claims to the USPS.  (Complaint of the United States at ¶1, attached hereto as Exhibit "H").

---

[1] The costs and expenses paid up front by Vantage, which are typically reimbursed by its clients, often include all or some of the following elements:  postage, printing, envelopes, the cost of the product, mail house charges, bank fees, mail permit fees, the National Change of Address

10. On June 15, 1998, the United States (the "Government") filed a Notice of Intervention and exercised its right to proceed with the action filed by the Relator. (Complaint of the United States at ¶2).

11. On June 20, 1998, the Government filed its Complaint in the civil action captioned U.S. ex rel. Lawrence Saklad v. Henry R. Lewis et. al., No. 97-10052-MLW ("the *qui tam* action"). (See Complaint of the United States).

12. The *qui tam* action sought recovery for alleged postal revenue deficiencies, penalties and exemplary damages claimed to be due as a result of fundraising mailings made by Vantage for its customers at "not-for-profit" postal rates. (Complaint at ¶8). The Government alleged that the mailings made by Vantage were not eligible for mailing at the "not-for-profit" rates "because Vantage's contracts with such NPO customers either limited the NPO customer's liability to pay Vantage for its services and out-of-pocket costs or restricted the means by which Vantage could obtain payment for same in the event of a shortfall in the funds raised by the solicitation mailings and that, as a result, the mailings of such solicitations at the not-for-profit postage rates was proscribed by the United States Postal Service's Cooperative Mail Rule." (Id).

## THE SHRINERS AGREEMENT

13. In 1999, Vantage became engaged in the negotiation of "a substantial fundraising services contract" with the Shriners Hospitals for Children ("Shriners"). (Complaint at ¶10).

14. Jay Fleisher ("Fleisher"), Managing Attorney for the Shriners, was "primarily

---

("NCOA") fee, mail sweeping fees, and mail opening charges. (3/15/02 Melikian Tr. at 375, 384, 358; Gelb Tr. at 121-24, 75).

4

involved" in negotiating the contract on behalf of the Shriners.  (6/17/05 Deposition of Harry Melikian, hereinafter "6/17/05 Melikian Tr." at pp. 45-46, attached hereto as Exhibit "I"). Lawrence Lyon ("Lyon") was "primarily involved" "from Vantage's side" for negotiating the contract on behalf of Vantage.  (Id).

15.     As a prerequisite to entering into an agreement, Shriners "demanded, during the course of the negotiations, that any fundraising services contract with Vantage include terms that limited its liability to pay Vantage for its fundraising services and out-of-pocket expenses from Shriners' cash assets in the event that the fundraising programs failed to raise sufficient amounts to pay out of the fundraising proceeds." (Complaint ¶11).

16.     As an additional prerequisite, Shriners also wanted Vantage to mail its fundraising mailings at "not-for-profit" postal rates.  (Complaint ¶11).

17.     Because the Shriners wanted to limit its liability under any agreement and be able to mail at the reduced nonprofit postage rate, Vantage allegedly sought defendants' input as to how it could do so without violating the cooperative mail rule.  (Complaint at ¶13).

18.     An "Agreement to Provide Fund Raising Consulting and Management Services" ("the Agreement") was executed by the Shriners on June 17, 1999 and by Vantage on June 22, 1999.  (Complaint, Exhibit "A"). Among other things, the Agreement provided that Vantage was entitled to rent or exchange the Shriners' mailing list to offset any unpaid, outstanding balance due for Vantage's services at the conclusion of the contract term. (Id., ¶13).  The Agreement also stated that the Shriners were liable for any outstanding postage for mailings made pursuant to the Agreement. (Id. at ¶2).

19.     Prior to the execution of the Agreement, Vantage had received legal advice from an attorney other than Miller that the cooperative mail rule did not apply to charitable fundraising. (6/17/05 Melikian Tr. at pp. 66-67).

## THE UNDERLYING SHRINERS CLAIMS

20.     On June 15, 2000, Melikian sent a letter to Fleisher informing Fleisher that Shriners might be receiving a request for information from the United States Postal Inspection Service concerning the *qui tam* action. (June 15, 2000 letter, VANTAGE 1209, attached hereto as Exhibit "J").

