EXHIBIT___*C*___

---

Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01

PAGE 1 TO PAGE 147

Apex Reporting (617) 426-3077

---

CONDENSED TRANSCRIPT AND CONCORDANCE

*Apex Reporting*
*P.O. Box 3*
*Boston, MA    02112*
*Phone:   (617) 426-3077*
*FAX:    (617) 426-6844*

Vantage 20666

**APEX Reporting**
P.O. Box 3
Boston, MA  02112
**(617) 426-3077**

| | |
|---|---|
| DATE  1/17/02 | **Invoice** |
| INVOICE #  25877 | |
| PO # or Apex # | |
| TERMS  Net 15 | |

**BILL TO:**
Brian W. Leclair, Esq.
Attorney at Law
12 Fox Run Lane
Marblehead, MA  01945

**SHIP TO:**
Brian W. Leclair, Esq.
Attorney at Law
12 Fox Run Lane
Marblehead, MA  01945

| DATE | DESCRIPTION | QTY | UNIT | RATE | AMOUNT |
|---|---|---|---|---|---|
| | DOJ-USA V Vantage Travel, et al, 97-10052-MLW | | | | |
| 1/10/02 | Harvey Altergott | 221 | pgs | 2.25 | 497.25 |
| 1/10/02 | condensed | 221 | pgs | 0.25 | 55.25 |
| 1/17/02 | Express Delivery | 1 | shp | 25.00 | 25.00 |

1.50% PER MONTH ON UNPAID BALANCE
Fed ID# 04-3535286

**Total**          $577.50

**Vantage 20667**

BSA        Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01        XMAX(1)

## Page 1

```
[1]                                                    1 - 147
[2]
[3]
[4]            IN THE UNITED STATES DISTRICT COURT
[5]                         FOR THE
[6]                  DISTRICT OF MASSACHUSETTS
[7]
[8]
[9]   UNITED STATES OF AMERICA          )
      EX REL. LAURENCE SAKLAD,          )
[10]                                     )
              Plaintiffs.               )
[11]                                     )
      vs                                ) CIVIL ACTION
[12]                                     ) NO. 97-10052-MLW
      HENRY R. LEWIS,                   )
[13]  HARRY MELIKIAN, AND               )
      VANTAGE TRAVEL SERVICE, INC.      )
[14]                                     )
              Defendants.               )
[15]                                     )
      vs                                )
[16]                                     )
      AMERICAN TRAPSHOOTING             )
[17]  HALL OF FAME, ET AL.              )
                                        )
[18]          Third-Party Defendants.   )
[19]
[20]          THE ORAL DEPOSITION OF HENRY LEWIS,
[21]  held pursuant to Notice, and the applicable provisions of
      the Federal Rules of Civil Procedure, before Marilyn
[22]  Franklin, a Court Reporter and Notary Public in and for the
      Commonwealth of Massachusetts, at the offices of the United
[23]  States Attorney, 1 Courthouse Way, Boston, Massachusetts, on
[24]  Tuesday, October 16, 2001, commencing at 10.20 a.m.
[25]
```

## Page 2

```
[1]   APPEARANCES:
[2]   For the Plaintiff:
[3]         PETER K. LEVITT, Assistant U.S. Attorney
            Office of the United States Attorney
[4]         1 Courthouse Way, Suite 9200
            Boston, MA  02210
[5]         (617) 748-3100
[6]   For Defendant Vantage Travel & Henry Lewis:
            BRIAN W. LECLAIR, ESQ.
[7]         Attorney at Law
            12 Fox Run Lane
[8]         Marblehead, MA  01945
            (781) 631-9981
[9]
[10]  For Defendant Moose International:
[11]        MARK A. DARLING, ESQ.
            MICHAEL J. MINTZ, ESQ.
[12]        Cogavin & Waystack
            Two Center Plaza
[13]        Boston, MA  02108
            (617) 742-3340
[14]
[15]  For Defendant Wildlife Forever:
[16]        BRIAN P. McDONOUGH, ESQ.
            JOSEPH R. VALLE, JR., ESQ.
[17]        Riemer & Braunstein, LLP
            Three Center Plaza
[18]        Boston, MA  02108
            (617) 523-9000
[19]  For the General Federation of Women's Club:
[20]        SCOTT A. BELL, ESQ.
            Morrison, Mahoney & Miller, LLP
[21]        250 Summer Street
            Boston, MA  02210
[22]        (617) 439-7500
[23]
[24]
[25]
```

## Page 3

```
[1]
[2]   ALSO PRESENT:
[3]        BETH ANN IRVINE, Special Agent
           United States Postal Service
           Office of Inspector General
[4]        444 Washington Street, Suite 201
           Woburn, MA  01801-1072
[5]        (781) 904-8417
[6]
[7]        ALAN E. DOUILLETTE, Postal Inspector
           United States Postal Service
[8]        495 Summer Street
           Boston, MA  02210
           (617) 556-4423
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

## Page 4

