# In The Matter Of:

*United States of America, et al   v.*
*Henry R. Lewis, et al*

---

*Dallas Ray Graves*
*February 20, 2002*

---

*Fuller & Associates, Inc.*
*5260 Renaissance Tower*
*1201 Elm Street*
*Dallas, TX  75270*
*(214) 744-1250    FAX: (214) 744-1252*

Original File 0220GRAV.V1, 158 Pages
Min-U-Script® File ID: 2611504955

## Word Index included with this Min-U-Script®



**Page 1**

[1]        IN THE UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
[2] UNITED STATES OF AMERICA           )
     EX REL. LAURENCE SAKLAD,          )
[3]          Plaintiff,                 )
[4] VERSUS                          ) NO. 97-10052-MLW
[5] HENRY R. LEWIS, VANTAGE            )
     TRAVEL SERVICE, INC., and         )
[6] HARRY S. MELIKIAN,                 )
             Defendants.                )
[7]
[8]
[9]
[10]            ORAL DEPOSITION
[11]                 OF
[12]           DALLAS RAY GRAVES
[13]
[14]
[15]        ANSWERS AND DEPOSITION of DALLAS RAY
[16] GRAVES produced as a witness at the instance of the
[17] Defendants, taken in the above styled and numbered cause
[18] at 10:09 a.m. on the 20th day of February, 2002, before
[19] Deborah F. Wheeler, a Certified Shorthand Reporter in
[20] and for the State of Texas, at the offices of Fuller &
[21] Associates, Inc., located at 1201 Elm Street, Suite
[22] 5260, in the City of Dallas, County of Dallas and State
[23] of Texas, in accordance with Federal Rules of Procedure
[24] and the agreement set forth.
[25]

**Page 2**

[1]           APPEARANCES
[2] FOR THE PLAINTIFF:
[3] Mr. Peter K. Levitt
     Assistant U.S. Attorney
[4] U.S. Attorney's Office
     U.S. Courthouse
[5] One Courthouse Way, Suite 9200
     Boston, Massachusetts 02210
[6] (617) 748-3355
     Fax: (617) 748-3969
[7]
[8]
      FOR THE DEFENDANTS:
[9]
      Mr. Seth Perlman
[10] PERLMAN & PERLMAN
      220 Fifth Avenue, 7th Floor
[11] New York, New York 10001
      (212) 889-0575
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 3**

[1]           INDEX

[2] Appearances ................................ 2

[3] DALLAS RAY GRAVES

[4] Examination by Mr. Seth Perlman ............. 5

[5] Examination by Mr. Peter K. Levitt ........ 109

[6] Re-Examination by Mr. Seth Perlman ........ 151

[7]

           EXHIBITS

[8]

NO. DESCRIPTION                    PAGE

[9] 1 .............................................. 98

     Letter to Hank, Dallas and Harry from Frances
[10] Cohen 5/23/96

     2 .......................................... 70
[11] Letter to James Ward from Michael Lampert 3/4/96

     3A .......................................... 77
[12] Letter to Edward Wallace from Dallas Graves 9/26/95

     4 .......................................... 79
[13] Memo to Frank Celani/Kim Tanian 6/21/95

     5 .......................................... 85
[14] Release of Contract Claim DOJ 08108 through 08109

     6 .......................................... 87
[15] Program Agreement DOJ 01935 through 01940

     7 .......................................... 89
[16] Program Agreement DOJ 02719 through 02724

     8 .......................................... 90
[17] Program Agreement DOJ 03578 through 03583

     9A .......................................... 92
[18] Letter to Mel Parness from Fred Chandler 7/15/96

     DOJ 00306
[19] 9B ............................................ 91

     Program Agreement DOJ 00309 through 00313 and
[20] V-1 00696

     10A ........................................... 96
[21] Letter to Mark Saunders from Fred Chandler 7/18/96

     DOJ 03645
[22] 10B ........................................... 96

     Program Agreement DOJ 03648 through 03655
[23] 11 ............................................ 99

     Program Agreement DOJ 01755 through 01761 and
[24] DOJ 01782 through 01783
[25]

Vantage 20717

Dallas Ray Graves
February 20, 2002

United States of America, et al   v.
Henry R. Lewis, et al

---

Page 4

[1]
    12 ............................................ 99
[2] Program Agreement DOJ 01313 through 01320
    13A ...................................... NOT ID
[3] Letter to Sam Nakis from Fred Chandler 2/11/97
    13B .......................................... 101
[4] Program Agreement DOJ 00060 through 00067
    14 .......................................... 102
[5] Program Agreement DOJ 03201 through 03208
    16 .......................................... 106
[6] Production Agreement DOJ 25226 through 25227
    17 .......................................... 108
[7] Production Agreement DOJ 25223 through 25224
    18 .......................................... 121
[8] Memo to Frank Celani from Harry Melikian 6/21/95
    19 .......................................... 142
[9] Letter to Lawrence Lyon from Roger Kyle-Keith
    12/8/95
[10] 20 ........................................ 134
    Handicap report - Larry Lyon
[11] 21 ........................................ 128
    Handicap report - Fred Chandler
[12] 22 ........................................ 125
    Handicap report - Ron Lewis
[13] 23 ........................................ 125
    Handicap report - Summary
[14]
[15] NOTE: Exhibits 3B and 15 marked but not introduced.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 5

[1] DALLAS RAY GRAVES,

[2] having being first duly sworn, testified as follows:

[3] **EXAMINATION**

[4] **BY MR. PERLMAN:**

[5] Q: Could you please state your full name for the

[6] record?

[7] A: Dallas Ray Graves.

[8] Q: Mr. Graves, where do you currently reside?

[9] A: In Rowlett, Texas.

[10] Q: Could you give us that address?

[11] A: 1706 Indian Trail in Rowlett, Texas.

[12] Q: And prior to — well, scratch that.

[13] Did you say Riley, Texas?

[14] A: Rowlett.

[15] Q: Rowlett. Prior to living in Rowlett, Texas,

[16] where did you live?

[17] A: I lived in Boston, actually Quincy.

[18] Q: Quincy, Massachusetts?

[19] A: Uh-huh.

[20] Q: Mr. Graves, just a primary question, are you

[21] currently taking any medication?

[22] A: No.

[23] Q: Have you had any alcohol in the past 24 hours?

[24] A: No.

[25] Q: Got to ask it. Do you want to just tell me a

---

Page 6

[1] little bit about your educational background?

[2] A: I have an Associate's degree in business. I

[3] have finished that at the School of Banking, University

[4] of Wisconsin, and that's — and I have extended hours

[5] toward a BA, and that's it.

[6] Q: You said — what did you do at the University

[7] of Wisconsin?

[8] A: I went through their bank operations program at

[9] the University of Wisconsin.

[10] Q: Mr. Graves, are you currently employed?

[11] A: Yes.              —

[12] Q: Where are you employed?

[13] A: A company called Innovations.

[14] Q: What sort of a company is that?

[15] A: It's a fulfillment distribution company.

[16] Q: What type of clients do they service mostly?

[17] A: Mostly clients who do promotional type items or

[18] collateral type distributions.

[19] Q: Did you fulfill a work for nonprofit

[20] organizations?

[21] A: No.

[22] Q: What's your position there?

[23] A: President.

[24] Q: Do you have an ownership interest in that

[25] company?

---

Vantage 20718

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 7

[1] **A:** I own the company.
[2] **Q:** How long have you worked there?
[3] **A:** For a year. January of last year is when we
[4] started that company.
[5] **Q:** Other than yourself, are there other employees
[6] in the company?
[7] **A:** No, just a partner that I have there.
[8] **Q:** And that company is located?
[9] **A:** In Dallas.
[10] **Q:** Prior to working at Innovations, who was your
[11] previous employer?
[12] **A:** When I came back to Texas I was working for
[13] CCSI Internet Solutions. That was an Internet company
[14] we had, but it's no longer in existence.
[15] **Q:** That was another company that you owned as
[16] well?
[17] **A:** (Witness nodded head.)
[18] **Q:** And what did that company do?
[19] **A:** Provided subscriber Internet service.
[20] **Q:** Is that company still in business?
[21] **A:** No.
[22] **Q:** When did it fold?
[23] **A:** Actually, it's probably been two years ago we
[24] actually ended that company.
[25] **Q:** And prior to — CCSI you said?

Page 8

[1] **A:** Uh-huh.
[2] **Q:** Prior to CCSI, where did you work?
[3] **A:** I worked for Vantage.
[4] **Q:** And that was up until what date?
[5] **A:** I worked — my resignation — actual
[6] resignation was September of, let's see, '96, and then I
[7] extended that until January of '97.
[8] **Q:** How long did you work for Vantage?
[9] **A:** Approximately a year and a half.
[10] **Q:** So you would have started in June of '95 or so?
[11] **A:** That's correct. I think it was actually July
[12] 1st.
[13] **Q:** Now, when I say Vantage, were you ever employed
[14] by Vantage Financial Services?
[15] **A:** That's a good question. I think it's Vantage
[16] Group Services is what it was called.
[17] **Q:** Vantage Group Services. Are you aware of a
[18] company called Vantage Financial Services?
[19] **A:** I think the name existed. I think it was a
[20] company that was out there. I don't know what they did
[21] with it.
[22] **Q:** How about Vantage Travel Services?
[23] **A:** I know that company.
[24] **Q:** Going forward I'm just going to use the word
[25] "Vantage" to refer to the Vantage part that you worked

Page 9

[1] for. Prior to working at Vantage, where did you work?
[2] **A:** For Boston Financial Data Services.
[3] **Q:** And Boston Financial Data provide what kind of
[4] services?
[5] **A:** Financial services. The part I was in
[6] actually — was involved in was financial transaction
[7] processing.
[8] **Q:** What type of transactions are we talking about?
[9] **A:** If someone — lock box type transactions.
[10] **Q:** When you say "lock box," why don't you describe
[11] that to me a little bit?
[12] **A:** It's where — if it's in a commercial account,
[13] if someone would send in a payment with an invoice or
[14] coupon or if they were making a contribution to a — to
[15] some type of investment plan it would be that document
[16] plus a check, and in the case of Vantage or those types
[17] of groups we were processing it would be where there is
[18] a donation with a check.
[19] **Q:** Donations to the nonprofit organization?
[20] **A:** Uh-huh.
[21] **MR. LEVITT:** Dallas, you need to answer
[22] yes or no. I think a couple of times you've given a
[23] uh-huh.
[24] **MR. PERLMAN:** Let's go off the record a
[25] second.

Page 10

[1] (Discussion off the record 10:15 a.m. to
[2] 10:15 a.m.)
[3] **Q:** (BY MR. PERLMAN) Let's just go back to the
[4] processing of donations. These donations would be in
[5] the form of checks?
[6] **A:** Yes.
[7] **Q:** And the checks would be made out to who?
[8] **A:** To the individual nonprofit.
[9] **Q:** Did you ever experience a situation where
[10] checks were made out to someone other than a nonprofit
[11] organization such as a fund raising company?
[12] **A:** I wasn't a processor, so I wouldn't know.
[13] **Q:** Now, you said that you began working at Vantage
[14] in July of 1995. What was your — is that correct?
[15] **A:** Yes.
[16] **Q:** What was your position or title at that time?
[17] **A:** President of Group Services.
[18] **Q:** As president of Group Services, what were your
[19] responsibilities?
[20] **A:** If you want to know what they told me my
[21] responsibilities, I could tell you that.
[22] **Q:** We'll start with that. What did they tell you
[23] your responsibilities were?
[24] **A:** It was to manage the group services division
[25] which involves sales, the administrators, and

Vantage 20719

**Dallas Ray Graves**
**February 20, 2002**

United States of America, et al   v.
Henry R. Lewis, et al

---

Page 11

[1] production.
[2] Q: Sales, administration, and production?
[3] A: Uh-huh.
[4] THE REPORTER: Is that yes?
[5] A: Yes. Oh, I'm sorry.
[6] Q: (BY MR. PERLMAN) That's what they told you
[7] your responsibilities were?
[8] A: Yes.
[9] Q: What actually were your responsibilities?
[10] A: Well, Mr. Lewis maintained the sales
[11] involvement. The production piece was an interesting
[12] piece whereby that reported as well to Mr. Lewis, in
[13] reality, and the administration was supervised by his
[14] in-house mistress which was still reporting to him, so
[15] in reality my job really wasn't needed and so...
[16] Q: Let's talk about the person who headed up
[17] administration.
[18] A: Okay.
[19] Q: Who was that?
[20] A: Susan Jones.
[21] Q: You said that Hank Lewis oversaw the sales
[22] force?
[23] A: Yes.
[24] Q: Who did you report to?
[25] A: I reported to Hank, Hank Lewis.

Page 12

[1] Q: Did you report to anyone else?
[2] A: No.
[3] Q: And how did you report to him? Describe to me
[4] how that would occur on a day-to-day basis.
[5] A: If he had meetings, I was there to update him
[6] on what was going on within the actual group itself, but
[7] in reality he maintained meetings with the sales force.
[8] He knew it anyway. Hank was a very informal type guy.
[9] If he worked out in the gym, he would have people out
[10] there. People still went to him direct or Hank still
[11] managed that, so there wasn't a real need to have
[12] conversation with Hank. I mean, he knew it already.
[13]    In a realistic environment I report and
[14] update to him what the financials or what the group
[15] services' new opportunities or new clients, but that
[16] wasn't that environment.
[17] Q: Let's talk about the sales force for a second.
[18] Who constituted the sales force?
[19] A: Let's see, there was Jay Gelb.
[20] THE REPORTER: I'm sorry?
[21] A: Jay Gelb.
[22] THE REPORTER: Thank you.
[23] Q: (BY MR. PERLMAN) G-E-L-B.
[24] A: Larry Lyon, Fred Chandler were the primary
[25] ones. Then they hired some young associate salespeople,

Page 13

[1] but I can't remember his name. He didn't last long.
[2] But those are the three primary salespeople.
[3] Q: Did they report to you at all?
[4] A: On paper.
[5] Q: What do you mean "reported on paper"?
[6] A: The chart would indicate that the salespeople
[7] reported to me. In reality Mr. Lewis ran all the — he
[8] held sales meetings on updates. He held the T&O
[9] meetings or handicap meetings. As much as I tried to
[10] get the opportunity to take that over, it didn't happen.
[11] Q: You say T&L meetings and handicap meetings?
[12] A: Yes. That's where Hank would go over deal by
[13] deal by deal with each salesperson separately.
[14] Q: Who was present at those meetings?
[15] A: Just Hank and the salespeople.
[16] Q: Were you present at those meetings?
[17] A: No.
[18] Q: Did you ever meet with either Jay Gelb, Larry
[19] Lyon, or Fred Chandler on a regular basis?
[20] A: I would talk to him because they were in our
[21] area, so absolutely.
[22] Q: How were you compensated?
[23] A: I was paid every two weeks.
[24] Q: Were you paid based on a straight salary?
[25] A: Yes.

Page 14

[1] Q: What was your compensation? Do you remember?
[2] A: 120. $120,000 a year.
[3] Q: These salespeople would go out and negotiate
[4] deals with various nonprofit organizations?
[5] A: Correct. Yes.
[6] Q: Correct is fine.
[7]    After having done so, would they then come
[8] back and talk to you about them?
[9] A: In most cases they talked to Hank about them.
[10] Q: Did they ever talk to you about them?
[11] A: Only if there was a need to negotiate price
[12] before they go talk to Hank. If they were trying to get
[13] a deal that didn't match up with their criteria which
[14] they said, that they'd come and say, hey, how can we
[15] make this a go deal with Hank, and so...
[16] Q: So, in other words, they would come to you and
[17] discuss various pricing options?
[18] A: Yeah, if — not pricing per se, based on
[19] sometimes it wasn't enough volume or et cetera, that
[20] type of thing. The actual pricing was set by the
[21] production department.
[22] Q: Did you have any ability to vary the pricing
[23]    or —
[24] A: I never had that responsibility. Hank was the
[25] only one that could vary the price.

---

Vantage 20720

United States of America, et al  v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

---

Page 15

[1]  **Q:** How was the price set? Let's talk about that a
[2]  little bit.
[3]  **A:** They would always get a — production would
[4]  always go out and get comps on the actual cost of the
[5]  job.
[6]  **Q:** When you say comps, what do you mean?
[7]  **A:** In other words, the components of it, depending
[8]  on whether it was a label program —
[9]  **THE REPORTER:** I'm sorry. Whether it was
[10] what? I didn't understand you.
[11] **A:** A label program, a card program. They did
[12] labels, cards, and I think those are the two primary
[13] ones. They didn't do too much of the other stuff.
[14]   But then what would happen, once they get
[15] the comps Hank would do 100 percent markup on that and
[16] say this is our price; this is the cost.
[17] **Q:** Did you ever have any input into this pricing
[18] policy?
[19] **A:** No.
[20] **MR. PERLMAN:** Off the record a second.
[21] (Discussion off the record 10:22 a.m. to
[22] 10:22 a.m.)
[23] **Q:** (BY MR. PERLMAN) Now, I would assume, and
[24] correct me if I'm wrong, that there were agreements
[25] between Vantage and its clients?

Page 16

[1]  **A:** Yes.
[2]  **THE REPORTER:** You might want to move your
[3]  hand too. Thank you.
[4]  **Q:** (BY MR. PERLMAN) And who would draft those
[5]  agreements?
[6]  **A:** If it was a standard agreement that they had a
[7]  standard contract that they would do, then the
[8]  administrator would draw up the contract and put in the
[9]  various components of the contract and send it out to
[10] the client.
[11] **Q:** And the administrator would be whom?
[12] **A:** The administrator that worked for group
[13] services. Each salesperson had an administrator
[14] assigned to them.
[15] **Q:** And that would be for standard contracts?
[16] **A:** Yes.
[17] **Q:** Who developed the standard contract?
[18] **A:** In my understanding, Harry Melikian.
[19] **Q:** Did he do it by himself or with assistance of
[20] attorneys or —
[21] **A:** No, I think Harry did it by himself.
[22] **Q:** How do you know that?
[23] **A:** Harry would always write whatever he had
[24] to dig. Revisions to contracts, Harry would do those
[25] revisions and he'd write those. He never actually —

Page 17

[1]  the time which I was there we never had a contract
[2]  written by legal counsel.
[3]  **Q:** Again, how would you know that?
[4]  **A:** How would I know that they were written
[5]  internally?
[6]  **Q:** Right.
[7]  **A:** Because Harry would write them. Actually, that
[8]  was Harry's — Harry proclaimed to be an attorney, so he
[9]  always wrote those documents.
[10] **Q:** Did he tell you he was an attorney?
[11] **A:** Yes.
[12] **Q:** Do you know for a fact whether he was an
[13] attorney or not?
[14] **A:** No.
[15] **Q:** Did you ever see a law degree on his wall or...
[16] **A:** No.
[17] **Q:** So we have a standard contract and then would
[18] there occasionally be variations to the standard
[19] contract?
[20] **A:** The only — there wouldn't be any variation to
[21] the contract itself as to the deal. There would be —
[22] they had a side letter, which was a big discussion.
[23] After I got there we brought that before our general
[24] counsel to have discussion on that side letter.
[25] **Q:** You brought that before whose general counsel?

Page 18

[1]  **A:** Vantage, which was Hill, Barlow.
[2]  **Q:** When you say side letter, what are you talking
[3]  about?
[4]  **A:** It just gave — it was a side letter that the
[5]  group would be asked to sign giving Vantage the right to
[6]  continue to mail in the program if there was any
[7]  shortfalls.
[8]  **Q:** The company could continue to mail?
[9]  **A:** Yes.
[10] **Q:** What was the idea behind that?
[11] **A:** That Hank would get his money back.
[12] **Q:** During your time there, did you ever — was
[13] there ever an occasion that you continued to mail beyond
[14] the end of the term of a contract?
[15] **A:** Yes.
[16] **Q:** And, again, that was to do what?
[17] **A:** To recover the cost of the program.
[18] **Q:** Was that a regular event or did that occur just
[19] on an occasion?
[20] **A:** I would say on occasion.
[21] **Q:** Do you recall whether there were any times when
[22] the costs weren't recovered and additional mailings
[23] weren't made?
[24] **A:** Yes.
[25] **Q:** When was that?

---

Vantage 20721

Dallas Ray Graves
February 20, 2002

United States of America, et al    v.
Henry R. Lewis, et al

Page 19

[1] **A:** I think there's American Numismatic. It was a
[2] Jay Gelb group, and Hank made a decision that it was a
[3] bad group from the beginning and that he wasn't going to
[4] waste any more money mailing it, and he just — not
[5] numismatic. I forgot the name of the group. Bed
[6] wedding type thing. You know what I mean? It was an
[7] interesting type group, and Hank just said it was a bad
[8] group from the beginning and he'd just take his money
[9] out of Jay Gelb's commission, so he just didn't do it.
[10] **Q:** You're not sure what the name of the group was,
[11] though?
[12] **A:** No, it's been so long ago. I just don't
[13] remember the name of that particular group.
[14] **Q:** Later on in the deposition we're going to go
[15] through some different groups, so possibly you'll recall
[16] it.
[17] Why did you say Hank thought it was a bad
[18] group?
[19] **A:** Hank made those decisions. He just thought
[20] from the response analysis that no matter what he did
[21] from a mailing perspective it wasn't going to do
[22] anything but cost him more money.
[23] **Q:** Were you mailing to existing donors for this
[24] organization or were you seeking out new donors?
[25] **A:** The group would always provide the donor list,

Page 20

[1] the actual mailing.
[2] **Q:** So the mailings that you were familiar with
[3] were made to existing donor mailings —
[4] **A:** That's correct.
[5] **Q:** — donor bases, excuse me.
[6] Was it possible this group had provided a
[7] donor list that was totally ineffective?
[8] **A:** That could be possible.
[9] **Q:** Any other possibilities that you could think of
[10] why this particular program didn't work?
[11] **A:** It was a nonprofit business. I think that you
[12] see a lot where a group may call it a donor, but it may
[13] have been a one-time donor that gave $5 that really
[14] doesn't have any direct correlation with that
[15] organization, and to them it looks like they have a
[16] great deal of membership or donor base where it may be
[17] just a one-time donor that gave.
[18] **Q:** So, in other words, the donor list was a more
[19] solid donor base, a more supportive donor base than in
[20] other cases?
[21] **A:** Yeah, because in the nonprofit arena you can
[22] have a real strong membership base type program or you
[23] can have a strong donor, you know, versus membership.
[24] **Q:** What type of organizations did Vantage seek out
[25] for the most part?

