```
                                                    Page 1
1                                   Volume: I
2                                   Pages: 1-192
3                                   Exhibits: 1-42
4             UNITED STATES DISTRICT COURT
5           FOR THE DISTRICT OF MASSACHUSETTS
6                 CA No. 04-11686WGY
7
8    - - - - - - - - - - - - - - - - - - -x
9    VANTAGE FINANCIAL SERVICES, INC.,
10                          Plaintiff,
11   vs.
12   NONPROFIT SERVICE GROUP INC. and
13   GEORGE E. MILLER,
14                          Defendant.
15   - - - - - - - - - - - - - - - - - - -x
16           30(b)(6) DEPOSITION OF VANTAGE
17              FINANCIAL SERVICES, INC.
18           BY HARRY MELIKIAN, DESIGNEE
19                   June 17, 2005
20                    11:00 a.m.
21              Peabody & Arnold, LLP
22                 30 Rowes Wharf
23              Boston, Massachusetts
24           Reporter: Nancy L. Russo
```

Page 42

1  matters pertaining to the issues raised in this
2  lawsuit?
3    A.  No.
4    Q.  Did you talk about the lawsuit at all?
5    A.  No.
6    Q.  What did you do to prepare for your
7  deposition today, if anything?
8    A.  Very little.
9    Q.  What did you do?
10    A.  Very little, just hardly anything. I just
11  wanted to make sure I understood before the deposition
12  what the facts are.
13    Q.  Did you look at any documents?
14    A.  No. I didn't look at any documents, per se,
15  no.
16    Q.  Did you look at anything to help prepare for
17  the deposition?
18    A.  I just look at some of my previous
19  depositions that I had done.
20    Q.  In which case was that?
21    A.  That was the case with the government.
22    Q.  The SAC-LAD case?
23    A.  Yes.
24    Q.  Did you look at your deposition transcripts

Page 43

1  in any other case?
2    A.  No.
3    Q.  Did you speak to anyone other than your
4  lawyers concerning this deposition today?
5    A.  No.
6    Q.  Have you ever been involved as an employee of
7  Vantage in drafting agreements to provide fund raising
8  services to Vantage's clients?
9    A.  Yes.
10    Q.  Can you describe the extent of your
11  involvement in drafting such agreements?
12    A.  It depends on the client.
13    Q.  Have you ever written entire agreements
14  yourself?
15    A.  Probably not.
16    Q.  What generally have you done in the way of
17  participating in the drafting of such fund raising
18  agreements?
19    A.  My personal involvement?
20    Q.  Yes.
21    A.  Only if there were modifications from certain
22  standard agreements would I get involved generally.
23    Q.  When you say standard agreements, what are
24  you referring to?

Page 44

1    A.  We have certain agreements -- two or three
2  agreements which are standard templates.
3    Q.  Can you identify those standard templates by
4  name?
5    A.  No.
6    Q.  Is it possible to generally describe each one
7  of those templates, how they differ from one another?
8      MR. JOHNSON:  Objection to form.
9    A.  If you can either rephrase the question -- I
10  am not sure I understand it properly.
11    Q.  Well, you indicated that there are two or
12  three standard templates for agreements that Vantage
13  employs. Is that currently the case?
14    A.  I believe there are two or three standards,
15  yes.
16    Q.  How long have those standards been in place?
17    A.  I can't give you a definite time. I would
18  say at least a year.
19    Q.  In June of '99, did Vantage have a standard
20  template agreement?
21    A.  I can't say with certainty. I don't want to
22  guess.
23    Q.  Do you know when Vantage began the practice
24  of keeping standard template agreements on hand?

Page 45

1    A.  Yes. And I can't guess on a date, but it's
2  been a while. I cannot guess.
3    Q.  Were you involved in negotiating the
4  agreement to provide fund raising consulting and
5  management services to the Shriners Hospitals for
6  Children that was signed by Vantage on or about
7  June 17, 1999?
8    A.  No.
9    Q.  Were you involved in any way in drafting that
10  agreement?
11    A.  No.
12    Q.  Who, to your knowledge, was involved in
13  negotiating that agreement?
14    A.  From whose perspective?
15    Q.  From yours.
16    A.  I need it to be rephrased. When you say who
17  was involved, from Vantage's side? Is that what you're
18  asking. I don't know what you are asking.
19    Q.  Yes, from Vantage side.
20    A.  To the best of my knowledge, the work was
21  done primarily by Larry Lyon. And I don't know anyone
22  else who had been involved.
23    Q.  Who, to your knowledge, was involved in
24  negotiating that agreement on behalf of the Shriners?

