EXHIBIT E

1

I
1 - 158

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, et al )
           Plaintiffs,  )
                        )
                        )
vs.                     )  CIVIL ACTION
                        )  NO. 97-10052-MLW
HARRY R. LEWIS, et al,     )
                        )
           Defendant.   )

THE ORAL DEPOSITION OF JAY ELLIOTT GELB, held pursuant to Notice, and the applicable provisions of the Federal Rules of Civil Procedure, before Lisa Looney, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the offices of the United States Attorney's Office, One Courthouse Way, Suite 9200, Boston, Massachusetts, on Thursday, September 28, 2000, commencing at 12:40 p.m.

ORIGINAL

APEX Reporting
(617) 426-3077

### Page 5

[1] STIPULATIONS
[2] IT IS HEREBY STIPULATED AND AGREED TO
[3] by and between the parties and their
[4] respective attorneys that the
[5] witness may read and sign the deposition
[6] before any Notary Public

### Page 6

[1] PROCEEDINGS
[2] (12:40 p.m.)
[3] JAY ELLIOT GELB, of 104 Walpole Street, Unit 5, [4] Canton, Massachusetts 02021, having been sworn by a [5] Notary Public to tell the truth, the whole truth and [6] nothing but the truth, testified upon his oath as [7] follows: [8] EXAMINATION BY MR. LEVITT:
[9]   Q  Mr. Gelb, will you state your name for the record?
[10]  A  Jay Elliot Gelb.
[11]  Q  What is your date of birth?
[12]  A  7/6/57.
[13]  Q  What's your home address?
[14]  A  104 Walpole Street, Unit 5, Canton, Mass. 02021.
[15]  Q  How are you currently employed?
[16]  A  How am —
[17]  Q  How are you currently employed? What is your position?
[18]  A  I am the executive vice president of sales for the [19] Vantage Group.
[20]  Q  How long have you held that position?
[21]  A  Since March of this year.
[22]  Q  What was your position before that time?
[23]  A  I was a sales representative for Vantage.
[24]  Q  How long did you hold that position, sales [25] representative?

### Page 7

[1]  A  Since I began with the company, which was July 18th, [2] 1995.
[3]  Q  What did you do before you joined Vantage?
[4]  A  I had owned — I was a manufacturer's representative in [5] the California market place.
[6]  Q  Where did you work?
[7]  A  I had owned my own company.
[8]  Q  What was the name of the company?
[9]  A  Nouveau Sales, N-o-u-v-e-a-u.
[10] Q  Where was that company located?
[11] A  In Manhattan Beach, California.
[12] Q  How long did you own that company?
[13] A  Five years.
[14] Q  What did that company do generally?
[15] A  We represented manufacturers in — with products in the [16] gift industry, selling to the carriage trade.
[17] Q  Can you explain a little bit about what that means?
[18] A  We called on department stores, card and gift stores. [19] We represented about thirty different gift lines, plush [20] animals, ceramics, things of that nature, and we had [21] exclusive territory in Southern California to represent [22] those lines.
[23] Q  You sold them to department stores?
[24] A  Yes.
[25] Q  What did you do before that time, before you started

### Page 8

[1] this company?
[2]  A  I was director of sales for Putnam Publishing in New [3] York.
[4]  Q  Can you give me the time frame when you were — held [5] that position?
[6]  A  I believe it was '85 to '87, in that range.
[7]  Q  What did you do before that time?
[8]  A  Before that time? I worked for — as a sales [9] representative for a company called Wallace Berry.
[10] Q  Do you have other work experience?
[11] A  I don't.
[12] Q  What's your educational background?
[13] A  I graduated Northeastern University, Bachelor of [14] Science in Business Administration. I have some [15] courses toward my Masters degree but did not finish it.
[16] Q  What are your responsibilities as executive vice [17] president of sales for Vantage?
[18] A  My direct responsibilities is to manage the sales force [19] of all of our divisions.
[20] Q  Explain the corporate structure of Vantage.
[21] A  The corporate structure? Under the Vantage Group we [22] have several divisions: Vantage Deluxe World Travel, [23] Vantage Financial Services, Vantage Direct Marketing [24] Services, and Vantage Insurance Services.
[25] Q  What company do you work for?

Page 9

[1] A I work for all of them.
[2] Q VantageGroup is the holding company.
[3] A Correct.
[4] Q Who is the president of VantageGroup, or the CEO?
[5] A The CEO is Henry Lewis.
[6] Q Who are the other officers of VantageGroup?
[7] A Harry Melikian.
[8] Q What is his title?
[9] A It was CFO. I don't – I'm not sure.
[10] Q Who are the other officers of VantageGroup?
[11] A Peter Pescatore.
[12] Q Will you spell that last name?
[13] A I can't. I think it's P-e-s-c-a-t-o-r-e.
[14] Q What is his title?
[15] A He is the CFO.
[16] Q Who are the other officers? Are there other officers [17] of VantageGroup?
[18] A Other officers? Not to my knowledge.
[19] Q Are you an officer of VantageGroup?
[20] A No.
[21] Q Are you an officer of any of the divisions?
[22] A I don't think so.
[23] Q You're executive vice president of sales —
[24] A M-hm.
[25] Q — for who?

Page 10

[1] A For the VantageGroup.
[2] Q Are there other executive vice presidents for the [3] VantageGroup?
[4] A Yes.
[5] Q What are their names?
[6] A I believe there's only one, and that would be Peter [7] DeMakis.
[8] Q What is his title?
[9] A Executive vice president, general manager, of Vantage [10] Direct Marketing Services.
[11] Q I take it his responsibilities are different than [12] yours.
[13] A Yes.
[14] Q What are his responsibilities?
[15] A He's responsible for the P&L of that division.
[16] Q What is P&L?
[17] A Profit and loss.
[18] Q When you say that he's responsible for the profit and [19] loss of that division, could you explain what that [20] means?
[21] A He oversees the finances. He's – he's the boss. He's [22] the guy in charge.
[23] Q He is in charge of VantageGroup.
[24] A Of Vantage Direct Marketing Services.
[25] Q And he's also an executive vice president of

Page 11

[1] VantageGroup.
[2] A That's correct. Oh, no. I'm sorry. I'm sorry. Can I [3] – I don't think he is. I don't know.
[4] Q I think you testified in response to a question that I [5] asked that he was the only other executive vice [6] president of VantageGroup of which you are aware.
[7] A Correct. That's correct.
[8] Q So, he is a – he is an executive vice president of [9] VantageGroup.
[10] A No. I'm sorry, then. Not of the VantageGroup. There [11] are so many different, you know, divisions here, so I'm [12] getting confused.
[13] Q Are you saying that he's the only other executive vice [14] president within the VantageGroup —
[15] A Yes.
[16] Q — which you're aware of?
[17] A Yes. Thank you. Yes.
[18] Q What does the marketing services division of [19] VantageGroup do?
[20] A What do they do?
[21] Q Yes.
[22] A We create and market premium induced fund raising [23] programs for the purpose of either attaining donors for [24] non-profit organizations, or raising funds through [25] their current donors.

Page 12

[1] Q What does Vantage Financial Services do?
[2] A It's one and the same. It's one and the same. I — [3] you know, I don't really – you're asking me about the [4] corporate structure, and probably —
[5] (Mr. Lucas entered the room.)
[6] A I'm sorry. Will you re —
[7] Q Yeah. Why don't we ask the question again.
[8] A Please.
[9] Q I asked you what Vantage Financial Services does. Is [10] that Vantage Financial Services, or Vantage Financial [11] Group?
[12] A It's Vantage Financial Services, Inc., and I'm not [13] sure. I'm not sure. I mean, I really am not.
[14] Q Well, you're an executive vice president —
[15] A Yeah.
[16] Q — for VantageGroup.
[17] A That's – yes, that's correct.
[18] Q You have no idea what Vantage Financial Services, [19] Inc., does.
[20] A Well, Vantage Financial Services was the direct [21] marketing services side, and I believe that that name [22] was incorporated to offer various, you know, financial [23] products to nonprofit organizations such as, you know, [24] credit cards, telephone cards, things of that nature.
[25] Q When you say it was incorporated for that purpose, when

### Page 13

[1] was it —
[2] A I – I'm sorry.
[3] Q When was it incorporated?
[4] A I don't know.
[5] Q Was it incorporated after you joined the company in [6] July 1995?
[7] A No.
[8] Q It was incorporated prior to that time.
[9] A Yes.
[10] Q You say it was incorporated for the purpose of [11] marketing credit cards, telephone cards.
[12] A Fund raising programs.
[13] Q Isn't that what you just said the Vantage Marketing [14] Services division does?
[15] A Yes. Yes.
[16] Q Are you saying that the Vantage Financial Services [17] Division and the Vantage Marketing Services Division do [18] the same thing, or overlap?
[19] A Under the – under the Vantage Financial Services, [20] Inc., is the Vantage Insurance and Vantage Direct [21] Marketing Services, and that's to the best of my [22] knowledge.
[23] Q My question was whether Vantage Financial Services, [24] Inc., Vantage Marketing Services Division, do the same [25] thing in the sense that they both are involved in fund

### Page 14

[1] raising services?
[2] A Yes.
[3] Q And these are fund raising services to nonprofit [4] institutions?
[5] A Yes.
[6] Q These are fund raising services involving direct mail [7] programs?
[8] A Yes.
[9] Q Label programs?
[10] A Yes.
[11] Q Calendar programs?
[12] A Yes.
[13] Q Is there a president or CEO of Vantage Financial [14] Services, Inc.?
[15] A Not to my knowledge.
[16] Q Do you – to your knowledge, is there an individual [17] that runs or operates Vantage Financial Services, Inc.?
[18] A I've already stated his name, Peter DeMakis.
[19] Q Well, you said that Peter DeMakis is executive vice [20] president/general manager of Vantage Direct Marketing [21] Services.
[22] A That's right. I did say that, and that is correct. [23] Your question – could you repeat the question, please?
[24] Q To your knowledge, who runs or operates Vantage [25] Financial Services, Inc.?

