Page 1

```
 1                    Volume: I
 2                    Pages:  1 - 105
 3           UNITED STATES DISTRICT COURT
 4            DISTRICT OF MASSACHUSETTS
 5              C.A. No. 04-11686-WGY
 6
 7   VANTAGE FINANCIAL SERVICES, INC.
 8            Plaintiff,
 9        v.
10   NONPROFIT SERVICE GROUP, INC.,
11   and GEORGE E. MILLER
12            Defendants.
13
14
15              **********
16      DEPOSITION OF LAWRENCE C. LYON
17         Thursday, July 21, 2005
18          Peabody & Arnold, LLP
19            30 Rowes Wharf
20          Boston, Massachusetts
21             10:00 a.m.
22      Reporter:  Linda M. Grieco
23   320 Congress Street, Boston, MA 02210
24
```

Page 2

```
 1   APPEARANCES:
 2
 3   DAVIS MALM & D'AGOSTINE
 4   (By Laurence M. Johnson, Esquire)
 5   One Boston Place
 6   Boston, Massachusetts 02108
 7   on behalf of the Plaintiff
 8   (617) 367-2500
 9   and
10   VANTAGE
11   (By Joel H. Peterson, General Counsel)
12   90 Canal Street
13   Boston, Massachusetts 02114-2031
14   on behalf of Plaintiff
15   (617) 878-6000
16
17   PEABODY & ARNOLD, LLP
18   (By Richard L. Nahigian, Esquire)
19   30 Rowes Wharf
20   Boston, Massachusetts 02110
21   on behalf of the Defendants
22   (617) 951-2100
23
24
```

1 (Pages 1 to 2)

Lawrence C. Lyon                                                                    07/21/2005

Page 3

1              I N D E X
2    Deposition of:         Direct  Cross
3    LAWRENCE C. LYON
4      By Mr. Nahigian         4
5
6
7
8
9
10             E X H I B I T S
11    No.                      Page
12    1    Subpoena              13
13    2    Promotional Folder of Vantage Group
14         Services              33
15    3    Collection of Documents 0735 - 0759    61
16    4    Fax 4/15/99 with Proposed Shriners
17         Hospitals Agreement        65
18    5    Fax to George Miller 7/10/01 with
19         Sons of Italy Agreement      68
20    6    Signed Agreement re Shriners Program   80
21    7    Letter to VerMaas and Turnipseed
22         10/25/00                81
23
24

Page 4

1              P R O C E E D I N G S
2              STIPULATION
3         It is stipulated by and between counsel
4    for the respective parties that the deposition is to
5    be read and signed by the deponent under the pains
6    and penalties of perjury within 30 days of receipt
7    of the last volume of the depositions; and that the
8    sealing and filing thereof are waived; and that all
9    objections, except as to form, and motions to strike
10   are reserved to the time of trial.
11              * * * * *
12         LAWRENCE C. LYON,
13   a witness called by counsel for the Defendants,
14   having been satisfactorily identified by the
15   production of his driver's license, and duly sworn
16   by the Notary Public, was examined and testified as
17   follows:
18              DIRECT EXAMINATION
19              BY MR. NAHIGIAN
20      Q.  Could you please state your full name for
21   the record?
22      A.  Lawrence Carl Lyon.
23      Q.  What is your address?
24      A.  My address in Massachusetts?

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                                          07/21/2005

Page 5

1    Q.  Yes.
2    A.  43 Country Club Way, Ipswich, Massachusetts.
3    Q.  Do you have an address in Florida?
4    A.  Yes, sir.
5    Q.  What is that address?
6    A.  921 Key Way, Nokomis, N-O-K-O-M-I-S.
7    Q.  Do you have an address in New Hampshire?
8    A.  450 Clough, C-L-O-U-G-H, Hill Road, Lyman,
9    L-Y-M-A-N.
10    Q.  Do you have any other addresses, residential
11   addresses?
12    A.  Nine -- 689 Back Nine Drive.
13    Q.  Where is that?
14    A.  Venice, Florida.
15    Q.  Any other addresses?
16    A.  No, sir.
17    Q.  What's your business address?
18    A.  921 Key Way.
19    Q.  In Nokomis?
20    A.  Yes, sir.
21    Q.  What business is that?
22    A.  Key Direct Marketing Group.
23    Q.  Are you an employee of that company?
24    A.  I'm the president.

Page 6

1    Q.  How long has that been the case?
2    A.  Four or five months.
3    Q.  Is that a company that you set up?
4    A.  Yes, sir.
5    Q.  Are there any other employees?
6    A.  No, sir.
7    Q.  What is the business of that company?
8    A.  Direct marketing.
9    Q.  Do you hold any other employment at this
10   time?
11    A.  Yes, sir.
12    Q.  What is that?
13    A.  I'm a consultant.
14    Q.  To whom or to what business are you a
15   consultant at this time?
16    A.  Vantage Travel Service, Inc.
17    Q.  Do you consult to any other businesses,
18   other than Vantage Travel Service, Inc.?
19    A.  I have no contracts.  I am soliciting.
20    Q.  Are there any particular companies that
21   you're soliciting at this time?
22        MR. JOHNSON:  I'm going to object to the
23   form of the question.
24        THE WITNESS:  I'm sorry?

3 (Pages 5 to 6)

Lawrence C. Lyon                                                    07/21/2005

Page 7

1    MR. JOHNSON:  I just objected to the
2  form of the question.  You can answer.
3    A.  I don't have any contracts.
4    Q.  Is there any business that you're going
5  after right now in terms of your consulting work?
6    A.  Yes, sir.
7    Q.  Can you identify any of the companies for
8  which you seek to consult?
9    A.  Do I have to?
10    MR. JOHNSON:  Are you willing to take
11  the answer pursuant to the terms of a
12  confidentiality order pursuant to which you will not
13  disclose the identity of any business he's
14  soliciting to anybody, including your clients?
15    MR. NAHIGIAN:  Without --
16    MR. JOHNSON:  Because that's information
17  which, number one, I don't even want to take the
18  time examining the question of whether it has
19  anything to do with this case.  But quite aside from
20  that issue, it's susceptible obviously to potential
21  misuse.  Unless we have -- the witness has
22  reasonable protection against misuse, I think we
23  would probably be inclined to go get a protective
24  order first.

Page 8

1    MR. NAHIGIAN:  Well, I don't want to set
2  any precedent right now.  I think we can set that
3  aside for now.
4    MR. JOHNSON:  We'll come back to it
5  later, then.
6    Q.  Do you have a contract currently with
7  Vantage Travel Service, Incorporated?
8    A.  No, sir.
9    Q.  Is there any document that describes the
10  terms of the consulting services that you provide to
11  Vantage Travel at this time?
12    A.  No, sir.
13    Q.  Do you consider yourself to be an employee
14  of Vantage Travel Service at this time or an
15  independent contractor?
16    MR. JOHNSON:  Objection to the form.
17    A.  I'm a consultant.  I'm not an employee.
18    Q.  At one time were you an employee of Vantage
19  Travel Service?
20    A.  Yes, sir.
21    Q.  When did you cease to be an employee of
22  Vantage Travel Service, as far as you know?
23    A.  I was terminated on January 2, 2000 -- what
24  year is this?  2003, I believe.

4 (Pages 7 to 8)

Lawrence C. Lyon                                                                                    07/21/2005

Page 9

1       MR. JOHNSON:  We're in 2005 now.  I take
2   it you don't object to my mentioning that, do you?
3       MR. NAHIGIAN:  No.
4   Q.  2003?
5   A.  I'm sorry, it must be 2004.  Is it 16, 18
6   months from 2004 until today?  January 2, 2004
7   terminated.
8   Q.  Do you have any understanding of the reasons
9   why you were terminated?
10      MR. JOHNSON:  Objection to the form.
11  Q.  You can answer.
12      THE WITNESS:  You say I can answer?
13      MR. JOHNSON:  You may answer.
14  A.  I would say a good portion of the decision
15  was due to the case involving the Shriners Hospitals
16  For Children.
17  Q.  Can you elaborate on that, what it was about
18  the Shriners case that contributed to the reasons
19  for your termination?
20      MR. JOHNSON:  Objection to the form.
21  Q.  You can answer.
22  A.  I can answer?
23  Q.  You can answer the question, unless Attorney
24  Johnson tells you not to answer.

Page 10

1   A.  I'm sorry, I'm a little hard of hearing.
2   Okay, could you repeat that, sir?
3   Q.  What was it about the Shriners Hospital case
4   that lead to your termination, as far as you know?
5       MR. JOHNSON:  Objection to the form.
6   You may answer.
7   A.  I was responsible for that deal.
8   Q.  Now, at the time you were terminated in
9   January of 2004, were you an employee, as far as you
10  know, of Vantage Travel Service, Inc. or Vantage
11  Financial Services, Inc.?
12  A.  I believe it was The Vantage Group.
13  Q.  Were you ever an employee of Vantage
14  Financial Services, Inc.?
15  A.  Yes, sir.
16  Q.  When was that?
17  A.  When the division began in 1990 -- sorry, I
18  don't know the exact date.  When the fund-raising
19  division first began.
20  Q.  You just mentioned The Vantage Group.  What
21  I'd like to know is during your tenure with Vantage,
22  did you distinguish in terms of your employment
23  between Vantage Financial Services, Inc. and Vantage
24  Travel Service, Inc. or did you consider yourself to

5 (Pages 9 to 10)

Lawrence C. Lyon                                                                07/21/2005

Page 11

1    be an employee of The Vantage Group, generally?
2        A.  I was an owner.
3            MR. JOHNSON:  Objection to form.
4        A.  Of the corporation.
5        Q.  Which corporation?
6        A.  All of them.
7        Q.  You held stock in the corporations?
8        A.  Yes, sir.
9        Q.  Which corporations are you referring to
10   specifically?
11       A.  All of them.
12       Q.  Would that include The Vantage Group, Inc.?
13       A.  I don't believe so.
14       Q.  Would it include Vantage Financial Services,
15   Inc.?
16       A.  Yes, sir.
17       Q.  Would it include Vantage Travel Service,
18   Inc.?
19       A.  Yes, sir.
20       Q.  Were there any other corporations that you
21   were an owner of?
22       A.  Cypress Realty Trust.
23       Q.  Anything else?
24       A.  No, sir.

Page 12

1        Q.  At some point did you cease to be an owner
2    of those entities that you just identified?
3        A.  Yes, sir.
4        Q.  When did that happen?
5        A.  On January 2, 2004.
6        Q.  In addition to being an owner of those
7    entities, did you also consider yourself to be an
8    employee of those entities prior to January 2, 2004?
9            MR. JOHNSON:  Objection, asked and
10   answered.
11       A.  No.
12       Q.  Let's step back.  Did you receive a subpoena
13   to appear for this deposition today?
14       A.  No, sir.
15       Q.  I have an indication here from a constable
16   that in-hand service on subpoena was made on you at
17   approximately 3:30 p.m. on July 16, 2005.
18       A.  Absolutely not.
19       Q.  Are you aware of whether or not someone at
20   your residence in Ipswich received a subpoena on
21   your behalf on that day?
22       A.  What was the date, sir?
23       Q.  It was last Saturday, I believe, July 16th.
24       A.  No, sir.

6 (Pages 11 to 12)

Lawrence C. Lyon                                                          07/21/2005

Page 13

1      MR. JOHNSON:  Mr. Nahigian, didn't that
2   subpoena, regardless of the question of its service,
3   didn't it call for the witness's appearance on a day
4   other than today?
5      MR. NAHIGIAN:  No, it called for today,
6   July 21, 2005.
7      (Attorney/client discussion off the
8   record.)
9      MR. JOHNSON:  I'm reminded he's here.
10  It doesn't seem particularly material.
11     MR. NAHIGIAN:  Well, there was an
12  accompanying document request.  That would make it
13  material.
14     (Exhibit 1 marked for identification.)
15     MR. JOHNSON:  I don't know that I
16  received the subpoena.  I know I did receive one
17  that scheduled for an earlier date.  The one you
18  talked about I have never seen.
19     MR. NAHIGIAN:  I think the one you
20  received said the deposition would continue from day
21  to day.  Marked as Exhibit 1 is a subpoena.  And, in
22  fact, we did change the date to July 21st prior to
23  service.
24   Q.  Have you ever seen that document before

Page 14

1   today?
2      (Document exhibited to witness.)
3    A.  No, sir.
4    Q.  Have you ever seen a copy of that document
5   before today?
6    A.  No, sir.
7    Q.  Could you describe your educational
8   background after high school?  What I'd like is the
9   names of any institutions attended and the dates of
10  attendance and any degrees obtained.
11   A.  Franklin Pierce College, Rindge,
12  New Hampshire, 1969 to 1973, BA.
13   Q.  Anything else after that?
14   A.  I passed the insurance license exam in 1977,
15  I believe.
16   Q.  In what jurisdiction?
17   A.  Massachusetts.
18   Q.  Do you still hold that license?
19   A.  No, sir.
20   Q.  Did you let it lapse?
21   A.  I stopped selling insurance.
22   Q.  Was there any particular reason why you
23  stopped selling insurance?  Did you switch jobs?
24   A.  I went to work in the travel industry.

7 (Pages 13 to 14)

Lawrence C. Lyon                                                                    07/21/2005

Page 15

1    Q.  As best you recall, I'd like you to give me
2    your employment history, giving me the names of the
3    places where you worked and the dates between which
4    you worked at those places, as best you recall.
5        A.  How far back?
6        Q.  After college.
7        A.  Fidelity Union Life Insurance Corporation in
8    Irving, Texas.
9        Q.  When did you work there?
10       A.  1975.
11       Q.  As best you recall, why don't you run
12   through the different places where you worked over
13   the years up to the present.
14       A.  Transnational Travel.
15       Q.  Okay.
16       A.  Vantage Travel.
17       Q.  Okay.  What did you do at Transnational
18   Travel?
19       A.  I sold travel programs.
20       Q.  To affinity groups?
21       A.  Yes, sir.
22       Q.  Do you recall between what years you worked
23   there?
24       A.  Yes, sir.

Page 16

1        Q.  What years were those?
2        A.  November 20, 1979 until October 24, 1983.
3        Q.  After that you went to Vantage Travel
4    Service, Inc; is that correct?
5        A.  That's the day we started.
6        Q.  When you say "we," to whom are you referring
7    besides yourself?
8        A.  My wife.
9        Q.  Your wife Nancy; is that correct?
10       A.  That's correct.
11       Q.  I'm not sure I understand.  You're saying
12   that you and she started the Vantage Travel
13   business?
14       A.  Yes.
15       Q.  Okay.  When did you and your wife do that?
16       A.  October 24, 1983.
17       Q.  At that time were you and your wife owners
18   of that business?
19       A.  Yes, sir.
20       Q.  Were there any other owners at that time?
21       A.  Yes, sir.
22       Q.  Who else?
23       A.  Mr. David Shields.
24       Q.  Do you have an address for him?

8 (Pages 15 to 16)

Lawrence C. Lyon

07/21/2005

Page 17

1   A. No, sir.
2   Q. Is he alive, as far as you know?
3   A. Hasn't called me.
4   Q. Do you have a last known address for him?
5   A. What's -- where is Muzzi Ford?
6   Q. In Needham.
7   A. I believe on Needham Street he had a
8   condominium.
9   Q. Were there any other owners of Vantage
10  Travel at that time, shortly after October 24, 1983?
11  A. Yes, sir.
12  Q. Who else?
13  A. Mr. Sam Rosenberg.
14  Q. Does he live in Brookline, if you know?
15  A. Newton.
16  Q. What's his address?
17  A. Newton.
18  Q. That's all you know?
19  A. That's all I know.
20  Q. Any other owners at that time?
21  A. Mr. Steve Wittenberg.
22  Q. Do you know what his address is?
23  A. Needham.
24  Q. Do you have a street address?

Page 18

1   A. No, sir.
2   Q. Anyone else?
3   A. Mr. Edward Lewis.
4   Q. Is he related to Henry Lewis?
5   A. He was.
6   Q. Is he deceased?
7   A. Deceased.
8   Q. What was his relationship to Henry Lewis?
9   A. Father.
10  Q. Anyone else?
11  A. You said owners?
12  Q. Right.
13  A. That's it.
14  Q. Did Harry Melikian become involved in that
15  business at some point?
16  A. Yes, sir.
17  Q. When did that happen, if you know?
18  A. I don't know the exact date.  It's 15 years
19  ago, 17 years ago.  I'm sorry, I can't tell you the
20  exact date.
21  Q. What was the business of Vantage Travel when
22  you were involved in organizing that company?  Was
23  it affinity travel services?
24  A. It was group travel.

9 (Pages 17 to 18)

Page 19

1    Q.  At some point during your career, did you
2    become involved in what's been described as premium
3    induced fund-raising services for nonprofit groups?
4    A.  Yes, sir.
5    Q.  When did you first become involved in that
6    type of business?
7    A.  In the '90's, mid '90's.
8    Q.  Did someone introduce you to that type of
9    business?
10   A.  I don't understand the question.
11   Q.  How did you become aware of that type of
12   business and what kind of training, if any, did you
13   receive in that type of business?
14        MR. JOHNSON:  Objection to the form.
15   Q.  You can answer.
16   A.  I became aware of the business at a Masonic
17   conference.
18   Q.  What happened at the Masonic conference that
19   caused you to become aware of the premium induced
20   fund-raising business?
21   A.  The Deputy Grand Master told me of a
22   fund-raising program they had just completed
23   utilizing premiums.
24   Q.  What, if anything, did you do next to become

Page 20

1    involved in that sort of business yourself?
2    A.  Got a copy of the package.
3    Q.  What did you do with the package?
4    A.  Read it.
5    Q.  Then what did you do?
6    A.  Asked how the program did.
7    Q.  Who did you ask?
8    A.  The Deputy Grand Master.
9    Q.  What was his name, if you recall?
10   A.  Do not recall.
11   Q.  At some point did you introduce this type of
12   business, the premium induced fund-raising business
13   to people at Vantage Travel?
14   A.  Yes, sir.
15   Q.  How long after the Masonic conference that
16   you just described did that occur?
17   A.  Don't know exactly.
18   Q.  Did you and your associates at Vantage set
19   up a separate corporation to engage in the premium
20   induced fund-raising business at some point?
21   A.  Yes, sir.
22   Q.  What was the name of that corporation?
23   A.  Vantage Group Services, Inc.
24   Q.  When was that corporation organized, if you

Lawrence C. Lyon                                                07/21/2005

Page 21

1   know?
2       A.  Don't know.  The mid '90's.
3       Q.  At the time that Vantage Group Services was
4   organized, do you know whether or not Vantage
5   Financial Services, Inc. was in existence?
6       A.  Do not know.
7       Q.  Were you involved in setting up a company
8   called Vantage Financial Services, Inc.?
9       A.  No, sir.
10      Q.  Do you know who set that company up?
11      A.  Some lawyer.
12      Q.  Do you know who requested some lawyer to set
13  that company up?
14      A.  No, sir.
15      Q.  Do you know whether or not Henry Lewis was
16  involved in setting up that company?
17      A.  Do not know.
18      Q.  Have you ever -- go ahead.
19      A.  I do not know specifically.
20      Q.  If you have any general sense, you can give
21  me that.
22          MR. JOHNSON:  Objection to the form.  I
23  don't know what you mean by "general sense."  If you
24  have knowledge, you are obligated to testify to it.

Page 22

1   However, you are not obligated to nor is it
2   appropriate for you to guess or speculate.
3       A.  I have no knowledge that Henry Lewis signed
4   any documents to set up this corporation.
5       Q.  Do you have any knowledge of any particular
6   person signing documents to set up Vantage Financial
7   Services, Inc.?
8       A.  No, sir.
9       Q.  Do you have any knowledge of any specific
10  person asking a lawyer to set up Vantage Financial
11  Services, Inc.?
12      A.  No, sir.
13      Q.  Have you ever been a shareholder of Vantage
14  Financial Services, Inc.?
15      A.  I was a shareholder of the whole corporation
16  from day one.
17      Q.  What do you mean by "the whole corporation"?
18      A.  The Vantage Group.
19      Q.  Do you know whether or not Vantage Financial
20  Services, Inc. has ever been a wholly-owned
21  subsidiary of The Vantage Group, Inc.?
22      A.  Yes.
23      Q.  It was?
24      A.  I believe so.

11 (Pages 21 to 22)

Lawrence C. Lyon                                                        07/21/2005

Page 23

1     Q. Do you know if it's still a subsidiary of
2  Vantage Group, Inc.?
3     A. I do not. I have no knowledge what happened
4  after January 2nd, sir.
5     Q. As of January 2, 2004, was Vantage Financial
6  Services, Inc. a wholly-owned subsidiary of The
7  Vantage Group, Inc.?
8          MR. JOHNSON: Objection to the form.
9          THE WITNESS: I'm sorry?
10         MR. JOHNSON: I just preserved an
11  objection to the form of the question. You can go
12  ahead and answer it, if you know.
13     A. I believe so.
14     Q. Do you know whether or not Vantage Travel
15  Service, Inc. has ever been a wholly-owned
16  subsidiary of The Vantage Group, Inc.?
17         MR. JOHNSON: Objection to the form.
18     Q. You can answer.
19     A. I believe so.
20     Q. Could you please tell me what position
21  titles you held at The Vantage Group over the years
22  that you were there? In other words --
23     A. Vice president.
24     Q. Were you vice president from the outset of

Page 24

1  your involvement with the Vantage companies?
2     A. Yes, sir.
3     Q. Of what particular Vantage entities were you
4  the vice president?
5     A. When I started, there was only travel.
6     Q. Did that change at some point?
7     A. Yes, sir.
8     Q. What changed?
9     A. We started selling credit cards.
10     Q. Through what entity?
11     A. Marine Midland Bank.
12     Q. When you say "we started selling credit
13  cards," I'm trying to understand what you were
14  referring to when you said "we"?
15     A. The Vantage Group.
16     Q. Were you a vice president of Vantage Travel
17  Services, Inc.? Let's take it one by one.
18     A. Yes, sir.
19     Q. Were you a vice president of The Vantage
20  Group, Inc.?
21     A. Yes, sir.
22     Q. Were you a vice president of Vantage
23  Financial Services, Inc.?
24     A. No, sir.

