Harry Melikian                                           06/17/2005

EXHIBIT    1

Page 1

1                                          Volume: I

2                                          Pages: 1-192

3                                          Exhibits: 1-42

4            UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6                 CA No. 04-11686WGY

7

8    - - - - - - - - - - - - - - - - - -x

9    VANTAGE FINANCIAL SERVICES, INC.,

10                         Plaintiff,

11   vs.

12   NONPROFIT SERVICE GROUP INC. and

13   GEORGE E. MILLER,

14                         Defendant.

15   - - - - - - - - - - - - - - - - - - x

16          30(b)(6) DEPOSITION OF VANTAGE

17             FINANCIAL SERVICES, INC.

18          BY HARRY MELIKIAN, DESIGNEE

19                  June 17, 2005

20                   11:00 a.m.

21              Peabody & Arnold, LLP

22                  30 Rowes Wharf

23              Boston, Massachusetts

24           Reporter: Nancy L. Russo

Page 42

1 matters pertaining to the issues raised in this
2 lawsuit?
3    A. No.
4    Q. Did you talk about the lawsuit at all?
5    A. No.
6    Q. What did you do to prepare for your
7 deposition today, if anything?
8    A. Very little.
9    Q. What did you do?
10    A. Very little, just hardly anything. I just
11 wanted to make sure I understood before the deposition
12 what the facts are.
13    Q. Did you look at any documents?
14    A. No. I didn't look at any documents, per se,
15 no.
16    Q. Did you look at anything to help prepare for
17 the deposition?
18    A. I just look at some of my previous
19 depositions that I had done.
20    Q. In which case was that?
21    A. That was the case with the government.
22    Q. The SAC-LAD case?
23    A. Yes.
24    Q. Did you look at your deposition transcripts

Page 43

1 in any other case?
2    A. No.
3    Q. Did you speak to anyone other than your
4 lawyers concerning this deposition today?
5    A. No.
6    Q. Have you ever been involved as an employee of
7 Vantage in drafting agreements to provide fund raising
8 services to Vantage's clients?
9    A. Yes.
10    Q. Can you describe the extent of your
11 involvement in drafting such agreements?
12    A. It depends on the client.
13    Q. Have you ever written entire agreements
14 yourself?
15    A. Probably not.
16    Q. What generally have you done in the way of
17 participating in the drafting of such fund raising
18 agreements?
19    A. My personal involvement?
20    Q. Yes.
21    A. Only if there were modifications from certain
22 standard agreements would I get involved generally.
23    Q. When you say standard agreements, what are
24 you referring to?

Page 44

1    A. We have certain agreements -- two or three
2 agreements which are standard templates.
3    Q. Can you identify those standard templates by
4 name?
5    A. No.
6    Q. Is it possible to generally describe each one
7 of those templates, how they differ from one another?
8       MR. JOHNSON: Objection to form.
9    A. If you can either rephrase the question -- I
10 am not sure I understand it properly.
11    Q. Well, you indicated that there are two or
12 three standard templates for agreements that Vantage
13 employs. Is that currently the case?
14    A. I believe there are two or three standards,
15 yes.
16    Q. How long have those standards been in place?
17    A. I can't give you a definite time. I would
18 say at least a year.
19    Q. In June of '99, did Vantage have a standard
20 template agreement?
21    A. I can't say with certainty. I don't want to
22 guess.
23    Q. Do you know when Vantage began the practice
24 of keeping standard template agreements on hand?

Page 45

1    A. Yes. And I can't guess on a date, but it's
2 been a while. I cannot guess.
3    Q. Were you involved in negotiating the
4 agreement to provide fund raising consulting and
5 management services to the Shriners Hospitals for
6 Children that was signed by Vantage on or about
7 June 17, 1999?
8    A. No.
9    Q. Were you involved in any way in drafting that
10 agreement?
11    A. No.
12    Q. Who, to your knowledge, was involved in
13 negotiating that agreement?
14    A. From whose perspective?
15    Q. From yours.
16    A. I need it to be rephrased. When you say who
17 was involved, from Vantage's side? Is that what you're
18 asking. I don't know what you are asking.
19    Q. Yes, from Vantage side.
20    A. To the best of my knowledge, the work was
21 done primarily by Larry Lyon. And I don't know anyone
22 else who had been involved.
23    Q. Who, to your knowledge, was involved in
24 negotiating that agreement on behalf of the Shriners?

