UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Vantage Financial Services, Inc.<br>　　　　　Plaintiff<br><br>v.<br><br>Nonprofit Service Group, Inc. and George E.<br>Miller<br>　　　　　Defendants | CIVIL ACTION NO. 04-11686WGY |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This is a multimillion dollar legal malpractice action against an attorney and a

corporation specializing in serving the nonprofit industry.  All of the claims in this action are

time-barred or fail as a matter of law.  Plaintiff Vantage Financial Services, Inc. ("Vantage")

claims that it suffered over $2 million in damages allegedly as a result of legal advice allegedly

provided by defendants Nonprofit Service Group, Inc. and George E. Miller ("Defendants")

during the negotiation of an "Agreement to Provide Fund Raising Consulting and Management

Services" ("the Agreement") with the Shriners Hospitals for Children ("the Shriners").  Vantage

alleges without support that the Agreement resulted in an increase of the amount Vantage paid to

the United States Government (the "Government") to resolve a pending *qui tam* action brought

against Vantage and two of its principals pursuant to the False Claims Act, 31 U.S.C. §3729(a) *et*

*seq.*  Vantage also seeks recovery of legal fees it allegedly incurred in defending the Agreement

in the course of the *qui tam* action in which the Government challenged the legality of other

fundraising mailings Vantage made on behalf of approximately 80 nonprofit entities.  Vantage

earned approximately $15 million in gross profit as a result of mailings made under the Agreement.

Vantage's complaint in this action alleges breach of contract (Count I), negligence-legal malpractice (Count II), fraudulent misrepresentation (Count III) negligent misrepresentation (Count IV), and violations of M.G.L. c. 93A (Count V).  Each of these causes of action, and the case in general, suffer from incurable defects that warrant the entry of summary judgment in favor of Defendants on a number of grounds.  Foremost, Vantage's common law claims are barred by the three-year statute of limitations applicable to legal malpractice and misrepresentation claims.  Vantage was on actual notice no later than March 2001, at which time the Government included the Agreement as part of the pending *qui tam* action, that it had suffered appreciable harm as a result of Defendants' alleged conduct.   At the time, Vantage was represented by separate counsel who was defending and advising Vantage as to its liability in the *qui tam* action.  Despite the fact that Vantage was aware in March 2001 that the Agreement had resulted in increased exposure to damages in the *qui tam* action, as well as the payment of additional legal fees to defend that claim, it waited, without justifiable delay, until July 13, 2004 to file its Complaint in this case.  As a result, its malpractice and misrepresentation claims against Defendants are time-barred.

Vantage's remaining claim for violation of G.L. c. 93A (Count V) also fails as a matter of law.  As the basis for its claim, Vantage alleges that Defendants misrepresented their expertise in the area of direct mail fundraising contracts and the rules and regulations applicable to such agreements, and that the Defendants also misrepresented the legality of the Agreement.   Despite Vantage's Complaint to the contrary, it has testified that Defendants are in fact expert in direct mail fundraising contracts.  In light of this testimony by Vantage, Vantage cannot dispute that

Defendants accurately represented their qualifications and expertise.   Similarly, there is no evidence that Defendants made representations concerning the Agreement that are actionable under c. 93A.  To this day, Vantage still believes that the Agreement was legal.  The fact that the Agreement became a part of the *qui tam* action in March 2001 does not in itself give rise to c. 93A liability, particularly since the Agreement was never determined to be illegal.  The Government's decision to include the Agreement in a civil action that was already pending, and that already included many other of Vantage's fundraising agreements, does not somehow mean that Defendants engaged in unfair or deceptive conduct.  Even if Vantage believes Defendants' advice was in error, this does not give rise to a c. 93A claim.

