UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VANTAGE FINANCIAL SERVICES, INC.<br>Plaintiff,<br><br>v.<br><br>NONPROFIT SERVICE GROUP AND<br>GEORGE E. MILLER,<br>    Defendants. | **C.A. No. 04-11686-WGY** |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The plaintiff, Vantage Financial Services, Inc. ("Vantage") submits this memorandum in opposition to the Motion for Summary Judgment filed by the defendants, Nonprofit Services Group ("NSG") and George E. Miller ("Miller") (collectively "Defendants"). In further support of this opposition, Vantage submits Plaintiff's Rule 56.1 Statement of Material Facts, the Affidavit of Henry Melikian and supporting papers attached as Exhibits A through Exhibit K, inclusive, of the authenticating affidavit of Laurence M. Johnson..

### FACTUAL BACKGROUND

Vantage engages in the business of assisting non-profit organizations (hereinafter "NPOs") in fundraising and membership solicitation and in providing solicitation preparation, printing, collating, addressing, envelope filling and mailing services to NPOs in connection therewith. During and prior to 1999, Vantage was a defendant in a civil action in the United States District Court for the District of Massachusetts (hereinafter the "Action"), originally commenced pursuant to the provisions of the Federal False Claims Act, in which recovery was sought as a result of fundraising mailings made by Vantage for various of its NPO customers at not-for-profit postal rates. It was further claimed in the Action that such mailings were not

eligible for mailing at not-for-profit postal rates ("NP Rates") because Vantage's contracts with

such NPO customers either limited the NPO customer's liability to pay Vantage for its services

and out-of-pocket costs or restricted the means by which Vantage could obtain payment for same

in the event of a shortfall in the funds raised by the solicitation mailings and that, accordingly,

mailings made pursuant thereto at NP Rates were in violation of the United States Postal

Service's Cooperative Mail Rule (hereinafter the "CMR").

While the Action was pending, Vantage began negotiating a very large fundraising

services contract with Shriners Hospitals for Children ("Shriners"), a large nonprofit

organization. While Shriners wanted to be able to mail its fundraising mailings at NP Rates,

Shriners had nonetheless demanded, during the course of the negotiations, that any fundraising

services contract with Vantage include terms providing that it would not have to pay Vantage

from its own cash assets not resulting from the fundraising program contemplated by the

agreement. In light of the Action, Vantage was extremely concerned that a contract with

Shriners not add to its potential liability in the Action.

At that time, Defendant Miller (and, when he formed it, NSG) had represented Vantage

since 1994 in numerous matters dealing with compliance with state registration requirements for

fundraisers and, since 1997, preparation of fundraising contracts with nonprofits. Miller held

himself out to Vantage as being knowledgeable and an expert in these areas. Based on these

representations, Vantage employed Defendants to prepare a contract that would satisfy Shriners'

demands and protect Vantage against further claims of CMR violations. Defendants were fully

aware that it was the Postal Service's position, since at least the 1980s, that a for-profit

fundraiser could not be at risk for any portion of the cost of a mailing made at NP Rates.

Defendants were also fully aware of both Shriners' requirements and Vantage's involvement in

the Action. Defendants negotiated and drafted a fundraising contract between Vantage and

Shriners (the "Shriners Contract"), which included the payment provision set forth in Paragraph

2

13.2 of the Shriners Contract. That provision limited Vantage's recourse, at Shriners' option, solely to the proceeds of follow up mailings and/or income from rental or exchange of the donor list that would result from the mailings, in each case for a period of thirty-six months. Defendants failed to draft or prepare any other provision that might have satisfied Shriners and still avoid a CMR violation. During negotiations with the Shriners and consultations with Vantage, Defendants assured Vantage that the Shriners Contract did not violate the CMR, that mailings made pursuant to the Shriners Contract were entitled to be mailed at NP Rates, and that the Shriners Contract created no CMR liability. Based on these representations, Vantage entered into the Shriners Contract with Shriners. Defendants also represented that agreements with similar provisions were in common use, had been accepted by the Postal Service, and that the Shriners Contract had been submitted to, and approved by, the Postal Service.

Despite Defendants' assurances, the United States included a claim against Vantage based on the Shriners Contract on or about March 1, 2001. On that date, however, Vantage had no reason to believe that Defendants' acts and omissions had caused it harm. Immediately thereafter, Vantage again consulted Defendants and was again and repeatedly assured that the Shriners Contract did not violate the CMR, that Shriners mailings were entitled to be mailed at NP Rates, and that Vantage was not liable with respect to the Shriners mailings. At this time, Defendants were continuing to represent Vantage in various matters. Between March 1, 2001 and May 5, 2003, Defendants consulted further with Vantage, and its litigation counsel in the *qui tam* case with respect to the Shriners Contract. When the United States filed a Motion for Summary Judgment in the *qui tam* case, Miller reaffirmed that he had repeatedly used the Shriners Contract's provisions with respect to payment in other contracts, and that such provisions had never been challenged by the Postal Service.

