UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VANTAGE FINANCIAL SERVICES, INC.
           Plaintiff,

v.                                            C.A. No. 04-11686-WGY

NONPROFIT SERVICE GROUP AND
GEORGE E. MILLER,
           Defendants.

**PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS OF RECORD THAT ARE EITHER UNDISPUTED OR AS TO WHICH THERE IS A MATERIAL ISSUE TO BE TRIED**

In accordance with Rule 56.1 of the Local Rules of this Court, Plaintiff Vantage Financial Services, Inc. (hereinafter "Vantage" or "Plaintiff") submits the following statement of material facts of record, which are either undisputed or as to which there exist genuine issues to be tried, and upon all of which Vantage relies in its opposition to Defendants' Motion for Summary Judgment.

**I. THE ATTORNEY/CLIENT RELATIONSHIP, DEFENDANTS' CONTINUING REPRESENTATION OF VANTAGE, AND THE TOLLING OF THE STATUTE OF LIMITATIONS PRIOR TO VANTAGE'S FIRST NOTICE THAT ACTIONABLE CONDUCT HAD OCCURRED**

1.     Defendant George E. Miller (hereinafter "Miller") had represented Vantage and its predecessors in numerous matters for many years prior to the matters giving rise to this case and going back to approximately 1993. Deposition of George E. Miller (hereinafter "Miller Dep."), p. 52; Deposition of Lawrence C. Lyon (hereinafter "Lyon Dep."), p. 73. The legal services that Miller (and beginning in April 1999, Nonprofit Service Group, Inc. (hereinafter "NSG"), a corporation owned by Miller and Carolyn Emigh) initially provided were to represent Vantage in connection with its compliance with state registration requirements for fundraisers (Miller Dep., pp. 53-56), but had broadened, by about 1997, to include the preparation of

fundraising contracts between Vantage and nonprofit organizations that were Vantage's clients. Miller Dep., p. 57; Lyon Dep., pp. 75-76. Such representation <u>extended through at least January 30, 2004</u>. Attached hereto as Exhibit "A" are copies of Defendants' bills to Vantage dated November 22, 2003, January 19, 2004, January 30, 2004, and February 12, 2004, together with Vantage's checks in payment of same, covering professional services rendered by Defendants' to Vantage from September 27, 2003 through January 30, 2004, and documenting Defendants' continuing representation of Vantage in various matters. Such bills were marked as Exhibit 18 to Defendant Miller's deposition. The services rendered by Defendants to Vantage during that time period included work <u>on January 21, 2004</u> to prepare a fundraising contract for submission to a state regulatory agency. Miller Dep., pp. 212-214.

Moreover, documents produced by Vantage, as well as documents produced by Defendants and documents made available to Defendants at their request by Shriners Hospitals for Children (hereinafter "Shriners"), conclusively show that Defendants were rendering services to Vantage <u>with respect to that certain Agreement to Provide Fund Raising Consulting and Management Services between Vantage and Shriners effective on or about June 22, 1999 (hereinafter the "Shriners Agreement"), including possible amendments thereto, and with respect to the *qui tam* case filed by Laurence Saklad against Vantage on or about January 1997 in which the United States intervened on or about July 1998 (hereinafter the "*qui tam* case") as late as March 18, 2003 and perhaps beyond</u>. Such documents include memoranda sent by Miller to persons at Shriners with respect to the *qui tam* case.

The time allowed Vantage to respond to Defendants' Motion for Summary Judgment has not permitted a comprehensive review to determine conclusively the entire extent of Defendants' continuing attorney-client relationship with Vantage. In any case, Defendants' documented and indisputable continuing representation of Vantage extended at least through January 2004, and thus for nearly three years beyond March 1, 2001, the date as of which Defendants argue that the

2

Statute of Limitations with respect to Vantage's claims in the present action started to run. Therefore, Defendants' representation of Vantage <u>did not conclude until less than six months prior to the commencement of this suit, well within the time limitation posed by the Statute of Limitations.</u> Affidavit of Harry S. Melikian in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Melikian Aff."), attached hereto as Exhibit "B", Para. 3.

