UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Vantage Financial Services, Inc.<br><br>　　　　　　Plaintiff<br><br>v.<br><br>Nonprofit Service Group, Inc. and George E. Miller<br><br>　　　　　　Defendants | CIVIL ACTION NO. 04-11686WGY |

**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I.　　INTRODUCTION

Local Rule 56.1 provides, in part, that "[m]aterial facts ... set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."  Disabled, by the facts, from heeding this command, Vantage has failed to controvert key facts set forth in defendants' corresponding Rule 56.1 Statement.  As a consequence, these facts are deemed admitted by Vantage.  These admissions include Vantage's belief that the Fundraising Agreement at issue (the "Agreement") complied with the Cooperative Mail Rule as it was in effect at the time of the Agreement, that the Shriners Hospitals for Children ("Shriners") had an unconditional obligation to pay for the full cost of the program, and that the Shriners was fully obligated to pay the full cost of the program, even if this meant that the Shriners was required to use funds other than those that were generated by the program.  "Defendants' Local Rule 56.1 Statement, ¶¶ 39-41).  It is also <u>undisputed</u> that Vantage continues

to believe that defendant George E. Miller ("Miller") is an expert with respect to "drafting the type of agreement that was entered into on June 17, 1999, between Vantage and the Shriners." (*Id.*, at ¶42). Nor does Vantage dispute that at least by March 2001, it was on actual notice that the government had broadened its claims in the *Qui Tam* action to include mailings under the Shriners Agreement, and that as of March 2001, Vantage immediately began to incur attorneys' fees in the defense of the government's claims with respect to the mailings made under the Shriners Agreement. (*Id.*, ¶¶ 29-33). Vantage similarly makes no effort to dispute the fact that Vantage profited under the Shriners Agreement to the extent of approximately $15 Million Dollars, and that its gross profit from the Agreement exceeds the amount of the damages it claims in this case. (*Id.*, ¶¶ 46, 49). Finally, Despite having had a full and fair opportunity to conduct discovery over the past 15 months, Vantage has adduced no evidence to dispute the fact that the Shriners would not have entered into the Agreement absent the provisions of Paragraph 13.2 that the government took issue with in the *Qui Tam* action. The significance of these admissions, and others, is discussed below.

## II.  **ARGUMENT**

### A.     **Vantage Has Failed To Produce Any Evidence That Defendants' Conduct Caused It To Sustain Damages.**

None of the evidentiary materials submitted by Vantage in opposition to summary judgment create a triable damages issue. Vantage's cursory reference to an alleged loss of business to a competitor as a result of defendants' conduct is totally devoid of factual support and appears nowhere in the Complaint or Vantage's initial disclosures on damages. More to the point, there is no evidence of record even suggesting that Vantage "probably would have obtained a better result" had the Agreement been drafted differently. *Jernigan v. Giard*, 398

Mass. 721, 723 (1986) (citation omitted).  The Affidavit of Ralph Semb, makes it clear that the

Shriners would not have entered into the Agreement absent the inclusion of certain key

paragraphs, including Paragraph 13.2 of the Agreement, as they appeared in the final Agreement.

According to Vantage, these same provisions, (including Paragraph 13.2) were the provisions

that the government found objectionable under the Cooperative Mail Rule in the underlying *Qui*

*Tam* action.

Vantage holds out the hope that it might be able to force Mr. Semb, in a deposition, to

change his sworn affidavit testimony.  The problem with this argument is twofold.  First,

Vantage has been on notice of Mr. Semb's position with respect to the Agreement since before

this case was even filed.  Mr. Semb submitted a declaration in the *Qui Tam* case that made his

views concerning the Agreement clear.  Vantage could have, but failed to elicit any discovery

from Mr. Semb or any other Shriners personnel in the 15 months since it filed this case.  Second,

Vantage concedes that "neither defendants nor the parties can ever know whether an agreement

could have been reached that satisfied both parties and complied with the [Cooperative Mail

Rule]."  (Memorandum in Opposition to Defendants' Motion for Summary Judgment, at p. 19).

