EXHIBIT ___A___

DRAFT III



# Agreement To Provide Fund Raising Consulting and Management Services

This Agreement To Provide Fund Raising Consulting and Management Services ("Agreement") is made and as of this ____ day of _____, 1999 ("Effective Date"), between Shriners Hospital For Children, Inc., a nonprofit corporation with its principal office located at 2900 Rocky Point Drive, Tampa, FL 33607 ("Shriners"), and Vantage Direct Marketing Services, ~~a division of~~ Vantage Financial Services, Inc., a Massachusetts corporation with its principal office located at 1244 Boylston Street, Chestnut Hill, MA 02467 ("Vantage").

## Recitals

A. Vantage has expertise and experience to create, produce, and manage direct response fund raising campaigns for nonprofit organizations both to identify new donors and renew existing ones, in particular to develop creative strategy, select lists of likely prospects, and use premium-based fund raising techniques.

B. Vantage has expertise and experience to create, prepare, and distribute informational and educational material customized to the specific purpose of a nonprofit organization.

C. Shriners is a nonprofit corporation that desires to raise funds from the public through direct response campaigns for its charitable purposes.

D. Shriners desires to raise funds to support the mission of Shriners to provide medical treatment for children.

## Agreements

Now, Therefore, in consideration of the foregoing premises and the mutual covenants and agreements set forth below, the receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant and agree as follows:

**Paragraph 1.** <u>Definitions</u>

    1.1 "Acknowledgment" is the program to thank donors by sending a letter to them that verifies Shriners receipt of their contributions and may contain educational material as defined in subparagraph 1.12 below.

    1.2 "Agreement" is defined in the introductory paragraph.

    1.3 "Caging" is the procedure whereby envelopes containing contributions from the public are opened, recorded, keypunched, verified, and deposited in the appropriate bank account by a "lockbox" facility jointly selected and mutually agreed to be both parties. Shriners shall exercise exclusive control over any and all bank accounts that receive deposits from the lockbox facility.

    1.4 "Campaign Approval Packet" is defined in Paragraph 6.

    1.5 "Campaign Period" is defined as the time between the date on which a direct mail package is mailed and the last day of the fourth month following the date of that mailing. By way of illustration, the parties agree that if a direct mail package is distributed on June 10, the campaign period for that mailing shall commence on June 10 and end on October 31.

    1.6 "Comment Mail" consists of correspondence or other written communications that recipients of Shriners direct mail packages send to Shriners. The caging facility shall open all comment mail, record, and forward it to the Shriners' Program Administrator. Shriners shall be solely responsible to review and respond to all comment mail received from recipients of its direct mail packages.

    1.7 "Direct Mail Package" contains correspondence or other related printed material which includes a request for financial support or combines such a request for financial support with material that is educational or is designed to raise public awareness.

    1.8 "Direct Mail Program" is defined in Paragraph 5.

    1.9 "Donor Acquisition Mailing" – Shriners conducts its donor acquisition program when it distributes direct mail packages that contain either a straight letter appeal or an appeal that uses a premium as part of the inducement, which

Shriners has given prior written approval to mail, to persons who potentially have a need for or use of information in the direct mail package or are interested in supporting Shriners financially.

    1.10   "Donor Renewal Mailing" – Shriners conducts its donor renewal program when it distributes direct mail packages, with Shriners prior written approval, to all or a part of its file of existing donors in order to provide them with educational material and/or request their continued financial support.

    1.11   "Educational Material" distributed in connection with a direct mail package, as distinguished from a request for financial support, shall be specific, help to accomplish the Shriners mission, should help the recipient or society or should assist Shriners to raise public awareness. Educational Material may be printed in a separate brochure or in components of a direct mail package in a manner determined by the Shriners' Program Administrator on a case-by-case basis.

    1.12   "Effective Date" is defined in the introductory paragraph.

    1.13   "Follow-Up Mailings" are direct mail packages distributed with the Shriners prior written approval to potential or existing donors who have previously received, but have not yet responded to, a direct mail package from the Shriners in order to encourage them to provide financial support or participate in Shriners' programs.

    1.14   "Gross Income" is defined for the purpose of this Agreement as the total of all contributions received as a direct and proximate result of a direct mail campaign before deducting any fees or expenses associated with that campaign.

