**EXHIBIT___C_____**



DRAFT V [221680]

# Agreement To Provide Fund Raising Consulting and Management Services

This Agreement To Provide Fund Raising Consulting and Management Services ("Agreement") is made and as of this _____ day of _____, 1999 ("Effective Date"), between Shriners Hospitals For Children~~, Inc~~., a nonprofit corporation with its principal office located at 2900 Rocky Point Drive, Tampa, FL 33607 ("Shriners"), and Vantage Financial Services, Inc., a Massachusetts corporation with its principal office located at 1244 Boylston Street, Chestnut Hill, MA 02467 ("Vantage").

## Recitals

A.   Vantage has expertise and experience to create, produce, and manage direct response fund raising campaigns for nonprofit organizations both to identify new donors and renew existing ones, in particular to develop creative strategy, select lists of likely prospects, and use premium-based fund raising techniques.

B.   Vantage has expertise and experience to create, prepare, and distribute informational and educational material customized to the specific purpose of a nonprofit organization.

C.   Shriners is a nonprofit corporation that desires to raise funds from the public through direct response campaigns for its charitable purposes.

D.   Shriners desires to raise funds to support the mission of Shriners to provide medical treatment for children.

**E.   *No mailings of any kind under this Agreement shall be made to contributors to Shriners from the Combined Federal Campaign, or similar campaigns (past, present or future), nor shall any mailing include any Shriner, or present or past donor to Shriners existing on the effective date of this Agreement or who subsequently make donations to Shriners independent of this Agreement.***

SHC 03274

*F.  All mailings made by Vantage for the benefit of Shriners pursuant to this Agreement require Shriners' prior written approval.*

*G.  Vantage assumes full obligation and responsibility for the payment of all vendors and suppliers arising out of the fulfillment of Vantage's obligations hereunder, said invoices to be subsequently reimbursed by Shriners only under the terms and conditions set forth in this Agreement.  Shriners shall reimburse Vantage only to the extent that Vantage has raised funds on behalf of Shriners in accordance with this Agreement. Vantage shall have no right or claim upon any other funds or accounts of Shriners.  In other words, Vantage and not Shriners, is liable for all expenses connected with this Agreement to the extent that Vantage has not raised funds to cover these costs.*

## Agreements

Now, Therefore, in consideration of the foregoing premises and the mutual covenants and agreements set forth below, the receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant and agree *that the Recitals above are a material part of this Agreement, and covenant and agree* as follows:

**Paragraph 1.  <u>Definitions</u>**

1.1  "Acknowledgment" is the program to thank donors by sending a letter to them that verifies Shriners receipt of their contributions and may contain educational material as defined in subparagraph 1.12 below.

1.2  "Agreement" is defined in the introductory paragraph.

1.3  "Caging" is the procedure whereby envelopes containing contributions from the public are opened, recorded, keypunched, verified, and deposited in the appropriate bank account by a "lockbox" facility jointly selected and mutually agreed to be both parties.  Shriners shall exercise exclusive **ownership and** control over any and all bank accounts that receive deposits from the lockbox facility.

1.4  "Campaign Approval Packet" is defined in Paragraph 6.

1.5  "Campaign Period" is defined as the time between the

SHC 03275

date on which a direct mail package is mailed and the last day
of the fourth month following the date of that mailing. By way
of illustration, the parties agree that if a direct mail package
is distributed on June 10, the campaign period for that mailing
shall commence on June 10 and end on October 31.

1.6  "Comment Mail" consists of correspondence or other
written communications that recipients of Shriners direct mail
packages send to Shriners. The caging facility shall open all
comment mail, record, and forward it to the Shriners' Program
Administrator. Shriners shall be solely responsible to review
and respond to all comment mail received from recipients of its
direct mail packages.

1.7  "Direct Mail Package" contains correspondence or other
related printed material which includes a request for financial
support or combines such a request for financial support with
material that is educational or is designed to raise public
awareness.

1.8  "Direct Mail Program" is defined in Paragraph 5.

1.9  "Donor Acquisition Mailing" – *Vantage for the benefit
of* Shriners conducts ~~its~~ *Shriners'* donor acquisition program
when ~~it~~ *Vantage for the benefit of Shriners* distributes direct
mail packages that contain either a straight letter appeal or an
appeal that uses a premium as part of the inducement, which
Shriners has given prior written approval to mail, to persons
who potentially have a need for or use of information in the
direct mail package or are interested in supporting Shriners
financially.

1.10  "Donor Renewal Mailing" – *Vantage for the benefit of*
Shriners conducts ~~its~~ *Shriners'* donor renewal ~~program~~ *mailing*
when ~~it~~ *Vantage for the benefit of Shriners* distributes direct
mail packages, with Shriners' prior written approval, to all or
a part of ~~its~~ *Shriners'* file of ~~existing~~ donors *generated as a
direct and proximate result of this Agreement* in order to
provide them with educational material and/or request their
continued financial support.

1.11  "Educational Material" distributed in connection with
a direct mail package, as distinguished from a request for
financial support, shall be specific, help to accomplish the
Shriners mission, should help the recipient or society or should
assist Shriners to raise public awareness. Educational Material
may be printed in a separate brochure or in components of a

SHC 03276

D̶direct M̶mail P̶package in a manner determined by the Shriners'
Program Administrator on a case-by-case basis.

1.12  "Effective Date" is defined in the introductory
paragraph.

1.13  "Follow-Up Mailings" are D̶direct M̶mail P̶packages
distributed with the Shriners prior written approval to
potential or existing donors who have previously received, but
have not yet responded to, a D̶direct M̶mail P̶package from the
Shriners in order to encourage them to provide financial support
or participate in Shriners' programs.

