DRAFT VI [222001]

*Sue - No more italics, bold, or line through.*

# Agreement To Provide Fund Raising Consulting and Management Services

This Agreement To Provide Fund Raising Consulting and Management Services ("Agreement") is made and as of this _____ day of _____, 1999 ("Effective Date"), between Shriners Hospitals For Children, a nonprofit corporation with its principal office located at 2900 Rocky Point Drive, Tampa, FL 33607 ("Shriners"), and Vantage Financial Services, Inc., a Massachusetts corporation with its principal office located at 1244 Boylston Street, Chestnut Hill, MA 02467 ("Vantage").

## Recitals

A. Vantage has expertise and experience to create, produce, and manage direct response fund raising campaigns for nonprofit organizations both to identify new donors and renew existing ones, in particular to develop creative strategy, select lists of likely prospects, and use premium-based fund raising techniques.

B. Vantage has expertise and experience to create, prepare, and distribute informational and educational material customized to the specific purpose of a nonprofit organization.

C. Shriners is a nonprofit corporation that desires to raise funds from the public through direct response campaigns for its charitable purposes.

D. Shriners desires to raise funds to support the mission of Shriners to provide medical treatment for children.

E. No mailings of any kind under this Agreement shall be made to contributors to Shriners from the Combined Federal Campaign, or similar campaigns (past, present or future), nor shall any mailing include any Shriner, or present or past donor [*donors*] to Shriners existing on the effective date of this Agreement or *future* who subsequently make major donations to Shriners independent of this Agreement.

1

F. All mailings made by Vantage for the benefit of Shriners pursuant to this Agreement require Shriners' prior written approval.

G. Vantage assumes full obligation and responsibility for the payment of all vendors and suppliers arising out of the fulfillment of Vantage's obligations hereunder, said invoices to be subsequently reimbursed by Shriners only under the terms and conditions set forth in this Agreement. Shriners shall reimburse Vantage only to the extent that Vantage has raised funds on behalf of Shriners in accordance with this Agreement. Vantage shall have no right or claim upon any other funds or accounts of Shriners. In other words, Vantage and not Shriners, is liable for all expenses connected with this Agreement to the extent that Vantage has not raised funds to cover these costs. [handwritten: "Except for postage" annotations throughout]

Agreements [handwritten: "except for postage"]

Now, Therefore, in consideration of the foregoing premises and the mutual covenants and agreements set forth below, the receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant and agree that the Recitals above are a material part of this Agreement, and covenant and agree as follows:

Paragraph 1.   <u>Definitions</u>

1.1 "Acknowledgment" is the program to thank donors by sending a letter to them that verifies Shriners receipt of their contributions and may contain educational material as defined in subparagraph 1.12 below.

1.2 "Agreement" is defined in the introductory paragraph.

1.3 "Caging" is the procedure whereby envelopes containing contributions from the public are opened, recorded, keypunched, verified, and deposited in the appropriate bank account by a "lockbox" facility jointly selected and mutually agreed to be both parties. Shriners shall exercise exclusive ownership and control over any and all bank accounts that receive deposits from the lockbox facility.

1.4 "Campaign Approval Packet" is defined in Paragraph 6.

1.5 "Campaign Period" is defined as the time between the date on which a direct mail package is mailed and the last day of the fourth month following the date of that mailing. By way

of illustration, the parties agree that if a direct mail package is distributed on June 10, the campaign period for that mailing shall commence on June 10 and end on October 31.

1.6 "Comment Mail" consists of correspondence or other written communications that recipients of Shriners direct mail packages send to Shriners. The caging facility shall open all comment mail, record, and forward it to the Shriners' Program Administrator. Shriners shall be solely responsible to review and respond to all comment mail received from recipients of its direct mail packages.

1.7 "Direct Mail Package" contains correspondence or other related printed material which includes a request for financial support or combines such a request for financial support with material that is educational or is designed to raise public awareness.

1.8 "Direct Mail Program" is defined in Paragraph 5.

1.9 "Donor Acquisition Mailing" - Vantage, for the benefit of Shriners, conducts Shriners' donor acquisition program when ~~it~~ Vantage for the benefit of Shriners distributes direct mail packages that contain either a straight letter appeal or an appeal that uses a premium as part of the inducement, which Shriners has given prior written approval to mail, to persons who potentially have a need for or use of information in the direct mail package or are interested in supporting Shriners financially.

