CERTIFIED ORIGINAL
LEGALINK BOSTON

Volume: I

Pages: 1 - 105

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 04-11686-WGY

VANTAGE FINANCIAL SERVICES, INC.

    Plaintiff,

  v.

NONPROFIT SERVICE GROUP, INC.,

and GEORGE E. MILLER

    Defendants.

\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF LAWRENCE C. LYON

Thursday, July 21, 2005

Peabody & Arnold, LLP

30 Rowes Wharf

Boston, Massachusetts

10:00 a.m.

Reporter: Linda M. Grieco

320 Congress Street, Boston, MA 02210

1  with George Miller --
2      A.  I had discussions -- I'm sorry.
3      Q.  How many discussions did you have with
4  George Miller concerning those issues?
5      A.  On a daily basis, a weekly basis, a monthly
6  basis?  How long are you referring to?
7      Q.  How long are you referring to?
8      A.  I'm referring from whatever the first draft
9  of this agreement was until the day it was signed,
10 George Miller and I talked daily, numerous times.
11     Q.  Can you recall those conversations
12 individually in your mind right now?
13     A.  Which paragraph?  Every paragraph there was
14 a problem.
15     Q.  I'm just saying, do you have a recollection,
16 as you sit here right now, of having those specific
17 conversations in terms of what was said?
18     A.  Absolutely.  Certain -- the most important
19 was that Mr. Fleischer kept insisting on some
20 paragraph, and I don't know where it is in here,
21 that there's no liability and the Shrine had no --
22 and this went on and on in every draft and redraft.
23 It kept coming up until I finally said enough, and I
24 called the Imperial Potentate and I told him I quit,

1  Q. When did George Miller indicate that to the
2  Shriners?
3  A. Probably in 20 conversations with Jay
4  Fleischer and definitely in a meeting with
5  Mr. Bracewell, Mr. Gramblin, myself and
6  Mr. Fleischer and in a January 2003 board meeting in
7  San Francisco with Mr. Claypool, Mr. VerMaas,
8  Mr. Fleischer, myself and Mr. Miller.
9  Q. What I started out asking you is whether or
10 not Mr. Miller made it known to the Shriners
11 Hospitals in any way that the Shriners Hospitals had
12 to be at risk for the full cost of the program in
13 order to enter into any fund-raising agreement with
14 Vantage?
15     MR. JOHNSON: Objection to the form.
16 A. I don't know if he used those words that
17 you're using.
18 Q. Did he indicate that in substance to the
19 Shriners Hospitals For Children?
20 A. Had --
21     MR. JOHNSON: Objection to the form.
22 A. Had to have liability.
23     THE WITNESS: I'm sorry?
24     MR. JOHNSON: I objected to the form of

 1    Q.  What did he tell you specifically about his
 2 expertise in relation to the Cooperative Mailing
 3 Rule at the time he was helping Vantage to draft the
 4 Shriners Hospital For Children agreement that was
 5 entered into on June 17, 1999?
 6    A.  He was getting frustrated on numerous
 7 occasions with Mr. Fleischer because Mr. Fleischer
 8 kept wanting to put things in the agreement that
 9 would violate the Cooperative Mailing Laws; and
10 George would keep telling him, "We want have this in
11 here.  If you put this in here, you're going to
12 violate the agreement.  You can't do this."  He kept
13 coming back and Fleischer would keep changing it,
14 and we'd go back.  Finally, as I said, there must be
15 50 drafts and George kept saying you can't do this
16 and you can't do this and you can't do this.
17    Q.  What were some of the things that George was
18 telling Fleischer he couldn't do?
19    A.  I don't know.  I'll read this and I can tell
20 you.  I mean, there would be things in here that if
21 I read this, I'm sure I can -- oh, yeah, recommended
22 opinion be obtained on the difference between gross
23 income received from net income paid in fund-raising
24 expense for calculating the ratio of such -- the

1   testified that the Shriners Hospitals for Children
2   program was the greatest responding acquisition and
3   donor program that you've ever seen as of I think
4   January of 2002.
5           MR. JOHNSON:  Is that a question?
6       Q.  Yes.
7           MR. JOHNSON:  Objection to the form.
8           MR. NAHIGIAN:  I'm not done with the
9   question.
10          MR. JOHNSON:  Maybe I won't object when
11  you're done.
12      Q.  Do you recall testifying to that?
13      A.  No.
14      Q.  Let me ask you before we pull the transcript
15  out, do you believe that the Shriners Hospitals for
16  Children program was the greatest responding
17  acquisition and donor program that you had ever seen up
18  to that point?
19      A.  Absolutely.
20      Q.  And do you continue to believe that today?
21      A.  I do.
22      Q.  Did you ever participate in any discussions
23  with anyone at Vantage concerning whether or not the
24  June 17, 1999 agreement with the Shriners Hospitals for