UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Vantage Financial Services, Inc.<br>        Plaintiff<br><br>v.<br><br>Nonprofit Service Group, Inc. and George E.<br>Miller<br><br>        Defendants | CIVIL ACTION NO. 04-11686-WGY |

## JOINT PRETRIAL MEMORANDUM

The parties to the above-entitled action submit this Joint Pretrial Memorandum in

compliance with the Court's Procedural Order of November 1, 2005.

### Preliminary Statement

The parties, by their respective counsel, have conferred with respect to the

possibility of settlement of the action, to stipulate as to uncontested facts, to narrow the issues to

be tried and to exchange designations of their respective witnesses and proposed exhibits.

Discussions with respect to settlement have not so far resulted in settlement of the action. This

Joint Pretrial Memorandum sets forth the results of their remaining efforts.

### 1.   Concise Summary of the Evidence that will be Offered by the Parties

#### a.   Plaintiff's Concise Summary of the Evidence

Defendant Miller is an attorney specializing in compliance with Postal Service

regulations dealing with mailings by and on behalf of non-profit organizations ("non-profits")

and in fundraising agreements between non-profits and professional fundraisers. He held

himself out to clients as being knowledgeable and expert in these fields. Miller, and later on

when he founded it, Defendant Nonprofit Service Group ("NSG") had represented Vantage in such matters since 1993.

In 1999, Vantage and Shriners Hospitals for Children ("SHC") entered into discussions contemplating the execution of a fundraising services agreement pursuant to which Vantage would handle the preparation and mailing of a series of substantial mailings to solicit contributions to SHC and to develop a donor list of contributors for future solicitations. At the time, Vantage was defending a civil action (the "Action") under the Federal False Claims Act that had been initiated against it by a disgruntled former employee and in which the United States ("Government") had intervened. The Government's principal contention in the Action was that certain fundraising agreements between Vantage and certain other non-profits left Vantage at risk to bear any shortfall between the amounts raised by the programs and their costs, and thus constituted cooperative mailings that not have been mailed at not-for-profit postal rates ("NP rates") pursuant to the Cooperative Mail Rule ("CMR"). Miller, as a result of his continuing representation of Vantage in other matters, was well aware of the Action and of the Governments claims in it.

Concerned lest a fundraising agreement with SHC add to the Government's claims against it, Vantage retained Miller and NSG to advise it and to assist in negotiating an agreement with SHC that would satisfy SHC's business concerns while, at the same time, complying with the CMR and insulating it from any risk of further liability to the Government based upon mailings to be made under the agreement with SHC. Miller represented Vantage with respect to negotiation of the Vantage-SHC Agreement, prepared various drafts thereof and negotiated with representatives of SHC.

The provisions of the Agreement with respect to payment were prepared by Miller. In relevant part, they provided that, in the event of termination of the agreement by SHC for cause, SHC would have the right to elect not to pay from its own funds any balance then due to Vantage for program charges under the Agreement, and instead to remit Vantage to attempting to recover such costs by either or both of follow-up mailings to persons on the Donor List developed during the course of the fundraising programs and rental or exchange of the Donor List to others. The Agreement further provided that in that event, Vantage could make such mailings and/or use of the Donor List for a period of thirty-six months but if there was still an unpaid balance, Vantage would have no further recourse against SHC and would have to bear the shortfall itself. The above-described payment provisions were accepted by SHC without significant modification substantially as originally proposed by Miller. Miller never proposed alternative provisions to SHC and accordingly it cannot be determined what other provisions might have been acceptable to SHC that would not have placed Vantage at risk of additional liability under the CMR. However, SHC's primary concern was not that Vantage bear the risk of bearing program costs, but rather the much narrower objective of being protected against having to satisfy such costs out of its other assets unrelated to the Agreement. SHC did not object to the use of whatever revenues could be realized from the programs and donor list developed pursuant to the Agreement and Miller failed to fully explore what provisions could have eliminated compliance issues under the CMR while still satisfying SHC objective.

In connection with its execution of the Agreement, Miller expressly advised Vantage that the payment provisions were common in the non-profit fundraising industry, that he had prepared numerous contracts with similar provisions for other clients, that such contracts had never been objected to or challenged by the Postal Service and, lastly, that he had submitted the

3

proposed Vantage-SHC Agreement to the Postal Service and had obtained its approval. In fact,

Miller had not submitted the Agreement to the Postal Service, although he was aware of a Postal

Service procedure for obtaining an "advance ruling" in such circumstances, he had never

prepared a fundraising services agreement for any non-profit or professional fundraiser with

substantively identical payment provisions, he had no knowledge of any instance in which the

Postal Service had been even been presented with, much less approved, a fundraising agreement

with such payment provisions, and he knew of no administrative decision by the Postal Service

or judicial precedent that had approved such payment provisions.

Despite the foregoing circumstances, Miller advised Vantage, in substance, that it was

safe to enter into the proposed Agreement with SHC, that the payment provisions contained

therein complied with the requirements of the CMR for mailings at NP rates and that Vantage

would not expose itself to any additional potential liability to further claims by the Government

as a result of entering into and performing the Agreement.

Furthermore, Miller failed to disclose to Vantage that, if challenged by the Government,

the payment provisions in the Agreement would present a matter of first impression with respect

to their compliance with the CMR, failed to disclose that no such payment provisions had never

been passed upon or approved by the Postal Service or by any court, failed to warn Vantage of

the likelihood that the Government would amend its claims in the Action to include claims under

the Agreement, and failed to warn Vantage that, given the extent of the mailings contemplated

by the Agreement, addition of claims under the Agreement to the Action might raise the level of

exposure in the Action so high that Vantage would be unable to bear the risk of litigating the

case and would have no alternative but to settle the Action.

