UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VANTAGE FINANCIAL SERVICES, INC.<br>Plaintiff<br><br>v.<br><br>NONPROFIT SERVICE GROUP and<br>GEORGE E. MILLER<br>Defendants | CIVIL ACTION NO. 04-11686-WGY |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR <u>SUMMARY JUDGMENT CONCERNING EXPERT TESTIMONY</u>**

**<u>INTRODUCTION</u>**

This legal malpractice action against defendants, George E. Miller and Nonprofit Service Group, Inc., involves the application of the United States Postal Service's Cooperative Mail Rule ("CMR") to an Agreement to Provide Fundraising, Consulting and Management Services (the "Agreement") executed on June 17th and 22nd, 1999, by plaintiff, Vantage Financial Services, Inc. ("Vantage") and Shriners Hospitals for Children ("Shriners"). Under the scheduling order in this case, expert disclosure was to have occurred on or before October 31, 2005. Defendants disclosed two experts on October 28, 2005. Vantage failed to disclose any experts by October 31, 2005 and, instead, filed a November 1, 2005 Motion to Extend Date for Serving Expert Reports, in which Vantage represented that it had "retained an expert to testify on its behalf at trial." (Motion to Extend Date for Serving Expert Reports, Document 46, at p.1, ¶2). On November 14, 2005, a Final Pre-Trial Conference occurred, during which Vantage

explained that it had retained an expert who had backed out. According to Vantage, it consulted a second expert, with the intention of submitting an expert report by November 14, 2005 (the date of the Pre-Trial Conference), but the second expert was unwilling to submit a report. The Court declined to extend the deadline for expert disclosure in any event.

Because Vantage cannot meet its burden of proof in the absence of expert testimony, defendants now move for summary judgment. This is not the rare case where the alleged legal malpractice is so gross or obvious as to obviate the need for expert testimony. Vantage cannot make the necessary showing to reach the jury on its legal malpractice claim without expert evidence addressed to the following two issues: (1) whether defendants' conduct met the standard of care applicable to similarly situated attorneys practicing in the relatively arcane fields of postal regulation and nonprofit fundraising agreements, and (2) whether there was anything similarly situated attorneys would have or could have done differently to achieve a better result in circumstances similar to those present in this case.

## FACTS

The following facts are drawn primarily from the allegations of the Complaint. While defendants deny all allegations of wrongdoing, the facts and claims actually pleaded in the Complaint are the proper backdrop against which to assess Vantage's failure to adduce expert testimony in support of its claims.

Vantage is engaged in the business of providing fundraising services to nonprofit organizations. (Complaint, ¶7). In or about 1999, Vantage became involved in the negotiation of a substantial fundraising services contract with Shriners. (Complaint, ¶

10).

> While Shriners wanted to be able to mail its fundraising mailings at not-for-profit postal rates, Shriners had nonetheless demanded, during the course of the negotiations, that any fundraising services contract with Vantage include terms that limited its liability to pay Vantage for its fundraising services and out-of-pocket expenses from Shriners' cash assets in the event that the fundraising programs failed to raise sufficient amounts to pay [Vantage's fund raising fees] out of the fundraising proceeds.

(Complaint, ¶11).

At the time of the negotiations with Shriners, Vantage was defending a civil action in the United States District Court for the District of Massachusetts (the "*Qui Tam* Case"). In the *Qui Tam* case, the United States Government (the "Government") alleged that Vantage had improperly mailed fundraising materials on behalf of nonprofit organizations at reduced not-for-profit postal rates. According to the Government, it was improper under the CMR for Vantage to mail fundraising solicitations at the reduced nonprofit postage rate because Vantage had agreed to limit its nonprofit customers' liability to pay Vantage for its fundraising services and out-of-pocket expenses in the event that Vantage's fundraising efforts failed to raise sufficient amounts to pay its fees and expenses. (Complaint, ¶8).

