# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
ex rel. LAURENCE SAKLAD, )
    Plaintiff, )
)
v. ) C.A. No. 97-10052-MLW
)
HENRY R. LEWIS, et al. )
    Defendants. )

MEMORANDUM AND ORDER

WOLF, D.J.                                                  March 5, 2004

I.    INTRODUCTION

    The United States of America has intervened in this False Claims Act case on behalf of the United States Postal Service ("USPS" or the "Postal Service") in an attempt to recover what it claims is over $6,000,000 in underpayment of postage by the defendants Vantage Travel Services, Inc. ("VTS"), The Vantage Group, Inc., Vantage Financial Services, Inc. and Vantage Direct Marketing Services (collectively "Vantage" or "the Vantage defendants"). Defendant Henry Lewis was Vantage's Chief Executive Officer. Defendant Harry Melikian was Vantage's Executive Vice President. The government alleges that the defendants, who do not have valid permits to send mail at the nonprofit rate, improperly underpaid postage by sending over 78,000,000 pieces of mail in cooperative mailings with 80 nonprofit groups in violation of the cooperative mail rule.

    The government asserts four causes of action: violation of the False Claims Act ("FCA") (Count I); common law fraud (Count II);

unjust enrichment (Count III); and an action to recover a debt under the Federal Debt Collection Procedure Act ("FDCPA") (Count IV).

The parties filed cross-motions for summary judgment with respect to the plaintiff's claims arising out of mailings associated with four charities: (a) Catholic Daughters of the Americas (the "Catholic Daughters"); (b) Fleet Reserve Association ("Fleet"); (c) Moose International (the "Moose"); and (d) Shriner's Hospital for Children ("Shriner's"). After a series of hearings that took place on August 30, 2002, May 5, 2003, and May 9, 2003 the court allowed the plaintiff's motion for summary judgment in part, and denied it in part. The court allowed, without objection, the defendants' motion for summary judgment on the False Claims Act and common law fraud claims with respect to mailings associated with Shriner's, allowed VTS' motion for summary judgment in all respects and denied the defendants' motions for summary judgment in all other respects.

This Memorandum and Order summarizes the reasons for those rulings and the transcripts of the various hearings contain a more complete record of the reasons for the court's decisions.

II. THE COOPERATIVE MAIL RULE APPLIES TO FUND-RAISING MAILINGS THAT DO NOT INVOLVE PRODUCTS AND SERVICES

The parties disputed whether the cooperative mail rule is properly applied to fund-raising mailings that do not involve products and services. The cooperative mail rule is most

2

succinctly stated in the Domestic Mail Manual, sections 625.521 and 625.525, which are incorporated in the Postal Service's regulations. Those provisions state, in pertinent part, that an organization authorized to mail at the special nonprofit bulk rates "may mail only its own matter at those rates." An organization "may not delegate or lend the use of its authorization to mail at the [nonprofit rate] to any other person or organization."

Section 625.521 of the Domestic Mail Manual, which is captioned, "Cooperative Mailings," states in part:

> Cooperative mailings may be made at the [nonprofit rate] only when each of the cooperating organizations is individually authorized to mail at the [nonprofit rate] at the post office where the mailing is deposited. Cooperative mailings involving the mailing of any matter on behalf of or produced for an organization not itself authorized to mail at the [nonprofit rate] at the post office where the mailing is deposited must be paid at the regular rate.

The cooperative mail rule existed for many years prior to 1990. 39 U.S.C. §3626 was enacted in 1990. It provides, in pertinent part, that reduced nonprofit mailing rates are not available if the mailing offers products or services if "the mail matter involved is part of a cooperative mailing (as defined under regulations of the Postal Service) with any person or organization not authorized to mail at the [nonprofit rate]" 39 U.S.C. §3626(j)(1)(D)(ii).

The Vantage defendants are not authorized to mail at the nonprofit rate.

The defendants argue that the 1990 statute both defined and

3

limited the authority of the Postal Service to apply its cooperative mail rule to mailings such as those at issue in this case, which either did not offer any products or services or provided only low cost articles which are exempt under 39 U.S.C. §3626(m)(1)(B). The government disagrees and asserts that the statute is intended only to clarify and supplement the existing Postal Service regulations regarding the cooperative mail rule. The government is correct.

The court must analyze this issue using the standards initially described by the Supreme Court in <u>Chevron U.S.A., Inc. v. National Resource Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984), and applied by the Supreme Court in <u>Barnhart v. Walton</u>, 535 U.S. 212, 217-18 (2002). <u>Chevron</u> states that when a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. <u>Chevron</u>, 467 U.S. at 842.

