# EXHIBIT 5

```
 1                              Volume: I
 2                              Pages:  1 - 105
 3            UNITED STATES DISTRICT COURT
 4              DISTRICT OF MASSACHUSETTS
 5               C.A. No. 04-11686-WGY
 6
 7    VANTAGE FINANCIAL SERVICES, INC.
 8            Plaintiff,
 9        v.
10    NONPROFIT SERVICE GROUP, INC.,
11    and GEORGE E. MILLER
12            Defendants.
13
14
15                 * * * * * * * * *
16        DEPOSITION OF LAWRENCE C. LYON
17           Thursday, July 21, 2005
18            Peabody & Arnold, LLP
19                30 Rowes Wharf
20             Boston, Massachusetts
21                  10:00 a.m.
22         Reporter:  Linda M. Grieco
23    320 Congress Street, Boston, MA 02210
24
```

Page 102

1  Vantage Financial Services?
2      A. I'm sorry, I don't talk like that, I'm
3  sorry.
4      Q. I try not to.
5      A. No, no, I don't speak to people like that.
6          MR. JOHNSON: Maybe this would be a good
7  point, would you like to call the hospital now?
8          MR. NAHIGIAN: Well, I don't think we
9  got an answer.
10     Q. Is the answer no?
11     A. I'm sorry?
12     Q. I asked you whether or not you asked George
13 Miller to get a specific ruling from the United
14 States Postal Service about whether or not the
15 language of the contemplated contract between
16 Vantage and the Shriners complied with postal
17 regulations?
18     A. Yes, sir, he told me --
19     Q. Did you ever ask him to do that?
20     A. Absolutely. Did I ever ask him to make sure
21 that this agreement would be approved by the post
22 office?
23     Q. To obtain a specific ruling of approval by
24 the post office.

Page 103

1      A. Oh, I'm sorry, sir. I didn't ask. Did I
2  say to obtain a specific ruling? No, sir, I never
3  say a statement like that.
4          MR. JOHNSON: Since now there is no
5  pending question, maybe now it would be a good time
6  to take a break.
7          MR. NAHIGIAN: Go ahead.
8          (Whereupon, a recess was taken.)
9          MR. NAHIGIAN: We've agreed to suspend
10 the deposition, and we will reconvene at 9 o'clock
11 a.m. next Wednesday, which is, July 27th, I believe.
12 Thank you.
13         (Whereupon, at 1:05 the deposition
14 suspended.)

Page 104

1                   C E R T I F I C A T E
2      I, LAWRENCE C. LYON, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the corrections listed below):
7  Page   Line       Correction

19 Signed under the pains and penalties of perjury this
20 ____ day of _____, 2005.
21         _____
22         LAWRENCE C. LYON

Page 105

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.              )
3      I, Linda M. Grieco, Professional Shorthand
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, do hereby certify
6  that LAWRENCE C. LYON, the witness whose deposition
7  is hereinbefore set forth, was duly sworn by me and
8  that such deposition is a true record of the
9  testimony given by the witness.
10     I further certify that I am neither related to
11 or employed by any of the parties in or counsel to
12 this action, nor am I financially interested in the
13 outcome of this action.
14     In witness whereof, I have hereunto set my hand
15 and seal this 24th day of July, 2005.

21         Linda M. Grieco
22         Notary Public
23         My commission expires
24         December 15, 2011

27 (Pages 102 to 105)

LegaLink Boston
(800) 822-3376

```
                                              Page 106
 1                               VOLUME:  II
 2                               PAGES:   106 to 245
 3                               EXHIBITS: 8 to 37
 4
 5          UNITED STATES DISTRICT COURT
 6            DISTRICT OF MASSACHUSETTS
 7    - - - - - - - - - - - - - - - - - -x
 8    VANTAGE FINANCIAL SERVICES, INC.,
 9                 Plaintiff,
10       v.                       Civil Action
11                                No. 04-11686-WGY
12    NONPROFIT SERVICE GROUP, INC.,
13    and GEORGE E. MILLER,
14                 Defendants.
15    - - - - - - - - - - - - - - - - - -x
16
17        CONTINUED DEPOSITION OF LAWRENCE C. LYON
18                   August 9, 2005
19                    10:20 a.m.
20                Peabody & Arnold, LLP
21                   30 Rowes Wharf
22                Boston, Massachusetts
23
24        Reporter:  Karen A. Interbartolo, RPR
```

