# EXHIBIT 6

Page 1

```
 1                              Volume: I
 2                              Pages: 1-192
 3                              Exhibits: 1-42
 4              UNITED STATES DISTRICT COURT
 5           FOR THE DISTRICT OF MASSACHUSETTS
 6                  CA No. 04-11686WGY
 7
 8    - - - - - - - - - - - - - - - - - - -x
 9    VANTAGE FINANCIAL SERVICES, INC.,
10                              Plaintiff,
11    vs.
12    NONPROFIT SERVICE GROUP INC. and
13    GEORGE E. MILLER,
14                              Defendant.
15    - - - - - - - - - - - - - - - - - - -x
16              30(b)(6) DEPOSITION OF VANTAGE
17                 FINANCIAL SERVICES, INC.
18              BY HARRY MELIKIAN, DESIGNEE
19                      June 17, 2005
20                       11:00 a.m.
21                   Peabody & Arnold, LLP
22                     30 Rowes Wharf
23                   Boston, Massachusetts
24              Reporter:  Nancy L. Russo
```

Page 182

1  Q. Can you tell me your approximation of what
2  the numbers are?
3  A. I don't know off the top of my head what the
4  gross margins were on the Shriners contract.
5  Q. Is it fair to say that Vantage made more
6  money in terms of gross profit from its agreement with
7  the Shriners Hospitals for Children dated
8  June 17th, 1999 than it is claiming in the way of
9  damages from Mr. Miller in this case?
10  MR. JOHNSON: Objection to the form.
11  A. I answered that. I believe we made more
12  money in gross profit than the amount of damages we are
13  claiming.
14  Q. What is it that Vantage believes Mr. Miller
15  and Nonprofit Service Group did wrong in this case?
16  MR. JOHNSON: Objection to the form.
17  A. Our belief is that Mr. Miller knowing that we
18  were under investigation by the postal service for
19  contracts relating to liability prepared an agreement
20  that was represented to be -- never been challenged or
21  was in agreement it had never been challenged by the
22  postal service. And we entered into that agreement
23  based upon his expert advice and knowledge and to our
24  detriment we were damaged.

Page 183

1  Q. Is there anything that Vantage believes
2  George Miller and Nonprofit Service Group should have
3  done differently than what they did in connection with
4  the underlining facts of this case?
5  MR. JOHNSON: Objection to the form.
6  A. My personal belief is that George should have
7  either disclosed to us that there were serious inherent
8  risks in this agreement in light of the pending
9  investigation by the government and/or, two, he should
10  have provided to us proof certain that this agreement
11  was basically a proper agreement under the cooperative
12  mail rule.
13  Q. Did Vantage request him to provide such a
14  proof certain?
15  A. I did not.
16  Q. Do you believe that there was any way in
17  which the agreement could have been written differently
18  to avoid the problems that later arose?
19  MR. JOHNSON: Objection to the form.
20  A. I'm not an expert in writing agreements. So
21  I can't tell you that answer.
22  Q. Do you continue to believe that Mr. Miller
23  was an expert in drafting the type of agreement that
24  was entered into on June 17, 1999 between Vantage and

Page 184

1  the Shriners?
2  A. Absolutely.
3  (Discussion off the record.)
4  BY MR. NAHIGIAN:
5  Q. Prior to June 17, 1999, did you believe that
6  there was a risk that the government would conclude
7  that the June 17th, 1999 agreement would violate the
8  cooperative mail rule?
9  MR. JOHNSON: Objection to the form.
10  A. That question doesn't make any sense.
11  (Record read.)
12  A. How could I know prior to June 17th if the
13  contract that was executed on June 17th would violate
14  the cooperative mail rule?
15  Q. I assume that it was in final draft form
16  before that date, but thank you for clarifying that.
17  MR. JOHNSON: Let's try and avoid
18  dialogue.
19  (Last question read back.)
20  A. The answer is absolutely not.
21  Q. You didn't think it was a risky proposition
22  at all?
23  A. Absolutely not.
24  Q. Why did Vantage retain George Miller to

Page 185

1  assist with drafting the agreement?
2  A. Because George came to Vantage and we went to
3  him. And he said he had done agreements of this sort
4  before and he was knowledgable and an expert in these
5  types of agreements and that these types of agreements
6  had never been challenged by the postal service.
7  Q. He said that to Vantage prior to Vantage
8  asking him to assist with this agreement?
9  A. My recollection is he said that to me. I did
10  have that conversation. I'm not going to say whether
11  he said it to others.
12  Q. Who brought the respective agreement with
13  Shriners to George Miller's attention from Vantage's
14  side, if anyone?
15  A. Nobody.
16  Q. How did he become aware of it, if you know?
17  A. He was part of the original process to
18  prepare the document.
19  Q. Who asked him to do that?
20  A. Larry Lyon.
21  Q. Do you know why Larry Lyon asked him to do
22  that? I'm not asking you to read Larry Lyon's mind.
23  Do you know why Larry Lyon asked Mr. Miller to assist
24  with the agreement?

47 (Pages 182 to 185)