# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT

---

VANTAGE FINANCIAL SERVICES, INC.
Plaintiff,

v.

NONPROFIT SERVICE GROUP AND
GEORGE E. MILLER,
Defendants.

---

04-3088

**COMPLAINT**

RECEIVED

JUL 13 2004

SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## 1. The Parties

1.     Plaintiff, Vantage Financial Services, Inc. (hereinafter "Vantage") is a corporation

organized and existing under the laws of the Commonwealth of Massachusetts with its principal

and usual place of business located in Boston, Suffolk County, Commonwealth of

Massachusetts.

2.     Defendant Nonprofit Service Group ("NSG") is a professional services

organization, at least two of the principals of which practice law and offer legal services among

the services that NSG provides to its clients.  NSG's principal place of business is located in

Arlington in the Commonwealth of Virginia.

3.     George E. Miller ("Miller") is an attorney who now or formerly was a member of

the bar of the State of Missouri. Miller is a principal of NSG and has his principal place of

business at NSG's offices in Arlington, Commonwealth of Virginia.  Miller holds himself out as

a specialist in "charitable solicitation law, including compliance with state regulations,

negotiating settlements, and fund raising contract drafting and enforcement" including

fundraising program compliance with postal regulations.

## 2. Jurisdiction and Venue

4.     With respect to the claims asserted in this action, both NSG and Miller:

(i)    transacted business within the Commonwealth of Massachusetts ("Massachusetts"),

(ii)    contracted with Vantage to supply services to Vantage within Massachusetts, and

(iii)    caused tortuous injury to Vantage in Massachusetts, by acts and/or omissions outside of Massachusetts. Both NSG and Miller regularly do or solicit business and/or engage in a persistent course of conduct and/or derive substantial revenue from services used, consumed or rendered within Massachusetts.

5.    Accordingly, pursuant to the provisions of G.L. ch. 223A, §3, the Courts of Massachusetts are vested with *in personam* jurisdiction over both NSG and Miller.

6.    Because Vantage's usual place of business is located in Suffolk County, venue is proper in this Court pursuant to G.L. ch. 223, §1.

### 3. The Facts

7.    Vantage engages in the business of assisting non-profit organizations (hereinafter "NPOs") in fundraising and membership solicitation and in providing solicitation preparation, printing, collating, addressing, envelope filling and mailing services to NPOs in connection therewith. Over a period of many years prior to 1999, Vantage had built a reputation as a provider of quality fundraising services to NPOs, provided such services to a large number of NPOs, both large and small, and had developed a successful and profitable business providing such services.

8.    During and prior to 1999, Vantage and two members of its senior management were defendants in a civil action in the United States District Court for the District of Massachusetts (hereinafter the "Action"), originally commenced by a disaffected former employee, pursuant to the provisions of the Federal False Claims Act, in which recovery was

sought for alleged postal deficiencies, penalties and exemplary damages claimed to be due as a result of fundraising mailings made by Vantage for various of its NPO customers at not-for-profit postal rates. It was further alleged in the Action that such mailings were not eligible for mailing at not-for-profit postal rates because Vantage's contracts with such NPO customers either limited the NPO customer's liability to pay Vantage for its services and out-of-pocket costs or restricted the means by which Vantage could obtain payment for same in the event of a shortfall in the funds raised by the solicitation mailings and that, as a result, the mailing of such solicitations at not-for-profit postage rates was proscribed by the United States Postal Service's Cooperative Mail Rule (hereinafter the "CMR").

9.    At all material times, Vantage had denied the allegations and was vigorously defending itself in the Action. Prior to 1999, the United States had intervened in the Action and was prosecuting it.

10.    While the Action was pending, Vantage consulted NSG and Miller and sought their assistance, professional services and legal counsel with respect to a substantial fundraising services contract that Vantage was then negotiating with Shriners Hospitals for Children ("Shriners") a large nonprofit corporation. It was anticipated by Vantage that any fundraising services contract with Shriners would involve repeated and substantial mailings on behalf of Shriners requiring the payment of several million dollars in postage even at not-for-profit postal rates.

