- 7 -

knowledgment of donations. These consultant services draw on
Vantage's particular Know-How in direct mail marketing and
premium fund raising techniques including but not limited to
name and address labels, note cards, holiday greeting cards,
lapel pins, and calendars.

5.2  Mail Schedule - Schedule A attached hereto sets forth
the preliminary mail schedule for the Shriners' Direct Mail
Program, including the proposed number of campaigns and for each
such campaign, whether it is a Donor Acquisition Mailing, Donor
Renewal Mailing, Donor Acknowledgment Mailing; Direct Mail
Package or Follow-up Mailing, whether a premium is proposed and,
if so, the type of premium to be offered and its cost; the
number of initial packages to be mailed; mail package design;
and the anticipated mail or drop date. Schedule A also sets
forth all costs, including but not limited to, the product
costs, postage, list costs, and results for each such campaign.
Costs other than postage cannot be unilaterally increased by
Vantage during this Agreement. Any cost increases must be
approved by Shriners in writing. The projected response rate
contained in Schedule A is a projection, and Vantage cannot
guarantee it.

5.3  Test Mailing - In order to identify a universe of pro-
spective Shriners' donors to receive Donor Acquisition Mailings
and to determine which lists Shriners will continue to mail to
under this Agreement, Vantage will recommend certain lists for
the Shriners to test. Vantage will arrange to have
approximately 5,000 names drawn randomly from each such list.
If the response from a list to the test package is 2.5 percent
(2.5%) or greater, that list will be part of the universe of
Shriner prospects. Vantage shall arrange for a test mailing of
a total of approximately 200,000 pieces on or about July 1,
1999, or at a later date if so directed in writing by Shriners,
which will conclude four months later as set forth in Schedule
A, and as approved by Shriners in writing. As soon as possible
following the test (but in any event within thirty (30) days
from conclusion of the test), Vantage shall advise Shriners how
many of the lists tested produced a response rate of 2.5 percent
(2.5%) or greater. Vantage shall make the determination as to
whether a list produced a response rate of 2.5 percent (2.5%) or
greater, but the Shriners may independently verify it. This
test mailing is to be made at the Nonprofit Standard A rate.
The cost of postage shall be paid from Gross Income. A complete
"Campaign Approval Packet" is not required for this test as the
Shriners have given approval, contemporaneously with the
execution of this Agreement, to the copy and graphics; however,

- 8 -

Vantage must obtain Shriners' written approval of the budget for
the test mailing.  This budget shall include all items shown in
the budget described in Section 6.1 of this Agreement.

Paragraph 6.    <u>Shriners Approval of Direct Mail Packages and
               Campaigns</u>

    6.1  At least sixty (60) days prior to the anticipated date
of the first mailing as set forth in Schedule A, Vantage shall
submit the "Campaign Approval Packet" to Shriners Program
Administrator which shall consist of:  copy and graphics for
each component of the mail package for the upcoming campaign,
the proposed number of packages to be mailed, the lists to be
mailed, and a budget that details all costs, including, but not
limited to, list costs, postage (including outgoing and return
postage, if any is contemplated, product cost and any other
costs or charges that will be on the billing statement of
paragraph 7.3.1, and projected results so that Shriners will
have a complete understanding of its financial obligation, the
concept and contents of the direct mail package, and the
anticipated number of new donors and total amount of donations.
There will be no costs on the list other than those costs
recited in Schedule A.   Vantage shall assign a unique job
identification code to each campaign or job and shall provide a
space for the Shriners Program Administrator to indicate
approval or disapproval of the proposed campaign and direct mail
package.

    6.2  Shriners Program Administrator shall review each
Campaign Approval Packet and shall notify Vantage of Shriners'
decision whether all or any part of the Campaign Approval Packet
is satisfactory no later than fourteen (14) days after Shriners'
Program Administrator receives the Campaign Approval Packet.
Shriners has the sole authority to approve, such approval to be
in writing, the specifications set forth in each Campaign
Approval Packet, and Vantage shall commence production only in
accordance with the express written approval of Shriners of the
specifications so approved, and Vantage shall cause the Direct
Mail Packages to be distributed as set forth in Schedule A as so
approved by Shriners.

