# EXHIBIT 2

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
      - - - - - - - - - - - - - ->
 4    VANTAGE FINANCIAL SERVICES,  :
      INC.,                        :
 5                                 :
          Plaintiff,               :
 6                                 : CASE NO.:  04-11686-WGY
      vs                           :
 7                                 :
      NONPROFIT SERVICE GROUP and  :
 8    GEORGE MILLER,               :
                                   :
 9        Defendants.              :
                                   :
10    - - - - - - - - - - - - - ->
11
12    DEPOSITION OF:     JAY FLEISHER, ESQUIRE
13    TAKEN:        Pursuant to Notice by
                    Counsel for Plaintiff
14
15    DATE:         October 28, 2005
16    PLACE:        Shriners Hospital
                    2900 Rocky Point Drive
17                  Tampa, Florida
18    TIME:         9:32 a.m. to 4:12 p.m.
19    REPORTED BY:    Shelly Noriega, RPR
                      Notary Public
20                    State of Florida at Large
21                    Pages 1 - 127
22
23
24
25
```

## Page 2

```
 1    APPEARANCES:
 2
 3    LAURENCE M. JOHNSON, ESQUIRE
        Davis, Malm & D'Agostine, P.C.
 4      One Federal Place
        Boston, Massachusetts 02108
 5      617-589-3810
        Ljohnson@davismalm.com
 6
          Appeared on behalf of Plaintiff
 7
 8
 9    MATTHEW J. GRIFFIN, ESQUIRE
        Peabody & Arnold, LLP
10      30 Rowes Wharf
        Boston, Massachusetts 02110-3342
11      617-951-2009
        Mjgriffin@peabodyarnold.com
12
          Appeared on behalf of Defendants
13
14
15
      MACKENZIE CANTER, III, ESQUIRE
16      Copilevitz & Canter, LLC
        Suite 215
17      1900 L Street, NW
        Washington, DC 20036
18      202-861-0740
        Maccanter@aol.com
19
          Appeared on behalf of Shriners Hospital
20
21
22
23
24
25
```

## Page 3

```
 1                    INDEX
 2                               PAGE
      Examination by Mr. Johnson...................5
 3
      Examination by Mr. Griffin..............81
 4
      Certificate of Reporter....................125
 5
      Errata Sheet.........................126
 6
      Read and Sign Letter.......................127
 7
 8
 9                INDEX OF EXHIBITS
10    NUMBER                     PAGE
11       1    Memo.......................12
12       2    Agreement..................26
13       3    Letter.....................29
14       4    E-mail.....................31
15       5    Handwritten notes.........41
16       6    Agreement..................74
17       7    Memo.......................77
18       8    Memo.......................78
19       9    Letter.....................81
20      10    Memo.......................85
21      11    Memo.......................87
22      12    Memo.......................97
23      13    Indemnity Agreement............102
24      14    Letter....................105
25      15    Affidavit................107
        16    Fax/Letter...............111
```

## Page 4

```
 1              INDEX CONTINUED
                     PAGE
 2
 3     17   Handwritten notes...............112
 4
 5     18   Letter.........................114
 6
 7     19   Letter.........................120
 8
 9        (Exhibits retained by Mr. Johnson.)
10
```

Page 5

1    The deposition of JAY FLEISHER, ESQUIRE, taken
2  pursuant to notice by counsel for the Plaintiff, on
3  October 28, 2005, commencing at 9:32 a.m., at Shriners
4  Hospital, 2900 Rocky Point Drive, Tampa, Florida, before
5  Shelly Noriega, RPR, Notary Public, State of Florida at
6  Large.
7            JAY FLEISHER, ESQUIRE
8  having been duly sworn to tell the truth, the whole
9  truth, and nothing but the truth, was examined and
10  testified as follows:
11            EXAMINATION
12  BY MR. JOHNSON:
13    Q   Good morning, Mr. Fleisher.  Would you identify
14  yourself for the record.
15    A   Yes.  My name is Jay Fleisher.
16    Q   Where do you live, sir?
17    A   My residence is 4810 West Juno, J-U-N-O, Street
18  in Tampa, Florida 33629.
19    Q   By whom are you employed?
20    A   Shriners Hospitals for Children.
21    Q   In what capacity?
22    A   Managing attorney.
23    Q   For how long have you held that position with
24  Shriners Hospitals for Children?
25    A   Approximately six years.

Page 6

1    Q   Could you give me just a brief chronological
2  summary of your formal education post high school?
3    A   I went to undergraduate at Columbia University
4  in New York City and then law school at the University of
5  Florida in Gainesville.
6    Q   Could you just give me the years of your
7  degrees, please?
8    A   Pardon?
9    Q   The years that you received your degrees.
10    A   I got the degree from Columbia in 1970 and the
11  degree from the University of Florida in 1977.
12    Q   And will you give me a brief chronological
13  summary of your employment prior to coming to Shriners
14  Hospitals for Children six years ago?
15    A   Let's see.  When I got out of Columbia in 1970,
16  I joined the Naval Air Force from 1970 to -- through 1975
17  and then went from the Naval Air Force in 1975 through
18  law school.  Graduated law school in 1977, went to work
19  for a law firm in Gainesville, Florida, which ultimately
20  became Brooten, B-R-O-O-T-E-N, & Fleisher.  That was
21  until approximately September of 1980.
22         And then I joined the staff of the Shriners
23  Hospitals for Children, Office of the General
24  Counsel -- that's what it was called at that time -- in
25  1980, November.  And I have been an attorney since 1980

Page 7

1  and assuming the managing attorney position in March of
2  1999.
3    Q   Prior to the dealings between Shriners
4  Hospitals for Children and Vantage, which are at issue in
5  this proceeding, had you had any occasion to become
6  involved in contractual dealings between Shriners and
7  Professional Fundraising Counsel?
8    A   No, sir.
9    Q   Okay.  Prior to the matters at issue in this
10  case, had you had any occasion to become knowledgeable
11  about whatever legal requirements may have at the time
12  been applicable to arrangements between nonprofit
13  organizations and Professional Fundraising Counsel?
14         MR. GRIFFIN:  Objection.  You may answer.
15    A   Not prior to the situation you're talking
16  about.
17  BY MR. JOHNSON:
18    Q   Shriners Hospitals for Children is, I take it,
19  a nonprofit organization?
20    A   Yes.
21    Q   Is it a 501(c)(3) organization?
22    A   Yes.
23    Q   Now, I take it that Shriners Hospitals for
24  Children had not previous to the Vantage matter ever
25  engaged the services of Professional Fundraising Counsel?

Page 8

1    A   Not to my knowledge.
2    Q   Okay.  Incidentally I take it that -- well, is
3  there another organization that also has the Shriners
4  name and which is related to the Shriners Hospitals for
5  Children?
6         MR. GRIFFIN:  Objection.
7    A   There is no organization exactly with the
8  Shriners name.
9  BY MR. JOHNSON:
10    Q   Well, what is the relationship, if any, between
11  Shriners Hospitals for Children and the -- I'm not sure
12  what the correct name of it is.  The paper's here if we
13  check and find it.  But the fraternal organization.
14    A   The fraternal --
15    Q   Sometimes referred to as the Shriners?
16    A   The fraternal relationship between -- they
17  share space in this building but the fraternal
18  organization pays rent to the hospital organization.
19  There are a certain number of positions on the boards of
20  directors of the two organizations which are occupied by
21  the same individuals.
22    Q   What's the name of the fraternal organization?
23    A   It's The, with a capital T, Imperial Council,
24  C-I-L, of the Ancient Arabic Order of the Noles of the
25  Mystic Shrine for North America.

2

Page 9

1    Q    Thank you.  Now I know why I didn't have it in
2  my mind.  Now, as I understand it you have always been in
3  the -- since you went to work for the Shriners Hospitals
4  for Children in November of 1980 you've always been
5  involved with the hospital organization, not the
6  fraternal organization?
7    A    That's correct.
8    Q    Have you ever had occasion to do any legal work
9  or render any legal services for the fraternal
10  organization?
11    A    On rare, rare occasions.
12    Q    In connection with whatever work you may have
13  done on rare occasions for the fraternal organization,
14  has that ever involved any dealings between the fraternal
15  organization and Professional Fundraising Counsel?  I'm
16  missing you, let me try again.
17    A    I'm trying to -- I don't know.
18    Q    In connection with -- I think you told me that
19  you had -- that Shriners Hospitals for Children had
20  never, prior to Vantage, had dealings with Professional
21  Fundraising Counsel.
22        My question is in whatever you may have done
23  from time to time for the fraternal organization, did any
24  of that ever include any dealings between the fraternal
25  organization and any Professional Fundraising Counsel?

Page 10

1    A    The fraternal organization, I believe, entered
2  into a contract with Vantage which predated my position.
3  I was not involved in that whatsoever.
4    Q    Okay.  So you weren't involved in any prior
5  dealings between the fraternal organization and Vantage
6  or between the fraternal organization and any other
7  Professional Fundraising Counsel?
8    A    Prior to what?
9    Q    Prior to your involvement in the Shriners
10  Hospitals for Children/Vantage contract which underlies
11  the matters at issue in this case?
12    A    That's correct.
13    Q    Okay.  Thank you.  Now, when did you first
14  become involved in dealings between Shriners Hospitals
15  for Children and Vantage with respect to the matter of
16  Vantage serving as Professional Fundraising Counsel for
17  Shriners Hospitals?
18    A    April of 1999.
19    Q    At the time that you -- well, strike it out.
20  How did you become involved at that time?  What was the
21  occasion for your becoming involved?
22    A    I was directed by the officials of Shriners
23  Hospitals to whom I answer to prepare a satisfactory
24  agreement with Vantage to act as fundraising counsel.
25    Q    Who were the people at Shriners Hospitals who

Page 11

1  you dealt with with respect to this matter?
2    A    Would have been Mr. Ralph Semb.  He was, at the
3  time, a chairman of the board of directors of the
4  corporation.  He's the individual that primarily I dealt
5  with.  And, second, a Mr. Gene Bracewell, that's G-E-N-E,
6  Bracewell, who I believe at the time -- I can't recall
7  exactly -- was the treasurer of the hospital
8  organization.
