Page 77

1  All I can tell you is that I had provided everything that
2  was in all of our files so --
3     Q   By when, as best you can recall it, had issues
4  with respect to the provisions of the Vantage/SHC
5  agreement been essentially resolved?
6     A   Yes, they were eventually resolved.
7     Q   No.  By when had they been essentially
8  resolved?
9     A   As between May 18 and June -- whatever it is
10 when it was signed.  I could not say exactly when.
11    Q   Let's mark as the next exhibit a memorandum
12 from Mr. Fleisher to Mr. Nobles, Mr. VerMaas and
13 Mr. DeVassie dated June 3, 1999.  Do you remember
14 Exhibit 7, sir?
15    A   Yes, I recognize that.
16    Q   Is that a memorandum that you prepared for the
17 addressees on or about the date it bears?
18    A   Yes, it is.
19    Q   Okay.  Were Mssrs. Nobels, DeVassie and VerMaas
20 all members of SHC?
21    A   That's correct.
22    Q   Does it refresh your recollection that by
23 June 3 any issues with respect to the agreement had been
24 resolved?
25    A   Yes.

Page 78

1     Q   Let's mark as the next exhibit a memorandum
2  dated May 25, 1999, from Mr. Miller to Mr. Fleisher.  Do
3  you recognize Exhibit 8, sir?
4     A   Yes, it has my handwriting on it.
5     Q   Did you receive that on or in due course of the
6  mails after the date it bears?
7     A   Pardon?
8     Q   Did you receive that document from Mr. Miller
9  on or in due course of the mails after the date it bears?
10    A   I would -- yes, I would presume we received it
11 on or about that date that it says, May 25 of 1999, and I
12 answered on May 27, 1999.
13    Q   Okay.  Does Exhibit 8 address the subject of
14 payment modalities at all?
15    A   Okay.  Let me take a moment to review that if I
16 could.
17    Q   By all means.
18    A   No, that was not addressed.  These pages do not
19 address any payment issues.
20    Q   Is it consistent with your best recollection
21 that by May 25 any issues with respect to payment
22 modalities had been resolved?
23    A   I believe so because it was May 18 -- May 18
24 notes indicate the problem with the Cooperative Mailing
25 Rule and the excess payments, promissory notes and so

Page 79

1  forth, and this one's dated May 25.  And I -- well, I
2  said "George, this language is fine.  Also I confirm
3  there's no problem with donors who first require" -- this
4  deals with 5.2 and 5.3.  Although it looks like
5  everything is resolved by then, I couldn't be 100 percent
6  sure because we might have only been dealing with 5.3.
7  That was the only page that was attached.
8          And I said -- he says in this, "here's the new
9  language that Carolyn proposed for 5.3," so forth and so
10 on.  And I say, "This language is fine and I confirm
11 there is no problem" -- and so forth.  So this might very
12 well have been just speaking to any provisions with 5.3.
13 So I could not say with certainty that by that date the
14 provisions regarding payment were 100 percent worked out.
15    Q   But that's consistent with your best memory, is
16 it not?
17    A   That they were worked out by that date?
18        MR. GRIFFIN:  Objection.
19    A   No.  On thinking on it again, I could not say
20 for certainty that they had been resolved by that date.
21 BY MR. JOHNSON:
22    Q   Let me put it another way.  Do you have any
23 memory to the contrary?
24    A   No.
25    Q   Do you have any memory, any specific

Page 80

1  affirmative memory, of any discussion -- having had any
2  discussion with Mr. Miller of any aspects of the payment
3  provisions after that conference call that you had with
4  him and perhaps with Mr. Lyon around May 20?
5     A   I could not recall.  I would not be able to say
6  one way or the other as to what happened six years ago on
7  May 20.
8         MR. JOHNSON:  Thank you, sir.  That's it.
9         MR. GRIFFIN:  You done?
10        MR. JOHNSON:  Yeah.
11        MR. GRIFFIN:  Could we put our stipulation on
12 the record as far as the documents produced?
13        MR. JOHNSON:  Why don't we go off the record
14 for a moment and you and I discuss what the
15 stipulation is and then when we've got common ground
16 we'll put it on the record.
17        (Discussion off the record.)
18        MR. JOHNSON:  All right.  We've agreed,
19 Mr. Griffin and I, in order to obviate the need for
20 examination on that topic, that the correspondence
21 files produced by Shriners in response to
22 Mr. Griffin's subpoena and limited to correspondence
23 appearing in those files are true and accurate
24 copies of correspondence appearing in the
25 correspondence files of Shriners and that such

Page 81

1  documents are kept by Shriners in the regular course
2  of its business.
3             EXAMINATION
4  BY MR. GRIFFIN:
5      Q   Can you recall the first date that you spoke to
6  George Miller regarding the contract for the Shriners and
7  Vantage?
8      A   Not the specific date. It would have been
9  after our board meetings in April of 1999. I did not
10 speak with him before those board meetings.
11     Q   I would like to mark as the next exhibit --
12 we're up to 7.
13         THE COURT REPORTER: No, 9.
14         MR. JOHNSON: Describe it for the record.
15 BY MR. GRIFFIN:
16     Q   Can you tell me what this document is?
17     A   It's a letter from me to Peter Levett,
18 Assistant US Attorney at the U.S. Department of Justice.
19     Q   Bates Number SHC04236 to SHC04276, correct?
20     A   Yes, that's correct.
21         MR. JOHNSON: Does the letter have a date?
22 BY MR. GRIFFIN:
23     Q   The letter's dated December 17, 2000, correct?
24     A   Correct.
25     Q   Attached to this letter are there minutes of

Page 82

1  the board meeting you just referred to where the Vantage
2  contract was discussed for the first time by the board?
3      A   What page is that? Is that SHC04241?
4      Q   I believe so.
5      A   That's correct.
6      Q   Right.
7      A   Yes. Those would be the minutes of the boards'
8  meeting.
9      Q   So as of that date it was the board's
10 understanding that Vantage had represented that this
11 contract would be at no cost to the Shriners outside of
12 the program receipts; is that correct?
13         MR. JOHNSON: Objection to the form.
14     A   From my presence at the board meetings, my
15 understanding is that it was represented to the boards
16 that that statement is correct.
17 BY MR. GRIFFIN:
18     Q   Do you know who made that representation on
19 behalf of Vantage?
20     A   There was no Vantage representative at the
21 board meetings during that time.
22     Q   Prior to the meeting, who had made these
23 representations to the Shriners?
24         MR. JOHNSON: Objection to the form.
25     A   I don't know.

Page 83

1  BY MR. GRIFFIN:
2      Q   But, to your knowledge, prior to Mr. Miller's
3  involvement negotiating the contract, Vantage had made a
4  representation regarding the payment provisions and
5  liability of the Shriners; is that correct?
6          MR. JOHNSON: Objection to the form. I also
7      point out to you that he just testified that it
8      wasn't to his knowledge, and nobody made such a
9      representation to him and that it's all third hand.
10 BY MR. GRIFFIN:
11     Q   The board minutes reflect the fact that Vantage
12 had made representations to the Shriners regarding the
13 Shriners' liability under the contract, correct?
14         MR. JOHNSON: Objection to the form.
15     A   That's correct.
16 BY MR. GRIFFIN:
17     Q   And that occurred before Mr. Miller's
18 involvement with the negotiations, correct?
19     A   That's correct.
20     Q   Would you agree that any negotiations going
21 forward between the Shriners and Vantage from that date
22 were limited by the initial representations made by
23 Vantage regarding liability for payment?
24         MR. JOHNSON: Objection to the form.
25     A   They were limited by the presentation at the

Page 84

1  board meetings as to how the finances of the program
2  would operate without financial risk to Shriners
3  Hospitals for Children.
4  BY MR. GRIFFIN:
5      Q   So the provisions in the contract going forward
6  limited by those representation reflected in the board
7  minutes; is that correct?
8          MR. JOHNSON: Objection to the form.
9      A   Up through shortly before the final agreement
10 where a compromise was reached concerning if the Shriners
11 just wanted to walk away from the contract.
12 BY MR. GRIFFIN:
13     Q   You testified earlier that you recalled a
14 conference here in Tampa with Larry Lyon prior to the
15 signing of the Shriners/Vantage agreement. Do you recall
16 that testimony?
17     A   Yes.
18     Q   And during that meeting did Mr. Lyon make any
19 representations regarding the Shriners' liability under
20 the agreement?
21         MR. JOHNSON: Objection to form.
22     A   I do not recall specifically. I can't recall
23 specifically one way or the other because I can't recall
24 whether that particular conference that we had dealt with
25 that particular topic because I can't remember whether

21

Page 85

1  that topic had arisen yet.
2  BY MR. GRIFFIN:
3  Q   I would like to mark as Exhibit Number 10 an
4  April 13, 1999, memorandum from you to Ralph Semb. It's
5  Bates-numbered SHC00370 through SHC00374.
6      MR. JOHNSON: You want to mark it again? It's
7  Exhibit 1.
8      MR. GRIFFIN: It's got handwritten notes the
9  original doesn't have.
10 BY MR. GRIFFIN:
11 Q   Can you just take a look at this, please, and
12 tell me if you recognize it?
13 A   Yes. That's the memorandum that I had given to
14 Mr. Semb prior to the board meetings after he had given
15 to me the contract that I presented to him from Vantage
16 to review prior to the board meetings.
17 Q   Do you recognize the handwritten notes on this
18 document?
19 A   Yes, those are mine.
20 Q   On Page 370, the first page --
21 A   Yes.
22 Q   -- underneath the fifth bullet --
23 A   The fifth bullet?
24 Q   Yes. It says "cost, fees and expenses are not
25 clearly laid out and should be under the agreement as

Page 86

1  first prepared. SHC could owe Vantage more than the
2  gross amount of donations taken in. Vantage would be
3  insulated from any program risk." Did I read that
4  correctly?
5  A   Yes, you did.
6  Q   There's a handwritten note by that says "says
7  no." Is that correct?
8  A   Right.
9  Q   Who was saying no to that provision?
10 A   The "says no" would have been during the board
11 meetings. I took this -- I took a copy of this
12 memorandum with me to the board meetings and at the board
13 meetings while the boards were going on, I believe --
14 well, I can't testify 100 percent certainty but I was
15 taking notes concerning what the boards had determined to
16 do or what was represented to them on this piece of
17 paper.
18 Q   And this is the April 1999 board meeting?
19 A   Yes.
20 Q   As a result of the board meeting was there any
21 procedure put in place for approving the final form of
22 the agreement?
23 A   Yes. There was a committee comprised of
24 several authorities at Shriners Hospitals for Children
25 that had to review the agreement and also legal

Page 87

1  department had to review the agreement before it would be
2  approved by the president of the corporation.
3  Q   Like to mark as Exhibit 11 a memorandum from
4  you to Louis Mulnar, Theodore Persuans, Jacob Wood, Chip
5  Jones, dated April 27, 1999, Bates-numbered SHC047233
6  through SHC047239. Do you recognize this document?
7  A   Yes.
8  Q   This is a memorandum you prepared?
9  A   Yes.
10 Q   If you look at the second-to-last sentence
11 going forward it says "I will provide each of you a copy
12 of the proposed agreement before transmitting it for
13 approval to the chairman of the board of directors,
14 chairman of the board of trustees and chairman of the
15 endowment, wills and gifts committee as directed by the
16 boards."
17     Is it correct that the approval process for the
18 agreement included you running the contract by the four
19 individuals identified on this memorandum as well as the
20 three chairmen?
21 A   No.
22 Q   Okay. What was the --
23 A   The approval process was the chairman of the
24 board of directors, chairman of the board of trustees and
25 chairman of the endowment and wills committee and

Page 88

1  copies -- I was giving these to those people that was
2  the -- let's see. Two employees of the corporation, the
3  general counsel and an outside auditor. They were not
4  officers of the organization. I was providing to them
5  courtesy copies for their review.
6  Q   So this is for their information?
7  A   Pardon?
8  Q   This was for their information?
9  A   Yes.
10 Q   But ultimately in order for it to be approved
11 the chairman of the board of directors, chairman of the
12 board of trustees and the chairman of the endowment,
13 wills and gift committees all had to approve the
14 contracts; is that correct?
15 A   That's correct.
16 Q   Can you identify for me who those individuals
17 were at this time?
18 A   At that time the chairman of the board of
19 directors was Mr. Semb, Ralph Semb. The chairman of the
20 board of trustees was Mr. John VerMaas, V-E-R-M-A-A-S,
21 and the chairman of the endowment, wills and gifts
22 committee was a Mr. Terrie -- that's I-E -- DeVassie.
23 Capital D, little E, capital V-A-S-S-I-E.
24 Q   So it's fair to say that no individual
25 themselves, including you, could approve final form of

22

Page 89

1  the agreement?
2    A  That's correct.
3    Q  If you look further in this Exhibit Number 11
4  there is yet another copy of your April 13, 1999,
5  memorandum to Ralph Semb which begins on SHC04725. Do
6  you see that?
7    A  Yes.
8    Q  And attached is the initial draft of the
9  agreement that you were provided by Mr. Semb; is that
10 correct?
11   A  It would appear to be. It's the same one that
12 we were looking at previously in my other testimony, so
13 it would appear to be, yes.
14   Q  Do you have any knowledge as to whether
15 Mr. Miller was involved in preparing this initial draft?
16   A  None whatsoever.
17   Q  You had not had any contact with Mr. Miller
18 regarding this draft as of April 27, 1999; is that
19 correct?
20   A  I can't remember if I contacted him between
21 April 13 and April 27. I know that prior -- at the time
22 I had received the agreement that's attached to the April
23 13, 1999, memorandum I had -- I didn't even know who
24 Mr. Miller was.
25   Q  If you look forward to SHC04737, third-to-last

