77:11 78:1 81:11
90:20 93:4 96:24
102:21 105:19
107:10 111:14
112:21 120:14,15
**Nobels** 77:19
**Nobles** 77:12 96:25
**nobody** 72:1,2 83:8
**Nobody's** 105:22
**Noles** 8:24
**None** 60:5 89:16
**nonprofit** 1:7 7:12,19
30:13 49:14 65:13
97:24 98:5,13 99:8
101:12 102:17 106:3
127:8
**nonprogram-related**
20:2 40:14,24
**Noriega** 1:18 5:5
124:20 125:6,24
127:22
**normal** 41:21 58:21
113:21
**normally** 42:12,17
**North** 8:25
**Notary** 1:19 5:5 124:21
127:22
**notations** 29:21 75:12
**note** 24:13,15,17,20
26:9 41:24 42:10,18
44:25 45:6,11 47:19
48:22 56:21 57:11
72:13 73:15 86:6
91:25 99:7,14 104:4
126:5 127:12
**notes** 3:14 4:2 41:11,12
41:15,16,17 42:15
43:1,5,17,25 44:12
44:14,22 45:5,12,13
45:15 46:3,5,6,11,13
46:19,22,23 47:13,21
47:23,25 49:8,11,25
50:18 52:3,6,9,20,24
52:25 56:15 72:15
73:11,12,14 75:18
78:24,25 85:8,17
86:15 91:7,18 92:1
92:21 112:22,24
113:2
**nothing** 5:9
**notice** 1:13 5:2 93:18
**noticed** 12:25
**not-for-profit** 66:1
**November** 6:25 9:4
111:15,17
**NSG** 126:3
**NSG0172** 105:20
**NSG173** 105:21
**number** 3:9 8:19 16:17

28:12 29:25 54:25
81:19 85:3 89:3
95:22 97:16 99:20,24
104:18,21 106:18
108:18 112:23 113:1
114:6 116:18 120:3
120:17
**numbering** 38:3
**Numbers** 12:15 111:19
**numerous** 16:4
**NW** 2:17

_____

**O**

**OATH** 124:1
**object** 63:21 93:19
103:24 107:24
**objecting** 98:21
**objection** 7:14 8:6
13:20 15:2 20:22
24:11 25:8 29:2 30:5
33:5 35:18 36:19
38:15 40:7 42:11,20
49:22 50:7 55:16
56:9 57:2,13 58:2
60:18 61:11,17,22
62:14 63:17 64:23
65:5 66:3 67:21
68:22 70:22 72:5
73:7,23 79:18 82:13
82:24 83:6,14,24
84:8,21 90:10,15
91:20 92:8 94:1,11
94:17,23 95:8,18
96:12,21 97:13 98:19
98:24 100:17,23
102:8,18 103:14
105:2 108:8,22 109:3
109:8,13 110:3,12
111:10 112:1,15
113:18 114:1,19
115:8,15,24 117:10
117:20 118:13,17,23
119:3,8,24 120:5
121:3,10 122:16
**objections** 60:13
**objective** 17:25
**obligated** 17:2 40:23
105:15
**obligation** 50:5 100:11
**obligations** 43:20,21
50:4 53:6,23 54:18
115:4
**obtain** 97:24
**obtained** 116:1
**obviate** 80:19
**obviously** 51:21 103:25
**occasion** 7:5,10 9:8
10:21 45:15,25 46:19
47:2,3 49:12 50:1

51:2 63:14 64:18
65:1 71:20,22,24
72:3
**occasions** 9:11,13
117:21
**occupied** 8:20
**occur** 20:25
**occurred** 52:7 83:17
**October** 1:14 5:3
**off** 33:18 39:17 43:11
43:12 67:7 80:13,17
91:15 100:1,3 102:24
103:5 122:17,20
**office** 6:23 21:22 33:4
58:22 60:11 61:6
121:13 127:17
**officer** 15:8 92:9
121:13
**officers** 44:13 55:1,6,7
58:19,23 72:8 88:4
116:18,23 120:21
122:2
**offices** 60:22
**official** 67:7 124:11
**officially** 106:6
**officials** 10:22
**Oh** 13:4 27:15 105:23
**okay** 7:9 8:2 10:4,13
12:2,8 13:11,17
14:21 17:14 18:12
19:23 20:10 21:5,13
22:19 25:24 26:5,12
26:23 27:19 30:15
31:3,23 33:23 34:10
34:20,25 36:3 37:22
38:1,12 39:3,15 42:2
43:5,25 44:17,20
45:2,9 46:23 47:11
47:17 49:17 50:17,25
51:4 53:20,20 54:1
56:3,18 57:5,23
59:16 62:4,10 63:8
63:12 64:13,15 65:22
66:23 69:2,3 72:23
75:16,18 76:8 77:19
78:13,15 87:22 90:20
91:6 93:15 95:10,14
117:6
**once** 66:20 114:25
127:13
**one** 2:4 20:17,18 21:14
26:14,19 29:18 32:4
32:8,8 33:11 37:4,21
38:19 44:2 46:17
55:21,25 58:4 63:3
67:13 70:14 72:10,21
75:3,9,19,20,20 76:1
76:25 80:6 84:23
89:11 92:11 99:4

101:7,14 102:9,9,13
102:24 103:17
105:24 106:4 110:14
119:18 120:6,8
122:21
**ones** 29:6 76:9,13,19,23
96:2
**one's** 79:1
**one-year** 121:15
**only** 27:22 29:20 30:12
30:24 37:2 56:10
62:11 75:20 79:6,7
96:2 98:4,11 113:8
**open** 127:17
**operate** 55:19 63:20
64:5 84:2
**operated** 122:4
**operating** 121:21
122:14,25
**operation** 64:7 98:16
100:11 121:20
**opinion** 102:6 104:25
110:4,4 111:12
**opportunity** 96:7
105:17
**opposed** 37:15 50:5
54:19 60:3 102:9,16
**opted** 92:7
**option** 40:3 71:15
**options** 92:19
**order** 8:24 49:14 80:19
88:10 95:23 98:5,12
**orders** 18:18
**organization** 7:19,21
8:3,7,13,18,18,22 9:5
9:6,10,13,15,23,25
10:1,5,6 11:8 20:8
88:4 117:22
**organizations** 7:13
8:20 66:1 106:5
**original** 29:14 85:9
90:13,17 91:15 93:24
118:11,20 119:16
**other** 10:6 15:17 16:14
16:17 17:10 18:14,19
19:2,19 20:5 25:12
26:6,8 29:19,25 30:3
30:9 31:19 45:6,6,11
45:18 46:18 48:13
50:12 53:8 55:2,25
56:6,10,21,24 57:5,8
57:9,20 59:10 60:15
62:21 63:6,15,24
64:20 65:1 67:13
70:3,14 72:21 74:5
75:19 76:8,9,21,23
76:25 80:6 84:23
89:12 92:18 98:4,15
101:14 104:18

117:12,22 119:17
122:21,23 123:3
92:24 96:25
**ought** 70:9
**out** 6:15 10:19 17:3
20:2,13 35:25 36:21
44:9 48:5 49:5 53:13
55:22 60:9 61:2
63:20,24 67:24 69:13
79:14,17 83:7 85:25
104:24 106:18,22
110:7,20 113:13
114:23 119:7,19,20
122:1
**outgoing** 99:8
**outlay** 44:15
**outside** 58:7,22 66:17
82:11 88:3 102:24
117:23 119:12,14
121:24,24 122:12
123:4
**outstanding** 15:16 32:7
36:9 37:7,10 39:10
93:16 94:7 95:7,10
95:17 110:10,13
111:4 112:14 113:25
114:20
**out-of-pocket** 26:22
**over** 45:20 51:25
104:14 109:11,18
122:7
**owe** 86:1 114:25
**owed** 95:2 113:10
**own** 28:13,15,16 44:4,4
49:21 60:22

_____

**P**

**page** 3:2,9 4:1 12:24
29:17,18,20,20,20
30:15,18,19 31:8
33:15 34:5 75:7,8,22
79:7 82:3 85:20,20
90:1 91:5 92:16 93:9
99:21,22,23 100:6
126:5,9
**pages** 1:20 42:24 75:10
78:18
**paid** 18:19 32:8 36:10
39:10 105:8 110:10
114:25
**paper** 73:16 74:17
86:17
**papers** 46:10
**paper's** 8:12
**paragraph** 14:7 15:12
28:18 30:15,17 31:7
31:18 33:14,25 34:8
34:21,23 35:2,9,17

36:1 37:1,19 39:8
53:5 90:3,6 92:2 93:9
93:16,22 94:4,25
95:1 96:6,11,15,20
97:16,22 98:2 99:5
99:24 100:6,8 104:25
105:7 106:1 116:14
**paragraphs** 32:5 33:13
36:7 37:11 43:20
55:14 56:7,25 57:24
61:1 65:10,24 67:1
**paralegal** 32:22
**Pardon** 6:8 78:7 88:7
107:1
**pare** 61:4
**part** 14:14 19:9 21:15
30:19 33:25 39:20
40:20 46:6 48:22,22
49:7 52:21 74:8
75:23 90:20 91:14
93:4 97:22 103:18
104:4 113:21
**participated** 25:25
58:17
**particular** 33:1 45:17
45:18,21 51:2 61:1
84:24,25 92:2 95:3
104:12 118:3 121:20
123:5
**parties** 11:25 69:11
104:6 125:14,15
**parts** 29:6,7,8 57:20
73:8
**party** 59:6,8
**passed** 23:6
**Paul** 118:5
**pay** 14:24,25 15:15
17:2,9 18:14,25
24:15 36:11 39:12,17
39:18 40:5,6,18
43:21 50:4,20,22
53:6 70:10 71:14
91:13,16 92:3 95:9
100:15 101:4 104:15
109:20,23 111:4
112:17 113:10,13
114:13,20
**payable** 93:17 94:8
95:10
**paying** 49:4,5 62:22
95:7,16 101:15
**payment** 14:23 22:16
24:8,9,24 26:8 29:1
30:20 31:10 42:3,8,9
43:8,8,19,20 45:6,11
45:18 46:2,20,24
47:1,20,21,25 48:25
52:16,18 53:23 54:18

56:6,23 58:20 59:18
60:2 62:6,13,20
64:19 65:2,8,23,25
69:25 73:19 74:6
78:14,19,21 79:14
80:2 83:4,23 92:7
100:10,12 111:8
112:6,13 113:17
114:18
**payments** 63:15 78:25
109:1,11 115:17
**pays** 8:18
**Peabody** 2:9
**Pearlman** 105:20,25
107:4 111:16,17
112:5,8
**penalties** 126:22
**people** 10:25 18:2 24:5
25:4 30:9 63:24 88:1
101:24
**percent** 13:14 14:2
33:10,10 51:23 53:12
67:22 79:5,14 86:14
115:17,19
**percentage** 44:5
**perfectly** 30:9
**performed** 117:13
**performing** 51:15
**perhaps** 26:2 80:4
**period** 52:21 66:25
67:6,8,13,16 70:1,8,9
70:11 90:8 110:1
111:8
**perjury** 126:22
**permission** 71:7
**permit** 106:3
**permits** 58:14
**permitted** 70:13
**person** 16:4 25:19
59:22 68:10 118:5
**personally** 124:7
**personnel** 64:4
**persons** 48:25 58:17
62:25 69:16
**Persuans** 87:4
**pertains** 13:25
**Peter** 81:17
**philanthropy** 120:24
**phone** 53:13 58:21
73:25 112:25
**phrase** 16:23 23:19,21
23:22 32:5 34:14
37:7,14 38:3,13,23
119:21 122:14
**phrases** 16:25
**piece** 73:16 86:16
**pieces** 120:11,13
**pitch** 105:17
**place** 1:15 2:4 42:23

86:21
**placed** 12:17
**Plaintiff** 1:5,13 2:6 5:2
**planned** 112:12
**please** 6:7 28:18 33:23
64:6 85:11 95:15
102:22 103:3 112:2
126:4,8 127:12,17
**plus** 48:13 114:21
**point** 1:16 5:4 11:11
16:15 18:22 19:23
20:12,25 21:5 25:13
26:5 27:9 32:4,10,12
32:17 35:7 52:15
53:14,21 59:14,15
66:7 83:7 92:4
100:20 101:7,17,20
101:20 104:13
106:19 118:2,8 127:7
**portion** 31:6 46:24
**portions** 75:6
**position** 5:23 7:1 10:2
17:2,9 19:18 20:1
40:22 111:7,23
113:24
**positions** 8:19
**positive** 51:24 53:12
**positively** 74:15
**possibility** 47:6 57:18
106:20
**possible** 19:2 21:2 65:2
65:3,3
**possibly** 51:25 53:22
**post** 6:2
**postage** 44:4,6,8,9
46:15 47:8,16 48:3
48:11,21,23 49:5,6
56:13,14 57:20 66:19
97:23 98:4,12,15
100:10,12,15 101:12
104:15 105:5,8
110:15,19 114:23
**postal** 22:14 23:4,15
24:10 65:13,19 99:7
101:4 105:1
**potential** 19:7 21:6
22:5,11,15 23:12
24:6,7 41:24 50:3
**practice** 41:10,21
42:21 73:11 113:21
**preapproved** 94:10
**preceded** 106:9
**precipitated** 105:24
**precise** 14:2 55:17,18
**precisely** 13:1
**predated** 10:2
**preliminary** 12:5
**preparation** 76:12
**prepare** 10:23 12:8

