# EXHIBIT 7

**Expert Report of Robert S. Tigner**
Vantage Financial Services, Inc. v. Nonprofit Service Group, Inc. et al.
Civil Action No. 04-11686WGY.

*The Association of*
*Direct Response*
*Fundraising Counsel*

I am Robert S. Tigner, general counsel to Association of Direct Response Fundraising Counsel (ADRFCO) and regulatory counsel to the Nonprofit Federation of the Direct Marketing Association (DMANF). I am an attorney licensed to practice law in Virginia and the District of Columbia. I have been retained by the defendants, George E. Miller and Nonprofit Service Group, Inc., to serve as a consultant and expert witness. I will be paid at the rate of $150 per hour for my services. My resume is attached and includes a list of cases in which I have served as expert witness and a listing of publications I have authored.

ADRFCO is the professional association for businesses that provide direct response fundraising consulting services to nonprofit organizations. Membership is not open to firms that solicit contributions from the public (that is, it is only open to fundraising counsel). The association has been in operation for almost twenty years and is comprised of 40 member firms. I have served as its general counsel for that entire period.

One of my primary duties is keeping abreast of regulatory requirements and interpreting them for the member firms. This function has frequently required me to be -- or become -- familiar with the language and dispositions made in members' contracts with their nonprofit clients. I was chiefly responsible for authoring ADRFCO's *Rules of Business Ethics and Practice* (the organization's ethics code to which all member firms must subscribe) and shepherding its adoption by the Association.

I have worked in the field of fundraising regulation and nonprofit accountability for over 20 years. I have had extensive experience in legislation, rulemaking, and adjudication concerning the U.S. Postal Service. In addition, my work in the arena of state solicitation law and with the fundraising agency member firms of ADRFCO has provided me the opportunity to review all or parts of hundreds of contracts between fundraisers and nonprofit organizations. In doing so, I have worked frequently and closely with legal counsel for fundraisers, with lawyers from state charity oversight offices, and with lawyers from the Postal Service.

I have been asked to answer a number of questions concerning the contract between Vantage and the Shriners. Specifically, I have been asked to assess the contract against the standards the Postal Service uses to determine what it terms "unauthorized cooperative mailings."

In that context, I have also been asked to examine various aspects of contingent security interests in donor list rental income (including ethical considerations, frequency of occurrence, and sufficiency in protecting fees owed to the secured party). And finally, I have been asked to

examine the degree of care exercised by Miller in comporting the contract to the requirements of the cooperative mail rule to the extent that it can be assessed from the face of the contract and from other facts known to me.

THE COOPERATIVE MAIL RULE

The "cooperative mail rule" (hereafter, CMR), as it is commonly known, derives from sections 703.1.6.1 and 703.1.6.3 of the *Domestic Mail Manual* (DMM). The sections specify what may be lawfully mailed at the nonprofit rate and when an authorized nonprofit mailer may lawfully undertake a cooperative mailing. In reality, the operative portion of the CMR is aimed at determining when there is an *unauthorized* cooperative mailing and does not exist as a formal rule within the *DMM*.

The Postal Service recognizes, of course, that commercial third parties may be instrumental in creating or executing a mailing by an authorized nonprofit mailer. The CMR attempts to sort out when the involvement of the third party is permissible, and when it casts doubt on whether the nonprofit mailer is the true and sole owner of the mailing and the enterprise it supports. The analysis employed is framed by the principal-agent relationship on the one hand and joint venture on the other. An arrangement in the nature of a joint venture will yield the conclusion that the nonprofit has executed an unauthorized cooperative mailing. The immediate consequence of this is that the mailer (and/or the unauthorized third party) will owe the Postal Service the difference in postage between nonprofit rates and standard rates for the mailing in question.

For 30 years, the Postal Service has been applying this rationale and analysis to arrangements between nonprofit mailers and various third parties. Both to aid mailers and its own determinations, the Service developed a series of factors to consider when evaluating the eligibility of a mailing in the CMR context. Neither the rationale nor the factors themselves have changed appreciably over this time. Today, these factors are set out in USPS Publication 417. Two years ago, USPS promulgated a rule change that curtailed the application of the CMR to agreements between fundraisers and authorized mailers (see "exception" portion of *DMM* 703.1.6.3). The change has no bearing on the essential USPS CMR methodology or on this case.

