dispositions of list rights to counsel are essential. These and other measures can only serve to protect the security and integrity of the donor list. Therefore:

(a) A member may not acquire any right or interest from its client that precludes the nonprofit client's right to conduct fundraising with its donor file when and as it sees fit.

(b) All income or financial benefit derived from the donor list's marketplace value must go to the nonprofit client unless the following conditions are met:

   *(i)* An allocation to counsel, as part of payment of fees for services rendered, is clearly specified in the contract.

   *(ii)* Before entering into the contract, counsel must provide the nonprofit client with a written, full, and fair disclosure of the marketplace value of donor lists.

   *(iii)* Any right of a member to income from the donor list must be terminated with the end of the member's services as counsel.

(c) Notwithstanding the above, a member may retain a contingent security interest in a donor list's marketplace applications, provided:

7

      (i) the security interest is fully and clearly set out in the contract; and

      (ii) the security interest applies solely to the satisfaction of earned and overdue fees of certain amount and attendant direct expenses, as set out in the client-counsel contract.

(d) To protect the security and integrity of the donor list, a member firm shall use its best efforts to assure that:

      (i) the nonprofit client has the right to evaluate proposed list rentals or exchanges, to examine the proposed mail packages or scripts, and to veto those rentals or exchanges it deems competitive or otherwise damaging to its fundraising interests.

      (ii) the donor file is protected by a "decoy" or "seed" system, monitored by the nonprofit client or its designated agent, designed to track every transaction involving the donor file.

      (iii) a regularly updated, duplicate copy ("fire file") of the donor file, readily accessible and obtainable by the nonprofit client, is maintained.

8

7. FUNDRAISING METHODS

Members of the Association owe obligations of truthfulness and integrity directly to the donating public. Accordingly, in conducting a campaign, members will not:

(a) Knowingly misrepresent a nonprofit organization's mission, accomplishments, or plans for the future. A member will take reasonable, affirmative steps to avoid such a misrepresentation.

(b) Knowingly impart expectations to the public that cannot be fulfilled. A member will take reasonable, affirmative steps to avoid creating such an expectation.

(c) Knowingly create confusion between the nonprofit client's identity and that of any other nonprofit, governmental, or business organization or person. A member will take reasonable, affirmative steps to avoid creating such confusion.

(d) Receive donations or exercise control over the expenditure of donations.

(e) Perform work for a client when reasonable professional judgement suggests that the undertaking in question will jeopardize the client's existence.

9

### 8. Conflict of Interest

Strong protections against even an appearance of conflict of interest are necessary. This is due to the great public trust placed in nonprofit organizations and, by implication, in the businesses that serve them. Accordingly, a member of the Association shall assure that:

(a) All decisions by the nonprofit client affecting its business dealings with the member shall be undertaken without the prospect of undue influence. No officer, director, principal, or fiduciary of a member (or close relative of any of the preceding) may serve a client organization as officer, director, or key employee.

(b) A client knows in advance of any material relationship between the member and a third party who provides services related to a direct response campaign on which the member advises. Whether or not disclosed, a member may not engage in an interested transaction that does not demonstrably benefit the client.

(c) No credit or loans be extended to a client conditioned upon the continuation of the employment relationship between member and client.

10

## 9. Donor Privacy

The health of direct response fundraising depends upon maintaining trust in and support for direct response methods among a substantial segment of the giving public. It follows that both donors and prospective donors must be afforded every reasonable consideration when making a gift to a nonprofit organization.

The ascendancy of public concern for issues of privacy compels the organized attention of the direct response community. Donors' right to "privacy", as they broadly define that right, must be acknowledged and protected and their reasonable requests honored by the organizations receiving their gifts. To assure this, a member of the Association will consistently, and *demonstrably*, encourage its nonprofit clients to:

(a) Maintain an "opt-out" system, whereby donors are regularly informed (ordinarily, at least once a year) of list rental/exchange practices and are afforded a reasonable opportunity to withdraw their names from such uses.

(b) Maintain an in-house suppression file to honor "don't mail to me" requests from the general public or from prospective donors who have self-identified as a result of a prior solicitation.

11

(c) Provide all donors/members with a reasonable opportunity to opt-out of listings in the organization's publications.

(d) Make every reasonable effort to honor donors' requests regarding frequency and types of mailings.

