UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VANTAGE FINANCIAL SERVICES, INC.
                Plaintiff,

        v.

NONPROFIT SERVICE GROUP AND
GEORGE E. MILLER,
                Defendants.

**C.A. No. 04-11686-WGY**

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The plaintiff, Vantage Financial Services, Inc. ("Vantage"), submits this memorandum in opposition to the Motion for Summary Judgment Concerning Expert Testimony filed by the defendants, Nonprofit Services Group ("NSG") and George E. Miller ("Miller") (collectively "Defendants"). In further support of this opposition, Vantage submits Plaintiff's Rule 56.1 Statement of Material Facts, Appendix of Exhibits and the authenticating affidavit of Neal J. Bingham.

### FACTUAL BACKGROUND

I.    DEFENDANTS' PARTICIPATION IN THE NEGOTIATION AND PREPARATION OF THE SHRINERS AGREEMENT

Defendant Miller was aware that at least since the 1980s, the United States Postal Service's position was that a for-profit fundraiser could not bear any portion of the risk relating to the cost of a mailing made at nonprofit rates, and the Postal Service's handbook stated that that policy was applicable to solicitation mailings. The policy of the United States Postal Service in this regard had not changed as of 1999 when the Shriners Agreement was negotiated. It was Defendant Miller who first proposed the language in the Shriners Agreement with respect to

payment of program costs by means of rental or exchange of the donor list in the event of termination of the Agreement by Shriners for cause. (Rule 56.1 Statement ¶¶ 1 and 2)

During the preparation of the Shriners Agreement, Miller's understanding of the Shriners' concerns with respect to payment of program costs was that Shriners not be obligated to pay for program costs except from revenues that the program generated. Miller understood that Shriners included in revenues that the program generated both donations made to Shriners in response to program mailings and revenues that could be realized from the rental or exchange of the donor list developed during the program. This represented the only un-modifiable requirement that Shriners had with respect to its liability for payment of program costs; i.e. that Shriners would not have to pay for program costs from its cash resources other than those resulting from the program and the development/exploitation of the donor list developed during the program. (Rule 56.1 Statement ¶3)

At the time of the negotiation of the Shriners Agreement, Miller knew that Vantage was involved in defending litigation involving allegations that its mailings at not-for-profit rates pursuant to various of its fundraising contracts with other nonprofits violated the Cooperative Mail Rule, and that as a consequence, Vantage's principal requirement was that the Shriners Agreement not violate the Cooperative Mail Rule. Miller acknowledged that in order to be in compliance with the Cooperative Mail Rule the Shriners Agreement had to provide that Shriners was solely at risk for the costs of the program. Nevertheless, Miller admitted in his deposition testimony that the payment provision he included in the Shriners Agreement at Paragraph 13.2 did not so provide. (Rule 56.1 Statement ¶4)

II.    DEFENDANTS' MALPRACTICE AND MISREPRESENTATIONS, AND VANTAGE'S
       RELIANCE UPON DEFENDANTS

Defendant Miller advised Vantage that the payment provisions contained in Paragraph 13.2 of the Shriners Agreement would satisfy the requirements of the Cooperative Mail Rule that

he had prepared contracts with similar payment provisions, and that contracts with similar provisions regarding follow up mailings and use of donor list rental income had never been objected to, or challenged by, the United States Postal Service. However, despite the fact that a procedure existed for obtaining an "advance ruling" from the Postal Service, Miller had never, at any time prior to the execution of the Shriners Agreement, presented any fundraising contract for any client to the Postal Service for such a ruling or for any review or approval. (Rule 56.1 Statement ¶5)

Miller has no knowledge of any prior instance in which a fundraising agreement had utilized a provision that limited the fundraiser's recourse, at the nonprofit's option, solely to the proceeds of follow up mailings and/or income from the rental or exchange of the donor list for payment of program charges, and at the time of negotiation of the Shriners Agreement, he was aware of no such ruling by the Postal Service. At the time in question, no decision of any court had ever held that a fundraising agreement containing provisions that left the fundraiser prospectively at risk with respect to payment of program charges could be retrospectively brought into compliance with the Cooperative Mail Rule if, in fact, the fundraiser was ultimately paid. (Rule 56.1 Statement ¶¶6 and 7)

