UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VANTAGE FINANCIAL SERVICES, INC.
          Plaintiff,

v.

NONPROFIT SERVICE GROUP AND
GEORGE E. MILLER,
          Defendants.

C.A. No. 04-11686-WGY

**PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS OF RECORD
THAT ARE EITHER UNDISPUTED OR AS TO WHICH THERE
IS A MATERIAL ISSUE TO BE TRIED WITH RESPECT TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT CONCERNING
EXPERT TESTIMONY**

In accordance with Rule 56.1 of the Local Rules of this Court, Plaintiff Vantage Financial Services, Inc. (hereinafter "Vantage" or "Plaintiff") submits the following statement of material facts of record, which are either undisputed or as to which there exist genuine issues to be tried, and upon all of which Vantage relies in its opposition to Defendants' Motion for Summary Judgment Concerning Expert Testimony.

**I. DEFENDANTS' PARTICIPATION IN THE NEGOTIATION AND
PREPARATION OF THE SHRINERS AGREEMENT**

1. Defendant Miller was aware that at least since the 1980s, the United States Postal Service's position was that a for-profit fundraiser could not bear any portion of the risk relating to the cost of a mailing made at nonprofit rates, and the Postal Service's handbook stated that that policy was applicable to solicitation mailings. Miller Dep., pp. 33-35, attached as **Exhibit**

**H**[1]. The policy of the United States Postal Service in this regard had not changed as of 1999 when the Shriners Agreement was negotiated. Miller Dep., pp. 39-40.

2. It was Defendant Miller who first proposed the language in the Shriners Agreement with respect to payment of program costs by means of rental or exchange of the donor list in the event of termination of the Agreement by Shriners for cause. Miller Dep., p. 220.

3. During the preparation of the Shriners Agreement, Miller's understanding of the Shriners' concerns with respect to payment of program costs was that Shriners not be obligated to pay for program costs except from revenues that the program generated. Miller Dep. p. 237. Miller understood that Shriners included in revenues that the program generated both donations made to Shriners in response to program mailings <u>and</u> revenues that could be realized from the rental or exchange of the donor list developed during the program. Miller Dep., pp. 241, 243-45. This represented the only un-modifiable requirement that Shriners had with respect to its liability for payment of program costs; i.e. that Shriners would not have to pay for program costs from its cash resources other than those resulting from the program and the development/exploitation of the donor list developed during the program. Miller Dep., pp. 250.

4. At the time of the negotiation of the Shriners Agreement, Miller knew that Vantage was involved in defending litigation involving allegations that its mailings at not-for-profit rates pursuant to various of its fundraising contracts with other nonprofits violated the Cooperative Mail Rule, and that as a consequence, Vantage's principal requirement was that the Shriners Agreement not violate the Cooperative Mail Rule. Miller Dep., pp. 111, 113, 115, 253, and 286-87. Miller acknowledged that in order to be in compliance with the Cooperative Mail Rule the Shriners Agreement had to provide that Shriners was solely at risk for the costs of the program.

---

[1] Unless otherwise states, all referenced Exhibits are attached to the Appendix of Exhibits in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment Concerning Expert Testimony, which has been filed herewith.

2

Miller Dep., p. 265. Nevertheless, Miller admitted in his deposition testimony that the payment provision he included in the Shriners Agreement at Paragraph 13.2 did not so provide. *Id*.

## II. DEFENDANTS' MALPRACTICE AND MISREPRESENTATIONS, AND VANTAGE'S RELIANCE UPON DEFENDANTS

5. Defendant Miller advised Vantage that the payment provisions contained in Paragraph 13.2 of the Shriners Agreement would satisfy the requirements of the Cooperative Mail Rule (Miller Dep., pp. 288-89), that he had prepared contracts with similar payment provisions (Miller Dep., p. 289), and that contracts with similar provisions regarding follow up mailings and use of donor list rental income had never been objected to, or challenged by, the United States Postal Service (Miller Dep., p. 290). However, despite the fact that a procedure existed for obtaining an "advance ruling" from the Postal Service (Miller Dep., pp. 93, 95-101), Miller had never, at any time prior to the execution of the Shriners Agreement, presented any fundraising contract for any client to the Postal Service for such a ruling or for any review or approval. Miller Dep., pp. 89-90, 131-33.

6. Miller has no knowledge of <u>any</u> prior instance in which a fundraising agreement had utilized a provision that limited the fundraiser's recourse, at the nonprofit's option, solely to the proceeds of follow up mailings and/or income from the rental or exchange of the donor list for payment of program charges, and at the time of negotiation of the Shriners Agreement, he was aware of no such ruling by the Postal Service. Miller Dep., pp. 133-34, 290-91.

