UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VANTAGE FINANCIAL SERVICES, INC.<br>Plaintiff,<br><br>v.<br><br>NONPROFIT SERVICE GROUP AND<br>GEORGE E. MILLER,<br>Defendants. | C.A. No. 04-11686-WGY |

## PLAINTIFF'S TRIAL MEMORANDUM

In accordance with this Court's Procedural Order dated November 1, 2005, Plaintiff, Vantage Financial Services, Inc., hereby submits the following Trial Memorandum.

### I. Brief Summary of the Case

Defendant Miller is an attorney. He and his firm hold themselves out as being expert and specialist in nonprofit organizations ("nonprofits"), fundraising arrangements between nonprofits and professional fundraising services organizations ("fundraisers") and compliance with US Postal Service requirements with respect to such arrangements. Defendants represented Vantage in the negotiation and preparation of a fundraising contract with Shriners Hospitals for Children, a large national nonprofit organization. At the time, as Defendants knew, Vantage was already a defendant in a *Qui Tam* action instituted by a disgruntled former employee, but in which the United States had intervened, which claimed that various other fundraising agreements between Vantage and various other nonprofits violated the Cooperative Mail Rule (the "CMR"), which prohibited mailings at nonprofit postal rates if the mailings were wholly or partially mailings of the for-profit fundraiser. Vantage engaged defendants to prepare a fundraising agreement with Shriners that would not violate the CMR and would protect it from possible additional liability on claims such as those that were the subject of the *Qui Tam* action.

394244v.1

Defendants negotiated a fundraising agreement between Vantage and Shriners. Defendants assured Vantage that the payment terms of the Agreement complied with the CMR, that they were in common use in the fundraising industry, that such terms had never been challenged by the Postal Service and, indeed, that they had submitted Shriners Agreement itself to the Postal Service which had approved it.

Contrary to Defendants' assurances, the particular payment terms that they included in the Shriners Agreement had never been used by Defendants before nor, to their knowledge, by anyone else. Such terms had never been submitted to or approved by the Postal Service nor had the Shriners Agreement been so submitted or approved.

When the United States learned of the Shriners Agreement during discovery in the *Qui Tam* case, it added claims against Vantage with respect to all of the mailings under the Shriners Agreement. This approximately doubled the single damages claims being asserted by the United States from $3million to $6million, plus possible treble damages and statutory penalties for each mailing. Vantage unsuccessfully moved for Summary Judgment on the Government's claims on the Shriners Agreement, *inter alia*. Judge Wolf indicated that unless, at trial, Vantage could prove that there was no risk that, under the Agreement's payment provisions, it could have to bear any portion of the costs of the mailing programs under the Agreement, he would hold that the Shriners Agreement violated the CMR and would impose liability for the mailings made pursuant thereto. Because such proof was impossible, and faced with possible liability that would have destroyed it, Vantage settled the case for $4.5million, some $2.25million of which was attributable to the Shriners Agreement claims.

## II. DEFENDANTS' PARTICIPATION IN THE NEGOTIATION AND PREPARATION OF THE SHRINERS AGREEMENT

Defendant Miller was aware that at least since the 1980s, the United States Postal Service's position was that a for-profit fundraiser could not bear any portion of the risk relating

-2-

to the cost of a mailing made at nonprofit rates, and the Postal Service's handbook stated that that policy was applicable to solicitation mailings. The policy of the United States Postal Service in this regard had not changed as of 1999 when the Shriners Agreement was negotiated. It was Defendant Miller who first proposed the language in the Shriners Agreement with respect to payment of program costs by means of rental or exchange of the donor list in the event of termination of the Agreement by Shriners for cause.

During the preparation of the Shriners Agreement, Miller's understanding of the Shriners' concerns with respect to payment of program costs was that Shriners not be obligated to pay for program costs except from revenues that the program generated. Miller understood that Shriners included in the revenues from which it was willing to pay for program costs, both what the program generated in donations made to Shriners in response to program mailings and revenues that could be realized from the rental or exchange of the donor list developed during the program. This represented the only un-modifiable requirement that Shriners had with respect to its liability for payment of program costs; i.e. that Shriners would not have to pay for program costs from its cash resources other than those resulting from the program and the development/exploitation of the donor list developed during the program.