21.     On September 7, 2000, Fleisher wrote to Vantage's legal counsel, Morris Goldings, Esq. ("Goldings"), requesting a release from any third-party claims that Vantage may have against Shriners in the *qui tam* action. (September 7, 2000, SHC 00948, attached hereto as Exhibit "K").

22.     On September 21, 2000, Vantage's legal counsel Brian LeClair ("LeClair") sent a letter to Fleisher stating his understanding that Shriners may have received a request for information from the Government seeking historical information concerning the Shriners' business dealings with Vantage. (September 21, 2000 letter, SHC 00931, attached hereto as Exhibit "L").

23.     On September 29, 2000, Fleisher sent a follow-up letter to Goldings expressing Fleisher's understanding that Vantage would be providing the Shriners with a release from any claims Vantage may have had against the Shriners in the *qui tam* action. (September 29, 2000 letter SHC 00931, attached hereto as Exhibit "M").

6

24.   On October 2, 2000, Miller sent a letter to Fleischer stating, in part:

> My client, Vantage Financial Services, Inc. has instructed me to inform you that VFS will defend any challenge that a mailing prepared and entered into the U.S. Mail pursuant to the contract between VFS and SHC dated June 17, 1999, constitutes an unauthorized cooperative mailing. VFS will bear the entire burden, financial or otherwise, of its defense. Further, by this letter, VFS agrees that it will refrain from impleading SHC as a third party defendant in any such litigation.

(October 2, 2000 letter, SHC 00912, attached hereto as Exhibit "N").

25.   On October 18, 2000, the Government supplemented its Rule 26(a)(1) Initial Disclosure in the *qui tam* action. ("Plaintiff's Supplemental Initial Disclosure," attached hereto as Exhibit "O"). "Shriners Hospitals for Children" was listed as likely to have discoverable information with respect to the Government's claims in the *qui tam* action. (Id.).

26.   Although it filed third-party claims against many of its nonprofit clients, Vantage agreed to refrain from impleading the Shriners as a third-party defendant in the *qui tam* action. (6/17/05 Melikian Tr. at pp. 164-65).

27.   On October 25, 2000, Lyon signed and delivered a letter to John D. VerMaas, Shriners' President, Gene Bracewell, Shriners' Treasurer, and Robert Turnipseed, Imperial Potentate of the Shriners organization, stating that "Vantage agrees to refrain from impleading the Shriners as a third party defendant in the current litigation between Vantage and the United States Postal Service, which is pending in Federal Court in Boston; provided, however, that the Shriners shall agree to amend Paragraph 13 of the Agreement by and between Vantage Financial Services, Inc. and Shriners Hospitals for Children, dated June 17, 1999. A copy of the proposed amendment is attached." (October 25, 2000 letter, SHC 00872, attached hereto as Exhibit "P"). Although Lyon signed the October 25, 2002 letter, it was written by Goldings and it was

"carbon copied" to Goldings and Melikian. (Id.; 7/21/05 Deposition of Lawrence Lyon, hereinafter "Lyon Tr." at pp. 81-82, attached hereto as Exhibit "Q").

28. With Vantage already under scrutiny by the Government for its prior mailing practices on behalf of numerous nonprofit entities, the Government incorporated the Agreement into its claims in the *qui tam* action. (Complaint at ¶19). According to the complaint in this case, the effect of the inclusion of the Shriners claims in the *qui tam* action was allegedly to significantly increase Vantage's damages exposure. (Id).

29. On March 1, 2001, the Government supplemented its interrogatory answers in the *qui tam* action by serving Vantage with a revised summary of its single damages claims arising from alleged postal revenue deficiency claims resulting from the allegedly improper use of nonprofit postage rates. (March 1, 2001 letter from Assistant United States Attorney Peter K. Levitt to Brian LeClair, counsel for Vantage attached hereto as Exhibit "R"). The Government included a spreadsheet entitled "Summary of Single Damages" which claimed $184,669.48 in single damages in relation to "Shriners Hospitals for Children." (Id.) The spreadsheet represented the Government's single damages calculations for February 2001. (Id.).