```
[1]                    I N D E X
[2]   WITNESS:                                    PAGE
[3]   Henry Lewis
[4]     (By Mr. Levitt)                              5
[5]     (By Ms. Mintz)                         139,142
[6]     (By Mr. Valle)                             140
[7]     (By Mr. Bell)                              140
[8]
[9]   EXHIBITS:       DESCRIPTION                 PAGE
[10]  1a    Program agreement, dated 10/27/95      86
[11]  1b    Letter, dated 10/27/95                 86
[12]  2     Letter, dated 10/25/90                 92
[13]  3     Letter, dated 11/16/90                 94
[14]  4     Letter from Richard Jarvis, dated
[15]        9/13/91                                97
[16]  5     Letter to Ralph Semb, dated 10/4/93   117
[17]  6     Letter from Larry Lyon, dated 10/11/95 128
[18]  7     Agreement between Vantage and the
[19]        National Council of Senior Citizens   130
[20]
[21]
[22]
[23]
[24]
[25]
```

**Vantage 20668**

BSA    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    XMAX(2)

## Page 5

S T I P U L A T I O N S

[1]
[2]
[3]    IT IS HEREBY STIPULATED AND AGREED TO,
[4]    by and between the parties and their
[5]    respective attorneys, that all
[6]    objections, except as to the form of the
[7]    questions, shall be reserved until the
[8]    time of trial, that the filing of the
[9]    deposition be waived; and, that the
[10]   witness may read and sign the deposition
[11]   without any Notary Public being present
[12]
[13]
[14]
[15]
[16]
[17]
[18].
[19]
[20]
[21]
[22]
[23]
[24]
[25]

## Page 7

[1]    Q Can you identify the corporate entities that [2] you're referring to when you say Vantage?

[3]    A I'm sorry. Could you repeat yourself?

[4]    Q Could you identify the corporate entities that you [5] refer to when you say Vantage?

[6]    A We have a travel company.

[7]    Q What's that called?

[8]    A Vantage Telex World Travel.

[9]    Q Are there any other companies ---

[10]   A I'm sorry, Vantage, I think we call it VDMS, [11] Vantage Direct Marketing Services.

[12]   Q Anything else?

[13]   A Not to my knowledge.

[14]   Q What about Vantage Group?

[15]   A Could be. I don't know.

[16]   Q You don't know what?

[17]   A I don't know if that's what the title is.

[18]   Q Do you know if there is a company called Vantage [19] Group that you are the CEO of?

[20]   A I call it Vantage, okay. Maybe it's Vantage [21] Group, okay. I don't know all the chains or letters or – [22] the organization chart, I guess that's what I'm saying.

[23]   Q What about Vantage Financial Services?

[24]   A I don't know if we used to call ourself that or [25] not. I'm not sure.

## Page 6

[1]    D E P O S I T I O N

[2]    (10:20:a.m.)

[3]    H E N R Y L E W I S , having been sworn by a Notary [4] Public to tell the truth, the whole truth and nothing [5] but the truth, testified upon his oath as follows:

[6]    MR. LEVITT: Brian, before we start, on [7] objections, reserved same as Melikian?

[8]    MR. LeCLAIR: Fine.

[9]    EXAMINATION

[10]   BY MR. LEVITT:

[11]   Q Mr. Lewis, my name is Peter Levitt. I'm an [12] Assistant United States Attorney. I represent the United [13] States in this case. Would you say your name for the [14] record?

[15]   A Henry Lewis, L-E-W-I-S.

[16]   Q How are you employed, Mr. Lewis?

[17]   A I'm the CEO of Vantage.

[18]   Q How long have you been in that position?

[19]   A I'm not sure when my title changed. At one time I [20] was the President and CEO.

[21]   Q How long have you been employed by Vantage?

[22]   A Nineteen years.

[23]   Q When you say Vantage, what does that refer to?

[24]   A That refers to a travel and fundraising business, [25] I guess that's what you'd say.

## Page 8

[1]    Q You don't know if Vantage ever had a company [2] called Vantage Financial Services?

[3]    A No, I don't.

[4]    Q What did you do to prepare for this deposition?

[5]    A Brian met me yesterday afternoon.

[6]    Q Did you review any documents?

[7]    A Yes.

[8]    Q What documents did you review?

[9]    A I reviewed a side letter.

[10]   Q Who was the side letter with, what company?

[11]   A I think it was the Texas Grand Lodge. I'm not [12] sure.

[13]   Q What other documents did you review?

[14]   A He showed me a letter from, I think, 1990-1991, [15] from the Post Office.

[16]   Q Who was the letter to?

[17]   A It was to me.

[18]   Q Do you recall what the letter was about?

[19]   A It had a list of groups on there, and referring to [20] some postal matters.

[21]   Q What postal matters?

[22]   A I don't know.

[23]   Q Did you review the document?

[24]   A Yeah, I looked at the document and – I did look [25] at the document.

Vantage 20669

BSA                  Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01                  XMAX(3)

## Page 9

[1]  Q What was it about?
[2]  A As I said, I don't recall.
[3]  Q You don't recall from yesterday what it was about?
[4]  A It was about some – I don't know because it was [5] kind of erroneous information on the letter when I looked at [6] it. That was the first thing I said.
[7]  Q What was erroneous about it?
[8]  A They weren't fundraising groups.
[9]  Q What weren't?
[10] A The list of associations on the letter.
[11] Q What did the letter say about those groups?
[12] A I don't recall. I didn't get into the detail of [13] the letter.
[14] Q Well, what did it say that you thought was [15] erroneous?
[16] A As I said, I don't recall. All I know is, when I [17] looked at the letter, they were not fundraising groups.
[18] Q Did the letter say that they were fundraising [19] groups?
[20] A I don't recall.
[21] Q I'm trying to understand. You said that the [22] letter was erroneous. I'm trying to figure out what that [23] was. Can you tell me in detail what was erroneous about the [24] letter?
[25] A When Brian showed it to me —

## Page 10

[1] MR. LeCLAIR: I'm going to instruct the witness [2] not to disclose the content of his conversation with me.
[3]  Q Can you tell me in detail what was erroneous about [4] the letter, without disclosing what your lawyer told you?
[5]  A When I looked at the letter, they were not [6] fundraising group on – inside the content of the letter.
[7]  Q And why do you say that makes the letter [8] erroneous?
[9]  A I don't know.
[10] Q What other documents did you review?
[11] A Nothing.
[12] Q Would you tell me your educational background and [13] work background?
[14] A My educational background?
[15] Q Yes.
[16] A I went to high school in Brookline/Boston area, [17] and I spent six months at the University of Tampa. That's [18] my education. My other background is travel background. I [19] was in the home improvement business for about a year or [20] two. Then I was a salesman.
[21] Q For who?
[22] A A company called United Travel Service.
[23] Q When was that?
[24] A I think it was probably late '70s.
[25] Q How long were you there?

## Page 11

[1]  A Six months, eight months, a year. I don't know. [2] In that time period.
[3]  Q What's the rest of your — .
[4]  A Then I became a salesman at a company called [5] Regency Travel. Then I became a salesman at Trans National [6] Travel.
[7]  Q What did you do after that?
[8]  A Started Vantage.
[9]  Q Do you recall what year you started Vantage?
[10] A Well, I didn't start the original operation. It [11] was run by Sam Rosenberg, if I recall right.
[12] Q When did you get involved with Vantage?
[13] A It was January/February '83-'84.
[14] Q What time period did you work at Trans National?
[15] A I think it was from '80 to '82-'83.
[16] Q Did you work at Trans National up to the point [17] when you got involved with Vantage?
[18] A No. I was out of work.
[19] Q How long were you out of work?
[20] A I'm going to say seven, eight, nine months.
[21] Q What did you do at Trans National?
[22] A Originally, Trans National bought Regency Travel. [23] So I was working inside of their building in a separate [24] organization. A year and a half after that or a year after [25] that, they disassembled that company, and I went to work as

## Page 12

[1] the Sales Manager.
[2]  Q You were a Sales Manager for Trans National?
[3]  A Yes.
[4]  Q What did you do in that capacity?
[5]  A I worked with the salesmen and the administrators.
[6]  Q Did you supervise the salesmen?
[7]  A Some of the times.
[8]  Q Was that part of your job?
[9]  A Some of the times.
[10] Q What were your other responsibilities?
[11] A I'd still go on the road myself and sell mostly [12] Shrine people.
[13] Q What were you selling them?
[14] A Travel.
[15] Q Explain what that means?
[16] A Sell them a package tour.
[17] Q Explain what that means?
[18] A Go to a Shriner or a group and offer them our [19] package tours. We were a wholesaler. We had pre-set tours; [20] go out and ask the association or sell the association [21] concept of working with our company.
[22] Q When you say the concept of working with your [23] company, what was it that they would do with your company?
[24] A Well, the opportunity to work with our tour [25] packages.

**Vantage 20670**

## Page 13

[1]  Q Can you give me an example of a tour package that [2] you would sell?

[3]  A A trip to Switzerland for a week or two weeks, [4] hotel, air, food, optional tours.

[5]  Q And you would sell the program to who?

[6]  A The leader of the group.

[7]  Q And who would the program be for?

[8]  A Their membership.

[9]  Q Were these for-profit or non-profit companies?

[10]  A Excuse me?

[11]  Q Were these for-profit or non-profit companies?

[12]  A Mostly non-profits.

[13]  Q Do you recall during your time at Trans National [14] an investigation by the Postal Service of Trans National?

[15]  A No.

[16]  Q Can you recall, during your time at Trans [17] National, coming into contact with the term Cooperative Mail [18] Rule?

[19]  A No.

[20]  Q As part of your duties as a sales manager, were [21] you aware of postal regulations governing travel programs?

[22]  A No.

[23]  Q During that time at Trans National, did you have [24] any conversations with anyone about postal regulations [25] governing travel programs?

## Page 14

[1]  A No.

[2]  Q Was there anyone at Trans National who was [3] responsible for being aware of regulations governing travel [4] programs?

[5]  A I wouldn't know.

[6]  Q Is there anybody who would know?

[7]  A I don't know the answer to that.

[8]  Q When you came to Vantage, what position did you [9] come in as?

[10]  A The President of the company.

[11]  Q And at that time, how many people were in the [12] company, approximately?

[13]  A Twenty.

[14]  Q How many people are in the company now, [15] approximately?

[16]  A A hundred thirty, a hundred and ten. I'm sorry. [17] About a hundred and thirty, I think.

[18]  Q What were your duties when you came on as [19] President of Vantage?

[20]  A Everything.

[21]  Q Tell me everything?

[22]  A Just help get the business going. We just started [23] the business, so I'd be involved with a lot of things.

[24]  Q When did Sam Rosenberg start the company?

[25]  A In October.

## Page 15

[1]  Q October of what year?

[2]  A I think it was '83.

[3]  Q And you joined it in January or February?

[4]  A Yeah.

[5]  Q Of?

[6]  A The following —

[7]  Q Of '84?

[8]  A Yes.

[9]  Q At that time, what was the name of the company?

[10]  A Excuse me?

[11]  Q At that time, what was the name of the company?

[12]  A I think it was just Vantage at that time.

[13]  Q And what business was Vantage in at that time?

[14]  A The travel business.

[15]  Q Just travel?

[16]  A Yes.

[17]  Q When did Vantage get into the fundraising [18] business?

[19]  A I'm going to say 1990.

[20]  Q Well, do you want to think about it? You're not [21] sure?

[22]  A I'm not sure. I'd better say I'm not sure.

[23]  Q Approximately 1990?

[24]  A Yeah.

[25]  Q Do you recall, during the 1980s, any investigation

## Page 16

[1] by the Postal Service of Vantage's, involving Vantage's [2] travel business?

[3]  A Yes.

[4]  Q Tell me everything you know about that?

[5]  A I guess there was some type of ruling that we [6] could no longer mail non-profit mail.

[7]  Q What happened?

[8]  A We stopped mailing non-profit mail.

[9]  Q That was in connection with the travel business?

[10]  A Yes.

[11]  Q When was that?

[12]  A I don't know exactly when that was.

[13]  Q Would you say the late '80s? Early '80s?

[14]  A I think it was the late '80s.

[15]  Q How did you become aware of this ruling?

[16]  A I can't recall how I became aware.

[17]  Q Do you recall if you were contacted by the Postal [18] Service, or if the company was contacted by the Postal [19] Service?

[20]  A I can't recall how we were made aware of it.

[21]  Q Did you ever see the rule itself, the ruling? Do [22] you recall that?

[23]  A I don't recall if I did or I didn't.

[24]  Q Did you have any conversations with anyone at that [25] time about the ruling?

Vantage 20671

## Page 17

[1]   A Yes.
[2]   Q Who did you have conversations with?
[3]   A Some attorney.
[4]   Q What was the name of the attorney?
[5]   A If I'm not mistaken, I think it was Walter [6] Wekstein, but I'm not positive.
[7]   Q Was he counsel for Vantage at that time?
[8]   A I assume so.
[9]   Q Do you know where he is today?
[10]  A He's in the Boston vicinity someplace.
[11]  Q Is he still an attorney for Vantage?
[12]  A No. He's retired.
[13]  Q Who else was present for these conversations?
[14]  A I assume Harry was. I'm not sure if he there [15] or not, but I assume.
[16]  Q By Harry, do you mean Harry Melikian?
[17]  A Yes.
[18]  Q Anyone else?
[19]  A Not that I can recall.
[20]  Q When did Harry Melikian start working at Vantage?
[21]  A I think he's been there for 14 years or 13 years. [22] I'm not positive. It could be 12.
[23]  Q So he started in the late '80s?
[24]  A Yes.
[25]  Q How did he come to work at Vantage?

## Page 18

[1]   A I don't understand what the question means.
[2]   Q Well, did he apply to work at Vantage? Did you [3] recruit him?
[4]   A We recruited him. I'm sorry.
[5]   Q Where did you recruit him from?
[6]   A An accounting place. I'm not sure which place it [7] was.
[8]   Q What did you recruit him for, what position or [9] what responsibilities generally?
[10]  A Accounting.
[11]  Q By accounting, do you mean strictly accounting, or [12] do you mean financial matters generally?
[13]  A Financial things. Mostly accounting.
[14]  Q Did you know Harry Melikian prior to that time?
[15]  A No.
[16]  Q Did anyone at Vantage know him?
[17]  A Not that I know of.
[18]  Q What was the — You said that there was a ruling [19] in the late '80s that meant that in your travel business, [20] you could no longer mail at the non-profit rate. Do you [21] recall specifically what the ruling was?
[22]  A No.
[23]  Q How did that affect your business?
[24]  A Are you talking customers?
[25]  Q Generally, how did it affect your business, in

## Page 19

[1] whatever way you think it affected your business.
[2]   A It made it — We had to be more selective in who [3] we did business with.
[4]   Q Why is that?
[5]   A Because of the cost of doing business.
[6]   Q It increased the cost of doing business?
[7]   A Yes.
[8]   Q Why is that?
[9]   A Because you couldn't mail non-profit.
[10]  Q What do you mail in the travel business? What is [11] the mailing that goes at the non-profit or for-profit rate?
[12]  A Excuse me, sir?
[13]  Q What is the mailing that goes at the for-profit or [14] non-profit rate in the travel business?
[15]  A Are you saying what's in the package? There's a [16] brochure, you know, that would describe the trip. There's a [17] letter from somebody, group, organization that would say [18] here's why to go on the trip, and there's a sign-up sheet, [19] you know, an application form.
[20]  Q This is a letter that goes to the members of the [21] organization?
[22]  A Yes.
[23]  Q From the organization?
[24]  A Yes, but it's — we produce the material, yes.
[25]  Q You produce the material on the organization's

## Page 20

[1] letterhead and send it out; is that correct?
[2]   A Yes.
[3]   Q How much more expensive did it make the cost of [4] doing business?
[5]   A I don't recall what the postage rates were in [6] those days.
[7]   Q Was it significant from a business perspective?
[8]   A No.
[9]   Q But it changed your customer list?
[10]  A I'd have to say to a degree, yes.
[11]  Q And when you say you had to be more selective for [12] your customers, what were you looking for? In what way did [13] you become more selective?
[14]  A We needed better affinity groups.
[15]  Q What does that mean?
[16]  A Stronger affinities.
[17]  Q When you say "affinity," what do you mean?
[18]  A Tighter relationship.
[19]  Q Tighter relationship?
[20]  A Yes.
[21]  Q What does the word "affinity" mean?
[22]  A A group or an organization that has a common bond, [23] goal.
[24]  Q Can you give me an example of an affinity group [25] with a tighter bond or goal, the type of group that you

Vantage 20672

## Page 21

[1] would want as a result of that change in mailing?
[2]    A  Shriners.
[3]  .  Q  Because it has a lot of members and it's a big [4] group?
[5]    A  No.
[6]    Q  Why is it?
[7]    A  Because they have a strong bond, and they travel [8] together well.
[9]    Q  So it's more likely that the program will be [10] successful because of that?
[11]    A  Yes.
[12]    Q  You mentioned getting into the fundraising [13] business in approximately 1990. Who made the decision to go [14] into the fundraising business?
[15]    A  We were broached by people from competition. I [16] would say myself.
[17]    Q  You say you were, I'm sorry, you were broached [18] by —
[19]    A  We were approached by people who were in the [20] business to partake and help them get in the business.
[21]    Q  You were approached – Who were you approached [by?
[22]    A  A company called Barton & Cotton.
[23]    Q  And who were you approached by at Barton-Cotton?
[24]    A  I don't recall. One of their salesmen.
[25]    Q  And maybe you could explain. I didn't quite get

## Page 22

[1] what you're saying. A salesman approached you?
[2]    A  Not me. Approached my salesmen.
[3]    Q  Who were the salesperson from Barton-Cotton who [4] approached Vantage?
[5]    A  I can't remember if it was – which salesman it [6] was. It was numerous —
[7]    Q  Was it Larry Lyon?
[8]    A  It was numerous salesmen.
[9]    Q  Was it Larry Lyon? Do you recall that?
[10]    A  I can't recall.
[11]    Q  And what was the purpose of this approach?
[12]    A  To see if our travel groups would be interested in [13] their fundraising business.
[14]    Q  Into going into business with Barton-Cotton?
[15]    A  Yes.
[16]    Q  What decision did you make in that connection?
[17]    A  Originally, I said, yeah. You know, they were [18] going to give us a small commission for doing introductions.
[19]    Q  You were going to help Barton-Cotton in its [20] fundraising business?
[21]    A  Yes.
[22]    Q  And you said yes. Who did you talk to at Barton- [23] Cotton about that?
[24]    A  Some of the salesmen there.
[25]    Q  You never talked to anyone higher up than the

## Page 23

[1] sales people?
[2]    A  At one time, I think somebody from management was [3] in at Vantage.
[4]    Q  Who was that?
[5]    A  I have no idea.
[6]    Q  Did you have any conversations with anyone from [7] the Riggs family at that time?
[8]    A  I have no idea.
[9]    Q  So what happened? You decided, at least [10] initially, go to into the fundraising business with Barton- [11] Cotton?
[12]    A  No. We were just going to give them some of our [13] leads, you know, our relationships and give it to them, and [14] we'd get a commission for that.
[15]    Q  And so, what happened yet, with respect to Vantage [16] and fundraising?
[17]    A  My recollection is we decided against that because [18] we had contacted one of their competitors who would give us [19] a better deal.
[20]    Q  Who was that?
[21]    A  Famous Artists or Famous Studios or Famous Artists [22] Studios. I'm not sure.
[23]    Q  Who did you talk to at Famous Artists or Famous [24] Artists Studios?
[25]    A  Various people.

## Page 24

[1]    Q  Can you remember anyone's name?
[2]    A  Charles Simon.
[3]    Q  Did you speak with Mr. Simon yourself?
[4]    A  I was part of the conversation, yes.
[5]    Q  Who else was there for that?
[6]    A  I think, Larry.
[7]    Q  Larry Lyon?
[8]    A  Yeah.
[9]    Q  Anyone else?
[10]    A  Not to my recollection.
[11]    Q  What was the deal with Famous Artists?
[12]    A  I don't recall, but I know it was a better deal [13] than we presently had.
[14]    Q  And again, it was they would give you some kind of [15] commission in exchange for what, just names of your clients?
[16]    A  Names and people we could turn onto their [17] fundraising business.
[18]    Q  So it was names of individual contacts among your [19] clients that you thought might be interested in fundraising?
[20]    A  Yes.
[21]    Q  Do you recall what they paid you for that?
[22]    A  No.
[23]    Q  So did you then enter into an arrangement with [24] Famous Artists?
[25]    A  Yes. I don't know if it was contractual, but

**Vantage 20673**

## Page 25

[1] there was an arrangement.

[2]   Q And how long did that arrangement remain in [3] effect?

[4]   A I don't recall because they got sold or bought [5] out. Then we had to deal with somebody else. I can't [6] recall if it was Famous Artists or Famous Studios or a [7] conglomerate. But I know something happened. They got [8] bought out or sold out. I'm not sure.

[9]   Q After they got bought out or sold out, whatever [10] happened, did you remain working with the subsequent [11] company?

[12]   A For a little while, I think. I'll say I don't [13] recall because I don't know exactly how it transpired. For [14] a little while, I would say yes.

[15]   Q Give me a sense of how long this arrangement in [16] total was in effect with Famous Artists to the subsequent company? [18] Are we talking about ten years? A year? Two years?

[19]   A I'd say a year and a half, two years. I'm not – [20] That's a rough –

[21]   Q And during that time, what was the extent of the [22] relationship?

[23]   A I don't understand what you're saying. I'm sorry.

[24]   Q Did the relationship, in terms of what you did [25] with this company, change at all, or was it —

## Page 26

[1]   A Moment to moment, from what I – it was a herky- [2] jerky relationship.

[3]   Q What do you mean by that?

[4]   A I wasn't paying a lot of attention to it, and it [5] was a herky-jerky relationship. They changed bosses. They [6] changed – You know, it seemed to be a poor communication [7] between both organizations.

[8]   Q What I'm asking you is, you said earlier that the [9] business relationship was that you would provide this [10] company with names of potential customers?

[11]   A Yes.

[12]   Q And that they would pay you something for those?

[13]   A Commission.

[14]   Q Commission?

[15]   A Yes.

[16]   Q I'm asking you, did the nature of that business [17] relationship in terms of what was done – what you did, [18] they did – did that change? Did you do more? Did you do [19] less? That's the question.

[20]   A I'm not clear what you're saying, Peter. I'm [21] sorry.

[22]   Q You said that the relationship was that they would [23] pay you money, a commission, in exchange for names of your [24] members; is that correct?

[25]   A Yes. Yes, I did.

## Page 27

[1]   Q Did that change? Did you do anything more as the [2] relationship went on? Is that the sum and substance of what [3] was done in that relationship, or was more done later?

[4]   A I can't answer that question. I'm not sure what [5] you're saying to me. When I say done, that's what we did. [6] We would turn them on to our groups, and they would pay us a [7] commission for doing that. Does that make sense what I'm [8] saying to you?

[9]   Q That makes sense. All I'm asking you is whether [10] that may have changed later? Did what you did – did what [11] Vantage did change? Did you, for example, get more involved [12] with working with them on their contracts and working [13] together in terms of selling product?

[14]   A We might have made a call with them, if that's [15] what you're asking. Yeah, we might have gone on the road to [16] make a call with them, but I don't know anything about any [17] contracts. Not to my knowledge. Let's put it that way.

[18]   Q So in addition to giving them leads, sales people [19] from Vantage went on calls with them occasionally?

[20]   A I would assume so, yes.

[21]   Q When you say you assume so, do you know whether [22] that happened or not? Is that – was that something that [23] was expected to happen?

[24]   A No.

[25]   Q Why do you say that you think that happened?

## Page 28

[1]   A Well, the expectation when we talked about it was [2] we would set them up with our group contacts. Do you follow [3] what I'm —

[4]   Q I do follow you. And in addition, there might be [5] some personal meetings together at the outset; is that what [6] you're saying?

[7]   A Yes. Yes. That's not how it – That's not where [8] we were, though. It was supposed to be here's the group.

[9]   Q Why did that relationship stop, that business [10] relationship?

[11]   A I think because they got bought out. I'm not 100 [12] percent sure. We weren't satisfied. I'm not 100 percent [13] sure.

[14]   Q Now, was Vantage at this time doing its own [15] fundraising? You said that 1990 was the period you said [16] that you were first approached by Barton-Cotton, and then, [17] decided to go with Famous Artists. Was Vantage doing its [18] own fundraising business at this time?

[19]   A No. No.

[20]   Q Was the company – When was Vantage Studios [21] established?

[22]   A I don't recall.

[23]   Q What was Vantage Studios?

[24]   A I think it was the initial – I'm not sure. I'm [25] going to say I don't know. I'm not sure, but I assume that

**Vantage 20674**

BSA

Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    XMAX(8)

## Page 29

[1] was the initial name we used to go out and sell fundraising.
[2] I'm not sure.
[3]     Q Who is Richard Jarvis?
[4]     A He was the person he had tried to start the [5] fundraising business.
[6]     Q When did you hire him?
[7]     A 1991, 1992, 1990 – I'm not sure exactly.
[8]     Q So your recollection is that Vantage Studios and [9] the fundraising business was started by Vantage sometime in [10] the period 1990 to 1992?
[11]    A Yes, sir.
[12]    Q You mentioned that Famous Artists was called [13] Famous Artists or Famous Artists Studios. Was Vantage [14] Studios in any way connected with Famous Artist Studios?
[15]    A Only as far as – As I said, I'm not sure of the [16] exact title. So I'm going to – Only as far as soliciting [17] or helping to solicit organizations to sell fundraising [18] products.
[19]    Q Helping Vantage Studios?
[20]    A No, no. Helping Famous Artists, or whatever they [21] called them at that time.
[22]    Q Who made the decision to go into the fundraising [23] business?
[24]    A Well, we were approached, as I said to you, to get [25] in the fundraising business.

## Page 30

[1]     Q Who made the – Okay, you were approached by [2] Famous Artists to go into business with them. Who made the [3] decision —
[4]     A Barton-Cotton.
[5]     Q First Barton-Cotton?
[6]     A I'm sorry. Barton & Cotton. I misled you. It [7] was Barton & Cotton that approached the salesmen.
[8]     Q Right. And then, you made a deal with Famous [9] Artists?
[10]    A Yes.
[11]    Q And who made the decision to – for Vantage itself [12] to go into the fundraising business rather than working with [13] Famous Artists?
[14]    A Myself, I would assume.
[15]    Q And why did you decide to do that?
[16]    A It looked like it could be profitable.
[17]    Q Is that what you learned from working with Famous [18] Artists in their program?
[19]    A Yeah, I would assume so.
[20]    Q Who made the decision to hire Jarvis?
[21]    A I did.
[22]    Q And what was his position?
[23]    A He was to run the division.
[24]    Q And who did he report to?
[25]    A Myself, I assume.

## Page 31

[1]     Q Well, do you have any doubt about that?
[2]     A I wasn't paying attention, but I assume myself.
[3]     Q You were the CEO at that time, or the President?
[4]     A Yes. I'm not sure what title it was.
[5]     Q You were basically running the company; is that [6] correct?
[7]     A Yes.
[8]     Q And he was hired to run the fundraising division?
[9]     A Yes.
[10]    Q Who else was working in the fundraising division [11] at that time?
[12]    A Larry Lyon, and I'm not sure what other cast of [13] people were there.
[14]    Q Larry Lyon was a salesperson at that time?
[15]    A Yes.
[16]    Q Where did you get your initial clients for the [17] fundraising division?
[18]    A I would assume it was some of the clients that we [19] had worked with with Famous Artists.
[20]    Q When you say that, do you mean the same clients [21] that you had recommended to Famous Artists?
[22]    A I would assume so.
[23]    Q Was Famous Artists still in business at that time?
[24]    A Again, I'm not sure how the – As I said, some [25] capital relationship with a buy-out, and the Simons were no

## Page 32

[1] longer involved with the business. Some kind of buy-out or