Page 21

[1] **A:** I think they just sought out any nonprofit to
[2] do those type of programs for.
[3] **Q:** Were they concerned at all about the type of
[4] donor base that the organization had?
[5] **A:** I would say they're always concerned about
[6] that, but they never could quantify that because it was
[7] always subjected to what the group provided.
[8] **Q:** Did you know whether they ever did any due
[9] diligence on the donor base.
[10] (Interruption in proceedings 10:29 a.m. to
[11] 10:29 a.m.)
[12] **MR. PERLMAN:** Let me turn this off. Do
[13] you want to read back the last question?
[14] (Requested portion was read.)
[15] **A:** No.
[16] **Q:** (BY MR. PERLMAN) Do you ever recall receiving
[17] any memos or correspondence from anybody in the company
[18] regarding due diligence?
[19] **A:** No.
[20] **Q:** So there were instances, again, where the donor
[21] base didn't appear to be what the company might have
[22] originally thought it was when they entered into the
[23] deal?
[24] **A:** Yes.
[25] **Q:** And that would result in what kind of an

Page 22

[1] outcome?
[2] **A:** A shortfall.
[3] **Q:** Now, we talked about these side letters.
[4] **A:** Uh-huh.
[5] **Q:** You said the side letters had a provision that
[6] allowed the company to manage to keep mailing?
[7] **A:** Correct.
[8] **Q:** If the donor base was not what it had appeared
[9] to be or was not a very supportive donor base, put it
[10] that way, then additional mailings wouldn't have made
[11] sense?
[12] **A:** That's correct. Yes.
[13] **Q:** Is that what you think happened in the case of
[14] American Numismatic or one of the other groups?
[15] **A:** Right. Hank looked at the response analysis,
[16] and there was no rhyme or reason to Hank's thought.
[17] Hank proclaims to be the guru of the nonprofit industry
[18] and no one was any better than him at doing donor
[19] analysis, et cetera, and if he made that commitment or
[20] he made that decision not to mail again, it didn't get
[21] mailed again. He managed — he managed those, uh, those
[22] programs.
[23] **Q:** Was there anybody else in charge of managing
[24] those programs?
[25] **A:** Supposedly that's what he hired a president

Vantage 20722

United States of America, et al  v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

---

Page 23

[1] for, but he didn't allow that to happen.

[2]    Q: So it was essentially Hank Lewis and, while you
[3] were there, supposedly yourself?

[4]    A: And Harry Melikian was always involved in the
[5] financials. He managed all the financial side of the
[6] group services.

[7]    Q: What was Harry Melikian's position in the
[8] company?

[9]    A: CFO, I guess.

[10]    Q: It would make sense that he would manage
[11] financial situations.

[12]    He wasn't the organization's general
[13] counsel?

[14]    A: No.

[15]    Q: Do you know what a program agreement is?

[16]    A: The agreement that the group signs.

[17]    Q: You testified that there was essentially a form
[18] program agreement that was used. Was there any other
[19] non-form agreements that occasionally would be used or
[20] did it always start with the form program agreement?

[21]    A: It was always the agreement. There's a
[22] checklist that each administrator had that they had to
[23] get from a new group and part of that was the agreement,
[24] all the components, et cetera, so there's — it was
[25] formalized on what each administrator had to get on

---

Page 24

[1] behalf of the salesperson in order to implement a
[2] program.

[3]    Q: You say "components." What are the components?

[4]    A: It would be the artwork, the logo, the indicia,
[5] all that kind of stuff.

[6]    Q: And that would come from the charity?

[7]    A: Yes.

[8]    Q: Besides the agreement of these components, was
[9] there anything else other than that, I suppose, donor
[10] list would come from the charity?

[11]    A: Just the agreement and all the components they
[12] need to do the program, roll out the program. The donor
[13] list, et cetera.

[14]    Q: Who made the initial contact with the
[15] charities?

[16]    A: The salespeople.

[17]    Q: And who followed up on those contacts?

[18]    A: The administrators.

[19]    Q: And what was the job of the administrators in
[20] following up?

[21]    A: Actually, they took it from that point on and
[22] did everything in order to get that job into production.

[23]    Q: Did you ever speak to anybody at any of the
[24] charities?

[25]    A: I actually spoke to — the answer is yes.

---

Page 25

[1]    Q: Do you remember anybody in particular that you
[2] spoke to?

[3]    A: I know Betty Briggs I spoke with.

[4]    Q: Who is Betty Briggs?

[5]    A: She's with the Order of the Eastern Star. Very
[6] few contacts direct with the groups, but I remember that
[7] one.

[8]    Q: Why that one in particular, do you know?

[9]    A: She called on occasions very upset about the
[10] continuance of her mailings and she didn't want it to
[11] happen, and she advised us to stop it.

[12]    Q: What do you mean "the continuance of the
[13] mailings"?

[14]    A: They continued to mail to her group and she
[15] wanted it stopped.

[16]    Q: Why were they continuing to mail to her group?

[17]    A: Because they had a shortfall in her program.

[18]    Q: Well, did the contract provide they could do
[19] that?

[20]    A: That's what Mr. Lewis stated, that we had the
[21] right to do it. Betty Briggs told him to stop it,
[22] though.

[23]    Q: And why were they continuing to mail?

[24]    A: Because they had the shortfall.

[25]    Q: Do you know why there was a shortfall in that

---

Page 26

[1] particular program?

[2]    A: Betty Briggs advised us that they had done too
[3] many programs and they had been — the donor base had
[4] been overmailed to.

[5]    Q: When you said they did too many programs, who
[6] did too many programs?

[7]    A: Vantage. They hit them with too many programs
[8] in too short a period of time.

[9]    Q: And she made that complaint to you?

[10]    A: She made it first to her salesperson and then
[11] she called me because it didn't stop.

[12]    Q: What did you do?

[13]    A: I took it to Hank.

[14]    Q: What did you tell Hank?

[15]    A: I told him that she was upset and she wanted us
[16] to stop the mailings.

[17]    Q: What did Hank say?

[18]    A: He said, "F. her." He says, "We're not
[19] stopping it. I'm going to get my money back."

[20]    Q: So, in other words, he had no intention of
[21] losing money on this particular client?

[22]    A: Yeah, that's correct. Yes.

[23]    Q: Is it true that he didn't have any intentions
[24] of losing money on any of the clients?

[25]    A: Yes.

---

Vantage 20723

Dallas Ray Graves
February 20, 2002

United States of America, et al    v.
Henry R. Lewis, et al

---

Page 27

[1] Q: Can you explain to me what a production
[2] agreement is?
[3] A: It outlines what the label program and what
[4] it's going to run.
[5] THE REPORTER: I'm sorry. I didn't quite
[6] understand you.
[7] A: It outlines that it's a label program or a card
[8] program and that it's going to go to X amount of donors
[9] and it's going to be — when it's going to be mailed, et
[10] cetera. It wasn't very extensive, so...
[11] Q: The production agreement wasn't very extensive?
[12] A: Yeah.
[13] Q: And what's a proforma?
[14] A: I don't know.
[15] Q: Was there ever an appendix or attachment to
[16] either a program agreement or production agreement that
[17] outlined a mailing schedule and anticipated results?
[18] A: That's two questions, I think. Half that
[19] question, I do know they gave them a mailing schedule,
[20] when they would be mailing because the group always
[21] wants to know when it's mailing. Now, did they give an
[22] outcome? There was never anything formal that I know of
[23] other than salespeople would always commit we, you know,
[24] we always get X percent back on every program that we
[25] do, you know, this is our experience, et cetera.

Page 28

[1] Q: And that was done verbally for the most part?
[2] A: Right.
[3] Q: So there was nothing in writing that you know
[4] of?
[5] A: Not that I know of.
[6] Q: Or that you recall?
[7] A: Yes.
[8] Q: Were you ever involved in drafting the
[9] program — production agreements?
[10] A: No.
[11] Q: You said you weren't involved in any of the
[12] drafts of the program agreements?
[13] A: Well, that's correct. Is that a yes or — I
[14] was not involved in those.
[15] Q: I could restate that question.
[16] A: Okay.
[17] Q: Were you involved in the drafting of the
[18] program agreements?
[19] A: No.
[20] Q: Did you ever negotiate any terms of a program
[21] agreement?
[22] A: No.
[23] Q: Were you ever involved in the modification of
[24] the language of any particular program agreement?
[25] A: No.

Page 29

[1] Q: Did you ever sign off on any modifications of
[2] the program agreements?
[3] A: No.
[4] Q: Did you approve any of the financial aspects of
[5] these program agreements?
[6] A: Can I ask a question? Are you asking if I
[7] signed the agreements or...
[8] Q: Well, I'll ask you that later.
[9] A: Okay. Not the financials, no.
[10] Q: So you didn't approve the financial aspects of
[11] these agreements?
[12] A: That's correct.
[13] Q: If you didn't do it, then who did?
[14] A: That would be Hank and Harry, along with the
[15] salesperson.
[16] Q: Who had the ultimate authority over these
[17] program agreements?
[18] A: Hank Lewis.
[19] Q: In a management capacity, other than yourself,
[20] who was primarily involved in dealing with the program
[21] agreements?
[22] A: It would be the salesperson and the
[23] administrators.
[24] Q: While you were at Vantage, did you introduce
[25] any new systems in the company?

Page 30

[1] A: Yes.
[2] Q: What was that?
[3] A: We did an automated system to track orders and
[4] production type of processes, et cetera.
[5] Q: "To check orders"?
[6] A: Tes.
[7] Q: What type of orders are we talking about?
[8] A: In other words, it was an automated system. It
[9] eliminates the need to go to a file cabinet, so the
[10] administrator would enter in all the key components of a
[11] new program into a systematic approach.
[12] Q: Was this new system your idea?
[13] A: Actually, it was Hank's idea.
[14] Q: What happened? Did Hank come to you and say
[15] I've got a new idea for a system or how did that happen?
[16] A: No, I think that Hank wanted a better way in
[17] which to handle the programs, and so he asked me from my
[18] technical background if I knew how we could get this
[19] resolved. I investigated it and brought him options.
[20] Q: Of various systems that you could use?
[21] A: That's correct.
[22] Q: And you presented the options to Hank Lewis?
[23] A: And to Harry. We all were involved in the
[24] review process of that.
[25] Q: And who ultimately decided on which system to

---

Page 27 - Page 30  (10)          Min-U-Script®          Fuller & Associates, Inc.(214)744-1250

Vantage 20724

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

---

Page 31

[1] use?

[2]   **A:** Actually, it was Hank from a cost — a

[3] financial perspective. Hank decided what to do.

[4]   **Q:** Was this an expensive system we're talking

[5] about here or what did this thing cost?

[6]   **A:** I think it was over $100,000.

[7]   **Q:** And is it a software system or full hardware

[8] computer system?

[9]   **A:** Hardware and software.

[10]   **Q:** Who administered putting the system into place?

[11]   **A:** Actually, a management team met on that on a

[12] weekly basis with the organization that was installing

[13] that.

[14]   **Q:** Were you part of that management team?

[15]   **A:** Yes.

[16]   **Q:** Did you interface most with these people or was

[17] there somebody else who interfaced more than you?

[18]   **A:** I would say I probably did more than the other

[19] management team members.

[20]   **Q:** How did the system work out?

[21]   **A:** I wasn't there when it was completed. I had

[22] left Vantage prior to its installation, full

[23] installation.

[24]   **Q:** Again, run by me — run through for me what the

[25] purpose of this system was and how it would bring

---

Page 32

[1] greater efficiencies to Vantage.

[2]   **A:** Everything at Vantage was paper based, so there

[3] was no way — if the administrator was out, there was no

[4] way of knowing what was in that particular job or what

[5] the status of a particular component was or, et cetera,

[6] so this was a whole automated process to manage the

[7] whole administrative functions within the group services

[8] line.

[9]   **Q:** Did it help with costing of jobs?

[10]   **A:** I don't know if they had a costing model in it

[11] or not. Mainly it was just a management tool to manage

[12] the actual administration piece of it.

[13]   **Q:** And each administrator would then interface

[14] with the system? Is that how it worked?

[15]   **A:** Right. I think it had a production piece in it

[16] where you're asking about managing the cost being a

[17] production component would be entered in, but they

[18] didn't manage that pricing. The production manager had

[19] already obtained a pricing from a vendor, that all they

[20] had to do was put that into it, so you would know what

[21] the real or actual cost or all the indirect and direct

[22] costs were associated with the program.

[23]   **Q:** And do you know what the overall reaction of

[24] Mr. Lewis was to this system?

[25]   **A:** Very positive in the very beginning.

---

Page 33

[1]   **Q:** What happened at the end?

[2]   **A:** He thought — he and the rest of the Vantage

[3] management with Harry Melikian felt like they got

[4] cheated, I think, and so...

[5]   **Q:** Why do you think they felt like they got

[6] cheated?

[7]   **A:** It's only hearsay on my part. Because — it's

[8] my understanding they didn't think that the group that

[9] was doing the project for them delivered all the

[10] components to them.

[11]   **Q:** They never told you this directly?

[12]   **A:** Who?

[13]   **Q:** Harry or Hank.

[14]   **A:** Hank and I had that conversation where —

[15] that's when I finally left because basically it was —

[16] it was complete — Hank decided he was just going to

[17] dump the project.

[18]   **Q:** So they eventually dumped the system

[19] altogether?

[20]   **A:** That's my understanding.

[21]   **Q:** Did you have check signing authority when you

[22] were at Vantage?

[23]   **A:** Yes.

[24]   **Q:** Was it limited?

[25]   **A:** It was limited.

---

Page 34

[1]   **Q:** How was it limited?

[2]   **A:** Based on if it was a group services check I

[3] would always run it by Harry. It was never based on me

[4] solely doing it. Actually, I had to — it was with

[5] Harry Melikian and I both doing it.

[6]   **Q:** Did it require double signatures on each check?

[7]   **A:** He would sign off on the actual form piece of

[8] it where we'd take it — or Frank Celani would have to

[9] sign off on it and then myself.

[10]   **Q:** Who was Frank Celani?

[11]   **A:** He was the financial person for group services.

[12]   **Q:** Who did he report to?

[13]   **A:** He reported to Harry and I both.

[14]   **Q:** So there was some sort of a check authorization

[15] system?

[16]   **A:** Right.

[17]   **Q:** When a check was finally authorized, who would

[18] sign the check?

[19]   **A:** I would sign the check.

[20]   **Q:** Were you ever in a position to approve any

[21] special incentives to potential clients?

[22]   **A:** No.

[23]   **Q:** Did you ever authorize Vantage to hire

[24] consultants for any purpose that you can recall?

[25]   **A:** It was technology consultant report. That's

---

Fuller & Associates, Inc.(214)744-1250      **Min-U-Script®**      (11) Page 31 - Page 34

Vantage 20725

---

Page 35

[1] the only group that I had. There was a consultant that
[2] was brought in for the group services for the fund
[3] raising side that Hank Lewis brought in.
[4]   **Q:** What was that again? I'm sorry.
[5]   **A:** There was an individual that was hired while I
[6] was there, Susan Hartford, who was supposed to be an
[7] expert in the industry on nonprofit that Hank Lewis
[8] hired.
[9]   **Q:** You say, "Supposed to be." Was she not an
[10] expert?
[11]   **A:** I don't know.
[12]   **Q:** She was — Susan Hartford was brought in to do
[13] what?
[14]   **A:** She would work with the administrators and
[15] salespeoples on target marketing and how to better
[16] approach the nonprofits and getting to that type of
[17] scenario.
[18]   **Q:** How did that differ from your job?
[19]   **A:** She was actually there basically just giving
[20] response analysis type stuff, in other words, we could
[21] get more lift and response to a particular program. She
[22] didn't do any management of a group. She actually came
[23] in trying to get more target toward better responses and
[24] those type of things.
[25]   **Q:** Your job was to manage the overall operation?

Page 36

[1]   **A:** Right.
[2]   **Q:** Did you ever have a formal review while you
[3] were at Vantage?
[4]   **A:** No.
[5]   **Q:** Did you ever receive any informal feedback on
[6] your performance?
[7]   **A:** Informal? Yes.
[8]   **Q:** Who would you receive that from?
[9]   **A:** From Hank Lewis.
[10]   **Q:** Anyone else?
[11]   **A:** No.
[12]   **Q:** Do you recall any meetings or series of
[13] meetings with Hank Lewis in Florida?
[14]   **A:** Yes.
[15]   **Q:** When was that?
[16]   **A:** I have the dates. It was towards the end of —
[17] I want to say May, June of '96. I have some notes from
[18] that meeting. I don't remember the date. It was right
[19] before I — actually, right before I tendered my
[20] resignation, shortly after that.
[21]   **Q:** So the meeting with Hank Lewis was right before
[22] you tendered your resignation?
[23]   **A:** Correct.
[24]   **Q:** You were looking through a pile of papers.
[25] Were you looking for something in particular?

Page 37

[1]   **A:** I had notes from that meeting.
[2]   **Q:** You have notes that you took personally?
[3]   **A:** Yes.
[4]   **Q:** Were you able to find them?
[5]   **A:** No.
[6]   **Q:** Do you know if you have them anywhere?
[7]   **A:** I do have them.
[8]   **Q:** Would you be able to give me a copy of them?
[9]   **A:** I can do that.
[10]   **Q:** I'd appreciate that. Why did you take notes?
[11]   **A:** Because it was — I felt the meeting was
[12] inappropriate. It was based on a reaction to my
[13] involvement of trying to manage Susan Jones which was
[14] Hank Lewis' mistress.
[15]   **Q:** (BY MR. PERLMAN) Off the record.
[16]     (Discussion off the record 10:49 a.m. to
[17] 10:50 a.m.)
[18]   **MR. PERLMAN:** Let's go back on the record.
[19]   **Q:** (BY MR. PERLMAN) Why don't you describe to me
[20] what took place at the Florida meeting?
[21]   **A:** Hank went through a list of issues saying —
[22] issues that needed to be addressed by myself that he
[23] felt wasn't being — it wasn't being accomplished in my
[24] role as the president of Vantage, and that I should use
[25] Susan Jones in a more proactive way because she was this

Page 38

[1] bright, knowledgeable individual and knew all about
[2] group services and these programs, et cetera, and I
[3] wasn't utilizing her skills.
[4]   **Q:** And what did you say to him?
[5]   **A:** I disagreed with him basically on all of those
[6] issues. It was — if she didn't agree with something I
[7] said, she would run to Hank and Hank would override it.
[8] It was one of those situations where anything that was
[9] said in the meeting she'd go tell Hank. Hank didn't
[10] like it. It was a reaction. So it was a bad situation
[11] of management then. And that was the entire environment
[12] there, and so it was an interesting thing to try to
[13] manage around that.
[14]   **Q:** What was Susan Jones' position?
[15]   **A:** She was supposed to be the supervisor of the
[16] administrators.
[17]   **Q:** Was she there prior to your joining the
[18] company?
[19]   **A:** Yes.
[20]   **Q:** Was she there during your entire tenure with
[21] the company?
[22]   **A:** Yes.
[23]   **Q:** When did you finally leave Vantage?
[24]   **A:** January of '97.
[25]   **Q:** And why did you leave ultimately?

---

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 39

[1] A: Actually, I resigned in September. Hank asked
[2] me to stay on and help in the transition and help
[3] complete the automation project that we spoke about, and
[4] then on January 20th he made a decision that was the end
[5] of it, so we parted ways.
[6] Q: He made the decision that the time period he
[7] wanted you to stay was now over?
[8] A: That's correct. Yes.
[9] Q: And at that point he asked you to leave?
[10] A: Yes.
[11] Q: How would you characterize your termination
[12] with Vantage?
[13] A: It was probably a mutual agreement. I was as
[14] unhappy with them probably as they were with me at that
[15] point so...
[16] Q: Would you say you left on good terms or bad
[17] terms?
[18] A: In my mind I left on good terms because I
[19] decided to leave.
[20] Q: Was there any dispute that you had with Vantage
[21] after you left the company?
[22] A: I did have a dispute with them.
[23] Q: What was that about?
[24] A: First dispute was over my vacation pay which
[25] they weren't going to pay me, so I had to address that,

Page 40

[1] and which that got resolved and I did receive my
[2] compensation for that. And the second one was on a
[3] issue with unemployment with Vantage, and it was a long,
[4] drawn out process and that got resolved also.
[5] Q: How did that get resolved?
[6] A: They had to honor the unemployment.
[7] Q: How about the vacation pay?
[8] A: They paid me my vacation pay.
[9] Q: After you asked them to pay it to you or —
[10] A: I went to the US attorneys office and told them
[11] of the issue because Vantage wasn't going to pay me at
[12] first.
[13] Q: The U.S. Attorney's office?
[14] A: Yes. I submitted a document whereby I had it in
[15] writing that they owed me that vacation pay, and they
[16] wrote them a letter and it was resolved.
[17] Q: Why didn't you go to the Commission of Labor of
[18] the state?
[19] A: I just wrote that to them saying basically that
[20] I'm not being compensated for monies owed me.
[21] Q: And what happened with the U.S. Attorneys'
[22] office?
[23] A: I think they probably notified them saying they
[24] had a complaint, and then Vantage resolved it.
[25] MR. PERLMAN: Do you mind if we take a

Page 41

[1] quick break for a second?
[2]    (Recess from 10:54 a.m. to 11:03 a.m.)
[3] Q: (BY MR. PERLMAN) I want to just come back to
[4] the side letters that we talked about. First of all,
[5] why were they called side letters?
[6] A: I don't know.
[7] Q: Who called them side letters?
[8] A: That was what they used, the term, when I got
[9] there at Vantage.
[10] Q: Are you aware of any of the language in the
[11] program agreements that needs to be modified in order to
[12] comply with postal regulations?
[13] A: No.
[14] Q: Do you remember whether you ever signed any
[15] modification to a program agreement or production
[16] agreement?
[17] A: No.
[18] Q: You don't recall whether —
[19] A: No.
[20] Q: While you were at Vantage, who were Vantage's
[21] competitors?
[22] A: (Witness whispering.)
[23] THE REPORTER: I'm sorry. I can't hear
[24] you.
[25] A: I'm just talking to myself for a second.