Page 46

1  A. Jay Fleisher.
2  Q. Who was responsible for drafting the
3  June 17th agreement on Vantage's side?
4  A. George Miller.
5  Q. Was anyone else involved in the drafting of
6  that agreement from Vantage's side?
7  A. I don't have any personal knowledge of
8  anybody else on Vantage's side.
9  Q. Do you know who was responsible for drafting
10 the agreement from the Shriners side?
11 A. I don't have personal knowledge.
12 Q. Do you have some knowledge from any source
13 that would help you answer that question?
14 A. The last question you asked?
15 Q. Yes.
16 A. The only source I would use would be Larry.
17 Q. Based on that source of information, who was
18 involved in drafting the agreement from the Shriners
19 side?
20         MR. JOHNSON: Objection to the form.
21 You may answer.
22 A. Jay Fleisher.
23 Q. Did Lynn Edmunds have any role in negotiating
24 or drafting the June 17th agreement with the Shriners?

Page 47

1  A. I do not know.
2  Q. Is there some particular reason why you don't
3  have that information?
4  A. Because I was on medical leave.
5  Q. When were you on medical leave?
6  A. March 23rd to May 31st.
7         MR. JOHNSON: That testimony has been
8  given.
9  A. '99.
10 Q. Did you return to work immediately after
11 May 31st?
12 A. I don't recall. I think it was on an
13 intermittent basis.
14 Q. What was the nature of your illness?
15 A. I had cancer.
16        (Exhibit No. 1 marked for
17 identification.)
18 Q. I'm going to show you what's been marked as
19 Exhibit 1. Could you please take a look at that?
20 A. (Witness complies.)
21 Q. I'm going to ask you whether or not you're
22 familiar with that document in the sense that you have
23 seen it before.
24 A. I have never seen this document before.

Page 48

1  Q. Would you just look at the top. It appears
2  to be a fax that originated from the Ipswich Country
3  Club dated April 15, 1999. Do you see that?
4  A. Yes, I do.
5  Q. In your experience, do you know whether or
6  not Larry Lyon is a member of the Ipswich Country Club?
7  A. I do not know that.
8  Q. Have you ever received faxes from him that
9  originated from the Ipswich Country Club?
10 A. No, I did not.
11        (Exhibit No. 2 marked for
12 identification.)
13 Q. I'm going to show you what's been marked as
14 Exhibit 2. It appears to be a collection of documents
15 that, again, were faxed from the Ipswich Country Club
16 on April 15, 1999. Have you ever seen that document
17 before today?
18 A. No. Excuse me. The first three pages I have
19 never seen before.
20 Q. Is there some portion of the document you
21 have seen before?
22 A. I'm looking at it right now. On the loan
23 agreement, I'm not specifically certain I can recall
24 seeing that before. With respect to the agreement to

Page 49

1  provide fund raising consulting and management
2  services, I've seen a similar executed document, but I
3  don't know if this is the exact document.
4  Q. Have you ever seen any draft versions of the
5  June 17, 1999 agreement to provide fund raising
6  consulting and management services that Vantage entered
7  into with Shriners Hospitals for Children?
8  A. No.
9  Q. Have you ever read the agreement that was
10 actually executed on June 17, 1999 between Vantage and
11 Shriners?
12 A. I have.
13 Q. If you look at Exhibit 2 starting at page
14 NSG 0766, if you look at it, does that appear to be the
15 same agreement that Vantage and the Shriners executed
16 on June 17, 1999?
17        MR. JOHNSON: Objection to the form.
18 A. No.
19 Q. Does it appear to be a draft of that
20 agreement?
21 A. I can't tell you because I never saw a draft.
22 Q. Why did you answer no to my previous
23 question?
24 A. What was your previous question?

13 (Pages 46 to 49)