### Page 15

[1] MR. LeCLAIR: Objection.
[2] MR. LEVITT: Grounds?
[3] MR. LeCLAIR: Well, I don't know what that means. [4] I don't know if the witness knows what it means.
[5] MR. LEVITT: Are you coaching the witness on this [6] question?
[7] MR. LeCLAIR: No. No. I'm telling you about my [8] objection. And I also don't know that you've [9] established a foundation as to whether, if you're [10] asking about corporate structure, if the witness even [11] knows.
[12] MR. LEVITT: Well, the witness can answer whether [13] he knows or not.
[14] MR. LeCLAIR: But you haven't asked him.
[15] MR. LEVITT: I just did.
[16] MR. LeCLAIR: No, you didn't ask him if he has [17] knowledge of what the corporate executive structure is.
[18] MR. LEVITT: I asked him about the corporate [19] structure, and he answered the questions. He had an [20] opportunity —
[21] MR. LeCLAIR: No, you didn't.
[22] MR. LEVITT: I did, early on.
[23] MR. LeCLAIR: The record will show what you did or [24] didn't ask.
[25] MR. LEVITT: Are you instructing the witness not

### Page 16

[1] to answer?
[2] MR. LeCLAIR: No. He can answer. I've got my – [3] I put my objection; you asked me the grounds, I gave it [4] to you.
[5] Q BY MR. LEVITT: You can answer the question.
[6] A I'm sorry. What is the question?
[7] Q The question is, who runs or operates Vantage [8] Financial Services, Inc.?
[9] MR. LeCLAIR: Objection. You can go ahead and [10] answer, if you can.
[11] A I'm not sure. I don't know. Obviously I'm not really [12] sure of the corporate structure, as you can well see [13] from the questions and answers that we're going through [14] here.
[15] Q BY MR. LEVITT: Mr. Gelb, you testified that you're [16] executive vice president of sales for VantageGroup.
[17] A M-hm.
[18] Q Are you also testifying that you don't know what the [19] corporate structure is of the company that you're [20] executive vice president of sales for?
[21] A Yeah, that's what I'm testifying, yes.
[22] Q Who are the employees of Vantage Financial Services, [23] Inc.?
[24] A Again, I don't know the corporate structure. I've got [25] a problem here obviously, because I'm not really sure,

BSA    Depo-USA V Harry Lewis, et al, 97-10052-MLW - Jay Elliott Gelb - 09/28/00    XMAX(6)

### Page 21

[1] Q For what division of VantageGroup?
[2] A Vantage Deluxe World Travel.
[3] Q Douglas Morgan you said was a sales representative
[4] A Yes.
[5] Q -- and a vice president?
[6] A Yes.
[7] Q For what division?
[8] A Vantage Deluxe World Travel.
[9] Q How about Richard Mance?
[10] A Vantage Deluxe World Travel.
[11] Q Daniel Calfcart?
[12] A Vantage Deluxe World Travel.
[13] Q Do these individuals you've mentioned that are all vice
[14] presidents and sales representatives of particular [15] divisions also work for the other divisions?
[16] A No.
[17] Q What does Vantage Insurance Fund Raising Services do?
[18] A It's not Vantage Insurance Fund Raising Services.
[19] Q What is it?
[20] A It's Vantage Insurance Services.
[21] Q What does that group do?
[22] A Vantage Insurance Services goes out and solicits [23] nonprofit organizations and via direct mail we offer [24] currently a long term health care program to the [25] members of the organization.

### Page 22

[1] Q How long has that division been in existence?
[2] A It began this year, the year 2000.
[3] Q Does that division have a president?
[4] A No.
[5] Q Have any vice presidents?
[6] A It does. It does. And this is also a sales [7] representative. So, when you asked me that question [8] prior this name should have been added to it. His name [9] is Joel Sussman.
[10] Q Does it have a CFO?
[11] A Not to my knowledge, no.
[12] Q Does Vantage Financial Services have a CFO?
[13] A I don't think so. Again, you're asking me questions [14] about the corporate structure, and I -- I'm not a [15] hundred percent sure.
[16] Q Answer what you can.
[17] A Okay.
[18] Q Where is VantageGroup located?
[19] A VantageGroup is located at 90 Canal Street in Boston.
[20] Q Does it have any other locations?
[21] A Not to my knowledge.
[22] Q How long has it been at that location?
[23] A I believe November of '99.
[24] Q Where was it previously?
[25] A In two separate locations, one at 111 Cyprus Street in

### Page 23

[1] Brookline, and the other location I don't remember the [2] exact address, but it was in Chestnut Hill on Route 9.
[3] Q Does VantageGroup own the property at 90 Canal Street?
[4] A I believe so.
[5] Q Does it own property at 111 Cyprus Street?
[6] A I believe so.
[7] Q It still owns that property?
[8] A I believe so.
[9] Q Does it own the property in Chestnut Hill
[10] A No. No.
[11] Q Does it rent the property at Chestnut Hill?
[12] A It did.
[13] Q VantageGroup no longer is located in any respect at
[14] Chestnut Hill?
[15] A No, it is not.
[16] Q What is located at 111 Cyprus Street?
[17] A I have no idea. I think a hospital, administrative [18] hospital, I think. I'm not even sure.
[19] Q But it's owned by VantageGroup, the property.
[20] A I believe it is.
[21] Q Does VantageGroup own any other property?
[22] A Not to my knowledge.
[23] Q Where is Vantage Deluxe located?
[24] A 90 Canal Street.
[25] Q Where is Vantage Financial Services located?

### Page 24

[1] A 90 Canal Street.
[2] Q Vantage Insurance?
[3] A 90 Canal Street.
[4] Q And Vantage Direct Marketing Services?
[5] A 90 Canal Street.
[6] Q Are you aware of any plans to move from that location?
[7] A No.
[8] Q Are you aware of any plans on the part of VantageGroup [9] to sell that property?
[10] A No.
[11] Q Are you aware of any discussions involving individuals
[12] at VantageGroup regarding the sale of that property at [13] 90 Canal Street?
[14] A No.
[15] Q As executive vice president of sales, you testified [16] that you manage the sales people within VantageGroup?
[17] A That's correct.
[18] Q And those are the individuals that you've previously [19] identified that are vice presidents in sales of all the [20] different divisions?
[21] A Yes.
[22] Q What do your duties and responsibilities entail in [23] managing the sales group?
[24] A Hiring, training, reaching sales quotas, doing [25] performance reviews, just the overall management of the

### Page 25

[1] sales people.
[2] Q How long has Allan Specter worked for VantageGroup?
[3] A To the best of my knowledge, about two and a half [4] years.
[5] Q How long has Michael Quinn worked for VantageGroup?
[6] A About one month.
[7] Q How long has Scott Brown worked for VantageGroup?
[8] A About one month.
[9] Q Douglas Morgan?
[10] A I believe over ten years.
[11] Q Richard Mance?
[12] A I believe between – two years, I'd say.
[13] Q Are you estimating?
[14] A Yes, I am estimating. Of course I am.
[15] Q Daniel Calfcart?
[16] A About a year.
[17] Q Directing your attention to the salesmen that are [18] affiliated with Vantage Financial Services, how are [19] their salaries derived?
[20] A Draw against commission.
[21] Q Will you explain what that means?
[22] A Explain draw against commission?
[23] Q Yes.
[24] A You receive a draw which is money and you then, based [25] on what you've sold, you get a percentage of the

### Page 26

[1] profits, and that is what we refer to as commission. [2] We look at the commission against the draw and either [3] the individual is going to get additional commission [4] money above his draw or weekly pay check, or deduct.
[5] Q The draw is simply a set salary per annum.
[6] A Yes.
[7] Q In addition to a salary they receive a percentage of [8] commissions?
[9] A Their salary is included in that percentage of [10] commissions.
[11] Q How is it included?
[12] A Because it's – it's a draw, not a salary. Okay? How [13] is it included? If a person is drawing fifty thousand [14] dollars and they bring in fifty thousand dollars in [15] commission, if they earn fifty thousand in commission, [16] that's a break even for everybody. If they bring in [17] seventy-five thousand, they make an extra twenty-five [18] thousand.
[19] Q Whatever amount over their draw they bring in [20] commissions they receive?
[21] A Sure.
[22] Q Not a percentage of it?
[23] A Not a percentage. It's commissions.
[24] Q How are commissions derived?
[25] A By the net profit of the program.

### Page 27

[1] Q When you say "the program," you're referring to a [2] mailing program?
[3] A Yes.
[4] Q This would be a mailing program with a particular [5] nonprofit organization?
[6] A We're just then talking about Vantage Financial [7] Services?
[8] Q Yes.
[9] A Okay. Yes.
[10] Q So that I'm clear, you're saying that – well, let me [11] ask you this question. When are the commissions [12] derived? Annually?
[13] A Yes.
[14] Q Can you give an example of how that would be done with [15] respect to a particular program?
[16] A I'm sorry. Can I?
[17] Q Could you give an example?
[18] A To respect to a particular program? Sure. We enter [19] into an agreement with a nonprofit organization, we [20] mail X amount of pieces; there's X amount of profit [21] involved, and the salesman receives a portion of that [22] profit toward his commission goal.
[23] Q What percentage of the profit does the sales person [24] receive?
[25] A Ten percent.