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                                                    07/21/2005

Page 25

1   Q.  Never?
2   A.  Not to my knowledge.  Could I ask?
3       (Attorney/client discussion off the
4   record.)
5   Q.  Now, I was asking you about the different
6   job titles you had.  Is there something you want to
7   say about that or should we just go on with another
8   question?
9       MR. JOHNSON:  Object to the form of the
10  question.  You may answer.
11  A.  I was a -- started as a vice president of
12  The Vantage Group, and that was my title until I got
13  older.  Then I became senior vice president of
14  Vantage Group Services.
15  Q.  Did you ever hold any titles as an officer
16  of Vantage Travel Service, Inc.?
17  A.  No, sir.
18  Q.  Did you ever hold any title as an officer of
19  Vantage Financial Services, Inc.?
20  A.  No, sir.
21  Q.  Now, I've been asking you about the
22  different job titles that you held.  Now I'd like to
23  know what your job responsibilities and duties were
24  during your tenure at Vantage.  If you could give it

Page 26

1   to me in chronological fashion, if there are
2   changes, that would be helpful.
3   A.  Sure.  I sold travel to organizations.
4   Q.  Anything else?
5   A.  I sold credit cards to organizations.
6   Q.  Anything else?
7   A.  I sold insurance to organizations.  I sold
8   fund-raising programs to organizations.
9   Q.  Anything else?
10  A.  No, sir.
11  Q.  What kind of fund-raising programs did you
12  sell to organizations?
13  A.  Travel programs, credit card programs,
14  insurance programs and fund-raising programs.
15  Q.  Were all those premium induced fund-raising
16  programs, as far as the fund-raising was concerned?
17  A.  No, sir.
18  Q.  Now, you referred to the fact that you sold
19  various services to organizations.  Did any of those
20  organizations include nonprofit organizations?
21  A.  The majority of them.
22  Q.  Was that true from the outset of your
23  affiliation with the Vantage companies?
24  A.  Yes, sir.

13 (Pages 25 to 26)

Lawrence C. Lyon                                                                    07/21/2005

Page 27

1    Q.  Have you ever heard of the Cooperative Mail
2    Rule?
3              MR. JOHNSON:  Objection to the form.
4    You may answer.
5        A.  Yes, sir.
6        Q.  When did you first hear of that?
7        A.  In the early 1980's.
8        Q.  In what context did you first hear about the
9    United States Postal Service's Cooperative Mail
10   Rule?
11       A.  We were told you could not mail travel
12   programs to groups with their nonprofit indicia.
13       Q.  Who told you and others that?
14       A.  I don't recall.
15       Q.  When you say "we," in terms of the we were
16   told --
17       A.  Salesmen.
18       Q.  Excuse me?
19       A.  Salesmen.
20       Q.  You've had your deposition taken before,
21   right?
22       A.  For this?
23       Q.  Not for this.  For any case.
24       A.  Yes, sir.

Page 28

1        Q.  I'm sure you're familiar with the sort of
2    ground rules.  But I just want to remind you that we
3    can't talk at the same time.  Otherwise it's very
4    difficult for the court reporter to take down what
5    we're saying.  So I'll try to let you finish before
6    I begin, and you need to let me finish my question
7    before you answer, okay?
8        A.  Yes, sir.
9        Q.  Did your understanding of the Cooperative
10   Mail Rule ever change after you first learned about
11   it?
12       A.  I never understood it.
13              MR. JOHNSON:  I should have objected to
14   the form.
15       Q.  Did you ever think that you understood it?
16              MR. JOHNSON:  Objection to the form.
17       A.  I'm not a lawyer, sir.
18       Q.  Was there any point in time when you felt
19   comfortable in terms of what you thought the
20   Cooperative Mail Rule provided for?  Right now I
21   understand that you don't think you understand it,
22   but I'm trying to find out whether or not there was
23   ever a point in time when you thought that you did
24   understand the rule and what it provided for?

14 (Pages 27 to 28)

Lawrence C. Lyon                                                                    07/21/2005

Page 29

1    A.  It seemed that the -- no, I thought I
2   understood what the Cooperative Mailing Rule was.
3    Q.  Did that change at some point?
4    A.  I think when they changed the law, it then
5   became very clear to me.
6    Q.  What became very clear to you when the law
7   was changed?
8    A.  That there was something wrong with the
9   Cooperative Mailing Law.
10    Q.  What was wrong based on what your
11   understanding was?
12    A.  That the intention of the Cooperative
13   Mailing Rules were set up to stop insurance
14   companies and banks from soliciting commercial goods
15   from nonprofit organizations using their nonprofit
16   permit.
17    Q.  Was it ever your understanding that the
18   Cooperative Mail Rule applied to charitable
19   fund-raising for nonprofit organizations?
20    A.  Yes.
21    Q.  When was that your understanding?
22    A.  I think when we were told -- when we were
23   told you couldn't mail fund-raising, nonprofit to
24   organizations.

Page 30

1    Q.  When were you told that?
2    A.  I don't recall the exact date.
3    Q.  Give me your best approximation of the date.
4        MR. JOHNSON:  Objection to the form.  If
5   you can put a time frame on it short of guessing or
6   speculating, do.
7    A.  I can't tell you the date, but we were told
8   that you couldn't mail fund-raising programs by I
9   believe it was -- no, I don't want to guess.  Don't
10   have the exact date.  I don't want to guess.
11    Q.  Are you aware that Vantage became involved
12   in false claims litigation involving the Cooperative
13   Mail Rule?
14        MR. JOHNSON:  Objection to the form.
15    Q.  You can answer.
16    A.  Yes.
17    Q.  Was that the case that was initiated by
18   Mr. Saklad, if you know?
19    A.  No, no, sir.
20    Q.  What case are you referring to?
21    A.  The credit card.  First it was travel, and
22   then credit cards.
23    Q.  And do you recall if there were lawsuits
24   involving those issues?

15 (Pages 29 to 30)

Lawrence C. Lyon                                                                    07/21/2005

Page 31

1    A. No, sir. I think we were just told to stop.
2    Q. At some point the government filed a lawsuit
3  against Vantage; is that correct?
4    A. Are you referring to Mr. Saklad?
5    Q. Yes.
6    A. Yes, sir, I'm aware.
7    Q. That's S-A-K-L-A-D, right, in terms of the
8  spelling of Saklad's name?
9    A. I believe so, yes.
10    Q. After the Saklad case was filed, did you
11  learn anything about the Cooperative Mail Rule that
12  you hadn't known prior to the filing of the lawsuit?
13    A. Yes, that this gentleman was entitled to a
14  bounty for going to the government with false
15  information.
16    Q. What I was asking was whether or not you
17  learned anything about what the Cooperative Mail
18  Rule provided for after the Saklad case was filed
19  that you didn't know before the Saklad case was
20  filed?
21    A. No, sir.
22    Q. Would you say that during your tenure at
23  Vantage, Vantage possessed expertise in preparing
24  fund-raising programs for its nonprofit customers?

Page 32

1        MR. JOHNSON: Objection to the form.
2    Q. You can answer.
3    A. I'm sorry, could you repeat that question?
4        MR. NAHIGIAN: Can you read it back,
5  please?
6        (Question read back.)
7    A. Possess knowledge of programs? Absolutely,
8  yes.
9    Q. What I was asking is whether or not you
10  considered Vantage to be an expert at setting up
11  those sorts of programs?
12    A. No, sir.
13        THE WITNESS: What does he mean
14  programs, selling the programs?
15        MR. JOHNSON: If you don't understand,
16  just ask him.
17    A. Programs?
18    Q. Fund-raising programs for nonprofit
19  organizations.
20    A. Yes.
21    Q. The answer is yes?
22    A. Yes, sir.
23    Q. And in connection with those fund-raising
24  programs for nonprofit organizations, would you say

16 (Pages 31 to 32)

Lawrence C. Lyon                                                07/21/2005

Page 33

1  that Vantage, during your tenure there, possessed
2  expertise in terms of compliance with postal
3  regulations applying to those fund-raising programs?
4         MR. JOHNSON:  Objection to the form.
5     A.  No, sir, I thought.
6     Q.  Excuse me?
7     A.  I said I thought.
8     Q.  What did you think?
9     A.  That we were in compliance.
10        MR. JOHNSON:  Well, he didn't ask you
11 whether you thought that you were in compliance.
12 All he asked you was whether you thought that
13 Vantage was an expert about compliance.
14    A.  Oh, no.  No, sir.
15    Q.  Let me just show you a document that we'll
16 mark as Exhibit 2.
17        (Exhibit 2 marked for identification.)
18        (Document exhibited to witness.)
19    Q.  I'm going to show you what's been marked as
20 Exhibit 2.  Do you recognize that document?
21        MR. JOHNSON:  Can we suspend for just a
22 moment?
23        MR. NAHIGIAN:  Mr. Johnson is on the
24 telephone.

Page 34

1         (Off the record.)
2     Q.  I think I asked whether or not you're
3  familiar with the document marked as Exhibit 2?
4     A.  Yes.
5     Q.  Could you just briefly identify it for the
6  record?
7     A.  It looks like a promotional folder that
8  somebody printed up so that they could mail out to
9  prospective clients.
10    Q.  It says Vantage Group Services on the front
11 page, correct?
12    A.  Yes, sir.
13    Q.  If you take a look at the third page of the
14 document, if you would.  Do you recognize the
15 handwriting on that page?
16    A.  No, sir.
17    Q.  I'll just refer you to something that is
18 written on that page in terms of the printed portion
19 of the page as opposed to the handwritten portion of
20 the page.  It says right here, quote, Vantage
21 understands the nonprofit world, its organizational
22 culture, legal parameters, postal regulations, and
23 then there's an ellipsis, and I'll close the quote
24 there.

17 (Pages 33 to 34)

Lawrence C. Lyon                                                          07/21/2005

Page 35

1    A.  And the frustration of having too much to do
2   and not enough staff or time to do it, is that what
3   you're referring to?
4    Q.  Right, right.
5    A.  Yes, sir.
6    Q.  Would you agree with the statement that you
7   and I both just collectively quoted from that
8   document?
9        MR. JOHNSON:  Objection to the form.
10    Q.  What I want to know is whether or not you,
11   beginning with the statement "Vantage understands
12   the nonprofit world" --
13    A.  I understand that, yes.
14        MR. JOHNSON:  And I objected to the
15   form.
16    Q.  Do you agree with the statements that you
17   and I both just read from the document?
18        MR. JOHNSON:  Objection to the form.
19    Q.  It's really a yes or no.
20    A.  It is?
21        MR. JOHNSON:  No, no, please.  The
22   witness is entitled to answer your questions, and
23   he's obligated to as best he can.  I don't think
24   it's appropriate to suggest the answers to him or

Page 36

1   limit him as to how he does that.  Just give the
2   most truthful answer you can, sir.
3    Q.  You can answer.
4    A.  Please repeat that, I'm sorry.  Do I
5   understand --
6    Q.  Let me start again.
7    A.  Okay.
8    Q.  I'm going to quote from the document,
9   Exhibit 2, third page.  Quote, Vantage understands
10   the nonprofit world, its organizational culture,
11   legal parameters, postal regulations and the
12   frustration of having too much to do and not enough
13   staff or time to do it, close quote.  Do you agree
14   with those statements that I've just read?
15        MR. JOHNSON:  Objection to the form.
16    A.  Yes, sir.
17        MR. JOHNSON:  This Exhibit 2,
18   Mr. Nahigian, bears a Bates number DOJ20604.  That's
19   a terminology that I'm not familiar with.  It's not
20   the way we numbered our documents nor the way you
21   numbered yours.  Am I correct in inferring from this
22   that you obtained this document from the
23   government's files.
24        MR. NAHIGIAN:  I think that it was

18 (Pages 35 to 36)

Lawrence C. Lyon                                                                    07/21/2005

Page 37

1   obtained from documents that were filed in court in
2   the underlying case. It appears to be a deposition
3   exhibit that was marked during a deposition in that
4   case on September 28, 2000. As you know, I don't
5   think we received any deposition exhibits from your
6   client so far.
7           MR. JOHNSON: If you haven't, that's
8   because we no longer have them.
9       Q. At the time you were affiliated with
10  Vantage, let's say from January 1, 1999 through
11  January 1, 2004, did you receive a salary or were
12  you compensated in some other fashion for the work
13  that you did?
14      A. I've never received a salary.
15      Q. Okay. Were you paid for the work that you
16  did for Vantage while you were there? If you're
17  having trouble understanding, you can --
18      A. I am having -- what do you mean?
19      Q. Did you receive commissions?
20      A. Oh, yeah.
21      Q. Is that how you were paid for the work you
22  did while you were at Vantage?
23      A. Yes, sir.
24      Q. Was that true throughout your tenure at

Page 38

1   Vantage until you left in 2004?
2       A. Yes, sir.
3       Q. Apart from any commissions that you earned
4   at Vantage, did you also receive a salary?
5       A. I received a draw.
6       Q. Why don't you describe for me what the terms
7   of your arrangement were in terms of the commissions
8   that you received in terms of perhaps a percentage
9   amount on sales or something of that nature. I
10  understand that you received commissions, but I'm
11  not sure upon what they were based. If you could
12  tell me that, that's what I'd like to know.
13          MR. JOHNSON: Objection to the form.
14          THE WITNESS: Do I have to answer this?
15  Yes?
16          MR. JOHNSON: He's not asking you for
17  the amounts of money you were paid. He's asking you
18  for what the structure of the arrangement was.
19      A. Ten percent of profits.
20      Q. Profits generated from what?
21      A. Travel programs, insurance programs, credit
22  card programs, fund-raising programs. I made ten
23  percent.
24      Q. Ten percent of Vantage's profits on those

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                                 07/21/2005

Page 39

1  programs?
2      A. Yes, sir.
3      Q. Would that have been gross profit, as far as
4  you know?
5          MR. JOHNSON: Objection to the form.
6      A. Net.
7      Q. Net profit. What is your understanding of
8  net profit?
9      A. There were expenses, overhead.
10     Q. All right. What do you mean by "overhead"?
11  I guess what I'm trying to find out --
12     A. Expenses. You know, T and E.
13     Q. T and E, what is that?
14     A. Travel and entertainment.
15     Q. When you say "net profit," are you referring
16  to Vantage's total revenues from a given program
17  less the direct costs associated with those
18  programs?
19         MR. JOHNSON: Objection to the form.
20     A. I got ten percent of the net profit on any
21  program I ever sold.
22     Q. When you say "net profit," are you talking
23  about the amount of revenues generated on such a
24  program less the direct costs associated with that

Page 40

1  program?
2          MR. JOHNSON: Objection to the form.
3      A. Direct and indirect costs.
4      Q. You mentioned a ten percent commission on
5  profits. Did the figure of ten percent remain
6  constant throughout your tenure at Vantage up until
7  the point when you left in January of 2004?
8      A. No, sir.
9      Q. Was there ever a time when the amount of
10  your commissions was either less than ten percent or
11  more than ten percent?
12     A. Yes, sir.
13     Q. When was that?
14     A. At the end of my tenure.
15     Q. What happened at the end of your tenure? If
16  you could give me a time frame in terms of dates,
17  that would be helpful.
18     A. On the expiration of the Shrine agreement.
19     Q. What happened with respect to your
20  commission on the expiration of the Shrine
21  agreement?
22     A. There was a disagreement on the amount of
23  commission owed.
24     Q. A disagreement between whom?

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                              07/21/2005

Page 41

1     A.  Mr. Melikian and Mr. Lewis and myself.
2     Q.  What happened in terms of any change in the
3   amount of your commission as a result of that
4   disagreement?
5     A.  A little five million dollar discrepancy
6   between the government and Vantage.
7     Q.  Are you referring to a settlement amount?
8     A.  Yes, sir.
9     Q.  What was the nature of the disagreement that
10  you had with Mr. Melikian and Mr. Lewis concerning
11  the amount of your commission at the conclusion of
12  the Shriners Hospital For Children agreement?
13    A.  I was responsible for that agreement.
14    Q.  What was the nature of the disagreement?
15    A.  An agreement that cost the company two,
16  three million dollars.
17    Q.  Did that have some impact on your
18  commission?
19    A.  Yes, sir.
20    Q.  What was that impact?
21    A.  A reduction in commission.
22    Q.  Can you quantify the reduction in your
23  commission for me?
24    A.  No, sir.

Page 42

1     Q.  In terms of percentage, can you --
2     A.  No, sir.
3     Q.  Is there any particular reason why you can't
4   do that?
5         MR. JOHNSON:  Objection to the form.  If
6   he can, he can.  If he can't, he can't.  He doesn't
7   have a reason not being able to testify to something
8   you asked him.
9         MR. NAHIGIAN:  The reason might be he
10  just doesn't have the information.
11    Q.  I just asked a question.  Can you do it?
12    A.  I can't tell you, sir.
13    Q.  As a result of that disagreement that you
14  described, did you have to pay money back to Vantage
15  that you had previously earned on commissions?
16        MR. JOHNSON:  Objection to the form.
17    A.  No, sir.
18    Q.  As a result of the disagreement -- strike
19  that.
20        As a result of the settlement with the
21  government that you described, was a decision made
22  at Vantage not to pay you a commission that you
23  otherwise would have earned had that settlement not
24  occurred?

21 (Pages 41 to 42)

Lawrence C. Lyon                                                    07/21/2005

Page 43

1    A.  Yes, sir.
2    Q.  Who made that decision?
3    A.  Mr. Melikian and Mr. Lewis.
4    Q.  Do you have any knowledge of what the amount
5  of money was that you lost as a result of that
6  decision made by Mr. Lewis and Mr. Melikian?
7           MR. JOHNSON:  Objection to form.
8    A.  No, sir.
9    Q.  Up until the point where that decision was
10 made, were you receiving as a commission ten percent
11 of Vantage's profits on the fund-raising program
12 that it performed for the Shriners Hospitals For
13 Children?
14   A.  No, sir.
15   Q.  Did you receive any commission as a result
16 of the profits on that program?
17   A.  No, sir.
18   Q.  Why not?
19   A.  They were rolling with the agreement.
20   Q.  What does that mean?
21   A.  I was drawing X amount of money.  And until
22 the program was finalized, that's all I got was what
23 I was drawing.
24   Q.  Did you have to pay any of the money that

Page 44

1  you drew back?
2    A.  No, sir.
3    Q.  How much money did you draw, if you recall,
4  as a result of that program?
5           THE WITNESS:  Do I have to answer these
6  questions, everything?  Yup?
7           MR. JOHNSON:  If you know the answer,
8  yes.
9    A.  I was drawing three hundred thousand dollars
10 a year.
11   Q.  Was that the case throughout the term of the
12 Shriners program?  When I refer to the Shriners
13 program, I'm referring to the program relating to
14 the June 17, 1999 agreement that Vantage Financial
15 Services, Inc. entered into with the Shriners
16 Hospital For Children.
17   A.  And your question again, I'm sorry, was --
18   Q.  Were you drawing three hundred thousand
19 dollars --
20   A.  From that point on?
21   Q.  -- from that point on?
22   A.  No, sir.
23   Q.  Just to be clear.  I don't want to have a
24 misleading transcript here.  But three hundred

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                                    07/21/2005

Page 45

1    thousand dollars, did that represent your total draw
2    based on all the work you were doing or was that
3    just a draw based on the Shriners program?
4        A.  No, sir, that was my total draw.
5        Q.  At any point in time while the Shriners
6    program was on going, do you know what portion of
7    your three hundred thousand dollar draw was
8    attributable, if at all, to the Shriners program?
9        A.  No, sir.
10       Q.  Now, you said that you weren't drawing three
11   hundred thousand dollars throughout the term of the
12   Shriners program.  What amounts were you drawing
13   during that time period that were different from
14   three hundred thousand dollars?
15       A.  I was drawing less.
16       Q.  Do you recall during what years you were
17   drawing less?
18       A.  Prior to the Shriners contract, I was
19   drawing less.
20       Q.  But after the Shriners contract -- when you
21   say prior to the Shriners contract, do you mean
22   prior to the date the contract was entered into?
23       A.  I don't know the exact date.
24       Q.  Okay.  What was your draw prior to the

Page 46

1    Shriners contract for the say two or three years
2    before that contract?
3        A.  I don't know exactly.  Less than three
4    hundred thousand.
5        Q.  Did you ever draw more than three hundred
6    thousand dollars during the term of the Shriners
7    contract?
8        A.  No, sir.
9        Q.  Try to explain to me how it worked.  As I
10   understood it, you received a draw, and was it the
11   case that when the program -- a given program
12   reached its conclusion, Vantage would take a look at
13   the numbers and decide whether or not you owed any
14   money back or whether or not you were entitled to
15   receive any additional money?
16       A.  That's correct.
17       Q.  Based solely on the performance of the
18   Shriners program, do you believe that had that
19   policy been applied to the Shriners program at its
20   conclusion, that you would have received additional
21   money beyond your draw during the years of the
22   Shriners program?
23       A.  On the conclusion?
24       Q.  Yes.

23 (Pages 45 to 46)

Lawrence C. Lyon

07/21/2005

Page 47

1  A. Yes, sir.
2  Q. How much additional money would you have
3  expected to receive?
4  A. More than I received.
5  Q. Have you ever kept any personal records of
6  the financial performance of the programs that you
7  sold and operated for Vantage?
8  A. Kept?
9  Q. Personal financial records.
10  A. No, sir. Outside of the company?
11  Q. Yes, sir.
12  A. No, sir.
13  Q. Do you have a file at your house --
14  A. No, sir.
15  Q. Let me finish.
16  A. I'm sorry.
17  Q. You don't have a file containing that
18  information outside of the company; is that correct?
19  A. I took nothing outside of the company.
20  Q. Have you ever kept a file containing that
21  sort of information concerning the financial
22  performance of the programs you operated outside of
23  company offices?
24       MR. JOHNSON: Objection to the form.