Page 66

1  A. Sorry.
2  Q. Did you hold that understanding in 1999?
3  A. I'm not sure.
4     MR. JOHNSON: Can we take a break?
5     MR. NAHIGIAN: Yes.
6     (Discussion off the record.)
7  BY MR. NAHIGIAN:
8  Q. Mr. Melikian, you answered quote, unquote, privileged information I think when I asked you what was the basis for your understanding that the cooperative mail rule never applied to charitable fund raising. I'm not sure what you were referring to there when you said privileged information.
14 A. Advice of counsel. In other words, I had received some advice from counsel.
16 Q. Can you identify the name of that counsel?
17    THE WITNESS: Do I have to?
18    MR. JOHNSON: You can identify the name of the attorney involved, yes.
20 A. It was --
21    MR. JOHNSON: Not the substance of the communication.
23 A. Tim May.
24 Q. What firm was affiliated with?

Page 67

1  A. Patten Boggs.
2  Q. What date did he provide you with this information concerning the cooperative mail rule?
4  A. I'm not certain of the date.
5  Q. Do you recall what year it was?
6  A. Sometime prior to 1999.
7  Q. When did you first become aware that there was a cooperative mail rule?
9  A. Probably in the very early '90s.
10    MR. JOHNSON: It is 1 o'clock. Are you going to break for lunch at some point?
12    MR. NAHIGIAN: We could.
13    (Discussion off the record.)
14 BY MR. NAHIGIAN:
15 Q. How did you become aware that there was a cooperative mail rule?
17 A. It was while I was in the travel business.
18 Q. What happened?
19 A. I believe it was '89 or '90. The postal service issued a directive for all insurance companies, banks and a multitude of other companies, travel companies who were sending mail out under the nonprofit's mailing permit and essentially selling product whether it's insurance, bank credit cards,

Page 68

1  travel, whatever, through the mail.
2  Q. Do you still believe that the cooperative mail rule as it was in effect in June of 1999 does not apply to charitable fund raising?
5     MR. JOHNSON: Objection to the form.
6  A. Please repeat that.
7     (Record read.)
8  A. The rule has been changed recently in the last year and a half.
10 Q. I asked in '99.
11 A. Do I still believe as it was in 1999 -- yes, I still believe that.
13 Q. When you referred to charitable fund raising, did you also include in that premium induced charitable fund raising?
16 A. I use the term charitable fund raising as a blanket.
18 Q. Does that include premium induced fund raising?
20 A. Yes.
21    (Exhibit No. 5 marked for identification.)
23 Q. I'm going to show you what's been marked as Exhibit 5. Can you review that and identify it for the

Page 69

1  record, if you can?
2  A. (Witness complies.) What is your question?
3  Q. Are you familiar with that document?
4     MR. JOHNSON: Objection to form.
5  Q. I asked you to identify it, but I guess my question is have you seen that document before today?
7  A. Well, it has my name on it and assuming I drafted it --
9     MR. JOHNSON: If you remember it, tell it. Don't assume anything.
11 A. Okay. I believe I drafted this memo.
12 Q. Could you just tell me what it is for the record?
14 A. It's a narrative relative to the current case with the USPS.
16 Q. It indicates the document is addressed to George Miller from Harry Melikian and appears the date of May 5, 2000; is that correct?
19    MR. JOHNSON: Objection to form.
20 A. That's what I'm reading.
21 Q. Do you recall why you prepared this memorandum for George Miller?
23 A. I believe my intent was to try to give George a historical perspective of the case.