Despite Vantage's numerous accusations, it has by its own admission not suffered any damages as a result of any act or omission by Defendants.  Vantage cannot claim that it is worse off as a result of Defendants' alleged advice.  Because it decided to enter into the Agreement, Vantage collected over $ 43 million, approximately $15 million of which was gross profit. Vantage admits, as it must, that the windfall it reaped was far in excess of any money that it expended to defend and settle the related claims in the *qui tam* action.  Indeed, Vantage's corporate designee under Fed.R.Civ.P. 30(b)(6) testified that Vantage's gross profits under the Agreement exceed the amount of the damages it seeks in this case.  If Defendants had advised Vantage not to enter into the Agreement, as Vantage apparently claims they should have done, Vantage would never have realized the enormous, resulting gains.   Vantage has Defendants to thank for consummating the Agreement which was, by any measure, an undisputed bonanza.

In the end, Vantage cannot show that it would have achieved a better result had it not entered into the Agreement.  There is no evidence that Defendants could have done anything to change the final provisions of the Agreement in a manner that would have been sure to avoid

scrutiny by the Government.  To the contrary, it is undisputed that the Shriners would not have

entered into the Agreement at all absent the contract provisions that were at issue in the *qui tam*

action.   Vantage had two choices: sign the Agreement as it was written or walk away.  Having

signed the Agreement and profited wildly by it, Vantage cannot claim that it was damaged by

Defendants.   Summary judgment must enter in Defendants' favor.

## II.   <u>FACTUAL BACKGROUND</u>

Vantage is engaged in the business of direct mail fundraising programs on behalf of

nonprofit entities.  (Defendants' Rule 56.1 Statement of Undisputed Facts, hereinafter "Rule 56.1

Statement," at ¶ 2.)  Under a typical agreement, such as the one at issue here, Vantage contracts

to create and send direct mail solicitations to the public seeking contributions for its nonprofit

clients.  (<u>Id</u>.)  Vantage's direct mail solicitations are accompanied by premium items, such as

personalized address labels, notecards, and the like as an inducement to encourage donations.

(<u>Id</u>.)  For its work, Vantage is typically reimbursed for its out-of-pocket costs and also receives a

markup for any mail pieces, including the premium enclosures, that it produces and sends on

behalf of the nonprofit.  (<u>Id</u>. at ¶ 7).

At the time the Agreement was entered into with the Shriners, nonprofit mailings were

governed by United States Postal Service ("USPS") regulations (Rule 56.1 Statement at ¶ 8).

Nonprofit entities were entitled to use a special reduced postage rate for their mailings; but the

USPS limited the circumstances under which a nonprofit could engage a for-profit entity, such as

Vantage, to mail on the nonprofit's behalf at the reduced nonprofit postage rates.  (<u>Id</u>.)  What is

referred to as the "cooperative mail rule" required, among other things, that in order to mail at

the reduced rate, a nonprofit had to assume financial risk for the cost of mailings under a

fundraising contract administered by a for-profit entity.  (<u>Id</u>.)  If it was determined that a for-

profit fundraiser, such as Vantage, assumed the risk of not being paid for its work in the event that, for example, charitable donations were insufficient to cover the fundraiser's fees and costs, such a contract would have violated the cooperative mail rule.  (Id.)

In 1997, the United States began pursuing a *qui tam* action[1] initiated by a former Vantage employee (Rule 56.1 Statement at ¶¶ 9-11).  In the *qui tam* action, the government alleged that Vantage entered into numerous direct mail fundraising contracts with nonprofit organizations that violated federal postal regulations and, in particular, the cooperative mail rule.  (Id. at 12).  Vantage's contract with the Shriners was just one of many contracts eventually included in the underlying action.  (Id. at ¶28.)   Vantage's practices dated back to the early 1990's and typically involved secret side-letter schemes in which Vantage would assure its nonprofit clients, by letter, that the nonprofits were not at risk for program shortfalls despite explicit terms to the contrary in the fundraising contracts themselves.  The Government sought single damages on account of its postal revenue deficiency claims as well as exemplary and statutory damages for False Claims Act violations.  (Id. at ¶ 12.)  In this lawsuit, Vantage alleges that approximately fifty percent of the total $4,500,000.00 settlement of the underlying action was somehow attributable to the Shriners claim.  (Id. at ¶¶ 36-37.)