In part in continuing reliance upon Defendants' repeated assurances that the Shriners Contract complied with the CMR, Vantage instructed its counsel to prepare a Motion for

3

Summary Judgment on its behalf in the *qui tam* case, and to oppose the Motion for Summary

Judgment filed by the United States. In connection with Vantage's Motion for Summary

Judgment, and its opposition to the United States' Motion, Miller supplied affidavits addressing

the Shriners Contract. In an Affidavit dated February 13, 2002, Miller expressly stated that he

had drafted <u>very similar</u> agreements <u>for at least six other nonprofits</u> who contracted to have

fundraising counsel other than Vantage perform fundraising services for them. He also stated the

payment provision was in common use in the industry and that the Postal Service had never

challenged it. In a subsequent affidavit, Miller continued to reaffirm his previous advice and

again represented that the terms of the Shriners Contract were sufficient to impose unconditional

liability for Vantage's charges upon Shriners.

      The Court held a hearing in mid-August 2002 and subsequently, on August 30, 2002,

Judge Wolf announced his intended decision with respect to the general issues on liability that

the parties had argued. Even then, since the parties had not briefed or argued with respect to

specific non-profits, Judge Wolf gave no indication of whether he would impose liability with

respect to the Shriners mailings. Thereafter the parties agreed to further brief the liability issues

with respect to four "test case" non-profits, including Shriners. A hearing was held on <u>May 5,</u>

<u>2003</u> (barely fourteen months prior to the commencement of this case) at which Judge Wolf, <u>for</u>

<u>the first time</u>, indicated his view that there might well be liability on the Shriners mailings and

that the United States was either entitled to summary judgment on those claims or that, at best,

Vantage would have to go to trial on them.

      Vantage had no reason to believe that the repeated advice given by Defendants might be

incorrect until Judge Wolf delivered his intended rulings with respect to the Shriners Contract.

As a result of the ruling, Vantage was now faced with the likelihood that Judge Wolf would

award some $3 million in revenue recovery damages against it on the Shriners mailings, together

with additional damages of approximately $3 million on the other claims in the case, plus

possible punitive damages with respect to mailings for a small number of the other non-profits.
A judgment in that amount would have destroyed Vantage. Faced with a choice between
continuing to risk such a judgment and negotiating a settlement, Vantage had no alternative but
to settle.

From initial negotiations with the Shriners to the summary judgment phase in the *qui tam*
case, Defendants advised Vantage and represented to the Court that the payment provisions in
Paragraph 13.2 of the Shriners Contract satisfied the requirements of the CMR, that the
Defendants had prepared contracts with similar payment provisions, and that contracts with
similar provisions regarding follow up mailings and use of donor list rental income had never
been objected to, or challenged by, the Postal Service. That these representations were false is
fully supported by information learned during discovery. Despite representations that
Defendants had prepared contracts similar to the Shriners Contract, Defendants have produced
no such fundraising agreements. In fact, Miller has admitted in his deposition testimony that he
is aware of no instance in which any agreement containing the payment provisions that he
drafted into the Shriners' Contract (and which were at issue in the *qui tam* case) were ever
presented to, reviewed, or approved by the Postal Service. Despite the fact that a procedure
existed for obtaining an "advance ruling" from the Postal Service, Defendants had never, at any
time prior to the execution of the Shriners Contract, presented any fundraising contract for any
client to the Postal Service for such a ruling or for any review or approval. Nor were Defendants
aware of any such ruling by the Postal Service. In fact, at the time, no decision of any court or
agency had ever held that a fundraising agreement that contained provisions that left the
fundraiser prospectively at risk with respect to payment of program charges, could be
retrospectively brought into compliance with the CMR if, in fact, the fundraiser was ultimately
paid. Moreover, despite express representation to the contrary made by Miller, Defendants never

submitted the Shriners Contract to the Postal Service for its review or approval, nor does Miller

recall whether he informed Vantage that he hadn't done so.

While the payment provision in the Shriners Contract thus presented a question of first

impression as to its compliance with the CMR, Miller failed to advise Vantage of this fact or of

the risk it presented , particularly in light of the Action.