   2. Miller left his prior law firm at the time that he participated in founding Defendant NSG, first as a sole proprietorship on or about 1994 and then as a corporation on or about April 1999. Thereafter, Defendant NSG, along with Miller, represented Vantage throughout the remainder of the period referred to in paragraph 1 above. See Melikian Aff., Para. 4. Miller Dep., pp 6-7.

   3. While the United States first included a <u>claim</u> based upon mailings made pursuant to the Shriners Agreement prepared by Defendants in a spreadsheet attached to its supplementary answers to interrogatories served on Vantage's litigation counsel on or about March 1, 2001, that is not the date as of which Vantage first had reason to believe that Defendants' acts and omissions had caused it harm. When the United States added a claim based upon the Shriners Agreement, Vantage again consulted Defendants Miller and NSG and was again assured that the Shriners Agreement did not violate the United States Postal Service's Cooperative Mail Rule (hereinafter the "Cooperative Mail Rule"), that mailings made pursuant to the Shriners Agreement were entitled to be mailed at not-for-profit rates, and that Vantage therefore was not liable on the claim asserted by the United States with respect to mailings made pursuant to the Shriners Agreement. Melikian Aff., Para. 5. Both NSG and Miller were continuing to represent Plaintiff Vantage in other matters at that time, and Vantage was entitled to continue to rely, and did in fact rely, upon Miller's repeated assurances that the Shriners Agreement created no additional liabilities for Vantage. *Id.*

4. On numerous occasions, between March 1, 2001 and May 5, 2003, Vantage, acting through Mr. Melikian and other employees, as well as its litigation counsel in the *qui tam* case, consulted further with Defendants' Miller and NSG with respect to the Shriners Agreement. While the time permitted Vantage to respond to and oppose Defendants' Motion for Summary Judgment has not permitted a thorough review by either Mr. Melikian or counsel of counsel's time and billing records to document these subsequent consultations with Defendant Miller, Mr. Melikian clearly recalls that, on at least two or three occasions both during the period when Vantage was preparing its own Motion for Summary Judgment in the *qui tam* case and its opposition to the Motion for Summary Judgment of the United States, and also perhaps during the period when the opposing motions had been briefed, but prior to announcement by Judge Wolf of his intended decision on [August 30, 2002][May 5, 2003], he participated in conference calls with Defendant Miller and one or more of Laurence Johnson, Brian LeClair and Seth Perlman (who served as Vantage's defense counsel in the *qui tam* case). During these conference calls, Defendant Miller re-affirmed that the provisions of the Shriners Agreement's with respect to payments to be made to Vantage were common in the industry, that Miller had used them repeatedly in other contracts that he had prepared for non-profit organizations and/or their for-profit fundraisers, that the United States Postal Service had been aware of such provisions, that it had never objected to or otherwise challenged them, and that the United States' claims with respect to the Shriners' mailings were without merit. Melikian Aff., Para. 6; Deposition of Harry Melikian (hereinafter "Melikian Dep.") relevant excerpts from which are attached hereto as Exhibit "C", pp. 54-57, 185.

5. Due in part to its continuing reliance upon Defendants' repeated assurances that the Shriners Agreement complied with the Cooperative Mail Rule, Vantage instructed its counsel to prepare a Motion for Summary Judgment on its behalf in the *qui tam* case, and to oppose the Motion for Summary Judgment filed by the United States. Melikian Aff., Para. 7.