Not only does this statement render meaningless any deposition of the Shriners on this point, it

also ignores the fact that Vantage bears the burden of proof on damages.  In order to establish

damages in this case, Vantage must produce evidence that the Agreement could have been

drafted in some other way that would have avoided Vantage's exposure to damages in the *Qui*

*Tam* action.  Having conceded that the parties can never know whether such an agreement could

have been reached, the only non-speculative evidence of record is that Vantage had the option of

either entering into the Agreement as it was written, or walking away from it.  Having chosen to

enter into the Agreement, Vantage profited to the extent of at least $15 Million Dollars, which

was far more than it paid by way of settlement in the *Qui Tam* case. It goes without saying that if Vantage had chosen to walk away from the deal, it would have realized no profit at all. There is no <u>genuine</u> dispute that the contract resulted in a net gain to Vantage, and that it could not have been written in a way that would have avoided the government's scrutiny in the *Qui Tam* action.

Vantage takes the unsupported position that defendants should be barred from arguing lack of damages because defendants allegedly failed to propose any alternative to the payment provisions contained in Paragraph 13.2 of the Agreement. Speculation, however, remains just that, regardless of what defendants allegedly failed to do. In any event, even if there were a basis for Vantage's argument on this point, it is premised on a demonstrably false characterization of the record. Absent from Vantage's summary judgment submission are copies of any of the draft agreements that the parties discussed before executing the final Agreement. The draft agreements reveal that they do contain proposals for payment methods other than the method ultimately agreed upon in Paragraph 13.2 of the Agreement. Attached as Exhibits A, B, C, and D to the accompanying Reply Affidavit in Support of Defendants' Motion for Summary Judgment ("Reply Aff.") are four such draft agreements that were marked as exhibits during Mr. Miller's deposition. Each of these drafts propose payment terms that are different from the terms ultimately agreed upon in Paragraph 13.2 of the final Agreement. Moreover, the payment proposals in these draft agreements are not subject to the same cooperative mail issues identified by the government in the final Agreement. As Mr. Miller testified, "[i]f you look at these early drafts, the risk for the cost of the program is placed on the Shrine." (George E. Miller Deposition Transcript ("Miller Tr."), an excerpt of which is attached to the Reply Aff. as Exhibit E, at p. 237).

In the end, defendants helped to negotiate and draft an agreement that they believed, in good faith, would comply with the Cooperative Mail Rule. This task was made all the more difficult by the Shriners' insistence that it have "no liability" under the Agreement, despite the fact that Mr. Miller made it known to the Shriners that it "had to be at risk for the full cost of the program in order to enter into any fundraising agreement with Vantage." (Lawrence C. Lyon Deposition Transcript ("Lyon Tr."), an excerpt of which is attached to the Reply Aff. as Exhibit F, at pp. 90, 95 and 98). As Mr. Lyon testified, the level of frustration with the Shriners continued to increase because it "kept wanting to put things in the Agreement that would violate the cooperative mailing laws." (*Id.* at p. 98). It was against this backdrop that defendants did the best they could to help the parties come to an agreement that would eliminate exposure to liability under the Cooperative Mail Rule and enable Vantage to profit from what Mr. Lyon characterized as "the greatest responding acquisition and donor program that [he] had ever seen. ..." (*Id.* p. 134).

**B.    Vantage's Common Law Claims Are Barred By The Statute of Limitations.**

The substance of Vantage's case is that defendants' alleged assurances caused Vantage to conclude that the government would not object to or challenge the Agreement, and that Vantage was consequently insulated from liability exposure on account of the Agreement. Once the government did challenge the Agreement, Vantage was on actual notice as of March 2001 that defendants' alleged assurances were wrong and that as a result Vantage had begun to incur attorney's fees to defend the Shriners' claims.

Notwithstanding the government's objection to the Shriners Agreement, Vantage continues to believe that the Agreement complied with the Cooperative Mail Rule. Moreover, Judge Wolf never decided the issue of whether or not the Agreement complied with the Rule.

Instead, Judge Wolf concluded that the donor list rental or exchange provision in Paragraph 13.2

of the Agreement might pass muster under the Cooperative Mail Rule, but that Vantage's

litigation counsel had failed to introduce critical evidence concerning the value of the list.