    1.15   "Know-How" means all factual knowledge and information not capable of precise or separate description but which, in accumulated form, after being acquired by trial and error or other means of experimentation, gives an ability to the acquirer to produce or market something which that person otherwise would not have known how to produce or market with the same accuracy or efficacy necessary to produce net income.

    1.16   "Mailing Lists" used for the Shriners Direct Mail Program contain names and addresses of persons who, by virtue of previous patterns of charitable giving or other identifiable demographic data or statistical studies, are likely to have a

need for or potential use of information in the Shriners' direct mail packages.

1.17 "Net Income" is the amount that remains after the costs are each billing statement are subtracted from donations that Shriners receive in response to the direct mail packages related to that billing.

1.18 "Notice" is defined in Paragraph 11.

1.19 "Program Account" is defined in Paragraph 7.2.

1.20 "Program Administrator" - Shriners shall designate in writing one (1) person to serve as the Program Administrator who shall have primary responsibility to communicate with Vantage and Shriners regarding planning and execution of Shriners direct mail campaigns during the term of this Agreement.

The Program Administrator shall have responsibility, on behalf of the Shriners, to secure approval or disapprove all Campaign Approval Packets. The Program Administrator will attempt to facilitate communication between Vantage and the Shriners' staff to the extent necessary so that Vantage may develop direct mail packages for the Shriners.

1.22 "Program Donors" are persons who respond to a direct mail package distributed pursuant to this Agreement.

1.23 "Shriners Suppression File" is the list of names of Shriner members and donors that the Shriners provide to Vantage quarterly and that Vantage agrees it will use to eliminate any name on the Shriners Suppression File from the lists of prospective donors that Vantage proposes to mail as part of the Shriners Direct Mail Program.

1.24 "Vendors" are individuals or businesses which provide supplies or services under contract with Vantage necessary to execute Shriners' direct mail campaigns. These vendors include, without limitation, suppliers of envelopes and other paper products, suppliers of promotional materials, printers, typesetters, artists, copy writers, letter shops, and data processors. Vantage will not use any Vendor in which Vantage has an ownership interest of fifty (50) percent or more.

NSG 0616

**Paragraph 2.   Authority of Vantage; Limitations on Authority**

During the term of this Agreement, Shriners shall retain Vantage exclusively to plan and manage the Direct Mail Program and to create, prepare, and distribute the direct mail packages itemized in Schedule A and any replacement or additional packages that Vantage may from time to time propose to Shriners. Vantage shall act solely as agent for Shriners pursuant to Shriners' written directive.


**Paragraph 3.   Term of Agreement**

3.1  This Agreement shall commence on the Effective Date hereof and shall extend for a term of four (4) years.

3.2  For solicitations conducted in the State of New York, this Agreement shall be effective as of fifteen (15) days following the date on which the Agreement is filed with the Attorney General's Charities Bureau. Notwithstanding the above, Shriners may, without giving any reason, cancel this contract without cost, penalty, or liability for a period of fifteen (15) days following the date of the filing hereof with the New York Charities Bureau, if Shriners notify Vantage by letter or other written notification indicating that it does not intend to be bound by this Agreement. Said notice ~~may be hand~~ delivered or mailed to Vantage at 1244 Boylston Street, Chestnut Hill, Massachusetts 02467. If notice is hand-delivered, the cancellation is effective as soon as it is deliver to Vantage. If the notice is mailed, the cancellation is effective as soon as the notice is deposited, properly addressed with postage prepared, in a mailbox. Shriners must also mail a duplicate copy of the notice of cancellation to the State of New York, Office of the Attorney General, Charities Bureau, The Capitol, Albany, NY 12224.

[handwritten margin note: shall be delivered by USPS, etc. or hand delivered by ...]

3.3  Vantage agrees to recognize the terms of any cooling off provision to the extent that any jurisdiction in which Shriners may conduct the Direct Mail Program requires fund raising counsel to offer a cooling off period, such as the State of New York.


**Paragraph 4.   Educational Material in Direct Mail Packages**

If Shriners would like Vantage to propose direct mail packages that are multipurpose, that is contain Educational Material that may be allocated to public education as defined by

NSG 0617

the American Institute of Certified Public Accountants, Shriners Program Administrator shall notify Vantage and indicate the approximate proportion of the content of the package that Shriners would like to be classified as public education.