1.14  "Gross Income" is defined for the purpose of this
Agreement as the total of all contributions received as a direct
and proximate result of a ~~direct mail campaign~~ *Direct Mail
Package, Direct Mail Program, Donor Renewal Mailing, Follow-up
Mailing, or any other Mailing under this Agreement* before
deducting any fees or expenses associated with that campaign.

1.15  "Know-How" means all factual knowledge and
information not capable of precise or separate description but
which, in accumulated form, after being acquired by trial and
error or other means of experimentation, gives an ability to the
acquirer to produce or market something which that person
otherwise would not have known how to produce or market with the
same accuracy or efficacy necessary to produce net income.

*1.16*  "Mailing Lists" used for the Shriners Direct Mail
Program contain names and addresses of persons who, by virtue of
previous patterns of charitable giving or other identifiable
demographic data or statistical studies, are likely to have a
need for or potential use of information in the Shriners' direct
mail packages. *Mailing Lists shall not include any Shriners,
any past or future contributor to Shriners from the Combined
Federal Campaign or similar campaigns (past, present or future),
nor include any past or present donors to Shriners existing on
the effective date of this Agreement or who subsequently make
donations to Shriners independent of this Agreement.*

1.17  "Net Income" is the amount that remains after the
costs of each billing statement *approved by Shriners in writing*
are subtracted from donations that Shriners receive in response
to the ~~direct mail packages~~ *Donor Acquisition Mailing, Direct
Mail Packages, Direct Mail Program, Donor Renewal Mailing,
Follow-up Mailings, or any other Mailing under this Agreement*
related to that billing.

SHC 03277

1.18   "Notice" is defined in Paragraph 12.

1.19   "Program Account" is defined in Paragraph 7.2.

1.20   "Program Administrator" – Shriners shall designate in writing one (1) person to serve as the Program Administrator who shall have primary responsibility to communicate with Vantage and Shriners regarding planning and execution of Shriners direct mail campaigns during the term of this Agreement.

The Program Administrator shall have responsibility, on behalf of the Shriners, to secure approval or disapprove all Campaign Approval Packets.  The Program Administrator will attempt to facilitate communication between Vantage and the Shriners' staff to ~~the extent necessary so that Vantage may~~ develop ***Vantage's D***~~d~~***irect M***~~m~~***ail P***~~p~~***ackages, Direct Mail Program, Donor Renewal Mailing, Follow-up Mailing, Donor Acquisition Mailings or Direct Mail Packages or any other Mailing under this Agreement*** for ~~the~~ Shriners.

1.21   "Program Donors" are persons who respond to a ***D***~~d~~***irect M***~~m~~***ail P***~~p~~***ackage, Donor Renewal Mailing, Follow-up Mailing, Donor Acquisition Mailings or Direct Mail Packages or any other Mailing*** distributed pursuant to this Agreement.

1.22   "Shriners Suppression File" is the list of names of Shriner members and donors that the Shriners provide to Vantage biannually ***(or more frequently if desired by Shriners)*** and that Vantage agrees it will use prior to each Donor Acquisition Mailing***, Direct Mail Package, Direct Mail Program, Donor Renewal Mailing or Follow-up Mailing or any other Mailing under this Agreement*** in order to eliminate names on the Shriners Suppression File from the lists of prospective donors that Vantage proposes to mail as part of ~~the Shriners Direct Mail Program~~ ***any mailing made pursuant to this Agreement.***

1.23   "Vendors" are individuals or businesses which provide supplies or services under contract with Vantage necessary to execute ~~Shriners' direct-mail campaigns~~ ***any mailing made pursuant to this Agreement.***  These vendors include, without limitation, suppliers of envelopes and other paper products, suppliers of promotional materials, printers, type-setters, artists, copy writers, letter shops, and data pro-cessors.  Vantage will not use any Vendor in which Vantage has ***a direct or indirect*** ~~an~~ ownership interest of fifty (50) percent or more.

SHC 03278

**Paragraph 2.**  **Authority of Vantage; Limitations on Authority**

During the term of this Agreement, Shriners ~~shall~~ retains Vantage ~~exclusively~~ to plan and manage the Direct Mail Program, *Donor Acquisition Mailing, Direct Mail Packages, Direct Mail Program, Donor Renewal Mailings, or Follow-up Mailings, or any other Mailing under this Agreement* and to create, prepare, and distribute the ~~D~~direct ~~M~~mail ~~P~~packages itemized in Schedule A and any replacement or additional packages that Vantage may from time to time propose to Shriners *and which Shriners approves in writing.*  Vantage shall act solely as agent for Shriners pursuant to Shriners' written directive.  *In no event shall Vantage have authority to receive contributions on behalf of Shriners or have access to such contributions.*

**Paragraph 3.**  **Term of Agreement**

3.1  This Agreement shall commence on the Effective Date hereof and shall extend for a term of four (4) years *unless sooner terminated in accordance with paragraph 5.3 of this Agreement.*

3.2  For solicitations conducted in the State of New York, this Agreement shall be effective as of fifteen (15) days following the date on which the Agreement is filed with the Attorney General's Charities Bureau.  Notwithstanding the above, Shriners may, without giving any reason, cancel this contract without cost, penalty, or liability for a period of fifteen (15) days following the date of the filing hereof with the New York Charities Bureau, if Shriners notify Vantage by letter or other written notification indicating that it does not intend to be bound by this Agreement.  Said notice may be hand delivered or mailed to Vantage at 1244 Boylston Street, Chestnut Hill, Massachusetts 02467.  If notice is hand-delivered, the cancellation is effective as soon as it is deliver to Vantage.  If the notice is mailed, the cancellation is effective as soon as the notice is deposited, properly addressed with postage prepared, in a mailbox.  Shriners must also mail a duplicate copy of the notice of cancellation to the State of New York, Office of the Attorney General, Charities Bureau, The Capitol, Albany, NY 12224.