1.10 "Donor Renewal Mailing" - Vantage, for the benefit of Shriners, conducts Shriners' donor renewal mailing when Vantage, for the benefit of Shriners, distributes direct mail packages, with Shriners' prior written approval, to all or a part of Shriners' file of donors in order to provide them with educational material and/or request their continued financial support. ⎣generated by this Agreement⎦

1.11 "Educational Material" distributed in connection with a direct mail package, as distinguished from a request for financial support, shall be specific, help to accomplish the Shriners mission, should help the recipient or society or should assist Shriners to raise public awareness. Educational Material may be printed in a separate brochure or in components of a Direct Mail Package in a manner determined by the Shriners' Program Administrator on a case-by-case basis.

SHC 03258

1.12 "Effective Date" is defined in the introductory paragraph.

1.13 "Follow-Up Mailings" are Direct Mail Packages distributed with the Shriners prior written approval to potential or existing donors who have previously received, but have not yet responded to, a Direct Mail Package from the Shriners in order to encourage them to provide financial support or participate in Shriners' programs.

1.14 "Gross Income" is defined for the purpose of this Agreement as the total of contributions received as a direct and proximate result of a Direct Mail Package, Direct Mail Program, Donor Renewal Mailing, Follow-up Mailing, or any other Mailing under this Agreement before deducting any fees or expenses associated with that campaign.

1.15 "Know-How" means all factual knowledge and information not capable of precise or separate description but which, in accumulated form, after being acquired by trial and error or other means of experimentation, gives an ability to the acquirer to produce or market something which that person otherwise would not have known how to produce or market with the same accuracy or efficacy necessary to produce net income.

1.16 "Mailing Lists" used for the Shriners Direct Mail Program contain names and addresses of persons who, by virtue of previous patterns of charitable giving or other identifiable demographic data or statistical studies, are likely to have a need for or potential use of information in the Shriners' direct mail packages. *Mailing Lists shall not include contributors to Shriners (past, present or future) from the Combined Federal Campaign, or similar campaigns, nor shall any mailing include any Shriners, or present or past donor to Shriners existing on the effective date of this Agreement or subsequently make major donations to Shriners independent of this Agreement.* [handwritten: unbold & omit; future donors who]

1.17 "Net Income" is the amount that remains after the costs of each billing statement approved by Shriners in writing are subtracted from donations that Shriners receive in response to the Donor Acquisition Mailing, Direct Mail Packages, Direct Mail Program, Donor Renewal Mailing, Follow-up Mailings, or any other Mailing under this Agreement related to that billing.

1.18 "Notice" is defined in Paragraph 12.

1.19 "Program Account" is defined in Paragraph 7.2.

SHC 03259

1.20 "Program Administrator" – Shriners shall designate in writing one (1) person to serve as the Program Administrator who shall have primary responsibility to communicate with Vantage ~~and Shriners~~ regarding planning and execution of Shriners direct mail campaigns during the term of this Agreement.

The Program Administrator shall have responsibility, on behalf of the Shriners, to secure approval or disapprove all Campaign Approval Packets. The Program Administrator will attempt to facilitate communication between Vantage and the Shriners' staff to develop Vantage's Direct Mail Packages, Direct Mail Program, Donor Renewal Mailing, Follow-up Mailing, Donor Acquisition Mailings or Direct Mail Packages or any other Mailing under this Agreement for Shriners.

1.21 "Program Donors" are persons who respond to a Direct Mail Package, Donor Renewal Mailing, Follow-up Mailing, Donor Acquisition Mailings or Direct Mail Packages or any other Mailing distributed pursuant to this Agreement.

1.22 "Shriners Suppression File" is the list of names of Shriners' members and donors that the Shriners provide to Vantage biannually (or more frequently if desired by Shriners) and that Vantage agrees it will use prior to each Donor Acquisition Mailing, Direct Mail Package, Direct Mail Program, Donor Renewal Mailing or Follow-up Mailing or any other Mailing under this Agreement in order to eliminate names on the Shriners Suppression File from the lists of prospective donors that Vantage proposes to mail as part of any mailing made pursuant to this Agreement.