Subsequent to its execution, the Government obtained discovery of the Agreement and
the mailings made pursuant to it and amended its damages claims to add claims for almost
$3million in claimed revenue deficiencies, as well as punitive damages, with respect to the SHC
mailings, thus approximately doubling the Government's claims and Vantage's exposure.
Ultimately, the Judge in the Action denied Vantage summary judgment on the SHC mailings and
indicated that the SHC Agreement would be found to violate the CMR unless Vantage could
conclusively demonstrate that follow-up mailings and rental or exchange of the donor list were
certain to be sufficient to recoup all unpaid program costs. A judgment against it on some
$6million in revenue recovery claims all of which would have been payable forthwith, would
have ruined Vantage. Faced with a judgment in that amount, approximately one-half of which
were attributable to mailings under the SHC Agreement, Vantage settled the case for $4.5
million.

### b.   **Defendants' Concise Summary of the Evidence**

### i.   **Liability**

Defendants, George E. Miller, an acknowledged expert in the field of postal regulation
and fundraising agreements ("Mr. Miller"), and Nonprofit Service Group, Inc. assisted Plaintiff,
Vantage Financial Services, Inc. ("Vantage") in negotiating and drafting the terms of an
Agreement to Provide Fundraising Consulting and Management Services (the "Agreement")
with the Shriners Hospitals for Children (the "Shriners") in June 1999. At the time, Vantage was
defending a *qui tam* case brought against Vantage and two of its principals under the False
Claims Act, 31 U.S.C. §3729(a) *et. seq.* In the *qui tam* case, the United States (the
"Government") challenged the legality of fundraising mailings Vantage made on behalf of
approximately eighty nonprofit entities. The impetus for the *qui tam* case, was Vantage's

practice of entering into secret side letters with its nonprofit clients under which Vantage varied the terms of its public agreements with numerous nonprofit clients by secretly agreeing not to invoice its clients for any outstanding balance owed under fundraising services contracts in the event that its fundraising efforts failed to generate sufficient revenue to cover Vantage's fundraising fees and costs. The Government alleged that this violated the United States Postal Service's Cooperative Mail Rule (the "CMR"). In essence, the CMR, as it was in effect at the time, required there to be a principal-agent relationship between a nonprofit entity and its for-profit fundraiser if the fundraiser intended to use the nonprofit's permit to mail fundraising solicitations at the reduced nonprofit postage rates available to nonprofits. In the *qui tam* case, the Government alleged that Vantage had violated the CMR because its arrangements with its nonprofit clients amounted to a series of joint ventures in which Vantage had secretly agreed to assume the risk that its fundraising efforts might be insufficient to cover its fundraising fees and costs.

During the course of the negotiation and drafting of the Agreement, defendants fully and repeatedly reminded Vantage (and the Shriners) that the Shriners had to be at risk for the cost of the fundraising program, and Mr. Miller proposed various contractual terms that would have made it unequivocally clear that the Shriners were at risk. Both Vantage and the Shriners elected to proceed with contractual language that provided for more than sufficient collateral to secure the Shriners' full payment for all program costs through a defined period of follow-up mailings and through the rental of the Shriners' donor list for a period of thirty-six months. These payment methods had been approved in the past by the United States Postal Service.

At no time did Vantage request defendants to submit the Agreement for pre-approval by the United States Postal Service. Nor did defendants ever advise Vantage that the Agreement

had been pre-approved by the United States Postal Service. There was no formal process for obtaining such approval. Defendants and Vantage agree that the Agreement that defendants helped to negotiate and draft complied with the CMR. In applying the CMR, the United States Postal Service has traditionally considered the following factors:(1) Who devised, designed and paid for the mail piece; (2) who paid the postage or the mailing, either directly or indirectly; (3) who bears the risks associated with the mailing; (4) who makes managerial decisions about the content of the mailings or the enterprise it supports; and (5) what are the participants' intentions and interests.

With respect to these factors, defendants will offer expert evidence establishing that: (1) The Shriners had the authority and responsibility for the content and design of the mail pieces to be mailed under the Agreement; (2) the Shriners paid for and was expressly responsible for paying all postage associated with the Agreement; (3) the Shriners received all of the proceeds from the mailings and had total control of the disposition of those proceeds, which were deposited into a bank account over which the Shriners had exclusive control; (4) the Shriners were solely at risk for any costs of the mailings that exceeded fundraising returns under the Agreement; and (5) the Shriners had the exclusive responsibility for fundamental decision making in the fundraising program.

Any attorney, such as Mr. Miller practicing in the area of postal regulation and fundraising agreements, would not reasonably have been expected to anticipate that compliance with the CMR would have been an issue raised in the first instance before a court, rather than before the United States Postal Service in administrative proceedings. No attorney in Mr. Miller's position would have been expected to foresee that the Government would seek to

include the Agreement in a false claims case involving secret and unlawful side agreements that were not at issue with respect to Vantage's Agreement with Shriners.

The Government nevertheless (and unpredictably) characterized the Agreement as inconsistent with the CMR. In so doing, the Government took issue with the fact that at the time the matter was litigated in the *qui tam* case it appeared that the Shriners fundraising program was not raising sufficient revenue to defray Vantage's fundraising fees and expenses. This would not have been the case, however, had Vantage adhered to the mail schedule that was attached to and incorporated into the Agreement, and which Vantage's witnesses have agreed constituted a reasonable projection of the financial performance of the fundraising program upon which the Shriners were entitled to rely. The mail schedule was a fundamental component of the Agreement, and the effect of including it as a part of the Agreement was to avoid CMR compliance issues. In the first two years of the fundraising program, Vantage departed from mail schedule by mailing quantities of fundraising solicitations that far exceeded what was provided by the mail schedule. In so doing, Vantage greatly increased its profits at the expense of the Shriners.