Vantage alleges that it retained defendants to assist in the preparation of a fundraising agreement (the "Agreement") with Shriners that not only would comply with the CMR, but also would (1) permit Vantage to mail at the reduced nonprofit postage rate, and (2) satisfy Shriners' demand that its liability to pay for Vantage's services be limited to amounts raised through Vantage's fundraising efforts. (Complaint, ¶¶11-13). Vantage also alleges that defendants represented that the Agreement "would be effective

to avoid any violation of the CMR and protect Vantage from possible claims with respect to mailings at not-for-profit postal rates made pursuant to the Contract and from any exposure to additional liability on claims such as those being asserted in the [*Qui Tam Case*]." (Complaint, ¶17). According to the Complaint, defendants advised Vantage that the Agreement contained provisions for payment of Vantage's fees and expenses that were similar to those employed in other nonprofit fundraising contracts, and that none of those provisions had been questioned, objected to or challenged by the United States Postal Service (the "Postal Service"). (Complaint, ¶17).

Notwithstanding defendants' efforts to help produce a fundraising agreement that satisfied both the requirements of the CMR and Shriners' demand that its liability be limited to fundraising proceeds, the Government took the position that the Agreement violated the CMR and incorporated the Agreement into its claims for damages in the *Qui Tam* Case. (Complaint, ¶19). The court in the *Qui Tam* Case never actually ruled, however, that the Agreement violated the CMR. Instead, the court acknowledged that the Agreement permitted Vantage to rent Shriners' donor list for thirty-six months to defray outstanding fundraising expenses. The court agreed that this constituted "payment in kind" that could satisfy the requirements of the CMR. The court noted, however, that Vantage had failed to offer any evidence that thirty-six months of list rental income would be enough to defray any outstanding fundraising expenses. The court therefore concluded that it was unable to rule on this issue because Vantage had failed to designate an expert on the value of the list rental income and to introduce critical evidence on this issue. While this left the government's postal revenue deficiency claim pending, the court did hold that Vantage and its principals were not liable under the False Claims Act

as a result of Vantage's reliance on defendants' expertise. Rather than proceed with the *Qui Tam* Case, Vantage elected to settle it for far less than the approximately $15 million, or more, in profit that it had realized from the Agreement. (Defendants' Rule 56.1 Statement of Undisputed Facts,

"Rule 56.1 Statement" at ¶13).

## VANTAGE'S CAUSES OF ACTION

On the basis of the allegations actually pleaded in the Complaint, Vantage originally sought recovery under five causes of action: breach of contract (Count I), negligence (Count II), fraudulent misrepresentation (Count III), negligent misrepresentation (Count IV), and violation of M.G.L. c.93A (Count V). On Summary Judgment, the court dismissed Counts III (fraudulent misrepresentation) and V (violation of M.G.L. c.93A). Of the surviving causes of action, Vantage's negligence claim alleges that defendants breached

> [a] duty to exercise reasonable professional skill and care and, in particular, to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fundraising contract drafting and enforcement" would have exercised in the circumstances.

(Complaint, ¶30).

Vantage's breach of contract claim contains identical language to that asserted in its negligence claim. (Complaint, ¶27). As such, the breach of contract claim "is nothing more than a restatement of the negligence cause of action" and therefore, adds nothing to

Vantage's Complaint beyond what was alleged in its negligence claim.  See Harris v. Magri, 39 Mass. App. Ct. 349, 352 (1995).

Vantage's remaining claim, for negligent misrepresentation, fails to specify what alleged misrepresentations are referred to therein.  Count IV of the Complaint simply alleges that defendants, "and each of them, knew of [sic] ought to have known that the aforesaid representations were false." (Complaint, ¶42).  The only conceivable antecedent to the reference to the "aforesaid representations" in paragraph 42 appears in Count III of the Complaint (fraudulent misrepresentation) that was dismissed on Summary Judgment.  In any event, Count III, which is incorporated by reference into Count IV (negligent misrepresentation), alleges that defendants falsely represented

> that they were skilled and experienced in advising nonprofits and their professional fundraisers in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fundraising contract drafting and enforcement," and that they had the experience and ability to prepare a contract that would satisfy Shriners' requirement for limitations on its liability to pay for Vantage's fundraising services out of Shriners' own cash assets while at the same time, complying with the requirements of the CMR and shielding Vantage from exposure to additional liability in the [*Qui Tam* Case]. [Defendants] further represented that the draft contract that [defendants] prepared for use with Shriners effectively met these objectives.