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court [may] not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation

<u>Id.</u> at 842-43.

More recently, in <u>Barnhart</u>, the Supreme Court said:

> [T]he legal question before us is whether the Agency's interpretation of the statute is lawful. This Court has previously said that, if the statute speaks clearly "to the precise question at issue," we "must give effect to

4

> the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S., at 842-843, 104 S.Ct. 2778. If, however, the statute "is silent or ambiguous with respect to the specific issue," we must sustain the Agency's interpretation if it is "based on a permissible construction" of the Act. <u>Id.</u>, at 843, 104 S.Ct. 2778. Hence we must decide (1) whether the statute unambiguously forbids the Agency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible. <u>Ibid.</u>; see also <u>United States v. Mead Corp.</u>, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

<u>Barnhart</u>, 535 U.S. at 217-18.

Here, the 1990 statute is silent on the issue of whether the Postal Service may apply the cooperative mail rule to mailings that do not offer products and services. The 1990 statute states, in effect, that the Postal Service must apply its cooperative mail rule to mailings involving products and services. The statutory provision appears to have resolved a particular, then current, dispute concerning mailings that involved products and services. The statute could have expressly stated that the cooperative mail rule could not be applied to mailings that do not involve products or services. It did not.

This silence indicates that the Postal Service has some discretion regarding this issue. In contrast to mailings involving products and services, the statute left the Postal Service discretion to decide whether to apply the cooperative mail rule to mailings that did not offer products and services. It was permissible for the Postal Service to issue regulations that it interprets as applying the cooperative mail rule to offers that do

5

not include products or services.

Barnhart is illuminating by analogy on this issue. First, in this case, the Postal Service's interpretation of the statute makes sense in terms of the statute's basic objectives. The statute's manifest aim is to limit the use of nonprofit rates to genuine nonprofit activities. That is, to subsidize and thus promote nonprofit organizations, but to limit that subsidy to serving those purposes. The statute addressed explicitly the main type of perceived abuse prevalent in 1990. It was, however, foreseeable that other schemes might be developed in the future or become more common. As indicated earlier, the statute could have expressly limited the cooperative mail rule to mailings involving products or services. It was permissible for the Postal Service to interpret the statute as leaving it the discretion to apply the cooperative mail rule to other schemes.

In 1991, soon after the statute was enacted, the Postal Service adopted cooperative mail rule regulations. After notice and an opportunity for public comment, the Postal Service adopted its present position in 1991. It informed Vantage, among others, that it asserted that the cooperative mail rule applied to mailings that did not include any products or services. The defendants claim that certain members of Congress are concerned about this application of the cooperative mail rule and may take action. However, while Congress has since 1991 repeatedly amended the eligibility requirements for the nonprofit rate that are included

6

in 39 U.S.C. §3626, it has not disturbed the Postal Service's interpretation of the 1990 statute or its application of the cooperative mail rule.

As the Supreme Court said in <u>Barnhart</u>, "[t]hese circumstances provide further evidence--if more is needed--that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." <u>Id.</u> at 220. As the statute is silent on the issue in question and the agency's construction is permissible, the court must defer to it. <u>Id.</u> at 218.

Applying the cooperative mail rule to the mailings at issue in this case does not violate the Constitution. Charitable solicitations are generally entitled to First Amendment protection. <u>See</u> <u>Riley v. Nat'l Fed. of the Blind, Inc.</u>, 487 U.S 781, 788-89 (1988). However, the government may restrict the exercise of constitutional activities by reasonable time, place, and manner restrictions that are content neutral and are narrowly tailored to serve a significant interest and leave open equal alternative channels of communication. <u>See</u> <u>United States v. Grace</u>, 461 U.S. 171, 177 (1983).

There are different degrees of First Amendment protection that are afforded to different kinds of speech. In this case, the cooperative mail rule is aimed at determining whether a particular mailing is primarily or exclusively a charitable solicitation. Use of the nonprofit rate is a privilege, not a right. <u>See</u> <u>Lewis Pub.</u>

7

Co. v. Morgan, 229 U.S. 288, 304-05 (1913). In the application of the cooperative mail rule, the Postal Service decides, subject to judicial review, whether the charitable rate can properly be used.

The cooperative mail rule is content neutral on its face. The evidence before the court does not indicate that it is being applied in a way that discriminates based on the content of any proposed mailing. The cooperative mail rule is narrowly tailored to serve the significant government interest of promoting charitable activity through a postal subsidy, and also limiting that subsidy to true charitable solicitations and discouraging fraud. Cf. Enterprise, Inc. v. United States, 833 F.2d 1216 (6th Cir. 1987) (upholding constitutionality of paid-subscriber rule). In addition, there are also ample other channels for communication, including mailing at regular rates.