Page 115

1  THE WITNESS: What?
2  Q. He's objecting.
3  MR. JOHNSON: I just objected to the
4  form. Don't let that interfere with whatever an
5  appropriate response to the question would otherwise
6  be.
7  A. I've never seen the document before. I
8  understand what they're saying, yes.
9  Q. Could you tell me what your understanding is
10 of what the document said?
11 A. That after a couple of conversations
12 regarding the commissions, I was informed that until
13 this program broke even and it started making profits,
14 I wasn't getting paid anything.
15 Q. Is it your understanding that in -- Which
16 program are you referring to?
17 A. Funded acquisitions. Shrine specifically.
18 Q. Anything other than the Shrine?
19 A. There were other deals. This was the only
20 thing of any significance.
21 Q. What is funded acquisition? What does that
22 term mean, as you understand it?
23 A. Financed business.
24 Q. Financed by who or what?

Page 116

1  A. Vantage.
2  Q. When exactly were you told that you weren't
3  going to be receiving any commission until this program
4  broke even? Was that sometime in 2000, 2001, 2002,
5  2003?
6  A. There were numerous references during the
7  course of the Shrine program regarding commissions
8  being held until after the program was over.
9  Q. Wasn't that the case for all the programs
10 that you handled?
11 A. No, sir.
12 Q. I thought you were receiving a draw and that
13 you would settle the commission after the program was
14 completed.
15 A. Correct.
16 Q. Did the Shrine program ever break even, to
17 your knowledge?
18 A. Yes.
19 Q. At what point did it break even, as far as
20 you know?
21 A. When they sent us a check for $7 million that
22 was outstanding.
23 Q. Do you know what Vantage's gross margin on
24 the entire Shriners Hospitals for Children was?

Page 117

1  A. Exactly?
2  Q. No. Your best approximation.
3  MR. JOHNSON: If you can answer the
4  question based upon knowledge, that's fine, but you're
5  not to speculate or guess about it.
6  A. No, sir.
7  Q. Can you give me your best approximation of
8  what the gross margin on the Shriners Hospitals for
9  Children program was?
10 A. Gross margin?
11 Q. Yes.
12 MR. JOHNSON: Best approximation is not
13 the same as a guess. It has to be based upon some
14 factual knowledge.
15 A. $15 million.
16 MR. JOHNSON: I'm sorry. Could you read
17 the answer back, please?
18 (Record read.)
19 A. Gross.
20 Q. Do you know what Vantage's gross revenues in
21 terms of the total amount of money that was paid on
22 account of the Shriners program were?
23 A. Again, this isn't an exact.
24 Q. I'm asking for your best approximation based

Page 118

1  on knowledge that you have. I'm not asking you to
2  guess.
3  A. Approximately $40 million gross revenue.
4  Q. Do you know whether or not Vantage calculated
5  net profit figures for the Shriners program?
6  A. No, sir.
7  Q. I asked you whether or not you knew. I'm
8  going to ask you a different question. Did Vantage
9  calculate net profit figures for the Shriners program,
10 to your knowledge?
11 MR. JOHNSON: Objection. Asked and
12 answered.
13 A. With me? No, sir.
14 Q. Not with you. Just at all. Did Vantage
15 calculate net profit figures for the Shriners Hospitals
16 for Children program?
17 A. They had to.
18 Q. Do you know whether or not it did?
19 A. No.
20 Q. Why do you say they had to?
21 A. They're running a business.
22 Q. Take a look at the last page of Exhibit 9
23 that's before you. Paragraph 2 says, "Only Larry Lyon
24 and senior management to, quote, unquote, sell funded