11.    While Shriners wanted to be able to mail its fundraising mailings at not-for-profit postal rates, Shriners had nonetheless demanded, during the course of the negotiations, that any fundraising services contract with Vantage include terms that limited its liability to pay Vantage for its fundraising services and out-of-pocket expenses from Shriners' cash assets in the event that the fundraising programs failed to raise sufficient amounts to pay out of the fundraising proceeds.

JUL-19-04 15:03    FROM-GELTNER & ASSOCIATES    202-6471138    T-730  P.08/38  F-948

12.     In light of the claims pursued by the United States in the Action, Vantage was extremely concerned lest, in entering into a fundraising services contract with Shriners, it add to its potential liability in the Action.

13.     To protect itself against the risk of such increased liability, Vantage employed NSG and Miller, and they accepted professional employment (hereinafter the "Engagement") to prepare a contract that would satisfy the desire of Shriners for protection against having to pay for Vantage's fundraising services out of Shriners' own cash assets, while at the same time containing provisions that would not violate the CMR, compromise the ability of Shriners to mail its fundraising materials at not-for-profit rates or expose Vantage to additional claims or potential liability such as that then being asserted against it in the Action. As a result of such employment, an attorney-client relationship came into existence between Miller and NSG, and each of them, as attorneys, and Vantage as their client.

14.     Both Miller and NSG were already well aware, through their activities with respect to the non-profit fundraising industry, of the Action. However, in connection with its employment of NSG and Miller, Vantage again expressly informed them of the pendancy of the Action and of the claims being asserted and positions being taken by the United States therein. Vantage emphasized to both NSG and Miller that it wanted to be sure that any terms in the contract with Shriners limiting the liability of Shriners or restricting the manner or means by which Vantage would have a right to enforce payment for its services and expenses incurred on behalf of Shriners must be consistent with the requirements of the CMR and must effectively protect Vantage from any further claims of the kind being asserted in the Action, based upon mailings made by Vantage on behalf of Shriners. Vantage also requested that NSG and Miller advise it if they concluded that it was not possible to prepare contract provisions that would both satisfy Shriners and protect Vantage from potential liability for violation of the CMR or additional claims against it in the Action and NSG and Miller agreed to do so.

-4-

15.    Pursuant to the Engagement, NSG and Miller prepared a fundraising services agreement between Vantage and Shriners (the "Contract"). A true and complete copy of the Contract is attached hereto as Exhibit "A."

16.    The Contract prepared by NSG and Miller provided, in relevant part, that Shriners would have the option of paying Vantage's then unpaid charges at the time of any termination of the Contract by Shriners either (1) directly in cash or (2) by permitting Vantage to rent or use for the benefit of Vantage's other customers Shriners' donor list file and to use the amounts paid by such other customers for the use of the Shriners donor list file to satisfy any outstanding amounts owed by Shriners to Vantage. The relevant provisions of the Contract appear at Paragraph 13.1(A) and (B) thereof.

17.    NSG and Miller advised Vantage that the above-described provisions would be effective to avoid any violation of the CMR and protect Vantage from possible claims with respect to mailings at not-for-profit postal rates made pursuant to the Contract and from any exposure to additional liability on claims such as those being asserted in the Action. Miller and NSG expressly assured Vantage that the form of contract drafted by Miller had been used repeatedly by fundraisers for non-profits with the knowledge and without question, objection or challenge by the Postal Service and that the use of that form of contract and the making of fundraising mailings and not-for-profit postage rates pursuant thereto complied with the CMR and was safe, lawful and appropriate.

18.    In reliance upon NSG's and Miller's advice, Vantage entered into the Contract with Shriners and thereafter proceeded to render substantial services and make extremely voluminous mailings on behalf of Shriners pursuant thereto, at not-for-profit postal rates.

19.    When the United States learned, through discovery, of the Contract and the mailings on behalf of Shriners made pursuant thereto, it promptly amended its Complaint in the Action to add claims with respect to all mailings made by Vantage on behalf of Shriners pursuant

to the Contract (the "Shriners Mailings"). The effect of such amendment was to increase the amount of the United States' claims by approximately $3,000,000 in compensatory damages and for an additional $6,000,000 in exemplary or punitive damages, thus approximately doubling the amount of the claims asserted against Vantage in the Action.