    6.3  <u>Use and Ownership of Mail Lists</u>

    6.3.1 Vantage agrees that it will not intentionally or
through its negligence mail to any name contained in the
Shriners Suppression File. To accomplish this objective, Vantage
shall designate the names of each respondent to the Shriners'

Direct Mail Program as "Program Donors." Shriners shall be the sole owner of the list of Program Donors. Vantage shall not use the list of Program Donors for any purpose except to carry out its rights and obligations pursuant to this Agreement. Vantage shall update the list of Program Donors weekly and maintain it during the term of this Agreement. Every six (6) months, Vantage shall provide a magnetic tape record, in a format that is mutually agreed to in advance, to Shriners of the names of all Program Donors along with the amount of any donation received up to that time. No later than ninety (90) days after termination of this Agreement, Vantage shall provide the list of Program Donors to Shriners that includes all updates that have been caged up to the seventy-fifth (75th) day after termination. Upon transmittal of the complete updated list of Program Donors, Vantage shall have no rights whatsoever to such list, except those specified in Section 13 of this Agreement.

6.3.2  In order to assist Vantage to carry out its obligation set forth in Sections 1.22 and 6.3.1, Shriners will prepare a list of all members and donors to be called the Shriners Suppression File. Vantage agrees that it will use this file to suppress the names contained thereon from any list of prospective donors that Vantage proposes to use in the Shriners Direct Mail Program. The Shriners will update the suppression file biannually (or more often, at Shriners' discretion), and provide a magnetic tape to Vantage of the updated suppression file in a mutually agreed format.

6.3.3  Prior to termination of this Agreement, Shriners may not use the list of Program Donors for the purpose of making a mass mailing similar to those made by Vantage under this Agreement, unless Vantage has given to Shriners its prior written approval, which approval will not be unreasonably withheld.

6.3.4  Unless caused by erroneous entries in Shriners' Suppression File, if Vantage breaches Section 6.3.1 or 8.2 of this Agreement, it shall pay liquidated damages to Shriners of ten dollars ($10) per name for the wrongful use of the Shriners' member and donor list.

6.3.5  Vantage shall secure a surety bond of one million dollars ($1,000,000) in the event that it fails to perform under Section 6.3.4 or Section 8.2 of this Agreement.

Paragraph 7.  Receipt of Proceeds and Costs

-10-

7.1  Program Account, Control of Funds Deposited - Vantage shall prepare all mail packages for Shriners under this Agreement so the mail packages include a clear statement that directs the recipient to send all donations to a designated post office box in the name of Shriners. Based on the number of responses, Vantage shall instruct the designated U.S. Post Office to sweep the designated postal box several times a week and forward the contents to the designated depository bank, Boston Financial Data Services, Inc., a subsidiary of State Street Bank of Boston ("Bank"), for deposit into a segregated account in the name of Shriners Hospitals for Children.

7.2  Boston Financial Data Services shall count, record by donor, and deposit all such proceeds in Shriners' segregated bank account at State Street Bank of Boston (hereinafter referred to as the "Program Account"). Shriners shall establish the Program Account so that it is dedicated solely to deposits that are generated pursuant to this Agreement. The Program Account shall be in Shriners' name, and Shriners alone shall own and control it. Any interest that accrues on funds deposited in the Program Account shall be the sole property of Shriners. Bank shall invoice Shriners directly for all fees and other costs associated with services that Bank renders to Shriners, or Bank may withdraw payment of such invoices from the Program Account, at Shriners' choice and at Shriners' discretion. Vantage shall prepare and submit a report to Shriners weekly that sets forth the amount of funds received and deposited pursuant to this Agreement or Shriners may receive such information directly from the Bank, at Shriners' choice and discretion.

7.3  Submission and Payment of Billing Statements

7.3.1  After a mailing is dropped, Vantage shall prepare and submit a billing statement, consistent with this Agreement, of the charges for that mailing to the Shriners Program Administrator along with a copy of the U.S. Postal Service ("USPS") Form 3602, or an equivalent form certified by the USPS, that shows the actual quantity of packages mailed and postage paid. Vantage shall use the unique job identification code it assigned to the mailing to which the billing statement relates so that Shriners can easily match each billing statement and the corresponding USPS Form 3602 to the correct Campaign Approval Packet of paragraph 6 herein in order to verify that invoiced charges are identical to those costs that Shriners approved and authorized Vantage to incur on behalf of the Shriners and to

-11-

§ 1.2
7.3.1

verify that the billing statement is based on the number of
packages that Shriners approved and that Vantage actually
mailed.  The charges contained in a billing statement shall not
be other than contained in Schedule A, and shall not exceed the
costs that Shriners approved in the Campaign Approval Packet,
nor include any additional costs.