9    Q    At the time you were asked to become involved,
10  did you acquire any understanding as to what the status
11  of the matter was at that point?
12    A    The status?
13    Q    Yeah.  For example, at the time you were asked
14  to become involved had somebody prepared some proposed
15  draft of an agreement?
16    A    No.  I became involved -- the brief chronology
17  was I was at a board of directors meeting where this
18  matter was discussed, and I listened to what this
19  discussion was, and I think that prior to that I had been
20  presented a draft of a proposed agreement from Mr. Semb.
21  I don't know exactly from whom he received that.
22    Q    So I gather when you became involved at about
23  that time you became aware that there had been some draft
24  of a proposed agreement that had been communicated
25  between the parties?

Page 12

1    A    Yes, that's correct.
2    Q    Okay.  Were you asked to do anything with
3  respect to that draft?
4    A    With respect to that draft I was asked to make
5  a preliminary review of it.
6    Q    Did you do so?
7    A    I did.
8    Q    Okay.  Did you prepare a memorandum to your
9  superiors at SHC with respect to that draft?
10    A    I don't recall.  It was six years ago.
11        MR. JOHNSON:  Let's mark as the first exhibit
12    for identification a memorandum dated April 13,
13    1999, from Jay Fleisher to Ralph Semb with what
14    purports to be the attached draft of an agreement.
15    It's SHC Bates Numbers 388 through 402.
16  BY MR. JOHNSON:
17    Q    Mr. Fleisher, I placed before you Fleisher
18  Exhibit 1, and ask if you would take a look at it and
19  tell me do you recognize it, sir?
20    A    Yes.
21    Q    Would you take a look at the draft agreement,
22  which is an attachment to your memo, and tell me whether
23  you recognize that as well?
24    A    Begins with Page 2.
25    Q    I noticed that.

3

Page 13

1    A   I don't recall precisely this agreement.  I
2  know that I did review an agreement at that time.
3    Q   Do you recognize your memorandum --
4    A   Oh, yes.
5    Q   -- as the memorandum that you prepared with
6  respect to the --
7    A   Yes, I do.
8    Q   -- first draft that you looked at the beginning
9  of your involvement in this matter?
10   A   Yes.
11   Q   Okay.  And was that the draft which somebody
12  had supplied to you as having come into existence before
13  . you became involved?
14   A   I cannot be 100 percent sure, but if you're
15  asking me to presume, I guess, the memorandum speaks for
16  itself.  Quite a few different drafts of that agreement.
17   Q   Okay.  Is it consistent with your best
18  recollection that the draft that's attached to your
19  memorandum is that draft that your memorandum refers to?
20      MR. GRIFFIN:  Objection.
21   A   Bear with me.
22  BY MR. JOHNSON:
23   Q   By all means.  And just by way of suggestion --
24   A   It would appear to me to be the agreement that
25  pertains to this memorandum by briefly reviewing the

Page 14

1  comments in the memorandum to the agreement.  I cannot be
2  100 percent sure that this was the precise agreement that
3  I looked at.
4    Q   Would you look at Item 25 in your memorandum
5  and would you then --
6    A   Yes.
7    Q   -- would you then look at Paragraph 12.1 of the
8  draft which is attached to Exhibit 1.  Look at it and
9  then tell me whether 12.1 is a draft that's attached to
10  Exhibit 1 appears to be the provision that you were
11  referring to in Item 25 of your memorandum?
12   A   Yes.
13   Q   Now, at the time that you reviewed the draft
14  and prepared your memorandum which is part of Exhibit 1,
15  had Mr. Semb or anybody else at SHC told you anything
16  about any of the business aspects of the proposed
17  arrangement between SHC and Vantage?
18   A   No.  I didn't learn of those until a subsequent
19  board meeting which was a few -- I think about a week
20  after this.
21   Q   Okay.  And I take it that at the time you
22  prepared your memorandum it was your assumption that the
23  payment provisions were just going to provide in
24  substance that Shriners was going to pay whatever it was
25  supposed to pay under the contract, whatever the charges

Page 15

1  that the contract provided for were?
2      MR. GRIFFIN:  Objection.
3    A   Again, I don't know if I can assume that or
4  you're asking me to assume that.  I went ahead, I made
5  comments concerning that -- you've got to remember this
6  was six years ago.  I made comments concerning that
7  within the context of being presented this agreement by a
8  single corporate officer before it was presented to our
9  boards of directors for review of the business matters.
10  BY MR. JOHNSON:
11   Q   May I take a quick look at the exhibit?  In
12  Item 25 when you wrote with respect to Paragraph 12.1,
13  "Section 12.1 should simply state the termination is upon
14  30 days and that upon the 30th day Vantage will cease all
15  solicitation and that SHC will pay to Vantage all
16  outstanding invoices submitted to SHC in accordance with
17  other terms of the agreement," did that reflect your then
18  current understanding of what the arrangement was going
19  to be with respect to that aspect of the transaction?
20   A   I believe it was my then current.  Subsequently
21  it was changed.
22   Q   I understand.  When did your understanding of
23  that change?
24   A   At a board meeting in -- shortly after that in
25  April of 1999.

Page 16

1    Q   And how did your understanding of that change
2  at the board meeting?
3    A   I was present at the board meeting and the
4  question was asked numerous times of the person who was
5  presenting this proposal, which is Mr. Semb, if there was
6  going to be any risk of loss to Shriners Hospitals for
7  Children if the total proceeds received from the program
8  did not cover the cost of the program.
9        And Mr. Semb made it very clear to the board
10  members that that was not the case.  That there would be
11  no exposure to the Shriners Hospitals for Children to any
12  risk of loss in this.  That he had been assured that by
13  Vantage, and, in fact, there were questions to that
14  effect that were asked by other board members at that
15  board session concerning that very point.
16       And then subsequent to the board minutes I also
17  worked with a number of other board members who
18  had -- well, I can't remember exactly who they are, but
19  my very clear understanding from that board meeting that
20  I was present that the contract was to be prepared so
21  that there was no exposure to loss by Shriners Hospitals
22  by entering into the contract.
23   Q   Now, Mr. Fleisher, when you use the phrase
24  "risk of loss" or "exposure to loss," is my understanding
25  correct that by those phrases you are intending to

4

Page 17

1  communicate that Shriners wasn't going to be in a
2  position where it would be obligated to pay for charges
3  in connection with the fundraising programs out of funds
4  or assets that didn't come or result from the programs
5  themselves?
6      A  That's correct.
7      Q  So that, in effect, is it fair to say that
8  Shriners' concern was that it didn't want to be in a
9  position where it might have to pay Vantage's program
10  charges by drawing on funds other than those generated
11  either from mailings or from the use of the donor list
12  developed in the course of the program?
13      A  That's not exactly correct.
14      Q  Okay. In what respect is it not correct?
15      A  You said in connection with the mailings. I
16  don't know about use of the donor list. I know that the
17  direction was that I was not to have the -- there was to
18  be no risk of loss to Shriners Hospitals for Children if
19  the proceeds of the campaigns, as a result of the
20  mailings, did not cover the expenses charged by Vantage.
21  So as far as the use of the -- I don't know exactly what
22  you're talking about as far as the use of the --
23      Q  Let me see if I can clarify. The programs
24  which were the subject of the proposed agreement, the
25  program had a dual objective, did it not? First of all

Page 18

1  to raise money; but, secondly, in the course of raising
2  money to develop a list of donors, people who had been
3  solicited and have contributed something to SHC and whom
4  you could go back to again?
5      A  That's true.
6      Q  So that the programs were going to develop two
7  things. They were going to develop contributions by way
8  of response, and they were also going to develop and
9  effect a solicitation list of donors for purposes of
10  future fundraising?
11      A  That's correct.
12      Q  Okay. And is it fair to say that SHC's concern
13  in this was that it didn't want to have to resort to
14  other resources to pay the program charges of these
15  programs? It wanted the program, in effect, to be
16  self-sustaining?
17      A  In essence, that's correct. My marching
18  orders, as they were, were that the invoices submitted by
19  Vantage were not to be paid by funds other than those
20  that were generated by the solicitations that we had made
21  in connection with the program.
22      Q  Now, at some point did you consider the
23  question of whether if funds -- funds -- funds raised by
24  solicitation mailings, if those didn't generate enough
25  contributions to pay program charges, whether an

Page 19

1  additional source of revenue, not raiding upon Shriners'
2  other funds, could also be realized by the possible
3  rental or exchange of the donor list developed in the
4  course of the programs?
5      A  That's true.
6      Q  And if and to the extent that the donor list
7  came to have some potential economic value, that economic
8  value also resulted from the programs, didn't it?
9  Because the donor list was developed as part of the
10  programs?
11      A  That had a value. I could not put a dollar
12  value on it.
13      Q  I understand that.
14      A  Yes.
15      Q  But whatever -- if it had some economic value
16  and if that value could be applied to satisfy program
17  charges, I take it that, too, was a way of avoiding
18  Shriners being in a position of having to pay program
19  charges from its other resources that didn't result from
20  programs?
21      A  I believe that's the case, but I have not
22  looked at that contract in a long time.
23      Q  Okay. From the point of view of SHC,
24  Mr. Fleisher, is it fair to say that as the dialogue that
25  ultimately resulted in the agreement progressed it came

Page 20

1  at least to be Shriners' position that it didn't want to
2  have to pay program charges out of nonprogram-related
3  revenues, but that within revenues generated from the
4  programs it didn't really care how those were used as
5  long as it didn't have to cut a check from its other
6  accounts?
7      A  I can't speak on behalf of the entire
8  organization, but I believe that's how the final
9  agreement was arranged.
10      Q  Okay. Now --
11      A  But there is an ultimate cutoff of that.
12      Q  We'll get to it. Now, at some point -- well,
13  strike it out. Let me start again. When you first
14  became aware during the board meeting that Mr. Semb had
15  indicated that Shriners wasn't to have any liability to
16  pay program charges except from the receipts from the
17  program, did you consider whether one way to accomplish
18  that -- one way to satisfy that interest would be to
19  simply have a provision saying that Shriners wasn't going
20  to have any liability except to the extent of the program
21  receipts?
22          MR. GRIFFIN: Objection.
23      A  Not at that meeting.
24  BY MR. JOHNSON:
25      Q  At any meeting. At any point did that occur?

5

Page 21

1   A   Yes, that's correct.
2   Q   As a possible modality for addressing Shriners'
3   concern?