Page 90

1  page in this exhibit.
2    A  Yes.
3    Q  It's Paragraph 12.1, termination without cause,
4  correct?
5    A  Yes.
6    Q  Within that paragraph there are provisions
7  concerning rental of the Shriners mailing list and
8  additional mailings for a 36-month period; is that
9  correct?
10       MR. JOHNSON: Objection to the form.
11   A  Yes. Yes.
12 BY MR. GRIFFIN:
13   Q  So those provisions were in the original form
14 of the agreement you received, correct?
15       MR. JOHNSON: Objection to the form.
16   A  The provisions that are shown there are in the
17 original form of the agreement to the best of my
18 recollection.
19 BY MR. GRIFFIN:
20   Q  Okay. I would like to look at next part of
21 Exhibit 6 here which was Exhibit 13B to the deposition
22 of --
23       MR. GRIFFIN: This is Mr. Miller, correct?
24       MR. JOHNSON: Mmm-hmm.
25 BY MR. GRIFFIN:

Page 91

1    Q  If you will look at -- well, let's identify it.
2  It's Draft 5 of the agreement to provide fundraising
3  consulting and management services, correct?
4    A  Yeah. SHC03322, that's where it starts.
5    Q  Yes. Look at Page SHC03336.
6    A  Okay. Yeah.
7    Q  Is this your handwriting notes on here?
8    A  Yes, it is.
9    Q  If you look on the bottom left-hand corner
10 there's a comment that begins with Bracewell. Could you
11 read that for me?
12   A  Something terminate -- yeah. "Bracewell, SHC
13 terminate. We chose to pay bills or let them use mailing
14 list." Yeah. This was cut -- there is part of that cut
15 off on there. If I had the original it would say,
16 "Bracewell-SHC terminate where we choose to pay bills or
17 let them use mail list."
18   Q  Do these notes document your prior testimony
19 concerning your conversations with Mr. Bracewell?
20       MR. JOHNSON: Objection to the form.
21   A  Helps to refresh my recollection that I had a
22 conversation with him concerning this.
23 BY MR. GRIFFIN:
24   Q  How was your recollection refreshed by this
25 note?

Page 92

1    A  Well, the notes said Mr. Bracewell told me that
2  regarding that particular paragraph there if Shriners
3  Hospitals for Children chose to terminate, we'd pay the
4  bills at that point or let them use the mail list to make
5  it up.
6    Q  So it was Mr. Bracewell's determination that
7  the Shriners opted for that payment method?
8        MR. JOHNSON: Objection to the form.
9    A  Mr. Bracewell was the corporate officer that I
10 was working most closely with during negotiations, and I
11 discussed it with him and he's the one that gave me that
12 advice.
13 BY MR. GRIFFIN:
14   Q  Did you also make the edits to these headings
15 here, termination without cause?
16   A  All of the handwriting on that page is mine.
17   Q  Does that document reflect your recollection in
18 any other way concerning conversations with Mr. Bracewell
19 or any member of the Shriners regarding the options for
20 satisfying liability under the contract?
21   A  Well, from my notes there it says Bracewell
22 terminates, so forth and so on at the corner. To the
23 best of my recollection, these changes resulted from
24 discussions with him or discussions with him and others.
25 I couldn't tell you for sure where exactly all of these

Page 93

1  changes came from, except I was acting under the
2  directions of Mr. Bracewell regarding termination without
3  cause, in essence.
4      Q    The next I would like to look at another part
5  of Exhibit 6 which was Exhibit 13F from Mr. Miller's
6  deposition. This was your May 12, 1999, memorandum to
7  Gene Bracewell?
8      A    Yes, that's my memorandum.
9      Q    If you look at Page SHC00312, Paragraph 13.1,
10 termination without cause.
11     A    00312, you say?
12     Q    00312.
13     A    0213?
14     Q    12.
15     A    12. Okay. All right.
16     Q    Paragraph 13.1 states that any outstanding
17 billing statements shall become due and payable to
18 Vantage with 60 days of such notice, correct?
19         MR. JOHNSON: Object to the form.
20     A    Yes.
21 BY MR. GRIFFIN:
22     Q    This draft of Paragraph 13.1 does not contain
23 any mention of the 36-month mailings or list rental that
24 were contained in the original agreement; is that
25 correct?

Page 94

1          MR. JOHNSON: Objection to the form.
2      A    No, it does not.
3  BY MR. GRIFFIN:
4      Q    And Paragraph 13.3 is titled "Event of
5  Default," correct?
6      A    Correct.
7      Q    And that also concluded all outstanding billing
8  statements shall be immediately due and payable to
9  Vantage and if directed by Shriners Vantage shall furnish
10 all preapproved mailing; is that correct?
11         MR. JOHNSON: Objection to form.
12     A    Yes.
13 BY MR. GRIFFIN:
14     Q    This does not include any of the 36-month
15 mailing -- recovery mailing provisions that were included
16 in the prior versions of the correct; is that correct?
17         MR. JOHNSON: Objection to the form.
18     A    That's correct.
19 BY MR. GRIFFIN:
20     Q    And based on the final version of the agreement
21 these provisions which impose liability on Shriners were
22 not included, correct?
23         MR. JOHNSON: Objection to the form.
24     A    I can say that the wording in the entire
25 Paragraph 13 is not the same wording as it ended up in

Page 95

1  the final version of Paragraph 13. There were
2  modifications of what would happen and who owed what when
3  the agreement terminated between this particular version
4  that we're talking about now and the final version.
5  BY MR. GRIFFIN:
6      Q    Under this version would you agree that the
7  Shriners were liable for paying any outstanding balance?
8          MR. JOHNSON: Objection to the form.
9      A    13.1, the Shriners would have to pay any
10 outstanding balance due and payable. 13. -- if -- okay.
11 Not under this version.
12 BY MR. GRIFFIN:
13     Q    Sorry? Didn't hear you.
14     A    Okay. Would you repeat the question as to
15 13.3, please?
16     Q    Under 13.3 are the Shriners liable for paying
17 outstanding liabilities?
18         MR. JOHNSON: Objection to the form.
19     A    It looks like we would be liable for that.
20 BY MR. GRIFFIN:
21     Q    Is it fair to say that all of these drafts
22 contained in Exhibit Number 6 you can't tell for certain
23 what date order these come in?
24     A    That's correct.
25     Q    And you can't tell for certain whose edits are

Page 96

1  reflected on all these drafts; is that correct?
2      A    Only the ones that bear my handwriting.
3          MR. GRIFFIN: Where is the final agreement?
4          MR. JOHNSON: It's 2, I think.
5  BY MR. GRIFFIN:
6      Q    Take a look at Paragraph 13.2. You have had
7  the opportunity to review that today; is that correct?
8      A    Correct.
9      Q    Would you have advised the Shriners to enter
10 into an agreement with Vantage absent the provisions in
11 Paragraph 13.2 as written?
12         MR. JOHNSON: Objection to the form.
13     A    No, I would not have.
14 BY MR. GRIFFIN:
15     Q    If you can look at Paragraph 13.1 also. You
16 have had the chance to review that today, too, correct?
17     A    Correct.
18     Q    Would you have had advised Shriners to enter
19 into this agreement with Vantage absent the inclusion of
20 Paragraph 13.1 as written?
21         MR. JOHNSON: Objection to the form.
22     A    No, I would not have advised them.
23 BY MR. GRIFFIN:
24     Q    Like to mark the next exhibit which is a May
25 20, 1999, memorandum from you to John Nobles and others

Page 97

1  which is Bates-numbered SHC04771 to SHC04772. Do you
2  recognize this document?
3  A  Yes, I do.
4  Q  Can you describe what it is?
5  A  It's a memorandum that I sent to the chairman
6  of the board of directors, the chairman of the board of
7  trustees and the chairman of the endowment, wills and
8  gift committee describing the substance of the agreement
9  that would be executed with Vantage.
10 Q  Does this memorandum memorialize your
11 conversations with your counsel, William Lehrfeld, that
12 you referred to earlier?
13     MR. JOHNSON: Objection to the form.
14 A  Yes, it does.
15 BY MR. GRIFFIN:
16 Q  Paragraph Number 1. The final sentence says,
17 "The final draft of the agreement has been prepared by me
18 and is being faxed today to Vantage attorney for their
19 final review." Do you see that statement? Is that
20 correct?
21 A  Yes.
22 Q  Paragraph 2A states in part SHC is liable for
23 all postage cost no matter what. This is required by law
24 to obtain lowest nonprofit rates for program. Does that
25 reflect the advice given to you by Mr. Lehrfeld,

Page 98

1  A  Yes, it does, I believe so.
2  Q  Going down to Paragraph 2B. Third sentence
3  states "Vantage's attorney maintains that SHC must be
4  fully liable for not only postage costs but all other
5  costs of the program in order for nonprofit mailing
6  rights to apply." Is that a correct reading of that?
7  A  Yes, it is.
8  Q  Is that a statement made by Mr. Miller?
9  A  Yes, by Mr. Miller.
10 Q  And then it goes on to say, "According to the
11 experts contacted by Mr. William Lehrfeld, SHC only has
12 to be fully liable for postage expended in order to use
13 the nonprofit rates. According to these experts, there
14 is no reason legally why Vantage could not itself absorb
15 any deficiency other than postage between donations and
16 costs at a time during the operation of the program."
17 Does that accurately reflect the advice given to you by
18 Mr. Lehrfeld?
19     MR. JOHNSON: Objection to the form.
20 A  Yes, it does.
21     MR. JOHNSON: I'm objecting to the form. I try
22     to give you some advance clue when I'm going to do
23     that just by holding up my hand so you'll give me a
24     chance to make my objection. Thanks, Mr. Fleisher.
25 A  Yes, it does.

Page 99

1  BY MR. GRIFFIN:
2  Q  It's true that you never had an attorney-client
3  relationship with Mr. Miller, correct?
4  A  No, never had one.
5  Q  Paragraph D in this is a reference to Vantage
6  contends SHC must sign a separate interest-bearing
7  promissory note for postal costs advanced to it by
8  nonprofit rates via outgoing mail. Is that correct?
9  A  Yes, it is.
10 Q  Is that statement attributable to Mr. Miller?
11 A  Yes, that would have been attributable to
12 Mr. Miller.
13 Q  So you had discussions with Mr. Miller
14 regarding the execution of a promissory note?
15 A  Yes, I did.
16 Q  And the Shriners determined not to proceed in
17 that fashion?
18 A  That's correct.
19 Q  If you can look at the agreement again, which
20 is Exhibit Number 2.
21 A  What page?
22 Q  Page 5.
23 A  Page 5 of the agreement?
24 Q  Yes. Look at Paragraph Number 2. Just take a
25 look at that.

Page 100

1  A  Can we go off the record for just a second?
2     MR. GRIFFIN: Sure.
3     (Discussion off the record.)
4  BY MR. GRIFFIN:
5  Q  I just previously asked you to look at
6  Paragraph 2 of the agreement on Page 5.
7  A  Mmm-hmm.
8  Q  That agreement -- that paragraph concluded
9  Shriners assumed complete and full responsibility for
10 payment of all postage incurred as a result of the
11 operation of this agreement and Vantage has no obligation
12 whatsoever for payment of postage; is that correct?
13 A  That's correct.
14 Q  So under this agreement you agreed that the
15 Shriners had to pay any postage that was incurred as a
16 result of mailings made under the agreement?
17     MR. JOHNSON: Objection to the form.
18 A  That's correct.
19 BY MR. GRIFFIN:
20 Q  At some point in time you learned that Vantage
21 was involved in a civil action brought by the United
22 States Government concerning its fundraising contracts?
23     MR. JOHNSON: Objection to the form. I don't
24     want to be hypertechnical with you, Mr. Griffin, but
25     that's not quite correct.

25

Page 101

1    A    Yes.
2    BY MR. GRIFFIN:
3    Q    Did Vantage ever communicate to you their
4    belief that the Shriners were liable to pay the postal
5    deficiencies that were being sought in that underlying
6    action brought by the government?
7    A    Yes, at one point.
8    Q    How was that communicated to you?
9    A    By -- during the contract -- during the term of
10   the contract at the latter stages of the trial there was
11   an invoice that we received from Vantage at the full
12   postage rate, not at the lower nonprofit rate. And
13   myself and I believe Bill Fossett contacted Matt somebody
14   or other, one of the folks at Vantage, and told them that
15   that was incorrect. We were supposed to be paying at the
16   lower rate.
17       And at that point the folks at Vantage that we
18   spoke to really didn't have any reason as to why the full
19   rate was being charged. Excess of $100,000 difference.
20   So at that point I surmised that -- at that point I
21   surmised that Vantage was protecting itself in the
22   event -- and I seem to recall -- I can't remember exactly
23   the series of letters back and forth between myself and
24   Vantage's counsel or the people at Vantage concerning why
25   they made that increase.

Page 102

1    I told them I didn't think there was any reason
2    for that increase, and there might have been some mention
3    that Vantage made regarding that suit. I can't recall
4    specifically. If it's anywhere, it's in the
5    correspondence.
6    Q    In your opinion was Vantage authorized to mail
7    at the regular bulk rates under the agreement?
8        MR. JOHNSON: Objection to the form.
9    A    The regular one as opposed to the lower one?
10   BY MR. GRIFFIN:
11   Q    Correct.
12   A    No, they were not authorized to mail at the
13   regular one.
14   Q    Would you have ever advised the Shriners to
15   enter into this agreement with Vantage if mailings were
16   to be made at the regular bulk rate as opposed to the
17   nonprofit standard rate?
18       MR. JOHNSON: Objection to the form.
19   A    No, I would not have.
20   BY MR. GRIFFIN:
21   Q    Just want to mark this as the next exhibit. If
22   you could identify this document for me, please.
23       THE DEPONENT: I need to confer with you about
24   that one. Can we step outside off the record for a
25   second?