60:21
**prepared** 11:14 13:5
14:14,22 16:20 22:25
35:14 60:15,17 61:4
77:16 86:1 87:8
97:17
**preparing** 61:7 89:15
**presence** 82:14
**present** 16:3,20 122:12
**presentation** 83:25
**presented** 11:20 15:7,8
51:19,20 85:15
116:22
**presenting** 16:5
**president** 87:2 120:16
**presume** 13:15 29:23
32:11 33:8 38:25
48:15 78:10
**pretty** 106:20
**previous** 7:24
**previously** 54:5 57:9
66:20 76:4 89:12
100:5 105:15 114:24
**primarily** 11:4 25:5
66:8 69:15
**primary** 69:17
**prior** 6:13 7:3,9,15
9:20 10:4,8,9 11:19
67:23 69:22 70:2,4
82:22 83:2 84:14
85:14,16 89:21 91:18
94:16 121:16
**pro** 48:16 119:15,17
**probably** 104:2
**problem** 21:6,6 22:5,11
23:8,12 26:20 33:22
49:19 66:21,22 78:24
79:3,11
**procedure** 28:10 60:10
86:21 127:14
**procedures** 122:25
**proceed** 24:23 45:3
99:16
**proceeded** 23:10 24:21
**proceeding** 7:5
**proceedings** 112:13
**proceeds** 16:7 17:19
21:11 108:14
**process** 30:19 61:23
87:17,23
**processor** 60:24 61:2
**produce** 36:10 39:11
40:5 72:23 73:15
**produced** 39:17 46:10
73:6,22 74:22 80:12
80:21
**professional** 7:7,13,25
9:15,20,25 10:7,16
61:1 125:6

**profit** 115:6
**program** 16:7,8 17:9
17:12,25 18:14,15,21
18:25 19:16,18 20:2
20:16,17,20 21:12
22:1,7,8 32:6 36:8
39:9 40:5,19 42:4
43:21 44:17 48:21,25
51:13,15,19 56:23
57:20 62:6 63:5,20
65:13 82:12 84:1
86:3 97:24 98:5,16
107:17 108:4,7,12,12
108:14,20 114:21
121:20 122:8 123:4
**programs** 17:3,4,23
18:6,15 19:4,8,10,20
20:4 22:1 105:13,17
**progressed** 19:25
**promissory** 24:13,15
24:16,20 26:9 44:25
45:6,11 56:21 57:10
78:25 99:7,14
**promissory-note** 24:24
**proof** 116:5
**proposal** 16:5 26:6,12
26:13,13 44:25 45:2
45:7,12 46:15 48:1,2
56:22 62:21 63:5,6
67:19 69:24 70:6,17
70:19,21,24,25 71:2
71:4,19 72:1,2,7,14
72:19,20 73:4,5,19
**proposals** 57:5 62:5,11
62:15,20 63:14,15
64:19,20 69:4,5,7
76:16,21 116:24,25
122:25 123:3,3
**proposed** 11:14,20,24
14:16 17:24 24:13
31:7,17 34:8 48:11
57:10,18,23 59:13
62:7 67:16 68:8,13
72:3 79:9 87:12
105:14
**proposing** 68:11
**proprietary** 30:21
**protecting** 101:21
**protection** 104:23
**provide** 14:23 26:24
27:12 87:11 91:2
127:14
**provided** 15:1 24:12
27:19 77:1 89:9
117:9 118:11,20
**providing** 88:4
**provision** 14:10 20:19
28:23,25 30:20 31:19
35:16 39:8,16,19

40:15 67:4,5 86:9
103:22 119:2
provisions 14:23 21:10
24:8,9 36:18 42:3
43:8,20 47:25 53:5
56:24 60:2 65:8,11
65:17,23 69:25 77:4
79:12,14 80:3 83:4
84:5 90:6,13,16
94:15,21 96:10
116:13 117:18
Public 1:19 5:5 124:21
127:22
purchasing 44:8
pure 40:20
purport 52:21
purported 46:11
purporting 61:15
purports 12:14 41:14
purpose 28:10 64:9
purposes 18:9
pursuant 1:13 5:2
put 19:11 23:13 44:9
79:22 80:11,16 86:21
103:18,20,24 108:24
putting 56:3,12 57:19
P.C 2:3
p.m 1:17 103:2,2
123:10 127:17

**Q**

qualify 44:6,8
quality 117:8,11
question 9:22 16:4
18:23 28:10 32:15
33:21,23 43:14,16
48:6 50:15 58:4
64:13 69:18 71:10,11
95:14 103:3 108:9
questions 16:13 24:25
60:12 61:23 64:6
127:17
quick 15:11
quite 13:16 45:23
69:12 100:25

**R**

raiding 19:1
raise 18:1 40:18
raised 18:23 48:17
raising 18:1
Ralph 11:2 12:13 52:13
52:13 85:4 88:19
89:5
ranking 121:13
rare 9:11,11,13
rate 44:6 48:10 101:12
101:12,16,19 102:16
102:17 110:15,16

rates 44:7 49:14 65:14
66:19 97:24 98:13
99:8 102:7
rather 38:4
ratified 109:24
Re 127:8
reached 35:15 55:4,6
84:10 109:21
reacted 61:21
read 3:6 28:19,22
35:24,25 36:1 44:24
48:1 86:3 91:11
112:2 126:4,22
127:12,15,16
reading 98:6 121:1
reads 120:20
ready 127:11
realization 40:17
realized 19:2
really 20:4 66:17
101:18 106:10
117:11,15
realm 69:13
reason 51:14 63:5,7
66:24 98:14 101:18
102:1 126:5,9 127:13
reasonable 67:10
reasons 31:19
recall 11:6 12:10 13:1
26:4,18 29:6 30:24
30:25 31:13,16 32:13
36:23 45:20,21 50:8
51:8,9,11,23 52:19
53:18 54:21 55:20,23
55:25 56:12,15,22
57:3,5 58:23 59:15
60:6 65:15,21 66:4
67:3,5,6,11,15 68:18
70:2,14,18 71:19
72:7,9 74:9,17 75:7
80:5 81:5 84:15,22
84:22,23 101:22
102:3 111:21 112:16
112:18,19 113:24
120:12
recalled 84:13
receipt 127:14
receipts 20:16,21 21:25
82:12
receive 29:14 60:11
61:14 78:5,8
received 6:9 11:21 16:7
21:8,13 33:4,11
66:14 72:18 78:10
89:22 90:14 101:11
115:18 116:4
receiving 26:18 32:25
32:25 111:21
recently 112:9

recited 104:12
recognize 12:19,23
13:3 27:4 29:12
32:21 75:9,14 76:5,6
76:20 77:15 78:3
85:12,17 87:6 97:2
103:6 105:21 112:23
114:6
recollection 13:18
28:21 30:12,16 45:14
46:1,25 49:17 50:1
51:1 52:7 53:4 54:6
55:9,13 56:5,10 58:5
58:13 59:16,21,23
60:19 62:24 68:15
70:20,23,24 71:1
76:10 77:22 78:20
90:18 91:21,24 92:17
92:23 113:15
recommended 113:9
record 5:14 43:11,12
80:12,13,16,17 81:14
100:1,3 102:24 104:4
122:17,20 125:10
records 27:20 28:13,15
28:17 74:23 75:2
recover 68:2
recovery 94:15
redrafted 44:3
reduced 44:6,7 117:1
red-line 34:22,24 35:1
35:4,16,20
red-lined 33:24
refer 43:7,18,18 45:5
46:24 47:24 52:21
109:16 119:22
reference 46:3,18
48:24 49:8 52:4 99:5
referred 8:15 23:3
48:23 49:8 82:1
97:12
referring 14:11 106:12
107:8 119:13,14
refers 13:19 44:20
72:13
reflect 15:17 33:14
44:25 50:18 76:16
83:11 92:17 97:25
98:17
reflected 26:16 34:16
34:22 35:14,16 57:24
65:9,24 73:5 74:7
84:6 96:1
reflection 107:21
reflects 110:9
refresh 28:21 30:16
46:25 49:17 50:1
77:22 91:21 113:15
refreshed 91:24

regarding 32:23 44:2
79:14 81:6 83:4,12
83:23 84:19 89:18
92:2,19 93:2 99:14
102:3 112:6
Registered 125:6
registration 30:10
regular 81:1 102:7,9,13
102:16
regulations 22:14 23:4
23:16 24:10
rejected 56:4 57:14,16
57:21 113:6
related 8:4 116:19
relationship 8:10,16
99:3 114:12 116:20
relative 125:13,15
rely 46:15 48:3
relying 47:14 48:23
remainder 49:11
110:21
remember 15:5 16:18
22:19,21 23:21 24:16
25:18 29:16 32:10,24
32:25 36:21 38:25
41:9 55:3,4 59:1 76:1
77:13 84:25 89:20
101:22 113:9
render 9:9 37:6
renewal 37:5
rent 8:18 71:7,16
rental 9:13 70:12 90:7
93:23
renumberings 32:5
repeat 43:13 95:14
103:3 118:18
report 125:8
REPORTED 1:18
reporter 3:4 74:16
81:13 125:1,7 126:7
REPORTING 127:1
reports 108:3
represent 40:21
representation 23:1
82:18 83:4,9 84:6
representations 82:23
83:12,22 84:19
representative 82:20
122:5
representatives 58:8,8
111:11
represented 50:11
65:24 68:17,19 82:10
82:15 86:16 107:25
request 72:24
requested 27:11,21
125:9
require 79:3
required 97:23

requirements 7:11
65:19
residence 5:17
resolution 52:15 53:14
121:16 122:8,21
123:5
resolve 52:1
resolved 59:2,12,18
60:2 77:5,6,8,24
78:22 79:5,20
resolving 26:20
resort 18:13
resources 18:14 19:19
respect 10:15 11:11 12:3
12:4,9 13:6 15:12,19
17:14 21:7 22:6,16
25:2,5 26:7 30:3,10
31:18,19 33:24 34:8
34:21 35:9,15 39:7
40:2,15 42:3,17
43:21 46:20,23,25
47:19,21 49:25 53:6
56:6,22 57:6 62:5,13
62:20 63:14 64:19
65:8 66:25 69:24
70:6 77:4,23 78:21
respond 60:12 61:9
responded 62:11 73:20
73:21
responding 49:1
response 18:8 49:2
72:19,23 80:21
responses 73:5
responsibility 100:9
responsible 36:11
39:12,18 40:6 48:9
49:15
rest 112:17
result 17:4,19 19:19
22:4 86:20 100:10,16
115:7
resulted 19:8,25 54:15
92:23
results 107:21
resumed 103:2
retained 4:6
return 126:6
revenue 19:1 36:10,14
36:22 37:15,21,24
38:4,7,10,13,16 39:1
71:18
revenues 20:3,3
review 12:5 13:2 15:9
64:6 72:22 78:15
85:16 86:25 87:1
88:5 96:7,16 97:19
105:13,15 125:9
reviewed 14:13 75:5,11
reviewing 13:25 38:11

**revised** 32:19
**right** 24:4 30:23 34:13
  34:17 38:21 39:23
  42:10 45:3 46:8
  53:24 57:17 61:21
  67:7 75:25 80:18
  82:6 86:8 93:15
  105:23 106:17
  108:21 116:12 123:7
  127:15,16
**rights** 98:6
**right-hand** 112:22
**risk** 16:6,12,24 17:18
  21:25 23:3 44:7
  48:20 84:2 86:3
**Rocky** 1:16 5:4 127:7
**rolled** 48:8
**Rowes** 2:10
**RPR** 1:18 5:5 124:20
  125:24 127:22
**rule** 23:20 24:2 65:19
  66:18 67:25 78:25
**Rules** 127:14
**rumor** 69:20
**run** 123:1
**running** 87:18

---

**S**

**same** 8:21 36:12 37:11
  37:13 38:3,18,22
  74:13 89:11 94:25
  117:13 119:22 126:5
**satisfactory** 10:23
  26:10 49:20
**satisfied** 40:16
**satisfy** 19:16 20:18
  35:23
**satisfying** 92:20
**saw** 105:23 106:8
**saying** 20:19 71:15
  86:9 112:16
**says** 29:22 30:21 34:10
  34:18 36:8 37:3,4,9
  39:9 44:2,14 46:14
  78:11 79:8 85:24
  86:6,6,10 87:11
  92:21 97:16 106:1
  113:6,8,11
**school** 6:2,4,18,18
**scientific** 116:5
**scriveners** 58:10
**seal** 103:18,20,24 104:5
  124:11
**second** 11:5 29:18
  31:25 75:22 100:1
  102:25 103:17
**secondly** 18:1
**second-to-last** 87:10
**secretary** 21:21 113:1