It should be noted here that there are no formal means by which individual cases applying the standards are made available to mailers and the public. Keeping abreast of Postal Service rulings and interpretations requires one to keep in touch with the postal bar and with the Service's lawyers. Over the years, there have been a few court cases as well as rulings and advisories that have been made public by the service (e.g., through Customer Support Rulings). But, "case law" created by private letter rulings by regional classification centers or by senior staff at Postal Service headquarters remains important and may be available only by word-of-mouth.

When evaluating a cooperative mailing arrangement to determine whether or not it may be "unauthorized," the Service relies primarily on the written contractual arrangements between the parties. However, the Service reserves the right to look beyond written agreements and to examine other relevant facts.

APPLICATION OF THE CMR TO THE CONTRACT

My general impression upon reviewing this contract for the first time was that great care had been taken with respect to CMR issues. It appeared to me that the CMR factors had been kept firmly in mind and that clear and unmistakable dispositions had been made in the contract in order to satisfy them. A more careful point by point, assessment of the factors bears out this first impression. The assessment follows (references are to the page numbers and the numbered paragraphs of the contract).

The Service's analytical factors appear in Publication 417 in the form of a series of six questions. The questions are reproduced here verbatim, followed by discussion applying the factors to the Vantage-Shriners contract.

*Who devised, designed, and paid for the mail piece?*

This item addresses the physical package that goes out in the mail. In part, it aims at the archetypical case in which, say, a seller of travel programs would deliver a preprinted advertising brochure to a nonprofit organization for mailing. But it also addresses the question of agency and control in more commonplace situations, such as the arrangement being examined here.

It is unmistakable that Shriners, the authorized mailer, has both the authority and responsibility for the design and content of the mailing packages. Paragraph 2 establishes generally that Vantage acts solely as the Shriners agent and acts solely pursuant to written directives. Paragraph 6.1 of the contract specifies the obligation of Vantage to submit package copy and design to Shriners for approval. And Paragraph 6.2 assures that Vantage may not mail the packages without that approval. As for payment, full charges for package production are billed to Shriners (as "package cost", see Para. 7.3.1), are to paid by Shriners (7.3.2), and, as I have been advised, were in fact paid by Shriners.

*Who paid the postage on the mailing, either directly or indirectly?*

Understandably, the payment of postage is an important and conspicuous issue. The Service will look to seek assurance that the mailer directly or indirectly, is paying all postage costs. Paragraph 2 of the contract is unequivocal in setting out Shriners' obligation for all postage costs, and in the terms of the agreement, for actually paying the postage. Nothing in the contract, or in my understanding of the actual conduct of the parties, contradicts the notion that Shriners was obliged to pay the postage and in fact did so.

A clause in paragraph 5.3 states "the cost of postage shall be paid from gross income." Read with other provisions of this contract, this clause does <u>not</u> set out a limitation on Shriners' obligation to pay postage. Rather, it merely establishes that the income from the fundraising program will be the primary source for postage payments. This conclusion is necessary in order to read this clause consistently with the obligations laid out in Paragraph 2. The conclusion is also consistent with the billing and payment provisions set out in Paragraphs 7.3.2 and 7.3.3 (with all program revenues being directed to a dedicated account and postage receiving payment priority).

*How are the profits and revenues divided from the mailing or an enterprise it supports?*

The disposition of proceeds from a mailing (in this case donations, or contributions) is always carefully examined by the Service. This contract is meticulous in clarifying that Shriners has sole and exclusive authority and control over the received donations. Paragraph 2 recites that Vantage has no authority to receive contributions nor may it have access to contributions. Paragraphs 7.1 and 7.2 describe an elaborate, but not unusual, procedure. They specify that proceeds are directed to a post office box in the name of Shriners and from there to a bank account in the sole name of Shriners and under the sole control of Shriners (thereby ruling out any possibility of, for example, an escrow account). Thus, there is no division of revenues.