(e) As appropriate and practical, utilize the Mail and/or Telephone Preference Service, administered by the Direct Marketing Association, as a suppression list for acquisition efforts.

(f) Establish and maintain formal procedures and standards for approving or rejecting list rental/exchange requests.

(g) Protect and monitor its donor file with a "decoy" (or "seed") system, designed to track every transaction involving the donor file.

## 10. CONFIDENTIALITY

All dealings between members of the Association and their clients are confidential, except:

(a) as provided in section 1;

(b) where the subject matter is a public record; or

(c) where a member is obeying the legitimate disclosure order of a lawful authority.

Printing courtesy of
Direct Impressions, Inc.
Richmond, Virginia

Binding courtesy of
Progress Printing
Lynchburg, Virginia

*Adopted May 1987.*
*Amended June 1988; March 1992; February 2002.*
© *2003 Association of Direct Response Fundraising Counsel*

*Provided as a public service by
the member agencies of ADRFCO.*

**The Association of
Direct Response Fundraising Counsel**
*1612 K Street, NW, Suite 510
Washington, DC 20006-2849
Ph: 202-293-9640 ▪ Fx: 202-887-9699
adrfco@msn.com*

**UNITED STATES POSTAL SERVICE**

June 30, 1995

Scott Hamel
Manager
Rates and Classification Service Center
5904 Richmond Highway Suite 500
Alexandria, VA 22303-2736

SUBJECT: ▓▓▓▓▓▓▓▓▓▓▓▓ Mailings at Pittsburgh

I have reviewed a copy of your decision dated May 26, 1995, concerning mailings of the ▓▓▓▓▓▓▓▓▓▓▓▓ (▓▓▓) at Pittsburgh, Pennsylvania. It should be noted that two contracts are at issue. My understanding is that the first is identical to a 1993 contract which the Chicago Rates and Classification Service Center determined resulted in improper cooperative mailings not eligible for the special bulk third-class rates. That decision is under appeal to this office. The second, a 1995 contract (which appears to resemble in material respects the so-called "Empower America Contract"), was entered into by ▓▓▓ after mailings were rejected at the special rates using the previous 1993 contract. The RCSC decision concludes that this second contract also results in improper cooperative mailings. As a basis for this conclusion, the decision explains that the mailings were deemed cooperative because of the involvement of Foxhall Corporation in sweepstakes which are a part of the mailpieces in question as well as the provision for payment of $50.00 to the fundraiser for every high dollar donor attracted by its fundraising efforts.

This memorandum principally concerns the 1995 contract and its various provisions. I will also remark about the involvement of Foxhall Corporation (Foxhall) in sweepstakes mailings. The decision concerning the appeal of the Chicago RCSC decision denying special rates for mailings made under the 1993 contract will be issued in a separate communication to be sent directly to ▓▓▓.

It should be noted that several concerns led to my decision to issue this memorandum despite the absence of a formal appeal to this office on the Pittsburgh mailings. First, there appears to be both industry and postal concern as to whether a third-party fundraiser, such as Direct Response Consulting Services (DRCS), may be engaged by a nonprofit organization to make mailings at the special bulk third-class rates, and, if so, whether mailings sent at the special rates may contain a

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-

-2-

disclosure statement indicating that a third-party fundraiser participated as an agent to prepare a mailing. Second, a question has been raised as to whether the use of Foxhall in a sweepstakes promotion automatically makes any related mailing by participating nonprofit organizations ineligible for the special rates. As indicated above, this memorandum will comment on Foxhall's participation in special rate mailings. Finally, a question has been raised concerning what can best be defined as a fundraiser's "conditional lien" on a mailing list generated by fundraising activities for the purpose of repaying debts incurred by the nonprofit organization for services rendered by the fundraiser. This last question will be addressed as a result of the submission of a contract, submitted to you by the Nonprofit Service Group, which was accompanied by a memorandum from the RCSC dated June 19, 1995.

Initially, I want to discuss the ▮ mailings at Pittsburgh. For the record, it is noted that ▮ is a nonprofit philanthropic organization exempt from the payment of Federal income tax under the provisions of section 501(c)(3) of the Internal Revenue Code and authorized by the Postal Service to mail at the special rates. On May 10, 1995, ▮ entered into a contract with DRCS "as its non-exclusive consultant and agent to create and mail direct response fund-raising packages on behalf of ▮..."