With respect to Defendants' claim that they made no misrepresentations in connection with the professional services rendered to Vantage, it is noteworthy that in the First Miller Affidavit filed in connection with the *qui tam* case, Miller expressly confirmed the representations that he had previously made to Mr. Melikian; that he had prepared numerous fundraising agreements containing "very similar" provisions to those which Judge Wolf ultimately concluded might well violate the Cooperative Mail Rule and that such agreements had never been questioned or challenged by the United States Postal Service. Of course, it is implicit in Miller's affidavit that he knew that the Postal Service had been made aware of the use of agreements with such provisions and, with such awareness, had not challenged them.

3

Otherwise, his representation would have been misleading and meaningless, at best.  In this connection, it is notable that despite being served with document requests requiring them to produce such agreements, Defendants have produced no fundraising agreements prior to the Shriners Agreement in which such provisions were utilized.  Furthermore, Miller admitted in his deposition testimony that he is aware of no instance in which any agreement containing the payment provisions that he drafted into the Shriners Agreement (and which were at issue in the *qui tam* case) was ever presented to, reviewed, or approved by the Postal Service.  Moreover, Miller testified that he, in fact, had never drafted an agreement similar to the Shriners Agreement in the context of the payment provisions incorporated in Paragraph 13.2, and critically had never informed Vantage of this fact.  Not only did this fly in the face of his statements made to Vantage, but it directly contradicted Miller's affidavit submitted in connection with the *qui tam* case.  See First Miller Affidavit, Para. 3.

In fact, prior to his preparation of the Shriners Agreement, and contrary to his representations to Vantage and to the necessary implication of his affidavits submitted in the *qui tam* case, Miller had never submitted to the United States Postal Service, for any determination or approval, any fundraising contract containing a provision permitting the nonprofit organization to satisfy its payment obligations by permitting either a finite or infinite number of follow-up mailings by the fundraiser.  (Rule 56.1 Statement ¶9)

Prior to his preparation of the Shriners Agreement, and contrary to his representations to Vantage and to the necessary implication of his affidavits submitted in the *qui tam* case, Miller had never submitted to the United States Postal Service, for any determination or approval, any fundraising contract containing a provision permitting the nonprofit organization to satisfy its payment obligations by permitting the fundraiser to rent or exchange the nonprofit's donor list. (Rule 56.1 Statement ¶10)

Similarly, prior to his preparation of the Shriners Agreement, Miller had never submitted to the United States Postal Service for any determination or approval, any fundraising contract providing for an assignment by the nonprofit organization of the rights to use its donor mailing list as collateral to secure the nonprofits payment obligations. At the time that he prepared the Shriners Agreement, Miller was aware of no ruling by the United States Postal Service or by any court that had approved any such provisions in fundraising agreements. (Rule 56.1 Statement ¶¶ 11 and 12)

In response to questions from Mr. Lyon as to whether he was sure that the Shriners Agreement complied with the Cooperative Mail Rule, Defendant Miller expressly and repeatedly represented to Mr. Lyon that the Shriners Agreement had been approved by the United States Post Office. In fact, Miller never submitted the Shriners Agreement to the United States Postal Service for its review or approval, nor does Miller recall whether he informed Vantage that he hadn't done so. Defendant Miller never disclosed to Vantage that he had never submitted any agreement containing a payment provision like that in Paragraph 13.2 of the Shriners Agreement to the United States Postal Service for its review or approval, or that, so far as he was aware, no such agreement had ever been submitted to the Postal Service by anyone. (Rule 56.1 Statement ¶¶ 13, 14 and 15)