7. At the time in question, no decision of any court had ever held that a fundraising agreement containing provisions that left the fundraiser prospectively at risk with respect to payment of program charges could be retrospectively brought into compliance with the Cooperative Mail Rule if, in fact, the fundraiser was ultimately paid. Miller Dep., pp. 295-96.

8. With respect to Defendants' claim that they made no misrepresentations in connection with the professional services rendered to Vantage, it is noteworthy that in the First Miller

3

Affidavit filed in connection with the *qui tam* case, Miller expressly confirmed the representations that he had previously made to Mr. Melikian; that he had prepared numerous fundraising agreements containing "very similar" provisions to those which Judge Wolf ultimately concluded might well violate the Cooperative Mail Rule and that such agreements had never been questioned or challenged by the United States Postal Service. Melikian Aff., Para 17, attached as **Exhibit B**; see First Miller Affidavit, Para. 3, attached as **Exhibit D**. Of course, it is implicit in Miller's affidavit that he knew that the Postal Service had been made aware of the use of agreements with such provisions and, with such awareness, had not challenged them. Otherwise, his representation would have been misleading and meaningless, at best. In this connection, it is notable that despite being served with document requests requiring them to produce such agreements, Defendants have produced no fundraising agreements prior to the Shriners Agreement in which such provisions were utilized. Furthermore, Miller admitted in his deposition testimony that he is aware of no instance in which any agreement containing the payment provisions that he drafted into the Shriners Agreement (and which were at issue in the *qui tam* case) was ever presented to, reviewed, or approved by the Postal Service. Melikian Aff., Para. 17; Miller Dep., pp. 175-76 and 290-91. See also Agreements marked as Exhibit 5 at Miller Deposition and attached hereto as **Exhibit I**. Moreover, Miller testified that he, in fact, had never drafted an agreement similar to the Shriners Agreement in the context of the payment provisions incorporated in Paragraph 13.2, and critically had never informed Vantage of this fact. Miller Dep., pp. 306-307. Not only did this fly in the face of his statements made to Vantage, see Melikian Aff., Para. 17, but it directly contradicted Miller's affidavit submitted in connection with the *qui tam* case. See First Miller Affidavit, Para. 3.

9. In fact, prior to his preparation of the Shriners Agreement, and contrary to his representations to Vantage and to the necessary implication of his affidavits submitted in the *qui tam* case, Miller had <u>never</u> submitted to the United States Postal Service, for any determination

4

or approval, any fundraising contract containing a provision permitting the nonprofit organization to satisfy its payment obligations by permitting either a finite or infinite number of follow-up mailings by the fundraiser. Miller, Dep., pp. 132, 175-76.

10. Prior to his preparation of the Shriners Agreement, and contrary to his representations to Vantage and to the necessary implication of his affidavits submitted in the *qui tam* case, Miller had never submitted to the United States Postal Service, for any determination or approval, any fundraising contract containing a provision permitting the nonprofit organization to satisfy its payment obligations by permitting the fundraiser to rent or exchange the nonprofit's donor list. *Id.*; Miller Dep., p. 212.

11. Similarly, prior to his preparation of the Shriners Agreement, Miller had never submitted to the United States Postal Service for any determination or approval, any fundraising contract providing for an assignment by the nonprofit organization of the rights to use its donor mailing list as collateral to secure the nonprofits payment obligations. Miller Dep., pp. 132-33.

12. At the time that he prepared the Shriners Agreement, Miller was aware of no ruling by the United States Postal Service or by any court that had approved any such provisions in fundraising agreements. Miller Dep., pp. 133-34.

13. In response to questions from Mr. Lyon as to whether he was sure that the Shriners Agreement complied with the Cooperative Mail Rule, Defendant Miller expressly and repeatedly represented to Mr. Lyon that the Shriners Agreement had been approved by the United States Post Office. Deposition of Lawrence C. Lyon (hereinafter "Lyon Dep.", attached as **Exhibit J**), pp. 100-101.

14. In fact, Miller never submitted the Shriners Agreement to the United States Postal Service for its review or approval, nor does Miller recall whether he informed Vantage that he hadn't done so. Miller Dep., pp. 303, 305.

15. Defendant Miller never disclosed to Vantage that he had never submitted any agreement containing a payment provision like that in Paragraph 13.2 of the Shriners Agreement to the United States Postal Service for its review or approval, or that, so far as he was aware, no such agreement had ever been submitted to the Postal Service by anyone. Miller Dep., pp. 306-07.

16. Defendant Miller never disclosed to Vantage that, so far as he was aware, no court had ever held that a fundraising agreement containing a payment provision such as that in Paragraph 13.2 of the Shriners Agreement complied with the Cooperative Mail Rule. Miller Dep., p. 307.