At the time of the negotiation of the Shriners Agreement, Miller knew that Vantage was involved in defending litigation involving allegations that its mailings at not-for-profit rates pursuant to various of its fundraising contracts with other nonprofits violated the Cooperative Mail Rule, and that as a consequence, Vantage's principal requirement was that the Shriners Agreement not violate the Cooperative Mail Rule.

In order to comply with the Cooperative Mail Rule the Shriners Agreement had to provide that Shriners was solely at risk for the costs of the program. Nevertheless, the payment provision that Miller included in the Shriners Agreement at Paragraph 13.2 did not so provide. Instead, the provisions prepared by Miller afforded Shriners an option, in the event of

-3-

termination of the Agreement for cause, to limit its liability for payment of then-outstanding program costs to revenues that could be raised through follow-up donor solicitation mailings and/or rental or exchange of the donor list for a period of thirty-six months and the provisions drafted by Miller expressly provided that at the end of the thirty-six month period "Vantage shall have no further recourse against Shriners." It was this very provision, prepared and proposed by Miller, that Judge Wolf ultimately determined resulted in the Agreement probably violating the Cooperative Mail Rule.

### III. DEFENDANTS' MALPRACTICE AND MISREPRESENTATIONS, AND VANTAGE'S RELIANCE UPON DEFENDANTS

Defendant Miller has specialized in the area of compliance with postal regulations dealing with nonprofit mailings since 1981, and held himself out to clients as being knowledgeable and expert about such matters. Miller was engaged by Vantage to prepare the Shriners Agreement because he was experienced in preparing fundraising agreements that complied with postal regulations, and because the Shriners Agreement was the biggest fundraising agreement in Vantage's history. He expressly represented to Vantage, in conversations with Mr. Lyon, that he was an expert in preparing fundraising agreements and making sure that they did not violate the Cooperative Mailing laws.

Miller advised Vantage that the payment provisions contained in Paragraph 13.2 of the Shriners Agreement would satisfy the requirements of the Cooperative Mail Rule, that he had prepared contracts with similar payment provisions, and that contracts with similar payment provisions regarding follow up mailings and use of donor list exchange or rental income had never been objected to, or challenged by, the United States Postal Service. However, despite the fact that a procedure existed for obtaining an "advance ruling" from the Postal Service, Miller had never, at any time prior to the execution of the Shriners Agreement, presented any fundraising contract for any client to the Postal Service for such a ruling or for any review or

approval. Moreover, Miller had never previously utilized payment provisions in a fundraising agreement that gave the non-profit the option of remitting fundraising counsel solely to income that could be generated from follow-up mailings and/or exchange or rental of the donor list and which in the event that income so realized was insufficient, exculpated the non-profit from any other liability for payment for program charges.

In fact, there will be no evidence of <u>any</u> prior instance in which a fundraising agreement had utilized a provision that limited the fundraiser's recourse, at the nonprofit's option, solely to the proceeds of follow up mailings and/or income from the rental or exchange of the donor list for payment of program charges, and at the time of negotiation and preparation of the Shriners Agreement, Miller was aware of no such ruling either by the Postal Service or by any court.

At the time in question, no decision of any court had ever held that a fundraising agreement containing provisions that left the fundraiser prospectively at risk with respect to payment of program charges could be retrospectively brought into compliance with the Cooperative Mail Rule if, in fact, the fundraiser was ultimately paid.