30. In March 2001, Vantage's attorneys reviewed and analyzed the Government's March 2001 damages claim with respect to the Shriners mailings under the Agreement . (April 17, 2001 "INTERIM BILL FOR LEGAL SERVICES RENDERED through March 31, in connection with U.S. Post Office," Vantage 21762-21767, attached hereto as Exhibit "S").

31. On March 2, 2001, LeClair reviewed the Government's updated damages calculations and engaged in email correspondence with Laurence Johnson, Esq., also counsel to Vantage, and Melikian. (Exhibit "S" at VANTAGE 21764).

32. On March 26, 2001, Vantage's attorneys conducted a "Comparison and analysis of USPS calculation of damages from 2/00-3/01." (Exhibit "S" at VANTAGE 21765).

33. On March 27, 2001, Vantage's attorneys engaged in additional email correspondence and analysis of the Government's damages calculations. (Exhibit "S" at VANTAGE 21766).

## *QUI TAM* SUMMARY JUDGMENT

34. Vantage was granted summary judgment in its favor on the Government's claims for fraud and violations of the False Claim Act. (3/5/2004 "Memorandum and Order" (Wolf, D.J.) at pp. 16-17, 19, attached hereto as Exhibit "T").

35. With respect to the Government's single damages claims,[2] the Court did not make a final determination as to whether payment in kind through the rental of Shriners' mailing list satisfied the cooperative mail rule. (Id. at pp. 17-19). The Court did, however, acknowledge that the list rental provision in the agreement was potentially a valid means of compliance with the cooperative mail rule. The Court noted, however, that it was unable to resolve this issue because Vantage failed to provide any expert evidence of the value of the Shriners' mailing list. (Id. at 18).

## *QUI TAM* SETTLEMENT

36. Vantage ultimately settled the Government's claims in the *qui tam* action for a total of $4,500,000.00. (Complaint at ¶25).

9

37. Although Vantage claims that one half of the settlement funds (or $2,250,000.00) were allocated to the Government's claims arising from the Shriners mailings under the Agreement, there was never any discussion between the United States Government and Vantage concerning the allocation of the settlement funds to any particular fundraising programs at issue in the litigation. (6/17/05 Melikian Tr. at p. 175; Plaintiff's Responses to Defendants' First Requests for Admissions ("Admissions"), at 6, ¶19, attached hereto as <u>Exhibit</u> "U'). Nor did the Vantage parties agree with the United States as to the allocation of the settlement funds to any particular fundraising programs at issue in the litigation. (Admissions, at 6, ¶18).

## **VANTAGE'S RULE 30(B)(6) TESTIMONY**

38. Through its Rule 30(b)(6) witness, Melikian, Vantage has testified that it still believes that the Cooperative Mail Rule as it was in effect in June of 1999 does not apply to charitable fundraising. (6/17/05 Melikian Tr. at p. 90).

39. Vantage believes that the Agreement complied with the Cooperative Mail Rule as it was in effect at that time. (6/17/05 Melikian Tr. at p. 90).

40. Vantage believes that under the Agreement, Shriners had an unconditional obligation to pay for the full cost of the program. (6/17/05 Melikian Tr. at p. 91).

41. Vantage believes Shriners was fully obligated to pay the full cost of the program, even if Shriners was required to use funds other than those that were generated by the program and deposited into the Program Account. (6/17/05 Melikian Tr at p. 92).

---

[2] The Court dismissed the claims for exemplary damages under the False Claims Act allegedly arising from the Shriners mailings under the Agreement, finding that Vantage relied on the

42. Vantage testified that he still believes that Miller is an expert with respect to drafting fundraising contracts such as the Agreement:

> Q: Do you continue to believe that Mr. Miller was an expert in drafting the type of Agreement that was entered into on June 17, 1999 between Vantage and the Shriners?
>
> A: Absolutely.

(6/17/05 Melikian Tr. at pp. 183-184).

## FINANCIAL ASPECTS OF THE SHRINERS AGREEMENT

43. Vantage had a general practice of attempting to realize a 20 to 40 percent gross profit margin as a result of the various mailings it made on behalf of the Shriners. (6/17/05 Melikian Tr. at p. 112).