[2] merger or – I'm not sure how it developed.
[3]     Q And was Vantage involved in that buy-out or [4] merger?
[5]     A No.
[6]     Q Who was Famous Artists bought out by?
[7]     A I'm not sure who.
[8]     Q You don't know if it was Barton-Cotton?
[9]     A I'm not sure.
[10]    Q When that buy-out occurred, did the successor [11] company stop being in the fundraising business?
[12]    A Not originally, no.
[13]    Q Originally, whatever company was the successor [14] company remained in the fundraising business?
[15]    A I think so.
[16]    Q You mentioned earlier Vantage Direct Marketing [17] Services. Was that the successor of company of Vantage [18] Studio with a successor division within Vantage?
[19]    A I'm not sure how it worked, Peter.
[20]    Q Was that a company that also was in the – that [21] was devoted to the fundraising business for Vantage?
[22]    A Could you repeat that again, please? I'm sorry.
[23]    Q Was Vantage Direct Marketing Services a company [24] that was – or a division that was devoted to fundraising?
[25]    A Yes.

**Vantage 20675**

Page 33

[1]   Q And Vantage Studios also was fundraising; is that [2] correct?
[3]   A As far as I know. I'm not trying to be rude. I [4] don't know.
[5]   Q I'm just trying to get a sense for the history. [6] And Vantage Financial Services, was that – that is also – [7] or that's the current fundraising vehicle, is it not, for [8] Vantage?
[9]   A I'm not sure what the title is.
[10]   Q You know your company is involved in fundraising?
[11]   A Yeah, that I do know.
[12]   Q Who are the officers of Vantage?
[13]   A Myself, and I think Harry. I'm not sure.
[14]   Q Harry Melikian?
[15]   A Yes.
[16]   Q What does that mean, that you're the officers?
[17]   MR. LeCLAIR: Objection.
[18]   Q What are the consequences of that?
[19]   MR. LeCLAIR: Objection.
[20]   Q You can answer the question.
[21]   MR. LeCLAIR: If he can.
[22]   Q Did it affect your pay?
[23]   A Not to my knowledge.
[24]   Q How are you reimbursed?
[25]   A Me personally?

Page 34

[1]   Q How are you paid by Vantage? How are you [2] compensated?
[3]   A Salary.
[4]   Q What's your salary?
[5]   A I think my salary is $400,000 a year.
[6]   Q Are there – Is there stock?
[7]   A Yes.
[8]   Q How much stock do you own?
[9]   A Seventy-some percent. I'm not even sure of the [10] percentile.
[11]   Q Does anyone else own stock? Who else owns stock?
[12]   A A fellow named Sam Rosenberg.
[13]   Q How much stock does he own?
[14]   A Eight or nine percent.
[15]   Q Anyone else?
[16]   A Larry Lyon, eight or nine percent, ten percent. [17] I'm not sure of the exact amount. Karen Broderick.
[18]   Q How much does she own?
[19]   A Three or four percent.
[20]   Q Who is she?
[21]   A She is – was in charge of the Operations [22] Department.
[23]   Q Is she still with the company?
[24]   A Yes, on a part-time basis.
[25]   Q What does she do now?

Page 35

[1]   A Helps in Quality.
[2]   Q Quality?
[3]   A Yes.
[4]   Q Can you be more specific in terms of what she [5] does?
[6]   A Make sure the quality of the travel programs, you [7] know, run efficiently.
[8]   Q Does she have anything to do with the fundraising [9] side?
[10]   A No.
[11]   Q When she was in charge of Operations, did she have [12] anything to do with the fundraising?
[13]   A No.
[14]   Q She was purely on the travel side?
[15]   A That's it.
[16]   Q Does anyone else own stock?
[17]   A No.
[18]   Q What's the stock worth?
[19]   MR. LeCLAIR: Objection.
[20]   A I would have no idea.
[21]   Q You have no idea?
[22]   A No.
[23]   Q Are you compensated in any other way?
[24]   A I get a year-end bonus.
[25]   Q What's that based on?

Page 36

[1]   A Nothing. No set measurement.
[2]   Q Is it overall performance of the companies under [3] Vantage?
[4]   A Excuse me?
[5]   Q Is it based on the overall performance of the [6] companies that come under the Vantage umbrella?
[7]   A Yes.
[8]   Q Vantage Travel and Vantage fundraising?
[9]   A Yes.
[10]   Q Is there anything else?
[11]   A I'd say no. No.
[12]   Q What was your bonus last year?
[13]   A I think it was two million dollars.
[14]   Q And the year before that?
[15]   A I think it was a million dollars, if I'm not [16] mistaken.
[17]   Q And we're talking about 1999. How about the year [18] before that?
[19]   A I can't recall exactly.
[20]   Q How is Harry Melikian compensated?
[21]   A He has pay.
[22]   Q What's his salary?
[23]   A One eighty-five, if I'm not mistaken.
[24]   MR. DARLING: I'm sorry?
[25]   THE WITNESS: One eighty-five.

**Vantage 20676**

BSA    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    XMAX(10)

### Page 37

[1]    Q And is he compensated in any other way?
[2]    A He gets a year-end bonus.
[3]    Q What's his bonus based on?.
[4]    A No base, just whatever I feel like giving him.
[5]    Q What factors do you take into consideration when [6] you decide Mr. Melikian's bonus?
[7]    A Performance, I guess.
[8]    Q And how do you – what factors do you take into [9] consideration when considering his performance?
[10]    A Profits, loyalty.
[11]    Q Anything else?
[12]    A No.
[13]    Q What do you mean by loyalty?
[14]    A Hard work.
[15]    Q When yOu say profits, profits of – do you mean [16] profits of the travel side and the fundraising side?
[17]    A Yes.
[18]    Q What was his bonus last year?
[19]    A Forty thousand dollars.
[20]    Q And the year before that?
[21]    A Thirty-five thousand dollars, forty thousand [22] dollars. I'm not exactly sure.
[23]    Q Is his bonus typically in the $40,000 range?
[24]    A Yes.
[25]    Q Are the Sales people for Vantage, Vantage's

### Page 38

[1] fundraising division compensated with a bonus?
[2]    A No.
[3]    Q Sales people of – Are the Sales people strictly [4] salaried?
[5]    A No.
[6]    Q Why don't you explain the compensation scheme for [7] the Sales people for —
[8]    A Commission.
[9]    Q — Vantage's fundraising?
[10]    A It's a commission deal. It's not a – You get [11] paid on a draw against commission.
[12]    Q Can you explain how that works?
[13]    A Based on a salesman's draw, we usually net it out [14] to ten percent of profits.
[15]    Q You say draw. That means they have a base salary; [16] is that correct?
[17]    A Yes.
[18]    Q And explain how the commission part works?
[19]    A A salesman draws $50,000. He needs to bring in a [20] half a million dollars in net revenue to cover his draw.
[21]    Q And if the sales person does not bring in a half [22] million net revenue, what happens?
[23]    A I'm not – not net revenue. Net profits. I'm [24] sorry.
[25]    Q You say a salesman has to draw – has a draw of

### Page 39

[1] 50,000?
[2]    A Yes, sir.
[3]    Q And would need to bring in a half a million net [4] profits to cover the draw?
[5]    A Yes.
[6]    Q What happens if a salesman doesn't bring in a half [7] million net profits?
[8]    A Cut in pay, you can let him go, or you can keep [9] him.
[10]    Q What would you do in that situation?
[11]    A I can't answer the question because I'd have to [12] know, or someone would have to know what is he working on. [13] I mean, there's a lot of variables there.
[14]    Q Has that happened before?
[15]    A Which part?
[16]    Q Has it happened where someone doesn't bring in [17] sufficient net profits to cover the draw?
[18]    A Sure.
[19]    Q And in those circumstances, what have you done?
[20]    A Various. I just gave you my laundry list, a [21] laundry list that I —
[22]    Q On occasion, you have cut pay?
[23]    A Sure.
[24]    Q On occasion, you have terminated for that reason?
[25]    A Yes.

### Page 40

[1]    Q On occasion, you have kept the person?
[2]    A Yes.
[3]    Q Then how does the commission work?
[4]    A If they get over their allotted net profits, [5] they'd be entitled to some type of additional commission. I [6] don't use the word bonus.
[7]    Q How is that calculated?
[8]    A The same scenario.
[9]    Q Do they get a percentage of the net profits?
[10]    A They would get ten percent. If a salesman did [11] 600,000, he'd be entitled to an additional $10,000.
[12]    Q What do your sales people typically make in [13] commissions?
[14]    A It's a wide scope.
[15]    Q Why don't you tell me the high numbers and the [16] lower numbers to give me a sense of the range?
[17]    A Some salesmen have started at a base pay of [18] $40,000, $35,000, and some sales people start at a base pay [19] at $150,000.
[20]    Q And that's based on prior performance? Time with [21] the company?
[22]    A What they have on a piece of paper. You know, [23] what they can bring to the party. Does that make sense?
[24]    Q That means how much work they have produced in the [25] past?

**Vantage 20677**

---

BSA                 Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01                 XMAX(11)

## Page 41

[1]   A In the past, or maybe they've come from another [2] company, you know.

[3]   Q That's just the base pay?

[4]   A Yeah.

[5]   Q Can you tell me the range in terms of commissions [6] that are paid out to salesmen?

[7]   A It could range from five thousand dollars to a [8] hundred thousand dollars.

[9]   Q Is 100K the high number, or is it sometimes more [10] than that?

[11]  A I'm not sure. I – I'm not sure of the exact [12] figures.

[13]  Q Tell me what the – how Vantage's fundraising [14] operation works?

[15]  A They go out and call on groups.

[16]  Q Can you be more specific than that?

[17]  A They set up appointments to call on groups.

[18]  Q And how are they fundraising? How does the [19] fundraising work?

[20]  A You act as a – I'm not sure the exact detail of [21] how it works myself, but the bottom line is, they go out and [22] solicit a group to do some type of product-induced package [23] to their members.

[24]  Q And are these primarily non-profits, the groups?

[25]  A Yes.

## Page 42

[1]   Q Tell me how the business works? This is a [2] profitable business, I take it?

[3]   MR. LeCLAIR: Objection.

[4]   Q Is this a profitable business?

[5]   A Yes.

[6]   Q What were Vantage's fundraising division's profits [7] last year?

[8]   A Without collections, I'd be guessing. I think [9] it's about two million dollars, a little better than two [10] million dollars.

[11]  Q Net profits?

[12]  A I don't know how many receivables we had going [13] into fall owing. Yeah, so there's a little – I don't know [14] how they do – how we do the bookkeeping, okay.

[15]  Q What does the two million represent?

[16]  A Pre-tax dollars. Is that what you're asking?

[17]  Q So a sales person goes out and gets a not-for- [18] profit company to do business with Vantage, selling – to do [19] fundraising. Describe how that relationship works, what [20] Vantage does?

[21]  A We put together the creative materials, the [22] product – products, package them, put them all together, [23] you know, assemble them, and have them produced and [24] marketed.

[25]  Q Have them produced and marketed?

## Page 43

[1]   A Yeah. You know, printed.

[2]   Q Who does that?

[3]   A We have various mail houses and printers. I'm not [4] sure which one. I wouldn't know.

[5]   Q Vantage contracts it out?

[6]   A Yes.

[7]   Q The printing?

[8]   A Yes.

[9]   Q How about the marketing?

[10]  A Could be. It's all – It's not produced at [11] Vantage. When I say the marketing, if there's a creative [12] package, then it's produced at – either with the [13] organization and Vantage or with a consultant and Vantage.

[14]  Q By marketing, you mean what's actually in the –

[15]  A Components.

[16]  Q The components of what's being sent out?

[17]  A Yes, sir.

[18]  Q And you said products. What sort of products?

[19]  A Mostly labels and cards, some calendars. Some [20] pins even. I'm sorry.

[21]  Q Labels, cards, pins?

[22]  A Pins.

[23]  Q Can you describe what these items might be?

[24]  A A little pin, you know, like a pin that would go [25] up here with the group or organization's logo or code or,

## Page 44

[1] you know, a Knights of Columbus pin, or whatever, Knights of [2] Columbus, K of C pin.

[3]   Q And the cards?

[4]   A Cards would be like a pack of greeting cards.

[5]   Q How would the – Tell me more about how the [6] program would work, how the – what Vantage would do? You [7] said they would put together the mailing?

[8]   A Yeah.

[9]   Q Then what happens next?

[10]  A It would go to either their own caging [11] operation – Is that what you're saying?

[12]  Q I'm asking you. I mean, how does the process [13] work? Vantage is in the business of doing fundraising for [14] non-profits, correct?

[15]  A Yes.

[16]  Q I'm asking you about how the business operates?

[17]  A Solicit the group; put together all the [18] components. We would do the mailing. We would be working [19] with an affiliate caging operation that would collect the [20] donations. Then after a certain time period – and again, [21] it varies – we would do a, it's known as a reminder, 'you [22] haven't made your donation, you know, please donate now. [23] Same scenario. We'd assemble the package, have it mailed [24] out to people who haven't donated off the original program; [25] ask for another type of solicitation. Money would then

Vantage 20678

BSA                    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Harry Lewis - 10/16/01                    XMAX(12)

Page 45

[1] be – go to the same caging operation. And that form would
[2] usually go two times, where there would be one reminder;
[3] then there would be a second reminder to go to the [4]
organization.
[5]   Q When you say "caging operation," is this a company [6]
that Vantage would contract with?
[7]   A Yes, or the group could have their own caging [8]
operation. I mean, it's —
[9]   Q Either way?
[10]   A Either way.
[11]   Q And a caging operation is just a company that acts [12]
as a repository for the donations that come in?
[13]   A Yes.
[14]   Q Where would that money go, the donations that come
[15] into the caging operation? What would the caging
operation [16] do with the money?
[17]   A It would go into, I think, a escrow account. I'm [18] not
sure, to be honest with you. I think it's an escrow [19] account.
[20]   Q An escrow account at the caging company?
[21]   A Yes.
[22]   Q And what would happen to that money? It doesn't [23]
just stay in the caging account, does it?
[24]   A No. Eventually, it would pay our contracted [25] amount,
and the group would keep the balance.

Page 46

[1]   Q When you say "pay our contracted amount," what do
[2] you mean?
[3]   A Whatever we contracted with the association.
[4]   Q Tell me about the contracts with the association, [5]
with the non-profits, how do those – how would those work?
[6]   A Meaning?
[7]   Q How were the contracts structured in terms of the [8]
payments?
[9]   A I wouldn't know.
[10]   Q You don't know how the contracts were structured?
[11]   A No.
[12]   Q Who is responsible for the contracts?
[13]   A In what time period?
[14]   Q Well, let's say 1995 to the present?
[15]   A It would be an array of people that were [16]
responsible for it.
[17]   Q Who are those people?
[18]   A John Flebbe, Dallas Graves. I'm not sure of the [19]
order. Victoria James, Tom Ferrara, Dick Jarvis. I'm not [20]
sure. There was a cast of them.
[21]   Q All these individual people could do whatever type [22]
of contract they wanted?
[23]   A I would say – I'm not sure any kind of contract [24] they
wanted, but they were in charge of doing contracts.
[25]   Q Who would review the contracts? Who would ensure

Page 47

[1] that they were uniform?
[2]   A Which time period?
[3]   Q In 1995 to the present.
[4]   A It would fall into their bailiwick with the [5] salesmen.
[6]   Q So the salesmen an these individuals could do [7]
whatever sort of contract they wanted, any sort of financial [8]
arrangements?
[9]   A No. We gave them standard – I mean, we had [10]
talked about – Let's put it this way. There would be some [11]
type of standardization between a bulk agreement, a non- [12]
profit agreement, what's workable in Canada.
[13]   Q Who would make those decisions?
[14]   A As I said, most of the decisions were made by [15]
John. I'm sure Harry would have some involvement with that.
[16]   Q Now, you just said that you gave them standard [17]
contracts. Who was responsible for the language of the [18]
standard contracts?
[19]   A Who was responsible? As I said, whoever was [20]
running the division at that time.
[21]   Q And you said that they did not have, those people [22]
did not have complete discretion about what sort of contract
[23] they drafted?
[24]   A I said the salesmen don't.
[25]   Q So the individuals who were running the division

Page 48

[1] could draft whatever sort of contract they wanted?
[2]   A I would assume not but, I mean – I would assume [3]
not. That wouldn't make good business sense.
[4]   Q No. So what I'm asking is, who was responsible [5] for
ensuring that that didn't happen?
[6]   A I would assume, Harry.
[7]   Q What was Harry's role during this period? Harry [8]
Melikian we're referring to?
[9]   A Yes.
[10]   Q What was his role at that time? We're talking [11] 1995
to present.
[12]   A He's in charge of Finance.
[13]   Q Do you know – You said there would be different [14]
contracts for non-profit or bulk, correct?
[15]   A Yeah.
[16]   Q What's the difference in the contracts?
[17]   A I wouldn't know.
[18]   Q How do you know they're different?
[19]   A I assume they are.
[20]   Q Why?
[21]   A Because one's non-profit and one's bulk, and one's [22]
in Canada. I mean, there's Canadian contracts, too.
[23]   Q Why do you think that those contracts would be any
[24] different?
[25]   A I have no idea.

Vantage 20679

### Page 49

[1] Q Well, you said it. I'm asking you why?

[2] A Well, just hearing it, non-profit and bulk, right?

[3] Q Hearing it from who?

[4] A Non-profit and bulk. The terms and conditions, I [5] assume, are different.

[6] Q Do you know that there – Do you know if there are [7] any regulations that govern non-profit mailings versus bulk [8] mail mailings?

[9] A Do I know it or do I assume it?

[10] Q Do you know if there are any regulations that [11] govern —

[12] A I assume there are, yes.

[13] Q You assume there are?

[14] A I assume there are, yes.

[15] Q What's that assumption based on?

[16] A Conversation.

[17] Q With who?

[18] A With whoever in my office.

[19] Q No, no. I'm not asking whoever. I'm asking who?

[20] A Don't know. As I said, I didn't have an incident, [21] I think it was in the late '80s, with my travel division. [22] And there's a difference between non-profit status and bulk [23] status.

[24] Q And that is based on regulations?

[25] A Yes, I assume. Yes.

### Page 50

[1] Q Who at Vantage was responsible for ensuring that [2] contracts were legal?

[3] MR. LeCLAIR: Objection.

[4] A I wouldn't know.

[5] Q Do you know if anybody at Vantage was responsible [6] for ensuring that contracts complied with applicable [7] regulations?

[8] MR. LeCLAIR: Objection.

[9] A Could you repeat that? I'm sorry.

[10] Q Do you know if anybody at Vantage was responsible [11] for ensuring that contracts complied with applicable [12] regulations?

[13] MR. LeCLAIR: Objection.

[14] A No.

[15] Q You don't know if anybody was responsible for [16] doing that?

[17] A No. I just assumed that they were.

[18] Q You just assumed that the contracts complied?

[19] A Yes. Yes.

[20] Q Did you ever make any effort to determine if, in [21] fact, the contracts complied with regulations?

[22] A The answer is yes to that.

[23] Q What did you do?

[24] A I went to the Sales people. And I don't know when [25] this is, but I assume after you notified us, or somebody

### Page 51

[1] notified us that they weren't in compliance.

[2] Q You're saying that in connection with this [3] lawsuit?

[4] A Yes, sir.

[5] Q And what did you do when you were informed of that [6] in connection with this lawsuit?

[7] A I spoke to my attorney at the time, which I don't [8] know which one it was. I'm not trying to be rude. And we [9] needed to do some type of compliance that we weren't doing.

[10] Q And what did you do to come into compliance?

[11] A Change the agreements.

[12] Q How did you change them?

[13] A I don't know.

[14] Q Who changed them?

[15] A I assume the attorney did, with whoever was the [16] acting boss at that time and Harry. My assumption.

[17] Q You weren't involved in that process at all?

[18] A No, I was involved with the process of making sure [19] that whatever was being done, that we stopped doing that. [20] That I was.

[21] Q And what was it that you were doing that you [22] stopped?

[23] A Contractual issues that we were doing improperly.

[24] Q What were those contractual issues?

[25] A I don't know all the detail, Peter.

### Page 52

[1] Q Did you delegate this responsibility?

[2] A I would assume so, yes.

[3] Q When you say you assume do, did you or didn't you?

[4] A Well, I was in a room with an attorney and Harry [5] and whoever was the acting boss at that time to make sure [6] whatever we were doing, we stopped.

[7] Q Since you don't – you say you don't know even [8] what that was, I'm asking you, who did you, as CEO make [9] responsible to ensure —

[10] A The attorney, Harry, and whoever the acting boss [11] was at that time.

[12] Q When you say "acting boss" —

[13] A Whoever the manager of the division was at the [14] time.

[15] Q Manager of the fundraising division?

[16] A Yes, sir.

[17] Q Who is the current manager of the fundraising [18] division?

[19] A A gentleman named Brian Nohle.

[20] Q Could you spell the last name?

[21] A N-O-H-L-E, I think it is, but I can get you the – [22] I'm not sure that's the right spelling.

[23] Q What is his title?

[24] A I don't know the exact title. I don't want to [25] guess.

Vantage 20680

## Page 53

[1] Q Who is the – I mean, you used the term manager of [2] the fundraising division?

[3] A Yes, sir.

[4] Q Who was the manager of the fundraising division [5] before Brian Nohle?

[6] A A fellow named Peter Demakis.

[7] Q Who was the manager of the fundraising division [8] prior to that?

[9] A I don't know. It was a woman. I'm not sure of [10] her name. I think about it. I'll tell you what her name [11] was.

[12] Q It was a woman?

[13] A Yes.

[14] Q When was Dallas Graves manager of the fundraising [15] division?

[16] A '94, '93, '95.

[17] Q Prior to your being apprised in 1997 that there [18] was a problem with the contracts in the fundraising, prior [19] to that time, were you aware that there were postal [20] regulations governing the use of non-profit mails?

[21] A I'd say yes.

[22] Q And what were you aware of, what regulations?

[23] A I wouldn't know what they were.

[24] Q Why do you say you were aware of them?

[25] A I told you, in the travel scenario.

## Page 54

[1] Q From travel experience you were aware there were [2] postal regulations governing non-profit?

[3] A Yes, sir.

[4] Q Prior to 1997, did you do anything to determine [5] how those regulations might apply to your fundraising [6] contracts?

[7] A No, sir.

[8] Q To your knowledge, did anyone at Vantage do [9] anything to determine whether those regulations applied to [10] Vantage's fundraising contracts?

[11] A I can't answer the question.

[12] Q Did anyone at Vantage, prior to 1997, ever talk to [13] you about regulations that might govern fundraising [14] contracts?

[15] A I can't answer the question. I can't recall. I [16] said I had the conversation with somebody in the travel [17] business in the late '80s.

[18] Q Do you remember any conversations prior to that [19] concerning regulations that governed non-profit mailing?

[20] A No.

[21] Q Did you ever ask anyone at Vantage to evaluate [22] the – what effect, if any, the non-profit regulations had [23] on Vantage's contracts?

[24] A I don't recall if I did or I didn't.

[25] Q Well, if you did, who would you ask to do that –

## Page 55

[2] MR. LeCLAIR: Objection.

[3] Q — prior to 1997?

[4] A I would assume I'd ask the manager of the [5] division.

[6] Q Did you ever arrange for any training of any of [7] your employees about the regulations governing non-profit [8] mailings?

[9] A Not to my recollection. I don't recall.

[10] Q Well, you don't recall whether you paid any third [11] party to come in and talk to your employees?

[12] A I don't recall.

[13] Q You say you don't recall. Is that because it [14] didn't happen?

[15] A I say it because I don't recall if I did or I [16] didn't.

[17] Q Do you think you might have?

[18] A No.

[19] Q Are you familiar with the term Cooperative Mail [20] Rule?

[21] A Yes, I am.

[22] Q When is the first time you became familiar with [23] that term?

[24] A I'm not sure when.

[25] Q Were you familiar with it prior to the events

## Page 56

[1] surrounding this lawsuit in 1997?

[2] A Not to my knowledge.

[3] Q You have an understanding of what the Cooperative [4] Mail Rule is?

[5] A No, I don't.

[6] Q Have you made any efforts to determine what the [7] Cooperative Mail Rule is?

[8] A Excuse me?

[9] Q Have you made any efforts to determine what the [10] Cooperative Mail Rule is?

[11] A No.

[12] Q Is there anyone at your company now that is [13] responsible for compliance issues?

[14] MR. LeCLAIR: Objection.

[15] A I assume, after the conversation I had four or [16] five years ago, that we made sure everything was in [17] compliance.

[18] Q Who did that?

[19] A As I said, the attorney. I'm not sure which one [20] it was at that time; Harry; whoever the General Manager was [21] at that time, or the VP.

[22] Q Did those individuals report to you about [23] compliance issues?

[24] A Excuse me. I'm sorry, Peter.

[25] Q Did those individuals report to you about

Vantage 20681

## Page 57

[1] compliance issues?

[2]   A Yes.

[3]   Q What did they report to you?

[4]   MR. LeCLAIR: I'm going to instruct the witness [5] not to disclose conversations with his attorneys.

[6]   Q What did those individuals report to you, [7] excluding your attorney?

[8]   A That there were issues with our agreements.

[9]   Q And what else?

[10]   A That's what they told me.

[11]   Q Did they report on whether those issues were [12] resolved?

[13]   A Yeah, they were resolved.

[14]   Q They told you that the issues were resolved?

[15]   A Yes.

[16]   Q Did they tell you how they were resolved?

[17]   A Yes.

[18]   Q How? What did they say?

[19]   A I guess there was an issue with side letters.

[20]   Q What was the issue?

[21]   A Some of the salesmen were using side letters.

[22]   Q What did they tell you about the side letters?

[23]   A They shouldn't be using them.

[24]   Q Did they tell you why?

[25]   A Yes.

## Page 58

[1]   Q Why?

[2]   A Because it was a form of violating the Coopera – [3] What was your terminology, corporate mailings or non-profit [4] mailings.

[5]   Q Did they tell you why they violated the [6] Cooperative Mail Rule?

[7]   A No.

[8]   Q Did you ask?

[9]   A No.

[10]   Q Did you do anything to determine why these side [11] letters violated the Cooperative Mail Rule?

[12]   A Could you repeat that, Peter?

[13]   Q Did you do anything to determine why these letters [14] violated the Cooperative Mail Rule?

[15]   A Yes.

[16]   Q What did you do?

[17]   A I asked – I mean, the competition was doing the [18] same type of thing. So I asked why, and they told me, just [19] like I said, it's not the right thing to be using side [20] letters, period.

[21]   Q Okay, that's a conclusion. Did they tell you [22] why —

[23]   A No.

[24]   Q My question is this. I'm going to ask this [25] question again.

## Page 59

[1]   A I'm sorry.

[2]   Q Did you do anything to determine why the side [3] letters violated the Cooperative Mail Rule?

[4]   A Well, I understood you weren't supposed to be [5] using them, as I stated. We weren't supposed to be using [6] side letters. That was my understanding.

[7]   Q Why weren't you supposed to be using side letters? [8] What was your understanding as to —

[9]   A It was in violation of the agreement. I'm not [10] sure, Peter, okay.

[11]   Q You've said that you understood —

[12]   A Violation of Cooperative Mailing.

[13]   Q What was it about the side letters – What was [14] your understanding as to what was it about the side letters [15] that violated the Cooperative Mail Rule?

[16]   A With due respect – I'm sorry.

[17]   Q Specifically, what do you mean by that?

[18]   A By releasing someone with a side letter, there's [19] no risk on the part of the organization.

[20]   Q There's no risk on the part of who?

[21]   A The organization.

[22]   Q The non-profit?

[23]   A The non-profit.

[24]   Q Did you do anything – Let me strike that. Do you [25] know where these – who drafted the side letters?

## Page 60

[1]   A No.

[2]   Q Did you do anything to find out who drafted side [3] letters?

[4]   A No.

[5]   Q Did you ask anyone else to find out where the side [6] letters came from?

[7]   A No.

[8]   Q Were you aware, prior to 1997, that side letters [9] were being used?

[10]   A Yes.

[11]   Q When did you become aware of that?

[12]   A I don't know. I can't recall.

[13]   Q What were you aware? In what circumstances were [14] you aware of the side letters being used?