Page 42

[1] MR. LEVITT: If you're talking at all,
[2] it's going to be on the record.
[3] Q: (BY MR. PERLMAN) Let me just throw a couple of
[4] names at you and tell me whether that rings a bell.
[5]    Does the name Barton Cotton mean anything
[6] to you?
[7] A: No.
[8] Q: How about Affinity Marketing?
[9] A: No.
[10] Q: Do you know whether Vantage had any significant
[11] competitors in the industry?
[12] A: I don't remember any competitor type of
[13] conversations other than L.D. Robinson was the one out
[14] in the suburbs that was always a topic of conversation.
[15] Q: Why were they a topic of conversation?
[16] A: Because Hank was always trying to buy him out
[17] or wanted to take his company over.
[18] Q: Do you know if there was ever any incentives
[19] offered to nonprofit customers as a result of
[20] competition from other firms?
[21] A: No.
[22] Q: Are you aware of any changes that were made in
[23] any of the deals by Vantage in order to remain
[24] competitive?
[25] A: No.

Vantage 20727

Page 43

[1]   **Q:** You don't recall — you're not —
[2]   **A:** The answer is no. It's not that I don't
[3]   recall. I don't know of any.
[4]   **Q:** You don't know of any.
[5]      Were you aware of any postal service
[6]   investigations of Vantage?
[7]   **A:** No.
[8]   **Q:** You don't remember ever hearing about the
[9]   postal service visiting with Vantage or meeting or
[10]  investigating them in any way?
[11]  **A:** No.
[12]  **Q:** Nobody ever discussed with you any postal
[13]  service investigations?
[14]  **A:** No.
[15]  **Q:** Do you know the difference between the
[16]  nonprofit mailing rate and bulk third class rate?
[17]  **A:** No.
[18]  **Q:** Do you know if there is a difference?
[19]  **A:** I know there's a difference now. There's a
[20]  discount for the nonprofits versus standard rate.
[21]  **Q:** Why do you say you know it now?
[22]  **A:** Because our company when I had CCSI we did a
[23]  mailing for National Wildlife and I called Peter
[24]  Bomasara which was our contact at the post office, and
[25]  he advised me of all the litigation that you have to

Page 44

[1]   mail. A for profit can't mail on behalf of a nonprofit,
[2]   et cetera, et cetera. You have to mail at full rate
[3]   unless you're a nonprofit and you own the permit,
[4]   da-da-da.
[5]   **Q:** Then why did you call him in the first place?
[6]   **A:** Because we were doing a mailing for National
[7]   Wildlife, and I wanted to make sure that we did it
[8]   right.
[9]   **Q:** But you were never aware of this when you were
[10]  working at Vantage?
[11]  **A:** No.
[12]  **Q:** Were you involved at all with any of the postal
[13]  permitting issues while you were at Vantage?
[14]  **A:** No.
[15]  **Q:** Let's just run through for a second how Vantage
[16]  would prepare mail and get it to the intended recipient.
[17]  Could you run that scenario through for me from
[18]  development of a copy piece to the actual deposit of the
[19]  piece in with the postal service?
[20]  **A:** Marylou Newman, who was over the production
[21]  side, would actually be involved in that piece. I don't
[22]  know all the details of that procedure.
[23]  **Q:** What's Marylou's last name again?
[24]  **A:** Newman.
[25]  **Q:** Newman.

Page 45

[1]   **A:** It was her job to work with the different
[2]   vendors, which at that time was, I believe, Century and
[3]   J&R, and she worked with them on behalf of those
[4]   mailings.
[5]   **Q:** And those were the printers?
[6]   **A:** Those were the mailers, the mail houses.
[7]   **Q:** Mail houses. Did you ever get involved in any
[8]   of the issues involving the actual mailing of the pieces
[9]   when you were there?
[10]  **A:** No.
[11]  **Q:** You mentioned Harry Melikian and you said that
[12]  his responsibility was Chief Financial Officer; is that
[13]  correct?
[14]  **A:** Yes.
[15]  **Q:** Did you report to Harry Melikian?
[16]  **A:** No.
[17]  **Q:** What was your opinion of Harry Melikian while
[18]  you were at employed at Vantage?
[19]  **A:** I thought he was a smart guy. Harry as a
[20]  person was a nice guy. Harry under pressure from Hank
[21]  was a bad guy.
[22]  **Q:** Why do you say that?
[23]  **A:** It's like in that environment there was like
[24]  Dr. Hyde and Mr. Jeckle environment. When individuals
[25]  were themself, it was a very operable environment to

Page 46

[1]   work in. When people were under pressure from
[2]   Mr. Lewis, it was a very uncomfortable situation to work
[3]   in.
[4]   **Q:** So as president of this division you primarily
[5]   reported to Hank Lewis?
[6]   **A:** Yes.
[7]   **Q:** What's your opinion of Harry Melikian now?
[8]   **A:** I really don't have an opinion of Harry. He's
[9]   not a personal friend of mine. He's not a business
[10]  associate, so I just don't have an opinion.
[11]  **Q:** Do you like him or dislike —
[12]  **A:** I don't dislike Harry.
[13]  **Q:** Have you ever had any disagreements with him?
[14]  **A:** I think the only major disagreement was the
[15]  deal with the unemployment where Harry was feisty, but
[16]  that was kind of interesting, but that was — he
[17]  maintained his issues and I maintained mine, and it was
[18]  a level playing field so nothing taken personal —
[19]  nothing taken personally.
[20]  **Q:** We discussed some of the disagreements that you
[21]  had with Henry Lewis. Is there any other disagreements
[22]  you can recall that we didn't discuss so far?
[23]  **A:** Hank and I had a lot of disagreements. That's
[24]  what made it very difficult to manage there. A
[25]  disagreement on how he would maintain that contract

Vantage 20728

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

---

**Page 47**

[1] people had to be on premise and that was a big issue we
[2] took to Hill & Barlow to resolve, keep him out of
[3] trouble from that. The sexual discrimination was an big
[4] issue in the department whereby my staff would come in
[5] about favoritism for Susan Jones because of the affair
[6] with Hank and made it very difficult, you know, and
[7] everybody else would take a beating from Hank and Susan
[8] Jones would get away, or no one else but — Hank would
[9] expect everybody to be there from eight to five, walk
[10] the floors checking on people, interesting enough, but
[11] it was okay if he and Susan hung out the night before
[12] and came in drunk or whatever or she didn't come in at
[13] all, so it wasn't — it wasn't a fair environment. It
[14] made it very difficult.
[15]     And the same thing — the most difficult
[16] thing in management at Vantage was Hank's personal
[17] relationship with some of the individuals in the
[18] company. As much as I think in his heart he wanted to
[19] have a company managed right and under the right
[20] auspices and whatever, his skill sets and his actions
[21] didn't support that.
[22]     Q: Was there anyone else that you ever had a
[23] disagreement with at Vantage?
[24]     A: A disagreement? No.
[25]     Q: Since your employment with Vantage terminated,

**Page 48**

[1] have you been in contact with any current Vantage
[2] employees?
[3]     A: No.
[4]     Q: Any former Vantage employees?
[5]     A: The only person I talked to — it's been over a
[6] year ago — a person, Julie Harris, that used to work
[7] there.
[8]     Q: Who was she?
[9]     A: She used to work in the mail room for Vantage.
[10] She was a really nice person.
[11]     Q: And you kept in touch with her just on a
[12] personal basis?
[13]     A: You know, I think the only other person that I
[14] spoke to — haven't spoke to in over a year and a half
[15] was John Depiaro who was over human resources while I
[16] was there.
[17]     THE REPORTER: What was the last name
[18] again?
[19]     A: Depiaro. And I don't even know how to spell
[20] that.
[21]     Q: (BY MR. PERLMAN) What kind of conversations
[22] have you had with these folks?
[23]     A: Just personally. Nothing to do with Vantage.
[24]     MR. LEVITT: Dallas, try to let him finish
[25] his question because it's hard for the stenographer.

**Page 49**

[1]     Q: (BY MR. PERLMAN) Now, you mentioned Marylou
[2] Newman. Was she ever known by a different name?
[3]     A: Gianasoli.
[4]     MR. PERLMAN: Do you want me to spell it
[5] for you? Yeah, I think I have it. G-I-A-N-A-S-O-L-I.
[6]     Q: (BY MR. PERLMAN) Did she work for you at
[7] Vantage?
[8]     A: Yes.
[9]     Q: What was your relationship with her?
[10]     A: We had a great relationship in the beginning
[11] and prior to my coming to Vantage.
[12]     Q: Did you have any personality clashes with her?
[13]     A: While she worked for me I had to release her
[14] from Vantage.
[15]     Q: Why was that?
[16]     A: We were discussing an issue and she blew up,
[17] and the problem with Marylou she would just start,
[18] "F'ing idiots" and this and whatever all, and a
[19] situation arise where it's a problem, and when I said
[20] that — when I brought her in to have a discussion about
[21] it so that we could get it resolved; she told me it was
[22] my F'ing problem, et cetera, so deal with it, and she
[23] stomped out. That was probably the turning point of my
[24] career at Vantage when I let Marylou go and she was very
[25] close personal friends with Hank for all those years.

**Page 50**

[1]     Q: Did she ever come back to the company?
[2]     A: She did.
[3]     Q: Did you rehire her?
[4]     A: Hank brought her back.
[5]     Q: Did you object to that?
[6]     A: I objected to it.
[7]     Q: What did you say?
[8]     A: I didn't think it was the — from a — it
[9] wasn't the right — it wasn't the right message to send
[10] to a company to bring Marylou back in. I understand
[11] that they needed a production person with her skill set,
[12] but I think they could have found that in the industry
[13] without having to bring that back into the organization,
[14] and we advised him against it.
[15]     Q: Did you have problems with anybody else at
[16] Vantage that you can recall?
[17]     A: No.
[18]     Q: I'm going to run through some names with you.
[19] I'd like to know — I'd like you to tell me whether
[20] you're familiar with these people, and if so, how. Dan
[21] Grundig, G-R-U-N-D-I-G?
[22]     A: He was an administrator...
[23]     THE REPORTER: I'm sorry?
[24]     A: He was an administrator for Larry Lyon,
[25] L-Y-O-N-S (sic), by the way.

---

Vantage 20729

Page 51

[1]    **Q:** Karen Tomascia?

[2]    **A:** She was Jay Gelb's administrator.

[3]    **Q:** Do you know if both these people are still with

[4] the company?

[5]    **A:** I don't know.

[6]    **Q:** Porita Walker?

[7]    **A:** I don't know that person.

[8]    **Q:** Now, you know Larry Lyon, Frank Chandler, and

[9] Jay Gelb?

[10]   **A:** Yes.

[11]   **Q:** We've already discussed that.

[12]    Gerry Muller?

[13]   **A:** (Witness whispering.)

[14]   **THE REPORTER:** I'm sorry?

[15]   **A:** The name rings a bell, but I don't know.

[16]   **Q:** (BY MR. PERLMAN) Jim Mooney?

[17]   **A:** Jim Mooney was one of the salespeople. That

[18] was the one I couldn't remember.

[19]   **Q:** That was the salesperson —

[20]   **A:** That I could not remember.

[21]   **Q:** Right. Mike Swiezynski, S-W-I-E-Z-Y-N-S-K-I?

[22]   **A:** No.

[23]   **Q:** Tara McLean?

[24]   **A:** Tara worked in the travel side. I just know of

[25] her.

Page 52

[1]    **Q:** Let's go back to Jim for a second. He was a

[2] salesperson. Was he still there when you left?

[3]    **A:** Yes, I think. I think so. As much as I can

[4] recall, I think he was still there. I think he left

[5] shortly after. He wasn't getting along with Hank or

[6] didn't sell enough or vice versa. They weren't happy

[7] with him. I don't recollect the exact dates.

[8]    **Q:** You were his supervisor?

[9]    **A:** Right. I think he may — what gets a little

[10] cloudy there, was he there after I actually formally

[11] resigned and came back and just working the transition

[12] piece. I don't know the exact dates.

[13]   **Q:** How about Trisha Casey?

[14]   **A:** I don't know Trisha Casey.

[15]   **Q:** How about David Brodsky?

[16]   **A:** David was a salesperson for travel, I think.

[17]   **Q:** David ever have any — do any work on your side

[18] of the company?

[19]   **A:** Every once in a while there was a crossover

[20] with a particular client. I think David worked with the

[21] group services salespersons. He'd sell travel trying to

[22] get them to work with him on one package for group

[23] services. That's the only involvement. That's why I

[24] don't know him that well.

[25]   **THE REPORTER:** Could you slow down just a

Page 53

[1] little bit for me, please?

[2]    **MR. PERLMAN:** Off the record.

[3] (Discussion off the record 11:19 a.m. to

[4] 11:19 a.m.)

[5]    **Q:** (BY MR. PERLMAN) Susan Jones, we already

[6] discussed. Again, what was her position?

[7]    **A:** She was the supervisor over the administrators.

[8]    **Q:** Kathy Kirby?

[9]    **A:** I don't know who Kathy Kirby is.

[10]   **Q:** David Caribino?

[11]   **A:** I don't know him.

[12]   **Q:** C-A-R-I-B-I-N-O. Peter Petras?

[13]   **A:** (Witness shakes head.)

[14]   **Q:** Do you know Peter Demakis?

[15]   **A:** No.

[16]   **Q:** Marylou Newman —

[17]   **A:** Yes.

[18]   **Q:** — we discussed. Frank Celani we also

[19] discussed.

[20]   **A:** Yes.

[21]   **Q:** How about Larry Saklad?

[22]   **A:** No.

[23]   **Q:** Never met him or spoke to him?

[24]   **A:** No.

[25]   **Q:** Ronald Lewis?

Page 54

[1]    **A:** Yes.

[2]    **Q:** Who is Ronald Lewis?

[3]    **A:** He was a salesperson in group services also for

[4] a small period of time.

[5]    **Q:** Do you recall any particular clients he might

[6] have brought into the company?

[7]    **A:** He was a personal friend of Hank's that was

[8] brought in, so I don't remember.

[9]    **Q:** Was he related to Hank, do you know?

[10]   **A:** No, I don't know that. I just know they were

[11] friends from when they were kids or whatever. We had to

[12] listen, you know, to that story. They go way back.

[13]   **Q:** How about Aaron Gilman?

[14]   **A:** No.

[15]   **Q:** Thomas Ferrara?

[16]   **A:** He's the person, I think, that took over my

[17] position, if I remember right.

[18]   **Q:** Did you have any contact with Thomas Ferrara?

[19]   **A:** Minimal. Just giving him — I would come in

[20] when I was doing the transition piece on the software

[21] which would be occasionally, and we would have — I'd

[22] just participate in the Monday meeting on updates with

[23] that. I didn't work direct with him on any of the

[24] transition into his new job as president, no.

[25]   **Q:** Did you try to update him as to what was

Vantage 20730

United States of America, et al   v.                                    Dallas Ray Graves
Henry R. Lewis, et al                                                   February 20, 2002

---

Page 55

[1] happening in the company —

[2]     A: No. My only role with him was — actually,

[3] that was being done by Hank. My only role was to work

[4] with him on the technology piece that was in transition.

[5]     Q: How about Kim Tanian known as Kim Szotfried?

[6]     A: She is an administrator. Plus she was an

[7] assistant to Frank Celani.

[8]     Q: George Kirshe?

[9]     A: No, I don't know him.

[10]     Q: Susan Coleman?

[11]     A: No.

[12]     Q: Kim Segers?

[13]     A: No.

[14]     Q: Doug Frank?

[15]     A: I know Doug.

[16]     Q: What was Doug's position?

[17]     A: I think he's on the travel side or financial

[18] side. He's a salesperson in travel. I don't know what

[19] all those people did up there. He was just on the

[20] travel side.

[21]     Q: Gary Bauer?

[22]     A: No.

[23]     Q: Robert Fetterman?

[24]     A: No.

[25]     Q: Wendy Davenport or Devenport?

---

Page 56

[1]     A: No.

[2]     Q: Elaine Doucet?

[3]     A: No.

[4]     Q: Patrick Emanuele?

[5]     A: No.

[6]     Q: John Flebbe?

[7]     A: Flebbe?

[8]     Q: Flebbe.

[9]     A: Yeah. He was the president prior to me.

[10]     Q: Gail Hunter?

[11]     A: No. Unless — the name just rings a bell. I

[12] don't know her so...

[13]     Q: Mr. Graves, you know we're here today because

[14] of a lawsuit filed by the U.S. Attorney General's

[15] office, correct?

[16]     A: Yes.

[17]     Q: You said you didn't know who Laurence Saklad is

[18] or was?

[19]     A: I just know conversations that involved his

[20] name.

[21]     Q: What kind of conversations are those?

[22]     A: Hank had bragged about beating him up.

[23]     Q: Beating him up in what way?

[24]     A: He'd always talk about how he took him outside

[25] and beat him up in the back of the building.

---

Page 57

[1]     Q: Physically beat him up?

[2]     A: That's what he said, yeah. Pushed him down the

[3] stairs, I mean, all bragging about it. Now, I can't

[4] tell you if that's credible or whatever, hearsay.

[5]     Q: But Hank said this to you?

[6]     A: Hank said it in a meeting when we met with Hill

[7] & Barlow on the subject of that Saklad lawsuit and the

[8] Joe Green lawsuit and Hank made references to those

[9] afterwards, and Hank bragged about doing that. Hank

[10] bragged about hitting Joe Green in his office and

[11] laughed about telling people he fell over a coffee table

[12] on his way out.

[13]     Q: Now, you said there was a Joe Green lawsuit.

[14] What was the lawsuit about?

[15]     A: I think Joe Green was just filing a lawsuit

[16] against Hank, and I don't know what the whole lawsuit

[17] pertained to, but I know that he struck Joe Green in his

[18] office and he came out bleeding, so...

[19]     Q: Do you know whether Mr. Saklad initiated a

[20] lawsuit against Vantage?

[21]     A: I don't know.

[22]     Q: Were there any of these lawsuits filed while

[23] you were employed at Vantage?

[24]     A: The only one I know of is like the one

[25] Laurence —

---

Page 58

[1]     THE REPORTER: I'm sorry.

[2]     Q: (BY MR. PERLMAN) Yeah, slow down.

[3]     A: Just this meeting here that I sat in on.

[4]     Q: Can I see what you're referring to?

[5]     A: Sure.

[6]     Q: Just let the record show that Mr. Graves is

[7] referring to a letter that appears to be on the

[8] letterhead of Hill & Barlow dated May 23rd, 1996.

[9]     This letter refers to Lawrence Saklad vs.

[10] Vantage, an employment discrimination case which appears

[11] to have been going on while you were an employee of

[12] Vantage.

[13]     A: Yes.

[14]     Q: Do you know anything about that?

[15]     A: No.

[16]     Q: Did you know about this lawsuit while you were

[17] there?

[18]     A: Only from that meeting.

[19]     Q: That was the first time you heard about it —

[20]     A: Yes.

[21]     Q: — this lawsuit? Was that the first time you

[22] ever heard Lawrence Saklad's name?

[23]     A: I heard his name as a salesperson there on the

[24] travel side before, but it was just in conversation that

[25] he was a prior salesperson.

---

Vantage 20731

Dallas Ray Graves
February 20, 2002

United States of America, et al  v.
Henry R. Lewis, et al

---

Page 59

[1]    Q: He was a salesperson on the travel side?

[2]    A: That was my understanding.

[3]    Q: Do you know whether he ever worked with any of

[4] the nonprofit clients?

[5]    A: I don't know that. No.

[6]    MR. PERLMAN: I'm not going to mark this

[7] as an exhibit unless you want to refer to this later.

[8]    MR. LEVITT: Yeah.

[9]    MR. PERLMAN: Why don't we mark this as

[10] Defendant's — how do you want to number these? Off the

[11] record a second.

[12]    (Discussion off the record 11:27 a.m. to

[13] 11:28 a.m.)

[14]    (Exhibits 1 to 2 marked.)

[15]    Q: (BY MR. PERLMAN) Let's go back to this lawsuit

[16] about which you are currently being deposed. When did

[17] you first hear about this lawsuit?

[18]    A: Actually, it was a lawsuit when I was

[19] subpoenaed, that it was an actual lawsuit. That's the

[20] only thing that I know that when it actually was an

[21] official lawsuit.

[22]    Q: Who were you subpoenaed by?

[23]    A: By, I think, you.

[24]    Q: Before that you weren't aware that there was an

[25] actual lawsuit —

Page 60

[1]    A: I just knew that there was investigation.

[2]    Q: You've got to wait until I finish the question.

[3]    Before that you weren't aware that there

[4] was a lawsuit being filed?

[5]    A: No.

[6]    Q: You just — were you aware that there was any

[7] sort of investigation going on by the Attorney General's

[8] office?

[9]    A: Yes.

[10]    Q: When did you first learn that?

[11]    A: Probably about a year and a half ago.

[12]    Q: And how did you learn that?

[13]    A: I was contacted by the U.S. postal inspector.

[14]    Q: Do you remember who that was?

[15]    A: (Witness whispering.)

[16]    THE REPORTER: I'm sorry?

[17]    A: Beth somebody.

[18]    Q: (BY MR. PERLMAN) Could it have been Beth Ann

[19] Irvine?

[20]    A: Yes.

[21]    Q: How were you contacted?

[22]    A: By telephone.

[23]    MR. PERLMAN: Hold on a second.

[24] (Discussion off the record 11:29 a.m. to

[25] 11:30 a.m.)

Page 61

[1]    MR. PERLMAN: Can you read back the last

[2] question?

[3]    (Requested portion was read.)

[4]    Q: (BY MR. PERLMAN) And you were contacted by

[5] telephone by Beth Ann Irvine?

[6]    A: Yes.

[7]    Q: Do you recall the substance of the

[8] conversation?

[9]    A: It was basically asking — wanting to meet and

[10] ask some questions concerning some side letters I had

[11] signed.

[12]    Q: She said she wanted to meet with you?