### Page 28

[1] Q Always.
[2] A Of the – yes, of the profit, yes.
[3] (Recess.)
[4] Q BY MR. LEVITT: Are you aware – you testified that [5] VantageGroup, Inc., owns 90 Canal Street.
[6] A I did testify, and I was incorrect.
[7] Q Do you have an understanding now about whether [8] VantageGroup, Inc., owns any real estate?
[9] A I do have an understanding, yes.
[10] Q What is that?
[11] A That they do not.
[12] Q Do you know whether any of the divisions of [13] VantageGroup, Inc., own any real estate?
[14] A I don't know.
[15] Q But you know VantageGroup does not, or you just don't [16] know?
[17] A I just don't know. I'm not privileged to it at all.
[18] MR. LEVITT: Excuse me. Would you go off the [19] record for a moment?
[20] (Discussion off the record.)
[21] Q BY MR. LEVITT: Do you know who owns 90 Canal [22] Street?
[22] A No.
[23] Q Do you know what real estate Henry Lewis owns?
[24] A No.
[25] Q You testified earlier, I believe – I may be incorrect.

### Page 29

[1] I believe you testified earlier that VantageGroup owns [2] 111 Cyprus Street.
[3]  A I did testify to that.
[4]  Q Do you know, now that you've had a chance to talk to [5] your attorney, whether VantageGroup in fact owns 111 [6] Cyprus Street?
[7]  MR. LeCLAIR: Objection. I'm going to instruct [8] the witness not to testify to the extent it involves [9] disclosing communications with his attorney.
[10]  Q BY MR. LEVITT: Do you know whether VantageGroup owns [11] 111 Cyprus Street?
[12]  A I don't know.
[13]  Q Who is Mary Lou Newman?
[14]  A She's our production manager.
[15]  Q When you say "our" what do you mean?
[16]  A She works for Vantage.
[17]  Q Is it fair to say that when you say "Vantage" you're [18] talking about VantageGroup and its divisions?
[19]  A It's fair to say, yes.
[20]  Q What does Ms. Newman do as production manager?
[21]  A I -- I don't -- I don't have a complete understanding [22] of her job description.
[23]  Q Tell me what you know.
[24]  A She oversees the production of some of our direct mail [25] programs, the production being the printing, mailing.

### Page 30

[1]  Q Does she oversee the production of direct -- the direct [2] mail programs conducted by the Vantage Financial [3] Services division?
[4]  A I have to answer that I don't know because I don't know [5] the corporate structure.
[6]  Q Let me ask it this way.
[7]  A Okay. Please.
[8]  Q You've testified that one of the things that Vantage [9] does is do programs for nonprofit organizations, [10] correct?
[11]  A I believe I said direct mail programs.
[12]  Q Correct. And that those are programs such as mailing [13] labels and calendars.
[14]  A That's correct.
[15]  Q Does Ms. Newman oversee those programs? I should say [16] the direct -- the production aspect of those programs?
[17]  A Some of it she does. She has people that work for her.
[18]  Q Who works for her?
[19]  A I'm not sure. I'm really not. I don't -- the creative [20] staff, I don't...
[21]  Q Do you know any members of the creative staff that work [22] for Mary Lou Newman?
[23]  A Not by last name.
[24]  Q When you say that she oversees the printing of mailing, [25] is that the printing of the contents of the direct mail

### Page 31

[1] programs?
[2]  A Yes.
[3]  Q The calendars? The labels?
[4]  A Yes.
[5]  Q Where is that done?
[6]  A I'm not sure.
[7]  Q Do you know if it's done at 90 Canal Street?
[8]  A The actual printing?
[9]  Q Yes.
[10]  A No, it is not done at 90 Canal Street.
[11]  Q Is she located at 90 Canal Street?
[12]  A Yes.
[13]  Q You believe there is another facility where the [14] printing is done?
[15]  A Yes.
[16]  Q You don't know where that facility is.
[17]  A We utilize lots of vendors. I don't have contact with [18] them.
[19]  Q You out source all of the printing?
[20]  A Yes. To the best of my knowledge.
[21]  Q You mentioned that one of your responsibilities is [22] training sales people.
[23]  A Yes.
[24]  Q Tell me about what that entails.
[25]  A It entails putting together a training program to

### Page 32

[1] educate the individuals on the various aspects of their [2] job.
[3]  Q Do you have training -- a training manual?
[4]  A No.
[5]  Q Do you have written training materials?
[6]  A Yes.
[7]  Q What are those materials?
[8]  A Well, it would just be a training schedule and any [9] policies.
[10]  Q When you say the written training materials are any [11] policies --
[12]  A I said "and." I said "and." I believe.
[13]  Q Can you explain what these written materials are?
[14]  A Yes. The written material is a training schedule that [15] I personally put together. It will vary from sales [16] person to sales person.
[17]  Q You do a training schedule for each sales person.
[18]  A Correct.
[19]  Q And can you explain what is in that training schedule?
[20]  A Yes. Partially I can. We -- we -- I hold an in house [21] seminar with people and try to explain to them the [22] nonprofit industry. We have what we call rules of the [23] road which is the structure that we utilize for sales [24] people going out on the road and returning, and what is [25] expected of them in terms of but not limited to sales

### Page 33

[1] reports, expenses. Guidelines.
[2] Q The question was what's in the training schedule.
[3] A Okay.
[4] Q And you responded saying that you have an in house
[5] seminar.
[6] A An in house training program.
[7] Q Is that – is the seminar included? Is simply the
[8] schedule of the seminar that's included in the —
[9] A Yes. Yes.
[10] Q But the document itself, the training schedule, also
[11] includes rules of the road?
[12] A Yes.
[13] Q That is, what is in the rules of the road?
[14] A That a sales person needs to call in twice a day, that
[15] they need to book their airline ticket fourteen days in
[16] advance.
[17] Q This is administrative material.
[18] A Yes.
[19] Q There is also a section on the nonprofit industry?
[20] A That's part of my in house training, that we discuss
[21] different sectors of the nonprofit industry.
[22] Q I'm asking whether there's a – you have a written –
[23] you have written materials that explain the nonprofit
[24] industry.
[25] A No. No.

### Page 34

[1] Q You mentioned policies.
[2] A M-hm.
[3] Q There are written materials that describe – and to
[4] just policies?
[5] A Yes.
[6] Q Do the training materials include training on rules,
[7] laws and/or regulations that govern the nonprofit
[8] industry?
[9] A No.
[10] Q Do you in your program seminar train the sales people
[11] about the rules, laws, regulations that govern the
[12] nonprofit industry?
[13] A No.
[14] Q Have you ever received any training at Vantage —
[15] A Minimal.
[16] Q — on —
[17] A I'm sorry.
[18] Q Your answer was minimum?
[19] A No. I'd like you to finish the question. I thought
[20] you were – I thought that was the question, but
[21] obviously you weren't finished.
[22] Q Have you received training at Vantage on the rules,
[23] regulations and laws that govern the nonprofit
[24] industry?
[25] A No.

### Page 35

[1] Q Have you received any training at Vantage on the
[2] rules, regulations and laws that govern direct mailing in the
[3] context of the nonprofit industry?
[4] A No.
[5] Q Have you provided your sales people with any training
[6] on the rules, regulations and laws that govern direct
[7] mailing in the nonprofit industry?
[8] A No.
[9] Q Have you ever distributed any materials to any of your
[10] sales people regarding or referring to the rules, laws
[11] and regulations that govern direct mailing in the
[12] nonprofit business?
[13] A No.
[14] Q Has anyone ever distributed to you any written material
[15] referring to or regarding the rules, regulations and
[16] laws regarding direct mailing in the nonprofit
[17] industry?
[18] A No.
[19] Q In your position as sales manager —
[20] A Good. Thank you. Because that's what it is.
[21] Everything else is just a title.
[22] Q In your position as sales manager have you ever
[23] discussed with any of your sales people any of the
[24] rules, regulations or laws governing or relating to the
[25] direct mailing in a nonprofit industry?

### Page 36

[1] A No.
[2] Q Has anyone at Vantage ever discussed with you the
[3] rules, regulations or laws governing or regarding the
[4] direct mailing at the nonprofit industry? In a
[5] nonprofit industry?
[6] A Yes.
[7] Q Who has discussed that with you?
[8] A I can't – I can't recall who discussed it. Well, no,
[9] I can't recall.
[10] Q Do you recall any – this or any discussion occurred?
[11] A Yes, I do remember.
[12] Q When?
[13] A When – I'm not sure what you call this, but the reason
[14] that we're here, when everything happened, that's when
[15] it was discussed, but I don't want to say that it was
[16] rules, laws and regulations. I can't say that that's
[17] true.
[18] Q Is the time frame you're considering the summer of
[19] 1997?
[20] A Yeah.
[21] Q Is this one discussion you're referring to?
[22] A Yes.
[23] Q Do you recall where that discussion took place?
[24] A No, I don't.
[25] Q Do you recall if it took place at 90 Canal Street?

### Page 37

[1] A No.
[2] Q You don't recall if it did or it did not?
[3] A It did not.
[4] Q Did it – do you recall if it occurred in person?
[5] A In person?
[6] Q Yes.
[7] A I don't understand the question.
[8] Q Do you recall if it occurred over the telephone?
[9] A No, it did not occur over the telephone.
[10] Q Did it occur in person with another —
[11] A Yes.
[12] Q Do you recall who was present during this discussion?
[13] A Henry Lewis.
[14] Q Do you recall if anyone else was present?
[15] A Yes.
[16] Q Who else was present?
[17] A Maurice Goldings.
[18] Q Was there anyone else present?
[19] A Not to my knowledge.
[20] Q Did you relay to your sales people this discussion?
[21] A No.
[22] Q Let me show you a document and just ask you first if
[23] you recognize it.
[24] A Yes.
[25] MR. LeCLAIR: Look at more than just the first

### Page 38

[1] page.
[2] THE WITNESS: Oh. I'm sorry.
[3] MR. LEVITT: Sorry, I made one copy.
[4] A No, I do not recognize this.
[5] Q BY MR. LEVITT: You answered initially that you
[6] recognized the first page.
[7] A Yes, that is correct.
[8] Q Do you recognize the second page?
[9] A No, I do not.
[10] MR. LEVITT: I am going to ask to mark it as
[11] Exhibit 1.
[12] (Gelb Deposition Exhibit 1 marked.)
[13] Q BY MR. LEVITT: You said you do not recognize the
[14] second page?
[15] A That's correct.
[16] Q You don't recognize the card of Ronald Lewis?
[17] A I recognize it. I've never seen it before.
[18] Q Do you recognize the third page? When I say
[19] "recognize," have you seen it before?
[20] A No.
[21] Q I'm going to use the numbers that – that page that I
[22] just referred to that says "Turnkey Program" is number
[23] "1" at the bottom.
[24] A Okay.
[25] Q Do you recognize the following page, page 2?