Page 48

1  A. No, sir.
2  Q. Is it fair to say while you were at Vantage,
3  you took particular interest in the financial
4  performance of the fund-raising programs that you
5  sold?
6       MR. JOHNSON: Objection to the form.
7  A. All of them.
8  Q. You can answer.
9  A. All of them.
10  Q. Your answer is yes?
11  A. Yes.
12  Q. That was because your compensation was
13  entirely based on the financial performance of the
14  programs you sold for Vantage; is that correct?
15  A. One. That would be one reason.
16  Q. Okay, give me the other reasons.
17  A. How the organization did.
18  Q. Anything else?
19  A. That's all I cared about.
20  Q. So it's fair to say that you took particular
21  interest in how the client or customer organization
22  did as a result of the fund-raising programs that
23  you sold and operated; is that correct?
24       MR. JOHNSON: Objection.

24 (Pages 47 to 48)

Lawrence C. Lyon                                                          07/21/2005

Page 49

1      A.  Absolutely.
2      Q.  Why did you take a particular interest in
3   that?
4      A.  They were my clients.
5      Q.  And you wanted them to do well, correct?
6      A.  Yes.
7      Q.  And you wanted to be able to do new business
8   with them in the future; is that correct?
9      A.  Yes.
10      Q.  As a general principle, is it fair to say
11   that in any given fund-raising program, the more
12   pieces that Vantage mails for the customer, the
13   greater Vantage's projected profit?
14          MR. JOHNSON:  Objection to the form.
15      A.  I'm sorry, sir, could you repeat that,
16   please?
17          MR. NAHIGIAN:  Could you read it back,
18   please?
19          (Question read back.)
20      A.  Projected profits?  Projected profits, yes.
21      Q.  And the greater Vantage's profit, the more
22   you would earn, correct?
23          MR. JOHNSON:  Objection to the form.
24      A.  I'm sorry, what?

Page 50

1      Q.  The great Vantage's profit on fund-raising
2   programs that you sold, the more you would earn?
3          MR. JOHNSON:  Objection to the form.
4   You ask projected to actual profit?
5          MR. NAHIGIAN:  Yes.
6      A.  In theory.
7      Q.  What are some of the factors that might
8   cause that theory not to hold true?
9      A.  Non-payment of an invoice.
10      Q.  In connection with the Shriners Hospital
11   program that you operated at Vantage, isn't it true
12   that in the end, the Shriners paid the full amount
13   of the fees that Vantage charged it for the
14   fund-raising program?
15      A.  Never saw the check.
16      Q.  You don't have that information?
17      A.  I have knowledge that they paid a final
18   invoice.  I do not know what the amount of the final
19   invoice was.
20      Q.  When was that final invoice paid, to your
21   knowledge?
22      A.  Prior to December 31st of 2003.
23      Q.  During your tenure at Vantage, did you ever
24   receive a special bonus or distribution just for

LegalLink Boston
(800) 822-3376

Lawrence C. Lyon                                                    07/21/2005

Page 51

1  bringing in business?
2       MR. JOHNSON:  Objection to the form.
3    A.  I don't recall.
4    Q.  If you know, who was responsible at Vantage
5  from January 1, 1999 through the end of 2003 for
6  approving the amount of compensation that you would
7  earn over that time period?
8    A.  Mr. Melikian, I believe.
9    Q.  When did you first form any business
10  relationship with the Shriners organization?
11   A.  In February of 1980.
12   Q.  Now, as I understand it, there is an
13  Imperial Shrine, is that the correct term, if you
14  know?
15   A.  The Imperial Shrine of North America?
16   Q.  Yes.
17   A.  Yes, I know that.
18   Q.  In February of 1980, was it the Imperial
19  Shrine of North America that you came into contact
20  with or some other aspect of the Shriners
21  organization?
22       MR. JOHNSON:  Objection to the form.
23   A.  I became aware of the Imperial Shrine of
24  North America.

Page 52

1    Q.  Was there a specific contact person or
2  specific contact persons that you encountered at
3  that time, February of 1980?
4    A.  Yes.
5    Q.  Who were those people?
6    A.  The Divan members of the Shrine Temples in
7  the Mid Atlantic Region.
8    Q.  And what was the nature, just briefly, of
9  the interaction that you had with the Divan members
10  at that time?
11   A.  I sold them travel programs.
12   Q.  Did you sell them travel programs
13  continuously over the years starting in February of
14  1980?
15   A.  I tried.
16   Q.  I take it you sold more than one program
17  over the years?
18   A.  Yes.
19   Q.  With what company were you affiliated when
20  you first began to sell travel programs to the
21  Shriners?
22   A.  Transnational Travel.
23   Q.  Now, at some point after you participated in
24  the formation of the Vantage companies, did you

26 (Pages 51 to 52)

Lawrence C. Lyon                                                          07/21/2005

Page 53

1  continue to sell travel programs to the Shriners?
2     A. Yes, sir.
3     Q. Did you sell any other programs or services
4  to the Shriners organization after Vantage was
5  formed?
6     A. Yes, sir.
7     Q. What other sorts of services and programs
8  did you sell to the Shriners?
9     A. Fund-raising programs.
10    Q. When did you first sell a fund-raising
11 program to the Shriners organization?
12       MR. JOHNSON: Objection to the form.
13 Before the witness answers, maybe for my
14 edification, I don't know what you mean by "a
15 Shriners organization."
16       MR. NAHIGIAN: Well, I was just going to
17 get an answer and then try and break it down as to
18 what aspect.
19       MR. JOHNSON: I suspect it will be
20 helpful to the witness if he understood what the
21 question was he was trying to answer.
22    Q. When did you first sell any fund-raising
23 program to any aspect of an organization that falls
24 under the umbrella term the Shriners, whether it be

Page 54

1  the Imperial Council in North America, an individual
2  Shrine or the Shriners Hospitals For Children?
3       MR. JOHNSON: Objection to the form.
4     A. I don't know the exact date. I remember the
5  Imperial Potentate or Deputy Imperial Potentate was
6  a Mr. Buky, I believe.
7     Q. At that point in time, whenever it was, were
8  you dealing with the Imperial Shrine or some other
9  aspect of the Shriners?
10    A. The Imperial Shrine, the fraternity.
11    Q. Why don't we move ahead to your first effort
12 to market a program to the Shriners Hospitals For
13 Children. When did that occur?
14    A. The first effort?
15    Q. Yes. First contact with the Shriners for
16 that purpose. I'll just help you out here, if I
17 can. I read something in a deposition transcript
18 somewhere that you were in South America in a
19 swimming pool with someone where the issue came up.
20    A. His name was Ralph Semb.
21    Q. S-E-M-B?
22    A. Yes. That was the sale. But of course, I
23 had talked to many people over the years prior to
24 that.

27 (Pages 53 to 54)

Lawrence C. Lyon                                                    07/21/2005

Page 55

1    Q.  In an effort to market a program to the
2  hospital, the Shriners Hospital For Children?
3    A.  Yes, sir.
4    Q.  How many years had you been trying to sell
5  such a program to the Shriners Hospitals For
6  Children as of the point when you actually made the
7  sale?
8    A.  It was forbidden territory.
9    Q.  What do you mean by that?
10    A.  The separation between the fraternity and
11  the hospital are two completely different groups.
12    Q.  You said that you had been working on
13  something for many years prior to making the sale to
14  the hospitals.  I'm not sure what you were referring
15  to.  Can you explain that to me?
16    A.  No, I can't tell you a date.  I can tell you
17  that Mr. Semb was the first Deputy Imperial
18  Potentate who would discuss the hospital program
19  with me.
20    Q.  Prior to that point, you had been
21  unsuccessful --
22    A.  Yes, sir.
23    Q.  -- in discussing the hospital?
24    A.  Yes, sir.

Page 56

1    Q.  That's a yes?
2    A.  Yes, sir.
3    Q.  Now, I mentioned something in one of my
4  questions earlier about a South American trip.  Is
5  that accurate, that you were on a trip in South
6  America --
7    A.  You read my deposition, sir.
8    Q.  I read it correctly?
9    A.  Yes, sir.
10        MR. NAHIGIAN:  I'm just trying to get
11  his --
12        MR. JOHNSON:  Objection to form.
13    Q.  I'm trying to get your testimony.
14        MR. JOHNSON:  Maybe you could get it the
15  proper way.
16    Q.  Why don't you describe for me the
17  circumstances under which you approached the
18  Shriners about a program for the Shriners Hospitals
19  For Children.
20        MR. JOHNSON:  Objection to the form.
21    Q.  You can answer.
22    A.  I was on a familiarization tour with Mr. and
23  Mrs. Semb in South America discussing a travel
24  program for Mr. Semb when he became the Imperial

28 (Pages 55 to 56)

Lawrence C. Lyon                                                                    07/21/2005

Page 57

1  Potentate.
2      Q.  At that point in time were you discussing
3  such a program with anyone other than Mr. Semb from
4  the Shriners?
5      A.  I'm sorry?
6      Q.  Was anyone else involved in those
7  discussions?
8      A.  No, sir, at that time.
9      Q.  At some point after that time, did other
10  individuals at the Shriners become involved in
11  discussions concerning a fund-raising program for
12  the Shriners Hospitals For Children, to your
13  knowledge?
14      A.  Yes, sir.
15      Q.  Could you identify those people, please?
16      A.  Mr. Gene Bracewell.
17      Q.  Anyone else?
18      A.  Mr. John VerMaas.
19      Q.  Could you spell that, please?
20      A.  To the best of my knowledge, V-E-R-M-A-A-S
21  or M-A-S-S.
22      Q.  I believe it's capital V-E-R-M-A-A-S.  Does
23  that sound accurate, V-E-R capital M-A-A-S?
24      A.  Or M-A-S-S.

Page 58

1      Q.  Who was the Imperial Potentate at that time,
2  if you recall?
3      A.  I believe it was a Mr. John VerMaas.
4      Q.  Now did the discussions that you referred to
5  a moment ago in your testimony result in the
6  June 17, 1999 agreement that Vantage Financial
7  Services, Inc. entered into with the Shriners
8  Hospital For Children?
9          MR. JOHNSON:  Objection, form.
10      A.  I'm sorry, could you repeat that?
11      Q.  I guess what I'm trying to find out is
12  whether or not the discussions with Mr. Semb and
13  others that you just described resulted or lead up
14  to the June 17, 1999 agreement --
15      A.  Yes, sir.
16      Q.  -- that is the subject of this case?
17      A.  Yes, sir.
18      Q.  It was not some other agreement that
19  resulted from those discussions that began in South
20  America?
21      A.  Of course, I sold a travel program to
22  Mr. Semb.
23      Q.  Okay.  It was a travel program?
24      A.  You said was there any other --

29 (Pages 57 to 58)

Lawrence C. Lyon                                                                              07/21/2005

Page 59

1    Q.  Okay.
2    A.  Yes, there was.
3    Q.  Okay, there was a travel program?
4    A.  Yes, sir.
5    Q.  But there was also a fund-raising program as
6    well; is that correct?
7    A.  Yes, sir.
8    Q.  I'm just trying to get it clear in my mind.
9    A.  Sure.
10   Q.  What was the travel program?  What did that
11   involve?
12   A.  That involved two hundred something
13   passengers to the South Pacific and a couple of
14   hundred passengers on a Panama Canal cruise.
15   Q.  When did that tour take place, if you know?
16   A.  In November of 1999 was the South Pacific
17   trip.  And in March or April of 2000 was the Panama
18   Canal trip.
19   Q.  Now, at some point after the discussion that
20   you had with Mr. Semb in South America occurred, did
21   Vantage enter into negotiations with the Shriners
22   Hospitals For Children to enter into a fund-raising
23   contract?
24   A.  I did.

Page 60

1    Q.  Was anyone else on Vantage's side involved
2    in those negotiations?
3    A.  Yes, sir.
4    Q.  Who?
5    A.  Evelyn Edmonds.
6    Q.  Anyone else from Vantage's side?
7    A.  No, sir.
8    Q.  In terms of those negotiations, with whom at
9    Shriners Hospitals For Children were you and
10   Ms. Edmonds dealing with?
11   A.  Ms. Edmonds was not involved in any
12   negotiations at the Shriners Hospital For Children.
13   Only in a presentation.  I was solely responsible
14   for all negotiations.
15   Q.  Who was your contact person or persons at
16   the Shriners Hospitals?  Who were you dealing with
17   there principally?
18   A.  On what aspect of the program?
19   Q.  On negotiating the terms of the contract
20   under which the program would operate.
21   A.  Mr. Jay Fleischer, Mr. Gene Bracewell,
22   Mr. Ralph Semb.
23   Q.  Now, you mentioned a presentation that
24   Ms. Edmonds was involved in; is that correct?

30 (Pages 59 to 60)

Page 61

1   A. Yes, sir.
2   Q. When did that presentation take place?
3   A. I don't know the exact date.
4   Q. Was it in 1998 or 1999?
5   A. I believe it was in 1999.
6   Q. Where did the presentation take place?
7   A. On a cruise ship.
8   Q. Did you participate in giving that
9   presentation?
10  A. Yes, sir.
11  Q. Do you recall what Ms. Edmonds said during
12  that presentation?
13  A. She put together the presentation.
14      (Exhibit 3 marked for identification.)
15  Q. I'm going to show you what's been marked as
16  Exhibit 3.
17      (Document exhibited to witness.)
18  Q. It's actually a collection of documents that
19  begin with the production number NSG0735 and
20  continue through production number NSG0759.
21      MR. JOHNSON: Is that the same as
22  Melikian Exhibit 1?
23      MR. NAHIGIAN: Yes.
24      MR. JOHNSON: I just offer, for whatever

Page 62

1   assistance it may be, I'd be perfectly happy to
2   stipulate with you that any exhibit marked at any
3   deposition may be used by either of us at any
4   subsequent deposition without having to remark it.
5   That might minimize the proliferation of paper in
6   the case. I'd be happy to agree to that if you
7   like. If not, do it your own way.
8       MR. NAHIGIAN: I don't think we're going
9   to have that much paper in this case that it will be
10  a problem.
11      MR. JOHNSON: I'm just trying to help.
12  I could care less whether you take me up on it or
13  not.
14  Q. Why don't you take a look at the --
15  A. This is the presentation right here.
16  Q. Could you read the production number? Is it
17  NSG0743?
18  A. Yes, sir.
19  Q. What about the March 12, 1999 letter that
20  precedes that? Just for the record, could you take
21  a look at that two-page letter that's included in
22  this exhibit?
23      (Pause)
24  A. Yes, sir.

Lawrence C. Lyon                                                                                 07/21/2005

Page 63

1    Q. If you look at page numbered NSG0742, is
2    that a true and accurate copy of your signature on
3    that page?
4    A. That is my signature.
5       (Off the record.)
6       MR. NAHIGIAN:  Larry, you can't take
7    telephone calls during the deposition.
8       MR. JOHNSON:  My secretary is out during
9    the day and there are some things I had to be aware
10   of.  So I'm having my calls forwarded.  I've put it
11   if possible -- it will be as few as possible.
12      (Discussion off the record.)
13   Q. If you take a look at the first page -- by
14   the way, of Exhibit 3, it looks like it was faxed,
15   this document was faxed from the Ipswich Country
16   Club; do you see that?  Part of it is cut off, but
17   if you look at the top of the document --
18   A. I absolutely see the Ipswich Country Club.
19   I don't know anything about this.  This is
20   something --
21      MR. JOHNSON:  There's no question before
22   you yet.
23      THE WITNESS:  I'm sorry?
24      MR. JOHNSON:  There isn't any question

Page 64

1    before you yet.  Why don't you wait for a question.
2    Q. So you see the reference to the Ipswich
3    Country Club?  Are you a member of the Ipswich
4    Country Club?
5    A. Yes, sir.
6    Q. Have you ever used the fax machine at the
7    Ipswich Country Club?
8    A. Yes, sir.
9    Q. Have you ever faxed anything to George
10   Miller from the Ipswich Country Club?
11   A. Do not know, sir.
12   Q. Have you ever faxed anything to Harry
13   Melikian, for example, from the Ipswich Country
14   Club?
15   A. Do not recall.  I have used the fax machine
16   prior to my getting one at the Ipswich Country Club.
17   Q. Has Mr. Melikian ever been a guest of yours
18   at the Ipswich Country Club?
19   A. In my home.
20   Q. Has he ever played golf with you there?
21   A. No, sir.
22   Q. Does he play golf at all?
23   A. Does he?  I don't think so.
24      MR. NAHIGIAN:  Mark this as the next

32 (Pages 63 to 64)

Page 65

1  exhibit.
2         (Exhibit 4 marked for identification.)
3         MR. JOHNSON:  While she's marking that,
4  can we go off the record?
5         (Discussion off the record.)
6     Q.  I'm going to show you what's been marked as
7  Exhibit 4.  It bears NSG production number 0760
8  through 0777.  This is also a fax that originated
9  from the Ipswich Country Club.
10        (Document exhibited to witness.)
11    A.  Must have been busy up there, huh?
12        MR. JOHNSON:  This is the same, I take
13 it, as Melikian Exhibit 2?
14        MR. NAHIGIAN:  Yes, and I'll state for
15 the record that it appears to be a fax that was made
16 after a fax represented by Exhibit 3 on April 15,
17 1999.
18    A.  I'm sorry, sir, could you repeat what you
19 want me to answer?  Did I ever see this before?
20    Q.  I'm just asking you to take a look at it
21 first, and then I'll ask a question.
22    A.  Okay, yup.
23    Q.  Are you familiar with that particular
24 document?

Page 66

1     A.  Yes.
2     Q.  Does it appear to be a fax that you sent
3  from the Ipswich Country Club on or about April 15,
4  1999?
5     A.  I have absolutely no recollection, but it
6  appears to be coming from the Ipswich Country Club.
7  It says so right on it.  And I am familiar with
8  these lists.
9     Q.  Why don't you take a look at the page that
10 bears the number 0766 on Exhibit 4.  I'd like to ask
11 you if you know what that particular document is?
12 It bears the heading agreement to provide
13 fund-raising, consulting and management services.
14        MR. JOHNSON:  Objection to the form.
15    A.  I don't understand what the question is.  Am
16 I familiar with what this is, what it looks like?
17    Q.  Yes, what is it?
18    A.  It looks like an agreement for -- similar to
19 the previous agreement.
20    Q.  Which previous agreement?
21    A.  The loan agreement for -- oh, I'm terribly
22 sorry.  Yes, I am familiar with this proposed
23 agreement.
24    Q.  So it's a proposed agreement with the

Lawrence C. Lyon                                                                    07/21/2005

Page 67

1  Shriners Hospitals For Children; is that correct?
2      A.  Let me just tell you in one second.
3  Proposed, yeah, it's not signed.
4      Q.  If you look at the previous exhibit, three,
5  and in particular the letter that you signed, you go
6  to the last page of that letter that you signed on
7  page number NSG0742, above your signature there's a
8  reference to the agreement enclosed; do you see
9  that?
10     A.  Yes.
11     Q.  Is the, quote unquote, agreement enclosed
12 referred to in Exhibit 3 here on page 0742 the
13 agreement that is part of Exhibit 4 that we just
14 looked at?
15     A.  I have absolutely no idea.  It is definitely
16 an agreement that was drawn up for the Shrine.
17     Q.  Turning to Exhibit 4, in particular page
18 0766.
19     A.  Yes.
20     Q.  Who drafted that proposed agreement?
21     A.  I do not know.
22     Q.  Do you know whether or not Mr. Melikian was
23 involved in drafting that agreement?
24     A.  I don't know.  The date was April 15th.  It

Page 68

1  looks to me like a -- I believe this was Mr. George
2  Miller drafting this agreement.
3      Q.  What causes you to believe that?
4      A.  Because I believe Evelyn Edmonds and I
5  agreed that we didn't want Mr. Melikian involved.
6      Q.  Why did you agree with Ms. Edmonds to that?
7      A.  Because we wanted a lawyer, not an
8  accountant.
9          (Exhibit 5 marked for identification.)
10     Q.  I'm going to show you what's been marked as
11 Exhibit 5, which is -- well, the front page is a fax
12 to George Miller.  Starting at the second page is an
13 agreement to provide fund-raising, consulting and
14 management services between Vantage and the order of
15 the Sons of Italy and America Foundation.
16         (Document exhibited to witness.)
17     Q.  Can you take a look at Exhibit 5, please,
18 and tell me whether or not I've described it
19 accurately?
20     A.  I'm sorry, can I tell you what?
21         MR. JOHNSON:  Objection to the form.
22     Q.  Did I describe the document accurately?
23     A.  Yes, this is an agreement from Matt Kaiser
24 to George Miller.

34 (Pages 67 to 68)

Lawrence C. Lyon

07/21/2005

Page 69

1    Q. And the date of the fax is July 10, 2001,
2  correct?
3    A. Yes, sir.
4    Q. The date of the agreement, referring to the
5  second page of the exhibit, appears to be the 20th
6  day of October, 1998; is that correct?
7    A. Yes.
8    Q. Who drafted this agreement? Does a true and
9  accurate copy of your signature appear on that
10  agreement?
11    A. Yes.
12    Q. Back to my previous question. Do you know
13  who drafted this agreement?
14    A. No, sir. I think this was a standard
15  agreement.
16    Q. Standard agreement of whose?
17    A. Vantage.
18    Q. Can you compare that agreement that is part
19  of Exhibit 5 with the agreement that appears in
20  Exhibit 4 that we were just looking at before?
21    A. Can I compare it?
22    Q. Yes.
23       MR. JOHNSON: Is that a time efficient
24  process?