Page 90

1  Q. Do you believe that the June 17, 1999
2  agreement that Vantage Financial Services, Inc. entered
3  into with the Shriners Hospitals for Children complied
4  with the cooperative mail rule as it was in effect at
5  the time?
6  A. Do I personally believe that?
7      MR. JOHNSON: Objection to the form.
8  A. The answer is yes.
9  Q. Do you believe that the manner in which the
10 June 17, 1999 agreement between the Shriners Hospitals
11 for Children and Vantage Financial Services was
12 performed complied with the cooperative mail rule as it
13 was in effect at the time?
14     MR. JOHNSON: Objection to the form.
15 A. I need some help.
16 Q. I guess in terms of the way the services were
17 provided under the agreement, what I would like to know
18 is whether or not you believe that the agreement
19 complied with the cooperative mail rule?
20     MR. JOHNSON: Objection to the form.
21 A. I really don't understand what you are asking
22 me. I'm sorry. So I can't answer it if I don't
23 understand it.
24 Q. Was there anything in the way that services

Page 91

1  were provided under the agreement that you believe
2  violated the cooperative mail rule as it was in effect
3  at the time?
4  A. My answer is no.
5  Q. Referring back to Exhibit 7, do you have any
6  understanding as to why the changes to paragraphs 13.1
7  and 13.2 were proposed?
8  A. No.
9  Q. Do you have an opinion as you sit here today?
10 A. Not without going back into the files -- not
11 without going back to look at the prior agreements.
12 Q. Under the June 17th agreement -- when I say
13 June 17th agreement, maybe we can make this easier, I'm
14 referring to the agreement that has been marked as
15 Exhibit 6. Okay? Under that agreement, do you believe
16 that Shriners Hospitals for Children had an
17 unconditional obligation to pay for the full cost of
18 that program?
19 A. I do believe that.
20     MR. JOHNSON: Objection to the form.
21 Q. Is there any particular reason why you
22 believe that other than the terms of the contract
23 itself?
24 A. The terms of the contract speak for

Page 92

1  themselves and that is my conclusion.
2  Q. Do you believe that under the June 17th
3  agreement that the Shriners was fully obligated to pay
4  for the full cost of the program even if the Shriners
5  were required to use funds other than those that were
6  generated by the program and deposited into the
7  program's account?
8      MR. JOHNSON: Objection to the form.
9  A. I do believe that.
10 Q. Is there any reason why you believe that
11 other than the terms of the agreement itself?
12 A. As I stated, the terms of the agreement speak
13 for themselves. That is my conclusion.
14 Q. Are you aware that at some point the United
15 States Postal Service took the position that the
16 June 17th agreement did violate the cooperative mail
17 rule?
18 A. Yes.
19 Q. Do you have any understanding of how in the
20 view of the United States Postal Service the Postal
21 Service believed the rule was violated?
22     MR. JOHNSON: Objection to the form.
23     MR. NAHIGIAN: Let me rephrase the
24 question.

Page 93

1  Q. I think what I asked was, do you have any
2  understanding of how the rule was violated as expressed
3  by the United States Postal Service?
4      MR. JOHNSON: Objection to the form.
5  A. My understanding of the proceedings were they
6  determined that the agreement violated the cooperative
7  postal rules because in the government's view the
8  agreement did not provide for unconditional liability.
9  Q. Did you ever give any consideration as to
10 whether or not the June 17th agreement could have been
11 drafted differently so as to avoid that conclusion on
12 the part of the government?
13 A. It never crossed my mind.
14 Q. Did you ever talk to anybody about that?
15 A. No.
16 Q. To your knowledge, did anyone else within
17 Vantage ever give any consideration to whether or not
18 the agreement could have been drafted differently to
19 satisfy the concerns articulated by the United States
20 government in the qui-tam action?
21 A. Your question doesn't make sense, so you need
22 to rephrase it. You are asking for something later
23 that happened prior.
24 Q. Well, at some point the United States Postal