In 1999, Vantage asked defendants to assist it in the negotiation of a lucrative fundraising contract with the Shriners.  (Rule 56.1 Statement at ¶ 17.)  As a prerequisite to doing business with the Shriners, the Shriners insisted that its liability to pay for fundraising services be limited to proceeds generated by Vantage's direct mail solicitations.  (Id. at ¶¶ 15, 52.)  The Shriners also wanted to mail at the reduced nonprofit postage rate despite its desire to limit its liability.

---

[1] United States ex rel. Lawrence Saklad v. Henry Lewis, et al, Civil Action No. 97-CV-10052MLW (the *qui tam* action").

5

(Id. at ¶¶ 16, 51.)  The Shriners would not have entered into the Agreement unless the provisions regarding the postal rates and the Shriners' liability were included in the Agreement as written. (Id. at ¶¶ 51-53).  Ultimately Vantage sought Defendants' assistance in creating an Agreement that would satisfy the Shriners and the cooperative mail rule.  (Id. at ¶ 17.)  The Agreement was executed by the Shriners on June 17, 1999 and by Vantage on June 22, 1999.  (Id. at ¶ 18.)  To ensure that Vantage would recoup its costs under the Agreement, Vantage had the option of recouping any shortfall by renting the mailing list of the Shriners.  (Id. at ¶ 18.)  The Shriners were also liable for the payment of any outstanding  postal charges resulting from the Agreement.  (Id. at 18.)

With Vantage already under scrutiny for its prior mailing practices, the Government decided to include the mailings made under the Agreement as part of its claims in the *qui tam* action. (Rule 56.1 Statement at ¶ 28.)  In response, Vantage's attorneys vehemently argued that the Agreement complied with the cooperative mail rule in all respects and filed for summary judgment on this basis.  (Id. at ¶ 34.)  In his rulings on the parties' motions for summary judgment in the *qui tam* action, Judge Mark Wolf did not make a final determination on the legality of the Agreement prior to Vantage and the Government reaching a settlement.  (Id. at ¶ 35.)  Judge Wolf did find that Vantage was not liable for false claims because it relied on Defendants' expert advice as to the legality of the Agreement.  (Id.)  Furthermore, Judge Wolf acknowledged that the contract provisions allowing for the use of the Shriners mailing list as collateral may have been sufficient to satisfy the cooperative mail rule. (Id.).  Vantage, however, failed to submit expert evidence in support of this crucial issue.  (Id.).

Vantage alleges that it settled the claims relating to the "Agreement" as part of a global settlement of the *qui tam* action.  It claims that fifty percent of the total $4,500.000.00 settlement

was allocated to the settlement of the Shriners postal revenue deficiency claim despite the fact

(1) Vantage and the Government never agreed to, or even discussed, an allocation of the

settlement funds to the various contracts at issue in the *qui tam* action (Rule 56.1 Statement at ¶

37); and (2) the Agreement explicitly stated that the Shriners were responsible for the payment of

any postage incurred under the Agreement. (Id. at ¶ 18.).  Despite this latter provision in the

Agreement, Vantage subsequently agreed to indemnify the Shriners from any liability arising

from the *qui tam* action and agreed not implead Shriners in the *qui tam* action.  (Id. at ¶ 24.)

Vantage now seeks to impose this liability on Defendants.[2]

## III.  ARGUMENT

Summary judgment must be granted when there is no dispute as to material facts and the

moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).  The Court must enter summary judgment if Vantage does

not make a sufficient showing of the essential elements of its case upon issues where it bears the

burden of proof.  See Celotex, 477 U.S. at 322.

### A.  It is beyond dispute that Vantage was aware no later than March 2001 that it suffered appreciable harm as a result of the Defendants' conduct.

All of Vantage's common law claims are subject to a three-year statute of limitation.

M.G.L. c. 260, §2A; M.G.L. c. 260 §4.[3]  Based on the undisputed facts, Vantage's claims

---

[2] An indemnity agreement was provided to the Shriners despite the fact that Vantage brought third-party claims against a number of its other charitable clients whose fundraising contracts with Vantage were implicated in the *qui tam* action.