<u>ARGUMENT</u>

I.    THE STATUTE OF LIMITATIONS ON PLAINTIFF'S MALPRACTICE CLAIM WAS
      TOLLED UNTIL AT LEAST MAY 2003

"The Massachusetts statute of limitations for a legal malpractice claim is three years." *St.*

*Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP,* ("*St. Paul*"), 379 F.

Supp. 183, 196 (D. Mass. 2005); M.G.L. c. 260, § 4.  Under Massachusetts law[1], a malpractice

claim accrues and the limitations period begins to run "once [a] client or former client knows or

reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's

conduct. . . ."  *St. Paul, 379 F. Supp. at 196 citing Rosen Constr. Ventures, Inc. v. Mintz, Levin,*

*Cohn, Ferris, Glovsky and Popeo, P.C.,*(*"Rosen"*), 364 F.3d 399, 405 (1st Cir.2004) *quoting*

*Williams v. Ely*, 423 Mass. 467, 473 (1996).  As such, this two-pronged examination requires

Vantage "to have (1) knowledge or sufficient notice that [it] was harmed and (2) knowledge or

sufficient notice of what the cause of harm was."  *St. Paul, 379 F. Supp. at 196 quoting Bowen v.*

*Eli Lilly & Co., Inc.*, 408 Mass. 204, 208 (1990) *quoting Rosen*, 364 F.3d at 405.  When viewed

in a light most favorable to Vantage, the facts of this case establish that Vantage had no reason to

believe that Defendants committed malpractice or made any actionable representations prior to

May 5, 2003.

---

[1] "[T]he substantive law of Massachusetts provides the rules of decision in this diversity case, *Pitts v. Aerolite SPE Corp.*, 673 F. Supp. 1123, 11227 (D. Mass. 1987), and Massachusetts specifies a three-year statute of limitations for legal malpractice claims." *Rosen Construction at 404.*

A.    **Vantage Did Not Know Its Harm Was Causally Linked To Defendants'
Malpractice Until After May 5, 2003**

Defendants seek to focus the Court on the date on which Vantage began paying legal fees

to address the United State's claim with respect to the Shriners Contract. "The statute of

limitations is not triggered under Massachusetts law merely because a client knew he was

incurring additional legal fees; the client must know that he or she is incurring those fees *because

of* the alleged malpractice." *St. Paul,* 379 F. Supp. at 198 (emphasis in original). Here, it may

have been possible (with the benefit of hindsight), to determine that Vantage sustained

appreciable (albeit minimal) harm as early as March 2001 when its attorneys began analyzing the

Government's expanded damages claim, which included a comparatively small claim on the

Shriners Contract.[2] The facts establish, however, that Vantage did not know that Defendants

caused even this minimal harm until much later.

When the Shriners Contract came under the scrutiny of the United States in May 2001,

Vantage had no idea that anything Defendants had done was to blame. (Rule 56.1 Statement, ¶

3.) Unlike the plaintiff in *Cantu v. St. Paul Cos.*, 401 Mass. 53, 58 (1987), relied upon by

Defendants, Vantage did not hire a second attorney to investigate Defendants when the United

States asserted claims under the Shriners Contract. That is because the inclusion of the Shriners

Contract by the United States did not cause Vantage to question Defendants' advice. (Rule 56.1

Statement, ¶ 3.) In fact, the record is devoid of any evidence suggesting that, as of 2001,

Vantage was dissatisfied with Defendants' legal services. *St. Paul,* 379 F. Supp. at 198 (that

client did not question attorney's advice was evidence that it did not know of the causal link to

attorney's malpractice). What the record shows instead is that Vantage continued to consult with

Defendants as it sought to develop its strategy in the *qui tam* case. (Rule 56.1 Statement, ¶¶ 3,

---

[2] The Government's initial $184,000 claim on the Shriners mailing amounted to about six percent of its then claims of $3,000,000.

4.)  During each of those consultations, Defendants assured Vantage that the payment provisions of the Shriners Contract were perfectly appropriate.  (Rule 56.1 Statement, ¶¶ 3, 4.)  What the record further shows is that these consultations, and Vantage's reliance on Defendants' advice, continued through the summary judgment stage of the *qui tam* matter, and certainly through May 17, 2002, when Miller submitted his supplemental affidavit in support of Vantage's motion for summary judgment.  (Rule 56.1 Statement, ¶¶ 4, 5, 6, 7, 22.)  Miller's two affidavits furnished for submission to the Court in the *qui tam* case make representations to the Court that are substantially the same as those relied upon by Vantage.  (Rule 56.1 Statement, ¶¶ 6, 7, 22.)  Moreover, it is indisputable that Vantage continued to retain Defendants to represent it in various other matters until at least February, 2004.  (Rule 56.1 Statement, ¶¶ 1, 3.)