6. In support of its Motion for Summary Judgment in the *qui tam* case, and its opposition to the United States' Motion for Summary Judgment, Vantage's counsel asked Defendant Miller to supply affidavits dealing, in part, with the Shriners Agreement. Melikian Aff., Para. 8. In an Affidavit dated February 13, 2002, that was ultimately filed by Vantage on or about April 25, 2002 in support of its Motion for Summary Judgment, Miller expressly stated as follows:

> The Shriners Contract was modeled after similar contracts that I have encountered in the course of my work with nonprofit organizations and their fundraising counsel (other than Vantage) over the last 13 years. During the last 12 years, I have myself drafted <u>very similar</u> agreements <u>for at least six other nonprofits</u> who contracted to have fundraising counsel other than Vantage perform fundraising services for them. I have never heard of the Postal Service taking the position that any of these contracts violates the Cooperative Mail Rule and I don't know of any reasonable basis for such an assertion.
>
> …It is normal and typical for nonprofits to use a consultant such as Vantage for their direct mail fundraising activities. To the best of my knowledge and belief, the terms set forth in the Shriners Contract that cover the consulting services that Vantage provides to the Shriners for the operation of its direct mail fundraising programs, including administration of the direct mail program for the Shriners, caging donations, <u>and payment of invoices, is the standard, typical and accepted practice within the nonprofit direct mail industry, and it has been for many years.</u>

(emphasis supplied in quoted excerpt). Affidavit of George Miller dated February 13, 2002 ("First Miller Aff.") attached hereto as Exhibit "D", Paras. 3 and 10. Defendants have been aware of the First Miller Affidavit at all times, and a copy of it was marked as Exhibit 6 at Miller's deposition in this case. Melikian Aff., Para. 8. In so stating, Defendant Miller intended to represent to the Court that he had drafted provisions in other fundraising contracts similar to the payment provisions in the Shriners Agreement that were the subject of the United States' claims. Miller Dep., p. 143. In fact, none of the agreements produced by Miller during documents discovery contain a payment provision of similar effect to Para 13.2 of the Shriners Agreement, the provision that Judge Wolf concluded probably violated the Cooperative Mail Rule. Miller Dep. Exhibits 5 and 17A-17E attached as Exhibit "I" hereto; Miller Dep., pp. 143-73.

5

7. Subsequent to the filing of the cross-motions for summary judgment and Vantage's opposition to the United States' Motion for Summary Judgment, Defendants Miller and NSG continued to re-affirm their previous advice and counsel with respect to the Shriners Agreement. Melikian Aff., Para. 9. In a Supplemental Affidavit dated May 17, 2002, and furnished to litigation counsel in the *qui tam* case in connection with their preparation of Vantage's reply papers on Summary Judgment, Defendant Miller again represented that the terms of the Shriners Agreement were sufficient to impose unconditional liability for Vantage's charges upon Shriners:

> Either the Shriners will pay the outstanding balance it owes to Vantage from some income source other than its direct mail program, or Vantage may rent or exchange the list of donors developed through the Shriners' direct mail program and use the proceeds to pay off the balance that the Shriners owes to Vantage. In addition, the Shriners granted a right to Vantage such that the Shriners would continue to solicit its direct mail donors for a term of no more than three years. The Shriners dedicated the proceeds of those solicitation mailings to satisfy any balance it may owe to Vantage. The parties agreed to the three-year term in the Shriners Agreement because they thought it would be more than long enough for the Shriners to generate sufficient revenue to pay off any outstanding balance. ....The Shriners have chosen to pay Vantage's fees from the revenue generated by its direct mail program. <u>This is a fairly common practice in direct response fundraising, but it does not relieve Shriners of the liability to pay any outstanding balance due Vantage.</u>

Miller Supplemental Affidavit, Dated May 17, 2002 ("Miller Suppl. Aff."), Paras. 11-12, attached hereto as Exhibit "E" (emphasis supplied).

8. The Court held a hearing in mid-August, and subsequently, on August 30, 2002, Judge Wolf announced his intended decision with respect to the general issues on liability that the parties had argued. Melikian Aff., Para. 10. Even then, since the parties had not briefed or argued with respect to specific non-profits, Judge Wolf gave no indication of whether he would impose liability with respect to the Shriners mailings, and Vantage still had no reason to question the advice given repeatedly by Defendants Miller and NSG. See, Hearing Transcript 8/30/02, p. 23, attached hereto as Exhibit "F."