(Defendants' Rule 56.1 Statement, ¶35; see also hearing transcript, May 5, 2003, submitted with

Vantage's Summary Judgment Opposition as Exhibit G, at pp. 44-46; 49-50).  In light of these

undisputed facts, the harm alleged in the Complaint is not that Vantage was ultimately found

liable in the *Qui Tam* action as a consequence of mailings associated with the Shriners

Agreement.  There never was any such finding of liability.  Vantage's alleged harm arises from

defendants' alleged failure to properly manage the risk that the government would expand its

claims to include the Shriners Agreement once it became aware of the Agreement.  Thus, the

Complaint alleges that Vantage employed defendants "[t]o protect itself against the risk of ...

increased liability" in the already pending *Qui Tam* action."  (Complaint, ¶13) (emphasis added).

Also according to the Complaint, "Vantage was extremely concerned lest, in entering into a

fundraising services contract with Shriners, it add to its potential liability in the Action."  (*Id.*

¶12).  According to Vantage's Rule 56.1 Statement, "[d]efendants never warned Vantage that if

the United States learned of the Shriners Agreement, it might broaden its claims in the *Qui Tam*

case to include claims with respect to mailings made pursuant to the Shriners Agreement."

(Plaintiff's Rule 56.1 Statement, ¶32) (emphasis added).  Once that happened, in March, 2001,

Vantage's initial disclosures and other admissions in this case make it clear that it allegedly

began to sustain appreciable harm in the form of attorneys' fees paid to defend the Shriners'

claims in the *Qui Tam* action.

　　　　Ultimately, Vantage's claims are premised on the false assertion that defendants

somehow warranted that the United States Postal Service had approved the Shriners Agreement

prior to its execution.  If this is what Vantage believed, then it had to have had actual knowledge of defendants' alleged malpractice when the government broadened its case to include the Shriners Agreement in the *Qui Tam* action.  To conclude otherwise would be illogical.  There is no basis in the record, or otherwise, to suggest that the United States Postal Service would have included the Shriners Agreement in the *Qui Tam* action if it had already approved the legality of the Agreement.  Once the Agreement became included in the government's claims in the *Qui Tam* action, Vantage was on actual notice that it was incurring legal expenses to defend a claim that it had hired defendants to prevent from ever being asserted.  The statute of limitations began to run at that time, March 2001, and Vantage's common law claims are consequently barred under the applicable three-year Statute of Limitations.

Neither *Eck v. Kellem*, 51 Mass. App. Ct. 850 (2001) nor *St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d 183 (D. Mass. 2005) suggest a different result.  It is clear in both *Eck* and *St. Paul* that the plaintiff-clients began to sustain appreciable harm as soon as they were forced to defend lawsuits that arose from their attorneys' alleged malpractice.  The issue in both cases, however, was whether the clients were aware that this harm was caused by their attorneys.  It was held in both cases that the clients could not have been aware of the causal connection until the Court had entered judgment against the clients.  As the court pointed out in *Eck*, whether or not the attorney was negligent had to await the outcome of the case that had been filed against its client.  *Eck*, 51 Mass. App. Ct. at 855.  Similarly, in *St. Paul*, the court concluded that the Statute of Limitations began to run when the Court ruled against the client in the underlying case.  Here, in contrast, there was no outcome.  There was never any determination that the Shriners Agreement violated the Cooperative Mail Rule.  As Judge Wolf stated,

> [t]he Court did not rule as to whether the government was entitled to summary judgment on its unjust enrichment and FDCPA claims with regard to Shriner's (sic) or if a trial was necessary to determine the value of the Shriners' mailing list.

(3/5/2004 "Memorandum and Order" "Wolf, D.J." at p. 18, attached to Defendants' Rule 56.1 Statement as Exhibit T).  Because there was no determination concerning the Shriners Agreement in the *Qui Tam* action, Vantage can never claim that it knew at any point that the Agreement had been found by the Court to violate the Cooperative Mail Rule.  Under these circumstances, Vantage's cause of action either accrued when the Shriners' claims were added to the *Qui Tam* case, or it never accrued at all.