**Paragraph 5.   Direct Mail Program**

5.1  Consultant Services - During the term of this Agreement, Shriners agree to use the services that Vantage provides and which are herein referred to as the "Direct Mail Program." Vantage agrees to provide the full range of services that Shriners request and approve in writing in order to conduct the Direct Mail Program including but not limited to selection of mailing lists, preparation and distribution of the initial direct mail package, caging, data processing, and acknowledgment of donations. These consultant services draw on Vantage's particular Know-How in direct mail marketing and premium fund raising techniques including but not limited to name and address labels, note cards, holiday greeting cards, lapel pins, and calendars.

5.2  Mail Schedule - Schedule A attached hereto sets forth the preliminary mail schedule for the Shriners' Direct Mail Program, including the proposed number of campaigns and for each such campaign, whether it's a donor acquisition, renewal, or acknowledgment mailing; whether a premium is proposed and, if so, the type of premium to be offered; the number of initial packages to be mailed; mail package design; and the anticipated mail or drop date. Schedule A also sets forth the product costs, postage, list costs, and results for each such campaign. The quantity to be mailed, results, postage, and list costs contained in Schedule A are projections, and Vantage cannot guarantee them.

5.3  Test Mailing - In order to identify a universe of prospective Shriner donors to receive donor acquisition mail packages, Vantage shall arrange for a test mailing on or about July 1, 1999, as set forth on Schedule A. The purpose of the test mailing is to determine lists of prospects where two and one-half percent (2.5%) or more of the names on the list respond to the test mail package. As soon as possible following the tests, Vantage shall advise Shriners as to the potential size of the universe of prospective donors available to receive donor acquisition packages.

NSG 0618

7 of 11

**Paragraph 6.   Shriners Approval of Direct Mail Packages and Campaigns**

   6.1  At least _____ (___) days prior to the anticipated date of each mailing as set forth on Schedule A, Vantage shall submit the "Campaign Approval Packet" to Shriners Program Administrator which shall consist of: copy and graphics for each component of the mail package for the upcoming campaign, the proposed number of packages to be mailed, the lists to be mailed, and a budget that details list costs, postage, product cost, and any other costs or charges, and projected results so that Shriners will have a complete understanding of its financial obligation, the concept and contents of the direct mail package, and the anticipated number of new donors and total amount of donations.  Vantage shall assign a unique job identification code to each campaign or job and shall provide a space for the Shriners Program Administrator to indicate approval or disapproval of the proposed campaign and direct mail package.

   6.2  Shriners Program Administrator shall review each Campaign Approval Packet and shall notify Vantage of Shriners' decision no later than _____ (___) days after Shriners Program Administrator receives the Campaign Approval Packet. Shriners has the sole authority to approve, such approval to be in writing, the specifications set forth in each Campaign Approval Packet, and Vantage may commence production in accordance with the specifications and cause the direct mail packages to be distributed only with the express written approval of Shriners.

   6.3  Use and Ownership of Mail Lists

      6.3.1  Vantage agrees that it will not intentionally mail to any Shriner member or donor. To accomplish this objective, Vantage shall designate the names of each respondent to the Shriners' Direct Mail Program as "Program Donors." Shriners shall be the sole owner of the list of Program Donors. Vantage shall not use the list of Program Donors for any purpose except to carry out its obligations pursuant to this Agreement. Vantage shall update the list of Program Donors weekly and maintain it during the term of this Agreement. Every six (6) months, Vantage shall provide a magnetic tape record, in a format that is mutually agreed to in advance, to Shriners of the names of all Program Donors along with the amount of any donation received up to that time. During the term of this Agreement, Shriners agree not to contact Program Donors without Vantage's approval in advance in writing. No later than ninety (90) days after termination, Vantage shall provide the list of

Program Donors to Shriners that includes all updates that have been caged up to the seventy-fifth (75th) day after termination. Upon transmittal of the complete updated list of Program Donors, Shriners shall enjoy all rights to such list without limitation.

6.3.2  In order to avoid any unintentional mailing to any Shriner member or donor, Shriners will prepare a list of all members and donors to be called the Shriners Suppression File. Vantage agrees that it will use this file to suppress the names contained thereon from any list of prospective donors that Vantage proposes to use in the Shriners Direct Mail Program. The Shriners will update the suppression file on a quarterly basis and provide a magnetic tape to Vantage of the updated suppression file in a mutually agreed format.