3.3  Vantage agrees to recognize the terms of any cooling off provision to the extent that any jurisdiction in which Shriners may conduct the Direct Mail Program requires fund raising counsel to offer a cooling off period, such as the State of New York.

**Paragraph 4.   Educational Material in Direct Mail Packages**

If Shriners would like Vantage to propose direct mail packages that are multipurpose, that is contain Educational Material that may be allocated to public education as defined by the American Institute of Certified Public Accountants, Shriners Program Administrator shall notify Vantage and indicate the approximate proportion of the content of the package that Shriners would like to be classified as public education.

**Paragraph 5.   Direct Mail Program**

5.1   Consultant Services - During the term of this Agreement, Shriners agree to use the services that Vantage provides and which are herein referred to as the "Direct Mail Program." Vantage agrees to provide the full range of services that Shriners request and approve in writing in order to conduct the Direct Mail Program including but not limited to selection of mailing lists, preparation and distribution of the initial direct mail package, caging, data processing, and acknowledgment of donations. These consultant services draw on Vantage's particular Know-How in direct mail marketing and premium fund raising techniques including but not limited to name and address labels, note cards, holiday greeting cards, lapel pins, and calendars.

5.2   Mail Schedule – Schedule A attached hereto sets forth the preliminary mail schedule for the Shriners' Direct Mail Program, including the proposed number of campaigns and for each such campaign, whether it's a D~~d~~onor A~~a~~cquisition *Mailing,Donor Renewal Mailing* ~~renewal, or~~ *Donor A*~~a~~cknowledgment M~~m~~ailing; *Direct Mail Package or Follow-up Mailing,* whether a premium is proposed and, if so, the type of premium to be offered *and its cost*; the number of initial packages to be mailed; mail package design; and the anticipated mail or drop date. Schedule A also sets forth *all costs, including but not limited to,* the product costs, postage, list costs, and results for each such campaign. *Costs other than postage cannot be unilaterally increased by Vantage during this Agreement. Any cost increases must be approved by Shriners in writing.* The ~~quantity to be mailed~~, results~~, postage, and list costs~~ contained in Schedule A are projections, and Vantage cannot guarantee them.

5.3   Test Mailing – In order to identify a universe of prospective Shriner donors to receive Donor Acquisition

SHC 03280

Mailings, *and to determine if Shriners will continue under this Agreement,* Vantage shall arrange for a test mailing on or about July 1, 1999, *which will conclude four months later* as set forth on Schedule A~, *and as approved by Shriners in writing.* The purpose of the test mailing is to determine *if ~~lists of prospects where~~* two and one-half percent (2.5%) or more of the ~~names~~ *total number of persons* on the list *to whom a test mailing was sent,* respond to the ~~test mail package~~ *Donor Acquisition Mailing.* As soon as possible following the tests, Vantage shall advise Shriners as to the potential size of the universe of prospective donors available to receive donor acquisition packages. *The determination of whether or not a 2.5% response to the test has been received is to be made by Vantage, but can be independently verified by Shriners, should Shriners so desire. If the response to the test is less than 2.5%, then Shriners may, if it so desires, terminate this entire Agreement without any liability whatsoever to Vantage.*

Paragraph 6.    <u>Shriners Approval of Direct Mail Packages and Campaigns</u>

6.1  At least _____ (___) days prior to the anticipated date of each mailing as set forth on Schedule A, Vantage shall submit the "Campaign Approval Packet" to Shriners Program Administrator which shall consist of: copy and graphics for each component of the mail package for the upcoming campaign, the proposed number of packages to be mailed, the lists to be mailed, and a budget that details *all costs, including, but not limited to,* list costs, postage, product cost~ and any other costs or charges *that will be on the billing statement of paragraph 7.3.1,* and projected results so that Shriners will have a complete understanding of its financial obligation, the concept and contents of the direct mail package, and the anticipated number of new donors and total amount of donations. Vantage shall assign a unique job identification code to each campaign or job and shall provide a space for the Shriners Program Administrator to indicate approval or disapproval of the proposed campaign and direct mail package.

6.2  Shriners Program Administrator shall review each Campaign Approval Packet and shall notify Vantage of Shriners' decision *whether all or any part of the Campaign Approval Packet is satisfactory* no later than _____ (___) days after Shriners Program Administrator receives the Campaign Approval Packet. Shriners has the sole authority to approve, such approval to be in writing, the specifications set forth in each

SHC 03281

Campaign Approval Packet, and Vantage ~~may~~ *shall* commence production *only* in accordance with the ~~specifications~~ *express written aproval of Shriners of the specifications so approved*, and cause the ~~D~~direct ~~M~~mail ~~P~~packages to be distributed *as set forth in Exhibit A as so approved by Shriners* ~~only with the express written approval of Shriners~~.