1.23 "Vendors" are individuals or businesses which provide supplies or services under contract with Vantage necessary to execute any mailing made pursuant to this Agreement. These vendors include, without limitation, suppliers of envelopes and other paper products, suppliers of promotional materials, printers, typesetters, artists, copywriters, letter shops, and data processors. Vantage will not use any Vendor in which Vantage has a direct or indirect ownership interest of fifty (50) percent or more.

Paragraph 2.    <u>Authority of Vantage; Limitations on Authority</u>

During the term of this Agreement, Shriners retains Vantage exclusively to plan and manage the Direct Mail Program, Donor Acquisition Mailing, Direct Mail Packages, Direct Mail Program, Donor Renewal Mailings, or Follow-up Mailings, or any other

SHC 03260

Mailing under this Agreement and to create, prepare, and distribute the Direct Mail Packages itemized in Schedule A and any replacement or additional packages that Vantage may from time to time propose to Shriners and which Shriners approves in writing. Vantage shall act solely as agent for Shriners pursuant to Shriners' written directive. In no event shall Vantage have authority to receive contributions on behalf of Shriners or have access to such contributions.

Paragraph 3.   <u>Term of Agreement</u>

   3.1  This Agreement shall commence on the Effective Date hereof and shall extend for a term of four (4) years unless sooner terminated in accordance with paragraph ~~5.3~~ 13 of this Agreement.

   3.2  For solicitations conducted in the State of New York, this Agreement shall be effective as of fifteen (15) days following the date on which the Agreement is filed with the Attorney General's Charities Bureau. Notwithstanding the above, Shriners may, without giving any reason, cancel this contract without cost, penalty, or liability for a period of fifteen (15) days following the date of the filing hereof with the New York Charities Bureau, if Shriners notify Vantage by letter or other written notification indicating that it does not intend to be bound by this Agreement. Said notice may be hand delivered or mailed to Vantage at 1244 Boylston Street, Chestnut Hill, Massachusetts 02467. If notice is hand-delivered, the cancellation is effective as soon as it is deliver to Vantage. If the notice is mailed, the cancellation is effective as soon as the notice is deposited, properly addressed with postage prepared, in a mailbox. Shriners must also mail a duplicate copy of the notice of cancellation to the State of New York, Office of the Attorney General, Charities Bureau, The Capitol, Albany, NY 12224.

   3.3  Vantage agrees to recognize the terms of any cooling off provision to the extent that any jurisdiction in which Shriners may conduct the Direct Mail Program requires fund raising counsel to offer a cooling off period, such as the State of New York.

Paragraph 4.   <u>Educational Material in Direct Mail Packages</u>

If Shriners would like Vantage to propose direct mail packages that are multipurpose, that is contain Educational Material that may be allocated to public education as defined by the American

Institute of Certified Public Accountants, Shriners Program Administrator shall notify Vantage and indicate the approximate proportion of the content of the package that Shriners would like to be classified as public education.

Paragraph 5.  Direct Mail Program

    5.1  Consultant Services - During the term of this Agreement, Shriners agree to use the services that Vantage provides and which are herein referred to as the "Direct Mail Program." Vantage agrees to provide the full range of services that Shriners requests and approves in writing in order to conduct the Direct Mail Program including but not limited to selection of mailing lists, preparation and distribution of the initial direct mail package, caging, data processing, and acknowledgment of donations. These consultant services draw on Vantage's particular Know-How in direct mail marketing and premium fund raising techniques including but not limited to name and address labels, note cards, holiday greeting cards, lapel pins, and calendars.

    5.2  Mail Schedule - Schedule A attached hereto sets forth the preliminary mail schedule for the Shriners' Direct Mail Program, including the proposed number of campaigns and for each such campaign, whether it is a Donor Acquisition Mailing, Donor Renewal Mailing, Donor Acknowledgment Mailing; Direct Mail Package or Follow-up Mailing, whether a premium is proposed and, if so, the type of premium to be offered and its cost; the number of initial packages to be mailed; mail package design; and the anticipated mail or drop date. Schedule A also sets forth all costs, including but not limited to, the product costs, postage, list costs, and results for each such campaign. Costs other than postage cannot be unilaterally increased by Vantage during this Agreement. Any cost increases must be approved by Shriners in writing. The contained in Schedule A are projections, and Vantage cannot guarantee them.