Although the Government never actually amended its complaint to include claims under the Agreement, Vantage agreed to submit the issue of whether the Agreement complied with the CMR for the court's decision on summary judgment in the *qui tam* case. On the strength of an Affidavit submitted by Mr. Miller, the Court held that Vantage and its principals were not liable under the False Claims Act as a result of the Agreement. The only remaining issue with respect to the Agreement, therefore, was whether Vantage was liable for single damages on account of the difference between the regular bulk mail postage rate and the nonprofit postage rate that it utilized for mailings under the Agreement. The Court acknowledged that the Agreement that

permitted Vantage to rent the Shriners' donor list for thirty-six months to defray outstanding fundraising expenses. The Court agreed that this constituted "payment in kind" that could satisfy the requirements of the CMR. The court noted, however, that Vantage had failed to offer any evidence that thirty-six months of list rental income would be enough to defray any outstanding fundraising expenses. The Court therefore concluded that it was unable to rule on this issue because Vantage had failed to designate an expert on the value of the list rental income and to introduce critical evidence on this issue. In this case, defendants will supply the missing expert evidence to show that under the Agreement as drafted, there was no question that the Shriners program would have raised sufficient income to defray all fundraising expenses.

With respect to the Government's other claims, the court granted summary judgment to the government under the False Claims Act as to numerous claims and ruled that the remaining claims would be the subject of a trial. Vantage elected to settle all the Government's claims, including claims arising from the Agreement and other claims arising from other fundraising agreements that, unlike the Agreement, were secretly accompanied by the improper side letters referred to above. According to the United States Attorney in the *qui tam* case, Vantage was facing claims totaling in excess of $25 Million, including multiple damages and statutory liquidated damages of up to $10,000 per violation under the False Claims Act. Even after subtracting the damages claimed by the Government with respect to the Agreement, Vantage's exposure was far greater that the $6 Million in damages it claims it was exposed to after the inclusion of the Agreement in the Government's case for $4.5 Million. If Vantage could not tolerate $6 Million in damages exposure, it could not have tolerated more than that. There will be no evidence that Vantage had any option but to settle the case. Vantage has conceded, at deposition, there was never a time when it could have settled the case for less than $4.5 Million.

This necessarily includes the period of time before the Shriners Agreement became a part of the qui tam case.

## ii.     **Damages**

Vantage cannot demonstrate that it is worse off as a result of defendants' conduct in assisting the parties to negotiate and draft the Agreement. In fact Vantage actually profited as a result of the Agreement to the extent of at least $15 Million (and probably more). Based on the recent testimony of Shriners personnel, it has become unequivocally clear that Shriners would not have agreed to any specific contractual provisions concerning the issue of payment other than those that appear in the Agreement. Moreover, while Vantage has claimed that defendants failed to propose language concerning payment that was different from that which appears in the Agreement, the parties considered different contractual provisions addressed to the issue of payment methods, all of which were rejected by the Shriners. In any event, whether the Shriners would have agreed to alternative terms, or whether such terms would have been acceptable to the Government are subjects of inadmissible speculation. In short, the evidence will be that Vantage had two choices. First, it had the option of entering into the Agreement as drafted. Second, it could have declined to do business with the Shriners. If Vantage had elected the latter option, however, it would not have profited to the extent of at least $15 Million, which was far more than the $2.25 Million that it claims to have paid in settlement of the claims arising under the Agreement in the *qui tam* case. The Agreement resulted in a substantial net gain to Vantage, and it consequently has sustained no damages as a result of defendants' alleged conduct.

Additionally, and in any event, the *qui tam* case was settled in gross. Vantage has admitted that there was neither any discussion, nor agreement with the Government concerning any allocation of the settlement fund to the various agreements that were the subject of the *qui*

*tam* case. Absent such allocation, there will be no evidence that any portion of the total settlement fund in the *qui tam* case was solely allocable to the Agreement, and not any of the other seventy-nine or so fundraising agreements at issue, many of which, unlike the Agreement, were the subject of a summary judgment against Vantage under the False Claims Act.

Vantage also had an obligation to mitigate its claimed damages, but it failed to do so. Under the Agreement, and as a matter of law, the Shriners were responsible for the payment of all postage associated with Agreement. Vantage, however, agreed not to enforce the Shriners obligation to pay the postage and instead, in consideration of $10, agreed to indemnify the Shriners against any liability for postage. Vantage did so notwithstanding its decision to implead and to seek recovery of postal revenue deficiencies from its other nonprofit clients in the *qui tam* case.

## 2.    **Agreed Facts**

1. Miller is and at all relevant times was an attorney at law.

2. Miller represented Vantage with respect to the preparation and negotiation of the Shriners Agreement.

## 3.    **Contested Facts**

Except as indicated in the above list of Agreed Facts, trial counsel anticipate that all facts set forth in their respective concise summaries of the evidence will be contested.

## 4.    **Jurisdictional Questions**

Defendants filed a Motion to Dismiss for lack of personal jurisdiction and for transfer of venue to the eastern district of Virginia under 28 U.S.C. §1406(a). The court denied the motion without prejudice, subject to renewal after the close of discovery.

## 5.    **Pending Motions**

Plaintiff has filed a Motion for Extension of Time to serve expert report. Defendants have opposed the motion and cross-moved for an order precluding plaintiff's experts.

## 6.     Issues of Law

### Plaintiff

An attorney holding himself out as an expert or specialist in a particular field of practice is liable for malpractice if he fails to exercise the reasonable professional skill and care that a specialist in the field would exercise.

The factfinder can find malpractice without need for resort to expert testimony, on the basis of a finding that the attorney has misrepresented the client material facts within the knowledge of the attorney, with respect to the risks attendant upon entering into an agreement that the attorney has negotiated and prepared by the attorney.

Plaintiff believes that admissions that he knew of no fundraising contract containing the payment provision contained in Paragraph 13.2 of the Vantage-Shriners Agreement that had ever been approved by the Postal Service or by any Court as complying with the Cooperative Mail Rule,. combined with his admissions that he never warned Vantage that the contract, if challenged by the Government, would present a question of first impression with respect to such compliance, permits findings of liability with respect to both legal malpractice and negligent misrepresentation.