(Complaint, ¶34).

While Vantage has recently relied on a statement made during a deposition by one of its employees, Lawrence Lyon, that defendant George E. Miller stated that the Agreement had been approved by the Postal Service, this allegation appears nowhere in the Complaint and cannot properly be considered to be the basis for any claim asserted in

the Complaint.

## DEFENDANTS' EXPERT

Defendants have designated two experts, including Robert S. Tigner, Esq. who is also general counsel to the Association of Direct Response Fundraising Counsel (ADRFCO) and regulatory counsel to the Nonprofit Federation of the Direct Marketing Association (DMANF). (Rule 56.1 Statement at ¶22). A copy of Attorney Tigner's Rule 26(a)(2) Disclosure is attached to the accompanying Local Rule 56.1 Statement. In Attorney Tigner's opinion,

> Mr. Miller took great care in helping the parties to negotiate and draft a fundraising contract that met the parties' objectives and complied with CMR. The defendants exercised the degree of care that would be expected of reasonable attorneys practicing under circumstances similar to those here. In particular, there was nothing that defendants either did or failed to do that could reasonably have been expected to expose Vantage to financial loss.
>
> It is also my opinion that an attorney practicing in this area would not reasonably anticipate that the factual issue of CMR compliance would arise in the first instance any place other than at [United States Postal Service ("USPS"), the administering agency. I repeat my view expressed above, that USPS was far more likely than not to have concluded that this contract did <u>not</u> violate the CMR. In other words, at the time the contract was executed, there was no reasonable basis to conclude that the U.S. Postal Service would take the position that the contract failed to comply with the requirements of the CMR. These premises being so, in my opinion there was no reasonable basis to conclude that the United States would seek to include the contract in pending litigation against Vantage that arose from very different conduct involving Vantage's use of secret side agreements that relieved its nonprofit clients from payment obligations incurred in "public" fundraising agreements with Vantage."

(Expert Report of Robert S. Tigner ("Tigner Report"), p. 9).

## **ARGUMENT**

**I.    EXPERT TESTIMONY IS GENERALLY NECESSARY FOR A PLAINTIFF TO MEET ITS BURDEN OF PROOF IN A LEGAL MALPRACTICE CASE.**

Under the well-known rubric of Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), a plaintiff cannot avoid summary judgment if it fails to make a showing sufficient to reach the jury on each of the essential elements of its case as to which it bears the burden of proof. Id. at 322. To succeed in a legal malpractice case, the plaintiff must show (1) the existence of an attorney-client relationship giving rise to a duty of care and/or contract, (2) a violation of that duty by the attorney which in turn (3) is the proximate cause of (4) a loss or damages. Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, 25 Mass. App. Ct. 107 (1987). The burden of introducing evidence to show that the attorney violated his duty to his client by failing to exercise reasonable care and skill rests on the plaintiff. Pongonis v. Saab, 396 Mass. 1005 (1985). In order to meet this burden, "[e]xpert testimony is generally necessary to establish that the attorney failed to meet the standard of care owed by an attorney in a particular case." Pongonis, 396 Mass. at 1005. It is the rare circumstance "where the claimed legal malpractice is so gross or obvious that laymen can rely on their common knowledge or experience to recognize or infer negligence from the facts." Wagenmann v. Adams, 829 F.2d 196, 218 (1st Cir. 1987), (quoting Glidden v. Terranova, 12 Mass. App. Ct. 597, 598 (1981), citing Pongonis, 396 Mass. at 1005).