There is no evidence in this case that the Postal Service uses the cooperative mail rule to discriminate against unpopular charitable causes. The defendants' clients are diverse, and many appear to be in the popular mainstream of American life, such as the Knights of Columbus, the Iowa Farm Bureau, and the Masons. Nor is the cooperative mail rule infirm due to overbreadth. Finally, there is no issue of prior restraint in this case because the Postal Service did not prevent the defendants from making any mailings.

III.    GENERAL COOPERATIVE MAIL RULE PRINCIPLES

The Postal Service determines whether a mailing is cooperative

under the cooperative mail rule by evaluating whether the participating entities have a joint venture or a principal-agent relationship. In making this evaluation, the Postal Service "certainly looks to traditional agency principles." United States v. Raymond & Whitcomb Co., 53 F. Supp. 2d 436, 441 (S.D.N.Y. 1999). For example, "[t]raditional indicia of an agency relationship include (1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; and (4) control by the principal." Id. (internal quotation marks omitted).

However, the most critical factor in the context of the cooperative mail rule is whether the parties share the cost, risk, or benefit of the mailings. Id. at 441-42. Such rate-disqualifying sharing may occur where the mailing: results from an authorized organization's delegation or lending of its nonprofit permit; is sent on behalf of or produced for an unauthorized organization; or benefits any other person or organization.

These, however, are not the sole criteria. The Postal Service also uses six additional factors, some of which distinguish the cooperative mailing inquiry from a pure agency law analysis, to evaluate not only the risk taken by each party, but also participation in the endeavor. Id. at 442. These factors are: (1) the identity of the party that devised, designed, prepared, and paid for the mail piece; (2) the identity of the party which directly or indirectly paid the postage for the mailing; (3) the way in which the profits and revenues from the mailing or

9

enterprise it supports are divided; (4) the risks entailed for the mailing or enterprise it supports and the identity of the party that bears these risks; (5) the identity of the party which makes managerial decisions concerning the contents of the mailings or the enterprise it supports and the way in which that party makes those decisions; and (6) the intent and interest of the participants in the mailing. Id.; accord Postal Svc. Pub'n 417; Postal Svc. Cust. Supp. Ruling PS-209.

The Postal Service's evaluation of these factors focuses less on the mailing piece itself than on the participating entities' relationship, as revealed by a review of all contracts and other relevant documents generated or executed by the parties. Generally, the Postal Service places the burden on the mailer to show that the relationship is a legitimate principal-agent relationship rather than a joint venture.

In applying these factors, courts have found certain aspects of particular mailings sufficient to constitute an ineligible cooperative mailing. In United States Postal Service v. University Publishing Corp., 835 F. Supp. 489, 491 (S.D. Ind. 1993), the court found an ineligible cooperative mailing because the revenues of the for-profit company were linked to the success of the mailings in generating contributions. The court relied, in part, on the fact that the for-profit company received the first $15 of every contribution to defray production and mailing costs. In Raymond & Whitcomb, the court found an ineligible cooperative mailing when

10

the for-profit company paid the postage and printing costs of the disputed mailing up front and the for-profit company helped shape much of the substance of the program. 53 F. Supp. 2d at 443. The court reached its conclusion in Raymond & Whitcomb even though the authorized nonprofit had ultimate control over the mailings and did the overwhelming share of the work. Id.

Although the mailings in these cases involved products or services, it is, for the reasons discussed earlier, permissible for the Postal Service to apply the cooperative mail rule to mailings that do not involve products or services.

Many of the agreements between Vantage and its nonprofit partners were evidenced by written contracts that were subsequently modified by "side letters". The written contracts were crafted so that the nonprofit retained full liability for the costs of a mailing program. Thus, if the USPS were to review the contract, it would presumably permit mailings at the nonprofit rate. However, the written contracts were modified by secret side letters that were not disclosed to the USPS. The provisions of the side letters were the key provisions establishing the terms by which the nonprofits would escape liability for the costs of the mailings and Vantage would share in the costs, risks, and benefit of the mailings.

Here, the undisputed contracts and the side letters for some of the mailings at issue show that the defendants shared in the costs, risks, and benefit of the subject mailings. Defendants took

11

a substantial risk by incurring and paying up front all of the costs associated with each fund-raising mailing, while pinning recovery of those outlays on anticipated donations.