20.    In preparing the Contract and advising Vantage that it was effective to prevent the exposure of Vantage to CMR liability, NSG and Miller failed to exercise reasonable professional skill and care and in particular, failed to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" would have exercised in the circumstances.

21.    Vantage relied upon NSG and Miller to exercise reasonable professional skill and care with respect to the professional services that they rendered to it.

22.    Vantage moved for summary judgment in its favor in the Action and, as a part of that Motion, specifically sought summary judgment in its favor with respect to the Shriners mailings. The United States moved for partial summary judgment in its favor on liability with respect to all of its claims, including those based upon the Shriners mailings.

23.    After extensive briefing and argument, the United States District Judge denied Vantage's motion for summary judgment and, granted the motion for summary judgment of the United States with respect to its claims based upon mailings made on behalf of certain of Vantage's customers other than Shriners and, with respect to the United States' claims based on the Shriners mailings, while it did not grant summary judgment to the United States, intimated that the Shriners mailings might well have violated the CMR because of the limitation of Vantage's right to collect payment for its billed and unpaid services and out-of-pocket expenses to the proceeds of rental of the Shriners donor list file to other customers might be found to provide inadequate assurance that Vantage would be paid in full for such services and expenses

-6-

878-J    8E/II d    0E1-1    8EII/Þ9-202    SЭ⊥YIↃOSSY ⅋ ᴚЭN⊥ПЭↃ-WOᴚℲ    90:9I Þ0-6I-⅂∩ſ

and thus might violate the CMR. In recognition of the fact that Vantage had consulted supposedly expert counsel in entering into the Contract and had expressly relied upon the advice of NSG and Miller, the Court granted summary judgment in Vantage's favor with respect to the United States' False Claims Act claims for exemplary damages, but reserved the United States' revenue recovery (single damages) claims for trial, concluding that such claims were not barred if the Shriners mailings in fact violated the CMR and NSG's and Miller's advice to the contrary had been erroneous.

24.    At that point, Vantage was faced with the choice between settling all the remaining claims of the United States or going to trial on all such claims, involving exposure to a judgment of more than twelve million ($12,000,000) dollars before assessment of interest. The remaining claims of the United States involved claims of approximately three million ($3,000,000) dollars based upon mailings made on behalf of other Vantage customers, three million ($3,000,000) dollars based upon the Shriners mailings and a possible additional six million ($6,000,000) dollars in exemplary damages. Of this, the claims for exemplary damages were subject to certain additional defenses not available with respect to the revenue recovery claims of the United States and thus Vantage's principal exposure was with respect to the $6,000,000 of revenue recovery claims. Nonetheless, because a judgment of such magnitude could have been fatally injurious to Vantage, it determined that it was necessary to settle the case, if possible.

25.    After protracted and vigorous negotiations with the United States, Vantage entered into an agreement to settle the United States' claims (the "Settlement Agreement") for four million five hundred thousand ($4,500,000) dollars. Approximately one half of this amount, or almost two million two hundred fifty thousand ($2,250,000) dollars, was agreed to by Vantage in order to resolve its potential liability with respect to the Shriners mailings.

### 4. Count I – Breach of Contract – Legal Malpractice

26.     Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 25, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

27.     NSG and Miller, and each of them, substantially and materially breached their contract of professional employment with Vantage by failing to exercise reasonable professional skill and care and, in particular, failing to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" would have exercised in the circumstances.

28.     As a result of the aforesaid breaches of contract, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

### 5. Count II Negligence – Legal Malpractice

29.     Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 28, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

30.     Pursuant to their attorney-client relationship with Vantage, NSG and Miller, and each of them, owed Vantage a duty to exercise reasonable professional skill and care and, in particular, to exercise the degree of care that a reasonable attorney holding himself out as a specialist in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" would have exercised in the circumstances.

JUL-19-04  15:06    FROM-GELTNER & ASSOCIATES    202-5471138    T-730  P.13/38  F-848

31.    NSG and Miller, and each of them, were negligent in failing to exercise such skill and care.

32.    As a result of the aforesaid negligence of NSG and Miller, and each of them, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

### 6. Count III    Fraudulent Misrepresentation

33.    Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 32, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

34.    In connection with obtaining the Engagement, NSG and Miller, and each of them, represented that they were skilled and experienced in advising non-profits and their professional fundraisers in "charitable solicitation law, including compliance with state regulations, negotiating settlements, and fund raising contract drafting and enforcement" and that they had the experience and ability to prepare a contract that would satisfy Shriners' requirement for limitations on its liability to pay for Vantage's fundraising services out of Shriners' own cash assets while at the same time, complying with the requirements of the CMR and shielding Vantage from exposure to additional liability in the Action. NSG and Miller further represented that the draft contract that Miller prepared for use with Shriners effectively met these objectives.