7.3.2  Shriners agrees to retain all funds received in
response to the Direct Mail Program in the Program Account.
Upon receipt and verification of the billing statement, and upon
verification from the Bank of the amount of funds available in
the Program Account to pay the charges on the billing statement,
Shriners shall pay the charges on the billing statement from the
Program Account.

7.3.3  Upon Shriners' verification of the correctness of a
billing statement, the order of payment from the Program Account
is as follows: first - postage; second - list rentals; third -
product cost.

7.4    Withdrawals from Program Account - Unless terminated
pursuant to Section 13 of this Agreement, beginning on the
effective date of this Agreement, and through the first eighteen
(18) months of operation of the Shriners' Direct Mail Program,
Shriners will not withdraw funds from the Program Account until
it is current with all undisputed outstanding billing
statements, and the Program Account contains at least one-half
of the total budgeted expense for the upcoming mailing that has
been approved by Shriners in writing.  Unless sooner terminated
pursuant to Section 13 of this Agreement, beginning on January
1, 2001, and at the conclusion of every three month period
thereafter, Shriners may withdraw an amount from the Program
Account equal to twenty percent (20%) of gross donations it
received in the same three-month period a year earlier.  Unless
sooner terminated pursuant to Section 13 of this Agreement, at
any time after April 1, 2001, Shriners may withdraw more than
twenty percent (20%) if it is current with all outstanding
undisputed billing statements, and the Program Account contains
at least one-half of the total budgeted expense for the upcoming
mailing that has been approved by Shriners in writing.

Paragraph 8.  Trademarks, Trade Names, Service Marks

8.1  Vantage agrees that it will use the name "Shriners
Hospitals for Children" or any of Shriners' trademarks, trade
names, or service marks ("Shriners Marks") only in connection
with the conduct and operation of Shriners' Direct Mail Program

provided for under this Agreement and only with the written
approval of Shriners for all such applications. Vantage
recognizes and acknowledges that the use of the Shriners Marks
shall not confer any proprietary rights on Vantage to the
Shriners Marks. Upon expiration or termination of this
Agreement, Vantage's right to use Shriners Marks shall
terminate, and Vantage shall cease all use of Shriners Marks,
except as permitted under Sections 13.1 and 13.2 of this
Agreement. Shriners shall accrue all goodwill relating to the
use of the Shriners Marks at any time.

   8.2   Vantage acknowledges that Shriners member and donor
lists are an asset of substantial value and shall maintain this
information in strictest confidence and shall use only the names
in accordance with this Agreement. The confidentiality
obligation imposed on Vantage pursuant to the preceding sentence
shall survive the term of this Agreement.

Paragraph 9.   Intellectual Property and Confidentiality

   9.1   Shriners recognizes that Vantage has expended Know-How
and other intellectual property of a proprietary nature that
Vantage has developed in order to fashion and present the Direct
Mail Program to Shriners as embodied in Schedule A. Shriners
recognize further that Vantage's intellectual property as rep-
resented by the Direct Mail Program and Schedule A has value to
Shriners, Vantage, and Vantage's competitors.

   9.2   Shriners shall use its best efforts to ensure the con-
fidentiality of Schedule A and all other Know-How, other Vantage
intellectual property of a proprietary nature, and any confi-
dential business information related thereto or that otherwise
relates to implementing this Agreement.

   9.3   Shriners shall use its best efforts to restrict access
to such information to personnel who have a need to know, in-
cluding by way of limitation:  (a) members of its legal de-
partment; (b) Shriners' Program Administrator or other high
level employee, such as its Executive Secretary; (c) accounting
department; (d) Shriners' corporate officers, directors and
      trustees; and (d) officials of governments or judiciaries
who have a legal right to know.

      9.4   Notwithstanding the foregoing, confidential infor-
            mation shall not include any information that (a) is
            or becomes a part of the public domain by some means
            other that through an act or omission of Shriners or

-13-

Vantage; (b) Vantage discloses to a third party
without any restriction on such third party; (c) is in
the possession of Vantage or Shriners without actual
or constructive knowledge of an obligation of
confidentiality with respect thereto at or prior to
the time it is disclosed under this Agreement; or (d)
is developed by Shriners independently of this
Agreement.