4   A   Yes, you are correct.
5   Q   Okay. And at some point did you become aware
6   that there was a problem or a potential problem with
7   respect to addressing SHC's interest by that means?
8   A   When I first received the contract from
9   Mr. Miller subsequent to the board meetings, it did not
10   include any provisions which would insulate Shriners
11   Hospitals from loss should the proceeds from the mailings
12   not cover the costs of the program.
13   Q   Okay. And when you received that draft -- and
14   that, I take it, was a later draft than the one that's
15   a part of Exhibit 1, was it not?
16   A   Correct.
17   Q   I take it you had some discussion with
18   Mr. Miller about that?
19   A   Yes.
20   Q   The subsequent draft are among the things which
21   my secretary has FedExed down to here care of your
22   office, so hopefully they will arrive while we're talking
23   and we can identify the draft you're talking to.
24        When you got that draft that you felt didn't
25   insulate SHC from risk of loss if the receipts of the

Page 22

1   programs weren't enough to pay the program charges, did
2   you have some discussion with Mr. Miller about that?
3   A   Yes, I did.
4   Q   And was it as a result of that discussion that
5   you became aware that there was a potential legal problem
6   with respect to simply exculpating SHC from liability
7   from -- from the program charges if there was a shortfall
8   in the program?
9   A   No.
10   Q   Did you eventually become aware of that, that
11   there was a potential problem from some source?
12   A   No.
13   Q   Did Mr. Miller ever tell you that the U.S.
14   Postal Service had some regulations which had an
15   application or a potential application to the kinds of
16   arrangement with respect to payment that SHC and Vantage
17   could make?
18   A   I believe he did.
19   Q   Okay. And do you remember what in substance it
20   was that he told you about that?
21   A   I can give you the gist of what I remember from
22   six years ago.
23   Q   Good.
24   A   Was that he told me -- I asked him why the
25   agreement that he prepared was inconsistent with the

Page 23

1   representation that had been made to our board members
2   and subsequently by our boards members to me that there
3   would be no risk of loss, and I believe he referred to
4   postal regulations.
5        And subsequent to that time I contacted our
6   attorney, who has since passed on, Mr. William Lehrfeld
7   in Washington, D.C., concerning that; and he looked at
8   it, and he did not believe it was going to be a problem
9   to have Shriners Hospitals for Children insulated from
10   loss. So I proceeded on that basis.
11   Q   But Mr. Miller had told you that in his view
12   there was some potential problem with Shriners simply
13   being insulated from loss, as you put it?
14   A   Yes. But I don't believe he went into that in
15   any great detail. He may have sent me some postal
16   regulations at the time, and that's what I sent to
17   Mr. Lehrfeld.
18   Q   Did either Mr. Miller or Mr. Lehrfeld, in your
19   communications with them, employ the phrase "Cooperative
20   Mail Rule"?
21   A   Yes, I believe I remember that phrase.
22   Q   I take it that's a phrase that's now meaningful
23   to you?
24   A   No, I don't do any more mailings so --
25   Q   Did it become meaningful to you during the

Page 24

1   course of the negotiation of the SHC/Vantage agreement?
2   A   I became aware of the rule. I don't know if it
3   became meaningful.
4   Q   All right. Did you become aware that there was
5   at least some of the people involved in the dialogue with
6   you felt that there was a potential -- there was a
7   potential issue that needed to be addressed in the
8   agreement and in the payment provisions of the agreement
9   so that those payment provisions wouldn't conflict with
10   the postal services regulations?
11        MR. GRIFFIN: Objection.
12   A   Mr. Miller provided me during those early
13   negotiations with a proposed separate promissory note
14   where Shriners Hospitals for Children would, I believe,
15   execute a promissory note in favor of Vantage to pay any
16   excess. I don't remember the terms of the promissory
17   note.
18        I also consulted the late Mr. Lehrfeld at that
19   time as to whether there was any necessity to execute
20   such a promissory note. He told me there was not. So
21   then I proceeded.
22   BY MR. JOHNSON:
23   Q   So I take it you didn't proceed further with
24   the promissory-note modality for dealing with payment
25   questions?

Page 25

1   A   Correct.

2   Q   I take it that you -- with respect to the legal

3   matters, is it fair to say that you on behalf of SHC and

4   Mr. Miller on behalf of Vantage were the people who were

5   carrying the ball primarily with respect to the legal

6   aspects of the agreement?

7   A   That's true.

8       MR. GRIFFIN:  Objection.

9   A   That's true.

10  BY MR. JOHNSON:

11  Q   Did you have any direct contact with anybody

12  else on behalf of Vantage other than Mr. Miller?

13  A   At what point?

14  Q   Up through the time that the agreement was

15  executed, and I think it was around June 17 of 1999.

16  A   Yes.  I believe there was a conference between

17  myself and Mr. Bracewell on behalf of Shriners and

18  Mr. Larry Lyon, and I can't remember if there was another

19  person.  I believe it was just Larry Lyon.  And there was

20  a conference at the headquarters concerning the

21  agreement.

22  Q   Down here in Tampa?

23  A   Yes.

24  Q   Okay.  And was there also a conference call

25  that you participated in maybe a week or ten days after

Page 26

1   that meeting in Tampa with at least you on behalf of SHC

2   and Mr. Miller and perhaps Mr. Lyon on behalf of Vantage?

3   A   There may have been, but I do not specifically

4   recall that.

5   Q   Okay.  At some point in the course of the

6   dialogue and negotiation, was some other proposal made by

7   either side with respect to a way for dealing -- a way to

8   deal with the payment issue something other than the

9   promissory note modality that you had decided was not

10  satisfactory, I take it?

11  A   Yes.

12  Q   Okay.  Who made that proposal?

13  A   I believe that proposal -- that proposal was

14  made by Mr. Miller.  It was not made by any one of our

15  attorneys.

16  Q   Was it reflected in a draft sent down to you by

17  Mr. Miller?

18  A   I do recall distinctly receiving a draft,

19  subsequent draft, from the one we're talking about that

20  had various alternatives resolving the problem short of

21  Shriners Hospitals for Children having to expend any

22  out-of-pocket money.

23  Q   Okay.  Mark as the next exhibit a copy of the

24  agreement to provide fundraising consulting and

25  management services dated June 17, 1999?

Page 27

1       MR. GRIFFIN:  What's the Bates on that, Larry?

2       MR. JOHNSON:  SHC4962 through 4982.

3   BY MR. JOHNSON:

4   Q   Do you recognize Exhibit 2, Mr. Fleisher?

5   A   Yes, I do.

6   Q   Is that a copy of the Shriners/Vantage

7   agreement as ultimately executed?

8   A   Yes, it is.

9   Q   At some point during the course of this

10  litigation, the Vantage/Miller litigation, Shriners was

11  requested by Mr. Miller's attorney, was it not, to

12  provide copies of certain documents?

13  A   By Mr. Miller's attorneys?

14  Q   Yes, sir.

15  A   Oh, during --

16  Q   During the course of this litigation, the

17  current litigation that you're testifying in today.

18  A   Yes.

19  Q   Okay.  And I take it that SHC provided copies

20  of certain documents from its records that had been

21  requested by Mr. Miller's attorneys?

22  A   Yeah.  We did so only because we knew the

23  documents could be subpoenaed anyway and why go through

24  the -- so they were supplied, yes.

25  Q   I understand.  I'm not at all faulting you for

Page 28

1   having --

2       MR. CANTER:  They were subpoenaed.

3       THE DEPONENT:  They were?

4       MR. GRIFFIN:  I think we sent a subpoena to

5   you, correct.

6       MR. CANTER:  Yes, they were subpoenaed.

7       THE DEPONENT:  Thank you for correcting my

8   memory.

9   BY MR. JOHNSON:

10  Q   My purpose is not to question the procedure

11  that was followed.  I take it that Exhibit 2 bearing an

12  SHC Bates number, that's the copy of the agreement that

13  comes from Shriners' own records?

14  A   I couldn't tell you if that comes from

15  Shriners' own records or not.  There are so many copies

16  of this.  I don't know if this is from Shriners' own

17  records.

18  Q   Would you look at Paragraph 13.2, please, sir.

19  A   Want me to read it?

20  Q   Just so you're familiar with it, sure.

21  A   Yes.  I'll refresh my recollection.  Yes, I

22  have read it.

23  Q   Now, is the provision to which I have just

24  invited your attention, is that in substance the

25  provision that was suggested by Mr. Miller as a means for

7

Page 29

1  dealing with the payment issue?
2       MR. GRIFFIN:  Objection.
3       A   In some form there were many, many
4  conversations and negotiations concerning the ultimate
5  wording of Section 13.2, and I don't know -- I can't
6  recall which ones that -- which parts of those that I had
7  suggested and which parts of that that he had suggested.
8  I believe it was we both suggested some parts of it.
9  BY MR. JOHNSON:
10      Q   Let me see if I can help.  Let's mark as the
11  next exhibit a letter dated May 24 from Mr. Miller to
12  Mr. Fleisher.  Do you recognize that, sir?
13      A   Yes.
14      Q   Did you receive that original of that document
15  on or in due course of the mails after the date it bears?
16      A   I remember the document because there are
17  some -- the check marks on the first page are not mine.
18  The check marks on the second page -- the first one is
19  not mine.  The other three may be mine.  On the -- this
20  page, Page 3, I only have half the page here and the
21  notations on that are there, but I don't see anything
22  where it says it's been signed by anybody on the bottom.
23      So I would presume this is a letter that I got
24  from Mr. Miller, but I couldn't tell because there's no
25  signature there.  He had a number of other folks working

Page 30

1  at his law firm.
2       Q   Did you deal with anybody else in his law firm
3  other than Mr. Miller with respect to the SHC/Vantage
4  agreement?
5       MR. GRIFFIN:  Objection.
6       A   The contract itself?
7  BY MR. JOHNSON:
8       Q   The contract itself, yes.  I understand
9  perfectly well you dealt with some other people after the
10  contract was executed with respect to registration
11  matters.