Page 103

1    (Mr. Fleisher's deposition was suspended at
2    12:45 p.m. and resumed at 3:30 p.m.)
3    A    Would you repeat the question, please?
4    BY MR. GRIFFIN:
5    Q    I think we left off and we were looking at the
6    indemnity agreement, correct? Do you recognize that
7    agreement?
8    A    Yes, I do.
9    Q    Were you involved in the negotiation of this
10   agreement?
11   A    Yes, I was.
12   Q    Can you tell me the background of what led to
13   this agreement?
14       MR. JOHNSON: Objection to the form.
15   A    Background of this is I had learned -- I think
16   it was earlier than this --
17       MR. CANTER: Can I interrupt one second? Do
18   you want to put this under seal, this part of the
19   testimony, Larry?
20       MR. JOHNSON: Why would I put it under seal?
21       MR. CANTER: Because it has a -- this is your
22   client. It's up to you. It has provision of
23   confidentiality your client insisted upon. If you
24   want to put this under seal, I won't object to it
25   obviously. I don't think Matt will either. It's up

Page 104

1    to you.
2        MR. JOHNSON: It would probably be a good idea.
3    I appreciate the suggestion.
4        MR. CANTER: Note on the record this part of
5    the testimony will be under seal then by agreement
6    of the parties.
7    BY MR. GRIFFIN:
8    Q    You can continue in your answer.
9    A    Yeah. There was sometime before that that I
10   had learned that the United States Government had brought
11   an action against Vantage for whatever counts that they
12   had in that particular case that's recited in there. And
13   at that point I became concerned that Vantage may attempt
14   to sue over Shriners Hospitals for Children for any
15   excess -- for any excess postage they had to pay, damages
16   or whatever in that case.
17       And there was a concern because there were a
18   number of other institutions who had been named
19   third-party defendants by Vantage, some of whom are
20   Masonic institutions, as is Shriners. So there were a
21   number of things going on at the time, and when I became
22   aware that I felt that Shriners Hospitals for Children
23   needed protection from Vantage in the event that Vantage
24   sustained any loss arising out of that lawsuit.
25   Q    Was it your opinion that Paragraph 2 of the

26

Page 105

1  contract created exposure for postal deficiencies?
2       MR. JOHNSON: Objection to the form.
3     A  No, I didn't believe that created any -- I
4  didn't believe anything in the entire contract created
5  liability for postage deficiencies.
6  BY MR. GRIFFIN:
7     Q  Under Paragraph 2 of the Shriners -- the
8  Shriners are liable for all postage paid for mailings
9  under the agreement, correct?
10    A  That's correct.
11    Q  What was the consideration that the Shriners
12 would give them for this agreement?
13    A  It was review of further programs that were
14 going to be proposed by Vantage that the hospitals were
15 not obligated to previously review or consider. In
16 essence, in exchange for this, Vantage would be given the
17 opportunity to pitch further programs to the
18 businesspeople at Shriners.
19    Q  I'll mark as the next exhibit a July 1, 2002,
20 letter to you from Seth Pearlman, Bates stamp NSG0172 to
21 NSG173. Do you recognize Exhibit 14?
22    A  I haven't seen it yet. Nobody's given it to
23 me. Oh, yeah. That's right. Yes, I saw that. That's
24 one of the things that precipitated this because the
25 letter was sent by Seth Pearlman to James Fleisher. And

Page 106

1  if you look at the bottom of it, the last paragraph says
2  "the governor believes that as the holder of the
3  nonprofit mailing permit the Grand Lodge is jointly and
4  severally liable for Vantage." The Grand Lodge was one
5  of the Masonic organizations.
6       It's not officially connected with Shriners and
7  it was named as a third-party defendant, I believe, by
8  Vantage in the government suit. When I saw this, this
9  was preceded -- this agreement, I believe -- yes. That's
10 what really gave me concern is when we got a letter like
11 that.
12    Q  So you understood although he was referring to
13 the Grand Lodge he meant the Shriners Hospitals for
14 Children?
15    A  I don't know what he meant. All I know is he
16 sent a letter to me supposedly, although he got the name
17 wrong and the address right, and it looked like to me it
18 was a form letter that was shotgunned out to any number
19 of third-party defendants. And at that point, whatever
20 it was, I got pretty nervous about the possibility of
21 Shriners Hospitals for Children being exposed to any
22 damages coming out of that suit, and that's when
23 subsequently the indemnity agreement was negotiated.
24    Q  With whom did you negotiate the indemnity
25 agreement?

Page 107

1     A  Pardon?
2     Q  With whom did you negotiate the indemnity
3  agreement?
4     A  Mr. Pearlman.
5     Q  Was Mr. Johnson involved in that negotiation at
6  all?
7     A  Larry?
8     Q  I'm referring to Laurence Johnson here.
9     A  Not to my knowledge, no.
10    Q  Mark as the next exhibit an affidavit of
11 Willard Fossett, Jr. Have you seen this document before?
12    A  Yes.
13    Q  Can you tell me who Mr. Fossett is?
14    A  Willard Fossett is the controller of Shriners
15 Hospitals for Children.
16    Q  And attached to this affidavit there is an
17 Exhibit A, Vantage direct mail program summary. Do you
18 see that?
19    A  Yes, I do.
20    Q  To your knowledge, is that an accurate
21 reflection of the financial results of the agreement
22 through September 30, 2004?
23    A  It was --
24       MR. JOHNSON: Object to the form.
25    A  It was represented by Mr. Fossett, who is the

Page 108

1  controller who calculated that, that it was a correct
2  calculation of the total amount that's consistent with
3  reports that I had been made aware of all along during
4  the program, but I didn't count the money.
5  BY MR. GRIFFIN:
6     Q  Exhibit A, what's indicated as far as net
7  program donations?
8       MR. JOHNSON: Objection to the form.
9     A  Did you ask a question?
10 BY MR. GRIFFIN:
11    Q  Yes. I said Exhibit A, what does it show as
12 far as net program donations under the program?
13    A  Well, $2,831,695.
14    Q  That's the net program proceeds to the Shriners
15 Hospitals for Children?
16    A  That's correct.
17    Q  And, to your knowledge, that's an accurate
18 number?
19    A  To my knowledge, yes.
20    Q  And total net program donations were
21 $46,220,167, right?
22       MR. JOHNSON: Objection to the form.
23    A  To my knowledge, that's correct. That's why I
24 asked Bill Fossett to put this together.
25 BY MR. GRIFFIN:

27

Page 109

1    Q   And payments to Vantage, it's indicated as
2    $36,043,436, correct?
3        MR. JOHNSON: Objection to the form.
4    A   Yes.
5    BY MR. GRIFFIN:
6    Q   And there is a line here that indicates Vantage
7    settlement, $7,254,293, correct?
8        MR. JOHNSON: Objection to the form.
9    A   That's correct.
10   BY MR. GRIFFIN:
11   Q   So total payments to Vantage were over 43
12   million dollars, correct?
13       MR. JOHNSON: Objection to the form.
14   A   It would appear, yes.
15   BY MR. GRIFFIN:
16   Q   What does the Vantage settlement refer to?
17   A   When the Vantage contract was terminating it
18   was, I think, over a four-year term there was some --
19   there were some issues as to what Shriners Hospitals for
20   Children had to pay in connection with the termination of
21   that contract, and a settlement was reached with Vantage
22   concerning what Shriners Hospitals for Children was still
23   liable to pay under the contract. And that was the
24   amount upon which we agreed and was ratified by our board
25   of directors, seven million.

Page 110

1    Q   So at the end of the contract period there was
2    a shortfall of donations; is that correct?
3        MR. JOHNSON: Objection to the form.
4    A   No. In my opinion, everybody else's opinion,
5    it just covered the whole thing by 2.8 million. The
6    gross donations covered the expenses by 2.8 million.
7    That's what we made out of the net.
8    BY MR. GRIFFIN:
9    Q   So the seven million, that just reflects the
10   outstanding balances that were paid to Vantage at the
11   end?
12       MR. JOHNSON: Objection to the form.
13   A   Those were the outstanding invoices that
14   Vantage had submitted to us less and except one invoice
15   which included postage at the full bulk mailing rate, not
16   the lower bulk -- charitable bulk mailing rate.
17       There was some discussion as to whether or not
18   Shriners Hospitals was liable for that amount. And I
19   believe we were not liable for that increased postage,
20   and basically if you back that out, the 7.2 million was
21   the remainder of Vantage's invoices.
22   BY MR. GRIFFIN:
23   Q   Vantage never conducted any additional mailings
24   under the contract as set forth in either 13.1 or 13.2,
25   correct?

Page 111

1    A   Not subsequent to the end of the term of the
2    contract. Not after final mailing.
3    Q   So essentially after final mailing the Shriners
4    agreed to pay what the outstanding balances were; is that
5    correct?
6    A   Yes, essentially.
7    Q   Was Vantage's position that at the end of the
8    contract period that Shriners were liable for payment of
9    those invoices?
10       MR. JOHNSON: Objection to the form.
11   A   I was told by representatives of Vantage that
12   that was their opinion.
13   BY MR. GRIFFIN:
14   Q   I'll mark this as the next exhibit. I have
15   marked a November 24, 2003, fax to Vantage Direct
16   Marketing Services, John Kenney, Jr., from Pearlman &
17   Pearlman. And attached thereto is a November 21, 2003,
18   letter to the Shriners Hospitals legal department.
19   That's Bates Numbers Vantage 491 to Vantage 4920.
20   A   Mmm-hmm.
21   Q   Do you recall receiving this letter?
22   A   Yes, I did.
23   Q   Am I correct this sets forth Vantage's position
24   that they would not settle for less than the full amount
25   due at the end of the agreement?

Page 112

1        MR. JOHNSON: Objection to the form.
2    A   Let me read it, please. Yes, that's a correct
3    statement you just made.
4    BY MR. GRIFFIN:
5    Q   So were you negotiating with Seth Pearlman
6    regarding the final payment under the contract? Is that
7    correct?
8    A   Initially it was Seth Pearlman, and then also
9    the fellow who is -- was at that time the -- who recently
10   had become the general counsel of Vantage and then
11   subsequently the -- with Mr. Johnson.
12   Q   Did Vantage ever indicate that they had planned
13   to initiate legal proceedings to enforce payment of the
14   outstanding invoices?
15       MR. JOHNSON: Objection to the form.
16   A   I don't recall them saying flat-out to me in a
17   letter, "we're going to sue you if you don't pay the rest
18   of those invoices." They may have, but I don't recall
19   that because if -- no, I don't recall that specifically.
20   BY MR. GRIFFIN:
21   Q   I'll mark this as the next exhibit. I have
22   marked some notes dated 12/2/03 in the upper right-hand
23   corner. Bates Number SHC04061. Do you recognize those
24   notes?
25   A   Yes. Most of them are mine, and the phone

Page 113

1  number there is from my secretary.
2      Q   And do those notes memorialize a conversation
3  you had with Laurence Johnson?
4      A   The conversation was with Mr. Johnson and John
5  Kenney, he was their general counsel, and myself. It
6  says "Fax a conclusion, share with client, rejected,
7  denied, changed mind." I don't know what fax they are
8  talking about. And then it says here "LJ said he only
9  recommended it" -- whoever it is, I don't remember -- "if
10  SHC agreed to pay interest and secured amount owed."
11          And then also it says "LJ said he had been
12  instructed to file suit today if things couldn't be
13  worked out; i.e., unless we agreed to pay all invoices
14  immediately."
15      Q   Does this refresh your recollection as to
16  whether Vantage had threatened litigation to enforce
17  payment under the contract?
18          MR. JOHNSON: Objection to the form.
19      A   Yes, it does. It's consistent with the habit I
20  stated earlier of trying to write down my important
21  conversations as I could as a normal part of my practice.
22  BY MR. GRIFFIN:
23      Q   In your discussions with Mr. Johnson, if you
24  recall, did he state that Vantage's position was that the
25  Shriners were liable for all the outstanding invoices?