**section** 15:13 29:5
  31:22 36:25 37:17
**secured** 113:10
**see** 6:15 17:23 29:10,21
  35:4,25 38:11,17
  39:13 46:12 48:1
  59:2,12 75:4 88:2
  89:6 97:19 107:18
**seem** 51:23 101:22
**seen** 105:22 107:11
  120:17 121:22
**self-sustaining** 18:16
**Semb** 11:2,20 12:13
  14:15 16:5,9 20:14
  44:13 58:24 63:1
  69:8,15 85:4,14
  88:19,19 89:5,9
**send** 49:1,5 71:17
  119:6
**sent** 23:15,16 26:16
  28:4 32:23 61:2
  63:19,24 67:3 97:5
  105:25 106:16 122:9
**sentence** 34:11 37:2
  87:10 97:16 98:2
  120:20
**separate** 24:13 99:6
**separately** 59:18
**September** 6:21 107:22
**series** 41:14 74:21
  101:23
**Service** 1:7 22:14 30:13
  127:9
**services** 1:4 7:25 9:9
  24:10 26:25 32:24
  91:3 111:16 117:8,12
  117:13 120:16,24
  127:8
**service's** 65:19
**serving** 10:16
**session** 16:15 121:18
  122:6
**set** 110:24
**Seth** 105:20,25 112:5,8
**sets** 111:23
**settle** 111:24
**settlement** 109:7,16,21
**seven** 109:25 110:9
  116:25
**several** 86:24
**severally** 106:4
**share** 8:17 113:6
**SHC** 12:9,15 14:15,17
  15:15,16 18:3 19:23
  21:25 22:6,16 25:3
  26:1 27:19 28:12
  40:21 41:20 44:6,8,9
  48:8 49:14 57:11,25
  59:17,24 60:1 62:20

**63:13 77:20 86:1**
  91:12 97:22 98:3,11
  99:6 113:10
**SHC's** 18:12 21:7
  61:20
**SHC/Vantage** 24:1
  30:3
**SHC00312** 93:9
**SHC00370** 85:5
**SHC00374** 85:5
**SHC01893** 114:6
**SHC03322** 91:4
**SHC03336** 91:5
**SHC04061** 112:23
**SHC04236** 81:19
**SHC04241** 82:3
**SHC04276** 81:19
**SHC047233** 87:5
**SHC047239** 87:6
**SHC04725** 89:5
**SHC04737** 89:25
**SHC04771** 97:1
**SHC04772** 97:1
**SHC200** 32:20
**SHC4962** 27:2
**sheet** 3:5 126:1,6,6,8
  127:12,13
**Shelly** 1:18 5:5 124:20
  125:6,24 127:22
**short** 26:20
**shortfall** 22:7 50:4,20
  50:22 53:7,24 56:6
  56:23 63:14 70:8,10
  71:5,13,13,14 110:2
**shortfalls** 49:15 62:6
  62:22 64:19
**shortly** 15:24 84:9
  121:16
**shotgunned** 106:18
**show** 52:13 108:11
**showed** 32:9
**shown** 90:16
**shows** 33:6
**Shrine** 8:25
**Shriner** 34:18
**Shriners** 1:15 2:19 5:3
  5:20,24 6:13,22 7:3,6
  7:18,23 8:3,4,8,11,15
  9:3,19 10:9,14,17,22
  10:25 14:24 16:6,11
  16:21 17:1,8,18 19:1
  19:18 20:1,15,19
  21:2,10 23:9,12
  24:14 25:17 26:21
  27:10 28:13,15,16
  31:12 36:11 37:6
  39:12,18 40:3,6,9,12
  40:14 41:2 42:5,8
  43:21 44:5,13,15

**45:2 47:6 48:12,18**
  48:19,20 49:4,19
  50:3,9,20 51:12,14
  53:6,15,16,23 54:9
  55:7 56:4,12 57:6,19
  58:8 62:21 63:4,6,22
  63:22,25 64:3,10,18
  67:13 69:15 70:9
  71:14 72:9 74:23
  75:2 80:21,25 81:1,6
  82:11,23 83:5,12,13
  83:21 84:2,10,19
  86:24 90:7 92:2,7,19
  94:9,21 95:7,9,16
  96:9,18 99:16 100:9
  100:15 101:4 102:14
  104:14,20,22 105:7,8
  105:11,18 106:6,13
  106:21 107:14
  108:14 109:19,22
  110:18 111:3,8,18
  113:25 115:2 116:20
  116:21 117:14
  118:16,22 119:7
  120:4,22 121:1
  122:15,24 127:6
**Shriners/Vantage** 27:6
  73:1 74:22 76:12
  84:15
**side** 26:7
**sign** 3:6 99:6 126:6
  127:13,15,16
**signature** 29:25 127:11
**signed** 29:22 67:23,24
  68:5 74:9,11 77:10
**significant** 73:13
**signing** 56:20 84:15
  116:8
**simply** 15:13 20:19
  22:6 23:12 38:12
  57:19
**since** 6:25 9:3 23:6
**Sincerely** 127:20
**single** 15:8 73:15,16
**sir** 5:16 7:8 12:19 27:14
  28:18 29:12 32:21
  46:7 54:1 70:4 74:5
  77:14 78:3 80:8
  117:6
**sit** 53:3 70:16 121:24
**situation** 7:15 54:12,14
**situations** 52:1 69:11
**six** 5:25 6:14 12:10
  15:6 22:22 41:9
  45:21 59:4 60:6
  72:16 80:6
**skip** 47:12
**small** 114:21
**Smith** 120:16 121:11

**121:11 122:10**
**solely** 53:18
**solicitation** 15:15 18:9
  18:24 49:1
**solicitations** 18:20
**solicited** 18:3
**soliciting** 121:21
**some** 11:14,23 18:22
  19:7,15 20:12 21:5
  21:17 22:2,11,14
  23:12,15 24:5 26:5,6
  27:9 29:3,8,17 30:9
  30:18 31:1 35:6 36:4
  40:21 41:23 51:14
  53:20 56:20,21 57:20
  59:11 60:3 68:12
  69:6,20 73:13,19
  76:10 98:22 100:20
  102:2 104:19 109:18
  109:19 110:17
  112:22 115:4 116:25
  117:1 122:3,3
**somebody** 11:14 13:11
  35:25 68:8,14,19
  69:20 101:13
**somehow** 54:12
**someone** 68:1,16,17
  75:13 76:3
**something** 18:3 26:8
  32:25 42:17 45:20
  46:12 47:14 48:13
  54:3 56:14 66:8 75:5
  75:11 91:12
**sometime** 104:9
**Sometimes** 8:15
**Somewhere** 120:6
**soon** 121:25
**sorry** 33:18 55:23
  95:13 115:25 117:5
**sought** 101:5
**source** 19:1 22:11 69:6
  69:20
**space** 8:17
**speak** 20:7 81:10
**speaking** 79:12 119:25
**speaks** 13:15 31:21
  32:11
**specific** 41:1 58:13
  59:3,22 60:5 62:5,24
  68:10 73:19 76:10
  79:25 81:8 119:20
**specifically** 26:3 30:24
  41:7 54:21,22 55:23
  56:15 58:23 59:17
  67:14,17 70:15,25
  84:22,23 102:4
  112:19
**speculation** 40:20
**spoke** 44:13 52:10

58:25 81:5 101:18
spokesman 69:17
squiggly 30:25
staff 6:22
stages 101:10
stamp 105:20
standard 102:17
staple 75:24
start 20:13 48:7 122:1
started 54:14
starts 91:4
state 1:19 5:5 15:13
   113:24 124:3,21
   125:3 127:22
stated 113:20
statement 50:9 82:16
   97:19 98:8 99:10
   112:3 116:3
statements 32:7 36:9
   39:10 93:17 94:8
states 1:1 93:16 97:22
   98:3 100:22 104:10
   122:22
status 11:10,12
stay 44:10 46:17
staying 46:21
stenographically 125:8
step 102:24
stick 50:15
still 49:14,19 70:8 71:5
   71:12,17 109:22
stipulation 80:11,15
stop 123:8
stopper 52:13
Street 2:17 5:17
strike 10:19 20:13 60:8
   114:9
subject 17:24 53:22
   78:13 118:21 126:23
submitted 15:16 18:18
   76:17,22 110:14
subpoena 28:4 80:22
subpoenaed 27:23 28:2
   28:6 73:17
subsequent 14:18
   16:16 21:9,20 23:5
   26:19 39:16 52:8,9
   52:22,23 53:11 54:6
   67:24 111:1 116:8
   119:16
subsequently 15:20
   23:2 51:21 106:23
   112:11 116:19
substance 14:24 22:19
   28:24 36:17 39:15,19
   41:17 55:14 56:7,24
   97:8 114:17 126:23
substantial 42:5
sue 104:14 112:17

sufficient 65:12,18
suggested 28:25 29:7,7
   29:8 34:20 54:22,24
   55:8,14,18,20,21
   56:5,23 58:5,20
   68:16
suggestion 13:23 54:7
   54:8 56:11 68:1
   104:3
suit 102:3 106:8,22
   113:12 116:1
Suite 2:16
sum 56:13,20
summary 6:2,13
   107:17
superiors 12:9
supplied 13:12 27:24
supposed 14:25 101:15
   122:25
supposedly 106:16
sure 8:11 13:14 14:2
   28:20 32:1 33:10,10
   38:23 43:3,3 45:24
   74:18 79:6 92:25
   100:2 118:7 124:25
surmised 101:20,21
surprise 50:8 58:19
surrounding 116:16
suspend 123:9
suspended 103:1
sustained 104:24
switching 117:7
sworn 5:8 124:8

T

T 8:23
take 7:18,23 8:2 12:18
   12:21 14:21 15:11
   19:17 21:14,17 23:22
   24:23 25:2 26:10
   27:19 28:11 31:14
   33:2 38:17 41:22
   42:2,15 49:12 50:25
   56:1 58:12 60:7 63:8
   63:25 66:13 67:11,15
   67:18 68:20 69:3
   70:20 72:23 73:3,11
   73:12,14,20 78:15
   85:11 96:6 99:24
taken 1:13 5:1 52:16
   86:2 126:2 127:11
taking 41:11 86:15
talk 122:18
talked 61:5
talking 7:15 17:22
   21:22,23 26:19 32:6
   34:7 76:4 95:4 113:8
Tampa 1:16 5:4,18
   25:22 26:1 84:14

127:7
telephone 41:11,12,15
   41:22
tell 5:8 12:19,22 14:9
   22:13 28:14 29:24
   42:25 43:6,17 44:21
   46:13 49:10,10 59:4
   59:12 62:24 75:19,20
   77:1 81:16 85:12
   92:25 95:22,25
   103:12 107:13 114:9
   114:17 121:9
telling 49:13 58:25
   59:24,25
ten 25:25
term 38:4,14 48:11
   101:9 109:18 111:1
   121:15
terminate 91:12,13,16
   92:3
terminated 95:3
terminates 92:22
terminating 109:17
termination 15:13
   31:11,19,20 35:10
   37:8,10 39:7 40:2,8
   40:16 41:3 43:9,9,22
   43:23 50:5,6,21,23
   51:12,14,22 53:7
   54:15,18,19,20,22,23
   59:19,20 60:3,4
   63:21 70:7 90:3
   92:15 93:2,10 109:20
terminology 74:5
terms 15:17 24:16 42:8
Terrie 52:11 88:22
test 44:17 48:11
testified 5:10 53:8
   63:10 66:20,20 71:25
   72:6 83:7 84:13
testify 58:14,16,18,18
   70:16 74:15 86:14
testifying 27:17
testimony 58:3 70:3
   84:16 89:12 91:18
   103:19 104:5 119:1
   125:10
text 36:4,5
Thank 9:1 10:13 28:7
   80:8 126:7 127:18
Thanks 98:24
their 49:2 88:5,6,8
   97:18 101:3 111:12
   113:5
themselves 17:5 88:25
Theodore 87:4
therefor 127:13
thereto 111:17
thing 30:25 33:8 42:9