However, the Service has been aware for some years that part of the acquired value of a fundraising campaign resides in the donor list. Therefore, a cautiously drafted fundraising consulting contract will contain a clear disposition of the list ownership rights. This contract does that. Paragraph 6.3.1 states clearly "Shriners shall be the sole owner of the list of program donors." This provision comports with industry ethical standards, but more importantly, it assures the Service that there are no "disguised" divisions of proceeds with the unauthorized party.

*What risks are entailed with the mailing or with an enterprise it supports and who bears these risks?*

The Service takes a strict view in it interpretation of this factor. In fact, a contractual promise extended by a fundraising consultant to a nonprofit mailer that the mailer need pay its bills only to the extent of contributions received played a part in the first ever finding of an unauthorized cooperative mailing in a fundraising context. More recently, the Service ruled that a mandate of state law requiring a professional fund raiser to return at least 1% of fundraising proceeds to the mailer nevertheless resulted in an unauthorized cooperative mailing. Clearly, any <u>guarantee</u> against loss afforded by the commercial party would result in a finding of an unauthorized cooperative mailing.

This contract is organized in such a fashion as to presume that the fundraising program will in fact pay all the bills. However, the contract, clearly stipulates that such a result has not been guaranteed by Vantage. Paragraph 5.2 states that the schedule of proposed the mailings incorporated in the contract is not a "guarantee" that the fundraising campaign will net revenues. Of similar effect, is the clause in paragraph 6.1 emphasizing Shriners understanding that it is responsible for the total costs incurred by each mailing. As with the discussion above regarding payment of postage, the statement in paragraph 7.3.2 that Shriners shall pay its bills "from the program account" merely directs Shriners to use those funds first and does not limit its payment obligation to those funds.

Finally, Paragraphs 13.1 and 13.2 establish means by which <u>all</u> billings owed to Vantage will be satisfied by Shriners. By my reading, neither paragraph is equivocal on this point. The apparent variance in the two paragraphs is, in reality, a distinction without a difference. Anyone having passing familiarity with the economics of fundraising, would recognize the abundance of the resources committed to satisfying Shriners' obligations. Postal Service analysis of risk does not, as a rule, assay whether or not there is some scenario, however remote, in which the mailer might not in fact bear all the costs. Rather, it looks to whether a non-authorized party has clearly and specifically undertaken to absorb some or all of the risk. Taken altogether, the contract very clearly establishes that Shriners bears the risk for the fundraising undertaking it describes.

*Who makes managerial decisions about the content of the mailing or the enterprise it supports?*

As with the previously discussed factors, the contract is very clear in establishing Shriners' responsibility and authority for the mail pieces themselves and for the fundraising program. Authority for approval of package copy and design is clearly set out in Paragraphs 6.1, 6.2, and 5.3.

In addition, Paragraph 6.1 establishes Shriners' control of the fundamental decisions regarding the overall fundraising program. Specifically, in reviewing and approving "Campaign Approval Packets" Shriners decides who is mailed to, how many pieces are mailed, and the cost of the pieces that are mailed. In short, under the contract, Shriners controls all the fundamental decisions in the fundraising program. Furthermore, Paragraph 6.2 goes so far as to halt mailing activities by Vantage, absent Shriners' actual exercise of its management authority.

*What are the participants' intentions and interests?*

I understand this factor to be something of a grab bag that encompasses both a general assessment of a contract and/or working arrangement as well as facts external to the contract. Taken as a whole, the Shriners-Vantage contract seems to present a fairly clear view of the parties' intentions. It appears that Shriners wished for this fundraising undertaking to be administratively self-contained. And fortified by the projections contained in Schedule A, Shriners surely had the expectation that the undertaking would pay for itself.

But the assignment of financial responsibility in the contract to Shriners, along with the consistent assignment of responsibility of all critical decision-making to Shriners, says loudly that Shriners understood and intended that it was the fully responsible and liable principal and Vantage its agent, not its guarantor. Moreover, my understanding is that Shriners, in fact, made cash payments to Vantage sufficient to liquidate all of its obligations following the completion of the contract. In so doing, in my opinion, Shriners merely fulfilled an obligation that was manifest in the contract in the first place.

*CMR Applied.*

My opinion is that this contract has been drafted to fall within the permissible bounds of the cooperative mail rule and that it does so. All the evidence of the contract, suggests that the Shriners-Vantage relationship was one of principal and agent.