Services provided by DRCS include: to plan, create, write and prepare layouts (with ▮'s approval) for mailings; to coordinate and develop ▮'s house-mail direct mail fund-raising program; to negotiate, arrange and enter into agreements on behalf of ▮ for any materials and services necessary to conduct mailings authorized by ▮; and, such other actions as ▮ may reasonably request from time to time.

According to the agreement, DRCS shall be reimbursed by ▮ for the incidental costs of packaging, mailing, shipping, overnight delivery and other courier services incurred in connection with DRCS's performance under this Agreement so long as such costs are reasonable, except as otherwise agreed between the parties. ▮ shall pay DRCS' incidental costs (including any necessary travel on ▮'s behalf) provided prior approval of ▮ has been received. ▮ shall pay all invoices within sixty (60) days of receipt by ▮. At ▮'s request, DRCS shall provide ▮ with estimates of income and expenses so that ▮ can determine its cash flow and plan its overall budget. DRCS shall provide ▮ with mailing schedules outlining the projected number of packages to be mailed.

Fees paid to DRCS include a fee of three and a half cents per name mailed for prospect mailings; a fee of six cents per name mailed for donor mailings; a fee of

- 3 -

three and a half cents per piece mailed for each prospect package directed to develop new high dollar donors; and a fee of fifty dollars for each new One Thousand Dollars High Dollar Club member who contributes to ▓▓▓ through the efforts of DRCS high dollar donor mailings. If an individual joins such a Club with partial payment, the fifty dollars fee shall apply to the partial payment. If an individual sends a contribution to support ▓▓▓, but does not join the High Dollar Club, then such contribution is excluded from the fifty dollar fee formula.

Other fees to DRCS include a fee of two thousand dollars for each promotional brochure created by DRCS for the High Dollar Club and a fee of one thousand five hundred dollars for each special project letter created by DRCS for mailing to the High Dollar Club members.

The contract provides ▓▓▓ authority to approve content, design, plans and expenses for all mail projects proposed by DRCS before costs are incurred or letters are mailed. All copy and graphics prepared by DRCS shall be approved in advance of printing and mailing by a representative of ▓▓▓. ▓▓▓ agrees to provide funds for postage in advance as needed for mailings conducted by DRCS for ▓▓▓ upon notice and invoice furnished by DRCS. Except for postage, DRCS shall generate DRCS invoices covering other fees owed by ▓▓▓ immediately after mailings. These invoices shall be due ninety days after the date of such mailings and shall be paid by ▓▓▓ as funds generated by such mailings become available.

Fees and charges under the agreement shall only be incurred upon written estimate by DRCS as to the total amount of such charges and the written approval by ▓▓▓ for such services prior to such services being rendered by DRCS. In addition, such fees shall not in any event exceed the fees charged by DRCS to similar clients for similar services. DRCS's engagement by ▓▓▓ is effective May 2, 1995. Either party may terminate the agreement by giving the other party thirty (30) days written notice in advance of said termination at any time.

While I have some concerns regarding certain provisions of the contract, overall the terms may be associated with those of a principal/agent relationship. The terms of the contract appear to make clear that ▓▓▓ is fully liable for the costs associated with services provided by DRCS with fees payable upon a certain date. These provisions appear to take precedence over language that indicates ▓▓▓ will pay invoices "as funds generated by... mailings become available." If, on the other hand, ▓▓▓ were not responsible for debts incurred under the contract except to the extent that revenues are raised by the program, DRCS would appear to be at risk, and a different finding might be required.

- 4 -

Another provision raising some concern pertains to the fifty dollar fee payable to DRCS in the event a One Thousand Dollars High Dollar Club member is added to the list of ▓▓▓ donors. This provision would appear to place DRCS in the position of sharing revenues which would ordinarily be inappropriate in a principal/agent relationship. However, it is noted that the fee is relatively small and that it is fixed rather than giving DRCS a percentage of revenues. Based upon my understanding of the terms of the contract, I do not believe that this one provision, in and of itself, compels a finding that mailings pursuant to the document are cooperative mailings. This determination is based upon evidence that revenues are not shared (with the minor exception of fees for high dollar donors), that the risk appears to be borne entirely by ▓▓▓, and that ▓▓▓ appears to have final authority over the fundraising venture and the mailings associated with it. On the other hand, if there were other indicia of cooperative mailings, the fifty dollar payments for attracting high dollar club donors would provide additional support for a decision that mailings are ineligible for the special rates.