Defendant Miller never disclosed to Vantage that, so far as he was aware, no court had ever held that a fundraising agreement containing a payment provision such as that in Paragraph 13.2 of the Shriners Agreement complied with the Cooperative Mail Rule. Defendant Miller never warned Vantage that if the United States Postal Service challenged the Shriners Agreement, it would present an issue of first impression that had never been decided by any court previously, or that, accordingly, he couldn't predict with confidence how a court might rule on the question. Although he was aware of the then-pending Cooperative Mail Rule litigation against Vantage, Defendant Miller never warned Vantage that if the United States learned of the

5

Shriners Agreement, it might broaden its claims in the *qui* tam case to include claims with respect to the mailings made pursuant to the Shriners Agreement. Defendant Miller never warned Vantage that should the United States assert claims under the Shriners Agreement, Vantage would then be faced with an issue as to whether the total claims against it were so large that it might have to settle the *qui* tam case if it were unable to take the risk of an adverse judgment in an amount that would put it out of business. (Rule 56.1 Statement ¶¶16, 17, 18 and 19)

Defendant Miller has specialized in the area of compliance with postal regulations dealing with nonprofit mailings since 1981, and held himself out to clients as being knowledgeable and expert about it. Miller was engaged by Vantage to prepare the Shriners Agreement because he was experienced in compliance of fundraising agreements with postal regulations, and because the Shriners Agreement was the biggest fundraising deal in Vantage's history. Defendant Miller expressly represented to Vantage, in conversations with Mr. Lyon, that he was an expert in preparing fundraising agreements and making sure that they did not violate the Cooperative Mailing laws. Defendants Miller and NSG made a conscious choice to carry no professional liability insurance with respect to their liabilities to clients. (Rule 56.1 Statement ¶¶20, 21 and 22)

III.   THE FACTS OF RECORD THAT CONTRADICT DEFENDANTS' CLAIMS (1) THAT VANTAGE COULD ONLY HAVE DONE BUSINESS WITH SHRINERS ON TERMS THAT VIOLATED THE COOPERATIVE MAIL RULE AND (2) THAT VANTAGE WOULD HAVE HAD TO FOREGO ANY PROFITS ON THE SHRINERS AGREEMENT IN ORDER TO AVOID THE LOSSES THAT IT INCURRED THROUGH SETTLING THE GOVERNMENT'S CLAIMS WITH RESPECT TO THE SHRINERS AGREEMENT

The very first draft of the Shriners Agreement prepared by Defendant Miller contained substantially the same provision as the executed version, giving Shriners the option, in the event that it terminated the Shriners Agreement for cause, to remit Vantage to recovery of program

costs solely through follow up mailings and/or rental or exchange of the donor list for a period of thirty-six months.  (Rule 56.1 Statement ¶23)

Despite his understanding of Shriners requirements with respect to its liability for payment of program costs, Defendant Miller never proposed any modality for such payment in the event of termination for cause, except the provision ultimately included in the Shriners Agreement permitting Shriners to elect not to pay program costs directly and to remit Vantage to recovery of such costs solely by follow up mailings and/or rental or exchange of the donor list, each for a period not to exceed thirty-six months (the provision that Judge Wolf ultimately determined might violate the Cooperative Mail Rule).  There was never any discussion of any modification to the payment provision as Miller had drafted it, and after the parties' conference call on May 20 or 21, 1999, that issue had been resolved and didn't come up again in further negotiations.  No further memoranda prepared or received by Miller purport to further discuss the issue.  (Rule 56.1 Statement ¶24)

Defendant Miller never even proposed to Shriners (or recommended to Vantage) that the provision for recovery of program costs by means of follow up mailings and/or rental or exchange of the donor list not be limited as to time, or that if so limited, it further provide that Shriners be liable for any unpaid balance at the end of such time, nor did he propose any other payment modalities other than what he originally proposed in Paragraph 13.2 of Ex. 11A, and which was ultimately reflected in the Shriners Agreement as executed.  Shriners never considered any payment proposals other than those actually made by Vantage and Miller during the negotiations.  Vantage relied upon Miller to consider how the Agreement could be drafted so as to avoid problems.  The draft agreements prepared by Defendant Miller reflect all of the payment modalities that Miller proposed to Shriners during the negotiations.  (Rule 56.1 Statement ¶¶25 and 26)