17. Defendant Miller never warned Vantage that if the United States Postal Service challenged the Shriners Agreement, it would present an issue of first impression that had never been decided by any court previously, or that, accordingly, he couldn't predict with confidence how a court might rule on the question. Miller Dep., p. 308.

18. Although he was aware of the then-pending Cooperative Mail Rule litigation against Vantage, Defendant Miller never warned Vantage that if the United States learned of the Shriners Agreement, it might broaden its claims in the *qui* tam case to include claims with respect to the mailings made pursuant to the Shriners Agreement. Miller Dep., pp. 253, 309.

19. Defendant Miller never warned Vantage that should the United States assert claims under the Shriners Agreement, Vantage would then be faced with an issue as to whether the total claims against it were so large that it might have to settle the *qui* tam case if it were unable to take the risk of an adverse judgment in an amount that would put it out of business. Miller Dep., p. 309.

20. Defendant Miller has specialized in the area of compliance with postal regulations dealing with nonprofit mailings since 1981, and held himself out to clients as being knowledgeable and expert about it. Miller Dep., p. 14, 26-29. Miller was engaged by Vantage

6

to prepare the Shriners Agreement because he was experienced in compliance of fundraising agreements with postal regulations, and because the Shriners Agreement was the biggest fundraising deal in Vantage's history. Lyon Dep., pp. 77-78, 86-87.

21. Defendant Miller expressly represented to Vantage, in conversations with Mr. Lyon, that he was an expert in preparing fundraising agreements and making sure that they did not violate the Cooperative Mailing laws. Lyon Dep., pp. 96-97.

22. Defendants Miller and NSG made a conscious choice to carry no professional liability insurance with respect to their liabilities to clients. Miller Dep., p. 11.

### III. THE FACTS OF RECORD THAT CONTRADICT DEFENDANTS' CLAIMS (1) THAT VANTAGE COULD ONLY HAVE DONE BUSINESS WITH SHRINERS ON TERMS THAT VIOLATED THE COOPERATIVE MAIL RULE AND (2) THAT VANTAGE WOULD HAVE HAD TO FOREGO ANY PROFITS ON THE SHRINERS AGREEMENT IN ORDER TO AVOID THE LOSSES THAT IT INCURRED THROUGH SETTLING THE GOVERNMENT'S CLAIMS WITH RESPECT TO THE SHRINERS AGREEMENT

23. The very first draft of the Shriners Agreement prepared by Defendant Miller contained substantially the same provision as the executed version, giving Shriners the option, in the event that it terminated the Shriners Agreement for cause, to remit Vantage to recovery of program costs solely through follow up mailings and/or rental or exchange of the donor list for a period of thirty-six months. Miller Dep., pp. 254-56, and Ex. 11A thereto.

24. Despite his understanding of Shriners requirements with respect to its liability for payment of program costs, Defendant Miller never proposed any modality for such payment in the event of termination for cause, except the provision ultimately included in the Shriners Agreement permitting Shriners to elect not to pay program costs directly and to remit Vantage to recovery of such costs solely by follow up mailings and/or rental or exchange of the donor list, each for a period not to exceed thirty-six months (the provision that Judge Wolf ultimately determined might violate the Cooperative Mail Rule). Miller Dep., pp. 255-56. There was never

7

any discussion of any modification to the payment provision as Miller had drafted it, and after the parties' conference call on May 20 or 21, 1999, that issue had been resolved and didn't come up again in further negotiations. Fleisher Dep., pp. 31-35, attached as **Exhibit L**; Miller Dep., p. 280-81. No further memoranda prepared or received by Miller purport to further discuss the issue. Miller Dep., pp. 282-83 and Exhibits 21A through 21F thereto.

25. Defendant Miller never even proposed to Shriners (or recommended to Vantage) that the provision for recovery of program costs by means of follow up mailings and/or rental or exchange of the donor list not be limited as to time, or that if so limited, it further provide that Shriners be liable for any unpaid balance at the end of such time, nor did he propose any other payment modalities other than what he originally proposed in Paragraph 13.2 of Ex. 11A, and which was ultimately reflected in the Shriners Agreement as executed. Fleisher Dep., pp. 69-70; Miller Dep., pp. 256-57, 266, 268, 298-300. Shriners never considered any payment proposals other than those actually made by Vantage and Miller during the negotiations. Fleisher Dep., pp. 64-65; Semb Dep., pp. 19-20, attached as **Exhibit M**. Vantage relied upon Miller to consider how the Agreement could be drafted so as to avoid problems. Lyon Dep., p. 135.