While Defendants' will claim that they made no misrepresentations in connection with the professional services rendered to Vantage, it is noteworthy that in the First Miller Affidavit filed in connection with the *qui tam* case, Miller expressly confirmed the representations that he had previously made to Mr. Melikian; that he had prepared numerous fundraising agreements containing "very similar" provisions to those which Judge Wolf ultimately concluded might well violate the Cooperative Mail Rule and that such agreements had never been questioned or challenged by the United States Postal Service. Of course, it is implicit in Miller's affidavit that he knew that the Postal Service had been made aware of the use of agreements with such provisions and, with such awareness, had not challenged them. Otherwise, his representation in his affidavit submitted to Judge Wolf would have been misleading and meaningless, at best. Despite being served with document requests requiring them to produce such agreements,

-5-

Defendants have produced no fundraising agreements prior to the Shriners Agreement in which such provisions were utilized. In fact, Miller had never even drafted an agreement similar to the Shriners Agreement in the context of the payment provisions incorporated in Paragraph 13.2, much less submitted one with such provisions to the Postal Service. Not only did this fly in the face of his statements made to Vantage, but it directly contradicted Miller's affidavit submitted in connection with the *qui tam* case.

In fact, prior to his preparation of the Shriners Agreement, and contrary to his representations to Vantage and to the necessary implication of his affidavits submitted in the *qui tam* case, Miller had never submitted to the United States Postal Service, for determination or approval, any fundraising contract containing a provision permitting the nonprofit organization to satisfy its payment obligations by permitting either a finite or infinite number of follow-up mailings by the fundraiser.

At the time that he prepared the Shriners Agreement, Miller was aware of no ruling by the United States Postal Service or by any court that had approved any such provisions in fundraising agreements.

Finally, in response to questions from Mr. Lyon, a Vantage employee involved in negotiating the fundraising agreement with Shriners, as to whether Miller was sure that the Shriners Agreement complied with the Cooperative Mail Rule, Miller expressly and repeatedly represented to Lyon that the Shriners Agreement had been submitted to and approved by the United States Post Office.

In fact, Miller never submitted the Shriners Agreement to the United States Postal Service for its review or approval, and Miller does not claim that he informed Vantage that he had not done so.

Miller has admitted that he never disclosed to Vantage that he had never submitted any agreement containing a payment provision like that in Paragraph 13.2 of the Shriners Agreement

-6-

to the United States Postal Service for its review or approval, or that, so far as he was aware, no such agreement had ever been submitted to the Postal Service by anyone.

Miller has also admitted that he never disclosed to Vantage that, so far as he was aware, no court had ever held that a fundraising agreement containing a payment provision such as that in Paragraph 13.2 of the Shriners Agreement complied with the Cooperative Mail Rule.

Miller has further admitted that he never warned Vantage that if the United States Postal Service challenged the Shriners Agreement, it would present an issue of first impression that had never been decided by any court previously, or that, accordingly, he couldn't predict with confidence how a court might rule on the question.

Finally, Miller has admitted that although he was aware of the then-pending Cooperative Mail Rule litigation against Vantage, he never warned Vantage that if the United States learned of the Shriners Agreement, it might broaden its claims in the *qui* tam case to include claims with respect to the mailings made pursuant to the Shriners Agreement and that, in that event, Vantage would then be faced with an issue as to whether the total claims against it were so large that it might have to settle the *qui* tam case if it were unable to take the risk of an adverse judgment in an amount that would put it out of business.

### IV. DEFENDANTS' CLAIMS (1) THAT VANTAGE COULD ONLY HAVE DONE BUSINESS WITH SHRINERS ON TERMS THAT VIOLATED THE COOPERATIVE MAIL RULE AND (2) THAT VANTAGE WOULD HAVE HAD TO FOREGO ANY PROFITS ON THE SHRINERS AGREEMENT IN ORDER TO AVOID THE LOSSES THAT IT INCURRED THROUGH SETTLING THE GOVERNMENT'S CLAIMS WITH RESPECT TO THE SHRINERS AGREEMENT WILL BE CONTRADICTED BY THE EVIDENCE AT TRIAL

The very first draft of the Shriners Agreement prepared by Defendant Miller contained substantially the same provision as the executed version, giving Shriners the option, in the event that it terminated the Shriners Agreement for cause, to remit Vantage to recovery of program costs solely through follow up mailings and/or rental or exchange of the donor list for a period of thirty-six months.