44. Vantage typically had a profit markup on costs of anywhere from 50% to 70%, or more. (3/15/02 Melikian Tr. At pp. 255-57. See also Graves Tr. at p.15, 124 (stating that Vantage typically used a 100% mark up on costs).

45. Vantage's gross profit margin under the Agreement was greater than the amount of damages that it claims in this case. (6/17/05 Melikian Tr. at p. 181).

46. Vantage made more money in terms of the gross profit from the Agreement than it is claiming in the way of damages in this case. (6/17/05 Melikian Tr. at p. 182).

47. As of February 6, 2003, Vantage had been paid $30,092,346.00 as a result of the Agreement. ("Major Acquisition Program Outstanding Balance Summary," VANTAGE 22589, attached hereto as Exhibit "V"). As of that date, Vantage had realized a cumulative gross profit

---

expert advice of Defendants.

margin of $12,271,283.00 as a result of the Agreement with the Shriners. (Id.)

48.    As of September 30, 2004, the mailings under the Agreement had generated $46,421,209.00 in gross donations. ("Vantage Direct Mail Program Summary" attached to Affidavit of Willard E. Fawcett, Jr. as Exhibit "A"). As of that date, $43,297,729.00 had been paid to Vantage. (Id). As of September 30, 2004, the Shriners had received $2,831,695.00 in net donations. (Id). Vantage retained 93% of all funds generated by the Agreement.

49.    Vantage's gross profit margin was approximately $15,000,000.00 (8/9/2005 (Deposition of Lawrence C. Lyon, hereafter "8/9/2005 Lyon Tr." at p. 117, attached hereto as Exhibit "W").

50.    Vantage has not produced in discovery any records of its final gross margin or net profit as a result of the services it provided under the Agreement. It also claims that it does not determine its net profits on individual contracts. (Admissions, at 1-2, ¶1).

## THE SEMB AFFIDAVIT

51.    The specific terms concerning postage for the mailings to be made under the Agreement were subject to the approval of the Shriners. (Affidavit of Ralph Semb, hereinafter "Semb Affidavit," at ¶5). The use of the Nonprofit Standard Mail rates was a precondition to the Shriners entering into the Agreement with Vantage. Id. Shriners Hospitals would not have entered into a fund raising agreement with Vantage if the mailings made under the Agreement were to be sent at regular bulk mail rates, because Shriners Hospitals was authorized to mail at the less expensive, nonprofit postal rates. Id.

52. The terms of Paragraph 7.3.2 of the Agreement were subject to the approval of the Shriners. (Semb Aff. at ¶6). Paragraph 7.3.2 of the Agreement states:

> Shriners agrees to retain all funds received in response to the Direct Mail Program in the Program Account. Upon receipt and verification of the billing statement, and upon verification from the Bank of the amount of funds available in the Program Account to pay the charges on the billing statement, Shriners shall pay the charges on the billing statement from the Program Account.

(Id.). The Shriners would not have entered into the Agreement absent the inclusion of the above-quoted Paragraph 7.3.2 of the Agreement, as written. (Id.).

53. The terms of Paragraph 13.2 of the Agreement were subject to the approval of the Shriners. Paragraph 13.2 of the Agreement states, in part:

> Upon conclusion of said thirty-six (36) month period, Vantage shall have no further recourse against Shriners.

The Shriners would not have entered into the Agreement absent the inclusion of Paragraph 13.2 of the Agreement, as written.

## VANTAGE'S ALLEGED DAMAGES

54. Vantage claims more than $2,390,633.07 in damages in this action. ("Plaintiff's Initial Disclosures," attached hereto as Exhibit "X", at (C)(3).

55. In addition to claiming more than $2,000,000.00 in damages attributable to the settlement of the Shriners' claims, Vantage also claims as damages fifty-percent of all defense costs from the time the United States added the Shriners' claims to the qui tam action. Id. at (C)(2).

                Respectfully submitted,
                Nonprofit Service Group, Inc. and
                George E. Miller,
                By their attorneys,

                /s/ Matthew J. Griffin
                Richard L. Nahigian
                BBO No. 549096
                Matthew J. Griffin
                BBO No. 641720
                Peabody & Arnold LLP
                30 Rowes Wharf
                Boston, MA 02110
                (617) 951-2100