[15]   A I was aware that the competition was giving people [16] financial guarantees. That's what I was aware of.

[17]   Q Okay. I asked you under what circumstances you [18] were aware of the side letters being used by Vantage?

[19]   A I can't – I don't recall under what [20] circumstances.

[21]   Q You said that you were aware of the side letters [22] being used prior to 1997; is that correct?

[23]   A Yes.

[24]   Q Tell me a specific instance in which you were [25] aware of a side letter being used?

Vantage 20682

## Page 61

[1]  A I – As I said to you, I was aware of it, but I [2] don't recall
under what circumstances I was aware of it, [3] what brought it
to my attention. I think that's what you're [4] asking me.

[5]  Q Did you ever question anyone about why side [6]
letters were used?

[7]  A Yes.

[8]  Q Who did you question?

[9]  A The manager of the division.

[10]  Q Who was that?

[11]  A I can't tell you which one.

[12]  Q Do you remember a conversation with a manager of
[13] the division about the side letters?

[14]  A Yes.

[15]  Q Tell me the conversation?

[16]  A I can't recall the exact conversation.

[17]  Q Well, tell me what you can remember about the [18]
conversation?

[19]  A That he informed em that there were some side [20]
letters, and I told him to stop it.

[21]  Q When was this?

[22]  A I don't recall the exact time.

[23]  Q Was this prior to the investigation in '97?

[24]  A Yes.

[25]  Q Was this in the early '90s?

## Page 62

[1]  A I can't recall.

[2]  Q Do you recall where the conversation was?

[3]  A No.

[4]  Q You recall it was a manager – it was with a [5] manager
of the division?

[6]  A Yes.

[7]  Q Was there anybody else present for that [8]
conversation?

[9]  A I can't recall.

[10]  Q Was this person a woman or a man?

[11]  A It had to have been a man.

[12]  Q Why do you say it had to be a man?

[13]  A Because I don't think I hired a woman executive [14] for
that division until late '90s.

[15]  Q Was that Lynn Edwards you hired in the late '90s?

[16]  A Yes. Lynn Edmonds, thank you. That's the – That [17]
was the woman's name, but I'd forgotten it.

[18]  Q She was the manager of the division between Peter
[19] Demakis and Dallas Graves?

[20]  A No, there were a few others.

[21]  Q In between those two?

[22]  A Yes, sir.

[23]  Q Do you recall if that conversation was with Dallas [24]
Graves?

[25]  A I can't recall who it was with.

## Page 63

[1]  Q Who were the other managers – When I asked you [2]
earlier about the managers in the fundraising division, you [3]
mentioned Brian Nohle, Peter Demakis. Now, we've
determined [4] Lynn Edmonds and Dallas Graves. Who was
the —

[5]  A There was a Tom Ferrara.

[6]  Q How do you spell the last name?

[7]  A I'm sorry. I don't know.

[8]  Q Can you say it again?

[9]  A Tom Ferrara.

[10]  Q Who else?

[11]  A John Flebbe.

[12]  Q Can you spell that?

[13]  A I'm sorry. I can't. I'm not sure how can spell [14] it. And
there was another woman out of New York. I can't [15] think of
her name that was in there.

[16]  Q Prior to Lynn Edmonds?

[17]  A Yes.

[18]  Q I thought you jut said you handed hired a woman [19]
until the '90s?

[20]  A No, the late '90s, I said.

[21]  Q So there was a woman also in the late '90s?

[22]  A Yes.

[23]  Q You don't remember her name?

[24]  A No, I'm sorry I don't.

[25]  Q Any others that you remember?

## Page 64

[1]  A No.

[2]  Q Do you recall the circumstances under which this [3]
person. this manager of the division told you about the wide
[4] seller?

[5]  A No.

[6]  Q Do you recall why you told this person to stop [7] using
them?

[8]  A No.

[9]  Q Did you see a side letter at that point?

[10]  A I don't recall.

[11]  Q What was your concern about the side letter?

[12]  A I had a lot of concerns about it.

[13]  Q Tell me those concerns?

[14]  A I didn't think it was a sales issue. I don't [15] think you
needed to use a side letter.

[16]  Q What do you mean?

[17]  A Well, it's not necessary to use a side letter to [18] sell
the deal, this deal.

[19]  Q Did you tell the person that the side letter [20] should –
the language should go right in the contract?

[21]  A No.

[22]  Q What did you tell the person?

[23]  A I think it was a proven group.

[24]  Q What do you mean?

[25]  A A group with a track record.

**Vantage 20683**

Page 65

[1]   Q So why does that matter?
[2]   A I just felt it wasn't necessary to give anybody a [3] side letter.
[4]   Q Why would it not be necessary to give a proven [5] group with a track record a side letter?
[6]   A Because the organization would know their results [7] from past history.
[8]   Q Why was that important?
[9]   A They know ho much money they're going to make.
[10]  Q Again, why is that important? Why does that mean [11] they don't seen a side leader?
[12]  A Because it's a proven track record of how much [13] money they're going to make.
[14]  Q I'm going to ask you again. I don't understand [15] why that means they don't need a side letter?
[16]  A I gave you my answer, Peter.
[17]  MR. LeCLAIR: Peter, if he doesn't have a [18] different answer, he can't help the fact he doesn't have a [19] different answer. Why don't you move on to another [20] question?
[21]  MR. LEVITT: Thank you very much, Brian. I [22] appreciate your input. It's very helpful.
[23]  Q You've testified that you told – that you [24] didn't – you said you didn't – you told this person he [25] didn't need the side letter because the group was a proven

Page 66

[1] group, had a proven track record. What was the purpose of [2] the side letter in that respect?
[3]   MR. LeCLAIR: Objection.
[4]   A It was like, as I've stated before.
[5]   Q Could you remind me?
[6]   A It was a risk – a non-liability risk by using the [7] side letter. I believe that's what I stated before.
[8]   Q The side letter took away the risk for the [9] organization?
[10]  A Yes.
[11]  Q And ensured that they would have no liability?
[12]  A Yes.
[13]  Q And so, if the company had a proven track record [14] of making money, that wouldn't be a concern because they [15] wouldn't have a risk anyways; is that the point?
[16]  A Yes.
[17]  Q Do you recall whether you – there were any other [18] occasions where you found out about side letters being used?
[19]  A No.
[20]  Q Did you do anything to ensure, after this one [21] incident, that side letters were not being used?
[22]  A Did I ensure it?
[23]  Q Did you do anything to make sure, after that one [24] incident that side letters were no longer being used?
[25]  A No.

Page 67

[1]   Q Did you talk to any of the other Sales people and [2] say, for example, that side letters should not be used?
[3]   A I don't recall. I think I did.
[4]   Q You think you did?
[5]   A Yeah.
[6]   Q So you did do something to make sure that side [7] letters were not —
[8]   A You said ensure. That's not what I said. That's [9] what you said.
[10]  Q Did you communicate to any of the other sales [11] people after this one incident that they should no longer [12] use side letters?
[13]  A I don't think so.
[14]  Q Did you communicate anything to any of the other [15] Sales people after this one incident about side letters?
[16]  A No.
[17]  Q You didn't talk to any of the other Sales people?
[18]  A I always talk to some of the Sales people.
[19]  Q You didn't talk to any of the other Sales people [20] about the side letters after this incident?
[21]  A Not to my knowledge.
[22]  Q Did you ask anyone at Vantage to discuss with any [23] of the Sales people the usage of side letters after this [24] incident?
[25]  A I don't recall if I did or I didn't.

Page 68

[1]   Q Were you concerned about other Sales people using [2] side letters after you found out about this one incident?
[3]   A No.
[4]   Q Why not?
[5]   A I just wasn't at the time.
[6]   Q Did you think that it was going on with other [7] Sales people?
[8]   A I wasn't sure if it was or it wasn't.
[9]   Q Did you do anything to find out if it was?
[10]  A No.
[11]  Q You mentioned – When I asked you if you had [12] concerns about the side letter in this one incident, you [13] said that you had numerous concerns. Can you tell me what [14] the rest of those concerns were?
[15]  A Well, my concern was my business.
[16]  Q What about your business?
[17]  A That the competition was guaranteeing funds to [18] customers, all our competitors.
[19]  Q And when did you first learn about that?
[20]  A I'd be guessing. I wouldn't know, Peter.
[21]  Q Would you say it was the early '90s or late '90s?
[22]  A I'd say it's the early '90s.
[23]  Q Who did you learn was among your competitors that [24] were giving guarantees?
[25]  A All of them.

**Vantage 20684**

BSA                    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01                    XMAX(18)

### Page 69

[1]   Q Who were your competitors?
[2]   A Barton & Cotton, Finn Marketing. Those are the [3] two
-big competitors. And I don't know if Famous Artists was [4] still
in business then or not, Peter.
[5]   Q How did you hear about this?
[6]   A You know, documentation or salesmen's [7]
conversation. People new they were guaranteeing people [8]
money.
[9]   Q When you say salesmen's conversation, does that [10]
mean your sales people talking to potential clients, and the [11]
clients would say, 'Well' —
[12]  A Yes, sir.
[13]  Q Let me —
[14]  A That's right. What you said was right.
[15]  Q I know. I hadn't finished. And just for the [16] record —
[17]  A I'm sorry.
[18]  Q That's okay. And the client would say, 'Well, [19]
Barton-Cotton is guaranteeing us $50,000,' for example?
[20]  A Yes.
[21]  Q That's how you – one of the ways that you learned [22]
about this?
[23]  A Yes.
[24]  Q What was your response?
[25]  A My personal response?

### Page 70

[1]   Q Well, what was your response as the CEO of [2]
Vantage?
[3]   A I don't recall what my response was.
[4]   Q You said you were concerned about —
[5]   A Well, it concerned me.
[6]   Q — concerned about the business?
[7]   A How do you stay in business if people are making [8]
guarantees?
[9]   Q If they're making guarantees and you're not, how [10]
do you stay in business?
[11]  A Yes.
[12]  Q So what did you do?
[13]  A I assume we kind of followed suit.
[14]  MR. DARLING: I'm sorry, sir?
[15]  THE WITNESS: I assume we followed suit.
[16]  Q You said, 'I assume we followed suit.' Do you [17] know
whether you followed suit or not?
[18]  A I assume we followed suit. The answer is yes.
[19]  Q You do know?
[20]  A Yes.
[21]  Q You did follow suit?
[22]  A Yes.
[23]  Q How did you follow suit? What did you do?
[24]  A I don't know all the details, but I assume we [25]
followed suit.

### Page 71

[1]   Q Well —
[2]   A I assume that's where these side letters came [3] from.
[4]   Q You assume, or do you know that to be the case?
[5]   A I assume.
[6]   Q Why are you using the word "assume"?
[7]   A Because it came as a, 'Hank Lewis says.'
[8]   Q What do you mean?
[9]   A That that was our policy. It was not a policy, [10] okay.
[11]  Q You never told your Sales people to do that?
[12]  A Yes.
[13]  Q But you know they did it?
[14]  A Some of them, yes.
[15]  Q When did you first become aware that they were [16]
doing this, using the side letters?
[17]  A I don't recall.
[18]  Q Was it prior to this investigation of '97, this [19] lawsuit in
'97?
[20]  A Excuse me?
[21]  Q Was it prior to this lawsuit in '97 that you first [22]
became aware that —
[23]  A I've already said yes to that.
[24]  Q You've said that one incident?
[25]  A Yes.

### Page 72

[1]   Q Is there any other incident you recall in which [2] you
became aware of side letters being used?
[3]   A No.
[4]   Q You said again that – previously that you were [5]
concerned when you found out about the side letters being [6]
used, and you said you had numerous concerns. Have you
told [7] me all of your concerns? Did you have other
concerns?
[8]   A No. No, Peter.
[9]   Q No, you haven't told me, or no, you didn't have [10] any
more?
[11]  A No, I didn't have any more.
[12]  Q And you said your concern was the business because
[13] your competitors were giving financial guarantees?
[14]  A Yes, sir.
[15]  Q Now, a side letter gave a financial guarantee —
[16]  MR. LeCLAIR: Objection.
[17]  Q — is that correct?
[18]  A No.
[19]  Q You said earlier removed the risk. If you told [20] your
employee not to use the side letter, were you then [21]
concerned about the business?
[22]  A Excuse me, Peter?
[23]  Q Let me see if I can ask this is a way that makes [24]
sense. Were you concerned that if you told your employee [25]
not to use the side letter, that Vantage would be at a

**Vantage 20685**

## Page 73

[1] competitive disadvantage?

[2]    A Could you say that again? I'm sorry.

[3]    Q Were you concerned that if you told your employee [4] not to use the side letter, that Vantage would be at a [5] competitive disadvantage?

[6]    A I assume so.

[7]    Q You assume you were concerned about that?

[8]    A I definitely was concerned about it.

[9]    Q What did you do to address that concern?

[10]   A Nothing.

[11]   Q Do you know —

[12] THE WITNESS: Can I have another glass of water? [13] That's what I do know.

[14] MR. LEVITT: We're going to break in 20 minutes. [15] Can you wait?

[16] THE WITNESS: Okay.

[17] MR. LEVITT: Do you want to take a – We can take [18] a short break now. Do you want to take a break?

[19] THE WITNESS: Do you mind? Two minutes.

[20] MR. LEVITT: We'll take a quick break now.

[21]   (Off the Record.)

[22]   (Whereupon, at 12:14 p.m., the deposition was [23] recessed, to be reconvened this same day.)

## Page 74

[1]    (1:19 p.m.)

[2]    A F T E R N O O N S E S S I O N

[3]    EXAMINATION (cont.)

[4] MR. LEVITT: Back on the record.

[5] BY MR. LEVITT:

[6]    Q Mr. Lewis, at some point, did you take over [7] responsibility for reviewing contracts from Harry Melikian?

[8]    A No.

[9]    Q That never happened?

[10]   A No.

[11]   Q You mentioned the relationship, the business [12] relationship you had with Famous Artists, that Vantage had [13] with Famous Artists, correct?

[14]   A Yes.

[15]   Q I'm sure I asked you this, but maybe you could [16] refresh my recollection. When was that?

[17]   A '90, '89. I'm not sure.

[18]   Q In that general time period?

[19]   A It might have been '88. I don't know. I'm not [20] sure.

[21]   Q You were – had questions, I think, about the name [22] of Famous Artists and what it was actually called. Does the [23] name Famous Hospitality Corporation ring a bell?

[24]   A No.

[25]   Q You remember it as Famous Artists?

## Page 75

[1]    A Yes.

[2]    Q I may have asked you this, as well. Do you recall [3] if the transaction you were referring to was a sale of the [4] Famous Artists division to Barton-Cotton in 1993? Does that [5] ring a bell?

[6]    A No.

[7]    Q Can you tell me the names of all the people at [8] Famous Artists that you had any contact with?

[9]    A Charles Simon. And there was another guy, and I [10] did meet his father once. I don't know what his name was.

[11]   Q The father of Charles Simon?

[12]   A Yeah. There was a Dad someplace. Then there was [13] another guy. And then, there was another guy from [14] Tennessee.

[15]   Q Does the name Bev Howard ring a bell?

[16]   A Excuse me, sir?

[17]   Q Does the name Bev Howard ring a bell?

[18]   A No.

[19]   Q Again, you may have testified to this point, but [20] do you recall how long the relationship between Vantage and [21] Famous Artists took place?

[22]   A I think it was a year, a year and a half, in that [23] vicinity. I'm not 100 percent sure.

[24]   Q Do you know if there was any contractual documents [25] in that connection?

## Page 76

[1]    A No.

[2]    Q You don't know if there were or weren't?

[3]    A Were or weren't, I don't know.

[4]    Q It may have been oral; it may have been in [5] writing. You're not sure?

[6]    A I'm not sure.

[7]    Q Do you have a sense of how lucrative the program [8] was for Vantage?

[9]    A No.

[10]   Q Were you aware that Famous Artists was [11] investigated by the Postal Service for violations of the [12] Cooperative Mail Rule in the early 1990s?

[13]   A No.

[14]   Q Did you, at any point, have any discussions with [15] anyone at Famous Artists about any problems they were [16] having using their non-profit – using the non-profit rates?

[17]   A No.

[18]   Q Who were the clients that you referred to Famous [19] Artists?

[20]   A I wouldn't know.

[21]   Q You don't remember?

[22]   A No.

[23]   Q Were you trying to target a particular type of [24] client for Famous Artists?

[25]   A No.

Vantage 20686.

## Page 77

[1]    Q Let me explain what I ---

[2]    A I'm sorry. Go ahead.

[3]    Q Let me explain what I mean by that. You referred [4] earlier to Imperial Shrine as —

[5]    A Yes.

[6]    Q — a client who had a strong – I can't remember [7] the term you used – a strong base, a strong —

[8]    A Affinity.

[9]    Q — affinity membership. Is that the right way to [10] say it?

[11]    A Yes, sir.

[12]    Q And my question about Famous Artists is were you [13] trying to refer those type of clients to Famous Artists?

[14]    A I would assume so. I mean, I don't have a list of [15] the clients, Peter.

[16]    Q No, I understand you don't remember. I'm asking [17] you, though, what the thinking was at the time in terms of [18] the types of clients you would refer to Famous Artists. For [19] example, would you refer them to your smaller clients that [20] had a very small member base, or would you refer them to [21] your larger clients that had a larger membership base and [22] many branches?

[23]    A I can't recall who we referred, but I assume it's [24] clients. I don't have a list.

[25]    Q Who at Vantage was responsible for that activity,

## Page 78

[1] referring the clients to Famous Artists?

[2]    A I would assume whoever the general manager is and [3] the sales people.

[4]    Q Do you know who the general manager was at that [5] time?

[6]    A No.

[7]    Q Was Mr. Melikian involved in that?

[8]    A Not to my knowledge.

[9]    Q Did you have any conversations with anyone at [10] Famous Artists about the Cooperative Mail Rule?

[11]    A No.

[12]    Q Was part of your practice at Vantage to attend [13] sales meetings?

[14]    A Mine?

[15]    Q Yes.

[16]    A Sometimes.

[17]    Q How often were sales meetings held?

[18]    A Usually quarterly.

[19]    Q Would you typically attend those?

[20]    A Sometimes, yeah.

[21]    Q Who ran the sales meetings?

[22]    A What time period?

[23]    Q Well, is there a title of a person that generally [24] would have run the sales meetings?

[25]    A No. It could vary.

## Page 79

[1]    Q Well, in the period 1995 to the present, who ran [2] the sales meetings?

[3]    A I could have run them. Jay Gelb could have run [4] them. The manager of the division could have run them. [5] Various people could have run them.

[6]    Q What would that depend on, whether you would run [7] it or Jay Gelb would run it or the manager would run it?

[8]    A It depended who was going to run it. I mean, [9] there was no set format of who was going to run it.

[10]    Q Well, who would make the decision as to who would [11] run it?

[12]    A I would assume it would be between myself or the [13] sales manager or the division head.

[14]    Q Was Jay Gelb a sales manager or division head?

[15]    A At one time, yes. A few times, yes.

[16]    Q Would Mr. Melikian typically attend these sales [17] meetings?

[18]    A Very rarely.

[19]    Q What happened at the sales meetings?

[20]    A We would discuss how to put together sales [21] materials, how to sell, how to go on the road.

[22]    Q So it would it be sort of a training for sales [23] people?

[24]    A It could be.

[25]    Q Could be? Was it sometimes?

## Page 80

[1]    A Could be.

[2]    Q Well, I don't know what you mean when you say [3] "could be"?

[4]    A Well, the agenda would vary.

[5]    Q Are you saying sometimes, there would be training, [6] and sometimes, not?

[7]    A Yes, I would say that's fair.

[8]    Q What other types of items were on the agenda?

[9]    A Time management. We'd have people come in and [10] train from the outside.

[11]    Q About how the sales people should manage their [12] time?

[13]    A Yes.

[14]    Q What else?

[15]    A New products.

[16]    Q Give me an example of what you mean by that?

[17]    A Instead of a trip to Spain, we're going to [18] Istanbul.

[19]    Q Let me focus your attention on the fundraising [20] division, okay.

[21]    A Okay.

[22]    Q Were there sales meetings that involved just [23] travel or just fundraising?

[24]    A Yes.

[25]    Q I'm going to ask about the fundraising.

Vantage 20687

Page 81

[1]   A Okay, I'm sorry.
[2]   Q That's okay. I'm going to ask you the same [3] questions because I'm not sure what you were referring to. [4] Were there sales meetings of just the fundraising group?
[5]   A Yes.
[6]   Q How often were those?
[7]   A Quarterly.
[8]   Q Who would run those?
[9]   A The same. Same answer as before.
[10]  Q What would be on the agenda, some of the agenda [11] items? I understand it would vary by meeting, but some of [12] the agenda items that would be discussed at sales meetings?
[13]  A Road trips, conventions, in-house visits, sales [14] paraphernalia, telephone reports, time management.
[15]  Q Was this to train the sales people about these [16] issues?
[17]  A Train them?
[18]  Q Remind them?
[19]  A Remind them? Okay, I think that's a good [20] terminology.
[21]  Q And would you sometimes hire outside consultants [22] to come in?
[23]  A Yes.
[24]  Q Was that typical?
[25]  A Yeah.

Page 82

[1]   Q How long would the meetings last, typically or [2] generally?
[3]   A Four or five hours.
[4]   Q Where did they usually take place?
[5]   A Various locations.
[6]   Q Would you have them on site at Vantage, or would [7] you go somewhere nice?
[8]   A Either/or.
[9]   Q Did you also discuss performance issues at these [10] meetings?
[11]  A Very rarely, I think.
[12]  Q What would you say was sort of the prime purpose [13] of these meetings?
[14]  A Training.
[15]  Q Did you at these meetings ever discuss issues [16] involving postal rates?
[17]  A No.
[18]  Q Did you ever discuss issues involving regulations [19] governing the use of non-profit mails?
[20]  A No.
[21]  Q Did you ever discuss the Cooperative Mail Rule?
[22]  A No, not to my recollection. Let's put it that [23] way.
[24]  Q When a new salesperson came to Vantage on the [25] fundraising side, how would that person be trained when they

Page 83

[1]   first came to Vantage?
[2]   A A sales person would usually do the training.
[3]   Q Another sales person?
[4]   A Somebody in -- Yes.
[5]   Q Would that entail taking that person out on the [6] road?
[7]   A It could.
[8]   Q Does that mean sometimes, it did and sometimes it [9] didn't?
[10]  A It could, yeah.
[11]  Q What other forms of training were there?
[12]  A I would assume they showed them how to make a [13] telephone appointment.
[14]  Q When you say you assume, does that mean you don't [15] know?
[16]  A I don't know.
[17]  Q Tell me about the training of new sales people [18] that you know of?
[19]  A They would be taken into a -- given a team, [20] somebody that would be a buddy. Does that make sense?
[21]  Q Yes.
[22]  A That's how they get trained.
[23]  Q So it was primarily from another sales person?
[24]  A Yes.
[25]  Q Are you aware of any other training?

Page 84

[1]   A No.
[2]   Q You mentioned earlier that at some point, you [3] became aware that your competitors were offering guarantees [4] to their non-profit clients. Do you recall that?
[5]   A Yes.
[6]   Q Do you recall when that was when you first became [7] aware of that?
[8]   A No.
[9]   Q Did you have any discussions with Harry Melikian [10] about that issue?
[11]  A Excuse me?
[12]  Q Did you have discussions with Harry Melikian about [13] that issue?
[14]  A I assume I did.
[15]  Q Again, do you remember?
[16]  A No.
[17]  Q Why do you say you assume you did?
[18]  A I assume that would be a topic of conversation.
[19]  Q Is that because your respective roles in the [20] company?
[21]  A Yes.
[22]  Q Was talking about that sort of issue part of the [23] practice or procedure of the company, how you operated?
[24]  MR. LeCLAIR: Objection.
[25]  A I can't answer that.

Vantage 20688

## Page 85

[1]   Q Did Vantage offer its clients guarantees?
[2]   A Are you talking in side letters? Is that what [3] you're saying to me?
[4]   Q In any way.
[5]   A I think the answer is yes.
[6]   Q What sort of guarantees did Vantage offer its [7] clients?
[8]   A I don't know.
[9]   Q Let me repeat the question in this way. When you [10] say that Vantage offered its – offered guarantees to [11] clients, I'm referring to non-profit clients. Is that the [12] way you understood the question?
[13]  A No.
[14]  Q Let me ask it again then. Did Vantage offer [15] guarantees to non-profit clients in its fundraising?
[16]  A I'm not sure. I'm not sure if they were for [17] profit or bulk or non-profit.
[18]  Q Your understanding is that there were guarantees [19] given, but you're not sure about the identity of the client?
[20]  A Yes.
[21]  Q Were you personally involved in any of those [22] guarantees?
[23]  A Not to my knowledge.
[24]  Q Were you personally involved in informing clients [25] that they would have no liability? I'm talking about non

## Page 86

[1] profit clients, informing clients that they would have no [2] liability if they ran a program with Vantage?
[3]   A Me?
[4]   Q Yes.
[5]   A No.
[6]   Q You never signed a letter in that respect?
[7]   A I'm told I did, but it wasn't a practice.
[8]   Q When you say you were told you did, what do you [9] mean?
[10]  A I saw a letter yesterday. I don't know.
[11]  Q Are you saying that you don't recall signing that [12] letter?
[13]  A It wasn't my signature.
[14]  Q Do you think that somebody signed that letter – [15] Well, let me rephrase the question. Were you aware that [16] that letter had gone out with your signature on it?
[17]  A No.
[18]  Q Was there anyone at Vantage that was authorized to [19] sign your signature?
[20]  A No.
[21]  Q Do you remember what client that letter dealt [22] with?
[23]  A I thought it was the Grand Lodge in Texas [24] yesterday.
[25]  MR. LEVITT: I'm going to show you a document.

## Page 87

[1] This will be – Actually, I'm going to show you two [2] documents, Exhibit 1a and Exhibit 1b. The program agreement [3] will be 1a; the letter will be 1b.
[4]   (The referred to documents were [5] marked for identification as [6] Exhibits No. 1a and 1b, [7] respectively.)
[8]   BY MR. LEVITT:
[9]   Q I'd ask you to take a look at – I'm going to show [10] you a program agreement. It's DOJ 01214, dated October 27, [11] 1995. That's Exhibit 1a. And then, a letter, DOJ 01206, [12] dated October 27, 1995. I'd ask you to take a look at the [13] letter first?
[14]  A This one here, Peter?
[15]  Q No. The letter, Exhibit 1b, and ask if that's the [16] letter that you're referring to?
[17]  A Yes.
[18]  Q And your testimony is that that's not your [19] signature?
[20]  A That's my testimony.
[21]  Q Do you know who Rosemary Swetland is?
[22]  A No.
[23]  Q Did you have any dealings with the Grand Chapter [24] of Texas, Order of the Eastern Star in 1995?
[25]  A Me personally?

## Page 88

[1]   Q Yes.
[2]   A No.
[3]   Q Do you know if they were a client?
[4]   A I assume they were by this letter.
[5]   Q You don't know, other than having seen this [6] letter, whether they were a client?
[7]   A At this time?
[8]   Q Yes.
[9]   A No.
[10]  Q Do you know who the —
[11]  A Can I put this down now, Peter?
[12]  Q Yeah, you can put it down. Did anybody at Vantage [13] have authority to sign your signature?
[14]  A No.
[15]  Q Are you aware of anyone at any other time signing [16] your signature at Vantage?
[17]  A No.
[18]  Q I'd ask you to take a look at Exhibit 1a, on Page [19] 6. Is that your signature?
[20]  A I'm sorry, Peter. Which one is Page 6? No.
[21]  Q Do you recognize the initials to the right of your [22] name?
[23]  A No.
[24]  Q Directing your attention to Exhibit 1a —
[25]  A This one here? Is this what you're saying?

**Vantage 20689**

## Page 89

[1]    Q That's what I'm referring to on Exhibit 1b. Do [2] you recognize those initials?

[3]    A No.

[4]    Q Turning back to the letter, Exhibit 1b, do you [5] recognize the initials next to that letter?

[6]    A No.

[7]    Q Have you ever seen Fred Chandler's initials [8] before?

[9]    A No.

[10]    Q Did you ever have occasion where someone at [11] Vantage would sign your name and initial it?

[12]    A No.

[13]    Q Were sales people at Vantage authorized to sign [14] your name and initial it?

[15]    A No.

[16]    Q In October 1995 –

[17]    THE WITNESS: May I look at this?

[18]    MR. LEVITT: You can do as you please.

[19]    Q In October 1995, who was responsible for reviewing [20] changes to contracts on behalf of the fundraising unit of [21] Vantage?

[22]    A I don't know.

[23]    Q Do you know who – Do you know the position that [24] typically held that responsibility?

[25]    A Whoever was the manager of the division.

## Page 90

[1]    Q And what's that based on?

[2]    A That's how we did it.

[3]    Q That's your understanding as to how things [4] operated?