[13]    A: Right.

[14]    Q: Did she eventually meet with you personally?

[15]    A: Yes.

[16]    Q: And when was that?

[17]    A: I don't know. Approximately a year and a half

[18] ago. It's been a way back. Maybe more than that. It's

[19] over two years ago.

[20]    Q: Did she come to Dallas to meet with you?

[21]    A: Yes.

[22]    Q: And during that meeting, could you recall the

[23] substance of your conversations?

[24]    A: It was just primarily going over the programs

[25] and these side letters. I mean, it's basically was I

Page 62

[1] aware of this side letter, and I go — in most of the

[2] cases no. I mean, for me to remember something two

[3] years ago that I signed — it's just a part of my job

[4] as signing this document — as part of the overall

[5] components of a program, the answer is no.

[6]    Q: So you discussed the side letters. Did you

[7] discuss anything else?

[8]    A: No, just if I had any documents or information

[9] that would be prudent for them, and I said I would look

[10] and see what I have.

[11]    Q: Did you look and see what you had?

[12]    A: I gave them some documents.

[13]    Q: What did you give them?

[14]    A: Some various letters that I had, that

[15] particular letter, and some program reports, T&O

[16] handicap reports. Whatever I have in this file I gave

[17] them.

[18]    MR. PERLMAN: Off the record a second.

[19] (Discussion off the record 11:32 a.m. to

[20] 11:33 a.m.)

[21]    Q: (BY MR. PERLMAN) Let's discuss for a second

[22] what you refer to as a T&O report. What exactly is a

[23] T&O report?

[24]    A: It's tentative and actual orders. Tentative so

[25] it's not an order yet, and the O stands for orders.

---

Page 59 - Page 62  (18)          Min-U-Script®          Fuller & Associates, Inc.(214)744-1250

Vantage 20732

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 63

[1]    Q: And what's it used for?

[2]    A: It's used for Hank to do forecasting to

[3] handicap what the numbers are going to be.

[4]    Q: What do you mean "handicap the numbers"?

[5]    A: In other words, Hank, when he had his meeting

[6] with a salesperson he would go through what he called a

[7] handicap report saying, "Okay, here's what you — your

[8] deals that are in; here's your deals that are pending,

[9] et cetera," and he would take that off the T&O report,

[10] so Hank's big meeting was you've got to get T's to O's.

[11]    Q: Tentatives to orders?

[12]    A: Yeah, convert them. So Hank was always a big

[13] proponent that "T's are a bunch of B.S.; O's are deals."

[14]    Q: Okay. Scratch the okay on that.

[15]    In your opinion does a T&O have any value

[16] other than in discussions between Hank and the

[17] salesperson?

[18]    A: No.

[19]    Q: It was simply a management tool to see where a

[20] particular salesperson was —

[21]    A: Toward their salary, their base commission, et

[22] cetera, so Hank would use it and say, "Okay, it's March

[23] and you've only got 20,000 O's and you've got 50,000

[24] T's. You're not going to get to your number, and I'm

[25] going to take — he was a big proponent — I'm going to

Page 64

[1] take away from you." If you didn't meet your numbers,

[2] he'd always remind you how he was going to take his

[3] money back.

[4]    Q: So, in other words, he had already given

[5] advances on amounts —

[6]    A: He paid them. Yeah, he was actually paying

[7] them, so basically they were doing a draw against

[8] commissions.

[9]    Q: The salesperson was doing a draw against

[10] commission?

[11]    A: Yes.

[12]    Q: Did you ever do a draw against commission in

[13] your job?

[14]    A: No.

[15]    Q: You were paid a straight salary always?

[16]    A: Yes.

[17]    Q: Did you discuss the T&O's with Beth Ann Irvine?

[18]    A: I just gave her copies of them.

[19]    Q: Why did you maintain copies of T&O's?

[20]    A: Just something I just happened to have in the

[21] folder that I had when I left Vantage. It was — she

[22] asked if I had any documents. I gave her whatever

[23] documents I had with Vantage. That was it.

[24]    Q: Did you use those yourself as a management

[25] tool?

Page 65

[1]    A: Did I? It is just a way that we looked at what

[2] the actual orders were. We looked at what the

[3] numbers — if we were going to hit our annual numbers

[4] forecasted.

[5]    Q: So the T&O would show what the actual orders

[6] were, but the tentatives wouldn't tell you anything?

[7]    A: That's correct.

[8]    Q: Now, you said you spoke with Beth Ann Irvine.

[9] Did you ever speak with Laurence Saklad about this

[10] lawsuit at all?

[11]    A: No.

[12]    Q: Did you speak with anybody else besides Beth

[13] Ann Irvine?

[14]    A: There was a postal inspector that came with

[15] her.

[16]    Q: Do you remember what his name was?

[17]    A: No.

[18]    Q: Did he say anything to you during these

[19] discussions?

[20]    A: No. Basically it was just asked me questions

[21] about those side letters was the bulk of the

[22] conversation, if I remember them. They went deal by

[23] deal by deal. For me to try to remember every program

[24] Vantage had and all that, I don't remember that. From

[25] that time point going forward it's like — you could

Page 66

[1] mention groups to me right now; I wouldn't even have a

[2] recollect of that.

[3]    Q: But there were side letters that you did sign?

[4]    A: Yes.

[5]    Q: And there were program agreements you signed as

[6] well?

[7]    A: Yes.

[8]    Q: So you met with Beth Ann Irvine and you met

[9] with another postal inspector whose name you can't

[10] recall at the time. Have you ever discussed this case

[11] with anyone else?

[12]    A: The only other meeting I had was with Beth Ann

[13] and Peter when I was in Boston on one occasion.

[14]    Q: And what was the substance of that meeting?

[15]    A: It was just to go over the documents that they

[16] had taken.

[17]    Q: Did you give them a written statement?

[18]    A: No.

[19]    Q: Have you ever given them a written statement?

[20]    A: No.

[21]    Q: You said you went over documents. Do you

[22] remember what particular documents you went over?

[23]    A: It's just these group names like T&O, what's —

[24] same kind of questions you're asking — what's a T;

[25] what's an O; what's a handicap; that type of thing,

Vantage 20733

Dallas Ray Graves
February 20, 2002

United States of America, et al    v.
Henry R. Lewis, et al

---

Page 67

[1] trying to get the Vantage logo down and what it means,
[2] so to the best of my knowledge I told them what the
[3] definition was.
[4]    Q: Did anybody ever tell you that you might be
[5] liable as an officer of Vantage in this case?
[6]    A: No.
[7]    Q: Were you ever shown a badge by anyone?
[8]    A: No.
[9]    Q: Did anyone from the U.S. Postal Inspector's
[10] office show you any sort of a badge or give you a card?
[11]    A: They gave me a card when they came to Dallas
[12] so...
[13]    Q: They gave you their cards.
[14]    Do you believe that either one of them had
[15] any sort of police authority?
[16]    A: No.
[17]    Q: Was there any suggestion of any sort of a
[18] criminal inquiry?
[19]    A: No.
[20]    Q: Do you feel that you were pressured or coerced
[21] in any way to meet with anyone from either the postal
[22] service or U.S. Attorney General's office?
[23]    A: No.
[24]    Q: I'm going to run through some other names, and
[25] let me know whether you're familiar with any of these

Page 68

[1] folks.
[2]    Michael Blanchard?
[3]    A: Yes.
[4]    Q: Who is Michael Blanchard?
[5]    A: He's an administrator.
[6]    Q: While you were at Vantage?
[7]    A: Seems like he was. Michael. Michael. No,
[8] Michael Lampert. I don't know who Michael Blanchard is.
[9]    THE REPORTER: Michael who?
[10]    A: I know Michael Lampert, not Michael Blanchard.
[11]    Q: (BY MR. PERLMAN) Michael Cooper?
[12]    A: No.
[13]    Q: James Degman?
[14]    A: No.
[15]    Q: Michael Desrosiers?
[16]    A: Debrago?
[17]    Q: No. D-E-S-R-O-S-I-E-R-S.
[18]    A: No.
[19]    Q: A lot of French names here. Allen Dulyet?
[20]    A: No.
[21]    MR. LEVITT: Duette.
[22]    MR. PERLMAN: Duette.
[23]    MR. LEVITT: (Attorney nodded head.)
[24]    Q: (BY MR. PERLMAN) Gloria Fanning?
[25]    A: No.

Page 69

[1]    Q: Beth Ann Irvine you said you did?
[2]    A: Yes.
[3]    Q: Helen Seweryn.
[4]    MR. LEVITT: Seweryn, S-E-W-E-R-YN.
[5]    Q: (BY MR. PERLMAN) Never met with any of these
[6] folks?
[7]    A: No.
[8]    Q: Charles Starks?
[9]    A: No.
[10]    Q: The only name you recognize then is Beth Ann
[11] Irvine?
[12]    A: Yes.
[13]    MR. PERLMAN: Off the record.
[14]    (Recess from 11:41 a.m. to 12:01 p.m.)
[15]    (Exhibits 3A, 3B, 4 to 8, 9A, 9B, 10A,
[16] 10B, 11, 12, 13A, 13B, 14 to 17 marked.)
[17]    MR. PERLMAN: Go back on the record. What
[18] was the last question?
[19]    (Requested portion was read.)
[20]    Q: (BY MR. PERLMAN) Just ask you this,
[21] Mr. Graves, did you have any discussions with Mr. Levitt
[22] immediately prior to this deposition?
[23]    A: I saw Mr. Levitt last night for a few minutes
[24] just to answer a question he had with regards to one of
[25] the documents.

Page 70

[1]    Q: Did he discuss your testimony today with you at
[2] all?
[3]    A: No.
[4]    Q: Did he discuss how you would testify today?
[5]    A: No.
[6]    Q: I'm going to show you what's been marked as
[7] Defendant's Exhibit Graves 2. We'll just stick with
[8] Defense Exhibit 2.
[9]    MR. LEVITT: Exhibit 2 is fine.
[10]    Q: (BY MR. PERLMAN) Make it a little easier.
[11] Which appears to be a letter on Vantage Group Services
[12] letterhead addressed to James Ward at the Grand Lodge of
[13] Texas Free and Accepted Masons. Take a look at that
[14] exhibit for me, please. Are you familiar with that
[15] letter? Have you ever seen it before?
[16]    A: No. No.
[17]    Q: There appears to be a signature line below
[18] which your name appears on the lower right-hand corner
[19] of the letter. Do you know why that would be there?
[20]    A: Probably because Michael Lampert was the
[21] administrator who wrote it up, because I was the
[22] president of group services, but this pricing stuff like
[23] this always had to have Hank's approval to do this kind
[24] of stuff.
[25]    Q: When you say, "Pricing stuff like this," what

---

Vantage 20734

United States of America, et al   v.
Henry R. Lewis, et al

Page 71

[1] do you mean?

[2]    **A:** Any time you would go in and adjust a price,
[3] but interesting enough, on Freddie's stuff, because
[4] Michael worked for Freddie, it was always Hank having to
[5] make those decisions. I mean, the only person that was
[6] allowed not to have to go through that process was Larry
[7] Lyon.

[8]    **Q:** Why Larry Lyon?

[9]    **A:** I think he was part owner. You know, Larry did
[10] Larry's deal. You know what I mean. And that was just
[11] Larry and Larry got away with that with Hank. Now, did
[12] they not have knock down drag out discussions over it?
[13] No, I mean, they would get into some hoopla over it, and
[14] Hank would always threaten to take it out of Larry's
[15] commissions. You know what I mean. But as I said
[16] earlier, and the preference, Hank was the one that had
[17] to sign. "It's my money; I sign off." Do you know what
[18] I mean, so...

[19]    **Q:** But I don't see Hank's name anywhere on this
[20] letter.

[21]    **A:** No. Kind of interesting. Hank never signed
[22] anything, so that's the interesting piece.

[23]    **Q:** This letter represents an adjustment in the
[24] price that Vantage charged to the client?

[25]    **A:** Yeah, and Michael had to have gotten an

Page 72

[1] approval, or Fred did, from Hank in order to issue this
[2] letter.

[3]    **Q:** Now, this letter also seems to indicate that
[4] there was a per piece fee charged by Vantage to the
[5] client?

[6]    **A:** That's how they did the actual account analysis
[7] report. And they did it on a per piece times the net
[8] mail, da-da-da.

[9]    **Q:** Is that how they charged the clients?

[10]    **A:** Actually, the way it was, the client was
[11] charged — the client was given the proceeds after
[12] Vantage had covered the cost of the program.

[13]    **Q:** But Vantage's fees were based on a per piece
[14] fee basis?

[15]    **A:** Yes.

[16]    **Q:** Was that always true? Was it ever based on a
[17] percentage of the profits?

[18]    **A:** No, I think it's always based on the actual
[19] cost of the program plus what they added on for the
[20] profit margin.

[21]    **Q:** That was reflected in the per piece fee?

[22]    **A:** Yes.

[23]    **Q:** So Vantage didn't share in the profits in these
[24] campaigns. They simply charged a per piece fee and
[25] collected it from the proceeds or from the company?

Page 73

[1]    **A:** Vantage profits from doing this because these
[2] programs came out of the actual fee that you see listed
[3] there, so it's on a unit cost. It's built in there.

[4]    **Q:** And that's how Vantage got paid?

[5]    **A:** Yeah, because that number on a per unit would
[6] equal cost plus profit margin.

[7]    **Q:** And from looking at this letter it would appear
[8] that this particular group, the Grand Lodge of Texas
[9] Free and Accepted Masons — you're going to have a lot
[10] of them like this, so just wait — was to pay Vantage,
[11] uh —

[12]    **A:** $1.05.

[13]    **Q:** — $1.05 per piece mail?

[14]    **A:** Yes.

[15]    **Q:** Now, this letter also seems to guarantee a
[16] minimum payment to the Grand Lodge of Texas. I'll leave
[17] it at that.

[18]    **A:** Yeah, that means they just keep mailing until
[19] they got to that number.

[20]    **Q:** They would keep mailing until the Grand Lodge
[21] of Texas received at least $100,000 and all of Vantage's
[22] costs were paid?

[23]    **A:** Yes.

[24]    **Q:** Would this mean that Vantage was guaranteeing
[25] that the program was going to be successful?

Page 74

[1]    **A:** Yes, in that letter.

[2]    **Q:** In this particular instance?

[3]    **A:** Yes.

[4]    **Q:** What would happen if there wasn't enough money
[5] raised to pay the minimum?

[6]    **A:** In that case that's when they just do another
[7] mailing. If Hank thought the group was a viable group
[8] and saw the response analysis report, he saw that there
[9] was enough response analysis to that, or what Vantage
[10] may do is change the product on that. If that was
[11] labels, that may be a better group for cards, and he'd
[12] run a card job and get low costs on creating a card
[13] program and get that out there to recover it. In a lot
[14] of cases that's what they would do.

[15]    **Q:** So prior to entering into this deal, would
[16] Vantage or did you as president of the division believe
[17] that there was any risk associated with not being able
[18] to collect enough funds to pay the minimum and pay the
[19] cost?

[20]    MR. LEVITT: Object to form.

[21]    **Q:** (BY MR. PERLMAN) Let me restate it even
[22] though — let me restate it.

[23]    Actually, why don't you read the question
[24] back?

[25]    (Requested portion was read.)

Vantage 20735

Dallas Ray Graves
February 20, 2002

United States of America, et al   v.
Henry R. Lewis, et al

---

Page 75

[1]  **Q:** Yeah, I wrote it out there with two questions.
[2] Let me ask you, did you, as president of Vantage Group
[3] Services, prior to entering into this agreement with the
[4] Grand Lodge of Texas, believe that there was a risk in
[5] not collecting enough money to pay the minimum and the
[6] costs and whatever profit Vantage expected to receive in
[7] this mailing?
[8]      **A:** I think all the programs had risk, so the
[9] bottom line would be was there —
[10]     **Q:** Why do you say all the programs had risk?
[11]     **A:** Because there's no guarantee. You don't know
[12] because you don't have the donor list or you don't know
[13] if they're a good donor list or all the components
[14] are — you're going to get the response that you think.
[15]      In a lot of cases with Vantage it's a
[16] group they have already done business with, and so they
[17] know what the track record is, so they know that they
[18] can expect a 30 percent or a 20 percent return on
[19] response to that particular program. In those cases
[20] Hank would take a larger risk like that or he would say,
[21] "I'll guarantee you $100,000," because I know he can do
[22] that because he's done it before. In a case with a new
[23] group, I don't think you'd ever see that type of a
[24] situation, and so what would happen would be unless
[25] there's a common agreement that they could continue on

Page 76

[1] with another mailing, et cetera. And that was always
[2] the — keeping in mind the runs were always printed
[3] enough where they're way extreme enough product to go
[4] back out where it didn't cost Vantage anything to
[5] produce the product because it was already there. Do
[6] you know what I mean?
[7]      **Q:** So was it they would overproduce the labels or
[8] the cards?
[9]      **A:** (Witness nodded head.)
[10]     **Q:** Yes?
[11]     **A:** Yes.
[12]     **Q:** So it was not expensive then to continue to
[13] mail, in other words?
[14]     **A:** Yes, except, for instance, say if they printed
[15] that job and 100,000 donor names, they may print 150,000
[16] of those because it's cheaper to print the 150,000
[17] because of discount and warehouse 50,000. If the
[18] program went and didn't get the results, they had 50,000
[19] more in reserve product that they could mail and the
[20] only cost to them was the mailing costs to get out there
[21] and recover the shortfall.
[22]     **Q:** When you say the mailing costs, you're talking
[23] about the cost of the mail house and the postage?
[24]     **A:** Yes. So you didn't have all the costs of the
[25] actual material product.

---

Page 77

[1]  **Q:** So that would, in their mind, lessen any
[2] potential risk they had in mailing these campaigns?
[3]      **MR. LEVITT:** I object to Form.
[4]      **A:** I don't know if that minimizes the risk. It
[5] gave them an alternative to risk.
[6]      **Q:** (BY MR. PERLMAN) What do you mean "an
[7] alternative to risk"?
[8]      **A:** In other words, the risk was still there. They
[9] had another process whereby they could go back and
[10] recover any shortfall. That was the program at Vantage.
[11] If there was a shortfall, and some programs had a
[12] shortfall, there would be another mailing.
[13]      In some cases — remember, like told you
[14] earlier, that one case Hank decided not to mail, just
[15] eat the loss.
[16]     **Q:** But that was the exception to the rule?
[17]     **A:** Yes.
[18]     **MR. PERLMAN:** Do you want to take a look
[19] at that?
[20]     **MR. LEVITT:** Yes.
[21]     **Q:** (BY MR. PERLMAN) Let me show you what's been
[22] marked as Defendant's Exhibit 3A which appears to be a
[23] letter on Vantage Group Services' letterhead signed by
[24] you and by Edward Wallace as president of the Ancient
[25] Order of Hibernians in America.

Page 78

[1]      **MR. PERLMAN:** Do you want Hibernians?
[2]      **THE REPORTER:** I can get it later. I'll
[3] have the document.
[4]      **Q:** (BY MR. PERLMAN) Are you familiar with this
[5] copy of this letter?
[6]      **A:** This is that side letter we were talking about.
[7]      **Q:** Is that your signature or a copy of your
[8] signature on the bottom of the letter?
[9]      **A:** Yes.
[10]     **Q:** Can you tell me why this side letter was
[11] executed?       —
[12]     **A:** It was an agreement between the group and
[13] Vantage to allow them to keep mailing. This was the
[14] process that Vantage utilized prior to me arriving there
[15] was to get a side letter to allow them to continue to
[16] mail, because under the agreement there was no real
[17] recourse for them to continue to mail if there was a
[18] shortfall, so Hank always wanted this leverage to be
[19] able to mail.
[20]     **Q:** Now, the original program agreement with which
[21] this side letter was associated, would it require that
[22] the charity pay all the costs in full?
[23]     **A:** No, the charity never paid.
[24]     **Q:** What do you mean "the charity never paid"?
[25]     **A:** The charity didn't take any liability for that

---

Vantage 20736

United States of America, et al  v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 79

[1] fact. Vantage always took all the liability to doing
[2] the program and returning to the charity profits.
[3]   Q: Is that what the contract would say?
[4]   A: The contract doesn't — I haven't looked at the
[5] contract in years. Just says we're going to do a
[6] mailing program or we're going to do this program and
[7] then drop this, et cetera, et cetera, so I don't think
[8] the agreement of the — I don't know exactly the
[9] verbiage within the contract, so — but the agreement —
[10] I think the agreement just outlines the program, that
[11] it's going to be labels or cards, et cetera.
[12]   Q: I'm going to show you what's been marked as
[13] Defendant's Exhibit 4 which appears to be a memorandum
[14] from Harry Melikian to Frank Celani and Kim Tanian?
[15]   A: Tanian.
[16]   Q: CC's to you. Can you tell me whether you've
[17] ever seen that memorandum or a copy of that memorandum
[18] before?
[19]   A: Yes.
[20]   Q: And what was that about?
[21]   A: To do the due diligence on the group because
[22] they didn't think the salespeople did a great job in
[23] knowing that it was a good group or a bad group, so
[24] their objective was to have Frank do a due diligence on
[25] the group.