### Page 39

[1] A Yes.
[2] Q What is that?
[3] A It's our brochure.
[4] Q Is this page – let me ask you – that page is numbered
[5] "2."
[6] A M-hm.
[7] Q You say it's part of the brochure.
[8] A Correct.
[9] Q You said it is the brochure. Are you saying it's part
[10] of the brochure?
[11] A It's one of the pages in the brochure.
[12] Q But if you go to the preceding page which says that
[13] it's page 1 —
[14] A Right.
[15] Q — you don't recognize that.
[16] A There's writing on here that I've never seen before.
[17] Q Fine.
[18] A The answer's no, I don't recognize it.
[19] Q I was asking whether you recognize the document.
[20] Let's put aside the writing.
[21] A Can you clarify the question then?
[22] Q I will.
[23] A Thank you.
[24] Q Showing you the document which is DOJ 20606,
[25] putting aside the writing that's on that document, the

### Page 40

[1] handwriting, I am asking you whether you recognize the
[2] document itself, without the handwriting.
[3] A Yes, I do.
[4] Q What is that?
[5] A It's a page in our brochure.
[6] Q That's page 1 of the brochure.
[7] A You know what? I really honestly couldn't tell you.
[8] Q It's numbered —
[9] A It's marked "1."
[10] Q — page 1.
[11] A I'll say it's marked "1."
[12] Q Would you flip through the pages after that and tell me
[13] if you recognize this as your brochure?
[14] (Witness complied.)
[15] A I recognize everything except for page 8.
[16] Q When you say "page 8," that's page numbered "8"?
[17] A That's correct.
[18] Q Okay. It's DOJ 20613? That's the number in the far
[19] right-hand corner. Is that correct? I'm referring to the —
[20]
[21] A Oh, I'm sorry. Could you say the number again? I'm
[22] sorry.
[23] Q DOJ 20613?
[24] A That's correct.
[25] Q You haven't seen that page before?

### Page 41

[1] A I don't recognize everything on this page.
[2] Q What don't you recognize?
[3] A Well, things are out of align, number one, and I don't [4] recognize the bottom right at all.
[5] Q By "the bottom right" are you referring to that – to a [6] – what looks like a stamp that says "Temporary [7] associate membership"?
[8] A Yes. From there all the way over to the right side of [9] the page. I don't recognize that.
[10] Q Okay. And when you refer to a block in the middle, is [11] that the – what appears to be some sort of stamps with [12] Lawrence Lyons' name on them? Is that what you said [13] when you didn't recognize something in the middle?
[14] A I just – I don't remember it being tilted like that.
[15] Q Okay. But otherwise you recognize the document that's [16] page 8 of the promotional material?
[17] A With the exception of what I just stated, yes.
[18] Q Okay. Turning back to page 1 of that document...
[19] A Is there a page marked "1"?
[20] Q Yes.
[21] Q Do you know whose handwriting it is —
[22] A No.
[23] Q — in the far right corner?
[24] A No.
[25] Q You said this is a promotional brochure; is that

### Page 42

[1] accurate?
[2] A Promotional. It's a corporate brochure. Somebody [3] requests information, we send out a brochure.
[4] Q Is this a brochure that is currently being used by [5] Vantage?
[6] A No.
[7] Q Do you know when Vantage stopped using this brochure?
[8] A I could only guess. I could not tell you accurately.
[9] Q You became executive vice president of sales in March [10] 2000.
[11] A Correct.
[12] Q Do you know if Vantage was using this brochure in March [13] 2000?
[14] A I'm not sure.
[15] Q You were a sales rep starting in July 1995?
[16] A M-hm.
[17] Q You have to say yes or no.
[18] A Yes. I'm sorry.
[19] Q Do you know whether Vantage was using this brochure at [20] that time?
[21] A They were not.
[22] Q Do you know whether Vantage was using – used this [23] brochure at some point subsequent to the time when you [24] started as a sales representative —
[25] A Subsequent meaning – I'm sorry.

### Page 43

[1] Q Let me finish the question.
[2] A Okay. I'm sorry.
[3] Q Do you know whether Vantage used this brochure – [4] started using this brochure at some point subsequent, [5] after, you started in July 1995?
[6] A Yes.
[7] Q And I want to clarify the question. You know that at [8] some point after July 1995, Vantage was using this [9] brochure.
[10] A Yes.
[11] Q You don't know if at some point prior to July 1995 it [12] might have been using the same brochure because you [13] weren't there.
[14] A I do know. They were not.
[15] Q How do you know?
[16] A Because I helped create this brochure.
[17] Q Do you recall when that was?
[18] A I don't know. I don't know.
[19] Q Do you recall whether it was shortly after you first [20] started at Vantage?
[21] A I wouldn't say shortly. If you're asking me that [22] question, my answer is I don't know the time frame, but [23] I – if you want me to give you a ballpark you can ask [24] me for that. I have no problem with that.
[25] Q Why don't you give me a ballpark.

### Page 44

[1] A Probably around '97.
[2] Q Do you recall who else you worked with in creating this [3] brochure?
[4] A I didn't work with anybody.
[5] Q When you say you helped create the brochure, what do [6] you mean by "helped"?
[7] A I proofread it.
[8] Q Do you know who created it?
[9] A No.
[10] Q Do you recall who gave it to you to proofread?
[11] A No. Nobody did. It was in my "in" box.
[12] Q Do you recall whether there was a note on it asking you [13] to proofread it?
[14] A No, I don't recall.
[15] Q Do you recall whether at that time there was a group at [16] Vantage that was responsible for creating promotional [17] material?
[18] A There was not.
[19] Q Were there individuals who were responsible for [20] creating promotional material?
[21] A No.
[22] Q When you proofread this brochure did you have any input [23] on it? By that I mean substantive.
[24] A I'm sorry.
[25] Q Substantive as opposed to – as opposed to —

### Page 45

[1] A I can't recall.
[2] Q Do you recall if you had any questions about it?
[3] A To the best of my knowledge I don't think I had any [4] questions, no.
[5] Q Do you recall who you gave it to when you were done?
[6] A No.
[7] Q Have you been involved in – in any capacity – in the [8] creation or production of any promotional material for [9] Vantage?
[10] A Referring to brochures?
[11] Q Brochures, anything, any material that is sent to [12] clients or prospective clients to promote Vantage [13] services or inform clients, potential clients of [14] Vantage services.
[15] A The questions is have I been involved? Well, I just [16] stated that I proofread that.
[17] Q Other than – other than with respect to this document.
[18] A Other than respect? No.
[19] Q Do you have a recollection of when Vantage stopped [20] using this brochure?
[21] A My recollection would be sometime in '99.
[22] Q Do you recall why?
[23] A We created a new brochure.
[24] Q Do you recall who created the new brochure?
[25] A No.

### Page 46

[1] Q Were you involved in any way?
[2] A No.
[3] Q From – I understand you don't know exactly when it [4] started or ended. You said around '97 and sometime in [5] '99. During that time period was this the only [6] brochure that Vantage had?
[7] A Yes.
[8] Q How was —
[9] A Whoa. I need a time out. I'm sorry. Are we – are we [10] talking about the financial services? Talking about [11] direct marketing services? You have to clarify that [12] for me.
[13] Q We're talking about Vantage Financial Services, and we [14] are talking about the direct mail programs to nonprofit [15] organizations. Direct mail programs for nonprofit [16] organizations.
[17] A Okay. Then – and the question again? I apologize.
[18] Q The question was, during this time period that you've [19] identified that this brochure was used was this the [20] only brochure?
[21] A I don't want to – I don't want the word "identified" [22] because what I said was "ballpark," I believe. And the [23] answer would be that, yes, it's the only brochure we [24] used.
[25] Q How was it used?

### Page 47

[1] A How was it used. We would mail it out to potential [2] clients who requested information.
[3] Q When you say "potential clients" you mean nonprofit [4] organizations?
[5] A Yes.
[6] Q Do you know whether it was also sent to potential [7] clients who did not request additional – request [8] written information?
[9] A I don't – I don't recall. I couldn't answer that.
[10] Q Do you recall if it was sent as advertising, cold [11] mailing?
[12] A To the best of my knowledge, no.
[13] Q Prior to the time period you've identified as a [14] ballpark around 1997 with respect to this brochure, was [15] there a different brochure in existence?
[16] A No. No, there wasn't.
[17] Q When you were a sales person prior to around 1997 [18] you didn't use a brochure?
[19] A No.
[20] Q No, you did not?
[21] A No, I did not.
[22] Q I show you a document that's DOJ 05202 and ask if [23] you recognize it?
[24] MR. LEVITT: Mark, I've got an extra copy.
[25] MR. DARLING: Oh. Great.