Page 70

1       MR. NAHIGIAN: No, I just want to ask
2  whether or not --
3    Q. I just want to ask you whether or not the
4  language appears to be the same in both agreements?
5       MR. JOHNSON: I object to the form.
6    Q. Or substantially the same.
7       MR. JOHNSON: Its similarity or lack of
8  similarity is a matter of objective fact.
9    A. Well, you've got loan agreement here and
10  this is the consulting.
11    Q. I want you to look at the two agreements,
12  the proposed agreement that is part of Exhibit 4 and
13  the Sons of Italy agreement that is part of Exhibit
14  5, and I want you to tell me whether or not the form
15  of both of those agreements is substantially the
16  same.
17       MR. JOHNSON: I object to the form of
18  the question. I respectfully suggest to you that is
19  an utter waste of time. If you're going to do that,
20  I suppose you have to look at all the pages of both
21  of them, Mr. Lyon.
22    A. They definitely appear to be similar, not
23  identical.
24    Q. If I suggested to you that George Miller did

35 (Pages 69 to 70)

Lawrence C. Lyon                                                        07/21/2005

Page 71

1  not draft the proposed agreement that is part of
2  Exhibit 4, would you agree with that statement?
3        MR. JOHNSON:  Object to the form of the
4  question.
5     A.  No, sir, I wouldn't agree with that at all.
6     Q.  You continue to believe that George Miller
7  drafted the proposed agreement that is part of
8  Exhibit 4?
9     A.  Do I believe that George Miller drafted this
10 agreement?
11    Q.  Part of Exhibit 4.
12    A.  Or part of it, yes, sir.
13    Q.  Which parts of it?
14    A.  Well, I remember one thing specifically was
15 that they were going to -- George came up with this
16 idea of creating a program administrator, which I
17 never heard of in my life.  So that's definitely
18 something that was not common in the regular
19 fund-raising program, program administrator.
20    Q.  Is the program administrator referenced in
21 the Sons of Italy contract that's marked as
22 Exhibit 5?
23    A.  That's where I'm reading, program
24 administrator.

Page 72

1     Q.  George Miller did not draft that Sons of
2  Italy agreement, did he?
3     A.  I don't --
4        MR. JOHNSON:  Whoa, whoa, whoa, just a
5  minute.  Mr. Nahigian, it's your premise to ask
6  questions but not to make statements the witness
7  that you then purport to require him to accept.
8     Q.  Let me ask you again.  You're not saying
9  that George Miller drafted the Sons of Italy
10 agreement that Matt Kaiser faxed to him in July of
11 2001, are you?
12       MR. JOHNSON:  Objection to form.
13    A.  I'm not sure.
14    Q.  You don't know one way or the other?
15    A.  Absolutely not.
16       (Attorney/client discussion off the
17 record.)
18    Q.  Referring to Exhibits 3 and 4.
19    A.  Yes.
20    Q.  Do you recall faxing those documents to
21 George Miller on April 15, 1999?
22    A.  No, sir.
23    Q.  Do you have any reason to believe that you
24 did not fax them to George Miller on April 15, 1999,

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                    07/21/2005

Page 73

1   as indicated by the top margin of the documents?
2       A.  I have no idea who.  It looks like it came
3   from the Shriners Hospital, and then it looks like
4   it went from -- to the Ipswich Country Club, not
5   from, because it's coming to 508.  I think that's
6   what that means.  I know this -- I know the Ipswich
7   Country Club.  This number is definitely a fax
8   number up at the club.  This document's not my --
9   this is to Ralph from Jay Fleischer regarding the
10  agreement.
11      Q.  And it includes additional documents after
12  that point, correct?
13          MR. JOHNSON:  Objection to the form.
14  Why do we have to argue about what it includes?
15      A.  This is definitely my letter to Ralph Semb.
16      Q.  Now, at some point Vantage asked George
17  Miller to assist in drafting a contract with the
18  Shriners Hospitals For Children; is that correct?
19      A.  Yes.
20      Q.  When did Vantage make the decision to ask
21  George Miller to become involved?
22      A.  George Miller's been involved for years with
23  the company.
24      Q.  Become involved with the Shriners Hospitals

Page 74

1   For Children contract.
2       A.  I don't know the date.  When we started
3   discussions.
4       Q.  Can you give me your best approximation when
5   those discussions began with George Miller?
6       A.  After my meeting with Mr. Semb, Mr. VerMaas
7   and Mr. Bracewell and Ms. Edmonds on the cruise.
8       Q.  So sometime in 1999?
9       A.  I don't know the date.  I can get it.  But I
10  know it was after we had the meeting on the cruise.
11      Q.  What would you look at to get the date?
12      A.  What would I --
13      Q.  Look at to get the date.
14      A.  The travel record of when I was there,
15  expense report, something.
16      Q.  All right.  Now you testified earlier that
17  you and Ms. Edmonds --
18      A.  March 15th.
19      Q.  So it would have been at some point after
20  March 15th?
21      A.  No, I just looked at the date when this is
22  when the presentation was drawn up.  So -- I don't
23  know the date that we spoke specifically about
24  drawing up an agreement.

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                                    07/21/2005

Page 75

1    Q.  Is it fair to say that you spoke to
2   George Miller about drawing up the agreement after
3   March 15, 1999?
4    A.  No.  It might have been prior to.
5    Q.  How long prior to, if you recall?
6    A.  After I felt there was probably some
7   interest on the part of the Shrine to move forward.
8    Q.  When did you feel that, that interest was
9   present?  Was it before the presentation that Evelyn
10  Edmonds gave or after?
11   A.  After.  I'm sorry, can I retract that?  I
12  don't know when the exact date was that Evelyn and I
13  discussed drafting an agreement.  But until the
14  board said to go forward, there would have been no
15  reason.
16   Q.  To retain George Miller?
17   A.  No, to draft a specific agreement, unless
18  there seemed to be collective interest in moving
19  forward.
20   Q.  Okay.  Did you approach George Miller about
21  helping with the agreement after the board of the
22  Shriners Hospitals For Children made the decision to
23  go forward with the agreement?
24   A.  No, nope.  I approached George Miller three

Page 76

1   or four years or so earlier than that about doing
2   registration for Vantage and had an on-going
3   relationship with George about contracts and
4   fund-raising and telemarketing and --
5    Q.  Did you ask George Miller to assist in
6   drafting a fund-raising agreement in connection with
7   the Shriners Hospitals For Children in 1999?
8    A.  Absolutely.
9    Q.  Did you do that after the board of the
10  Shriners Hospitals For Children made the decision to
11  go ahead with such an agreement?
12   A.  Absolutely not.
13   Q.  When did you do that?  When did you
14  discuss --
15   A.  Prior.
16   Q.  Okay, how long prior?  That's what I've been
17  trying to find out.
18   A.  I don't know the exact date, sir.
19   Q.  Do you know if it was prior to the
20  presentation that Evelyn Edmonds gave?
21   A.  I do not recall that.
22   Q.  Do you think it was after the presentation
23  that Evelyn Edmonds made to the Shriners Hospitals
24  For Children?

38 (Pages 75 to 76)

Lawrence C. Lyon                                                    07/21/2005

Page 77

1    A. I don't want to guess.
2    Q. Give me your best approximation, if you can.
3  I don't want you to guess, either.
4        MR. JOHNSON: Can you put a time frame
5  on it, if you can, based on your memory? If you
6  can't, then just tell us.
7    A. I don't know what date I spoke to George
8  about drafting this agreement. I don't know the
9  date.
10    Q. Was Mr. Melikian involved to any extent at
11  all in drafting the fund-raising agreement with the
12  Shriners Hospitals For Children?
13    A. Not to my knowledge.
14    Q. You've indicated earlier that you and
15  Ms. Edmonds decided to bring George Miller in
16  because you thought a lawyer should be drafting the
17  agreement and not an accountant, correct?
18    A. I did say that.
19    Q. Is there any other reason why the decision
20  was made to bring George Miller in to assist with
21  the agreement?
22    A. He was an expert.
23    Q. An expert in what?
24    A. In postal regulations, registration for

Page 78

1  organizations, attorneys general requirements, legal
2  language, compliance with all the regulations that
3  you had to have. And this was a significant
4  agreement.
5    Q. How did you become aware that Mr. Miller was
6  an expert in those matters that you just described?
7    A. I hired -- I originally brought him into the
8  company. He's a pro. I met him at the direct mail
9  marketing show and brought him into the company and
10  retained him to do all of our registrations and
11  handle all of the requirements for the company.
12    Q. So how did you become aware that he was an
13  expert in the matters that you just described?
14    A. I met him -- I'm sorry. I met him at the
15  direct mail, DMA show in Washington, D.C.
16    Q. Do you continue to believe that he's an
17  expert in the matters that you just described?
18    A. Obviously not.
19    Q. Why do you say that?
20    A. Well, because if he was an expert, then this
21  contract wouldn't have had so many holes in it.
22    Q. What holes are you referring to?
23    A. Sir, I -- okay. I'm not a lawyer. I was
24  told to stay out of it.

39 (Pages 77 to 78)

Page 79

1    Q.  Who told you to stay out of it?
2    A.  Mr. Melikian and Mr. Lewis when we were in
3   this lawsuit.  Obviously -- well, that's all I'm
4   going to say.  I've said enough.
5    Q.  Obviously what?  You can continue.
6    A.  Nothing, I had lost my train of thought for
7   a minute.
8    Q.  So I was asking you what the holes in the
9   contract that you were referring to consisted of.
10  Can you answer my question?
11   A.  I can't answer legal questions, because I'm
12  not a lawyer, and I wasn't present at the --
13  whatever happened in court.
14   Q.  When did you first become aware that there
15  were these holes in the contract that you just
16  described or referred to?
17   A.  I believe when either Mr. Melikian or
18  Mr. Lewis came back from a meeting with Mr. Wolf --
19  Judge Wolf.
20   Q.  When was that?
21   A.  I don't know.  In 1990 -- in 2000 something.
22  2003.  I don't know the date.
23   Q.  Were you told what information was imparted
24  during the meeting with Judge Wolf that you just

Page 80

1   described that caused you to conclude that there
2   were holes in the contract?
3    A.  I'm sorry, could you repeat that?  Was I
4   aware of what?
5    Q.  You mentioned a meeting with Judge Wolf,
6   correct?
7    A.  I wasn't at that meeting.
8    Q.  What were you told about the meeting that
9   caused you to conclude that there were holes in the
10  contract?
11   A.  I don't know if I was told anything, except
12  that at the meeting, the judge brought up something
13  about the Shriners Hospitals.  I said to Harry,
14  "What's the problem?  George got this thing
15  approved.  This is fine.  What are you talking
16  about?"  Well, and that's when --
17       MR. NAHIGIAN:  Why don't we mark this as
18  the next exhibit.
19       (Exhibit 6 marked for identification.)
20   Q.  I'm going to show you what's been marked as
21  Exhibit 6.
22       (Document exhibited to witness.)
23   Q.  Can you tell me what that document is,
24  please?

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                                    07/21/2005

Page 81

1        MR. JOHNSON:  Is this the same as
2    Melikian Exhibit 4?
3        MR. NAHIGIAN:  Yes.
4        A.  This looks like the signed agreement for the
5    Shriners program.
6        Q.  Does a true and accurate copy of your
7    signature appear on that agreement?
8        A.  This is not -- you mean -- I didn't write
9    these things in here.
10       THE WITNESS:  Is this what he's
11   referring to?
12       MR. JOHNSON:  No, he's asking you
13   whether at the end of it is your signature.
14       A.  The signature at the end, absolutely mine.
15       Q.  Can I --
16       MR. JOHNSON:  DOJ21946, presumably.
17       (Exhibit 7 marked for identification.)
18       Q.  I'm going to show you what's been marked as
19   Exhibit 7.
20       (Document exhibited to witness.)
21       Q.  Can you tell me what that document is?
22       A.  Yes, I do recall this.  Is that what you're
23   asking me?
24       Q.  Right.  Does a true and accurate copy of

Page 82

1    your signature appear on the first page of that
2    exhibit?
3        A.  Yes, sir.
4        Q.  Is this a letter dated October 25, 2000 that
5    you sent to Mr. VerMaas and Mr. Turnipseed of the --
6        A.  No.
7        Q.  What is it?
8        A.  I delivered it to them.  Mr. Goldings wrote
9    this on the telephone to Mr. Melikian and sent it
10   down to me at the board presentation.
11       Q.  Who is Mr. Goldings?
12       A.  Who is Mr. what?
13       Q.  Goldings.
14       A.  Morris Golding?
15       Q.  Yes.  Who is he?
16       A.  Are you serious?
17       Q.  Yes, for the record.
18       A.  He was our attorney, one of our attorneys.
19       Q.  In the false claims litigation?
20       A.  What?
21       Q.  In the false claims litigation initiated by
22   Mr. Saklad?
23       A.  Yes.
24       Q.  What was the purpose of this letter, as best

41 (Pages 81 to 82)

Lawrence C. Lyon                                                                 07/21/2005

Page 83

1   you recall?
2       A.  They were flipping out.
3       Q.  Who was flipping out?
4       A.  The Shriners.
5       Q.  What were they flipping out about, based on
6   your understanding?
7       A.  That they were going to get sued, that the
8   hospital was going to get sued because of this
9   postal problem in Boston.
10      Q.  Did they tell you why they thought they were
11  going to get sued?
12      A.  They didn't tell me -- no.
13      Q.  The letter enclosed a copy of a proposed
14  amendment to the June 17, 1990 agreement, correct?
15          MR. JOHNSON:  Objection to the form.
16      A.  Yes.
17      Q.  Have you --
18      A.  Oh, I don't know.  It's not signed by -- I
19  don't know if this is an accurate one, because it's
20  not signed by VerMaas or Bracewell.
21      Q.  Why don't you take a look at the first page
22  of Exhibit 7.  Have you read that yourself yet since
23  I showed it to you?  If you haven't, please read it.
24          (Pause)

Page 84

1       A.  Yes.
2       Q.  Now, the letter refers to a copy of a
3   proposed amendment, correct, in the second
4   paragraph?
5       A.  Yeah, yes.
6       Q.  The letter refers to amending paragraph 13
7   of the June 17, 1999 agreement, correct?  I refer
8   you to the second paragraph of the first page.
9       A.  I'm sorry.  Yes.
10      Q.  The letter indicates that Vantage would
11  refrain from impleading Shriners as a third party in
12  the Boston litigation, but that the Shriners needed
13  to agree to amend paragraph 13, correct?
14      A.  That's exactly what it says.
15      Q.  Now, why did you write that letter --
16      A.  I didn't.
17      Q.  Based on your understanding, why did Vantage
18  make that proposal to the Shriners Hospitals?
19      A.  My understanding was that they wanted some
20  security that they weren't going to be brought into
21  the lawsuit in Boston.  That's why they wrote the
22  letter.
23      Q.  Why who wrote the letter?
24      A.  Mr. Goldings and Mr. Melikian.

42 (Pages 83 to 84)

Lawrence C. Lyon                                                                07/21/2005

Page 85

1    Q.  Do you know why the letter stated that the
2  Shriners would have to agree to amend paragraph 13
3  of the June 17, 1999 agreement?
4    A.  No, I don't know.  I know one thing that
5  they -- I think they got a letter, to tell you the
6  truth, I think they got a letter from the
7  government, and they freaked out.
8    Q.  Who got a letter from the government?
9    A.  The Shriners.
10    Q.  What did the letter say, as far as you know?
11    A.  I don't -- it was about the postal thing.
12  That must -- okay, that's all right.  That's why.
13    Q.  Do you know why Vantage asked the Shriners
14  in this letter that you signed to amend paragraph 13
15  of the agreement?
16    A.  No.  No, sir, I'm sorry.
17    Q.  Do you know whether or not there was any
18  concern within Vantage that there was something
19  wrong with paragraph 13 of the agreement?
20    A.  I don't know anything about paragraph 13 of
21  the agreement right now.  I know that in the
22  boardroom, I had to step outside with Mr. Goldings
23  and go make a telephone call to Mr. Melikian to get
24  this, Mr. Fleischer's requirement or whatever

Page 86

1  signed.
2    Q.  Now, you told me earlier that the decision
3  was made to consult Mr. Miller concerning the
4  agreement with the Shriners Hospitals because it was
5  necessary to have a lawyer involved rather than an
6  accountant.  Is there any other reason why
7  Vantage --
8    A.  That was -- I'm sorry, go ahead.
9    Q.  Is there any other reason why the decision
10  was made by Vantage to have Mr. Miller involved in
11  drafting the contract?
12    A.  I believe because of the on-going postal
13  cooperative mailing situation that we wanted to have
14  an expert in Washington, D.C. with postal
15  connections to, you know, make sure that this thing
16  was buttoned up properly.
17    Q.  Was there any concern within Vantage prior
18  to June 17, 1999 that entering into a fund-raising
19  contract with the Shriners Hospitals For Children
20  might be a risky proposition in light of the
21  litigation that was on-going in Boston?
22    A.  I don't understand what you mean by that.
23  I'm not clear about your question.
24    Q.  Well, you tied the litigation in Boston to

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon

07/21/2005

Page 87

1    Vantage's need to have a lawyer in Washington
2    involved in buttoning up the agreement.  I guess I'm
3    wondering what the litigation in Boston had to do
4    with the need to get a Washington lawyer involved?
5            MR. JOHNSON:  Objection to the form.
6        A.  I believe George had been involved with
7    other programs, legal programs, registration issues,
8    et cetera, et cetera, for the company prior to this.
9    And when this program was being drafted, we
10   absolutely wanted to have outside, not internal
11   people, involved with writing this agreement.
12       Q.  I'm trying to find out why was that?
13       A.  Why was that?
14       Q.  Why did you want outside people involved in
15   drafting this particular contract?
16       A.  I mean, the biggest deal in the company's
17   history.
18       Q.  Any other reason why you wanted outside
19   counsel involved in drafting this contract?
20       A.  Didn't want to have any postal problems.
21       Q.  What kinds of postal problems?
22       A.  Any.
23       Q.  Were there any specific kinds of postal
24   problems that you had in mind at that time?

Page 88

1        A.  Any.  Anything that would be a problem with
2    the post office.
3        Q.  Did you have any concern prior to June 17,
4    1999 that the government might take the position
5    that the contract contemplated between Vantage and
6    the Shriners Hospitals might violate the Cooperative
7    Mail Rule?
8        A.  Absolutely unequivocally none whatsoever.
9    This contract, I was told, was approved, was
10   reviewed and had nothing in there that would violate
11   any postal regulations, none.
12       Q.  Prior to being told that, did you have any
13   concerns that it might violate postal regulations?
14       A.  I didn't have an agreement prior to this.
15       Q.  So you had no such concerns prior to the
16   date the agreement was entered into that the
17   agreement contemplated between Vantage and the
18   Shriners Hospitals might violate postal regulations?
19       A.  I don't know what you're getting at.  But
20   I'm trying to explain to you, this agreement,
21   because of the organization, had an enormous amount
22   of time, energy and negotiations to make sure that
23   there was nothing in this agreement, nothing line to
24   line that would cause any problems for the

44 (Pages 87 to 88)

Lawrence C. Lyon                                                    07/21/2005

Page 89

1  corporation with the postal -- post office, the
2  attorneys general, the registration people or
3  anybody else.  And it was too big of an agreement to
4  just let me write it, if you understand what I'm
5  saying.
6      Q.  Did you have any specific discussion with
7  George Miller prior to June 17, 1999 concerning the
8  issue of whether or not the proposed agreement would
9  violate any postal regulations?  By proposed
10  agreement, I mean the draft agreements that were
11  being considered in connection with the Shriners
12  Hospitals For Children program.
13          MR. JOHNSON:  Prior to when?
14          MR. NAHIGIAN:  Prior to June 17, 1999.
15      A.  Of course.
16      Q.  Could you recall any of those discussions in
17  terms of what was said by you and what was said by
18  George?
19      A.  You gave me this thing here, number 0735.
20  Every one of those lines was a concern of mine.
21      Q.  Did you discuss them with George Miller?
22      A.  Absolutely.
23      Q.  Why don't you tell me what you recall --
24  well, first off, how many discussions did you have

Page 90

1  with George Miller --
2      A.  I had discussions -- I'm sorry.
3      Q.  How many discussions did you have with
4  George Miller concerning those issues?
5      A.  On a daily basis, a weekly basis, a monthly
6  basis?  How long are you referring to?
7      Q.  How long are you referring to?
8      A.  I'm referring from whatever the first draft
9  of this agreement was until the day it was signed,
10  George Miller and I talked daily, numerous times.
11      Q.  Can you recall those conversations
12  individually in your mind right now?
13      A.  Which paragraph?  Every paragraph there was
14  a problem.
15      Q.  I'm just saying, do you have a recollection,
16  as you sit here right now, of having those specific
17  conversations in terms of what was said?
18      A.  Absolutely.  Certain -- the most important
19  was that Mr. Fleischer kept insisting on some
20  paragraph, and I don't know where it is in here,
21  that there's no liability and the Shrine had no --
22  and this went on and on in every draft and redraft.
23  It kept coming up until I finally said enough, and I
24  called the Imperial Potentate and I told him I quit,

45 (Pages 89 to 90)

Lawrence C. Lyon                                                    07/21/2005

Page 91

1    I'm done.  I've spent 20 thousand dollars already on
2    this contract with Mr. Fleischer.  Can't get this
3    thing done.  I'm packing up.  He at that point said
4    I'm going to get Bracewell involved, you and George
5    Miller come down and meet with Fleischer and
6    Bracewell, because I was sick of listening to
7    Fleischer insisting on changing this agreement and
8    putting us in jeopardy.
9        Q.  Who was the Imperial Potentate that you
10   called?
11       A.  The Deputy Imperial Potentate at the time
12   was Mr. Ralph Semb.
13       Q.  What specifically was Mr. Fleischer
14   insisting on?
15       A.  We'll be here for three days, do you mind?
16   I mean, I do.  But if you want to sit here.  There
17   must be a hundred drafts of this agreement, and
18   every paragraph had a problem with this guy.
19       Q.  What was the essence of the problem, if you
20   will, if you can identify it?  Did it have to do
21   with --
22       A.  He didn't want us involved.  I think that's
23   a good essence.
24       Q.  On behalf the Shriners Hospitals For