**Page 162**

1  Shrine.
2     Q. Did Vantage continue to do additional
3  mailings at the nonprofit rate under the June 17th
4  agreement after March 1, 2001?
5     A. Yes.
6        (Exhibit No. 36 marked for
7  identification.)
8     Q. I'm going to show you what's been marked as
9  Exhibit 36. It's another copy of the December 4, 2003
10 letter I showed you before. I direct your attention to
11 the page that has production number SHC 01896. Is that
12 a true copy of Henry Louis' signature on that page?
13    A. That appears to be Mr. Lewis' signature, yes.
14    Q. Could you just identify that document for the
15 record, please?
16    A. This appears to be the document that was sent
17 by Mr. Johnson's office to Mr. Fleisher with respect to
18 the wrapping up of the Shriners arrangement.
19    Q. What is the date of that document?
20    A. It says December 4, 2003.
21        (Exhibit No. 37 marked for
22 identification.)
23    Q. I show you what's been marked as Exhibit 37.
24 It's a copy of an August 23, 2000 letter from

**Page 163**

1  Lawrence C. Lyon to Jay Fleisher. Have you ever seen
2  that document before today?
3     A. (Witness reads.) Your question is what?
4     Q. Have you ever seen that document before
5  today?
6     A. No.
7     Q. In the first paragraph on the first page of
8  the exhibit there is a reference to a meeting in Tampa
9  on October 26, 2000. Do you have any knowledge of that
10 meeting?
11    A. No, I do not.
12    Q. The first paragraph also refers to a meeting
13 to be scheduled prior to the scheduled meeting on
14 Thursday afternoon, October 26, 2000. Do you know
15 anything about that prior meeting?
16    A. I do not.
17    Q. Do you know whether or not Larry Lyon and an
18 attorney for Vantage ever met with Mr. Turnipseed,
19 Mr. Bracewell and Mr. Fleisher prior to a meeting that
20 was scheduled for 1 o'clock on October 26, 2000?
21    A. I do not.
22        (Exhibit No. 38 marked for
23 identification.)
24    Q. I'll show you what's been marked as

**Page 164**

1  Exhibit 38. Is that a document you have seen before
2  today?
3     A. It shows there are three pages, but there is
4  only two. That's the first problem. Do I recognize
5  the document?
6     Q. Yes.
7     A. I recall a similar document, yes.
8     Q. The second page of the exhibit is an
9  October 26, 2000 letter to Mr. Turnipseed from Mr. Lyon
10 and indicates carbon copies to Morris Goldings and you.
11 Did you receive a copy of this letter shortly after
12 October 26, 2000?
13    A. I would assume I did.
14    Q. Do you believe you did?
15    A. I believe I did.
16    Q. Do you recognize the signature to be
17 Larry Lyon's signature on the second page of this
18 exhibit?
19        MR. JOHNSON: Objection to the form.
20    A. It appears to be Mr. Lyon's signature.
21    Q. The letter indicates that Vantage agreed to
22 refrain from impleading the Shriners as a third party
23 defendant in the litigation between Vantage and the
24 United States Postal Service. Do you recall that?

**Page 165**

1        MR. JOHNSON: Objection to the form.
2     A. Do I recall that that is what we agreed to?
3     Q. Yes.
4     A. I do.
5     Q. Why did Vantage agree to that?
6     A. To preserve a long-term relationship with the
7  group.
8     Q. Has Vantage ever entered into any fund
9  raising agreements with the Shriners Hospitals for
10 Children subsequent to December of 2003?
11    A. No.
12        (Exhibit No. 39 marked for
13 identification.)
14    Q. Let me show you what's been marked as the
15 next numbered exhibit. That is a September 18, 2002
16 letter from Jay Fleisher to Mr. Miller enclosing two
17 indemnity agreements that have been executed on behalf
18 of the Shriners Hospitals for Children; is that
19 correct?
20        MR. JOHNSON: Objection to the form.
21    Q. Did I describe the document accurately?
22    A. It's an indemnity agreement signed by the
23 Shriners Hospital, yes.
24    Q. Are you aware that Vantage entered into