[3] An attorney malpractice claim is a hybrid action with both tort and contract elements (a contract duty to meet the standard of care), not two separate causes of action.  See Ryan v. Ryan, 419 Mass. 86, 89 (1994).

accrued no later than March 2001, and were time-barred as of March 2004.  Vantage's

Complaint in this action, which was filed on July 13, 2004, was untimely.  A cause of action

accrues on the happening of an event likely to put the plaintiff on notice.  Riley v. Presnell, 409

Mass. 239, 243 (1991).  A plaintiff must have: (1) knowledge or sufficient notice that she was

harmed as a result of the defendant's conduct, and (2) knowledge or sufficient notice of what the

harm was.  Williams v. Ely, 423 Mass. 467, 473 (1996); Hendrickson v. Sears, 365 Mass. 83, 89-

90 (1974).  Both of these conditions are satisfied in this case.  As of March 2001, Vantage was

aware (1) that the Agreement that Defendants helped draft had become included in the *qui tam*

action and (2) that it faced harm in the form of postal deficiencies for mailings under the

Agreement and legal fees to defend the claim.

On March 1, 2001, the Government, by letter from Assistant United States Attorney Peter

K. Levitt ("Mr. Levitt"),  supplemented its interrogatory answers in the *qui tam* action by serving

Vantage with a revised summary of the Government's claims for postal revenue deficiencies

resulting from Vantage's allegedly improper use of nonprofit postage rates. (Rule 56.1 Statement

at ¶ 29.)  Mr. Levitt wrote, in part:

> Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, the
> United States supplements its interrogatory answers by enclosing
> (i) a revised Summary of Single Damages, (ii) a revised synopsis
> of calculations, entitled February 2001 Synopsis of Calculations,
> and (iii) a revised spreadsheet that was used to generate the
> calculations, entitled "Documentation of mailings that violate the
> Cooperative Mail Rule," along with an explanation sheet."

(Id.)  The "Summary of Single Damages" referred to as (i) in Mr. Levitt's letter claimed

$184,669.48 in single damages in relation to "Shriner's Hospitals for Children."  Likewise, the

spreadsheet attached as (iii) to Mr. Levitt's letter entitled "Documentation of mailings that

violate the Cooperative Mail Rule" identifies 35 "Shriners Hosp." mailings the Government

alleged violated the Cooperative Mail rule.[4]  (<u>Id</u>.)  Vantage cannot dispute that as of March 1, 2001 the Government was claiming damages in the *qui tam* action arising from the Agreement between the Shriners and Vantage.

Soon after Mr. Levitt's letter was sent, Vantage's attorneys spent significant time reviewing and analyzing the Government's new claims.  Its attorneys' contemporaneous review and knowledge of the claims is imputed to Vantage.  <u>HDH Corporation v. LaFlamme</u>, 62 Mass. App. Ct. 1106 (2004) <u>citing</u> <u>Ratshesky v. Piscopo</u>, 239 Mass. 180, 186 (1921); <u>Manfredi v. O'Brien</u>, 282 Mass. 458, 461 (1933); <u>Goldston v. Randolph</u>, 293 Mass. 253, 258 (1936); <u>Quinn v. Hintlian</u>, 4 Mass. App. Ct. 805 (1976).   The review and analysis by Vantage's attorneys is documented in the legal bills from Vantage's then law firm, Mahoney Hawkes LLP, whose contemporaneous billing entries confirm Vantage's awareness that the Government had included the Agreement in the *qui tam* action.  (Rule 56.1 Statement at ¶ 30.)  For example, on March 2, 2001 Vantage's attorney ("BWL") billed for "Damages calculation from Levitt and e-mail to L. Johnson; e-mail from L. Johnson and to H. Melikian."  (<u>Id</u>. at ¶ 31.)  More specifically, on March 26, 2001, "EBW" billed 3.90 hours for "Comparison and analysis of USPS calculation of damages from 2/00-3/01."  (<u>Id</u>. at 32.)  Furthermore, "EBW" billed an additional .60 hours on March 27, 2001 for "Email from/to BWL regarding status of USPS damages calculation analysis; continued review of same."  (<u>Id</u>. at 33.)  Based on the above billing entries, it is clear that Vantage did in fact receive, review and analyze the damages calculations in Mr. Levitt's March 1, 2001 letter.