That Vantage cannot be found to have known of the causal link between its harm and Defendants' negligence is illustrated in the case of *Eck v. Kellem*, 51 Mass. App. Ct. 850 (2001).  There, an attorney (the "first attorney") drafted a contract for the sale of property and assured his client, the seller, that a contract provision protected him from any future claims by the buyer under c. 21E.  The buyer later sued the client/seller for damages resulting from contamination and the client/seller hired separate counsel to defend the contamination suit.  The client/seller and litigation counsel relied on the opinion of the first attorney, who continued to assure them that contract would protect the client/seller.  When the client/seller was ultimately found liable, he filed a malpractice action against the first attorney.[3]  The first attorney moved for summary judgment on the grounds that the statute of limitations had be begun to run upon the filing of the contamination suit.  The court disagreed.  Central to the court's decision were two facts.  First, although the first attorney did not represent the client/seller during the litigation, he continued to insist that the subject contract would protect the client/seller.  *Eck*, 51 Mass. App. Ct. at 854.

Second, litigation counsel was entirely aligned with the first attorney's legal opinion. *Eck*, 51 Mass. App. Ct. at 854-855. It followed, the court found, that the client/seller had the right to rely on litigation counsel's professional assistance and would have been reasonable in concluding, based on litigation counsel's reliance on the first attorney's opinion, that the contamination suit was frivolous, that the contract would protect him, and that a malpractice claim would, at that time, have been inappropriate. *Eck*, 51 Mass. App. Ct. at 855. As such, the court ruled that the client/seller could not have been held to have knowledge of the first attorney's negligence, for purposes of triggering the statute of limitations, until the contamination suit concluded.

*Eck* is factually similar to (but presents a weaker case for tolling the statute of limitations) than the present case. Like the first attorney in *Eck*, Defendants continued to insist that the Shriners Contract would provide the protections Defendants' promised throughout the *qui tam* litigation. When the Shriners Contract was added, Defendants did not change their position about the validity of those payment provisions. (Rule 56.1 Statement, ¶ 3.) To the contrary, Defendants vigorously continued to assert, both to Vantage and its litigation counsel, that the Shriners Contract's payment provisions did not violate the CMR. (Rule 56.1 Statement, ¶ 3, ___.) Like the client/seller in *Eck*, Vantage had the right to "repose confidence in the professional[] ability and good faith of [Defendants and its counsel in the *qui tam* case]." *Eck*, 51 Mass. App. Ct. at 855 *quoting Cantu v. St. Paul Cos.*, 401 Mass. at 58. Because Vantage did repose such confidence, as it was entitled to do,"[w]hether, in fact, [Defendants were] negligent in the preparation of the [Shriners Contract] had to await the outcome of the [*qui tam*] suit." *Eck*, 51 Mass. App. Ct. at 855. Here, however, unlike the *Eck* case, Vantage also continued to employ Defendants on other matters until at least February, 2004 and there was here actual continuing attorney/client relationship with Defendants until then.

---

[3] The client/seller also filed a malpractice action against litigation counsel for unrelated reasons.

That Vantage was persuaded by Defendants' continued insistence until Judge Wolf made his opinion clear is further evidenced by Vantage's continued relationship with Defendants after May 2001. As is established by the legal bills submitted to Vantage by NSG, Defendants' continued to advise Vantage in connection with this and other matters through 2003. (Rule 56.1 Statement, ¶ 1.) During this period, Vantage continued to utilize Defendants' services based on their representations regarding their skill and knowledge in the area of nonprofit fundraising. (Rule 56.1 Statement, ¶¶ 3, 4, 5, 6, 7, 8, 27.) Defendants' reliance on *Lyons v. Nutt*, 436 Mass. 244 (2002) for the proposition that that Vantage had actual knowledge prior to this time is erroneous. In that case, the client's testimony during his deposition that a law firm "didn't know what they were doing" was sufficient to demonstrate "actual knowledge." *Lyons*, 436 Mass. at 248. In the present case, there is no such evidence on the record. The only evidence before this Court establishes that Vantage continued to trust and rely upon Defendants legal interpretation of the Shriners Contract until at least 2003. From this, the only reasonable inference that may be drawn is that Vantage had no actual knowledge of the malpractice until May 2003 when Judge Wolf first indicated Vantage's probable liability for the Shriners mailings. *See St. Paul*, 379 F. Supp. at 198 (that client did not question attorney's advice was evidence that it did not know of the causal link to attorney's malpractice). Summary judgment must thus be denied.