6

9. Thereafter the parties agreed to further brief the liability issues with respect to four "test case" non-profits, including Shriners. Melikian Aff., Para. 11. A hearing was held on <u>May 5, 2003</u> (barely fourteen months prior to the commencement of this case) at which Judge Wolf, <u>for the first time</u>, indicated his view that there might well be liability with respect to the Shriners mailings, and that the United States was either entitled to summary judgment on those claims or that, at best, Vantage would have to go to trial on them. Vantage had no reason to believe that the repeated advice given by Defendants Miller and NSG might be incorrect until Judge Wolf delivered his intended rulings with respect to the Shriners Agreement on that date. *Id.*; Hearing Transcript of May 5, 2003, pp. 22-23, attached hereto as Exhibit "G."

## II. THE EVENT THAT FIRST PUT VANTAGE ON NOTICE THAT ACTIONABLE CONDUCT HAD OCCURRED AND TRIGGERED THE RUNNING OF THE STATUTE OF LIMITATIONS

10. At the hearing of May 5, 2003, Vantage learned that, despite the repeated assurances of Defendants Miller and NSG that the Shriners Agreement complied with the Cooperative Mail Rule and created no liability for Vantage thereunder, Judge Wolf was leaning in the direction of finding Vantage liable on all of the mailings made under the Shriners Agreement. The revenue recovery represented by those mailings amounted to almost $3 million, and approximately doubled the size of the revenue recovery claim being asserted against Vantage. Melikian Aff., Para. 12.

11. Until Judge Wolf's indication of Vantage's probable liability on the Shriners mailings, Vantage had no reason to believe that it had suffered any harm as a result of Defendants' preparation of the Shriners Agreement. Vantage was already defending the other claims that were the subject of the *qui tam* case, and thus the inclusion of a relatively minor claim with respect to the Shriners Agreement (initially only $184,669.48 (see Defendants' Statement of Undisputed Facts, Para. 29) out of total claims that then amounted to $2,946,041.18 (see Defendants' Exhibits, Tab "R")), added nothing significant to the magnitude of the claims

7

pending against Vantage and little (at that time) to the expense of defending against them. Because Miller had advised, and continued to repeatedly advise, that the claim with respect to the Shriners Agreement was without merit, and as Vantage continued to rely on that advice in good faith, Vantage had no reason to presume either that Defendants' had failed to represent it properly, or that it would incur any loss or harm as a result thereof. Melikian Aff., Para. 13.

12. That situation changed, for the first time, on May 5, 2003 when Judge Wolf indicated that there was a likelihood that he would find Vantage liable on the Shriners mailings. Melikian Aff., Para. 14; see Hearing Transcript, Exhibit "G", pp. 22-23. At that hearing, Judge Wolf stated:

> However, in my present view, which is not my final view, <u>either the government is entitled to summary judgment on the Shreiner's [sic] Federal Debt Collection Procedure Act claim</u> because – well, at least with regard to paragraph 13.2 – because either there's an indefinite mailing scheme for a period of three years, I think, or even though there's an alternative of renting or exchanging the Shreiner's [sic] list, if at the end of the period Vantage is out of money, there's no liability for Shreiner's [sic].
>
> Possibly, there's material facts in dispute as to the value of that list but, I mean, it seems to me at the moment, <u>either the Shreiner's [sic] needs to be tried or the government wins.</u>

(emphasis supplied) .

13. As a result, Vantage was now faced with the likelihood that Judge Wolf would award some $3 million in revenue recovery damages against it on the Shriners mailings, together with approximately $3 million in additional damages on the other claims in the case, plus possible punitive damages with respect to mailings for a small number of the other non-profits. A judgment in that amount would have destroyed Vantage. Faced with a choice between continuing to risk such a judgment and negotiating a settlement, Vantage had no alternative but to pursue the latter. Melikian Aff., Para. 15.