Critical to the Court's decision in *Eck* was the fact that the client's litigation attorney relied on the assurances of the defendant attorney during the course of the underlying litigation which gave rise to the subsequent malpractice claim against the defendant attorney.  Here, Vantage's litigation counsel, the same attorney who represents Vantage in this case, has offered no testimony to suggest that litigation counsel relied on defendants' assurances in the *Qui Tam* action.  Because Vantage was represented by experienced litigation counsel in the *Qui Tam* action, it is up to counsel to explain the extent of counsel's reliance on defendants, as well as what impact that reliance had on counsel's conduct in the litigation.  Vantage has presented no such evidence here.

On the one hand, Vantage claims that its cause of action did not accrue until the court indicated that the Agreement "<u>may have</u> violated the Cooperative Mail Rule."  (Defendants' Rule 56.1 Statement, Exhibit T, at p. 17) (emphasis added).  On the other hand Vantage steadfastly maintains, even now, that the Agreement was lawful.  Vantage's position becomes all the more untenable when one considers that the court in the *Qui Tam* action never actually ruled

that the Shriners Agreement violated the Cooperative Mail Rule.  Vantage cannot have it both

ways.  If it had any claim at all (which defendants deny), it was that defendants failed to take

such steps as were necessary to prevent the government from including the Shriners mailings in

the *Qui Tam* action.  As of March 2001, Vantage was on actual notice that defendants' efforts

had failed to prevent the government from expanding the scope of its claims to include the

Shriners' mailings.  At that time, Vantage was also on actual notice that it had begun to sustain

appreciable harm, in the form of attorneys' fees,  as a result of the addition of those claims to the

*Qui Tam* action.  Because Vantage was on actual notice that defendants' alleged conduct had

caused it to sustain appreciable harm as of March 2001, Vantage's common law legal

malpractice claims are time barred.

### C.    There Is No Evidence To Suggest That Defendants Violated Chapter 93A

Vantage's c. 93A claim has been somewhat of a moving target.  To the extent that

Vantage's c. 93A allegations are premised on alleged misrepresentation, it has failed to allege

this claim with the particularity required by Fed. R. Civ. p. 9(b).  Initially, Vantage claimed that

Mr. Miller told it that similar agreements had been employed in the past without objection by the

Postal Service.  The focus of Vantage's claim now appears to be an allegation that Mr. Miller

represented that specific provisions very similar to Paragraph 13.2 of the Agreement were

common in the industry and had never been objected to or challenged by the Postal Service.

When Mr. Miller was questioned about these issues on deposition, his answers failed to lend any

support whatsoever to this claim:

> Q.    Did you tell either Mr. Lyon or Mr. Melikian in
> words, substance or effect that provisions very

> similar to those appearing in the Shriners Agreement, and particularly in Paragraph 13.2 of the Shriners Agreement, were common in the industry?
>
> A.    No.
>
> Q.    Did you tell either Mr. Lyon or Mr. Melikian in words, substance or effect that provisions similar to those used in the Shriners Agreement had never been objected to or challenged by the Postal Service?
>
> A.    Provisions providing for additional mailings or provisions providing for list rental income to be used to satisfy any kind of shortfall, yes.

(Miller Tr., at pp. 288-290, copies of which are included in Exhibit E to the Reply Aff.)

What Vantage is attempting to prove is that Mr. Miller represented that other fundraising contracts had included language similar to Paragraph 13.2 of the Shriners Agreement, which not only provided for payment of outstanding balances through follow-up mailings and the rental or exchange of the donor list, but also allegedly exculpated the nonprofit organization from any further liability after a defined period of follow-up mailings and donor list rental or exchange. As Mr. Miller's above-quoted testimony demonstrates, however, he never told Vantage that this alleged exculpatory provision, appearing in Paragraph 13.2, was common in the industry.  Nor does the Affidavit of Harry Melikian and the other materials, submitted by Vantage in opposition to summary judgment, demonstrate otherwise.   (Melikian Aff., ¶6).