6.3.3  Prior to termination of this Agreement, Shriners may not use the list of Program Donors for any purpose other than the Direct Mail Program without the prior agreement of Vantage.  Vantage agrees that it will not withhold approval unreasonably.  Until such time as Shriners pay all outstanding billing statements, Vantage shall have the right either to rent the list of Program Donors or to distribute additional direct mail packages until list rental income or donations are sufficient to pay all outstanding billing statements.

6.3.4  If Vantage intentionally breaches this provision, it shall pay liquidated damages to Shriners of ten dollars ($10) per name for the wrongful use of the Shriners' member and donor list.

6.3.4  Vantage shall secure a surety bond of one million dollars ($1,000,000) in the event that it fails to perform under the terms of this provision.


Paragraph 7.  Receipt of Proceeds and Costs

7.1  Program Account, Control of Funds Deposited - Vantage shall prepare all mail packages for Shriner's Direct Mail Program so that they include a clear statement that directs the recipient to send all donations to a designated post office in the name of Shriners.  Based on the number of responses, Vantage shall instruct the U.S. Post Office to sweep the designated postal box several times a week and forward the contents to the designated depository bank, Boston Financial Data Services, Inc., a subsidiary of State Street Bank of Boston ("Bank"), for

deposit into a segregated account in the name of Shriners Hospital for Children, Inc.

7.2 Bank shall count, record by donor, and deposit all such proceeds in Shriners' segregated bank account at State Street Bank of Boston (hereinafter referred to as the "Program Account"). Shriners shall establish the Program Account there so that it is dedicated solely to deposits that are generated pursuant to this Agreement. The Program Account shall be in Shriner's name, and Shriners shall control it. Any interest that accrues on funds deposited in the Program Account shall be the sole property of Shriners. Bank shall invoice Shriners directly for all fees and other costs associated with services that Bank renders to Shriners. Vantage shall prepare and submit a report to Shriners weekly that sets forth the amount of funds received and deposited pursuant to this Agreement.

7.3 <u>Submission and Payment of Billing Statements</u>

7.3.1 After a mailing is dropped, Vantage shall prepare and submit a billing statement of the charges for that mailing to the Shriners Program Administrator along with a copy of the U.S. Postal Service ("USPS") Form 3602 or the equivalent form that shows the actual quantity of packages mailed and postage paid. Vantage shall use the unique job identification code it assigned to the mailing to which the billing statement relates so that Shriners may match each billing statement and the corresponding USPS Form 3602 to the correct Campaign Approval Packet in order to verify that invoiced charges are identical to those costs that Shriners approved and authorized Vantage to incur on behalf of the Shriners and to verify that the billing statement is based on the number of packages that Shriners approved and that Vantage actually mailed. The charges contained in a billing statement may not exceed the costs that the Shriners approved in the Campaign Approval Packet without Shriners written approval.

7.3.2 Shriners agree to retain all funds received in response to the Direct Mail Program in the Program Account. Upon receipt and verification of the billing statement, and upon verification from the Bank of the amount of funds available in the Program Account to pay the charges on the billing statement, Shriners shall pay the charges on the billing statement.

7.3.3 Upon Shriners' verification of a billing statement, Shriners agree to pay the charges on the billing

NSG 0621

statement weekly from the Program Account on the following order: (a) postage, (b) list rentals, and (c) product cost.

7.4 **Escrow** - During the first eighteen (18) months of the Shriners' Direct Mail Program beginning on the Effective Date, Shriners agree not to withdraw funds from the Program Account until it is current with all outstanding billing statements, and the Program Account contains at least one-half of the total budgeted expense for the upcoming campaign. Beginning on January 1, 2001, and at the conclusion of every three month period thereafter, Shriners may withdraw an amount from the Program Account equal to fifteen percent (15%) of gross donations it received in the same three-month period a year earlier. At any time after April 1, 2001, Shriners reserve the right to withdraw more than fifteen percent (15%) if it is current with all outstanding billing statements, and the Program Account contains at least one-half of the total budgeted expense for the upcoming donor acquisition mailing.

Paragraph 8.   **Trademarks, Trade Names, Service Marks**

8.1 Vantage agrees that it will use the name "Shriners Hospitals for Children" or any of Shriners' trademarks, trade names, or service marks ("Shriners Marks") only in connection with the conduct and operation of Shriners' Direct Mail Program provided for under this Agreement and with the approval of Shriners for all such applications. Vantage recognizes and acknowledges that the use of the Shriners Marks shall not confer any proprietary rights on Vantage to the Shriners Marks. Upon expiration or termination of this Agreement, Vantage's right to use Shriners Marks shall terminate, and Vantage shall cease all use of Shriners Marks. Shriners shall accrue all goodwill relating to the use of the Shriners Marks.