### 6.3    Use and Ownership of Mail Lists

6.3.1    Vantage agrees that it will not intentionally, *or through negligence,* mail *anything* to any ~~Shriner member or donor~~ *person listed in Recital E of this Agreement*. To accomplish this objective, Vantage shall designate the names of each respondent to the Shriners' Direct Mail Program as "Program Donors." Shriners shall be the sole owner of the list of Program Donors. Vantage shall not use the list of Program Donors for any purpose except to carry out its obligations pursuant to this Agreement. Vantage shall update the list of Program Donors weekly and maintain it during the term of this Agreement. Every six (6) months, Vantage shall provide a magnetic tape record, in a format that is mutually agreed to in advance, to Shriners of the names of all Program Donors along with the amount of any do-nation received up to that time. ~~During the term of this Agreement, Shriners agree not to contact Program Donors without Vantage's approval in advance in writing.~~ No later than ninety (90) days after termination *of this Agreement*, Vantage shall provide the list of Program Donors to Shriners that includes all updates that have been caged up to the seventy-fifth (75th) day after termination. Upon transmittal of the complete updated list of Program Donors, Shriners shall enjoy all rights to such list without limitation.

6.3.2    In order *for Vantage* to avoid any unintentional mailing to any ~~Shriner member or donor~~ *person listed in Recital E of this Agreement*, Shriners will prepare a list of all *such* members and donors to be called the Shriners Suppression File. Vantage agrees that it will use this file to suppress the names contained thereon from any list of prospective donors that Vantage proposes to use in the Shriners Direct Mail Program. The Shriners will update the suppression file biannually *(or more frequently if desired by Shriners)* and provide a magnetic tape to Vantage of the updated suppression file in a mutually agreed format.

~~6.3.3   Prior to termination of this Agreement, Shriners may not use the list of Program Donors for any purpose other than the Direct Mail Program without the prior agreement~~

~~of Vantage.  Vantage agrees that it will not withhold approval~~
~~unreasonably.  Until such time as Shriners pay all outstanding~~
~~billing statements, Vantage shall have the right either to rent~~
~~the list of Program Donors or to distribute additional direct~~
~~mail packages until list rental income or donations are suf-~~
~~ficient to pay all outstanding billing statements.~~

6.3.4 If Vantage intentionally breaches **section 6.3.1
or 8.2 of this Agreement** ~~this provision~~, it shall pay liquidated
damages to Shriners of ten dollars ($10) per name for the
wrongful use of the Shriners' member and donor list.

6.3.4  Vantage shall secure a surety bond of one
million dollars ($1,000,000) in the event that it fails to
perform under ~~the terms of this provision~~ **section 6.3.2 or 8.2
of this Agreement**.

**Paragraph 7.  Receipt of Proceeds and Costs**

7.1 <u>Program Account, Control of Funds Deposited</u> - Vantage
shall prepare all mail packages for Shriner ~~as~~ ~~Direct Mail
Program~~ **under this Agreement** so ~~that they~~ **the mail packages**
include a clear statement that directs the recipient to send all
donations to a designated post office **box** in the name of
Shriners.  Based on the number of responses, Vantage shall
instruct the **designated** U.S. Post Office to sweep the designated
postal box several times a week and forward the contents to the
designated depository bank, Boston Financial Data Services,
Inc., a subsidiary of State Street Bank of Boston ("Bank"), for
deposit into a segregated account in the name of Shriners
Hospital for Children, Inc.

7.2  Boston Financial Data Services shall count, record by
donor, and deposit all such proceeds in Shriners' segregated
bank account at State Street Bank of Boston (hereinafter
referred to as the "Program Account").  Shriners shall establish
the Program Account there so that it is dedicated solely to
deposits that are generated pursuant to this Agreement.  The
Program Account shall be in Shriner's name, and Shriners **alone**
shall **own and** control it.  Any interest that accrues on funds
deposited in the Program Account shall be the sole property of
Shriners.  Bank shall invoice Shriners directly for all fees and
other costs associated with services that Bank renders to
Shriners**, or may withdraw payment of such invoices from the
Program Account, at Shriners' choice**.  Vantage shall prepare and
submit a report to Shriners weekly that sets forth the amount of

SHC 03283

funds received and deposited pursuant to this Agreement **or Shriners may receive such information directly from the Bank, at Shriners' choice**.

### 7.3   Submission and Payment of Billing Statements

7.3.1   After a mailing is dropped, Vantage shall prepare and submit a billing statement of the charges for that mailing to the Shriners Program Administrator along with a copy of the U.S. Postal Service ("USPS") Form 3602 or the equivalent form that shows the actual quantity of packages mailed and postage paid.  Vantage shall use the unique job identification code it assigned to the mailing to which the billing statement relates so that Shriners may match each billing statement and the corresponding USPS Form 3602 to the correct Campaign Approval Packet **of paragraph 6 herein** in order to verify that invoiced charges are identical to those costs that Shriners approved and authorized Vantage to incur on behalf of the Shriners and to verify that the billing statement is based on the number of packages that Shriners approved and that Vantage actually mailed.  The charges contained in a billing statement ~~may~~ **shall** not exceed the costs that ~~the~~ Shriners approved in the Campaign Approval Packet, **nor include any additional costs,** without Shriners' written approval.

7.3.2   Shriners agree to retain all funds received in response to the Direct Mail Program in the Program Account. Upon receipt and verification of the billing statement, and upon verification from the Bank of the amount of funds available in the Program Account to pay the charges on the billing statement, Shriners shall **direct the Bank to** pay the charges on the billing statement **from the Program Account**.

7.3.3   Upon Shriners' verification of **the correctness of** a billing statement, Shriners agree to pay the charges on the billing statement weekly from the Program Account ~~on~~ **in** the following order:  (a) postage, (b) list rentals, and (c) product cost.