    5.3  Test Mailing - In order to identify a universe of prospective Shriners' donors to receive Donor Acquisition Mailings, *and to determine if Shriners will continue mailings under this Agreement,* Vantage shall arrange for test mailings of 200,000 pieces (lots of 5,000 each) on or about July 1, 1999, which will conclude four months later as set forth in Schedule A, and as approved by Shriners in writing. The purpose of the test mailing is to determine if *each group of 5,000 of the 200,000 test mailing has a response rate of* two and one-half percent (2.5%) or more *(i.e. more than 125 responses)*

7

SHC 03262

~~names on the list respond to the test mail package~~ *of the test*. As soon as possible following the tests *(but in any event within thirty (30) days from ~~the~~ conclusion)* Vantage shall ~~advise~~ Shriners how many of the sets of 5,000 test mailings had a ~~2.5%~~ *two and one-half percent (2.5%)* or more response rate. ~~as to the potential size of the universe of prospective donors available to receive donor acquisition packages~~. The determination of whether or not a 2.5% response rate to the test has been received is to be made by Vantage, but can be independently verified by Shriners, should Shriners so desire. If the response to *a particular test of 5,000* is less than 2.5%, then Shriners *and Vantage will not pursue that test group further under this Agreement. This test mailing is to be made at the lowest applicable U.S. bulk rate postage available. Solely as to these tests, any cost between the bulk postage and corresponding non-profit rates shall be added as an expense for computing net income, per Section 1.17 of this Agreement.* No "campaign approval packet" is required for this test as approval has already been given to the content of the test packet. *[at the termination of this Agreement]*

Paragraph 6.    Shriners Approval of Direct Mail Packages and Campaigns

    6.1    At least ~~————(——)~~ *sixty (60)* days prior to the anticipated date of ~~each~~ *the first* mailing as set forth ~~on~~ *in* Schedule A, Vantage shall submit the "Campaign Approval Packet" to Shriners Program Administrator which shall consist of: copy and graphics for each component of the mail package for the upcoming campaign, the proposed number of packages to be mailed, the lists to be mailed, and a budget that details all costs, including, but not limited to, list costs, postage, product cost~~,~~ and any other costs or charges that will be on the billing statement of paragraph 7.3.1, and projected results so that Shriners will have a complete understanding of its financial obligation, the concept and contents of the direct mail package, and the anticipated number of new donors and total amount of donations. Vantage shall assign a unique job identification code to each campaign or job and shall provide a space for the Shriners Program Administrator to indicate approval or disapproval of the proposed campaign and direct mail package.

*[no (icy in the ()]*

    6.2    Shriners Program Administrator shall review each Campaign Approval Packet and shall notify Vantage of Shriners' decision whether all or any part of the Campaign Approval Packet is satisfactory no later than ~~————(——)~~ *fourteen (14)* days after Shriners' Program Administrator receives the Campaign Approval Packet. Shriners has the sole authority to approve, such approval to be in writing, the specifications set forth in

SHC 03263

each Campaign Approval Packet, and Vantage shall commence production only in accordance with the express written approval of Shriners of the specifications so approved, and cause the Direct Mail Packages to be distributed as set forth in ~~Exhibit~~ Schedule A as so approved by Shriners.

6.3   Use and Ownership of Mail Lists

6.3.1   Vantage agrees that it will not intentionally mail to any Shriners' member or donor person listed in Recital E of this Agreement. To accomplish this objective, Vantage shall designate the names of each respondent to the Shriners' Direct Mail Program as "Program Donors." Shriners shall be the sole owner of the list of Program Donors. Vantage shall not use the list of Program Donors for any purpose except to carry out its obligations pursuant to this Agreement. Vantage shall update the list of Program Donors weekly and maintain it during the term of this Agreement. Every six (6) months, Vantage shall provide a magnetic tape record, in a format that is mutually agreed to in advance, to Shriners of the names of all Program Donors along with the amount of any donation received up to that time. During the term of this Agreement, Shriners agree not to contact Program Donors without Vantage's approval in advance in writing. No later than ninety (90) days after termination of this Agreement, Vantage shall provide the list of Program Donors to Shriners that includes all updates that have been caged up to the seventy-fifth (75th) day after termination. Upon transmittal of the complete updated list of Program Donors, Shriners shall enjoy all rights to such list without limitation.