While the Court granted summary judgment on Plaintiff's claim for intentional misrepresentation, it denied summary judgment on Plaintiff's claim for negligent misrepresentation.

### Defendants

An attorney, such as Mr. Miller, may be held liable for legal malpractice only if the plaintiff can show that it "probably would have obtained a better result had the attorney exercised adequate skill and care." Jernigan v. Giard, 398 Mass. 721, 723 (1986), quoting Fishman v. Brooks, 396 Mass. 643, 647 (1986). While it is not clear what the basis for Vantage's damages claim is, it appears to suggest that defendants should have prevented Vantage's exposure to damages in connection with the Shriners Agreement in the *qui tam* case. There is no evidence, on the basis of recently completed depositions, that the Shriners would have agreed to contractual terms that were different from those appearing in the Agreement with respect to the Shriners obligation to pay for Vantage's services. If Vantage has any claim at all, therefore, it would be limited to the suggestion that defendant should have advised Vantage not to enter into the Agreement at all. If that had been the case, however, Vantage would not profited to the extent of at least $15 Million, which is far more than what it claims to have sustained in damages in this case. It cannot prove, therefore, that it would have been better off had it not entered into the Agreement as written.

On Summary Judgment, the court dismissed Vantage's fraud claim and its claim under c.93A. Defendants believe that Vantage's remaining claims are barred by the three year statute of limitation applicable to legal malpractice claims, M.G.L. c.260, §4.

The standard of care against which Defendants' actions must be measured is beyond the experience and knowledge of the ordinary layperson. This means that the standard of care owed by Defendants in this action must be established by expert testimony. The only testimony which is competent on the issue of the standard of care in this case is expert testimony. *Colucci, supra*, 25 Mass. App. Ct. at 111; *Glidden, supra*, 12 Mass. App. Ct. at 598; *Dipiero v. Goodman*, 14 Mass. App. Ct. 929, 930 (1982) *cert. denied* 103 S.Ct. 1418 (1983). Expert testimony is

necessary to establish both (a) the standard of care applicable in the circumstances of this case and (b) whether the defendants departed from that standard. *Fishman v. Brooks,* 396 Mass. 643, 647 (1986); *Colucci, supra,* 25 Mass. App. Ct. at 111; *Pongonis v. Saab,* 396 Mass. 1005 (1985) (rescript); *Fall River Savings Bank v. Callahan,* 18 Mass. App. Ct. 76, 82 (1984), *review denied,* 392 Mass. 1103 (1984); *Brown v. Gerstein,* 17 Mass. App. Ct. 558, 566, *review denied,* 391, Mass. 105 (1984); *Dipiero, supra,* 14 Mass. App. Ct. at 929-930. Vantage has the burden of establishing through expert testimony the standard of care owed by Defendants, and that Defendants' acts did not conform to that standard of care. *See Callahan v. Westinghouse Broadcasting Company, Inc.,* 372 Mass. 582, 588 (1977); *Ryan v. Ryan,* 419 Mass. 86, 92, 93 (1994).

Negligence that causes no harm is without legal consequence. Vantage cannot show that any conduct of Defendants was the proximate cause of any loss to Vantage. *Colucci, supra,* 25 Mass. App. Ct. at 111; *Jernigan v. Giard,* 398 Mass. 721, 723 (1986); *Fishman, supra,* 396 Mass. at 647; *Colucci, supra,* 25 Mass. App. Ct. at 113; *Dipiero, supra,* 14 Mass. App. Ct. at 929; *Hurd v. DiMento & Sullivan,* 440 F.2d 1322 (1st Cir. 1971) *cert. denied,* 92 S.Ct. 136 (1971).

Actual loss is an element of the tort of legal malpractice. Therefore, Vantage must prove that it in fact suffered harm or loss as a result of the defendant attorney's negligence. *McLellan v. Fuller,* 226 Mass. 374, 377-78 (1917); Fall *River Savings Bank v. Callahan,* 18 Mass. App. Ct. 76, 81 (1984) review denied by 392 Mass. 1103 (1984); Levin *v. Berley,* 728 F.2d 551, 554 (1st Cir. 1984) ("The mere breach of a professional duty, causing only nominal damages, speculative harm, or threat of future harm - not yet realized - does not suffice to create a cause of action for negligence."). Damages must be proved by Vantage by a preponderance of the evidence and not

14

left to speculation. Vantage must establish its claim to damages upon a solid foundation in fact and cannot recover when an essential element is left to conjecture, surmise or hypothesis. *Snelling & Snelling of Mass., Inc. v. Wall*, 345 Mass. 634, 636 (1963); *MacDonald v. Hawker*, 11 Mass. App. Ct. 869, 877 (1981). The law requires that Vantage prove the amount of its damages with reasonably certainty and that such an amount be based upon the evidence.

## 7.   Requested Amendments to the Pleadings

None. The Court dismissed Vantage's fraudulent misrepresentation claim and its claim under c. 93A on summary judgment.

## 8.   Other Matters to Aid in the Disposition of the Action

The correspondence files produced by Shriners in response to Defendants' subpoena and limited to correspondence appearing in those files are true and accurate copies of correspondence appearing in the correspondence files of Shriners and such documents were kept by Shriners in the regular course of its business. Fleisher dep. tx., pp. 80-81.

## 9.   Probable Length of Trial

Counsel anticipate a jury trial that is likely to require approximately five to ten days.