The Complaint alleges that in preparing the Agreement and advising Vantage that "it was effective to prevent the exposure of Vantage to CMR liability" defendants failed to exercise the degree of skill and care that a reasonable, similarly situated attorney would have exercised in the circumstances. (Complaint, ¶20). This is not a claim that can be resolved without expert testimony concerning the applicable standard of care and the degree to which any deviation from that standard caused Vantage's alleged harm. Vantage cannot proceed to trial without expert testimony to support its claim that defendants departed from the course of action that would have been expected of attorneys practicing in the specialized and even arcane fields of postal regulation and nonprofit fundraising agreements.

    **1.** **This Is Not A Case In Which The Alleged Legal Malpractice Is So Obvious As To Allow The Case To Proceed To A Jury Verdict Without Expert Testimony.**

This is not a case in which the alleged legal malpractice is so obvious as to allow the case to proceed to a jury verdict without expert testimony. Compare Glidden, 12 Mass. App. Ct. at 598 (expert testimony unnecessary where attorney who assured his clients that he would remove an action to Superior Court did nothing further except to ignore the client's attempts to reach him and to suggest client contact other counsel); Wagenmann, 829 F.2d at 218-219 (expert testimony unnecessary where the client's attorney allegedly did almost nothing to prevent the client's alleged false arrest and commitment to an institution). In this case, defendants are not alleged to have abandoned the client. Instead, Vantage takes issue with the steps defendants employed to help produce a complicated agreement involving a highly specialized and even arcane area of the law. Defendants spent over two months in the negotiation and drafting process that

resulted in the Agreement. During that time, at least six drafts of the Agreement were produced, and probably more. (Rule 56.1 Statement at ¶3). As alleged in the Complaint, a principal focus of defendants' efforts involved the development of contractual terms that would (1) permit Vantage to mail at the reduced nonprofit postage rate, and (2) satisfy Shriners' demand that its liability to pay for Vantage's services be limited to amounts raised through Vantage's fundraising efforts.

The issue of CMR compliance has never been a simple matter. CMR compliance issues are all the more complex where, as here, the requirements of the parties call for something other than a straightforward fee for services arrangement. Shriners wanted to mail at the nonprofit rate, but insisted on contractual language that limited its liability to pay for Vantage's services. If necessary, Defendants will introduce expert evidence that the Agreement not only satisfied these two requirements, but also complied with the requirements of the CMR. (Tigner Report at pp. 2-10). As Attorney Tigner explains in his expert report, in applying the CMR, the Postal Service traditionally has considered the following factors: (1) who devised, designed and paid for the mail piece; (2) who paid the postage, either directly or indirectly; (3) who bears the risks associated with the mailings; (4) who makes the managerial decisions about the content of the mailings; and (5) what are the participants' intentions and interests. With respect to these five factors, upon analysis of the twenty-one page (including attachments) Agreement, a copy of which is attached to the Complaint, Attorney Tigner has opined that (1) Shriners had the authority and responsibility for the content and design of the mail pieces to be mailed under the Agreement; (2) Shriners paid for and was expressly responsible for paying all postage associated with the Agreement; (3) Shriners received all of the proceeds from the

mailings and had total control of the disposition of those proceeds, which were deposited into a bank account over which Shriners had exclusive control; (4) Shriners was solely at risk for any costs of the mailings that exceeded fundraising returns under the Agreement; and (5) Shriners had the exclusive responsibility for fundamental decision-making in the fundraising program. (Tigner Report at pp. 2-10).