This court identified three types of contractual arrangements that resulted in ineligible cooperative mailings. The first was the "no liability" arrangement. Under this arrangement, Vantage released the nonprofit from liability for the costs of the mailings. Under this arrangement the defendants must be said to have taken a risk and not received a benefit, incurring a financial cost. As the cooperative mail rule bars risk and cost sharing, this arrangement rendered defendants ineligible for the nonprofit rate.

The second was the "finite mailings" arrangement. Under this arrangement, Vantage would have the right to continue mailing to the nonprofits mailing list a finite number of times to recoup its costs and, because of the markup it applied to its costs, receive a benefit. The third arrangement was the "infinite mailings" arrangement. Under this arrangement, Vantage would have the right to continue mailing as many times as was necessary to cover its costs and profit from its markup.

Under the latter two arrangements, the defendants took a risk, and then, upon receiving no benefit and facing a financial loss, took an additional financial risk in order to cover its costs and, because of markup, receive a benefit. They took the additional financial risk by financing the additional mailings.

If the additional efforts were successful, the defendants had taken multiple risks and received a benefit without any actual cost. If the defendants' additional efforts were not successful, they had taken multiple risks and incurred a financial cost. In either case, some of the defendants shared the risk and either cost or benefit with the nonprofit organization, thus rendering themselves ineligible for the nonprofit rate under the cooperative mail rule. See Raymond & Whitcomb, 53 F. Supp. 2d at 441-42.

Under all three arrangements, the defendants have in some way linked their revenue to the success of the mailing in violation of the cooperative mail rule. See Univ. Pub., 835 F. Supp. at 491. Under all three arrangements, the defendants shaped much of the substance of the fund-raising program, contributing to the violation of the cooperative mail rule, see Raymond & Whitcomb, at 443, even if the nonprofits retained ultimate decision-making power for almost every one of the subject mailings. The defendants helped devise and design the mail pieces, including their size, type, layout, content; arranged and oversaw the printing, stuffing, mailing, mail opening, and caging services provided by subcontractors; and decided when the mailing should be sent.

For all of these reasons, a reasonable fact-finder would be compelled to conclude that mailings sent under agreements that fit one of the three criteria described were ineligible for the nonprofit rate.

13

IV.  APPLICATION OF COOPERATIVE MAIL RULE PRINCIPLES TO TEST CASES

The parties briefed cross-motions for summary judgment with respect to mailings associated with four charities that were to serve as test cases. The charities were: (a) the Catholic Daughters; (b) Fleet; (c) the Moose; and (d) Shriner's.

With regard to the individual defendants, Lewis and Melikian, there are genuine issues of material fact that preclude summary judgment for either the government or the defendants on the FCA, fraud and FDCPA claims. At issue is whether Lewis or Melikian knew of the side letters that rendered the agreements between Vantage and various charities joint ventures in violation of the cooperative mail rule. This issue requires a trial. Lewis and Melikian are, however, entitled to summary judgment on the unjust enrichment claim, count III, as this claim attempts to enforce contracts implied in law with the corporate entities. See Raymond & Whitcomb, 53 F. Supp. 2d at 444 ("More precisely, the United States' unjust enrichment claim is a qunatum meruit claim for the value of services rendered, which is appropriate when there is no properly agreed-upon payment amount for agreed-upon provision of goods or services.").

With regard to Vantage Travel Services, the government has failed to provide evidence sufficient to prove that this particular defendant was involved with the mailings of the four nonprofits at issue. Therefore, Vantage Travel Services is entitled to summary

14

judgment on all of the claims against it.

With regard to the other Vantage defendants, the government is entitled to summary judgment on some of its claims.[1] Neither the government nor the defendants are entitled to summary judgment on claims relating to Fleet, as there are genuine issues of material fact relating to the terms of the agreement between Vantage and Fleet. Therefore, there must be a trial to determine whether the Fleet mailings violated the cooperative mail rule.

There is no genuine dispute that the mailings associated with the Catholic Daughters were sent pursuant to an infinite mailings agreement. There is also no genuine dispute that the mailings associated with the Moose were sent pursuant to a finite mailings agreement. Thus, all of these mailings violated the cooperative mail rule and the government is entitled to summary judgment on its unjust enrichment and FDCPA claims against Vantage with respect to these mailings.