35.    The aforesaid representations, and each of them, concerned matters of fact.

36.    The aforesaid representations, and each of them, were false and both NSG and Miller knew that they were false.

37.    The aforesaid representations, and each of them, were made by NSG and Miller with the intention that Vantage rely upon them in entering into the Engagement.

38.    Vantage believed and reasonably relied upon the aforesaid representations, and each of them.

39.    As a result of the aforesaid false and fraudulent misrepresentations, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

### 7. Count IV   Negligent Misrepresentation

40.    Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 39, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

41.    NSG and Miller, and each of them, was under a duty to refrain from inducing Vantage to enter into the Engagement by means of representations that they knew, or should have known, were false.

42.    NSG and Miller, and each of them, knew of ought to have known that the aforesaid representations were false.

43.    As a result of the aforesaid negligent misrepresentations, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial.

### 8. Count V   Unfair and Deceptive Acts and Practices – Violation of G.L. ch. 93A

44.    Vantage re-alleges and incorporates by reference herein the allegations of paragraphs 1 through 43, inclusive of this Complaint as fully as if each such paragraph were set forth herein in its entirety.

45.    Vantage, NSG and Miller, and each of them, are all persons engaged in the conduct of trade or commerce within the meaning of G.L. ch 93A, §§ 1 and 2 as amended, and

the rules and regulations of the Attorney General of the Commonwealth of Massachusetts promulgated pursuant thereto.

46.    None of the wrongful acts, or the transactions to which they relate, that are the subject of this claim, constitute acts or transactions which are exempt from the provisions and prohibitions of G.L.ch. 93A pursuant to the provisions of §3 thereof.

47.    The acts and transactions constituting the unfair and deceptive acts and practices as hereinbefore set forth occurred primarily and substantially within the Commonwealth of Massachusetts, within the meaning of G.L. ch. 93A, §11.

48.    At all times material hereto, NSG and Miller, and each of them, were well aware that their course of conduct was likely to have the effect of inducing Vantage to enter into the Engagement and to proceed with the Contract and the Shriners mailings, and thereby to expose Vantage to substantial additional liability and related expense in the Action. Notwithstanding such awareness, NSG and Miller, and each of them, nonetheless deliberately embarked upon and pursued their wrongful course of conduct and committed the wrongful acts hereinbefore set forth, and each of the aforesaid acts, to promote and advance their own interests. The use and employment of the aforesaid unfair and deceptive acts and practices constituted knowing and willful violations by NSG and Miller, and each of them, of G.L. ch. 93A §2, within the meaning of §11.

49.    As a result of the aforesaid unfair and deceptive acts and practices, Vantage has incurred damages in an amount of close to $2,250,000 in settling the claims based on the Shriners mailings, incurred additional expenses in defending the Action, and has suffered other legally compensable damages, all in an amount to be proven at trial, all before doubling or trebling as authorized by §11.

50.    In addition, Vantage is entitled to recovery of its reasonable attorneys fees and costs, as required by §11.

WHEREFORE, Vantage prays:

1.    That this Court, after notice and a hearing, enter a preliminary injunction enjoining the defendants NSG and Miller, and each of them, from conveying, transferring, encumbering, hypothecating or otherwise disposing of their assets, except in the ordinary course of business, pending further order of this Court,

2.    That this Court, after a trial on the merits or upon such other basis as is appropriate for adjudication thereof, determine and adjudicate the amount of damages sustained by Vantage as a result of the wrongful conduct hereinbefore set forth in Counts I through IV, inclusive and award Judgment against defendants NSG and Miller, and each of them, in such amount, together with interest and their costs in maintaining this proceeding,