Paragraph 10.    Compliance with State Law and Registration
                 Requirements

     Shriners and Vantage agree that each party is responsible
to comply with its duties and registration obligations pursuant
to the laws and regulations of each state provided, however,
that Vantage shall in all events be responsible to register this
Agreement with the appropriate jurisdictions as required by law.
Each party shall bear its own registration and licensing costs
and fees, all penalties under state law for noncompliance, and
all expenses or fees incurred by that party as a result of any
administrative or legal action arising from noncompliance.  Both
parties agree that they will provide a complete list to the
other party of the jurisdictions where they have registered as
well as the registration number if they have received one.
Shriners has the option to direct Vantage not to mail anything
to a particular state, should Shriners determine it is not in
its best interests for Shriners to register to solicit for
charitable contributions in that state.  As of the execution of
this Agreement, Shriners has not registered to solicit for
charitable contributions in the states of:  Alabama, Arkansas,
Louisiana, Maine, Michigan, and Nebraska.  If Shriners elects to
register in those states, it will advise Vantage.

Paragraph 11.    Indemnification

     Shriners and Vantage each agrees to indemnify, defend, and
hold harmless the other party to this Agreement and its
respective partners, directors, trustees, officers, agents, and
employees, from and against any loss, damage, liability, claims
or causes of action (including attorneys' fees and expenses of
litigation) in any way resulting from such party's intentional
or negligent acts or omissions or the intentional or negligent
acts or omissions of such party's partners, directors, trustees,
officers or employees, or members in connection with or in any
way related to the Direct Mail Program or any such party's
breach of its respective obligations under this Agreement.
Vantage and Shriners shall indemnify each other only up to the

limits of each other's respective comprehensive general liability insurance policy.

Paragraph 12.    Notice

12.1   Any Notice or other communication between Shriners and Vantage concerning or required under this Agreement shall be in writing and shall be sent by Certified U.S. Mail or overnight courier service to the address listed below or to such other address as either of the parties may hereafter specify by such Notice to the other:

> To:  Shriners Hospitals for Children
>      2900 Rocky Point Drive
>      Tampa, FL 33607
>      Attn:  Director of Giving
>      Copy to:  Executive Vice President of Shriners
>                Hospitals for Children

> To:  Vantage Direct Mail Services
>      1244 Boylston Street
>      Boston, MA 02467
>      Attn:  Ms. Lynn S. Edmonds
>             Executive Vice President and General
>             Manager

12.2   Service - Determination of the date that Notice is received:  (a) certified mail is the date received;  (b) first class mail is the date postmarked; and (c) overnight courier service is the date sent.

Paragraph 13.    Termination, Proprietary Material

13.1   Termination Without Cause by Shriners - At any time within the term of this Agreement, Shriners may terminate this Agreement unilaterally without cause by providing Vantage with sixty (60) days prior written notice in accordance with the notice requirements of Paragraph 12 above.  In that event, this Agreement shall automatically terminate on the sixtieth (60) day following the date of the written notice or at the end of the mailing campaign during which the written notice is given, whichever occurs first. Upon termination, Shriners shall have two options to satisfy Billing Statements prepared by Vantage which have been approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement:

-15-

A.   First, Shriners may pay such billing statements directly.   If such direct payments are made by Shriners, Vantage shall within thirty (30) days of complete payment, deliver to Shriners, at Vantage's cost, all materials prepared by Vantage on behalf of Shriners, including, but not limited to Mailing Lists.

B.   Second, at Shriners' option, Shriners may permit Vantage to rent or exchange Shriners' donor file and use the proceeds to satisfy any outstanding Billing Statements approved by Shriners in accordance with Section 7.3.1 of this Agreement. If Shriners elects this second method of payment, Vantage also has the right to continue to conduct Donor Renewal Mailings to those donor names acquired through the efforts of Vantage.   In this case the Donor Renewal Mailings must be approved by Shriners in the manner provided by Paragraph 6 of this Agreement, but Shriners' approval shall not be unreasonably withheld.   Shriners agrees to apply all Gross Income from these Donor Renewal Mailings to settle any Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement.   Vantage may continue to conduct Donor Renewal Mailings, or continue to rent or exchange Shriners' donor file, until the balance of Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement, which is outstanding upon the termination of this Agreement, is paid in full by Shriners.   Vantage shall mail to Program Donors for thirty-six (36) months until all outstanding billing statements are paid or until such mailings no longer produce net income at which time Shriners shall be responsible to pay the balance.   In no case shall Vantage continue to conduct Donor Renewal Mailings after thirty-six (36) months from the date of the Notice of Termination.