12      A   To the best of my recollection, it was only
13  Mr. Miller on behalf of Nonprofit Service Group as far as
14  negotiating an agreement.
15      Q   Okay.  Does the last page or paragraph of
16  Exhibit 3 refresh your recollection as to --
17      A   The last paragraph?
18      Q   Yeah.  Some of the -- what appears on Page 3,
19  the last page of the exhibit, as to part of the process
20  of negotiation of the payment provision.
21      A   Where it says "adds the following proprietary
22  materials"?
23      Q   Right.
24      A   I don't recall that specifically.  The only
25  thing I do recall is the little squiggly line with a

Page 31

1  circle in it and X insert meant there was some language
2  in there that I wanted to insert.
3       Q   Okay.
4       A   There were -- yeah, a lot of going back and
5  forth on this agreement.
6       Q   Now, that portion of Exhibit 3 deals with a
7  proposed modification of Paragraph 13.1, does it not?
8       A   On the top of the third page it deals with --
9  yes.  In addition to 13.1(b).
10      Q   And 13.1(a) and (b) deal with payment
11  modalities in the event of termination without cause by
12  Shriners, do they not?
13      A   As best as I can recall.
14      Q   Take a look at the agreement.  I think you
15  will --
16      A   The best I recall, yes, that's correct.
17      Q   Does Exhibit 3 contain any proposed
18  modifications with respect to Paragraph 13.2, that's the
19  provision with respect to termination for reasons other
20  than termination without cause?
21      A   Would not appear so from here.  Just speaks to
22  section 13.1 and 13.3.
23      Q   Okay.  Let's mark as the next exhibit an e-mail
24  from Christine Gray to Mr. Fleisher dated May 26, 1999.
25      A   Hang on just a second.

Page 32

1       Q   Sure.
2       A   During the course of all these negotiations,
3  there was so many -- there were so many changes to this
4  agreement that at one point or another there were various
5  renumberings of paragraphs.  And the phrase that you're
6  talking about "Vantage shall mail to program donors for
7  36 months until all outstanding billing statements are
8  paid," the one circled on this in Exhibit 3, that -- one
9  form of that showed up on 14.2.
10      So at that point I truthfully cannot remember
11  if -- I would presume that 13.1(b) speaks to the 13.1(b)
12  of the final agreement at that point in the negotiations.
13  I cannot recall if 13.1(b) was then at that time the
14  equivalent of what 13.2 ended up to be.  I don't know if
15  that answers the question.
16      Q   I think the next exhibit I'm going to mark for
17  identification may clarify that point for you.  Let's
18  mark as Exhibit 4 an e-mail from Christine Gray to
19  Mr. Fleisher dated May 26, 1999, with an attached revised
20  draft to the agreement SHC200 through 220.  Do you
21  recognize Exhibit 4, sir?
22      A   Yes.  Christine Gray is a paralegal in our
23  department, and she had sent this e-mail to me regarding
24  the agreement of fundraising services.  I remember
25  receiving something like that or I remember receiving

8

Page 33

1  this particular e-mail.
2      Q   And I take it that with that e-mail Mrs. Gray
3  transmitted to you a – whatever the latest draft that
4  had been received from Mr. Miller's office was?
5      MR. GRIFFIN:  Objection.
6      A   It shows that a Word document was attached.  I
7  don't know if this is the final draft.  I would have
8  to – I would presume this is the thing that was attached
9  as the Word document to Ms. Gray's e-mail.  I cannot be
10  100 percent sure, and I can't be 100 percent sure if this
11  is the final one I received from Mr. Miller.
12  BY MR. JOHNSON:
13     Q   Would you look at Paragraphs 13.1 and 13.2 of
14  the draft?  Does Paragraph 13.1 reflect the change
15  discussed on the last page of Exhibit 3 which is also
16  before you?
17     A   I hadn't finished 13.1 yet.
18     Q   I'm sorry.  Didn't mean to cut you off.  Go
19  ahead.
20     A   Let me do that and then if you'll ask the
21  question that would be better.
22     Q   No problem at all.
23     A   Okay.  Now ask the question again, please.
24     Q   Does the red-lined change with respect to
25  Paragraph 13.1 in the draft that's a part of Exhibit 4 –

Page 34

1      A   13.1(b)?
2      Q   Yes.  13.1(b).
3      A   Yes.
4      Q   Is that the change that's discussed on the last
5  page of Exhibit 3, the exhibit that's just ahead of you
6  there?
7      A   This change on Exhibit 3 you're talking about?
8      Q   Proposed change with respect to paragraph 13.1
9  and –
10     A   Okay.  Where it says "add to 13.1 be the
11  following sentence, approval shall not be unreasonably
12  withheld"?
13     Q   Right.
14     A   That, the phrase "approval shall not be
15  unreasonably withheld" in this letter which is 3 is
16  reflected in 13.1(b).
17     Q   (b), right.
18     A   It says, "Shriner approval shall not be
19  unreasonably withheld," that's correct.
20     Q   Okay.  And is the additional suggested change
21  with respect to 13.1(b) appearing in the next paragraph
22  of Exhibit 3 also reflected in the red-lined version of
23  Paragraph 13.1(b) attached to Exhibit 4?
24     A   It's in the red-line, that's correct.
25     Q   Okay.  In the draft that's attached to

Page 35

1  Exhibit 4, are there any red-line changes whatsoever in
2  Paragraph 13.2?
3      A   Well, not in the version that you've attached
4  to Exhibit 4.  I don't see any changes – red-line
5  changes to 13.2.
6      Q   Now, did you discuss with Mr. Miller at some
7  point either before or after the transmission of
8  Exhibits 3 and 4, the changes that are discussed in those
9  exhibits are indicated in them with respect to Paragraph
10  13.1(b) dealing with termination without cause?
11     A   Yes, I would have discussed those with him.
12  Certainly.
13     Q   And is it fair to say that as of the time that
14  the draft reflected in Exhibit 4 was prepared that you
15  and Mr. Miller had reached common ground with respect to
16  the provision reflected in the red-line version of
17  Paragraph 13.1(b)?
18     MR. GRIFFIN:  Objection.
19     A   If that would be correct.  If, in fact, 13.1(b)
20  red-line changes ended up being in the 13.1(b) of the
21  final agreement.
22  BY MR. JOHNSON:
23     Q   Can you satisfy yourself that that's the case?
24     A   I'll have to read it word for word here.
25  Somebody want to read it out loud then I can see if –

Page 36

1      Q   Would you like me to read Paragraph 13.1(b)?
2      A   Well, I can get it here.
3      Q   Okay.
4      A   There is a difference between some of the text
5  in this Exhibit 4 and the text in the final agreement.
6  No, this did not find its way into – no, these
7  paragraphs are different and the highlighted language
8  where it says "Vantage shall mail to program donors for
9  36 months until all outstanding billing statements are
10  paid or until such mailings no longer produce net revenue
11  at which time Shriners would be responsible to pay the
12  balance" is not the exact same wording that's in this
13  final version.
14     Q   The difference is that instead of net revenue
15  the final version called it net income?
16     A   I believe so.  Yes, net income.  Correct.
17     Q   Is there any difference substance in the two
18  provisions?
19     MR. GRIFFIN:  Objection.
20     A   I believe there is.  I would have to go through
21  the entire agreement to figure out and remember why.
22  There is a difference, I believe, between net revenue and
23  net income, as I recall from the time.  I would have to
24  go back through the entire agreement.  I think there is a
25  definition section in the agreement.  There's also

Page 37

1  another change from this paragraph.
2      Well, the only difference is the sentence in
3  the middle where it says "Vantage may continue" -- and
4  this is not the highlighted one. Says "Vantage may
5  continue to conduct donor renewal mailings or continue to
6  render, exchange Shriners donor file" so forth and so on,
7  there is a phrase -- the words "which is outstanding upon
8  termination" in this version attached as Exhibit 1, and
9  the words "which is" are not in this version. Just says
10 "outstanding upon the termination of the agreement." So
11 these two paragraphs are not exactly the same.
12 BY MR. JOHNSON:
13     Q  I understand they are not exactly the same.
14 The differences you identified, the use of the phrase
15 "net revenue" in the draft as opposed to net income in
16 the agreement as executed, would you look back at the
17 definition section?
18     A  On which?
19     Q  Paragraph 1 on the draft.
20     A  The draft or the final agreement?
21     Q  The draft. The one that uses "net revenue."
22     A  Okay.
23     Q  If you will look at the definitions.
24     A  Of net revenue?
25     Q  Yeah.

Page 38

1      A  Okay.
2      Q  It should be around 1.17, but it may not be
3  exactly the same numbering. Was the phrase defined --
4  the term there in the draft net revenue rather than net
5  income?
6      A  No, there is no definition in here of net
7  revenue in the -- this Exhibit 4.
8      Q  Is there a definition of net income?
9      A  Yes, in that draft.
10     Q  And there is no definition of net revenue?
11     A  Not that I can see from reviewing it.
12     Q  Okay. So the final agreement simply changed
13 the phrase "net revenue" so that it would be consistent
14 with the defined term "net income"?
15     MR. GRIFFIN: Objection.
16     A  We've got net revenue in here and I would have
17 to -- let me take a look and see if the definition in
18 1.17 and net income in Exhibit 4 is the same definition
19 as net income in 1.17. This one. The actual final
20 version. Just compare the two.
21     All right. The definition in the final
22 agreement and Exhibit 4 of net income are the same
23 wording. I cannot say for sure that the phrase was
24 changed to net income just to be consistent. I would
25 presume it would. I don't remember exactly why, but I

Page 39

1  do -- I would -- there is no definition of net revenue.
2  BY MR. JOHNSON:
3      Q  Okay. On 13.1(b)?
4      A  Of which?
5      Q  Of the final.
6      A  The final.
7      Q  With respect to termination without cause,
8  towards the bottom of the paragraph, there is a provision
9  that says "Vantage shall mail to program donors for 36
10 months until all outstanding billing statements are paid
11 or until such mailings no longer produce net income, at
12 which time Shriners shall be responsible to pay the
13 balance." Do you see that?