Page 114

1          MR. JOHNSON: Objection to the form.
2      A   Yes.
3  BY MR. GRIFFIN:
4      Q   I have marked a December 4, 2003, letter from
5  Laurence Johnson. It's a duplicate, I believe. Bates
6  Number SHC01893 to 01900. Do you recognize this
7  document?
8      A   Yes, I do.
9      Q   Were you involved -- strike that. Can you tell
10  me what this document is?
11      A   This document was the embodiment in writing of
12  how we were going to exit our relationship with Vantage
13  and who would do what and who would pay what.
14      Q   Were you involved in the negotiation of this
15  agreement?
16      A   Yes, I was.
17      Q   Can you tell me, in substance, what the final
18  agreed payment was to Vantage?
19          MR. JOHNSON: Objection to the form.
20      A   Basically we were going to pay the outstanding
21  bills plus another small amount to get the final program
22  donor list that was generated, and we were going to back
23  out the $223,000 additional postage that I mentioned
24  previously.
25          And then once we paid that we wouldn't owe

Page 115

1  Vantage any more, and then Vantage would do certain
2  things to tie up loose ends here and Shriners would do
3  certain things to tie up loose ends and then there would
4  be some continuing obligations of Vantage here.
5  BY MR. GRIFFIN:
6      Q   Do you have any idea how much profit Vantage
7  made as a result of that agreement?
8          MR. JOHNSON: Objection to the form.
9      A   No.
10  BY MR. GRIFFIN:
11      Q   Did you ever try to come up with an estimate of
12  that amount?
13      A   Yes.
14      Q   What was your estimate?
15          MR. JOHNSON: Objection to the form.
16      A   I had four board members that the estimate was
17  approximately 50 percent of Vantage's gross payments
18  received from us.
19      Q   So 50 percent of the 43 million dollar figure?
20      A   That's correct.
21      Q   Do you know how the board members calculated
22  that amount?
23      A   Board members --
24          MR. JOHNSON: Objection to the form.
25      A   Sorry. No board member calculated that. I

Page 116

1  obtained a copy of Henry Lewis' deposition in the suit
2  that the federal government had filed on Vantage. In his
3  deposition I believe there is a statement that they made
4  about 50 cents on every dollar they received. So it was
5  just a scientific guess. I don't have any proof or
6  anything or knowledge.
7  BY MR. GRIFFIN:
8      Q   At any time subsequent to signing the agreement
9  with Vantage --
10      A   Which agreement?
11      Q   The June 1999 fundraising agreement, Exhibit 2.
12      A   All right.
13      Q   Did Vantage ever ask that the provisions of
14  Paragraph 13.2 be amended?
15      A   Yes, I believe so.
16      Q   What are the circumstances surrounding that?
17      A   We were coming to the end of the contract and
18  Vantage told me and they told a number of our officers
19  who subsequently related to me they wanted to keep
20  Shriners' business and keep the relationship with
21  Shriners.
22          And there were -- there was presented by the
23  Vantage businesspeople to our officers, and including
24  myself, various proposals that if we entered into these
25  proposals that the seven million and change would in some

Page 117

1 form or some degree be reduced.
2     Q   Did you ever execute any further agreements
3 with Vantage beyond the June 1999 agreement?
4     A   If you call that an agreement, yes.
5     Q   Any fundraising agreements. I'm sorry.
6     A   Okay. Fundraising agreements? No, sir.
7     Q   Just switching gears now. How do you
8 characterize the quality of the services that Vantage
9 provided under the agreement?
10        MR. JOHNSON: Objection to the form.
11    A   I really had no basis to compare the quality of
12 the services by Vantage against any other institution
13 that performed the same services because this was a first
14 time that the Shriners Hospitals had ever done this. So
15 really I had no baseline.
16 BY MR. GRIFFIN:
17    Q   Were there ever any issues in your mind with
18 Vantage not complying with the provisions of the
19 agreement?
20        MR. JOHNSON: Objection to the form.
21    A   Yes. On many, many occasions there were times
22 that I felt and other folks in the organization felt that
23 Vantage was going outside of the agreement or not living
24 up to the agreement. And it became a very high
25 visibility topic of discussion amongst the various board

Page 118

1 members and involved the board itself and myself, such
2 that it got to the point that before we would allow
3 Vantage to make any particular mailing that I had to
4 approve the mailing, Bill Fossett had to approve the
5 mailing and a third person, who is deceased now, Paul
6 Gramlin, had to approve the mailing.
7        And my job was to make sure that each of the
8 mailings from an administrative point of view was
9 consistent with the contract.
10 BY MR. GRIFFIN:
11    Q   That's provided for in the original agreement,
12 Exhibit 2, correct?
13        MR. JOHNSON: Objection.
14 BY MR. GRIFFIN:
15    Q   That there be approval of the mailings by
16 Shriners?
17        MR. JOHNSON: Objection, form.
18    A   Repeat that.
19 BY MR. GRIFFIN:
20    Q   It's provided for in the original agreement
21 that any mailings were subject to the approval of the
22 Shriners, correct?
23        MR. JOHNSON: Objection to the form.
24    A   That's correct.
25 BY MR. GRIFFIN:

Page 119

1     Q   And is it your testimony that Vantage did not
2 always follow that provision of the contract?
3         MR. JOHNSON: Objection to the form.
4     A   That's correct.
5 BY MR. GRIFFIN:
6     Q   Did Vantage -- so Vantage did, in fact, send
7 out mailings that were not approved by the Shriners?
8         MR. JOHNSON: Objection to the form.
9     A   That's correct.
10 BY MR. GRIFFIN:
11    Q   Is that what you mean when you said they were
12 doing things outside of the agreement? Is that what you
13 were referring to?
14    A   Outside of the agreement, I'm referring to
15 mailings that were not in what's known as a pro forma and
16 was attached to the original agreement or subsequent
17 variation of the pro forma and other agreements that we
18 had with Vantage and mailings. And there were one or two
19 instances where we just found out flat-out that they had
20 mailed things out without our specific approval.
21    Q   You also used the phrase "not living up to the
22 agreement." Would that refer to the same behavior or is
23 there anything else you were thinking of?
24        MR. JOHNSON: Objection to the form.
25    A   That's basically what I was speaking of.

Page 120

1 BY MR. GRIFFIN:
2     Q   Did you ever come to any conclusion as to the
3 number of mailings that Vantage made that weren't
4 authorized by the Shriners?
5         MR. JOHNSON: Objection to the form.
6     A   A few. Somewhere between one and three.
7 BY MR. GRIFFIN:
8     Q   One and three total mailings that weren't
9 authorized?
10    A   Yes.
11    Q   How many pieces of mail do those involve?
12    A   I don't recall. There were many, many, many
13 thousands of mailings -- pieces of mail.
14    Q   Let's mark this as the next exhibit. What is
15 marked next is an August 9, 2001, letter to Henry Lewis,
16 president of Vantage Group Services from Kenneth Smith.
17 Bates Number Vantage 5000 to Vantage 50001. Had you seen
18 this document before?
19    A   Yes, I have.
20    Q   It reads in the first sentence "After
21 considerable deliberation with the officers and directors
22 of Shriners Hospitals for Children, I'm informing you
23 that we believe it is no longer in the best interest of
24 our philanthropy or Vantage Group Services, Inc., for
25 Mr. Lawrence C. Lyon to be associated with our current

Page 121

1  Shriners Hospitals account." Is that a correct reading
2  of that?
3      MR. JOHNSON: Objection to the form.
4  A  Yes.
5  BY MR. GRIFFIN:
6  Q  Do you know what the circumstances were behind
7  this letter?
8  A  Yes, I do.
9  Q  Can you tell me?
10     MR. JOHNSON: Objection to the form.
11 A  Ken Smith -- Kenneth W. Smith at the time was
12 the chairman of the board of directors and also by virtue
13 of that office the highest ranking officer of our
14 fraternity. It was what's known as his year, and each
15 member comes up for a one-year term.
16     Shortly prior to this resolution attached to
17 the letter being adopted, that is what's known as the
18 Imperial session in July of 2001, there had been many,
19 many disagreements with Lawrence Lyon concerning the
20 operation of the program and, in particular, Mr. Lyon's
21 methods of operating in soliciting board members.
22     Mr. Lyon -- I had seen him at just about all of
23 our board meetings from the time this contract began,
24 whether to sit outside of our -- immediately outside of
25 our boardroom and as soon as the board meeting had ceased

Page 122

1  or had a break, he would come out and start butting the
2  horn of various officers.
3      Some folks didn't like that. Some folks didn't
4  like the way that he operated. They just became fed up
5  with him as the representative. And consequently at that
6  July session at our fundraising evaluation committee,
7  which is the committee that had jurisdiction over
8  evaluating this program, deposited this resolution, it
9  was adopted and the letter was then sent to Henry Lewis
10 by Mr. Smith.
11 BY MR. GRIFFIN:
12 Q  Aside from him being present outside the board
13 meetings, is there anything else about his methods of
14 operating, to borrow your phrase, that the board had
15 issues with or anybody at Shriners had issues with?
16     MR. JOHNSON: Objection to the form.
17     THE DEPONENT: Can I go off the record and I
18 talk to him?
19     MR. GRIFFIN: Sure. Yeah.
20     (Discussion off the record.)
21 A  The other one we had, as this resolution
22 states, a fundraising evaluation committee which
23 evaluates all fundraising efforts by folks other than
24 Shriners, you know, individual volunteers and all
25 proposals under our operating procedures, are supposed to

Page 123

1  be run through that fundraising committee, and there were
2  folks on the boards who believed that Mr. Lyon was trying
3  to make other proposals or proposals concerning the
4  program to board members outside of those on this
5  particular committee, and that's why this resolution was
6  adopted.
7      MR. GRIFFIN: All right. I guess instead of
8  marking a new document, we'll stop there. We've
9  agreed to suspend.
10     (Deposition concluded at 4:12 p.m.)

Page 124

1           CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6      I, the undersigned authority, certify that
7  JAY FLEISHER, ESQUIRE, personally appeared before me and
8  was duly sworn.
9
10
11     WITNESS my hand and official seal this date:
12 11/01/2005.
13
14
15
16
17
18
19
20
           SHELLY NORIEGA, RPR
21         Notary Public
           State of Florida
22
23
24
25

Page 125

1  CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6       I, SHELLY NORIEGA, Registered Professional
7  Reporter, certify that I was authorized to and did
8  stenographically report the foregoing deposition; that a
9  review of the transcript was requested; and that the
10 transcript is a true record of the testimony given by the
11 witness.
12
13      I further certify that I am not a relative,
14 employee, attorney, or counsel of any of the parties, nor
15 am I a relative or employee of any of the parties'
16 attorney or counsel connected with the action, nor am I
17 financially interested in the action.
18
19      Dated: 11/01/2005.
20
21
22
23      _____
24          SHELLY NORIEGA, RPR
25

Page 127

1       JONES REPORTING COMPANY
              (617)451-8900
2
3            LETTER TO DEPONENT
4
5  11/01/2005
6  JAY FLEISHER, ESQUIRE
   Shriners Hospitals for Children
7  2900 Rocky Point Drive
   Tampa, Florida 33607
8
   Re: VANTAGE FINANCIAL SERVICES, INC. Vs NONPROFIT
9  SERVICE GROUP and GEORGE MILLER
10 Dear Mr. Fleisher:
11 The transcript of your deposition taken in the
   above-styled case is now ready for signature via this
12 courtesy copy. Please read the deposition, note any
   amendments or corrections on the errata sheet, and the
13 reason therefor, and sign it. Once completed, Mr. Canter
   will forward your errata sheet to all counsel.
14
   The Rules of Civil Procedure provide 30 days from receipt
15 of this letter for you to exercise your right to read and
   sign. Failure to do so will constitute waiver of your
16 right to read and sign.
17 Our office is open Monday through Friday, 8:30 a.m. to
   5:30 p.m. If you have any questions, please don't
18 hesitate to call us. Thank you for your attention to
   this matter.
19
20 Sincerely,
21
22 Shelly Noriega, RPR
   Notary Public, State of Florida
23
24 cc: L. Johnson, Esq.; M. Griffin, Esq.
25

Page 126

1       ERRATA SHEET
2  TO BE ATTACHED TO DEPOSITION OF JAY FLEISHER, ESQUIRE
   TAKEN 10/28/05
3  IN THE CASE OF VANTAGE VS. NSG,
   CASE NO.: 04-11686-WGY
4  _____
   INSTRUCTIONS: Please read this certified transcript of
5  your deposition and make note of any errors in
   transcription and the reason for same on this page.
6  Do not mark on the transcript itself. Sign and date this
   sheet. Then return both this sheet and the transcript to
7  the court reporter. Thank you.
8  (COUNSEL: Please attach the completed Errata Sheet to
   your copy of the transcript.)
9
   PAGE LINE ERROR OR AMENDMENT / REASON FOR CHANGE
10 __ __ _____
11 __ __ _____
12 __ __ _____
13 __ __ _____
14 __ __ _____
15 __ __ _____
16 __ __ _____
17 __ __ _____
18 __ __ _____
19 __ __ _____
20 __ __ _____
21 __ __ _____
22
   Under penalties of perjury, I declare that I have read my
23 deposition and that it is true and correct, subject to
   any changes in form or substance entered here.
24
25 _____   _____
   DATE       JAY FLEISHER, ESQUIRE

**A**
able 80:5
about 7:11,16 11:22
 14:16,19 17:16,22
 21:18 22:2,20 26:19
 32:6 34:7 41:2,6 42:8
 42:8,10 45:10,18
 47:5,6,14,20 49:11
 50:2,3,19 52:18 53:5
 53:22 54:17 61:5
 62:4 63:10 66:4,9,10
 66:11,15,24 67:13,24
 69:2,6,7,19,21,21,21
 76:4 77:17 78:11
 95:4 102:23 106:20
 113:8 116:4 121:22
 122:13
above-styled 127:11
absent 96:10,19
absorb 98:14
absorbs 44:16
acceptable 53:14
accepted 40:15 58:1
 67:7
accomplish 20:17
accordance 15:16
According 98:10,13
account 121:1
accounts 20:6
accurate 80:23 107:20
 108:17
accurately 98:17
acquire 11:10
act 10:24
acting 93:1
action 100:21 101:6
 104:11 125:16,17
actual 38:19
actually 47:25 54:3
 60:21 64:20
add 34:10 63:9
addition 31:9
additional 19:1 34:20
 90:8 110:23 114:23
address 49:19 78:13,19
 106:17
addressed 24:7 71:6
 78:18
addressees 77:17
addressing 21:2,7
adds 30:21
administrative 118:8
adopted 121:17 122:9
 123:6
advance 98:22
advanced 99:7
advice 92:12 97:25
 98:17
advised 96:9,18,22