110:5
things 18:7 21:20 60:17
   73:13 74:4 104:21
   105:24 113:12 115:2
   115:3 119:12,20
think 9:18 11:19 14:19
   25:15 28:4 31:14
   32:16 36:24 46:9
   53:10,11,12 66:21
   75:4,23,23,24 76:1
   96:4 102:1 103:5,15
   103:25 109:18
thinking 79:19 119:23
thinks 48:18
third 31:8 69:6 83:9
   98:2 118:5
third-hand 69:20
third-party 104:19
   106:7,19
third-to-last 89:25
though 44:18 50:15
   63:8
thought 41:18 42:18
   47:9,13 52:25 67:10
thousands 120:13
threatened 113:16
three 29:19 87:20
   120:6,8
through 6:16,17 12:15
   25:14 27:2,23 32:20
   36:20,24 43:5,17
   84:9 85:5 87:6
   107:22 123:1 127:17
tie 115:2,3
time 1:16 6:24 7:11
   9:23,23 10:19,20
   11:3,6,9,13,23 13:2
   14:13,21 19:22 23:5
   23:16 24:19 25:14
   32:13 35:13 36:11,23
   39:12,25 42:12,15
   47:4,4 48:4 49:3
   51:18,20 52:10,14,22
   53:13 54:25 55:11
   58:19 60:25 62:10,12
   62:12 63:2 66:13,25
   67:10,19 68:12 69:16
   69:22 70:1,8,9 71:9
   71:10,17 72:10 73:11
   73:14 82:2,21 88:17
   88:18 89:21 98:16
   100:20 104:21 112:9
   116:8 117:14 121:11
   121:23
times 16:4 42:14 51:9
   69:10 73:9,13 117:21
titled 94:4
today 27:17 53:3 70:16
   96:7,16 97:18 113:12

together 53:19 108:24
told 9:18 14:15 22:20
   22:24 23:11 24:20
   47:5 62:4 66:20 69:2
   69:7,21 92:1 101:14
   102:1 111:11 116:18
   116:18
top 31:8 75:22
topic 51:2,7 80:20
   84:25 85:1 117:25
total 16:7 108:2,20
   109:11 120:8
totally 53:17
towards 39:8 73:25
transaction 15:19
   42:13
transcript 125:9,10
   126:4,6,6,8 127:11
transcription 126:5
transmission 35:7
transmitted 33:3
transmitting 87:12
treasurer 11:7
trial 101:10
true 18:5 19:5 25:7,9
   80:23 99:2 125:10
   126:23
trustees 87:14,24 88:12
   88:20 97:7
truth 5:8,9,9
truthfully 32:10
try 9:16 41:17,24 42:18
   73:11 98:21 115:11
trying 9:17 53:13
   113:20 123:2
two 8:20 18:6 36:17
   37:11 38:20 88:2
   119:18
type 68:16

U

ultimate 20:11 29:4
ultimately 6:19 19:25
   27:7 40:15 48:9
   49:15 56:8 57:25
   65:9 88:10
under 14:25 42:4 51:15
   83:13 84:19 85:25
   92:20 93:1 95:6,11
   95:16 100:14,16
   102:7 103:18,20,24
   104:5 105:7,9 108:12
   109:23 110:24 112:6
   113:17 117:9 122:25
   126:22
undergraduate 6:3
underlies 10:10
underlying 101:5
underneath 85:22

undersigned 124:6
understand 9:2 15:22
  19:13 27:25 30:8
  37:13 45:23 49:7
  71:24
understanding 11:10
  15:18,22 16:1,19,24
  48:24 49:3 82:10,15
understood 64:11
  106:12
United 1:1 100:21
  104:10
University 6:3,4,11
unless 113:13
unreasonably 34:11,15
  34:19
until 6:21 14:18 32:7
  36:9,10 39:10,11
  48:5
upfront 57:19
upper 112:22
use 16:23 17:11,16,21
  17:22 37:14 40:3,17
  91:13,17 92:4 98:12
used 20:4 119:21
uses 37:21
U.S 22:13 81:18

**V**

value 19:7,8,11,12,15
  19:16
Vantage 1:4 7:4,24
  9:20 10:2,5,15,16,24
  14:17 15:14,15 16:13
  17:20 18:19 22:16
  24:15 25:4,12 26:2
  32:6 36:8 37:3,4 39:9
  44:16 46:15 47:14
  48:1,2,18,23 50:12
  51:7,14 54:9,12 55:8
  55:21 58:9 59:1
  62:17 64:2,21 68:1
  68:13,14,17,17,20
  69:16,17,24 70:6
  72:2 81:7 82:1,10,19
  82:20 83:3,11,21,23
  85:15 86:1,2 93:18
  94:9,9 96:10,19 97:9
  97:18 98:14 99:5
  100:11,20 101:3,11
  101:14,17,21,24
  102:3,6,15 104:11,13
  104:19,23,23 105:14
  105:16 106:4,8
  107:17 109:1,6,11,16
  109:17,21 110:10,14
  110:23 111:11,15,19
  111:19 112:10,12
  113:16 114:12,18

115:1,1,4,6 116:2,9
116:13,18,23 117:3,8
117:12,18,23 118:3
119:1,6,6,18 120:3
120:16,17,17,24
126:3 127:8
Vantage's 17:9 42:4
  98:3 101:24 110:21
  111:7,23 113:24
  115:17
Vantage/Miller 27:10
Vantage/SHC 62:8
  77:4
variation 119:17
various 26:20 32:4
  60:8 116:24 117:25
  122:2
VerMaas 77:12,19
  88:20
version 34:22 35:3,16
  36:13,15 37:8,9
  38:20 94:20 95:1,3,4
  95:6,11
versions 74:13 94:16
very 16:9,15,19 53:2
  56:19 74:1 79:11
  117:24
via 99:8 127:11
view 19:23 23:11 66:8
  118:8
virtue 121:12
visibility 117:25
volunteers 122:24
vs 1:6 126:3 127:8
V-A-S-S-I-E 88:23
V-E-R-M-A-A-S 88:20

**W**

W 121:11
waiver 127:15
walk 51:13 84:11
walking 54:10 63:5,6
want 17:8 18:13 20:1
  28:19 35:25 40:12,22
  54:11 71:14 85:6
  100:24 102:21
  103:18,24
wanted 18:15 31:2
  51:13 52:11 59:11,17
  60:2 84:11 116:19
Washington 2:17 23:7
wasn't 17:1 20:15,19
  49:20 68:20 71:10
  83:8
way 13:23 18:7 19:17
  20:17,18 26:7,7 36:6
  45:7 55:1,25 58:20
  59:2 60:9 64:4 67:13
  70:14 72:21 75:19

76:25 79:22 80:6
  84:23 92:18 122:4
ways 56:22 62:5 65:2,3
  65:3
week 14:19 25:25
well 8:2,10 10:19 12:23
  16:18 20:12 30:9
  35:3 36:2 37:2 53:2,3
  54:17 55:12 56:19
  58:23 60:7 68:19
  74:3 79:1,12 86:14
  87:19 91:1 92:1,21
  108:13
went 6:3,17,18 9:3 15:4
  23:14 68:3
were 10:25 11:9,13
  12:2 14:10,23 15:1
  16:13,14 17:24 18:6
  18:7,8,18,18,19,20
  20:4 25:4,4 27:24
  28:2,3,6 29:3 31:4
  32:3,4 41:23 42:14
  46:10 49:1,6 51:9,17
  52:25 53:13,18 54:11
  55:1,9 58:6,10,14
  60:15 61:1,4 62:6,11
  63:15,19 64:20 65:12
  65:12,18,20 66:8,13
  69:2,3,4,5,11,12,13
  73:9,10,12 74:5 76:4
  76:7,13,14,17,22
  77:6,19 79:14,17
  83:22,25 86:13 88:3
  88:17 89:9,12 90:13
  93:24 94:15,21 95:1
  95:7 101:4,5,15
  102:12,15 103:9,5
  104:17,20 105:13,14
  108:20 109:11,19
  110:10,13,19 111:4,8
  112:5 113:25 114:9
  114:12,14,20,22
  116:17,22 117:17,21
  118:21 119:7,11,13
  119:15,18,23 120:12
  121:6 123:1
weren't 10:4 22:1 59:6
  66:11 120:3,8
West 5:17
we'll 20:12 80:16 123:8
we're 21:22 26:19
  81:12 95:4 112:17
we've 38:16 80:15,18
  123:8
Wharf 2:10
whatsoever 10:3 35:1
  89:16 100:12
while 21:22 86:13
whole 5:8 42:15 110:5

Willard 107:11,14
William 23:6 97:11
  98:11
willingness 41:2
wills 87:15,25 88:13,21
  97:7
withheld 34:12,15,19
witness 124:11 125:11
Wood 87:4
word 33:6,9 35:24,24
  60:24 61:2
wording 29:5 36:12
  38:23 74:14 94:24,25
words 37:7,9 60:15
work 6:18 9:3,8,12
  53:13
worked 16:17 48:5
  79:14,17 113:13
working 29:25 63:1,1,2
  92:10
worried 66:8,10,11
wouldn't 24:9 42:19
  114:25
write 113:20
writing 75:4 114:11
written 96:11,20
wrong 106:17
wrote 15:12

**X**

X 31:1

**Y**

yeah 11:13 27:22 30:18
  31:4 37:25 41:8,12
  43:2,4 44:20 66:11
  71:23 75:8,25 76:5
  80:10 91:4,6,12,14
  104:9 105:23 122:19
year 121:14
years 5:25 6:6,9,14
  12:10 15:6 22:22
  41:9 45:21 59:4 60:6
  72:16 80:6
York 6:4

**$**

$100,000 101:19
$2,831,695 108:13
$223,000 114:23
$36,043,436 109:2
$46,220,167 108:21
$7,254,293 109:7

**0**

00312 93:11,12
01900 114:6
02108 2:4
02110-3342 2:10

0213 93:13
04-11686-WGY 1:6
  126:3

**1**

1 1:20 3:10 12:18 14:8
  14:10,14 21:15 37:8
  37:19 75:10 85:7
  97:16 105:19
1.148 48:6
1.17 38:2,18,19
10 3:19 75:8 85:3
10/28/05 126:2
100 13:14 14:2 33:10
  33:10 51:23 53:12
  67:22 79:5,14 86:14
102 3:22
105 3:23
107 3:24
11 3:20 87:3 89:3
11/01/2005 124:12
  125:19 127:5
11:40 74:19
11:50 74:19
111 3:25
112 4:2
114 4:3
12 3:10,21 93:6,14,15
12A 74:23 75:4
12B 74:23 75:4
12C 74:24 75:6,7
12D 74:24 75:10
12.1 14:7,9 15:12,13
  90:3
12/2/03 112:22
12:45 103:2
120 4:4
125 3:4
126 3:5
127 1:20 3:6
13 3:22 12:12 85:4 89:4
  89:21,23 94:25 95:1
  95:10
13A 74:24 75:11,11
13B 74:24 75:17 90:21
13C 74:24 75:18,25
  76:2
13F 74:24 76:4 93:5
13.1 31:7,22 33:13,14
  33:17,25 34:8,10
  74:14 93:9,16,22
  95:9 96:15,20 110:24
13.1(a) 31:10
13.1(b) 31:9 32:11,11
  32:13 34:1,2,16,21
  34:23 35:10,17,19,20
  36:1 39:3,21,22
  43:20 53:5 55:14,19
  56:7,25 57:24 65:10

65:24 67:1 74:7
**13.2** 28:18 29:5 31:18
  32:14 33:13 35:2,5
  43:21 53:6 54:13
  55:14,19 56:7,25
  57:24 65:10,24 67:1
  74:7,14 96:6,11
  110:24 116:14
**13.3** 31:22 94:4 95:15
  95:16
**14** 3:23 105:21
**14B** 74:24 76:6
**14.2** 32:9
**15** 3:24
**16** 3:25
**17** 4:2 25:15 26:25
  74:11,12 81:23
**18** 4:3 46:12,14,21,23
  47:13,22,24 48:5
  49:13,18,25 50:18
  52:12,15,17,22 77:9
  78:23,23
**19** 4:4
**1900** 2:17
**1970** 6:10,15,16
**1975** 6:16,17
**1977** 6:11,18
**1980** 6:21,25,25 9:4
**1999** 7:2 10:18 12:13
  15:25 25:15 26:25
  31:24 32:19 44:2
  46:12,14 52:12 77:13
  78:2,11,12 81:9 85:4
  86:18 87:5 89:4,18
  89:23 93:6 96:25
  116:11 117:3

_____
**2**
**2** 3:11 12:24 27:4 28:11
  75:10 96:4 99:20,24
  100:6 104:25 105:7
  116:11 118:12
**2A** 97:22
**2B** 98:2
**2.8** 110:5,6
**20** 80:4,7 96:25
**2000** 81:23
**2001** 120:15 121:18
**2002** 105:19
**2003** 111:15,17 114:4
**20036** 2:17
**2004** 107:22
**2005** 1:14 5:3
**202-861-0740** 2:18
**21** 111:17
**215** 2:16
**220** 32:20
**24** 29:11 111:15
**25** 14:4,11 15:12 78:2

78:11,21 79:1
**26** 3:11 31:24 32:19
  74:7
**27** 78:12 87:5 89:18,21
**28** 1:14 5:3
**29** 3:12
**2900** 1:16 5:4 127:7

_____
**3**
**3** 3:12 29:20 30:16,18
  31:6,17 32:8 33:15
  34:5,7,15,22 35:8
  39:20 77:13,23
**3:30** 103:2
**30** 2:10 15:14 107:22
  127:14
**30th** 15:14
**31** 3:13
**33607** 127:7
**33629** 5:18
**36** 32:7 36:9 39:9 67:7
  67:9,9 71:5,12
**36-month** 66:25 67:4
  67:13 90:8 93:23
  94:14
**370** 85:20
**388** 12:15