A review of the CMR factors bears this out. Shriners has the authority and responsibility for the content and design of the mail pieces. Shriners pays, and has responsibility for paying, postage. Shriners receives all of the proceeds from the mailings and has total control of the disposition of those proceeds. Shriners bears the risk of the costs of the mailing exceeding the returns from fundraising during the course of the contract. Shriners has the responsibility for the fundamental decision making in the fundraising program.

Furthermore, it is my opinion that the Postal Service, left to its own devices, would come to the same conclusion. Given the vast number of USPS employees that might have rendered an opinion on this contract, it is always possible that one or more of them could have found this arrangement to violate the CMR. However, the USPS review process ends at Postal Service headquarters. And the review of cooperative mail rule issues is in the hands of very experienced em-

ployees who are intimately familiar with the intricacies of the CMR and the history of USPS interpretations of it.

While it is true, that USPS headquarters rulings may, for example, look very critically at the issue of risk allocation, they do so in the context of the dispositions made by the contract. That is, absent external evidence that the arrangement is otherwise than is established by the contract, their analysis would focus on what the contract sets out. In other words, I believe that the USPS experts would agree with the analysis above and with the conclusion that this contract does not violate the CMR.

## DONOR LISTS AND SECURITY INTERESTS

In his memorandum opinion in *U. S. v. Lewis*, Judge Wolf, sets out a somewhat different analysis of the Vantage-Shriners contract. He says, in effect, that the prospect that Vantage might not collect all costs and fees owed it is tantamount to CMR-proscribed risk-sharing. I believe that Judge Wolf's reasoning is logical, as far as it goes. But I also believe that it varies from actual USPS analysis and from that which the Service would have employed in this case. Nevertheless, the existence of the opinion invites a more detailed look at the methods of payment employed in the Shriners contract.

*Conditional Liens.*

In fundraising business terms, the acquisition of a donor is the equivalent of acquiring a valuable asset. This is well understood in the fundraising community, and is elementary. Value can be extracted from this asset in two distinct, though related, ways. First, a nonprofit's already-acquired donors are its primary sources for subsequent, increasingly efficient fundraising. And second, a nonprofit may rent its donor file for cash (or exchange it for the use of the file of another organization). In each instance, the nonprofit has an asset to expend in order to serve its needs.

When a nonprofit hires a direct mail fundraising consultant, almost invariably part of the undertaking involves acquiring new donors. Since acquiring new donors is expensive, usually done at a net loss, a consultant may justifiably be concerned about how certain he is to be paid and when. Historically, consultants employed a variety of forms of so-called "co-ownership" of donor lists as a means of securing payment.

Approximately 15 years ago, the Association of Direct Response Fundraising Counsel prescribed ethical standards (see Rule 6(c) of *Rules of Business Ethics & Practice*, Exhibit 1, attached) that permitted some donor list rights to consultants and proscribed others. The *Rules* make it clear that a contingent security interest in a donor list, clearly established by contract and to be applied to the consultant's fees and attendant expenses, is an ethical, acceptable practice. This device, though never the norm, was in common use 10 years ago among direct mail fundraising consultants and is still frequently employed today.

Two things are certain: when working on the Vantage contract, Miller knew very well that the use of the donor file as security against fees was a common and ethical practice. Miller had in fact, worked with ADRFCO and ADRFCO members when its list rule was under consid-

eration. He also knew that the Postal Service had explicitly ruled that the use of conditional liens against donor lists did not constitute a violation of the cooperative mailing rule.

A June 30, 1995 opinion letter (Exhibit 2, attached) signed by USPS senior manager Anita Bizzotto analyzes a contractual grant of a "conditional lien" in a fundraiser-nonprofit mailer contract with respect to the cooperative mail rule. She, in effect, prescribes circumstances in which such a lien would be acceptable, as follows: "if the nonprofit owes the fees to the fundraiser at the time of a specified event, such as the termination of the parties' relationship, [and] the fundraiser may utilize the list only to generate revenue sufficient to liquidate the debt." USPS concludes that such a conditional lien is permissible and does not "constitute the type of sharing of assets or revenues that compels a finding of a cooperative venture."