It must be understood that this decision is necessarily based on the file provided, and that the basis document in the file is the contract. In the absence of contrary evidence, this document must be presumed to represent the parties' dealings. In addition, my decision assumes that the nonprofit and for-profit fundraiser are independent entities and the arrangement between them is the result of "arms-length" dealings, and that fees charged to DRCS are consistent with those generally charged in the market. Evidence that the terms of the contract are not adhered to, that fees are inconsistent with market rates, or other evidence contrary to these assumptions may lead to a different decision in this matter.

The May 26 decision also finds that mailings are cooperative "based on the sponsorship of the sweepstakes by Foxhall Corporation." According to information submitted by counsel on behalf of ▓▓▓, Foxhall is a Virginia business corporation affiliated with DRCS. According to counsel, Foxhall contracted with Ventura Associates, Inc. (Ventura) for the convenience of its nonprofit clients, including ▓▓▓, which elected to use a "sweepstakes" format of charitable solicitation.

Ventura is an independent "judging organization" based in New York which provides contest administration services for many organizations. Ventura has no affiliation with DRCS or any of DRCS's clients.

According to counsel, Ventura had refused to enter into a contract with several small charities, such as ▓▓▓, as a consortium. Instead, it prefers, for reasons of administrative convenience, to contract with a single entity. Foxhall serves as this entity. Counsel also asserts that Foxhall does not charge any fees for its services

- 5 -

"as a nominee or conduit." Rather, Foxhall collects funds from the charities to pay the operation of the sweepstakes, pro rata. Each charity's payment is based on the number of sweepstakes "packages" it mailed as part of the "cooperative" sweepstakes, administered by Ventura. Foxhall did not own any of the materials that were mailed and did not have any financial stake in the outcome of the mailings. It made no profit. It collected funds from the participating charities, including ▮, and paid Ventura's fees.

I do not see where the presence of Foxhall in making the sweepstakes possible for a small charity like ▮ makes mailings which are otherwise owned by ▮ cooperative mailings ineligible for the special rates. It appears that Foxhall is nothing more than an agent working on behalf of its nonprofit clients including ▮. Since there is no evidence that there is anything other than a principal/agent relationship between the nonprofit organizations and Foxhall, e.g., that Foxhall bears the risk in the operation of the sweepstakes or that the nonprofits are not unconditionally liable for these expenses, authorized nonprofit organizations participating in the sweepstakes promotion are not disqualified from utilizing the special rates. Considering my findings concerning the contract, I believe ▮ should be permitted to make mailings at the special bulk third-class rates under the provisions of the new contract, at least as long as there is no evidence warranting a different conclusion. Please advise ▮ accordingly.

To summarize then, there is no prohibition against a third party fundraiser, such as DRCS, from being employed by a nonprofit organization in a principal/agent relationship for the purpose of making special rate fundraising mailings. Such mailings may carry a disclaimer or disclosure statement indicating that DRCS, or any fundraiser, is under contract as an agent participating in the preparation of special rate mailings. This memorandum also makes clear that postal requirements do not automatically forbid Foxhall from participating in a sweepstakes promotion so long as it too acts in an agency capacity to the nonprofit organizations.

My final remarks concern the so-called "conditional lien" on the donor list generated by the fundraising efforts conducted on behalf of the nonprofit organization. This lien, which we understand to be in line with generally accepted industry practices, including ethical standards promulgated by the Association of Direct Response Fundraising Counsel, appears to provide the for-profit fundraiser extremely limited rights concerning the list. That is, if the nonprofit owes fees to the fundraiser at the time of a specified event, such as the termination of the parties' relationship, the fundraiser may utilize the list only to generate revenue sufficient to liquidate the debt. The list remains the property of the nonprofit at all times, and the fundraiser may not use it, or the names on it, for any other purpose, except as permitted under

- 6 -

the "conditional lien." The rights of the for-profit fundraiser contrast those of the nonprofit organization, which generally has the right to make whatever use of the list that it wishes, except during the period of the conditional lien, including the right to rent, exchange or otherwise transfer the list or to use it for its own mailings. Under these circumstances, I do not believe that the "conditional lien" constitutes the type of sharing of assets or revenues that compels a finding of a cooperative venture.

**Signed - Anita J. Bizzotto**

Anita J. Bizzotto
Manager
Business Mail Acceptance

cc: All RCSCs

MS:BMA:JMLease:393674