In fact, the Shriners' only concern with respect to the payment provisions of the Agreement was that Shriners be protected from having to pay for program costs by using its own separate assets unrelated to revenues that could be generated as a result of the Agreement. Shriners was willing to pay for program costs by using "anything that could be raised or realized as a result of the programs –that could be used to the extent necessary to defray the program charges." Shriners did not care what assets, including revenues that could be generated from the rental or exchange of the donor list developed as a result of the programs, were applied to payment of program charges so long as Shriners did not have to make payment from non-program related assets. Semb executed the Affidavit supplied to Miller's attorneys in connection with Defendants' first Motion for Summary Judgment in the form submitted to him and it was only intended to convey that Shriners wouldn't have entered into the Agreement without a provision assuring Shriners that it wouldn't have to pay for program charges from non-program related resources. His concern was with the substance of that requirement; not with the particular means or language by which it was accomplished. Fleisher's concern was the same and Fleisher, similarly, would have been satisfied with any contract provisions that effectively protected Shriners against having to pay for program charges except out of revenues that could be generated from the program mailings or use of the donor list. (Rule 56.1 Statement ¶27)

Unfortunately however, Miller didn't suggest any payment provisions other than those appearing in the contract as executed and the earlier "upfront funding" and "promissory note" mechanisms that had been rejected early in the negotiations, despite the fact that Shriners had already accepted the principal with respect to termination without cause, that it would have to accept ultimate liability if follow up mailings and/or revenue generated by rental of the donor list was insufficient to make up any shortfall in program charges. (Rule 56.1 Statement ¶28)

IV.    NOTHING IN DEFENDANTS' EXPERT REPORTS EVEN ADDRESSES, MUCH
LESS APPROVES THE MISREPRESENTATIONS MADE BY DEFENDANTS AS
CONSISTENT WITH REASONABLE PROFESSIONAL SKILL AND CARE

Defendants' expert reports ignore the issue in this case. Mr. Tigner's report is addressed

to the question of whether an attorney should be held to have anticipated that the Postal Service

would claim that the payment provisions of the Shriners' Agreement contravened the CMR.

Miller himself has admitted that he was always aware that in order to comply with the CMR,

Shriners had to be solely at risk for bearing all program costs and that his draft of Paragraph 13.2

of the Shriners Agreement failed to so provide and left Vantage expressly liable for program

costs that had not been recovered by follow up mailings and/or rental of the donor list at the

expiration of the thirty-six month period after termination for cause. Thus, Miller has

acknowledged that he was, in fact, aware of precisely what his retained experts have argued he

was not required to be aware of. This admission renders Mr. Tignor's opinions irrelevant to

Defendants' liability. (Rule 56.1 Statement ¶29)

Furthermore, the Tigner report fails to address the actual issue presented by the evidence

of Miller's misrepresentations. Tigner's report does not even mention the various

misrepresentations that Miller himself has admitted, both in his deposition testimony and in his

affidavit submitted in the *Qui Tam* case to Judge Wolf; not to speak of the additional

misrepresentations testified to by Mr. Lyon. Indeed, the Tignor report indicates no awareness

that any representations at all were made by Miller to his clients. (Rule 56.1 Statement ¶30)

V.    THE ALLEGATIONS OF THE COMPLAINT SQUARELY RAISE THE
MISREPRESENTATION CLAIMS ASSERTED HERE

The Complaint expressly alleges that Defendants represented that (1) the payment

provisions of the Agreement "had been used repeatedly by fundraisers for non-profits" and (2)

that such use had been "with the knowledge and without question, objection or challenge by the

Postal Service" (Rule 56.1 Statement ¶31)