26. The draft agreements prepared by Defendant Miller reflect all of the payment modalities that Miller proposed to Shriners during the negotiations. Miller Dep., p. 297.

27. In fact, the Shriners' only concern with respect to the payment provisions of the Agreement was that Shriners be protected from having to pay for program costs by using its own separate assets unrelated to revenues that could be generated as a result of the Agreement. Shriners was willing to pay for program costs by using "anything that could be raised or realized as a result of the programs –that could be used to the extent necessary to defray the program charges." Semb Dep., pp. 25-26, see also pp. 12-14; Fleisher Dep., pp. 16-17. Shriners did not care what assets, including revenues that could be generated from the rental or exchange of the donor list developed as a result of the programs, were applied to payment of program charges so

long as Shriners did not have to make payment from non-program related assets. Fleisher Dep., pp. 18-20. Semb executed the Affidavit supplied to Miller's attorneys in connection with Defendants' first Motion for Summary Judgment in the form submitted to him and it was only intended to convey that Shriners wouldn't have entered into the Agreement without a provision assuring Shriners that it wouldn't have to pay for program charges from non-program related resources. His concern was with the substance of that requirement; not with the particular means or language by which it was accomplished. Semb Dep., pp. 29-31, 35-36, 37. Fleisher's concern was the same and Fleisher, similarly, would have been satisfied with any contract provisions that effectively protected Shriners against having to pay for program charges except out of revenues that could be generated from the program mailings or use of the donor list. Fleisher Dep., pp. 182-83, 185.

28. Unfortunately however, Miller didn't suggest any payment provisions other than those appearing in the contract as executed and the earlier "upfront funding" and "promissory note" mechanisms that had been rejected early in the negotiations (Miller Dep., 56-57, 62), despite the fact that Shriners had already accepted the principal with respect to termination without cause, that it would have to accept ultimate liability if follow up mailings and/or revenue generated by rental of the donor list was insufficient to make up any shortfall in program charges. Fleisher Dep., pp. 39-40.

### IV. NOTHING IN DEFENDANTS' EXPERT REPORTS EVEN ADDRESSES, MUCH LESS APPROVES THE MISREPRESENTATIONS MADE BY DEFENDANTS AS CONSISTENT WITH REASONABLE PROAFESSIONAL SKILL AND CARE

29. Defendants' expert reports ignore the issue in this case. Mr. Tigner's report is addressed to the question of whether an attorney should be held to have anticipated that the Postal Service would claim that the payment provisions of the Shriners' Agreement contravened the CMR. Miller himself has admitted that he was always aware that in order to comply with the

CMR, Shriners had to be <u>solely</u> at risk for bearing all program costs ( Miller Dep., p. 265) and that his draft of Paragraph 13.2 of the Shriners Agreement failed to so provide and left Vantage expressly liable for program costs that had not been recovered by follow up mailings and/or rental of the donor list at the expiration of the thirty-six month period after termination for cause. *Id* Thus, Miller has acknowledged that he was, in fact, aware of precisely what his retained experts have argued he was not required to be aware of. This admission renders Mr. Tignor's opinions irrelevant to Defendants' liability.

30. Furthermore, the Tigner report fails to address the actual issue presented by the evidence of Miller's misrepresentations. Tigner's report does not even mention the various misrepresentations that Miller himself has admitted, both in his deposition testimony and in his affidavit submitted in the *Qui Tam* case to Judge Wolf; not to speak of the additional misrepresentations testified to by Mr. Lyon. Indeed, the Tignor report indicates no awareness that any representations at all were made by Miller to his clients. Griffin Aff., Ex. 7.

### V. THE ALLEGATIONS OF THE COMPLAINT SQUARELY RAISE THE MISREPRESENTATION CLAIMS ASSERTED HERE

31. The Complaint expressly alleges that Defendants represented that (1) the payment provisions of the Agreement "had been used repeatedly by fundraisers for non-profits" and (2) that such use had been "with the knowledge and without question, objection or challenge by the Postal Service" (Complaint [Griffin Aff., Ex. 1], Para. 17.

32. The Negligent Misrepresentation Count (Count IV) expressly incorporates by reference and relies upon those prior paragraphs of the Complaint. Complaint, Paras. 40, 43.

                                       VANTAGE FINANCIAL SERVICES, INC.
                                       By its Attorneys,

                                       /s/ Laurence M. Johnson
                                       Laurence M. Johnson
                                       BBO #252720
                                       Neal J. Bingham
                                       BBO #652029
                                       Davis, Malm & D'Agostine
                                       One Boston Place
                                       Boston, MA 02108
                                       (617) 367-2500
                                       ljohnson@davismalm.com

390172v.1