Despite his understanding of Shriners requirements with respect to its liability for payment of program costs, Miller never proposed any modality for such payment in the event of termination for cause, except the provision ultimately included in the Shriners Agreement permitting Shriners to elect not to pay program costs directly and to remit Vantage to recovery of such costs solely by follow up mailings and/or rental or exchange of the donor list, each for a period not to exceed thirty-six months. There was never any discussion of any modification to the payment provision as Miller had drafted it.

Defendant Miller never even proposed to Shriners (or recommended to Vantage) that the provision for recovery of program costs by means of follow up mailings and/or rental or exchange of the donor list not be limited as to time, or that if so limited, it further provide that Shriners be liable for any unpaid balance at the end of such time, nor did he propose any other payment modalities other than what he originally proposed in Paragraph 13.2 of the Agreement. Vantage relied upon Miller to consider how the Agreement could be drafted so as to avoid problems. The draft agreements prepared by Defendant Miller reflect all of the payment modalities that Miller proposed to Shriners during the negotiations.

However, Shriners' witnesses have testified that it was interested only in making sure that the payment provisions in the Agreement protected it from having to pay for program costs from out of assets apart from those that could be realized in connection with the Agreement itself; i.e.;, both contributions received from program solicitation mailings and revenues that could be generated from exploitation of the donor list developed from the program mailings. There is no reason to suppose that Shriners would not have accepted a provision that permitted Vantage to rent or exchange the donor list <u>until</u> program costs were recovered (rather than for a 36 month period, as provided in the payment provision drafted by Miller) but Miller never even proposed such a provision. Examination of Judge Wolf's opinion in the *Qui Tam* case strongly indicates that Judge Wolf would have concluded that such a provision complied with the CMR.

-8-

## V. Principal Anticipated Legal Issues

### a. Expert Testimony in a malpractice case based upon an attorney's misrepresentations is unnecessary and inadmissible

The sole significant legal issue that Plaintiff anticipates Defendants will argue at trial is their claim that Plaintiff's claims cannot go to the jury without the support of expert testimony, which Plaintiff does not intend to offer and believes is not necessary. Plaintiff submits the following with respect to that issue.

Expert testimony is simply unnecessary under the facts of the present case. "An attorney owes his client an obligation to exercise a reasonable degree of care and skill in the performance of his legal duties." *Glidden v. Terranova*, 12 Mass. App. Ct. 597, 598 (1981) citing *Caverly v. McOwen*, 123 Mass. 574 (1878); *McLellan v. Fuller*, 226 Mass. 374 (1917). As Defendants point out, "expert testimony is generally necessary to establish that the attorney failed to meet the standard of care owed by an attorney in a particular case." *Pongonis v. Saab*, 396 Mass. 1005, 1005 (1985). "However, expert testimony is not essential where the claimed legal malpractice is so gross or obvious that laymen can rely on their common knowledge or experience to recognize or infer negligence from the facts." *Glidden v. Terranova*, 12 Mass. App. Ct. at 598-599 *citing Gilbert v. Williams*, 8 Mass. 51, 57 (1811) ("whenever an attorney disobeys the lawful instructions of his client, and a loss ensues, for that loss the attorney is responsible"); *Varnum v. Martin*, 15 Pick. 440 (1834) (evidence found sufficient to sustain a verdict against the attorney on the ground of negligence despite the apparent lack of expert testimony).[1] Moreover, where,

---

[1] The rule that expert testimony is not always required to prove legal malpractice is recognized in other jurisdictions. *See e.g. Wright v. Williams*, 47 Cal.App.3d 802, 121 Cal. Rptr. 194 (1975); *Collins v. Greenstein*, 61 Haw. 26, 595 P.2d 275 (1979); *House v. Maddox*, 46 Ill.App.3d 68, 4 Ill.Dec. 644, 360 N.E.2d 580 (1977); *Central Cab Co. v. Clarke*, 259 Md. 542, 270 A.2d 662 (1970); *Hill v. Okay Constr. Co.*, 312 Minn. 324, 252 N.W.2d 107 (1977); *Olfe v. Gordon*, 93 Wis.2d 173, 286 N.W.2d 573 (1980).

as here, "a matter may easily be comprehended by jurors the testimony of an expert has no place." *Turcotte v. DeWitt*, 332 Mass. 160, 165 (1955).