[5]    A Yes.

[6]    Q Was it your understanding that Mr. Melikian was – [7] ever had responsibility for reviewing changes to contracts?

[8]    A Say that again, please?

[9]    Q Was it your – Is it your understanding that Mr. [10] Melikian ever had responsibility for reviewing changes to [11] program agreements in the fundraising division?

[12]    A I would assume that he helped out.

[13]    Q What is that assumption based on?

[14]    A Harry stuck his hands in a lot of pies. But the [15] bottom line is, it would go to the – the way the procedure [16] is supposed to work, the department head would be [17] responsible for the contract going out and signing for the [18] contract.

[19]    Q Were you aware that there was a policy or practice [20] when changes were made to the standard program agreement, [21] that there was a different policy or practice when changes [22] were made to the standard program agreement?

[23]    A No.

[24]    Q Were you aware that there was a standard program [25] agreement?

## Page 91

[1]    A Yes.

[2]    Q I'd ask you to take a look at Exhibit 1a again -- [3] or 1b. You can take a look at both of them – the program [4] agreement.

[5]    A Which is?

[6]    Q Which is 1a. It says "Program Agreement" at the [7] top.

[8]    A Okay.

[9]    Q Is that the standard program agreement?

[10]    A I wouldn't know.

[11]    Q How do you know there was a standard program [12] agreement?

[13]    A How do I know? Because we had some kind of [14] templates done, and that was a standard. I wouldn't know if [15] this is the standard or it's been changed. I wouldn't know.

[16]    Q Were you familiar with the substance and terms of [17] the program agreements?

[18]    A No.

[19]    Q You referred earlier to finding out that one of [20] your salespeople was using side letters. Do you recall [21] that?

[22]    A Yes.

[23]    Q Taking a look at Exhibit 1b, is that the type of [24] side letter that you're referring to?

[25]    A I wouldn't know.

## Page 92

[1]    Q Did you know at that time what was contained in [2] the side letters?

[3]    A At which time, Peter? I'm sorry.

[4]    Q When you learned from one of your employees – you [5] learned that one of your employees was using side letters.

[6]    A Yes.

[7]    Q You knew what was in the side letters?

[8]    A No.

[9]    Q What did you know about the side letters?

[10]    A Just that it was a release.

[11]    Q A release for the non-profit?

[12]    A No. A release from liability.

[13]    Q For the non-profit?

[14]    A Yes.

[15]    Q At that time, when that happened, did that [16] employee show you one of the side letters?

[17]    A Not to my recollection.

[18]    Q Your recollection – What is your recollection [19] with respect to how that information was given to you?

[20]    A Either someone showed it to me or someone told me.

[21]    Q Do you recall – You can move those if you like?

[22]    A Do you want me to keep them there? Whatever you [23] want me to do.

[24]    Q Do you recall that Vantage was investigated in [25] 1990 by the Postal Service?

**Vantage 20690**

BSA    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    XMAX(24)

## Page 93

[1]  A I don't recall it. He showed me something [2] yesterday, I think it was.

[3]  Q Other than what – Other than information you [4] reviewed with your attorney, do you remember any issue in [5] 1990 having to do with the Postal Service and Vantage?

[6]  A No.

[7]  MR. LEVITT: I'd ask you to take a look at a [8] letter. It will be Exhibit 2, DOJ 10811, dated October 25, [9] 1990.

[10]  (The referred to document was [11] marked for identification as [12] Exhibits No. 2.)

[13]  BY MR. LEVITT:

[14]  Q Do you recall this letter?

[15]  A Yes.

[16]  Q What do you recall about this letter?

[17]  A That Brian showed it to me yesterday.

[18]  Q Do you recall seeing it prior to yesterday?

[19]  A No.

[20]  Q Who is Walter Wekstein?

[21]  A That was an attorney of mine, the man I said that [22] was retired.

[23]  Q That's in 1990, he was your attorney?

[24]  A I assume so.

[25]  Q Do you recall the name – the initials are here -

## Page 94

[1] H.E. Seweryn?

[2]  A No.

[3]  Q Do you recall that name now?

[4]  A No, sir.

[5]  Q Do you recall the name Helen Seweryn?

[6]  A No.

[7]  Q Do you recall any conversations with any postal [8] employees in 1990?

[9]  A No.

[10]  Q Do you remember – Do you recall any conversations [11] with any postal employees in 1991?

[12]  A No.

[13]  Q This letter says – the first sentence reads, "The [14] investigation into the misuse of special bulk rate mailing [15] privileges to make cooperative mailings between non-profit [16] organization and your company requires that additional [17] documents be furnished by your firm." [18] Can you recall any investigation involving [19] cooperative mailings?

[20]  A Yes.

[21]  Q What investigation do you recall?

[22]  A In the travel business. I told you that this [23] morning.

[24]  Q For Trans National?

[25]  A No, no. For Vantage.

## Page 95

[1]  Q And when was that?

[2]  A The late '80s.

[3]  Q Is this the letter that you were referring to when [4] you said it had erroneous information in it?

[5]  A It looked like erroneous information to me.

[6]  Q What's erroneous about this letter?

[7]  A These are travel customers, most of them. That's [8] what I – When I looked at this letter, it had not – when [9] he showed it to me yesterday, I don't know what relevance it [10] had here. So that's the first thing I said. I'm not a [11] lawyer. I'm not a judge, or anything.

[12]  Q What's erroneous about some of these being travel [13] customers?

[14]  A Because I assumed we were mailing these bulk. [15] That was my assumption when I saw this yesterday.

[16]  Q Because your assumption was that you had changed [17] because of the prior investigation?

[18]  A Yes, sir.

[19]  MR. LEVITT: I'm going to show you another [20] document. This will be Exhibit 3. I'm sorry, Brian. I [21] only have one extra copy of that. This is DOJ 10971. It's [22] a letter, dated November 16, 1990.

[23]  (The referred to document was [24] marked for identification as [25] Exhibits No. 3.)

## Page 96

[1]  BY MR. LEVITT:

[2]  Q Do you recall seeing this letter before?

[3]  A No.

[4]  Q It refers to – The letter refers to Henry Lewis, [5] President, Vantage Financial Services. Were you President [6] of Vantage Financial Services in 1990?

[7]  A I don't know what my title was.

[8]  Q Was Vantage Financial Services in the fundraising [9] business?

[10]  A I can't answer that honestly. I don't know what [11] the exact title was. So I don't want to say yes to [12] something I'm not sure of.

[13]  Q Well, you testified that Vantage Travel Services [14] was in the travel business?

[15]  A Yes.

[16]  Q Did you have any other company that was involved [17] in anything but the fundraising business?

[18]  A Yes.

[19]  Q What?

[20]  A Credit cards.

[21]  Q What company was that?

[22]  A We would market credit cards. So I'm not sure if [23] that's the name or not the name. I'm guessing.

[24]  Q When did you stop marketing – or actually, when [25] did you start and when did you stop marketing credit cards?

**Vantage 20691**

Page 97

[1]  A I think we started in '86. We were still [2] receiving some revenues. I'm not sure how long we lasted, [3] but we actively marketed for over a year. And then, we [4] brokered some business out.

[5]  Q So you started in '86 and stopped a year later?

[6]  A No. We still brokered some business out. And I [7] don't know the exact times. So I don't want to say one [8] thing when I'm not sure of the answer.

[9]  Q You testified earlier that Richard Jarvis was [10] hired to be President of the fundraising unit; is that [11] correct?

[12]  A Yes.

[13]  Q Again, this letter in the first paragraph refers [14] to – states, "Review of the contractual information shows [15] that mailings made in conjunction with your organization's [16] programs in non-profit groups were cooperative in nature." [17] Do you recall being aware of that in 1990?

[18]  A I would assume yes to that.

[19]  Q Why do you say you're assuming?

[20]  A Because I'm trying to get my placement of time, to [21] be honest with you, Peter, when the travel incident was in [22] the late '80s, or was it this late. I'm not – I'm a [23] little – not sure what time period that is. Does that make [24] sense to you?

[25]  MR. LEVITT: Let me see if I can refresh your

Page 98

[1] recollection. I'm going to show you another document, [2] Exhibit 4.

[3]  THE WITNESS: Should I move these?

[4]  MR. LEVITT: You can put these on top of here, if [5] you'd like. And this is a letter and an attachment. The [6] letter is from Richard Jarvis, and it's dated September 13, [7] 1991. It's DOJ 10858. It's the same document we discussed [8] with Melikian. Take a look at it.

[9]  (The referred to document was [10] marked for identification as [11] Exhibits No. 4.)

[12]  BY MR. LEVITT:

[13]  Q I'd ask you to take a look at this letter. Do you [14] recall seeing this letter before?

[15]  A No.

[16]  Q This letter states, "These have been reviewed by [17] our counsel to be concurrent with postal regulations [18] regarding cooperative mailings. Please note Paragraph [19] 6(c)." Do you recall, during this time period, an issue [20] with respect to making contracts concurrent with postal [21] regulations regarding cooperative mailings?

[22]  A No.

[23]  Q I ask you to look at the contracts that are [24] attached here, the first one for the Ohio Scottish Right. [25] There's one with the New York State Council Knights of

Page 99

[1] Columbus. There's one with the Knights of Columbus [2] Charities. There's one with the Michigan Scottish Right, [3] and with the Indiana State Elks Association. There's one [4] with the Independent Telephone Pioneer Association.

[5]  Do you recall whether these clients were clients [6] of your fundraising division?

[7]  A I would assume by this paperwork, they are.

[8]  Q Well, why don't you take a look at the paperwork [9] entirely and see if you can do more than assume?

[10]  A They must be, okay.

[11]  Q Did you have any knowledge of this – of these [12] contracts being sent out to the Postal Service?

[13]  A No.

[14]  Q Does this assist you in resolving your confusion [15] about whether these letters that I showed you involved the [16] fundraising business?

[17]  A I would assume from what I just saw that it's [18] replying to the fundraising business.

[19]  Q Did you ever have any conversations with Richard [20] Jarvis about any issues involving the Postal Service and [21] postal regulations?

[22]  A No.

[23]  Q During this time period, who was Richard Jarvis [24] reporting to?

[25]  A Me.

Page 100

[1]  Q When did Richard Jarvis leave the company?

[2]  A I don't know the exact time period.

[3]  Q One of these letters refers to Richard Jarvis as [4] General Manager, and one refers to him as President. Do you [5] have a recollection of what his title was?

[6]  A No.

[7]  Q Was it your practice to closely monitor what Mr. [8] Jarvis was doing?

[9]  A No.

[10]  Q How would you describe your practice vis a vis [11] monitoring Mr. Jarvis's activities?

[12]  A We had no standardization whatsoever in those [13] days.

[14]  Q I understand if you had no standardization, but [15] how would you describe your relationship with Mr. Jarvis in [16] terms of overseeing his work?

[17]  A Shaky at best.

[18]  Q Why do you say that?

[19]  A Because of the results. He did get a lot of good [20] results for the business that he —

[21]  Q The company didn't do well?

[22]  A No, no.

[23]  Q I'm trying to get a feel for your management [24] relationship with Mr. Jarvis. Did you meet with him often?

[25]  A No.

Vantage 20692

Page 101

[1]   Q When I say "meet," I mean to discuss business, the [2] business of the fundraising. Do you understand what I mean [3] when I say that?
[4]   A Yes.
[5]   Q How often would you say that you met with him to [6] discuss business issues?
[7]   A Monthly.
[8]   Q And would you talk on the phone during that time [9] or not?
[10]  A I didn't spend much time. Very little time of [11] mine was spent.
[12]  Q What were you focusing on at this time?
[13]  A The travel business.
[14]  THE WITNESS: Can I move this, Peter?
[15]  MR. LEVITT: Sure. You can – whenever you're [16] done with these, you can put them in the middle. Right here [17] in the middle is fine.
[18]  Q On the fundraising side, were there any times when [19] you would be called in to assist in making a deal with a [20] non-profit?
[21]  A Me personally?
[22]  Q Yes.
[23]  A Not to my recollection.
[24]  Q And to be clear what I'm asking, I'm saying before [25] a contract is signed, a salesperson is negotiating the

Page 102

[1] terms, whether you were ever called in, in any way, to [2] assist in getting the deal done. That's what I mean by that [3] question.
[4]   A With a client? I'm confused.
[5]   Q Okay, let me try to explain it. A situation where [6] a salesperson is trying to negotiate a contract with a [7] client, either a new client or an old client that they're [8] trying to re-op, the salesperson is trying to re-op.
[9]   A I don't think I've ever been on a call in the [10] fundraising business to sell fundraising.
[11]  Q Never on a phone call, or never on a personal [12] visit?
[13]  A On a personal visit. I've never been on the road.
[14]  Q Did you ever meet with any of the non-profit [15] clients in your offices at Vantage?
[16]  A Yes.
[17]  Q On the fundraising side?
[18]  A Yes.
[19]  Q Who did you meet with?
[20]  A I don't recall.
[21]  Q Is it fairly common that you would meet with —
[22]  A No, very rarely.
[23]  Q What was the circumstances for these rare visits?
[24]  A If they were in Boston, and they came into the [25] office, you know, I'd be introduced or chit-chat with them,

Page 103

[1] et cetera, et cetera.
[2]   Q Did you ever have any meetings with non-profit [3] clients on the fundraising side that were business oriented, [4] rather than just saying hello?
[5]   A No, not that I can recall – I'm sorry. I did. I [6] did make a call, Alabama Wildlife.
[7]   Q Why don't you tell me about that?
[8]   A I don't know. I guess Dick had sold the group a [9] fundraising deal.
[10]  Q Dick who?
[11]  A Katz. And someone stole the cash receipts out of [12] the organization.
[13]  Q Someone stole the cash receipts from where?
[14]  A I guess they were doing the caging. They were [15] doing some of the caging.
[16]  Q Alabama Wildlife was?
[17]  A Yeah. I guess, history, you know, the Executive [18] Director left with the money.
[19]  Q And what happened?
[20]  A I had to go down there and try to make some sort [21] of a commitment to get the money back with Dick.
[22]  Q What sort of commitment did you offer them?
[23]  A I can't recall.
[24]  Q Who did you meet with?
[25]  A Some people down at the Alabama Wildlife.

Page 104

[1]   Q Do you recall their names?
[2]   A No, I'm sorry, I don't.
[3]   Q Do you recall how many people you met with?
[4]   A Two.
[5]   Q Where did you meet?
[6]   A Some place in Alabama.
[7]   Q Was it their offices?
[8]   A Yes.
[9]   Q How long did you meet with them; do you recall?
[10]  A Two hours.
[11]  Q From your perspective, or from Vantage's [12] perspective, what was the purpose of the meeting?
[13]  A Well, we were out of pocket money that was [14] collected and they had stolen – someone had stolen from the [15] organization. Does that make sense? They couldn't pay [16] their receivable.
[17]  Q They couldn't pay their bill to you —
[18]  A Yes.
[19]  Q — because the money —
[20]  A Was misappropriated.
[21]  Q — that they were caging from the solicitations [22] was misappropriated?
[23]  A Yes.
[24]  Q Do you recall how much money they owed you?
[25]  A No.

Vantage 20693

BSA    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    XMAX(27)

## Page 105

[1]    Q Do you recall if it was a lot of money?
[2]    A It was a lot of money in the scheme of things, I [3] think,
at that time.
[4]    Q More than 50,000?
[5]    A I'd be guessing, Peter. I don't know.
[6]    Q Do you recall anything about your conversations [7]
with the representatives of the Alabama Wildlife about how [8]
you were going to try to resolve the problem?
[9]    A No.
[10]    Q Do you remember any issues they raised as [11]
concerns?
[12]    A I mean, they were in the same – I mean, they were [13]
in a terrible jackpot themselves.
[14]    Q Do you recall if you decided you'd do another [15]
mailing?
[16]    A I don't recall.
[17]    Q Do you recall if you walked away, from the out of [18]
pocket?
[19]    A Yes.
[20]    Q What do you recall?
[21]    A That we weren't made whole. I do recall that. I [22] don't
remember the amounts, though, Peter.
[23]    Q Do you recall if you made efforts to try to recoup [24]
the money somehow, or whether you just simply said —
[25]    A I can't recall.

## Page 106

[1]    Q Any other times where you can recall meeting with [2]
your non-profit clients on the fundraising side?
[3]    A I met with them. There could have been multi- [4]
purposes, but my main thrust was selling travel deals.
[5]    Q I'm sorry. You do remember meeting with —
[6]    A I've met with other clients that have dual [7] purposes at
Vantage, but my conversation would be a travel- [8] related
conversation.
[9]    Q Do you recall occasions where you worked with [10]
Sales people on the fundraising side to help them get [11]
business, to help them make a deal with a non-profit, where
[12] the non-profit itself might not have been involved in the [13]
meeting, but you and the sales person were working
together?
[14]    A Could you repeat that again, please?
[15]    Q Sure. Let me come at it this way. I asked you [16] about
meetings with the non-profit clients on the [17] fundraising side
where you're trying to get business. Now, [18] I'm asking you a
follow-up. Do you recall just meeting with [19] sales people?
For example, a sales person comes to you and [20] says, 'I'm
trying to make this deal with X non-profit,' and [21] talking with
the sales person about how to try to get the [22] deal done?
[23]    A I assume I have.
[24]    Q Why do you assume you have?
[25]    A Because I know some of the sales people would come

## Page 107

[1] to me and ask me.
[2]    Q What would the sales people ask you when they came
[3] to you?
[4]    A They'd ask me, 'how do I get this deal?'
[5]    Q Do you recall that happening?
[6]    A There were a few times.
[7]    Q Who do you recall asking you that question?
[8]    A Larry, Larry Lyon.
[9]    Q Anyone else?
[10]    A Not to my knowledge.
[11]    Q What do you recall Larry asking you?
[12]    A How would he get this deal.
[13]    Q Do you recall what deal that was?
[14]    A No.
[15]    Q Do you recall specifically what he was asking you, [16]
what the problem was or what the impediment was?
[17]    A No.
[18]    Q Do you recall what you told him?
[19]    A No.
[20]    Q Do you recall that happening on more than one [21]
occasion?
[22]    A Yes.
[23]    Q How many times, would you say?
[24]    A I wouldn't —
[25]    Q Many times? More than 10?

## Page 108

[1]    A I would say more than 10.
[2]    Q Would you help Larry Lyon or try to help him?
[3]    A Yes.
[4]    Q And that never involved a phone call to the non- [5]
profit client?
[6]    A No.
[7]    Q How were you able to help Larry Lyon?
[8]    A Well, we have a big advantage that we try to take [9]
care of it, and we put people on fan trips.
[10]    Q What is that?
[11]    A Give them a free trip.
[12]    Q Tell me how that works?
[13]    A That's a tool that we would have in the travel [14]
business where a hotel or an airline will give us free [15] seats.
And then, we put group leaders on there, and we sell [16]
them.
[17]    Q And you would do this if Larry Lyon came to you [18]
with a problem about a fundraising program?
[19]    A Yes.
[20]    Q I'm not getting it. What would you – Can you [21] give
me an example of how that would work, how that would [22]
help him?
[23]    A Well, giving someone a free travel program [24]
probably has a value of anywhere from three to five thousand
[25] dollars a person.

Vantage 20694

## Page 109

[1]  Q And that would be incentive for them to do a [2] fundraising program?

[3]  A Yes, or both.

[4]  Q Both a travel program and a fundraising program?

[5]  A Yes.

[6]  Q What sorts of trips would you offer?

[7]  A Cruise packages, a trip to London, South Pacific.

[8]  Q How many people would it typically be for?

[9]  A Ten to twenty.

[10]  Q So I'm clear, is this what you would offer in the [11] fundraising program to get the business?

[12]  A Yes.

[13]  Q Ten to twenty. So they could give it to their [14] members; is that the point?

[15]  A No.

[16]  Q You tell me how it works?

[17]  A Group leaders only.

[18]  Q So 10 to 20 of the group leaders of the non-profit [19] could go on this free trip?

[20]  A Yes, sir.

[21]  Q What do you mean by "group leader"?

[22]  A The president of an association.

[23]  Q You mean like the administration, the people who [24] run the non-profit?

[25]  A Yes.

## Page 110

[1]  Q These were typically programs that you were [2] running on the travel side and you had extra seats? Is that [3] how it would work?

[4]  A No. Go to the airline or the cruise line, and [5] they would give us X amount of free seats because of the [6] business we gave them. Then we'd take those free seats, and [7] we'd invite those organizations to take those seats.

[8]  Q And what about the rest of the costs associated [9] with the trip?

[10]  A Everything would be paid for, even by the airline, [11] or the hotel would comp the rooms, give them to us for free.

[12]  Q Would Vantage put any costs in if there was —

[13]  A Sure.

[14]  Q Like what?

[15]  A You know, some meals and tours.

[16]  Q Would the trips be all expenses paid?

[17]  A Ninety-five percent.

[18]  Q And it's either airlines, free tickets, free [19] hotels, and then, free expenses towards, that sort of thing?

[20]  A Are you talking dollars -- hard dollars or soft [21] dollars, Peter?

[22]  Q What do you mean by the difference?

[23]  A It's all soft dollars. We didn't give anybody any [24] hard dollars here, if that's what you're referring to. [25] That's not where I'm going here.

## Page 111

[1]  Q No, I'm not – I'm trying to figure out what it [2] was.

[3]  A Okay. Free hotel, free air. Usually the ground [4] people would pay for that because they did our business. [5] We'd have to pay incidental charges, which might be [6] admission to a museum or admission to the opera house in [7] Sydney that you don't get comped.

[8]  Q So you might give them a packet of tickets or [9] something?

[10]  A Yes, which would include some tours.

[11]  Q And meals?

[12]  A Usually, the hotels would pick up some of the [13] meals, and then, most of the dinners, they were on their [14] own, or we took them out to dinner a few nights during the [15] course of the trip.

[16]  Q Would you often go with them on the trip?

[17]  A Me personally?

[18]  Q Well, I'll ask you personally?

[19]  A No.

[20]  Q Would somebody, typically?

[21]  A Yes.

[22]  Q A sales person?

[23]  A Yes.

[24]  Q Whoever had the account or —

[25]  A Yes.

## Page 112

[1]  Q — wanted the account?

[2]  A Yes.

[3]  Q Who made decisions about, you know, what groups [4] would get one of these trips? Who made the ultimate [5] decision?

[6]  A It would either be myself, the sales manager or [7] the division head.

[8]  Q So you didn't have to, you know, okay it? If a [9] division manager wanted to take a bunch of people out on a [10] trip, they could do it on their own?

[11]  A Sure.

[12]  Q Were you oftentimes involved in these trips?

[13]  A Yes, because I was involved in the travel [14] business.

[15]  Q So they'd have to come to you because you were [16] heavily involved in the travel business?

[17]  A And we would be using a lot of those seats for [18] travel-related customers.

[19]  Q Were these trips typically given to customers that [20] you hadn't done business with yet and wanted to do business [21] with, or —

[22]  A Both.

[23]  Q Can you explain why?

[24]  A Well, a client's profitable, and we want to keep [25] the client.

Vantage 20695

Page 113

[1]   Q So it was both a reward and an inducement to ---
[2]   A Yes.
[3]   Q Off the top of your head, what are some of the [4] clients that you've taken on these trips?
[5]   A Most of them.
[6]   Q Any in particular that you take often?
[7]   A No.
[8]   Q How often would you take clients on these trips?
[9]   A I'd say 100 trips a year.
[10]  Q You do 100 of these trips a year?
[11]  A Yes.
[12]  Q For 100 different clients?
[13]  A Yes.
[14]  Q A hundred different clients in the fundraising [15] program?
[16]  A It could be a mix and match.
[17]  Q Well, let me ask you this. I'm not asking you [18] about your travel clients. Clients that are in the [19] fundraising program —
[20]  A It seems to me that's a tough distinction because [21] some of them are both.
[22]  Q Some of them overlap?
[23]  A They do both.
[24]  Q Are there some clients that are more profitable [25] because of their work – because of their participation in

Page 114

[1]  the travel program than in the fundraising program?
[2]   A Could you repeat that again, please?
[3]   Q Are there some clients that are more profitable [4] for Vantage because of their participation in the travel [5] program, as opposed to their participation —
[6]   A Yes.
[7]   Q — in the fundraising program? You have to let [8] me finish because —
[9]   A I'm sorry.
[10]  Q — the transcript won't reflect things properly. [11] It makes it hard on the Court Reporter.
[12]  The question was, are there some clients that are [13] more profitable because of their participation in the travel [14] program than because of their participation in the [15] fundraising program?
[16]  A Yes.
[17]  Q Generally, speaking is the travel program more [18] profitable than the fundraising program?
[19]  A No.
[20]  Q You say the fundraising program is more profitable [21] than the travel program?
[22]  A Yes.
[23]  Q Do you recall dealing the Imperial Council on the [24] fundraising side?
[25]  A No.

Page 115

[1]   Q Do you recall that Vantage had a contractual [2] arrangement with the Imperial Council from the fundraising [3] side?
[4]   A I know we had a lot of contracts.
[5]   Q You know that you had a lot of contracts with [6] them?
[7]   A Yes.
[8]   Q Okay, that's my question. You just don't recall [9] being personally involved?
[10]  A Right.
[11]  Q Do you know Ralph Semb?
[12]  A Yes.
[13]  Q Who was he?
[14]  A He was the past Imperial Potentate.
[15]  Q For?
[16]  A The Shriners. I'm sorry. I'm sorry. I thought [17] you knew that.
[18]  Q Well, I did. But we have to get it on the record. [19] And when I say the Imperial Council, that's the same as the [20] Shriners?
[21]  A Yes, sir.
[22]  Q What's the complete name; do you know what it is?
[23]  A I only know him as the Imperial Potentate.
[24]  Q Well, you know him, Ralph Semb is the Imperial [25] Potentate?

Page 116

[1]   A He's the past Imperial Potentate.
[2]   Q I was asking if you knew the entire name of the [3] Imperial Council of Shriners?
[4]   A No, I'm sorry. I don't.
[5]   Q Is that a big client?
[6]   A Yes.
[7]   Q Is that client – How does that client – In terms [8] of, you know, the amount of business, how does it compare [9] with your other clients?
[10]  A What day and age are you asking?
[11]  Q Well, let's put it this way. Throughout the [12] 1990s, is it correct to say that Vantage had contracts with [13] the Imperial Council for Shriners?
[14]  A With travel or fundraising?
[15]  Q Fundraising.
[16]  A Yes, off and on.
[17]  Q With travel, as well?
[18]  A Yes.
[19]  Q Throughout that period, how would you compare the [20] amount of business that Vantage got from the Imperial [21] Council compared to other clients?
[22]  A Good size amount of business.
[23]  Q Would you say that it was one of your bigger [24] clients?
[25]  A Yes.

Vantage 20696

Page 117

[1] Q Who would you say were your biggest clients during
[2] that period of the 1990s? And I'm asking on the fundraising
[3] side.
[4] A I only know the biggest client, and that wasn't [5] the
biggest client.
[6] Q Who was the biggest client?
[7] A The National Wildlife Association.
[8] Q And when you say the National Wildlife [9] Association,
are there several different organizations that [10] fall under the
National Wildlife Association?
[11] A I don't know.
[12] Q You don't know if it's an umbrella group?
[13] A I'm saying I don't know.
[14] Q Are you able to name – You mentioned the Imperial
[15] Council as one of the bigger clients?
[16] A Yes, sir.
[17] Q Are you able to name some of the other big [18]
clients?
[19] A No, I'm sorry, I'm not. I wouldn't know off the [20] top of
my head.
[21] Q The only two that come to your mind then are the [22]
Wildlife Association and the Imperial Council?
[23] A No. The Moose was a big client that I remember.
[24] Q Any others that come to your mind?
[25] A No.

Page 118

[1] Q Fleet Reserve, was that a big one?
[2] A That's a good client, yeah.
[3] Q Humane Society?
[4] A That's a good client.
[5] Q Did you have – You mentioned Ralph Semb was the
[6] Imperial Potentate?