Page 80

[1]   Q: Frank Celani?
[2]   A: Yes.
[3]   Q: Why?
[4]   A: Because a lot of times the salesperson was just
[5] smoking mirror on the group, it wasn't a good group,
[6] because they were just trying to meet numbers.
[7]   Q: What do you mean "it wasn't a good group"?
[8]   A: It wasn't — their member list wasn't good.
[9] Their donor list was not that good. Their actual fund
[10] raising, they hadn't raise X amount of dollars. They
[11] would ask them to do a little bit more.
[12]   Q: So the purpose of doing this due diligence
[13] would be what?
[14]   A: You can just have Frank follow the group
[15] because they didn't want to take the word of the
[16] salesperson anymore.
[17]   Q: What were they concerned about?
[18]   A: Before they did that program, instead of just
[19] listening to the salesperson, because that was the only
[20] contact of the group, was to basically have someone else
[21] like Frank Celani do a follow-up. He would ask them how
[22] many programs they have done, what was of the results.
[23] You know what I mean, just very —
[24]   THE REPORTER: Just very what?
[25]   A: — global type question. They weren't what you

Page 81

[1] would normally see if you were a banker or a credit —
[2] you know, a financial to deliver a credit rating of a
[3] company, et cetera, so it was fact finding on Frank's
[4] part more so than anything.
[5]   Q: (BY MR. PERLMAN) Could you read the first
[6] paragraph in that memorandum?
[7]   A: The following —
[8]   Q: You have to read it slowly.
[9]   A: "The following will serve as the minimum
[10] procedures to be followed in evaluating the financial
[11] capability of a not for profit being able to pay Vantage
[12] as it relates to direct mail acquisition projects
[13] undertaken on behalf of the group."
[14]   Q: Now, what you just read, does that appear to
[15] indicate to you that Vantage was concerned that certain
[16] nonprofits were not going to be able to meet their
[17] obligation with respect to paying Vantage for its
[18] services?
[19]   A: No.
[20]   Q: Well, why would Vantage want to evaluate the
[21] financial capability of a not-for-profit organization
[22] with respect to its ability to pay Vantage?
[23]   A: My interpretation of that memo when it came out
[24] was just to do more investigation into the group, and if
[25] they had done fund raising programs, how successful they

Page 82

[1] were. That was a memorandum — it's got some cliches as
[2] far as terminology in there. And the other issue is for
[3] the group to pay Vantage. It's not to pay Vantage.
[4] It's would it be a successful program with Vantage for
[5] Vantage —
[6]   Q: Slow down. Slow down.
[7]   A: Oh, I'm sorry.
[8]   THE REPORTER: You really need to slow
[9] down a little bit. The words all run together.
[10]   A: So, in other words, it's — that kind of
[11] contradicts the process in which Vantage creates a
[12] program whereby Vantage would pay all up front and then
[13] recover it out of the actual program itself, so there's
[14] no group paying Vantage. It's the ability to put
[15] together a successful program in order for Vantage and
[16] the group to make money.
[17]   Q: (BY MR. PERLMAN) So, in other words, Vantage
[18] was attempting to minimize its risks —
[19]   A: Right.
[20]   Q: — with respect to these deals?
[21]   A: Yes.
[22]   Q: But this letter seems to indicate that they
[23] want to be sure the group has the financial capability
[24] to pay Vantage?
[25]   A: They never got the monies.

Vantage 20737

Dallas Ray Graves
February 20, 2002

United States of America, et al    v.
Henry R. Lewis, et al

Page 83

[1] **Q:** Yes or no?

[2] **A:** No.

[3] **Q:** Well, what does the following mean to you:

[4] "Evaluating the financial capability of a not-for-profit

[5] organization being able to pay Vantage as it relates to

[6] direct mail acquisition"?

[7] **A:** What I said basically was to do due diligence

[8] on the group, not so much the financials.

[9] **Q:** This letter indicates that the due diligence

[10] procedures include obtaining the latest financial

[11] report, correct?

[12] **A:** (Witness nodded head.)

[13] **Q:** Why would the organization — why would Vantage

[14] want to obtain the latest copy of its financial report?

[15] **A:** Because I think that indicates their — what

[16] they've done in their fund raising process prior to

[17] that, any programs they've done and how successful. I

[18] think there's a big issue on do they really have donors

[19] or members.

[20] **Q:** It goes on to say, "This report will show you

[21] that the nonprofit is in a deficit funding mode, that

[22] is, that they run an operating deficit, must make up the

[23] shortfall from outside sources."

[24] **A:** That really means — that's directed toward the

[25] program itself. In other words, if we run this program

Page 84

[1] and there's — are we going to incur a shortfall and are

[2] we going to have to rerun it, and we already know that

[3] up front and that's a larger risk, or do we minimize it

[4] and say that we think that the first run will actually

[5] cover the costs.

[6] **Q:** So this was an attempt again by Vantage to see

[7] how the group had performed in the past in its fund

[8] raising activities?

[9] **A:** Yes.

[10] **Q:** Well, it also says, "Obtain a bank reference.

[11] This is important inasmuch as the nonprofit may be

[12] constantly at a low level of cash on hand at all times."

[13] Why would Vantage be concerned about the organization

[14] having a low level of cash on hand?

[15] **A:** I don't know, but very few nonprofits gave them

[16] that information; I can tell you that. They just didn't

[17] provide that.

[18] **Q:** That's not what I asked, though.

[19] **A:** I don't know.

[20] **Q:** It's okay if you don't know. The letter also

[21] says that, "Remember, on acquisition type of mailings,

[22] we are relying on financial worthiness of the

[23] nonprofit." Why would Vantage be concerned about the

[24] financial worthiness of a nonprofit if they were getting

[25] all of the money out of the campaign?

Page 85

[1] **A:** Acquisition is totally different than an

[2] existing membership or donor base.

[3] **Q:** How so?

[4] **A:** Acquisition means that they have acquired that

[5] donor list from some other outside entity and they mail

[6] to it, so it's an acquisition list. In a lot of cases

[7] it would be Vantage's acquisition list from another

[8] group.

[9] **Q:** Does this mean that Vantage wanted the

[10] nonprofit client to be responsible for all payments in

[11] an acquisition program?

[12] **A:** Yes.

[13] **Q:** Regardless of whether the acquisition program

[14] produced a net?

[15] **A:** And they wanted them to be responsible for the

[16] cost of the program. In other words, so Vantage

[17] wouldn't take a loss.

[18] **Q:** I'm going to show you what's been marked as

[19] Defendant's Exhibit 5 which again is on Vantage Group

[20] Services' letterhead and it shows "Release of Contract

[21] Claim." Appears to involve the IFBF Agricultural

[22] Leadership and Promotion Foundation. Have you ever seen

[23] that document before?

[24] **A:** Yes, I have. I signed it.

[25] **Q:** That is your signature that appears?

Page 86

[1] **A:** Yes.

[2] **Q:** Or a copy of your signature that appears on the

[3] document? You have to say yes now.

[4] **A:** Yes. I was letting her catch up here.

[5] **Q:** She's starting to get with you already.

[6] Why was there a release signed in this

[7] particular deal?

[8] **A:** I don't remember. I don't remember.

[9] **Q:** The second paragraph of page 1 says, "It is

[10] mutually agreed upon that all future donations for the

[11] above label program will be the sole property of Vantage

[12] Financial Services, Inc." Do you know why that

[13] particular paragraph was included in this document?

[14] **A:** I can only speculate that means if there was a

[15] shortfall in that program and that the group was

[16] agreeing we're not going to mail anymore. Vantage won't

[17] mail anymore, but if there's anything that comes in

[18] after this, that Vantage could take it against the loss.

[19] **Q:** Why would you believe that it says that they're

[20] not going to mail anymore?

[21] **A:** When you do a release like that, that means the

[22] group would have been — didn't want — wasn't — was

[23] unhappy with the program and didn't want — didn't want

[24] their donors or their members affected by it anymore, so

[25] it basically probably — my only speculation that's —

Vantage 20738

United States of America, et al  v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 87

[1] you don't usually see that. This means someone from
[2] that group must have been really hot about it and just
[3] wanted to release that Vantage wasn't going to mail to
[4] them anymore.
[5] Q: Do you remember this particular situation?
[6] A: No.
[7] Q: So you're speculating?
[8] A: Yes. That's what I said, it's speculation.
[9] Q: Mr. Graves, I'm going to show you what's been
[10] marked as Defendant's Exhibit 6 which appears to —
[11] which has a title on page 1 of program agreement with
[12] the Massachusetts State Council Knights of Columbus.
[13] MR. PERLMAN: Off the record.
[14] (Discussion off the record 12:29 p.m. to
[15] 12:29 p.m.)
[16] Q: (BY MR. PERLMAN) Mr. Graves, have you ever
[17] seen that agreement before?
[18] A: Appears to be the standard agreement that we
[19] used for groups.
[20] Q: Referring you to the last page of this exhibit.
[21] Would that be a copy of your signature?
[22] A: Yes.
[23] Q: I'd like you to refer to paragraph 6(c) of this
[24] agreement. Could you read that, please, slowly.
[25] A: Reading lessons today. It's a good thing I can

Page 88

[1] read.
[2] "In the event that gross collections
[3] associated with a program are insufficient to cover the
[4] expenses and costs described in subparagraphs (a) and
[5] (b), above, then the organization will be billed by
[6] Vantage for the shortfall, which will be due and payable
[7] within 30 days of invoice."
[8] Q: I would say that paragraph sort of speaks for
[9] itself. Wouldn't you?
[10] A: I'm not answering that question. Define what
[11] in your opinion is "speaks for itself."
[12] Q: What does that paragraph mean to you, or
[13] subparagraph?
[14] A: Okay. It just says that in this case —
[15] Vantage has the ability — has the right to bill the
[16] client if they didn't cover their costs, that's correct.
[17] Q: Do you know whether or not this agreement was
[18] ever modified?
[19] A: That's where the side letter came from.
[20] Q: Do you know whether there was a side letter for
[21] this agreement?
[22] A: I don't remember that.
[23] Q: And the side letter would modify that
[24] particular provision?
[25] A: Yes.

Page 89

[1] Q: If there was no side letter, then, in your
[2] opinion, would the client be required to pay Vantage 30
[3] days after they were billed?
[4] A: Yes.
[5] Q: Regardless of whether or not the proceeds were
[6] sufficient enough to pay the expenses?
[7] A: If Vantage would bill them.
[8] Q: Assuming that Vantage billed them.
[9] A: Yes.
[10] MR. PERLMAN: Do you want to see this?
[11] MR. LEVITT: No.
[12] Q: (BY MR. PERLMAN) Mr. Graves, I want to show
[13] you what's been marked as Defendant's Exhibit No. 7
[14] which again says "Program Agreement" on the first page
[15] and appears to be the agreement between Vantage and the
[16] New Jersey State Council Knights of Columbus. Have you
[17] ever seen that program agreement before?
[18] A: Yes.
[19] Q: Is that your signature that appears on the last
[20] page?
[21] A: Yes.
[22] Q: Do you remember signing that agreement?
[23] A: No. I guess I did sign it, so...
[24] Q: Okay. Is there any reason to believe that you
[25] didn't sign this agreement?

Page 90

[1] A: No.
[2] MR. LEVITT: Who is the nonprofit?
[3] MR. PERLMAN: New Jersey State Council
[4] Knights of Columbus.
[5] Q: (BY MR. PERLMAN) Just one more thing about
[6] this agreement, Mr. Graves. Do you know whether or not
[7] there was a side letter agreement?
[8] A: No.
[9] Q: You don't recall?
[10] A: No.
[11] Q: I'm going to show you what's been marked as
[12] Defendant's Exhibit 8 which again appears to be a
[13] program agreement between Vantage and the United States
[14] Tennis Association. Finally, an easy one.
[15] Do you recall this agreement?
[16] A: This is a process here. No.
[17] Q: You don't recall the agreement?
[18] A: (Witness shakes head.)
[19] Q: Referring to the last page of that agreement,
[20] does your signature appear on that page?
[21] A: Yes.
[22] Q: Is there any reason for you to believe that
[23] that's not your signature?
[24] A: No.
[25] Q: Any reason for you to believe you didn't then

Vantage 20739

Dallas Ray Graves
February 20, 2002

United States of America, et al   v.
Henry R. Lewis, et al

---

Page 93

[1] sign this program agreement?

[2]   **A:** No.

[3]   **Q:** Do you know whether there was a side letter?

[4]   **A:** No.

[5]   **MR. PERLMAN:** Off the record.

[6] (Discussion off the record 12:35 p.m. to

[7] 12:35 p.m.)

[8]   **Q:** (BY MR. PERLMAN) I want to show you what's

[9] been marked as Defendant's Exhibit 9A — make that 9B,

[10] excuse me. Which appears again to be a program

[11] agreement between Vantage and Bnai Zion, B-N-A-I. Do

[12] you recall ever having seen that agreement before?

[13]   **A:** No.

[14]   **Q:** Do you recall that client at all?

[15]   **A:** I remember this client name, but I don't

[16] remember this agreement.

[17]   **Q:** Again I'll refer to you to the second to the

[18] last page.

[19]   **A:** Uh-huh.

[20]   **Q:** Does that appear to be a copy of your signature

[21] on that agreement?

[22]   **A:** Yes.

[23]   **Q:** Do you have any reason to believe that you

[24] didn't sign this agreement?

[25]   **A:** No.

Page 92

[1]   **Q:** Let me refer you to paragraph 6(c) of

[2] Defendant's Exhibit 8. Is that the same form language

[3] that we've seen in the other agreements with respect to

[4] the payment to Vantage within 30 days of invoicing?

[5]   **A:** Yes.

[6]   **MR. PERLMAN:** Do you want to see this one?

[7]   **MR. LEVITT:** No.

[8]   **Q:** (BY MR. PERLMAN) I'd like to show you what's

[9] been marked as Defendant's Exhibit 9A which appears to

[10] be a letter to Bnai Zion Foundation from Fred Chandler.

[11] Do you remember ever having seen that before?

[12]   **A:** No.

[13]   **MR. LEVITT:** You have to answer out.

[14]   **A:** No.

[15]   **Q:** (BY MR. PERLMAN) Do you have any reason to

[16] believe that you would not have seen that letter?

[17]   **A:** What was the question?

[18]   **Q:** Do you have any reason to believe that you

[19] would not have seen that letter before?

[20]   **A:** I would say yes because I didn't sign this

[21] letter, so...

[22]   **Q:** Is this letter a modification of the program

[23] agreement between Vantage and Bnai Zion Foundation?

[24]   **A:** That's the side letter agreement.

[25]   **Q:** Would Fred Chandler have sent out a side letter

Page 93

[1] agreement to the client without you first having seen

[2] it?

[3]   **A:** Yes.

[4]   **Q:** Even while you were president of the division?

[5]   **A:** Yes.

[6]   **Q:** Would he take it upon himself to send this

[7] letter out?

[8]   **A:** Yes.

[9]   **Q:** And you don't recall him ever having checked

[10] with you about whether or not it was appropriate to send

[11] this letter?

[12]   **A:** No.

[13]   **Q:** Referring to what appears to be subparagraph A

[14] of the Defendant's Exhibit 9A, it states, "Vantage Group

[15] Services shall have the right to continue the

[16] fund-raising program until such shortfall is

[17] eliminated." Would that be a standard side letter term

[18] found in most of these agreements?

[19]   **A:** Yes.

[20]   **Q:** Does that modify paragraph 6(c) of Defendant's

[21] Exhibit 9B which we referred to previously?

[22]   **A:** Yes.

[23]   **Q:** It also states in subparagraph C of this

[24] letter, Defendant's Exhibit 9A, that "In the event that

[25] the proceeds of the program are insufficient to cover

Page 94

[1] all program costs (including postage and bank charges if

[2] applicable) Vantage Group Services shall perform the

[3] caging of the funds." Do you know why that was put into

[4] this letter?

[5]   **A:** No, because Vantage always did the caging.

[6]   **Q:** Vantage always did the caging?

[7]   **A:** Yes.

[8]   **Q:** For all of its clients?

[9]   **A:** Yes.

[10]   **Q:** There weren't any clients that caged themselves

[11] in-house?

[12]   **A:** Not that I can remember.

[13]   **Q:** There wasn't any bank that would do caging on

[14] the outside?

[15]   **A:** The bank — BFDS did that on behalf of Vantage.

[16]   **THE REPORTER:** Who did it? I'm sorry.

[17]   **A:** Boston Financial Data Services caged all of

[18] Vantage's clients.

[19]   **Q:** (BY MR. PERLMAN) Boston Financial Data

[20] Services, okay.

[21]   **A:** For which Vantage marked that up and made money

[22] off of it too.

[23]   **Q:** Did the client ultimately pay for those costs?

[24]   **A:** It came out of the proceeds of the program.

[25]   **Q:** And those proceeds belonged to the client?

---

Vantage 20740

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 95

[1]   A: Yes.

[2]   Q: So the client was responsible for paying the

[3]   caging costs?

[4]   A: Client is responsible — yeah, to pay the

[5]   caging cost.

[6]   MR. PERLMAN: You okay here? Off the

[7]   record.

[8]   (Discussion off the record 12:40 p.m. to

[9]   12:41 p.m.)

[10]   A: To that question, Vantage set the price on the

[11]   caging. Vantage negotiated with the banks Vantage's

[12]   agreement with BFDS on the charges.

[13]   Q: (BY MR. PERLMAN) And those charges —

[14]   A: Were ultimately — yeah.

[15]   Q: — paid by the charity?

[16]   A: They were inclusive in the overall cost of the

[17]   program that Vantage did on behalf of the client.

[18]   Q: In the same way that the client would pay for

[19]   the production of the mail pieces and the postage of the

[20]   mail pieces?

[21]   A: Yes.

[22]   Q: So essentially Vantage would act as an agent on

[23]   behalf of the client in obtaining these services?

[24]   A: Yes.

[25]   Q: (BY MR. PERLMAN) Do you want to see this?

Page 96

[1]   MR. LEVITT: Sure.

[2]   Q: (BY MR. PERLMAN) Let me show you what's been

[3]   marked as Defendant's Exhibit 10B. Again, it appears to be a

[4]   program agreement — hang on a second — program

[5]   agreement between Vantage and the Western Youth Tennis

[6]   Foundation. Have you ever seen that program agreement

[7]   before?

[8]   A: The answer is yes.

[9]   Q: Does your signature appear on the second to the

[10]   last page of that agreement?

[11]   A: Yes.

[12]   Q: Do you recall this client in particular?

[13]   A: Not — no.

[14]   Q: Let me show you what's been marked as

[15]   Defendant's Exhibit 10A which is a letter — I'm

[16]   sorry — which is a letter between, appears to be

[17]   written by Fred Chandler from Vantage to Mark Saunders

[18]   of the Western Youth Tennis Foundation. Have you ever

[19]   seen that letter before?

[20]   A: No.

[21]   Q: Is that what you would characterize as a

[22]   standard side letter?

[23]   A: Yes.

[24]   Q: And, again, Mr. Chandler would have the right

[25]   to send that out on his own accord?

Page 97

[1]   A: Yes.

[2]   Q: Without checking with you?

[3]   A: Yes.

[4]   Q: Do you know if he would check with anyone else?

[5]   A: Not in the side letters because actually after

[6]   communicating with counsel we advised him to quit

[7]   sending side letters out.

[8]   Q: When was that?

[9]   A: After we met with Hill & Barlow in that meeting

[10]   you saw with Saklad and that group on that topic.

[11]   Q: You advised the salespersons to stop sending

[12]   these side letters?

[13]   A: We did, yes.

[14]   Q: And they went and sent them out on their own

[15]   anyway?

[16]   A: I would think that this was prior to that

[17]   meeting. Based on — you have to look at the date of

[18]   that meeting.

[19]   Q: Hold on.

[20]   A: You have my —

[21]   Q: Yes. Well, the meeting —

[22]   A: Was May.

[23]   Q: — appeared to have taken place on May 30th,

[24]   1996.

[25]   A: Yeah. They didn't get back to us. They

Page 98

[1]   actually took all the contracts. Well, actually she

[2]   came back with the comment, advised us to stop using

[3]   these, so it had to be — I don't know the exact date

[4]   when she advised us, because that meeting took place and

[5]   they were advised not to use side letters anymore in

[6]   that meeting. If you'll see in the text of this right

[7]   here we brought it up.

[8]   Q: When you say "this," you're referring to

[9]   Defendant's Exhibit 1?

[10]   A: You're good at this. Keep it up. Oh, here.

[11]   "In addition we have been asked to review your contract

[12]   with respect to issues" — that's when it brought that

[13]   up.

[14]   Q: So is it possible that Mr. Chandler sent this

[15]   out on his own without any authorization from anyone?

[16]   A: Yes.

[17]   Q: And even possibly in contravention of

[18]   directives he had been given by people inside of

[19]   Vantage, such as yourself or Hank —

[20]   A: Yes.

[21]   Q: — Lewis?

[22]   MR. PERLMAN: Do you want...

[23]   MR. LEVITT: (Attorney shakes head.)

[24]   Q: (BY MR. PERLMAN) Let me see what else we have

[25]   here.

Vantage 20741

Dallas Ray Graves
February 20, 2002

United States of America, et al   v.
Henry R. Lewis, et al

Page 99

[1]      Mr. Graves, I'd like to refer you to
[2] Defendant's Exhibit 11 which appears to be a program
[3] agreement between Vantage and the Indiana Elks
[4] Association.
[5]      Could you please let me know whether
[6] you've ever seen that program agreement before?
[7]    **A:** The answer is if I signed it, the answer is
[8] yes.
[9]    **Q:** That's your signature or a copy of your
[10] signature that appears on — what's the page number
[11] there —
[12]    **A:** 5.
[13]    **Q:** — page 5 of the agreement?
[14]    **A:** Yes.
[15]    **Q:** Do you know whether or not there was a side
[16] letter issued along with this?
[17]    **A:** No.
[18]    **Q:** You don't recall whether there was one?
[19]    **A:** No. I don't recall the group.
[20]    **Q:** Mr. Graves, I'd like to refer you to what's
[21] been marked as Defendant's Exhibit 12. Again, a program
[22] agreement between Vantage — or it appears to be a
[23] program agreement between Vantage and the Grand Lodge of
[24] Michigan Free and Accepted Masons. Have you ever seen
[25] that agreement before?

Page 100

[1]    **A:** Yes.
[2]    **Q:** Do you recall that agreement?
[3]    **A:** No.
[4]    **Q:** Is your signature on the agreement?
[5]    **A:** Yes.
[6]    **Q:** Do you have any reason to believe that's not
[7] your signature or a copy of your signature?
[8]    **A:** No.
[9]    **Q:** Do you recall this particular client at all?
[10]    **A:** I don't recall the Masons from it being a
[11] travel group. I remember it being — Grand Lodge — so
[12] many pieces of the Grand Lodge. They had that account
[13] so, they had all the Grand Lodges.
[14]    **Q:** This might have been one of the Grand Lodges
[15] your division worked with?
[16]    **A:** Yeah.
[17]    **Q:** They also worked with them in the travel
[18] service division?
[19]    **A:** Right.
[20]    **Q:** Do you know whether or not there was ever a
[21] side letter executed with that?
[22]    **A:** No.
[23]    **Q:** At this time you don't recall this agreement
[24] other than you're agreeing that's your signature on the
[25] agreement?