### Page 48

[1] A Your question here?
[2] Q BY MR. LEVITT: My question's whether you recognize [3] that document.
[4] A I'd have to answer no. 1996. I'd have to say I [5] recognize the contents but I don't recognize it being [6] sent to this client.
[7] Q Direct your attention to the lower left-hand corner of [8] that document.
[9] A Uh-huh. Yeah.
[10] Q Where it says, "J. Gelb, Vice President, Sales and [11] Marketing."
[12] A Uh-huh.
[13] Q Do you recognize that as your signature?
[14] A No. It's not. I don't recognize it as my signature.
[15] Q Was it your practice to have someone sign documents for [16] you?
[17] A No.
[18] Q Did you have a secretary at that time?
[19] A No.
[20] Q To your recollection did you ever authorize anyone at [21] Vantage to sign a document on your behalf?
[22] A Yes.
[23] Q Do you recall authorizing someone to sign a document [24] – a letter to the American Numismatic Association?
[25] A No.

### Page 57

[1]  Q BY MR. LEVITT: How do you know that?
[2]  A Because the group has to pay their bill in thirty days.
[3]  Q And that's what paragraph 6C says.
[4]  A Yeah.
[5]  Q Do you understand why paragraph 6C makes this a [6] contract for a nonprofit?
[7]  A No. I'm not a lawyer.
[8]  Q Nobody at Vantage ever explained that to you?
[9]  A No.
[10] Q You were just told if it has paragraph 6C in it, as it [11] is in this agreement, that makes it a contract for a [12] nonprofit?
[13] A I'm not really sure if I was told it. Obviously I [14] attained the knowledge somehow, so--
[15] Q That became your understanding.
[16] A Yeah.
[17] (Discussion off the record.)
[18] Q We were looking at what's marked Exhibit 3 which is the [19] program agreement. Correct? We're going to back track [20] a little.
[21] A Correct.
[22] Q And you testified that this is a nonprofit -- this is a [23] contract for a nonprofit mailing because of section 6C.
[24] A I did testify to that, yes. However, I really didn't [25] review it properly, and that's why I asked to speak to

### Page 58

[1] -- to Brian, because I just -- I'm rushing this thing. [2] I just, you know, I just am not looking through the [3] documents properly, and I don't want to give anybody [4] any information that isn't the truth. And so, to the [5] best of my knowledge this is -- yeah, this is a [6] nonprofit agreement.
[7] I mean, I don't go through agreements. I sell [8] deals, that's what I do for a living. Okay? So, legal [9] matters, corporate structures, you got the wrong guy. [10] I gotta be up front. Okay?
[11] Q And you testified that there is two contracts when you [12] got to Vantage, a contract for the bulk mailers and a [13] contract for the nonprofits.
[14] A I did testify to that, yes.
[15] Q I think where we left off was that I had asked you who [16] told you why there was two different contracts.
[17] A Right. And my answer to that was I don't remember.
[18] Q Were you ever told why there was two different [19] contracts?
[20] A No.
[21] Q Do you have an understanding sitting here today why [22] there's two different contracts?
[23] A Yes.
[24] Q What is that?
[25] A If a nonprofit organization can't -- doesn't have an

### Page 59

[1] indicia to mail nonprofit, then we have to mail it [2] bulk. That would be why there's two agreements. And [3] -- that's it. That's my understanding.
[4] Q When you say "an indicia of nonprofit," what do you [5] mean?
[6] A An indicia. It's the little thing that allows them to [7] mail the permit number.
[8] Q Sure. But why are the two contracts different? Do you [9] have an understanding as to why the two contracts are [10] different?
[11] A No. I don't. It's a good questions, too, and I don't.
[12] Q Is your understanding that they're different with [13] respect to 6C?
[14] A No. Just that they're different. I jumped the gun. [15] That's why I stopped. Because I was wrong and I gave [16] you information that wasn't correct.
[17] Q Well, let's talk about that.
[18] A Okay.
[19] Q When you first looked at this contract and you looked [20] at section 6C you said this is a contract for bulk [21] mailer. Why did you say that?
[22] A I didn't read it carefully, and really what I was doing [23] was I was trying to recollect the program that we put [24] together for the American Numismatic, and I did not [25] read the agreement thoroughly. Therefore, my answer

### Page 60

[1] would not reflect reading that agreement, but would [2] reflect thinking back to 1996 as to what happened in [3] that particular agreement. That was my -- that's why I [4] stopped.
[5] Q And when your attorney asked you to read section 6C [6] more carefully, what changed your mind?
[7] A I actually read it. That was really when I read it for [8] the first time. I never changed my mind. That's when [9] I really read it for the first time.
[10] Q And what is it, having read it for the first time, what [11] was it about section 6C indicates that this was a [12] contract for a nonprofit?
[13] A That the invoice is due and payable in thirty days.
[14] Q And that is the distinction that you understood, or [15] understand, between the bulk mail contracts and the [16] nonprofit contracts?
[17] A In 1996 that was my understanding.
[18] Q You don't recall how you came to that understanding.
[19] A I had virtually no training in this company, so that's [20] why it's very difficult. I had no training. I was [21] thrown to the wolves. So, that's when you asked me [22] about did anybody talk to me, it's not -- no, the [23] answer's no.
[24] Q Does the company -- did the company do any training [25] at that time?

BSA    Depo-USA V Harry Lewis, et al, 97-10052-MLW - Jay Elliott Gelb - 09/28/00    XMAX(18)

### Page 69

[1] A I don't know. See, I don't think we typically operate [2] any certain way.
[3] Q BY MR. LEVITT: What was the purpose of this letter, [4] Exhibit 4?
[5] A I believe I've already stated that to you.
[6] Q No, you haven't.
[7] MR. LeCLAIR: Objection. I believe he did.
[8] MR. LEVITT: I don't believe so.
[9] THE WITNESS: He did.
[10] MR. LeCLAIR: I think there's a question and an [11] answer that told you why it was sent.
[12] MR. LEVITT: Well, I'm not withdrawing the [13] question so I'm going to ask him to answer.
[14] Q BY MR. LEVITT: What's the purpose of Exhibit 4?
[15] THE WITNESS: Do you want me to re-answer the [16] question, Brian?
[17] MR. LeCLAIR: Yeah. If —
[18] A It was created out of a need to compete against my [19] competitors.
[20] Q BY MR. LEVITT: Is this letter part of your agreement [21] with the American Numismatic Association?
[22] A I mean, I don't know. You're asking me to ask about an [23] agreement in 1996. I – I don't know. I mean, it's in [24] front of us. It's signed.
[25] Q Was this your understanding as to how that program

### Page 70

[1] would operate?
[2] A Can't remember. I really can't remember. Do you know [3] how many deals I've written since the American [4] Numismatic?
[5] Q You've done other letters like this, I take it.
[6] A Very few, but you. Very few.
[7] Q And you've testified that you think it was done to – [8] to compete.
[9] A I don't think; I know.
[10] Q Why was this simply not put into the agreement itself?
[11] A Can't answer that. Why wasn't it put into the [12] agreement? Can't answer it. Don't know why.
[13] Q Do you know what Vantage group owns a real estate [14] division of the company?
[15] A I don't know.
[16] Q Do you know if Henry Lewis does?
[17] A I don't know.
[18] Q Do you know any other companies that Henry Lewis owns [19] or is affiliated with?
[20] A I don't.
[21] Q Did you ever ask anyone at Vantage why there was two [22] separate contracts for mailers for nonprofit mailers [23] and bulk rate mailers?
[24] A No.
[25] Q Did you ever look into that issue in any way?

### Page 71

[1] A No.
[2] Q I'm going to ask you to look at Exhibit 4 again and [3] give me an interpretation of what that means.
[4] MR. LeCLAIR: Objection. Go ahead and do it.
[5] A Just the whole document?
[6] Q BY MR. LEVITT: Yeah. You can go paragraph by [7] paragraph. I mean, what is – what is...
[8] A What is my interpretation of it? It's – my [9] interpretation is that this is something that I needed [10] to use to get a deal. That's my interpretation.
[11] Q What does it mean?
[12] A Heck, I don't know. What does it mean?
[13] Q Yeah. I mean, you wrote this.
[14] A Yeah.
[15] Q And I'm asking you what the words mean.
[16] A It means that we can, you know, continue to mail to [17] their donors to help them raise money to pay their [18] bills.
[19] Q And what are you referring to when you say that? What [20] provision here? What language?
[21] A The – let's see. Everything's one sentence. But it's [22] under "A" where Vantage group services shall have the [23] right to continue the fund raising program.
[24] Q Until such shortfall is eliminated?
[25] A Yeah.