Page 92

1    Children, was Mr. Fleischer insisting that the
2    Shriners not be at risk for the full cost of the
3    program, other than from funds generated by the
4    fund-raising program?
5            MR. JOHNSON:  Objection.
6        A.  I don't want to keep --
7            MR. JOHNSON:  Just a moment, please.
8    Are you asking whether Fleischer ever said that to
9    him?
10           MR. NAHIGIAN:  Yes.
11           MR. JOHNSON:  Fine, that's the question.
12   Did Fleischer ever tell you that he was insisting
13   that Shriners not be liable for the program costs.
14       A.  Absolutely he did.
15       Q.  On more than one occasion did he tell you
16   that?
17       A.  Yes, sir, and Mr. Miller.
18       Q.  He told --
19       A.  Conference calls.
20       Q.  Did anyone else affiliated with the Shriners
21   Hospitals say that to you as well?
22       A.  The contract negotiations were all between
23   George Miller, me and Jay Fleischer until we reached
24   the final straw where I just threw up my hands and

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                                                          07/21/2005

Page 93

1    said that's it.  And at that point -- I'm sorry,
2    there was one other person in the room, Mr. Paul
3    Gramblin, who was the director of development, was
4    in the room with Mr. Miller, myself, Mr. Bracewell
5    and Mr. Fleischer.  The five of us were in the room
6    together.
7        Q.  When did that meeting occur?
8        A.  I don't have a date.  Prior to June -- prior
9    to the beginning --
10       Q.  June 17, 1999, the date of the agreement?
11       A.  Yes, yes.
12       Q.  Where did that meeting take place?
13       A.  At the Shriners headquarters in Tampa,
14   Florida.
15       Q.  Did the Shriners ever ask you what would
16   happen if the program did not generate enough money
17   to pay Vantage's charges?
18       A.  Absolutely.
19       Q.  What, if anything, did you say when you were
20   asked that question?
21          MR. JOHNSON:  Objection to the form.  Go
22   ahead.
23       A.  I told them they have -- that the program
24   itself would pay any shortfall or deficiency so that

Page 94

1    the Shriners wouldn't have to write a check out of
2    their endowment fund to pay for this.
3        Q.  Did you tell the Shriners that on more than
4    one occasion prior to June 17, 1999?
5        A.  Yes, sir.
6        Q.  Was George Miller ever present when you said
7    that to the Shriners?
8        A.  Absolutely.
9        Q.  Do you know whether or not George Miller
10   ever said or indicated in any way to the Shriners
11   Hospitals that the Shriners had to be at risk for
12   the full cost of the program?
13       A.  Yes.
14       Q.  Did he in fact say that to the Shriners?
15       A.  That they would have to be at risk, meaning
16   they had to be at risk or they would be violating
17   the agreement?
18       Q.  Right.  And you recall George Miller stating
19   that to the Shriners?
20       A.  I recall George saying to them that by using
21   the rental of the list, mailing the donor file, that
22   those precautions would eliminate any out-of-pocket
23   expense to the Shriners endowment fund by using
24   that.

47 (Pages 93 to 94)

Lawrence C. Lyon                                                                    07/21/2005

Page 95

1    Q.  When did George Miller indicate that to the
2  Shriners?
3    A.  Probably in 20 conversations with Jay
4  Fleischer and definitely in a meeting with
5  Mr. Bracewell, Mr. Gramblin, myself and
6  Mr. Fleischer and in a January 2003 board meeting in
7  San Francisco with Mr. Claypool, Mr. VerMaas,
8  Mr. Fleischer, myself and Mr. Miller.
9    Q.  What I started out asking you is whether or
10  not Mr. Miller made it known to the Shriners
11  Hospitals in any way that the Shriners Hospitals had
12  to be at risk for the full cost of the program in
13  order to enter into any fund-raising agreement with
14  Vantage?
15        MR. JOHNSON:  Objection to the form.
16    A.  I don't know if he used those words that
17  you're using.
18    Q.  Did he indicate that in substance to the
19  Shriners Hospitals For Children?
20    A.  Had --
21        MR. JOHNSON:  Objection to the form.
22    A.  Had to have liability.
23        THE WITNESS:  I'm sorry?
24        MR. JOHNSON:  I objected to the form of

Page 96

1  the question.
2    Q.  Is your answer yes?
3    A.  Yes.
4    Q.  Did he indicate that prior to June 17, 1999?
5    A.  Yes.
6    Q.  In connection with the work that Mr. Miller
7  did in drafting the agreement with the Shriners
8  Hospitals For Children that was entered into on
9  June 17, 1999, did Mr. Miller ever make any specific
10  statements to you about his expertise or the scope
11  of his expertise?
12    A.  Could you repeat that?  I want to make sure
13  I heard it, because I can't believe you're asking me
14  this.  I'm sorry.  Did he ever tell me that he was
15  an expert?
16    Q.  Yes.
17    A.  Yes, sir, he did.
18    Q.  When?
19    A.  Every day.
20    Q.  Do you recall --
21    A.  At night drinking, all the time.  He's a
22  pro, he and Carolyn, the Postmaster General, the
23  Assistant General.
24    Q.  Excuse me?

48 (Pages 95 to 96)

Lawrence C. Lyon                                                                                    07/21/2005

Page 97

1     A.  The Assistant Postmaster General.
2     Q.  What about the Assistant Postmaster General?
3     A.  They knew all these guys and were involved
4  with all kinds of agreements, fund-raising
5  agreements, telemarketing agreements, cases that
6  they've been involved with.
7     Q.  When did Mr. Miller tell you those things?
8     A.  From the first time I met George Miller.
9     Q.  Did he ever --
10    A.  And I believe -- and he was.
11    Q.  Did he ever tell you that he was an expert
12  specifically in connection with the work he was
13  doing for Vantage pertaining to the contract with
14  the Shriners Hospitals For Children that was entered
15  into on June 17, 1999?
16    A.  Yeah.  I'm sorry, yes, sir.
17    Q.  What specifically did he tell you about his
18  expertise on those occasions?
19    A.  That, that was his business.  That he
20  handled all the states and the registration
21  requirements and the contract requirements and the
22  postal regulations and what was required to make
23  sure you don't violate Cooperative Mailing Laws, et
24  cetera, et cetera.

Page 98

1     Q.  What did he tell you specifically about his
2  expertise in relation to the Cooperative Mailing
3  Rule at the time he was helping Vantage to draft the
4  Shriners Hospital For Children agreement that was
5  entered into on June 17, 1999?
6     A.  He was getting frustrated on numerous
7  occasions with Mr. Fleischer because Mr. Fleischer
8  kept wanting to put things in the agreement that
9  would violate the Cooperative Mailing Laws; and
10  George would keep telling him, "We want have this in
11  here.  If you put this in here, you're going to
12  violate the agreement.  You can't do this."  He kept
13  coming back and Fleischer would keep changing it,
14  and we'd go back.  Finally, as I said, there must be
15  50 drafts and George kept saying you can't do this
16  and you can't do this and you can't do this.
17    Q.  What were some of the things that George was
18  telling Fleischer he couldn't do?
19    A.  I don't know.  I'll read this and I can tell
20  you.  I mean, there would be things in here that if
21  I read this, I'm sure I can -- oh, yeah, recommended
22  opinion be obtained on the difference between gross
23  income received from net income paid in fund-raising
24  expense for calculating the ratio of such -- the

49 (Pages 97 to 98)

Lawrence C. Lyon                                                                    07/21/2005

Page 99

```
 1   bottom line is that the Shriners Hospitals had an
 2   eight billion dollar endowment, and George came back
 3   to Mr. Fleischer and said, "You'd have to be mailing
 4   one hundred million packages a year to offset your
 5   96 cents on the dollar that you raise for the
 6   hospital that comes directly from each dollar
 7   raised.  And there's no way you're going to be
 8   mailing that kind of mail, and you don't have to
 9   worry about the ratios."  I mean, every single
10   paragraph there would be something else that
11   Fleischer would ask for, and George would come back
12   and say you can't do this or you can't do that.
13       Q.  Did Mr. Miller or anyone at Nonprofit
14   Service Group -- you understand that Mr. Miller's
15   company is called Nonprofit Service Group?
16       A.  Yes.
17       Q.  Did Mr. Miller or Nonprofit Service Group
18   ever suggest that you look at Nonprofit Service
19   Group's Website?
20       A.  Sir, I don't know how to turn on a computer,
21   and I'm not into computers.
22       Q.  I'm not asking whether or not you ever
23   looked at it.  Do you know whether or not they ever
24   suggested that you take a look at it?
```

Page 100

```
 1       A.  No, I do not -- I doubt they would ever talk
 2   to me about something like that.
 3       Q.  Do you know whether or not Mr. Miller or
 4   anyone else at Nonprofit Service Group ever
 5   suggested to anyone else at Vantage that Vantage
 6   ought to take a look at Nonprofit Service Group's
 7   Website?
 8           MR. JOHNSON:  Objection to form.
 9       A.  No, sir.  I'm not familiar with anything to
10   do with Websites, and I don't care about Websites.
11   I don't know anything about them.  I'm sorry, I
12   mean, I don't have any knowledge.
13           MR. JOHNSON:  He didn't ask you whether
14   you cared about Websites.
15       A.  Okay.  Well, he never asked me to look at
16   his Website, and I wouldn't know how to do it if he
17   did.
18           MR. JOHNSON:  Next question.
19       Q.  Do you know whether or not he ever asked
20   anyone else at Vantage to look at his Website?
21       A.  No, sir, I do not.
22       Q.  Let me finish.
23       A.  I'm sorry.
24       Q.  Prior to June 17, 1999, did Mr. Miller ever
```

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                          07/21/2005

Page 101

1   talk to you about whether or not the form of the
2   agreement that he was proposing for the Shriners
3   Hospitals For Children program was a form that had
4   been used before without challenge by the
5   government?
6       A.  I'm sorry, could you repeat?  Do I recall --
7   I'm sorry, could you say that again?  Do I recall
8   him what?
9           MR. NAHIGIAN:  Can you read it back?
10          (Question read back.)
11      A.  He never used the word form.  He told me
12  point blank that this agreement had been approved by
13  the post office on more than one occasion, because
14  daily I asked him, are you sure, are you sure, are
15  you sure.
16      Q.  When you say "this agreement," what
17  agreement specifically?
18      A.  I'm sorry, the agreement of June 17th for
19  the Shriners Hospitals For Children fund-raising
20  agreement.
21      Q.  Did you ever ask Mr. Miller to obtain a
22  specific ruling from the Postal Service about the
23  specific contract language that was contemplated
24  between the Shriners Hospitals For Children and

Page 102

1   Vantage Financial Services?
2       A.  I'm sorry, I don't talk like that, I'm
3   sorry.
4       Q.  I try not to.
5       A.  No, no, I don't speak to people like that.
6           MR. JOHNSON:  Maybe this would be a good
7   point, would you like to call the hospital now?
8           MR. NAHIGIAN:  Well, I don't think we
9   got an answer.
10      Q.  Is the answer no?
11      A.  I'm sorry?
12      Q.  I asked you whether or not you asked George
13  Miller to get a specific ruling from the United
14  States Postal Service about whether or not the
15  language of the contemplated contract between
16  Vantage and the Shriners complied with postal
17  regulations?
18      A.  Yes, sir, he told me --
19      Q.  Did you ever ask him to do that?
20      A.  Absolutely.  Did I ever ask him to make sure
21  that this agreement would be approved by the post
22  office?
23      Q.  To obtain a specific ruling of approval by
24  the post office.

LegaLink Boston
(800) 822-3376

Lawrence C. Lyon                                                              07/21/2005

Page 103

1    A.  Oh, I'm sorry, sir.  I didn't ask.  Did I
2  say to obtain a specific ruling?  No, sir, I never
3  say a statement like that.
4         MR. JOHNSON:  Since now there is no
5  pending question, maybe now it would be a good time
6  to take a break.
7         MR. NAHIGIAN:  Go ahead.
8         (Whereupon, a recess was taken.)
9         MR. NAHIGIAN:  We've agreed to suspend
10  the deposition, and we will reconvene at 9 o'clock
11  a.m. next Wednesday, which is, July 27th, I believe.
12  Thank you.
13         (Whereupon, at 1:05 the deposition
14  suspended.)
15
16
17
18
19
20
21
22
23
24

Page 104

1          C E R T I F I C A T E
2       I, LAWRENCE C. LYON, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the corrections listed below):
7  Page   Line       Correction
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18
19  Signed under the pains and penalties of perjury this
20  ____ day of _____, 2005.
21         _____
22         LAWRENCE C. LYON
23
24

52 (Pages 103 to 104)

Lawrence C. Lyon                                                    07/21/2005

Page 105

1   COMMONWEALTH OF MASSACHUSETTS)
2   SUFFOLK, SS.                    )
3        I, Linda M. Grieco, Professional Shorthand
4   Reporter and Notary Public in and for the
5   Commonwealth of Massachusetts, do hereby certify
6   that LAWRENCE C. LYON, the witness whose deposition
7   is hereinbefore set forth, was duly sworn by me and
8   that such deposition is a true record of the
9   testimony given by the witness.
10       I further certify that I am neither related to
11  or employed by any of the parties in or counsel to
12  this action, nor am I financially interested in the
13  outcome of this action.
14       In witness whereof, I have hereunto set my hand
15  and seal this 24th day of July, 2005.
16
17
18
19
20
21            Linda M. Grieco
22            Notary Public
23            My commission expires
24            December 15, 2011

53 (Page 105)

Lawrence C. Lyon

07/21/2005

**A**

able 42:7 49:7
absolutely 12:18 32:7
    49:1 63:18 66:5
    67:15 72:15 76:8,12
    81:14 87:10 88:8
    89:22 90:18 92:14
    93:18 94:8 102:20
accept 72:7
accompanying 13:12
accountant 68:8 77:17
    86:6
accurate 56:5 57:23
    63:2 69:9 81:6,24
    83:19 104:5
accurately 68:19,22
action 105:12,13
actual 50:4
addition 12:6
additional 46:15,20
    47:2 73:11
address 4:23,24 5:3,5,7
    5:17 16:24 17:4,16
    17:22,24
addresses 5:10,11,15
administrator 71:16,19
    71:20,24
affiliated 37:9 52:19
    92:20
affiliation 26:23
affinity 15:20 18:23
ago 18:19,19 58:5
agree 35:6,16 36:13
    62:6 68:6 71:2,5
    84:13 85:2
agreed 68:5 103:9
agreement 3:17,19,20
    40:18,21 41:12,13,15
    43:19 44:14 58:6,14
    58:18 66:12,18,19,20
    66:21,23,24 67:8,11
    67:13,16,20,23 68:2
    68:13,23 69:4,8,10
    69:13,15,16,18,19
    70:9,12,13 71:1,7,10
    72:2,10 73:10 74:24
    75:2,13,17,21,23
    76:6,11 77:8,11,17
    77:21 78:4 81:4,7
    83:14 84:7 85:3,15
    85:19,21 86:4 87:2
    87:11 88:14,16,17,20
    88:23 89:3,8,10 90:9
    91:7,17 93:10 94:17
    95:13 96:7 98:4,8,12
    101:2,12,16,17,18,20

102:21
agreements 70:4,11,15
    89:10 97:4,5,5
ahead 21:18 23:12
    54:11 76:11 86:8
    93:22 103:7
alive 17:2
amend 84:13 85:2,14
amending 84:6
amendment 83:14 84:3
America 51:15,19,24
    54:1,18 56:6,23
    58:20 59:20 68:15
American 56:4
amount 38:9 39:23
    40:9,22 41:3,7,11
    43:4,21 50:12,18
    51:6 88:21
amounts 38:17 45:12
answer 7:2,11 9:11,12
    9:13,21,22,23,24
    10:6 19:15 23:12,18
    25:10 27:4 28:7
    30:15 32:2,21 35:22
    36:2,3 38:14 44:5,7
    48:8,10 53:17,21
    56:21 65:19 79:10,11
    96:2 102:9,10
answered 12:10
answers 35:24 53:13
anybody 7:14 89:3
Apart 38:3
appear 12:13 66:2 69:9
    70:22 81:7 82:1
appearance 13:3
APPEARANCES 2:1
appears 37:2 65:15
    66:6 69:5,19 70:4
applied 29:18 46:19
applying 33:3
approach 75:20
approached 56:17
    75:24
appropriate 22:2 35:24
approval 102:23
approved 80:15 88:9
    101:12 102:21
approving 51:6
approximately 12:17
approximation 30:3
    74:4 77:2
April 59:17 65:16 66:3
    67:24 72:21,24
argue 73:14
Arnold 1:18 2:17
arrangement 38:7,18

aside 7:19 8:3
asked 12:9 20:6 33:12
    34:2 42:8,11 73:16
    85:13 93:20 100:15
    100:19 101:14
    102:12,12
asking 22:10 25:5,21
    31:16 32:9 38:16,17
    65:20 79:8 81:12,23
    92:8 95:9 96:13
    99:22
aspect 51:20 53:18,23
    54:9 60:18
assist 73:17 76:5 77:20
assistance 62:1
Assistant 96:23 97:1,2
associated 39:17,24
associates 20:18
Atlantic 52:7
attendance 14:10
attended 14:9
attorney 9:23 82:18
attorneys 78:1 82:18
Attorney/client 13:7
    25:3 72:16
attributable 45:8
aware 12:19 19:11,16
    19:19 30:11 31:6
    51:23 63:9 78:5,12
    79:14 80:4
a.m 1:21 103:11

**B**

B 3:10
BA 14:12
back 5:12 8:4 12:12
    15:5 32:4,6 42:14
    44:1 46:14 49:17,19
    69:12 79:18 98:13,14
    99:2,11 101:9,10
background 14:8
Bank 24:11
banks 29:14
based 29:10 38:11 45:2
    45:3 46:17 48:13
    77:5 83:5 84:17
basis 90:5,5,6
Bates 36:18
bears 36:18 65:7 66:10
    66:12
began 10:17,19 52:20
    58:19 74:5
beginning 35:11 93:9
behalf 2:7,14,21 12:21
    91:24

believe 8:24 10:12
    11:13 12:23 14:15
    17:7 22:24 23:13,19
    30:9 31:9 46:18 51:8
    54:6 57:22 58:3 61:5
    68:1,3,4 71:6,9 72:23
    78:16 79:17 86:12
    87:6 96:13 97:10
    103:11
best 15:1,4,11 30:3
    35:23 57:20 74:4
    77:2 82:24
beyond 46:21
big 89:3
biggest 87:16
billion 99:2
blank 101:12
board 75:14,21 76:9
    82:10 95:6
boardroom 85:22
bonus 50:24
Boston 1:20,23 2:5,6
    2:13,20 83:9 84:12
    84:21 86:21,24 87:3
bottom 99:1
bounty 31:14
Bracewell 57:16 60:21
    74:7 83:20 91:4,6
    93:4 95:5
break 53:17 103:6
briefly 34:5 52:8
bring 77:15,20
bringing 51:1
Brookline 17:14
brought 78:7,9 80:12
    84:20
Buky 54:6
business 5:17,21 6:7,14
    7:4,13 16:13,18
    18:15,21 19:6,9,12
    19:13,16,20 20:1,12
    20:12,20 49:7 51:1,9
    97:19
businesses 6:17
busy 65:11
buttoned 86:16
buttoning 87:2

**C**

C 1:16 3:3 4:1,12 104:1
    104:1,2,22 105:6
calculating 98:24
call 13:3 85:23 102:7
called 4:13 13:5 17:3
    21:8 90:24 91:10
    99:15

calls 63:7,10 92:19
Canal 2:12 59:14,18
capital 57:22,23
card 26:13 30:21 38:22
cards 24:9,13 26:5
    30:22
care 62:12 100:10
cared 48:19 100:14
career 19:1
Carl 4:22
Carolyn 96:22
case 6:1 7:19 9:15,18
    10:3 27:23 30:17,20
    31:10,18,19 37:2,4
    44:11 46:11 58:16
    62:6,9
cases 97:5
cause 50:8 88:24
caused 19:10 80:1,9
causes 68:3
cease 8:21 12:1
cents 99:5
Certain 90:18
certify 104:2,4 105:5
    105:10
cetera 87:8,8 97:24,24
challenge 101:4
change 13:22 24:6
    28:10 29:3 41:2
changed 24:8 29:4,7
changes 26:2
changing 91:7 98:13
charged 50:13
charges 93:17
charitable 29:18
check 50:15 87:19,21
Children 9:16 41:12
    43:13 44:16 54:2,13
    55:2,6 56:19 57:12
    58:8 59:22 60:9,12
    67:1 73:18 74:1
    75:22 76:7,10,24
    77:12 86:19 89:12
    92:1 95:19 96:8
    97:14 98:4 101:3,19
    101:24
chronological 26:1
circumstances 56:17
claims 30:12 82:19,21
Claypool 95:7
clear 29:5,6 44:23 59:8
    86:23
client 37:6 48:21
clients 7:14 34:9 49:4
close 34:23 36:13
Clough 5:8