Page 174

1   A.  It is the settlement agreement between
2   Vantage, myself, Henry Lewis and the United States of
3   America.
4   Q.  Your signature appears on that document; is
5   that correct?
6   A.  It certainly does.
7   Q.  For the record, what was the total amount of
8   the settlement?
9   A.  4.5 million dollars.
10  Q.  To be paid over what period of time?
11  A.  $700,000 deposit and the balance to be paid
12  over five years.
13  Q.  Did Vantage finance the $700,000 deposit?
14  A.  No.
15  Q.  Is it financing any other portion of the
16  settlement payments?
17  A.  Paying it out of operations.
18  Q.  Do you know how much has been paid to date?
19      MR. JOHNSON:  There is a schedule on
20  the agreement, isn't there?
21      MR. NAHIGIAN:  I think so.
22  A.  Is there?
23      MR. JOHNSON:  There certainly is.  Look
24  at the last pages.

Page 175

1   A.  We have made a total of 19 payments so far.
2   Q.  And all of those 19 payments have been made
3   on time, to your knowledge?
4   A.  Every one of them.
5   Q.  Was there ever any discussion between the
6   government and the Vantage parties concerning the
7   allocation of the settlement amount for the various
8   programs at issue in the litigation?
9   A.  No.
10  Q.  When I say programs, I mean overall mailing
11  programs on behalf of nonprofit organizations.  Do you
12  understand that?
13  A.  I do.
14  Q.  Okay.  Does Vantage at the present time
15  allocate any portion of the financial settlement to the
16  conduct relating to the Shriners Hospitals for Children
17  agreement that was entered into on June 17th, 1999?
18  A.  I don't understand the question.  Please
19  rephrase it.
20  Q.  Do you have any knowledge about how Vantage
21  has calculated the damages it claims to have suffered
22  in this case?
23  A.  Yes.
24  Q.  What do you know about that?

Page 176

1   A.  We took it all as a one time period cost in
2   the year that it was settled.
3   Q.  What is the total amount of damages that
4   Vantage is claiming in this case?
5   A.  4.5 million.
6   Q.  What is your basis for claiming that
7   George Miller and Nonprofit Service Group are
8   responsible for the 4.5 million dollars in damages to
9   Vantage?
10  A.  I don't understand your last question.  I
11  think I misunderstood your last question.
12  Q.  What I was trying to find out is how -- what
13  is your damage calculation for this case -- the case
14  against George Miller and Nonprofit Service Group?
15  A.  I'm not clear what you just asked me.  I'm
16  sorry.
17  Q.  Let me try to make it clearer.  How much in
18  the way of damages are you seeking from George Miller
19  and Nonprofit Service Group in this case that we're
20  here for today?
21  A.  I don't know the answer off the top of my
22  head.
23  Q.  Do you know whether or not Vantage has
24  allocated any portion of the 4.5 million dollar

Page 177

1   settlement amount to the damages that it seeks in this
2   case against George Miller and Nonprofit Service Group?
3   A.  Again, I'm trying to understand what you're
4   saying, but I'm not sure I do.
5   Q.  As far as you know, what is the basis for
6   Vantage Financial Services' damages claims against
7   George Miller and Nonprofit Service Group?  What is the
8   factual basis?
9   A.  The factual basis is that prior to the
10  Shriners being incorporated into the action, the
11  government's claim of single damages was about a
12  million and a half dollars -- maybe less.  And then
13  once the Shriners were brought into the action, the
14  government's single damages calculation increased by
15  nearly three million dollars.
16  Q.  Does Vantage claim that George Miller and
17  Nonprofit Service Group are responsible for the portion
18  of the damages paid or the settlement paid to the
19  government only in proportion to the amount that the
20  Shriners mailings had to the total amount of the
21  mailings in the case?
22      MR. JOHNSON:  Objection to the form.
23  A.  I would say the answer is yes.
24  Q.  Do you know what that figure is?