Vantage's claims are not rescued by the fact that in March 2001 it did not know the complete extent of the potential harm it faced as a result of the Agreement. The fact that

---

[4] Both spreadsheets include a reference to "US Postal Inspection Service" in the top margin.

Vantage was exposed to even $1.00 of potential damages in March 2001 was sufficient notice of
its cause of action against the Defendants.  A plaintiff need not know the full extent of the harm
in order for its cause of action to accrue.  Olsen v. Bell. Tel. Labs., Inc., 388 Mass. 171, 175
(1983); see also, White v. Peabody Constr. Co., 386 Mass. 121, 130 (1982) (the "notice"
required is not notice of every fact which must eventually be proved in support of the claim).
Any suggestion that Vantage allegedly settled the Shriners claim for far in excess of the damages
that were originally claimed in March 2001 has no practical or legal significance.  Vantage
cannot hide from or ignore the fact that the Government clearly put it on notice, as of March
2001, that it was seeking damages as a result of the Agreement.  Furthermore, since Vantage is
claiming as damages fifty percent of all defense costs from the date the date the Shriners claims
were added to the *qui tam* action, its cause of action against Defendants accrued no later than
March 2001. (Rule 56.1 Statement at ¶55).

      The fact that Vantage's claims sound in legal malpractice also do not rescue them from
the statute of limitations.  The statute of limitations applicable to a legal malpractice claim begins
to run when a client "knows or reasonably should know that he or she has sustained appreciable
harm as a result of the lawyer's conduct." Lyons v. Nutt, 436 Mass. 244, 247 (2002) citing
Williams v. Ely, 423 Mass. 467, 473 (1996).  Although courts have sometimes applied what is
referred to as the "continuing representation doctrine" to toll the statute of limitations in a legal
malpractice action, the circumstances under which the doctrine applies are limited and do not fit
the facts of this case:

> The doctrine has no application, however, where the client actually
> knows that he suffered appreciable harm as a result of his
> attorney's conduct.  If the client has such knowledge, then there is
> no "innocent reliance which the continued representation doctrine
> seeks to protect."

Lyons, 436 Mass. at 250 citing Cantu v. St. Paul Cos., 401 Mass 53, 58 (1987).   Here, Vantage

was actually aware that it suffered appreciable harm long before it ended its relationship with the

Defendants.  As of the date that the Government made known its intention to pursue claims

relating to the Agreement – March 1, 2001 – Vantage could no longer claim innocent reliance on

the Defendants and, as a result, it is not entitled to any relief from the running of the statue of

limitations.

The continuing representation doctrine is particularly out of place in this case since, at all

times, Vantage had independent counsel defending it in the *qui tam* action.  Part of the reasoning

behind the doctrine is the recognition that "a person seeking professional assistance has a right to

repose confidence in the professional's ability and good faith, and realistically cannot be

expected to question and assess the techniques employed or the manner in which the services are

rendered."  Lyons, 436 Mass. at 249-50 citing Murphy v. Smith, 411 Mass. 133, 137 (1991)

quoting Cantu, 401 Mass. at 58.  These policy considerations do not apply here as Vantage, a

sophisticated business entity, was being represented by counsel other than Defendants at the time

the Agreement was made part of the *qui tam* action in March 2001.   Vantage's counsel in the *qui*

*tam* action, which included counsel who are prosecuting this action, received, analyzed and

defended against the Government's claims arising from the Agreement.  Furthermore, incurring

the fees of these attorneys was itself appreciable harm arising from the Agreement.  See Mass.

Elec. Co. v. Fletcher, Tilton & Whipple, P.C., 394 Mass 265, 268 (1985) (incurring of legal fees

constitutes a sufficiently appreciable harm for purposes of the accrual of a cause of action).