**B.     The Statute Of Limitations Was Tolled Under The Doctrine Of Continued Representation**

Defendants' argument that the statute of limitations began to run in May 2001 must also fail on the independent ground that the facts of this case clearly implicate the doctrine of continuing representation. The statute of limitations began to run only when Vantage knew that there was a causal link between the harm it suffered and Defendants' malpractice. *St. Paul, 379 F. Supp. at 197 citing Eck*, 51 Mass. App. Ct. at 853. "The continuing representation doctrine 'recognizes that a person seeking professional assistance has a right to repose confidence in the

professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered.'" *Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 364 F.3d at 406 *quoting Murphy v. Smith*, 411 Mass. 133, 137 (1991). As such, the statute of limitations is tolled "while the defendant attorney continues to represent the plaintiff. . . ." *Rosen*, 364 F.3d at 406 *quoting Cantu v. St. Paul Cos.*, 401 Mass. 53, 57 (1987).

That the doctrine is applicable to the facts of the present case is illustrated in the *St. Paul* case. There, a patent attorney advised his client, Vicam, to send a letter notifying Vicam's customers that a competitor, Neogen, had developed a product that Vicam considered to infringe on one of its patents. The patent attorney never advised Vicam that sending the letter might expose Vicam to liability for defamation or other business torts. Predictably, Neogen filed such a suit against Vicam. During the course of the litigation, the patent attorney and its litigation counsel continued to assure Vicam that Neogen's claims were baseless and that Vicam had a high likelihood of prevailing. *Id.* at 188. On cross-motions for summary judgment, the court ruled against Vicam and found that there were triable issues on Neogen's tort claims, particularly whether Vicam acted in bad faith by sending the letter. Within three years of the courts decision on the summary judgment motions, but more than three years after the filing of the patent action, Vicam filed a malpractice action against patent counsel. Patent counsel moved for dismissal of all claims on the grounds that the statute of limitations had expired. He argued that the statute began to run when Neogen filed the complaint against Vicam in the underlying patent action. The court in the malpractice action disagreed and found that the statute was tolled under the doctrine of continuing representation on the ground that Vicam believed that Neogen was responsible for its harm due in large part to patent counsel's continued assurances that Neogen's suit was meritless. Vicam therefore could not have known of the causal connection between Vicam's harm and patent counsel's negligence until the ruling on summary judgment.

Like patent counsel in *St. Paul,* Vantage believed that the Government added a claim under the Shriners Contract that was baseless. It so believed on the basis of Defendants' continuing assistance to that effort, (Rule 56.1 Statement, ¶¶ 3, 4, 5), confirmed in Miller's own affidavits prepared for submission to the *qui tam* court. (Rule 56.1 Statement, ¶¶ 6, 7.) Defendants did everything they could to ensure that Vantage's focus remainder steadfastly on the United States and off of themselves. This is illustrated by their actions beginning in 2001. When the Government added claims based upon the Shriners Contract in March 2001, Vantage again consulted Defendants who continued to assure Vantage that the Shriners Contract did not violate the CMR, that mailings made pursuant to that Agreement were entitled to be mailed at not-for-profit rates and that Vantage was not liable on the claims asserted by the Government with respect to mailings pursuant to the Shriners Contract. (Rule 56.1 Statement, ¶¶ 3, 4.) Vantage had a right to rely on these representations. *See Rosen*, 364 F.3d at 405-406 (where prior counsel continued to advise litigation counsel during litigation, malpractice claim accrued only after entry of judgment). Between March 2001 and August 2002, Vantage and its litigation counsel in the *qui tam* case continued to consult with Defendants about the Shriners Contract on repeated occasions. (Rule 56.1 Statement, ¶ 4.) During these consultations, Defendants never suggested that there was a problem with the payment provisions and instead continued to maintain that the Shriners Contract's provisions with respect to payment to Vantage were common in the industry, that Miller had used them repeatedly in other contracts and that Postal Service had been aware of such provisions and that it had never objected or otherwise challenged them. (Rule 56.1 Statement, ¶ 4) As is set forth above, those representations were untrue. Nevertheless, when Vantage was considering its position during the summary judgment phase in the *qui tam* case, Defendants continued to lead Vantage and its litigation counsel astray. Based in part on Defendants' continued representations and willingness to submit supporting affidavits, Vantage instructed its counsel to prepare a motion for summary judgment in the *qui tam* case and

to oppose the United State's motion. (Rule 56.1 Statement, ¶ 5.) Vantage had every right to rely on Defendants' continuing representations until Judge Wolf made it clear that Vantage would at best have to try its liability and at worst lose on the United State's claims. *See Rosen*, 364 F.3d at 405-406 (where prior counsel continued to advise litigation counsel during litigation, malpractice claim accrued only after entry of judgment).