14. Not surprisingly, when the case was finally resolved, Judge Wolf adhered to his reasoning articulated on May 5, 2003. Melikian Aff., Para. 16. In his opinion, dated March 5, 2004, a copy of which is attached as <u>Exhibit K</u>, Judge Wolf again concluded that unless it could

8

be shown that the value of Vantage's right to sell or lease the Shriners' mailing list was so great that there was <u>no risk</u> that it would fail to generate enough revenue to pay all of Vantage's charges, the Shriners Agreement still violated the Cooperative Mail Rule:

> The court finds, however, that the Shriner's mailings may have violated the cooperative mail rule. Consequently, either the government is entitled to summary judgment on its unjust enrichment and FDCPA claims against the Vantage defendants or a trial is necessary on this issue. ….Although the defendants correctly argue that "payment in kind" as opposed to payment in cash does not violate the cooperative mail rule, an agreement that does not provide for <u>full liability</u> for the nonprofit organization does. By limiting Vantage's recourse to defined assets, Shriner's and Vantage <u>created an arrangement in which Vantage shared the risk</u> …because there was no guarantee that, if the mailings were unsuccessful, Shriners would cover the costs of the mailings advanced by Vantage.

(Exhibit K, p. 17)

Judge Wolf went on to make it clear that unless Vantage could prove that "the Shriner's mailing list was so valuable that there was no real difference between the non-recourse arrangement in the Shriner's contract and a full-recourse contract" the Shriners Agreement would be found to violate the Cooperative Mail Rule and Vantage would be liable on all of the governments claims on the Shriners mailings. *Ibid,* at p. 18. In essence, Judge Wolf ruled that the only way in which Vantage could have safely avoided liability on the Shriners mailings would have been to include a provision that if the sale or rental of the mailing list failed to produce enough revenue to pay Vantage's charges, then Shriners would be unconditionally liable for the balance. Hearing Transcript of May 5, 2003, p. 44:

> THE COURT: You could have been asked to say that ultimately – because at the end of all of this, if it turns out that renting the list didn't eliminate the debt, you could say Shreiner's [sic] has to pay the debt. …if at the end of the day there's no liability for Shreiner's [sic] if there's a shortfall, it violates a [sic] cooperative mail rule.

The Court's conclusion directly contradicts the advice admittedly given by Defendants and relied upon by Vantage at all times until the Court's first pronouncement to the contrary at the May 5, 2003 hearing. Thus, the first time when Vantage knew, could or should have known

9

that it had been harmed by the Defendants' acts and omissions was May 5, 2003, <u>less than fifteen months prior to the filing of the complaint in this case.</u>  Melikian Aff., Para. 16.

### III. DEFENDANTS' PARTICIPATION IN THE NEGOTIATION AND PREPARATION OF THE SHRINERS AGREEMENT

15. Defendant Miller was aware that at least since the 1980s, the United States Postal Service's position was that a for-profit fundraiser could not bear any portion of the risk relating to the cost of a mailing made at nonprofit rates, and the Postal Service's handbook stated that that policy was applicable to solicitation mailings. Miller Dep., pp. 33-35. The policy of the United States Postal Service in this regard had not changed as of 1999 when the Shriners Agreement was negotiated. Miller Dep., pp. 39-40.

16. It was Defendant Miller who first proposed the language in the Shriners Agreement with respect to payment of program costs by means of rental or exchange of the donor list in the event of termination of the Agreement by Shriners for cause. Miller Dep., p. 220.

17. During the preparation of the Shriners Agreement, Miller's understanding of the Shriners' concerns with respect to payment of program costs was that Shriners not be obligated to pay for program costs except from revenues that the program generated. Miller Dep. p. 237. Miller understood that Shriners included in revenues that the program generated both donations made to Shriners in response to program mailings <u>and</u> revenues that could be realized from the rental or exchange of the donor list developed during the program. Miller Dep., pp. 241, 243-45. This represented the only un-modifiable requirement that Shriners had with respect to its liability for payment of program costs; i.e. that Shriners would not have to pay for program costs from its cash resources other than those resulting from the program and the development/exploitation of the donor list developed during the program. Miller Dep., pp. 250.