At most, all Mr. Miller ever told Mr. Melikian and Mr. Lyon was that "provisions providing for additional mailings or provisions providing for list rental income to be used to satisfy a shortfall had never been objected to or challenged by the Postal Service."  Contrary to Vantage's unsupported assertion in its opposition, defendants have been involved in the preparation of numerous fundraising contracts with provisions similar to those employed in the

Shriners Agreement.  Some of those agreements, the ones that defendants were able to locate and

produce, are included in Exhibit I to the Authentication of Laurence M. Johnson and Exhibits in

Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.  Among those

agreements, provisions for follow-up mailings and donor list rental to defray outstanding

fundraising expenses appear in the following pages of Exhibit I:  NSG2015, NSG2047,

NSG2063, NSG2098, NSG2121, NSG2137, NSG2157, NSG2170, NSG2185, NSG2211,

NSG2226, NSG2248, NSG2249, and NSG2243.

        Vantage's claim that defendants misrepresented the existence of similar fundraising

contracts is not supported by the record.  To the extent that Vantage seeks to add late-blooming

allegations that were never alleged in the Complaint and were never identified in its Answers to

Interrogatories, those allegations should be rejected.  Fed. R. Civ. P. 9(b) imposed an obligation

on Vantage to allege, in its pleadings, any allegations of fraud or misrepresentation with

particularity.  It is far too late in the day for Vantage to change its allegations now.

        As Vantage correctly points out, the Complaint focuses primarily on Mr. Miller's alleged

misrepresentation of his expertise.  Vantage's Rule 56.1 Statement does not even attempt to

dispute the fact that Vantage continues to believe that Mr. Miller "is an expert with respect to

drafting fundraising contracts such as the Agreement."  (Defendants' Local Rule 56.1 Statement,

¶42).  Instead, Vantage concedes that Mr. Miller "has specialized in the area of compliance with

postal regulations dealing with nonprofit mailing since 1981. ..."  (Plaintiff's Local Rule 56.1

Statement, ¶34).  Vantage seems to suggest that whether it believes that Mr. Miller is an expert

does not necessarily mean that he is an expert.  This argument, however, misses the point.

Vantage has conceded the issue of Mr. Miller's expertise, both in the deposition testimony of its

Rule 30(b)(6) designee and in its Local Rule 56.1 Statement.  Having admitted that Mr. Miller

was, and is, an expert in the preparation of fundraising contracts such as the Shriners Agreement, Vantage cannot claim that Mr. Miller's alleged statements to that effect (even if there were any) were misrepresentations.  In any event, it seems clear that in order to demonstrate that Mr. Miller misrepresented his expertise, Vantage would be required to introduce something more than evidence that it became involved in litigation as a result of the Agreement.  As with its claim concerning the existence of similar contract provisions, Vantage has failed to make a sufficient showing to support its claim that Mr. Miller misrepresented his expertise.  As these are the only two grounds alleged in the Complaint to support Vantage's c. 93A claim, that claim, together with all claims sounding in misrepresentation or fraud must be dismissed.

### III.   CONCLUSION

In view of the Shriners' insistence that its liability to pay Vantage for its services be limited, it was a remarkable achievement for defendants to have facilitated an agreement that enabled Vantage to reap tremendous profits and, later, to stave off summary judgment in the *Qui Tam* action.  Indeed, it was on the strength of Mr. Miller's Affidavit (which Vantage refers to repeatedly in its opposition) that Judge Wolf actually dismissed the false claims act allegations against Vantage arising from the Shriners Agreement.  (Defendants' Local Rule 56.1 Statement, ¶34).

Although Vantage's common law claims are time barred and its c. 93A claim is not supported by the evidence, Vantage's case fails in any event because it cannot offer any evidence

to show that defendants' conduct caused it to sustain damages.  Defendants' Motion for

Summary Judgment should be allowed.

<div style="margin-left: 50%;">

Respectfully submitted,

Nonprofit Service Group and
George E. Miller,
By their attorneys,

/s/ Richard L. Nahigian
Richard L. Nahigian, Esq., BBO#: 549096
Matthew J. Griffin, Esq., BBO#641720
PEABODY & ARNOLD LLP
30 Rowes Wharf, 6th Floor
Boston, MA  02110-3342
(617) 951-2100

</div>

Dated:  10/14/05

PABOS2:RNAHIGI:624415_1
14794-90433

13