8.2 Vantage acknowledges that Shriners member and donor lists are an asset of substantial value and shall maintain this information in strictest confidence and shall use only the names in accordance with this Agreement. The confidentiality obligation imposed on Vantage pursuant to the preceding sentence shall survive the term of this Agreement.

Paragraph 9.   **Intellectual Property and Confidentiality**

9.1 Shriners recognize that Vantage has expended Know-How and other intellectual property of a proprietary nature that

Vantage has developed in order to fashion and present the Direct Mail Program to Shriners as embodied in Schedule A. Shriners recognize further that Vantage's intellectual property as represented by the Direct Mail Program and Schedule A has value to Shriners, Vantage, and Vantage's competitors. (Vantage hereby discloses the contents of Schedule A based on the understanding that Shriners intend to execute this Agreement and compensate Vantage over the term of this Agreement for its Know-How and other intellectual property.)

9.2  Shriners shall use best efforts to ensure the confidentiality of Schedule A and all other Know-How, other Vantage intellectual property of a proprietary nature, and any confidential business information related thereto or that otherwise relates to implementing this Agreement.

9.3  Shriners shall use best efforts to restrict access to such information to personnel who have a need to know, including by way of limitation: (a) members of its law department; (b) Shriners Program Administrator; (c) accounting department; (d) Shriners corporate officers; and (d) officials of governments or judiciaries who have a legal right to know.

9.4  Notwithstanding the foregoing, confidential information shall not include any information that (a) is or becomes a part of the pubic domain by some means other that through an act or omission of Shriners or Vantage; (b) Vantage discloses to a third party without any restriction on such third party; or (c) is in the possession of Vantage or Shriners without actual or constructive knowledge of an obligation of confidentiality with respect thereto at or prior to the time it is disclosed under this Agreement.

Paragraph 10.   **Indemnification**

Shriners and Vantage each agrees to indemnify, defend, and hold harmless the other party to this Agreement and its respective partners, directors, officers, agents, employees, members, and affiliates from and against any loss, damage, liability, claims or causes of action (including attorneys' fees and expenses of litigation) in any way resulting from such party's acts or omissions or the acts or omissions of such party's partners, directors, officers or employees, or members in connection with or in a way related to the Direct Mail Program or any such party's breach of its respective obligations under this Agreement. Vantage shall indemnify Shriners

up to the limits of Vanatge's comprehensive general liability insurance policy.

**Paragraph 11.   Notice**

   11.1  Any Notice or other communication between Shriners and Vantage concerning or required under this Agreement shall be in writing and shall be sent by Certified U.S. Mail or overnight courier service to the address listed below or to such other address as either of the parties may hereafter specify by such Notice to the other:

   To:  Shriners Hospitals for Children, Inc.
        2900 Rocky Point Drive
        Tampa, FL 33607
        Attn:  Director of Giving
        Copy to:  Executive Vice President of Shriners
                  Hospitals for Children


   To:  Vantage Direct Mail Services
        1244 Boylston Street
        Boston, MA 02467

        Attn:  Ms. Lynn S. Edmonds
               Executive Vice President and General
               Manager

   11.2  Service - Determination of the date that Notice is received:  (a) certified mail is the date received; (b) first class mail is the date postmarked; and (c) overnight courier service is the date sent.


**Paragraph 12.   Termination**

   12.1  At any time either party may terminate this Agreement with or without cause by providing Notice to the other party no later than sixty (60) days prior to termination.  In that event, this Agreement shall automatically terminate on the sixtieth (60th) day following the Notice or at the end of the first mail campaign following Notice, whichever occurs first.  Upon Notice of termination by either party, all outstanding billing statements shall become due and payable within sixty (60) days.

   12.2  Liquidated Damages - In the event that Shriners terminate this Agreement without cause prior to the natural

NSG 0624

[handwritten margin note: Acquired pursuant to VFS effort including lists that have been identified]

expiration of this Agreement, Shriners shall pay an amount to Vantage that is computed as follows: ten dollars ($10) for [handwritten: net] every Program Donor, and Shriners shall ~~use best efforts to prevent use of~~ use any direct mail package or other creative material that Vantage developed for Shriners, or any copy or graphics that is similar thereto, until the time that this Agreement would have expired naturally without Vantage's approval in writing in advance.