7.4   ~~Escrow~~ **Withdrawals from Program Account** - During the first eighteen (18) months of the Shriners' Direct Mail Program beginning on the Effective Date, Shriners ~~agree~~ **will** not ~~to~~ withdraw funds from the Program Account until it is current with all **undisputed** outstanding billing statements, and the Program Account contains at least one-half of the total budgeted expense for the upcoming **mailing** ~~campaign~~ **that has been approved by Shriners in writing**.  Beginning on January 1, 2001, and at the

conclusion of every three month period thereafter, Shriners may withdraw an amount from the Program Account equal to ~~fifteen~~ *twenty* percent (~~15~~*20*%) of gross donations it received in the same three-month period a year earlier. At any time after April 1, 2001, Shriners ~~reserve the right to~~ *may* withdraw more than ~~fifteen~~ *twenty* percent (~~15~~*20*%) if it is current with all outstanding *undisputed* billing statements, and the Program Account contains at least one-half of the total budgeted expense for the upcoming ~~donor acquisition~~ mailing *that has been approved by Shriners in writing. If Vantage breaches this Agreement in any material respect, Shriners may withdraw all, or any part of the Program Account any time.*

**Paragraph 8.    Trademarks, Trade Names, Service Marks**

8.1   Vantage agrees that it will use the name "Shriners Hospitals for Children" or any of Shriners' trademarks, trade names, or service marks ("Shriners Marks") only in connection with the conduct and operation of Shriners' Direct Mail Program provided for under this Agreement and with the *written* approval of Shriners for all such applications. Vantage recognizes and acknowledges that the use of the Shriners Marks shall not confer any proprietary rights on Vantage to the Shriners Marks. Upon expiration or termination of this Agreement, Vantage's right to use Shriners Marks shall terminate, and Vantage shall cease all use of Shriners Marks. Shriners shall accrue all goodwill relating to the use of the Shriners Marks.

8.2   Vantage acknowledges that Shriners member and donor lists are an asset of substantial value and shall maintain this information in strictest confidence and shall use only the names in accordance with this Agreement. The confidentiality obligation imposed on Vantage pursuant to the preceding sentence shall survive the term of this Agreement.

**Paragraph 9.    Intellectual Property and Confidentiality**

9.1   Shriners recognize that Vantage has expended Know-How and other intellectual property of a proprietary nature that Vantage has developed in order to fashion and present the Direct Mail Program to Shriners as embodied in Schedule A. Shriners recognize further that Vantage's intellectual property as represented by the Direct Mail Program and Schedule A has value to Shriners, Vantage, and Vantage's competitors. ~~Vantage hereby discloses the contents of Schedule A based on the understanding~~

SHC 03285

~~that Shriners intend to execute this Agreement and compensate Vantage over the term of this Agreement for its Know How and other intellectual property.~~

9.2   Shriners shall use best efforts to ensure the confidentiality of Schedule A and all other Know-How, other Vantage intellectual property of a proprietary nature, and any confidential business information related thereto or that otherwise relates to implementing this Agreement.

9.3   Shriners shall use best efforts to restrict access to such information to personnel who have a need to know, including by way of limitation:  (a) members of its ~~law~~ *legal* department; (b) Shriners' Program Administrator *or other high level employee, such as its Executive Secretary*; (c) accounting department; (d) Shriners' corporate officers, *directors and trustees*; and (d) officials of governments or judiciaries who have a legal right to know.

*9.4*   Notwithstanding the foregoing, confidential information shall not include any information that (a) is or becomes a part of the public domain by some means other that through an act or omission of Shriners or Vantage; (b) Vantage discloses to a third party without any restriction on such third party; ~~or~~ (c) is in the possession of Vantage or Shriners without actual or constructive knowledge of an obligation of confidentiality with respect thereto at or prior to the time it is disclosed under this Agreement~~.~~; *or (d) is developed by Shriners independently of this Agreement.*

**Paragraph 10.   Compliance with State Law and Registration Requirements**

Shriners and Vantage agree that each party is responsible to comply with its duties and registration obligations pursuant to the laws and regulations of each state provided, however, that Vantage shall in all events be responsible to register this Agreement with the appropriate jurisdictions as required by law. Each party shall bear its own registration and licensing costs and fees, all penalties under state law for noncompliance, and all expenses or fees incurred by that party as a result of any administrative or legal action arising from noncompliance.  Both parties agree that they will provide a complete list to the other party of the jurisdictions where they have registered as well as the registration number if they have received one.

**Paragraph 11.    Indemnification**

Shriners and Vantage each agrees to indemnify, defend, and hold harmless the other party to this Agreement and its respective partners, directors, **trustees,** officers, agents, **and** employees, ~~members, and affiliates~~ from and against any loss, damage, liability, claims or causes of action (including attorneys' fees and expenses of litigation) in any way resulting from such party's **intentional or negligent** acts or omissions or the **intentional or negligent** acts or omissions of such party's partners, directors, **trustees,** officers or employees, or members in connection with or in ~~a~~ **any** way related to the Direct Mail Program or any such party's breach of its respective obligations under this Agreement.  Vantage **and Shriners** shall indemnify ~~Shriners~~ **each other only** up to the limits of ~~Vantage's~~ **each other's respective** comprehensive general liability insurance policy.


**Paragraph 12.    Notice**

12.1  Any Notice or other communication between Shriners and Vantage concerning or required under this Agreement shall be in writing and shall be sent by Certified U.S. Mail or overnight courier service to the address listed below or to such other address as either of the parties may hereafter specify by such Notice to the other:

        To:  Shriners Hospitals for Children~~, Inc.~~
             2900 Rocky Point Drive
             Tampa, FL 33607
             Attn:  Director of Giving
             Copy to:  Executive Vice President of Shriners
                       Hospitals for Children


        To:  Vantage Direct Mail Services
             1244 Boylston Street
             Boston, MA 02467

             Attn:  Ms. Lynn S. Edmonds
                    Executive Vice President and General
                    Manager

12.2  Service – Determination of the date that Notice is received:  (a) certified mail is the date received; (b) first

class mail is the date postmarked; and (c) overnight courier
service is the date sent.