6.3.2   In order to avoid any unintentional mailing to any Shriners' member or donor, Shriners will prepare a list of all members and donors to be called the Shriners Suppression File. Vantage agrees that it will use this file to suppress the names contained thereon from any list of prospective donors that Vantage proposes to use in the Shriners Direct Mail Program. The Shriners will update the suppression file biannually and provide a magnetic tape to Vantage of the updated suppression file in a mutually agreed format.

6.3.3   Prior to termination of this Agreement, Shriners may not use the list of Program Donors for ~~any~~ the purpose of making a mass mailing ~~to those donors~~ similar to that made by Vantage under this Agreement, unless Vantage has given to Shriners its prior written approval, which approval will not be unreasonably withheld. Until such time as Shriners has paid all outstanding billing statements, Shriners will

SHC 03264

either pay Vantage's billing statements directly, or at
Shriners'] discretion permit Vantage to distribute additional
direct mail packages until Gross Income is sufficient to pay all
outstanding billing statements. ~~purpose other than the Direct
Mail Program without the prior agreement of Vantage. Vantage
agrees that it will not withhold approval unreasonably. Until
such time as Shriners pay all outstanding billing statements,
Vantage shall have the right either to rent the list of Program
Donors or to distribute additional direct mail packages until
list rental income or donations are sufficient to pay all
outstanding billing statements.~~

   6.3.4 If Vantage intentionally breaches section 6.3.1
or 8.2 of this Agreement, it shall pay liquidated damages to
Shriners of ten dollars ($10) per name for the wrongful use of
the Shriners' member and donor list.

   6.3.45 Vantage     shall secure a surety bond of one
million dollars ($1,000,000) in the event that it fails to
perform under section 6.3.2 or 8.2 of this Agreement.

Paragraph 7.   Receipt of Proceeds and Costs

   7.1 Program Account, Control of Funds Deposited - Vantage
shall prepare all mail packages for Shriners' under this
Agreement so the mail packages include a clear statement that
directs the recipient to send all donations to a designated post
office box in the name of Shriners. Based on the number of
responses, Vantage shall instruct the designated U.S. Post
Office to sweep the designated postal box several times a week
and forward the contents to the designated depository bank,
Boston Financial Data Services, Inc., a subsidiary of State
Street Bank of Boston ("Bank"), for deposit into a segregated
account in the name of Shriners Hospital for Children, Inc.

*[margin note: omit line]*

   7.2 Boston Financial Data Services shall count, record by
donor, and deposit all such proceeds in Shriners' segregated
bank account at State Street Bank of Boston (hereinafter
referred to as the "Program Account"). Shriners shall establish
the Program Account there so that it is dedicated solely to
deposits that are generated pursuant to this Agreement. The
Program Account shall be in Shriners' name, and Shriners alone
shall own and control it. Any interest that accrues on funds
deposited in the Program Account shall be the sole property of
Shriners. Bank shall invoice Shriners directly for all fees and
other costs associated with services that Bank renders to
Shriners, or *Bank* may withdraw payment of such invoices from the

Program Account, at Shriners' choice. Vantage shall prepare and submit a report to Shriners weekly that sets forth the amount of funds received and deposited pursuant to this Agreement or Shriners may receive such information directly from the Bank, at Shriners' choice.

7.3   **Submission and Payment of Billing Statements**

7.3.1   After a mailing is dropped, Vantage shall prepare and submit a billing statement of the charges for that mailing to the Shriners Program Administrator along with a copy of the U.S. Postal Service ("USPS") Form 3602 or the equivalent form that shows the actual quantity of packages mailed and postage paid. Vantage shall use the unique job identification code it assigned to the mailing to which the billing statement relates so that Shriners may match each billing statement and the corresponding USPS Form 3602 to the correct Campaign Approval Packet of paragraph 6 herein in order to verify that invoiced charges are identical to those costs that Shriners approved and authorized Vantage to incur on behalf of the Shriners and to verify that the billing statement is based on the number of packages that Shriners approved and that Vantage actually mailed. The charges contained in a billing statement shall not exceed the costs that the Shriners approved in the Campaign Approval Packet, nor include any additional costs, without Shriners' written approval.