## 10.   Witnesses

### a.   Plaintiff's Witness List

Plaintiff expects to call the following witnesses at trial:

| NAME | ADDRESS AND TELEPHONE # |
|------|-------------------------|
| Harry Melikian | Vantage Financial Services, 90 Canal Street Boston, MA 02114 (617) 878-6000 |
| Lawrence Lyon | Vantage Financial Services 90 Canal St. |

| | Boston, MA 02114 |
| | (617) 878-6000 |
| Peter DeMakis | Vantage Financial Services, |
| | 90 Canal Street |
| | Boston, MA 02114 |
| | (617) 878-6000 |
| Brian LeClair | 12 Fox Run Lane |
| | Marblehead, MA 01945 |
| | (781) 631-9981 |

| | |
|---|---|
| Seth Perlman | Perlman & Perlman |
| | 220 5th Avenue, 7th Fl |
| | New York, NY |
| | (212) 889-0575 |
| Jay Fleisher (by deposition) | Shriners Hospital for Children, Tampa, FL |
| Ralph Semb (by deposition) | Shriners Hospital for Children, Tampa, FL |

## b.     **Defendants' Witness List**

### i.     **Fact Witnesses**

George E. Miller, 1601 North Kent Street, Arlington, VA.

Carolyn A. Emigh, 1601 North Kent Street, Arlington, VA.

Laurence Johnson, Davis, Malm, D'Agostine, One Boston Place, Boston, MA;

Brian W. LeClair, 12 Fox Run Lane, Marblehead, MA.

Harry Melikian, 90 Canal Street, Boston, MA 02114.

Lawrence Lyon, 90 Canal Street, Boston, MA 02114.

Henry Lewis, 90 Canal Street, Boston, MA 02114.

Lynn (Edmonds) Robbins, 201 Summer Street, Holliston, MA.

Peter Demakis, 243 Largemont Lane, Hanover, MA 02339.

Peter K. Levitt, One Courthouse Way, Boston, MA 02210.

Ralph Semb, 66 French King Highway, Erving, MA 01344-4413.

Jay Fleisher, Shriners Hospitals for Children, Tampa, FL.

Bill Fawcett, Shriners Hospital for Children, Tampa, FL.

Lawrence Saklad - address unknown.

Beth Ann Irvine – address unknown.

Alan E. Douillette – address unknown.

Keeper of the Records of Vantage Financial Services, Inc.

### ii..    **Expert Witnesses**

Robert S. Tigner, Esq., 1612 K Street NW, #510, Washington, DC 20006-2802.

Barbara M. Sims, 9663 C Main Street, Fairfax, VA 22032.

### 11.    **Exhibits**

### A. **Plaintiff's Proposed Exhibits**

1.    Defendants' bills to Vantage dated November 22, 2003, January 19, 2004, January 30, 2004 and February 12, 2004 and Vantage's checks in payment of same

2.    Affidavit of George Miller dated February 13, 2002

3.    Supplemental Affidavit of George Miller dated May 17, 2002

4.    Hearing Transcript dated August 30, 2002

5.    Hearing Transcript dated May 5, 2003

6.    Excerpts from the Deposition Transcript of George E. Miller

7.    Draft Fundraiser Contracts:

- Miller Depo Exhibit 5 (NSG 1906- NSG 1912);

- Transmittal form dated June 13, 1996 with Standard Work Agreement attached (NSG 1913 – NSG 1917);

- Miller letter dated April 14, 1997 re: State Registration Services (NSG 1918 – NSG 1921);

- Letter to George Miller dated March 26, 1997 re: Registration as a

Professional Fundraiser (NSG 1922 – NSG1924);

- Agreement dated Dec. 2, 1988 (NSG 1925 – NSG 1954)

- Letter to George Miller re: Draft Agreement dated June 5, 1997 (NSG 1955 – NSG 1956)

- Agreement, Draft II (NSG 1957 – NSG 1964)

- Loan Agreement to Fund Direct Mail Program 1997 (NSG 1965 – NSG 1967)

- Draft Agreement, 1997 (NSG 1968 – NSG 1975)

- Transmittal Form dated June 10, 1997 from George Miller (NSG 1976 – NSG 1977)

- Transmittal Form dated June 10, 1997 from George Miller (NSG 1978 – NSG 1979)

- Comments (NSG 1980 – NSG 1988)

- Proposed Contract Provisions (NSG 1989 – NSG 1990)

- Letter dated July 23, 1996 from Carolyn Emigh of Nonprofit Service Group re: Product Marketing Program (NSG 1991 – NSG 1993)

- Product Marketing Program Projections 1996 & 1997 (NSG 1994 – NSG 2002)

- Draft Agreement 1997 (NSG 2003 – NSG 2013)

- Draft Agreement II , 1997 (NSG 2014 – NSG 2022)

- Transmittal Form dated July 1, 1996 from George Miller re: enclosing draft contract / agreement dated 1996  (NSG 2023 – NSG 2034)

- Fax Transmission Cover Sheet to George E. Miller re: Addendum to Contract (NSG 2035 – NSG 2036)

- Addendum to Contract dated 1-17-97 (NSG 2037)

- Letter to George Miller re: Addendum to Contract, dated January 7, 1997 (NSG 2038 – NSG 2039)

- 1995, 1996 & 1997 Projections Report (NSG 2040 – NSG 2043)

- Agreement dated February 15, 1996 (NSG 2044 – NSG 2059)

- Agreement dated February 15, 1996 (NSG 2060 – NSG 2075)

- Letter to George Miller dated January 30, 1998 (NSG 2076 – NSG 2088)

- Transmittal Form dated February 8, 1998 from George Miller enclosing a direct mail program agreement and a loan agreement in draft form - (NSG 2089 – NSG 2090)

- Transmittal Form dated February 16, 1998 from George Miller enclosing revised draft of the direct Mail Program Agreement (NSG 2091- NSG 2092)

- Direct Mail Program Agreement dated 1998 (NSG 2097 – NSG 2104)

- Loan Agreement for Direct Mail Program dated 1998 (NSG 2093 – NSG 2096)

- Direct mail Program Agreement, Draft III , 1998(NSG 2105 – NSG 2112)

- Facsimile to George Miller enclosing old Direct Mail Program, the old Loan Agreement and comments (NSG 2113 – NSG 2128)