As also reflected in the Tigner Report, the Agreement included provisions that were designed to address the issue of risk allocation that, in Attorney Tigner's view, satisfied the requirement that Shriners bear the sole risk for any costs of the mailings that exceeded fundraising returns under the Agreement. While the United States Attorney, in the *Qui Tam* Case, took a different view of the Agreement, it is undisputed that the court in the *Qui Tam* Case never actually ruled that the Agreement violated the CMR. (Rule 56.1 Statement at ¶12). Instead, the court acknowledged that the Agreement permitted Vantage to rent Shriners' donor list for thirty-six months to defray outstanding fundraising expenses. (Id.). The court agreed that this constituted "payment in kind" that could satisfy the requirements of the CMR. (Id.). The court noted, however, that Vantage had failed to offer any evidence that thirty-six months of list rental income would be enough to defray any outstanding fundraising expenses. (Id.). The court therefore concluded that it was unable to rule on this issue because Vantage had failed to designate an expert on the value of the list rental income and to introduce critical evidence on this issue. (Id.). As indicated in Attorney Tigner's report, defendants have supplied the missing expert evidence in this case to show that under the Agreement as drafted, there was no question that the fundraising mailings under the Agreement would have raised sufficient income to defray all fundraising expenses. (Tigner Report, at pp.

5-10).

While the court did not rule on the Government's postal revenue deficiency claim with respect to the Agreement, it did hold that Vantage and its principals were not liable under the False Claims Act as a result of Vantage's reliance on defendants' expertise. (Rule 56.1 Statement at ¶12). Had defendants engaged in the sort of dereliction of duty that might have dispensed with the need for expert testimony in this case, it seems unlikely that the court could have concluded that Vantage was insulated from false claims act liability on the basis of defendants' legal counsel.

The Complaint essentially alleges that defendants failed to exercise the degree of care expected of similarly situated attorneys and, as a result, misrepresented the safety and efficacy of the Agreement to satisfy Shriners demands while at the same time shielding Vantage from further liability in the *Qui Tam* Case. On this theory of liability, Vantage cannot suggest that its malpractice allegations are so obvious as to eliminate the need for expert testimony. Thus, Vantage seeks, ultimately to no avail, to chart a different course from the one laid out in the Complaint. The Complaint alleges that defendants advised Vantage that the Agreement was similar to other agreements that had not been challenged by the Government. Vantage has now attempted to expand upon that statement by claiming in the Pretrial Memorandum that defendants knew of no language that was "substantively identical" to certain payment provisions of the Agreement and that defendants had failed to disclose this. (Joint Pretrial Memorandum at p.4). The gist of the claim seems to be that defendants did not tell Vantage that the language had never been considered by the Postal Service or by any court and would present a matter of first impression if the Government challenged the Agreement. Defendant George Miller

testified at deposition that although other aspects of the payment provisions in the Agreement had been employed before with no difficulty, he was unaware of certain language concerning the issue of recourse being employed in other agreements prior to its incorporation into the Agreement. Although Vantage ought to be precluded from proceeding with these allegations due to its failure to allege them in the Complaint; these allegations, like those actually pleaded by Vantage, lack viability in any event in the absence of expert testimony.

      The fact that the Agreement contained language that defendants had not encountered before does not mean that the language was necessarily novel, or at least so novel as to warrant a different course from the one taken by the parties to the Agreement. A novel approach does not inexorably lead to litigation. It is a lawyer's responsibility to address the client's needs by developing creative solutions in light of the client's needs, evolving business practices and the continuing development of the law. Only through expert testimony can Vantage address whether reasonable, similarly situated attorneys would have regarded the issue to be novel, or novel enough to warrant a disclosure to the client. The question is what would a reasonable, similarly situated attorney have done under the circumstances present in this case. Expert testimony would be necessary before a jury could decide what steps, if any, a similarly situated attorney should have taken or could have taken to achieve a better result. Such testimony necessarily must take into account both Vantage's desire to enter into what turned out to be a highly lucrative fundraising agreement and Shriners' demand that its liability to pay for Vantage's services be limited to proceeds raised through its fundraising efforts. It would not be enough for Vantage simply to argue to the jury that defendants had breached an