Under the collective knowledge doctrine, as adopted by the First Circuit in <u>United States v. Bank of New England, N.A.</u>, 821 F.2d 844, 856 (1st Cir. 1987), the government is entitled to summary judgment on its False Claims Act claims against Vantage as to Catholic Daughters and the Moose because, in view of the undisputed material facts, a reasonable fact-finder would be compelled to conclude that either there was a single Vantage

---

[1] The parties did not brief the issue of whether summary judgment is appropriate for the fraud claims.

employee who knew both (a) that there were side letters associated with these two charities and (b) that the side letters' terms precluded use of the nonprofit rates under the cooperative mail rule or that the Vantage enterprise was so grossly negligent in not putting the two pieces of information together that it had the requisite scienter under the False Claims Act.

With regard to Shriner's, Vantage had obtained a letter from outside counsel advising it that the mailings did not violate the cooperative mail rule. The government acknowledged that there is no evidence to indicate that the individual and Vantage defendants did not rely in good faith on the opinion of outside counsel with respect to the propriety of the Shriner's mailings. Therefore, all defendants are entitled to summary judgment on the fraud and FCA claims relating to Shriner's as, relying on the advice of counsel, they lacked the necessary scienter to establish liability under the FCA or for common law fraud. See John T. Boese, Civil False Claims and Qui Tam Actions §2.04[D] (2d ed. 2003 Supp.) ("The 'expert advice' defense is available even with the lowered intent standard under the civil False Claims Act. If a defendant has satisfied the criteria set forth in these cases [applying the defense in the context of criminal fraud]--full disclosure and good faith reliance--there is no way the false claim could be submitted 'knowingly.'"). Melikian and Lewis are entitled to summary judgment on the FDCPA claims relating to Shriner's as well, because in the absence of a valid fraud or FCA claim, Lewis and Melikian do not

16

owe a debt to the government in their individual capacities.

The court finds, however, that the Shriner's mailings may have violated the cooperative mail rule. Consequently, either the government is entitled to summary judgment on its unjust enrichment and FDCPA claims against the Vantage defendants or a trial is necessary on this issue. The Shriner's agreement provided that if Vantage was terminated without cause, Shriner's would be fully liable for the costs of the mailings. See §13.1. However, if the agreement were terminated for any other reasons, Vantage would not be able to recoup its costs directly from Shriner's. See §13.2. Rather, Vantage had two options. It could recoup its costs under an infinite mailings agreement that expired in three years, at which point Shriner's liability would be extinguished. Alternatively, Vantage could rent Shriner's mailing list to other companies for three years and use the proceeds to cover the costs and markup associated with the Shriner's mailings. Again, at the end of the three year period, Shriner's liability would be extinguished.

Although the defendants correctly argue that "payment in kind" as opposed to payment in cash does not violate the cooperative mail rule, an agreement that does not provide for full liability for the nonprofit organization does. By limiting Vantage's recourse to defined assets, Shriner's and Vantage created an arrangement in which Vantage shared the risk, costs and benefits of the fund-raising mailings because there was no guarantee that, if the

17

mailings were unsuccessful, Shriner's would cover the costs of the mailings advanced by Vantage.

The Vantage defendants argued that the Shriner's mailing list was so valuable that there was no real difference between the non-recourse arrangement in the Shriner's contract and a full-recourse contract. There is, however, no evidence in the record supporting this claim. The court did not resolve the questions of (1) whether a non-recourse agreement would be more properly characterized as a principal-agent agreement than a joint venture if the asset was sufficiently valuable; and (2) if so, whether the burden of proof on this issue would fall on the plaintiff or the defendant. Therefore, the court did not rule as to whether the government was entitled to summary judgment on its unjust enrichment and FDCPA claims with regard to Shriner's or if a trial was necessary to determine the value of the Shriner's mailing list.

V.     ORDER

Accordingly, it is hereby ORDERED that:

1.     Defendant Vantage Travel Services' motion for summary judgment is ALLOWED with respect to all claims arising out of mailings associated with Catholic Daughters, Fleet, the Moose and Shriner's.

2.     Defendants Harry Melikian and Henry Lewis' motion for summary judgment is ALLOWED with respect to count III and with respect to all claims arising out of mailings associated with Shriner's and DENIED in all other respects.

3. The government's motion for summary judgment is ALLOWED with respect to counts I, III and IV against all Vantage defendants except Vantage Travel Services with respect to mailings associated with Catholic Daughters and the Moose and DENIED in all other respects. The court is, however, taking under advisement the government's motion for summary judgment on Counts III and IV against the Vantage defendants for mailings associated with Shriner's.

4. The Vantage defendants' motion for summary judgment is ALLOWED with respect to counts I and II for all mailings associated with Shriner's and DENIED in all other respects.

```
                              /s/ Mark L. Wolf
                           UNITED STATES DISTRICT JUDGE
```

19