3.    That this Court, after a trial on the merits or upon such other basis as is appropriate for the adjudication thereof, determine and adjudicate, with respect to Count V, that the aforesaid unfair and deceptive acts and practices committed by NSG and Miller, and each of them, constituted knowing and willful violations of the provisions of G.L. ch. 93A, §2 and enter judgment in favor of Vantage for three times but not less than twice the amount of such damages sustained by it as a result of such violations, together with its costs, including but not limited to its reasonable attorneys' fees in connection with this proceeding,

4.    For such other and further relief as this Court shall deem appropriate.

VANTAGE FINANCIAL SERVICES, INC.
By its Attorney,

Laurence M. Johnson (BBO #252720)
Davis, Malm & D'Agostine
One Boston Place
Boston, MA 02108
(617) 367-2500
ljohnson@davismalm.com

*Dated: July 12, 2004*

J:\Johnson\VANTAGE\Malpractice Claim 8642-4\complaint.doc

-12-

JUL-19-04 15:08    FROM-GELTNER & ASSOCIATES    202-6471138    T-730  P.17/39  F-843

## Agreement To Provide Fund Raising
## Consulting and Management Services

This Agreement To Provide Fund Raising, Consulting and
Management Services ("Agreement") is made and as of this _____
day of _____, 1999 between Shriners Hospitals For
Children, a nonprofit corporation with its principal office
located at 2900 Rocky Point Drive, Tampa, FL 33607 ("Shriners"),
and Vantage Financial Services, Inc., a Massachusetts corpo-
ration with its principal office located at 1244 Boylston
Street, Chestnut Hill, MA 02467 ("Vantage").

### Recitals

A.   Vantage has expertise and experience to create,
produce, and manage direct response fund raising campaigns for
nonprofit organizations both to identify new donors and renew
existing ones, in particular to develop creative strategy,
select lists of likely prospects, and use premium-based fund
raising techniques.

B.   Vantage has expertise and experience to create,
prepare, and distribute informational and educational material
customized to the specific purpose of a nonprofit organization.

C.   Shriners is a nonprofit corporation that desires to
raise funds from the public through direct response campaigns
for its charitable purposes.

D.   Shriners desires to raise funds to support the
mission of Shriners to provide hospital and medical care for
children, and otherwise engage in charitable activities such as
research.

### Agreements

Now, Therefore, in consideration of the foregoing premises
and the mutual covenants and agreements set forth below, the
receipt and sufficiency of which is hereby acknowledged, the
parties hereto covenant and agree as follows:

Paragraph 1.   Definitions

1.1  "Acknowledgment" is the program to thank donors by
sending a letter to them that verifies Shriners receipt of their
contributions and may contain educational material as defined in
subparagraph 1.12 below.

- 2 -

1.2  "Agreement" is defined in the introductory paragraph.

1.3  "Caging" is the procedure whereby envelopes containing contributions from the public are opened, recorded, keypunched, verified, and deposited in the appropriate bank account by a "lockbox" facility jointly selected and mutually agreed to by both parties.  Shriners shall exercise exclusive ownership and control over any and all bank accounts that receive deposits from the lockbox facility.

1.4  "Campaign Approval Packet" is defined in Paragraph 6.

1.5  "Campaign Period" is defined as the time between the date on which a direct mail package is mailed and the last day of the fourth month following the date of that mailing.  By way of illustration, the parties agree that if a direct mail package is distributed on June 10, the campaign period for that mailing shall commence on June 10 and end on October 31.

1.6  "Comment Mail" consists of correspondence or other written communications that recipients of Shriners direct mail packages send to Shriners.  The caging facility shall open all comment mail, record, and forward it to the Shriners' Program Administrator.  Shriners shall be solely responsible to review and respond to all comment mail received from recipients of its direct mail packages.

1.7  "Direct Mail Package" contains correspondence or other related printed material which includes a request for financial support or combines such a request for financial support with material that is educational or is designed to raise public awareness.

1.8  "Direct Mail Program" is defined in Paragraph 5.

1.9  "Donor Acquisition Mailing" – Vantage, for the benefit of Shriners, conducts Shriners' donor acquisition program when Vantage, for the benefit of Shriners, distributes direct mail packages that contain either a straight letter appeal or an appeal that uses a premium as part of the inducement, which Shriners has given prior written approval to mail, to persons who potentially have a need for or use of information in the direct mail package or are interested in supporting Shriners financially.