13.2 Termination for any Other Reason - In the event this Agreement is terminated for any other reason than that provided in Section 13.1 hereof, after sixty (60) days from termination Vantage shall have the right to rent or exchange Shriners' donor file and use the proceeds to satisfy any outstanding Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement.   In addition, Vantage has the right to continue to conduct Donor Renewal Mailings to those donor names acquired through the efforts of Vantage, which Donor Renewal Mailings must be approved by Shriners in the manner provided by Paragraph 6 of this Agreement.   Gross Income from these Donor Renewal Mailings will be used to settle any outstanding Billing Statements approved by Shriners in accordance with Paragraph 7.3.1 of this Agreement.   Vantage may continue to conduct Donor

-16-

Renewal Mailings, or continue to rent or exchange Shriners'
donor file until thirty-six (36) months from termination of this
Agreement.  In no case shall Vantage continue to conduct Donor
Renewal Mailings for this paragraph after thirty-six (36) months
from the date of termination.  Upon the conclusion of said
thirty-six (36) month period, Vantage shall have no further
recourse against Shriners.

   13.3  Proprietary Material - Proprietary material shall
include without limitation selection of mailing lists,
preparation and distribution of the initial direct mail package,
acknowledgement of donations, and specialized mail packages that
includes such premiums as name and address labels, note cards,
holiday greeting cards, lapel pins, and calendars.  In the event
that Shriners terminates this Agreement Shriners shall not use
any proprietary material that Vantage developed for Shriners,
for a period of five (5) years from the date of the termination.
Excluded therefrom shall be any material that is proprietary to
Shriners, which was utilized by Vantage to develop its material.

   13.4  Bankruptcy - This Agreement shall terminate
immediately upon the filing by either party of any petition in
bankruptcy or for reorganization or debt consolidation under the
Federal Bankruptcy Laws or under any comparable law by or
against either party, or upon either party's making an
assignment of its assets for the benefit its creditors, or upon
the application of either party for the appointment of a
receiver or trustee of its assets.

Paragraph 14.   General

   14.1  Headings - The headings set out in this Agreement are
for the convenience of reference only and shall not be deemed a
substantive part of this Agreement.

14.2  Counterparts - This Agreement may be executed in
counterparts, all of which taken together shall constitute on
Agreement
   14.3  Benefit - This Agreement shall be binding upon and
inure to the benefit of the parties signing it, their
successors, and assigns.  Neither party shall have the right to
assign its rights or liabilities under this Agreement, in whole
or in part, without prior written consent of the other party.

   14.4  Recitals - The Recitals to this Agreement are hereby
incorporated as an integral part of this Agreement.

14.5  Use of Terms - Use of the terms "hereunder," "hereof," "herein," and similar terms refer to this Agreement.

14.6  Waiver - No failure on the part of either party to notify the other party of any noncompliance hereunder and no failure on the part of any party to exercise its rights created by such noncompliance shall prejudice any remedy for any subsequent non-compliance; any waiver by any party of any breach or non-compliance with any term or condition of this Agreement shall be limited to the particular instance and shall not operate or be deemed to waive any future breaches or noncompliance with any term or condition.

14.7  Other Agreements - This Agreement constitutes the entire agreement between the parties and it supersedes all negotiations, representations, warranties, commitments, offers, contracts, and writings executed prior to the Effective Date, except as otherwise provided in this Agreement.  Other than those documents required to be signed during the term of this Agreement's operation, there are no other exhibits, attachments, recitals or documents that make up, supplement or otherwise enhance or limit this Agreement other than those attached hereto, and dated and signed by the parties.

14.8  Severability - The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant in this Agreement.  If all or a portion of a covenant herein contained is held to be unenforceable, the parties agree to be bound by any lesser covenant subsumed within the terms of such covenant, as if the resulting covenant were separately stated in this Agreement.

14.9  Survival - All covenants and agreements within this Agreement made by the parties within this Agreement, which take effect after its termination, shall survive the termination of this Agreement.

14.10  Modifications - All modifications to this Agreement can only be made by a writing signed and dated by both parties.