14     A  Yes, I do.
15     Q  Okay. Can you and I agree that the substance
16 of that provision, namely if the subsequent mailings
17 haven't produced enough net income to pay off the
18 balance, that Shriners was going to be responsible to pay
19 the balance, that the substance of that provision also
20 appears in the draft that's a part of Exhibit 3 in
21 13.1(b)?
22     A  They both appear on 13.1(b), yes.
23     Q  And both the draft and the final, right?
24     A  Yes.
25     Q  So I -- is it fair to say that by that time you

Page 40

1  and Mr. Miller had come to common ground, that at least
2  with respect to the eventuality of termination at
3  Shriners' option without cause, that in that event if use
4  of the mailing list and the follow-up mailings didn't
5  produce enough money to pay the program charges that
6  Shriners was going to be responsible to pay the balance?
7      MR. GRIFFIN: Objection.
8      A  That's correct. If there was termination
9  without cause by Shriners.
10 BY MR. JOHNSON:
11     Q  And is it fair to say, Mr. Fleisher, that
12 having in mind Shriners' concern that it didn't want in
13 any event to have to cut a check for any balance from its
14 nonprogram-related funds, is it fair to say that Shriners
15 ultimately accepted that provision with respect to
16 termination without cause because it was satisfied that
17 follow-up mailings and/or realization of money from use
18 of the donor list was going to raise enough money to pay
19 any program charges?
20     A  That would be pure speculation on my part.
21     Q  Did that represent some modification by SHC of
22 its position that it didn't want in any circumstance to
23 be obligated to have to cut a check from it's
24 nonprogram-related assets?
25     A  Yes, it did.

10

Page 41

1    Q   Now, did you have any specific discussions with
2  Mr. Miller about Shriners' willingness to do that in the
3  circumstance of termination without cause?
4    A   Yes. That came up during the negotiations.
5    Q   What did you say to him and what did he say to
6  you about that?
7    A   Specifically?
8    Q   Yeah.
9    A   You've got to remember this is six years ago.
10   Q   Did you incidentally have any practice of
11  taking notes of your telephone communications?
12   A   Yeah, I took notes of telephone conversations.
13   Q   Let's mark as the next exhibit for
14  identification a series of what purports to be
15  handwritten notes. When you had telephone discussions
16  with Mr. Miller, did you -- and when you made notes did
17  you try to make notes of any discussion of substance of
18  any matter that you thought was important --
19   A   Yes.
20   Q   -- to SHC?
21   A   That's our normal practice.
22   Q   So I take it that if you had a telephone
23  conversation and you were discussing some matter of
24  potential importance you would try to make a note of it?
25   A   Yes. Either there or on the file memorandum or

Page 42

1  on the document itself.
2    Q   Okay. And I take it that it's fair to say, is
3  it not, that the payment provisions with respect to
4  Vantage's program charges under the agreement, that was a
5  matter of substantial importance to Shriners?
6    A   That's correct.
7    Q   So that if you had discussions with Mr. Miller
8  about the payment terms or about the extent of Shriners'
9  liability to make payment, that's the kind of thing you
10  would have made a note about, right?
11       MR. GRIFFIN: Objection.
12   A   Normally, depending upon how much time there
13  was to conclude the transaction, there may not have
14  been -- I know that there were times when I did not have
15  time to take whole notes on everything.
16  BY MR. JOHNSON:
17   Q   But normally with respect to something that you
18  thought was important you would try to make a note of it,
19  wouldn't you?
20       MR. GRIFFIN: Objection.
21   A   That's my customary practice.
22  BY MR. JOHNSON:
23   Q   Let me place Exhibit 5 before you and ask you,
24  first of all, would you glance at the handwritten pages
25  of that and tell me whether they are all handwritten

Page 43

1  notes of yours?
2    A   Yeah. Those are my handwriting. That's my
3  handwriting. Let me look just to make sure, but sure
4  looks look my handwriting. Yeah. Yes, they are.
5    Q   Okay. Would you glance through the notes which
6  are now Exhibit 5 and tell me whether there are any of
7  them that refer to discussion between you and Mr. Miller
8  of the payment provisions, payment in the event of
9  termination with cause or in the event of termination
10  without cause?
11       MR. CANTER: Go off the record.
12       (Discussion off the record.)
13   A   I would appreciate it if you would repeat the
14  question.
15  BY MR. JOHNSON:
16   Q   Yes. The question asked you to just glance
17  through your handwritten notes and tell me if any of them
18  appear to refer -- appear to you to refer to any
19  discussion you had with Mr. Miller of the payment
20  obligations, payment provisions, of Paragraphs 13.1(b) or
21  13.2 with respect to Shriners' obligations to pay program
22  charges in the event of either termination without cause
23  or termination for cause.
24   A   Yes.
25   Q   Okay. Which notes appear to deal with either

Page 44

1  of those issues?
2    A   One dated May 7 of 1999, regarding -- it says
3  "George Miller agreement has been redrafted. New issue,
4  own agreement for postage. Own agreement for direct
5  mail. Loan money to Shriners' Hospital as a percentage
6  to qualify for reduced rate of postage. SHC would have
7  to be at risk to get reduced rates if the loan would
8  qualify. SHC would be considered purchasing postage or
9  SHC put out the funds itself for postage."
10   Q   Let's stay with May 7 for just for the moment
11  then.
12   A   Also on May 4 there is -- my notes here say
13  that Bracewell and Semb or Shriners officers spoke to
14  Larry Lyon. And it says -- my notes say "clear up again
15  that if expenses, costs (any outlay by Shriners
16  Hospitals) exceeds gross income, Vantage absorbs in the
17  test and the entire program." Okay. You are concerned
18  with the conversations with George Miller, though,
19  correct?
20   Q   Yeah. May 7. Okay. That refers to a
21  conversation with Mr. Miller, or can you tell from your
22  notes?
23   A   Yes, it does.
24   Q   And the excerpts that you read appears to
25  reflect discussion of the promissory note proposal?

Page 45

1     A   Yes.

2     Q   Okay.  That was the proposal that Shriners did

3  not proceed with, right?

4     A   Correct.

5     Q   Did -- do those notes refer to discussion of

6  any other payment modality other than the promissory note

7  proposal which didn't find its way into the agreement?

8     A   No.

9     Q   Okay.  Let's go to the next discussion or did

10  you have any discussion on May 7 with Mr. Miller about

11  any payment modality other than the promissory note

12  proposal so far as your notes indicate?

13     A   As far as my notes indicate, no.

14     Q   Do you have any recollection independent of

15  your notes of having had any discussion on that occasion

16  with Mr. Miller?

17     A   On that particular day?

18     Q   On that particular day about any other payment

19  modality.

20     A   I cannot recall something that happened over

21  six years ago on a particular day, and I cannot recall

22  that.

23     Q   I quite understand.

24     A   Sure.

25     Q   Can we then go to the next occasion on which

Page 46

1  you either have an independent recollection of having

2  discussed payment modalities with Mr. Miller or as to

3  which your notes contain a reference to such a

4  discussion.

5     A   These notes?

6     Q   Any of the notes that are a part of Exhibit 5,

7  sir.

8     A   All right.

9     Q   I think I have included in Exhibit 5 all the

10  papers that were produced to Mr. Miller's lawyers in

11  which purported to be handwritten notes of yours.

12     A   I see something here on May 18 of 1999.  If

13  these are all of my notes, I can't tell from just

14  looking at it where it says "May 18, 1999, George Miller

15  Vantage proposal is to rely on donor to affix postage,"

16  and then it goes on "method to be decided."

17     Q   Now, let's stay with that one for just a

18  moment.  Is there anything else, any other reference in

19  your notes on that to the discussion on that occasion

20  with respect to any discussion of payment modalities,

21  just staying with May 18 for the moment?

22     A   No, not that my notes would indicate.

23     Q   Okay.  Do your notes with respect to the May 18

24  portion that does refer to payment modalities, does that

25  refresh your recollection in any respect as to your

Page 47

1  discussion of payment modalities with Mr. Miller on that

2  occasion?

3     A   Yes.  On that occasion I believe that was the

4  first time -- I believe that was the first time that I

5  had learned about -- that I had been told by Mr. Miller

6  about the possibility of Shriners Hospitals for Children

7  entering into a loan-type of arrangement or fronting

8  money itself for postage.

9     Q   I thought the May 7 contained discussion of

10  loans.

11     A   Okay.  May 7 is concerning loans.  Now, let's

12  skip to --

13     Q   I thought your notes on the May 18 discussion

14  with Mr. Miller said something about Vantage relying on

15  the donor list.

16     A   To affix postage, that's correct.

17     Q   Okay.

18     A   Methods to be decided.

19     Q   What does your note say with respect to your

20  discussion with Mr. Miller about payment matters?

21     A   With respect to payment on these notes from May

22  18?

23     Q   Your notes of your discussion with Mr. Miller

24  on May 18 to the extent that they refer to any discussion

25  of payment provisions, what do your notes actually say?

Page 48

1     A   I can read them.  Let's see.  "Vantage proposal

2  list to George Miller 5/18/99.  Vantage proposal is to

3  rely on the donor to affix postage.  The method to be

4  decided."  Which to me at that time would be the method

5  of how that's done would be worked out.  "Until 18 months

6  deficit of 1.148 million" -- then I have a question

7  mark -- "five million to start."  I have no idea what

8  that was.  "Deficit is rolled forward and SHC is

9  ultimately responsible for all costs."

10         Then goes on to say "Commercial bulk rate at

11  test with difference in postage proposed go to term.

12  Shriners Hospitals for Children not liable."  Then it

13  goes on "not liable" and plus something or other

14  exceeding gross income.

15         "If don't meet goals," which I would presume

16  would be the goals in the pro forma in the amount of

17  money raised from the mailings, "the bottom line is that

18  they," they being Vantage, "thinks Shriners bears all

19  cost exceeding gross income.  Exposure to Shriners

20  Hospitals bottom line, all risk to Shriners Hospitals for

21  Children.  Entire program, not just postage."

22     Q   Now, the first part of that note, the part that

23  referred to Vantage relying on donors for postage, in

24  your understanding is that a reference to discussion of

25  payment of program charges or a discussion of how persons

12

Page 49

1 responding to solicitation mailings were going to send in
2 their response?