102:14
affidavit 3:24 107:10
 107:16
affirmative 53:4 56:4
 58:13 59:16,21,23
 80:1
affix 46:15 47:16 48:3
after 14:20 15:24 25:25
 29:15 30:9 35:7
 52:17 61:14 68:5
 74:7 78:6,9 80:3 81:9
 85:14 111:2,3 120:20
again 9:16 15:3 18:4
 20:13 33:23 44:14
 55:20 62:23 79:19
 85:6 99:19
against 56:14 104:11
 117:12
ago 6:14 12:10 15:6
 22:22 41:9 45:21
 60:6 72:16 80:6
agree 39:15 83:20 95:6
agreed 80:18 100:14
 109:24 111:4 113:10
 113:13 114:18 123:9
agreement 3:11,15,22
 10:24 11:15,20,24
 12:14,21 13:1,2,16
 13:24 14:1,2 15:7,17
 17:24 19:25 20:9
 22:25 24:1,8,8 25:6
 25:14,21 26:24 27:7
 28:12 30:4,14 31:5
 31:14 32:4,12,20,24
 35:21 36:5,21,24,25
 37:10,16,20 38:12,22
 42:4 44:3,4,4 45:7
 54:13,15 56:8 57:1
 60:22,24 61:3 62:8
 64:5,5,11,17 65:9,18
 67:2,23,23 68:5,13
 69:23 70:4 73:1 74:9
 74:22 76:2,3,9,12
 77:5,23 84:9,15,20
 85:25 86:22,25 87:1
 87:12,18 89:1,9,22
 90:14,17 91:2 93:24
 94:20 95:3 96:3,10
 96:19 97:8,17 99:19
 99:23 100:6,8,11,14
 100:16 102:7,15
 103:6,7,10,13 104:5
 105:9,12 106:9,23,25
 107:3,21 111:25
 114:15 115:7 116:8
 116:10,11 117:3,4,9
 117:19,23,24 118:11
 118:20 119:12,14,16
 119:22

agreements 117:2,5,6
 119:17
ahead 15:4 33:19 34:5
 64:8 68:2
Air 6:16,17
allow 68:1 118:2
along 108:3
already 53:8 59:13
 63:10 71:25
alternatives 26:20
although 79:4 106:12
 106:16
always 9:2,4 119:2
amended 116:14
AMENDMENT 126:9
amendments 127:12
America 8:25
among 21:20
amongst 117:25
amount 48:16 86:2
 108:2 109:24 110:18
 111:24 113:10
 114:21 115:12,22
Ancient 8:24
and/or 40:17 53:6
another 8:3 25:18 32:4
 37:1 67:8 79:22 89:4
 93:4 114:21
answer 7:14 10:23 63:8
 69:4 76:25 104:8
answered 78:12
answers 32:15
anybody 14:15 25:11
 29:22 30:2 51:7 54:2
 57:6 59:24 62:17
 64:2 69:23 70:5
 72:18 122:15
anyone 63:21
anything 12:2 14:15
 29:21 46:18 64:8
 105:4 116:6 119:23
 122:13
anyway 27:23
anywhere 102:4
apart 69:12
appear 13:24 31:21
 39:22 43:18,18,25
 56:25 65:17 89:11,13
 109:14
APPEARANCES 2:1
appeared 2:6,12,19
 60:8 124:7
appearing 34:21 76:23
 80:23,24
appears 14:10 30:18
 39:20 44:24 55:13
 56:7 66:25
applicable 7:12
application 22:15,15

applied 19:16
apply 98:6
appreciate 43:13 104:3
approval 34:11,14,18
 87:13,17,23 118:15
 118:21 119:20
approve 88:13,25
 118:4,4,6
approved 87:2 88:10
 119:7
approving 86:21
approximately 5:25
 6:21 115:17
April 10:18 12:12
 15:25 81:9 85:4
 86:18 87:5 89:4,18
 89:21,21,22
Arabic 8:24
arisen 85:1
arising 104:24
Arnold 2:9
around 25:15 38:2
 51:17 55:2 80:4
arranged 20:9
arrangement 14:17
 15:18 22:16 47:7
 68:16
arrangements 7:12
arrive 21:22
aside 51:10 56:3
 122:12
asked 11:9,13 12:2,4
 16:4,14 22:24 43:16
 100:5 108:24
asking 13:15 15:4 66:4
 69:19,21
aspect 15:19 70:3
aspects 14:16 25:6 80:2
assets 17:4 40:24
Assistant 81:18
associated 120:25
assume 15:3,4
assumed 100:9
assuming 7:1
assumption 14:22
assured 16:12
attach 126:8
attached 12:14 13:18
 14:8,9 32:19 33:6,8
 34:23,25 35:3 37:8
 76:1,2 79:7 81:25
 89:8,22 107:16
 111:17 119:16
 121:16 126:2
attachment 12:22
attempt 104:13
attention 28:24 127:18
attorney 5:22 6:25 7:1
 23:6 27:11 61:21

69:14 81:18 97:18
 98:3 125:14,16
attorneys 26:15 27:13
 27:21
attorney-client 99:2
attributable 99:10,11
auditor 88:3
August 120:15
authorities 63:22 86:24
authority 124:6
authorized 102:6,12
 120:4,9 125:7
avoiding 19:17
aware 11:23 20:14 21:5
 22:5,10 24:2,4 76:21
 104:22 108:3
away 51:13 54:10 63:5
 63:6 84:11
a.m 1:17 5:3 74:19,19
 127:17

**B**
b 31:10 34:17 53:16
back 18:4 31:4 36:24
 37:16 49:6 54:5 61:4
 62:23 64:7 74:4
 101:23 110:20
 114:22
background 55:10
 103:12,15
bag 54:11
balance 36:12 39:13,18
 39:19 40:6,13 95:7
 95:10
balances 110:10 111:4
ball 25:5
based 94:20
baseline 117:15
basically 62:18 110:20
 114:20 119:25
basis 23:10 117:11
bat 67:8
Bates 12:15 27:1 28:12
 81:19 105:20 111:19
 112:23 114:5 120:17
Bates-numbered 85:5
 87:5 97:1
bear 13:21 96:2
bearing 28:11
bears 29:15 48:18
 77:17 78:6,9
became 6:20 11:16,22
 11:23 13:13 20:14
 22:5 24:2,3 104:13
 104:21 117:24 122:4
become 7:5,10 10:14
 10:20 11:9,14 21:5
 22:10 23:25 24:4
 93:17 112:10

becoming 10:21
before 5:4 12:17 13:12
  15:8 33:16 35:7
  42:23 57:8 64:16
  67:22,23 68:7,13
  72:6,10,10,22 73:8
  74:8 81:10 83:17
  84:9 87:1,12 104:9
  107:11 118:2 120:18
  124:7
began 121:23
begin 56:13
beginning 13:8
begins 12:24 89:5
  91:10
behalf 2:6,12,19 20:7
  25:3,4,12,17 26:1,2
  30:13 68:14 69:23
  70:5 82:19
behavior 119:22
behind 121:6
being 15:7 19:18 23:13
  35:20 48:18 50:2,19
  52:13,16 53:14,17
  54:17 56:14 58:10
  97:18 101:5,19
  106:21 121:17
  122:12
belief 101:4
believe 10:1 11:6 15:20
  19:21 20:8 22:18
  23:3,8,14,21 24:14
  25:16,19 26:13 29:8
  36:16,20,22 47:3,4
  49:3,23 51:8 54:8
  55:18 58:24 72:6
  74:8 78:23 82:4
  86:13 98:1 101:13
  105:3,4 106:7,9
  110:19 114:5 116:3
  116:15 120:23
believed 123:2
believes 106:2
best 13:17 30:12 31:13
  31:16 52:7 54:1,6
  55:12 58:5 60:19
  77:3 78:20 79:15
  90:17 92:23 120:23
better 33:21
between 7:3,6,12 8:10
  8:16 9:14,24 10:5,6
  10:14 11:25 14:17
  25:16 36:4,22 43:7
  50:3,19 54:18 55:5,6
  58:7 60:3 63:4 65:25
  69:2,14 77:9 83:21
  89:20 95:3 98:15
  101:23 120:6
beyond 117:3

Bill 101:13 108:24
  118:4
billing 32:7 36:9 39:10
  93:17 94:7
bills 91:13,16 92:4
  114:21
bit 64:13 69:18
board 11:3,17 14:19
  15:24 16:2,3,9,14,15
  16:16,17,19 20:14
  21:9 23:1 52:14 55:1
  55:6 81:9,10 82:1,2
  82:14,21 83:11 84:1
  84:6 85:14,16 86:10
  86:12,12,18,20 87:13
  87:14,24,24 88:11,12
  88:18,20 97:6,6
  109:24 115:16,21,23
  115:25 117:25 118:1
  121:12,21,23,25
  122:12,14 123:4
boardroom 121:25
boards 8:19 15:9 23:2
  82:7,15 86:13,15
  87:16 123:2
board's 82:9
bore 72:25
borrow 122:14
Boston 2:4,4,10
both 29:8 39:22,23
  67:1 71:15 126:6
bottom 29:22 39:8
  48:17,20 91:9 106:1
Bracewell 11:5,6 25:17
  44:13 51:10,25 52:5
  52:10,12 58:24 59:10
  59:17,22 62:25 69:8
  69:16 76:6 91:10,12
  91:19 92:1,9,18,21
  93:2,7
Bracewell's 92:6
Bracewell-SHC 91:16
breached 54:12
break 74:19 122:1
brief 6:1,12 11:16
  52:11
briefly 13:25
Brooten 6:20
brought 100:21 101:6
  104:10
building 8:17
bulk 48:10 102:7,16
  110:15,16,16
bullet 85:22,23
business 14:16 15:9
  58:21 81:2 116:20
businesspeople 55:22
  69:15 105:18 116:23
butting 122:1

B-R-O-O-T-E-N 6:20

C

C 120:25
calculated 108:1
  115:21,25
calculation 108:2
call 25:24 52:13 58:25
  80:3 117:4 127:18
called 6:24 36:15 55:10
calls 55:1,2 58:22 74:1
came 19:7,25 41:4
  70:25 93:1
campaigns 17:19
Canter 2:15,16 28:2,6
  43:11 103:17,21
  104:4 127:13
capacity 5:21
capital 8:23 88:23,23
care 20:4 21:21 52:16
Carolyn 79:9
carried 55:22
carrying 25:5
case 1:6 7:10 10:11
  16:10 19:21 35:23
  50:13 104:12,16
  126:3,3 127:11
cause 31:11,20 35:10
  39:7 40:3,9,16 41:3
  43:9,10,22,23 50:5,6
  50:21,23 51:16,22
  52:1,2 53:8 54:16,16
  54:19,20,22,23 59:3
  59:3,19,20 60:3,4
  66:14 70:7 90:3
  92:15 93:3,10
cc 127:24
cease 15:14
ceased 121:25
cents 116:4
certain 8:19 27:12,20
  67:22 95:22,25 115:1
  115:3
Certainly 35:12
certainty 79:13,20
  86:14
Certificate 3:4 124:1
  125:1
certified 126:4
certify 124:6 125:7,13
chairman 11:3 52:14
  87:13,14,14,23,24,25
  88:11,11,12,18,19,21
  97:5,6,7 121:12
chairmen 87:20
chance 96:16 98:24
change 15:23 16:1
  33:14,24 34:4,7,8,20
  37:1 74:17 116:25

126:9
changed 15:21 38:12
  38:24 113:7
changes 32:3 35:1,4,5,8
  35:20 61:1,5,15 74:5
  74:6 76:6 92:23 93:1
  126:23
characterize 117:8
characterizing 61:23
charged 17:20 101:19
charges 14:25 17:2,10
  18:14,25 19:17,19
  20:2,16 22:1,7 40:5
  40:19 42:4 43:22
  48:25 57:20
charitable 110:16
check 8:13 20:5 29:17
  29:18 40:13,23 49:21
Children 5:20,24 6:14
  6:23 7:4,18,24 8:5,11
  9:4,19 10:15 16:7,11
  17:18 23:9 24:14
  26:21 47:6 48:12,21
  49:4 50:10 54:10
  55:7 56:12 72:9 84:3
  86:24 92:3 104:14,22
  106:14,21 107:15
  108:15 109:20,22
  120:22 127:6
Children/Vantage
  10:10
Chip 87:4
choice 70:10
choose 91:16
chose 91:13 92:3
Christine 31:24 32:18
  32:22
chronological 6:1,12
chronology 11:16
circle 31:1
circled 32:8
circumstance 40:22
  41:3
circumstances 59:19
  116:16 121:6
City 6:4
civil 100:21 127:14
clarify 17:23 32:17
  69:18
clear 16:9,19 44:14
clearly 85:25
client 103:22,23 113:6
closely 63:1,2 92:10
clue 98:22
colleagues 57:11,25
  62:19 63:13 64:10,18
  67:12
Columbia 6:3,10,15
come 13:12 17:4 40:1