_____
**4**
**4** 3:13 32:18,21 33:25
  34:23 35:1,4,8,14
  36:5 38:7,18,22
  44:12 74:8 114:4
**4:12** 1:17 123:10
**402** 12:15
**41** 3:14
**43** 109:11 115:19
**4810** 5:17
**491** 111:19
**4920** 111:19
**4982** 27:2

_____
**5**
**5** 3:2,14 42:23 43:6
  46:6,9 52:21 91:2
  99:22,23 100:6
**5.2** 79:4
**5.3** 79:4,6,9,12
**5/18/99** 48:2
**5:30** 127:17
**50** 115:17,19 116:4
**5000** 120:17
**50001** 120:17
**501(c)(3)** 7:21

_____
**6**
**6** 3:15 75:1 76:10,24
  90:21 93:5 95:22
**60** 93:18

**617)451-8900** 127:1
**617-589-3810** 2:5
**617-951-2009** 2:11

_____
**7**
**7** 3:16 44:2,10,20 45:10
  47:9,11 77:14 81:12
**7.2** 110:20
**74** 3:15
**77** 3:16
**78** 3:17

_____
**8**
**8** 3:17 75:7 78:3,13
**8:30** 127:17
**81** 3:3,18
**85** 3:19
**87** 3:20

_____
**9**
**9** 3:18 75:8 81:13
  120:15
**9:32** 1:17 5:3
**97** 3:21

## Page 128

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
 3   ----------------->
 4   VANTAGE FINANCIAL SERVICES,  :
     INC.,                        :
 5        Plaintiff,              :
 6                              : CASE NO.:  04-11686-WGY
     vs                          :
 7                                :
     NONPROFIT SERVICE GROUP and  :
 8   GEORGE MILLER,               :
 9        Defendants.             :
     ----------------->
10
11   CONTINUED DEPOSITION
12   OF:        JAY FLEISHER, ESQUIRE
13   TAKEN:     Pursuant to Notice by
                Counsel for Plaintiff
14
     DATE:      November 9, 2005
15
16   PLACE:     Shriners Hospital
                2900 Rocky Point Drive
17              Tampa, Florida
18   TIME:      1:15 p.m. to 2:55 p.m.
19   REPORTED BY:   Shelly Noriega, RPR
                    Notary Public
                    State of Florida at Large
20
21              Volume 2
                Pages 128 - 200
22
23
24
25
```

## Page 129

```
 1   APPEARANCES:
 2   (Appearing by telephone)
 3
 4   LAURENCE M. JOHNSON, ESQUIRE
     Davis, Malm & D'Agostine, P.C.
     One Boston Place
 5   Boston, Massachusetts 02108
     617-589-3810
 6   Ljohnson@davismalm.com
 7        Appeared on behalf of Plaintiff
 8
 9
     MATTHEW J. GRIFFIN, ESQUIRE
10   Peabody & Arnold, LLP
     30 Rowes Wharf
11   Boston, Massachusetts 02110-3342
     617-951-2009
12   Mjgriffin@peabodyarnold.com
13        Appeared on behalf of Defendants
14
15
16   MACKENZIE CANTER, III, ESQUIRE
     Copilevitz & Canter, LLC
17   Suite 215
     1900 L Street, NW
18   Washington, DC 20036
     202-861-0740
19   Maccanter@aol.com
20        Appeared on behalf of Shriners Hospital
21
22
23
24
25
```

## Page 130

```
 1
               INDEX
 2
               PAGE
 3   Examination by Mr. Griffin.............131, 194
 4   Examination by Mr. Johnson............167, 195
 5   Certificate of Reporter....................198
 6   Errata Sheet...............................199
 7   Read and Sign Letter.......................200
 8
 9          INDEX OF EXHIBITS
10   NUMBER                      PAGE
11      20   Memo............................132
12      21   Memo............................134
13      22   Letter..........................137
14      23   Letter..........................138
15      24   E-mail..........................139
16      25   E-mail..........................144
17      26   Memo............................146
18      27   E-mail..........................148
19      28   E-mail..........................150
20      29   E-mail..........................151
21      30   Letter..........................154
22      31   Letter..........................156
23      32   Labels..........................157
24      33   E-mail..........................159
25      34   Fax.............................164
```

## Page 131