*Schedule A (and the "pro forma")*

It is common practice in the fundraising business for consultants to construct mail plans and/or projected returns similar to those in Schedule A of the Shriners-Vantage contract. These serve the purpose of permitting the nonprofit to budget expenses and revenues for the period of the plan, often a year. But, they may also serve the purpose of reflecting a consultant's judgment about a nonprofit's potential in the mail. This may have competitive aspects in instances where the consultant and mailer are not yet in a consultant-client relationship. In any case, it is most unusual for mail plans and projections to be actually incorporated in a fundraising contract, as they were here.

Schedule A is more or less standard in direct mail fundraising terms. It consists of projected mailing dates, projected quantities to be mailed, descriptions of packages to be mailed, "in mail" cost of the packages, projected number of donors responding, and projected average gift per donor. This level of detail, among other things, affords the consultant and client with the means of evaluating and managing expenses and revenues.

There are number of reasons for not including projections within a contract, the most prominent of which is a fundraiser's need to assure that there is no mistake about the place of such plans in the business relationship. Projections may be a fundraiser's conservative judgment about a program's potential, an admitted optimistic stretch, something in between, and/or collaboration with the client setting out mutually derived plans. But they are not contractual or performance guarantees for which the consultant wishes to be held accountable. This caution serves legal (including the CMR), ethical, and business considerations.

Against this backdrop of common industry practices, the so-called "pro forma" included in Schedule A seems a misnomer. In any event, it is not "pro forma" in any usual use of that term. It surely cannot be considered a mere formality or placeholder. It was obviously intended to travel along with all other contract terms through Shriners' approval process, including review by board members and senior officers. It will have been filed with state charity offices. It will have been made a public document open to inspection by one and all. In my opinion, its inclusion in the contract is clear evidence that Vantage wished for Schedule A to be regarded as a statement of the program's reasonable expectations and expected Shriners, and everyone else, to treat them as such.

**Report of Robert Tigner**
**Page 7 of 10**

This conclusion is supported by the language of the contract itself. Paragraph 5.2 references Schedule A and, among other things, establishes the Schedule A costs as the default for the duration of the contract. Paragraph 6.1 has similar language. But the point here is merely that Vantage intended that Shriners, and others, would accept Schedule A as a reasonable statement of the actual direct mail program to be executed under the contract.

*Value of the Lien*

Paragraph 13.2 of the contract (and paragraph 13.1), effectively affords vantage with a conditional security interest in the Shriners donor file. In the event that Vantage is owed fees and expenses upon termination of the contract, Vantage may rent Shriners donor file and conduct donor renewal mailings to it for a period of three years. In my opinion, this security interest would be sufficient to fully protect a direct mail fundraiser in almost any foreseeable circumstances. In other words, one would not even have to examine the details of the mail plan to conclude that the fundraiser would be fully compensated. The facts of this case illustrate the point that this security is more -- well more -- than adequate.

As I said above, the mail plans set out in Schedule A can be fairly imputed to Vantage as its reasonable expectation of fundraising performance and results. Accordingly, the adequacy of the paragraph 13.2 security arrangement can be measured with some precision based on the Schedule A data. Doing so, addresses the concerns voiced by Judge Wolf in his memorandum opinion. To achieve the necessary level of precision, I have asked a fundraising expert, Barbara Sims, to measure the value of these liens using conventional and conservative methods. Her work appears in a separate expert report submitted in this case.

I asked her to assess the value of the security interest at specified points in the program. The scenarios we selected suppose termination at six months, twelve months and eighteen months. At each of these points, Schedule A reports cumulative program results. At each of these intervals, the overall program shows a deficit. Under the contract, all program revenues were devoted to paying mailing costs. Therefore, the deficits equate to the total amount owed to Vantage at that juncture.

Accordingly, at six months the program will have accumulated 185,000 donors and Vantage will be owed approximately $950,000. Under paragraph 13.2 if the program ended then and there Vantage would have the option of renting those 185,000 names for three years. They would also have the option of mailing these donors renewal packages. The conservative projections prepared by Ms. Sims show that list rentals (Exhibit 1, Sims report) for this period would produce approximately $680,000 in net revenue and donor renewal mailings (Exhibit 2, Sims report) would produce approximately $1,250,000 in net revenues.