9

The Negligent Misrepresentation Count (Count IV) expressly incorporates by reference

and relies upon those prior paragraphs of the Complaint.  (Rule 56.1 Statement ¶32)

## ARGUMENT

I.  **DEFENDANTS' MALPRACTICE WAS SO GROSS AND OBVIOUS THAT EXPERT TESTIMONY IS NOT REQUIRED**

   A.   Defendants' Disregard Of Vantage's Interests Were So Gross And Obvious That Expert Testimony Is Necessary For Plaintiff To Establish Malpractice

Expert testimony is simply unnecessary under the facts of the present case.  "An attorney

owes his client an obligation to exercise a reasonable degree of care and skill in the performance

of his legal duties." *Glidden v. Terranova*, 12 Mass. App. Ct. 597, 598 (1981) citing *Caverly v.*

*McOwen*, 123 Mass. 574 (1878); *McLellan v. Fuller*, 226 Mass. 374 (1917).  As Defendants

point out, "expert testimony is generally necessary to establish that the attorney failed to meet the

standard of care owed by an attorney in a particular case." *Pongonis v. Saab*, 396 Mass. 1005,

1005 (1985).  "However, expert testimony is not essential where the claimed legal malpractice is

so gross or obvious that laymen can rely on their common knowledge or experience to recognize

or infer negligence from the facts." *Glidden v. Terranova*, 12 Mass. App. Ct. at 598-599 *citing*

*Gilbert v. Williams*, 8 Mass. 51, 57 (1811) ("whenever an attorney disobeys the lawful

instructions of his client, and a loss ensues, for that loss the attorney is responsible"); *Varnum v.*

*Martin*, 15 Pick. 440 (1834) (evidence found sufficient to sustain a verdict against the attorney

on the ground of negligence despite the apparent lack of expert testimony).[1]  Moreover, where,

as here, "a matter may easily be comprehended by jurors the testimony of an expert has no

place." *Turcotte v. DeWitt*, 332 Mass. 160, 165 (1955).

---

[1] The rule that expert testimony is not always required to prove legal malpractice is recognized in other jurisdictions. *See e.g. Wright v. Williams*, 47 Cal.App.3d 802, 121 Cal. Rptr. 194 (1975); *Collins v. Greenstein*, 61 Haw. 26, 595 P.2d 275 (1979); *House v. Maddox*, 46 Ill.App.3d 68, 4 Ill.Dec. 644, 360 N.E.2d 580 (1977); *Central Cab Co. v. Clarke*, 259 Md. 542, 270 A.2d 662 (1970); *Hill v. Okay Constr. Co.*, 312 Minn. 324, 252 N.W.2d 107 (1977); *Olfe v. Gordon*, 93 Wis.2d 173, 286 N.W.2d 573 (1980).

The acts constituting Defendants' malpractice in this case are so obvious that it falls within those cases that allow such a finding without the assistance of expert testimony. The *Wagenmann* case, relied on heavily by Defendants, is instructive in understanding this point and materially analogous to the facts of the present case. *See Wagenmann v. Adams*, 829 F.2d 196 (1st Cir. 1987). There, the attorney was appointed to represent a client in both criminal and commitment proceedings. The client alleged that, as a result of the attorney's malpractice, he was committed to a mental institution. The attorney could have, but did not, seek a hearing before the judge on the issue of his competency. Nor, during the course of representation, did the attorney interview the psychiatrist who had examined his client and determined that commitment would be in appropriate. With a single phone call by the psychiatrist informing the court of his opinion, the client was immediately released. Here, the court found the attorney's failures to utilize the procedure available for the hearing and to explore the psychiatrist's favorable opinion of the client was a dereliction of his duty that did not require the opinion of an expert for the jury to conclude. To the contrary, it was obvious that he had disregarded his client's interests. *Id.* at 219-220.