The facts underlying Defendants' malpractice in this case are so obvious that it falls within those cases that allow such a finding without the assistance of expert testimony. The *Wagenmann* case, relied on heavily by Defendants, is instructive in understanding this point and materially analogous to the facts of the present case. *See Wagenmann v. Adams*, 829 F.2d 196 (1st Cir. 1987). There, the attorney was appointed to represent a client in both criminal and commitment proceedings. The client alleged that, as a result of the attorney's malpractice, he was committed to a mental institution. The attorney could have, but did not, seek a hearing before the judge on the issue of his competency. Nor, during the course of representation, did the attorney interview the psychiatrist who had examined his client and determined that commitment would be in appropriate. With a single phone call by the psychiatrist informing the court of his opinion, the client was immediately released. Here, the court found the attorney's failures to utilize the procedure available for the hearing and to explore the psychiatrist's favorable opinion of the client was a dereliction of his duty that did not require the opinion of an expert for the jury to conclude. To the contrary, it was obvious that he had disregarded his client's interests. *Id.* at 219-220.

Defendants in the present case were similarly derelict in their duty to Vantage. As is set forth in more detail above, Defendants had several avenues available which would have made it possible for them to intelligently opine as to the legality of the Shriners' Contract. They could have utilized USPS procedures for obtaining an advanced ruling. Miller's deposition testimony, without more and without the need for supporting expert testimony, creates a question of fact as to whether this dereliction of duty constituted malpractice. Despite being fully aware of this procedure, Defendants never submitted the Shriners' Contract, or any fundraising contract, for such a ruling. Instead, he either gave the question no attention at all or simply assumed that the

-10-

Shriners' Contract satisfied the payment provisions of the CMR. Admittedly, however, he ignored this procedure even though he had no knowledge of any fundraising contracts using similar payment provisions or any court decision supporting the use of such provision. In other words, Defendants had no basis for advising Vantage that it could safely utilize the Shriners' Contract. Like the attorney in *Wagenmann*, this decision was an example of "shoddy representation" that does not require an expert to explain. *Id.* at 220.

Defendants' numerous misrepresentations to Vantage serve as an independent basis for its malpractice claim. *See e.g. Chipman v. Shocket*, 60 Mass. App. Ct. 1109, n.5 (2003) (attorney's misrepresentation went to the jury as a basis for legal malpractice claims); *Hendrickson v. Sears*, 365 Mass 83, (1976) (attorneys misrepresentations regarding the quality of title to real property was a basis for malpractice claim). That such representations may serve as a basis for malpractice is further illustrated by *Glidden*, another case relied upon by Defendants. There, the plaintiffs/clients hired the defendant/attorney to represent them. The attorney promised to remove the clients' case from state district court to the superior court and later intentionally misrepresented that he had done so. When a default entered against the client for failure to prosecute the attorney represented that "everything is well in hand" and that he would straighten the whole thing out." *Id.* at 599. In fact, he never did and, as a result, the client, relying on the attorney's misrepresentation, was subsequently found to be in contempt and imprisoned for failure to pay the judgment. These failures to act and misrepresentations were sufficiently gross and obvious that they did not require the admission of expert testimony. An attorney's misrepresentation to the client of a material objective fact within the scope of his representation of the client is, as a matter of law, malpractice.