[7] A Yes.
[8] Q What was his relationship with Vantage?
[9] A Just like the other Imperial Potentates.
[10] Q What I'm trying to get to is, was he the person [11] who
negotiated contracts with Vantage or entered into [12]
contracts with Vantage; do you know?
[13] A I assume so. I'm not – I don't know.
[14] MR. LEVITT: Let me show you a document. This [15] will
be Exhibit 5.
[16] (The referred to document was [17] marked for
identification as [18] Exhibits No. 5.)
[19] BY MR. LEVITT:
[20] Q Do you recognize that letter?
[21] A I recognize it now, yes.
[22] Q This is DOJ 21988, a letter dated October 4, 1993, [23]
to Ralph Semb from Lawrence Lyon and Henry Lewis. Do you
[24] recall that Larry Lyon was the sales person responsible for
[25] the Imperial Council?

Page 119

[1] A Yes.
[2] Q Do you recognize your signature on this letter?
[3] A Yes, I do.
[4] Q Do you remember the circumstances under which this
[5] letter was written?
[6] A No.
[7] Q The letter says that Vantage Group Services, a [8]
division of Vantage Financial Services, agrees that the [9]
Imperial Council will not sustain any financial loss as a [10]
result of a couple of programs that are mentioned here, and
[11] to the extent that it may sustain a financial loss, that [12]
Vantage will indemnify and save the Imperial Council [13]
harmless therefrom.
[14] Do you recall those issues coming up with respect [15] to
the Imperial Council?
[16] A No.
[17] Q Do you recall any conversations with Ralph Semb [18]
about these issues?
[19] A No.
[20] Q Do you recall any conversations with Larry Lyon [21]
about these issues?
[22] A No.
[23] Q Do you recall some request that the Imperial [24]
Council be held harmless from any financial loss?
[25] A I would assume that's what happened.

Page 120

[1] Q I'm not asking you if you assume it. I'm asking [2] you if
you recall that request being made?
[3] A No. No.
[4] Q Do you recall – and this period, this is October [5] 1993
– do you recall any problems with any programs that [6]
Vantage ran for the Imperial Council?
[7] A Could you repeat that? I'm sorry.
[8] Q During this period – and this letter is October [9] 1993 –
do you recall any problems being brought to your [10]
attention about programs that were run for the Imperial [11]
Council?
[12] A No.
[13] Q Do you recall any dissatisfaction on the part of [14] the
Imperial Council with respect to the work being done by [15]
Vantage?
[16] A No.
[17] Q Do you recall other instances where non-profits [18]
asked specifically for a letter or an agreement that they [19]
would have – they would be held harmless for any financial
[20] loss?
[21] A I stated that to you this morning. I knew of [22] another.
[23] Q The side letter that was brought to your attention [24]
by a sales person?
[25] A Yes.

Vantage 20697

Page 121

[1]   Q Were you aware of any other instances?
[2]   A No.
[3]   Q Are you aware that that is a – that that was a [4] concern for non-profit clients?
[5]   A Yes.
[6]   Q How are you aware of that?
[7]   A Well, I told you. The competition has given the [8] people guarantees.
[9]   Q When you say guarantees, what do you mean?
[10]  A Money.
[11]  Q Up front money?
[12]  A Up front money, or against draw, or whatever.
[13]  Q What do you mean, against draw?
[14]  A Against draw.
[15]  Q I'm sorry. I'm not —
[16]  A You guarantee someone $50,000. Here it is, a [17] check. You buy the business.
[18]  Q So in that case, a guarantee of $50,000 as an [19] incentive to do the business?
[20]  A Yes.
[21]  Q Were you – And that's what you mean when you [22] refer to it as guarantees?
[23]  A Yes.
[24]  Q Were you aware of any other practices by your [25] competitors designed to help them get business?

Page 122

[1]   A No. You don't need any others.
[2]   Q What's that?
[3]   A I don't think you need any others.
[4]   Q What about were you aware of any practices of your [5] competitors, for example, like this, agreeing to holding a [6] client harmless, saying 'do this program with us, and I [7] guarantee you'll have no financial liability if the program [8] is unsuccessful'?
[9]   A Say that again? I'm very sorry.
[10]  Q Were you aware of practices by your competitors in [11] which they would tell clients, potential clients that if [12] they did the program with the competitor, the competitor [13] would guarantee that they'd have no risk, if a program was [14] unsuccessful?
[15]  A Yes.
[16]  Q Tell me about that? What did you hear about that?
[17]  A All of Affinity marketing agreements stated that [18] they had no risk.
[19]  Q And were you aware of Vantage doing that as well?
[20]  A I said yes.
[21]  Q And that was – And why was that?
[22]  A Because either the sales manager or the salesman [23] came and showed me an agreement, or talked to me about an [24] agreement. I'm not sure which one it was.
[25]  Q And that was an agreement that said that the non

Page 123

[1] profit would have no risk; is that correct?
[2]   A Yes.
[3]   MR. LeCLAIR: Peter, you may want to clarify and [4] make sure he said Vantage as opposed to Affinity.
[5]   MR. LEVITT: I'm sorry. I don't understand your [6] point, Brian.
[7]   MR. LeCLAIR: Well, you switched names, and it's [8] not clear to me he heard you.
[9]   Q Let me ask the question again. You said that [10] Affinity's contracts had language such that the non-profit [11] would have no risk?
[12]  A Yes.
[13]  Q Were you aware of Vantage doing the same thing?
[14]  A And I said yes.
[15]  Q I think we've covered this, but I'm going to ask [16] you again. You also talked about the competitors giving up [17] front guarantees?
[18]  A Yes.
[19]  Q Were you aware of Vantage doing that, as well?
[20]  A No. Am I aware of it right now? I'm back to – [21] You'd better restate that.
[22]  Q Yes, I understand your point. Let me ask you [23] this. Are you now aware —
[24]  A Yes.
[25]  Q Let me finish. Are you now aware that Vantage

Page 124

[1] gave financial guarantees of money to non-profit clients in [2] the fundraising business?
[3]   A Yes.
[4]   Q How are you aware of that?
[5]   A Because they told me. People told me.
[6]   Q Who told you?
[7]   A The general manager. The salesman. Whoever.
[8]   Q When did they tell you this?
[9]   A I don't know. I can't recall, Peter.
[10]  Q Do you recall the people who told you this?
[11]  A No.
[12]  Q Do you recall if this was prior to the start of [13] the investigation, the start of this case in '97?
[14]  A Excuse me? Say that again, please?
[15]  Q Do you recall if those conversations were prior to [16] the start of this case in 1997?
[17]  A No.
[18]  Q You don't recall either way?
[19]  A No. I'm not sure when. I don't want – I'm not [20] going to say something I'm not sure of.
[21]  Q Do you recall how you responded?
[22]  A No.
[23]  Q You don't recall what you said to them when they [24] told you this?
[25]  A No. And again, I'm going to make my statement.

**Vantage 20698**

## Page 125

[1] I'm not sure if it was bulk business or non-profit business.
[2]    Q Did you ask?
[3]    A I don't recall.
[4]    Q You don't recall if you ever found out, and you [5] don't recall if you asked about it?
[6]    A No. I'll repeat what I said. I'm not sure if it [7] was bulk business or non-profit business.
[8]    Q Right, in which the guarantees of money were [9] given?
[10]    A Yes.
[11]    Q It was in the fundraising side; is that correct?
[12]    A Yes.
[13]    Q What percentage of your business in the [14] fundraising side is non-profit?
[15]    A Today or – Today?
[16]    Q Well, let's start with today.
[17]    A Fifty percent.
[18]    Q Five years ago?
[19]    A I'd be guessing to answer the question.
[20]    Q Well, estimate?
[21]    A Sixty percent.
[22]    Q You mean 40 percent of your business five years [23] ago was for profit?
[24]    A Or bulk, bulk business. All the Canadian business [25] is bulk business.

## Page 126

[1]    Q Putting aside the Canadian business, what [2] percentage would you say was non-profit five years ago?
[3]    A I'd be guessing to answer that.
[4]    Q You're not able to estimate?
[5]    A No.
[6]    Q What percentage of your business is Canadian on [7] the fundraising side?
[8]    A Today?
[9]    Q No. Five years ago.
[10]    A A good percentage.
[11]    Q More than 50 percent?
[12]    A I'd be guessing to answer the question.
[13]    Q You're not able to estimate more or less than 50 [14] percent?
[15]    A I think less, but it was up there.
[16]    Q When you were told that Vantage was giving [17] financial guarantees, did you endeavor to find out whether [18] that was on the non-profit side or the for-profit side?
[19]    A No.
[20]    Q Did you ask why?
[21]    A Ask why about what?
[22]    Q Did you ask why they were giving these guarantees?
[23]    A No, but I made an assumption.
[24]    Q What was your assumption?
[25]    A That's what the competition was offering.

## Page 127

[1]    Q Did you tell your employees that they shouldn't do [2] this?
[3]    A Yes.
[4]    Q You told them to stop?
[5]    A Stop, yeah.
[6]    Q Why?
[7]    A It wasn't a good business practice.
[8]    Q Why?
[9]    A It's not a good business practice giving people [10] guarantees.
[11]    Q Well, if that's what you need to do to get the [12] business, why isn't it good business?
[13]    A Because when someone goes into a business [14] proposition, it's not a good idea how to get into businesses [15] to give people guarantees.
[16]    Q Well, if your competitors are doing it, and that's [17] the only way to stay competitive, why isn't it good [18] business?
[19]    A Because you're setting a precedent in the [20] marketplace.
[21]    Q What do you mean by that?
[22]    A You're setting a precedent. Everyone will be [23] looking for guarantees. Then one guarantee of five dollars [24] becomes ten dollars, and then, ten dollars becomes fifteen [25] dollars.

## Page 128

[1]    Q How are you going to compete with your competitors [2] who are giving guarantees if you don't?
[3]    A I just didn't think it was a good business [4] practice. I had been in that business before.
[5]    Q I understand that. But my question was, how are [6] you going to compete with your competitors who are, as you [7] say, offering guarantees, if you tell your sales people they [8] can't offer guarantees?
[9]    A Put them on free trips was my answer.
[10]    Q Who was – Who had to approve the giving of a [11] guarantee at Vantage?
[12]    A The department head.
[13]    Q The head of, in this case, the fundraising [14] division?
[15]    A Yes.
[16]    Q That's who was supposed to approve it?
[17]    A Yes.
[18]    Q What about Harry Melikian?
[19]    A Meaning?
[20]    Q Did he have to approve it, if it's a change to the [21] contract?
[22]    A I don't know if he would have to or not.
[23]    Q Well, is there any sort of procedure in place?
[24]    A Not really.
[25]    Q Sales division head could do whatever they wanted?

Vantage 20699

## Page 129

[1]   A  I don't think there would have been that many. [2] You know, we're not talking about a procedure that everyone [3] used. Again, I don't have the figures and the facts, but [4] it's going to be very few and far between before there would [5] be any guarantees.

[6]   Q  Well, how do you know that?

[7]   A  That's what I know.

[8]   Q  So if you were not one of the approving officials, [9] how would you know?

[10]   A  Because the practice was shunned on. That's why.

[11]   Q  Who shunned on it?

[12]   A  Everybody.

[13]   Q  Who?

[14]   A  Sales manager, the division head, myself.

[15]   MR. LEVITT: Let me show you a document, Exhibit [16] 6. It's DOJ 21955. It's a letter from Larry Lyon to Ralph [17] Semb, dated October 11, 1995.

[18]   (The referred to document was [19] marked for identification as [20] Exhibits No. 6.)

[21]   THE WITNESS: Do you want me to take this one, [22] Peter?

[23]   MR. LEVITT: Yes, please.

[24]   THE WITNESS: This one goes over here?

[25]   MR. LEVITT: You can put that one right on top

## Page 130

[1] there.

[2]   Q  Take a look at that document?

[3]   A  Okay.

[4]   Q  Have you seen this document before?

[5]   A  No.

[6]   Q  It states that, "Vantage will guarantee $100,000 [7] up front on the execution of our agreement to the Imperial [8] Council Membership Committee." Were you aware of that [9] guarantee?

[10]   A  No.

[11]   Q  It also states, "We're certain that it will be [12] profitable for us and the Imperial, and we assume this by [13] offering to give 100,000 up front upon acceptance of this [14] agreement." Were you aware of any discussions concerning [15] this issue?

[16]   A  No.

[17]   Q  Do you know whether this $100,000 guarantee was [18] paid?

[19]   A  No.

[20]   Q  Is this the first you've ever heard of this [21] $100,000 guarantee?

[22]   A  Yes.

[23]   Q  Who was the division manager in October 1995?

[24]   A  I wouldn't know exactly. I wouldn't know.

[25]   Q  Were you aware of any other guarantees that were

## Page 131

[1] as much as $100,000?

[2]   A  No.

[3]   Q  Were you aware of a $25,000 guarantee to General [4] Federation of Women's Club?

[5]   A  I don't recall.

[6]   Q  Were you aware of a $15,000 guarantee to the Order [7] of Sons of Italy in America?

[8]   A  No.

[9]   Q  Were you aware of a $20,000 guarantee to Wildlife [10] Forever?

[11]   A  No.

[12]   MR. LEVITT: We'll go off the record for a minute.

[13]   (Off the Record.)

[14]   MR. LEVITT: I'm going to show you a document, and [15] mark it as Exhibit 7.

[16]   (The referred to document was [17] marked for identification as [18] Exhibits No. 7.)

[19]   BY MR. LEVITT:

[20]   Q  I ask you to take a look at that document and see [21] if you recognize it?

[22]   A  No.

[23]   Q  Were you aware that at some point in the last [24] couple of years, Vantage made changes to its standard [25] program agreement?

## Page 132

[1]   A  Am I supposed to look at something here?

[2]   Q  You can look at it or not. I'll repeat my [3] question?

[4]   MR. BELL: Peter, just for the benefit of us, read [5] what —

[6]   MR. LEVITT: Sure. The Bates on it is VAN 00972, [7] and it is titled "Agreement to Provide Fundraising [8] Consulting and Management Services." It's an agreement [9] between Vantage and the National Council of Senior Citizens.

[10]   Q  Are you aware that the National Council of Senior [11] Citizens is a client of Vantage?

[12]   A  No.

[13]   Q  Are you aware that they've ever been a client of [14] Vantage?

[15]   A  Yes.

[16]   Q  What's your understanding as to the status of [17] National Council of Senior Citizens?

[18]   A  We used to do some travel insert cards for them.

[19]   Q  Do you know if they were ever – if you ever did [20] any fundraising business for them?

[21]   A  No.

[22]   Q  You don't know either way?

[23]   A  No, I don't.

[24]   Q  Were you aware that, at some point in the last [25] couple of years, Vantage changed its standard program

**Vantage 20700**

Page 133

[1] agreement on the fundraising side?
[2]    A Since 1996-1997?
[3]    Q Yes.
[4]    A Yes.
[5]    Q What's your understanding of that?
[6]    A It's what I said this morning. I assume we [7] changed how we put agreements together.
[8]    Q Based on this lawsuit?
[9]    A Yes, sir.
[10]    Q Are you aware that this contract, Exhibit 7, is a [11] new form of program agreement at Vantage?
[12]    A No. I'm not saying it is or it isn't. That's [13] what I'm trying to say to you.
[14]    Q I understand. Do you — Who at Vantage on the [15] fundraising side in 1999 would be responsible for making [16] changes to a program agreement?
[17]    A The general manager and, I assume George Miller, [18] who is an attorney.
[19]    Q Who was the general manager at that time?
[20]    A I assume, Peter Demakis.
[21]    Q Is he still employed with Vantage?
[22]    A Yes.
[23]    Q Is he still the manager of Vantage Financial [24] Services?
[25]    A No, sir.

Page 134

[1]    Q What is his position?
[2]    A He's on his way out. He's on his leave.
[3]    Q He's on leave?
[4]    A He's leaving the company. He's in transition [5] right now.
[6]    Q What was his position up until he went on — into [7] transition?
[8]    A He was in the charge of the area.
[9]    Q Excuse me?
[10]    A He's in charge of the area.
[11]    Q Which area?
[12]    A Fundraising area. Am I saying that properly?
[13]    Q Were you present for any discussions about — in [14] the last couple of years about making changes to the [15] contracts for fundraising programs, aside from conversation [16] involving counsel?
[17]    A No.
[18]    Q We get nervous when questions like that are asked. [19] Let me ask you again. Aside from conversations with [20] counsel, were you present for any conversations in the last [21] couple of years concerning the subject of making changes to [22] Vantage's contracts for its fundraising programs?
[23]    A No.
[24]    Q Did you ask anyone to make changes to it?
[25]    A Six or seven years ago, yeah.

Page 135

[1]    Q Six or seven years ago?
[2]    A 1996, 1995.
[3]    Q As a result of this lawsuit, you asked someone to [4] make changes?
[5]    A Yes.
[6]    Q Who did you ask to make the changes?
[7]    A I told you this morning, legal counsel.
[8]    Q Who else?
[9]    A Whoever the general manager was, and Harry [10] Melikian.
[11]    Q This morning you said that you —
[12]    A Am I reading this still?
[13]    Q No. You can put it here. This morning you said [14] that you got a two million dollar bonus this year?
[15]    A Yes.
[16]    Q And I asked you about profits from Vantage. And I [17] thought that you had said that it was — that Vantage's [18] profits this year were two million dollars. Was I mistaken [19] about that?
[20]    A You said the fundraising.
[21]    Q Just the fundraising was two million dollars?
[22]    A Yes, sir.
[23]    Q What about Vantage Travel?
[24]    A It was about three and a half million.
[25]    Q I think you testified earlier that the

Page 136

[1] financial — the fundraising was more profitable than the [2] travel. Has that changed this year?
[3]    A No, I didn't say that.
[4]    Q Maybe I misunderstood. Is the travel program more [5] profitable than the fundraising program?
[6]    A Yes. No, no. I want to be clear. You asked me [7] if I had a group leader on a trip, which one would be more [8] profitable. Isn't that what you asked me? You got the [9] notes here better than me. That's what you asked me.
[10]    Q Your recollection is that I asked you, if you had [11] a group leader on a —
[12]    A Well, that's what we were talking about, free [13] trips to organizations, which one would be more profitable. [14] And then, you asked me, and I said to you most of the time, [15] it would be a fundraising group leader.
[16]    Q And why is that?
[17]    A Because usually, the size of the organization.
[18]    Q Why?
[19]    A Production of mailing.
[20]    Q I'm not following this. You're saying that the [21] group leader — the fundraising program would be more [22] profitable or not?
[23]    A Yes, I said. I didn't say all the time either. I [24] said most of the time.
[25]    Q Is the answer that an individual fundraising

Vantage 20701

## Page 137

[1] program would be more profitable than an individual travel [2] program?

[3]    A No.

[4]    Q Is there any way you can explain this to me? I'm [5] have difficulty understanding the distinction you're making.

[6]    A Sometimes size doesn't have anything to do with [7] response rates in the travel business. It could be a very [8] small group that has great response rates. Does that make [9] sense what I just aid?

[10]    Q Um-hmm.

[11]    A And based on the size of the organization and the [12] cost of the program, profits could be – You could mail out [13] an individual Shrine or a travel program, you could have 100 [14] people show up for the trip, but the organization is only [15] 5,000 members. You couldn't make a lot of money in the [16] fundraising business doing that. Does that answer your [17] question?

[18]    Q Um-hmm. But generally speaking, the travel [19] program is more profitable than the fundraising program?

[20]    A No.

[21]    Q The other way around?

[22]    A Yes, sir.

[23]    Q Right, okay.

[24]    A But it's not a rule of thumb. I want to be clear [25] here. I'm not trying to throw you a curve ball, but it's

## Page 138

[1] not a yes or a no answer. It all depends on the type of [2] organization.

[3]    Q I'm talking about generally, not a particular [4] organization. This year, at least, the fundraising program [5] is more – the fundraising division was more profitable than [6] the travel division?

[7]    A No.

[8]    Q No?

[9]    A No, I didn't say that. You said on an [10] organization level.

[11]    Q Yeah.

[12]    A My travel business, I'm not all predominantly in [13] the organization business anymore. I have a direct mail [14] file internally that there's no organization involved with. [15] So 75 percent of my business comes from my non-organization [16] business. Am I saying that properly now?

[17]    Q Let me ask you this. In 1995, that general time [18] period, which division was more profitable?

[19]    A The travel division.

[20]    Q Is that usually the case?

[21]    A Yes.

[22]    Q Is it usually substantially more profitable?

[23]    A Yes.

[24]    Q You mentioned two million profits in fundraising?

[25]    A That was last year, I said.

## Page 139

[1]    Q And travel?

[2]    A Three and a half.

[3]-    Q Is that pretty typical?

[4]    A Yes. If anything, it's less.

[5]    Q Typical for both, two million for fundraising —

[6]    A Again, what time period? Tell me your time period [7] and I'll try to give you a guesstimate.

[8]    Q Okay. Let's go to 1995, fundraising?

[9]    A I'll be honest with you. I don't even know if we [10] were making profits.

[11]    Q '98?

[12]    A Three to one.

[13]    Q Three to one, travel to —

[14]    A Yes.

[15]    Q An estimate of the numbers?

[16]    A I can't tell you off the top of my head.

[17]    Q Similar to what —

[18]    A No, no, no, not that. No, no. No, not even [19] close.

[20]    Q Last year was a good year?

[21]    A Yes.

[22]    Q And the year before that?

[23]    A No, very little profits in the fundraising [24] business. It was all tied up in another transaction.

[25]    Q What transaction?

## Page 140

[1]    A We have a customer that didn't pay us.

[2]    Q Who was that?

[3]    A The Canadian Wildlife Association.

[4]    Q How much didn't they pay you?

[5]    A A million dollars.

[6]    Q That was a bulk program?

[7]    A Excuse me?

[8]    Q That was a bulk program?

[9]    A Yes, sir.

[10]    MR. LEVITT: I'd like to take a five-minute break. [11] I don't have much left at all.

[12]    (Off the Record from 3:02 p.m. to 3:07 p.m.)

[13]    MR. LEVITT: I don't have anything further.

[14]    MS. MINTZ: I just have a quick one.

[15]    CROSS-EXAMINATION

[16]    BY MS. MINTZ:

[17]    Q Mr. Lewis —

[18]    A May I just ask who you are?

[19]    Q Sure. Michelle Mintz. I represent Moose.

[20]    A Oh, okay.

[21]    Q Did you ever have any conversations with anyone at [22] Moose regarding programs that Vantage was doing for them?

[23]    A No.

[24]    Q Did you ever have any conversations with anyone at [25] Vantage regarding any programs that you were doing for

Vantage 20702

BSA     Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01     XMAX(36)

Page 141

[1] Moose?
[2]   A No.
-[3]   MS. MINTZ: That's all I have.
[4]   MR. VALLE: I just have a question. Joseph Valle [5] on behalf of Wildlife Forever, a third-party defendant. [6] Nice to meet you, Mr. Lewis.
[7]   THE WITNESS: Hi. Call me Hank.
[8]   CROSS-EXAMINATION
[9]   BY MR. VALLE:
[10]   Q Do you know anybody at Wildlife Forever by name?
-[11]   A No.
[12]   Q Have you ever had any dealings with anybody at [13] Wildlife Forever?
[14]   A No.
[15]   Q Are you aware of any contractual arrangements that [16] your company did with Wildlife Forever?
[17]   A No.
[18]   MR. VALLE: I have no further questions.
[19]   MR. BELL: I have a few follow-ups in the same [20] line of questioning.
[21]   THE WITNESS: May I ask who you are?
[22]   MR. BELL: I'm with three non-profits. We'll do [23] the first one, General Federation of Women's Club.
[24]   CROSS-EXAMINATION
[25]   BY MR. BELL:

Page 142

[1]   Q Have you ever had any conversations with anybody [2] at General Federation of Women's Club regarding any [3] programs?
[4]   A No.
[5]   Q Did you have any conversations with anyone at [6] Vantage regarding programs with General Federation?
[7]   A Yes.
[8]   Q Can you tell me about them?
[9]   A I think we sponsored a China program in General [10] Federation of Women's Club. In the mid-'90s, we sold them [11] some travel.
[12]   Q Was that on the fundraising side or the travel [13] side?
[14]   A No, travel side.
[15]   Q With respect to the fundraising side —
[16]   A No.
[17]   Q Just let me finish the question. I know you might [18] know where I'm going, but with respect to the fundraising [19] side, did you have any conversations with anyone ate Vantage [20] regarding the fundraising program in general for Federation [21] of Women's Club?
[22]   A No.
[23]   Q And with respect to Catholic Daughters of America, [24] did you have any conversations with anyone at Catholic [25] Daughters of America with respect to fundraising programs?

Page 143

[1]   A No.
[2]   Q Did you have any conversations with anyone at [3] Vantage regarding any fundraising program with Catholic [4] Daughters of America?
[5]   A No.
[6]   Q And with respect to American Legion Department of [7] Tennessee, have you ever had any conversations with anyone [8] from American Legion Department of Tennessee regarding [9] program agreements?
[10]   A No.
[11]   Q Did you have any conversations with anyone at [12] Vantage regarding any program agreements with American [13] Legion Department of Tennessee?
[14]   A No.
[15]   MR. BELL: That's all I have.
[16]   MS. MINTZ: Can I ask one more? I'm sorry.
[17]   FURTHER CROSS-EXAMINATION
[18]   BY MS. MINTZ:
[19]   Q Did you testify before that you knew that Moose [20] was one of Vantage's biggest clients?
[21]   A Yes.
[22]   Q How did you know that if you didn't have any [23] conversations with anyone?
[24]   A Because of the group.
[25]   MS. MINTZ: That's all.

Page 144

[1]   MR. LEVITT: Good. Thank you.
[2]   THE WITNESS: Thank you.
[3]   (Whereupon, at 3:15 p.m., the deposition was [4] completed.)

Vantage 20703

BSA    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    XMAX(37

Page 145

[1]   C E R T I F I C A T E [2] COMMONWEALTH OF
MASSACHUSETTS )
      ) SS. [3] COUNTY OF SUFFOLK )
[4]   I, Marilyn Franklin, a Court Reporter and Notary [5] Public,
within and for the Commonwealth of Massachusetts, do [6]
hereby certify that there came before me on this 16th the [7]
day of October, 2001, the person hereinbefore named, who
was [8] by me duly sworn to tell the truth, the whole truth, and
[9] nothing but the truth, concerning and touching the matter
in [10] controversy in this cause; that he was thereupon
examined [11] upon his oath, and his examination reduced to
typewriting, [12] under my direction, and that this deposition
transcript is a [13] true and accurate record of the testimony
given by the [14] witness.
[15]   I further certify that I am not related to any of [16] the
parties hereto or their counsel, and that I am in no way [17]
interested in the outcome of said cause.
[18]   Dated at Boston, Massachusetts, this 16th day of [19]
October, 2001.
[21]
      Marilyn Franklin
[22]   NOTARY PUBLIC
      My Commission Expires:
[23]   October 3, 2004

Page 146

[1]   CORRECTION SHEET
[2]   DEPOSITION OF HENRY LEWIS [3] PAGE NO. LINE NO.
SUGGESTED CORRECTION

Page 147

[1]   SIGNATURE OF WITNESS:
[2]   I have read the foregoing transcript and the same [3]
contains a true and accurate recording of my answers to the
[4] questions therein set forth, subject to the change and/or [5]
correction sheet(s) attached.
[8]
[9]   Deponent

Vantage 20704

## Look-See Concordance Report

- - -
UNIQUE WORDS: **1,442**
TOTAL OCCURRENCES: **6,576**
NOISE WORDS: **385**
TOTAL WORDS IN FILE: **23,444**

SINGLE FILE CONCORDANCE
- - -
CASE SENSITIVE
- - -
NOISE WORD LIST(S): **NOISE.NOI**
- - -
INCLUDES ALL TEXT OCCURRENCES
- - -
IGNORES PURE NUMBERS
- - -
WORD RANGES @ BOTTOM OF PAGE
- - -
MAXIMUM TRACKED OCCURRENCE
THRESHOLD: **200**

--- **$** ---

**$10,000** [1] *40:11*
**$100,000** [4] *130:6, 17, 21; 131:1*
**$15,000** [1] *131:6*
**$150,000** [1] *40:19*
**$20,000** [1] *131:9*
**$25,000** [1] *131:3*
**$35,000** [1] *40:18*
**$40,000** [2] *37:23; 40:18*
**$400,000** [1] *34:5*
**$50,000** [4] *38:19; 69:19; 121:16, 18*

--- **1** ---

**100K** [1] *41:9*
**10:20:a.m.** [1] *6:2*
**12:14** [1] *73:22*
**16th** [2] *145:6, 18*
**1980s** [1] *15:25*
**1990-1991** [1] *8:14*
**1990s** [3] *76:12; 116:12; 117:2*
**1996-1997** [1] *133:2*
**1:19** [1] *74:1*
**1a** [8] *87:2, 3, 6, 11; 88:18, 24; 91:2, 6*
**1b** [8] *87:2, 3, 6, 15; 89:1, 4; 91:3, 23*

--- **3** ---

**3:02** [1] *140:12*
**3:07** [1] *140:12*
**3:15** [1] *144:3*

--- **7** ---

**70s** [1] *10:24*

--- **8** ---

**80s** [9] *16:13, 14; 17:23; 18:19; 49:21; 54:17; 95:2; 97:22*

--- **9** ---

**90s** [10] *61:25; 62:14, 15; 63:19, 20, 21; 68:21, 22; 142:10*

--- **A** ---