Page 101

[1]    **A:** Yes.
[2]    **Q:** Okay. At this time I'd like to show you what's
[3] been marked as Defendant's Exhibit 13B which again
[4] appears to be a program agreement between Vantage and
[5] AHEPA, A-H-E-P-A, which appears to stand for American
[6] Hellenic Educational Progressive Association.
[7]      Are you familiar with that agreement?
[8]    **A:** I don't remember this group, no. No, I don't
[9] even remember this group.
[10]    **THE REPORTER:** I'm sorry?
[11]    **A:** No. The group doesn't even ring a bell.
[12]    **Q:** (BY MR. PERLMAN) The date on this agreement
[13] appears to be or at least is listed in the first line as
[14] the first day of October 1996 you were still the
[15] president of the division at that time?
[16]    **A:** No.
[17]    **Q:** You were still working for Vantage at that
[18] time, weren't you?
[19]    **A:** I was only working outside of Vantage. The new
[20] president was on board, I think, because I left on
[21] September the 20th.
[22]    **Q:** You testified you worked all the way through to
[23] January —
[24]    **A:** But I wasn't there every day and not in the
[25] president's capacity. I only worked there on the

Page 102

[1] transition with the technology piece. That's where that
[2] new president, whatever his name was you had listed
[3] there.
[4]    **Q:** The president at that time would have been
[5] Thomas Ferrara?
[6]    **A:** Yes.
[7]    **Q:** And you don't remember any involvement at all
[8] in this particular group?
[9]    **A:** No.
[10]    **Q:** I'd like to show you Defendant's Exhibit 14, a
[11] program agreement — appears to be a program agreement
[12] between Vantage and the Polish National Alliance. Are
[13] you familiar with that agreement?
[14]    **A:** Yes.
[15]    **Q:** You recall the agreement in particular?
[16]    **A:** No. I just remember that group.
[17]    **Q:** You remember that group. Is that your
[18] signature that appears on the second to the last page of
[19] that agreement?
[20]    **A:** Yes.
[21]    **Q:** This is a standard form of agreement that
[22] Vantage used?
[23]    **A:** Yes.
[24]    **Q:** Do you recall whether or not there was ever a
[25] side letter?

**Min-U-Script®**        Fuller  &  Associates, Inc. (214) 744-1250

Vantage 20742

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 103

[1]  **A:** No.

[2]  **Q:** Since this agreement was — scratch that.

[3]  Were side letters executed with all

[4]  agreements while you were there?

[5]  **A:** No. It was on a case-by-case basis. If they

[6]  felt like they had known the group for a long time or

[7]  done work with them, there wasn't side letters.

[8]  **Q:** Would the group normally ask for a side letter

[9]  or some type of —

[10]  **A:** No, the — I'm sorry.

[11]  THE REPORTER: "Some type of"...

[12]  **Q:** (BY MR. PERLMAN) — alternative arrangement?

[13]  **A:** I'm sorry. The group wouldn't ask for it.

[14]  What would happen is Vantage would want it and a lot of

[15]  times the group would refuse to sign one and say, "No,

[16]  we'll let you do whatever, but we're not going to sign

[17]  this," or they wanted it incorporated in the contracts,

[18]  which was very difficult, which we never did incorporate

[19]  it in the contracts.

[20]  **Q:** Why not?

[21]  **A:** Because it was — that's why I brought it up to

[22]  the legal counsel because we had so much trouble with

[23]  some groups with that saying it was an issue with them,

[24]  so when we asked to incorporate it in the contract, she

[25]  asked us to do away with that.

Page 104

[1]  **Q:** I'm not quite following you. Who is she?

[2]  **A:** Frances Cohen.

[3]  **Q:** Who is Frances Cohen?

[4]  **A:** She's with Hill & Barlow.

[5]  **Q:** So some groups would ask to have the terms of

[6]  the side letter incorporated into the agreement?

[7]  **A:** Yeah. They wanted it — if you're willing to

[8]  make —

[9]  THE REPORTER: If you're going to make

[10]  what?

[11]  **A:** If we're going to have a contract, we want one

[12]  contract. Their attorneys, when they took it to general

[13]  counsel — some groups never took it to general counsel.

[14]  The ones that took it before general counsel, normally

[15]  the general counsel would come back and say no. They

[16]  didn't want everything inclusive in one contract.

[17]  **Q:** Would some groups say that they don't want to

[18]  sign a side letter at all and simply go with the

[19]  contract the way it was structured originally?

[20]  **A:** No, you'd have them where they'd sign the

[21]  contract and the director of the program would sign it

[22]  on behalf of the side letter — do you know what I

[23]  mean — say, fine, we'll just do it.

[24]  **Q:** Run that — run that —

[25]  THE REPORTER: Say that again. I'm sorry.

Page 105

[1]  MR. LEVITT: Can I jump in for a second.

[2]  Do you need a break?

[3]  MR. PERLMAN: Do you want a break?

[4]  MR. LEVITT: No, I'm asking the witness if

[5]  he wants a break.

[6]  THE WITNESS: No, that's fine. I'm okay.

[7]  **A:** Basically it was group by group. Some groups

[8]  didn't have a problem with it being a side letter. If

[9]  indeed there was an issue from counsel from a particular

[10]  group and they want to incorporate it, a lot of times we

[11]  just forewent it.

[12]  **Q:** What was that last word?

[13]  **A:** Forego. We'd forego the — forewent, whatever

[14]  you want to call it. We just went without a side

[15]  agreement. And based on the fact that Hank knew he was

[16]  going —

[17]  THE REPORTER: Without what agreement?

[18]  **A:** Side agreement.

[19]  MR. LEVITT: You've got to slow down,

[20]  Dallas.

[21]  **A:** They would just go ahead and go forward with

[22]  the program, and they'd just know they were going to

[23]  mail it again if there was a problem, because the

[24]  director at that point manages the program, and the

[25]  nonprofit — executive of the nonprofit. They have a

Page 106

[1]  executive director. Whoever the contact was within the

[2]  organization would say, "No problem, I'll let you do

[3]  that." Do you know what I mean?

[4]  **Q:** (BY MR. PERLMAN) It was verbal, in other

[5]  words?

[6]  **A:** Yeah.

[7]  **Q:** But under the written terms of the program

[8]  agreement Vantage had the right to submit a bill and

[9]  expect it to be paid within 30 days?

[10]  **A:** According to 6(c), that's correct.

[11]  **Q:** I'd like to refer you to what's been marked as

[12]  Defendant's Exhibit 16 which appears to be a production

[13]  agreement between Vantage and the United States Navy

[14]  Memorial Foundation. Can you tell me whether or not

[15]  you've ever seen that production agreement before?

[16]  **A:** I do remember this, yeah.

[17]  **Q:** Do you know why there was no program agreement

[18]  associated with that?

[19]  **A:** No.

[20]  **Q:** Well, let me ask you this, was there a program

[21]  agreement associated with that?

[22]  **A:** No, and I don't remember why.

[23]  MR. LEVITT: Did you —

[24]  THE REPORTER: "No, and I don't remember

[25]  why"?

Vantage 20743

Dallas Ray Graves
February 20, 2002

United States of America, et al   v.
Henry R. Lewis, et al

---

Page 107

[1]  A: You have me thinking simply asking me
[2] questions.
[3]  Q: (BY MR. PERLMAN) So there would be times when
[4] Vantage would sign production agreements that didn't
[5] have program agreements associated with them?
[6]  A: This is — this is a Larry Lyons deal and Larry
[7] Lyons, like I told you earlier, does things on his own,
[8] so this is probably something Larry just drafted up and
[9] said basically and got Hank to agree to it. Most cases
[10] that's what was used (indicating). This is an exception
[11] to the rule.
[12]  Q: How do you know Hank agreed to this?
[13]  A: Because I remember Larry talking to Hank about
[14] this, and they got into a big issue over the pricing.
[15]  Q: What was the issue over pricing?
[16]  A: The 75 cents.
[17]  Q: Which was less than the normal charge?
[18]  A: Yeah.
[19]  Q: 75 cents per piece?
[20]  A: Uh-huh.
[21]  MR. LEVITT: You have to say yes or no.
[22]  A: Yes. I'm sorry.
[23]  Q: (BY MR. PERLMAN) Now, this production
[24] agreement which is dated August 19th, 1996, signed by,
[25] appears to be a Henry McKinney, U.S. and retired

Page 108

[1] president, CEO, for the U.S. Navy Memorial Foundation,
[2] but it's not signed by anybody — by anybody from
[3] Vantage; is that correct?
[4]  A: That's correct.
[5]  Q: Do you know why that would be?
[6]  A: Maybe they never did the program.
[7]  Q: Let me show you what's been marked as
[8] Defendant's Exhibit 17. Final exhibit.
[9]   Also entitled "Production Agreement
[10] Between Vantage and the United States Navy Memorial
[11] Foundation," but it's dated — let me just see that for
[12] a second.
[13]  A: June 13.
[14]  Q: June 13th, 1996. Do you know why there were
[15] two different production agreements?
[16]  A: It appears that they never got this agreed to
[17] at this point and then they had to go back and get it
[18] again with a different person, or if this person left, I
[19] don't know.
[20]  Q: This one is signed on behalf of the U.S. Navy
[21] Memorial Foundation by a Roger Kyle-Keith, Director of
[22] Direct Mail, apparently.
[23]  A: Right.
[24]  Q: Do you recall anything else about this deal at
[25] all?

Page 109

[1]  A: No. I just remember Hank and him having a big
[2] foray over that about Larry would cover any costs if it
[3] had a shortfall. They would get into some shouting
[4] matches.
[5]  Q: Did you ever recall a situation where Vantage
[6] may have shared in any way in the net proceeds, by net
[7] proceeds I mean the proceeds after paying Vantage's flat
[8] fixed fees and all the costs and postage?
[9]  A: No.
[10]  Q: So Vantage never entered into any kind of a
[11] partnership with any of the nonprofits?
[12]  A: No, not that I'm aware of.
[13]  MR. PERLMAN: I think that's it. I have
[14] no further questions.
[15]  MR. LEVITT: I'm going to have about an
[16] hour or less. Off the record.
[17]   (Discussion off the record 1:03 p.m. to
[18] 1:03 p.m.)
[19]   (Lunch from 1:03 p.m. to 1:42 p.m.)
[20]         EXAMINATION
[21]        BY MR. LEVITT:
[22]  Q: Mr. Graves, you were asked to bring some
[23] documents here today by Mr. Perlman; is that correct?
[24]  A: The subpoena asked me to bring whatever
[25] documents I have, and this is what I have.

Page 110

[1]  Q: Are any of the documents you brought today
[2] documents that you did not previously produce to the
[3] government when the government asked you about
[4] documents?
[5]  A: I think there's a few maybe. There's a
[6] document — I'm not sure — you can look at this one if
[7] you're not sure, and I think this document may pertain
[8] to something he brought up, and I don't know.
[9]  Q: Are these documents you produced previously?
[10]  A: Yes, I think you have them. I'm not sure. So
[11] this is the file I have, so, and the rest of which is
[12] like T&O's and production of handicap reports. I don't
[13] have your other documents. My notes on the Florida
[14] deal, but I'll get that to you.
[15]  Q: If you could produce a copy of those to me as
[16] well, I'd appreciate it.
[17]  MR. LEVITT: Mark this one document that
[18] you just provided to me, letter from Harry Melikian to
[19] Frank Celani, cc to Dallas Graves. Why don't we mark
[20] that as — what are we on? Exhibit 17?
[21]  THE REPORTER: 18, I think.
[22]   (Exhibit 18 marked.)
[23]  Q: (BY MR. LEVITT) Maybe you could put those
[24] documents to the side for now. If there are some
[25] documents you want to show me later —

---

Vantage 20744

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

Page 111

[1]   A: No. I just thought you were still talking.

[2]   Q: No. Why don't you put those to the side.

[3]   MR. LEVITT: Why don't we mark this other

[4]   document. This is a letter, United States Navy Memorial

[5]   Foundation letter as Exhibit 19.

[6]   (Exhibit 19 marked.)

[7]   MR. LEVITT: I'm not going to give them to

[8]   him right now.

[9]   Q: (BY MR. LEVITT) Mr. Graves, Mr. Perlman asked

[10]  you if side letters were used all the time at Vantage,

[11]  and I believe your answer was no. Is that your

[12]  recollection?

[13]  A: No is my recollection, yes.

[14]  Q: Okay. And you said that sometimes there were

[15]  verbal agreements?

[16]  A: Yes.

[17]  Q: Can you describe when that would happen?

[18]  A: By — on groups like Kentucky — like the

[19]  Knights of Columbus, KFC groups and whatever that they

[20]  had done for a long time, it was just a verbal agreement

[21]  that that would continue on.

[22]  Q: And that what would continue on that?

[23]  A: If there's a problem in the program, like with

[24]  the Shriners or those groups, those are big groups that

[25]  Vantage had done before, it was, I guess, a verbal

Page 112

[1]   agreement, because it was one of Larry Lyon's groups,

[2]   that they continued mailing and there wasn't a side

[3]   letter on those.

[4]   Q: Was it your understanding the verbal agreement

[5]   would be essentially the same as the terms of the side

[6]   letter?

[7]   A: That Vantage has the right to continue to mail

[8]   to recover the cost of the burden, yes.

[9]   Q: Are you aware of — strike that.

[10]  Mr. Perlman then pointed out to you that

[11]  there was this provision in paragraph 6(c) of the

[12]  contract that Vantage had the right to bill the

[13]  nonprofit and that the nonprofit had to pay within 30

[14]  days. Do you remember seeing that?

[15]  A: Yes.

[16]  Q: Are you aware of any situation where the —

[17]  that's how the program operated, program through Vantage

[18]  nonprofit operated under that section 6(c) provision?

[19]  A: Would you repeat that?

[20]  Q: Are you aware of any situation where a program

[21]  between Vantage and a nonprofit operated under that

[22]  section 6(c) of the agreement, that is, I can explain

[23]  what I mean by that, that Vantage would bill the

[24]  nonprofit and the nonprofit would pay Vantage within 30

[25]  days?

Page 113

[1]   A: No.

[2]   Q: How is it that the programs operated, from your

[3]   experience?

[4]   A: What would happen would be Vantage would set up

[5]   the account for the individual groups, set up the

[6]   program. Proceeds would be deposited in that account.

[7]   The only time at which maybe you're making reference

[8]   whereby they would be billed is whereby that group had

[9]   rights to sign on that account that the money was

[10]  deposited in for the lock box and then Vantage would

[11]  bill them and get the proceeds out of it.

[12]  Q: Is it your understanding that Vantage in all

[13]  circumstances always paid only from proceeds?

[14]  A: That's correct.

[15]  Q: Was there any situation that you're aware of at

[16]  Vantage where the nonprofit group had to pay an invoice

[17]  within 30 days regardless of whether there was such

[18]  proceeds to pay that invoice?

[19]  A: No.

[20]  Q: Was there a typical or let me say a stock sales

[21]  pitch that the salesmen used with respect to the

[22]  nonprofit organizations?

[23]  A: Yeah. Yes. They would basically make

[24]  reference to the programs and the results that they've

[25]  gotten out of the various programs and we'd always say

Page 114

[1]   that, you know, we always see an X percent back, et

[2]   cetera, and that was how it was sold to the group

[3]   basically.

[4]   THE REPORTER: And that was what?

[5]   A: How it was sold to the individual nonprofit, so

[6]   basically — and it really involved whether it was in a

[7]   group that was an acquisition or a donor or a member

[8]   type group.

[9]   Q: (BY MR. LEVITT) I'll ask you about those

[10]  different groups, but in terms of the sales pitch, was

[11]  there any mention in the sales pitch about cost and how

[12]  payments would be made?

[13]  A: Yes.

[14]  Q: What was that?

[15]  A: That the Vantage would pay for the program and

[16]  all the up-front and then the proceeds as they came in

[17]  Vantage would get their monies back first.

[18]  Q: And was there discussion about what would

[19]  happen if there was a shortfall?

[20]  A: No, unless they — if we got into the side

[21]  letter situation with them whereby there was a side

[22]  letter that allowed Vantage to continue mailing if there

[23]  was a shortfall.

[24]  Q: And what about in the situation where there

[25]  wasn't a side letter?

Fuller  &  Associates, Inc. (214)744-1250   **Min-U-Script®**   (31)  Page 111 - Page 114

Vantage 20745

Page 115

[1]  A: Vantage would mail it anyway if there's a
[2] shortfall; unless, like I had made mention earlier, Hank
[3] made a decision it wasn't prudent for him to do so.
[4]  Q: And what would happen in that case?
[5]  A: He would — his comments were always that he
[6] would take it out of the salesman's commissions. Now,
[7] whether that happened, I don't know.
[8]  Q: Were there — Mr. Perlman asked you some
[9] questions about how the programs operated and what the
[10] risk was to Vantage with respect to getting its money
[11] back. Do you remember that?
[12]  A: Yes.
[13]  Q: What was your understanding as to the risk to
[14] the nonprofit?
[15]  A: There wasn't any.
[16]  Q: Why not?
[17]  A: Because Vantage was taking on all the costs up
[18] front on the program.
[19]  Q: What if the program was unsuccessful?
[20]  A: Then, like I stated, Vantage would continue to
[21] mail it until they recovered their loss.
[22]  Q: Was there any risk that the nonprofit would
[23] have to pay at some point out of their own pocket?
[24]  A: I don't remember any cases where they went
[25] after anybody to do that.

Page 116

[1]  THE REPORTER: I didn't hear the end of
[2] it.
[3]  A: I don't remember any cases where they went
[4] after the group to pay.
[5]  Q: (BY MR. LEVITT) You mentioned — Mr. Perlman
[6] showed you an exhibit, Exhibit 10. It was a Western
[7] Youth Tennis agreement, and there was a side letter,
[8] Exhibit 10A, and there was some discussion as to whether
[9] that side letter was sent after this meeting with
[10] Frances Cohen. Do you recall him asking you that?
[11]  A: Yes.
[12]  Q: And he asked you is it possible that
[13] Mr. Chandler sent this letter out without authority, and
[14] you said yes. Do you remember that?
[15]  A: Yes.
[16]  Q: What did you mean by that?
[17]  A: Fred could have sent that out without having
[18] anybody's authority, Hank's or my authority to do it,
[19] so...
[20]  Q: Do you know whether that happened?
[21]  A: I would think it did if Freddie didn't get
[22] somebody else to sign that letter.
[23]  Q: When you say you think it did, do you have any
[24] basis —
[25]  A: Well, basically —

Page 117

[1]  Q: You have to let me finish. Sorry. I'm asking
[2] you not — I'm asking you not to speculate but to answer
[3] just what you know, what you have knowledge of. Do you
[4] know whether Mr. Chandler sent that out without, for
[5] example, confirming with Hank Lewis?
[6]  A: I don't know — I don't know that answer.
[7]  Q: Let me ask you, what was the typical — was
[8] Mr. Lewis typically aware of how the programs were
[9] operated?
[10]  A: Yes.
[11]  Q: And how was he aware of that?
[12]  A: Hank was involved in the day-to-day activity of
[13] all the salespeople.
[14]  Q: How did he keep abreast of that?
[15]  A: He met with them and every one of them would
[16] run into the gym room, the workout room where he worked
[17] out every day and would yip-yap with him and —
[18] yip-yap — talk, discuss openly about all their accounts
[19] and their deals.
[20]  Q: Were there any more formalized meetings with
[21] him as well?
[22]  A: Hank met with them on Mondays to go over T&O's
[23] and handicap reports.
[24]  Q: And was it your understanding that Mr. Lewis
[25] was aware of how the programs were operated?