### Page 72

[1] Q What's a shortfall?
[2] A You know, it's my interpretation —
[3] Q I'm sorry. I asked you a question.
[4] A I'm sorry.
[5] MR. LeCLAIR: I think that's what he was trying to [6] do, answer it.
[7] Q BY MR. LEVITT: Oh, I'm sorry. I thought you were [8] going back to something else. I asked you what a [9] shortfall is.
[10] A Yeah. I'm going to tell you what my interpretation [11] is, is that the program falls short of funds coming in. [12] That would be my interpretation.
[13] Q Is that that the contributions that come in as a result [14] of the program are less than the program cost, [15] Vantage's cost and profit?
[16] A Yes.
[17] Q To date at that point.
[18] A No, I'm not sure I understand that.
[19] Q Okay. Is it correct that in these programs for [20] nonprofits Vantage gets paid its fees from the [21] contributions that come in to the nonprofits?
[22] A That is not true.
[23] Q Why don't you explain to me how Vantage gets paid, [24] then.
[25] A By the organization writing a check when we send out an

### Page 73

[1] invoice.
[2] Q Where is that check? Is that not – is that – isn't [3] that check drawn on a bank account that is funded by [4] the contributions to the program?
[5] A No, it is not.
[6] Q You don't believe that to be the case?
[7] A I know it's not the case.
[8] Q You don't believe – you don't – do you know whether [9] Vantage sets up bank accounts with its nonprofit [10] clients and the contributions go in to be deposited?
[11] A Vantage doesn't set up any accounts for anybody.
[12] Q Do you believe that Vantage – do you know whether [13] Vantage and nonprofits on occasion set up bank accounts [14] where contributions come in?
[15] A Not Vantage and the client, no.
[16] Q Okay. Do you know whether clients set up bank accounts [17] where the contributions from programs come in and where [18] the checks are written to fund Vantage?
[19] A It's a two-part question. Let me answer the first part [20] first.
[21] Q Go right ahead.
[22] A Do I know whether organizations set up accounts for [23] contributions to come in? The answer is yes.
[24] The second part of your question, which I believe [25] was is that bank account used to pay off Vantage's

### Page 74

[1] invoices? The answer is sometimes it is, sometimes it [2] isn't.
[3] Q Let me read something to you. You tell me what it [4] means.
[5] A Sure.
[6] Q "To prevent the American Numismatic Association from [7] incurring any financial liability, VantageGroup [8] Services agrees not to invoice American Numismatic [9] Association until sufficient funds are collected to [10] cover the relevant invoice." [11] What does that mean to you?
[12] A It means that we work with the organization and we'll [13] only – we'll invoice them based on what they can [14] afford, based on what the program brings in, if it's a [15] situation where the allocation of the cost of the [16] program is coming from the donations.
[17] Q Let me show you Exhibit 2. Under where it says, [18] "Vantage will finance all costs of the program," it [19] says, "banking fees." What are those fees?
[20] A What are the banking fees?
[21] Q Yes. That Vantage will finance.
[22] A Well, first I want to state one thing here when you ask [23] that question. This is a letter that I send out that [24] is – I'm not sure of the right terminology, but let's [25] just call it smoke and mirrors, or salesmen's fluff, if

### Page 75

[1] you will. Okay? What we do is we don't finance. We [2] pay the up front costs, because we don't know how many [3] pieces we're mailing.
[4] In other words, on a postal bank, okay – I know [5] you asked me about the banking fees, but I feel like I [6] have to answer this question properly. We don't know [7] how many pieces are going to be mailed. We don't know [8] the size of the postal bank. So, we can't invoice [9] somebody until we get a form called a 3602 which [10] generally doesn't come to us till, on a good day, [11] three, four weeks after the packages – the packages [12] have been mailed.
[13] The banking fees, which is your question, is when [14] the organization sets up a bank account in their name, [15] there are fees associated, what is referred to as [16] sweeping costs. A sweeping cost, so that I can explain [17] that to you, would be that the package would come to a [18] P.O. box in the town and state where the organization [19] is, so that it appears that it goes directly back to [20] the organization. The mail gets swept from that [21] location to the banking facility that does the mail [22] opening. And not every one of our clients do that. [23] Some of them do their own mail opening. But the ones [24] that use that facility, we pay the banking fees.
[25] I shouldn't say we pay the banking fees. We have

### Page 76

[1] an account – and that's not right either. I've got to [2] word this right. The organization ultimately pays the [3] fee. We just do it up front, because we can't bill [4] them until we know how much has gone in.
[5] Q Why did you say so it will appear that the package – [6] that the post office box is set up so that it will [7] appear that the – let me finish the question. So that [8] – so that it will appear that it's going to the [9] organization
[10] A Why did I say that?
[11] Q Yeah.
[12] A Well, in the nonprofit industry people are skeptical of [13] making contributions because of, let's say, scams. So, [14] if I'm a nonprofit organization and I reside my office [15] in Washington, D.C., and I get a package in the mail [16] and it tells me to send a check, or asks me to send a [17] check to Kalamazoo, Michigan, I'm going to be leery of [18] that package. So, what was developed were these P.O. [19] boxes set up in these towns so that the mail gets [20] swept, just like the electric company does, just like [21] almost any major company in America does.
[22] So, when I say "appears," it does go back to that [23] P.O. box, and then it's called the sweeping fee. Okay? [24] So, I say "appears," that's...
[25] Q So, when this says Vantage will finance all costs of

### Page 77

[1] the program including banking fees, are you saying [2] that's not true?
[3]  A  That's not true.
[4]  Q  So, this letter is a lie?
[5]  A  That letter's fluff.
[6]  Q  Fluff in the sense of being untrue.
[7]  A  Fluff in the sense that it's not a hundred percent [8] correct.
[9]  Q  Well, I'm asking about one specific —
[10]  A  You're asking me about the banking fees?
[11]  Q  Yeah.
[12]  A  It's not correct.
[13]  Q  Okay. So —
[14]  A  We don't pay any banking fees.
[15]  Q  So, this is untrue.
[16]  A  It's fluff.
[17]  Q  You don't want to say the word "untrue"?
[18]  A  It's not – it's fluff.
[19]  Q  But you said it's incorrect.
[20]  A  I said it's fluff. It's a sales person doing what they [21] feel they need to do to bring a program to fruition.
[22]  Q  You understand that the nonprofit organizations rely on [23] these letters, do you not?
[24]  MR. LeCLAIR: Objection.
[25]  THE WITNESS: Can I answer?

### Page 78

[1]  MR. LeCLAIR: You can answer.
[2]  A  I do not.
[3]  Q  BY MR. LEVITT: Do you think they ignore them?
[4]  A  You're asking for speculation, and I can't tell you [5] what they do. I'll tell you – no.
[6]  Q  I'll ask you another question.
[7]  A  Sure.
[8]  Q  What else is fluff, "fluff"?
[9]  A  Most of it. Most of it.
[10]  Q  Why don't you show me what else is fluff. Point to it.
[11]  Will Vantage do all the work? Fluff?
[12]  A  No.
[13]  Q  True?
[14]  A  True.
[15]  Q  Will Vantage write all the appeal letters? Fluff or [16] true?
[17]  A  True.
[18]  Q  Will Vantage collect mail —
[19]  A  Collate.
[20]  Q  Collate mail?
[21]  A  Collate mail or components, true. Design —
[22]  Q  Will Vantage design and manufacture all product?
[23]  A  True.
[24]  Q  Will Vantage produce response analysis on a weekly [25] basis?

### Page 79

[1]  A  True.
[2]  Q  Will Vantage finance all costs of the program?
[3]  A  Fluff.
[4]  Q  Will Vantage finance postal banks?
[5]  A  Up front.
[6]  Q  True or fluff?
[7]  A  Will they finance? Fluff.
[8]  Q  Will Vantage finance banking fees? True or fluff?
[9]  A  Fluff.
[10]  Q  Will Vantage finance list management techniques? True [11] or fluff?
[12]  A  Fluff.
[13]  Q  Will Vantage finance all component costs including [14] product?
[15]  A  Fluff.
[16]  Q  It states that Vantage will not begin billing until [17] sufficient funds are generated. True or fluff?
[18]  A  Varies from organization to organization. No, I take [19] it back. Fluff.
[20]  Q  What is NCOA?
[21]  A  National change of address.
[22]  Q  It states that, "Your optional costs are NCOA and mail [23] opening fees." True or fluff?
[24]  A  True.
[25]  Q  It states that, "Your financial obligations," and then

### Page 80

[1] in bold, "from proceeds are product and postage." True [2] or fluff?
[3]  A  Fluff.
[4]  Q  Directing your attention on Exhibit 4 to paragraph "C," [5] would you read that into the record?
[6]  A  "In the event a shortfall exists after the completion [7] of the mailing programs, referred to in "A" above, [8] Vantage agrees that organization will have no further [9] liability for any costs, fees or expenses not covered [10] by the contributions."
[11]  Q  What does that mean?
[12]  A  It means that they don't have any financial liability. [13] They have liability; not financial.
[14]  Q  Will you explain the difference?
[15]  A  Liability? Well, a nonprofit organization typically [16] only has one asset, unless they're a huge group and has [17] real estate holdings. The only asset that a nonprofit [18] organization typically has is their donor list. That [19] is the value of an organization. And the liability is [20] to be able to use those donors for mailings to help [21] them pay their bills.
[22]  Q  Okay. So, why – tell me what you mean when you say [23] they don't have financial liability but they have [24] liability.
[25]  A  The liability is the fact that they have to – they

### Page 81

[1] would need to use the donor file.
[2] Q Who would need to use the donor file?
[3] A The nonprofit organization.
[4] Q Would have to use it in what way?
[5] A To mail it. To get donations from it.
[6] Q You mean Vantage would have – would be able to [7] continue using the mailing list. There's a shortfall. [8] Okay?
[9] A Yeah.
[10] Q It says in the event a shortfall exists after [11] completion of the mailing programs. Okay?
[12] A Uh-huh.
[13] Q And that means that there is – the contributions that [14] have come in are not sufficient to cover Vantage's [15] costs and fees, correct?
[16] A Correct.
[17] Q Okay. This says, "The organization will have no [18] further liability for any of those costs, fees, and/or [19] expenses not covered by contributions." Correct?
[20] A That's what it says.
[21] Q Okay. That means that if —
[22] A But it doesn't define liability. Just no further [23] liability.
[24] Q Let me ask you another question.
[25] A Sure.

### Page 82

[1] Q I'll give you a hypothetical. Contributions that come [2] in are $100,000. Vantage's fees and costs are [3] $200,000. Programs are over. What happens under [4] paragraph '"C"?
[5] A What happens under paragraph "C"? First of all, the [6] organization might just pay the bill and not want us to [7] continue to mail. If they will want us to continue to [8] mail to their donors to help them raise money to pay [9] their bills, then we would go ahead and continue [10] mailing their donors to help them pay their bills.
[11] Q What if they don't want to send any more mailings out?
[12] A Then they pay us.
[13] Q Well, it just says – it says right here there's no [14] financial liability?
[15] A Where's the word "financial"?
[16] Q "No further liability for any costs, fees or expenses." [17] What does that mean if not that?
[18] A Well, you're looking at "C," but in "C," and I'm not a [19] Harvard grad here, but it does refer to "A" above. So, [20] I guess what would happen would be what it says in "A."
[21] Q No, no. All it says is – it says, "In the event a [22] shortfall exists after the completion of the mailing [23] programs referred to in 'A' above."
[24] A Uh-huh.
[25] Q So, you look to "A" above to see the mailing programs.