**club** 5:2 63:16,18 64:3 64:4,7,10,14,16,18 65:9 66:3,6 73:4,7,8
**collection** 3:15 61:18
**collective** 75:18
**collectively** 35:7
**college** 14:11 15:6
**come** 8:4 91:5 99:11
**comes** 99:6
**comfortable** 28:19
**coming** 66:6 73:5 90:23 98:13
**commercial** 29:14
**commission** 40:4,20,23 41:3,11,18,21,23 42:22 43:10,15 105:23
**commissions** 37:19 38:3,7,10 40:10 42:15
**common** 71:18
**Commonwealth** 105:1 105:5
**companies** 6:20 7:7 24:1 26:23 29:14 52:24
**company** 5:23 6:3,7 18:22 21:7,10,13,16 41:15 47:10,18,19,23 52:19 73:23 78:8,9 78:11 87:8 99:15
**company's** 87:16
**compare** 69:18,21
**compensated** 37:12
**compensation** 48:12 51:6
**completed** 19:22
**completely** 55:11
**compliance** 33:2,9,11 33:13 78:2
**complied** 102:16
**computer** 99:20
**computers** 99:21
**concern** 85:18 86:17 88:3 89:20
**concerned** 26:16
**concerning** 41:10 47:21 57:11 86:3 89:7 90:4
**concerns** 88:13,15
**conclude** 80:1,9
**conclusion** 41:11 46:12 46:20,23
**condominium** 17:8
**conference** 19:17,18 20:15 92:19

**confidentiality** 7:12
**Congress** 1:23
**connection** 32:23 50:10 76:6 89:11 96:6 97:12
**connections** 86:15
**consider** 8:13 10:24 12:7
**considered** 32:10 89:11
**consisted** 79:9
**constable** 12:15
**constant** 40:6
**consult** 6:17 7:8 86:3
**consultant** 6:13,15 8:17
**consulting** 7:5 8:10 66:13 68:13 70:10
**contact** 51:19 52:1,2 54:15 60:15
**containing** 47:17,20
**contemplated** 88:5,17 101:23 102:15
**context** 27:8
**continue** 13:20 53:1 61:20 71:6 78:16 79:5
**continuously** 52:13
**contract** 8:6 45:18,20 45:21,22 46:1,2,7 59:23 60:19 71:21 73:17 74:1 78:21 79:9,15 80:2,10 86:11,19 87:15,19 88:5,9 91:2 92:22 97:13,21 101:23 102:15
**contractor** 8:15
**contracts** 6:19 7:3 76:3
**contributed** 9:18
**conversations** 90:11,17 95:3
**cooperative** 27:1,9 28:9,20 29:2,9,12,18 30:12 31:11,17 86:13 88:6 97:23 98:2,9
**copy** 14:4 20:2 63:2 69:9 81:6,24 83:13 84:2
**corporation** 11:4,5 15:7 20:19,22,24 22:4,15,17 89:1
**corporations** 11:7,9,20
**correct** 16:4,9,10 31:3 34:11 36:21 46:16 47:18 48:14,23 49:5 49:8,22 51:13 59:6

60:24 67:1 69:2,6 73:12,18 77:17 80:6 83:14 84:3,7,13
**Correction** 104:7
**corrections** 104:6
**correctly** 56:8
**cost** 41:15 92:2 94:12 95:12
**costs** 39:17,24 40:3 92:13
**Council** 54:1
**counsel** 2:11 4:3,13 87:19 105:11
**Country** 5:2 63:15,18 64:3,4,7,10,13,16,18 65:9 66:3,6 73:4,7
**couple** 59:13
**course** 54:22 58:21 89:15
**court** 1:3 28:4 37:1 79:13
**creating** 71:16
**credit** 24:9,12 26:5,13 30:21,22 38:21
**Cross** 3:2
**cruise** 59:14 61:7 74:7 74:10
**culture** 34:22 36:10
**currently** 8:6
**customer** 48:21 49:12
**customers** 31:24
**cut** 63:16
**Cypress** 11:22
**C-L-O-U-G-H** 5:8
**C.A** 1:5

_____ **D** _____

**D** 3:1 4:1
**daily** 90:5,10 101:14
**date** 10:18 12:22 13:17 13:22 18:18,20 30:2 30:3,7,10 45:22,23 54:4 55:16 61:3 67:24 69:1,4 74:2,9 74:11,13,21,23 75:12 76:18 77:7,9 79:22 88:16 93:8,10
**dated** 82:4
**dates** 14:9 15:3 40:16
**David** 16:23
**DAVIS** 2:3
**day** 12:21 13:3,20,21 16:5 22:16 63:9 69:6 90:9 96:19 104:20 105:15
**days** 4:6 91:15

**deal** 10:7 87:16
**dealing** 54:8 60:10,16
**deceased** 18:6,7
**December** 50:22 105:24
**decide** 46:13
**decided** 77:15
**decision** 9:14 42:21 43:2,6,9 73:20 75:22 76:10 77:19 86:2,9
**Defendants** 1:12 2:21 4:13
**deficiency** 93:24
**definitely** 67:15 70:22 71:17 73:7,15 95:4
**degrees** 14:10
**delivered** 82:8
**deponent** 4:5
**deposition** 1:16 3:2 4:4 12:13 13:20 27:20 37:2,3,5 54:17 56:7 62:3,4 63:7 103:10 103:13 105:6,8
**depositions** 4:7
**Deputy** 19:21 20:8 54:5 55:17 91:11
**describe** 14:7 38:6 56:16 68:22
**described** 19:2 20:16 42:14,21 58:13 68:18 78:6,13,17 79:16 80:1
**describes** 8:9
**development** 93:3
**difference** 98:22
**different** 15:12 25:5,22 45:13 55:11
**difficult** 28:4
**direct** 3:2 4:18 5:22 6:8 39:17,24 40:3 78:8 78:15
**directly** 99:6
**director** 93:3
**disagreement** 40:22,24 41:4,9,14 42:13,18
**disclose** 7:13
**discrepancy** 41:5
**discuss** 55:18 76:14 89:21
**discussed** 75:13
**discussing** 55:23 56:23 57:2
**discussion** 13:7 25:3 59:19 63:12 65:5 72:16 89:6
**discussions** 57:7,11

58:4,12,19 74:3,5 89:16,24 90:2,3
**distinguish** 10:22
**distribution** 50:24
**DISTRICT** 1:3,4
**Divan** 52:6,9
**division** 10:17,19
**DMA** 78:15
**document** 8:9 13:12,24 14:2,4 33:15,18,20 34:3,14 35:8,17 36:8 36:22 61:17 63:15,17 65:10,24 66:13 68:16 68:22 80:22,23 81:20 81:21
**documents** 3:15 22:4,6 36:20 37:1 61:18 72:20 73:1,11
**document's** 73:8
**doing** 45:2 76:1 97:13
**DOJ20604** 36:18
**DOJ21946** 81:16
**dollar** 41:5 45:7 99:2,5 99:6
**dollars** 41:16 44:9,19 45:1,11,14 46:6 91:1
**donor** 94:21
**doubt** 100:1
**draft** 71:1 72:1 75:17 89:10 90:8,22 98:3
**drafted** 67:20 69:8,13 71:7,9 72:9 87:9
**drafting** 67:23 68:2 73:17 75:13 76:6 77:8,11,16 86:11 87:15,19 96:7
**drafts** 91:17 98:15
**draw** 38:5 44:3 45:1,3 45:4,7,24 46:5,10,21
**drawing** 43:21,23 44:9 44:18 45:10,12,15,17 45:19 74:24 75:2
**drawn** 67:16 74:22
**drew** 44:1
**drinking** 96:21
**Drive** 5:12
**driver's** 4:15
**due** 9:15
**duly** 4:15 105:7
**duties** 25:23
**D'AGOSTINE** 2:3
**D.C** 78:15 86:14

_____ **E** _____

**E** 1:11 3:1,10 4:1,1 39:12,13 104:1,1

Lawrence C. Lyon

07/21/2005

Page 3

**earlier** 13:17 56:4
74:16 76:1 77:14
86:2
**early** 27:7
**earn** 49:22 50:2 51:7
**earned** 38:3 42:15,23
**edification** 53:14
**Edmonds** 60:5,10,11
60:24 61:11 68:4,6
74:7,17 75:10 76:20
76:23 77:15
**educational** 14:7
**Edward** 18:3
**efficient** 69:23
**effort** 54:11,14 55:1
**eight** 99:2
**either** 40:10 62:3 77:3
79:17
**elaborate** 9:17
**eliminate** 94:22
**ellipsis** 34:23
**employed** 105:11
**employee** 5:23 8:13,17
8:18,21 10:9,13 11:1
12:8
**employees** 6:5
**employment** 6:9 10:22
15:2
**enclosed** 67:8,11 83:13
**encountered** 52:2
**endowment** 94:2,23
99:2
**energy** 88:22
**engage** 20:19
**enormous** 88:21
**enter** 59:21,22 95:13
**entered** 44:15 45:22
58:7 88:16 96:8
97:14 98:5
**entering** 86:18
**entertainment** 39:14
**entirely** 48:13
**entities** 12:2,7,8 24:3
**entitled** 31:13 35:22
46:14
**entity** 24:10
**Esquire** 2:4,18
**essence** 91:19,23
**et** 87:8,8 97:23,24
**Evelyn** 60:5 68:4 75:9
75:12 76:20,23
**exact** 10:18 18:18,20
30:2,10 45:23 54:4
61:3 75:12 76:18
**exactly** 20:17 46:3
84:14

**exam** 14:14
**EXAMINATION** 4:18
**examined** 4:16
**examining** 7:18
**example** 64:13
**exception** 104:5
**Excuse** 27:18 33:6
96:24
**exhibit** 13:14,21 33:16
33:17,20 34:3 36:9
36:17 37:3 61:14,16
61:22 62:2,22 63:14
65:1,2,7,13,16 66:10
67:4,12,13,17 68:9
68:11,17 69:5,19,20
70:12,13 71:2,8,11
71:22 80:18,19,21
81:2,17,19 82:2
83:22
**exhibited** 14:2 33:18
61:17 65:10 68:16
80:22 81:20
**exhibits** 37:5 72:18
**existence** 21:5
**expected** 47:3
**expense** 74:15 94:23
98:24
**expenses** 39:9,12
**expert** 32:10 33:13
77:22,23 78:6,13,17
78:20 86:14 96:15
97:11
**expertise** 31:23 33:2
96:10,11 97:18 98:2
**expiration** 40:18,20
**expires** 105:23
**explain** 46:9 55:15
88:20
**extent** 77:10

_____
        **F**
_____

**F** 104:1
**fact** 13:22 26:18 70:8
94:14
**factors** 50:7
**fair** 48:2,20 49:10 75:1
**falls** 53:23
**false** 30:12 31:14 82:19
82:21
**familiar** 28:1 34:3
36:19 65:23 66:7,16
66:22 100:9
**familiarization** 56:22
**far** 8:22 10:4,9 15:5
17:2 26:16 37:6 39:3
85:10

**fashion** 26:1 37:12
**Father** 18:9
**fax** 3:16,18 64:6,15
65:8,15,16 66:2
68:11 69:1 72:24
73:7
**faxed** 63:14,15 64:9,12
72:10
**faxing** 72:20
**February** 51:11,18
52:3,13
**feel** 75:8
**fees** 50:13
**felt** 28:18 75:6
**Fidelity** 15:7
**figure** 40:5
**file** 47:13,17,20 94:21
**filed** 31:2,10,18,20 37:1
**files** 36:23
**filing** 4:8 31:12
**final** 50:17,18,20 92:24
**finalized** 43:22
**finally** 90:23 98:14
**financial** 1:7 10:11,14
10:23 11:14 21:5,8
22:6,10,14,19 23:5
24:23 25:19 44:14
47:6,9,21 48:3,13
58:6 102:1
**financially** 105:12
**find** 28:22 39:11 58:11
76:17 87:12
**fine** 80:15 92:11
**finish** 28:5,6 47:15
100:22
**first** 7:24 10:19 19:5
27:6,8 28:10 30:21
51:9 52:20 53:10,22
54:11,14,15 55:17
63:13 65:21 79:14
82:1 83:21 84:8
89:24 90:8 97:8
**five** 6:2 41:5 93:5
**Fleischer** 60:21 73:9
90:19 91:2,5,7,13
92:1,8,12,23 93:5
95:4,6,8 98:7,7,13,18
99:3,11
**Fleischer's** 85:24
**flipping** 83:2,3,5
**Florida** 5:3,14 93:14
**folder** 3:13 34:7
**follows** 4:17
**forbidden** 55:8
**Ford** 17:5
**foregoing** 104:3

**form** 4:9 6:23 7:2 8:16
9:10,20 10:5 11:3
19:14 21:22 23:8,11
23:17 25:9 27:3
28:14,16 30:4,14
32:1 33:4 35:9,15,18
36:15 38:13 39:5,19
40:2 42:5,16 43:7
47:24 48:6 49:14,23
50:3 51:2,9,22 53:12
54:3 56:12,20 58:9
66:14 68:21 70:5,14
70:17 71:3 72:12
73:13 83:15 87:5
93:21 95:15,21,24
100:8 101:1,3,11
**formation** 52:24
**formed** 53:5
**forth** 105:7
**forward** 75:7,14,19,23
**forwarded** 63:10
**Foundation** 68:15
**four** 6:2 76:1
**frame** 30:5 40:16 77:4
**Francisco** 95:7
**Franklin** 14:11
**fraternity** 54:10 55:10
**freaked** 85:7
**front** 34:10 68:11
**frustrated** 98:6
**frustration** 35:1 36:12
**full** 4:20 50:12 92:2
94:12 95:12
**fund** 94:2,23
**funds** 92:3
**fund-raising** 10:18
19:3,20,22 20:12,20
26:8,11,14,15,16
29:19,23 30:8 31:24
32:18,23 33:3 38:22
43:11 48:4,22 49:11
50:1,14 53:9,10,22
57:11 59:5,22 66:13
68:13 71:19 76:4,6
77:11 86:18 92:4
95:13 97:4 98:23
101:19
**further** 104:4 105:10
**future** 49:8

_____
        **G**
_____

**G** 4:1
**Gene** 57:16 60:21
**general** 2:11 21:20,23
49:10 78:1 89:2
96:22,23 97:1,2

**generally** 11:1
**generate** 93:16
**generated** 38:20 39:23
92:3
**gentleman** 31:13
**George** 1:11 3:18 64:9
68:1,12,24 70:24
71:6,9,15 72:1,9,21
72:24 73:16,21,22
74:5 75:2,16,20,24
76:3,5 77:7,15,20
80:14 87:6 89:7,18
89:21 90:1,4,10 91:4
92:23 94:6,9,18,20
95:1 97:8 98:10,15
98:17 99:2,11 102:12
**getting** 64:16 88:19
98:6
**give** 15:1 21:20 25:24
30:3 36:1 40:16
48:16 74:4 77:2
**given** 39:16 46:11
49:11 105:9
**giving** 15:2 61:8
**go** 7:23 21:18 23:11
25:7 65:4 67:5 75:14
75:23 76:11 85:23
86:8 93:21 98:14
103:7
**going** 6:22 7:4 31:14
33:19 36:8 45:6
53:16 61:15 62:8
65:6 68:10 70:19
71:15 79:4 80:20
81:18 83:7,8,11
84:20 91:4 98:11
99:7
**Golding** 82:14
**Goldings** 82:8,11,13
84:24 85:22
**golf** 64:20,22
**good** 9:14 91:23 102:6
103:5
**goods** 29:14
**government** 31:2,14
41:6 42:21 85:7,8
88:4 101:5
**government's** 36:23
**Gramblin** 93:3 95:5
**Grand** 19:21 20:8
**great** 50:1
**greater** 49:13,21
**Grieco** 1:22 105:3,21
**gross** 39:3 98:22
**ground** 28:2
**group** 1:10 3:13 5:22

Lawrence C. Lyon

10:12,20 11:1,12
18:24 20:23 21:3
22:18,21 23:2,7,16
23:21 24:15,20 25:12
25:14 34:10 99:14,15
99:17 100:4
**groups** 15:20 19:3
27:12 55:11
**Group's** 99:19 100:6
**guess** 22:2 30:9,10
39:11 58:11 77:1,3
87:2
**guessing** 30:5
**guest** 64:17
**guy** 91:18
**guys** 97:3

---
**H**
---

**H** 2:11 3:10
**Hampshire** 5:7 14:12
**hand** 105:14
**handle** 78:11
**handled** 97:20
**hands** 92:24
**handwriting** 34:15
**handwritten** 34:14
**happen** 12:4 18:17
93:16
**happened** 19:18 23:3
40:15,19 41:2 79:13
**happy** 62:1,6
**hard** 10:1
**Harry** 18:14 64:12
80:13
**heading** 66:12
**headquarters** 93:13
**hear** 27:6,8
**heard** 27:1 71:17 96:13
**hearing** 10:1
**held** 11:7 23:21 25:22
**help** 54:16 62:11
**helpful** 26:2 40:17
53:20
**helping** 75:21 98:3
**Henry** 18:4,8 21:15
22:3
**hereinbefore** 105:7
**hereunto** 105:14
**high** 14:8
**Hill** 5:8
**hired** 78:7
**history** 15:2 87:17
**hold** 6:9 14:18 25:15,18
50:8
**holes** 78:21,22 79:8,15
80:2,9

**home** 64:19
**hospital** 10:3 41:12
44:16 50:10 55:2,2
55:11,18,23 58:8
60:12 73:3 83:8 98:4
99:6 102:7
**hospitals** 3:17 9:15
43:12 54:2,12 55:5
55:14 56:18 57:12
59:22 60:9,16 67:1
73:18,24 75:22 76:7
76:10,23 77:12 80:13
84:18 86:4,19 88:6
88:18 89:12 91:24
92:21 94:11 95:11,11
95:19 96:8 97:14
99:1 101:3,19,24
**house** 47:13
**huh** 65:11
**hundred** 44:9,18,24
45:7,11,14 46:4,5
59:12,14 91:17 99:4

---
**I**
---

**idea** 67:15 71:16 73:2
**identical** 70:23
**identification** 13:14
33:17 61:14 65:2
68:9 80:19 81:17
**identified** 4:14 12:2
**identify** 7:7 34:5 57:15
91:20
**identity** 7:13
**impact** 41:17,20
**imparted** 79:23
**Imperial** 51:13,15,18
51:23 54:1,5,5,8,10
55:17 56:24 58:1
90:24 91:9,11
**impleading** 84:11
**important** 90:18
**inclined** 7:23
**include** 11:12,14,17
26:20
**included** 62:21
**includes** 73:11,14
**including** 7:14
**income** 98:23,23
**Incorporated** 8:7
**independent** 8:15
**indicate** 95:1,18 96:4
**indicated** 73:1 77:14
94:10
**indicates** 84:10
**indication** 12:15
**indicia** 27:12

**indirect** 40:3
**individual** 54:1
**individually** 90:12
**individuals** 57:10
**induced** 19:3,19 20:12
20:20 26:15
**industry** 14:24
**inferring** 36:21
**information** 7:16 31:15
42:10 47:18,21 50:16
79:23
**initiated** 30:17 82:21
**insisting** 90:19 91:7,14
92:1,12
**institutions** 14:9
**insurance** 14:14,21,23
15:7 26:7,14 29:13
38:21
**intention** 29:12
**interaction** 52:9
**interest** 48:3,21 49:2
75:7,8,18
**interested** 105:12
**internal** 87:10
**introduce** 19:8 20:11
**invoice** 50:9,18,19,20
**involve** 59:11
**involved** 18:14,22 19:2
19:5 20:1 21:7,16
30:11 57:6,10 59:12
60:1,11,24 67:23
68:5 73:21,22,24
77:10 86:5,10 87:2,4
87:6,11,14,19 91:4
91:22 97:3,6
**involvement** 24:1
**involving** 9:15 30:12
30:24
**in-hand** 12:16
**Ipswich** 5:2 12:20
63:15,18 64:2,3,7,10
64:13,16,18 65:9
66:3,6 73:4,6
**Irving** 15:8
**issue** 7:20 54:19 89:8
**issues** 30:24 87:7 90:4
**Italy** 3:19 68:15 70:13
71:21 72:2,9

---
**J**
---

**January** 8:23 9:6 10:9
12:5,8 23:4,5 37:10
37:11 40:7 51:5 95:6
**Jay** 62:1 73:9 92:23
95:3
**jeopardy** 91:8

**job** 25:6,22,23
**jobs** 14:23
**Joel** 2:11
**John** 57:18 58:3
**Johnson** 2:4 6:22 7:1
7:10,16 8:4,16 9:1,10
9:13,20,24 10:5 11:3
12:9 13:1,9,15 19:14
21:22 23:8,10,17
25:9 27:3 28:13,16
30:4,14 32:1,15 33:4
33:10,21,23 35:9,14
35:18,21 36:15,17
37:7 38:13,16 39:5
39:19 40:2 42:5,16
43:7 44:7 47:24 48:6
48:24 49:14,23 50:3
51:2,22 53:12,19
54:3 56:12,14,20
58:9 61:21,24 62:11
63:8,21,24 65:3,22
66:14 68:21 69:23
70:5,7,17 71:3 72:4
72:12 73:13 77:4
81:1,12,16 83:15
87:5 89:13 92:5,7,11
93:21 95:15,21,24
100:8,13,18 102:6
103:4
**judge** 79:19,24 80:5,12
**July** 1:17 12:17,23 13:6
13:22 69:1 72:10
103:11 105:15
**June** 44:14 58:6,14
83:14 84:7 85:3
86:18 88:3 89:7,14
93:8,10 94:4 96:4,9
97:15 98:5 100:24
101:18
**jurisdiction** 14:16

---
**K**
---

**Kaiser** 68:23 72:10
**keep** 92:6 98:10,13
**kept** 47:5,8,20 90:19,23
98:8,12,15
**Key** 5:6,18,22
**kind** 19:12 26:11 99:8
**kinds** 87:21,23 97:4
**knew** 97:3
**know** 8:22 10:4,10,18
10:21 13:15,16 17:2
17:14,18,19,22 18:17
18:18 20:17 21:1,2,4
21:6,10,12,15,17,19
21:23 22:19 23:1,12