Harry Melikian                                                                      06/17/2005

Page 178

1  A. I'm not sure I get -- what figure are you
2  referring to?
3  Q. The portion of the settlement amount paid to
4  the government that Vantage believes George Miller and
5  Nonprofit Service Group are responsible for?
6  A. Approximately three million dollars.
7  Q. Does any of that include attorney's fees?
8  A. No, it does not.
9  Q. Do you know what portion of the attorney's
10 fees, costs and expenses Vantage incurred in defending
11 the underlining case are attributable to the defense of
12 the Shriners related claims?
13 A. I don't have the specific number.
14 Q. Do you think Vantage has a number somewhere?
15 A. Yes, but I don't have it off the top of my
16 head.
17 Q. How would the number be calculated, do you
18 know?
19 A. It would have to be calculated based upon
20 when the Shriners were brought into the action.
21     MR. JOHNSON: You might want to look at
22 the initial disclosure. I think it's articulated
23 pretty clear in that.
24     MR. NAHIGIAN: It may be articulated,

Page 179

1  but the reasoning is not clear.
2      MR. JOHNSON: I thought it was, but if
3  it's not, there are easy ways to clarify it.
4  Q. Did you ever submit an affidavit in the
5  underlining case by the government that stated in
6  effect that the position that the government was taking
7  against you could have the potential to expose you to
8  financial ruin?
9  A. Yes.
10 Q. Is that one of the reasons why you personally
11 decided to settle the case?
12     MR. JOHNSON: Objection to the form.
13 A. There were several reasons.
14 Q. Give me the reasons why Vantage and the other
15 defendants decided to settle the case, as far as you
16 know?
17 A. One, to stop the bleeding. Two, to have some
18 certain we were at least at a point where we could say
19 the case was over. And, three, we had to move on with
20 our lives.
21 Q. Was a trial scheduled on the issue of your
22 personal liability and Mr. Lewis' personal liability
23 for December of 2003?
24 A. I know it was to be following a case that

Page 180

1  Judge Wolfe was hearing whenever that ended.
2  Q. In connection with the services that George
3  Miller and Nonprofit Service Group provided relating to
4  the June 17, 1999 agreement with the Shiners, who was
5  George Miller's client?
6      MR. JOHNSON: Objection to the form.
7  A. Vantage Financial Services.
8  Q. Who was Nonprofit Service Group's client?
9  A. I don't understand your question.
10 Q. Did Nonprofit Service Group, Incorporated, as
11 far as you know, provide legal services to Vantage
12 Financial Services in connection with the June 17, '99
13 agreement?
14 A. I believe they did.
15 Q. On whose behalf did Nonprofit Service Group
16 provide those services?
17 A. Vantage Financial Services.
18 Q. Has George Miller ever acted as your personal
19 attorney?
20 A. No.
21 Q. To your knowledge, has George Miller ever
22 acted as Henry Lewis' personal attorney?
23 A. No, he has not, to my knowledge.
24 Q. Has Nonprofit Service Group ever provided any

Page 181

1  services to you personally?
2  A. No, they have not.
3  Q. Has Nonprofit Service Group ever provided any
4  services to Mr. Lewis personally?
5  A. To my knowledge, they have not.
6  Q. Has George Miller ever provided legal
7  services to Vantage Group, Incorporated, to your
8  knowledge?
9  A. No.
10 Q. Has Nonprofit Service Group ever provided any
11 services to Vantage Group, Incorporated?
12 A. No.
13 Q. Has Vantage Financial Services, Incorporated
14 paid all that it owes to the attorneys that represented
15 it in the underlining case brought by the government?
16 A. Yes.
17 Q. Do you know what that figure is?
18 A. I do not.
19 Q. Do you know whether or not Vantage's gross
20 margin on the entire agreement with the Shriners is
21 greater than the amount of damages that it claims in
22 this case?
23     MR. JOHNSON: Objection to the form.
24 A. I would say yes.