Under these circumstances, Vantage cannot claim innocent reliance on Defendants to avoid the statute of limitations.[5]

### B.    Defendants' alleged conduct is not actionable under c. 93A.

Although the provisions of c. 93A do apply to attorneys in the abstract, <u>Frullo v. Landenberger</u>, 61 Mass.App.Ct. 814, 822 (2004), to establish liability the malpractice plaintiff must prove that the defendant attorney's actions fall "within the penumbra of some common-law, statutory or other established concept of unfairness." <u>Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.</u>, 406 Mass. 7, 14 (1989).  An unfair act or practice within the meaning of Chapter 93A is one that is immoral, unethical, oppressive or unscrupulous.  See <u>PMP Associates, Inc. v. Globe Newspaper Co</u>., 366 Mass. 593, 596 (1975); <u>Purity Supreme, Inc. v. Attorney General</u>, 380 Mass. 762, 777 (1980).  A higher standard of misconduct is required in cases, such as this one, that are brought by a business under § 11 of c. 93A.  <u>Madan v. Royal Indemnity Co.</u>, 26 Mass. App. Ct. 756, 763 n.7 (1989); <u>Levings v. Forbes & Wallace, Inc</u>., 8 Mass. App. Ct. 498, 504 (1979).

A negligent act, standing by itself, does not give rise to a claim against an attorney under Chapter 93A.  <u>Squeri v. McCarrick</u>, 32 Mass. App. Ct. 203, 206 (1992).  Accordingly, the typical malpractice claim does not give rise to a c. 93A violation.  The only cases in which c. 93A has been applied to attorneys involve either financial dealings between an attorney and his client, <u>Gwenard v. Burke</u>, 387 Mass. 802, 808-811 (1982) (use of unlawful contingent fee agreement or intentional misrepresentations); <u>Brown v. Gerstein</u>, 17 Mass. App. Ct. 558 (1984).  An attorney's

---

[5] It is abundantly clear that the potential claims against Defendants were known to Vantage and could have been filed in a timely manner.  The 93A demand letter served by the same attorney who was counsel for Vantage in the *qui tam* action and in this action was sent to defendants on February 12, 2004.

departure from the standard of care that is merely negligent has never been held to constitute an unfair or deceptive trade practice.

Here, Defendants' advice with respect to entering into the Agreement cannot, in itself, form the basis of a claim for a violation of c. 93A. Vantage alleges in its Complaint that Defendants made intentional misrepresentations which give rise to c. 93A liability. Although Vantage's claim for violation of c. 93A (Count V) does not specifically identify the complained of conduct, it is apparent the Vantage is asserting that Defendants' alleged "Fraudulent Misrepresentation[s]" (Count III) form the basis of its c. 93A claim:

> In connection with obtaining the Engagement, NSG and Miller, and each of them, represented that they were skilled and experienced in advising non-profits and their professional fundraisers in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" and that they had the experience and ability to prepare a contract that would satisfy Shriners' requirement for limitations on its liability to pay for Vantage's fundraising services out of Shriners' own cash assets while at the same time, complying with the requirements of the CMR and shielding Vantage from exposure to additional liability in the Action. NSG and Miller further represented that the draft contract that Miller prepared for use with Shriners effectively met these objectives.

(Complaint, ¶34). Neither of the above-alleged misrepresentations is sufficient to give rise to a claim for violation of c. 93A and both lack evidentiary support. Through discovery it has become apparent that there is no basis for Vantage's 93A claim.

### 1.    Defendants did not misrepresent their qualifications.

Although Vantage's Complaint alleges that Defendants misrepresented their expertise in the direct mail fundraising business, Vantage has since backed away from that allegation. Vantage's 30(b)6 witness has testified that Vantage "absolutely" considers Defendants expert in

this field.  (Rule 56.1 Statement at ¶ 42.)  Vantage's own testimony resolves this aspect of its

93A claim in favor of Defendants.

### 2. Defendants' alleged representations as to the legality of the Agreement do not constitute unfair or deceptive conduct.

The Defendants' alleged statements with respect to the legality of the Agreement do not

rise to level of a c. 93A violation.  If anything, Defendants were merely exercising their

professional judgment with respect to whether the Agreement violated the cooperative mail rule,

and nothing more.  If Vantage had filed a timely action for malpractice, it could have had a

vehicle for at least complaining about Defendants' legal advice, but it cannot, without more,

recast an alleged malpractice claim as a claim for violations of c. 93A.  See Squeri, 32 Mass.