Defendants' argument for the inapplicability of the doctrine is difficult to understand. Defendants' reliance on *Mass. Elec. Co. v. Fletcher, Tilton & Whipple, P.C.*, 394 Mass. 265, 268 (1985) for the proposition that the incurring of legal fees by Vantage makes the doctrine inapplicable is unfounded. In that case, it was undisputed that the client knew that the negligent that attorney had committed malpractice more than three years before filing the malpractice lawsuit. The only issue in that case was whether the client had sustained harm when the underlying lawsuit was filed or when it ultimately settled. There, since the client immediately began incurring legal fees it would not have otherwise incurred upon the filing of the lawsuit, the court naturally found that the harm occurred at that time.

The facts of *Mass. Elec. Co.* are clearly inapposite. Unlike the client in that case, there remains a question of fact as to whether Vantage began suffering damage in 2001 as a result of inclusion of the Shriners in the *qui tam* case. At that time, the amount attributed to the Shriners was but a small percentage of the total damages alleged by the United States and did not add anything at all to the expense of defending the *qui tam* case. (Rule 56.1 Statement, ¶ 11.) Most significantly, however, *Mass. Elec. Co.* adds nothing to the second prong the statute of limitations analysis; whether Vantage knew that Defendants were the cause of their harm in March 2001. The issue of when the client should have know the attorney caused the harm was simply not addressed by the court in *Mass. Elec. Co.* because that fact was not disputed. In this case, however, both Defendants' continued assurances as to the validity of the payment

provisions of the Shriners Contract and Defendants continuing representation of Vantage until February, 2004, establishes clearly that the opposite is true. (Rule 56.1 Statement, ¶¶ 3-7.)

The only other substantive matter addressed in Defendants' motion regarding the doctrine of continuing representation is whether or not Vantage has satisfied the innocent reliance prerequisite of the doctrine. As Defendants correctly set forth, "[t]he doctrine has no application . . . where the client actually knows that he suffered harm as a result of his attorney's conduct. *Lyons*, 436 Mass. at 250. As is set forth above, however, Vantage had no actual knowledge of Defendants' negligence and had every right to rely on their assurances. *Eck*, 51 Mass. App. Ct. at 855. Defendants' only other resort is to suggest the policy considerations of the doctrine of continuing representation do not apply to "sophisticated business entities," which are "represented by counsel." (Defendants' Brief, p. 11.) Defendants do not cite any authority for this proposition. That is because it is not the law of Massachusetts. In fact, many of the cases cited by Vantage in its summary judgment papers referred to sophisticated business that were entitled to rely on the doctrine. *See e.g. Rosen*, 364 F.3d 399; *St. Paul*, 379 F. Supp.2d 183. When viewed in a light most favorable to Vantage, the facts establish that Vantage did not have any reason to know that it was harmed, or that Defendants were the cause of their harm, until May 5, 2003, a mere fourteen months prior to the filing of the present lawsuit. If Defendants' statute of limitations claim is not frivolous on its face, it is surely so bootless as to be close to that status and provides no colorable support for Summary Judgment.

II.    <u>DEFENDANTS' ACTIONS ARE ACTIONABLE UNDER CHAPTER 93A</u>

Defendants concede, albeit grudgingly in their Brief (Defendants' Brief, p. 12), that "[t]here is no doubt that the provisions of G.L. c. 93A apply to attorneys." *Frullo v. Landenberger*, 61 Mass. App. Ct. 814, 822 (2004) *citing Guenard v. Burke*, 387 Mass. 802, 809 (1982); *Brown v. Gerstein*, 17 Mass. App. Ct. 558, 570 (1984). While Defendants also acknowledge that intentional misrepresentations of fact may result in 93A liability, it is further

14

well established that "negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice within the meaning of c. 93A, § 2(a )." *Golber v. BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 261 (1999) *quoting Glickman v. Brown*, 21 Mass. App. Ct. 229, 235 (1985).

There are questions of fact both as to whether Defendants misrepresented their qualifications and whether they made deliberate or negligent misrepresentations to both Vantage and the *qui tam* court, as to the circumstances bearing upon the compliance of the Shriners Contract with the CMR. At issue in this case is not whether NSG and Miller had some general experience in the area of nonprofit fundraising. Presumably they did. However, Vantage needed something very specific from Defendants. Vantage apprised Defendants that Vantage was involved in litigation with the United States and wanted them to prepare a contract for Shriners that would, at a minimum, allow Vantage to mail Shriners' fundraising mailings at not-for-profit postal rates, limit Shriners' liability to pay Vantage for its fundraising services and out-of-pocket expenses from Shriners' cash assets in the event that the fundraising programs failed to raise sufficient amounts to pay out of the fundraising proceeds, and ensure that Vantage would avoid additional claims or potential liability such as that then being asserted against it in the Action. (Rule 56.1 Statement, ¶¶ 3, 17, 18.)