18. At the time of the negotiation of the Shriners Agreement, Miller knew that Vantage was involved in defending litigation involving allegations that its mailings at not-for-profit rates

10

pursuant to various of its fundraising contracts with other nonprofits violated the Cooperative Mail Rule, and that as a consequence, Vantage's principal requirement was that the Shriners Agreement not violate the Cooperative Mail Rule. Miller Dep., pp. 111, 113, 115, 253, and 286-87. Miller acknowledged that in order to be in compliance with the Cooperative Mail Rule the Shriners Agreement had to provide that Shriners was solely at risk for the costs of the program. Miller Dep., p. 265. Nevertheless, Miller admitted in his deposition testimony that the payment provision he included in the Shriners Agreement at Paragraph 13.2 did not so provide. *Id.*

### IV. DEFENDANTS' MALPRACTICE AND MISREPRESENTATIONS, AND VANTAGE'S RELIANCE UPON DEFENDANTS

19. Defendant Miller advised Vantage that the payment provisions contained in Paragraph 13.2 of the Shriners Agreement would satisfy the requirements of the Cooperative Mail Rule (Miller Dep., pp. 288-89), that he had prepared contracts with similar payment provisions (Miller Dep., p. 289), and that contracts with similar provisions regarding follow up mailings and use of donor list rental income had never been objected to, or challenged by, the United States Postal Service (Miller Dep., p. 290). However, despite the fact that a procedure existed for obtaining an "advance ruling" from the Postal Service (Miller Dep., pp. 93, 95-101), Miller had never, at any time prior to the execution of the Shriners Agreement, presented any fundraising contract for any client to the Postal Service for such a ruling or for any review or approval. Miller Dep., pp. 89-90, 131-33.

20. Miller has no knowledge of <u>any</u> prior instance in which a fundraising agreement had utilized a provision that limited the fundraiser's recourse, at the nonprofit's option, solely to the proceeds of follow up mailings and/or income from the rental or exchange of the donor list for payment of program charges, and at the time of negotiation of the Shriners Agreement, he was aware of no such ruling by the Postal Service. Miller Dep., pp. 133-34, 290-91.

11

21. At the time in question, no decision of any court had ever held that a fundraising agreement containing provisions that left the fundraiser prospectively at risk with respect to payment of program charges could be retrospectively brought into compliance with the Cooperative Mail Rule if, in fact, the fundraiser was ultimately paid. Miller Dep., pp. 295-96.

22. With respect to Defendants' claim that they made no misrepresentations in connection with the professional services rendered to Vantage, it is noteworthy that in the First Miller Affidavit filed in connection with the *qui tam* case, Miller expressly confirmed the representations that he had previously made to Mr. Melikian; that he had prepared numerous fundraising agreements containing "very similar" provisions to those which Judge Wolf ultimately concluded might well violate the Cooperative Mail Rule and that such agreements had never been questioned or challenged by the United States Postal Service. Melikian Aff., Para 17; see First Miller Affidavit, Para. 3. Of course, it is implicit in Miller's affidavit that he knew that the Postal Service had been made aware of the use of agreements with such provisions and, with such awareness, had not challenged them.  Otherwise, his representation would have been misleading and meaningless, at best.  In this connection, it is notable that despite being served with document requests requiring them to produce such agreements, Defendants have produced no fundraising agreements prior to the Shriners Agreement in which such provisions were utilized.  Furthermore, Miller admitted in his deposition testimony that he is aware of no instance in which any agreement containing the payment provisions that he drafted into the Shriners Agreement (and which were at issue in the *qui tam* case) was ever presented to, reviewed, or approved by the Postal Service. Melikian Aff., Para. 17; Miller Dep., relevant excerpts from which are attached as Exhibit "H", pp. 175-76, and 290-91. See also Agreements marked as Exhibit 5 at Miller Deposition and attached hereto as Exhibit "I." Moreover, Miller testified that he, in fact, had never drafted an agreement similar to the Shriners Agreement in the context of the payment provisions incorporated in Paragraph 13.2, and critically had never informed