12.3 <u>Event of Default</u> - Either party may terminate this Agreement if the other party breaches any provision hereunder and fails to cure such breach within the period set forth below. The non-breaching party must give Notice of default along with a statement specifying the alleged breach no later than ten (10) calendar days after learning of the breach, and the breaching party has ten (10) calendar days from service of Notice to cure the breach.

12.4 <u>Bankruptcy</u> - This Agreement shall terminate immediately if either party becomes insolvent in that its liabilities exceed its assets, is adjudicated to be insolvent, takes advantage of or is subject to any insolvency proceeding, makes an assignment for the benefit of creditors, or is subject to receivership, conservatorship, or liquidation.

Paragraph 13.    <u>General</u>

13.1 <u>Headings</u> - The headings set out in this Agreement are for the convenience of reference only and shall not be deemed a substantive part of this Agreement.

13.2 <u>Counterparts</u> - This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on both parties.

13.3 <u>Benefit</u> - This Agreement shall be binding upon and inure to the benefit of the parties signing it, their successors, and assigns. Neither party shall have the right to assign its rights or liabilities under this Agreement, in whole or in part, without prior written consent of the other party.

13.4 <u>Recitals</u> - The Recitals to this Agreement are hereby incorporated herein as an integral part hereof.

13.5 <u>Use of Terms</u> - Use of the terms "hereunder," herein,"

and similar terms refer to this Agreement.

13.6  **Waiver** - No failure on the part of either party to notify the other party of any noncompliance hereunder and no failure on the part of any party to exercise its rights created by such noncompliance shall prejudice any remedy for any subsequent non-compliance; any waiver by any party of any breach or non-compliance with any term or condition of this Agreement shall be limited to the particular instance and shall not operate or be deemed to waive any future breaches or noncompliance with any term or condition.

13.7  **Other Agreements** - This Agreement constitutes the entire agreement between the parties and it supersedes all negotiations, representations, warranties, commitments, offers, contracts, and writings executed prior to the Effective Date, except as otherwise provided in this Agreement.

13.8  **Severability** - The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant in this Agreement.  If all or a portion of a covenant herein contained is held to be unenforceable, the parties agree to be bound by any lesser covenant subsumed within the terms of such covenant, as if the resulting covenant were separately stated in this Agreement.

13.9  **Survival** - All representations, covenants, and agreements made by the parties hereto shall survive the execution and delivery of this Agreement.

13.9  **Modifications** - All modifications to this Agreement must be made in writing and signed by both parties.

13.10  **Governing Law** - This Agreement shall be deemed to have been made in the State of Florida and shall be construed according to the laws of that state.

13.11  **Mediation** - Shriners and Vantage agree that with respect to any dispute, controversy, or claim that may arise out of or in connection with this Agreement, they shall submit such disagreement to non-binding mediation by a single mediator in Florida such mediator to be agreed to mutually by the parties. The parties shall divide the cost of the mediator equally among them.

13.12  **Relationship of Parties** - This Agreement does not constitute and shall not be construed to constitute a part-

NSG 0626

15 of 15

nership or joint venture between Shriners and Vantage. Neither party shall have any right to obligate or bind the other party in any manner whatsoever except as authorized in this Agreement or as either party may specifically authorize the other in writing.

    In Witness Whereof, we have executed this Agreement on behalf of Shriners and Vantage as of the Effective Date first entered above.

**Vantage Financial Services, Inc.**

By:

_____  _____
Witness                       Evelyn S. Edmonds
                              Executive Vice President and
                              General Manager


_____  _____
Witness                       Lawrence C. Lyon
                              Senior Vice President Sales
                              and Marketing


Shriners Hospitals for Children, Inc.

By:

_____  _____
Witness                    (2) Name: John D. Vermaas
                               Title: Chmn S&H, SH for Children
                                      Brd of Trustees

By:

_____  _____
Witness                    (3) Name: Jerry Bracewell
                               Title: Treasurer,
                                      Imperial

(4) Jon Jenn K. Molnar
    Exec VP, SH for Children
  (1) Ralph Semb     Deputy Imperial Potentate

NSG 0627