**Paragraph 13.    Termination *Without Cause***

13:1  At any time either party may terminate this Agreement
~~with or~~ without cause by providing Notice to the other party no
later than sixty (60) days prior to termination.  In that event,
this Agreement shall automatically terminate on the sixtieth
(60th) day following the Notice or at the end of the first mail
campaign following Notice, whichever *later* occurs ~~first~~.  Upon
Notice of termination by either party, all *existing and future
gross income may be withdrawn by Shriners from the Program
Account notwithstanding paragraph 7.4 or any other paragraph of
this Agreement, and* outstanding billing statements shall become
due and payable *to Vantage* within sixty (60) days *of such
Notice.*

13.2  <u>Liquidated Damages</u> – In the event that Shriners
terminates this Agreement without cause ~~prior to the natural
expiration of this Agreement~~, Shriners shall ~~pay an amount to
Vantage that is computed as follows:  ten dollars ($10) for
every Program Donor, and Shriners shall~~ not use any ~~direct mail
package or other~~ creative material that Vantage developed for
Shriners. ~~, or any copy or graphics that is similar thereto, or
any lists that Vantage identified for Shriners until the time
that this Agreement would have expired naturally without
Vantage's approval in writing in advance.~~

13.3  <u>Event of Default</u> – Either party may terminate this
Agreement if the other party breaches any provision hereunder
and fails to cure such breach within the period set forth below.
The non-breaching party must give Notice of default along with a
statement specifying the alleged breach ~~no later than ten (10)
calendar days after learning of the breach,~~ and the breaching
party has ten (10) calendar days from service of Notice to cure
the breach. *If the breach is not cured, all existing and future
gross income shall be immediately withdrawn by Shriners from the
Program Account notwithstanding paragraph 7.4 or any other
paragraph of this Agreement, and all outstanding billing
statements shall immediately become due and payable to Vantage
and if directed by Shriners, Vantage shall finish all pre-
approved mailings through the applicable Campaign Period.*

13.4  <u>Bankruptcy</u> – This Agreement shall terminate
immediately if either party becomes insolvent in that its

SHC 03288

liabilities exceed its assets, is adjudicated to be insolvent, takes ad-vantage of or is subject to any insolvency proceeding, makes an assignment for the benefit of creditors, or is subject to receivership, conservatorship, or liquidation.

**Paragraph 14.    <u>General</u>**

14.1   <u>Headings</u> - The headings set out in this Agreement are for the convenience of reference only and shall not be deemed a substantive part of this Agreement.

14.2   <u>Counterparts</u> - This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on both parties.

14.3   <u>Benefit</u> - This Agreement shall be binding upon and inure to the benefit of the parties signing it, their successors, and assigns.  Neither party shall have the right to assign its rights or liabilities under this Agreement, in whole or in part, without prior written consent of the other party.

14.4   <u>Recitals</u> - The Recitals to this Agreement are hereby incorporated herein as an integral part hereof.

14.5   <u>Use of Terms</u> - Use of the terms "hereunder," herein,"and similar terms refer to this Agreement.

14.6   <u>Waiver</u> - No failure on the part of either party to notify the other party of any noncompliance hereunder and no failure on the part of any party to exercise its rights created by such noncompliance shall prejudice any remedy for any sub-sequent non-compliance; any waiver by any party of any breach or non-compliance with any term or condition of this Agreement shall be limited to the particular instance and shall not operate or be deemed to waive any future breaches or noncompliance with any term or condition.

14.7   <u>Other Agreements</u> - This Agreement constitutes the entire agreement between the parties and it supersedes all negotiations, representations, warranties, commitments, offers, contracts, and writings executed prior to the Effective Date, except as otherwise provided in this Agreement.

14.8   <u>Severability</u> - The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant in this Agreement.  If all or a portion of a covenant herein contained is held to be unenforceable, the parties agree to be bound by any lesser covenant subsumed within

SHC 03289

the terms of such covenant, as if the resulting covenant were separately stated in this Agreement.

14.9   <u>Survival</u> - All representations, covenants, and agreements made by the parties hereto shall survive the execution and delivery of this Agreement.

14.10   <u>Modifications</u> - All modifications to this Agreement must be made in writing and signed by both parties.

14.11   <u>Governing Law</u> - This Agreement shall be deemed to have been made in the State of Florida and shall be construed according to the laws of that state.

14.12   <u>Mediation</u> – With respect to any dispute, controversy, or claim that may arise out of or in connection with this Agreement, Shriners and Vantage agree that they shall submit such disagreement to non-binding mediation by a single mediator in Florida, such mediator to be agreed to mutually by the parties.  The parties shall divide the cost of the mediator equally among them.

14.13   <u>Relationship of Parties</u> – This Agreement does not constitute and shall not be construed to constitute a partnership or joint venture between Shriners and Vantage. Neither party shall have any right to obligate or bind the other party in any manner whatsoever except as authorized in this Agreement or as either party may specifically authorize the other in writing.

In Witness Whereof, we have executed this Agreement on behalf of Shriners and Vantage as of the Effective Date first entered above.