7.3.2   Shriners agrees to retain all funds received in response to the Direct Mail Program in the Program Account. Upon receipt and verification of the billing statement, and upon verification from the Bank of the amount of funds available in the Program Account to pay the charges on the billing statement, Shriners shall pay the charges on the billing statement.

7.3.3   Upon Shriners' verification within ten (10) business days of the correctness of a billing statement, Shriners agree to pay the charges on the billing statement weekly from the Program Account on in the following order: (a) postage, (b) list rentals, and (c) product cost.

7.4   **Withdrawals from Program Account** - During the first eighteen (18) months of the Shriners' Direct Mail Program beginning on the Effective Date, Shriners will not withdraw funds from the Program Account until it is current with all undisputed outstanding billing statements, and the Program Account contains at least one-half of the total budgeted expense for the upcoming mailing that has been approved by Shriners in

11

writing. Beginning on January 1, 2001, and at the conclusion of every three month period thereafter, Shriners may withdraw an amount from the Program Account equal to twenty percent (20%) of gross donations it received in the same three-month period a year earlier. At any time after April 1, 2001, may withdraw more than twenty percent (20%) if it is current with all outstanding undisputed billing statements, and the Program Account contains at least one-half of the total budgeted expense for the upcoming mailing that has been approved by Shriners in writing.

*[handwritten: Shriners]*
*[handwritten: (unless the Agreement has been terminated)]*

Paragraph 8.    <u>Trademarks, Trade Names, Service Marks</u>

    8.1 Vantage agrees that it will use the name "Shriners Hospitals for Children" or any of Shriners' trademarks, trade names, or service marks ("Shriners Marks") only in connection with the conduct and operation of Shriners' Direct Mail Program provided for under this Agreement and with the written approval of Shriners for all such applications. Vantage recognizes and acknowledges that the use of the Shriners Marks shall not confer any proprietary rights on Vantage to the Shriners Marks. Upon expiration or termination of this Agreement, Vantage's right to use Shriners Marks shall terminate, and Vantage shall cease all use of Shriners Marks. Shriners shall accrue all goodwill relating to the use of the Shriners Marks.

*[handwritten: only]*

    8.2 Vantage acknowledges that Shriners member and donor lists are an asset of substantial value and shall maintain this information in strictest confidence and shall use only the names in accordance with this Agreement. The confidentiality obligation imposed on Vantage pursuant to the preceding sentence shall survive the term of this Agreement.

Paragraph 9.    <u>Intellectual Property and Confidentiality</u>

    9.1 Shriners recognizes that Vantage has expended Know-How and other intellectual property of a proprietary nature that Vantage has developed in order to fashion and present the Direct Mail Program to Shriners as embodied in Schedule A. Shriners recognize further that Vantage's intellectual property as represented by the Direct Mail Program and Schedule A has value to Shriners, Vantage, and Vantage's competitors.

    9.2     Shriners shall use *its* best efforts to ensure the confidentiality of Schedule A and all other Know-How, other Vantage intellectual property of a proprietary nature, and any

12

SHC 03267

confidential business information related thereto or that otherwise relates to implementing this Agreement.

9.3 Shriners shall use *its* best efforts to restrict access to such information to personnel who have a need to know, including by way of limitation: (a) members of its legal department; (b) Shriners' Program Administrator or other high level employee, such as its Executive Secretary; (c) accounting department; (d) Shriners' corporate officers, directors and trustees; and (d) officials of governments or judiciaries who have a legal right to know.

9.4 Notwithstanding the foregoing, confidential information shall not include any information that (a) is or becomes a part of the public domain by some means other that through an act or omission of Shriners or Vantage; (b) Vantage discloses to a third party without any restriction on such third party; (c) is in the possession of Vantage or Shriners without actual or constructive knowledge of an obligation of confidentiality with respect thereto at or prior to the time it is disclosed under this Agreement; or (d) is developed by Shriners independently of this Agreement.