- Agreement To Provide Fund Raising Consulting and Management Services, dated June, 2002 (NSG 2129 – NSG 2141)

- Term and Termination of Agreement, 1998 (NSG 2142 – NSG 2153)

- Loan Agreement for Direct Mail Program, draft, 1998 (NSG 2154 – NSG 2156)

- Suggested Revisions to Agreement, 1998 (NSG 2157 – NSG 2160

- Nonprofit Service Group Invoice dated June 27, 2002 re: Invoice No.: 02-01, amount due $1,700.00 (NSG 2161)

- Agreement To Provide Fund Raising Consulting and Management Services, June 2002 (NSG 2162 – NSG 2172)

- Agreement To Provide Fund Raising Consulting and Management Services, June 2002 (NSG 2173 – NSG 2190)

- Agreement To Provide Fund Raising Consulting and Management Services, June, 2002 (NSG 2191 – NSG 2208)

- Loan Agreement For Direct Mail Program dated April 30, 1998 (NSG 2218 - NSG 2221)

- Letter to George Miller dated February 24, 1998 (NSG 2209 – NSG 2217)

- Miller Depo Exhibit 17A (Letter of Proposal And Agreement dated January 11, 1988) (NSG 2222 – NSG 2228)

- Miller Depo Exhibit 17B (Agreement dated February 1991) (NSG 2248-NSG 2249)

- Miller Depo Exhibit 17C (Agreement dated February 1, 1991) (NSG 2229 – NSG 2247

- Miller Depo Exhibit 17D (Agreement To Provide Fund Raising Consulting and Management Services) (NSG 2250 – NSG 2263)

- Miller Depo Exhibit 17E (Agreement To Provide Fund Raising Consulting and Management Services) (NSG 2264 – NSG 2274)

8.      Excerpts from the Deposition Transcript of Lawrence C. Lyon

9.      Memorandum and Order of Judge Wolf dated March 5, 2004

10.     Miller Depo Exhibit 1, NSG website printouts

11.     Miller Depo Exhibit 2, letter from Mr. Dillman to Mr. Finch, 3/23/92, with attachments

12.     Miller Depo Exhibit 3, invoices from NSG to Vantage Financial Services

13.     Miller Depo Exhibit 4, memo from Mr. Melikian to Mr. Miller, 5/5/00

14.     Miller Depo Exhibit 5, series of redacted drafts of fund-raising contracts

15.     Miller Depo Exhibit 6, Mr. Miller's affidavit, 2/13/02

16.     Miller Depo Exhibit 7, letter from Mr. Lyon to Mr. Semb, 3/12/99

17.     Miller Depo Exhibit 8A, draft of Shriners agreement

18.     Miller Depo Exhibit 8B, draft agreement

19.     Miller Depo Exhibit 9, draft agreement

20.     Miller Depo Exhibit 10, draft agreement

21.     Miller Depo Exhibit 11A, fax with a draft agreement

22.     Miller Depo Exhibit 12A, draft agreement

23.     Miller Depo Exhibit 12B, draft agreement

24.     Miller Depo Exhibit 12C, draft agreement

25.     Miller Depo Exhibit 12D, draft agreement

26.     Miller Depo Exhibit 13A, draft agreement

27.     Miller Depo Exhibit 13B, draft agreement

28.     Miller Depo Exhibit 13C, draft agreement

29.     Miller Depo Exhibit 13D, draft agreement

30.     Miller Depo Exhibit 13E, draft agreement

31.     Miller Depo Exhibit 13F, memo from Mr. Fleisher to Mr. Bracewell with draft agreement

32.     Miller Depo Exhibit 14A, draft agreement

33.     Miller Depo Exhibit 14B, draft agreement

34.     Miller Depo Exhibit 15, memo from Mr. Fleisher to Mr. Semb, 4/13/99

35.     Miller Depo Exhibit 16, memo from Mr. Miller to Mr. Lyon, 4/28

36.     Miller Depo Exhibit 17A, Document dated January 11, 1988 entitled "Letter of Proposal and Agreement"

37.     Miller Depo Exhibit 17B, Document entitled "Agreement," dated February 1, 1991

38.     Miller Depo Exhibit 17C, Document entitled "Agreement Between" Blank "and" Blank," dated February 1, 1991

39.     Miller Depo Exhibit 17D, Document entitled, "Agreement to Provide Fund-Raising, Consulting and Management Services"

40.     Miller Depo Exhibit 17E, Document entitled, "Agreement to Provide Fund-Raising Consultant and Management Services"

41.     Miller Depo Exhibit 18, Series of bills from the Nonprofit Service Group to Vantage Direct Marketing Services, with attachment

42.     Miller Depo Exhibit 19, Memo dated April 29, 1999 from Mr. Miller to Mr. Lyon

43.     Miller Depo Exhibit 20, Document dated May 5, 1999 addressed to Larry

44.     Miller Depo Exhibit 21A, Memo from Mr. Fleisher to Mr. Miller, Dated May 17, 1999

45.     Miller Depo Exhibit 21B, Letter from Mr. Miller to Mr. Fleisher, dated May 24, 1999

46.     Miller Depo Exhibit 21C, Telecopier transmittal form from Mr. Miller to Mr. Lyon, dated May 24, 1999

47.     Miller Depo Exhibit 21D, Memo from Mr. Miller to Mr. Fleisher, dated May 25, 1999

48.     Miller Depo Exhibit 21E, Memo from Mr. Miller to Mr. Fleisher, dated May 25, 1999, with some handwritten interlineations

49.     Miller Depo Exhibit 21F, Memo from Mr. Miller to Mr. Fleisher, dated June 1, 1999

50.     Miller Depo Exhibit 22, Document entitled, "Agreement to Provide Fund-Raising Consulting and Management Services"

## B. Defendants' Proposed Exhibits

1.  July 10, 2001 facsimile transmission from matt Kaiser to George E. Miller, enclosing 1998 Sons of Italy Agreement and loan agreement(NSG001-019)

2.  Agreement to Provide Fundraising, Consulting And Management Services dated June 17, 1999 and June 22, 1999 (with Amendments) (Vantage 4864-4900).