alleged duty of disclosure concerning the potential legal consequences of certain contractual language. To support such a claim, Vantage must present expert testimony addressed to (1) the various interpretations of the law then prevailing among similarly situated and knowledgeable attorneys in the areas of postal regulation and nonprofit fundraising contracts, (2) the manner in which similarly situated attorneys would have applied the law to the circumstances of the case, and (3) whether similarly situated attorneys would have made the disclosure based on the status of the law as well as its application to the specific contractual language at issue. In this regard, it is significant that Jay Fleisher, Shriners' legal counsel involved in drafting the agreement, testified at deposition that he was not concerned that the Agreement presented CMR compliance issues because he had consulted knowledgeable outside counsel, the late William Lehrfeld, who had advised that the Agreement was in compliance with the CMR. (Rule 56.1 Statement at ¶4).

### 2. **Without Expert Testimony, Vantage Cannot Show That There Was Anything That Similarly Situated Attorneys Could Have Done To Achieve A Better Result**

Even if Vantage is permitted to proceed on what essentially is an omission claim that it failed to plead in the Complaint, the claim is meaningless unless Vantage can show that alternatives were available that would have enabled it to achieve a better result. The issue is essentially one of causation. See Siano v. Martinelli, 12 Mass. App. Ct. 946, 947 (1981) (judgment for defendant attorney affirmed where no evidence that attorney's conduct caused client's alleged harm). Vantage might suggest that it had known what it did not know at the time, it either would not have executed the Agreement or would have entertained alternative contractual language. Vantage cannot, without conceding defeat

on the issue of causation and damages, claim that it would have walked away from the deal but for defendants' alleged failure to disclose. Vantage would not have been better off had it not executed the Agreement because it expressly conceded at deposition that its profits under the Agreement exceeded the amount of the damages it claims in this case. (Rule 56.1 Statement at ¶21). Those profits, totaling at least $15 million, are far more than the $2.25 million plus attorneys' fees that it claims it paid to litigate and settle the claims arising under the Agreement. (Id. at ¶13). Having realized a net financial gain from the Agreement, it cannot meet its burden in this case by claiming that defendants should have counseled it to back out of the agreement with Shriners. See Flanders & Medeiros, Inc. v. Bogosian, 65 F.3d 198, 207 (1st Cir. 1995) (Rhode Island law: Summary judgment for attorneys affirmed where plaintiff failed to adduce evidence that attorneys' alleged breaches damaged plaintiff).

  This leaves the issue of what alternative contractual language, if any, could have been employed that both met Shriners' demands and satisfied the CMR. This is an issue of causation that is inextricably linked to the standard of care that would have been expected of a similarly situated attorney in the circumstances of this case. The issue could only be resolved through expert testimony concerning whatever alternative contractual language, if any, reasonable, similarly situated lawyers would have considered in the relevant circumstances. Without expert testimony, Vantage cannot suggest what reasonable, similarly situated attorneys would have or could have done to achieve a better result. In any event, the issue now seems mooted by the recent depositions of Attorney Fleisher and Ralph Semb, a Shriners Board member who was involved in the negotiations which resulted in the Agreement. These depositions

occurred after oral argument on defendants' initial motion for summary judgment. They demonstrate that as a practical matter, no alternative contractual language would have satisfied Shriners. Both witnesses made it clear that Shriners would not have executed the Agreement had it contained payment provisions different from those that were actually employed. (Rule 56.1 Statement at ¶5).

## II.    VANTAGE'S BREACH OF CONTRACT AND MISREPRESENTATION CLAIMS DO NOT ELIMINATE THE NEED FOR EXPERT TESTIMONY.

Although the Complaint alleges claims for breach of contract and misrepresentation, these claims do not eliminate the need for expert testimony. Both the breach of contract claim and the misrepresentation claim flow from the Complaint's allegations that defendants departed from the applicable standard of care. These claims are also subject to Vantage's inability to demonstrate, through expert testimony or otherwise, that it was worse off than it might otherwise have been but for defendants' alleged conduct.