1.10  "Donor Renewal Mailing" – Vantage, for the benefit of

- 3 -

Shriners, conducts Shriners' donor renewal mailing when Vantage, for the benefit of Shriners, distributes direct mail packages, with Shriners' prior written approval, to all or a part of Shriners' file of donors generated by this Agreement, in order to provide them with educational material and/or request their continued financial support. 

1.11  "Educational Material" distributed in connection with a direct mail package, as distinguished from a request for financial support, shall be specific, help to accomplish the Shriners mission, should help the recipient or society or should assist Shriners to raise public awareness. Educational Material may be printed in a separate brochure or in components of a Direct Mail Package in a manner determined by the Shriners' Program Administrator on a case-by-case basis. 

1.12  "Effective Date" is defined in paragraph 15. 

1.13  "Follow Up Mailings" are Direct Mail Packages distributed with the Shriners prior written approval to potential or existing donors who have previously received, but have not yet responded to, a Direct Mail Package from the Shriners in order to encourage them to provide financial support or participate in Shriners' programs. 

1.14  "Gross Income" is defined for the purpose of this Agreement as the total of contributions received as a direct and proximate result of a Direct Mail Package, Direct Mail Program, Donor Renewal Mailing, Follow-up Mailing, or any other Mailing under this Agreement before deducting any fees or expenses associated with that campaign. Gross Incomes shall also include any contributions from persons excluded from Mailing Lists by Shriners pursuant to the last sentence to Section 1.16 herein. 

1.15  "Know-How" means all factual knowledge and information not capable of precise or separate description but which, in accumulated form, after being acquired by trial and error or other means of experimentation, gives an ability to the acquirer to produce or market something which that person otherwise would not have known how to produce or market with the same accuracy or efficacy necessary to produce net income. 

1.16  "Mailing Lists" used for the Shriners Direct Mail Program contain names and addresses of persons who, by virtue of previous patterns of charitable giving or other identifiable demographic data or statistical studies, are likely to have a need for or potential use of information in the Shriners' direct 

- 4 -

mail packages.  It is the intent of the parties that Mailing
Lists shall not include any past or present contributors to
Shriners or any individual who donates to Shriners through the
Combined Federal Campaign, or similar campaigns, or to any
Shriner members or to future donors who may make major donations
to Shriners independent of this Agreement.  Shriners also has
the discretion to exclude from Mailing Lists names of
individuals who contribute $5,000 or more pursuant to the Direct
Mail Program.

1.17 "Net Income" is the amount that remains after the
costs of each billing statement approved by Shriners in writing
are subtracted from donations that Shriners receive in response
to the Donor Acquisition Mailing, Direct Mail Packages, Direct
Mail Program, Donor Renewal Mailing, Follow-up Mailings, or any
other Mailing under this Agreement related to that billing.

1.18 "Notice" is defined in Paragraph 12.

1.19 "Program Account" is defined in Paragraph 7.2.

1.20 "Program Administrator" - Shriners shall designate in
writing one (1) person to serve as the Program Administrator who
shall have primary responsibility to communicate with Vantage
regarding planning and execution of Shriners direct mail
campaigns during the term of this Agreement.  The Program
Administrator shall have responsibility, on behalf of the
Shriners, to secure approval or disapprove all Campaign Approval
Packets.  The Program Administrator will attempt to facilitate
communication between Vantage and the Shriners' staff to develop
Vantage's Direct Mail Packages, Direct Mail Program, Donor
Renewal Mailing, Follow-up Mailing, Donor Acquisition Mailings
or Direct Mail Packages or any other Mailing under this
Agreement for Shriners.

1.21 "Program Donors" are persons who respond to a Direct
Mail Package, Donor Renewal Mailing, Follow-up Mailing, Donor
Acquisition Mailings or Direct Mail Packages or any other
Mailing distributed pursuant to this Agreement.