14.11  Governing Law - This Agreement shall be deemed to have been made in the State of Florida and shall be construed according to the laws of that state.

14.12  Mediation - With respect to any dispute, controversy, or claim that may arise out of or in connection with this Agreement, Shriners and Vantage agree that they shall submit

such disagreement to non-binding mediation by a single mediator
in Florida, such mediator to be agreed to mutually by
the parties.  The parties shall divide the cost of the mediator
equally among them.

14.13  Relationship of Parties - This Agreement does not
constitute and shall not be construed to constitute a
partnership or joint venture between Shriners and Vantage.
Neither party shall have any right to obligate or bind the other
party in any manner whatsoever except as authorized in this
Agreement or as either party may specifically authorize the
other in writing.

Paragraph 15.  Effective Date

This Agreement shall not become effective until all ex-
hibits, attachments and recitals mentioned in this Agreement
have been appended to this Agreement and executed by the
parties.  Such exhibits, attachments and recitals must be con-
sistent with this Agreement, otherwise the Agreement does not
become effective.

In Witness Whereof, we have executed this Agreement on
behalf of Shriners and Vantage as of the Effective Date first
entered above.

Vantage Financial Services,
Inc.

By: _____
Evelyn S. Edmonds
Executive Vice President and
General Manager

By: _____
Lawrence C. Lyon
Senior Vice President Sales
and Marketing

STATE OF _____        )
_____         ) ss.:
COUNTY OF _____       )

The foregoing instrument was acknowledged before me, the
undersigned Notary Public, in and for said State, on the 22
day of JUNE _____, 1998, by DOUGLAS C. MORGAN _____,
as _____ and _____ as
_____ of Vantage Financial Services, Inc., a

-19-

_____ corporation, for the purposes therein expressed as the act and deed of said corporation. They are personally known to me. In witness whereof I hereunto set my hand and official seal.

Notary Public _____

Notary's Name
Typed
My Commission Expires:

Shriners Hospitals for
Children

By _____
John D. VerMaas
President

By _____
Gene Bracewell
Treasurer

STATE OF FLORIDA          )
                          ) ss.:
COUNTY OF HILLSBOROUGH)

The foregoing instrument was acknowledged before me, the undersigned Notary Public, in and for said State, on the 17th day of _____June_____, 19⁹⁹, by John D. VerMaas, as President and Gene Bracewell as  Treasurer       of Shriners Hospitals for Children, a Colorado corporation, for the purposes therein expressed as the act and deed of said corporation. They are personally known to me.  In witness whereof I hereunto set my hand and official seal.

_____
Notary Public  Suzanne Walsh
                    Notary's Name
                    Typed
My Commission Expires:



## Schedule A and proforma Attachment

**Package Descriptions and Costs:**

1.  Name and Address Labels - Full sheet ¾ line address with stamp section die-cut. 4 color process or PMS line copy (Black text on backer of label sheet). Includes 5 ½ x 8 ½ cover letter (folds in half), Carrier Envelope 5 ½ x 8 ½. Courtesy Reply Envelope. Package cost: $0.55 for test; $0.37 for roll-out. (Validation)

2.  Cards - Holiday/All Occasion 5 x 7 cards; Notecards 6 x 4 ½. Available in a 5 or 10 pack with a 7 x 14 cover letter. Carrier Envelope 5 ¾ x 8 ½/Box. Courtesy Reply Envelopes and Banded envelopes in which to mail cards:
    Package cost: $1.25 - Note cards: $1.50 - Holiday cards

3.  Calendar - 12 month, 24 page plus 4 page cover or a 32 page self cover. Presend components are used for the mailing device. Includes Carrier Envelope, Courtesy Reply Envelope, Cover letter and Reply form. The entire package is polybagged.
    Package cost: $1.35

4.  Lapel Pin - cloisonne, die struck enamel based, photo domed available on various metals. (pin size ¾ ̋ - 1 ̋). Pin is blistered onto a pin backer, includes 7 x 14 cover letter/remittance form, Carrier Envelope and Courtesy Reply Envelope.
    Package cost: $1.50

5.  Decals - 3 ̋ round on a 3 ¼ x 3 ¼ square liner cut as one up and print in either PMS colors, 4 color process or combination. Prints on 3.5 mil matte clear polyolefin with permanent adhesive. Includes 7 x 14 Cover letter/remittance form, Carrier Envelope and Courtesy Reply Envelope.
    Package cost: $0.25