3    A  My understanding I believe at that time is that
4 the Shriners Hospitals for Children would be paying the
5 postage to send out the mailings and also be paying for
6 postage for any mailings that were mailed back.
7    Q  Is it the latter part which you understand to
8 be referred to in that first reference in your notes
9 there?
10    A  I couldn't tell.  I cannot tell.
11    Q  Now, the remainder of your notes about this,
12 does -- I take it you had a discussion on that occasion
13 on May 18 with Miller in which he was telling you that in
14 order to mail at nonprofit rates SHC still had to be
15 ultimately responsible for any shortfalls?
16    A  That's correct.
17    Q  Okay.  Does this refresh your recollection that
18 as of May 18 you and Mr. Miller hadn't yet found a
19 modality to address that problem and still give Shriners
20 satisfactory comfort that it wasn't going to have to cut
21 a check from its own funds?
22    MR. GRIFFIN:  Objection.
23    A  I believe so.  That's correct.
24 BY MR. JOHNSON:
25    Q  Does -- do your notes with respect to May 18

Page 50

1 refresh your recollection as to whether on that occasion
2 you had any discussion with Mr. Miller about there being
3 any -- about any potential difference between Shriners'
4 obligations to pay a shortfall in the event of
5 termination for cause as opposed to its obligation in the
6 event of termination without cause?
7    MR. GRIFFIN:  Objection.
8    A  What I do recall is expressing surprise at
9 Mr. Miller's statement that Shriners Hospitals for
10 Children would have to be liable for the costs that
11 exceed gross income because it had been represented to us
12 by other employees at Vantage that that would not be the
13 case.
14 BY MR. JOHNSON:
15    Q  Let's just stick with my question, though, if
16 we may.
17    A  Okay.
18    Q  Do your notes reflect any discussion on May 18
19 with Mr. Miller about there being any difference between
20 the extent of Shriners' liability to pay a shortfall in
21 the event of termination for cause as compared with the
22 extent of its liability to pay such a shortfall in the
23 event of termination without cause?
24    A  No, there is no discussion of any difference.
25    Q  Okay.  And I take it that you don't have an

Page 51

1 independent recollection of having had any discussion of
2 that particular topic with Mr. Miller on that occasion?
3    A  Not with Mr. Miller.
4    Q  Okay.
5    A  Others.
6    Q  Do you have any discussion of that -- of that
7 topic with anybody else at Vantage?
8    A  I believe -- I cannot recall if -- I can't
9 recall the times that there were negotiations with
10 Mr. Bracewell and myself and Mr. Lyon aside from whatever
11 negotiations we had with Mr. Miller that I recall Larry
12 Lyon as making the distinction of termination by Shriners
13 if it just wanted to walk away from the program and
14 termination by Shriners if for some reason Vantage was
15 not performing under the program, such as -- you know,
16 which would be for cause.
17    And there were many conversations around that
18 time, because it was -- there was a lot of discussion
19 because the program was presented by Mr. Miller at that
20 time as different than it had been presented to us, and
21 subsequently there was -- obviously ended up with a
22 difference in termination with and without cause.
23    And I seem to recall -- I cannot be 100 percent
24 positive -- that there was a conversation with myself and
25 Larry Lyon and possibly Mr. Bracewell over how do we

Page 52

1 resolve this in situations where there is cause or not
2 cause.
3    Q  Do you have any -- in your notes is there any
4 reference to any such conversation with Mr. Lyon and
5 Mr. Bracewell?
6    A  Not in these notes.  This was a conversation
7 that may have occurred.  Best of my recollection, it
8 would have been subsequent to these.  Because this is --
9 it would have been subsequent to this because these notes
10 indicate that I spoke with Gene Bracewell at that time or
11 Terrie DeVassie wanted Gene to brief him.
12    May 18, 1999, Mr. Bracewell said this would be
13 a show stopper.  No liability.  Call Ralph.  Ralph being
14 the chairman of the board of directors at that time.  So
15 at that point, May 18, there was no resolution of our
16 final payment or being taken care of?
17    Q  When after May 18 did you next have any
18 conversation with Mr. Miller about payment modalities?
19    A  I don't recall exactly what date it was.
20    Q  Do you have -- do any of your notes that are a
21 part of Exhibit 5 purport to refer to any period -- any
22 discussion at any time subsequent to May 18?
23    A  Not in these.  No, not subsequent.  Not in
24 these notes.
25    Q  I thought those were all the handwritten notes

13

Page 53

1  that I have found.
2      A    They may very well be.
3      Q    Well, as you sit here today, do you have any
4  affirmative recollection of having had any discussion
5  with Mr. Miller about the provisions of Paragraph 13.1(b)
6  and/or 13.2 with respect to Shriners' obligations to pay
7  for any shortfall in the event of termination with or
8  without cause other than what you've already testified
9  to?
10     A    Yes.  I think there was a conversation
11  subsequent to that with him, and I think -- I cannot be
12  100 percent positive but I think Larry Lyon was on the
13  phone at the time and we were trying to work out an
14  acceptable resolution getting from Point A, being
15  Shriners Hospitals liable for everything if the gross
16  income didn't cover costs; and, B, Shriners Hospitals
17  being totally liable for everything in there.  And I
18  cannot recall if those conversations were solely with
19  Mr. Miller or with Mr. Miller and Mr. Lyon together.
20     Q    Okay.  Okay.  You have a memory that at some
21  point you had a conversation at least with Mr. Miller,
22  possibly also with Mr. Lyon, about the subject of the
23  extent of Shriners payment obligations in the event of a
24  shortfall, right?
25     A    Correct.

Page 54

1      Q    Okay.  Now, what's your best memory, sir, of
2  what you and Mr. Miller, or anybody else as to whom you
3  have a memory of having said something, actually said
4  during that conversation?
5      A    I'll go back to what I have said previously.
6  That to the best of my recollection the subsequent
7  conversations with Mr. Miller, a suggestion was made and
8  I believe the suggestion was made by Mr. Lyon that
9  Vantage had a concern with Shriners Hospitals for
10  Children just walking away from the deal, and they didn't
11  want to be left holding the bag, as it were, or a
12  situation where Vantage had somehow breached the
13  agreement and which would have ended up as 13.2
14  situation.  And that's when we started to formulate what
15  finally resulted in the agreement with the termination
16  for cause and without cause.
17     Q    Well, who said what about there being any
18  difference between termination -- the payment obligations
19  if there was termination for cause as opposed to
20  termination without cause?
21     A    I can't recall who specifically said -- who
22  specifically suggested first termination with cause or
23  termination without cause and how that would be handled
24  differently.  I don't know who exactly suggested that.
25         Because by that time there are a number of our

Page 55

1  board officers involved and calls were going all the way
2  around, other than my calls with just Mr. Miller.  So I
3  can't remember whether there was a compromise.  I can't
4  remember if there was a compromise that was reached
5  between myself and Mr. Miller and Mr. Lyon or if that was
6  a compromise that was reached between board officers of
7  Shriners Hospitals for Children and officers or employees
8  of Vantage and then suggested to Mr. Miller and myself.
9         I do have a recollection that there was a lot
10  of what's called background deals or whatever at that
11  time.
12     Q    Well, is it consistent with your best
13  recollection that the language which appears in
14  Paragraphs 13.1(b) and 13.2 was in substance suggested by
15  Mr. Miller?
16         MR. GRIFFIN:  Objection.
17     A    The precise language may have been.  The
18  precise language, I believe, was suggested by Mr. Miller,
19  but the idea of how 13.1(b) and 13.2 would operate I
20  cannot recall.  Again, like I said, if that was suggested
21  by Mr. Miller or an idea suggested by one of the Vantage
22  businesspeople and carried out by Mr. Miller, that, I'm
23  sorry, I cannot recall that specifically.
24  BY MR. JOHNSON:
25     Q    That you don't recall one way or the other, I

Page 56

1  take it?
2      A    Correct.
3      Q    Okay.  Now, putting aside the loan modality
4  which Shriners rejected, do you have an affirmative
5  recollection that Mr. Miller ever suggested any modality
6  with respect to payment of a shortfall other than the
7  substance of what appears in Paragraphs 13.1(b) and 13.2
8  of the agreement as ultimately executed?
9         MR. GRIFFIN:  Objection.
10     A    The only other recollection I have -- and it
11  may be in connection with the loans suggestion, I can't
12  recall -- was Shriners Hospitals for Children putting up
13  a sum of money for postage to begin with and then that
14  postage being credited against something.  That's in
15  those notes, but I don't recall specifically what that
16  dealt with.
17  BY MR. JOHNSON:
18     Q    Okay.  But either --
19     A    Very well could --
20     Q    -- either fronting some sum of money or signing
21  a promissory note for some money.  Other than those, do
22  you recall any proposal with respect to ways of dealing
23  with payment for any program shortfall suggested by
24  Mr. Miller other than the substance of the provisions
25  that appear in Paragraphs 13.1(b) and 13.2 of the

14

Page 57

```
1   agreement as executed?
2        MR. GRIFFIN:  Objection.
3        A   No, I don't recall any.
4   BY MR. JOHNSON:
5        Q   Okay.  Now, do you recall any other proposals
6   that you or anybody else at Shriners made with respect to
7   that?
8        A   No.  Other than what I had said before
9   that -- other than what I had said previously.
10       Q   Now, when Mr. Miller proposed the promissory
11  note modality, you and your colleagues at SHC considered
12  that, didn't you?
13       MR. GRIFFIN:  Objection.
14       A   Rejected it.
15  BY MR. JOHNSON:
16       Q   You considered it and rejected it, didn't you?
17       A   Right.
18       Q   And when Mr. Miller proposed the possibility of
19  Shriners simply putting up a fund upfront to cover
20  postage or maybe some other parts of program charges, you
21  considered and rejected that, didn't you?
22       A   Correct.
23       Q   Okay.  And when Mr. Miller proposed the
24  modality that's reflected in Paragraphs 13.1(b) and 13.2,
25  you and your colleagues at SHC considered and ultimately
```

Page 58

```
1   accepted that, didn't you?