95:23 115:11 120:2
  122:1
comes 28:13,14 121:15
comfort 49:20
coming 6:13 75:1
  106:22 116:17
commencing 5:3
comment 91:10
comments 14:1 15:5,6
  60:12 73:4
Commercial 48:10
committee 86:23 87:15
  87:25 88:22 97:8
  122:6,7,22 123:1,5
committees 88:13
common 35:15 40:1
  65:25 80:15
communicate 17:1
  101:3
communicated 11:24
  101:8
communications 23:19
  41:11
COMPANY 127:1
compare 38:20 117:11
compared 50:21 59:19
complete 73:11,12
  100:9
completed 63:19 126:8
  127:13
comply 65:18
complying 117:18
comprised 86:23
compromise 55:3,4,6
  84:10
compromises 58:6,7
concern 17:8 18:12
  21:3 40:12 54:9
  104:17 106:10
concerned 44:17 66:14
  66:18 104:13
concerning 15:5,6
  16:15 23:7 25:20
  29:4 47:11 58:20
  64:4,7 67:25 73:15
  73:16 84:10 86:15
  90:7 91:19,22 92:18
  100:22 101:24
  109:22 121:19 123:3
conclude 42:13
concluded 94:7 100:8
  123:10
conclusion 113:6 120:2
conduct 37:5
conducted 110:23
confer 102:23
conference 25:16,20,24
  80:3 84:14,24
confidentiality 103:23

confirm 79:2,10
conflict 24:9
connected 106:6
  125:16
connection 9:12,18
  17:3,15 18:21 56:11
  109:20
consequently 122:5
consider 18:22 20:17
  63:14 64:19 65:1,3
  71:19 105:15
considerable 120:21
consideration 105:11
considered 44:8 57:11
  57:16,21,25 61:21
  62:11 71:8 72:10
  73:20 76:11,23
considering 70:21,23
  71:1,4,20 72:4
consistent 13:17 38:13
  38:24 55:12 78:20
  79:15 108:2 113:19
  118:9
constitute 127:15
consulted 24:18
consulting 26:24 91:3
contact 25:11 89:17
contacted 23:5 89:20
  98:11 101:13
contain 31:17 46:3
  61:15 73:4 93:22
contained 47:9 76:14
  93:24 95:22
containing 61:15
contains 72:18,19
contends 99:6
context 15:7
continue 37:3,5,5 68:2
  71:16 104:8
continued 4:1 70:12
continuing 61:22 115:4
contract 10:2,10 14:25
  15:1 16:20,22 19:22
  21:8 30:6,8,10 72:10
  72:11 81:6 82:2,11
  83:3,13 84:5,11
  85:15 87:18 92:20
  101:9,10 105:1,4
  109:17,21,23 110:1
  110:24 111:2,8 112:6
  113:17 116:17 118:9
  119:2 121:23
contracts 65:25 88:14
  100:22
contractual 7:6
contrary 79:23
contributed 18:3
contributions 18:7,25
controller 107:14

108:1
conversation 41:23
  44:21 51:24 52:4,6
  52:18 53:10,21 54:4
  91:22 113:2,4
conversations 29:4
  41:12 44:18 51:17
  53:18 54:7 58:17
  59:7,9 63:3 69:1
  73:12 91:19 92:18
  97:11 113:21
cooperative 23:19
  65:19 66:18 67:25
  78:24
copies 27:12,19 28:15
  80:24 88:1,5
Copilevitz 2:16
copy 26:23 27:6 28:12
  64:5 86:11 87:11
  89:4 116:1 126:8
  127:12
corner 91:9 92:22
  112:23
corporate 15:8 58:23
  92:9
corporation 11:4 87:2
  88:2
correct 8:12 9:7 10:12
  12:1 16:25 17:6,13
  17:14 18:11,17 21:1
  21:4,16 25:1 28:5
  31:16 34:19,24 35:19
  36:16 40:8 42:6
  44:19 45:4 47:16
  49:16,23 53:25 56:2
  57:22 58:14 61:12,18
  62:2,18 63:11,18
  64:1,24 65:6 66:16
  73:2 77:21 81:19,20
  81:23,24 82:5,12,16
  83:5,13,15,18,19
  84:7 86:7 87:17
  88:14,15 89:2,10,19
  90:4,9,14,23 91:3
  93:18,25 94:5,6,10
  94:16,16,18,22 95:24
  96:1,7,8,16,17 97:20
  98:6 99:3,8,18
  100:12,13,18,25
  102:11 103:6 105:9
  105:10 108:1,16,23
  109:2,7,9,12 110:2
  110:25 111:5,23
  112:2,7 115:20
  118:12,22,24 119:4,9
  121:1 126:23
correcting 28:7
corrections 127:12
correctly 86:4

correspondence 72:17
  73:21,22,25 74:1
  80:20,22,24,25 102:5
cost 16:8 48:19 82:11
  85:24 97:23
costs 21:12 44:15 48:9
  50:10 53:16 98:4,5
  98:16 99:7
Council 8:23
counsel 1:13 5:2 6:24
  7:7,13,25 9:15,21,25
  10:7,16,24 66:17
  88:3 97:11 101:24
  112:10 113:5 125:14
  125:16 126:8 127:13
count 108:4
counts 104:11
COUNTY 124:4 125:4
course 17:12 18:1 19:4
  24:1 26:5 27:9,16
  29:15 32:2 62:7
  63:12,16 64:16,21
  76:18 78:5,9 81:1
court 1:1 74:16 81:13
  126:7
courtesy 88:5 127:12
cover 16:8 17:20 21:12
  53:16 57:19
covered 110:5,6
created 105:1,3,4
credited 56:14
current 15:18,20 27:17
  120:25
customary 42:21
cut 20:5 33:18 40:13,23
  49:20 91:14,14
cutoff 20:11
C-I-L 8:24

D

D 88:23 99:5
damages 104:15
  106:22
date 1:14 29:15 52:19
  58:17 77:17 78:6,9
  78:11 79:13,17,20
  81:5,8,21 82:9 83:21
  95:23 124:11 126:6
  126:25
dated 12:12 26:25
  29:11 31:24 32:19
  44:2 77:13 78:2 79:1
  81:23 87:5 112:22
  125:19
dates 62:25
Davis 2:3
day 15:14 45:17,18,21
days 15:14 25:25 93:18
  127:14

DC 2:17
deal 26:8 30:2 31:10
  43:25 54:10
dealing 24:24 26:7 29:1
  35:10 56:22 59:18
  62:5 65:2,4 79:6
dealings 7:3,6 9:14,20
  9:24 10:5,14
deals 31:6,8 55:10 79:4
dealt 11:1,4 30:9 56:16
  84:24
Dear 127:10
deceased 118:5
December 81:23 114:4
decided 26:9 46:16
  47:18 48:4 60:1
declare 126:22
Default 94:5
defendant 106:7
defendants 1:9 2:12
  104:19 106:19
deficiencies 101:5
  105:1,5
deficiency 98:15
deficit 48:6,8
defined 38:3,14
definitely 75:5
definition 36:25 37:17
  38:6,8,10,17,18,21
  39:1
definitions 37:23
degree 6:10,11 117:1
degrees 6:7,9
deliberation 120:21
denied 113:7
department 32:23
  81:18 87:1 111:18
depending 42:12
DEPONENT 28:3,7
  102:23 122:17 127:3
deposited 122:8
deposition 1:12 5:1
  72:22 74:25 90:21
  93:6 103:1 116:1,3
  123:10 125:8 126:2,5
  126:23 127:11,12
describe 81:14 97:4
describing 97:8
detail 23:15
determination 92:6
determined 86:15
  99:16
DeVassie 52:11 77:13
  77:19 88:22
develop 18:2,6,7,8
developed 17:12 19:3,9
dialogue 19:24 24:5
  26:6
difference 36:4,14,17

36:22 37:2 48:11
  50:3,19,24 51:22
  54:18 63:4 101:19
differences 37:14
different 13:16 36:7
  51:20 64:13
differently 54:24
direct 25:11 44:4
  107:17 111:15
directed 10:22 87:15
  94:9
direction 17:17 69:9
directions 93:2
directly 69:22 70:2
directors 8:20 11:3,17
  15:9 52:14 87:13,24
  88:11,19 97:6 109:25
  120:21 121:12
disagreements 121:19
discuss 35:6 61:9 80:14
discussed 11:18 33:15
  34:4 35:8,11 46:2
  61:16 62:7 69:14
  82:2 92:11
discussing 41:23
discussion 11:19 21:17
  22:2,4 41:17 43:7,12
  43:19 44:25 45:5,9
  45:10,15 46:4,19,20
  47:1,9,13,20,23,24
  48:24,25 49:12 50:2
  50:18,24 51:1,6,18
  52:22 53:4 59:11
  60:14 61:14 65:11,16
  67:11 80:1,2,17
  100:3 110:17 117:25
  122:20
discussions 41:1,15
  42:7 65:15,21,22
  66:23 92:24,24 99:13
  113:23
distinct 71:1
distinction 51:12 60:3
distinctly 26:18
DISTRICT 1:1,1
document 29:14,16
  33:6,9 42:1 78:8
  81:16 85:18 87:6
  91:18 92:17 97:2
  102:22 107:11 114:7
  114:10,11 120:18
  123:8
documents 27:12,20,23
  72:24,25 76:23 80:12
  81:1
doing 119:12
dollar 19:11 115:19
  116:4
dollars 109:12

donations 86:2 98:15 108:7,12,20 110:2,6
done 9:13,22 48:5 80:9 117:14
donor 17:11,16 19:3,6 19:9 37:5,6 40:18 46:15 47:15 48:3 70:12 71:7,16 114:22
donors 18:2,9 32:6 36:8 39:9 48:23 79:3
down 21:21 25:22 26:16 67:9 98:2 113:20
draft 11:15,20,23 12:3 12:4,9,14,21 13:8,11 13:18,19 14:8,9,13 21:13,14,20,23,24 26:16,18,19 32:20 33:3,7,14,25 34:25 35:14 37:15,19,20,21 38:4,9 39:20,23 59:14 60:11,14,21 61:15 67:3 72:18 74:7 89:8,15,18 91:2 93:22 97:17
drafts 13:16 60:8,15,23 61:3,7,20 73:3 74:22 74:25 75:1 76:8,17 76:22 95:21 96:1
drawing 17:10
Drive 1:16 5:4 127:7
dual 17:25
due 29:15 78:5,9 93:17 94:8 95:10 111:25
duly 5:8 124:8
duplicate 114:5
during 20:14 23:25 24:12 27:9,15,16 32:2 41:4 54:4 62:7 62:12 63:12,15 64:16 64:21 69:10 73:8 76:11,17 82:21 84:18 86:10 92:10 98:16 101:9,9 108:3
D'Agostine 2:3
D.C 23:7

**E**

E 88:23
each 87:11 118:7 121:14
earlier 84:13 97:12 103:16 113:20
early 24:12
economic 19:7,7,15
edits 92:14 95:25
education 6:2
effect 16:14 17:7 18:9 18:15 64:11 65:21

efforts 122:23
either 17:11 23:18 26:7 35:7 41:25 43:22,25 46:1 56:18,20 67:12 69:8 70:5,11 71:6,15 72:17 103:25 110:24
else's 75:13 110:4
embodiment 114:11
employ 23:19
employed 5:19
employee 125:14,15
employees 50:12 55:7 88:2
employment 6:13
end 60:17 63:22 70:9 71:4,11 73:25 110:1 110:11 111:1,7,25 116:17
ended 32:14 35:20 51:21 54:13 58:9 94:25
endowment 87:15,25 88:12,21 97:7
ends 115:2,3
enforce 112:13 113:16
engaged 7:25
enough 18:24 22:1 39:17 40:5,18
enter 96:9,18 102:15
entered 10:1 116:24 126:23
entering 16:22 47:7
entire 20:7 36:21,24 44:17 48:21 72:22 94:24 105:4
entirely 63:18
entitle 65:12
equivalent 32:14
errata 3:5 126:1,8 127:12,13
ERROR 126:9
errors 126:5
Esq 127:24,24
ESQUIRE 1:12 2:3,9 2:15 5:1,7 124:7 126:2,25 127:6
essence 18:17 93:3 105:16
essentially 77:5,7 111:3 111:6
estimate 115:11,14,16
evaluates 122:23
evaluating 122:8
evaluation 122:6,22
even 89:23
event 31:11 40:3,13 43:8,9,22 50:4,6,21 50:23 53:7,23 94:4 101:22 104:23

eventuality 40:2
eventually 22:10 77:6
ever 7:24 9:8,14,24 22:13 56:5 65:10,16 67:16,19 69:24 70:6 70:17 72:2,14 101:3 102:14 112:12 115:11 116:13 117:2 117:14,17 120:2
every 73:15,16 116:4
everybody 110:4
everything 42:15 53:15 53:17 77:1 79:5
exact 36:12 58:16 74:13
exactly 8:7 11:7,21 16:18 17:13,21 37:11 37:13 38:3,25 52:19 54:24 68:18 72:7 77:10 92:25 101:22
examination 3:2,3 5:11 80:20 81:3
examined 5:9
example 11:13
exceed 50:11
exceeding 48:14,19
exceeds 44:16
except 20:16,20 93:1 110:14
excerpts 44:24
excess 24:16 78:25 101:19 104:15,15
exchange 19:3 37:6 70:12 71:7,16 105:16
exculpating 22:6
execute 24:15,19 117:2
executed 25:15 27:7 30:10 37:16 56:8 57:1 68:13 72:11 97:9
execution 69:22 70:4 99:14
exercise 127:15
exhibit 12:11,18 14:8 14:10,14 15:11 21:15 26:23 27:4 28:11 29:11 30:16,19 31:6 31:17,23 32:8,16,18 32:21 33:15,25 34:5 34:5,7,22,23 35:1,4 35:14 36:5 37:8 38:7 38:18,22 39:20 41:13 42:23 43:6 46:6,9 52:21 74:8,21,23 75:1 76:10,24 77:11 77:14 78:1,3,13 81:11 85:3,7 87:3 89:3 90:1,21,21 93:5 93:5 95:22 96:24

99:20 102:21 105:19 105:21 107:10,17 108:6,11 111:14 112:21 116:11 118:12 120:14
exhibits 3:8 4:6 35:8,9
existence 13:12
existing 59:14
exit 114:12
expend 26:21
expended 98:12
expenses 17:20 44:15 85:24 110:6
experience 69:12
experts 98:11,13
explain 64:10 69:10
explaining 63:20
exposed 106:21
exposure 16:11,21,24 48:19 105:1
expressing 50:8
extend 70:11
extent 19:6 20:20 42:8 47:24 50:20,22 53:23
e-mail 3:13 31:23 32:18,23 33:1,2,9

**F**

fact 16:13 35:19 83:11 119:6
Failure 127:15
fair 17:7 18:12 19:24 25:3 35:13 39:25 40:11,14 42:2 60:9 61:6 62:10 63:12 64:17 66:7 88:24 95:21
fairly 76:16
familiar 28:20
far 17:21,22 30:13 45:12,13 63:20 66:18 69:12 80:12 108:6,12
fashion 99:17
fast 73:10,13
faulting 27:25
favor 24:15
fax 111:15 113:6,7
faxed 97:18
Faxes 74:4
Fax/Letter 3:25
fed 122:4
federal 116:2
FedExed 21:21
feel 61:25
fees 85:24
fellow 112:9
felt 21:24 24:6 104:22 117:22,22
few 13:16 14:19 74:1