```
 1        The continued deposition of JAY FLEISHER, ESQUIRE,
 2   taken pursuant to notice by counsel for the Plaintiff, on
 3   November 9, 2005, commencing at 1:15 p.m., at Shriners
 4   Hospital, 2900 Rocky Point Drive, Tampa, Florida, before
 5   Shelly Noriega, RPR, Notary Public, State of Florida at
 6   Large.
 7              EXAMINATION
 8   BY MR. GRIFFIN:
 9     Q   You understand you are still under oath from
10   your prior deposition?
11     A   Yes, sir
12     Q   I'd just like to start by marking Exhibit
13   Number 20, which is going to be the June 14, 2002,
14   memorandum to Mr. Fleisher from Paul Gramblin. Begins
15   with SHC01514.  If you could give that to the reporter
16   and have her mark it and let me know when you have had a
17   chance to look at it.
18     A   2152?
19     Q   01514.
20        MR. CANTER:  Kind of cropped off on the
21   photocopy, by the way.
22        THE DEPONENT:  Yeah, half of it got cut off.
23        MR. GRIFFIN:  I'm going to try and take these
24   in order as I sent them.
25        THE DEPONENT:  Do you want me to give her the
```

Page 132

1   whole stack and the rest of the two pages attached
2   to that?
3        MR. GRIFFIN: Yes. That will be Exhibit Number
4   20, I believe.
5   BY MR. GRIFFIN:
6        Q   Mr. Fleisher, can you look at that document and
7   tell me if you recognize it?
8        A   Yes, I do.
9        Q   Was there something humorous about receiving a
10  customer satisfaction survey from Vantage?
11       MR. JOHNSON: Object to the form. Before you
12  answer, I will address this question to the court
13  reporter. Having in mind we're doing this by
14  telephone, Madam Reporter, would you like us to
15  identify us -- who the speaker is before we say
16  something? Or can you, at least with the people who
17  are not there in your presence, tell anything --
18       THE COURT REPORTER: I'm able to discern it so
19  far. I'll let you know if I have a problem.
20       A   We thought it incongruous that we had been
21  asked to fill out a customer satisfaction survey after
22  events that had taken place before then which indicated
23  to us that the service was not what it should have been
24  from Vantage.
25  BY MR. GRIFFIN:

Page 133

1        Q   What events are those you're referring to?
2        MR. JOHNSON: Objection to the form.
3        A   Well, there are the materials that you had
4   provided. Mainly sending out some sloppy material to
5   prospective donors, printing up one million copies of a
6   particular mail-out that had the wrong phone number on it
7   for the hospitals, sending out more mailing numbers than
8   the contract would have allowed. That's primarily what
9   it was.
10       MR. JOHNSON: Just so it's clear on the record,
11  my objection to the form with respect to this
12  question is specifically addressed to the lack of
13  foundation that this witness has personal knowledge
14  and is competent to testify to this matter.
15  BY MR. GRIFFIN:
16       Q   Looking at Exhibit 20, Mr. Fleisher, there is a
17  handwritten note on the bottom there. Do you see that?
18       A   Yes.
19       Q   Is that your handwriting?
20       A   Where it says "your copy forwarded to JF at
21  session"? That?
22       Q   Mine says "at board meeting."
23       A   Okay. That's mine. That one is my notes.
24       Q   Can you read that note to me?
25       A   Yeah. "At board meeting" which meant at the

Page 134

1   board meetings we were having -- the board meetings that
2   we had subsequent to this would have been the end of
3   June. Burt Oien said on July 2 that he had advised Paul
4   Gramblin to trash this. Throw it away.
5        Q   And you had a discussion with Burt Oien
6   concerning this?
7        A   Yes, I did.
8        Q   Do you recall what Mr. Oien said to you beyond
9   what's reflected in the note?
10       MR. JOHNSON: Objection to the form.
11       A   No.
12  BY MR. GRIFFIN:
13       Q   Is it fair to say if the answers to the survey
14  had, in fact, been filled out they wouldn't have been
15  positive?
16       MR. JOHNSON: Objection to the form.
17       A   They would not have been positive in many
18  respects.
19  BY MR. GRIFFIN:
20       Q   I would like to mark as Exhibit Number 21 the
21  October 17, 2002, memorandum to Mr. Fleisher from Paul
22  Gramblin. Begins with Bates Number SHC03053.
23  Mr. Fleisher, this is a memorandum concerning the mailing
24  of holiday cards; is that correct?
25       MR. JOHNSON: Objection to the form.

Page 135

1        A   Yes, it is.
2   BY MR. GRIFFIN:
3        Q   Do you recognize this document?
4        A   Yes, I do.
5        Q   In the document Mr. Gramblin refers to
6   deception on the part of Vantage. Do you know what he's
7   referring to?
8        MR. JOHNSON: Objection to the form.
9        A   Not precisely. That's too long ago to remember
10  that.
11  BY MR. GRIFFIN:
12       Q   Do you recall what, if any, issues surrounded
13  this holiday card mailing?
14       MR. JOHNSON: Objection to the form. Lack of
15  foundation, among other deficiencies.
16       A   At that point I was one of the three folks who
17  were required to review each mailing together with the
18  approval form, and from reviewing the approval form as
19  against what was known as the pro forma, I could not
20  ascertain whether that was the correct amount of holiday
21  cards to be mailed.
22  BY MR. GRIFFIN:
23       Q   The note on the bottom of that Exhibit 21, is
24  that your handwriting?
25       A   Yes, it is.

2

Page 136

1    Q   Can you just read that note for me, please?
2    A   "Paul, at this point things are so confused I
3  have no idea if Vantage is sticking to the revised pro
4  forma. I cannot tell if they are sending out more or
5  less than agreed to. I'm not signing off on any of
6  this."
7    Q   Why were you having difficulty figuring out
8  whether the pro forma was being followed?
9    A   This part I do recall distinctly. It was
10 because of the way that the document called "Shriners
11 Hospitals for Children Campaign Approval," which consists
12 of three pages, was filled out.
13     It made it very difficult to -- this was a
14 persistent problem with Vantage -- to match up the
15 numbers and the costs and so forth on the third page of
16 that document, which the -- with the amended pro forma of
17 the contract that said how many mailings would be, what
18 the cost would be, total cost, so forth and so on.
19     Q   If you look at SHC03058, which is contained in
20 that exhibit --
21     A   Yes.
22     Q   -- is that an example of the campaign approval
23 form you were talking about?
24     A   Yes.
25     Q   And on this approval form it indicates that

Page 137

1  mail quantity of 600,000 is X'd out and 750,000 was
2  replaced; is that correct?
3      MR. JOHNSON:  Objection to the form.
4    A   That's what it would indicate.
5  BY MR. GRIFFIN:
6    Q   So was Vantage proposing to sent out an extra
7  150,000 holiday card mailings?
8      MR. JOHNSON:  Objection to the form.  Lack of
9  foundation.
10   A   I don't know who crossed out 600,000 to
11 750,000, but from reading the materials, that refreshed
12 my recollection that this was a big problem with me that
13 Vantage was trying to get approval for an additional
14 150,000 cards mailed out without our approval.
15 BY MR. GRIFFIN:
16   Q   I want to mark the next Exhibit 22, which is a
17 November 4, 2002, letter from Mr. Fleisher to Lawrence
18 Lyon at Vantage.  Begins with Bates Number SHC01727.  Do
19 you recognize this document?
20   A   Yes, I do.
21   Q   And was this letter sent to Mr. Lyon who
22 addressed the holiday mail cards we just talked about?
23   A   Yes.
24     MR. JOHNSON:  Object to the form.
25   A   Yes.

Page 138

1  BY MR. GRIFFIN:
2    Q   On the second page of that exhibit, the first
3  paragraph, you look -- look at that, please.
4    A   I'm looking at it.
5    Q   Was there an issue regarding Vantage's failure
6  to remove names from the mailing list?
7    A   Yes.
8    Q   What was the problem with that?
9      MR. JOHNSON:  Objection to the form.  Lack of
10 foundation.
11   A   The problem was many folks -- not many but
12 folks -- certain folks were on the mailing list that
13 Vantage -- to whom Vantage mailed the material and the
14 department of development would receive, or sometimes
15 they would forward it to me, requests or directions from
16 the people who received that material to be taken off
17 their mailing list and to not be solicited again.
18     We had expected that after letting Vantage know
19 that a particular person should be taken off the mailing
20 list that the person would be taken off at least before
21 the next mailing, and in some instances that did not
22 occur.
23 BY MR. GRIFFIN:
24   Q   Let me mark Exhibit 23, which is a February 3,
25 2003, letter from Paul Gramblin to Ms. Lalak Deckman.

Page 139

1  Begins with SHC01682.  Do you recognize this document and
2  the attachments?
3    A   Yes, I do.
4    Q   Are these documents -- document an example of
5  consumer complaints regarding the failure of Vantage to
6  remove names from the mailing list?
7      MR. JOHNSON:  Objection to the form.
8    A   Yes, they do.
9  BY MR. GRIFFIN:
10   Q   In your opinion, what impact does this type of
11 error have on the Shriners?
12     MR. JOHNSON:  Objection to the form.
13   A   Negative publicity with the general public
14 which could impact on decreased donations.  It's negative
15 public relations primarily.
16 BY MR. GRIFFIN:
17   Q   Next I want to mark Exhibit 24.  It is a
18 February 3, 2003, e-mail to you from Bill Fawcett and
19 others.  Begins with Bates Number SHC02910.  Do you
20 recognize this document?
21   A   Yes, I do.
22   Q   First line says "both of Paul's and Bill's
23 statements about percentages are true." Can you tell me
24 what that refers to?
25     MR. JOHNSON:  Objection to the form.

3

Page 140

1    A    "Both of Paul's and Bill's statements about
2    percentages are true." I would have to read what Paul's
3    and Bill's statements about percentages were.
4    BY MR. GRIFFIN:
5    Q    Okay.
6    A    Yes. It pertains to making the same mistake
7    over and over regarding removing folks from the mailing
8    list, and also incorrectly referring that 93 percent of
9    our annual operating budget went to direct patient care.
10   Q    Does it also refer to the fact that Vantage was
11   claiming that only 13 cents out of every dollar was for
12   fundraising cost?
13       MR. JOHNSON: Objection to the form. Lack of
14   foundation.
15   A    The message from Bill Fawcett with a copy to me
16   indicates that. Well, not exactly. It says Bill Fawcett
17   said to me "Bill says I think they" -- being Vantage --
18   "should use 13 cents out of every dollar you contribute
19   through this direct mail program goes to Shriners
20   Hospital. The remaining goes to fundraising cost.
21   Aren't we supposed to tell the truth?"
22   BY MR. GRIFFIN:
23   Q    So in the mailings that Vantage was making on
24   behalf of the Shriners, were they making representations
25   as to what percentage of every dollar went to the

Page 141

1    Shriners as opposed to fundraising costs?
2        MR. JOHNSON: Objection to the form. Lack of
3    foundation and also violation of the Best Evidence
4    Rule.
5    A    I cannot recall whether they made it an actual
6    mailing that had the 93 percent stated as going to the
7    hospitals for operating expenses. I do know that in my
8    review, Mr. Fawcett's review and Mr. Gramblin's review of
9    a certain of the fundraising materials Vantage sent to us
10   for review, that statement was made and we -- primarily
11   me -- requested that that statement be removed.
12   BY MR. GRIFFIN:
13   Q    Would you agree that it was in Vantage's best
14   interest as far as profit to mail out the most expensive
15   item as possible?
16       MR. JOHNSON: Objection to the form.
17   A    I have no idea what's in Vantage's best
18   interest.
19   BY MR. GRIFFIN:
20   Q    For example, this e-mail refers to t-shirts at
21   $4.50 apiece that were mailed out. And in the second
22   paragraph, second-to-last sentence says "higher the item
23   cost to you the greater the chance that donations won't
24   cover cost." Do you see that?
25   A    Yes.

Page 142

1    Q    Can you tell me what that means?
2        MR. JOHNSON: Objection to the form.
3    A    Exactly what it says. It says if the item
4    costs -- if Shriners Hospitals for Children paid more for
5    a particular item that was mailed out, and it was -- the
6    greater the possibility that donations would not cover
7    the cost because if you -- if you -- if it cost you more
8    to make a mailing in the way of including an item that
9    cost more money than other items, then of course the
10   chances were that the donations received in response to
11   that mailing would not cover the cost. I mean, if your
12   costs are more than your intake it's not going to cover
13   the cost.
14   BY MR. GRIFFIN:
15   Q    Likewise, the more mailings you send out the
16   cost would be increased?
17   A    Total cost?
18   Q    Total cost.
19       MR. JOHNSON: Objection to form.
20   A    Yes.
21   BY MR. GRIFFIN:
22   Q    And the higher cost either on a per-item basis
23   or a total cost basis, the higher the cost the more money
24   that Vantage gets reimbursed in the mailing, correct?
25       MR. JOHNSON: Objection to the form.

Page 143

1    A    That's correct.
2    BY MR. GRIFFIN:
3    Q    Do you recall Vantage proposing to increase the
4    t-shirt test mailing from 10,000 to 60,000?
5    A    Yes, I do.
6    Q    Was that mailing actually made at 60,000?
7    A    I can't remember right at the moment.
8    Q    Do you recall whether it was approved?
9    A    I can't recall right at the moment. I mean, I
10   can't recall it now.
11   Q    Going down on that e-mail to the e-mail from
12   Paul Gramblin to Bill Fawcett and you on the 13th. There
13   is a sentence in there that begins "also Burt advised."
14   Do you see that?
15   A    Okay. Which one is this?
16   Q    It's the second e-mail. Paul Gramblin's
17   e-mail.
18   A    Paul Gramblin to Bill Fawcett and myself and
19   the second sentence is "also Burt informed me that."
20   Yes.
21   Q    The next sentence refers to some mailing jobs.
22   A    Mmm-hmm.
23   Q    Were there issues with Vantage sending out
24   those mailings?
25       MR. JOHNSON: Objection to the form.

4

Page 144

1    A   Yes.
2   BY MR. GRIFFIN:
3    Q   What were the problems with those mailings?
4    MR. JOHNSON:  Objection to the form. Lack of
5   foundation.
6    A   I don't recall right at the moment. I would
7   have to review them -- the materials.
8   BY MR. GRIFFIN:
9    Q   There is a reference to the pro forma. Do you
10  recall whether those mailings were reflected in the
11  original pro forma?
12   MR. JOHNSON:  Objection to the form.
13   A   No. But I'm looking at a February 18 e-mail
14  that pretty much sets everything out as far as the
15  problem.
16  BY MR. GRIFFIN:
17   Q   All right. Let's mark that as the next
18  exhibit. Begins SHC02909. That's Number 25. Does
19  Exhibit Number 25 refresh your recollection as to what
20  the issues were that were raised in the Exhibit 24?
21   A   Yeah. Let me read it again. I just scanned
22  these materials before the deposition. Yes, I remember
23  that now.
24   Q   Does that refresh your recollection as to
25  whether the mailings referred to in Exhibit 24 are in

Page 145

1   compliance with the pro forma?
2    A   Yes, it does.
3    Q   What do you remember about that?
4    A   That they did not in some respects.
5    Q   How did they not comply?
6    A   As far -- didn't comply in some respects as to
7   the number set out or the cost of some items being sent
8   out and whether or not the pro forma even permitted
9   certain items to be sent out.
10   Q   If you look at the fourth paragraph of that
11  e-mail, Exhibit Number 25, there is a reference to a
12  mailing of 150,000 more letters asking people if they
13  wanted t-shirts. Do you see that?
14   A   Yes, I do.
15   Q   Do you know if that mailing was ever made?
16   A   I don't recall.
17   Q   According to this e-mail that mailing was not
18  in the original pro forma; is that correct?
19   A   That's correct.
20   MR. JOHNSON:  Objection to the form.
21   A   Sorry.
22   MR. JOHNSON:  Objection to the form.
23  BY MR. GRIFFIN:
24   Q   Is it accurate that there was no record of the
25  committee's approving of that mailing?

Page 146

1    A   That's correct.