These calculations do not allow for the fact that Vantage may have been entitled to the list manager fees attributed to others by Ms. Sims. And they do not allow for the fact that some considerable portion of the "costs" of the renewal mailings are in fact profits to Vantage. And perhaps most important, they presume that the renter or mailer is keeping the long-term health of the donor file foremost in mind. A party bent only on extracting the most short-run dollars from renting the list and mailing renewals could wring out considerably more. Vantage would have at its disposal valuable security worth, very conservatively, *twice what it was owed.*

At twelve months, the program was projected to have produced 335,000 donors and indebtedness to Vantage of approximately $1,150,000. Ms. Sims projects that three years of list rentals of this file would produce net revenues of approximately $1,250,000. And, the projection for three years of donor renewal mailings to these donors predicted net income of approximately $2,250,000. The list rental revenues alone would cover the indebtedness and the total value of the security interest would be worth, conservatively, *three times* what Vantage was owed.

At eighteen months, the respective numbers are 485,000 donors, $900,000 in indebtedness, $1.8 million in list rental revenues, and $3.3 million in net revenues from donor renewal mailings. At this juncture, the value of the security interest would be *more than five times* what Vantage was owed.

Further illustrative computations are superfluous. The excess of value over indebtedness would continue to climb with the growth of the file and Schedule A predicts continued growth. And in any event, the Schedule A projections demonstrate that the overall program would have been in the black before the end of the second year (i.e., at twenty-four months).

I conclude that, in this case, appearances are *not* deceiving. On its face, paragraph 13.2 would seem to assure that Vantage will be fully paid. The above analysis demonstrates with clarity that Vantage did not intend to run any risk of loss. It provided itself with an astonishingly generous cushion of protection unequalled in my experience.

## CONCLUSION

In my opinion, Mr. Miller took great care in helping the parties to negotiate and draft a fundraising contract that met the parties' objectives and complied with CMR. The defendants exercised the degree of care that would be expected of reasonable attorneys practicing under circumstances similar to those here. In particular, there was nothing that defendants either did or failed to do that could reasonably have been expected to expose Vantage to financial loss.

It is also my opinion that an attorney practicing in this area would not reasonably anticipate that the factual issue of CMR compliance would arise in the first instance anyplace other than at USPS, the administering agency. I repeat my view expressed above, that USPS was far more likely than not to have concluded that this contract did not violate the CMR. In other words, at the time the contract was executed, there was no reasonable basis to conclude that the U.S. Postal Service would take the position that the contract failed to comply with the requirements of the CMR. These premises being so, in my opinion there was no reasonable basis to conclude that the United States would seek to include the contract in pending litigation against Vantage that arose from very different conduct (involving Vantage's use of secret side agreements that relieved its nonprofit clients from payment obligations incurred in "public" fundraising agreements with Vantage).

I base these opinions, and conclusions set out in the text of this report, on my education, training, experience, the relevant body of decisional statutory and regulatory law, my review and

analysis of the contract at issue in this matter, a June 30, 1995 opinion letter signed by USPS senior manager Anita Bizzotto (attached, Exhibit 2), the ADRFCO ethics rules (attached, Exhibit 1), Judge Wolf's memorandum opinion in *U.S. v. Lewis*, and the expert report submitted in this case by Barbara Sims.


Submitted by:

*Robert S. Tigner*
Robert S. Tigner
October 25, 2005

# ROBERT S. TIGNER
809 N. Danville St ◆ Arlington, VA  22201 ◆ 703-812-8421 ◆ rstigner@msn.com

## PRINCIPAL EMPLOYMENT

1986-present    *Association of Direct Response Fundraising Counsel* (ADRFCO), Washington, DC
<u>General Counsel</u> - serve as general counsel and executive director to this professional association of direct mail fundraising consultants.  Duties include administering a comprehensive code of ethical standards, consulting with member firms on regulatory complance matters, legislative analysis and representation, producing a newsletter on regulatory issues, and a wide range of administrative and legal responsibilities.