Defendants in the present case were similarly derelict in their duty to Vantage. As is set forth in more detail above, Defendants had several avenues available which would have made it possible for them to intelligently opine as to the legality of the Shriners Agreement. Despite being aware that the CMR required Vantage to be <u>solely</u> at risk for program costs, Defendants proposed the language of paragraph 13.2.[2] They could have utilized Postal Service procedures for obtaining an advanced ruling. (Rule 56.1 Statement, ¶ 5.) Miller's deposition testimony, without more and without the need for supporting expert testimony, creates a question of fact as

---

[2] The expert report of Mr. Tigner adds nothing to the analysis. It is his opinion that an attorney should not be held to have anticipated that the Postal Service would claim that the payment provisions of the Shriners Agreement

to whether this dereliction of duty constituted malpractice. Despite being fully aware of this procedure, Defendants never submitted the Shriners Agreement, or any fundraising contract, for such a ruling. (Rule 56.1 Statement, ¶ 5.) Instead, they either gave the question no attention at all or simply assumed that the Shriners Agreement satisfied the payment provisions of the CMR. Admittedly, however, he ignored this procedure even though he had no knowledge of any fundraising contracts using similar payment provisions or any court decision supporting the use of such provision. (Rule 56.1 Statement, ¶¶ 6, 7, 8.) In other words, Defendants had no basis for advising Vantage that it could safely utilize the Shriners Agreement. Like the attorney in *Wagenmann*, this decision was an example of "shoddy representation" that does not require an expert to explain. *Id.* at 220.

Defendants' numerous misrepresentations to Vantage serve as an independent basis for its malpractice claim. *See e.g. Chipman v. Shocket*, 60 Mass. App. Ct. 1109, n.5 (2003) (attorney's misrepresentation went to the jury as a basis for legal malpractice claims); *Hendrickson v. Sears*, 365 Mass 83, (1976) (attorneys misrepresentations regarding the quality of title to real property was a basis for malpractice claim). That such representations may serve as a basis for malpractice is further illustrated by *Glidden*, another case relied upon by Defendants. There, the plaintiffs/clients hired the defendant/attorney to represent them. The attorney promised to remove the clients' case from state district court to the superior court and later intentionally misrepresented that he had done so. When a default entered against the client for failure to prosecute the attorney represented that "everything is well in hand" and that he would straighten the whole thing out." *Id.* at 599. In fact, he never did and, as a result, the client, relying on the attorney's misrepresentation, was subsequently found to be in contempt and

---

contravened the CMR. That Defendants admit that they knew of this requirement renders the experts report moot. (Rule 56.1 Statement. ¶¶ 29-30).

imprisoned for failure to pay the judgment. These failures to act and misrepresentations were sufficiently gross and obvious that they did not require the admission of expert testimony.

As in *Glidden*, Defendants not only failed to utilize obvious procedures that would have served Vantage's interests, they made numerous misrepresentations in the course of their representation that independently serve as a basis for malpractice. As is set forth in detail above Defendants expressly reported to Vantage and later to Judge Wolf (1) that the payment provisions contained in Paragraph 13.2 of the Shriners Agreement were in common use in nonprofit fundraising agreements and (2) that such provisions had never been challenged or objected to by the Postal Service. (Rule 56.1 Statement, ¶ 8.) We know now that those statements were false. Not only had Defendants never drafted a contract with a similar payment provision, to Defendants' knowledge, no such provision had ever been drafted or passed upon by either the Postal Service or a court. (Rule 56.1 Statement, ¶¶ 9, 10, 11, 12.) These and other misrepresentations, as well as Defendants' failure to utilize established procedures, are sufficiently obvious and within the common knowledge and experience of laymen to allow Defendants' negligence to go to the jury without expert testimony.