As in *Glidden*, Defendants not only failed to utilize obvious procedures that would have served Vantage's interests, they made numerous misrepresentations in the course of their representation that independently serve as a basis for malpractice. As is set forth in detail above,

-11-

they misrepresented to Vantage, and later to Judge Wolf, (1) that the particular payment provisions of the Shriners Agreement were in common use in nonprofit fundraising agreements, (2) that such provisions had never been objected to or challenged by the Postal Service (and thus, necessarily, that the provisions were known to the Postal Service) and (3) that the Shriners Agreement itself had been submitted to and approved by the Postal Service. These misrepresentations were all as to matters of objective fact and they were all inaccurate. Defendants either made them without bothering to consider or ascertain their accuracy or with knowledge of their falsity. The difference is immaterial, from the point of view of malpractice liability, as even the former constitutes a dereliction that is so gross and obvious that jurors need no imprimatur from an expert to recognize it as malpractice.

### b. Defendants Have Failed To Establish That Plaintiff's Defense In The Underlying Action Would Have Been Successful

It is generally understood that "[w]here a party who was the plaintiff in a legal action sues his attorney for negligence in the prosecution of that action, he must establish that he probably would have succeeded in the underlying litigation were it not for the attorney's negligence. *Glidden v. Terranova*, 12 Mass. App. Ct. at 600 (citations omitted). However, in cases where the plaintiff in a malpractice case was a defendant in the underlying litigation, our courts recognize that the "he [the client] should not shoulder the burden of proving a defense in the malpractice action." *Glidden v. Terranova*, 12 Mass. App. Ct. at 600 *citing Nolan, Tort Law* § 182 at 297.

In the present case, Plaintiff was the defendant in the Underlying Action. The burden was on the United States to prove that the Shriners Contract violated the C MR. Plaintiff's defense, which had been reinforced by Defendants' continuing reassurances, was that the Shriners Agreement complied. Vantage did not have the burden of proving its defenses in the *Qui Tam* case. On the contrary, Defendants must prove that Plaintiff's defense to the claims

-12-

would have succeeded and even if it could be adduced, such proof would be insufficient. Vantage engaged Defendants, who held themselves out as experts in CMR compliance, for the precise purpose of protecting itself against exposure to additional CMR claims by the Government. Here, Defendants' malpractice placed Vantage in the position of having to either try the *Qui Tam* case at the price of being put out of business should its defenses not succeed, or settle the case because it could not afford to take that risk. That was precisely the risk that Defendants had been employed to avoid. Vantage would not have been in that position had the Defendants' representations, upon which it relied, been accurate. Defendants' malpractice thus proximately caused the damages incurred by Vantage in settling the *Qui Tam* case without regard to any *post hoc* speculation as to whether it might have successfully defended the claims against it.

Indeed, the "expert" testimony that Defendants anticipate offering in this case is entirely beside the point and is inadmissible. Defendants' "experts" do not purport to address the liability issue in this case; whether an attorney's misrepresentations as to matters of objective fact within the scope of the representation are either malpractice as a matter of law, or can be found to be malpractice without resort to expert testimony. Their opinions purport to address entirely different issues not relied upon by Plaintiff to establish liability.

Because the opinions expressed in their reports do not address the liability issue presented in this case, they are irrelevant. Needless to say, were they to now attempt to address the liability issue presented, such new testimony should be excluded as differing from, and going substantially beyond, what was contained in their reports. Whether defendants made material misrepresentations of objective fact is itself a matter of fact and not one of opinion. Juries deal with misrepresentation cases all the time without the need for expert testimony. Moreover, whether such a misrepresentation constitutes malpractice is not a matter upon which expert testimony is even permissible, much less illuminating, that question (just as other "obvious"

forms of malpractice, such as missing a statute of limitations) being wholly for the Court and jury. Accordingly, Plaintiffs will seek, by Motion In Limine, a ruling at the commencement of trial excluding any testimony from Defendants' "experts" and prohibiting any reference to them in opening statements.