**able** [5] *108:7; 117:14, 17; 126:4, 13*
**acceptance** [1] *130:13*
**account** [6] *45:17, 19, 20, 23; 111:24;*
*112:1*
**Accounting** [1] *18:10*
**accounting** [4] *18:6, 11, 13*
**accurate** [2] *145:13; 147:3*
**act** [1] *41:20*
**acting** [4] *51:16; 52:5, 10, 12*
**actively** [1] *97:3*
**activities** [1] *100:11*
**activity** [1] *77:25*
**acts** [1] *45:11*
**addition** [2] *27:18; 28:4*
**additional** [3] *40:5, 11; 94:16*
**address** [1] *73:9*
**administration** [1] *109:23*
**administrators** [1] *12:5*
**admission** [2] *111:6*
**advantage** [1] *108:8*
**affect** [3] *18:23, 25; 33:22*
**affected** [1] *19:1*
**affiliate** [1] *44:19*
**affinities** [1] *20:16*
**Affinity** [4] *77:8; 122:17; 123:4, 10*
**affinity** [5] *20:14, 17, 21, 24; 77:9*
**afternoon** [1] *8:5*
**age** [1] *116:10*
**agenda** [5] *80:4, 8; 81:10, 12*
**agreeing** [1] *122:5*
**Agreement** [2] *91:6; 132:7*
**agreement** [22] *47:11, 12; 59:9; 87:2,*
*10; 90:20, 22, 25; 91:4, 9, 12; 118:20;*
*122:23, 24, 25; 130:7, 14; 131:25; 132:8;*
*133:1, 11, 16*
**agreements** [8] *51:11; 57:8; 90:11;*
*91:17; 122:17; 133:7; 143:9, 12*
**agrees** [1] *119:8*
**aid** [1] *137:9*
**air** [2] *13:4; 111:3*
**airline** [3] *108:14; 110:4, 10*
**airlines** [1] *110:18*
**Alabama** [5] *103:6, 16, 25; 104:6; 105:7*
**allotted** [1] *40:4*
**America** [4] *131:7; 142:23, 25; 143:4*
**American** [3] *143:6, 8, 12*
**amount** [7] *34:17; 45:25; 46:1; 110:5;*
*116:8, 20, 22*
**amounts** [1] *105:22*
**answer** [23] *14:7; 27:4; 33:20; 39:11;*
*50:22; 54:11, 15; 65:16, 18, 19; 70:18;*
*81:9; 84:25; 85:5; 96:10; 97:8; 125:19;*
*126:3, 12; 128:9; 136:25; 137:16; 138:1*
**answers** [1] *147:3*
**anybody** [11] *14:6; 50:5, 10, 15; 62:7;*
*65:2; 88:12; 110:23; 141:10, 12; 142:1*
**anymore** [1] *138:13*
**anyways** [1] *66:15*
**anywhere** [1] *108:24*
**applicable** [2] *50:6, 11*
**application** [1] *19:19*
**applied** [1] *54:9*
**apply** [2] *18:2; 54:5*
**appointment** [1] *83:13*
**appointments** [1] *41:17*
**appreciate** [1] *65:22*
**apprised** [1] *53:17*
**approach** [1] *22:11*
**Approached** [1] *22:2*
**approached** [10] *21:9, 21, 23; 22:1, 4;*
*28:16; 29:24; 30:1, 7*
**approve** [3] *128:10, 16, 20*
**approving** [1] *129:8*
**Approximately** [1] *15·23*

**approximately** [3] *14:12, 15; 21:13*
**area** [5] *10:16; 134:8, 10, 11, 12*
**arrange** [1] *55:6*
**arrangement** [5] *24:23; 25:1, 2, 15;*
*115:2*
**arrangements** [2] *47:8; 141:15*
**array** [1] *46:15*
**Artist** [1] *29:14*
**Artists** [38] *23:21, 23, 24; 24:11, 24;*
*25:6, 17; 28:17; 29:12, 13, 20; 30:2, 9,*
*13, 18; 31:19, 21, 23; 32:6; 69:3; 74:12,*
*13, 22, 25; 75:4, 8, 21; 76:10, 15, 19, 24;*
*77:12, 13, 18; 78:1, 10*
**Aside** [1] *134:19*
**aside** [2] *126:1; 134:15*
**asking** [25] *26:8, 16; 27:9, 15; 42:16;*
*44:12, 16; 48:4; 49:1, 19; 52:8; 61:4;*
*77:16; 101:24; 106:18; 107:7, 11, 15;*
*113:17; 116:2, 10; 117:2; 120:1*
**assemble** [2] *42:23; 44:23*
**assist** [3] *99:14; 101:19; 102:2*
**Assistant** [1] *6:12*
**associated** [1] *110:8*
**Association** [7] *99:3, 4; 117:7, 9, 10, 22;*
*140:3*
**association** [5] *12:20; 46:3, 4; 109:22*
**associations** [1] *9:10*
**assume** [64] *17:8, 14, 15; 27:20, 21;*
*28:25; 30:14, 19, 25; 31:2, 18, 22; 48:2,*
*6, 19; 49:5, 9, 12, 13, 14, 25; 50:25;*
*51:15; 52:2, 3; 55:4; 56:15; 70:13, 15,*
*16, 18, 24; 71:2, 4, 5, 6; 73:6, 7; 77:14;*
*23; 78:2; 79:12; 83:12, 14; 84:14, 17,*
*18; 88:4; 90:12; 93:24; 97:18; 99:7, 9,*
*17; 106:23, 24; 118:13; 119:25; 120:1;*
*130:12; 133:6, 17, 20*
**assumed** [3] *50:17, 18; 95:14*
**assuming** [1] *97:19*
**assumption** [7] *49:15; 51:16; 90:13;*
*95:15, 16; 126:23, 24*
**ate** [1] *142:19*
**attached** [2] *98:24; 147:5*
**attachment** [1] *98:5*
**attend** [3] *78:12, 19; 79:16*
**attention** [7] *26:4; 31:2; 61:3; 80:19;*
*88:24; 120:10, 23*
**Attorney** [1] *6:12*
**attorney** [13] *17:3, 4, 11; 51:7, 15; 52:4,*
*10; 56:19; 57:7; 93:4, 21, 23; 133:18*
**attorneys** [1] *57:5*
**authority** [1] *88:13*
**authorized** [2] *86:18; 89:13*
**aware** [57] *13:21; 14:3; 16:15, 16, 20;*
*53:19, 22, 24; 54:1; 60:8, 11, 13, 14, 15,*
*16, 18, 21, 25; 61:1, 2; 71:15, 22; 72:2;*
*76:10; 83:25; 84:3, 7; 86:15; 88:15;*
*90:19, 24; 97:17; 121:1, 3, 6, 24; 122:4,*
*10, 19; 123:13, 19, 20, 23, 25; 124:4;*
*130:8, 14, 25; 131:3, 6, 9, 23; 132:10,*
*13, 24; 133:10; 141:15*

--- **B** ---

**background** [5] *10:12, 13, 14, 18*
**bailiwick** [1] *47:4*
**balance** [1] *45:25*
**ball** [1] *137:25*
**Barton** [4] *21:22; 30:6, 7; 69:2*
**Barton-Cotton** [12] *21:23; 22:3, 14, 19,*
*22; 23:10; 28:16; 30:4, 5; 32:8; 69:19;*
*75:4*

From **$10,000** to **Barton-Cotton**

**base** [8] 37:4; 38:15; 40:17, 18; 41:3; 77:7, 20, 21
**Based** [2] 38:13; 133:8
**based** [9] 35:25; 36:5; 37:3; 40:20; 49:15, 24; 90:1, 13; 137:11
**basically** [1] 31:5
**basis** [1] 34:24
**Bates** [1] 132:6
**becomes** [2] 127:24
**behalf** [2] 89:20; 141:5
**believe** [1] 66:7
**BELL** [5] 132:4; 141:19, 22, 25; 143:15
**bell** [4] 74:23; 75:5, 15, 17
**benefit** [1] 132:4
**Bev** [2] 75:15, 17
**bigger** [2] 116:23; 117:15
**biggest** [5] 117:1, 4, 5, 6; 143:20
**bill** [1] 104:17
**bond** [3] 20:22, 25; 21:7
**bonus** [10] 35:24; 36:12; 37:2, 3, 6, 18, 23; 38:1; 40:6; 135:14
**bookkeeping** [1] 42:14
**boss** [4] 51:16; 52:5, 10, 12
**bosses** [1] 26:5
**Boston** [4] 10:16; 17:10; 102:24; 145:18
**bought** [6] 11:22; 25:4, 8, 9; 28:11; 32:6
**branches** [1] 77:22
**break** [5] 73:14, 18, 20; 140:10
**Brian** [10] 6:6; 8:5; 9:25; 52:19; 53:5; 63:3; 65:21; 93:17; 95:20; 123:6
**broached** [2] 21:15, 17
**brochure** [1] 19:16
**Broderick** [1] 34:17
**brokered** [2] 97:4, 6
**Brookline** [1] 10:16
**buddy** [1] 83:20
**building** [1] 11:23
**bulk** [17] 47:11; 48:14, 21; 49:2, 4, 7, 22; 85:17; 94:14; 95:14; 125:1, 7, 24, 25; 140:6, 8
**bunch** [1] 112:9
**business** [120] 6:24; 10:19; 14:22, 23; 15:13, 14, 18; 16:2, 9; 18:19, 23, 25; 19:1, 3, 5, 6, 10, 14; 20:4, 7; 21:13, 14, 20; 22:13, 14, 20; 23:10; 24:17; 26:9, 16; 28:9, 18; 29:5, 9, 23, 25; 30:2, 12; 31:23; 32:1, 11, 14, 21; 42:1, 2, 4, 18; 44:13, 16; 48:3; 54:17; 68:15, 16; 69:4; 70:6, 7, 10; 72:12, 21; 74:11; 94:22; 96:9, 14, 17; 97:4, 6; 99:16, 18; 100:20; 101:1, 2, 6, 13; 102:10; 103:3; 106:11, 17; 108:14; 109:11; 110:6; 111:4; 112:14, 16, 20; 116:8, 20, 22; 121:17, 19, 25; 124:2; 125:1, 7, 13, 22, 24, 25; 126:1, 6; 127:7, 9, 12, 13, 18; 128:3, 4; 132:20; 137:7, 16; 138:12, 13, 15, 16; 139:24
**businesses** [1] 127:14
**buy** [1] 121:17
**buy-out** [4] 31:25; 32:1, 3, 10

**– C –**

**caging** [13] 44:10, 19; 45:1, 5, 7, 11, 15, 20, 23; 103:14, 15; 104:21
**calculated** [1] 40:7
**calendars** [1] 43:19
**Call** [1] 141:7
**call** [11] 7:10, 20, 24; 27:14, 16; 41:15, 17; 102:9, 11; 103:6; 108:4
**calls** [1] 27:19

**Canada** [2] 47:12; 48:22
**Canadian** [5] 48:22; 125:24; 126:1, 6; 140:3
**capacity** [1] 12:4
**capital** [1] 31:25
**Cards** [1] 44:4
**cards** [8] 43:19, 21; 44:3, 4; 96:20, 22, 25; 132:18
**care** [1] 108:9
**case** [7] 6:13; 71:4; 121:18; 124:13, 16; 128:13; 138:20
**cash** [2] 103:11, 13
**cast** [2] 31:12; 46:20
**Catholic** [3] 142:23, 24; 143:3
**CEO** [6] 6:17, 20; 7:19; 31:3; 52:8; 70:1
**certify** [2] 145:6, 15
**cetera** [2] 103:1
**chains** [1] 7:21
**Chandler** [1] 89:7
**Change** [1] 51:11
**change** [8] 21:1; 25:25; 26:18; 27:1, 11; 51:12; 128:20; 147:4
**changed** [11] 6:19; 20:9; 26:5, 6; 27:10; 51:14; 91:15; 95:16; 132:25; 133:7; 136:2
**changes** [12] 89:20; 90:7, 10, 20, 21; 131:24; 133:16; 134:14, 21, 24; 135:4, 6
**Chapter** [1] 87:23
**charge** [6] 34:21; 35:11; 46:24; 48:12; 134:8, 10
**charges** [1] 111:5
**Charities** [1] 99:2
**Charles** [3] 24:2; 75:9, 11
**chart** [1] 7:22
**check** [1] 121:17
**China** [1] 142:9
**chit-chat** [1] 102:25
**circumstances** [8] 39:19; 60:13, 17, 20; 61:2; 64:2; 102:23; 119:4
**Citizens** [3] 132:9, 11, 17
**clarify** [1] 123:3
**clear** [6] 26:20; 101:24; 109:10; 123:8; 136:6; 137:24
**client** [26] 69:18; 76:24; 77:6; 85:19; 86:21; 88:3, 6; 102:4, 7; 108:5; 112:24, 25; 116:5, 7; 117:4, 5, 6, 23; 118:2, 4; 122:6; 132:11, 13
**Clients** [1] 113:18
**clients** [50] 24:15, 19; 31:16, 18, 20; 69:10, 11; 76:18; 77:13, 15, 18, 19, 21, 24; 78:1; 84:4; 85:1, 7, 11, 15, 24; 86:1; 99:5; 102:15; 103:3; 106:2, 6, 16; 113:4, 8, 12, 14, 18, 24; 114:3, 12; 116:9, 21, 24; 117:1, 15, 18; 121:4; 122:11; 124:1; 143:20
**Chub** [5] 131:4; 141:23; 142:2, 10, 21
**code** [1] 43:25
**collect** [1] 44:19
**collected** [1] 104:14
**collections** [1] 42:8
**Columbus** [4] 44:1, 2; 99:1
**coming** [2] 13:17; 119:14
**Commission** [4] 26:13, 14; 38:8; 145:22
**commission** [10] 22:18; 23:14; 24:15; 26:23; 27:7; 38:10, 11, 18; 40:3, 5
**commissions** [2] 40:13; 41:5
**commitment** [2] 103:21, 22
**Committee** [1] 130:8
**common** [2] 20:22; 102:21
**COMMONWEALTH** [1] 145:2
**Commonwealth** [1] 145:5

**communicate** [2] 67:10, 14
**communication** [1] 26:6
**comp** [1] 110:11
**companies** [5] 7:9; 13:9, 11; 36:2, 6
**company** [49] 7:6, 18; 8:1, 10; 10:22; 11:4, 25; 12:21, 23; 14:10, 12, 14, 24; 15:9, 11; 16:18; 21:22; 25:11, 17, 25; 26:10; 28:20; 31:5; 32:11, 13, 14, 17, 20, 23; 33:10; 34:23; 40:21; 41:2; 42:18; 45:5, 11, 20; 56:12; 66:13; 84:20, 23; 94:16; 96:16, 21; 100:1, 21; 134:4; 141:16
**compare** [2] 116:8, 19
**compared** [1] 116:21
**comped** [1] 111:7
**compensated** [5] 34:2; 35:23; 36:20; 37:1; 38:1
**compensation** [1] 38:6
**compete** [2] 128:1, 6
**competition** [6] 21:15; 58:17; 60:15; 68:17; 121:7; 126:25
**competitive** [3] 73:1, 5; 127:17
**competitor** [2] 122:12
**competitors** [14] 23:18; 68:18, 23; 69:1, 3; 72:13; 84:3; 121:25; 122:5, 10; 123:16; 127:16; 128:1, 6
**complete** [2] 47:22; 115:22
**completed** [1] 144:4
**compliance** [7] 51:1, 9, 10; 56:13, 17, 23; 57:1
**complied** [4] 50:6, 11, 18, 21
**Components** [1] 43:15
**components** [2] 43:16; 44:18
**concept** [2] 12:21, 22
**concern** [6] 64:11; 66:14; 68:15; 72:12; 73:9; 121:4
**concerned** [10] 68:1; 70:4, 5, 6; 72:5, 21, 24; 73:3, 7, 8
**concerning** [4] 54:19; 130:14; 134:21; 145:9
**concerns** [9] 64:12, 13; 68:12, 13, 14; 72:6, 7; 105:11
**conclusion** [1] 58:21
**concurrent** [2] 98:17, 20
**conditions** [1] 49:4
**confused** [1] 102:4
**confusion** [1] 99:14
**conglomerate** [1] 25:7
**conjunction** [1] 97:15
**connected** [1] 29:14
**connection** [5] 16:9; 22:16; 51:2, 6; 75:25
**consequences** [1] 33:18
**consideration** [2] 37:5, 9
**considering** [1] 37:9
**consultant** [1] 43:13
**consultants** [1] 81:21
**Consulting** [1] 132:8
**cont** [1] 74:3
**contact** [2] 13:17; 75:8
**contacted** [3] 16:17, 18; 23:18
**contacts** [2] 24:18; 28:2
**contained** [1] 92:1
**contains** [1] 147:3
**content** [2] 10:2, 6
**contract** [13] 45:6; 46:22, 23; 47:7, 22; 48:1; 64:20; 90:17, 18; 101:25; 102:6; 128:21; 133:10
**contracted** [3] 45:24; 46:1, 3
**contracts** [39] 27:12, 17; 43:5; 46:4, 7, 10, 12, 24, 25; 47:17, 18; 48:14, 16, 22,

Basic Systems Applications    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    Concordance by Look-See40

23; 50:2, 6, 11, 18, 21; 53:18; 54:6, 10, 14, 23; 74:7; 89:20; 90:7; 98:20, 23; 99:12; 115:4, 5; 116:12; 118:11, 12; 123:10; 134:15, 22
**Contractual** [1] 51:23
**contractual** [6] 24:25; 51:24; 75:24; 97:14; 115:1; 141:15
**controversy** [1] 145:10
**conventions** [1] 81:13
**Conversation** [1] 49:16
**conversation** [17] 10:2; 24:4; 54:16; 56:15; 61:12, 15, 16, 18; 62:2, 8, 23; 69:7, 9; 84:18; 106:7, 8; 134:15
**conversations** [27] 13:24; 16:24; 17:2, 13; 23:6; 54:18; 57:5; 78:9; 94:7, 10; 99:19; 105:6; 119:17, 20; 124:15; 134:19, 20; 140:21, 24; 142:1, 5, 19, 24; 143:2, 7, 11, 23
**Coopera** [1] 58:2
**Cooperative** [14] 13:17; 55:19; 56:3, 7, 10; 58:6, 11, 14; 59:3, 12, 15; 76:12; 78:10; 82:21
**cooperative** [5] 94:15, 19; 97:16; 98:18, 21
**copy** [1] 95:21
**corporate** [3] 7:1, 4; 58:3
**Corporation** [1] 74:23
**CORRECTION** [2] 146:1, 3
**correction** [1] 147:5
**cost** [4] 19:5, 6; 20:3; 137:12
**costs** [2] 110:8, 12
**Cotton** [4] 21:22; 30:6, 7; 69:2
**Council** [21] 98:25; 114:23; 115:2, 19; 116:3, 13, 21; 117:15, 22; 118:25; 119:9, 12, 15, 24; 120:6, 11, 14; 130:8; 132:9, 10, 17
**counsel** [6] 17:7; 98:17; 134:16, 20; 135:7; 145:16
**COUNTY** [1] 145:3
**couple** [5] 119:10; 131:24; 132:25; 134:14, 21
**course** [1] 111:15
**Court** [2] 114:11; 145:4
**cover** [3] 38:20; 39:4, 17
**covered** [1] 123:15
**creative** [2] 42:21; 43:11
**Credit** [1] 96:20
**credit** [2] 96:22, 25
**CROSS-EXAMINATION** [4] 140:15; 141:8, 24; 143:17
**Cruise** [1] 109:7
**cruise** [1] 110:4
**current** [2] 33:7; 52:17
**curve** [1] 137:25
**customer** [2] 20:9; 140:1
**customers** [8] 18:24; 20:12; 26:10; 68:18; 95:7, 13; 112:18, 19
**Cut** [1] 39:8
**cut** [1] 39:22

**– D –**

**Dad** [1] 75:12
**Dallas** [5] 46:18; 53:14; 62:19, 23; 63:4
**DARLING** [2] 36:24; 70:14
**Dated** [1] 145:18
**dated** [7] 87:10, 12; 93:8; 95:22; 98:6; 118:22; 129:17
**Daughters** [3] 142:23, 25; 143:4
**day** [4] 73:23; 116:10; 145:7, 18
**days** [2] 20:6; 100:13

**deal** [17] 23:19; 24:11, 12; 25:5; 30:8; 38:10; 64:18; 101:19; 102:2; 103:9; 106:11, 20, 22; 107:4, 12, 13
**dealing** [1] 114:23
**dealings** [2] 87:23; 141:12
**deals** [1] 106:4
**dealt** [1] 86:21
**decide** [2] 30:15; 37:6
**decided** [4] 23:9, 17; 28:17; 105:14
**decision** [8] 21:13; 22:16; 29:22; 30:3, 11, 20; 79:10; 112:5
**decisions** [3] 47:13, 14; 112:3
**defendant** [1] 141:5
**definitely** [1] 73:8
**degree** [1] 20:10
**delegate** [1] 52:1
**Demakis** [4] 53:6; 62:19; 63:3; 133:20
**Department** [4] 34:22; 143:6, 8, 13
**department** [2] 90:16; 128:12
**depend** [1] 79:6
**depended** [1] 79:8
**depends** [1] 138:1
**Deponent** [1] 147:9
**DEPOSITION** [1] 146:2
**deposition** [4] 8:4; 73:22; 144:3; 145:12
**Describe** [1] 42:19
**describe** [4] 19:16; 43:23; 100:10, 15
**designed** [1] 121:25
**detail** [5] 9:12, 23; 10:3; 41:20; 51:25
**details** [1] 70:24
**determine** [8] 50:20; 54:4, 9; 56:6, 9; 58:10, 13; 59:2
**determined** [1] 63:3
**developed** [1] 33:2
**devoted** [2] 32:21, 24
**Dick** [4] 46:19; 103:8, 10, 21
**difference** [3] 48:16; 49:22; 110:22
**difficulty** [1] 137:5
**dinner** [1] 111:14
**dinners** [1] 111:13
**Direct** [3] 7:11; 32:16, 23
**direct** [1] 138:13
**Directing** [1] 88:24
**direction** [1] 145:12
**Director** [1] 103:18
**disadvantage** [2] 73:1, 5
**disassembled** [1] 11:25
**disclose** [2] 10:2; 57:5
**disclosing** [1] 10:4
**discretion** [1] 47:22
**discuss** [8] 67:22; 79:20; 82:9, 15, 18, 21; 101:1, 6
**discussed** [2] 81:12; 98:7
**discussions** [5] 76:14; 84:9, 12; 130:14; 134:13
**dissatisfaction** [1] 120:13
**distinction** [2] 113:20; 137:5
**division** [45] 30:23; 31:8, 10, 17; 32:18, 24; 38:1; 42:6; 47:20, 25; 49:21; 52:13, 15, 18; 53:2, 4, 7, 15; 55:5; 61:9, 13; 62:5, 14, 18; 63:2; 64:3; 75:4; 79:4, 13, 14; 80:20; 89:25; 90:11; 99:6; 112:7, 9; 119:8; 128:14, 25; 129:14; 130:23; 138:5, 6, 18, 19
**document** [19] 8:23, 24, 25; 86:25; 93:10; 95:20, 23; 98:1, 7, 9; 118:14, 16; 129:15, 18; 130:2, 4; 131:14, 16, 20
**documentation** [1] 69:6
**documents** [8] 8:6, 8, 13; 10:10; 75:24; 87:2, 4; 94:17
**doesn't** [6] 39:6, 16; 45:22; 65:17, 18;

137:6
**DOJ** [7] 87:10, 11; 93:8; 95:21; 98:7; 118:22; 129:16
**dollar** [1] 135:14
**dollars** [24] 36:13, 15; 37:19, 21, 22; 38:20; 41:7, 8; 42:9, 10, 16; 108:25; 110:20, 21, 23, 24; 127:23, 24, 25; 135:18, 21; 140:5
**donate** [1] 44:22
**donated** [1] 44:24
**donation** [1] 44:22
**donations** [3] 44:20; 45:12, 14
**doubt** [1] 31:1
**draft** [1] 48:1
**drafted** [3] 47:23; 59:25; 60:2
**draw** [11] 38:11, 13, 15, 20, 25; 39:4, 17; 121:12, 13, 14
**draws** [1] 38:19
**dual** [1] 106:6
**due** [1] 59:16
**duly** [1] 145:8
**duties** [2] 13:20; 14:18

**– E –**

**Early** [1] 16:13
**early** [4] 61:25; 68:21, 22; 76:12
**Eastern** [1] 87:24
**Edmonds** [3] 62:16; 63:4, 16
**education** [1] 10:18
**educational** [2] 10:12, 14
**Edwards** [1] 62:15
**effect** [3] 25:3, 16; 54:22
**efficiently** [1] 35:7
**effort** [1] 50:20
**efforts** [3] 56:6, 9; 105:23
**Eight** [1] 34:14
**eight** [3] 11:1, 20; 34:16
**eighty-five** [2] 36:23, 25
**Elks** [1] 99:3
**em** [1] 61:19
**employed** [3] 6:16, 21; 133:21
**employee** [4] 72:20, 24; 73:3; 92:16
**employees** [7] 55:7, 11; 92:4, 5; 94:8, 11; 127:1
**endeavor** [1] 126:17
**ensure** [5] 46:25; 52:9; 66:20, 22; 67:8
**ensured** [1] 66:11
**ensuring** [4] 48:5; 50:1, 6, 11
**entail** [1] 83:5
**enter** [1] 24:23
**entered** [1] 118:11
**entities** [2] 7:1, 4
**entitled** [2] 40:5, 11
**erroneous** [11] 9:5, 7, 15, 22, 23; 10:3, 8; 95:4, 5, 6, 12
**escrow** [3] 45:17, 18, 20
**established** [1] 28:21
**estimate** [4] 125:20; 126:4, 13; 139:15
**et** [2] 103:1
**evaluate** [1] 54:21
**events** [1] 55:25
**Eventually** [1] 45:24
**Everybody** [1] 129:12
**exact** [10] 29:16; 34:17; 41:11, 20; 52:24; 61:16, 22; 96:11; 97:7; 100:2
**exactly** [6] 16:12; 25:13; 29:7; 36:19; 37:22; 130:24
**EXAMINATION** [2] 6:9; 74:3
**examination** [1] 145:11
**examined** [1] 145:10

Basic Systems Applications   Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01   Concordance by Look-See(41)

**example** [10] 13:1; 20:24; 27:11; 67:2; 69:19; 77:19; 80:16; 106:19; 108:21; 122:5
**exchange** [2] 24:15; 26:23
**excluding** [1] 57:7
**Excuse** [13] 13:10; 15:10; 19:12; 36:4; 56:8, 24; 71:20; 72:22; 75:16; 84:11; 124:14; 134:9; 140:7
**execution** [1] 130:7
**Executive** [1] 103:17
**executive** [1] 62:13
**Exhibit** [17] 87:2, 11, 15; 88:18, 24; 89:1, 4; 91:2, 23; 93:8; 95:20; 98:2; 118:15; 129:15; 131:15; 133:10
**Exhibits** [7] 87:6; 93:12; 95:25; 98:11; 118:18; 129:20; 131:18
**expectation** [1] 28:1
**expected** [1] 27:23
**expenses** [2] 110:16, 19
**expensive** [1] 20:3
**experience** [1] 54:1
**Expires** [1] 145:22
**Explain** [2] 12:15, 17
**explain** [9] 21:25; 38:6, 12, 18; 77:1, 3; 102:5; 112:23; 137:4
**extent** [2] 25:21; 119:11
**extra** [2] 95:21; 110:2

**– F –**

**fact** [2] 50:21; 65:18
**factors** [2] 37:5, 8
**facts** [1] 129:3
**fair** [1] 80:7
**fairly** [1] 102:21
**fall** [3] 42:13; 47:4; 117:10
**familiar** [4] 55:19, 22, 25; 91:16
**family** [1] 23:7
**Famous** [43] 23:21, 23; 24:11, 24; 25:6, 16, 17; 28:17; 29:12, 13, 14, 20; 30:2, 8, 13, 17; 31:19, 21, 23; 32:6; 69:3; 74:12, 13, 22, 23, 25; 75:4, 8, 21; 76:10, 15, 18, 24; 77:12, 13, 18; 78:1, 10
**fan** [1] 108:9
**father** [2] 75:10, 11
**February** [1] 11:13; 15:3
**Federation** [6] 131:4; 141:23; 142:2, 6, 10, 20
**feel** [2] 37:4; 100:23
**fellow** [2] 34:12; 53:6
**felt** [1] 65:2
**Ferrara** [3] 46:19; 63:5, 9
**fifteen** [1] 127:24
**Fifty** [1] 125:17
**figure** [2] 9:22; 111:1
**figures** [2] 41:12; 129:3
**file** [1] 138:14
**Finance** [1] 48:12
**Financial** [9] 7:23; 8:2; 18:13; 33:6; 96:5, 6, 8; 119:8; 133:23
**financial** [13] 18:12; 47:7; 60:16; 72:13, 15; 119:9, 11, 24; 120:19; 122:7; 124:1; 126:17; 136:1
**find** [4] 60:2, 5; 68:9; 126:17
**finding** [1] 91:19
**Fine** [1] 6:8
**fine** [1] 101:17
**finish** [3] 114:8; 123:25; 142:17
**finished** [1] 69:15
**Finn** [1] 69:2
**firm** [1] 94:17

**First** [1] 30:5
**first** [15] 9:6; 28:16; 55:22; 68:19; 71:15, 21; 83:1; 84:6; 87:13; 94:13; 95:10; 97:13; 98:24; 130:20; 141:23
**Five** [2] 125:18; 126:9
**five** [7] 41:7; 56:16; 82:3; 108:24; 125:22; 126:2; 127:23
**five-minute** [1] 140:10
**Flebbe** [2] 46:18; 63:11
**Fleet** [1] 118:1
**focus** [1] 80:19
**focusing** [1] 101:12
**follow** [3] 28:2, 4; 70:21, 23
**follow-up** [1] 106:18
**follow-ups** [1] 141:19
**followed** [6] 70:13, 15, 16, 17, 18, 25
**following** [2] 15:6; 136:20
**follows** [1] 6:5
**food** [1] 13:4
**for-profit** [5] 13:9, 11; 19:11, 13; 126:18
**foregoing** [1] 147:2
**Forever** [5] 131:10; 141:5, 10, 13, 16
**forgotten** [1] 62:17
**form** [4] 19:19; 45:1; 58:2; 133:11
**format** [1] 79:9
**forms** [1] 83:11
**forth** [1] 147:4
**Forty** [1] 37:19
**forty** [1] 37:21
**found** [4] 66:18; 68:2; 72:5; 125:4
**Four** [1] 82:3
**four** [2] 34:19; 56:15
**Franklin** [2] 145:4, 21
**Fred** [1] 89:7
**Free** [1] 111:3
**free** [15] 108:11, 14, 23; 109:19; 110:5, 6, 11, 18, 19; 111:3; 128:9; 136:12
**front** [5] 121:11, 12; 123:17; 130:7, 13
**Fundraising** [3] 116:15; 132:7; 134:12
**fundraising** [126] 6:24; 9:8, 17, 18; 10:6; 15:17; 21:12, 14; 22:13, 20; 23:10, 16; 24:17, 19; 28:15, 18; 29:1, 5, 9, 17, 22, 25; 30:12; 31:8, 10, 17; 32:11, 14, 21, 24; 33:1, 7, 10; 35:8, 12; 36:8; 37:16; 38:1, 9; 41:13, 18, 19; 42:6, 19; 44:13; 52:15, 17; 53:2, 4, 7, 14, 18; 54:5, 10, 13; 63:2; 80:19, 23, 25; 81:4; 82:25; 85:15; 89:20; 90:11; 96:8, 17; 97:10; 99:6, 16, 18; 101:2, 18; 102:10, 17; 103:3, 9; 106:2, 10, 17; 108:18; 109:2, 4, 11; 113:14, 19; 114:1, 7, 15, 18, 20, 24; 115:2; 116:14; 117:2; 124:2; 125:11, 14; 126:7; 128:13; 132:20; 133:1, 15; 134:15, 22; 135:20, 21; 136:1, 5, 15, 21, 25; 137:16, 19; 138:4, 5, 24; 139:5, 8, 23; 142:12, 15, 18, 20, 25; 143:3
**funds** [1] 68:17
**furnished** [1] 94:17

**– G –**

**gave** [7] 39:20; 47:9, 16; 65:16; 72:15; 110:6; 124:1
**Gelb** [3] 79:3, 7, 14
**gentleman** [1] 52:19
**George** [1] 133:17
**gets** [2] 37:2; 42:17
**Give** [3] 25:15; 80:16; 108:11
**give** [20] 13:1; 20:24; 22:18; 23:12, 13, 18; 24:14; 40:16; 65:2, 4; 108:14, 21;

109:13; 110:5, 11, 23; 111:8; 127:15; 130:13; 139:7
**given** [7] 83:19; 85:19; 92:19; 112:19; 121:7; 125:9; 145:13
**giving** [12] 27:18; 37:4; 60:15; 68:24; 72:13; 108:23; 123:16; 126:16, 22; 127:9; 128:2, 10
**glass** [1] 73:12
**goal** [2] 20:23, 25
**goes** [6] 19:11, 13, 20; 42:17; 127:13; 129:24
**govern** [3] 49:7, 11; 54:13
**governed** [1] 54:19
**governing** [7] 13:21, 25; 14:3; 53:20; 54:2; 55:7; 82:19
**Grand** [3] 8:11; 86:23; 87:23
**Graves** [5] 46:18; 53:14; 62:19, 24; 63:4
**great** [1] 137:8
**greeting** [1] 44:4
**ground** [1] 111:3
**Group** [5] 7:14, 19, 21; 109:17; 119:7
**group** [32] 10:6; 12:18; 13:6; 19:17; 20:22, 24, 25; 21:4; 28:2, 8; 41:22; 43:25; 44:17; 45:7, 25; 64:23, 25; 65:5, 25; 66:1; 81:4; 103:8; 108:15; 109:18, 21; 117:12; 136:7, 11, 15, 21; 137:8; 143:24
**groups** [13] 8:19; 9:8, 11, 19; 20:14; 22:12; 27:6; 41:15, 17, 24; 97:16; 112:3
**guarantee** [14] 72:15; 121:16, 18; 122:7, 13; 127:23; 128:11; 130:6, 9, 17, 21; 131:3, 6, 9
**guaranteeing** [3] 68:17; 69:7, 19
**guarantees** [28] 60:16; 68:24; 70:8, 9; 72:13; 84:3; 85:1, 6, 10, 15, 18, 22; 121:8, 9, 22; 123:17; 124:1; 125:8; 126:17, 22; 127:10, 15, 23; 128:2, 7, 8; 129:5; 130:25
**guess** [9] 6:25; 7:22; 16:5; 37:7; 52:25; 57:19; 103:8, 14, 17
**guessing** [7] 42:8; 68:20; 96:23; 105:5; 125:19; 126:3, 12
**guesstimate** [1] 139:7
**guy** [3] 75:9, 13

**– H –**

**H.E.** [1] 94:1
**hadn't** [2] 69:15; 112:20
**half** [9] 11:24; 25:19; 38:20, 21; 39:3, 6; 75:22; 135:24; 139:2
**handed** [1] 63:18
**hands** [1] 90:14
**Hank** [2] 71:7; 141:7
**happening** [2] 107:5, 20
**happens** [3] 38:22; 39:6; 44:9
**Hard** [1] 37:14
**hard** [3] 110:20, 24; 114:11
**harmless** [4] 119:13, 24; 120:19; 122:6
**Harry** [22] 17:14, 16, 20; 18:14; 33:13, 14; 36:20; 47:15; 48:6, 7; 51:16; 52:4, 10; 56:20; 74:7; 84:9, 12; 90:14; 128:18; 135:9
**haven't** [3] 44:22, 24; 72:9
**he'd** [1] 40:11
**head** [11] 79:13, 14; 90:16; 112:7; 113:3; 117:20; 128:12, 13, 25; 129:14; 139:16
**hear** [2] 69:5; 122:16
**heard** [2] 123:8; 130:20
**Hearing** [1] 49:3

From **example** to **Hearing**

**offices** [2] *102:15; 104:7*
**officials** [1] *129:8*
**oftentimes** [1] *112:12*
**Oh** [1] *140:20*
**Ohio** [1] *98:24*
**Okay** [13] *30:1; 58:21; 60:17; 73:16; 80:21; 81:1, 19; 91:8; 102:5; 111:3; 115:8; 130:3; 139:8*
**okay** [12] *7:20, 21; 42:14; 59:10; 69:18; 71:10; 80:20; 81:2; 99:10; 112:8; 137:23; 140:20*
**old** [1] *102:7*
**opera** [1] *111:6*
**operated** [2] *84:23; 90:4*
**operates** [1] *44:16*
**operation** [10] *11:10; 41:14; 44:11, 19; 45:1, 5, 8, 11, 15*
**Operations** [2] *34:21; 35:11*
**opportunity** [1] *12:24*
**opposed** [2] *114:5; 123:4*
**optional** [1] *13:4*
**oral** [1] *76:4*
**Order** [2] *87:24; 131:6*
**order** [1] *46:19*
**organization** [26] *7:22; 11:24; 19:17, 21, 23, 25; 20:22; 43:13, 25; 45:4; 59:19, 21; 65:6; 66:9; 94:16; 97:15; 103:12; 104:15; 136:17; 137:11, 14; 138:2, 4, 10, 13, 14*
**organizations** [5] *26:7; 29:17; 110:7; 117:9; 136:13*
**oriented** [1] *103:3*
**original** [2] *11:10; 44:24*
**Originally** [3] *11:22; 22:17; 32:13*
**originally** [1] *32:12*
**ourself** [1] *7:24*
**outcome** [1] *145:17*
**outset** [1] *28:5*
**outside** [2] *80:10; 81:21*
**overall** [2] *36:2, 5*
**overlap** [1] *113:22*
**overseeing** [1] *100:16*
**owed** [1] *104:24*
**owing** [1] *42:13*
**owns** [1] *34:11*

**– P –**

**p.m.** [5] *73:22; 74:1; 140:12; 144:3*
**Pacific** [1] *109:7*
**pack** [1] *44:4*
**package** [8] *12:16, 19; 13:1; 19:15; 41:22; 42:22; 43:12; 44:23*
**packages** [2] *12:25; 109:7*
**packet** [1] *111:8*
**PAGE** [1] *146:3*
**Page** [2] *88:18, 20*
**paid** [8] *24:21; 34:1; 38:11; 41:6; 55:10; 110:10, 16; 130:18*
**paper** [1] *40:22*
**paperwork** [2] *99:7, 8*
**Paragraph** [1] *98:18*
**paragraph** [1] *97:13*
**paraphernalia** [1] *81:14*
**part** [10] *12:8; 13:20; 24:4; 38:18; 39:15; 59:19, 20; 78:12; 84:22; 120:13*
**part-time** [1] *34:24*
**partake** [1] *21:20*
**participation** [5] *113:25; 114:4, 5, 13, 14*
**parties** [1] *145:16*
**party** [2] *40:23; 55:11*

**pay** [18] *26:12, 23; 27:6; 33:22; 36:21; 39:8, 22; 40:17, 18; 41:3; 45:24; 46:1; 104:15, 17; 111:4, 5; 140:1, 4*
**paying** [2] *26:4; 31:2*
**payments** [1] *46:8*
**People** [2] *69:7; 124:5*
**people** [62] *12:12; 14:11, 14; 21:15, 19; 23:1, 25; 24:16; 27:18; 31:13; 37:25; 38:3, 7; 40:12, 18; 44:24; 46:15, 17, 21; 47:21; 50:24; 60:15; 67:1, 11, 15, 17, 18, 19, 23; 68:1, 7; 69:7, 10; 70:7; 71:11; 75:7; 78:3; 79:5, 23; 80:9, 11; 81:15; 83:17; 89:13; 103:25; 104:3; 106:10, 19, 25; 107:2; 108:9; 109:8, 23; 111:4; 112:9; 121:8; 124:10; 127:9, 15; 128:7; 137:14*
**percent** [17] *28:12; 34:9, 14, 16, 19; 38:14; 40:10; 75:23; 110:17; 125:17, 21, 22; 126:11, 14; 138:15*
**percentage** [5] *40:9; 125:13; 126:2, 6, 10*
**percentile** [1] *34:10*
**Performance** [1] *37:7*
**performance** [5] *36:2, 5; 37:9; 40:20; 82:9*
**period** [23] *11:2, 14; 28:15; 29:10; 44:20; 46:13; 47:2; 48:7; 58:20; 74:18; 78:22; 79:1; 97:23; 98:19; 99:23; 100:2; 116:19; 117:2; 120:4, 8; 138:18; 139:6*
**person** [25] *29:4; 38:21; 40:1; 42:17; 62:10; 64:3, 6, 19, 22; 65:24; 78:23; 82:25; 83:2, 3, 5, 23; 106:13, 19, 21; 108:25; 111:22; 118:10, 24; 120:24; 145:7*
**personal** [4] *28:5; 69:25; 102:11, 13*
**personally** [8] *33:25; 85:21, 24; 87:25; 101:21; 111:17, 18; 115:9*
**perspective** [2] *20:7; 104:11, 12*
**Peter** [31] *6:11; 26:20; 32:19; 51:25; 53:6; 56:24; 58:12; 59:10; 62:18; 63:3; 65:16, 17; 68:20; 69:4; 72:8, 22; 77:15; 87:14; 88:11, 20; 92:3; 97:21; 101:14; 105:5, 22; 110:21; 123:3; 124:9; 129:22; 132:4; 133:20*
**phone** [3] *101:8; 102:11; 108:4*
**pick** [1] *111:12*
**piece** [1] *40:22*
**pies** [1] *90:14*
**pin** [4] *43:24; 44:1, 2*
**Pins** [1] *43:22*
**pins** [2] *43:20, 21*
**Pioneer** [1] *99:4*
**place** [8] *18:6; 75:21; 82:4; 104:6; 128:23*
**placement** [1] *97:20*
**Please** [1] *98:18*
**please** [8] *32:22; 44:22; 89:18; 90:8; 106:14; 114:2; 124:14; 129:23*
**pocket** [2] *104:13; 105:18*
**point** [12] *11:16; 64:9; 66:15; 74:6; 75:19; 76:14; 84:2; 109:14; 123:6, 22; 131:23; 132:24*
**policy** [4] *71:9; 90:19, 21*
**poor** [1] *26:6*
**position** [7] *6:18; 14:8; 18:8; 30:22; 89:23; 134:1, 6*
**positive** [2] *17:6, 22*
**Post** [1] *8:15*
**postage** [1] *20:5*
**Postal** [9] *13:14; 16:1, 17, 18; 76:11; 92:25; 93:5; 99:12, 20*

**postal** [12] *8:20, 21; 13:21, 24; 53:19; 54:2; 82:16; 94:7, 11; 98:17, 20; 99:21*
**Potentate** [5] *115:14, 23, 25; 116:1; 118:6*
**Potentates** [1] *118:9*
**potential** [3] *26:10; 69:10; 122:11*
**practice** [11] *78:12; 84:23; 86:7; 90:19, 21; 100:7, 10; 127:7, 9; 128:4; 129:10*
**practices** [3] *121:24; 122:4, 10*
**pre-set** [1] *12:19*
**Pre-tax** [1] *42:16*
**precedent** [2] *127:19, 22*
**predominantly** [1] *138:12*
**prepare** [1] *8:4*
**present** [8] *17:13; 46:14; 47:3; 48:11; 62:7; 79:1; 134:13, 20*
**presently** [1] *24:13*
**President** [8] *6:20; 14:10, 19; 31:3; 96:5; 97:10; 100:4*
**president** [1] *109:22*
**pretty** [1] *139:3*
**previously** [1] *72:4*
**primarily** [2] *41:24; 83:23*
**prime** [1] *82:12*
**printed** [1] *43:1*
**printers** [1] *43:3*
**printing** [1] *43:7*
**Prior** [3] *53:17; 54:4; 63:16*
**prior** [17] *18:14; 40:20; 53:8, 18; 54:12, 18; 55:3, 25; 60:8, 22; 61:23; 71:18, 21; 93:18; 95:17; 124:12, 15*
**privileges** [1] *94:15*
**problem** [4] *53:18; 105:8; 107:16; 108:18*
**problems** [3] *76:15; 120:5, 9*
**procedure** [4] *84:23; 90:15; 128:23; 129:2*
**process** [3] *44:12; 51:17, 18*
**produce** [2] *19:24, 25*
**produced** [5] *40:24; 42:23, 25; 43:10, 12*
**product** [2] *27:13; 42:22*
**product-induced** [1] *41:22*
**Production** [1] *136:19*
**products** [5] *29:18; 42:22; 43:18; 80:15*
**profit** [4] *85:17; 86:1; 123:1; 125:23*
**profitable** [20] *30:16; 42:2, 4; 112:24; 113:24; 114:3, 13, 18, 20; 130:12; 136:1, 5, 8, 13, 22; 137:1, 19; 138:5, 18, 22*
**Profits** [1] *37:10*
**profits** [18] *37:15, 16; 38:14, 23; 39:4, 7, 17; 40:4, 9; 42:6, 11; 135:16, 18; 137:12; 138:24; 139:10, 23*
**Program** [1] *91:6*
**program** [61] *13:5, 7; 21:9; 30:18; 44:6, 24; 76:7; 86:2; 87:2, 10; 90:11, 20, 22, 24; 91:3, 9, 11, 17; 108:18, 23; 109:2, 4, 11; 113:15, 19; 114:1, 5, 7, 14, 15, 17, 18, 20, 21; 122:6, 7, 12, 13; 131:25; 132:25; 133:11, 16; 136:4, 5, 21; 137:1, 2, 12, 13, 19; 138:4; 140:6, 8; 142:9, 20; 143:3, 9, 12*
**programs** [16] *13:21, 25; 14:4; 35:6; 97:16; 110:1; 119:10; 120:5, 10; 134:15, 22; 140:22, 25; 142:3, 6, 25*
**properly** [3] *114:10; 134:12; 138:16*
**proposition** [1] *127:14*
**proven** [6] *64:23; 65:4, 12, 25; 66:1, 13*
**Provide** [1] *132:7*
**provide** [1] *26:9*
**PUBLIC** [1] *145:22*

From **offices** to **PUBLIC**