Page 118

[1]  A: Yes.
[2]  Q: Was it your understanding that Mr. Melikian was
[3] aware of how the programs were operated?
[4]  A: Yes.
[5]  Q: You mentioned this meeting with Frances Cohen
[6] that she advised Vantage to stop using the side letter.
[7] Do you recall that?
[8]  A: Yes.
[9]  Q: Do you know in fact if Vantage stopped using
[10] the side letter as a result of that advice?
[11]  A: No. There was a memo put out to the
[12] salespeople to stop.
[13]  Q: Do you know if they actually did stop?
[14]  A: No.
[15]  Q: Do you know if they continued to operate the
[16] programs in the same fashion as they had previously?
[17]  A: Yes, that didn't change.
[18]  Q: So regardless of whether the side letters
[19] continued to be used, the programs continued to operate
[20] in the same way as they did under the side letter?
[21]  A: Yes.
[22]  MR. PERLMAN: Objection to form of that
[23] question.
[24]  Q: (BY MR. LEVITT) You mentioned that Vantage
[25] paid to set up — contracted with BFDS, Boston

Vantage 20746

United States of America, et al  v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

---

Page 119

[1] Financial, to do the caging, that is, I take it, to —
[2] where the money comes in from the proceeds; is that
[3] correct?
[4]    A: Yes.
[5]    Q: And Mr. Perlman asked you some questions about
[6] that saying that the client, the nonprofit, ultimately
[7] paid for that caging fee. Do you recall that?
[8]    A: Yes.
[9]    Q: Did the nonprofit pay for that out of its own
[10] pocket?
[11]    A: No.
[12]    Q: Where did that money come from?
[13]    A: Out of the proceeds of the program.
[14]    Q: Did anything that — any costs of the program
[15] ever come directly from the nonprofit's pocket, meaning
[16] the nonprofit's own bank account?
[17]    A: If there's a bank account set up where the
[18] proceeds went into it, it did, but Vantage had rights,
[19] in other words, there was a lock box account that that
[20] was set up to be deposited into, and then Vantage billed
[21] them to get the monies out saying basically here's the
[22] bill and we know how much money is in there because
[23] Vantage supplied the lock box reports to the client.
[24] The bank gave Vantage those reports.
[25]    Q: Okay. My question, putting aside the bank

Page 120

[1] account that's set up for the program proceeds, were
[2] there any program costs or expenses that the nonprofit
[3] had to pay from its own bank account, from its own
[4] finances rather than proceeds?
[5]    MR. PERLMAN: I have to object to that
[6] because that assumes that the proceeds don't belong to
[7] the charity.
[8]    Q: (BY MR. LEVITT) Let me clarify the question.
[9]    There are — we've talked about these bank
[10] accounts that are set up where the proceeds come into
[11] the program — where the results — the proceeds of the
[12] program are deposited, correct?
[13]    A: Right.
[14]    Q: Is it your understanding that all program
[15] expenses, costs, everything came from those accounts?
[16]    A: Yes.
[17]    Q: Did — were there ever any other — were there
[18] guaranties, money up front that Vantage would sometimes
[19] pay its — pay to nonprofit clients?
[20]    A: If I answer, it would only be hearsay only. I
[21] don't know for a fact. I'd have to say no.
[22]    Q: You don't know if Vantage ever paid $10,000 to
[23] a group up front?
[24]    A: I know that on some of the deals that Larry
[25] Lyons had that he took 10,000 or $20,000 advance and

Page 121

[1] gave it to the group.
[2]    Q: And was there anybody at Vantage who had to
[3] approve those sort of payments?
[4]    A: Harry and Hank.
[5]    Q: Do you know who wrote the side letters?
[6]    A: Who drafted that side letter?
[7]    Q: Yes. The stock side letter.
[8]    A: It was my understanding that Harry Melikian
[9] wrote that side letter.
[10]    Q: And what's that based on, that understanding?
[11]    A: When I came there we asked about the agreements
[12] because if there's any modifications that are in it, he
[13] modified the agreement. If there's any — on the side
[14] letter deal it was he that drafted it and he said just
[15] stop using it.
[16]    THE REPORTER: And just what? It was he
[17] that drafted it and just stopped using it? I didn't
[18] hear what you said. I'm sorry.
[19]    A: No, it was he that drafted it and when we
[20] stopped using it, it was his comment. But, yeah, if
[21] there's going to be any changes to it, that he would do
[22] that basically. He approved any changes to the
[23] contract.
[24]    Q: Let me show you what's marked as Graves Exhibit
[25] 18, the June 21, 1995 memo. I don't — go off the

Page 122

[1] record a second.
[2]    (Discussion off the record 2:01 p.m. to
[3] 2:02 p.m.)
[4]    MR. LEVITT: Back on the record.
[5]    Q: (BY MR. LEVITT) Do you recognize that
[6] document, Exhibit 18?
[7]    A: Yes.
[8]    Q: What is that?
[9]    A: It's a letter or a memo from Harry Melikian
[10] with regard to any change to contracts or agreements or
[11] costs for the group services division.
[12]    Q: And is that typically how Mr. Melikian would
[13] make changes to the contracts, through a memo? Would he
[14] typically inform people of changes to the contract
[15] through a memo?
[16]    A: He was good about doing memos like this, yes.
[17]    Q: Actually, could you read the second paragraph
[18] up there. It's the second arrow.
[19]    A: I'll go slow for you.
[20]    "If there are major issues that are raised
[21] by clients which would materially change the contract or
[22] production agreement, those changes need to be run by
[23] me. Once approved, those contracts can be signed by you
[24] as the controller of Vantage Financial Services, Inc."
[25]    Q: And the first paragraph as well.

---

Vantage 20747

---

**Page 123**

[1]  A: "Effective immediately —

[2]  Q: Yes.

[3]  A: — you are authorized to sign those group

[4] service contracts and production agreements which

[5] require no major changes. Your signature would replace

[6] my signature."

[7]  Q: Is that consistent with your recollection that

[8] if any changes were to be made to any standard contracts

[9] it had to be run by Mr. Melikian?

[10]  A: Yes.

[11]  Q: What about if there was changes made to a

[12] standard side letter, if there was an additional term

[13] put in a standard side letter?

[14]  A: That would still — that issue you would take

[15] before Harry.

[16]  Q: Several times during your — Mr. Perlman's

[17] questioning of you there was talk about when there was a

[18] shortfall, a mailing done to recover the costs of the

[19] program. Do you recall discussion about that issue?

[20]  A: Yes.

[21]  Q: And when you say in that context "the costs" of

[22] the program, and putting the costs in parenthesis, did

[23] those costs include the Vantage's profit markup?

[24]  A: Yes.

[25]  Q: So whenever there was a shortfall mailing, that

---

**Page 124**

[1] mailing was to recoup not only Vantage's out-of-pocket

[2] costs but its markup, its profit markup; is that

[3] correct?

[4]  A: Yes.

[5]  Q: And what was — was there — who set the profit

[6] margin for a particular program?

[7]  A: Hank always had the number there that they

[8] wanted. He and Harry — when I came, that number was

[9] already existing. Costs would be double that equals the

[10] cost of the program.

[11]  Q: So the profit margin then was what?

[12]  A: Would be 100 percent of the cost.

[13]  Q: And do you know who set that?

[14]  A: I would — I would — I would guess Hank set

[15] that.

[16]  Q: You have to guess on that?

[17]  A: Hank and Harry. Harry was the financial

[18] person. Hank was the one who agreed to a program before

[19] it could go out the door.

[20]  Q: Did you bring any handicap reports with you

[21] today?

[22]  A: I have some in here.

[23]  Q: Could you pull those out? Could you pull out

[24] all of them?

[25]  MR. LEVITT: You can go off the record for

---

**Page 125**

[1] a moment while he does that.

[2]  (Discussion off the record 2:07 p.m. to

[3] 2:08 p.m.)

[4]  MR. LEVITT: Back on the record.

[5]  Q: (BY MR. LEVITT) You've handed me three — no,

[6] four handicap reports — let's see. Three handicap

[7] reports for individual salespeople and one handicap

[8] report summary. Why don't we have these each

[9] individually marked as exhibits starting with 20.

[10]  (Exhibits 20 to 23 marked.)

[11]  MR. LEVITT: Back on the record.

[12]  Q: (BY MR. LEVITT) These handicap reports, why

[13] don't we start by you tell us what a handicap report is?

[14]  A: It's a — it's a actual list of the individual

[15] salesperson's deals, as they're called, and it goes down

[16] and says, okay, here's the cost of all the components,

[17] and then they go in and put the margin in it, and then

[18] they put the net profit they're looking for, and it runs

[19] it on — it's all on that spread sheet right there.

[20]  Q: As opposed to the T&O reports the handicap

[21] reports are the actual summaries of sort of the

[22] financial aspects of the program?

[23]  A: Right. Yes.

[24]  Q: You've got a handicap report here for Larry

[25] Lyon, one for Fred Chandler, one for Ron Lewis and a

---

**Page 126**

[1] handicap report summary, and they're all for 1996. Is

[2] that accurate?

[3]  A: Is that what it says on there? Yes.

[4]  Q: Do you have any other handicap reports?

[5]  A: No, that's all I have.

[6]  MR. PERLMAN: May I see it?

[7]  MR. LEVITT: (Hands document to

[8] Mr. Perlman.)

[9]  Q: (BY MR. LEVITT) How often are these handicap

[10] reports produced or how often were they produced when

[11] you were there?

[12]  A: They're updated monthly because as a new deal

[13] comes on those get updated.

[14]  Q: Are they in a computer system?

[15]  A: They're just on an Excel spread sheet.

[16]  Q: Who manages the handicap reports?

[17]  A: The administrator.

[18]  Q: And who was it when you were there?

[19]  A: There was — each salespersons had their own

[20] administrator and Susan Jones was the supervisor.

[21]  Q: Okay. So each individual salesperson's

[22] administrator handled the handicap reports?

[23]  A: Yeah, and, actually, the roll-up one, because

[24] he was pretty technical, Michael Lampert rolled them up

[25] for Susan. Michael Lampert.

---

Vantage 20748

United States of America, et al   v.
Henry R. Lewis, et al

**Dallas Ray Graves**
**February 20, 2002**

Page 127

[1]  **Q:** When you say roll-up, you mean summary?

[2]  **A:** He would do all that work for her, do the
[3] summary.

[4]  **Q:** So would — for instance, would Larry Lyon's
[5] administrator handle his handicap report?

[6]  **A:** Yes.

[7]  **Q:** Who was Larry Lyon's administrator in 1996?

[8]  **A:** Dan Grundig. Dan Grundig. Is that how you say
[9] his last name, Grundig?

[10]  **Q:** G-R-U-N-D-I-G?

[11]  **A:** Yeah.

[12]  **Q:** And who was Fred Chandler's administrator?

[13]  **A:** Michael Lampert.

[14]  **Q:** And Ron Lewis?

[15]  **A:** I think he shared Michael with Freddie.

[16]  **Q:** What you gave me here is — is this the
[17] handicap report that comes at the end of the year that
[18] has all four quarters and a total?

[19]  **A:** Yes.

[20]  **Q:** Are there interim reports that the salespeople
[21] have?

[22]  **A:** Yeah, that's — that's where the T&Os come.
[23] There's a T&O — once it become an O, moves over.

[24]  **Q:** But what I'm asking you, are there reports that
[25] are called handicap reports that, for example, are like

Page 128

[1] this but just for the first quarter of 1996?

[2]  **A:** Yes.

[3]  **Q:** And who reviews those reports?

[4]  **A:** Hank in the sales meetings.

[5]  **Q:** Hank Lewis?

[6]  **A:** Yes.

[7]  **Q:** And do you know where these reports are kept at
[8] Vantage?

[9]  **A:** I would think each administrator had them for
[10] each salesperson.

[11]  **Q:** So there should be handicap reports for every
[12] quarter for every salesperson for every year?

[13]  **A:** Yes.

[14]  **Q:** Can you — let me show you the handicap report
[15] for Fred Chandler which is Exhibit 21, and using that as
[16] an example can you point out where it shows Vantage's
[17] costs and Vantage's markup? If you could point to a
[18] column to start.

[19]  **A:** Where it says, "Average cost," that's the
[20] actual cost to produce the product.

[21]  **Q:** Okay.

[22]  **A:** Where it says, "Average profit," that's the
[23] margin that Vantage, it wants for their profit.

[24]  **Q:** That's what Vantage wants or what Vantage got?

[25]  **A:** Got.

Page 129

[1]  **Q:** Okay.

[2]  **A:** Then the sales price would be the average cost
[3] plus the average profit.

[4]  **Q:** Okay. So, for example, for Mr. Chandler then,
[5] for the second quarter of 1996, for labels the average
[6] cost of the labels was 50 cents and the average profit
[7] to Vantage on those labels was 52 cents?

[8]  **A:** Yes.

[9]  **Q:** And the average sales price of $1.02 was what
[10] Vantage charged to nonprofits?

[11]  **A:** Yes.

[12]  **Q:** With respect to that average profit, it appears
[13] that it differs in some cases, for example, in that
[14] (indicating) instance I just read to you it's over 100
[15] percent, correct?

[16]  **A:** Yes.

[17]  **Q:** But then in the first quarter of 1996 the
[18] labels, the average cost was 43 cents, the average
[19] profit was 36 cents?

[20]  **A:** It would depend on if it was group that they
[21] were already doing and they gave them a concession on
[22] pricing.

[23]  **Q:** So there might be a lower price to get the
[24] business?

[25]  **A:** Yes.

Page 130

[1]  **Q:** And with respect to the holiday cards, fourth
[2] quarter 1996, the average cost was 57 cents?

[3]  **A:** Uh-huh.

[4]  **Q:** Is that correct?

[5]  **A:** Yes.

[6]  **Q:** And the average profit was $1.18?

[7]  **A:** Yes.

[8]  **Q:** So in that case the average profit was 200
[9] percent; is that correct?

[10]  **A:** Yes.

[11]  **MR. PERLMAN:** Go off the record a second.

[12] (Discussion off the record 4:16 p.m. to
[13] 4:16 p.m.)

[14]  **MR. LEVITT:** Back on the record.

[15]  **Q:** (BY MR. LEVITT) So just looking at this
[16] example with Fred Chandler, situation in the first
[17] quarter it's under 100 percent, second quarter for
[18] profit, second quarter over 100 percent for profit,
[19] fourth quarter over 200 percent for profit. Is that
[20] spread in terms — or that fluctuation something that
[21] was typical in terms of what you saw?

[22]  **A:** Yes.

[23]  **Q:** Is it correct to say that — in this example
[24] where in the first quarter of 1996 Vantage's profit was
[25] 36 cents as compared to Vantage's profit in the fourth

Vantage 20749

Page 131

[1] quarter on the holiday cards of — strike that if you
[2] would. Let me start again.
[3]     In the first quarter of 1996 for the
[4] labels Vantage's profit is under 100 percent, whereas in
[5] the fourth quarter it's over 200 percent. Is it correct
[6] to say that in the fourth quarter the amount of money
[7] that went to the group is going to be less in terms of
[8] percentage compared to what Vantage makes in the first
[9] quarter?
[10]    A: It depends on the program whether it's a label
[11] program or a card program. See, in the card program
[12] you're in there's a lot more profit to be built in that
[13] on the runs because if you get a cheap cards versus the
[14] labels were all generic — generic stock; whereby cards
[15] could be put on a different type of stock, et cetera.
[16]    Q: Okay.
[17]    A: You get into the production pieces on that, but
[18] actual — what you're asking, the answer is, yes, based
[19] on the actual product.
[20]    Q: Comparing —
[21]    MR. PERLMAN: What's the answer yes to?
[22]    A: To the product, basically, yes, it is more
[23] money that Vantage makes on a deal at the end of the
[24] year unfortunately that would be in the fourth quarter
[25] because all the card programs are always fourth quarter.

Page 132

[1]    Q: (BY MR. LEVITT) Let me ask a different
[2] question.
[3]     Let's talk about a label program in the
[4] same quarter. Two label programs in the same quarter,
[5] two different nonprofits, is it correct that they might
[6] get a different profit marking —
[7]    A: Yes
[8]    Q: — of markup?
[9]    A: Yes.
[10]    Q: And assuming those costs are the same in those
[11] two examples, where there's a different profit margin,
[12] the costs are the same, is it fair to say that in the
[13] one that has the higher profit margin for Vantage, that
[14] Vantage is going to make more money as a percentage
[15] compared to the situation where there's a lesser profit
[16] margin?
[17]    MR. PERLMAN: Objection to the form.
[18] Change in what, Peter?
[19]    Q: (BY MR. LEVITT) As a percentage of compared to
[20] cost?
[21]    A: Yes.
[22]    Q: Let me show you again Exhibit 21, the Fred
[23] Chandler report. Is there — under the totals is there
[24] a way to see what Vantage's total cost was and Vantage's
[25] total profit for the programs run by Fred Chandler?

Page 133

[1]    A: If you took the tentative revenue minus the
[2] order revenue, you would come out with actual total
[3] revenue. Go over and see the gross margin.
[4]    Q: Yeah. But where do you — so — is there a
[5] column here that shows the total profit to Vantage for
[6] Fred Chandler's work for 1996?
[7]    A: Underneath his gross margin.
[8]    Q: Total gross margin?
[9]    A: Uh-huh.
[10]    Q: In this case it's $1,321,794; is that correct?
[11]    A: Right.
[12]    Q: And where does it show total cost?
[13]    A: You'd have to add the 348 and 742 together.
[14]    MR. PERLMAN: Referring to what columns?
[15]    A: The — which cost columns here where it says
[16] "tentative total costs and order total costs," so those
[17] are costing columns (indicating).
[18]    Q: (BY MR. LEVITT) In your — when you were at
[19] Vantage, where these handicap reports kept for the
[20] previous — were the previous years' handicap reports
[21] kept on file somewhere?
[22]    A: Yes.
[23]    Q: And did you know where they were kept?
[24]    A: Susan Jones has them.
[25]    Q: She was responsible for keeping them?

Page 134

[1]    A: Yes. Actually, one of the things that we did
[2] was try to do a comparative, I mean, year before, prior
[3] to, so I think there's actually a report that should
[4] reflect that.
[5]    Q: For each year there should be a report that
[6] compares previous year to the current year?
[7]    A: Yes.
[8]    Q: And what is that — did that have a name?
[9]    A: It's just a handicap report.
[10]    Q: Handicap report.
[11]    MR. PERLMAN: Can I see some of the other
[12] ones?
[13]    MR. LEVITT: Yeah.
[14]    Q: (BY MR. LEVITT) Let me show you Exhibit 20
[15] which is the Larry Lyon handicap report. Were the
[16] profit margins for Larry Lyon's programs different than
[17] others?
[18]    A: Yes.
[19]    Q: How is it different?
[20]    A: Larry could sell a deal whatever way he wanted.
[21] He didn't have to get approval.
[22]    Q: And why was that?
[23]    A: That was just how Larry operated.
[24]    Q: Did Hank Lewis know that?
[25]    A: Yeah. Hank allowed it, and so — because they

Vantage 20750

United States of America, et al    v.
Henry R. Lewis, et al

**Dallas Ray Graves**
**February 20, 2002**

Page 135

[1] were partners for so long and Larry was actually part
[2] owner at one time, and I don't know the whole history
[3] there, but that was just a relationship that was there.
[4]    Q: Was — that have anything to do with whether
[5] Larry Lyon was a good salesperson?
[6]    A: If you ask Larry, Larry would say yes, but if
[7] you ask anybody else, they would say they could sell
[8] like he could.
[9]    Q: Let me ask the question a different way. Was
[10] Larry Lyon one of the top grossing salespeople?
[11]    A: Yes.
[12]    Q: Was he one of the top grossing salespeople
[13] every year?
[14]    A: Yes.
[15]    Q: And what was it that was different about, if
[16] anything, about his profit margins?
[17]    A: They were less.
[18]    Q: And why was that?
[19]    A: We always said he had the slug accounts which
[20] was the groups that he had sold over and over, the
[21] Knights of Columbus, those type of accounts, the
[22] Shriners, and, et cetera, et cetera, Telephone Pioneers,
[23] so basically, the relationships he had on travel when he
[24] was over there before and relationships he was bringing
[25] over to group services, and that's just the deal he cut

Page 136

[1] with them. In a lot of cases in Larry's deal he would
[2] sell on the travel side too, so he would make up some of
[3] his margins here over on the travel side. He was one of
[4] the few salesmen that Hank allowed to sell travel and
[5] group.
[6]    Q: In terms of the relationship between travel and
[7] the group sales, was it ever the case that a salesperson
[8] would recoup a shortfall in one with a program in the
[9] other?
[10]    A: No.
[11]    Q: Was it ever the case that a special deal would
[12] be offered in one of the sides as an inducement to get
[13] the business on the other side?
[14]    A: Yes.
[15]    Q: What do you remember about that?
[16]    A: A lot of comped travel, comped, free — free
[17] travel.
[18]    Q: Can you explain what you mean?
[19]    A: They would — on the travel side they would get
[20] so many free trips with a cruise line, et cetera, and
[21] Hank would use those to get group services' business.
[22]    Q: And how would he use them?
[23]    A: He would get the group on those cruises and get
[24] them to buy into the travel side. We'd put them on a
[25] cruise or put the executive director on a cruise and we

Page 137

[1] would give them so many free trips.
[2]    Q: And what was the purpose of that?
[3]    A: To get more business out of them. He wanted
[4] the travel business and he wanted the group services
[5] business.
[6]    Q: So would they give the free trips to try to get
[7] more business for the group side?
[8]    A: Yes.
[9]    Q: Do you know how much those trips were typically
[10] worth?
[11]    A: No.
[12]    Q: Do you know where the side letters were kept?
[13]    A: They were always in the files. Each
[14] administrator kept those files with each client, with
[15] each group with that salesperson.
[16]    Q: Do you know that for a fact, that the side
[17] letters were kept in those files?
[18]    A: Yes.
[19]    Q: How do you know that?
[20]    A: In the front of that folder they did there was
[21] a check-off list for everything that had to be in there.
[22] And Susan Jones was responsible for sitting down with
[23] each administrator every week and going through every
[24] folder making sure all the components were there, and if
[25] they didn't have them, during the Monday meeting they'd

Page 138

[1] get berated in front of everybody.
[2]    Q: Do you —
[3]    A: Can I add one more thing to that? If they
[4] didn't have the folder, like if Hank came to the meeting
[5] and he wanted to see the folder for this pickup — a
[6] group, he'd make that administrator get up out of that
[7] meeting, go get that folder and bring it to him. He'd
[8] go through it, and if it wasn't there, it was a
[9] catastrophe every day.
[10]    I actually wrote a letter in here of one of
[11] the administrators — you even have them on your list —
[12] Paula Freiburg that left the company because of how she
[13] was treated at one of those meetings.
[14]    Q: You mentioned just now and previously when
[15] Mr. Perlman was asking you questions about the different
[16] components of the mailing programs, and it was unclear
[17] to me — you were talking about this checklist that was
[18] sent to the nonprofit — as to what the nonprofit had to
[19] provide, but it was unclear to me exactly what a
[20] nonprofit provided at the outset. I know that you've
[21] testified that they provided the donor list. What else?
[22]    A: They had to provide the colors, their colors,
[23] their PMS colors for their logos. They had to provide
[24] artwork for that. The photo sheet on that and J-peg, or
[25] whatever, pick some type formats. They had to provide

Fuller & Associates, Inc.(214)744-1250        **Min-U-Script®**        (37) Page 135 - Page 138

Vantage 20751

Page 139

[1] copy. So, in other words, they had to either approve
[2] the copy or —
[3]    THE REPORTER: Approve the copy or what? I
[4] didn't understand the word. Sorry.
[5]    A: Let me just go back. There's component —
[6]    MR. PERLMAN: She's — approved copy —
[7]    A: Approved copy of the letter that was going out
[8] with the labels.
[9]    Q: (BY MR. LEVITT) Let me stop you. I'm asking
[10] you not — I'm asking you what the nonprofit provided at
[11] the outset of a program. So before you answer, when
[12] Vantage contracts with a nonprofit and says we're going
[13] to do this mailing program, was there anything
[14] physically, say physically to start, that the nonprofit
[15] gave to Vantage to assist Vantage in putting a program
[16] together?
[17]    A: I think we can clarify that question. After it
[18] was sold to the group?
[19]    Q: Yes. Let me try to walk you through this as
[20] sort of an example, but if you don't understand it,
[21] again, ask me a question.
[22]    Vantage and a nonprofit sign a contract.
[23] Okay. Now it goes to the production stage, but it's
[24] right at the beginning now, and I take it that one of
[25] the things — unless it's a donor acquisition program,

Page 140

[1] that one of the things at the beginning is the nonprofit
[2] hands over to Vantage its donor list?
[3]    A: Yes.
[4]    Q: It's a physical item. Here's our list of
[5] donors for you to send the mailings.
[6]    My question to you is, is there anything
[7] else that physically they would hand — the nonprofit
[8] would typically hand over to Vantage?
[9]    A: The artwork, colors, PMS colors, the logo.
[10]    Q: Let's take this one at a time. You say the
[11] artwork. What do you mean?
[12]    A: The artwork that goes on every component.
[13]    Q: Okay. Are you saying that the nonprofit would
[14] put together the artwork?
[15]    A: It would be their organization logo.
[16]    Q: So they would give Vantage a copy of the
[17] organization logo?
[18]    A: Right.
[19]    Q: And the next one you mentioned?
[20]    A: That would be the PMS colors. In other words,
[21] you'd have to match those colors to that logo.
[22]    Q: The colors of the organization?
[23]    A: Yes.
[24]    Q: So if the organization had red, white, and blue
[25] as its colors?