### Page 83

[1] When those programs are complete, Vantage agrees that [2] organization will have no further liability for any [3] costs, fees, and/or expenses —
[4] A Okay.
[5] Q — not covered by contributions.
[6] A Okay.
[7] Q What does that mean?
[8] A What does it means? It means that, as it says in "A," [9] we're allowed to go back to their donor file to help [10] them bring in money to pay their bill. Why don't you [11] read A"."
[12] Q "A" says you've got a right until the shortfall is [13] eliminated.
[14] A Okay.
[15] Q Okay? By mailing up to two complete programs to the [16] donors.
[17] A Okay.
[18] Q "C" says, when the two completed programs referenced in [19] "A" are complete, Vantage agrees that organization will [20] have no further liability for any costs, fees, and/or [21] expenses. What does that mean, Mr. Gelb?
[22] A I guess it's contradictory.
[23] Okay. I'm reading it. What it means is that we [24] as an organization know that with the two – up to [25] doing two complete donor mailings, and that's complete

### Page 84

[1] donors, that's not just the donors we bring in, that's [2] all their donors, because if you know how many donors [3] they have, and you know how the first program, the [4] recouping program did, you obviously know how the [5] second one's going to do, and in the – in the few [6] instances where this type of thing has occurred it's [7] always been recouped in one mailing.
[8] So, what it means? It means that after we've done [9] two complete mailings they don't have any liability for [10] the costs.
[11] Q For the shortfall. If there's a shortfall. It says, [12] "In the event a shortfall exists."
[13] A Well, that's – that's – that's what it says.
[14] Q Okay.
[15] A That's what it says.
[16] Q So, it means that after the two mailing programs [17] referenced in paragraph "A" are complete, if a [18] shortfall exists the organization will have not further [19] liability with respect to the shortfall.
[20] A That's what it says.
[21] Q Okay.
[22] A But that's not the case. It's not what happened. But [23] that is what it says.
[24] Q Well, I'm not asking you what happened in this [25] particular case. I'm asking you what this says and

### Page 121

[1] says "average gift" up there. The dollar fifteen is [2] the cost of the -- that's per piece, the cost per [3] piece.
[4]  Q Okay. In other words, if you multiply one-fifteen [5] times fifty-four three-oh-one you should get to --
[6]  A Sixty-two four-four-six.
[7]  Q The next line?
[8]  A The next line is a standard program for us is a [9] three-part mailing, so we mail out two follow-up [10] notices. The next line is the first of those two [11] follow-up notices. And what we do is suppress the [12] people that make a donation and only mail those people [13] that didn't. So, you can see that the 51,000 pieces [14] were mailed, and then the cost of the postage for that [15] is $4,763. The dollar fifteen cost encompasses all of [16] the creative, all of the reminder letters, so that the [17] organization just has to pay for, of course, the [18] product, and then the postage and any banking fees.
[19]  Q The NCOA?
[20]  A That's a National Change of Address.
[21]  Q Okay.
[22]  A And that's $750 charge.
[23]  Q Okay. So, this is separate from what you call the [24] product sell price.
[25]  A Yes.

### Page 122

[1]  Q It's an additional charge.
[2]  A Right. It's option for them -- for us to run that [3] through.
[4]  Q So, in addition to the product sell price they have an [5] NCOA charge.
[6]  A M-hm.
[7]  Q And the next line?
[8]  A That's the cost to set up a P.O. box which is a sweep [9] -- what we call a sweep P.O. box.
[10]  Q Okay. That's an additional charge.
[11]  A Yes.
[12]  Q Just to set it up, $500, and then to sweep it is the [13] next line; is that right?
[14]  A Right. Yes. And the sweeping is overnight mail from [15] the P.O. box to Boston Financial Data Services.
[16]  Q I'm sorry. So, it's only for overnight mail?
[17]  A It's overnight, yeah, they take the mail from the P.O. [18] box and they overnight it to Boston Financial Data [19] Services, either once a week, every day, or three times [20] a week.
[21]  Q Send it by overnight mail.
[22]  A Yeah.
[23]  Q And that -- so, this is an additional charge for having [24] it sent by overnight mail.
[25]  A It's not an additional charge. That's the charge.

### Page 123

[1]  Q Well, it's an additional charge to the product sell [2] price.
[3]  A It's additional charge to having the banking. But [4] yeah, it's -- yeah, if they're going to work with [5] Boston Financial, these are the costs associated.
[6]  Q Okay. The next line?
[7]  A The next line says, "One advance for $20,000," and I [8] have no understanding of what that is.
[9]  Q You don't know what an advance is?
[10]  A I don't know anything about this.
[11]  Q I just ask you to look at Exhibit 18 again, second [12] paragraph, if you'd read it.
[13]  (Pause.)
[14]  A We advanced them $20,000.
[15]  Q And then the next line is permit fee?
[16]  A Right.
[17]  Q What is that?
[18]  A That's a permit fee to go from when you set up an [19] indicia, it's typically set up with a post office near [20] your organization. So, we have to mail from where our [21] mail house is, so there's a cost to set up the postal [22] permit at that mail house.
[23]  Q So, these are all costs that Vantage has incurred and [24] is now charging to the nonprofit.
[25]  A No, not that Vantage has incurred.

### Page 124

[1]  Q Well, why is it being charged to the nonprofit then?
[2]  A The nonprofit's accruing them.
[3]  Q If they've already accrued it why is it being charged [4] to them here?
[5]  MR. LeCLAIR: Objection.
[6]  Q BY MR. LEVITT: This is -- this --
[7]  A I completely don't understand what you're talking [8] about.
[9]  Q This says program costs.
[10]  A Uh-huh.
[11]  Q Okay?
[12]  A Yeah.
[13]  Q And these are the items of the program costs, are they [14] not?
[15]  A That's correct.
[16]  Q And those program costs are the product sell price, [17] postage, the NCOA, the setup sweeping P.O. box, the [18] sweeping P.O. box fees, the advance, the permit fee, [19] the bank fee, the mail opening process; is that [20] correct?
[21]  A That's correct.
[22]  Q Okay.
[23]  A For this particular organization.
[24]  Q Okay. And these are the charges to the nonprofit.
[25]  A Yes.

BSA    Depo-USA V Harry Lewis, et al, 97-10052-MLW - Jay Elliott Gelb - 09/28/00    XMAX(32)

### Page 125

[1] Q Let's look at paragraph "B." It says "revenue." Will [2] you walk through that? Just take one line.
[3] A I'll take the first line. It says that on 10/24 – is [4] that '96? I can't read it – two hundred and [5] sixty-four pieces of mail came in, of which two hundred [6] and fifty-seven had money, which means that seven [7] pieces came in without money, and the total dollars [8] were $2,747.75, which averaged out to $10.69 per gift. [9] And in flowing across the chart you'll see "mail with [10] money," then "cumulative," it cumes it as you keep [11] going.
[12] Q So, this is the first mail, this is the first coming [13] in?
[14] A It's the first hit, yeah. Yup. And then you have [15] "positive response," which means mail with just money. [16] The "negative response" is mail with letters. And then [17] they cume the average gift, and they cume the total [18] dollars, and then we show the profit for the [19] organization.
[20] Q And this – and the profit for the group here, the [21] organization, it's – in this case it's negative [22] $99,000.
[23] A Well, on the first line.
[24] Q Oh, I understand. That's what we're reading.
[25] A Yeah.

### Page 126

[1] Q The first line.
[2] A Yeah.
[3] Q It's negative $99,000.
[4] A Right.
[5] Q And that's negative because of the program costs that [6] we previously discussed.
[7] A Sure. Yeah.
[8] Q Okay. "C," collections by Vantage. Can you walk [9] through that top line?
[10] A Yeah. That shows the date that somebody made a payment [11] to us, so the top line on January 28, '97, a check was [12] sent to us for $44,104.57. Shows how much was [13] collected and how much is owed.
[14] Q So, it's $44,000 collected and $58,000 is still owed.
[15] A As of January 28th, 1997, yes.
[16] Q And the balance to Vantage is the program costs we [17] described.
[18] A M-hm. Yes.
[19] Q All right. "D."
[20] A "D" is the – showing the three-part mail. It begins [21] with how many days in the mail, the program has been [22] in, so you get product in the two follow-up letters. [23] Then it shows you how many donors have —
[24] Q It appears – I'm sorry to interrupt.
[25] A Not a problem.

### Page 127

[1] Q The pre-send?
[2] A The pre-send is something that we only use with more [3] expensive programs to help the group save money. It's [4] a letter that goes out before the premium, and it's [5] usually used with a higher price premium like a [6] calendar or a card, and gives the donor or the member [7] the opportunity to say no, thank you, so that you don't [8] have to mail the calendar so you don't – so it helps [9] the – what it does is it helps the cost of the program [10] for the organization. Doesn't help us, we only get [11] paid for product we drop, but it helps the [12] organization.
[13] Q When you send a pre-send you're saying you don't – you [14] don't include those charges?
[15] A Well, they're included in the cost of the program, but [16] the cost of the program is built into the package. So, [17] if I don't mail a package it's just they're paying the [18] postage. It's not much. I mean, it's pennies. It's [19] built in.
[20] Q The cost of the program has profit built into it as [21] well for Vantage, does it not?
[22] A Right. But if I send you a letter and you say to me [23] no, thank you, and I don't send you a calendar, I can't [24] charge you for that. I can only charge you for what I [25] mail.