23:14 25:23 30:18
31:19 35:10 37:4
38:12 39:4,12 44:7
45:6,23 46:3 50:18
51:4,14,17 53:14
54:4 59:15 61:3
63:19 64:11 66:11
67:21,22,24 69:12
72:14 73:6,6 74:2,9
74:10,23 75:12 76:18
76:19 77:7,8 79:21
79:22 80:11 83:18,19
85:1,4,4,10,13,17,20
85:21 86:15 88:19
90:20 94:9 95:16
98:19 99:20,23 100:3
100:11,16,19
**knowledge** 21:24 22:3
22:5,9 23:3 25:2 32:7
43:4 50:17,21 57:13
57:20 77:13 100:12
**known** 17:4 31:12
95:10

---
**L**
---

**L** 2:18
**lack** 70:7
**language** 70:4 78:2
101:23 102:15
**lapse** 14:20
**Larry** 63:6
**Laurence** 2:4
**law** 29:4,6,9
**Lawrence** 1:16 3:3
4:1,12,22 104:2,22
105:6
**Laws** 97:23 98:9
**lawsuit** 31:2,12 79:3
84:21
**lawsuits** 30:23
**lawyer** 21:11,12 22:10
28:17 68:7 77:16
78:23 79:12 86:5
87:1,4
**lead** 10:4 58:13
**learn** 31:11
**learned** 28:10 31:17
**left** 38:1 40:7
**legal** 34:22 36:11 78:1
79:11 87:7
**letter** 3:21 62:19,21
67:5,6 73:15 82:4,24
83:13 84:2,6,10,15
84:22,23 85:1,5,6,8
85:10,14
**let's** 12:12 24:17 37:10

Lawrence C. Lyon

07/21/2005

**Lewis** 18:3,4,8 21:15
22:3 41:1,10 43:3,6
79:2,18
**liability** 90:21 95:22
**liable** 92:13
**license** 4:15 14:14,18
**life** 15:7 71:17
**light** 86:20
**limit** 36:1
**Linda** 1:22 105:3,21
**line** 88:23,24 99:1
104:7
**lines** 89:20
**list** 94:21
**listed** 104:6
**listening** 91:6
**lists** 66:8
**litigation** 30:12 82:19
82:21 84:12 86:21,24
87:3
**little** 10:1 41:5
**live** 17:14
**LLP** 1:18 2:17
**loan** 66:21 70:9
**long** 6:1 20:15 75:5
76:16 90:6,7
**longer** 37:8
**look** 34:13 46:12 62:14
62:21 63:1,13,17
65:20 66:9 67:4
68:17 70:11,20 74:11
74:13 83:21 99:18,24
100:6,15,20
**looked** 67:14 74:21
99:23
**looking** 69:20
**looks** 34:7 63:14 66:16
66:18 68:1 73:2,3
81:4
**lost** 43:5 79:6
**Lyman** 5:8
**Lyon** 1:16 3:3 4:12,22
70:21 104:2,22 105:6
**L-Y-M-A-N** 5:9

**M**

**M** 1:22 2:4 105:3,21
**MA** 1:23
**machine** 64:6,15
**mail** 27:1,9,11 28:10,20
29:18,23 30:8,13
31:11,17 34:8 78:8
78:15 88:7 99:8
**mailing** 29:2,9,13
86:13 94:21 97:23
98:2,9 99:3,8

**mails** 49:12
**majority** 26:21
**making** 55:13
**MALM** 2:3
**management** 66:13
68:14
**March** 59:17 62:19
74:18,20 75:3
**margin** 73:1
**Marine** 24:11
**mark** 33:16 64:24
80:17
**marked** 13:14,21 33:17
33:19 34:3 37:3
61:14,15 62:2 65:2,6
68:9,10 71:21 80:19
80:20 81:17,18
**market** 54:12 55:1
**marketing** 5:22 6:8
78:9
**marking** 65:3
**Masonic** 19:16,18
20:15
**Massachusetts** 1:4,20
2:6,13,20 4:24 5:2
14:17 105:1,5
**Master** 19:21 20:8
**material** 13:10,13
**Matt** 68:23 72:10
**matter** 70:8
**matters** 78:6,13,17
**mean** 21:23 22:17
32:13 37:18 39:10
43:20 45:21 53:14
55:9 81:8 86:22
87:16 89:10 91:16
98:20 99:9 100:12
**meaning** 94:15
**means** 73:6
**meet** 91:5
**meeting** 74:6,10 79:18
79:24 80:5,7,8,12
93:7,12 95:4,6
**Melikian** 18:14 41:1,10
43:3,6 51:8 61:22
64:13,17 65:13 67:22
68:5 77:10 79:2,17
81:2 82:9 84:24
85:23
**member** 64:3
**members** 52:6,9
**memory** 77:5
**mentioned** 10:20 40:4
56:3 60:23 80:5
**mentioning** 9:2
**met** 78:8,14,14 97:8

**mid** 19:7 21:2 52:7
**Midland** 24:11
**Miller** 1:11 3:18 64:10
68:2,12,24 70:24
71:6,9 72:1,9,21,24
73:17,21 74:5 75:2
75:16,20,24 76:5
77:15,20 78:5 86:3
86:10 89:7,21 90:1,4
90:10 91:5 92:17,23
93:4 94:6,9,18 95:1,8
95:10 96:6,9 97:7,8
99:13,17 100:3,24
101:21 102:13
**Miller's** 73:22 99:14
**million** 41:5,16 99:4
**mind** 59:8 87:24 90:12
91:15
**mine** 81:14 89:20
**minimize** 62:5
**minute** 72:5 79:7
**misleading** 44:24
**misuse** 7:21,22
**moment** 33:22 58:5
92:7
**money** 38:17 42:14
43:5,21,24 44:3
46:14,15,21 47:2
93:16
**monthly** 90:5
**months** 6:2 9:6
**Morris** 82:14
**motions** 4:9
**move** 54:11 75:7
**moving** 75:18
**Muzzi** 17:5
**M-A-A-S** 57:23
**M-A-S-S** 57:21,24

**N**

**N** 3:1 4:1
**Nahigian** 2:18 3:4 4:19
7:15 8:1 9:3 13:1,5
13:11,19 32:4 33:23
36:18,24 42:9 49:17
50:5 53:16 56:10
61:23 62:8 63:6
64:24 65:14 70:1
72:5 80:17 81:3
89:14 92:10 101:9
102:8 103:7,9
**name** 4:20 20:9,22 31:8
54:20
**names** 14:9 15:2
**Nancy** 16:9
**nature** 38:9 41:9,14

52:8
**necessary** 86:5
**need** 28:6 87:1,4
**needed** 84:12
**Needham** 17:6,7,23
**negotiating** 60:19
**negotiations** 59:21 60:2
60:8,12,14 88:22
92:22
**neither** 105:10
**net** 39:6,7,8,15,20,22
98:23
**never** 13:18 25:1 28:12
37:14 50:15 71:17
100:15 101:11 103:2
**new** 5:7 14:12 49:7
**Newton** 17:15,17
**night** 96:21
**Nine** 5:12,12
**Nokomis** 5:6,19
**nonprofit** 1:10 19:3
26:20 27:12 29:15,15
29:19,23 31:24 32:18
32:24 34:21 35:12
36:10 99:13,15,17,18
100:4,6
**Non-payment** 50:9
**nope** 75:24
**North** 51:15,19,24 54:1
**Notary** 4:16 105:4,22
**November** 16:2 59:16
**NSG** 65:7
**NSG0735** 61:19
**NSG0742** 63:1 67:7
**NSG0743** 62:17
**NSG0759** 61:20
**number** 7:17 36:18
61:19,20 62:16 65:7
66:10 67:7 73:7,8
89:19
**numbered** 36:20,21
63:1
**numbers** 46:13
**numerous** 90:10 98:6
**N-O-K-O-M-I-S** 5:6

**O**

**O** 4:1
**object** 6:22 9:2 25:9
70:5,17 71:3
**objected** 7:1 28:13
35:14 95:24
**objection** 8:16 9:10,20
10:5 11:3 12:9 19:14
21:22 23:8,11,17
27:3 28:16 30:4,14

32:1 33:4 35:9,18
36:15 38:13 39:5,19
40:2 42:5,16 43:7
47:24 48:6,24 49:14
49:23 50:3 51:2,22
53:12 54:3 56:12,20
58:9 66:14 68:21
72:12 73:13 83:15
87:5 92:5 93:21
95:15,21 100:8
**objections** 4:9
**objective** 70:8
**obligated** 21:24 22:1
35:23
**obtain** 101:21 102:23
103:2
**obtained** 14:10 36:22
37:1 98:22
**obviously** 7:20 78:18
79:3,5
**occasion** 92:15 94:4
101:13
**occasions** 97:18 98:7
**occur** 20:16 54:13 93:7
**occurred** 42:24 59:20
**October** 16:2,16 17:10
69:6 82:4
**offer** 61:24
**office** 88:3 89:1 101:13
102:22,24
**officer** 25:15,18
**offices** 47:23
**offset** 99:4
**oh** 33:14 37:20 66:21
83:18 98:21 103:1
**okay** 10:2 15:15,17
16:15 28:7 36:7
37:15 45:24 48:16
58:23 59:1,3 65:22
75:20 76:16 78:23
85:12 100:15
**older** 25:13
**on-going** 76:2 86:12,21
**operate** 60:20
**operated** 47:7,22 48:23
50:11
**opinion** 98:22
**opposed** 34:19
**order** 7:12,24 68:14
95:13
**organization** 48:17,21
51:10,21 53:4,11,15
53:23 88:21
**organizational** 34:21
36:10
**organizations** 26:3,5,7

26:8,12,19,20,20
29:15,19,24 32:19,24
78:1
organized 20:24 21:4
organizing 18:22
originally 78:7
originated 65:8
ought 100:6
outcome 105:13
outset 23:24 26:22
outside 47:10,18,19,22
85:22 87:10,14,18
out-of-pocket 94:22
overhead 39:9,10
owed 40:23 46:13
owner 11:2,21 12:1,6
owners 16:17,20 17:9
17:20 18:11
o'clock 103:10

**P**

P 4:1
Pacific 59:13,16
package 20:2,3
packages 99:4
packing 91:3
page 3:11 34:11,13,15
34:18,19,20 36:9
63:1,3,13 66:9 67:6,7
67:12,17 68:11,12
69:5 82:1 83:21 84:8
104:7
pages 1:2 70:20
paid 37:15,21 38:17
50:12,17,20 98:23
pains 4:5 104:19
Panama 59:14,17
paper 62:5,9
paragraph 84:4,6,8,13
85:2,14,19,20 90:13
90:13,20 91:18 99:10
parameters 34:22
36:11
part 63:16 67:13 69:18
70:12,13 71:1,7,11
71:12 75:7
participate 61:8
participated 52:23
particular 6:20 14:22
22:5 24:3 42:3 48:3
48:20 49:2 65:23
66:11 67:5,17 87:15
particularly 13:10
parties 4:4 105:11
parts 71:13
party 84:11

passed 14:14
passengers 59:13,14
Paul 93:2
Pause 62:23 83:24
pay 42:14,22 43:24
93:17,24 94:2
Peabody 1:18 2:17
penalties 4:6 104:19
pending 103:5
people 20:13 52:5
54:23 57:15 87:11,14
89:2 102:5
percent 38:19,23,24
39:20 40:4,5,10,11
43:10
percentage 38:8 42:1
perfectly 62:1
performance 46:17
47:6,22 48:4,13
performed 43:12
period 45:13 51:7
perjury 4:6 104:19
permit 29:16
person 22:6,10 52:1
60:15 93:2
personal 47:5,9
persons 52:2 60:15
pertaining 97:13
Peterson 2:11
pieces 49:12
Pierce 14:11
place 2:5 59:15 61:2,6
93:12
places 15:3,4,12
Plaintiff 1:8 2:7,14
play 64:22
played 64:20
please 4:20 23:20 32:5
35:21 36:4 49:16,18
57:15,19 68:17 80:24
83:23 92:7
point 12:1 18:15 19:1
20:11,20 24:6 28:18
28:23 29:3 31:2 40:7
43:9 44:20,21 45:5
52:23 54:7 55:6,20
57:2,9 59:19 73:12
73:16 74:19 91:3
93:1 101:12 102:7
policy 46:19
pool 54:19
portion 9:14 34:18,19
45:6
position 23:20 88:4
Possess 32:7
possessed 31:23 33:1

possible 63:11,11
post 88:2 89:1 101:13
102:21,24
postal 27:9 33:2 34:22
36:11 77:24 83:9
85:11 86:12,14 87:20
87:21,23 88:11,13,18
89:1,9 97:22 101:22
102:14,16
Postmaster 96:22 97:1
97:2
Potentate 54:5,5 55:18
57:1 58:1 90:24 91:9
91:11
potential 7:20
precautions 94:22
precedent 8:2
precedes 62:20
premise 72:5
premium 19:2,19 20:12
20:19 26:15
premiums 19:23
preparing 31:23
present 15:13 75:9
79:12 94:6
presentation 60:13,23
61:2,6,9,12,13 62:15
74:22 75:9 76:20,22
82:10
preserved 23:10
president 5:24 23:23
23:24 24:4,16,19,22
25:11,13
presumably 81:16
previous 66:19,20 67:4
69:12
previously 42:15
principally 60:17
principle 49:10
printed 34:8,18
prior 12:8 13:22 31:12
45:18,21,22,24 50:22
54:23 55:13,20 64:16
75:4,5 76:15,16,19
86:17 87:8 88:3,12
88:14,15 89:7,13,14
93:8,8 94:4 96:4
100:24
pro 78:8 96:22
probably 7:23 75:6
95:3
problem 62:10 80:14
83:9 88:1 90:14
91:18,19
problems 87:20,21,24
88:24

process 69:24
production 4:15 61:19
61:20 62:16 65:7
Professional 105:3
profit 39:3,7,8,15,20
39:22 49:13,21 50:1
50:4
profits 38:19,20,24
40:5 43:11,16 49:20
49:20
program 3:20 19:22
20:6 39:16,21,24
40:1 43:11,16,22
44:4,12,13,13 45:3,6
45:8,12 46:11,11,18
46:19,22 49:11 50:11
50:14 52:16 53:11,23
54:12 55:1,5,18
56:18,24 57:3,11
58:21,23 59:3,5,10
60:18,20 71:16,19,19
71:20,23 81:5 87:9
89:12 92:3,4,13
93:16,23 94:12 95:12
101:3
programs 15:19 26:8
26:11,13,13,14,14,16
27:12 30:8 31:24
32:7,11,14,14,17,18
32:24 33:3 38:21,21
38:22,22 39:1,18
47:6,22 48:4,14,22
50:2 52:11,12,20
53:1,3,7,9 87:7,7
projected 49:13,20,20
50:4
proliferation 62:5
promotional 3:13 34:7
proper 56:15
properly 86:16
proposal 84:18
proposed 3:16 66:22
66:24 67:3,20 70:12
71:1,7 83:13 84:3
89:8,9
proposing 101:2
proposition 86:20
prospective 34:9
protection 7:22
protective 7:23
provide 8:10 66:12
68:13
provided 28:20,24
31:18
Public 4:16 105:4,22
purport 72:7

purpose 54:16 82:24
pursuant 7:11,12
put 30:5 61:13 63:10
77:4 98:8,11
putting 91:8
p.m 12:17

**Q**

quantify 41:22
question 6:23 7:2,18
9:23 13:2 19:10
23:11 25:8,10 28:6
32:3,6 42:11 44:17
49:19 53:21 63:21,24
64:1 65:21 66:15
69:12 70:18 71:4
79:10 86:23 92:11
93:20 96:1 100:18
101:10 103:5
questions 35:22 44:6
56:4 72:6 79:11
quit 90:24
quite 7:19
quote 34:20,23 36:8,9
36:13 67:11
quoted 35:7

**R**

R 4:1 104:1
raise 99:5
raised 99:7
Ralph 54:20 60:22 73:9
73:15 91:12
ratio 98:24
ratios 99:9
reached 46:12 92:23
read 4:5 20:4 32:4,6
35:17 36:14 49:17,19
54:17 56:7,8 62:16
83:22,23 98:19,21
101:9,10 104:3
reading 71:23
really 35:19
Realty 11:22
reason 14:22 42:3,7,9
48:15 72:23 75:15
77:19 86:6,9 87:18
reasonable 7:22
reasons 9:8,18 48:16
recall 15:1,4,11,22 20:9
20:10 27:14 30:2,23
44:3 45:16 51:3 58:2
61:11 64:15 72:20
75:5 76:21 81:22
83:1 89:16,23 90:11
94:18,20 96:20 101:6

101:7
receipt 4:6
receive 12:12 13:16
  19:13 37:11,19 38:4
  43:15 46:15 47:3
  50:24
received 12:20 13:16
  13:20 37:5,14 38:5,8
  38:10 46:10,20 47:4
  98:23
receiving 43:10
recess 103:8
recognize 33:20 34:14
recollection 66:5 90:15
recommended 98:21
reconvene 103:10
record 4:21 13:8 25:4
  34:1,6 62:20 63:5,12
  65:4,5,15 72:17
  74:14 82:17 104:5
  105:8
records 47:5,9
redraft 90:22
reduction 41:21,22
refer 34:17 44:12 84:7
reference 64:2 67:8
referenced 71:20
referred 26:18 58:4
  67:12 79:16
referring 11:9 16:6
  24:14 30:20 31:4
  35:3 39:15 41:7
  44:13 55:14 69:4
  72:18 78:22 79:9
  81:11 90:6,7,8
refers 84:2,6
refrain 84:11
regarding 73:9
regardless 13:2
Region 52:7
registration 76:2 77:24
  87:7 89:2 97:20
registrations 78:10
regular 71:18
regulations 33:3 34:22
  36:11 77:24 78:2
  88:11,13,18 89:9
  97:22 102:17
related 18:4 105:10
relating 44:13
relation 98:2
relationship 18:8 51:10
  76:3
remain 40:5
remark 62:4
remember 54:4 71:14

remind 28:2
reminded 13:9
rental 94:21
repeat 10:2 32:3 36:4
  49:15 58:10 65:18
  80:3 96:12 101:6
report 74:15
reporter 1:22 28:4
  105:4
represent 45:1
represented 65:16
request 13:12
requested 21:12
require 72:7
required 97:22
requirement 85:24
requirements 78:1,11
  97:21,21
reserved 4:10
residence 12:20
residential 5:10
respect 40:19
respectfully 70:18
respective 4:4
responsibilities 25:23
responsible 10:7 41:13
  51:4 60:13
result 41:3 42:13,18,20
  43:5,15 44:4 48:22
  58:5
resulted 58:13,19
retain 75:16
retained 78:10
retract 75:11
revenues 39:16,23
reviewed 88:10
Richard 2:18
right 7:5 8:2 18:12
  27:21 28:20 31:7
  34:20 35:4,4 39:10
  62:15 66:7 74:16
  81:24 85:12,21 90:12
  90:16 94:18
Rindge 14:11
risk 92:2 94:11,15,16
  95:12
risky 86:20
Road 5:8
rolling 43:19
room 93:2,4,5
Rosenberg 17:13
Rowes 1:19 2:19
rule 27:2,10 28:10,20
  28:24 29:2,18 30:13
  31:11,18 88:7 98:3
rules 28:2 29:13

ruling 101:22 102:13
  102:23 103:2
run 15:11

_____ S _____

S 3:10 4:1
Saklad 30:18 31:4,10
  31:18,19 82:22
Saklad's 31:8
salary 37:11,14 38:4
sale 54:22 55:7,13
sales 38:9
Salesmen 27:17,19
Sam 17:13
San 95:7
satisfactorily 4:14
Saturday 12:23
saw 50:15
saying 16:11 28:5 72:8
  89:5 90:15 94:20
  98:15
says 34:10,20 66:7
  84:14
scheduled 13:17
school 14:8
scope 96:10
seal 105:15
sealing 4:5
second 67:2 68:12 69:5
  84:3,8
secretary 63:8
security 84:20
see 63:16,18 64:2 65:19
  67:8
seek 7:8
seen 13:18,24 14:4
sell 26:12 52:12,20 53:1
  53:3,8,10,22 55:4
selling 14:21,23 24:9
  24:12 32:14
Semb 54:20 55:17
  56:23,24 57:3 58:12
  58:22 59:20 60:22
  73:15 74:6 91:12
senior 25:13
sense 21:20,23
sent 66:2 82:5,9
separate 20:19
separation 55:10
September 37:4
serious 82:6
service 1:10 6:16,18
  8:7,14,19,22 10:10
  10:24 11:17 12:16
  13:2,23 16:4 23:15
  25:16 99:14,15,17,18