46 (Pages 178 to 181)

Page 182

1  Q. Can you tell me your approximation of what
2  the numbers are?
3  A. I don't know off the top of my head what the
4  gross margins were on the Shriners contract.
5  Q. Is it fair to say that Vantage made more
6  money in terms of gross profit from its agreement with
7  the Shriners Hospitals for Children dated
8  June 17th, 1999 than it is claiming in the way of
9  damages from Mr. Miller in this case?
10     MR. JOHNSON: Objection to the form.
11  A. I answered that. I believe we made more
12  money in gross profit than the amount of damages we are
13  claiming.
14  Q. What is it that Vantage believes Mr. Miller
15  and Nonprofit Service Group did wrong in this case?
16     MR. JOHNSON: Objection to the form.
17  A. Our belief is that Mr. Miller knowing that we
18  were under investigation by the postal service for
19  contracts relating to liability prepared an agreement
20  that was represented to be -- never been challenged or
21  was in agreement it had never been challenged by the
22  postal service. And we entered into that agreement
23  based upon his expert advice and knowledge and to our
24  detriment we were damaged.

Page 183

1  Q. Is there anything that Vantage believes
2  George Miller and Nonprofit Service Group should have
3  done differently than what they did in connection with
4  the underlining facts of this case?
5     MR. JOHNSON: Objection to the form.
6  A. My personal belief is that George should have
7  either disclosed to us that there were serious inherent
8  risks in this agreement in light of the pending
9  investigation by the government and/or, two, he should
10  have provided to us proof certain that this agreement
11  was basically a proper agreement under the cooperative
12  mail rule.
13  Q. Did Vantage request him to provide such a
14  proof certain?
15  A. I did not.
16  Q. Do you believe that there was any way in
17  which the agreement could have been written differently
18  to avoid the problems that later arose?
19     MR. JOHNSON: Objection to the form.
20  A. I'm not an expert in writing agreements. So
21  I can't tell you that answer.
22  Q. Do you continue to believe that Mr. Miller
23  was an expert in drafting the type of agreement that
24  was entered into on June 17, 1999 between Vantage and

Page 184

1  the Shriners?
2  A. Absolutely.
3     (Discussion off the record.)
4  BY MR. NAHIGIAN:
5  Q. Prior to June 17, 1999, did you believe that
6  there was a risk that the government would conclude
7  that the June 17th, 1999 agreement would violate the
8  cooperative mail rule?
9     MR. JOHNSON: Objection to the form.
10  A. That question doesn't make any sense.
11     (Record read.)
12  A. How could I know prior to June 17th if the
13  contract that was executed on June 17th would violate
14  the cooperative mail rule?
15  Q. I assume that it was in final draft form
16  before that date, but thank you for clarifying that.
17     MR. JOHNSON: Let's try and avoid
18  dialogue.
19     (Last question read back.)
20  A. The answer is absolutely not.
21  Q. You didn't think it was a risky proposition
22  at all?
23  A. Absolutely not.
24  Q. Why did Vantage retain George Miller to

Page 185

1  assist with drafting the agreement?
2  A. Because George came to Vantage and we went to
3  him. And he said he had done agreements of this sort
4  before and he was knowledgable and an expert in these
5  types of agreements and that these types of agreements
6  had never been challenged by the postal service.
7  Q. He said that to Vantage prior to Vantage
8  asking him to assist with this agreement?
9  A. My recollection is he said that to me. I did
10  have that conversation. I'm not going to say whether
11  he said it to others.
12  Q. Who brought the respective agreement with
13  Shriners to George Miller's attention from Vantage's
14  side, if anyone?
15  A. Nobody.
16  Q. How did he become aware of it, if you know?
17  A. He was part of the original process to
18  prepare the document.
19  Q. Who asked him to do that?
20  A. Larry Lyon.
21  Q. Do you know why Larry Lyon asked him to do
22  that? I'm not asking you to read Larry Lyon's mind.
23  Do you know why Larry Lyon asked Mr. Miller to assist
24  with the agreement?