App. Ct. at 206 (negligent act, standing by itself, does not give rise to a claim under Chapter

93A).   Errors in judgment simply do not rise to the level of actionable conduct under c. 93A.

Vantage cannot transform its malpractice claim into a c. 93A claim simply to avoid the

preclusive impact of the statute of limitations

Like its claim that Defendants misrepresented their qualifications, Vantage cannot

recover on their claim that Defendants misrepresented the legality of the agreement.  Although

Paragraph 17 of the Complaint alleges that "Miller and NSG expressly assured Vantage that the

form of the contract drafted by Miller had been used repeatedly by fundraisers for non-profits

with the knowledge and without question, objection or challenge by the Postal Service," Vantage

backtracked from this allegation in its answers to interrogatories.  When asked to state the basis

of the allegations in Paragraph  17 of the Complaint, Vantage responded in part, "Defendants. . .

**intimated** that the USPS was aware of at least some of such contracts and that the USPS had

never challenged any of them."  ("Plaintiff's Answers to Defendants' First Set of

Interrogatories," at Answer No. 13) (emphasis added).  The vague intimation alluded to in

14

Vantage's interrogatory answer falls far short of the level of unscrupulous misrepresentation necessary to constitute a violation of c. 93A.

Vantage has explicitly testified that, to this day, it believes that the Agreement complied with the cooperative mail rule. It is clear from this testimony that Vantage still agrees with Defendants' assessment of the legality of the Agreement. As such, Vantage cannot claim that it was deceived in this regard. The existence, or nonexistence, of similar contracts approved by the USPS was not and is not determinative of whether Vantage believed the Agreement was legal.

Vantage's accusations with respect to the legality of the agreement are mere window dressing for what is actually an alleged negligence claim, and a defective one at that. Vantage's claim amounts to nothing more than an assertion that Defendants should have advised Vantage not to enter into the Agreement in light of the pending *qui tam* action. Vantage cannot state a claim for violation of c. 93A simply because Defendants did not accurately foresee that the Government would exercise its discretion and include the Agreement in the *qui tam* action. The Government's decision to pursue claims relating to the Agreement does not equate to proof that the Defendants misrepresented the legality of the Agreement. In fact, the Agreement was never determined to be illegal. Vantage is simply asserting, without support, that Defendants committed an error in judgment. Any such error in judgment cannot form the basis of a c. 93A claim. Despite the allegations in its Complaint, Vantage has presented no proof of an intentional misrepresentation that materially affected it decision to enter into the Agreement. Its own answers to interrogatories and testimony resolve its c. 93A claim in Defendants' favor.

### C. Ultimately, Vantage suffered no damages as a result of the Defendants' actions.

There are numerous issues of causation that support the entry of summary judgment in Defendants' favor. Chief among them is the fact that Vantage did not suffer any damages as a

result of Defendants' alleged conduct.  By entering into the Agreement, Vantage received over

$43 million in revenue.  (Rule 56.1 Statement at ¶ 48.)  Vantage retained over 93% of every

fundraising dollar that was generated by the Agreement.  Approximately $15 million of the funds

received by Vantage represented gross profit.  (Id. at ¶ 49.)  Vantage's profit resulting from the

Agreement was admittedly far in excess of any amount paid to the Government to resolve the *qui*

*tam* action.  (Id. at ¶¶ 45, 46.)  An attorney may be held liable for legal malpractice only if the

plaintiff can show that it "probably would have obtained a better result had the attorney exercised

adequate skill and care."  Jernigan v. Giard, 398 Mass. 721, 723 (1986) quoting Fishman v.

Brooks, 396 Mass. 643, 647 (1986).  In light of the enormous benefit it received as a result of the

Agreement, Vantage cannot show that it would have obtained a better result if Defendants

advised Vantage not to enter into the Agreement in the first place, as Vantage apparently claims

Defendants should have done.  If Defendants had advised Vantage not to enter into the

Agreement, Vantage would be out $15 million.  By entering into the Agreement, Vantage reaped

a significant profit.  Defendants should be thanked, not sued.