During negotiations with Defendants about preparing a contract for Shriners, Defendants expressly represented that they had previously prepared numerous contracts that would satisfy both Shriners' and Vantage's needs. (Rule 56.1 Statement, ¶ 19.) Miller specifically told Vantage that Defendants had experience drafting payment provisions that limited a nonprofit's liability to pay out-of-pocket costs from its own cash assets and that those payment provisions had never been questioned or challenged by the Postal Service. (Rule 56.1 Statement, ¶¶ 22, 32.) Of course, it is implicit that Miller knew that the Postal Service had been made aware of the use of agreements with such provisions, for otherwise his representation would have been misleading

15

and meaningless, at best. Based on these representations, Vantage engaged Defendants to draft the Shriners Contract, which included Paragraph 13.2 of the Shriners Contract, the payment provision. (Rule 56.1 Statement, ¶ 40.) This is the expertise that Vantage sought from Defendants and this is expertise that Defendants claimed they had. Given the *qui tam* court's conclusion that the Shriners Contract probably violated the CMR, the contracts probable invalidity is wholly inconsistent with Defendants' claimed expertise.

It is now undisputed that Defendants misrepresented their level of experience to Vantage. During discovery in this case, Miller admitted during his deposition that he was aware of no instance in which Defendants drafted a payment provision similar to the Shriners Contract and no such contracts have been produced in response to Vantage's document requests. (Rule 56.1 Statement, ¶¶ 6, 20.) Nevertheless, Defendants continued to represent that the United State's case against Vantage in connection with the Shriners Contract was without merit. Miller even went as far as to represent to the Court in the underlying action that he had prepared "very similar agreements for at least six other nonprofits. (Rule 56.1 Statement, ¶ 6.)

Most tellingly, Defendants also expressly represented to both Vantage and the court that Miller had prepared numerous "very similar" fundraising agreements and that those agreements had not been challenged by the Postal Service. During discovery, Miller failed to produce any prior agreement utilizing the payment provision appearing in Paragraph 13.2 of the Shriners Contract (or any provision of like substance), and Miller ultimately acknowledged that he had never submitted any fundraising contract's payment provision for Postal Service review or approval and knew of no such agreement that had ever been submitted by anyone. (Rule 56.1 Statement, ¶¶ 6, 22.)

Moreover, Miller expressly, and falsely, represented to Lyon that the Shriners Contract itself had been submitted to the Postal Service. While Miller has not admitted to this

misrepresentation, Lyon's testimony establishes it for purposed of the instant motion. (Rule 56.1 Statement, ¶ 32.)

The above intentional and/or negligent misrepresentations provide ample support for a chapter 93A claim. It is immaterial whether the allegation of the complaint, drafted before Vantage had learned, through discovery, of the full extent of Defendants' misrepresentations, focused more on Defendants' qualifications. Vantage can now rely upon the further misrepresentations that have come to light and would be entitled, even at trial and *a priori* in opposing the instant motion, to amend the allegations of the complaint to conform to the proof. See Fed.R.Civ.P. 15(b).

Based on these facts, a finder of fact could conclude that Defendants knew that they had misrepresented both their experience and the safety of Vantage entering into the Shriners Contract. *Golber v. BayBank Valley Trust Co.*, 46 Mass. App. Ct. at 261; *Brown v. Gerstein*, 17 Mass. App. Ct. 558 (1984) (attorney's deceit constituted unfair and deceptive conduct). Even if Vantage was not able to prove such knowledge, their 93A claim would survive because under Massachusetts law, where a defendant engages in a representation with a "reckless disregard for whether it was true or false," such conduct may be regarded as a "willful" violation of G.L. c. 93A, § 2. *Wang Laboratories v. Business Incentives, Inc.*, 398 Mass. 854 (1986); *see also Shaw v. Rodman Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 712 (1985). Here, Defendants represented that the Shriners Contract had been approved and would protect Vantage, even though he had never submitted the Shriners Contract or any other contract with a similar payment provisions to the Postal Service for its determination or approval. (Rule 56.1 Statement, ¶¶ 20, 32.) Nor was he aware of any ruling by the Postal Service or by any court that had approved such a payment provision. (Rule 56.1 Statement, ¶ 21.) Although he was aware of the underlying litigation, he continued to misrepresent his experience and failed to warn Vantage that the United States might broaden its claims if it learned of the Shriners Contract. (Rule 56.1

17

Statement, ¶¶ 35, 36, 37.)  At a minimum, Defendants' failure to so inform Vantage constitutes reckless disregard for the truth.