12

Vantage of this fact. Miller Dep., pp. 306-307. Not only did this fly in the face of his statements made to Vantage, see Melikian Aff., Para. 17, but it directly contradicted Miller's affidavit submitted in connection with the *qui tam* case. See First Miller Affidavit, Para. 3.

23. In fact, prior to his preparation of the Shriners Agreement, and contrary to his representations to Vantage and to the necessary implication of his affidavits submitted in the *qui tam* case, Miller had <u>never</u> submitted to the United States Postal Service, for any determination or approval, any fundraising contract containing a provision permitting the nonprofit organization to satisfy its payment obligations by permitting either a finite or infinite number of follow-up mailings by the fundraiser. Miller, Dep., pp. 132, 175-76.

24. Prior to his preparation of the Shriners Agreement, and contrary to his representations to Vantage and to the necessary implication of his affidavits submitted in the *qui tam* case, Miller had never submitted to the United States Postal Service, for any determination or approval, any fundraising contract containing a provision permitting the nonprofit organization to satisfy its payment obligations by permitting the fundraiser to rent or exchange the nonprofit's donor list. *Id.*; Miller Dep., p. 212.

25. Similarly, prior to his preparation of the Shriners Agreement, Miller had never submitted to the United States Postal Service for any determination or approval, any fundraising contract providing for an assignment by the nonprofit organization of the rights to use its donor mailing list as collateral to secure the nonprofits payment obligations. Miller Dep., pp. 132-33.

26. At the time that he prepared the Shriners Agreement, Miller was aware of no ruling by the United States Postal Service or by any court that had approved any such provisions in fundraising agreements. Miller Dep., pp. 133-34.

27. In response to questions from Mr. Lyon as to whether he was sure that the Shriners Agreement complied with the Cooperative Mail Rule, Defendant Miller expressly and repeatedly

represented to Mr. Lyon that the Shriners Agreement had been approved by the United States Post Office. Deposition of Lawrence C. Lyon (hereinafter "Lyon Dep."), pp. 100-101.

28. In fact, Miller never submitted the Shriners Agreement to the United States Postal Service for its review or approval, nor does Miller recall whether he informed Vantage that he hadn't done so. Miller Dep., pp. 303, 305.

29. Defendant Miller never disclosed to Vantage that he had never submitted any agreement containing a payment provision like that in Paragraph 13.2 of the Shriners Agreement to the United States Postal Service for its review or approval, or that, so far as he was aware, no such agreement had ever been submitted to the Postal Service by anyone. Miller Dep., pp. 306-07.

30. Defendant Miller never disclosed to Vantage that, so far as he was aware, no court had ever held that a fundraising agreement containing a payment provision such as that in Paragraph 13.2 of the Shriners Agreement complied with the Cooperative Mail Rule. Miller Dep., p. 307.

31. Defendant Miller never warned Vantage that if the United States Postal Service challenged the Shriners Agreement, it would present an issue of first impression that had never been decided by any court previously, or that, accordingly, he couldn't predict with confidence how a court might rule on the question. Miller Dep., p. 308.

32. Although he was aware of the then-pending Cooperative Mail Rule litigation against Vantage, Defendant Miller never warned Vantage that if the United States learned of the Shriners Agreement, it might broaden its claims in the *qui* tam case to include claims with respect to the mailings made pursuant to the Shriners Agreement. Miller Dep., pp. 253, 309.

33. Defendant Miller never warned Vantage that should the United States assert claims under the Shriners Agreement, Vantage would then be faced with an issue as to whether the total claims against it were so large that it might have to settle the *qui* tam case if it were unable to

take the risk of an adverse judgment in an amount that would put it out of business. Miller Dep., p. 309.