**Vantage Financial Services, Inc.**

By:

Witness _____

_____
Evelyn S. Edmonds
Executive Vice President and
General Manager

SHC 03290

_____        _____
Witness                            Lawrence C. Lyon
                                   Senior Vice President Sales
                                   and Marketing

                                   **Shriners Hospitals for
                                   Children, ~~Inc.~~**

                                   By:
                                   _____
_____
Witness                            John D. Ver~~m~~*Maas*
                                   ~~Chairman, Board of Trustees~~
                                    *President*


_____        _____
~~Witness~~                         ~~Gene Bracewell~~
_____        ~~Imperial Treasurer~~



_____        _____
~~Witness~~                         ~~Lewis K. Molnar~~
_____        ~~Executive Vice President~~



_____        _____
~~Witness~~                         ~~Ralph Sembs~~
_____        ~~Deputy Imperial Potentate~~

SHC 03291

D R A F T

# Shriners Hospitals for Children
## Schedule A

|  | Cost Per Piece in Cents | | |
|---|---|---|---|
| **Product** | **Product Cost** | **Postage and List Costs** | **In-Mail Cost** |
| **Name Label Package Test** (See "Package Descriptions" #1 for product specifications.) | $0.55 | $0.17 | $0.72 |
| **Heart Package Test** (See "Package Descriptions" #8 for product specifications.) | 0.40 | 0.17 | 0.57 |
| **Label Validation** | 0.37 | 0.17 | 0.54 |
| **Thank You/Acknowledgement** (See "Package Descriptions" #6 for product specifications.) | 0.15 | 0.09 | 0.24 |
| **Name Labels (Acquisition)** (See "Package Descriptions" #1 for product specifications.) | 0.37 | 0.17 | 0.54 |
| **Name Labels (Donor)** (See "Package Descriptions" #1 for product specifications.) | 0.55 | 0.27 | 0.82 |
| **Spring Note Cards (5 cards/pkg)** (See "Package Descriptions" #2 for product specifications.) | 1.25 | 0.27 | 1.52 |
| **Holiday Labels** (See "Package Descriptions" #? for product specifications.) | 0.55 | 0.27 | 0.82 |

SHC 03292

May 11,99 17:58 No.005 P.03

D R A F T

# Shriners Hospitals for Children
## Schedule A (con't)

| Product | Cost Per Piece in Cents | | |
| --- | --- | --- | --- |
| | Product Cost | Postage and List Costs | In-Mail Cost |
| Holiday Cards (10 cards/pkg)<br><br>(See "Package Descriptions" #2 for product specifications.) | 1.50 | 0.35 | 1.85 |
| Special Appeal<br><br>(See "Package Descriptions" #9 for product specifications.) | 0.20 | 0.09 | 0.29 |
| Annual Fund Decal<br><br>(See "Package Descriptions" #5 for product specifications.) | 0.25 | 0.09 | 0.34 |
| All Occasion Cards (10 cards/pkg)<br><br>(See "Package Descriptions" #2 for product specifications.) | 1.50 | 0.35 | 1.85 |
| Calendars<br><br>(See "Package Descriptions" #3 for product specifications.) | 1.35 | 0.35 | 1.70 |
| Lapel Pins<br><br>(See "Package Descriptions" #4 for product specifications.) | 1.50 | 0.35 | 1.85 |

SHC 03293

Package Descriptions:

1. Name and Address Labels – Full sheet ¾ line address with stamp section die-cut, 4 color process or PMS line copy, foil stamp. Black text on backer of label is optional. Includes 5 ½ x 8 ½ cover letter (folds in half), Carrier Envelope 5 ½ x 8 ½, Courtesy Reply Envelope.

2. Cards – Holiday/All Occasion 5 x 7 cards; Notecards 6 x 4 ½. Available in a 5 or 10 pack with a 7 x 14 cover letter, Carrier Envelope 5 ¾ x 8 ½/Box, Courtesy Reply Envelopes and Banded envelopes in which to mail cards.

3. Calendar – 12 month, 24 page plus 4 page cover or a 32 page self cover. Presend components are used for the mailing device. Includes Carrier Envelope, Courtesy Reply Envelope, Cover letter and Reply form. The entire package is polybagged.

4. Lapel Pin – cloisonne, die struck enamel based, photo domed available on various metals. (pin size ¾" – 1"). Pin is blistered onto a pin backer, includes 7 x 14 cover letter/remittance form, Carrier Envelope and Courtesy Reply Envelope.

5. Decals – 3" round on a 3 ¼ x 3 ¼ square liner cut as one up and print in either PMS colors, 4 color process or combination. Prints on 3.5 mil matte clear polyolefin with permanent adhesive. Includes 7 x 14 Cover letter/remittance form, Carrier Envelope and Courtesy Reply Envelope.

6. Thank You – 7 x 7 personalized double buckslip (folds in half). Includes Carrier Envelope and Courtesy Reply Envelope.

7. Reminders – 7 x 3 ½ personalized remittance slip, includes 5 ½ x 8 ½ cover letter (folds in thirds), Carrier Envelope and Courtesy Reply Envelope.

8. Heart Package – 7 x 7 Double Buckslip, with peel and stick label on top panel, bottom panel is personalized copy. Includes, 4 ½ x 7 Double Window Carrier (label shows through top window). Courtesy reply envelope.

9. Special Appeal – 8 ½ x 14 personalized letter/remittance form, includes, a #10 Window Carrier, and #9 Reply Envelope.

SHC 03294

Loan Agreement

for

Direct Mail Program

This Loan Agreement (hereinafter referred to as the "Agreement") is made this 12th day of March, 1999 ("Effective Date"), by and between Shriners Hospitals for Children, a nonprofit corporation with its principal office at 2900 Rocky Point Drive, Tampa, FL 33607 ("Shriners"), and Vantage Direct Marketing Services, a division of Vantage Financial Services, Inc., a Massachusetts corporation with its principal office located at 1244 Boylston, Chestnut Hill, MA 02467 ("Vantage"), in order to establish and underwrite the Shriners Direct Mail Program.