Paragraph 10.   Compliance with State Law and Registration Requirements

Shriners and Vantage agree that each party is responsible to comply with its duties and registration obligations pursuant to the laws and regulations of each state provided, however, that Vantage shall in all events be responsible to register this Agreement with the appropriate jurisdictions as required by law. Each party shall bear its own registration and licensing costs and fees, all penalties under state law for noncompliance, and all expenses or fees incurred by that party as a result of any administrative or legal action arising from noncompliance. Both parties agree that they will provide a complete list to the other party of the jurisdictions where they have registered as well as the registration number if they have received one.

Paragraph 11.   Indemnification

Shriners and Vantage each agrees to indemnify, defend, and hold harmless the other party to this Agreement and its respective partners, directors, trustees, officers, agents, and employees, from and against any loss, damage, liability, claims or causes of action (including attorneys' fees and expenses of litigation) in any way resulting from such party's intentional or negligent acts or omissions or the intentional or negligent

13

SHC 03268

acts or omissions of such party's partners, directors, trustees, officers or employees, or members in connection with or in any way related to the Direct Mail Program or any such party's breach of its respective obligations under this Agreement. Vantage and Shriners shall indemnify each other only up to the limits of each other's respective comprehensive general liability insurance policy.

Paragraph 12.    <u>Notice</u>

    12.1  Any Notice or other communication between Shriners and Vantage concerning or required under this Agreement shall be in writing and shall be sent by Certified U.S. Mail or overnight courier service to the address listed below or to such other address as either of the parties may hereafter specify by such Notice to the other:

>    To:  Shriners Hospitals for Children
>         2900 Rocky Point Drive
>         Tampa, FL 33607
>         Attn:  Director of Giving
>         Copy to:  Executive Vice President of Shriners
>                   Hospitals for Children
>
>    To:  Vantage Direct Mail Services
>         1244 Boylston Street
>         Boston, MA 02467
>         Attn:  Ms. Lynn S. Edmonds
>                Executive Vice President and General
>                Manager

    12.2  <u>Service</u> - Determination of the date that Notice is received:  (a) certified mail is the date received; (b) first class mail is the date postmarked; and (c) overnight courier service is the date sent.

Paragraph 13.    <u>Termination</u>            *[handwritten: Termination without cause]*

    13.1  At any time either party may terminate this Agreement without cause by providing Notice to the other party no later than sixty (60) days prior to termination.  In that event, this Agreement ~~shall automatically~~ terminate ~~on the~~ sixtieth (60th) day following the Notice or at the end of the first mail campaign *during which* ~~following~~ Notice *was given*, whichever later occurs.  Upon Notice of termination by either party, all *Net Income* may be withdrawn by Shriners from the Program Account.  *Payment of Vantage's outstanding billing statements*

SHC 03269

*shall be made in the manner provided in Section 7.2 of this Agreement, with billing statements becoming due and payable by Shriners to Vantage within sixty (60) days of such notice.*

13.2 ~~Liquidated Damages~~ <u>Proprietary Material</u> - In the event that Shriners terminates this Agreement without cause, Shriners shall not use any ~~proprietary~~ creative material that Vantage developed for Shriners, *for a period of five (5) years form the date of the termination. Excluded therefrom shall be any material that is proprietary to Shriners, which was utilized by Vantage to develop its material.*

13.3 ~~Event of Default~~ <u>Termination With Cause</u> - Either party may terminate this Agreement if the other party breaches any provision hereunder and fails to cure such breach within the period set forth below. The non-breaching party must give Notice of default along with a statement specifying the alleged breach ~~no later than ten (10) calendar days after learning of the breach,~~ and the breaching party has ten (10) calendar days from service of Notice to cure the breach. *If the breach is not cured, all Net Income may be withdrawn by Shriners from the Program Account. Payment of Vantage's outstanding billing statements shall be made in the manner provided in Section 7.2 of this Agreement, with billing statements becoming due and payable by Shriners to Vantage within sixty (60) days of such notice.*

13.4 <u>Bankruptcy</u> - This Agreement shall terminate immediately if either party becomes insolvent in that its liabilities exceed its assets, is adjudicated to be insolvent, takes ad-vantage of or is subject to any insolvency proceeding, makes an assignment for the benefit of creditors, or is subject to receivership, conservatorship, or liquidation.