3.  Agreement to Provide Fundraising, Consulting and Management Services (copy Draft I) (NSG0584-0595).

4.  Agreement to Provide Fundraising, Consulting and Management Services (HSC00359-00369).

5.  Agreement to Provide Fundraising, Consulting and Management Services (Draft II) (NSG0596-0612).

6.  Agreement to Provide Fundraising, Consulting and Management Services (Draft III) (NSG0613-0627).

7.  Fax from Jay Fleisher to George E. Miller dated May 21, 1999 with attached Agreement to Provide Fundraising, Consulting and Management Services (NSG0701-0720).

8.  Agreement to Provide Fundraising, Consulting and Management Services (SHC03217-0326).

9.  Agreement to Provide Fundraising, Consulting and Management Services (SHC03237-03255).

10. Agreement to Provide Fundraising, Consulting and Management Services (Draft for discussion date: _____) (SHC03346-03364).

11. Agreement to Provide Fundraising, Consulting and Management Services (SHC03365-SHC03381).

12. Agreement to Provide Fundraising, Consulting and Management Services (Draft V) (SHC03298-03321).

13. Agreement to Provide Fundraising, Consulting and Management Services (Draft V) (SHC03322-033345).

14. Agreement to Provide Fundraising, Consulting and Management Services (Draft V) (SHC03274-03297).

15. Agreement to Provide Fundraising, Consulting and Management Services (Draft V) (NSG0628-0643).

16. Agreement to Provide Fundraising, Consulting and Management Services (Draft V) (NSG0644-0664).

17. Nonprofit Service Group billing records/Invoices for services rendered in connection with the Shriners Agreeement

18. Memorandum from Jay Fleisher to Gene Bracewell dated May 12, 1999 with attached Agreement (Draft V) (SHC00296-00321).

19. Agreement to Provide Fundraising, Consulting and Management Services (Draft VI) (NSG0672-0690).

20. Agreement to Provide Fundraising, Consulting and Management Services (Draft VI) (SHC03256-03273).

21. Telecopier transmittal form dated May 24, 1999 from George E. Miller to Larry Lyon (NSG0721-0720).

22. Email dated May 26, 1999 from Christine Gray to Jay Fleisher with attached Draft Agreement (Vantage 5616-5636).

23. Facsimile transmission from Ipswich Country Club dated April 15, 1999.

24. Continuation of facsimile from Ipswich Country Club dated April 15, 1999 (NSG0760-0777).

25. Memo dated April 28, 1999 from George E. Miller to Larry C. Lyon (NSG0795-NSG0804).

26. Handwritten fax cover sheet to Jay Fleisher from George E. Miller with attached Loan Agreement for direct mail program (SHC00414-SHC00417).

27. Letter dated May 24, 1999 from George E. Miller to Jay Fleisher (NSG0812-0814).

28. Draft #5 ("Jay proposed language shown in (G)) (NSG0665).

29. Handwritten notes (NSG1182-1187).

30. Handwritten notes (NSG0076-0077).

31. Handwritten notes (NSG0078-0089).

32. Handwritten notes (NSG1004-1005).

33. Handwritten notes (NSG0111).

34. Handwritten notes (NSG0112-0118).

35. Handwritten notes (NSG1177-1179).

36. Handwritten notes (NSG1180-1181).

37. Handwritten notes (NSG1188-1200).

38. Handwritten notes (NSG1201-1204).

39. Decision of Donald D. Dillman dated March 23, 1992 in the Brickmill Studios, Inc. matter (NSG1809-NSG1813).

40. Appeal Brief (NSG1814-NSG1905).

41. Memo dated May 2, 2000 from Carolyn A. Emigh to Matt Kaiser (NSG0865-0869).

42. Growth of donor file (NSG1206-1209).

43. Facsimile transmission dated April 27, 2000 from Matt Kaiser to George Miller (NSG0861-0864).

44. Shriners Hospital 2001 Forecast of Program Results (NSG1225).

45. Shriners Hospital Actual vs. Pro forma Results to Date (NSG1226-NSG1228).

46. Shriners Hospital for Children - 2003 Actual to Date and Forecast Results Versus Original Pro forma (Vantage 23861-23865).

47. Spreadsheet (NSG1216-1220).

48. Shriners Hospital Pro forma.xls (NSG1221-1224).

49. Shriners With Assumptions Without Interest (Vantage 7771).

50. Shrine Product Pricing (Vantage 8104).

51. Response Analysis Reports.

52. Shriners Plan (Vantage 23945).

53. Memo dated May 5, 2000 to George Miller from Harry Melikian, Subject Narrative Relative to Current Case with USPS (Vantage 4741-4750).

54. Vantage website.

55. Vantage Group Services "Unlock the Power" (DOJ20604-20615).

56. Vantage Direct Mail Program Summary (SHC01860-01861).

57. Affidavit of Willard Fawcett, Jr.

58. Vantage Program Totals (11/17/2003) (Vantage 23815).

59. Major Acquisition Program Outstanding Balance Summary (Vantage 22589).

60. Letter dated March 12, 2002, from Brian W. LeClair to Peter K. Levitt with Cost Query Report Summary.

61. Schedule "B" Vantage Direct Marketing Services Schedule of Service Fees (NSG0807).

62. Memorandum dated October 24, 2003 from Terry Ahern to Ralph Semb, subject: Shrine Proposal (SHC02200-02203)

63. Composite Exhibit: November 12, 1999 letters from Brian W. LeClair to Nonprofit Groups enclosing Third-Party Summons, Third-Party Complaints and copy of the Complaint in United States v. Lewis, et al (Vantage 9904-9944).