### 1.    Breach of Contract

Vantage's breach of contract claim alleges that defendants breached

> their contract of professional employment with Vantage by failing to exercise reasonable professional skill and care and, in particular, failing to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation, including compliance with state regulations, negotiating settlements, and fundraising contract drafting and enforcement" would have exercised in the circumstances.

(Complaint, ¶27).

"On its face, this 'contract' claim is nothing more than a restatement of the negligence cause of action and, therefore, subject to the same general requirement of expert evidence 'to establish [a failure] to meet the standard of care in the particular circumstances,' as properly applied ... to [Vantage's] negligence claim." Harris v. Magri, 39 Mass. App. Ct. 349 at 352-53, (quoting Colucci, 25 Mass. App. Ct. at 111).

### 2. Misrepresentation

There are, of course, circumstances in which an intentional misrepresentation or fraud claim against an attorney is not subject to the requirement of expert testimony. This is not such a circumstance. The court has already dismissed Vantage's fraud claim on summary judgment. While Vantage continues to claim that defendant George Miller affirmatively advised Vantage that the Agreement had been approved by the Postal Service prior to its execution by the parties, this is not a claim that was pleaded in the Complaint. This claim first surfaced during a deposition of one of Vantage's principals, Lawrence Lyon, on August 9, 2005. Vantage chose not to seek an amendment to its Complaint to assert this claim. By the time the allegation surfaced, preliminary discovery, including interrogatories and document requests, as well as the deposition of Vantage's corporate designee under Fed. R. Civ. P. 30(b)(6), had already been completed.

Regardless of whether or not Vantage is entitled to assert the claim at this late stage of the case, it would still be subject to the requirement of expert testimony for the same reasons that Vantage's other claims require expert testimony. Assuming, purely for the sake of argument, that defendants had advised Vantage that had the Agreement had been approved, it would still be necessary to consider what the result would have been

had the misrepresentation not been made. Mr. Lyon confirmed that he never asked defendants to seek the Postal Service's approval before the Agreement was executed. (Rule 56.1 Statement at ¶20). Thus, there is no evidence from which one could infer that Vantage would have done anything differently had the alleged misrepresentation never occurred (which, in fact, it never did). This alleged misrepresentation adds nothing to Vantage's already empty claims. Vantage cannot avoid the problem by claiming that it either would not have entered into the Agreement or would have investigated alternative contractual terms had it known that the Postal Service had not approved the Agreement. The claim would nevertheless be subject to the same flaws addressed in Part I (2) above. Had Vantage chosen to back out of the transaction, it would not have realized the substantial profits it earned under the Agreement – profits that far exceeded its claimed damages in this case. As far as alternative contractual language is concerned, this necessarily would have to be the subject of expert testimony for the reasons already discussed above.

For the same reason, Vantage's negligent misrepresentation claim (whatever that claim might actually be) lacks content without expert testimony to support it. The word "negligent" in the phrase "negligent misrepresentation" is not mere surplusage. Otherwise any negligent misrepresentation claim could simply be gauged on the basis of a fraud standard. Negligence necessarily implicates an allegation that the defendant failed to adhere to the standard of care, custom or practice that would be expected of a reasonable, similarly situated person under similar circumstances. As shown above in Part I (2), Vantage cannot reach the jury on the negligent misrepresentation claim asserted in this case without (or with) expert testimony.

## CONCLUSION

In a case of this complexity, involving a relatively obscure area of law, Vantage cannot present a triable issue of legal malpractice under any theory of liability in the absence of expert testimony. For this reason, as amplified by the additional reasons set forth above, defendants' motion for summary judgment should be allowed.

                              Respectfully submitted,
                              Nonprofit Service Group and George E. Miller,
                              By their attorneys,

                              /s/ Matthew J. Griffin
                              Richard L. Nahigian, BBO No. 549096
                              Matthew J. Griffin, BBO No. 641720
                              PEABODY & ARNOLD LLP
                              30 Rowes Wharf, 6th Floor
                              Boston, MA 02110-3342
                              (617) 951-2100

PABOS2:RNAHIGI:626789_1
14794-90433