1.22 "Shriners Suppression File" is the list of names of
Shriners' members and donors that the Shriners agrees to provide
to Vantage biannually (or more frequently if desired by
Shriners) and that Vantage agrees it will use prior to each
Donor Acquisition Mailing under this Agreement in order to
eliminate names on the Shriners Suppression File from the lists
of prospective donors that Vantage proposes to mail as part of

- 5 -

any mailing made pursuant to this Agreement. The Shriners
Suppression File list of names includes: All past and present
contributors to Shriners, or any individual who donates to
Shriners through the Combined Federal Campaign, or similar
campaigns, or any Shriner members or to future donors who may
make major donations to Shriners independent of this Agreement.
Also, Shriners has the discretion to exclude from subsequent
Donor Renewal Mailings any individuals who contribute $5,000 or
more pursuant to the Direct Mail Program.

    1.23 "Vendors" are individuals or businesses which provide
supplies or services under contract with Vantage necessary to
execute any mailing made pursuant to this Agreement. These
vendors include, without limitation, suppliers of envelopes and
other paper products, suppliers of promotional materials,
printers, typesetters, artists, copywriters, letter shops, and
data processors. Vantage will not use any Vendor in which
Vantage has a direct or indirect ownership interest of fifty
(50) percent or more.

Paragraph 2.  Authority of Vantage; Limitations on Authority

    During the term of this Agreement, Shriners retains Vantage
exclusively to plan and manage the Direct Mail Program, Donor
Acquisition Mailing, Direct Mail Packages, Direct Mail Program,
Donor Renewal Mailings, or Follow-up Mailings, or any other
Mailing under this Agreement and to create, prepare, and
distribute the Direct Mail Packages itemized in Schedule A,
which is attached hereto and made a part hereof by reference,
and any replacement or additional packages that Vantage may from
time to time propose to Shriners and which Shriners approves in
writing. Vantage shall act solely as agent for Shriners pur-
suant to Shriners' written directive. In no event shall Vantage
have authority to receive contributions on behalf of Shriners or
have access to such contributions. All mailings made by Vantage
pursuant to this Agreement require Shriners' prior written
approval. Shriners assumes complete and full responsibility for
payment of all postage incurred as a result of the operation of
this Agreement, and Vantage has no obligation whatsoever for
payment of postage.

Paragraph 3.  Term of Agreement

    3.1 This Agreement shall commence on the Effective Date
hereof and shall extend for a term of four (4) years unless
sooner terminated in accordance with paragraph 13 of this
Agreement.

- 6 -

3.2  For solicitations conducted in the State of New York, this Agreement shall be effective as of fifteen (15) days following the date on which the Agreement is filed with the Attorney General's Charities Bureau.  Notwithstanding the above, Shriners may, without giving any reason, cancel this contract without cost, penalty, or liability for a period of fifteen (15) days following the date of the filing hereof with the New York Charities Bureau, if Shriners notify Vantage by letter or other written notification indicating that it does not intend to be bound by this Agreement.  Said notice may be hand delivered or mailed to Vantage at 1244 Boylston Street, Chestnut Hill, Massachusetts 02467.  If notice is hand-delivered, the cancellation is effective as soon as it is deliver to Vantage. If the notice is mailed, the cancellation is effective as soon as the notice is deposited, properly addressed with postage prepared, in a mailbox.  Shriners must also mail a duplicate copy of the notice of cancellation to the State of New York, Office of the Attorney General, Charities Bureau, The Capitol, Albany, NY 12224.

3.3  Vantage agrees to recognize the terms of any cooling off provision to the extent that any jurisdiction in which Shriners may conduct the Direct Mail Program requires fund raising counsel to offer a cooling off period, such as the State of New York.

Paragraph 4.  Educational Material in Direct Mail Packages

If Shriners would like Vantage to propose direct mail packages that are multipurpose, that is contain Educational Material that may be allocated to public education as defined by the American Institute of Certified Public Accountants, Shriners Program Administrator shall notify Vantage and indicate the approximate proportion of the content of the package that Shriners would like to be classified as public education.

Paragraph 5.  Direct Mail Program

5.1  Consultant Services - During the term of this Agreement, Shriners agrees to use the services that Vantage provides and which are herein referred to as the "Direct Mail Program."  Vantage agrees to provide the full range of services that Shriners requests and approves in writing in order to conduct the Direct Mail Program including but not limited to selection of mailing lists, preparation and distribution of the initial direct mail package, caging, data processing, and ac-