6.  Thank You - 7 x 7 personalized double buckslip (folds in half). Includes Carrier Envelope and Courtesy Reply Envelope. Package cost: $0.15

7.  Reminder - 7 x 3 ½ personalized remittance slip. includes 5 ½ x 8 ½ cover letter (folds in thirds), Carrier Envelope and Courtesy Reply Envelope. All Donor Mailings include two Reminder notices. Package cost: $0.09

8.  Heart Package - 7 x 7 Double Buckslip, with peel and stick label on top panel, bottom panel is personalized copy. Includes, 4 ½ x 7 Double Window Carrier (label shows through top window). Courtesy reply envelope.
    Package cost: $0.40

9.  Special Appeal - 8 ½ x 14 personalized letter/remittance form. includes, a #10 Window Carrier, and #9 Reply Envelope. Package cost: $0.20

AUG-28-03  15:48   FROM VANTAGE EXECUTIVE OFFICES   6617734644P1

| Mailed Yr/Date | QTY | Product | Buyers | Donations | Product Cost | Net Unit Cost | In Mail Cost | Total Cost | Current Program Results $$ | Cumulative Program Results $$ | Per Donor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **YR ONE** | | | | | | | | | | | |
| 1/1/99 | 100,000 Acquisition Test - Labels | Labels | 7,500 | 20,000 | 0.55 | 0.110 | 0.77 | 72,000 | (32,000) | (42,000) | |
| 7/1/99 | 100,000 Acquisition Test - Heart Pkg | | 2,500 | 37,500 | 0.40 | 0.110 | 0.57 | 57,000 | (19,500) | (61,500) | |
| 7/1/99 | 1,000,000 Label Validation | | 30,000 | 390,000 | 0.32 | 0.177 | 0.54 | 549,000 | (159,000) | (261,500) | |
| 8/15/99 | 25,000 Thank You/Acknowledgment | | 1,750 | 71,000 | 0.15 | 0.090 | 0.24 | 8,400 | 12,600 | (228,900) | |
| 11/03/99 | 5,000,000 Acquisition Labels | | 150,000 | 1,950,000 | 0.21 | 0.170 | 0.51 | 2,100,000 | (720,000) | (948,900) | |
| 12/23/99 | 25,000 Thank You/Acknowledgment | | 7,500 | 90,000 | 0.15 | 0.090 | 0.24 | 35,000 | 54,000 | (894,900) | |
| 3/15/00 | 150,000 Acquisition Labels | | 150,000 | 1,990,000 | 0.37 | 0.170 | 0.54 | 2,700,000 | (720,000) | (1,614,900) | |
| 3/15/00 | 5,000,000 Spring Labels/Donors (5 cds) | | 49,750 | 689,750 | 0.37 | 0.176 | 1.57 | 261,205 | 412,535 | (1,202,350) | |
| 4/15/00 | 185,000 Thank You/Acknowledgment | | 7,500 | 90,000 | 0.15 | 0.270 | 0.24 | 35,000 | 54,000 | (1,148,350) | |
| 5/1/00 | 150,000 Thank You/Acknowledgment | | | | | | | | | | (7.85) |
| | Unique Donors to date | | 235,000 | | | | | | | | |
| **YR TWO** | | | | | | | | | | | |
| 8/1/00 | 335,000 Holiday Labels (Donors) | | 83,150 | 1,255,250 | 0.55 | 0.270 | 0.67 | 274,000 | 931,559 | (185,800) | |
| 6/30/01 | 5,000,000 Acquisition Labels | | 150,000 | 1,950,000 | 0.37 | 0.120 | 0.54 | 2,200,000 | (720,000) | (905,800) | |
| 6/15/00 | 335,000 Holiday Labels (10 cd pak)(Donors) | | 83,150 | 1,255,250 | 1.50 | 0.350 | 1.65 | 618,750 | 536,500 | (290,300) | |
| 6/15/00 | 150,000 Holiday Labels (10 cd pak) (Donors) | | 37,500 | 562,500 | 1.50 | 0.350 | 1.65 | 237,500 | 545,050 | 34,750 | |