2        MR. GRIFFIN:  Objection.  It's not the
3   testimony.
4        A   That's the question that Mr. Miller is the one
5   that suggested that.  To the best of my recollection,
6   there is -- there were compromises -- there may have been
7   compromises outside of Mr. Miller and myself between
8   representatives of Shriners Hospitals and representatives
9   of Vantage which ended up in Mr. Miller and myself just
10  being the scriveners, as it were, of those.
11  BY MR. JOHNSON:
12       Q   You said that there may have been, but I take
13  it you have no specific affirmative recollection that
14  permits you to testify that there were?  That's correct,
15  isn't it?
16       A   I cannot -- I could not testify as to any exact
17  date of conversations and persons who participated in
18  that.  But I could testify or what I would testify to is
19  at that time, because of the surprise that our officers
20  had concerning the suggested way of final payment, that
21  the normal mode of business would have been for phone
22  calls to have been made outside of my office,
23  specifically -- well, I do recall corporate officers --
24  and I believe it was Mr. Bracewell or Mr. Semb getting a
25  call and telling me that they had spoke to folks at
```

Page 59

```
1   Vantage.  I can't remember if it was Larry Lyon.  And
2   this is the way that they would like to see it resolved
3   for cause or not for cause.  More specific than that from
4   six years later, I couldn't tell you.
5   BY MR. JOHNSON:
6        Q   And you weren't a party to any of those
7   conversations?
8        A   No, I was not a party to any of those
9   conversations.
10       Q   And other than learning from Mr. Bracewell that
11  there had been some discussion and that they wanted to
12  see the matter resolved -- now, did they tell you that
13  there was -- was there already proposed language in an
14  existing draft at that point?
15       A   I don't know.  I don't recall at that point.
16       Q   Okay.  Do you have an affirmative recollection
17  that Mr. Bracewell specifically mentioned that SHC wanted
18  the payment issue resolved dealing separately with the
19  circumstances of termination for cause as compared with
20  termination without cause?
21       A   No, not an affirmative recollection from
22  Mr. Bracewell.  Not from any specific person.
23       Q   Do you have an affirmative recollection of
24  anybody at SHC telling you that?
25       A   Telling what?
```

Page 60

```
1        Q   That they -- that SHC had decided that it
2   wanted the payment issue resolved by provisions that made
3   some distinction between termination for cause as opposed
4   to termination without cause?
5        A   None from a specific individual that I can
6   recall from six years ago.
7        Q   Well, now, I take it that the language which
8   appeared in the various drafts -- incidentally -- strike
9   it out.  Is it fair to say that the way that the
10  negotiation procedure was that in general you would
11  receive a draft from Mr. Miller's office, you would look
12  at it, you would respond with any comments, questions or
13  objections that you had and then there would be
14  discussion of those and a further draft would be
15  prepared?  In other words, were most of the drafts --
16       A   Yes.
17       Q   -- prepared at Mr. Miller's end of things?
18       MR. GRIFFIN:  Objection.
19       A   That's the best of my recollection.
20  BY MR. JOHNSON:
21       Q   Did you actually prepare any draft of the
22  agreement here in your own offices?
23       A   No, no initial drafts.  There may -- I know
24  that the agreement would have been on our word processor,
25  or whatever it was at that time, so I could look at it
```

Page 61

1   and there likely were changes and particular paragraphs
2   that would have been on the word processor sent out. But
3   I don't — you know, most of the drafts of the agreement
4   were prepared by Mr. Miller and he would pare back the
5   changes I talked about.
6       Q   Is it fair to say that Mr. Miller's office took
7   the labor in preparing the drafts?
8       A   Yes.
9       Q   And then you would respond to those and discuss
10  them with him, if necessary?
11      MR. GRIFFIN: Objection.
12      A   That's correct.
13  BY MR. JOHNSON:
14      Q   And after any such discussion would you receive
15  the draft containing or purporting to contain the changes
16  that you had discussed?
17      MR. GRIFFIN: Objection.
18      A   That's correct.
19  BY MR. JOHNSON:
20      Q   And it was those drafts which you as SHC's
21  managing attorney considered and reacted to right?
22      MR. GRIFFIN: Just a continuing objection to
23  the questions characterizing the process of the
24  negotiations.
25      MR. JOHNSON: Do whatever you feel you have to

Page 62

1   do.
2       A   Correct.
3   BY MR. JOHNSON:
4       Q   Okay. Now, have you now told me about all of
5   the specific proposals with respect to ways of dealing
6   with payment for any program shortfalls that were
7   proposed or discussed during the course of the
8   negotiation of the Vantage/SHC agreement?
9       A   Yes.
10      Q   Okay. At the time is it fair to say that you
11  considered and responded only to the proposals which were
12  made from time to time during the negotiation with
13  respect to payment?
14      MR. GRIFFIN: Objection.
15      A   Proposals made by whom?
16  BY MR. JOHNSON:
17      Q   Made by Mr. Miller or anybody else at Vantage.
18      A   Yes, that's basically correct.
19      Q   Did you or to your knowledge your colleagues at
20  SHC initiate any proposals with respect to payment
21  yourselves other than the initial proposal that Shriners
22  should have no liability for paying any shortfalls?
23      A   Then again, I would have to go back to the
24  recollection I had where I could not tell you specific
25  persons and dates, and it might have been Mr. Bracewell

Page 63

1   with whom I'm working — was working closely, or Mr. Semb
2   that I was working closely with at the time, or Mr. Lyon
3   who may have been in on one of those conversations that
4   there would have to be a difference between Shriners
5   walking away from the proposal on a program for no reason
6   and Shriners walking away from a proposal for any other
7   reason.
8       Q   Okay. I take it, though, that in the answer
9   you just gave me you're not intending to add to what you
10  already testified to about that, are you?
11      A   No, I'm not. That's correct.
12      Q   Okay. Is it fair to say that during the course
13  of the negotiation you and your colleagues at SHC had no
14  occasion to consider proposals with respect to shortfall
15  payments other than the proposals that were made during
16  the course of the negotiation?
17      MR. GRIFFIN: Objection.
18      A   No. That's not entirely correct, because when
19  these negotiations were completed I had sent a memorandum
20  out explaining how the program would operate as far as
21  termination goes and never had anyone object to that
22  as — on the Shriners end, the Shriners authorities.
23  BY MR. JOHNSON:
24      Q   You sent out a memorandum to other people at
25  Shriners, I take it?

Page 64

1       A   Correct.
2       Q   Not to Mr. Miller or anybody at Vantage?
3       A   No, no. It was a memorandum to Shriners
4   personnel concerning this is the final way that this
5   agreement would operate. Here's a copy of the agreement.
6   Please review it. If you have any questions or so forth
7   concerning this operation, get back with me. And I never
8   got anything but go ahead.
9       Q   The purpose of that memorandum was just to
10  explain to your colleagues at Shriners what the legal
11  effect of the agreement was as you understood it?
12      A   Yes.
13      Q   Okay. My question was a little bit different,
14  Mr. Fleisher.
15      A   Okay.
16      Q   During the course of the negotiation before you
17  got to a final agreement, isn't it fair to say that you
18  and your colleagues at Shriners did not have occasion to
19  consider proposals with respect to payment for shortfalls
20  other than the proposals that were actually made by
21  Mr. Miller or by others at Vantage during the course of
22  the negotiation?
23      MR. GRIFFIN: Objection.
24      A   That's correct.
25  BY MR. JOHNSON:

16

Page 65

1    Q   You didn't have occasion to consider any other
2  possible ways in dealing with the payment issue and you
3  didn't consider any ways possible -- possible ways of
4  dealing with it, did you?
5        MR. GRIFFIN:  Objection.
6    A   That's correct.
7  BY MR. JOHNSON:
8    Q   Now, with respect to the payment provisions
9  ultimately incorporated into the agreement as reflected
10  in Paragraphs 13.1(b) and 13.2, did you ever have any
11  discussion with Mr. Miller as to whether those provisions
12  were or were not, in his judgment, sufficient to entitle
13  the program mailings to be made at nonprofit postal
14  rates?
15    A   I don't recall any such discussions.
16    Q   Did you ever have any discussion with
17  Mr. Miller as to whether those provisions as they appear
18  in the agreement were sufficient to comply with whatever
19  the postal service's Cooperative Mail Rule requirements
20  were?
21    A   I can't recall any discussions to that effect.
22    Q   Okay.  Did you have any discussions with
23  Mr. Miller as to whether the payment provisions as
24  reflected in Paragraphs 13.1(b) and 13.2 represented a
25  common modality for payment in contracts between

Page 66

1  not-for-profit organizations and professional
2  fundraisers?
3        MR. GRIFFIN:  Objection.
4    A   No, I never -- I don't recall asking about
5  that.
6  BY MR. JOHNSON:
7    Q   Fair to say, is it not, that from your point of
8  view that isn't something that you were primarily worried
9  about, is it?
10    A   Worried about?
11    Q   Yeah.  You weren't worried about --
12    A   No, I was not.
13    Q   And at the time, I take it, you were -- hadn't
14  received any information to cause you to be concerned
15  about it, had you?
16    A   That's correct.  Because we had had information
17  from our outside counsel that we really didn't have to be
18  concerned with the Cooperative Mailing Rule as far as
19  postage rates go.  That was the late Mr. Lehrfeld, like I
20  testified previously.  So once he had testified -- told
21  me that there was not a problem, I didn't think it was a
22  problem.
23    Q   Okay.  Now, did you have any discussions with
24  Mr. Miller about the reason for or the need for the
25  36-month time period that appears with respect to

Page 67

1  follow-up mailings both in Paragraphs 13.1(b) and 13.2 of
2  the agreement?
3    A   I recall that he sent me a draft that had the
4  36-month provision in it or it might have been a longer
5  provision.  I can't recall.  It would be in the file.
6  And then if that was a period -- I cannot recall whether
7  the 36 months was accepted by our official right of the
8  bat or if there was another period and it was negotiated
9  down to 36 months or whether 36 months was just the
10  reasonable time that they thought.
11    Q   I take it you don't recall any discussion
12  either with Mr. Miller or with your colleagues at
13  Shriners one way or the other about the 36-month period?
14    A   Not specifically, no.
15    Q   And I take it you don't recall whether a longer
16  period had ever been proposed?