120:6
fifth 85:22,23
figure 36:21 115:19
file 37:6 41:25 67:5 72:22 113:12
filed 116:2
files 77:2 80:21,23,25
final 20:8 32:12 33:7 33:11 35:21 36:5,13 36:15 37:20 38:12,19 38:21 39:5,6,23 52:16 58:20 64:4,17 74:12,13 84:9 86:21 88:25 94:20 95:1,4 96:3 97:16,17,19 111:2,3 112:6 114:17 114:21
finally 54:15 72:11
finances 84:1
financial 1:4 84:2 107:21 127:8
financially 125:17
find 8:13 36:6 45:7
fine 79:2,10
finished 33:17
firm 6:19 30:1,2
first 10:13 12:11 13:8 17:25 20:13 21:8 29:17,18 42:24 47:4 47:4 48:22 49:8 54:22 67:24 75:3 79:3 81:5 82:2 85:20 86:1 117:13 120:20
five 48:7
flat-out 112:16 119:19
Fleisher 1:12 5:1,7,13 5:15 6:20 12:13,17 12:17 16:23 19:24 27:4 29:12 31:24 32:19 40:11 64:14 74:25 77:12 78:2 98:24 105:25 124:7 126:2,25 127:6,10
Fleisher's 103:1
Florida 1:16,19 5:4,5 5:18 6:5,11,19 124:3 124:21 125:3 127:7 127:22
folks 29:25 58:25 101:14,17 117:22 122:3,3,23 123:2
follow 119:2
followed 28:11
following 30:21 34:11
follows 5:10
follow-up 40:4,17 67:1 69:25 70:11 71:17
Force 6:16,17
foregoing 125:8

**form** 29:3 32:9 82:13
  82:24 83:6,14,24
  84:8,21 86:21 88:25
  90:10,13,15,17 91:20
  92:8 93:19 94:1,11
  94:17,23 95:8,18
  96:12,21 97:13 98:19
  98:21 100:17,23
  102:8,18 103:14
  105:2 106:18 107:24
  108:8,22 109:3,8,13
  110:3,12 111:10
  112:1,15 113:18
  114:1,19 115:8,15,24
  117:1,10,20 118:17
  118:23 119:3,8,24
  120:5 121:3,10
  122:16 126:23
**forma** 48:16 119:15,17
**formal** 6:2
**formulate** 54:14
**forth** 31:5 37:6 64:6
  67:25 74:4 75:9 79:1
  79:9,11 92:22 101:23
  110:24 111:23
**forward** 48:8 83:21
  84:5 87:11 89:25
  127:13
**Fossett** 101:13 107:11
  107:13,14,25 108:24
  118:4
**found** 49:18 53:1 67:24
  119:19
**four** 87:18 115:16
**four-year** 109:18
**fraternal** 8:13,14,16,17
  8:22 9:6,9,13,14,23
  9:24 10:1,5,6
**fraternity** 121:14
**Friday** 127:17
**from** 6:10,11,16,17
  9:23 11:20,21 12:13
  16:7,19 17:4,11,11
  19:8,19,19,23 20:3,5
  20:16,16 21:8,11,11
  21:25 22:6,7,7,11,21
  23:9,13 26:19 27:20
  28:13,14,16 29:11,24
  31:21,24 32:18 33:4
  33:11 36:23 37:1
  38:11 40:13,17,23
  44:21 46:13 47:21
  48:17 49:21 51:10,13
  53:14 54:10 59:3,10
  59:21,22 60:5,6,11
  62:12 63:5,6 66:7,17
  69:6,9,19 72:15,18
  74:19,23 75:1 76:10
  76:24 77:12 78:2,8

  81:17 82:14 83:21
  84:11 85:4,15 86:3
  87:3 92:21,23 93:1,5
  96:25 101:11 104:23
  105:20 111:16 113:1
  114:4 115:18 118:8
  120:16 121:23
  122:12 127:14
**fronting** 47:7 56:20
**full** 100:9 101:11,18
  110:15 111:24
**fully** 98:4,12
**fund** 57:19
**fundraisers** 66:2
**fundraising** 7:7,13,25
  9:15,21,25 10:7,16
  10:24 17:3 18:10
  26:24 32:24 91:2
  100:22 116:11 117:5
  117:6 122:6,22,23
  123:1
**funds** 17:3,10 18:19,23
  18:23,23 19:2 40:14
  44:9 49:21
**furious** 73:10
**furnish** 94:9
**furnished** 76:14
**further** 24:23 60:14
  71:6,6 89:3 105:13
  105:17 117:2 125:13
**future** 18:10

**G**

**Gainesville** 6:5,19
**gather** 11:22
**gave** 63:9 69:4 92:11
  106:10
**gears** 117:7
**Gene** 11:5 52:10,11
  93:7
**general** 6:23 60:10
  88:3 112:10 113:5
**generate** 18:24
**generated** 17:10 18:20
  20:3 114:22
**generating** 71:18
**George** 1:8 44:3,18
  46:14 48:2 79:2 81:6
  127:9
**getting** 53:14 58:24
**gift** 88:13 97:8
**gifts** 87:15 88:21
**gist** 22:21
**give** 6:1,6,12 22:21
  49:19 98:22,23
  105:12
**given** 85:13,14 97:25
  98:17 105:16,22
  125:10

**giving** 88:1
**glance** 42:24 43:5,16
**go** 18:4 27:23 33:18
  36:20,24 43:11 45:9
  45:25 48:11 54:5
  62:23 64:8 66:19
  68:2 80:13 100:1
  122:17
**goals** 48:15,16
**goes** 46:16 48:10,13
  63:21 98:10
**going** 14:23,24 15:18
  16:6 17:1 18:6,7,8
  20:19 23:8 31:4
  32:16 39:18 40:6,18
  49:1,20 55:1 70:7
  83:20 84:5 86:13
  87:11 98:2,22 104:21
  105:14 112:17
  114:12,20,22 117:23
**good** 5:13 22:23 104:2
**government** 100:22
  101:6 104:10 106:8
  116:2
**governor** 106:2
**Graduated** 6:18
**Gramlin** 118:6
**Grand** 106:3,4,13
**Gray** 31:24 32:18,22
  33:2
**Gray's** 33:9
**great** 23:15
**Griffin** 2:9 3:3 7:14 8:6
  13:20 15:2 20:22
  24:11 25:8 27:1 28:4
  29:2 30:5 33:5 35:18
  36:19 38:15 40:7
  42:11,20 49:22 50:7
  55:16 56:9 57:2,13
  58:2 60:18 61:11,17
  61:22 62:14 63:17
  64:23 65:5 66:3
  67:21 68:22 70:22
  72:5 73:7,23 76:15
  79:18 80:9,11,19
  81:4,15,22 82:17
  83:1,10,16 84:4,12
  85:2,8,10 90:12,19
  90:23,25 91:23 92:13
  93:21 94:3,13,19
  95:5,12,20 96:3,5,14
  96:23 97:15 99:1
  100:2,4,19,24 101:2
  102:10,20 103:4
  104:7 105:6 108:5,10
  108:25 109:5,10,15
  110:8,22 111:13
  112:4,20 113:22
  114:3 115:5,10 116:7

  117:16 118:10,14,19
  118:25 119:5,10
  120:1,7 121:5 122:11
  122:19 123:7 127:24
**Griffin's** 80:22
**gross** 44:16 48:14,19
  50:11 53:15 86:2
  110:6 115:17
**ground** 35:15 40:1
  80:15
**Group** 1:7 30:13
  120:16,24 127:9
**guess** 13:15 116:5
  123:7
**G-E-N-E** 11:5

**H**

**habit** 113:19
**half** 29:20
**hand** 83:9 98:23
  124:11
**handled** 54:23
**handwriting** 43:2,3,4
  75:6,8,10,12,13,14
  75:17,21,21 76:7,20
  78:4 91:7 92:16 96:2
**handwritten** 3:14 4:2
  41:15 42:24,25 43:17
  46:11 52:25 85:8,17
  86:6
**Hang** 31:25
**happen** 95:2
**happened** 45:20 80:6
**having** 5:8 13:12 19:18
  26:21 28:1 40:12
  45:15 46:1 51:1 53:4
  54:3 69:25 71:19
  72:9,14 76:11 80:1
**headings** 92:14
**headquarters** 25:20
**hear** 95:13
**heard** 69:6,19,20
**held** 5:23
**help** 29:10
**Helps** 91:21
**Henry** 116:1 120:15
  122:9
**hesitate** 127:18
**high** 6:2 117:24
**highest** 121:13
**highlighted** 36:7 37:4
**HILLSBOROUGH**
  124:4 125:4
**him** 22:24 35:11 41:5
  52:11 53:11 61:10
  80:4 81:10 83:9
  85:15 89:20 91:22
  92:11,24,24 121:22
  122:5,12,18

**holder** 106:2
**holding** 54:11 98:23
**hopefully** 21:22
**horn** 122:2
**hospital** 1:15 2:19 5:4
  8:18 9:5 11:7 44:5
**hospitals** 5:20,24 6:14
  6:23 7:4,18,23 8:4,11
  9:3,19 10:10,14,17
  10:23,25 16:6,11,21
  17:18 21:11 23:9
  24:14 26:21 44:16
  47:6 48:12,20,20
  49:4 50:9 53:15,16
  54:9 55:7 56:12 58:8
  72:9 84:3 86:24 92:3
  104:14,22 105:14
  106:13,21 107:15
  108:15 109:19,22
  110:18 111:18
  117:14 120:22 121:1
  127:6
**hypertechnical** 100:24

**I**

**idea** 48:7 55:19,21
  104:2 115:6
**identification** 12:12
  32:17 41:14
**identified** 37:14 76:9
  76:24 87:19
**identify** 5:13 21:23
  74:25 75:3,7,12,17
  76:19 88:16 91:1
  102:22
**III** 2:15
**immediately** 94:8
  113:14 121:24
**Imperial** 8:23 121:18
**importance** 41:24 42:5
**important** 41:18 42:18
  113:20
**impose** 94:21
**Inc** 1:4 120:24 127:8
**incidentally** 8:2 41:10
  60:8
**include** 9:24 21:10
  94:14
**included** 46:9 87:18
  94:15,22 110:15
**including** 69:5,7 88:25
  116:23
**inclusion** 96:19
**income** 36:15,16,23
  37:15 38:5,8,14,18
  38:19,22,24 39:11,17
  44:16 48:14,19 50:11
  53:16
**inconsistent** 22:25

incorporated 65:9
incorrect 101:15
increase 101:25 102:2
increased 110:19
incurred 100:10,15
indemnity 3:22 103:6
  106:23,24 107:2
independent 45:14
  46:1 51:1
INDEX 3:1,8 4:1
indicate 45:12,13 46:22
  52:10 78:24 112:12
indicated 20:15 35:9
  108:6 109:1
indicates 109:6
individual 11:4 60:5
  88:24 122:24
individuals 8:21 87:19
  88:16
information 66:14,16
  88:6,8
informing 120:22
initial 60:23 62:21
  83:22 89:8,15
Initially 112:8
initiate 62:20 112:13
insert 31:1,2
insisted 103:23
instances 119:19
instead 36:14 123:7
institution 117:12
institutions 104:18,20
instructed 113:12
INSTRUCTIONS
  126:4
insulate 21:10,25
insulated 23:9,13 86:3
intending 16:25 63:9
interest 20:18 21:7
  113:10 120:23
interested 125:17
interest-bearing 99:6
interrupt 103:17
invited 28:24
invoice 101:11 110:14
invoices 15:16 18:18
  110:13,21 111:9
  112:14,18 113:13,25
involve 120:11
involved 7:6 9:5,14
  10:3,4,14,20,21 11:9
  11:14,16,22 13:13
  24:5 55:1 89:15
  100:21 103:9 107:5
  114:9,14 118:1
involvement 10:9 13:9
  83:3,18
issue 7:4,9 10:11 24:7
  26:8 29:1 44:3 59:18

60:2 65:2
issues 44:1 77:3,23
  78:19,21 109:19
  117:17 122:15,15
Item 14:4,11 15:12
I-E 88:22
i.e 113:13

_____
J
J 2:9
Jacob 87:4
James 105:25
Jay 1:12 5:1,7,15 12:13
  124:7 126:2,25 127:6
job 118:7
John 88:20 96:25
  111:16 113:4
Johnson 2:3 3:2 4:6
  5:12 7:17 8:9 12:11
  12:16 13:22 15:10
  20:24 24:22 25:10
  27:2,3 28:9 29:9 30:7
  33:12 35:22 37:12
  39:2 40:10 42:16,22
  43:15 49:24 50:14
  55:24 56:17 57:4,15
  58:11 59:5 60:20
  61:13,19,25 62:3,16
  63:23 64:25 65:7
  66:6 68:4,24 71:3
  72:12 73:18 74:2,18
  74:20 79:21 80:8,10
  80:13,18 81:14,21
  82:13,24 83:6,14,24
  84:8,21 85:6 90:10
  90:15,24 91:20 92:8
  93:19 94:1,11,17,23
  95:8,18 96:4,12,21
  97:13 98:19,21
  100:17,23 102:8,18
  103:14,20 104:2
  105:2 107:5,8,24
  108:8,22 109:3,8,13
  110:3,12 111:10
  112:1,11,15 113:3,4
  113:18,23 114:1,5,19
  115:8,15,24 117:10
  117:20 118:13,17,23
  119:3,8,24 120:5
  121:3,10 122:16
  127:24
joined 6:16,22
jointly 106:3
Jones 87:5 127:1
Jr 107:11 111:16
judgment 65:12
July 105:19 121:18
  122:6
June 25:15 26:25 74:10