2    Q   In the next paragraph there is a reference to a
3   quote, roll out, end quote, of 500,000 of something at
4   2.95 each. Do you see that?
5    A   It actually says 50,000 at -- oh, 500,000 of
6   something at 2.95 each, correct. Yeah, I see that now.
7   Yes.
8    Q   Do you have any recollection as to what that
9   something was?
10   MR. JOHNSON:  Objection to the form. Lack of
11  foundation.
12   A   I don't recall.
13  BY MR. GRIFFIN:
14   Q   The next paragraph, last line, states "rather I
15  see what are apparently random selections of approval
16  forms for us to sign." Can you tell me what you meant by
17  that?
18   MR. JOHNSON:  Objection to the form.
19   A   What I meant by that is we were receiving
20  approval forms to approve certain mail-outs that were not
21  provided in the pro forma as under the contract.
22  BY MR. GRIFFIN:
23   Q   I want to mark as Exhibit Number 26 a March 11,
24  2003, memorandum to you, Bill Fawcett from Paul Gramblin.
25  Begins with Bates Number SHC01670. Do you recognize this

Page 147

1   document?
2    A   Yes, I do.
3    Q   Did you have any discussion with Mr. Gramblin
4   concerning the content of this memorandum?
5    A   I don't recall that I did or did not.
6    Q   Did you ever reach an opinion that Vantage was
7   engaging in fraud?
8    MR. JOHNSON:  Objection to the form.
9    A   I can't recall one way or the other if I ever
10  made that statement and, if I made it, who I would have
11  made it to.
12  BY MR. GRIFFIN:
13   Q   Apart from conversations you may have had
14  regarding this memorandum, did you reach any conclusions
15  yourself as to whether Vantage was engaging in fraud?
16   MR. JOHNSON:  Objection to the form. Lack of
17  foundation.
18   A   No, I didn't. I did not reach any such
19  conclusion.
20  BY MR. GRIFFIN:
21   Q   Do you have any idea as to what Paul Gramblin
22  was referring to when he said parallels could be drawn to
23  Vantage?
24   MR. JOHNSON:  Objection to the form.
25   A   Yes, I do.

5

Page 148

1 BY MR. GRIFFIN:
2    Q   What's your understanding of that?
3    A   My understanding was that the articles
4 mentioning that supreme court case that was to be
5 considered dealt with telemarketers who did not inform
6 the people they were soliciting that 85 percent of the
7 funds contributed the telemarketers went to the
8 company, and made a comparison to the information being
9 prepared and sent out by Vantage which did not advise the
10 prospective donors to the materials they sent out on our
11 behalf that about 93 cents of every dollar collected was
12 going to Vantage's costs.
13    Q   Does that document refresh your recollection as
14 to whether Vantage actually sent out mailings that stated
15 that 93 cents out of every dollar?
16    A   No, it does not.
17    Q   I would like to mark as the next exhibit a
18 March 13, 2003, e-mail from Mr. Fleisher.
19    A   March 13?
20    Q   Yes. It's Bates Number SHC01667.
21    A   That says March 10.
22    Q   On the top, very top, it says March 13, 2003.
23    A   Yeah. Okay.
24    Q   Do you recognize this document?
25    A   Yes, I do.

Page 149

1    Q   Does this document reflect another example of
2 Vantage failing to remove names from the mailing list?
3        MR. JOHNSON: Objection to the form.
4    A   Yes, it does.
5 BY MR. GRIFFIN:
6    Q   Do you recall anything about the particular
7 circumstances of this individual as being discussed in
8 this e-mail?
9    A   Yes, I do.
10    Q   What's your recollection of that?
11        MR. JOHNSON: Objection to the form. Lack of
12    foundation that this witness has knowledge that's
13    personal and that he's competent to testify to the
14    matter.
15    A   I was informed that the fellow was writing what
16 was termed bogus checks in response to the solicitations
17 that came out to him subsequent to his request to have
18 his name removed from the mailing list.
19 BY MR. GRIFFIN:
20    Q   And Vantage continued to send mailings to this
21 individual?
22        MR. JOHNSON: Objection to the form.
23    A   I do not know if Vantage continued to send
24 mailings to this individual. Subsequent to March 13,
25 2003, I do know that Vantage continued to send mailings

Page 150

1 to this individual after we had requested his name be
2 removed and through a number of times subsequent to the
3 first request that we had made to remove his name.
4 BY MR. GRIFFIN:
5    Q   And the cost of those multiple mailings to this
6 individual, those would be reimbursed to Vantage?
7        MR. JOHNSON: Object to the form.
8    A   Well, we -- those mailings that -- any mailing
9 that was made out was part of the cost of a mailing that
10 Vantage would do on our behalf, and they would submit the
11 invoices and we would pay the invoices. So to the extent
12 that any particular one was made to an individual whose
13 name had been requested then, however small, Vantage was
14 being paid for that.
15 BY MR. GRIFFIN:
16    Q   I would like to mark as the next exhibit April
17 30, 2003, e-mail from Paul Gramblin to Mike Andrews.
18 Bates SHC01620. Mr. Fleisher, you are a CC on this
19 e-mail, correct?
20    A   Yes, I am.
21    Q   Do you recognize this document?
22    A   Let me -- If I have a moment to review it.
23 Yes, I do.
24    Q   Can you tell me what the Second Chance videos
25 were?

Page 151

1        MR. JOHNSON: Objection to the form. Lack of
2    foundation.
3    A   The Second Chance videos were videos that were
4 created by the Shriners Hospitals for Children's public
5 relations department to portray Shriners Hospitals for
6 Children in a favorable light to the public.
7 BY MR. GRIFFIN:
8    Q   This e-mail refers to 10,000 of those being
9 returned to the Shriners; is that correct?
10    A   No. The 10,000 were mailed out -- of those
11 were mailed out and then a certain number of those,
12 doesn't recite there, were being returned by people, the
13 people who were solicited.
14    Q   Do you know the reason why those videos were
15 returned?
16        MR. JOHNSON: Objection to the form.
17    A   No.
18 BY MR. GRIFFIN:
19    Q   Next I want to mark June 20, 2003, e-mail from
20 Paul Gramblin to Bill Fawcett, CC to Mr. Fleisher.
21 Begins SHC01615. Do you recognize this document?
22    A   Yes, I do.
23    Q   This e-mail refers to an issue regarding a
24 mailing of t-shirts; is that correct?
25        MR. JOHNSON: Objection to the form. Lack of

6

Page 152

1    foundation.
2    A   Yes, it does.
3   BY MR. GRIFFIN:
4    Q   Can you tell me what the circumstances
5   underlying that t-shirt mailing were?
6        MR. JOHNSON: Objection to the form. Lack of
7   foundation. And, in particular, no testimony that
8   this witness has personal knowledge of the matter or
9   is competent to testify to it.
10   A   I would have to refresh my recollection from
11  reading this.
12  BY MR. GRIFFIN:
13   Q   Sure.
14   A   Yes. I recall now the problem was in
15  fulfillment of the request for t-shirts. The mail-out
16  would be made whereby an individual was requested to mail
17  something back if they'd like to receive a t-shirt, and
18  then Shriners Hospitals for Children would be charged as
19  a part of the cost whatever t-shirts were mailed. And
20  there was a problem that a number of individuals sent in
21  those cards to indicate that they did want to receive
22  those, and it was not fulfilled within a timeframe we
23  expected.
24  BY MR. GRIFFIN:
25   Q   Going down further on the exhibit there is a

Page 153

1   June 6, 2003, e-mail from Bill Fawcett to Paul Gramblin,
2   CC to you. Do you see that?
3    A   Yes, I do.
4    Q   In the first line it sounds like they have
5   screwed up another batch of credit card donations. Do
6   you know who "they have" refers to?
7        MR. JOHNSON: Objection to the form. Lack of
8   foundation. And particularly lack of foundation
9   that this witness might know what Mr. Fawcett was
10  referring to.
11   A   I have worked with Bill Fawcett in excess of 15
12  years and from the tone of that paragraph I have
13  absolutely no doubt that the "they" he is referring to is
14  Vantage.
15  BY MR. GRIFFIN:
16   Q   Do you recall having any conversations with
17  Bill Fawcett regarding the processing of credit card
18  donations?
19   A   Yes, I do.
20   Q   Were there some problems with respect to
21  Vantage's processing of credit card donations?
22        MR. JOHNSON: Objection to the form.
23   A   I do not recall any specific problems.
24   Q   What was the issue in general?
25        MR. JOHNSON: Objection to the form.

Page 154

1    A   I don't recall. All I recall is that there was
2   a problem with the credit card processing. I don't
3   recall exactly what it was.
4   BY MR. GRIFFIN:
5    Q   I want to mark next a November 26, 2003, letter
6   to John Kenney from Jay Fleisher.
7    A   Is that the new material?
8    Q   It's not the next item in the pile. It's the
9   item after that.
10   A   Oh, November. Right.
11        MR. CANTER: This is Bates 03028.
12        MR. GRIFFIN: Bates 8149, Vantage prefix. We
13  skipped over that 03028.
14        MR. CANTER: Okay. Okay.
15        MR. JOHNSON: Are you coming back to that one
16  or can I put it aside?
17        MR. GRIFFIN: Put it aside. Thank you.
18  BY MR. GRIFFIN:
19   Q   Earlier you referred to a problem with Vantage
20  listing an inaccurate telephone number on the mailings;
21  is that correct?
22   A   That's correct. That's correct.
23   Q   Does Exhibit 30 refer or document that
24  testimony?
25   A   Yes, it does.

Page 155

1    Q   Can you describe for me what the issue was with
2   that mailing?
3    A   Approximately -- well, not approximately,
4   exactly a million mailings had been mailed out by
5   Vantage, and the text of the mailings was not reviewed by
6   myself, Mr. Gramblin and Mr. Fawcett ahead of time. And
7   the number that they put on the bottom of it, the
8   813-281-0306, is not the telephone number of the Shriners
9   Hospitals headquarters.
10   Q   Whose telephone number was that?
11   A   An individual person in Tampa. A female.
12   Q   Did that individual receive telephone calls
13  from prospective donors?
14        MR. JOHNSON: Objection to the form.
15   A   Yes, she did.
16  BY MR. GRIFFIN:
17   Q   Do you have any idea as to the volume of
18  telephone calls she received?
19        MR. JOHNSON: Objection to the form.
20   A   In excess of 20.
21  BY MR. GRIFFIN:
22   Q   Did you speak with this individual yourself?
23   A   I can't recall. I think I did but I can't
24  recall precisely.
25   Q   What, if anything, was done to rectify that

7

Page 156

1  situation?
2      A   Something was arranged whereby the phone -- I
3  think -- I can't be precise.  Something was done to
4  reroute the phone calls on that number to, I think, our
5  headquarters but I can't be -- I'm not sure of that.
6      Q   Do you recall Vantage agreeing to install an
7  answering service in this individual's home?
8      A   Yes, I do.
9      Q   Is that part of the final settlement agreement
10 with Vantage?
11     A   Yes, it was.
12     Q   Next I want to mark October 2, 2003, letter
13 from Paul Gramblin to Larry Lyon with CC to Mr. Fleisher.
14 SHC02029.  Do you recognize this letter?
15     A   Yes, I do.
16     Q   This letter refers to a recipient receiving a
17 calendar in a wrinkled and torn state.  Do you see that?
18     A   Yes, I do.
19     Q   Do you recall the circumstances of that?
20         MR. JOHNSON:  Objection to the form.  Lack of
21 foundation.
22     A   It was part of a batch where I myself saw the
23 calendars that went out which had similar problems as
24 described in Mr. Gramblin's letter of October 2.
25 BY MR. GRIFFIN:

Page 157

1      Q   Again, in your opinion, how does that reflect
2  on the Shriners?
3      A   Negatively.  It's bad publicity to do such
4  sloppy work.
5      Q   Next I want to mark the sheet of labels that's
6  Bates Number Vantage 12456 through 12457.  Mr. Fleisher,
7  can you tell me what this document is?
8      A   Yes.  It's a typical type of return address
9  labels that Vantage would send out on occasion so people
10 could use them as return envelope stickers and ask them
11 to make a contribution to Shriners Hospitals.
12     Q   On the second page, Bates 12457, on the
13 right-hand side in bold it says "remarkably only three
14 cents of every dollar goes to fundraising and
15 administration, an incredibly low figure of which we are
16 very proud."  Do you see that?
17     A   Yes, I do.
18     Q   Does this document refresh your recollection as
19 to whether Vantage actually made mailings containing that
20 statement?
21     A   In that instance they did.  It does refresh my
22 recollection.
23     Q   And that's something that would not have been
24 approved by the Shriners, correct?
25         MR. JOHNSON:  Objection to the form.

Page 158

1      A   It would not have been approved by me.
2  BY MR. GRIFFIN:
3      Q   Did you ever learn or come to find out what the
4  actual percentage of per dollar donation that was
5  retained by Vantage at the end of the program?
6      A   Yes, I did.  That was submitted in the previous
7  deposition as an exhibit.
8          MR. CANTER:  This is Mac Canter.  Let me note
9  this is a generic statement referring to all the
10 revenues of Shriners, not necessarily revenues
11 pertaining to the mail program.
12         MR. GRIFFIN:  I'm glad you noticed that, Mac.
13 So did I.
14         MR. CANTER:  Just so we're clear.  I just want
15 to make sure there's a point of clarity.
16         MR. GRIFFIN:  Okay.
17 BY MR. GRIFFIN:
18     Q   To your knowledge, Mr. Fleisher, this is a
19 mailing that was sent out by Vantage on behalf of the
20 Shriners, correct?
21     A   No.  I can't recall if it was or was not sent
22 out, and if it had been reviewed by me ahead of time it
23 definitely would not have been sent out in its form
24 presented.
25     Q   My question that time was, though, you can tell

Page 159

1  this was something that was created by Vantage, though,
2  correct?
3          MR. JOHNSON:  Objection to the form.
4      A   Yes, I can.
5  BY MR. GRIFFIN:
6      Q   I don't think I got an answer to my prior
7  question as to what percent of every dollar was paid to
8  Vantage under the program.
9          MR. JOHNSON:  Objection to the form.
10     A   About -- well, approximately 93 percent.
11 BY MR. GRIFFIN:
12     Q   I want to mark the next exhibit.  March 15,
13 2001, e-mail from Mr. Fleisher to Bill Fawcett.  Begins
14 SHC01253.  Aside from the cost of the postage for
15 mailings made under the agreement, what other costs
16 were -- was Vantage reimbursed?
17     A   Besides the postage they were reimbursed their
18 charge to us for creation of the materials that were made
19 out, printing of it, thinking of it, so forth, and they
20 also charged us bank fees where there's a holding account
21 where these funds were sent in by individuals and then
22 there was a fee for the bank to do that and that got
23 charged back to us by Vantage.
24     Q   Was it your understanding that Vantage paid
25 that fee out and then Shriners was billed for it and

8

Page 160

1 reimbursed Vantage?
2    A    That was what was represented to us by the
3 folks at Vantage.
4    Q    Was the reality of the situation something
5 different?
6        MR. JOHNSON: Objection to the form.
7    A    I don't know. I could not tell what they
8 were -- I did not -- we could not investigate that. I
9 couldn't get the information.
10 BY MR. GRIFFIN:
11    Q    If you look at the exhibit we just marked,
12 there is an e-mail further down from Bill Fawcett dated
13 March 15, 2001. Mr. Fawcett writes in the second line
14 "Basically since we have taken control of the banking,
15 you stopped paying their 'bank charge' fees of 18 cents
16 per item. This was seen as direct profit for Vantage, as
17 the credits received for balances in the accounts
18 substantially outweigh all actual charges from the bank."
19        Does that refresh your recollection as to
20 whether Vantage was actually paying the bank fees?
21        MR. JOHNSON: Objection to the form. Lack of
22 foundation.
23    A    I don't recall if they were actually paying the
24 bank fee. What I do recall is when we went to our own
25 collection bank, the fees were substantially less than 18

Page 161

1 cents an item.
2 BY MR. GRIFFIN:
3    Q    Who was originally doing the bank processing
4 under the agreement?
5    A    I think it was State Street Bank did it
6 initially. It was in the agreement and then it was
7 changed after that.
8    Q    Was State Street selected by Vantage?