2000-present    *Nonprofit Federation of the Direct Marketing Association*, Washington, DC
<u>Regulatory Counsel</u> - part-time consultant/advisor to this consortium of nonprofit organizations and allied fundraising businesses on matters related to regulation of fundraising.  Duties include analysis of federal and state legislation, making presentations to legislative bodies, and peparation of compliance advisories for the organization's membership.

1990-2000    *National Federation of Nonprofits*, Washington, DC
<u>General Counsel</u> - serve as lawyer/advisor to consortium of nonprofit organizations (operated as NonProfit Mailers Federation until 1992, merged with Nonprofit Council of DMA in 2000).  Duties included analysis of federal and state legislation and postal regulations and ratemaking, making presentations to legislative bodies, and writing articles for the organization's newsletter.

1986-1991    *Self-Employed*, New York, NY and Hyattsville, MD
<u>Lawyer/Consultant</u> - Working in private practice as lawyer and consultant to nonprofit organizations and companies in the fundraising industry.

1979-1985    *HALT, Inc.*, Washington, DC
<u>General Counsel/Director of Program Services</u> - HALT is a national, nonprofit organization working to promote citizen self-reliance in legal affairs and reform in the civil legal system.  Worked in all aspects of the organization's operations, including administration and fundraising.  Formal positions became those cited.

1971-1974    *U. S. Office of Education, Department of HEW*, Washington, DC
<u>Management Intern/Educational Program Specialist</u> - began in a management training program, drawing work assignments from around the agency.  Final position was with a major student financial aid program during its start-up period.  Duties were spread over a wide range of administrative and program tasks.

## EDUCATION

*National Law Center/George Washington University*, Washington, DC
Attended: August, 1973 to May, 1976
Degree:  JD., May, 1976

*Johns Hopkins University*, Baltimore, MD
Attended: September, 1966 to May, 1970
Degree:  BA., May, 1970

## PUBLICATIONS

*In Brief* - wrote and produced approximately one hundred issues from 1990 to present of this trade letter of the Association of Direct Response Fundraising Counsel. The Association describes it as "news of legislative and regulatory developments of interest to direct response fundraisers."

## BAR MEMBERSHIPS

*Virginia*: October, 1976
*District of Columbia*: March, 1980

## APPEARANCES AS EXPERT

*Public Citizen, et al. v. Pinellas County* (2002) - for plaintiffs
*American Heart Disease Prevention Foundation v. Hughey* (1997) - for plaintiffs
*United Cancer Council v. Commissioner of Internal Revenue* (1992) - for the government

## VOLUNTEER/NONPROFIT ACTIVITIES

1986-1991   *Council of NY Law Associates*, New York, NY
Lawyer - serve as volunteer counsel to nonprofit organizations for administrative and regulatory matters. The Council screened and trained volunteers and refers them to nonprofits seeking help.

1986-1990   *Better Business Bureau of Metro New York*, New York, NY
Arbitrator - conduct arbitration hearings for the BBB's Auto Line, a program for resolving disputes between automobile retailers and purchasers.

1984-1986   *Model Solicitations Law Project* of the National Assn of Attorneys General (NAAG) and the National Assn of State Charity Officials (NASCO), New York, NY
Member, Private Sector Advisory Group - served as representative of the Nonprofit Mailers Federation through the project's completion. The Group advised NAAG/NASCO as the latter devised a model law (formally adopted by NAAG in December, 1986) governing the regulation of charitable solicitation.

1983-1986   *NonProfit Mailers Federation*, Washington, DC
Member, Board of Directors

1980-1986   *HALT, Inc.*, Washington, DC
Member, Board of Directors

1981-1985   *Fee Arbitration Board*, Washington, DC
Arbitrator - conducted arbitration hearings in a voluntary program sponsored by the District of Columbia Bar aimed at resolving lawyer-client fee disputes.

# RULES of BUSINESS ETHICS & PRACTICE



The Association of Direct Response Fundraising Counsel

Exhibit 1

# THE ASSOCIATION OF DIRECT RESPONSE FUNDRAISING COUNSEL

Members of the Association are businesses or divisions of businesses that provide *consulting services* to nonprofit organizations with respect to direct response fundraising. Members do not solicit funds from the public.

Services provided by members include offering advice and counsel; conducting feasibility studies and tests; designing and managing campaigns; developing and producing solicitation materials; and obtaining lists of prospective donors.