B.    Vantage Does Not Have To Prove A Causal Link Between Defendants' Negligence And Vantage's Harm By Way Of An Expert

1.    Causation in this case is within the ken of the ordinary juror

Nor is expert testimony necessary for Vantage to put on expert evidence on the issue of causation. Again, the issue is whether it is appropriate for laymen to rely on their common knowledge or experience to determine this question. *Wagenmann v. Adams*, 829 F.2d at 221 (expert testimony not necessary to establish that an attorney's malpractice caused client harm). Like the record before the court in *Wagenmann*, the record in this case creates questions a fact as to whether Defendants caused Vantage's damages. Significant here is the fact that Defendants never proposed any modality for a payment other than that found in Paragraph 13.2. There was

13

never any discussion of modification. (Rule 56.1 Statement ¶¶24, 25). The only reason that

Vantage did not do so was because of Defendants' repeated assurances, not only that similar

payment provisions were in common use, but also that both other such agreements and, indeed,

the Shriners Agreement itself, had been approved by the Postal Service. (Rule 56.1 Statement ¶¶

26, 27, 28.) It is obvious that, had Defendants admitted at the outset that such was not the case

and that the payment provision in the Shriners Agreement were unique and presented a matter of

first impression, Vantage would have insisted that Defendants put this and alternative language

before the Postal Agreement before going forward with the Shriners Agreement. (Rule 56.1

Statement, ¶24) A jury does not need the opinion of an expert to conclude that Vantage was

harmed as a result of its reliance on these and other misrepresentations.

> ### 2.    Defendants Have Failed To Establish That Plaintiff's Defense In The Underlying Action Would Have Been Successful

Defendants' assertion that summary judgment is appropriate because Plaintiff cannot

meet its burden of proving that Plaintiff probably would have been unsuccessful in the

Underlying Action fails for a second independent reason. It is generally understood that

"[w]here a party who was the plaintiff in a legal action sues his attorney for negligence in the

prosecution of that action, he must establish that he probably would have succeeded in the

underlying litigation were it not for the attorney's negligence. *Glidden v. Terranova*, 12 Mass.

App. Ct. at 600 (citations omitted). However, in cases where the plaintiff in a malpractice case

was a defendant in the underlying litigation, our courts recognize that the "he [the client] should

not shoulder the burden of proving a defense in the malpractice action." *Glidden v. Terranova*,

12 Mass. App. Ct. at 600 *citing Nolan, Tort Law* § 182 at 297.

In the present case, Plaintiff was the defendant in the Underlying Action. The burden

was on the United States to prove that the Shriners Agreement violated the C MR. Plaintiff's

defense, which had been reinforced by Defendants' continuing reassurances, was that the

Shriners Agreement complied. Vantage did not have the burden of proving its defenses in the

*Qui Tam* case. On the contrary, Defendants must prove that Plaintiff's defense to the claims

would have succeeded and even if it could be adduced, such proof would be insufficient.

Vantage engaged Defendants, who held themselves out as experts in CMR compliance, for the

precise purpose of protecting itself against exposure to additional CMR claims by the

Government. Here, Defendants' malpractice placed Vantage in the position of having to either

try the *Qui Tam* case at the price of being put out of business should its defenses not succeed, or

settle the case because it could not afford to take that risk. That was precisely the risk that

Defendants had been employed to avoid. Vantage would not have been in that position had the

Defendants' representations, upon which it relied, been accurate. A question of fact therefore

exists as to whether Defendants' malpractice proximately caused the damages incurred by

Vantage in settling the *Qui Tam* case without regard to any *post hoc* speculation as to whether it

might have successfully defended the claims against it.

C.   There Remains A Question Of Fact As To Whether Vantage Could Have Achieved
     A Better Result Under The Shriners Agreement Absent Defendants' Negligence.
     Vantage Suffered Appreciable Harm As A Result Of Defendants' Negligence

A jury does not require the assistance of expert testimony to conclude that Vantage could

have achieved a better result. The evidence on this summary judgment record establishes that

the very first draft of the Shriners Agreement prepared by Defendant Miller contained

substantially the same payment provision as the executed version. Despite his understanding of

Shriners requirements with respect to its liability for payment of program costs, Defendant Miller

never proposed any modality for such payment in the event of termination for cause, except the

provision ultimately included in the Shriners Agreement permitting Shriners to elect not to pay

program costs directly and to remit Vantage to recovery of such costs solely by follow up

mailings and/or rental or exchange of the donor list, each for a period not to exceed thirty-six

months (the provision that Judge Wolf ultimately determined probably violated the Cooperative

15

Mail Rule).  There was never any discussion of any modification to the payment provision as Miller had drafted it.  (Rule 56.1 Statement, ¶24.)