### c. Inadmissibility of Evidence on Irrelevant Matters

Defendants, in their Pretrial Memorandum, designated one hundred and thirteen proposed exhibits. The Pretrial Order had required both parties to include in their Joint Pretrial Memorandum lists of all proposed exhibits. On Wednesday, January 25, just five days prior to scheduled empanelment, Defendants served a revised list of proposed exhibits that now includes one hundred and fifty two proposed exhibits. Only a handful of Defendants' proposed exhibits have anything whatsoever to do with the negotiation of the Shriners' Agreement (or Defendants' role in it), Judge Wolf's ultimate determination that the Shriners' Agreement probably violated the requirements of the Cooperative Mail Rule for making mailings pursuant to it at not-for-profit postal rates, or the settlement of the Government's *Qui Tam* case against Vantage and the amount of that settlement fairly attributable to Vantage's exposure with respect to the Shriners' Agreement. Those are the matters at issue in this case.

Instead, in an obvious attempt to divert the Court's and Jury's attention from the matters at hand, one hundred and twenty-seven of the exhibits proposed by Defendants (all but twenty-five) concern themselves, instead with such irrelevant matters as:

(1) Vantage's post-Agreement performance of the Shriners' Agreement and the ongoing business relationship with Shriners,

(2) termination of the Shriners' Agreement and resolution of certain issues that had arisen between Vantage and Shriners,

(3) the effect of the Government's inclusion of claims based on the Shriners' Agreement upon the business relationship between Vantage and Shriners, and

(4) other aspects of the Government's case against Vantage that have nothing whatsoever to do with the claims based upon the Shriners' Agreement such as (for example), portions of the Government's evidence with respect to Vantage's liability on its claims based upon substantially dissimilar fundraising agreements with other non-profits.

These matters have nothing to do with whether Miller made material misrepresentations during the negotiation of the Shriners' Agreement or the harm caused to Vantage as a result. On the contrary, they can only serve to unnecessarily protract the trial and confuse and/or prejudice the jury. While some of these issues may have to be dealt with during trial as individual exhibits are offered, Plaintiff is considering whether, in order to save time at trial, some of them can be dealt with equally fairly, and more efficiently, by the presentation of appropriate motions *in limine* prior to empanelment.

### III. Proposed Questions for Voir Dire Examination

1. Has any member of the panel been acquainted with or had any business dealings with any of the following parties or witnesses in this case or their counsel or law firms?

Vantage Financial Services, Inc. (or its affiliates, Vantage Direct Marketing Services, Inc., Vantage Travel Service, Inc.

Henry Lewis

Harry Melikian

Larry Lyon

Nonprofit Service Group

George E. Miller

Carolyn Emigh

Davis, Malm & D'Agostine, PC

Laurence M. Johnson

Neal Bingham

-15-

      Peabody & Arnold, PC

      Richard Nahigian

      Matthew Griffin

2. Has any member of the Panel, or any member of his or her immediate family, ever been employed or had business dealings with a non-profit organization?

3. Has any member of the Panel or any member of his or her immediate family, ever been employed by or had business dealings with a law firm?

4. Has any member of the Panel, or any member of his or her immediate family, ever been employed by or had business dealings with a company providing direct mail fundraising services to non-profit organizations?

6. Has any member of the Panel ever been employed by or had business dealings with (other than purchasing postage) the United States Postal Service?

7. Has any member of the Panel, or any member of his or her immediate family, ever been a plaintiff or a defendant in a civil lawsuit alleging negligence or malpractice.

## IV.  Requested Jury Instructions

Plaintiff requests that the Court instruct the Jury in accordance with the Requested Jury Instructions filed herewith as Exhibit "A.".

## V.  Proposed Special Verdict Form

Plaintiff proposes that the case be submitted to the jury on special questions to be answered pursuant to the Special Verdict Form attached hereto as Exhibit "B".

339521v.1

        VANTAGE FINANCIAL SERVICES, INC.

        By its Attorneys,

        */s/ Laurence M. Johnson*
        Laurence M. Johnson
        BBO #252720
        Davis, Malm & D'Agostine
        One Boston Place
        Boston, MA 02108
        (617) 367-2500
        ljohnson@davismalm.com