5; 137:15
lower [1] 40:16
loyalty [2] 37:10, 13
lucrative [1] 76:7
Lynn [4] 62:15, 16; 63:4, 16
Lyon [14] 22:7, 9; 24:7; 31:12, 14;
34:16; 107:8; 108:2, 7, 17; 118:23, 24;
119:20; 129:16

– M –

Mail [13] 13:17; 55:19; 56:4, 7, 10; 58:6,
11, 14; 59:3, 15; 76:12; 78:10; 82:21
mail [10] 16:6, 8; 18:20; 19:9, 10; 43:3;
49:8; 137:12; 138:13
mailed [1] 44:23
Mailing [1] 59:12
mailing [11] 16:8; 19:11, 13; 21:1; 44:7,
18; 54:19; 94:14; 95:14; 105:15; 136:19
mailings [10] 49:7, 8; 55:8; 58:3, 4;
94:15, 19; 97:15; 98:18, 21
mails [2] 53:20; 82:19
main [1] 106:4
man [4] 62:10, 11, 12; 93:21
manage [1] 80:11
Management [1] 132:8
management [4] 23:2; 80:9; 81:14;
100:23
Manager [5] 12:1, 2; 52:15; 56:20;
100:4
manager [31] 13:20; 52:13, 17; 53:1, 4,
7, 14; 55:4; 61:9, 12; 62:4, 5, 18; 64:3;
78:2, 4; 79:4, 7, 13, 14; 89:25; 112:6, 9;
122:22; 124:7; 129:14; 130:23; 133:17,
19, 23; 135:9
managers [2] 63:1, 2
Marilyn [2] 145:4, 21
mark [1] 131:15
marked [7] 87:5; 93:11; 95:24; 98:10;
118:17; 129:19; 131:17
market [1] 96:22
marketed [3] 42:24, 25; 97:3
Marketing [4] 7:11; 32:16, 23; 69:2
marketing [6] 43:9, 11, 14; 96:24, 25;
122:17
marketplace [1] 127:20
MASSACHUSETTS [1] 145:2
Massachusetts [2] 145:5, 18
match [1] 113:16
material [2] 19:24, 25
materials [2] 42:21; 79:21
matter [2] 65:1; 145:9
matters [3] 8:20, 21; 18:12
meals [3] 110:15; 111:11, 13
mean [48] 17:16; 18:11, 12; 20:15, 17,
21; 26:3; 31:20; 33:16; 37:13, 15; 39:13;
43:14; 44:12; 45:8; 46:2; 47:9; 48:2, 22;
53:1; 58:17; 59:17; 64:16, 24; 65:10;
69:10; 71:8; 77:3, 14; 79:8; 80:2, 16;
83:8, 14; 86:9; 101:1, 2; 102:2; 105:12;
109:21, 23; 110:22; 121:9, 13, 21;
125:22; 127:21
Meaning [2] 46:6; 128:19
means [6] 12:15, 17; 18:1; 38:15; 40:24;
65:15
meant [1] 18:19
measurement [1] 36:1
meet [10] 75:10; 100:24; 101:1; 102:14,
19, 21; 103:24; 104:5, 9; 141:6
meeting [6] 81:11; 104:12; 106:1, 5, 13,
18

meetings [17] 28:5; 78:13, 17, 21, 24;
79:2, 17, 19; 80:22; 81:4, 12; 82:1, 10,
13, 15; 103:2; 106:16
Melikian [18] 6:7; 17:16, 20; 18:14;
33:14; 36:20; 37:6; 48:8; 74:7; 78:7;
79:16; 84:9, 12; 90:6, 10; 98:8; 128:18;
135:10
member [1] 77:20
members [6] 19:20; 21:3; 26:24; 41:23;
109:14; 137:15
Membership [1] 130:8
membership [3] 13:8; 77:9, 21
mentioned [11] 21:12; 29:12; 32:16;
63:3; 68:11; 74:11; 84:2; 117:14; 118:5;
119:10; 138:24
merger [2] 32:2, 4
Michelle [1] 140:19
Michigan [1] 99:2
mid [1] 142:10
middle [2] 101:16, 17
Miller [1] 133:17
million [16] 36:13, 15; 38:20, 22; 39:3, 7;
42:9, 10, 15; 135:14, 18, 21, 24; 138:24;
139:5; 140:5
mind [3] 73:19; 117:21, 24
Mine [1] 78:14
mine [2] 93:21; 101:11
MINTZ [6] 140:14, 16; 141:3; 143:16,
18, 25
Mintz [1] 140:19
minute [1] 131:12
minutes [2] 73:14, 19
misappropriated [2] 104:20, 22
misled [1] 30:6
mistaken [4] 17:5; 36:16, 23; 135:18
misunderstood [1] 136:4
misuse [1] 94:14
mix [1] 113:16
Moment [1] 26:1
moment [1] 26:1
Money [2] 44:25; 121:10
money [21] 26:23; 45:14, 16, 22; 65:9,
13; 66:14; 69:8; 103:18, 21; 104:13, 19,
24; 105:1, 2, 24; 121:11, 12; 124:1;
125:8; 137:15
monitor [1] 100:7
monitoring [1] 100:11
Monthly [1] 101:7
months [4] 10:17; 11:1, 20
Moose [5] 117:23; 140:19, 22; 141:1;
143:19
morning [6] 94:23; 120:21; 133:6;
135:7, 11, 13
Mostly [3] 13:12; 18:13; 43:19
mostly [1] 12:11
move [4] 65:19; 92:21; 98:3; 101:14
MS [6] 140:14, 16; 141:3; 143:16, 18, 25
multi-purposes [1] 106:3
museum [1] 111:6
Myself [3] 30:14, 25; 33:13
myself [7] 12:11; 21:16; 31:2; 41:21;
79:12; 112:6; 129:14

– N –

N-O-H-L-E [1] 52:21
name [32] 6:11, 13; 15:9, 11; 17:4; 24:1;
29:1; 52:20; 53:10; 62:17; 63:6, 15, 23;
74:21, 23; 75:10, 15, 17; 88:22; 89:11,
14; 93:25; 94:3, 5; 96:23; 115:22; 116:2;
117:14, 17; 141:10

named [4] 34:12; 52:19; 53:6; 145:7
Names [1] 24:16
names [7] 24:15, 18; 26:10, 23; 75:7;
104:1; 123:7
National [18] 11:5, 14, 16, 21, 22; 12:2;
13:13, 14, 17, 23; 14:2; 94:24; 117:7, 8,
10; 132:9, 10, 17
nature [2] 26:16; 97:16
needs [1] 38:19
negotiate [1] 102:6
negotiated [1] 118:11
negotiating [1] 101:25
nervous [1] 134:18
Net [2] 38:23; 42:11
net [9] 38:13, 20, 22, 23; 39:3, 7, 17;
40:4, 9
Nice [1] 141:6
nice [1] 82:7
nights [1] 111:14
nine [3] 11:20; 34:14, 16
Nineteen [1] 6:22
Ninety-five [1] 110:17
Noble [3] 52:19; 53:5; 63:3
non [2] 85:25; 122:25
non-liability [1] 66:6
non-organization [1] 138:15
Non-profit [1] 49:4
non-profit [52] 13:9, 11; 16:6, 8; 18:20;
19:9, 11, 14; 47:11; 48:14, 21; 49:2, 7,
22; 53:20; 54:2, 19, 22; 55:7; 58:3;
59:22, 23; 76:16; 82:19; 84:4; 85:11, 15,
17; 92:11, 13; 94:15; 97:16; 101:20;
102:14; 103:2; 106:2, 11, 12, 16, 20;
108:4;
109:18, 24; 121:4; 123:10; 124:1; 125:1,
7, 14; 126:2, 18
non-profits [6] 13:12; 41:24; 44:14;
46:5; 120:17; 141:22
not-for-profit [1] 42:17
NOTARY [1] 145:22
Notary [2] 6:3; 145:4
note [1] 98:18
notes [1] 136:9
notified [2] 50:25; 51:1
November [1] 95:22
number [1] 41:9
numbers [3] 40:15, 16; 139:15
numerous [4] 22:6, 8; 68:13; 72:6

– O –

oath [2] 6:5; 145:11
Objection [12] 33:17, 19; 35:19; 42:3;
50:3, 8, 13; 55:2; 56:14; 66:3; 72:16;
84:24
objections [1] 6:7
occasion [5] 39:22, 24; 40:1; 89:10;
107:21
occasionally [1] 27:19
occasions [2] 66:18; 106:9
occurred [1] 32:10
October [15] 14:25; 15:1; 87:10, 12;
89:16, 19; 93:8; 118:22; 120:4, 8;
129:17; 130:23; 145:7, 19, 23
offer [8] 12:18; 85:1, 6, 14; 103:22;
109:6, 10; 128:8
offered [2] 85:10
offering [4] 84:3; 126:25; 128:7; 130:13
Office [1] 8:15
office [2] 49:18; 102:25
officers [2] 33:12, 16

Case 1:04-cv-11686-WGY    Document 27-6    Filed 09/28/2005    Page 46 of 50

Basic Systems Applications    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    Concordance by Look-See™2

hearing [1] 49:2
heavily [1] 112:16
held [4] 78:17; 89:24; 119:24; 120:19
Helen [1] 94:5
hello [1] 103:4
help [11] 14:22; 21:20; 22:19; 65:18; 106:10, 11; 108:2, 7, 22; 121:25
helped [1] 90:12
helpful [1] 65:22
Helping [2] 29:19, 20
helping [1] 29:17
Helps [1] 35:1
HENRY [1] 146:2
Henry [3] 6:15; 96:4; 118:23
hereby [1] 145:6
hereinbefore [1] 145:7
hereto [1] 145:16
herky-jerky [2] 26:1, 5
Hi [1] 141:7
high [3] 10:16; 40:15; 41:9
higher [1] 22:25
hire [3] 29:6; 30:20; 81:21
hired [5] 31:8; 62:13, 15; 63:18; 97:10
history [3] 33:5; 65:7; 103:17
ho [1] 65:9
holding [1] 122:5
home [1] 10:19
honest [3] 45:18; 97:21; 139:9
honestly [1] 96:10
Hospitality [1] 74:23
hotel [4] 13:4; 108:14; 110:11; 111:3
hotels [2] 110:19; 111:12
hours [2] 82:3; 104:10
house [1] 111:6
houses [1] 43:3
Howard [2] 75:15, 17
Humane [1] 118:3
hundred [5] 14:16, 17; 41:8; 113:14

– I –

I'd [26] 12:11; 14:23; 15:22; 20:10; 25:19; 36:11; 39:11; 42:8; 53:21; 55:4; 62:17; 68:20, 22; 87:9, 12; 88:18; 91:2; 93:7; 98:13; 102:25; 105:5; 113:9; 125:19; 126:3, 12; 140:10
I've [5] 66:4; 71:23; 102:9, 13; 106:6
idea [6] 23:5, 8; 35:20, 21; 48:25; 127:14
identification [7] 87:5; 93:11; 95:24; 98:10; 118:17; 129:19; 131:17
identify [2] 7:1, 4
identity [1] 85:19
impediment [1] 107:16
Imperial [25] 77:4; 114:23; 115:2, 14, 19, 23, 24; 116:1, 3, 13, 20; 117:14, 22; 118:6, 9, 25; 119:9, 12, 15, 23; 120:6, 10, 14; 130:7, 12
important [2] 65:8, 10
improperly [1] 51:23
improvement [1] 10:19
in-house [1] 81:13
incentive [2] 109:1; 121:19
incident [12] 49:20; 66:21, 24; 67:11, 15, 20, 24; 68:2, 12; 71:24; 72:1; 97:21
incidental [1] 111:5
include [1] 111:10
increased [1] 19:6
indemnify [1] 119:12
Independent [1] 99:4
Indiana [1] 99:3

individual [5] 24:18; 46:21; 136:25; 137:1, 13
individuals [5] 47:6, 25; 56:22, 25; 57:6
inducement [1] 113:1
information [6] 9:5; 92:19; 93:3; 95:4, 5; 97:14
informed [2] 51:5; 61:19
informing [2] 85:24; 86:1
initial [5] 28:24; 29:1; 31:16; 89:11, 14
initially [1] 23:10
initials [5] 88:21; 89:2, 5, 7; 93:25
input [1] 65:22
insert [1] 132:18
inside [2] 10:6; 11:23
instance [1] 60:24
instances [2] 120:17; 121:1
instruct [1] 57:4
interested [3] 22:12; 24:19; 145:17
internally [1] 138:14
introduced [1] 102:25
introductions [1] 22:18
investigated [2] 76:11; 92:24
investigation [9] 13:14; 15:25; 61:23; 71:18; 94:14, 18, 21; 95:17; 124:13
invite [1] 110:7
involved [22] 11:12, 17; 14:23; 27:11; 32:1, 3; 33:10; 51:17, 18; 78:7; 80:22; 85:21, 24; 96:16; 99:15; 106:12; 108:4; 112:12, 13, 16; 115:9; 138:14
involvement [1] 47:15
involving [6] 16:1; 82:16, 18; 94:18; 99:20; 134:16
issue [9] 57:19, 20; 64:14; 84:10, 13, 22; 93:4; 98:19; 130:15
issues [18] 51:23, 24; 56:13, 23; 57:1, 8, 11, 14; 81:16; 82:9, 15, 18; 99:20; 101:6; 105:10; 119:14, 18, 21
Istanbul [1] 80:18
Italy [1] 131:7
items [4] 43:23; 80:8; 81:11, 12

– J –

jackpot [1] 105:13
James [1] 46:19
January [1] 11:13; 15:3
Jarvis [13] 29:3; 30:20; 46:19; 97:9; 98:6; 99:20, 23; 100:1, 3, 8, 11, 15, 24
Jay [3] 79:3, 7, 14
job [1] 12:8
John [3] 46:18; 47:15; 63:11
joined [1] 15:3
Joseph [1] 141:4
judge [1] 95:11
jut [1] 63:18

– K –

Karen [1] 34:17
Katz [1] 103:11
keep [4] 39:8; 45:25; 92:22; 112:24
kept [1] 40:1
Knights [4] 44:1; 98:25; 99:1
knowledge [10] 7:13; 27:17; 33:23; 54:8; 56:2; 67:21; 78:8; 85:23; 99:11; 107:10

– L –

L-E-W-I-S [1] 6:15
Labels [1] 43:21
labels [1] 43:19

language [3] 47:17; 64:20; 123:10
larger [1] 77:21
Larry [16] 22:7, 9; 24:6, 7; 31:12, 14; 34:16; 107:8, 11; 108:2, 7, 17; 118:24; 119:20; 129:16
Last [1] 139:20
last [15] 36:12; 37:18; 42:7; 52:20; 63:6; 82:1; 131:23; 132:24; 134:14, 20; 138:25
lasted [1] 97:2
late [15] 10:24; 16:13, 14; 17:23; 18:19; 49:21; 54:17; 62:14, 15; 63:20, 21; 68:21; 95:2; 97:22
laundry [1] 39:20, 21
Lawrence [1] 118:23
lawsuit [7] 51:3, 6; 56:1; 71:19, 21; 133:8; 135:3
lawyer [2] 10:4; 95:11
leader [7] 13:6; 65:11; 109:21; 136:7, 11, 15, 21
leaders [3] 108:15; 109:17, 18
leads [2] 23:13; 27:18
learn [2] 68:19, 23
learned [4] 30:17; 69:21; 92:4, 5
leave [3] 100:1; 134:2, 3
leaving [1] 134:4
LeCLAIR [19] 6:8; 10:1; 33:17, 19, 21; 35:19; 42:3; 50:3, 8, 13; 55:2; 56:14; 57:4; 65:17; 66:3; 72:16; 84:24; 123:3, 7
legal [2] 50:2; 135:7
Legion [3] 143:6, 8, 13
letter [79] 8:9, 10, 14, 16, 18; 9:5, 10, 11, 13, 17, 18, 22, 24; 10:4, 5, 6, 7; 19:17, 20; 59:18; 60:25; 64:9, 11, 15, 17, 19; 65:3, 5, 15, 25; 66:2, 7, 8; 68:12; 72:15, 20, 25; 73:4; 86:6, 10, 12, 14, 16, 21; 87:3, 11, 13, 15, 16; 88:4, 6; 89:4, 5; 91:24; 93:8, 14, 16; 94:13; 95:3, 6, 8, 22; 96:2, 4; 97:13; 98:5, 6, 13, 14, 16; 118:20, 22; 119:2, 5, 7; 120:8, 18, 23; 129:16
letterhead [1] 20:1
letters [45] 7:21; 57:19, 21, 22; 58:11, 13, 20; 59:3, 6, 7, 13, 14, 25; 60:3, 6, 8, 14, 18, 21; 61:6, 13, 20; 66:18, 21, 24; 67:2, 7, 12, 15, 20, 23; 68:2; 71:2, 16; 72:2, 5; 85:2; 91:20; 92:2, 5, 7, 9, 16; 99:15; 100:3
level [1] 138:10
LEVITT [32] 6:6, 10; 65:21; 73:14, 17, 20; 74:4, 5; 86:25; 87:8; 89:18; 93:7, 13; 95:19; 96:1; 97:25; 98:4, 12; 101:15; 118:14, 19; 123:5; 129:15, 23, 25; 131:12, 14, 19; 132:6; 140:10, 13; 144:1
Levitt [1] 6:11
LEWIS [1] 146:2
Lewis [9] 6:11, 15, 16; 71:7; 74:6; 96:4; 118:23; 140:17; 141:6
liability [5] 66:11; 85:25; 86:2; 92:12; 122:7
LINE [1] 146:3
line [4] 41:21; 90:15; 110:4; 141:20
list [7] 8:19; 9:10; 20:9; 39:20, 21; 77:14, 24
locations [1] 82:5
Lodge [2] 8:11; 86:23
logo [1] 43:25
London [1] 109:7
loss [4] 119:9, 11, 24; 120:20
lot [13] 14:23; 21:3; 26:4; 39:13; 64:12; 90:14; 100:19; 105:1, 2; 112:17; 115:4,

**Public** [2] 6:4; 145:5
**purely** [1] 35:14
**purpose** [4] 22:11; 66:1; 82:12; 104:12
**purposes** [1] 106:7
**Putting** [1] 126:1

**– Q –**

**Quality** [2] 35:1, 2
**quality** [1] 35:6
**Quarterly** [1] 81:7
**quarterly** [1] 78:18
**question** [28] 18:1; 26:19; 27:4; 33:20; 39:11; 54:11, 15; 58:24, 25; 61:5, 8; 65:20; 77:12; 85:9, 12; 86:15; 102:3; 107:7; 114:12; 115:8; 123:9; 125:19; 126:12; 128:5; 132:3; 137:17; 141:4; 142:17
**questioning** [1] 141:20
**questions** [5] 74:21; 81:3; 134:18; 141:18; 147:4
**quick** [2] 73:20; 140:14

**– R –**

**raised** [1] 105:10
**Ralph** [6] 115:11, 24; 118:5, 23; 119:17; 129:16
**ran** [4] 78:21; 79:1; 86:2; 120:6
**range** [4] 37:23; 40:16; 41:5, 7
**rare** [1] 102:23
**rarely** [3] 79:18; 82:11; 102:22
**rate** [4] 18:20; 19:11, 14; 94:14
**rates** [5] 20:5; 76:16; 82:16; 137:7, 8
**re-op** [2] 102:8
**read** [2] 132:4; 147:2
**reading** [1] 135:12
**reads** [1] 94:13
**reason** [1] 39:24
**recall** [132] 8:18; 9:2, 3, 12, 16, 20; 11:9, 11; 13:13, 16; 15:25; 16:16, 17, 20, 22, 23; 17:19; 18:21; 20:5; 21:24; 22:9, 10; 24:12, 21; 25:4, 6, 13; 28:22; 36:19; 54:15, 24; 55:9, 10, 12, 13, 15; 60:12, 19; 61:2, 16, 22; 62:1, 4, 9, 23, 25; 64:2, 6, 10; 66:17; 67:3, 25; 70:3; 71:17; 72:1; 75:2, 20; 77:23; 84:4, 6; 86:11; 91:20; 92:21, 24; 93:1, 14, 16, 18, 25; 94:3, 5, 7, 10, 18, 21; 96:2; 97:17; 98:14, 19; 99:5; 102:20; 103:5, 23; 104:1, 3, 9, 24; 105:1, 6, 14, 16, 17, 20, 21, 23, 25; 106:1, 9, 18; 107:5, 7, 11, 13, 15, 18, 20; 114:23; 115:1, 8; 118:24; 119:14, 17, 20, 23; 120:2, 4, 5, 9, 13, 17; 124:9, 10, 12, 15, 18, 21, 23; 125:3, 4, 5; 131:5
**receipts** [2] 103:11, 13
**receivable** [1] 104:16
**receivables** [1] 42:12
**receiving** [1] 97:2
**recessed** [1] 73:23
**recognize** [7] 88:21; 89:2, 5; 118:20, 21; 119:2; 131:21
**recollection** [13] 23:17; 24:10; 29:8; 55:9; 74:16; 82:22; 92:17, 18; 98:1; 100:5; 101:23; 136:10
**recommended** [1] 31:21
**reconvened** [1] 73:23
**Record** [3] 73:21; 131:13; 140:12
**record** [11] 6:14; 64:25; 65:5, 12; 66:1, 13; 69:16; 74:4; 115:18; 131:12; 145:13
**recording** [1] 147:3

**recoup** [1] 105:23
**recruit** [3] 18:3, 5, 8
**recruited** [1] 18:4
**reduced** [1] 145:11
**refer** [7] 6:23; 7:5; 77:13, 18, 19, 20; 121:22
**referred** [11] 76:18; 77:3, 23; 87:4; 91:19; 93:10; 95:23; 98:9; 118:16; 129:18; 131:16
**referring** [12] 7:2; 8:19; 48:8; 75:3; 78:1; 81:3; 85:11; 87:16; 89:1; 91:24; 95:3; 110:24
**refers** [6] 6:24; 96:4; 97:13; 100:3, 4
**reflect** [1] 114:10
**refresh** [2] 74:16; 97:25
**regarding** [10] 98:18, 21; 140:22, 25; 142:2, 6, 20; 143:3, 8, 12
**Regency** [2] 11:5, 22
**regulations** [22] 13:21, 24; 14:3; 49:7, 10, 24; 50:7, 12, 21; 53:20, 22; 54:2, 5, 9, 13, 19, 22; 55:7; 82:18; 98:17, 21; 99:21
**reimbursed** [1] 33:24
**related** [1] 145:15
**relationship** [21] 20:18, 19; 25:22, 24; 26:2, 5, 9, 17, 22; 27:2, 3; 28:9, 10; 31:25; 42:19; 74:11, 12; 75:20; 100:15, 24; 118:8
**relationships** [1] 23:13
**release** [3] 92:10, 11, 12
**releasing** [1] 59:18
**relevance** [1] 95:9
**remain** [1] 25:2, 10
**remained** [1] 32:4
**remember** [20] 22:5; 24:1; 54:18; 61:12, 17; 63:23, 25; 74:25; 76:21; 77:6, 16; 84:15; 86:21; 93:4; 94:10; 105:10, 22; 106:5; 117:23; 119:4
**Remind** [2] 81:18, 19
**remind** [1] 66:5
**reminder** [3] 44:21; 45:2, 3
**removed** [1] 72:19
**repeat** [10] 7:3; 32:22; 50:9; 58:12; 85:9; 106:14; 114:2; 120:7; 125:6; 132:2
**rephrase** [1] 86:15
**replying** [1] 99:18
**report** [6] 30:24; 56:22, 25; 57:3, 6, 11
**Reporter** [2] 114:11; 145:4
**reporting** [1] 99:24
**reports** [1] 81:14
**repository** [1] 45:12
**represent** [3] 6:12; 42:15; 140:19
**representatives** [1] 105:7
**request** [2] 119:23; 120:2
**requires** [1] 94:16
**Reserve** [1] 118:1
**reserved** [1] 105:8
**resolve** [1] 105:8
**resolved** [4] 57:12, 13, 14, 16
**resolving** [1] 99:14
**respect** [13] 23:15; 59:16; 66:2; 86:6; 92:19; 98:20; 119:14; 120:14; 142:15, 18, 23, 25; 143:6
**respective** [1] 84:19
**respectively** [1] 87:7
**responded** [1] 124:21
**response** [6] 69:24, 25; 70:1, 3; 137:7, 8
**responsibilities** [2] 12:10; 18:9
**responsibility** [5] 52:1; 74:7; 89:24; 90:7, 10

**responsible** [17] 14:3; 46:12, 16; 47:17, 19; 48:4; 50:1, 5, 10, 15; 52:9; 56:13; 77:25; 89:19; 90:17; 118:24; 133:15
**rest** [3] 11:3; 68:14; 110:8
**restate** [1] 123:21
**result** [3] 21:1; 119:10; 135:3
**results** [3] 65:6; 100:19, 20
**retired** [2] 17:12; 93:22
**revenue** [3] 38:20, 22, 23
**revenues** [1] 97:2
**Review** [1] 97:14
**review** [6] 8:6, 8, 13, 23; 10:10; 46:25
**reviewed** [3] 8:9; 93:4; 98:16
**reviewing** [4] 74:7; 89:19; 90:7, 10
**reward** [1] 113:1
**Richard** [7] 29:3; 97:9; 98:6; 99:19, 23; 100:1, 3
**Riggs** [1] 23:7
**Right** [7] 30:8; 98:24; 99:2; 101:16; 115:10; 125:8; 137:23
**right** [12] 11:11; 49:2; 52:22; 58:19; 64:20; 69:14; 77:9; 88:21; 123:20; 129:25; 134:5
**ring** [4] 74:23; 75:5, 15, 17
**risk** [11] 59:19, 20; 66:6, 8, 15; 72:19; 122:13, 18; 123:1, 11
**Road** [1] 81:13
**road** [5] 12:11; 27:15; 79:21; 83:6; 102:13
**role** [2] 48:7, 10
**roles** [1] 84:19
**room** [1] 52:4
**rooms** [1] 110:11
**Rosemary** [1] 87:21
**Rosenberg** [3] 11:11; 14:24; 34:12
**rough** [1] 25:20
**rude** [2] 33:3; 51:8
**Rule** [13] 13:18; 55:20; 56:4, 7, 10; 58:6, 11, 14; 59:3, 15; 76:12; 78:10; 82:21
**rule** [2] 16:21; 137:24
**ruling** [6] 16:5, 15, 21, 25; 18:18, 21
**run** [18] 11:11; 30:23; 31:8; 35:7; 78:24; 79:3, 4, 5, 6, 7, 8, 9, 11; 81:8; 109:24; 120:10
**running** [4] 31:5; 47:20, 25; 110:2

**– S –**

**salaried** [1] 38:4
**Salary** [1] 34:3
**salary** [4] 34:4, 5; 36:22; 38:15
**sale** [1] 75:3
**Sales** [19] 12:1, 2; 37:25; 38:3, 7; 50:24; 67:1, 15, 17, 18, 19, 23; 68:1, 7; 71:11; 106:10; 128:25; 129:14
**sales** [45] 13:20; 23:1; 27:18; 38:21; 40:12, 18; 42:17; 64:14; 67:10; 69:10; 78:3, 13, 17, 21, 24; 79:2, 13, 14, 16, 19, 20, 22; 80:11, 22; 81:4, 12, 13, 15; 83:2, 3, 17, 23; 89:13; 106:13, 19, 21, 25; 107:2; 111:22; 112:6; 118:24; 120:24; 122:22; 128:7
**salesman** [12] 10:20; 11:4, 5; 22:1, 5; 38:13, 19, 25; 39:6; 40:10; 122:22; 124:7
**salesmen** [15] 12:5, 6; 21:24; 22:2, 8, 24; 30:7; 40:17; 41:6; 47:5, 6, 24; 57:21; 69:6, 9
**salespeople** [1] 91:20
**salesperson** [6] 22:3; 31:14; 82:24; 101:25; 102:6, 8

Basic Systems Applications    Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Hanry Lewis - 10/16/01    Concordance by Look-See-AG

Sam [3] *11:11; 14:24; 34:12*
satisfied [1] *28:12*
save [1] *119:12*
saying [22] *7:22; 19:15; 22:1; 25:23; 26:20; 27:5, 8; 28:6; 44:11; 51:2; 80:5; 85:3; 86:11; 88:25; 101:24; 103:4; 117:13; 122:6; 133:12; 134:12; 136:20; 138:16*
scenario [3] *40:8; 44:23; 53:25*
scheme [2] *38:6; 105:2*
school [1] *10:16*
scope [1] *40:14*
Scottish [2] *98:24; 99:2*
seats [6] *108:15; 110:2, 5, 6, 7; 112:17*
second [1] *45:3*
selective [3] *19:2; 20:11, 13*
Sell [1] *12:16*
sell [10] *12:11, 20; 13:2, 5; 29:1, 17; 64:18; 79:21; 102:10; 108:15*
seller [1] *64:4*
selling [4] *12:13; 27:13; 42:18; 106:4*
Semb [6] *115:11, 24; 118:5, 23; 119:17; 129:17*
send [1] *20:1*
Senior [3] *132:9, 10, 17*
sense [13] *25:15; 27:17, 9; 33:5; 40:16, 23; 48:3; 72:24; 76:7; 83:20; 97:24; 104:15; 137:9*
sentence [1] *94:13*
separate [1] *11:23*
September [1] *98:6*
Service [10] *10:22; 13:14; 16:1, 18, 19; 76:11; 92:25; 93:5; 99:12, 20*
Services [14] *7:11, 23; 8:2; 32:17, 23; 33:6; 96:5, 6, 8, 13; 119:7, 8; 132:8; 133:24*
setting [2] *127:19, 22*
seven [3] *11:20; 134:25; 135:1*
Seventy-some [1] *34:9*
Seweryn [2] *94:1, 5*
Shaky [1] *100:17*
SHEET [1] *146:1*
sheet [2] *19:18; 147:5*
show [10] *86:25; 87:1, 9; 92:16; 95:19; 98:1; 118:14; 129:15; 131:14; 137:14*
shows [1] *97:14*
Shrine [3] *12:12; 77:4; 137:13*
Shriner [1] *12:18*
Shriners [5] *21:2; 115:16, 20; 116:3, 13*
shunned [2] *129:10, 11*
sign [4] *86:19; 88:13; 89:11, 13*
sign-up [1] *19:18*
SIGNATURE [1] *147:1*
signature [8] *86:13, 16, 19; 87:19; 88:13, 16, 19; 119:2*
signed [3] *86:6, 14; 101:25*
significant [1] *20:7*
signing [3] *86:11; 88:15; 90:17*
Simon [4] *24:2, 3; 75:9, 11*
Simons [1] *31:25*
sir [25] *19:12; 29:11; 39:2; 43:17; 51:4; 52:16; 53:3; 54:3, 7; 62:22; 69:12; 70:14; 72:14; 75:16; 77:11; 94:4; 95:18; 109:20; 115:21; 117:16; 133:9, 25; 135:22; 137:22; 140:9*
site [1] *82:6*
situation [2] *39:10; 102:5*
Six [3] *11:1; 134:25; 135:1*
six [1] *10:17*
Sixty [1] *125:21*
size [4] *116:22; 136:17; 137:6, 11*

smaller [1] *77:19*
Society [1] *118:3*
soft [2] *110:20, 23*
sold [5] *25:4, 8, 9; 103:8; 142:10*
Solicit [1] *44:17*
solicit [2] *29:17; 41:22*
solicitation [1] *44:25*
solicitations [1] *104:21*
soliciting [1] *29:16*
Somebody [1] *83:4*
somebody [8] *19:17; 23:2; 25:5; 50:25; 54:16; 83:20; 86:14; 111:20*
somehow [1] *105:24*
Someone [1] *103:13*
someone [12] *39:12, 16; 59:18; 89:10; 92:20; 103:11; 104:14; 108:23; 121:16; 127:13; 135:3*
someplace [2] *17:10; 75:12*
somewhere [1] *82:7*
Sons [1] *131:7*
sorry [40] *7:3, 10; 14:16; 18:4; 21:17; 25:23; 26:21; 30:6; 32:22; 36:24; 38:24; 43:20; 50:9; 56:24; 59:1, 16; 63:7, 13, 24; 69:17; 70:14; 73:2; 77:2; 81:1; 88:20; 92:3; 95:20; 103:5; 104:2; 106:5; 114:9; 115:16; 116:4; 117:19; 120:7; 121:15; 122:9; 123:5; 143:16*
sort [13] *43:18; 47:7, 22; 48:1; 79:22; 82:12; 84:22; 85:6; 103:20, 22; 110:19; 128:23*
sorts [1] *109:6*
South [1] *109:7*
Spain [1] *80:17*
speak [1] *24:3*
speaking [2] *114:17; 137:18*
special [1] *94:14*
specific [3] *35:4; 41:16; 60:24*
Specifically [1] *59:17*
specifically [3] *18:21; 107:15; 120:18*
spell [4] *52:20; 63:6, 12, 13*
spelling [1] *52:22*
spend [1] *101:10*
spent [2] *10:17; 101:11*
spoke [1] *51:7*
sponsored [1] *142:9*
SS [1] *145:2*
standard [12] *47:9, 16, 18; 90:20, 22, 24; 91:9, 11, 14, 15; 131:24; 132:25*
standardization [3] *47:11; 100:12, 14*
Star [1] *87:24*
start [11] *6:6; 11:10; 14:24; 17:20; 29:4; 40:18; 96:25; 124:12, 13, 16; 125:16*
Started [1] *11:8*
started [5] *11:9; 14:22; 17:23; 29:9; 40:17; 97:1, 5*
State [2] *98:25; 99:3*
stated [5] *59:5; 66:4, 7; 120:21; 122:17*
statement [1] *124:25*
States [2] *6:12, 13*
states [4] *97:14; 98:16; 130:6, 11*
status [3] *49:22, 23; 132:16*
stay [4] *45:23; 70:7, 10; 127:17*
stock [7] *34:6, 8, 11, 13; 35:16, 18*
stole [2] *103:11, 13*
stolen [2] *104:14*
Stop [1] *127:5*
stop [5] *28:9; 32:11; 61:20; 64:6; 96:24, 25; 127:4*
stopped [5] *16:8; 51:19, 22; 52:6; 97:5*
strictly [2] *18:11; 38:3*

strike [1] *59:24*
strong [4] *21:7; 77:6, 7*
Stronger [2] *20:16*
structured [2] *46:7, 10*
stuck [1] *90:14*
Studio [1] *32:18*
Studios [12] *23:21, 22, 24; 25:6; 28:20, 23; 29:8, 13, 14, 19; 33:1*
subject [2] *134:21; 147:4*
subsequent [2] *25:10, 17*
substance [2] *27:2; 91:16*
substantially [1] *138:22*
successful [1] *21:10*
successor [4] *32:10, 13, 17, 18*
sufficient [1] *39:17*
SUFFOLK [1] *145:3*
SUGGESTED [1] *146:3*
suit [8] *70:13, 15, 16, 17, 18, 21, 23, 25*
sum [1] *27:2*
supervise [1] *12:6*
supposed [7] *28:8; 59:4, 5, 7; 90:16; 128:16; 132:1*
surrounding [1] *56:1*
sustain [2] *119:9, 11*
Swetland [1] *87:21*
switched [1] *123:7*
Switzerland [1] *13:3*
sworn [2] *6:3; 145:8*
Sydney [1] *111:7*

– T –

talk [9] *22:22; 23:23; 54:12; 55:11; 67:1, 17, 18, 19; 101:8*
talked [5] *22:25; 28:1; 47:10; 122:23; 123:16*
talking [13] *18:24; 25:18; 36:17; 48:10; 69:10; 84:22; 85:2, 25; 106:21; 110:20; 129:2; 136:12; 138:3*
Tampa [1] *10:17*
target [1] *76:23*
team [1] *83:19*
Telephone [1] *99:4*
telephone [2] *81:14; 83:13*
Telex [1] *7:8*
templates [1] *91:14*
Ten [2] *109:9, 13*
ten [7] *14:16; 25:18; 34:16; 38:14; 40:10; 127:24*
Tennessee [4] *75:14; 143:7, 8, 13*
term [5] *13:17; 53:1; 55:19, 23; 77:7*
terminated [1] *39:24*
terminology [2] *58:3; 81:20*
terms [12] *25:24; 26:17; 27:13; 35:4; 41:5; 46:7; 49:4; 77:17; 91:16; 100:16; 102:1; 116:7*
terrible [1] *105:13*
testified [6] *6:5; 65:23; 75:19; 96:13; 97:9; 135:25*
testify [1] *143:19*
testimony [3] *87:18, 20; 145:13*
Texas [3] *8:11; 86:23; 87:24*
Thank [3] *65:21; 144:1, 2*
thank [1] *62:16*
therefrom [1] *119:13*
therein [1] *147:4*
thereupon [1] *145:10*
They'd [1] *107:4*
they'd [3] *40:5; 112:15; 122:13*
they're [5] *48:18; 65:9, 13; 70:9; 102:7*
they've [2] *41:1; 132:13*

Depo-USA V Harry R. Lewis, et al, 97-10052-MLW - Harry Lewis - 10/16/01    Concordance by Look-See(47)

Basic Systems Applications

thinking [1] 77:17
third [1] 55:10
third-party [1] 141:5
thirty [2] 14:16, 17
Thirty-five [1] 37:21
thousand [6] 37:19, 21; 41:7, 8; 108:24
Three [4] 34:19; 139:2, 12, 13
three [3] 108:24; 135:24; 141:22
throw [1] 137:25
thrust [1] 106:4
thumb [1] 137:24
tickets [2] 110:18; 111:8
tied [1] 139:24
Tighter [2] 20:18, 19
tighter [1] 20:25
times [10] 12:7, 9; 45:2; 79:15; 97:7;
101:18; 106:1; 107:6, 23, 25
title [11] 6:19; 7:17; 29:16; 31:4; 33:9;
52:23, 24; 78:23; 96:7, 11; 100:5
titled [1] 132:7
Tom [3] 46:19; 63:5, 9
tool [1] 108:13
topic [1] 84:18
total [1] 25:16
touching [1] 145:9
tough [1] 113:20
tour [3] 12:16, 24; 13:1
tours [5] 12:19; 13:4; 110:15; 111:10
towards [1] 110:19
track [5] 64:25; 65:5, 12; 66:1, 13
Train [1] 81:17
train [2] 80:10; 81:15
trained [2] 82:25; 83:22
Training [1] 82:14
training [7] 55:6; 79:22; 80:5; 83:2, 11,
17, 25
Trans [12] 11:5, 14, 16, 21, 22; 12:2;
13:13, 14, 16, 23; 14:2; 94:24
transaction [3] 75:3; 139:24, 25
transcript [3] 114:10; 145:12; 147:2
transition [2] 134:4, 7
transpired [1] 25:13
Travel [9] 7:8; 10:22; 11:5, 6, 22; 12:14;
36:8; 96:13; 135:23
travel [59] 6:24; 7:6; 10:18; 13:21, 25;
14:3; 15:14, 15; 16:2, 9; 18:19; 19:10,
14; 21:7; 22:12; 35:6, 14; 37:16; 49:21;
53:25; 54:1, 16; 80:23; 94:22; 95:7, 12;
96:14; 97:21; 101:13; 106:4; 108:13, 23;
109:4; 110:2; 112:13, 16; 113:18; 114:1,
4, 13, 17, 21; 116:14, 17; 132:18; 136:2,
4; 137:1, 7, 13, 18; 138:6, 12, 19; 139:1,
13; 142:11, 12, 14
travel-related [2] 106:7; 112:18
trip [13] 13:3; 19:16, 18; 80:17; 108:11;
109:7, 19; 110:9; 111:15, 16; 112:10;
136:7; 137:14
trips [13] 81:13; 108:9; 109:6; 110:16;
112:4, 12, 19; 113:4, 8, 9, 10; 128:9;
136:13
true [2] 145:13; 147:3
truth [6] 6:4, 5; 145:8, 9
Turning [1] 89:4
Twenty [1] 14:13
twenty [2] 109:9, 13
type [13] 16:5; 20:25; 40:5; 41:22;
44:25; 46:21; 47:11; 51:9; 58:18; 76:23;
77:13; 91:23; 138:1
types [2] 77:18; 80:8
typewriting [1] 145:11
Typical [1] 139:5

typical [2] 81:24; 139:3
typically [10] 37:23; 40:12; 78:19; 79:16;
82:1; 89:24; 109:8; 110:1; 111:20;
112:19

— U —

ultimate [1] 112:4
Um-hmm [2] 137:10, 18
umbrella [1] 117:12
understand [12] 9:21; 18:1; 25:23;
65:14; 77:16; 81:11; 100:14; 101:2;
123:5, 22; 128:5; 133:14
understanding [11] 56:3; 59:6, 8, 14;
85:18; 90:3, 6, 9; 132:16; 133:5; 137:5
understood [3] 59:4, 11; 85:12
uniform [1] 47:1
unit [2] 89:20; 97:10
United [3] 6:12; 10:22
University [1] 10:17
unsuccessful [2] 122:8, 14
usage [1] 67:23

— V —

VALLE [3] 141:4, 9, 18
Valle [1] 141:4
value [1] 108:24
VAN [1] 132:6
Vantage [158] 6:17, 21, 23; 7:2, 5, 8, 10,
11, 14, 18, 20, 23; 8:1, 2; 11:8, 9, 12;
14:8, 19; 15:12, 13, 17; 16:1; 17:7, 11,
20, 25; 18:2, 16; 22:4; 23:3, 15; 27:11,
19; 28:14, 17, 20, 23; 29:8, 9, 13, 19;
30:11; 32:3, 16, 17, 18, 21,
23; 33:1, 6, 8, 12; 34:1; 36:3, 6, 8;
37:25; 38:9; 41:13; 42:6, 18, 20; 43:5,
11, 13; 44:6, 13; 45:6; 50:1, 5, 10; 54:8,
10, 12, 21, 23; 60:18; 67:22; 70:2;
72:25; 73:4; 74:12; 75:20; 76:8; 77:25;
78:12; 82:6, 24; 83:1; 85:1, 6, 10, 14;
86:2, 18; 88:12, 16;
89:11, 13, 21; 92:24; 93:5; 94:25; 96:5,
6, 8, 13; 102:15; 104:11; 106:7; 110:12;
114:4; 115:1; 116:12, 20; 118:8, 11, 12;
119:7, 8, 12; 120:6, 15; 122:19; 123:4,
13, 19, 25; 126:16; 128:11; 130:6;
131:24; 132:9, 11, 14, 25; 133:11, 14,
21, 23; 134:22; 135:16,
17, 23; 140:22, 25; 142:6, 19; 143:3, 12,
20
variables [1] 39:13
varies [1] 44:21
vary [3] 78:25; 80:4; 81:11
VDMS [1] 7:10
vehicle [1] 33:7
versus [1] 49:7
vicinity [2] 17:10; 75:23
Victoria [1] 46:19
violated [5] 58:5, 11, 14; 59:3, 15
violating [1] 58:2
Violation [1] 59:12
violation [1] 59:9
violations [1] 76:11
vis [2] 100:10
visit [2] 102:12, 13
visits [2] 81:13; 102:23
VP [1] 56:21

— W —

wait [1] 73:15

walked [1] 105:17
Walter [2] 17:5; 93:20
wanted [8] 46:22, 24; 47:7; 48:1; 112:1,
9, 20; 128:25
water [1] 73:12
ways [1] 69:21
We'd [3] 44:23; 80:9; 111:5
we'd [3] 23:14; 110:6, 7
We'll [3] 73:20; 131:12; 141:22
We're [3] 48:10; 73:14; 130:11
we're [4] 36:17; 48:8; 80:17; 129:2
we've [2] 63:3; 123:15
week [1] 13:3
weeks [1] 13:3
Wekstein [2] 17:6; 93:20
weren't [12] 9:8, 9; 28:12; 51:1, 9, 17;
59:4, 5, 7; 76:2, 3; 105:21
whatsoever [1] 100:12
whenever [1] 101:15
Whereupon [2] 73:22; 144:3
Whoever [5] 52:13; 89:25; 111:24;
124:7; 135:9
whoever [8] 47:19; 49:18, 19; 51:15;
52:5, 10; 56:20; 78:2
wholesaler [1] 12:19
wide [2] 40:14; 64:3
Wildlife [14] 103:6, 16, 25; 105:7; 117:7,
8, 10, 22; 131:9; 140:3; 141:5, 10, 13,
16
WITNESS [14] 36:25; 70:15; 73:12, 16,
19; 89:17; 98:3; 101:14; 129:21, 24;
141:7, 21; 144:2; 147:1
witness [3] 10:1; 57:4; 145:14
woman [8] 53:9, 12; 62:10, 13, 17;
63:14, 18, 21
Women [5] 131:4; 141:23; 142:2, 10, 21
won't [1] 114:10
word [3] 20:21; 40:6; 71:6
work [22] 10:13; 11:14, 16, 18, 19, 25;
12:24; 17:25; 18:2; 37:14; 40:3, 24;
41:19; 44:6, 13; 46:5; 90:16; 100:16;
108:21; 110:3; 113:25; 120:14
workable [1] 47:12
worked [4] 12:5; 31:19; 32:19; 106:9
working [13] 11:23; 12:21, 22; 17:20;
25:10; 27:12; 30:12, 17; 31:10; 39:12;
44:18; 106:13
works [8] 38:12, 18; 41:14, 21; 42:1, 19;
108:12; 109:16
World [1] 7:8
worth [1] 35:18
wouldn't [19] 14:5; 43:4; 46:9; 48:3, 17;
50:4; 53:23; 66:14, 15; 68:20; 76:20;
91:10, 14, 15, 25; 107:24; 117:19;
130:24
writing [1] 76:5
written [1] 119:5

— Y —

y0u [1] 37:15
Yeah [19] 8:24; 15:4, 24; 24:8; 27:15;
30:19; 33:11; 41:4; 42:13; 43:1; 44:8;
48:15; 57:13; 67:5; 75:12; 81:25; 88:12;
103:17; 138:11
yeah [6] 22:17; 78:20; 83:10; 118:2;
127:5; 134:25
year [29] 10:19; 11:1, 9, 24; 15:1; 25:18,
19; 34:5; 36:12, 14, 17; 37:18, 20; 42:7;
75:22; 97:3, 5; 113:9, 10; 135:14, 18;
136:2; 138:4, 25; 139:20, 22

**year-end** [2] *35:24; 37:2*
**years** [17] *6:22; 17:21; 25:18, 19; 56:16; 125:18, 22; 126:2, 9; 131:24; 132:25; 134:14, 21, 25; 135:1*
**yesterday** [9] *8:5; 9:3; 86:10, 24; 93:2, 17, 18; 95:9, 15*
**York** [2] *63:14; 98:25*
**You'd** [1] *123:21*
**you'd** [3] *6:25; 98:5; 105:14*
**you'll** [1] *122:7*
**You've** [3] *59:11; 65:23; 71:24*
**you've** [2] *113:4; 130:20*
**yourself** [2] *7:3; 24:3*

From **year-end** to **yourself**