Page 141

[1]    A: Right.
[2]    Q: In that case, would the organization simply
[3] tell Vantage our colors are red, white, and blue?
[4]    A: No, there's a number. There's a PMS number
[5] that they give them. It's red PMS number 84.
[6]    Q: So they've got to give them — assuming they
[7] have a logo and assuming they already have colors —
[8]    A: And they do.
[9]    Q: — they give those to Vantage?
[10]    A: Uh-huh.
[11]    Q: Anything else?
[12]    A: Only any copy if they've already written the
[13] copy.
[14]    Q: So if they already have their idea of what the
[15] copy should be?
[16]    A: The welcome letter.
[17]    Q: Typically would they have their own letter?
[18]    A: No, normally Vantage would provide that.
[19]    Q: Is there anything else that the nonprofit would
[20] give?
[21]    A: No.
[22]    Q: Mr. Perlman asked you about the United States
[23] Navy Memorial Foundation. Do you recall that?
[24]    A: Yes.
[25]    Q: He showed you a program agreement?

Page 142

[1]    A: Yes.
[2]    Q: And I believe he asked you if there was a side
[3] letter with that. And I think your answer was you
[4] didn't recall.
[5]    A: Right. Yes.
[6]    Q: Let me show you a document dated December 8th,
[7] 1995. It's marked as Graves Exhibit 19. Ask you if you
[8] recognize that document?
[9]    A: Yes.
[10]    Q: Does that document indicate anything about
[11] whether this program operated under the shortfall
[12] provision?
[13]    A: This letter states that, "However, if the
[14] income generated by the 'code BLB' mailing does not
[15] cover production costs, then Vantage will have the
[16] opportunity to make up the shortfall by mailing — by
[17] conducting, rather — sorry about that — another
[18] mailing to all active Navy Memorial donors generated by
[19] the 'BLB' mailing and last summer's test program done by
[20] Vantage (which is coded as mailing 'BDP')." Then it
[21] goes, "Revenue generated by this mailing may also be
[22] used to offset the shortfall for code 'BDP' mailing
[23] incurred this summer." Do you want me to read anymore?
[24]    Q: No, that's fine.
[25]    A: I'm getting reading lessons today.

Vantage 20752

United States of America, et al   v.
Henry R. Lewis, et al

Dallas Ray Graves
February 20, 2002

---

Page 143

[1]    Q: You mention that in your current — well, in —
[2] after you left Vantage, you were involved in nonprofit
[3] mailing?
[4]    A: Yes.
[5]    Q: And you called a Peter Bombasaro at the postal
[6] service?
[7]    A: Yes.
[8]    Q: And how did you know to call that person?
[9]    A: He was the person that I dealt with when I
[10] worked at BFDS in setting up all our PO boxes.
[11]    Q: And why did you call him?
[12]    A: Because I wasn't aware of what the stipulations
[13] of the programs were, and we wanted to make sure we
[14] mailed it right.
[15]    Q: Because you were going to be mailing something
[16] on behalf of a nonprofit organization?
[17]    A: Yes.
[18]    Q: And what did Mr. Bombasaro tell you?
[19]    A: He advised me that — to mail it at the full
[20] rate because we were a for profit; they're a nonprofit;
[21] and that a nonprofit doing business with a for profit
[22] you can't constitute using the discounted rate.
[23]    Q: When you were at Vantage, did you ever call the
[24] postal service to ask about doing mailings for
[25] nonprofits?

---

Page 144

[1]    A: I wasn't involved in that side of it. Marylou
[2] Newman was the person over all the mailings.
[3]    Q: So you're saying that wasn't your
[4] responsibility?
[5]    A: Correct. Yes.
[6]    Q: Your understanding is it would have been
[7] Marylou Newman's responsibility?
[8]    A: Yes.
[9]    Q: Do you know if she ever called the postal
[10] service for advice about what rate should be used for
[11] mailing?
[12]    A: No.
[13]    Q: You're not aware or —
[14]    A: I don't know that she ever had.
[15]    Q: Did you ever have any conversations with her
[16] about that?
[17]    A: No.
[18]    Q: Do you know, and I realize it's been some time,
[19] but do you recall any specific groups that received
[20] up-front money?
[21]    A: The only ones, like I mentioned earlier, I know
[22] a few of Larry's groups where it had to be that Shriner
[23] group or Knights of Columbus where they had to pay for
[24] some stuff up front.
[25]    Q: You can't remember any other groups where

---

Page 145

[1] Vantage gave the group an up-front payment?
[2]    A: The only other person that was involved was a
[3] guy with — Arkeef (ph), whatever, Arkeef. He did some
[4] work, and I know — there was once in a meeting that
[5] Hank Lewis told him he wanted his money back.
[6]    Q: Who is Arkeef?
[7]    A: He was the executive director of, uh...
[8]    Q: If I say a name, might it refresh your
[9] recollection?
[10]    A: It has to do animals.
[11]    Q: Animals?
[12]    A: Yeah, animals. But he went to AOPA, so
[13] American Associates of Airline Pilots, whatever.
[14]    Q: Do you recall if he was associated with the
[15] humane society?
[16]    A: That's what it was Humane Society of U.S.
[17]    Q: What do you recollect about Arkeef and money?
[18]    A: He was given money up front.
[19]    Q: By who?
[20]    A: By Larry.
[21]    Q: And were you present during these conversation?
[22] How do you know this?
[23]    A: No. That I was at a meeting where Hank told
[24] Larry to tell him get the deal done or I want my money
[25] back.

---

Page 146

[1]    Q: What deal was he talking about getting done?
[2]    A: Getting Humane Society's program.
[3]    Q: So he had given him money up front and he
[4] hadn't gotten the program started?
[5]    A: Right. Yes.
[6]    Q: Do you know how much money was paid to Arkeef?
[7]    A: I heard the number $10,000.
[8]    Q: Any other organizations you can recall getting
[9] up-front money?
[10]    A: No.
[11]    Q: Was it your understanding that anyone at
[12] Vantage had to approve the paying of up-front money?
[13]    A: Hank.
[14]    MR. LEVITT: Why don't we go off the
[15] record a moment.
[16]    (Recess from 2:41 p.m. to 2:43 p.m.)
[17]    MR. LEVITT: Let's go back on the record.
[18]    Q: (BY MR. LEVITT) Mr. Perlman showed you what's
[19] been marked as Exhibit 2 which was a letter from, a
[20] letter to James Ward. Do you remember Mr. Perlman
[21] showing you that?
[22]    A: Yes.
[23]    Q: And this letter discusses a net minimum of
[24] $100,000 in total funds. And I believe your testimony
[25] was that Hank Lewis would have to approve that type of

---

Vantage 20753

Dallas Ray Graves
February 20, 2002

United States of America, et al   v.
Henry R. Lewis, et al

Page 147

[1] financial deal. Do you recall that?

[2]    A: Yes.

[3]    Q: Is that —

[4]    A: That's correct. Yes.

[5]    Q: And Mr. Perlman noted that the letter wasn't

[6] signed by Mr. Lewis, and your testimony, I believe, was

[7] that Hank never signed anything. Do you recall saying

[8] that?

[9]    A: Yes.

[10]    Q: Do you know why Hank didn't — Hank Lewis

[11] didn't sign anything?

[12]    A: Hank just never signed anything.

[13]    Q: Typically what would he do? How would he

[14] approve items?

[15]    A: He would just say, "Okay, but if I don't get my

[16] money back, I get it from your commissions," you know

[17] what I mean, basically. Hank is that kind of guy. Hank

[18] is a verbal guy.

[19]    Q: Mr. Perlman also showed you an Exhibit 4 which

[20] is a memo from Harry Melikian to Frank Celani

[21] containing — this was the due diligence memo. Do you

[22] recall seeing that?

[23]    A: Yes.

[24]    Q: And you testified that your — that your

[25] interpretation of that letter was that it was to

Page 148

[1] determine — discussion was about determining how

[2] successful the group has been with respect to prior

[3] fund-raising programs rather than so much the financial

[4] background of the group. Do you recall that?

[5]    A: Yes.

[6]    Q: Why is that your opinion?

[7]    A: Because the only thing that they ever got

[8] whenever we requested financials was the end year

[9] report.

[10]    Q: And was there anything done in terms of due

[11] diligence on prior fund raising programs?

[12]    A: They would ask them — they would ask those

[13] questions on how successful they were with other

[14] programs. What they —

[15]    Q: I'm sorry. You go ahead.

[16]    A: What they would do — it really was a follow-up

[17] sales call is what it amounted to.

[18]    Q: Maybe you can list the items that were

[19] requested.

[20]    A: They would call the group up and ask them how

[21] many actual members they have, how many — how much —

[22] was it all members and true membership or was it a donor

[23] list or how much acquisition work they did, that type of

[24] thing.

[25]    Q: Anything else?

Page 149

[1]    A: Actually, if they'd done any label programs

[2] before, those type of things, so they could get a gauge

[3] on if they were going to be doing a label program, if

[4] they had already done one successfully, when was the

[5] last one that he had done a fund-raising program.

[6] Because timing is of an issue. You don't want to drop a

[7] mailing on a group that just finished a mailing last

[8] month.

[9]    Q: Anything else that you can recall?

[10]    A: No.

[11]    Q: There was some discussion about the fact that

[12] this letter states that it appears to be limited to

[13] direct mail acquisition projects. Is that your

[14] understanding?

[15]    A: That was always the riskiest piece of the

[16] business.

[17]    Q: Why is that?

[18]    A: Because there is — you don't know where that

[19] acquisition list is coming from, those names.

[20]    Q: Did that make it risky?

[21]    A: Because it could have been someone who donated

[22] $5 and they're no longer alive, or it could be someone

[23] who donated when they were at a street fair and gave $5

[24] to Pita, or whatever, do you know what I mean, and they

[25] wrote their name down on the card because they wanted on

Page 150

[1] the mailing list.

[2]    Q: And when you say — what is a donor acquisition

[3] program?

[4]    A: A donor acquisition program is where they

[5] actually get lists from wherever and go out and try to

[6] acquire new donors or new members.

[7]    Q: Vantage goes out and gets the donor?

[8]    A: Yes. That's part of the program getting them

[9] to give the $5 and become a donor.

[10]    Q: So when you say it's the riskiest type of

[11] program, to whom is it the riskiest?

[12]    A: In this case to Vantage because you're mailing

[13] and you have the cost of the program and you're mailing

[14] to an unknown list.

[15]    Q: Why does that make it risky?

[16]    A: Because you don't know what percentage of that

[17] list are deceased. You don't know what percentage of

[18] that list are animal activists if it's an animal

[19] activist group. You don't know what makes up that

[20] acquisition person. It may have been someone whose

[21] father was part of the Masons but he no longer — he no

[22] longer gives to the Masons.

[23]    Q: So the risk is that it's — what is the risk,

[24] just to be precise?

[25]    A: The risk is the whole cost of that program. If

Vantage 20754

Page 151

[1] you go out and you only get a — let's say the program
[2] costs X and you're only getting a response rate of less
[3] than 1 percent, you're in the tank with that program.
[4]    **Q:** When you say, "You're in the tank," who do you
[5] mean?
[6]    **A:** Vantage is. And how do you remail that? How
[7] do you remail that acquisition list?
[8]    **Q:** You mean how do you recoup the shortfall?
[9]    **A:** Yeah. You're going to have to get a donor
[10] list. You're going to have to get a member list.
[11]    **MR. LEVITT:** Thank you, I'm done.
[12]                    **EXAMINATION**
[13]                    **BY MR. PERLMAN:**
[14]    **Q:** I've got a few follow-up questions on some of
[15] the things just asked.
[16]    Mr. Graves, you testified in response to a
[17] question by Mr. Levitt that you weren't aware of any
[18] situations in which paragraph 6(c) requiring payment
[19] within 30 days was exercised. Does that mean to say
[20] that payments were never made to Vantage by their
[21] charity clients within 30 days?
[22]    **A:** No. They made payments out of that account
[23] that the monies were going into, deposited into.
[24]    **Q:** "That account" being the account where the
[25] charity proceeds went into?

Page 152

[1]    **A:** Correct, yes.
[2]    **Q:** Those proceeds belong to the charity?
[3]    **A:** It was deposited into the charity's account.
[4]    **Q:** And payments were made within 30 days out of
[5] that account on a regular basis?
[6]    **A:** Vantage would bill every 30 days, that is
[7] correct, yes.
[8]    **Q:** So it was more unusual that payments wouldn't
[9] be made in 30 days than it was usual?
[10]    **A:** Repeat that.
[11]    **Q:** It was more the exception that payments
[12] wouldn't be made within 30 days out of the charity's
[13] proceeds account?
[14]    **A:** Yes. Because in a lot of cases there's an ACH
[15] set up, so it's automatically taken out.
[16]    **Q:** What's an ACH?
[17]    **A:** An automatic draft of the account number where
[18] Vantage had a right to create an ACH against the
[19] account.
[20]    **THE REPORTER:** Can you slow down? I'm
[21] sorry.
[22]    **A:** ACH.
[23]    **THE WITNESS:** Am I aggravating to you?
[24]    **MR. PERLMAN:** It's been a long day.
[25]    **A:** An ACH. It's a draft really on that account.

Page 153

[1]    **Q:** (BY MR. PERLMAN) So there was a system set up
[2] for Vantage to receive payments every 30 days?
[3]    **A:** Yes.
[4]    **Q:** That system was set up prior to the
[5] establishment — as part of establishing a relationship?
[6]    **A:** Yes, be it invoice or drafting.
[7]    **Q:** You also testified that there was no risk to
[8] the nonprofit because Vantage would simply continue the
[9] mailings?
[10]    **A:** No risk? I don't think I said there was no
[11] risk. I believe I said there's always a risk to Vantage
[12] if Vantage had to remail.
[13]    **Q:** Was there a risk to the nonprofit?
[14]    **A:** No, other than their list was just like it —
[15] remailed.
[16]    **THE REPORTER:** I am sorry, but you're just
[17] swallowing your words for me, for what I'm trying to do
[18] down here. You just need to slow down and enunciate a
[19] little bit better for me.
[20]    **MR. PERLMAN:** And you're speaking in that
[21] direction.
[22]    **THE REPORTER:** I'm sorry.
[23]    **THE WITNESS:** Because I have a cold, I'm
[24] sorry.
[25]    **THE REPORTER:** Right. "No, other than

Page 154

[1] their list was — was there a risk to the nonprofit?"
[2]    **ANSWER:** "No, other than their list was" —
[3]    **A:** Remailed to.
[4]    **Q:** (BY MR. PERLMAN) Do you consider the donor
[5] list of a not-for-profit organization to be a valuable
[6] asset of that organization?
[7]    **A:** Yes.
[8]    **Q:** Is it one of their most valuable assets?
[9]    **A:** Yes.
[10]    **Q:** Could it in some cases be the most valuable
[11] asset an organization has?
[12]    **A:** Yes.
[13]    **Q:** When Vantage would continue to mail to that
[14] donor list, would that have any effect on the donor
[15] list?
[16]    **A:** Yes.
[17]    **Q:** What would that effect be?
[18]    **A:** You could lose membership from a member whom
[19] says I've gotten this five times in the last three
[20] months; stop it.
[21]    **Q:** So, in fact, the fact the risk to the nonprofit
[22] was the value of their donor list could be significantly
[23] diminished?
[24]    **MR. LEVITT:** Object to form. You can
[25] answer.

**Vantage 20755**

**Dallas Ray Graves**
**February 20, 2002**

United States of America, et al   v.
Henry R. Lewis, et al

---

Page 155

[1] **A:** Yes.

[2] **Q:** (BY MR. PERLMAN) You can answer.

[3] **A:** Yes.

[4] **Q:** You said that the stock side letter agreement

[5] was drafted by Harry Melikian according to comments that

[6] you overheard from somebody. Do you remember where you

[7] heard that?

[8] **A:** That was common knowledge in the group service

[9] group that, when I got there, that was a letter that

[10] Harry and them had created and that we used.

[11] **Q:** When you say "Harry and them," it could have

[12] been Harry and some other people?

[13] **A:** Harry and the previous president.

[14] **Q:** And you said the changes in the side letter or

[15] the program agreements required Harry's approval. What

[16] kind of changes are we talking about?

[17] **A:** If there was ever any changes to the contract

[18] or to the letter, Harry had to agree to the changes, to

[19] the verbiage.

[20] **Q:** What if there were grammatical changes to the

[21] agreement?

[22] **A:** We still ran that by Harry, any changes to a

[23] document, agreement.

[24] **Q:** Was it Hank who had the ultimate authority over

[25] whether these agreements were accepted or not?

Page 156

[1] **A:** Yes.

[2] **Q:** So Harry just reviewed them for technical

[3] aspects?

[4] **A:** Harry reviewed them for technical and the

[5] financial side saying it's a good deal or not, if Hank

[6] agreed to some pricing.

[7] **Q:** So Hank would ultimately be the one to agree to

[8] the pricing?

[9] **A:** Yes.

[10] **Q:** It wasn't Harry?

[11] **A:** Yes.

[12] **Q:** You also testified that Larry could sell a deal

[13] any way he wanted; is that correct?

[14] **A:** Yes.

[15] **Q:** Did that require Hank's approval ultimately?

[16] **A:** In Larry's opinion, no.

[17] **Q:** "In Larry's opinion, no"?

[18] **A:** Larry would go do it and then he would tell

[19] Hank and then it would create conversation.

[20] **Q:** Would Larry occasionally offer advances to

[21] clients without consulting Hank?

[22] **A:** No.

[23] **Q:** He would always talk to Hank before —

[24] **A:** He had to get the money from Hank.

[25] **Q:** Is there anybody else that Larry would consult

Page 157

[1] with besides Hank?

[2] **A:** No.

[3] **Q:** Were there any other salespeople that would

[4] offer advances that you know of?

[5] **A:** No.

[6] **Q:** So Larry was the only one — Larry Lyon was the

[7] only one who offered advances?

[8] **A:** Yes.

[9] **Q:** Let's talk — just retouch on the issue of

[10] acquisition mailings. Do acquisition mailings often

[11] make money? You're not sure?

[12] **A:** I'm not sure on that one.

[13] **Q:** Let's step back for one second. What is the

[14] purpose of an acquisition mailing?

[15] **A:** To build membership, build donor base.

[16] **Q:** So the primary purpose is to build a donor

[17] base, making money or netting money on the acquisition

[18] mailing, and the secondary purpose for —

[19] **A:** In a lot of cases, that's correct.

[20] **Q:** But the primary purpose is to build donor bases

[21] and acquire new names?

[22] **A:** Yes.

[23] **Q:** Assuming that most acquisition mailings break

[24] even or lose money, why would Vantage agree to offer any

[25] kind of a limited risk or no risk option to a client?

Page 158

[1] **A:** Hank didn't like acquisition work. That's one

[2] of the things Hank never liked. In his mind the deal

[3] was always a donor or a member mailing. Every time

[4] you'd — in fact, I remember him explicitly saying,

[5] "We're not going to do any more acquisition work. I'm

[6] not here to do acquisition work. I'm here to make

[7] money."

[8] **Q:** Because he felt that acquisition mailings were

[9] a loser?

[10] **A:** Huge risk.

[11] **Q:** And he wanted to avoid that risk?

[12] **A:** Yes.

[13] **MR. PERLMAN:** I believe that's all I have.

[14] **MR. LEVITT:** Okay.

[15] (Off the record at 2:59 p.m.)

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Vantage 20756

Ex 9

8. American Truck Historical Society (# 9)

DOJ # 05401. RA for program LM737. Notes Continue the program until shortfall is
eliminated.
DOJ # 05404. RA for program LB828. Notes Vantage has the right to continue the
program until shortfall is eliminated.
Spoke with Larry L. Scheef in May 2000. Told me money was due when invoiced;
however, if the group did not pay the shortfall, V had the right to solicit more funds, but it
never happened because we always made money.

Imperial Shrine

DOJ # 21993. RA for LD437 states Organization has no financial liability. No provision
for shortfall program. Refers to 10/12/93 agreement.
DOJ # 21995. RA for LM436 states the same as above. Refers to 10/12/93 agreement.
DOJ # 21904 – 21909. Contract dated 10/12/93.
DOJ # 21950. Shriner's memo dated 10/31/95. Discusses $150000 + loss and V failing
to recover their costs.
DOJ # 21979. Memo signed document with .....letter from V to indemnify against loss in
program signed. ML NC
DOJ # 21988. Letter to Imperial Shrine Ralph Semb dated 10/4/93. Group will not
sustain any financial loss. Held harmless. Signed by Larry Lyon and Henry Lewis.
DOJ #21957. Memo dated 3/15/95 discussing a shortfall and congratulating the
organization on getting the hold harmless letter.
Spoke with Charlie Cumpstone, Ralph Semb, John Cawood, Gene Bracewell, Gary
Dunwoody, Jay Fleisher, Ted Corsones.
Ralph Semb said Larry Lyon told him the Shriner's Hospital would not be liable for a loss.
The Shriner's would not have done the program if there was a risk of financial loss.
Gene Bracewell said he was told that the expense were less than donations, Shriner's
would have no financial loss...Vantage would continue the program to make up for
shortfalls.

**Vantage 20757**