### Page 128

[1] Q Are you saying that when you send a pre-send the –
[2] whatever charges that are – that Vantage expends on [3] the pre-send you don't bill to the —
[4] A Oh, we do, but it's just the cost of a letter. It's [5] just a letter. It's pennies.
[6] Q I interrupted you. You were going on.
[7] A Yeah. I was telling – just telling you about the [8] summary mailing. It just says that on the product you [9] have how many days in the mail, how many people [10] donated.
[11] Q "Number of days" means what?
[12] A "Number of days" means how many days in the mail the [13] program has been.
[14] Q Okay. Continue.
[15] A And the number of donors are how many people have made [16] a contribution. In this case you'll see that there was [17] 3,222 people. The next column is the total amount of [18] gifts to that cycle of the program, and in the case of [19] the product it's thirty-four thousand hundred and [20] eighty-four fifty-seven. It shows the average gift for [21] that cycle at $10.61, and the overall response rate for [22] that cycle which is 5.93 percent.
[23] Q And it's the same thing for remind number one, remind [24] number two?
[25] A Yes. It's identical.

### Page 137

[1] Q BY MR. LEVITT: I'm going to show you three documents [2] and ask you if you recognize your signature on them.
[3] A Yes, I recognize my signature.
[4] Q On all three?
[5] A Yes.
[6] Q And do you recall that California Columbian Charities [7] was a client of yours?
[8] A Yes.
[9] Q You actually recognize the documents?
[10] A No.
[11] MR. LEVITT: Why don't we mark these as Exhibit [12] 20A, "B" and "C." The program agreement is "A," the [13] letter is "B," and the agreement amendment is "C."
[14] (Gelb Deposition Exhibits 20A, "B" [15] and "C" marked.)
[16] Q BY MR. LEVITT: I show you two documents and ask you if [17] you can identify your signature?
[18] A Yes, I recognize my signature.
[19] Q On both documents?
[20] A Yes.
[21] Q Do you recall that Children's Aid International is a [22] client of yours?
[23] A Yes.
[24] Q Do you recognize the documents themselves?
[25] A No.

### Page 138

[1] MR. LEVITT: These will be Exhibits 21A and "B." [2] The program agreement is 21A and the letter is 21B.
[3] (Gelb Deposition Exhibits 21A and [4] 21B marked.)
[5] MR. LEVITT: I'm done.
[6] Q BY MR. DARLING: Mr. Gelb, my name is Mark Darling. I [7] represent Moose International, Inc. Did Moose [8] International, Inc., pay for all of the mailings that [9] were conducted through Vantage?
[10] A Yes, they did.
[11] Q The materials that were identified as Exhibit 1, the [12] brochure —
[13] A Yes.
[14] Q — you recall that? All right. Is this a brochure [15] that you would give to prospective clients?
[16] A Yes.
[17] Q And in the brochure I see it under — it says that [18] Vantage understands the nonprofit world? Does that [19] sound about right?
[20] A Yes.
[21] Q All right. And it also says its organizational [22] culture, legal parameters, postal regulations — you [23] want to take a look at it?
[24] MR. DARLING: I don't know if you have the [25] original marked or not.

### Page 139

[1] MR. LEVITT: Here's the original.
[2] Q BY MR. DARLING: Did I read that right?
[3] A You did.
[4] Q All right. So, when you would go out as a sales person [5] or when you send your sales force out, do you have them [6] say to prospective clients that Vantage understands [7] legal parameters, postal regulations, the culture of [8] the nonprofit world?
[9] A I've been in the position of sales manager since March [10] of 2000, and what I have instructed them to do is to [11] explain the U.S. Postal Service's interpretation of [12] those regulations.
[13] Q But do they also go out and explain post – did they – [14] did you go out and explain postal regulations and legal [15] parameters and what not to clients back when you were [16] selling from '95 up to the time you became the sales [17] manager?
[18] A No to the postal regulations. In terms of legal [19] parameters, the only thing I can think that fits that [20] bill would be state registration, and the answer would [21] be yes, I did discuss state registration with all [22] organizations.
[23] Q Did you say to the nonprofits that you had a lot of [24] experience with mailings and setting up mailings and [25] sending them out, and basically that Vantage would

### Page 140

[1] handle all of that on their behalf?
[2] A I – I can't answer that question to say what I exactly [3] said to people. Did I make the impression that, you [4] know, I had an expertise in this area, the answer would [5] be yes, but not in regard to the postal.
[6] Q Okay. Well, in terms of the actual mailings, would you [7] tell a prospective client – and I don't mean word for [8] word – but generally as part of your sales pitch, if [9] you will, that Vantage would take care of all the [10] mailing, they'd get it all set up, they'd get it mailed [11] out through the post office? In other words, the [12] prospective client wouldn't have to do anything in that [13] regard.
[14] A Yes. That we – we did say that it was a turnkey [15] program.
[16] Q Right. So, you handled it all from start to finish, [17] don't worry, we'll get your mailing out, we'll handle [18] the whole thing.
[19] A I don't use the word "don't worry," but everything [20] else, yes.
[21] Q Sales fluff, as I believe you put it before?
[22] A Yeah. Sure.
[23] Q Okay. So – so, that's the impression you gave to [24] someone, a prospective client, because you wanted to [25] have them as a client.

### Page 141

[1]  A  I don't feel that I gave them a false impression. You [2] say — you used the term —
[3]  Q  I used the term "fluff" —
[4]  A  Right.
[5]  Q  — because you used it.
[6]  A  Because I used it. And I want to say that — that I [7] feel and always will that I was honest with my clients [8] to the best of my knowledge and presented accordingly.
[9]  Q  I'm not suggesting that you were anything other. All [10] I'm trying to say is — and see if this is how it went [11] — is that in trying to land a client you would say to [12] them, we handle everything, we handle all the mailings, [13] we handle all of these things, getting them out the [14] door, when they come back in we can handle all that for [15] you, you know, we'll make your life easy if you sign up [16] with us type of thing.
[17]  A  Yes.
[18]  Q  All right. You said that the Moose International [19] account was yours?
[20]  A  Yes.
[21]  Q  You also said that that was some four years ago or so [22] that you dealt with them?
[23]  A  Yes.
[24]  Q  Do you have any memory of any conversations with anyone [25] from the Moose when you were working that account?

### Page 142

[1]  A  Do I have any recollection of some of the conversation? [2] Yeah, to some degree, sure.
[3]  Q  With whom did you deal at the Moose?
[4]  A  I dealt with two gentlemen primarily, Paul Klinger and [5] Frank Sarnecki.
[6]  Q  Did you also tell Mr. Klinger and/or Mr. Sarnecki that [7] Vantage would take care of all the mailings, get [8] everything sent out, everything mailed through the post [9] office and what not as we discussed a moment ago?
[10]  A  Not — not that way, no.
[11]  Q  What did you say to them?
[12]  A  They came to us and they wanted to mail 250,000 [13] packages of cards, and what I said to them is that [14] would be a big mistake because you don't know how the [15] file would react, you could lose your shirt doing that. [16] So, I told them that I'd love to take that order but I [17] want to continue — I want to build a relationship [18] here. And I told them that the best thing to do is [19] choose a premium that has the least amount of liability [20] and we'll test it across the entire file on a random [21] select, and if the program is successful on the test [22] that then we should mail more packages.
[23]  Q  So, you were telling them that you had expertise, [24] obviously —
[25]  A  Yes.

### Page 143

[1]  Q  — in this area and that they should consider doing [2] things the way you had it set up.
[3]  MR. LeCLAIR: Objection. You can go ahead and [4] answer.
[5]  THE WITNESS: Could you repeat the question? I'm [6] sorry.
[7]  Q BY MR. DARLING: Sure. So, you were telling them that [8] you had expertise in this area and they shouldn't just [9] go out willy nilly and send out a mailing, that you [10] could set it up in such a way as to test their file and [11] to make certain that they — they had a successful [12] program.
[13]  A  I told them —
[14]  MR. LeCLAIR: Objection. Go ahead.
[15]  A  I told them that regardless of who they work with that [16] they shouldn't just go out and drop packages like that [17] at that price.
[18]  Q BY MR. DARLING: Maybe I'm making that question too [19] complicated. When you went in there you were saying, [20] look, we know how to do these mailing things, we want [21] your business, we have the expertise in this area, and [22] here's my suggestion, don't do this, do this.
[23]  MR. LeCLAIR: Objection. Go ahead and answer it.
[24]  A  I'm — I'm not sure. You've got — I don't understand [25] the question exactly.

### Page 144

[1]  Q BY MR. DARLING: Okay. Well, if you don't understand [2] it, that means I'm not asking the question very well.
[3]  You said that they came to you?
[4]  A  They called us.
[5]  Q  Okay. So, I take it that you went out to them. Did [6] you actually go out to their —
[7]  A  Yes.
[8]  Q  — facility? And you met with them?
[9]  A  Yes.
[10]  Q  And they gave you some kind of idea that they wanted to [11] send out some kind of a mailing.
[12]  A  Yes.
[13]  Q  And you said to them when you heard their idea, no, [14] no, no, don't do it that way. You should do it another [15] way.
[16]  A  That's correct.
[17]  Q  And you should do it another way because I have [18] expertise in this area, I know what I'm doing, I've [19] been involved with these types of mailings and programs [20] before, and you should do it the way I'm suggesting in [21] order to have a successful program.
[22]  MR. LeCLAIR: Objection.
[23]  A  I didn't state that, no.
[24]  Q BY MR. DARLING: I'm not saying so — in so many [25] precise words, but is that the impression that you were