100:4,6 101:22
  102:14
services 1:7 3:14 8:10
  10:11,14,23 11:14
  18:23 19:3 20:23
  21:3,5,8 22:7,11,14
  22:20 23:6 24:17,23
  25:14,19 26:19 34:10
  44:15 53:3,7 58:7
  66:13 68:14 102:1
Service's 27:9
set 6:3 8:1,2 20:18
  21:10,12 22:4,6,10
  29:13 105:7,14
setting 21:7,16 32:10
settlement 41:7 42:20
  42:23
shareholder 22:13,15
Shields 16:23
ship 61:7
short 30:5
shortfall 93:24
Shorthand 105:3
shortly 17:10
show 33:15,19 61:15
  65:6 68:10 78:9,15
  80:20 81:18
showed 83:23
Shrine 40:18,20 51:13
  51:15,19,23 52:6
  54:2,8,10 67:16 75:7
  90:21
Shriners 3:16,20 9:15
  9:18 10:3 41:12
  43:12 44:12,12,15
  45:3,5,8,12,18,20,21
  46:1,6,18,19,22
  50:10,12 51:10,20
  52:21 53:1,4,8,11,15
  53:24 54:2,9,12,15
  55:2,5 56:18,18 57:4
  57:10,12 58:7 59:21
  60:9,12,16 67:1 73:3
  73:18,24 75:22 76:7
  76:10,23 77:12 80:13
  81:5 83:4 84:11,12
  84:18 85:2,9,13 86:4
  86:19 88:6,18 89:11
  91:24 92:2,13,20
  93:13,15 94:1,3,7,10
  94:11,14,19,23 95:2
  95:10,11,19 96:7
  97:14 98:4 99:1
  101:2,19,24 102:16
sick 91:6
side 60:1,6

signature 63:2,4 67:7
  69:9 81:7,13,14 82:1
signed 3:20 4:5 22:3
  67:3,5,6 81:4 83:18
  83:20 85:14 86:1
  90:9 104:19
significant 78:3
signing 22:6
similar 66:18 70:22
similarity 70:7,8
single 99:9
sir 5:4,16,20 6:4,6,11
  7:6 8:8,12,20 10:2,15
  11:8,16,19,24 12:3
  12:14,22,24 14:3,6
  14:19 15:21,24 16:19
  16:21 17:1,11 18:1
  18:16 19:4 20:14,21
  21:9,14 22:8,12 23:4
  24:2,7,18,21,24
  25:17,20 26:10,17,24
  27:5,24 28:8,17
  30:19 31:1,6,21
  32:12,22 33:5,14
  34:12,16 35:5 36:2
  36:16 37:23 38:2
  39:2 40:8,12 41:8,19
  41:24 42:2,12,17
  43:1,8,14,17 44:2,22
  45:4,9 46:8 47:1,10
  47:11,12,14 48:1
  49:15 53:2,6 55:3,22
  55:24 56:2,7,9 57:8
  57:14 58:15,17 59:4
  59:7 60:3,7 61:1,10
  62:18,24 64:5,8,11
  64:21 65:18 69:3,14
  71:5,12 72:22 76:18
  78:23 82:3 85:16
  92:17 94:5 96:17
  97:16 99:20 100:9,21
  102:18 103:1,2
sit 90:16 91:16
situation 86:13
sold 15:19 26:3,5,7,7
  26:18 39:21 47:7
  48:5,14,23 50:2
  52:11,16 58:21
solely 46:17 60:13
soliciting 6:19,21 7:14
  29:14
somebody 34:8
Sons 3:19 68:15 70:13
  71:21 72:1,9
sorry 6:24 9:5 10:1,17
  18:19 23:9 32:3 36:4

44:17 47:16 49:15,24
57:5 58:10 63:23
65:18 66:22 68:20
75:11 78:14 80:3
84:9 85:16 86:8 90:2
93:1 95:23 96:14
97:16 100:11,23
101:6,7,18 102:2,3
102:11 103:1
**sort** 20:1 28:1 47:21
**sorts** 32:11 53:7
**sound** 57:23
**South** 54:18 56:4,5,23
58:19 59:13,16,20
**speak** 102:5
**special** 50:24
**specific** 22:9 52:1,2
75:17 87:23 89:6
90:16 96:9 101:22,23
102:13,23 103:2
**specifically** 11:10
21:19 71:14 74:23
91:13 97:12,17 98:1
101:17
**speculate** 22:2
**speculating** 30:6
**spell** 57:19
**spelling** 31:8
**spent** 91:1
**spoke** 74:23 75:1 77:7
**SS** 105:2
**staff** 35:2 36:13
**standard** 69:14,16
**start** 36:6
**started** 16:5,12 24:5,9
24:12 25:11 74:2
95:9
**starting** 52:13 68:12
**state** 4:20 65:14
**stated** 85:1
**statement** 35:6,11 71:2
103:3
**statements** 35:16 36:14
72:6 96:10
**states** 1:3 27:9 97:20
102:14
**stating** 94:18
**stay** 78:24 79:1
**step** 12:12 85:22
**Steve** 17:21
**stipulate** 62:2
**stipulated** 4:3
**STIPULATION** 4:2
**stock** 11:7
**stop** 29:13 31:1
**stopped** 14:21,23

**straw** 92:24
**street** 1:23 2:12 17:7,24
**strike** 4:9 42:18
**structure** 38:18
**subject** 58:16
**subpoena** 3:12 12:12
12:16,20 13:2,16,21
**subsequent** 62:4
**subsidiary** 22:21 23:1,6
23:16
**substance** 95:18
**substantially** 70:6,15
**sued** 83:7,8,11
**SUFFOLK** 105:2
**suggest** 35:24 70:18
99:18
**suggested** 70:24 99:24
100:5
**suppose** 70:20
**sure** 16:11 26:3 28:1
38:11 55:14 59:9
72:13 86:15 88:22
96:12 97:23 98:21
101:14,14,15 102:20
**susceptible** 7:20
**suspect** 53:19
**suspend** 33:21 103:9
**suspended** 103:14
**swimming** 54:19
**switch** 14:23
**sworn** 4:15 105:7
**S-A-K-L-A-D** 31:7
**S-E-M-B** 54:21

——————
**T**
**T** 3:10 39:12,13 104:1
104:1
**take** 7:10,17 9:1 24:17
28:4 34:13 46:12
49:2 52:16 59:15
61:2,6 62:12,14,20
63:6,13 65:12,20
66:9 68:17 83:21
88:4 93:12 99:24
100:6 103:6
**taken** 27:20 103:8
**talk** 28:3 100:1 101:1
102:2
**talked** 13:18 54:23
90:10
**talking** 39:22 80:15
**Tampa** 93:13
**telemarketing** 76:4
97:5
**telephone** 33:24 63:7
82:9 85:23

**tell** 18:19 23:20 30:7
38:12 42:12 55:16,16
67:2 68:18,20 70:14
77:6 80:23 81:21
83:10,12 85:5 89:23
92:12,15 94:3 96:14
97:7,11,17 98:1,19
**telling** 98:10,18
**tells** 9:24
**Temples** 52:6
**ten** 38:19,22,24 39:20
40:4,5,10,11 43:10
**tenure** 10:21 25:24
31:22 33:1 37:24
40:6,14,15 50:23
**term** 44:11 45:11 46:6
51:13 53:24
**terminated** 8:23 9:7,9
10:8
**termination** 9:19 10:4
**terminology** 36:19
**terms** 7:5,11 8:10
10:22 27:15 28:19
31:7 33:2 34:18 38:6
38:7,8 40:16 41:2
42:1 60:8,19 89:17
90:17
**terribly** 66:21
**territory** 55:8
**testified** 4:16 74:16
**testify** 21:24 42:7
**testimony** 56:13 58:5
104:4,5 105:9
**Texas** 15:8
**Thank** 103:12
**theory** 50:6,8
**thereof** 4:8
**thing** 71:14 80:14 85:4
85:11 86:15 89:19
91:3
**things** 63:9 81:9 97:7
98:8,17,20
**think** 7:22 8:2 13:19
28:15,21 29:4,22
31:1 33:8 34:2 35:23
36:24 37:5 62:8
64:23 69:14 73:5
76:22 85:5,6 91:22
102:8
**third** 34:13 36:9 84:11
**thought** 28:19,23 29:1
33:5,7,11,12 77:16
79:6 83:10
**thousand** 44:9,18 45:1
45:7,11,14 46:4,6
91:1

**three** 41:16 44:9,18,24
45:7,10,14 46:1,3,5
67:4 75:24 91:15
**threw** 92:24
**Thursday** 1:17
**tied** 86:24
**time** 4:10 6:10,15,21
7:18 8:11,14,18 10:8
16:17,20 17:10,20
21:3 28:3,18,23 30:5
35:2 36:13 37:9 40:9
40:16 45:5,13 51:7
52:3,10 54:7 57:2,8,9
58:1 69:23 70:19
77:4 87:24 88:22
91:11 96:21 97:8
98:3 103:5
**times** 90:10
**title** 25:12,18
**titles** 23:21 25:6,15,22
**today** 9:6 12:13 13:4,5
14:1,5
**told** 19:21 27:11,13,16
29:22,23 30:1,7 31:1
78:24 79:1,23 80:8
80:11 86:2 88:9,12
90:24 92:18 93:23
101:11 102:18
**top** 63:17 73:1
**total** 39:16 45:1,4
**tour** 56:22 59:15
**train** 79:6
**training** 19:12
**transcript** 44:24 54:17
104:3
**Transnational** 15:14
15:17 52:22
**travel** 6:16,18 8:7,11
8:14,19,22 10:10,24
11:17 14:24 15:14,16
15:18,19 16:3,12
17:10 18:21,23,24
20:13 23:14 24:5,16
25:16 26:3,13 27:11
30:21 38:21 39:14
52:11,12,20,22 53:1
56:23 58:21,23 59:3
59:10 74:14
**trial** 4:10
**tried** 52:15
**trip** 56:4,5 59:17,18
**trouble** 37:17
**true** 26:22 37:24 50:8
50:11 63:2 69:8 81:6
81:24 104:4 105:8
**Trust** 11:22

**truth** 85:6
**truthful** 36:2
**try** 28:5 46:9 53:17
102:4
**trying** 24:13 28:22
39:11 53:21 55:4
56:10,13 58:11 59:8
62:11 76:17 87:12
88:20
**turn** 99:20
**Turning** 67:17
**Turnipseed** 3:21 82:5
**two** 41:15 46:1 55:11
59:12 70:11
**two-page** 62:21
**type** 19:6,8,11,13 20:11

——————
**U**
**umbrella** 53:24
**underlying** 37:2
**understand** 16:11
19:10 24:13 28:21,21
28:24 32:15 35:13
36:5 38:10 51:12
66:15 86:22 89:4
99:14
**understanding** 9:8
28:9 29:11,17,21
37:17 39:7 83:6
84:17,19
**understands** 34:21
35:11 36:9
**understood** 28:12,15
29:2 46:10 53:20
**unequivocally** 88:8
**Union** 15:7
**United** 1:3 27:9 102:13
**unquote** 67:11
**unsuccessful** 55:21
**utilizing** 19:23
**utter** 70:19

——————
**V**
**v** 1:9
**Vantage** 1:7 2:10 3:13
6:16,18 8:7,11,14,18
8:22 10:10,10,12,13
10:20,21,23,23 11:1
11:12,14,17 15:16
16:3,12 17:9 18:21
20:13,18,23 21:3,4,8
22:6,10,13,18,19,21
23:2,5,7,14,16,21
24:1,3,15,16,19,22
25:12,14,16,19,24
26:23 30:11 31:3,23

31:23 32:10 33:1,13
34:10,20 35:11 36:9
37:10,16,22 38:1,4
40:6 41:6 42:14,22
44:14 46:12 47:7
48:2,14 49:12 50:11
50:13,23 51:4 52:24
53:4 58:6 59:21
68:14 69:17 73:16,20
76:2 84:10,17 85:13
85:18 86:7,10,17
88:5,17 95:14 97:13
98:3 100:5,5,20
102:1,16
Vantage's 38:24 39:16
43:11 49:13,21 50:1
60:1,6 87:1 93:17
various 26:19
Venice 5:14
VerMaas 3:21 57:18
58:3 74:6 82:5 83:20
95:7
vice 23:23,24 24:4,16
24:19,22 25:11,13
violate 88:6,10,13,18
89:9 97:23 98:9,12
violating 94:16
volume 1:1 4:7
V-E-R 57:23
V-E-R-M-A-A-S 57:20
57:22

—————— W ——————
wait 64:1
waived 4:8
want 7:17 8:1 25:6
28:2 30:9,10 35:10
44:23 65:19 68:5
70:1,3,11,14 77:1,3
87:14,20 91:16,22
92:6 96:12 98:10
wanted 49:5,7 68:7
84:19 86:13 87:10,18
wanting 98:8
Washington 78:15
86:14 87:1,4
wasn't 79:12 80:7
waste 70:19
way 5:2,6,18 36:20,20
56:15 62:7 63:14
72:14 94:10 95:11
99:7
Website 99:19 100:7
100:16,20
Websites 100:10,10,14
Wednesday 103:11

weekly 90:5
went 14:24 16:3 73:4
90:22
weren't 45:10 84:20
we'll 8:4 33:15 91:15
we're 9:1 28:5 62:8
We've 103:9
Wharf 1:19 2:19
whatsoever 88:8
whereof 105:14
whoa 72:4,4,4
wholly-owned 22:20
23:6,15
wife 16:8,9,15,17
willing 7:10
witness 4:13 6:24 7:21
9:12 14:2 23:9 32:13
33:18 35:22 38:14
44:5 53:13,20 61:17
63:23 65:10 68:16
72:6 80:22 81:10,20
95:23 105:6,9,14
witness's 13:3
Wittenberg 17:21
Wolf 79:18,19,24 80:5
wondering 87:3
word 101:11
words 23:22 95:16
work 7:5 14:24 15:9
37:12,15,21 45:2
96:6 97:12
worked 15:3,4,12,22
46:9
working 55:12
world 34:21 35:12
36:10
worry 99:9
wouldn't 71:5 78:21
94:1 100:16
write 81:8 84:15 89:4
94:1
writing 87:11
written 34:18
wrong 29:8,10 85:19
wrote 82:8 84:21,23

—————— X ——————
X 3:1,10 43:21

—————— Y ——————
yeah 37:20 67:3 84:5
97:16 98:21
year 8:24 44:10 99:4
years 15:13,22 16:1
18:18,19 23:21 45:16
46:1,21 52:13,17

54:23 55:4,13 73:22
76:1
yup 44:6 65:22

—————— 0 ——————
02108 2:6
02110 2:20
02114-2031 2:13
02210 1:23
04-11686-WGY 1:5
0735 3:15 89:19
0742 67:12
0759 3:15
0760 65:7
0766 66:10 67:18
0777 65:8

—————— 1 ——————
1 1:2 3:12 13:14,21
37:10,11 51:5 61:22
1:05 103:13
10 69:1
10/25/00 3:22
10:00 1:21
105 1:2
12 62:19
13 3:12 84:6,13 85:2,14
85:19,20
15 18:18 65:16 66:3
72:21,24 75:3 105:24
15th 67:24 74:18,20
16 9:5 12:17
16th 12:23
17 18:19 44:14 58:6,14
83:14 84:7 85:3
86:18 88:3 89:7,14
93:10 94:4 96:4,9
97:15 98:5 100:24
17th 101:18
18 9:5
1969 14:12
1973 14:12
1975 15:10
1977 14:14
1979 16:2
1980 51:11,18 52:3,14
1980's 27:7
1983 16:2,16 17:10
1990 10:17 79:21 83:14
1998 61:4 69:6
1999 37:10 44:14 51:5
58:6,14 59:16 61:4,5
62:19 65:17 66:4
72:21,24 74:8 75:3
76:7 84:7 85:3 86:18
88:4 89:7,14 93:10

94:4 96:4,9 97:15
98:5 100:24

—————— 2 ——————
2 3:13 8:23 9:6 12:5,8
23:5 33:16,17,20
34:3 36:9,17 65:13
2nd 23:4
20 16:2 91:1 95:3
20th 69:5
2000 8:23 37:4 59:17
79:21 82:4
2001 69:1 72:11
2003 8:24 9:4 50:22
51:5 79:22 95:6
2004 9:5,6,6 10:9 12:5
12:8 23:5 37:11 38:1
40:7
2005 1:17 9:1 12:17
13:6 104:20 105:15
2011 105:24
21 1:17 13:6
21st 13:22
24 16:2,16 17:10
24th 105:15
25 82:4
27th 103:11
28 37:4

—————— 3 ——————
3 3:15 61:14,16 63:14
65:16 67:12 72:18
3:30 12:17
30 1:19 2:19 4:6
31st 50:22
320 1:23
33 3:14
367-2500 2:8

—————— 4 ——————
4 3:4,16 65:2,7 66:10
67:13,17 69:20 70:12
71:2,8,11 72:18 81:2
4/15/99 3:16
43 5:2
450 5:8

—————— 5 ——————
5 3:18 68:9,11,17 69:19
70:14 71:22
50 98:15
508 73:5

—————— 6 ——————
6 3:20 80:19,21
61 3:15
617 2:8,15,22

65 3:17
68 3:19
689 5:12

—————— 7 ——————
7 3:21 81:17,19 83:22
7/10/01 3:18

—————— 8 ——————
80 3:20
81 3:22
878-6000 2:15

—————— 9 ——————
9 103:10
90 2:12
90's 19:7,7 21:2
921 5:6,18
951-2100 2:22
96 99:5

*90 Canal Street  Boston, MA 02114-2031*



**VANTAGE**
THE VANTAGE GROUP

Delivery by Hand



TELEPHONE: 617 878-6000
FAX: 617 878-6156

October 25, 2000



Mr. John D. VerMaas, President
Mr. Gene Bracewell, Treasurer
Shriners Hospital for Children
2900 Rocky Point Drive
Tampa, FL 33607-1435

and

Mr. Robert Turnipseed
Imperial Potentate
Imperial Council Shrine of North America
2900 Rocky Point Drive
Tampa, FL 33607-1435

Dear Messrs VerMaas, Bracewell and Turnipseed:

You recently raised an issue regarding any potential postage deficiency claims that may be asserted against either the Imperial Council Shrine of North America and/or the Shriners Hospitals for Children (hereinafter individually and collectively referred to as "Shriners") as a result of the ongoing litigation between Vantage and the United States Postal Service. Currently, Vantage is vigorously defending against any and all of the alleged postage deficiency claims.

Given the long term relationship between Vantage and the Shriners, Vantage agrees to refrain from impleading the Shriners as a third party defendant in the current litigation between Vantage and the United States Postal Service, which is pending in Federal Court in Boston; provided, however, that the Shriners shall agree to amend Paragraph 13 of the Agreement by and between Vantage Financial Services, Inc. and Shriners Hospital for Children, dated June 17, 1999. A copy of the proposed amendment is attached.

This letter does not affect the rights or obligations of the parties pursuant to any other provisions of the agreement dated June 17, 1999 and referred to above.

This letter supersedes all prior oral or written communications relating to this subject matter.

Sincerely,

Lawrence C. Lyon
Senior Vice President
   Sales & Marketing

SHC 00872

Cc:   Morris Goldings, Esquire, Mahoney, Hawkes & Goldings
       Harry S. Melikian, Executive Vice President, The Vantage Group, Inc.

*www.vantagetravel.com*

## Addendum

This Addendum is made to the Agreement To Provide Fund Raising, Consulting and Management Services ("Agreement") dated June 17, 1999.  This Addendum is entered into this _____ day of October  , 2000, by and between Shriners Hospitals For Children, a nonprofit corporation with its principal office located at 2900 Rocky Point Drive, Tampa, FL 33607 (hereinafter "Shriners"), and Vantage Financial Services, Inc., a Massachusetts corporation with its principal office located at 90 Canal Street, Boston, MA 02114 (hereinafter "Vantage").

## Recitals

A.  Shriners and Vantage are parties to the Agreement dated June 17, 1999.

B.  In light of Vantage agreeing to refrain from impleading Shriners and the Imperial Council Shrine of North America as a third party defendant in any pending litigation between Vantage and the United States Postal Service, the parties desire to modify Paragraph 13 of the Agreement.

## Agreement

Now, therefore, in consideration of the foregoing premises and the mutual covenants and agreements set forth below, the parties hereto covenant and agree to amend Paragraph 13 of the Agreement as follows:

**Section 1.**

Paragraph 13.1 of the Agreement is deleted.

**Section 2.**

Insert a new Paragraph 13.1 as follows:

"Paragraph 13.1 Breach and Event of Default

"If one party determines that the other party has breached the Agreement, then the non-breaching party shall give Notice to the other party within five (5) business days after discovery of the breach and shall state the nature of the breach in the Notice.  If the breaching party fails to cure the breach within forty five (45) days from the date of Notice, then an event of default has occurred, and the non-breaching party may terminate the Agreement, provided, however, that the non-breaching party shall facilitate any effort to cure the alleged breach."

SHC 00884

Section 3.

Paragraph 13.2 is amended as follows:

(a) Delete the heading and insert in lieu thereof: "Paragraph 13.2 Termination in the Event of Default."

(b) At the beginning of the first sentence of Paragraph 13.2 after the phrase, "In the event this Agreement is terminated," delete the words:  "for any other reason than that provided in Section 13.1 hereof."

In Witness Whereof, we have executed this Agreement on behalf of Shriners and Vantage as of the Effective Date first entered above.

Vantage Financial Services, Inc.

By: _____
Henry R. Lewis
President & Chief Executive Officer

Vantage Financial Services, Inc.

By: _____
Lawrence C. Lyon
Senior Vice President Sales &
Marketing

COMMONWEALTH OF MASSACHUSETTS )ss.:
COUNTY OF SUFFOLK      )

The foregoing instrument was acknowledged before me, the undersigned Notary Public, in and for said Commonwealth, on the 25th day of October, 2000 by Henry R. Lewis, as President & Chief Executive Officer and Lawrence C. Lyon, Senior Vice President Sales & Marketing of Vantage Financial Services, Inc., a Massachusetts corporation, for the purposes therein expressed as the act and deed of said corporation. They are personally known to me.  In witness whereof I hereunto set my hand and official seal.

_____
Notary Public  10/24/00
John J. Muller
Commission Expires:

MY COMMISSION EXPIRES AUGUST 23, 200_

SHC 00885

Shriners Hospitals for Children

By: _____
John D. VerMaas
President


By: _____
Gene Bracewell
Treasurer


STATE OF FLORIDA            )
                           ) ss.:
COUNTY OF HILLSBOROUGH)

The foregoing instrument was acknowledged before me, the undersigned Notary Public, in and for said State, on the _____ day of _____, 2000, by John D. VerMaas, as President and Gene Bracewell as Treasurer of Shriners Hospitals for Children, a Colorado corporation, for the purposes therein expressed as the act and deed of said corporation. They are personally known to me. In witness whereof I hereunto set my hand and official seal.


_____
Notary Public _____
                Notary's Name
                Typed
My Commission Expires:

SHC 00886