Similarly, the lack of any damages dooms the plaintiffs' c. 93A claim.  Such a claim

requires a plaintiff to show that the allegedly unfair or deceptive act caused the loss of money or

property to be actionable. Frullo, 61 Mass. App. Ct. at 823 citing Massachusetts Farm Bureau

Fedn., Inc. v. Blue Cross of Mass., Inc., 403 Mass. 722, 730 (1989).   In Frullo, the Appeals

Court affirmed summary judgment in favor of the defendant attorney where there was "no

showing that the plaintiffs lost anything as a result of the defendant's actions, deceptive or

otherwise.  Such a showing required evidence that the plaintiffs, absent the defendant's c. 93A

violation, would probably have prevailed in the underlying case. . . If they were destined to lose

that case irrespective of the defendants' actions or omissions, the c. 93A violations caused them

no loss of money or property. The absence of evidence on this essential element is fatal."
Frullo, 61 Mass.App.Ct. at 823. Here, Defendants actions did not cause the loss of any money,
but resulted in a huge gain for Vantage. The undisputed fact is that the Agreement, as drafted,
resulted in a $15 million gross profit for Vantage. As such, there is no basis upon which Vantage
can recover damages.[6]

Vantage cannot claim that the same $15 million profit could have been realized by
drafting the Agreement in such a way as to avoid having it included in the *qui tam* action. Not
only is this claim speculative, it is also contrary to the evidence. Beyond the fact that there is no
way to predict whether the Government would have taken issue with any fundraising agreement
between Vantage and the Shriners, the undisputable fact is that the Shriners would not have
entered into the Agreement if it had been drafted in any other way. The inclusion of key
paragraphs with respect to the postal rates to be used for mailings under the Agreement and the
Shriners' liability for payment to Vantage under the Agreement were prerequisites to the
Agreement being consummated. Vantage alleges this in its Complaint (¶11) and supporting
evidence of this fact is provided by the Shriners.

Ralph Semb, the Chairman of the Board of Directors of the Shriners Hospitals at the time
the Agreement was finalized, has verified by affidavit that the Shriners would not have entered
into the Agreement absent the inclusion of key terms and paragraphs. (Rule 56.1 Statement at ¶¶
51-53). According to Mr. Semb, the individual with ultimate approval of the Agreement, the
Shriners would not have entered into the Agreement unless mailings were made at the nonprofit

---

[6] It is noteworthy that Vantage failed to mitigate the settlement payment by exercising its
contractual right to have the Shriners pay for outstanding postage, which was the Government's
remaining damages claim in the *qui tam* action. Vantage also failed to present any expert

mailings rates and Shriners' liability for payment under the Agreement was limited. (Id.).  If the Agreement was written differently, it would have never been entered into in the first place. Vantage has no evidence to the contrary.

## CONCLUSION

Seen for what it really is, Vantage's lawsuit against Defendants is nothing more than untimely attempt to squeeze every last dollar out of its Agreement with the Shriners.  Vantage is apparently dissatisfied with retaining ninety-three cents of every dollar generated in the Shriners' name and is apparently dissatisfied with reaping $15 million in profit as a result of the Agreement.  Having come out ahead on the deal, Vantage has no basis to seek damages from Defendants.  But for Defendants' alleged acts and omissions, the Agreement would never have existed and Vantage would not have $15 million in its coffers.  Summary judgment should enter in Defendants' favor on all claims.

Respectfully submitted,

Nonprofit Service Group and
George E. Miller,
By their attorneys,

/s/ Matthew J. Griffin

Richard L. Nahigian, Esq., BBO#: 549096
Matthew J. Griffin, Esq., BBO#641720
PEABODY & ARNOLD LLP
30 Rowes Wharf, 6th Floor
Boston, MA  02110-3342
(617) 951-2100

620642_1

---

evidence in the *qui tam* action concerning the rental value of the Shriner's mailing list, which could have prevailed at the summary judgment state.  (Rule 56.1 Statement at ¶¶ 34-35.)