Defendants seek to deflect the Court's attention from the issue at hand by citing to deposition testimony of Vantage's 30(b)(6) designee who testified that he considers Miller to be an expert in the field of nonprofit fundraising.  While our courts are generally unwilling to hold a party to either conclusions of law or lay opinions stated during a deposition, (*see Gwenard v. Burke*, 387 Mass. 802 *citing Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2nd Cir.1969)), there is another reason for disregarding Defendants' argument.  Whether Vantage testified that it generally believed Defendants to be experts in the fundraising field simply does not bear on the question of whether Defendants either misrepresented their expertise in drafting payment provisions similar to the one they prepared in the Shriners Contract or the circumstances bearing on Vantage's safety from claims that the Contract violated the CMR.  Those are the only representations that matter in this case and the now uncontested facts in this case establish that they were false.

III.    <u>DAMAGES IS A TRIABLE ISSUE</u>

Defendants' argument that Vantage did not suffer damages as a result of Defendants' malpractice is unfounded.  There is no doubt that under both its malpractice and 93A claims, Vantage has to prove damages.  Defendants, however, would have the Court believe that because Vantage received revenue as a result of the Shriners mailings, and because Vantage may have receive some financial benefit from the Shriners mailings, that Vantage was thus not harmed.  The facts of the case belie this argument.  There can be no dispute that as a result of Shriners' inclusion in the Action, the recovery sought by the United States doubled.  (56.1 Statement, 10.)  A judgment in that amount would have destroyed Vantage and Vantage was therefore left with no choice but to settle the case.  (56.1 Statement, 13.)  At a minimum, Vantage is entitled to recover as damages that portion of the settlement attributable to the Shriners mailings.

Defendants suggest that despite their malpractice and this loss suffered by Vantage, "Defendants should be thanked." (Defendants Brief, p. 16.) The basis of this ludicrous statement is Defendants' claim that without the payment provision drafted by Defendants, Shriners would never have entered into a contract with Vantage. That suggestion is not supported by the record and depends on the further unsupportable contention that no other payment provision would have satisfied both Vantage and Shriners. Miller never even proposed to Shriners (or recommended to Vantage) that the provision for recovery of program costs by means of follow up mailings and/or rental or exchange of the donor list not be limited as to time, or that if so limited, it provide that Shriners be liable for any unpaid balance at the end of such time. (56.1 Statement, 40.) Nor did he propose any other payment modalities other than what he originally proposed in Paragraph 13.2 of the Shriners Contract and which was ultimately reflected in the Shriners Contract as executed. (56.1 Statement, 40.) Because of that failure, neither Defendants nor the parties can ever know whether an agreement could have been reached that satisfied both parties and complied with the CMR. Because the difficulty is of their own making, Defendants should not ever be permitted to argue that our profit on the Shriners Contract is a set-off. In any case, their failure to have explored other provisions raises, at the very least, a triable issue. Defendants suggestion also ignores the fact that Shriners blamed Vantage for the problems resulting from the Shriners Contract and, as a result, gave their subsequent business to one of Vantage's competitors, Barton Cotton, this resulting in large additional losses on Shriners' continuing business.

Defendants' attempt to counter their failure to have explored alternative provisions with That other payment provisions may have been available is foreclosed by the Affidavit of Ralph W. Semb. In light of the fact that Defendants did not even suggest alternative language to Shriners, the Semb affidavit simply does not speak to whether or not some other provision may have been suitable. In any event, Plaintiffs are entitled to test Semb's affidavit in discovery.

19

Vantage is still engaged in discovery in this case and has made arrangements to take the deposition of Semb and Jay Fleischer, the attorney for Shriners who negotiated the Agreement with Defendant Miller.  If there is any question as to the existence of a triable issue on Defendants' "damage" defense, Vantage is entitled under Fed. R. Civ. P. 56(f) to discovery of Shriners' witnesses before the Court accepts Defendants' untested evidence.

VANTAGE FINANCIAL SERVICES, INC.

By its Attorneys,

Laurence M. Johnson
BBO #252720
Neal J. Bingham
BBO#652029
Davis, Malm & D'Agostine
One Boston Place
Boston, MA 02108
(617) 367-2500
ljohnson@davismalm.com

383582v.1