34. Defendant Miller has specialized in the area of compliance with postal regulations dealing with nonprofit mailings since 1981, and held himself out to clients as being knowledgeable and expert about it. Miller Dep., p. 14, 26-29. Miller was engaged by Vantage to prepare the Shriners Agreement because he was experienced in compliance of fundraising agreements with postal regulations, and because the Shriners Agreement was the biggest fundraising deal in Vantage's history. Lyon Dep., pp. 77-78, 86-87.

35. Defendant Miller expressly represented to Vantage, in conversations with Mr. Lyon, that he was an expert in preparing fundraising agreements and making sure that they did not violate the Cooperative Mailing laws. Lyon Dep., pp. 96-97.

36. Defendants Miller and NSG made a conscious choice to carry no professional liability insurance with respect to their liabilities to clients. Miller Dep., p. 11.

### V. THE FACTS OF RECORD THAT CONTRADICT DEFENDANTS' CLAIMS (1) THAT VANTAGE COULD ONLY HAVE DONE BUSINESS WITH SHRINERS ON TERMS THAT VIOLATED THE COOPERATIVE MAIL RULE AND (2) THAT VANTAGE WOULD HAVE HAD TO FOREGO ANY PROFITS ON THE SHRINERS AGREEMENT IN ORDER TO AVOID THE LOSSES THAT IT INCURRED THROUGH SETTLING THE GOVERNMENT'S CLAIMS WITH RESPECT TO THE SHRINERS AGREEMENT

37. The very first draft of the Shriners Agreement prepared by Defendant Miller contained substantially the same provision as the executed version, giving Shriners the option, in the event that it terminated the Shriners Agreement for cause, to remit Vantage to recovery of program costs solely through follow up mailings and/or rental or exchange of the donor list for a period of thirty-six months. Miller Dep., pp. 254-56, and Ex. 11A thereto.

38. Despite his understanding of Shriners requirements with respect to its liability for payment of program costs, Defendant Miller never proposed any modality for such payment in the event of termination for cause, except the provision ultimately included in the Shriners Agreement permitting Shriners to elect not to pay program costs directly and to remit Vantage to recovery of such costs solely by follow up mailings and/or rental or exchange of the donor list, each for a period not to exceed thirty-six months (the provision that Judge Wolf ultimately determined might violate the Cooperative Mail Rule). Miller Dep., pp. 255-56. There was never any discussion of any modification to the payment provision as Miller had drafted it, and after the parties' conference call on May 20 or 21, 1999, that issue had been resolved and didn't come up again in further negotiations. Miller Dep., p. 280-81. No further memoranda prepared or received by Miller purport to further discuss the issue. Miller Dep., pp. 282-83 and Exhibits 21A through 21F thereto.

39. Defendant Miller never even proposed to Shriners (or recommended to Vantage) that the provision for recovery of program costs by means of follow up mailings and/or rental or exchange of the donor list not be limited as to time, or that if so limited, it further provide that Shriners be liable for any unpaid balance at the end of such time, nor did he propose any other payment modalities other than what he originally proposed in Paragraph 13.2 of Ex. 11A, and which was ultimately reflected in the Shriners Agreement as executed. Miller Dep., pp. 256-57, 266, 268, 298-300. Vantage relied upon Miller to consider how the Agreement could be drafted so as to avoid problems. Lyon Dep., p. 135.

40. The draft agreements prepared by Defendant Miller reflect all of the payment modalities that Miller proposed to Shriners during the negotiations. Miller Dep., p. 297.

VANTAGE FINANCIAL SERVICES, INC.

By its Attorneys,

*/s/ Neal Bingham*

Laurence M. Johnson
BBO #252720
Neal J. Bingham
BBO #652029
Davis, Malm & D'Agostine
One Boston Place
Boston, MA 02108
(617) 367-2500
ljohnson@davismalm.com

383509v.1

17