**Paragraph 1.     Funds Advanced**

When Vantage advances funds to the Shriners pursuant to the Direct Mail Program Agreement, Vantage shall submit a billing statement to the Shriners that indicates the job code used on the budget for the mailing to which the billing relates.  Attached to the billing statement shall be a copy of the actual U.S. Postal Service form, such as the Form 3602, that indicates the actual quantity of packages mailed and postage paid.

**Paragraph 2.     Terms and Conditions**

a.   In the event that the Shriners is unable to pay a billing statement referred to in Paragraph 1 or any interest accrued thereon within a ninety (90) day period from the date on the billing statement, the Shriners agrees to assign the net proceeds of any follow-up or renewal mailing(s) to reduce the funds that Vantage advanced and any interest accrued thereon.

b.   The Shriners agrees to repay such advance as it receives net revenues from its Direct Mail Program campaigns.  In the order of priority of expenses, the Shriners agrees to give priority to repaying any such advance for postage (exclusively).  Interest shall accrue every thirty (30) days on any unpaid balance.  The Shriners agrees to pay interest at the lesser of the following rates:  (i) the rate that Vantage borrows any such funds that Vantage may from time to time advance or (ii) the rate that the Internal Revenue Service ("IRS") designates as the minimum rate at that time that qualifies the loan as a bona fide commercial loan.

**Paragraph 3.     Notice**

a.   Any Notice or other communication between the Shriners and Vantage concerning or required under this Agreement shall be in writing and shall be sent by certified or first class U.S. Mail or recognized national overnight courier service to the address listed below or to such other address as either of the parties may hereafter specify by such Notice to the other:

        To:   Shriners Hospitals for Children
              2900 Rocky Point Drive
              Tampa, FL 33607
              Attn: _____


        To:   Vantage Financial Services, Inc.
              1244 Boylston Street
              Chestnut Hill, MA 02467
              Attn: Lynn S. Edmonds
                    Executive Vice President

SHC 03295

b.  Determination of the date that Notice received: (i) Certified mail is the date received; (ii) first class mail is the date postmarked; and (iii) overnight courier service is the date sent.

**Paragraph 4.**  <u>Miscellaneous Provisions</u>

a.  <u>Headings</u> - The headings set out in this Agreement are for the convenience of reference only and shall not be deemed a substantive part of this Agreement.

b.  <u>Counterparts</u> - This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on both parties.

c.  <u>Benefit</u> - This Agreement shall be binding upon and inure to the benefit of the parties signing it, their successors, and assigns.  Neither party shall have the right to assign its rights or liabilities under this Agreement, in whole or in part, without prior written consent of the other party.

d.  <u>Use of Terms</u> - Use of terms "hereunder," hereinafter," and similar terms refer to this Loan Agreement.

e.  <u>Waiver</u> - No failure on the part of either party to notify the other party of any noncompliance hereunder and no failure on the part of any party to exercise its rights created by such noncompliance shall prejudice any remedy for any subsequent non-compliance; any waiver by any party of any breach or non-compliance with any term or condition of this Agreement shall be limited to the particular instance and shall not operate or be deemed to waive any future breaches or noncompliance with any term or condition.

f.  <u>Other Agreements</u> - This Agreement constitutes the entire agreement between the parties and it supersedes all negotiations, representations, warranties, commitments, offers, contracts, and writings executed prior to the date hereof, except as otherwise provided in this Agreement.

g.  <u>Severability</u> - The parties agree that each of the fore-going covenants shall be construed as independent of any other covenant in this Agreement.  If all or a portion of a covenant herein contained is held to be unenforceable, the parties agree to be bound by any lesser covenant subsumed within the terms of such covenant, as if the resulting covenant were separately stated in this Agreement.

h.  <u>Survival</u> - All representations, covenants, and agreements made by the parties hereto shall survive the execution and delivery of this Agreement.

i.  <u>Modifications</u> - All modifications to this Agreement must be made in writing and signed by both parties.

k.  <u>Governing Law</u> - This Agreement shall be deemed to have been made in the Commonwealth of Massachusetts and shall be construed according to the laws of that state.

SHC 03296

## 3 of 3

1.  <u>Disputes</u> – Vantage and the Shriners agree that all disputes and matters that may arise out of or in connection with or incident to this Agreement, shall be litigated if at all in or before a court, whether state or federal, located in the Commonwealth of Massachusetts, to the exclusion of the courts of any other state. The Shriners specifically consents to the jurisdiction in the Massachusetts courts. Neither party shall be liable for any punitive damage damages based upon a breach of this Agreement. Each party agrees to pay it's own attorney fees and costs in connection with the (a) enforcement of or preservations of rights under this Agreement or (b) any litigation proceeding or dispute whether arising hereunder or otherwise in any way related to the parties' relationship to one another.

In Witness Whereof, we have executed this Agreement on behalf of the Shriners and Vantage as of the date first entered above.

**Vantage Financial Services, Inc.**

By: _____

Witness _____

Name: Evelyn S. Edmonds
Title: Executive Vice President
       and General Manager

By: _____

Witness _____

Name: Lawrence C. Lyon
Title: Sr. Vice President
       Sales and Marketing

**Shriners Hospitals for Children**
By: _____

Witness _____

Name: _____
Title: _____

Witness _____

Name: _____
Title: _____

SHC 03297