Paragraph 14.   <u>General</u>

14.1 <u>Headings</u> - The headings set out in this Agreement are for the convenience of reference only and shall not be deemed a substantive part of this Agreement.

14.2 <u>Counterparts</u> - This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on both parties.

14.3 <u>Benefit</u> - This Agreement shall be binding upon and inure to the benefit of the parties signing it, their successors, and assigns. Neither party shall have the right to assign its rights or liabilities under this Agreement, in whole

SHC 03270

or in part, without prior written consent of the other party.

14.4  **Recitals** - The Recitals to this Agreement are hereby incorporated herein as an integral part hereof.

14.5  **Use of Terms** - Use of the terms "hereunder," herein," and similar terms refer to this Agreement.

14.6  **Waiver** - No failure on the part of either party to notify the other party of any noncompliance hereunder and no failure on the part of any party to exercise its rights created by such noncompliance shall prejudice any remedy for any subsequent non-compliance; any waiver by any party of any breach or non-compliance with any term or condition of this Agreement shall be limited to the particular instance and shall not operate or be deemed to waive any future breaches or noncompliance with any term or condition.

14.7  **Other Agreements** - This Agreement constitutes the entire agreement between the parties and it supersedes all negotiations, representations, warranties, commitments, offers, contracts, and writings executed prior to the Effective Date, except as otherwise provided in this Agreement.

14.8  **Severability** - The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant in this Agreement. If all or a portion of a covenant herein contained is held to be unenforceable, the parties agree to be bound by any lesser covenant subsumed within the terms of such covenant, as if the resulting covenant were separately stated in this Agreement.

14.9  **Survival** - All representations, covenants, and agreements made by the parties hereto shall survive the execution and delivery of this Agreement.

14.10  **Modifications** - All modifications to this Agreement must be made in writing and signed by both parties.

14.11  **Governing Law** - This Agreement shall be deemed to have been made in the State of Florida and shall be construed according to the laws of that state.

14.12  **Mediation** - With respect to any dispute, controversy, or claim that may arise out of or in connection with this Agreement, Shriners and Vantage agree that they shall submit such disagreement to non-binding mediation by a single

SHC 03271

mediator in Florida, such mediator to be agreed to mutually by the parties. The parties shall divide the cost of the mediator equally among them.

14.13 <u>Relationship of Parties</u> - This Agreement does not constitute and shall not be construed to constitute a partnership or joint venture between Shriners and Vantage. Neither party shall have any right to obligate or bind the other party in any manner whatsoever except as authorized in this Agreement or as either party may specifically authorize the other in writing.

In Witness Whereof, we have executed this Agreement on behalf of Shriners and Vantage as of the Effective Date first entered above.

**Vantage Financial Services, Inc.**

By:_____
Evelyn S. Edmonds
Executive Vice President and General Manager

By:_____
Lawrence C. Lyon
Senior Vice President Sales and Marketing

STATE OF         )
                 ) ss.:
COUNTY OF        )

The foregoing instrument was acknowledged before me, the undersigned Notary Public, in and for said State, on the \_\_\_\_ day of _____, 19\_\_, by _____, as _____ and _____ as _____of Vantage Financial Services, Inc., a _____ corporation, for the purposes therein expressed as the act and deed of said corporation. They are personally known to me. In witness whereof I hereunto set my hand and official seal.

Notary Public _____
                Notary's Name Typed
My Commission Expires:

SHC 03272

Shriners Hospitals for Children

By: _____

John D. VerMaas
President

_____

Gene Bracewell
Imperial Treasurer

STATE OF FLORIDA    )
                    ) ss.:
COUNTY OF HILLSBOROUGH)

The foregoing instrument was acknowledged before me, the undersigned Notary Public, in and for said State, on the ____ day of _____, 19__, by John D. VerMaas, as President and Gene Bracewell as Imperial Treasurer of Shriners Hospitals for Children, a Colorado corporation, for the purposes therein expressed as the act and deed of said corporation. They are personally known to me. In witness whereof I hereunto set my hand and official seal.

Notary Public _____
                        Notary's Name
                        Typed
My Commission Expires:

SHC 03273