64. Letter dated March 1, 2001 from Peter K. Levitt to Brian W. LeClair enclosing Revised Summary of Single Damages, Revised Synopsis of Calculations, Revised Spreadsheet

entitled Documentation of Mailings that Violate the Cooperative Mail Rule and Explanation Sheet.

65. Letter dated April 18, 2001 from Laurence M. Johnson to Harry S. Melikian enclosing Bill for Services Rendered through March 31, 2001 (Vantage 21762-21767).

66. Vantage Group Vendor Ledger Inquiry W/SQL Print (Vantage 5222-5225).

67. Complaint in the *Qui Tam* case (10363-10390).

68. Second Amended Complaint in the *Qui Tam* case (Vantage 10391-Vantage 10420).

69. Third Amended Complaint in the *Qui Tam* case (Vantage 10421, 10453).

70. Hearing Transcripts in the *Qui Tam* case.

71. Letter dated October 25, 2000 to John D. VerMaas, Gene Bracewell and Robert Turnipseed from Lawrence C. Lyon with attached Addendum (SHC00872, SHC00884-886).

72. Facsimile transmission from Harry S. Melikian to Henry Lewis dated August 26, 2002 with attached letter dated October 26, 2000 to Robert Turnipseed from Lawrence C. Lyon (Vantage 5081-5082).

73. Letter dated July 21, 2002 from Seth Perlman to James (sic) Fleisher (NSG0172-0173).

74. Letter dated July 10, 2002 from Jay Fleisher to Seth Perlman (NSG0127-0128).

75. Indemnity Agreement (NSG0161-062).

76. Settlement Agreement (Vantage 4838-4862).

77. Facsimile transmission and letter dated November 21, 2003 from Seth Perlman to John Kenney, Jr. (Vantage 4918-4920).

78. Letter dated December 4, 2003 from Laurence M. Johnson to Jay Fleisher (SHC01893-01900).

79. Declaration of Alan E. Douillette in the *qui tam* case.

80. Judge Wolf's Memorandum and Order dated march 5, 2004 in the *qui tam* case.

81. Hearing transcript dated may 5, 2003 in the *qui tam* case.

82. Letter dated June 30, 1995 from Anita Bizzoto to Scott Hamel.

83. Association of Direct Response Fundraising Counsel Rules of Ethics & Practices.

84. Spreadsheets attached to expert report of Barbara M. Sims.

85. Exhibits to Deposition of Jay Fleisher.

86. March 15, 2001 email from Jay Fleisher to Bill Fawcett (SHC01253-SHC01254).

87. June 14, 2002 memorandum from Paul Gramblin to Jay Fleisher (SHC01514-SHC01517).

88. October 17, 2002 memorandum from Paul Gramblin to Jay Fleisher (SHC03053-SHC03062).

89. November 4, 2002 letter from Jay Fleisher to Lawrence Lyon (SHC01727-SHC01729).

90. February 3, 2003 letter from Paul Gramblin to Adrienne Deckman (SHC01682-SHC01684).

91. February 13, 2003 email from Jay Fleisher to Bill Fawcett (SHC02910-SHC02911).

92. February 18, 2003 email from Jay Fleisher to Paul Gramblin (SHC02909).

93. March 11, 2003 memorandum to Jay Fleisher from Paul Gramblin (SHC01670-SHC01675).

94. March 13, 2003 email from Jay Fleisher (SHC01667-SHC01668).

95. April 30, 2003 email from Paul Gramblin to Mike Andrews (SHC01620).

96. June 10, 2003 email from Paul Gramblin to Bill Fawcett (SHC01615-SHC01618).

97. November 7, 2002 email from Jay Fleisher to Paul Gramblin (SHC03028-SHC03052).

98. October 2, 2003 letter from Paul Gramblin to Lawrence Lyon (SHC02029).

99. November 26, 2003 letter from Jay Fleisher to John Kenney (Vantage 8149-Vantage 8155).

100.   Mailing labels (Vantage 12456-Vantage 12457).

101.   May 21, 1999 fax from Jay Fleisher to George Miller (NSG0701-NSG0720).

102.   December 2, 2003 notes of Jay Fleisher (SHC04061).

103.   April 13, 1999 memorandum from Jay Fleisher to Ralph Semb (SHC00370-SHC00374).

104.   April 27, 1999 memorandum from Jay Fleisher to Louis Molnar (SHC04723).

105.   May 7, 1999 notes of Jay Fleisher (SHC04754-SHC04757).

106.   May 20, 1999 memorandum to John Nobles from Jay Fleisher (SHC00236-SHC00237).

107.   October 30, 2003 from Jay Fleisher (SHC01565-SHC01567).

108.   December 19, 2000 letter to Peter Levitt from Jay Fleisher (SHC04237-SHC04276).

109.   Handwritten notes of Jay Fleisher (SHC04765-SHC04768).

110.   Handwritten notes of Jay Fleisher (SHC04154-SHC04156).

111.   Handwritten notes of Jay Fleisher (SHC04754-SHC04757).

112.   Handwritten notes of Jay Fleisher (SHC04170-SHC04174).

113.   January 25, 2001 email from Paul Gramblin to Robert Turnipseed (SHC01266).

Respectfully submitted,

Vantage Financial Services, Inc.
By its attorneys,

_____
s/Laurence M. Johnson
Laurence M. Johnson BBO# 252720
Neal J. Bingham BBO# 652029
Davis, Malm & D'Agostine
One Boston Place
Boston, MA 02108
(617) 367-2500
ljohnson@davismalm.com


Nonprofit Service Group and
George E. Miller,
By their attorneys,

/s/Richard L. Nahigian

_____
Richard L. Nahigian, Esq., BBO#: 549096
Matthew J. Griffin, Esq., BBO#641720
PEABODY & ARNOLD LLP
30 Rowes Wharf, 6th Floor
Boston, MA  02110-3342
(617) 951-2100