| 11/1/00 | 150,000 Holiday Labels (10 cd pak)(Donors) | | 62,650 | 745,700 | 0.10 | 0.090 | 0.79 | 140,650 | 417,100 | 679,750 | |
| 12/28/00 | 465,000 Special Appeal (Donors) | | 38,830 | 592,000 | 0.25 | 0.090 | 0.34 | 166,900 | 545,050 | 1,036,650 | |
| 4/1/01 | 465,000 Labels (Donors) | | 121,250 | 1,515,750 | 0.15 | 0.270 | 0.24 | 397,700 | 1,471,850 | 2,517,000 | |
| | | | | | | | | | | | 8.18 |
| | Unique Donors to date | | 635,000 | | | | | | | | |
| **YR THREE** | | | | | | | | | | | |
| 7/1/01 | 465,000 All Occasion Cards (10 cds) (Donors) | | 121,250 | 1,818,750 | 1.50 | 0.35 | 1.65 | 897,250 | 921,500 | 3,439,400 | |
| 10/1/01 | 465,000 Calendars (Donors) | | 121,250 | 1,818,750 | 1.25 | 0.35 | 1.70 | 424,500 | 584,250 | 4,033,650 | |
| 9/22/01 | 465,000 Special Appeal (Donors) | | 43,050 | 786,709 | 0.78 | 0.09 | 0.84 | 148,650 | 645,050 | 5,078,700 | |
| 9/15/02 | 5,000,000 Acquisition Labels | | 150,000 | 5,940,000 | 0.37 | 0.17 | 0.54 | 38,000 | 54,000 | 4,350,200 | |
| 2/15/02 | 7,500 Plus (Donors) | | 92,000 | 1,245,000 | 1.50 | 0.09 | 0.24 | 897,250 | 616,750 | 4,442,700 | |
| 5/15/02 | 635,000 Annual Fund (Donors) | | 50,000 | 192,000 | 0.25 | 0.09 | 0.34 | 215,900 | 545,100 | 5,261,650 | |
| | | | | | | | | | | 5,017,553 | 9.15 |
| | Unique Donors to date | | 635,000 | | | | | | | | |
| **YR FOUR** | | | | | | | | | | | |
| 8/15/02 | 5,000,000 Acquisition Labels | | 150,000 | 1,950,000 | 0.37 | 0.17 | 0.34 | 2,700,000 | (720,000) | 5,067,549 | |
| 8/30/02 | 635,000 Holiday Cards (10 cd pak) (Donors) | | 158,750 | 2,381,250 | 1.50 | 0.15 | 1.65 | 1,174,730 | 1,205,500 | 6,294,650 | |
| 10/15/02 | 7,500 Thank You/Acknowledgment | | 7,500 | 90,000 | 0.15 | 0.09 | 0.24 | 36,000 | 54,000 | 6,348,650 | |
| 10/28/02 | 285,000 Special Appeal (Donors) | | 78,650 | 1,271,700 | 0.37 | 0.17 | 0.28 | 277,850 | (134,050) | 7,362,100 | |
| 10/28/02 | 5,000,000 Acquisition Labels | | 150,000 | 5,988,000 | 0.55 | 0.27 | 0.57 | 2,100,000 | (720,000) | 6,673,100 | |
| 3/8/03 | 180,000 Thank You/Acknowledgment | | 150,000 | 2,943,750 | 0.25 | 0.09 | 0.67 | 643,700 | 2,380,000 | 9,085,150 | |
| 3/4/03 | 185,000 Labels (Donors) | | 7,500 | | 0.15 | 0.09 | 0.24 | 317,000 | 54,000 | 9,539,250 | |
| 6/4/03 | 190,000 Thank You/Acknowledgment | | 74,630 | 1,122,000 | 0.25 | 0.09 | 0.34 | 313,800 | 694,100 | 11,696,700 | |
| 9/15/03 | 535,000 Annual Fund Prem Pkg (Donors) | | 233,750 | 3,506,250 | 1.50 | 0.35 | 1.65 | 1,328,750 | 1,376,500 | | |
| 10/21/03 | 935,000 Holiday Cards (10 cd pak) (Donors) | | 233,750 | 3,506,250 | 1.25 | 0.25 | 1.70 | 1,569,250 | 1,616,750 | 13,523,590 | |
| | | | | | | | | | | | 14.45 |
| | Unique Donors to date | | 973,000 | 41,298,109 | | | | 27,872,694 | 13,523,590 | | |
| **TOTAL** | | | | | | | | | | | |