17    A   Not specifically, no.
18    Q   I take it you have no memory that there was
19  ever a proposal that there would be no time limit, do
20  you?
21        MR. GRIFFIN:  Objection.
22    A   I cannot be 100 percent certain but before the
23  prior agreement was signed -- before the agreement was
24  signed and subsequent to when we first found out about
25  the rule concerning cooperative mailing, so forth, that a

Page 68

1  suggestion was made by someone that we just allow Vantage
2  to go ahead and continue the mailings to recover and it
3  went on.
4  BY MR. JOHNSON:
5    Q   That was after the agreement had been signed?
6    A   No.  That would have been -- that would have
7  been before.
8    Q   Do you have a memory that somebody proposed
9  that?
10    A   I don't have a memory of a specific person
11  proposing that.
12    Q   Do you have a memory that that was at some time
13  before the agreement was executed, proposed by Vantage or
14  somebody on behalf of Vantage?
15    A   Yes.  I have a recollection that that was --
16  that type of an arrangement was suggested by someone at
17  Vantage or someone who represented who Vantage.  I could
18  not recall exactly who.
19    Q   Well, if it was somebody who represented
20  Vantage I take it it would have been Mr. Miller, wasn't
21  it?
22        MR. GRIFFIN:  Objection.
23    A   No.
24  BY MR. JOHNSON:
25    Q   No?

17

Page 69

1  A  No. Because of the many conversations that
2  were had between -- that I was told about by -- you okay?
3  Q  Okay. I take it you were not limited yourself
4  in the answer you gave to proposals that were made to
5  you? You were including proposals that you may have
6  heard about from some third source?
7  A  I was including proposals that I was told about
8  by either Mr. Bracewell or Mr. Semb, that this is what
9  you do, and it was not direction I got from Mr. -- I
10 would have to explain that during these times of
11 negotiations when there were situations where the parties
12 were quite far apart it had been my experience that the
13 negotiations that were lifted out of the realm of at
14 least myself as an attorney and discussed between the
15 Shriners businesspeople, primarily Mr. Semb and
16 Mr. Bracewell and persons at Vantage and at that time the
17 primary spokesman for Vantage was Mr. Lyon.
18 Q  Let me clarify my question a little bit because
19 I'm not asking you about what you may have heard from
20 some third-hand source or heard a rumor of somebody
21 told you about. I'm asking you about what you know about
22 directly. At any time prior to the execution of the
23 agreement did Mr. Miller or anybody else on behalf of
24 Vantage ever make any proposal to you with respect to
25 having payment provisions with follow-up mailings not

Page 70

1  limited by any time period?
2  A  Not directly to me that I recall. I had prior
3  testimony on the other aspect of that.
4  Q  Prior to the execution of the agreement, sir,
5  did either Mr. Miller or anybody else on behalf of
6  Vantage ever make any proposal to you that with respect
7  to termination for cause that if there was going to be a
8  time period and if there was still a shortfall left at
9  the end of the time period that then Shriners ought to
10 have a choice as to whether it would pay the shortfall or
11 extend the period in which either follow-up mailings or
12 continued rental or exchange of the donor list would be
13 permitted?
14 A  I could not recall that one way or the other
15 specifically.
16 Q  So as we sit here today you cannot testify that
17 any such proposal was ever made?
18 A  I couldn't, no. I could not recall any such
19 proposal.
20 Q  And I take it you have no recollection of
21 considering any such proposal, do you?
22     MR. GRIFFIN: Objection.
23 A  I have a recollection of considering that
24 proposal. I do not have a recollection of how the --
25 specifically as to how that proposal came to me, but I do

Page 71

1  have a distinct recollection of considering that
2  proposal.
3  BY MR. JOHNSON:
4  Q  Considering a proposal that if at the end of
5  the 36 months there was still a shortfall, that then it
6  should be addressed either by further mailings or further
7  permission to rent or exchange the donor list; you
8  considered that?
9  A  Yes. Without any time limit.
10 Q  No, no. My question wasn't without any time
11 limit. My question was if at the end of the time limit,
12 the 36 months or whatever else, if there was still a
13 shortfall, that then if there was a shortfall and if
14 Shriners didn't want to pay the shortfall itself, that it
15 should have the option of saying that either or both of
16 you could continue to rent or exchange the donor list or
17 you could send more follow-up mailings if they're still
18 generating revenue?
19 A  I recall having to consider that proposal.
20 Q  What was the occasion for your considering
21 that?
22 A  The occasion?
23 Q  Yeah.
24 A  I don't understand what you mean "occasion."
25 Q  You've already testified that Mr. Miller never

Page 72

1  made any such proposal to you and that nobody else at
2  Vantage ever made any such proposal to you. So if nobody
3  had proposed it, what was the occasion for you
4  considering it?
5     MR. GRIFFIN: Objection.
6  A  I believe that I testified before that I could
7  not recall exactly who made such a proposal to me,
8  whether it was Mr. Miller or any of the officers of
9  Shriners Hospitals for Children. But I recall having
10 considered that at one time before the contract or before
11 the contract was finally executed.
12 BY MR. JOHNSON:
13 Q  Do you have any note that refers to any such
14 proposal ever having been made?
15 A  I don't know if I have any notes. That's from
16 six years ago.
17 Q  Is there any correspondence that you either
18 received from anybody or any draft that contains any such
19 proposal or that contains any response of yours to any
20 such proposal?
21 A  I could not say that one way or the other. I
22 did not review the entire file before this deposition.
23 Q  Okay. You did, I take it, produce in response
24 to the request for documents that Mr. Miller's lawyers all
25 the documents that you had that bore on the negotiation

Page 73

1  of the Shriners/Vantage agreement, didn't you?
2      A   That's correct.
3      Q   So I take it that if there are any drafts that
4  contain any such proposal or if there are any comments or
5  responses by you to any such proposal, they are reflected
6  in what has been produced, are they not?
7          MR. GRIFFIN:   Objection.
8      A   As I said before, during the latter parts of
9  the negotiations there were times where these
10 negotiations were so fast and furious that I did not have
11 time to take complete notes. It was my practice to try
12 and take complete notes as to any conversations that were
13 significant, but at some times things just moved so fast
14 that I did not have time to take notes.
15         I did produce every single note concerning and
16 every single piece of paper concerning the negotiations
17 so -- as had been subpoenaed.
18 BY MR. JOHNSON:
19     Q   And if some specific payment proposal was made
20 to you, you had considered it and responded to it, I take
21 it you had responded to it in correspondence, that
22 correspondence has been produced, has it not?
23         MR. GRIFFIN:   Objection.
24     A   No. I would not necessarily have
25 correspondence towards the end. It was all mostly phone

Page 74

1  calls and very few correspondence.
2  BY MR. JOHNSON:
3      Q   Well, now --
4      A   Faxes back and forth and things like that.
5      Q   Other than changes in terminology, sir, were
6  there any changes made to the payment modality as
7  reflected in 13.1(b) and 13.2 after the May 26 draft
8  which is before you as part of Exhibit 4, I believe?
9      A   I couldn't recall. The agreement was signed,
10 what, in June?
11     Q   Signed June 17.
12     A   June 17. I could not recall if the final -- if
13 there are final versions there with the same exact
14 wording as 13.1 and 13.2, then I would say no. I
15 couldn't testify positively.
16         THE COURT REPORTER:   Can I have just minute to
17 change paper?
18         MR. JOHNSON:   Sure.
19         (Break from 11:40 a.m. to 11:50 a.m.)
20 BY MR. JOHNSON:
21     Q   Let's mark as the next exhibit a series of
22 drafts of the Shriners/Vantage agreement all produced
23 from Shriners records and marked as Exhibit 12A, 12B,
24 12C, 12D, 13A, 13B, 13C, 13F and 14B at Mr. Miller's
25 deposition. Mr. Fleisher can you identify the drafts

Page 75

1  which have been marked as Exhibit 6 as drafts coming from
2  Shriners records?
3      A   The first one, I could not identify it. I
4  don't see my writing on it. That's 12A, I think. 12B, I
5  can definitely say this is something that I had reviewed
6  because my handwriting is on many portions of it. 12C --
7  12C I can identify because there is a line-out on Page 8
8  and, yeah, there's my handwriting on Page 9, 10 and so
9  forth. So I recognize that one.
10         12D, my handwriting is on Pages 1 and 2, so it
11 would have been something that I reviewed. 13A -- 13A, I
12 can't identify because that handwriting -- the notations
13 on that is not my handwriting. It's someone else's.
14     Q   Do you recognize whose handwriting it is?
15     A   No, I don't.
16     Q   Okay.
17     A   No. 13B I can identify because the handwriting
18 notes on that are -- those are mine. Yes. Okay. 13C, I
19 cannot tell one way or the other whether this is
20 one -- there's only one mark on that. I can't tell if
21 that's my handwriting or not. It's not handwriting.
22 It's just a line on top of the second page.
23     Q   I think those -- I think that's part of what
24 you've just looked at. I think the staple --
25     A   Yeah. All right. This is 13C. I don't

Page 76

1  remember that. This one attached to -- I think it was
2  attached to 13C. I don't know if it's a loan agreement.
3  This may have been the loan agreement that someone
4  was -- what we were talking about previously. 13F is
5  mine. Yeah, I recognize that. That's my memorandum to
6  Mr. Bracewell. 14B, I recognize that because the changes
7  on there were my handwriting.
8      Q   Okay. Now, are there any other drafts of the
9  agreement other than the ones that you have identified
10 from Exhibit 6 which you have some specific recollection
11 of having considered during the negotiation in
12 preparation of the Shriners/Vantage agreement?
13     A   If these are all of the ones that were
14 contained in the materials that were furnished to
15 Mr. Griffin, then these would be all of them.
16     Q   And do they fairly reflect the proposals that
17 were made in the drafts submitted to you during the
18 course of the negotiation?
19     A   As to the ones that I could identify that I
20 recognize because I had my handwriting on, yes.
21     Q   Are you aware of any proposals in any other
22 drafts that you -- that were submitted to you and that
23 you considered other than ones appearing in the documents
24 you have identified from Exhibit 6?
25     A   I couldn't answer that one way or the other.

19