74:11,12 77:9,13,23
  116:11 117:3
Juno 5:17
jurisdiction 122:7
just 6:1,6 13:23 14:23
  25:19 28:20,23 31:21
  31:25 34:5 37:9
  38:20,24 43:3,16
  44:10 46:13,17,21
  48:21 50:15 51:13
  54:10 55:2 58:9
  61:22 63:9 64:9 67:9
  68:1 73:13 74:16
  75:22,24 79:12 82:1
  83:7 84:11 85:11
  98:23 99:24 100:1,5
  102:21 110:5,9 112:3
  116:5 117:7 119:19
  121:22 122:4
Justice 81:18
J-U-N-O 5:17

_____
K
keep 116:19,20
Ken 121:11
Kenneth 120:16 121:11
Kenney 111:16 113:5
kept 81:1
kind 42:9
kinds 22:15
knew 27:22
know 9:1,17 11:21 13:2
  15:3 17:16,16,21
  24:2 28:16 29:5
  32:14 33:7 42:14
  51:15 54:24 59:15
  60:23 61:3 69:21
  72:15 76:2 82:18,25
  89:21,23 106:15,15
  113:7 115:21 121:6
  122:24
knowledge 8:1 62:19
  83:2,8 89:14 107:9
  107:20 108:17,19,23
  116:6
knowledgeable 7:10
known 119:15 121:14
  121:17

_____
L
L 2:17 127:24
labor 61:7
laid 85:25
language 31:1 36:7
  55:13,17,18 59:13
  60:7 79:2,9,10
Large 1:19 5:6
Larry 25:18,19 27:1
  44:14 51:11,25 53:12

59:1 84:14 103:19
  107:7
last 30:15,17,19 33:15
  34:4 106:1
late 24:18 66:19
later 21:14 59:4
latest 33:3
latter 49:7 73:8 101:10
Laurence 2:3 107:8
  113:3 114:5
law 6:4,18,18,19 30:1,2
  97:23
Lawrence 120:25
  121:19
lawsuit 104:24
lawyers 46:10 72:24
learn 14:18
learned 47:5 100:20
  103:15 104:10
learning 59:10
least 20:1 24:5 26:1
  40:1 53:21 69:14
led 103:12
left 54:11 70:8 103:5
left-hand 91:9
legal 7:11 9:8,9 22:5
  25:2,5 64:10 86:25
  111:18 112:13
legally 98:14
Lehrfeld 23:6,17,18
  24:18 66:19 97:11,25
  98:11,18
less 110:14 111:24
let 9:16 17:23 20:13
  29:10 33:20 38:17
  42:23 43:3 69:18
  78:15 79:22 91:13,17
  92:4 112:2
letter 3:6,12,18,23 4:3
  4:4 29:11,23 34:15
  81:17,21,25 105:20
  105:25 106:10,16,18
  111:18,21 112:17
  114:4 120:15 121:7
  121:17 122:9 127:3
  127:15
letters 101:23
letter's 81:23
let's 6:15 12:11 29:10
  31:23 32:17 41:13
  44:10 45:9 46:17
  47:11 48:1 50:15
  74:21 77:11 78:1
  88:2 91:1 120:14
Levett 81:17
Lewis 116:1 120:15
  122:9
liabilities 95:17
liability 20:15,20 22:6

42:9 50:20,22 52:13
  62:22 83:5,13,23
  84:19 92:20 94:21
  105:5
liable 48:12,13 50:10
  53:15,17 95:7,16,19
  97:22 98:4,12 101:4
  105:8 106:4 109:23
  110:18,19 111:8
  113:25
lifted 69:13
like 32:25 36:1 55:20
  59:2 66:19 74:4 79:4
  81:11 85:3 87:3
  90:20 93:4 95:19
  96:24 106:10,17
  122:3,4
likely 61:1
limit 67:19 71:9,11,11
limited 69:3 70:1 80:22
  83:22,25 84:6
line 30:25 48:17,20
  75:22 109:6 126:9
line-out 75:7
list 17:11,16 18:2,9
  19:3,6,9 40:4,18
  47:15 48:2 70:12
  71:7,16 90:7 91:14
  91:17 92:4 93:23
  114:22
listened 11:18
litigation 27:10,10,16
  27:17 113:16
little 30:25 64:13 69:18
  88:23
live 5:16
living 117:23 119:21
LJ 113:8,11
Ljohnson@davismal...
  2:5
LLC 2:16
LLP 2:9
loan 44:5,7 56:3 76:2,3
loans 47:10,11 56:11
loan-type 47:7
Lodge 106:3,4,13
long 5:23 19:22 20:5
longer 36:10 39:11
  67:4,15 120:23
look 12:18,21 14:4,7,8
  15:11 28:18 31:14
  33:13 37:16,23 38:17
  43:3,4 60:11,25
  85:11 87:10 89:3,25
  90:20 91:1,5,9 93:4,9
  96:6,15 99:19,24,25
  100:5 106:1
looked 13:8 14:3 19:22
  23:7 75:24 106:17

**looking** 46:14 89:12 103:5
**looks** 43:4 79:4 95:19
**loose** 115:2,3
**loss** 16:6,12,21,24,24 17:18 21:11,25 23:3 23:10,13 104:24
**lot** 31:4 51:18 55:9
**loud** 35:25
**Louis** 87:4
**lower** 101:12,16 102:9 110:16
**lowest** 97:24
**Lyon** 25:18,19 26:2 44:14 51:10,12,25 52:4 53:12,19,22 54:8 55:5 59:1 63:2 69:17 80:4 84:14,18 120:25 121:19,22 123:2
**Lyon's** 121:20

**M**

**M** 2:3 127:24
**Maccanter@aol.com** 2:18
**MACKENZIE** 2:15
**made** 15:4,6 16:9 18:20 23:1 26:6,12,14,14 41:16 42:10 54:7,8 57:6 58:22 60:2 62:12,15,17 63:15 64:20 65:13 68:1 69:4 70:17 72:1,2,7 72:14 73:19 74:6 76:17 82:18,22 83:3 83:8,12,22 98:8 100:16 101:25 102:3 102:16 108:3 110:7 112:3 115:7 116:3 120:3
**mail** 23:20 32:6 36:8 39:9 44:5 49:14 65:19 91:17 92:4 99:8 102:6,12 107:17 120:11,13
**mailed** 49:6 119:20
**mailing** 40:4 66:18 67:25 78:24 90:7 91:13 94:10,15,15 98:5 106:3 110:15,16 111:2,3 118:3,4,5,6
**mailings** 17:11,15,20 18:24 21:11 23:24 36:10 37:5 39:11,16 40:4,17 48:17 49:1,5 49:6 65:13 67:1 68:2 69:25 70:11 71:6,17 90:8 93:23 100:16

102:15 105:8 110:23 118:8,15,21 119:7,15 119:18 120:3,8,13
**mails** 29:15 78:6,9
**maintains** 98:3
**make** 12:4 22:17 41:17 41:24 42:9,18 43:3 69:24 70:6 84:18 92:4,14 98:24 118:3 118:7 123:3 126:5
**making** 51:12
**Malm** 2:3
**management** 26:25 91:3
**managing** 5:22 7:1 61:21
**many** 28:15 29:3,3 32:3 32:3 51:17 69:1 75:6 117:21,21 120:11,12 120:12,12 121:18,19
**March** 7:1
**marching** 18:17
**mark** 12:11 26:23 29:10 31:23 32:16,18 41:13 48:7 74:21 75:20 77:11 78:1 81:11 85:3,6 87:3 96:24 102:21 105:19 107:10 111:14 112:21 120:14 126:6
**marked** 74:23 75:1 111:15 112:22 114:4 120:15
**Marketing** 111:16
**marking** 123:8
**marks** 29:17,18
**Masonic** 104:20 106:5
**Massachusetts** 1:1 2:4 2:10
**materials** 30:22 76:14
**Matt** 101:13 103:25
**matter** 7:24 10:15 11:1 11:11,18 13:9 41:18 41:23 42:5 59:12 97:23 127:18
**matters** 7:9 10:11 15:9 25:3 30:11 47:20
**MATTHEW** 2:9
**may** 7:11,14 9:12,22 15:11 23:15 26:3 29:11,19 31:24 32:17 32:19 37:3,4 38:2 42:13 44:2,10,12,20 45:10 46:12,14,21,23 47:9,11,13,21,24 49:13,18,25 50:16,18 52:7,12,15,17,22 53:2 55:17 56:11 58:6,12 60:23 63:3

69:5,19 74:7 76:3 77:9 78:2,11,12,21 78:23,23 79:1 80:4,7 93:6 96:24 104:13 112:18
**maybe** 25:25 57:20
**mean** 33:18 71:24 119:11
**meaningful** 23:22,25 24:3
**means** 13:23 21:7 28:25 78:17
**meant** 31:1 106:13,15
**meet** 48:15
**meeting** 11:17 14:19 15:24 16:2,3,19 20:14,23,25 26:1 82:1,8,22 84:18 86:18,20 121:25
**meetings** 21:9 81:9,10 82:14,21 84:1 85:14 85:16 86:11,12,13 121:23 122:13
**member** 92:19 115:25 121:15
**members** 16:10,14,17 23:1,2 77:20 115:16 115:21,23 118:1 121:21 123:4
**memo** 3:10,16,17,19,20 3:21 12:22
**memorandum** 12:8,12 13:3,5,15,19,19,25 14:1,4,11,14,22 41:25 63:19,24 64:3 64:9 76:5 77:11,16 78:1 85:4,13 86:12 87:3,8,19 89:5,23 93:6,8 96:25 97:5,10
**memorialize** 97:10 113:2
**memory** 28:8 53:20 54:1,3 67:18 68:8,10 68:12 79:15,23,25 80:1
**mention** 93:23 102:2
**mentioned** 59:17 114:23
**method** 46:16 48:3,4 92:7
**methods** 47:18 121:21 122:13
**middle** 37:3
**might** 17:9 62:25 67:4 79:6,11 102:2
**Miller** 1:8 21:9,18 22:2 22:13 23:11,18 24:12 25:4,12 26:2,14,17 28:25 29:11,24 30:3

30:13 33:11 35:6,15 40:1 41:2,16 42:7 43:7,19 44:3,18,21 45:10,16 46:2,14 47:1,5,14,20,23 48:2 49:13,18 50:2,19 51:2,3,11,19 52:18 53:5,19,19,21 54:2,7 55:2,5,8,15,18,21,22 56:5,24 57:10,18,23 58:4,7,9 61:4 62:17 64:2,21 65:11,17,23 66:24 67:12 68:20 69:23 70:5 71:25 72:8 78:2,8 80:2 81:6 89:15,17,24 90:23 98:8,9 99:3,10,12,13 127:9
**Miller's** 27:11,13,21 33:4 46:10 50:9 60:11,17 61:6 72:24 74:24 83:2,17 93:5
**million** 48:6,7 109:12 109:25 110:5,6,9,20 115:19 116:25
**mind** 9:2 40:12 113:7 117:17
**mine** 29:17,19,19 75:18 76:5 85:19 92:16 112:25
**minute** 74:16
**minutes** 16:16 81:25 82:7 83:11 84:7
**missing** 9:16
**Mjgriffin@peabody...** 2:11
**Mmm-hmm** 90:24 100:7 111:20
**modalities** 31:11 46:2 46:20,24 47:1 52:18 78:14,22
**modality** 21:2 24:24 26:9 45:6,11,19 49:19 56:3,5 57:11 57:24 65:25 74:6
**mode** 58:21
**modification** 31:7 40:21
**modifications** 31:18 95:2
**moment** 44:10 46:18 46:21 78:15 80:14
**Monday** 127:17
**money** 18:1,2 26:22 40:5,17,18 44:5 47:8 48:17 56:13,20,21 108:4
**months** 32:7 36:9 39:10 48:5 67:7,9,9

71:5,12
**more** 23:24 59:3 71:17 86:1 115:1
**morning** 5:13
**most** 60:15 61:3 92:10 112:25
**mostly** 73:25
**moved** 73:13
**Mssrs** 77:19
**much** 42:12 115:6
**Mulnar** 87:4
**must** 98:3 99:6
**myself** 25:17 51:10,24 55:5,8 58:7,9 69:14 101:13,23 113:5 116:24 118:1
**Mystic** 8:25

**N**

**name** 5:15 8:4,8,12,22 106:16
**named** 104:18 106:7
**namely** 39:16
**Naval** 6:16,17
**necessarily** 73:24
**necessary** 61:10
**necessity** 24:19
**need** 66:24 80:19 102:23
**needed** 24:7 104:23
**negotiate** 106:24 107:2
**negotiated** 67:8 106:23
**negotiating** 30:14 83:3 112:5
**negotiation** 24:1 26:6 30:20 60:10 62:8,12 63:13,16 64:16,22 72:25 76:11,18 103:9 107:5 114:14
**negotiations** 24:13 29:4 32:2,12 41:4 51:9,11 61:24 63:19 69:11,13 73:9,10,16 83:18,20 92:10
**nervous** 106:20
**net** 36:10,14,15,16,22 36:23 37:15,15,21,24 38:4,4,6,8,10,13,14 38:16,18,19,22,24 39:1,11,17 108:6,12 108:14,20 110:7
**never** 9:20 63:21 64:7 66:4 71:25 99:2,4 110:23
**new** 6:4 44:3 79:8 123:8
**next** 26:23 29:11 31:23 32:16 34:21 41:13 45:9,25 52:17 74:21