9    A    Yes. The first bank it was was selected by
10 Vantage.
11    Q    And at some point the banks changed; is that
12 correct?
13    A    Yes, they did.
14    Q    Who did it change to?
15    A    I can't recall who it changed to. I would have
16 to go through the file.
17    Q    What was the reason for the change in the
18 banks?
19        MR. JOHNSON: Objection to the form.
20    A    Again, Vantage represented us -- to us that
21 something had occurred with their -- I believe with their
22 arrangement with State Street or State Street -- I think
23 it was State Street was not going to be doing this type
24 of collection business any longer and so that a bank -- a
25 different bank would have to be located.

Page 162

1 BY MR. GRIFFIN:
2    Q    Do you know if the money in the program account
3 generated interest?
4    A    Not personally.
5    Q    Is it your understanding that what Mr. Fawcett
6 is suggesting is that there was sufficient funds in the
7 program account which the bank used to pay their
8 processing charge but then Vantage billed the Shriners
9 for that anyway?
10        MR. JOHNSON: Objection to the form.
11    A    That was Mr. Fawcett's conclusion as related to
12 me.
13 BY MR. GRIFFIN:
14    Q    You discussed that with him?
15    A    Yes, I did.
16    Q    In the last paragraph of -- the last sentence
17 of the paragraph I was just reading from, Mr. Fawcett
18 also writes "therefore, we have always assumed that there
19 was profit built into several of the billing categories."
20 Do you see that?
21    A    Yes, I do.
22    Q    Do you know what other billing categories he's
23 talking about?
24        MR. JOHNSON: Objection to the form.
25    A    There are numerous categories under the pro

Page 163

1 forma, such as printing charges and preparation charges.
2 If you review the pro forma attached to the contract it
3 would list all those various charges.
4 BY MR. GRIFFIN:
5    Q    With respect to the 18 cent bank charge, does
6 that refer to every piece that was mailed out or only
7 those pieces that were received back to the bank?
8    A    Only those that were received back by the bank,
9 to the best of my knowledge.
10    Q    Prior to switching banks, do you have any idea
11 of how many donations were received that were subject to
12 the 18 cent bank charge figure?
13    A    No, I do not.
14        MR. JOHNSON: Foundation.
15 BY MR. GRIFFIN:
16    Q    Would you agree if you multiplied that number
17 of donations by 18 cents that would have represented pure
18 profit for Vantage?
19        MR. JOHNSON: Objection to the form.
20    A    That was Mr. Fawcett's conclusion that he
21 related to me.
22 BY MR. GRIFFIN:
23    Q    Do you have any reason to disagree with his
24 conclusion?
25        MR. JOHNSON: Objection to form.

9

Page 164

1    A  No, I don't.
2  BY MR. GRIFFIN:
3    Q  Now, when the banks switched over, was there
4  also a change in the mailing house?
5    A  I believe there was.
6    Q  Do you recall a switch to Merkle?
7    A  Yes, I do.
8    Q  And when the bank was switched and the switch
9  was made to Merkle, was there any attempt by Vantage to
10  raise its charges with respect to Merkle's services?
11    MR. JOHNSON: Objection to the form.
12    A  Yes, there was.
13  BY MR. GRIFFIN:
14    Q  What was the explanation for that?
15    A  That the charge for Merkle to them was going to
16  be increased from what the charge to them was by the
17  other mailing house.
18    Q  Were the Shriners provided any documentation of
19  those charges and changes?
20    MR. JOHNSON: Objection to the form. Lack of
21  foundation.
22    A  I don't recall.
23  BY MR. GRIFFIN:
24    Q  Next I want to mark a fax, May 21, 1999, to
25  George Miller from Jay Fleisher.

Page 165

1    MR. CANTER: Matt, I don't have all these
2  documents you're referring to. This is Mac Canter.
3  My package doesn't contain some of these documents.
4    MR. GRIFFIN: I e-mailed two additional
5  documents. That last one and this is the last I'm
6  going to use.
7    MR. CANTER: When did you e-mail it?
8    MR. GRIFFIN: Yesterday. Do you want a break
9  and go take a look for it?
10    MR. CANTER: Go ahead, and I can find it here
11  on the screen. I'll look. Yeah, I've got it in
12  front of me right now.
13  BY MR. GRIFFIN:
14    Q  Do you recognize that document?
15    A  Yes, I do.
16    MR. CANTER: Excuse me one second here. Let me
17  print this thing out.
18  BY MR. GRIFFIN:
19    Q  Mr. Fleisher, previously in your deposition we
20  marked an Exhibit Number 12 which was a May 20, 1999,
21  memorandum from you to John Nobles and others. Do you
22  recall that exhibit?
23    A  Not precisely.
24    Q  Do you have those exhibits with you today?
25    A  No, I don't.

Page 166

1    Q  Well, let me turn -- earlier in the deposition
2  I read a passage from that memo. It said, quote, the
3  final draft of the agreement has been prepared by me and
4  is being faxed today to Vantage attorney for their final
5  review, end quote. Do you see that statement? Is that
6  correct? And your response is "yeah." Vantage's
7  attorney, does that refer to George Miller?
8    A  Yes, it does.
9    Q  And then subsequently on May 21, 1999, you
10  faxed to George Miller a draft of the agreement; is that
11  correct?
12    A  That's correct.
13    Q  As reflected in the exhibit we just marked,
14  correct?
15    A  That's correct.
16    Q  And, if you can, look at Page 14 of the draft
17  agreement attached to the May 21, 1999, fax, if you
18  would.
19    A  Yes, I have it.
20    Q  Page 14 there's a paragraph heading 13.1,
21  "Termination Without Cause by Shriners;" is that correct?
22    A  Yes.
23    Q  And on Page 15 there's a paragraph 13.2
24  "Termination For Any Other Reason;" is that correct?
25    A  Yes.

Page 167

1    MR. JOHNSON: Form.
2    MR. GRIFFIN: Those are all the questions I
3  have. Thank you.
4    EXAMINATION
5  BY MR. JOHNSON:
6    Q  Okay. I have a few questions, Mr. Fleisher.
7  I'll try not to keep you longer than I have to, sir.
8  First with respect to some of the things you were asked
9  this afternoon. With regard to Exhibit 33, that's your
10  memo to Mr. Fawcett --
11    A  Yes, I have it.
12    Q  Okay. I'm trying to read my own writing. Bear
13  with me for a moment. The reference to Merkle in there,
14  I think Mr. Griffin asked you a question whether Merkle
15  was the mailing house. The reference in the exhibit is
16  to Merkle as the caging vendor.
17    Do you know what a caging vendor in the context
18  of a fundraising for nonprofit organizations is?
19    A  Yes, I do. They were not the mailing house.
20  They were the ones who received the responses from the
21  solicited individuals with the funds enclosed.
22    Q  They were the organization that, I take it,
23  received contributions, got them deposited into the
24  account that Shriners had set up for that purpose and
25  handled that function; is that right?

10

Page 168

1    A   That's correct.

2    Q   You don't have any knowledge as to whether they

3    were also the mailing house, do you?

4    A   I have no knowledge of that.

5    Q   Okay. And you have no direct knowledge beyond

6    the provisions that are in the agreement as executed as

7    to who pays the caging vendor for its services and

8    how -- if and to the extent that Vantage did so, Shriners

9    reimbursed Vantage?

10   A   Not that I can recall at the present time.

11   Q   Okay. And you don't have any personal

12   knowledge, I take it, that the actual method that was

13   followed and practiced differed in any respect from what

14   was provided in the agreement, do you, sir?

15       MR. GRIFFIN: Objection.

16   A   I don't recall that. No, I don't have any

17   personal recollection of it.

18   BY MR. JOHNSON:

19   Q   Let's go for a moment, if we may, to Exhibit

20   32. That's the set of labels and the promotional

21   materials that's attached as Vantage 12457. Now --

22   A   I've got it.

23   Q   Back to what is said in the promotional

24   materials, the reference to 516 million dollars, is it

25   your understanding that that figure was a figure with

Page 169

1    respect to what has been raised in program mailings or

2    was a figure with respect to Shriners total income from

3    contributions during some period of time?

4    A   Neither.

5    Q   What was your understanding that the 516

6    million dollars represented?

7    A   That was the operating budget to operate all 22

8    of the Shriners Hospitals.

9    Q   Okay. So I take it the operating budget to

10   operate all of the Shriners Hospitals consisted of both

11   contributions and income on whatever investment property

12   Shriners had and whatever compensation Shriners was

13   receiving from patients or from healthcare providers?

14   A   That's not correct.

15   Q   What did the operating income consist of, sir?

16   A   The operating income at that time consisted of

17   income both realized and unrealized from the Shriners

18   Hospitals for Children endowment fund and from bequests

19   and donations to Shriners Hospitals for Children.

20       It did not consist of any payments by patients,

21   nor payments from third parties such as insurance

22   companies or the government.

23   Q   Okay. Now, the statement on the -- on the

24   right-hand portion of the second page of Exhibit 32, only

25   three cents of every dollar goes to fundraising and

Page 170

1    administration, is it your understanding that considered

2    in the context of the hospitals' total operating budget

3    of 516 million dollars, is it your understanding that

4    that was, in fact, true?

5        MR. GRIFFIN: Objection.

6    A   No, it was not true.

7    BY MR. JOHNSON:

8    Q   How much of Shriners' operating budget during

9    whatever period the 516 million dollars refers to -- how

10   much of Shriners 516 million dollar operating budget did

11   go to fundraising and administration?

12   A   Approximately nine cents of every dollar.

13   Q   Okay. Do you know whether that information has

14   been -- had been furnished to Vantage or not of your own

15   personal knowledge?

16   A   No.

17   Q   Did you know -- I take it as you sit here today

18   you know of nothing on the basis of which you could

19   testify of your own knowledge that this statement was not

20   believed by Vantage to be true when it was included in

21   the promotional materials, do you?

22       MR. GRIFFIN: Objection.

23   A   I received these materials from Paul Gramblin

24   in earlier form, I believe, and there was a memo from

25   myself to Paul Gramblin where I distinctly remember the

Page 171

1    Shriners celebrity connection telling him to take that

2    out because there wasn't any authorization for that, and

3    a number of other things on the three cent business being

4    incorrect. I don't know if Paul relayed that on to

5    Vantage.

6    BY MR. JOHNSON:

7    Q   Perhaps you can answer the question that I

8    asked you, Mr. Fleisher, and that question was whether

9    you have any knowledge of your own personal direct

10   knowledge that at the time this statement was included in

11   the promotional literature by Vantage that Vantage knew

12   that that information was not accurate?

13       MR. GRIFFIN: Objection.

14   A   That's a correct statement that you just made.

15   BY MR. JOHNSON:

16   Q   That you don't have any such personal

17   knowledge? That's right?

18       MR. GRIFFIN: Objection.

19   A   That's correct. That's correct.

20   BY MR. JOHNSON:

21   Q   Let's move to Exhibit 30, if we can, sir. This

22   business with the incorrect telephone number, I take it

23   that you hadn't reviewed the promotional information that

24   contained the incorrect telephone number before it went

25   out; otherwise, I take it, you would have caught that,

11

Page 172

1  right, sir?
2      A   Yes, I would have.
3    . Q   Do you have knowledge, personal knowledge --
4  not just what somebody may have told you, but do you have
5  personal knowledge as to what other persons, if any,
6  reviewed that material before it went out?
7      A   Yes.
8      Q   Okay.  And what personal knowledge do you say
9  you have as to what other persons reviewed that material
10 before it went out?
11     A   Both Paul Gramblin and Bill Fawcett, because I
12 recall meeting with them concerning that.
13     Q   So what you're saying is that they told you
14 about -- something about what other people had reviewed
15 before this material -- before it went out?
16     A   No, I'm not saying that.
17     Q   What is it you're saying?
18     A   You asked me if I had personal knowledge if
19 whether or not anyone else other than me had reviewed
20 this material before it went out.  I met with Mr. Fawcett
21 and Mr. Gramblin regarding this particular material and
22 we all agreed that the -- that material made incorrect
23 statements, and I don't recall personally making a
24 statement to Vantage pointing out that those were
25 incorrect.

Page 173

1      Q   We're talking about the erroneous telephone
2  number.  Do you have that in mind?
3      A   Yes.  Well, the erroneous telephone number was
4  the subject of an e-mail from Susan Corliss at Vantage.
5      Q   I don't want to cut you off, but my question
6  was just do you have in mind that what we're talking
7  about is the material contained an erroneous telephone
8  number?  I take it you have that in mind, sir?
9      A   Yes.  Now, would you please repeat the
10 question?
11     Q   Okay.  Now, with respect to that material that
12 included the erroneous telephone number, is that one or
13 more other persons at Shriners that told you that they
14 hadn't reviewed that material before it went out?
15     A   I don't know what that question means.  Does it
16 mean -- I really don't know what the question means.  I
17 apologize.
18     Q   That's okay.  I'll try to find a more effective
19 way to communicate with you, Mr. Fleisher.
20     A   Thank you.
21     Q   We started this when I asked you whether you
22 had reviewed the material with the erroneous telephone
23 number and you told me that you hadn't, right?
24     A   I had at one time.  Yes, I did.
25     Q   Yeah, but I thought you said you hadn't

Page 174

1  reviewed that material with the erroneous telephone
2  number before it went out.  Am I wrong about that?  Had
3  you reviewed it before it went out?
4      A   Oh, that particular one?  You are correct on
5  that.  I had not reviewed that one.  I was thinking of
6  the one that had the celebrities mentioned in it.
7      Q   That's why I mentioned a moment ago -- I put
8  the context to you again so that hopefully we would be on
9  the same page.
10     A   All right.
11     Q   Talking about the materials with the erroneous
12 telephone number and as a result of that some woman
13 somewhere in Florida got 20 or so calls.  Do you recall
14 Mr. Griffin asking you about that earlier this afternoon?
15     A   Yes, I do.
16     Q   Okay.  And you've just told me with respect to
17 that incident that you hadn't reviewed that material with
18 the erroneous number before it went out, right?
19     A   That's correct.
20     Q   Okay.  Now, I gather that you have received
21 some information from at least some other people at
22 Shriners the substance of which was that they told you
23 that they hadn't reviewed that material before it went
24 out either; is that correct?
25         MR. GRIFFIN:  Objection.

Page 175

1      A   That's correct.
2  BY MR. JOHNSON:
3      Q   And what they told you about that, that was
4  your basis for the testimony you gave to Mr. Griffin
5  earlier today that that material had not been reviewed by
6  Shriners before it was sent out by Vantage?
7          MR. GRIFFIN:  Objection.
8      A   That's correct.
9  BY MR. JOHNSON:
10     Q   I didn't hear your answer.
11     A   I know.  I was waiting for the objection.
12         MR. GRIFFIN:  I objected.
13         MR. JOHNSON:  Fine.
14     A   That's correct.  That's a correct statement.
15  BY MR. JOHNSON:
16     Q   Okay.  You didn't have -- other than what they
17 told you about that you didn't have any other basis for
18 forming a belief about whether they had or hadn't
19 reviewed that material before it went out, did you?
20     A   Other than what they told me, that's correct.
21     Q   And the people who told you that they hadn't
22 reviewed that material before it went out, those were
23 just some of the people who worked at Shriners, weren't
24 they?
25     . MR. GRIFFIN:  Objection.

12