All those enjoying membership in the Association subscribe to the following standards and requirements as a condition of that membership. Some provisions of these Rules may not be applicable to services provided by members to certain political or religious organizations.

1

# RULES *of* BUSINESS ETHICS & PRACTICE

### 1. ACCOUNTABILITY OF MEMBERS

The Association recognizes special obligations of public accountability due to the status enjoyed by the client group it serves. Accordingly, upon the request of a member of the public, a member will:

(a) Acknowledge the existence of a client relationship with a particular nonprofit organization.

(b) Provide a copy of the contract governing its employment as fundraising counsel or inform the inquirer where the contract may be obtained.

(c) Provide a list of the member's owners and/or principals.

### 2. ACCOUNTABILITY OF CLIENTS

A member of the Association will not knowingly serve an organization that fails to meet minimum standards of public accountability. A member will take reasonable, affirmative steps to assure that a client organization meets these standards. A client organization must:

2

(a) Maintain an independent, functioning board of directors (or other governing body).

(b) Provide detailed information on its finances upon request.

(c) Provide detailed information on its programs upon request.

(d) Not permit self-dealing or material conflict of interest on the part of its officers, directors, or employees.

(e) Operate consistently with its stated purposes.

## 3. OBTAINING CLIENTS

Nonprofit organizations deserve an extra degree of care when approached by a business offering fundraising services. Accordingly, a member of the Association will not:

(a) Exaggerate its performance record or lead a prospective client to a false conclusion that a given result is guaranteed.

(b) Offer any kind of compensation to an officer, director, employee, or advisor of a prospective client for aid in obtaining the client's business.

(c) Enter into the business relationship without reasonable assurance that the client understands the economics and processes of direct response fundraising.

3

(d) Enter into the business relationship without first stating in writing the reasonable expectations for fundraising income.

(e) Perform work for compensation for a client without a written contract.

(f) Execute a contract with any party other than one reasonably appearing to have the authority to commit the client.

## 4. Contracts

For the protection of both members of the Association and nonprofit clients, contracts must contain minimum safeguards. Therefore, any contract entered into between a member and a nonprofit organization will contain provisions that:

(a) Clearly describe the services to be provided and the compensation to be paid.

(b) Specify the period for which the contract has effect.

(c) Allow the nonprofit organization ten days from the date of the contract's signing in which to cancel the contract without obligation.

(d) Require final approval from the client for list selection, copy, and cost projections.

4

(e) Promise prompt, detailed analysis of results upon the campaign's conclusion, upon the close of the client's annual accounting period, or upon the client's reasonable request.

(f) State that the client bears financial responsibility for all services procured in execution of the campaign.

(g) *(i)* Clearly state the terms and conditions, if any, for relieving the client of its contractual obligations before the time specified as the contract duration; and
*(ii)* give the client fair notice of any continuing obligations that may exist after a termination by the client.

## 5. FEES

A member of the Association must base its fee on actual services to be provided at a prearranged, reasonable level of compensation. Necessarily, "reasonable" can only be determined by all the factors involved, including: the time and type of labor involved, the nature and duration of the professional relationship between provider and client, and the ability and experience of those performing the services.

Fees based on a percentage of fundraising proceeds, however stated, are not favored. A member may enter into

5

such an arrangement only if it is based on an actual, demonstrable, and fair assessment of probable outcomes, *and* if the resulting compensation remains within reasonable bounds.

## 6. Donor Lists

The acquired donor list is the essential product of a direct response campaign. Its primary value for the nonprofit client lies in future fundraising from donors who are now identified as such and have a relationship with the organization. The donor list also has secondary, but considerable, value due to its potential as a commodity in the direct response marketplace.

The economic justification for direct response fundraising rests on the future management and control of this resource by the nonprofit organization. As an ethical principle, it follows that the donor list is inherently the property of the nonprofit. At the same time, we recognize that the list resource can afford the means by which a nonprofit, especially one that is new or undercapitalized, can sustain a fundraising program.

A nonprofit organization is free to dispose of its list resource — like any other property — in any manner it chooses. But, the fiduciary relationship of client and fundraising counsel creates a special case. The Association firmly believes that voluntary restraints upon

6