Defendant Miller never even proposed to Shriners (or recommended to Vantage) that the provision for recovery of program costs by means of follow up mailings and/or rental or exchange of the donor list not be limited as to time, or that if so limited, it further provide that Shriners be liable for any unpaid balance at the end of such time, nor did he propose any other payment modalities other than what he originally proposed in Paragraph 13.2 of the Agreement.  Vantage relied upon Miller to consider how the Agreement could be drafted so as to avoid problems.  (Rule 56.1 Statement ¶¶ 25, 26.)  The draft agreements prepared by Defendant Miller reflect all of the payment modalities that Miller proposed to Shriners during the negotiations.

However, Shriners' witnesses have testified that it was interested only in making sure that the payment provisions in the Agreement protected it from having to pay for program costs from out of assets apart from those that could be realized in connection with the Agreement itself; i.e., both contributions received from program solicitation mailings and revenues that could be generated from exploitation of the donor list developed from the program mailings.  (Rule 56.1 Statement, ¶27.)  A jury could reasonably find that Shriners would have accepted a provision that permitted Vantage to rent or exchange the donor list until program costs were recovered (rather than for a 36 month period, as provided in the payment provision drafted by Miller), but Miller never even proposed such a provision.  (Rule 56.1 Statement, ¶¶27, 28.)  The same jury could also find that by effectively doubling the damage claim in the underlying *qui tam* case, the cost of settlement to Vantage had also doubled.  Nothing about this damage analysis suggests the need for, or the admissibility of, expert testimony.  These are not appropriate issues for summary judgment.

II.    VANTAGE'S CONTRACT AND MISREPRESENTATION COUNTS RAISE
       MATERIAL ISSUES OF FACT

In arguing that Vantage's intentional and negligent misrepresentations claim should be

dismissed, Defendants focus on a single misrepresentation, that being Defendant Miller's

representation that he had utilized the advanced ruling procedure.  For purposes of summary

judgment Defendants do not dispute that the statement was made either intentionally or

negligently.  Instead, Defendants argue that whether Vantage was harmed as a result of this

misrepresentation must be proven by expert testimony.  As outlined above, and despite

Defendants ignoring the same, there are numerous examples of Defendants making

misrepresentations that Vantage relied upon before agreeing to the language of the payment

provision. (Rule 56.1 Statement, ¶¶ 5 – 22.)  That Vantage suffered harm as a result of its

reliance on these statements is not a complicated matter and the general rule with regard to

expert testimony therefore applies.  Vantage was left with little choice but to settle the *Qui Tam*

case and was left with an irreconcilable breakdown with what should have been its largest

customer. (Rule 56.1 Statement, ¶ 19.)  Where, as here, "a matter may easily be comprehended

by jurors the testimony of an expert has no place." *Turcotte v. DeWitt*, 332 Mass. 160, 165

(1955); *see also Glidden v. Terranova*, 12 Mass. App. Ct. at 598-599.

Similarly, little need be said on Vantage's breach of contract count.  It is undisputed that

underlying Vantage's breach of contract claim is Defendants' misrepresentations and their

failure to take advantage of established procedures, which Defendants knew were available, to

ensure the Shriners Agreement complied with the CMR.  These matters are easily

comprehensible and are therefore not an appropriate area for expert testimony.  Summary

judgment on these counts must be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment must be denied in its entirety.

VANTAGE FINANCIAL SERVICES, INC.

By its Attorneys,

Laurence M. Johnson, BBO #252720
Neal J. Bingham, BBO#652029
Davis, Malm & D'Agostine
One Boston Place
Boston, MA 02108
(617) 367-2500

Dated: December 12, 2005

387748v.2